

### STATE BAR OF TEXAS
### TASK FORCE ON HABEAS COUNSEL TRAINING & QUALIFICATIONS

### TASK FORCE REPORT
**April 27, 2007**

State Bar President Martha Dickie determined that there was a need to create a Task Force on Habeas Counsel Training & Qualifications in response to concerns raised by the State Bar's Standing Committee on Legal Services to the Poor in Criminal Matters, by the Board of Directors' Subcommittee on Legal Services and by individual members of the Board regarding the quality of representation provided by some Texas lawyers in state capital habeas proceedings.

On October 27, 2006, after having consulted with the Hon. Barbara Walther, Chair of the Judicial Section of the State Bar, President Dickie appointed twelve Task Force members whom she believed to be uniquely qualified to study capital habeas practice in Texas and to recommend measures to effectively address any problems and issues which the Task Force might identify.

## I. Recommendations of the Task Force

After meeting together and with experts experienced in capital habeas litigation, the Task Force has concluded that there are recurring problems which undermine the integrity of capital habeas practice in the Texas courts and makes the following recommendations:

- That a State Public Defender Office be established to represent individuals seeking habeas relief in Texas death penalty cases. Except in those cases in which a conflict of interest arises, the lawyers in this office would have the

1

responsibility for representing all indigent individuals seeking such habeas relief. The office should be headed by a Chief Counsel with a well respected and recognized record of representing individuals in capital habeas proceedings.

• That this office be supported with adequate funding that will allow the lawyers of the office to fully investigate all cases and to provide effective capital habeas representation to all of their clients.

• That an appointment system be created to provide for the appointment of lawyers not employed by the State Public Defender Office to provide capital habeas representation in those cases in which a conflict of interest arises and the State Public Defender Office cannot participate.

• That this appointment system be supported with adequate funding that will allow the appointed lawyers to fully investigate all cases to provide effective capital habeas representation to all of their clients without experiencing substantial financial losses.

## II.    How the Task Force Came to These Recommendations

Members of the Task Force came together in Austin on three occasions. After the first meeting, a request was made to the Hon. Sharon Keller, Presiding Judge of the Texas Court of Criminal Appeals, for a judicial liaison to be named to the Task Force. Because of her concerns about capital habeas issues of which she had first hand knowledge as a member of the Court, the Hon. Cheryl Johnson agreed to accept this position and provided valuable assistance to the Task Force.

Jim Marcus, Adjunct Clinical Professor at the University of Texas School of Law's Capital Punishment Center, and Andrea Keilen, Director of the Texas Defender Service, also provided valuable assistance to the Task Force. Each has had significant experience in capital habeas litigation and was able to advise the Task Force as to the challenges faced by habeas counsel and the problems with habeas counsel which each has observed.

Robert L. Spangenberg of the Spangenberg Group prepared a report from a study which his group had conducted on capital habeas issues in Texas and in other states. He strongly recommended to the Task Force that a statewide office be created to represent

the majority of applicants in capital habeas proceedings. [Note: Mr. Spangenberg is well known to those in the criminal justice system in Texas and, also, to members of the Texas Legislature for his preparation of *The Fair Defense Report* in December 2000, as part of the Texas Appleseed Project.] He also provided valuable assistance to the committee.

Members of the Task Force were also provided with the *Guidelines and Standards for Texas Capital Cases* which were adopted on April 21, 2006, by the State Bar's Board of Directors. These *Guidelines and Standards* contain a lengthy section on the duties of habeas counsel.

### III. The Importance of Capital Habeas Proceedings in Texas

An applicant in a capital habeas proceeding has one final opportunity to raise issues of constitutional dimension in order to establish his innocence or to show that he did not receive a fair trial. Habeas proceedings are the only opportunity available to those sentenced to death to raise post conviction claims of prosecutorial misconduct or ineffective assistance of trial counsel and to present evidence not developed or discovered during trial – including evidence as to the actual innocence of the applicant.

The very nature of capital habeas practice demands that the lawyers who represent those convicted of capital murder and sentenced to death have the ability and the desire to provide the effective assistance of counsel to their clients. This is a highly specialized area of practice. The Texas and federal courts are unforgiving when deadlines are not met. Often, even excellent and well-respected criminal lawyers are neither cognizant of nor well equipped to deal with the pitfalls that can result in irreparable harm to the client – a client for whom the consequence of a crucial mistake will be death.

To render effective assistance, habeas counsel must understand that the state habeas proceeding is not a second direct appeal. Claims based on evidence already presented at trial are reserved for direct appeals and are not cognizable in state habeas proceedings. Habeas representation, therefore, must include a thorough and independent investigation of all aspects of the case and habeas counsel cannot assume that the trial record presents either a complete or accurate picture of the facts and issues in the case. This investigation must include not only a newfound look at the facts in the case but,

3

also, an investigation of any mitigating evidence that was not presented at trial and any evidence of mental retardation.

Because the scope and nature of federal habeas review is totally dependent on the quality of representation provided by state habeas counsel, such counsel must understand that a federal court will find procedural default if a claim for relief is not presented in a state habeas proceeding and, thereafter, is presented to a federal district court.

In short, if counsel does not include everything that is conceivably proper to raise in a state habeas proceeding, the opportunity to submit new evidence and to challenge in the federal courts the effectiveness of trial and appellate counsel in the federal courts is irretrievably lost.

## IV. Discussion of Task Force Recommendations

### A. State Public Defender Office

On March 1, 2007, the Task Force issued a preliminary report to President Dickie recommending that a State Public Defender Office be established and that it be adequately funded. That recommendation has not changed.

The creation of such a statewide office would address four problems that currently impact those individuals seeking capital habeas relief, those lawyers, who are appointed to represent them, the district judges who appoint those lawyers and the judges of the Court of Criminal Appeals who review those lawyers' work product:

*1. Capital habeas applicants are not receiving consistently competent representation.* In Texas, capital habeas applicants have a statutory (not constitutional) right to representation by counsel during these proceedings. Article 11.071 of the Texas Code of Criminal Procedure, as amended, governs habeas proceedings in death penalty cases.

In Article 11.071 §2(c), the legislature provides that the convicting court shall appoint *competent* counsel. This statutory provision was interpreted by the Court of Criminal Appeals in *Ex Parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002) which held that, while a prisoner sentenced to death has the right to the appointment of competent counsel in a habeas proceeding, the competence of such counsel is unrelated to his or her actual

4

representation or work on a specific case. If the lawyer is on the approved appointment list, that lawyer is competent to be appointed, regardless of what he or she did after the appointment. In effect, *Ex Parte Graves* distinguished between "competent" counsel and "effective" counsel and held that, in capital habeas cases, prisoners are entitled to the former but not the latter.

As mentioned earlier, the Task Force was made aware of recurring problems which undermine the integrity of capital habeas practice in the Texas courts. The following were mentioned as being recurring problems:

- Some lawyers on the Court of Criminal Appeals' appointment list have accepted appointments and then "farmed out" these cases to other lawyers who were not on the Court's approved appointment list.

- Some lawyers with a history of serious disciplinary problems have, nevertheless, been appointed and have failed to carry out their obligations to their clients.

- Some lawyers who have accepted appointments have admitted to being unqualified, inexperienced and/or overburdened. Thus, they were unable to do the meaningful work required of them.

- Some lawyers have filed petitions that were only two to four pages in length and raised no cognizable issue.

- Some lawyers have filed petitions that clearly indicate that there has been a failure to investigate and present evidence outside of the trial record; rather, these lawyers have treated the state habeas proceeding as a second direct appeal.

- Some petitions – or partial petitions – were cut and pasted verbatim from other petitions in other cases. These were done without any regard to the factual circumstances of the case at bar or the legal issues of the case.

**2. *The district judges who have the responsibility for the appointment of habeas counsel do not have the information or means to determine which lawyers on the Court of Criminal Appeals' approved appointment list are overburdened, poorly trained, unmotivated, or are under confidential investigation for disciplinary violations.*** Unfortunately, the district judges who have appointed the lawyers who perform poorly do

not learn of the problems until after an application for writ of habeas corpus is filed. At that time, it is simply too late in the process for the district judges to remedy the problem.

*3. The lawyers who are taking their appointments seriously and are spending the required time to investigate the cases and prepare their writs are not being properly compensated for their work.* Some cases can take upwards of 800 hours of lawyer time to prepare an effective writ, depending on the complexity of the issues and the length of the trial court record. Add to this the expenses associated with investigating the case and paying fees to mitigation and mental retardation experts and it is obvious that many lawyers and law firms are spending much more than the compensation which they receive. Counties want the state to pay the lawyers' bills and are often capping compensation at the state limit of $25,000 – even on complicated and time-consuming cases.

Under our present system, a habeas lawyer may make a claim for reimbursement for expenses incurred. If the convicting court denies the request in whole or in part, the court must state the reasons for such a denial in a written order. The lawyer's only avenue for relief is the filing of a motion for reconsideration. This is hardly an adequate remedy.

*4. The lawyers who accept capital habeas appointments are presently accountable to no one.* It would be anticipated that the Chief Counsel of a State Public Defender Office would carefully select the lawyers who would work in the office, require disclosures of confidential disciplinary complaints as a condition of employment, monitor the lawyers' performance and have personal knowledge of their work ethic. Such a day to day observation of the lawyers in the office by the Chief Counsel cannot be duplicated by any group created by the bench or bar.

## B. There is a Need to Establish an Effective Counsel Appointment Process for Capital Habeas Proceedings

Even with the establishment of a State Public Defender Office, situations will arise in which the appointment of a private lawyer is necessary; e.g.; when two or more individuals are convicted of capital murder in the same case.

While the Task Force is fully supportive of the Court of Criminal Appeals' actions to improve the appointment process as set out in paragraph V, below, it recommends these additional provisions to help ensure quality and accountability:

- An entity or group should be appointed to maintain the list of lawyers eligible for appointment in capital habeas proceedings. This entity or group must be knowledgeable of what is required in providing effective capital habeas representation, must be able to identify qualified Texas lawyers who are eligible to be placed on the appointment list, and must be able to review and monitor the list to ensure that those lawyers who show themselves unqualified to represent defendants in capital habeas proceedings are removed from the list.

- While the entity or group recommended above would maintain the appointment list, the Court of Criminal Appeals should continue in its role as the appointment authority as to who is qualified for such an appointment.

- In order to increase accountability in capital habeas representation, every lawyer filing a capital habeas writ should be required to certify that he or she actually did the work on the writ. If more than one lawyer worked on the writ, each of them should sign the writ and certify their direct involvement.

## C.  The Need to Implement an Adequate Funding Structure

This recommendation seeks to address two issues currently hindering the ability of appointed counsel to provide effective representation in capital habeas proceedings:

### 1.  There are currently problems with the adequacy of compensation. As mentioned in paragraph IV.A.3, the current state maximum for compensation of appointed lawyers in capital habeas proceedings is $25,000. While each county can pay appointed lawyers more than the $25,000, this is rarely done. Not only is this amount intended to compensate counsel for his or her work on the writ, the lawyer must use these funds to pay for experts, investigators and support staff so necessary to the provision of effective assistance of counsel, or pay these expenses from his or her own pocket. In the great majority of cases in which effective representation is rendered, this amount is grossly inadequate. This inadequacy of funding puts the appointed lawyer at an unfair

disadvantage when compared to that of the State's lawyers – either from the Office of Attorney General or from the larger district attorneys' offices.

The *Guidelines and Standards for Texas Capital Counsel* assert that appointed counsel in death-penalty cases should be fully compensated for actual time and service performed at an hourly rate commensurate with the prevailing rates for similar services performed by retained counsel in the jurisdiction, with no distinction between rates for services performed in or out of court.

**2.** **There are currently problems with the appropriate allocation of compensation.**   The Task Force recommends that the compensation paid to lawyers appointed to represent inmates in capital habeas proceedings be broken out and separately allocated to attorney's fees and to non-attorney's fees and expenses, such as investigator and expert fees, support staff and other expenses necessary to effective representation. The *Guidelines and Standards for Texas Capital Counsel* address this issue as well for capital cases and provide that non-attorney members of the defense team (e.g.; investigators and mitigation experts) should  be compensated at rates commensurate with high-quality legal representation.

### V. The Commendable Actions of the Court of Criminal Appeals

Until quite recently, the performance of Texas capital habeas lawyers was neither regulated nor monitored by any court or government agency.  Unfortunately, this resulted in a list containing lawyers who were, at best, unqualified to serve as capital habeas counsel and at worst, lawyers who, as mentioned in paragraph IV.A.1., filed habeas writs copied verbatim from writs filed in other cases, lawyers who filed writs with absolutely no cognizable claims, lawyers who were serving suspensions from the practice of law for neglecting their clients and even lawyers who were deceased.

In December 2006, however, the Court of Criminal Appeals commendably amended their rules for the appointment of capital habeas counsel.  These rules have substantially tightened up the eligibility standards for appointment, including requirements that each lawyer on the appointment list must exhibit continued proficiency and commitment to providing quality representation and that each lawyer must certify, on a biennial basis,

8

that he or she has completed a minimum of six CLE hours devoted to the law and practice of writs of habeas corpus, with an emphasis on death-penalty cases.   A continuing duty has also been imposed on each lawyer on the list to report to the Court of Criminal Appeals a finding by any federal or state court of ineffective assistance of counsel during any criminal case, or a public disciplinary action by any federal or state licensing authority.

Additionally, the Court iterated its discretionary authority to remove any lawyer from the appointment list if it determines that the lawyer has, in any filed application for writ of habeas corpus, demonstrated "substandard proficiency" in representing defendants in death-penalty cases; has been found by any court to have rendered ineffective assistance of counsel in any criminal case; has engaged in unprofessional or unethical behavior; or has failed to inform the Court of any action required to be reported under the rules.

## VI. Senators Ellis' and Duncan's Proposed Legislation

In the current legislative session, Senator Ellis and Senator Duncan have filed a bill (S.B. 1655) that would establish a Capital Writs Committee of the Texas Judicial Council and would create a Statewide Office of Capital Writs.   On April 10, 2007, President Dickie, Presiding Judge Keller and Judge Johnson testified concerning S.B. 1655 before the Senate Committee on Criminal Justice.   During her testimony, President Dickie expressed the State Bar's support of the bill.   The Committee favorably voted the bill out of Committee and it went to the Senate for action.   On April 16th, the bill passed the Senate with no discussion.

Pursuant to this bill, the State Bar President would appoint the five members of the Capital Writs Committee who would serve at the pleasure of the State Bar President and would be composed of:

- Three attorneys who are members of the State Bar of Texas and who are not employed as prosecutors or law enforcement officials, one of whom must have knowledge of and experience with habeas corpus proceedings in this state;
- One state district judge; and,

- One state appellate judge who is not a member of the court of criminal appeals.

The Capital Writs Committee would elect one member to serve as the presiding officer and would submit to the Court of Criminal Appeals a list of three to five persons it recommends for appointment as the Director of an Office of Capital Writs.

The Office of Capital Writs would be prohibited from representing a defendant in a federal habeas review and would be authorized to refuse any appointment on the basis of a conflict of interest, the lack of sufficient resources to provide adequate representation for the defendant, the inability of the office to provide representation of the defendant in accordance with the rules of professional conduct, or on a showing of other good cause.

The Task Force has reviewed S.B. 1655 and would recommend that the State Bar continue to support the adoption of the bill during the current legislative session.

## VII.  Conclusion

The members of the Task Force would like to express their appreciation to State Bar President Dickie and Judge Barbara Walther for the opportunity to serve on this Task Force and to be entrusted with studying and making recommendations concerning an issue of the utmost importance to our system of justice.  The Task Force also extends its gratitude to the Texas Court of Criminal Appeals for its assistance and counsel provided through the person of Judge Cheryl Johnson and, also, to Jim Marcus, Andrea Keilen and Robert L. Spangenberg.  Without their contributions and the support of the Court of Criminal Appeals, the work of the Task Force would have been of substantially reduced value.

As a matter of personal privilege, the co-chairs wish to express their appreciation to all of the members of the Task Force who worked so diligently on this project.

Respectfully Submitted:

F. R. (Buck) Files, Co-Chair

Judge Wilford Flowers, Co-Chair

## TASK FORCE ON HABEAS COUNSEL TRAINING AND QUALIFICATION
## ROSTER

**Mr. Buck Files (Co-Chair)**
State Bar Board of Directors

**Hon. Wilford Flowers (Co-Chair)**
147th District Court

**Hon. Steve Ables**
216th Judicial District

**Ms. Betty Blackwell**
Chair, Commission for Lawyer Discipline

**Mr. Don Clemmer**
Texas Attorney General's Office

**Hon. David Evans**
48th District Court

**Hon. Belinda Hill**
230th District Court

**Mr. Randy Leavitt**
First Assistant Travis County Attorney

**Prof. Michael Moore**
UT Arlington
Public Member

**Prof. Walter Steele, Jr.**
SMU Law School

**Hon. Ben Woodward**
119th District Court

**Justice Carolyn Wright**
5th District Court of Appeals

**Judge Cheryl Johnson**
Texas Court of Criminal Appeals Liaison

**Ms. Andrea Keilen (*Advisory Member*)**
Texas Defender Service

**Excerpt From "Guidelines & Standards for Texas Capital Counsel"**
**Adopted by the State Bar Board of Directors**
**April 2006**

### Guideline 12.2 - <u>Duties of Post-Trial Counsel</u>

*******

B.  Duties of Habeas Corpus Counsel

    1.  General Responsibilities

        a.  Habeas corpus counsel must understand that the state habeas corpus proceeding is not a second direct appeal. Direct appeal-like, record-based claims are not cognizable in state habeas corpus and can be fatal to the capital client. Counsel should not accept an appointment if he or she is not prepared to undertake the comprehensive extra-record investigation that habeas corpus demands.

        b.  Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation. Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation.  Counsel must not assume that the trial record presents either a complete or accurate picture of the facts and issues in the case.

        c.  Habeas corpus counsel must treat the habeas corpus stage as both the first and last meaningful opportunity to present new evidence to challenge the capital client's conviction and sentence.  Therefore, counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place, including – but not limited to – claims involving police and prosecutorial misconduct, faulty eyewitness evidence, unreliable jailhouse informant testimony, coerced confessions, dubious or flawed forensic scientific methods, ineffective assistance of trial and appellate counsel, and juror misconduct.

        d.  Because state habeas corpus is the first opportunity for a capital client to raise challenges to the effectiveness of trial or direct appeal counsel, state habeas corpus

1

counsel should not accept the appointment if he or she represented the client at the capital murder trial or on direct appeal of the capital conviction and death sentence.

e.   Habeas corpus counsel should assume that any meritorious issue not contained in the first state application for writ of habeas corpus will be waived or procedurally defaulted in subsequent federal habeas corpus litigation, or barred by strict rules governing successive state habeas corpus applications. State habeas corpus counsel's lack of diligence, mistakes, missteps, and omissions will be attributed to the capital client and will follow the client throughout all remaining proceedings in state and federal court.

f.   Habeas corpus counsel must master the set of procedural rules and statutes that may restrict the capital client's opportunity for federal habeas corpus review, including the federal statute of limitations found in the Antiterrorism and Effective Death Penalty Act. State habeas corpus counsel's failure to understand AEDPA's implications may result in the unwitting forfeiture of a capital client's right to federal habeas corpus review.

g.   Attorneys seeking to qualify to receive state habeas corpus appointments should be required to satisfactorily complete a comprehensive training program. At least once every two years, attorneys seeking to remain on the state habeas corpus appointment roster should be required to successfully complete a specialized training program that focuses on the representation of death row inmates in state and federal post-conviction proceedings.

2.   Client Communication

a.   Without exception, habeas corpus counsel has a duty to meet the capital client face-to-face as soon as possible after appointment. Counsel, or some member of the defense team, should make every effort to establish a relationship of trust with the client. It is also essential for counsel or some member of the defense team to develop a relationship of trust with the client's family or others on whom the client relies for support and advice.

b.   Habeas corpus counsel has a duty to keep the capital client informed of case developments, the progress of the investigation, potential legal issues, and litigation deadlines. Although some strategic decisions require the client's knowledge and agreement, others, which may be made by counsel, should nonetheless be fully discussed with the client beforehand.

c.   It is a dereliction of habeas corpus counsel's duty to simply acquiesce to a capital client's insistence that he or she wishes to be executed, or wants to challenge only the conviction but not the sentence. Counsel must try to identify the source of the client's feelings about these matters. Counsel should consult lawyers, clergy, mental health professionals, the client's family or others who have worked with similarly situated death row inmates.

d.   Habeas corpus counsel should be familiar enough with the capital client's mental condition to make a reasoned decision – fully documented, for the benefit of actors at later stages of the case –whether to assert the position that the client is not competent to waive further proceedings.

e.   Habeas corpus counsel should make appropriate efforts to determine whether any foreign country might consider the capital client to be one of its nationals. Unless predecessor counsel has already done so, counsel representing a foreign national should immediately advise the client of his or her right to communicate with the relevant consular office; and obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's conviction and sentence.

3.   The Duty to Investigate

a.   Because habeas corpus counsel must review what are, in essence, two different trials, providing quality representation in capital cases requires counsel to conduct a thorough and independent investigation of both the conviction and sentence. Habeas corpus counsel must promptly obtain the investigative resources necessary to examine both phases, including the

assistance of a fact investigator and a mitigation specialist, as well as any appropriate experts.

b.    Habeas corpus counsel must obtain and read the entire record of the trial, including all transcripts and motions. Counsel has an obligation to independently verify that the official record of all prior proceedings is complete, and to supplement it if necessary. Counsel must also inspect the evidence and obtain the files of trial and appellate counsel, scrutinizing them for what is missing as well as what is present. Counsel should interview prior counsel and members of the defense team.

c.    Because the mental vulnerabilities of many death row inmates increase the possibilities for error, habeas corpus counsel must take seriously the possibility of the capital client's innocence, carefully analyze the quality of the prosecution's case in aggravation, and investigate all possible defenses and potentially mitigating evidence.

d.    In short, habeas corpus counsel has a duty to make an independent examination of all of the available evidence – both that which the jury heard and that which it did not – to determine whether the jurors made a fully informed resolution of the issues at both guilt and punishment.

4.   The Guilt-Innocence Phase Investigation

a.    Habeas corpus counsel should conduct a guilt-innocence phase investigation regardless of any admission or statement by the capital client about the facts of the crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be examined. Instead, counsel must independently investigate the circumstances of the crime and all evidence inculpating the client. Counsel should not assume the accuracy of the evidence admitted at trial.

b.    Informal discovery requests should be made to law enforcement and the district attorney for additional documentation not contained within the district clerk's file, such as: witness statements; police reports; physical evidence; search and arrest warrant documents; and any other information immediately available to permit commencement of the habeas investigation.

4

c.    Should the State not maintain a complete open file policy, formal discovery motions should be pursued to the Court for resolution and ruling. Counsel should further be aware that requests may be made for disclosure of District Attorney files through the Texas Attorney General's Open Records Division.

d.    The assistance of a fact investigator with specialized training is indispensable to discovering and developing the facts that must be unearthed in habeas corpus proceedings.

e.    Habeas corpus counsel's obligation to reinvestigate the case will require counsel to interview most, if not all, of the critical witnesses for the prosecution and investigate their backgrounds. Counsel must determine if a witness's testimony bears scrutiny or whether motives for fabrication or bias were left uncovered at the time of trial.

f.    Habeas corpus counsel must also assess all of the non-testimonial evidence and consider whether to perform independent forensic testing, either because some technology, such as DNA testing, was unavailable at the time of trial, or because trial counsel failed to ensure that the necessary testing took place.

g.    Habeas corpus counsel should seek out and interview potential witnesses who might challenge the prosecution's version of events, including eyewitnesses or other witnesses having purported knowledge of events surrounding the offense; potential alibi witnesses; witnesses familiar with aspects of the capital client's life history that might affect the likelihood that the client committed the offense or the degree of culpability for the offense.

h.    Habeas corpus counsel must attempt to obtain evidence and information in the possession of the prosecution or law enforcement authorities, including police reports, autopsy reports, photos, video or audio tape recordings, and crime scene and crime lab reports, together with the raw data forming the basis of any reports or conclusions, and any other physical evidence. Counsel should pursue such evidence and information through public information act requests to the appropriate government agencies, or through informal and    formal discovery.

i.   Habeas corpus counsel has a duty to conduct additional investigation to determine whether racial discrimination tainted the imposition of the death penalty or the composition of the jury. Counsel should investigate whether minorities or women were underrepresented on the jury lists from which grand and petit juries were drawn.

j.   Habeas corpus counsel should maintain copies of media reports about the case to determine the effects of pretrial publicity, as well as to review the public statements of potential witnesses and other trial participants.

1.   The Mitigation Investigation

a.   Habeas corpus counsel must conduct a mitigation investigation regardless of the expressed desires of the capital client. Counsel may not conclude that a mitigation investigation would be futile, because counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation.

b.   Habeas corpus counsel should not rely on his or her own observations of the capital client's mental status as sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. For that reason, at least one member of the defense team should be qualified to screen for mental or psychological disorders or defects and recommend further investigation of the client if necessary.

c.   Habeas corpus counsel should retain an independent mitigation specialist as a member of the defense team as soon    as possible after appointment. The mitigation specialist should have the ability to: (i.) compile a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation, interviews, and collection of documents; (ii.) analyze the significance of the information in    terms of impact on development, including effect on personality and

behavior; (iii.) find mitigating themes in the client's life history; (iv.) identify the need for assistance from mental health experts; (v.) assist in locating appropriate experts; (vi.) provide social history information to experts to enable them to conduct competent and reliable evaluations; and (vii.) work with the defense team and experts to develop a comprehensive and cohesive case in mitigation that could have been presented at trial.

d.   Habeas corpus counsel's mitigation investigation should include a review of the capital client's (i.) medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage); (ii.) family and social history (including physical, sexual, or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities); (iii.) educational history (including achievement, performance, behavior, and activities) and special educational needs (including cognitive limitations and learning disabilities); (iv.) military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services); (v.) employment and training history (including skills and performance, and barriers to employability); and (vi.) prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

e.   Note: Counsel should be advised that, in obtaining a prisoner's records from the Texas Department of Corrections, Institutional Division, some records can be found at the main Classification Division of the TDC in Huntsville, but also, other records are separately maintained at the Polunsky Unit, the Death Row facility, therefore any investigation or subpoena of records needs to be directed at both locations.

7

f.     Habeas corpus counsel should locate and interview the capital client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others.

g.     Habeas corpus counsel should obtain releases for securing confidential records relating to all potentially relevant information about the capital client, his or her siblings and parents, and other family members, including but not limited to school records, social service and welfare records, juvenile dependency or family court records, medical records, military records, employment records, criminal and correctional records, family birth, marriage, and death records, alcohol and drug abuse assessment or treatment records, and INS records.

h.     Habeas corpus counsel must also investigate prior convictions and unadjudicated offenses that the prosecution presented as aggravating circumstances, or that otherwise came into evidence. If a prior conviction is legally flawed, counsel should seek to have it set aside. Counsel may also find extenuating circumstances that can be offered to lessen the weight of a prior conviction or unadjudicated offense.

2.   Making a Record

a.     Habeas corpus counsel must demand on behalf of the capital client all resources necessary to provide high quality legal representation, to conduct a thorough investigation of both the conviction and sentence, to procure documentary evidence, and to retain experts. Because counsel should not have to disclose privileged communications or strategy to the prosecution in order to secure these resources, counsel must insist upon making such requests ex parte and in camera. If resources are denied, counsel should make an adequate record to preserve the issue for further review.

b.     Habeas corpus counsel must ensure that there is a complete record for every issue raised, including objections, motions, statements of grounds, oral and

8

written arguments of both sides, discussions among counsel and the court, evidence proffered and received, rulings of the court, reasons given by the court for its rulings, and any agreements reached between the parties. If a court refuses to allow a proceeding to be recorded, counsel should state the objection to the court's refusal and, at the first available opportunity, make a record of what transpired in the unrecorded proceeding.

c.   Habeas corpus counsel must file a written request for an evidentiary hearing on all disputed factual issues and provide the trial court with an in-depth explanation of why a hearing is necessary.

3.  Presenting Legal Claims

a.   Habeas corpus counsel must evaluate each potential claim in light of the near certainty that any claim not presented in the first state application for writ of habeas corpus will be waived or otherwise defeated by defenses such as procedural default or failure to exhaust. For this reason, counsel must be especially sensitive to the need to preserve all potential issues for later review by including them in the first state application for writ of habeas corpus.

b.   Habeas corpus counsel should consider every legal claim potentially available, and thoroughly investigate the basis for each potential claim before deciding not to include it in the first state application for writ of habeas corpus.

c.   Habeas corpus counsel has a duty to preserve issues calling for a change in existing precedent. Counsel should object to anything that appears unfair or unjust even if it involves challenging well-accepted practices and long-standing precedent.

d.   Habeas counsel should attach all available proof to the application (affidavits, documentary evidence, etc.) even though doing so is not technically required by state law. Failing to attach proof in state court will likely waive the client's ability to present it in federal court. When proof is unavailable, habeas counsel should plead all factual allegations with the greatest possible specificity.

e.  Habeas corpus counsel should consider the possible advantages to the capital client of asserting legal claims whose basis has only recently become known or available to counsel. Counsel should supplement claims previously made with additional factual or legal information that comes to counsel's attention, even if it occurs after the first state application for writ of habeas corpus has been filed.

4.  Negotiating a Settlement

a.  Habeas corpus counsel has an obligation to take all steps that may be appropriate in the exercise of professional judgment to achieve an agreed-upon disposition of the case. If a negotiated disposition would be in the best interest of the capital client, initial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate. Similarly, a client's initial opposition should not prevent counsel from engaging in an ongoing effort to persuade the client to accept an offer of resolution that is in the client's best interest.

b.  Habeas corpus counsel should consider making overtures to members of the victim's family—possibly through an intermediary, such as a clergy member, victim liaison, or representative of an organization such as Murder Victim's Families for Reconciliation—to ascertain their current feelings about the death penalty and the possibility of settling the case.

5.  Facilitating Federal habeas Corpus Review

a.  State habeas corpus counsel must file a motion for appointment of federal habeas counsel in federal district court immediately after the conclusion of state habeas corpus proceedings, as required by Section 2 of Article 11.071. Any delay in filing this motion may deprive the capital client of the right to federal review.

b.  If state habeas corpus counsel does not intend to continue representing the capital client in federal habeas corpus proceedings, state habeas corpus counsel must not cease acting on the capital client's behalf until the federal district court has formally appointed new counsel. State habeas corpus counsel's duty includes monitoring

10

the case in federal district court and, if necessary, urging the federal district court to appoint federal habeas corpus counsel as soon as possible after the termination of state habeas corpus proceedings.

c.   Even after state habeas corpus counsel has been formally replaced, he or she owes a continuing duty of complete fidelity to the capital client. State habeas corpus counsel has a responsibility to cooperate with successor counsel in evaluating state habeas corpus counsel's representation of the client.

d.   State habeas corpus counsel's continuing duty to safeguard the interests of the capital client and cooperate fully with successor counsel includes, but is not limited to, maintaining the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation; providing the client's files, as well as information regarding all aspects of the representation, to successor counsel; sharing potential further areas of legal and factual research with successor counsel; and cooperating with such professionally appropriate legal strategies as may be chosen by successor counsel.

11



# TEXAS COURT OF CRIMINAL APPEALS'
# AMENDED RULES
# FOR THE APPOINTMENT OF ATTORNEYS
# AS COUNSEL UNDER ARTICLE 11.071
# SEC. 2(d), TEXAS CODE OF CRIMINAL PROCEDURE

Per Curiam.

## O R D E R

The following rules are adopted by the Court of Criminal Appeals regarding the appointment of attorneys as counsel under TEX. CODE CRIM. PROC. art. 11.071, Sec. 2(d):

1    The Court of Criminal Appeals will maintain a list of those attorneys eligible for appointment by the convicting court for purposes of representing an applicant on an initial application for writ of habeas corpus under art. 11.071. The list will provide the name, address, telephone number, and administrative judicial region from which an attorney will accept appointments.

2    The convicting court will appoint an attorney from the list of eligible attorneys maintained by the Court of Criminal Appeals.

3.    Those attorneys seeking to be added to the list of attorneys eligible for appointment under art. 11.071, shall complete and submit an Application for Appointment as Counsel pursuant to art. 11.071, to the Court of Criminal Appeals. Counsel will be notified by the Court of Criminal Appeals of eligibility for appointment. Any attorney seeking to be removed from the list of those eligible for appointment shall make a written request to the Court of Criminal Appeals.

4.    An attorney on the list of attorneys eligible for appointment under art. 11.071,

shall exhibit continued proficiency and commitment to providing quality representation to defendants in death-penalty cases.

5.      An attorney on the list of attorneys eligible for appointment under art. 11.071, shall certify, on a biennial basis, that he has completed a minimum of six hours of CLE devoted to the law and practice of writs of habeas corpus, with an emphasis on death-penalty cases.

6.      Attorneys on the list of attorneys eligible for appointment under art. 11.071, have a continuing duty to report to the Clerk of the Court of Criminal Appeals (1) a finding by any federal or state court of ineffective assistance of counsel during any criminal case, or (2) a public disciplinary action by any federal or state licensing authority. Such an attorney shall notify the Court within thirty days of any such finding or action.

7.      The Court of Criminal Appeals may at any time, by majority vote, remove an attorney from the list of attorneys eligible for appointment under art. 11.071, if it determines that the attorney has: (1) in any application for writ of habeas corpus filed in the trial court or forwarded to this Court exhibited substandard proficiency in providing quality representation to defendants in death-penalty cases; (2) been found by any federal or state court to have rendered ineffective assistance of counsel in any criminal case; (3) engaged in a practice of unprofessional or unethical behavior; or (4) failed to inform this Court of reportable actions under section 6 of these rules.

8.      There is no appeal from the Court's discretionary decision to remove an attorney from the list of attorneys eligible for appointment under art. 11.071. However, an attorney may request reconsideration within 15 days of receipt of the Court's removal notice. If an attorney is removed from the art. 11.071 appointment list, that attorney may reapply for appointment to the list after twenty-four months. An attorney who reapplies must demonstrate that his current level of proficiency, effectiveness and professionalism as defense counsel meets the required standards in all respects (*see* 6(1), (2), (3), and (4) above), and the attorney must certify that, since the time of his removal from the list, he has handled at least three non-death penalty writs of habeas corpus. He shall submit copies of the materials he has filed in those cases with the Clerk of the Court of Criminal Appeals

9.      The convicting court may not appoint an attorney as counsel if the attorney

represented the applicant at trial or on direct appeal unless (1) the applicant and the attorney request the appointment on the record, and (2) the convicting court finds good cause to make the appointment.

10.      The list of those attorneys eligible for appointment by the convicting court shall be available from Louise Pearson, Clerk, Court of Criminal Appeals, P. O. Box 12308, Capitol Station, Austin, Texas, 78711 and shall be posted on the Court's website at www.cca.courts.state.tx.us.

11.      Upon receiving notice of an appointment by the convicting court, the Court of Criminal Appeals will promptly notify the convicting court whether the appointment is approved or rejected.

12.      These rules become effective on December 15, 2006.

IT IS SO ORDERED THIS THE 11th DAY OF DECEMBER, 2006.