IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

### CAUSE NO. 2:03-CV-0039

_____


JOHN LEZELL BALENTINE
Petitioner,


v.


RICK THALER, Director,
Texas Department of Criminal Justice, Institutional Division
Respondent.

_____


MOTION FOR RELIEF FROM JUDGMENT
PURSUANT TO FEDERAL RULE OF
CIVIL PROCEDURE 60(b)(6)

_____


**(EXECUTION SCHEDULED FOR AUGUST 22, 2012)**

Lydia M. V. Brandt
Counsel of Record
THE BRANDT LAW FIRM, P.C.
Texas Bar No. 00795262
P.O. Box 850843
Richardson, Texas 75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

COUNSEL FOR PETITIONER, BALENTINE

# TABLE OF CONTENTS

I.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Procedural History: Mr. Balentine presented a substantial claim of ineffective-assistance-of-trial-counsel for the first time in federal court and strenuously argued since the inception of his first federal habeas proceedings that the grossly deficient performance of state habeas counsel should excuse any procedural default.  Despite his repeated, diligent efforts raise the issue, review of Mr. Balentine's claim has been barred until now by "overwhelming" precedent that precluded any argument for cause based on the performance of state habeas counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    The defense rested at trial without presenting any witnesses or evidence during the penalty phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Because he was unaware of his duties as post-conviction counsel, Mr. Balentine's state habeas counsel treated the initial state habeas proceedings like another direct appeal and failed to investigate or adequately plead the ineffective assistance of trial counsel claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.    Mr. Balentine's IAC of trial counsel claim was procedurally defaulted in his initial federal habeas proceeding.  The federal courts rejected his various arguments that the IAC of state habeas counsel should excuse the default. . . . . . . . . . . . . . . . . . . . . . 5

      D.    Mr. Balentine's second attempt to secure federal review of his ineffective assistance of trial counsel claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      E.    Mr. Balentine's third attempt to secure federal review of his ineffective assistance of counsel claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.  Given the opportunity, Mr. Balentine can satisfy the two-part *Martinez* test for establishing cause for the procedural default of his ineffective assistance of trial counsel claim. . . . . 15

      A.    Appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            1.    "I did not know at the time of my appointment to represent Mr. Balentine ... that a state habeas proceeding is not another direct appeal": There is no question that Mr. Balentine's initial counsel was grossly deficient in state habeas corpus proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                  a.    The statutory duty of Texas capital habeas corpus counsel is to conduct a thorough extra-record investigation and identify the factual bases for relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                  b.    The contemporaneous standard of care in Texas capital habeas corpus cases, as reflected in State Bar of Texas materials, prescribed a broad and thorough investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                  c.    State habeas counsel neglected his duty as post-conviction counsel to investigate Mr. Balentine's case. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

                        (1)    Mr. Balentine's initial state habeas counsel failed to "investigate ... the factual ... grounds for the filing of an

i

application for a writ of habeas corpus.". . . . . . . . . . . . . . 22

    (a)    Other than one meeting on the eve of filing the habeas application, Mr. Birdsong's review of the case was limited to the four corners of the trial record. . . . . 22

    (b)    Mr. Birdsong's record-bound review of the case was supplemented only by 42 hours of an investigator's time, most of which was devoted to a rudderless record review. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

  (2)    Mr. Birdsong filed an application comprised largely of claims cut and pasted from Brittany Holberg's habeas application (which were appropriated from her direct appeal brief), supplemented only by: (1) claims raised and rejected in Mr. Balentine's direct appeal; and, (2) ten pages of perfunctory, unsupported allegations. . . . . . . . . . . . . . . . . . . . . . . . . . 26

    (a)    The vast majority of the initial application was boilerplate briefing lifted from other pleadings in other cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    (b)    Counsel's failure to investigate doomed his ineffectual attempt to allege extra-record claims, including the IAC claim. . . . . . . . . . . . . . . . . . . . . 31

  2.    Mr. Balentine's first state habeas proceeding was the "initial-review collateral proceeding" within the meaning of *Martinez* in which the claim should have been raised. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    a.    *Martinez* applies to the first proceeding in which a prisoner can obtain relief for a violation of his Sixth Amendment right the effective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    b.    In Texas, *relief* on most extra-record ineffective assistance of counsel claims requiring extensive investigation before they can be pled—like a *Wiggins* claim—is only available in post-conviction proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    c.    Panels of the Fifth Circuit have adopted divergent approaches to *Martinez*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    d.    Regardless of whether *Martinez* applies to all Texas cases, it binds every federal court adjudicating a case in which post-conviction was "the first occasion to raise a claim of ineffective assistance at trial." *Martinez* thus applies to Mr. Balentine because several circumstances precluded him from raising his claim on direct appeal. . . . . . . . . 54

B.    Mr. Balentine's underlying ineffective-assistance-of-trial-counsel claim is a substantial one and has sufficient merit to satisfy the predicate showing described in *Miller-El v. Cockrell*, 537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

  1.    The prevailing standard of care at the time of Mr. Balentine's trial mandated that the defense conduct a thorough social history. . . . . . . . . . . . . . . . . . 61

  2.    Mr. Balentine's initial trial counsel—who departed the case before trial because he was ethically precluded from representing Mr. Balentine—did not conduct any penalty phase investigation during the eight months he

represented Mr. Balentine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

3.    Other than initiating several record requests a week before trial, the defense did not conduct any life history investigation in preparation for the penalty phase of Mr. Balentine's trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

4.    At the penalty phase of Mr. Balentine's capital trial, defense counsel rested without presenting any evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

5.    A life history investigation conducted during Mr. Balentine's federal habeas proceedings revealed "substantial" mitigating evidence that was available during trial and post-conviction proceedings sufficient to show a reasonable probability that but for trial counsel's failure to conduct such an investigation, Mr. Balentine would have been sentenced to life instead of death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

IV.    The unique and extraordinary circumstances of this case compel relief under Fed. R. Civ. P. 60(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

A.    Rule 60(b)(6) relief is available to Mr. Balentine. . . . . . . . . . . . . . . . . . . . . . . . 72

B.    The advent of *Martinez*, Mr. Balentine's uncommon due diligence, and the merit of his underlying claims are extraordinary circumstances which, along with the factors identified as relevant by the Fifth Circuit, warrant relief from the judgement procedurally defaulting Mr. Balentine's IAC of trial counsel claim. . . . . . . . . . . 75

1.    While not every change in decisional law *alone* is an extraordinary circumstance, *Martinez* was a stunning reversal of two-decades of Supreme Court and homogeneous circuit precedent. . . . . . . . . . . . . . . . . . . . . . . . 76

2.    The *Gonzalez* Court unanimously identified the petitioner's diligence in advocating for the newly established legal rule as a factor in determining whether a change in the law warrants relief from judgment.  Mr. Balentine's uncommon diligence weighs in favor of relief from judgment. . . . . . . . . 81

3.    No court has considered Mr. Balentine's ineffective assistance of counsel claims, both have substantial merit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

4.    The other *Seven Elves* factors weigh in favor Rule 60(b)(6) relief. . . . . . 86

5.    *Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012), does not control the outcome of Mr. Balentine's case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

V.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

CERTIFICATE OF CONFERENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Exhibit 1:    Kent Birdsong Affidavit [also reproduced in Third State Application, as Exhibit 24]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Exhibit 2:    State Bar of Texas, Texas Criminal Appellate Manual (3rd ed. 1996) ("State Bar Manual") [also reproduced in Third State Application, as Exhibit 3]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

iii

Exhibit 3:        Kent Birdsong Voucher (December 12, 2000) [also reproduced in Third State Application, as Exhibit 5]. . . . . . . . . . . . . . . . . . . 101

Exhibit 4:        Kent Birdsong Voucher (January 25, 2001) [also reproduced in Third State Application, as Exhibit 6]. . . . . . . . . . . . . . . . . . . . . . . 101

Exhibit 5:        Werner Tally Affidavit (affidavit) and Bill (Exhibit A)  (June 25, 2003) [also reproduced in Third State Application, as Exhibit 23 (affidavit) and Exhibit A (Bill)]. . . . . . . . . . . . . . . . . . . . . . . . . 101

Exhibit 6:        Motion for New Trial filed by James Durham. . . . . . . . . . . . . 101

Exhibit 7:        Docket Sheet, pages 376-382, *State v. Balentine*, No. 39,532-D (320th Dist. Ct. Potter County 1998-1999) (dates of appointment, withdrawal, and substitution of counsel; filing and overruling of M/New Trial; etc.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Exhibit 8:        Chronology (appointment, withdrawal and substitution of trial and appellate counsel; filing, deadlines and ruling on Motion for New Trial, etc.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Exhibit 9:        *Capital Sentencing Strategy: A Defense Primer*, July 1994 ("1994 State Bar Materials"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Exhibit 10:       Kathy Garrison Affidavit [also reproduced in Third State Application, as Exhibit 10]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Exhibit 11:       Jim Patterson, Investigations:  Garrison Bill for Investigative Services [also reproduced in Third State Application, as Exhibit 11] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Exhibit 12:       Jane McHan Affidavit, with Interview Summary Exhibits A (Clara Smith, mother), B (Eric Smith, half-brother), C (Angelique Watson, mother of John Balentine's son), D (Lynn Rowe, half-brother) [also reproduced in Third State Application, as Exhibit 12]. . . . . . . . 102

Exhibit 13:       Jane McHan Affidavit (Social History Affidavit) [also reproduced in Third State Application, as Exhibit 13]. . . . . . . . . . . . . . . . . . . . 102

I.       **Introduction.**

Pursuant to Fed. R. Civ. P. 60(b)(6), Petitioner John Balentine requests relief from the Court's final judgment denying Mr. Balentine's petition for writ of habeas corpus.  In his petition, Mr. Balentine raised a claim that his Sixth Amendment right to effective assistance of counsel was violated by trial counsel's failure to investigate and present substantial mitigating evidence in the punishment phase of the trial.  Trial counsel simply rested without presenting a case for sparing Mr. Balentine's life.  Because state habeas counsel had likewise failed to investigate the case, federal review of Mr. Balentine's claim was unquestionably defaulted.  This Court, based on "overwhelming precedent," rejected Mr. Balentine's argument that state habeas counsel's grossly deficient performance should excuse any default applicable to the ineffective-assistance-of-counsel claim.

The Supreme Court recently created an exception to the overwhelming precedent that precluded federal review of Mr. Balentine's Sixth Amendment claim.  In *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), the Court held that the ineffective assistance of post-conviction counsel can be cause for the procedural default of an ineffective assistance of trial counsel claim.  *Id*. at 1318. *Martinez* represents a "jurisprudential sea change" in relevant law that determines whether Mr. Balentine's Sixth and Fourteenth Amendment effective assistance of counsel claims can receive review on their merits by a federal court.  *Vicknair v. Formosa Plastics Corp., Louisiana*, 98 F.3d 837, 839 (5th Cir. 1996).

A unique constellation of equities compels the equitable remedy of allowing Mr. Balentine to finally present his argument that the deficient performance of his state habeas counsel caused the procedural bar to federal review of Mr. Balentine's ineffective assistance of trial counsel claim.  Mr. Balentine has not, in the wake of *Martinez*, suddenly recognized that his ineffective-assistance-of-

1

counsel claim is truly defaulted and belatedly discovered that his state habeas counsel was ineffective. Since filing his federal petition in August of 2004, Mr. Balentine has forthrightly acknowledged the procedural default and consistently argued that the grossly deficient performance of state habeas counsel caused the default. The few other similarly-situated Texas prisoners will now have *Martinez* applied to their cases. *See Cantu v. Thaler*, 132 S.Ct. 1791 (2012) (Mem.) (vacating the lower court decision and remanding for further proceedings in light of *Martinez*); *Newbury v. Thaler*, 132 S.Ct. 1793 (2012) (Mem.) (same). Given the unique and extraordinary circumstances of this case, equity and justice require that this Court accord the same review to Mr. Balentine.

**II.    Procedural History:   Mr. Balentine presented a substantial claim of ineffective-assistance-of-trial-counsel for the first time in federal court and strenuously argued since the inception of his first federal habeas proceedings that the grossly deficient performance of state habeas counsel should excuse any procedural default. Despite his repeated, diligent efforts raise the issue, review of Mr. Balentine's claim has been barred until now by "overwhelming" precedent that precluded any argument for cause based on the performance of state habeas counsel.**

**A.    The defense rested at trial without presenting any witnesses or evidence during the penalty phase.**

In April, 1999, John Balentine was tried and convicted of capital murder for the shooting deaths of three young men. One of the victims had previously threatened Mr. Balentine. RR 20:55-56, 60, 191-92; RR 22:131-32. When Mr. Balentine was arrested, he confessed to the murders. RR 22:131-141.

The penalty phase lasted one day. At the close of the prosecution's case, ***the defense rested without calling a single witness***. RR 26:80. Except for the criminal history introduced by the prosecution, the jury heard no evidence whatsoever about Mr. Balentine's background, childhood,

or family.  USDC Doc #53:  Magistrate's Report at 31.[1]  The same day, the jury returned an affirmative answer to the special issue regarding future dangerousness and a negative answer to the mitigation special issue, and the judge imposed a sentence of death in accordance with Texas law. Defense counsel's failure to present a case for a life sentence was in no respect strategic.  It was entirely the result of their failure to conduct the kind of life history investigation that, by 1999, was routine in capital cases.

The conviction and sentence were affirmed on direct appeal.  *Balentine v. State,* 71 S.W.3d 763 (Tex. Crim. App. 2002).

> **B.      Because he was unaware of his duties as post-conviction counsel, Mr. Balentine's state habeas counsel treated the initial state habeas proceedings like another direct appeal and failed to investigate or adequately plead the ineffective assistance of trial counsel claim.**

Mr. Balentine's appointed state habeas attorney filed an application for post-conviction writ of habeas corpus that was based solely on the trial record and reflected no extra-record investigation whatsoever.  *See*  Application for Post Conviction Writ of Habeas Corpus, *Ex parte Balentine,* No. 39-532-D (320th Dist. Ct. Potter County, filed October 24, 2000) (*"Balentine* First Application" or "*Balentine* Initial Application").  The application raised numerous unpreserved, record-based constitutional challenges to the Texas death penalty statute which had been previously rejected by the Court of Criminal Appeals and/or the Fifth Circuit in other cases.  Findings of Fact and Conclusions of Law, *Ex parte Balentine,* No. 39-532-D (320th Dist. Ct. Potter County October 24, 2002).  The application also included two record-based penalty phase ineffective assistance of

---

[1]      USDC Doc #53:  Report and Recommendation to Deny Petition for Writ of Habeas Corpus, *Balentine v. Quarterman,* No. 2:03-cv-00039 (N.D. Tex Sept. 27, 2007) [referred to herein as "Magistrate Report"].

counsel claims based solely on trial counsel's failure to call any penalty phase witnesses and their failure to seek a continuance "to permit additional time for adequate and thorough pretrial investigations." However, state habeas counsel, who erroneously believed that a habeas proceeding was simply another direct appeal, *also* failed to investigate Mr. Balentine's life history. As a result, this lawyer alleged no facts that could have been discovered through reasonable investigation which would have demonstrated, had trial counsel performed reasonably, a reasonable probability that Mr. Balentine would have been sentenced to life. The application also failed to allege a single fact regarding trial counsel's penalty phase investigation or the availability of any witnesses or evidence that could have been presented with or without a continuance.[2] In its conclusions of law, the trial court recommended that relief be denied, noting the absence of any non-record factual allegations to support the penalty phase IAC claims. *See* [Third] Application for Post Conviction Writ of Habeas Corpus and Motion to Vacate Judgment, *Ex parte Balentine*, No. WR-54,071 (320th Dist. Ct. Potter County, June 13, 2011) ("Third State Application" or "Third Application").[3] In a two-page, unpublished order, the Court of Criminal Appeals adopted the trial court's findings and recommendation. *Ex parte Balentine*, No WR-54-071-01 (Tex. Crim. App. Dec. 4, 2002).

---

[2]     The work of state habeas counsel is described in detail, *infra*, at III. A.1. c. State habeas counsel neglected his duty as post-conviction counsel to investigate Mr. Balentine's case.

[3]     On June 13, 2011, Mr. Balentine filed in the Court of Criminal Appeals a third application for post-conviction relief, attaching a substantial number of exhibits in support of his claims [hereafter "Third State Application" or "Third Application"]. Some of the most crucial of those exhibits are attached as exhibits to this 60(b) pleading, but have been renumbered. Nonetheless, they are also cross-referenced to the same exhibit (with the original number) that had been filed with Third State Application (*i.e.* "Third State Application, Exhibit __ ").

4

**C.    Mr. Balentine's IAC of trial counsel claim was procedurally defaulted in his initial federal habeas proceeding.  The federal courts rejected his various arguments that the IAC of state habeas counsel should excuse the default.**

For Mr. Balentine's federal habeas corpus proceedings, this Court appointed new counsel who conducted a thorough life history investigation.  Mr. Balentine raised nine claims in his federal habeas petition, including an ineffective assistance of counsel claim based on trial counsel's failure to conduct a proper penalty phase investigation, citing *Wiggins v. Smith*, 359 U.S. 510 (2003), and *Williams v. Taylor*, 529 U.S. 362 (2000).  To establish prejudice from trial counsel's deficient performance, the ineffective assistance of counsel claim detailed powerful mitigating evidence of Mr. Balentine's growing up in dire poverty, exposure to violence in his family and neighborhood, being victimized by multiple kinds of abuse and neglect, and yet, having strong positive character traits—all of which was available but never developed at trial or in state habeas proceedings.  The magistrate judge found that this new case in mitigation was "substantial."  USDC Doc #53: Magistrate's Report at 31.

Six of the nine claims in Mr. Balentine's federal petition for habeas corpus relief, including the IAC claim, had not been raised in state court.   USDC Doc #27:  Amended Petition for Writ of Habeas Corpus ("Amended Petition"), *Balentine v. Quarterman*, No.2:03-CV-39-J (N.D. Tex. August 19, 2004).

Anticipating the State's exhaustion and procedural default defenses with respect to the claims not raised in state court, Mr. Balentine argued that he had cause for any alleged default because state habeas counsel "violated 'the first rule of habeas corpus': the burden of alleging facts which entitle a state a habeas petitioner to relief."  USDC Doc #27:  Amended Petition at 17.  Mr. Balentine argued that his state habeas counsel's wholesale failure to investigate the case and present extra-record evidence was so far below the standard of care that his counsel "acted outside the

course of the representation" and was not acting as Mr. Balentine's agent.  *See*  USDC Doc #27: Amended Petition at 12–30.  He also argued that the exhaustion requirement should be excused under 28 U.S.C. § 2254(b)(1)(B)(ii) because Texas grants condemned state habeas applicants the right to counsel in order to gain meaningful access to state habeas remedies, but does not require habeas counsel to provide effective assistance of counsel, and Mr. Balentine's state habeas counsel was in fact ineffective.  USDC Doc #27:  Amended Petition at 43–49.

The magistrate judge concluded that Mr. Balentine was not excused from the exhaustion requirements and that his ineffective assistance of counsel claim, as well as other claims, were unexhausted and procedurally defaulted.  USDC Doc #53:  Magistrate's Report at 9.  Though acknowledging that Mr. Balentine's IAC claim presented a substantial issue, the magistrate judge equated Mr. Balentine's arguments for avoiding exhaustion and establishing cause with an assertion of the right to effective state habeas counsel which the Fifth Circuit had previously rejected.  USDC Doc #53:  Magistrate's Report at 6–8; 31.

Mr. Balentine filed objections to the magistrate's exhaustion and default findings, and a motion to stay and hold in abeyance the federal proceedings so that he could present his unexhausted claims in the state court and thereafter return for federal review.  This Court denied Mr. Balentine's motion to stay the federal proceedings, overruled his objections to the magistrate judge's report, adopted the report and recommendations, and denied the petition for writ of habeas corpus.  In the procedural holding from which Mr. Balentine now seeks relief, this Court adopted the magistrate's determination that Mr. Balentine's arguments for escaping the consequences of his state habeas counsel's failings were "simply . . . another method of alleging ineffective assistance of state habeas counsel," and held that Mr. Balentine "cannot overcome the overwhelming precedent applicable to this argument."  USDC Doc #53:  Magistrate's Report  at 22.

6

Mr. Balentine appealed to the Fifth Circuit, arguing both that (1) *Coleman* left open the question of whether state habeas counsel's ineffectiveness may excuse a default where state collateral review is the first place to raise the trial ineffective assistance of counsel claim; and, (2) pursuant to the statutory exception to exhaustion in 28 U.S.C. § 2254(b)(1)(b)(ii), the systemic problem with ineffective habeas counsel in Texas should excuse exhaustion.  The Fifth Circuit rejected the first argument, noting that circuit precedent foreclosed a cause argument predicated on state habeas counsel's ineffectiveness.  *Balentine v. Thaler*, 324 Fed.Appx. 304, 305-06 (5th Cir. 2009).  The court of appeals rejected Mr. Balentine's second argument, holding "the district court correctly characterized Balentine's argument as merely another way of asserting that having ineffective state habeas counsel should excuse procedural default.  We have rejected similar arguments before.  *See Roberts v. Dretke*, 356 F.3d 632, 640 (5th Cir. 2004); *Martinez*,  255 F.3d at 239 n.10."  *Id.* at 306; *see also id.* ("Since there is no right to counsel in habeas proceedings in the first place, there can be no right to have the state habeas system appoint effective counsel.").  Thus, like this Court, the Fifth Circuit held that Mr. Balentine's ineffective assistance of trial counsel claim was procedurally defaulted and it did not review the merits of his claim.  *Id.*

The State of Texas, unwilling to wait for the conclusion of Mr. Balentine's first federal habeas proceedings, scheduled Mr. Balentine's execution for September 30, 2009.[4]

Mr. Balentine sought review of the procedural default ruling in the Supreme Court, arguing that the State of Texas's indifference to the systemic inadequacies of its court-appointed state post-

---

[4]  *See* First [1st] Warrant of Execution for September 30, 2009 *State v. Balentine*, No. 39,532-D (320th Dist. Ct. Potter County June 23, 2009).  The Fifth Circuit stayed Mr. Balentine's execution on September 29, 2009, just one day before he was scheduled to die.  *See* Stay of Execution, *Balentine v. Thaler*, No. 09-70013 (5th Cir. Sept. 29, 2009); *Balentine v. Thaler*, 626 F.3d 842, 845 (5th Cir. 2010).  Those proceedings are described *infra*.

conviction counsel rendered the Texas system ineffective to protect Mr. Balentine's rights. *Balentine v. Thaler*, (First) Pet. for Writ of Certiorari, No. 09-5128 (filed with SCOTUS July 2, 2009) at pp. 6–10 [hereinafter "First Writ Pet.]. Mr. Balentine alleged he was a victim of Texas's indifference because his court-appointed state habeas counsel, selected from a list of attorneys approved by the State of Texas to handle capital state habeas cases, lacked the training and background necessary to handle the case. As a result, the state habeas application was facially deficient and waived any meaningful review of Mr. Balentine's ineffective assistance of trial counsel claim in either state or federal court. First Writ Pet. at 9–10.

Respondent opposed Mr. Balentine's bid for Supreme Court review, arguing that, "[a]lthough Balentine maintains that 28 U.S.C. § 2254(b)(1)(B)(ii) excuses his failure to exhaust because the Texas system for appointing habeas counsel is defective, distilled to its essence ***the claim is nothing more than an improper allegation of ineffective habeas counsel which cannot serve to excuse a default***. *Coleman*, 501 U.S. at 752; *Martinez*, 255 F.3d at 240-41." *Balentine v. Thaler*, Respondent's Brief in Opposition, No. 09-5128 (filed with SCOTUS Sept. 11, 2009) at 13 (emphasis added). *See also id*. at 19 ("Assuming *arguendo* that state habeas counsel's omission constitutes ineffective assistance, this Court has long held that there is no constitutional right to state postconviction counsel, therefore, such counsel cannot be found constitutionally ineffective nor can counsel's ineffectiveness serve as legal grounds to excuse a procedural default. *Coleman*, 501 U.S. at 752 (citing *Pennsylvania v. Finley*, 481 U.S. 551(1987), *Murray v. Giarratano*, 492 U.S. 1 (1989), and *Wainwright v. Torno*, 455 U.S. 586 (1982)).").

The United States Supreme Court denied *certiorari* on October 20, 2009. *Balentine v. Thaler*, 130 S.Ct. 484 (2009) (Mem.).

8

Thus, from the beginning through the end of his initial federal habeas corpus proceedings, Mr. Balentine (1) acknowledged that his ineffective assistance of trial counsel claim was procedurally defaulted; and, (2) argued that the deficient performance of his state habeas counsel caused the default. Based on the wall of Fifth Circuit and Supreme Court precedent foreclosing Mr. Balentine's argument for cause, the courts held that he lacked cause for his defaulted Sixth Amendment claim and thus never addressed it.

### D.     Mr. Balentine's second attempt to secure federal review of his ineffective assistance of trial counsel claim.

On August 21, 2009, Mr. Balentine filed a subsequent application for state post-conviction relief and a motion to vacate the judgment in his previous state habeas proceeding. He raised two claims: (1) the same ineffective assistance of trial counsel claim—based on his trial counsel's failure to investigate, develop, and present mitigating evidence at the penalty phase of his case—he presented in his initial federal habeas corpus proceedings; and, (2) a claim under *Batson v. Kentucky*, 476 U.S. 79 (1986). [Second] Subsequent Application for Post Conviction Writ of Habeas Corpus and Motion to Vacate Judgment, *Ex parte Balentine*, No. WR-54071-02 (Tex. Crim. App. filed August 13, 2009) at 4–30 (hereinafter "Second Application"). Mr. Balentine argued that the state court should vacate or reopen its prior state habeas judgment and permit him to litigate his new claims, or it should find that the federal claims were previously unavailable under TEX. CODE CRIM. PROC. art. 11.071 § 5(a)(1) because the state saddled him with incompetent state habeas counsel who completely abdicated his statutory and professional responsibilities. Second Application at 13–17; 35–37. The state did not file any response to the application.

Mr. Balentine's pleas that counsel in the first state habeas proceeding had utterly failed to investigate and support the claim of ineffective assistance of trial counsel, and thus provided no assistance at all to Mr. Balentine, went unheeded.  On September 22, 2009, the Texas Court of Criminal Appeals dismissed the application in a perfunctory two-page order, over the dissent of Judge Holcomb.  The order recited the procedural history and then stated that the two claims "fail to satisfy the requirements of Article 11.071 § 5."  TCCA Order denying Second Application for Post Conviction Writ of Habeas Corpus and Motion to Vacate Judgment,  *Ex parte Balentine*, No. WR-54071-02, slip op. at 2 (Tex. Crim. App. Sept. 22, 2009) (not designated for pub.).

The following day, on September 23, 2009, Mr. Balentine sought relief pursuant to Federal Rule of Civil Procedure 60(b) from this Court's previous judgment defaulting his ineffective assistance of counsel claim.  USDC Doc #85: [First] 60(b) Petition, *Balentine v. Thaler*, No.2:03-CV-39-J (N.D. Tex.  Sept 23, 2009).  Mr. Balentine argued that the Texas Court of Criminal Appeals' September 22, 2009, dismissal of his first successive application did not constitute an independent ground that would bar federal review of the claim because, pursuant to the Fifth Circuit's decision in *Ruiz v. Quarterman*, 504 F. 3d 523 (5th Cir. 2007), the state court decision was based on a legal standard that was interwoven with federal law and the state court had failed to make clear the basis of its decision.  USDC Doc #85: [First] 60(b) Petition, at 11–16.  On September 28, 2009, this Court found that the Texas Court of Criminal Appeals' September 22, 2009, decision was based on an independent state law ground and denied the motion.  USDC Doc #89:  Order Denying [First] 60(b) Petition.

On September 29, 2009, a three judge panel of the Fifth Circuit Court of Appeals stayed Mr. Balentine's execution and subsequently unanimously reversed this Court on the basis of *Ruiz*. *Balentine v. Thaler*, 609 F.3d 729, 734 (5th Cir. 2010).  Thereafter, however, the panel granted

10

rehearing and reversed itself, holding that the Texas Court of Criminal Appeals' opinion rested on adequate state procedural grounds, and affirmed this Court's denial of the Rule 60(b) motion. *Balentine v. Thaler*, 626 F.3d 842, 851 (5th Cir. 2010).  The Fifth Circuit subsequently denied *en banc* rehearing.  *Balentine v. Thaler*, 629 F.3d 470 (5th Cir. 2010).  The Supreme Court denied *certiorari* on June 13, 2011.  *Balentine v. Thaler*, 131 S.Ct. 2992  (2011) (Mem.).

Mr. Balentine's second attempt to secure federal review of his ineffective assistance of trial counsel claim was thus unsuccessful.

**E.      Mr. Balentine's third attempt to secure federal review of his ineffective assistance of counsel claim.**

On March 31, 2011, the State of Texas—again unwilling to wait for the conclusion of Mr. Balentine's pending federal proceedings—scheduled Mr. Balentine for execution on June 15, 2011. *See*  Second [2nd] Warrant of Execution for June 15, 2011 *State v. Balentine*, No. 39,532-D (320th Dist. Ct. Potter County, filed June 23, 2009).  On June 6, 2001, nine days before the scheduled execution, the Supreme Court granted *certiorari* in *Martinez v. Ryan* to address the following question:

> Whether a defendant in a state criminal case who is prohibited by state law from raising on direct appeal any claim of ineffective assistance of trial counsel, but who has a state-law right to raise such a claim in a first post-conviction proceeding, has a federal constitutional right to effective assistance of first post-conviction counsel specifically with respect to his ineffective-assistance-of-trial-counsel claim.

*Martinez v. Ryan*, 131 S.Ct. 2960 (2011).

On June 13, 2011, six days after the grant of *certiorari* in *Martinez v. Ryan*, Mr. Balentine filed his third state habeas application, arguing that the court should grant a stay of execution and hold his case pending the decision in *Martinez*. [Third] Application for Post Conviction Writ of

Habeas Corpus and Motion to Vacate Judgment, *Ex parte Balentine*, No. WR-54,071 (320th Dist. Ct. Potter County, June 13, 2011). In this application, Mr. Balentine argued that if Mr. Martinez prevailed, the Supreme Court decision would overturn Texas case law holding that state capital habeas petitioners were not entitled to effective assistance of counsel and require the Texas courts to hear the ineffective assistance of counsel claim that Mr. Balentine had so long sought to have heard.

Less than twenty-four hours after it was filed, the Court of Criminal Appeals summarily rejected, over the dissent of three judges, Mr. Balentine's *Martinez*-based attempt to secure review of his ineffective assistance claim. After reciting the procedural history of Mr. Balentine's case, the Court wrote:

> Applicant presents two allegations in his application. In the first allegation, he asserts that his initial state habeas counsel performed deficiently in preparing his writ application. In his second allegation, applicant asserts that he was deprived of his Sixth Amendment right to effective assistance of trial counsel when his trial attorneys failed to conduct a proper life history investigation in preparation for the penalty phase of his trial. We have reviewed the application and find that applicant's allegations fail to satisfy the requirements of Article 11.071 § 5. Accordingly, applicant's application is dismissed, and his motion to stay his execution is denied.

*Ex parte Balentine*, No. WR-54,071-03 (Tex. Crim. App. June 14, 2011).

Mr. Balentine immediately sought Supreme Court review of the Court of Criminal Appeals' decision and moved for a stay of execution. On June 15, 2011, approximately one hour before Mr. Balentine's second scheduled execution, the Supreme Court issued a stay pending further consideration of his petition for a writ of *certiorari*. *Balentine v. Texas*, 131 S.Ct. 3017 (2011) (Mem.).

The Supreme Court decided *Martinez* on March 20, 2012. Instead of addressing whether a defendant has a constitutional right to counsel for the initial opportunity to raise a claim of

ineffective assistance of trial counsel, the Supreme Court addressed the narrower question of whether the ineffective representation of state habeas counsel can establish cause for a procedural defaulted claim in federal habeas corpus proceedings:

> *Coleman v. Thompson*, *supra,* left open, and the Court of Appeals in this case addressed, a question of constitutional law: whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial.   ....
>
> This is not the case, however, to resolve . . . [the] constitutional matter [left open in *Coleman*].  The precise question here is whether ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal habeas proceeding.

*Martinez v. Ryan*, 132 S.Ct. at 1315.  As described in more detail, *infra*, the Supreme Court answered the latter question in the affirmative.

The Supreme Court held a number of other cases pending the *Martinez* decision.  Some, like Mr. Balentine's case, had arrived in the Court via petitions for *certiorari* directed to state courts which refused to either consider the constitutional question raised in *Martinez* or await the Supreme Court's decision.  Others came to the Court via petitions for *certiorari* directed to United States Courts of Appeals which had defaulted ineffective assistance of trial counsel claims.  Because *Martinez* deferred the constitutional question and instead permitted federal habeas corpus petitioners to demonstrate cause for a default based on the ineffectiveness of state post-conviction counsel, the Supreme Court was without authority to vacate the decisions of the state courts regardless of whether state habeas counsel were patently deficient.

Thus, on March 26, 2012, in the cases in which the petitioners were still litigating their initial federal habeas petitions, the Supreme Court granted *certiorari*, vacated the lower court opinion, and remanded for further proceedings in light of *Martinez*.  *See Cantu v. Thaler*, 132 S.Ct. 1791 (2012) (Mem.) (vacating the lower court decision and remanding for further proceedings in light of

13

*Martinez*); *Newbury v. Thaler*, 132 S.Ct. 1793 (2012) (Mem.) (same); *Smith v. Colson*, 132 S.Ct. 1790 (2012) (Mem.) (same); *Middlebrooks v. Colson*, 132 S.Ct. 1791 (2012) (Mem.) (same); *Woods v. Holbrook*, 132 S.Ct. 1819 (2012) (Mem.) (same).

On the same date, it denied *certiorari* to the litigants seeking review of a state court decision, most of whom—like Mr. Balentine—had completed their initial federal habeas corpus proceedings. *See e.g. Cook v. Arizona*, 132 S.Ct. 1790 (2012) (Mem.); *Newbold v. North Carolina*, 132 S.Ct. 1792 (2012) (Mem.); *Sanders v. Kentucky*, 132 S.Ct. 1792 (2012) (Mem.); *Williams v. Arkansas*, 132 S.Ct. 1791 (2012) (Mem.); *Foster v. Texas*, 132 S.Ct. 1821 (2012) (Mem.). The Supreme Court also denied Mr. Balentine's petition for a writ of *certiorari*. *Balentine v. Texas*, 132 S.Ct. 1791 (2012).

\* \* \* \*

The *Martinez* decision has now cleared the way for this Court to review the claim Mr. Balentine raised in his 2004 petition for habeas corpus relief. Mr. Balentine will first show that, given the opportunity, he can satisfy the *Martinez* test for establishing cause for the default of ineffective assistance of trial counsel claim.[5] He will then demonstrate that the unique and extraordinary circumstances of this case warrant relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(6).

---

[5] Mr. Balentine submits that it would be premature to assess the merits of the ineffective assistance of counsel allegation during either trial or post-conviction without additional fact development. *See e.g.* USDC Doc #53: Magistrate Report at 32 ("a review of the merits of this claim would require this Court to allow further discovery, and/or hold an evidentiary hearing to hear testimony from trial counsel and defense investigators regarding the extent of the defense investigation in preparation for the punishment phase of petitioner's trial, whether any mitigation evidence was obtained, and, if so, why it was not presented.").

The arguments are presented here to demonstrate that far from being a futile gesture, reopening consideration of Mr. Balentine's 2004 amended habeas petition would likely result in merits review of his ineffective assistance of counsel claim and, ultimately relief.

III.     **Given the opportunity, Mr. Balentine can satisfy the two-part *Martinez* test for establishing cause for the procedural default of his ineffective assistance of trial counsel claim.**

*Martinez* held that petitioners can show cause for a procedurally defaulted ineffective

assistance of counsel claim by demonstrating:

(1)     that "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)"; and,

(2)     "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that … [it] has some merit."

*Martinez*, 132 S.Ct. at 1318–19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing

standard for certificate of appealability).  Mr. Balentine will address each part of the *Martinez* test

in turn.

A.     **Appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).**

1.     **"I did not know at the time of my appointment to represent Mr. Balentine ... that a state habeas proceeding is not another direct appeal":[6] There is no question that Mr. Balentine's initial counsel was grossly deficient in state habeas corpus proceedings.**

Mr. Balentine's state habeas counsel, Mr. Kent Birdsong, indisputably failed to perform the

basic tasks necessary to identifying the factual bases for a habeas corpus application, much less the

investigation necessary to plead and prove any habeas claims.  Instead, Mr. Birdsong filed a

document comprised mostly of direct appeal points of error he copied from briefs in other cases,

supplemented only by a few unsupported superficial claims for relief.  While Mr. Birdsong's

---

[6]     Exhibit 1:  Affidavit of Kent Birdsong at ¶ 9  [also reproduced in Third State Application, as Exhibit  24].

15

representation may have been minimally sufficient for *direct appeal* counsel, it did not comply with the statutory duties or the applicable standard of care for Texas capital *habeas corpus* counsel. As Mr. Birdsong subsequently acknowledged, "[w]hat I realize now, that I did not know at the time of my appointment to represent Mr. Balentine, is that a state habeas proceeding is not another direct appeal." Exhibit 1: Affidavit of Kent Birdsong at ¶ 9 [also reproduced in Third State Application, as Exhibit 24].

> **a.     The statutory duty of Texas capital habeas corpus counsel is to conduct a thorough extra-record investigation and identify the factual bases for relief.**

Article 11.071 of the Texas Code of Criminal Procedure governs Texas capital habeas corpus proceedings. Tex. Code Crim. Proc. art. 11.071 § 1. The appointment of counsel is mandatory unless waived by the prisoner. *Id*. at § 2. The habeas statute *requires* that counsel conduct an extra-record investigation:

> Investigation of Grounds for Application
>
> Sec. 3. (a) On appointment, counsel *shall* investigate expeditiously, *before and after* the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus.

*Id*. at § 3 (emphasis added). Counsel must be thorough and exercise reasonable diligence to uncover the factual basis for every available claim. *Id*. at § 5(e) (claims are not cognizable in subsequent habeas applications, and thus waived, unless "the factual basis was not ascertainable through the exercise of reasonable diligence" when the prior application was filed). Investigation is so fundamentally important that Texas courts are obligated to grant all reasonable investigative funding requests. *Id*. at § 3(c); § 3(d).

16

**b.      The contemporaneous standard of care in Texas capital habeas corpus cases, as reflected in State Bar of Texas materials, prescribed a broad and thorough investigation.**

One year after the 1995 passage of article 11.071 overhauled capital habeas corpus proceedings and established a right to counsel, the State Bar of Texas published the third edition of the Texas Criminal Appellate Manual.  Exhibit 2:  State Bar of Texas, Texas Criminal Appellate Manual (3rd ed. 1996) ("State Bar Manual")  [also reproduced in Third State Application, as Exhibit 3].  One of the chapters in the State Bar Manual was a primer for defense counsel litigating capital habeas corpus cases.  *Id*.  The State Bar Manual confirms that, by 1996, the prevailing standard of care in capital habeas corpus representation compelled counsel to conduct extensive investigation.

The manual begins with "essential ideas to bear in mind" when considering the habeas corpus litigation, the first two of which stress the need to investigate the case:

> 1. ***State habeas litigation is not the same as a direct appeal.  Habeas litigation concentrates on developing and presenting facts outside the appellate record*** which, in conjunction with facts in the record, raise important constitutional claims.  Habeas counsel must know the appellate record, but cannot be bound to it, or they will offer their clients nothing more than another attempt at a direct appeal.
>
> 2. *Writ practice requires investigation*.  You can't learn about, develop, and present facts outside the record if you don't investigate the case.  ***Investigation for a writ can be as intensive as investigation in preparation for trial.  This must be so particularly where habeas counsel believes that trial counsel may have rendered ineffective assistance of counsel***.  It is impossible to accurately evaluate the effectiveness of counsel without knowing what the counsel in question knew or could have known.

Exhibit 2: State Bar Manual at 4 (emphasis added).

The State Bar Manual repeatedly emphasizes the paramount importance of extra-record fact development:

> Facts outside the record are critical to a successful writ application.  Those facts must be sought out through investigation . . . .  Because of the nature of habeas claims, habeas counsel must investigate not only the client's background and the facts that

> gave rise to the offense, but also the investigation by police and defense counsel and the actions of the jury. There is no quick and easy way to do this and counsel will almost certainly need the help of a trained investigator to do an efficient and complete job . . . .

Exhibit 2: State Bar Manual at 31.

Ten pages—almost 25%—of the State Bar Manual are dedicated to describing the scope and depth of the requisite investigation. State Bar Manual at 31–40. Of course, any investigation begins with the client, and the State Bar Manual describes the "[t]opics to cover" during client interviews:

> (1) Your client['s] version of the facts of the offense; (2) his or her relationship with the trial and direct appeal lawyers; (3) anything the client found strange, unusual or objectionable about the trial or direct appeal; (4) **your client's social history, including his or her background, education, family history, medical history, drug abuse history, etc**. You should strive to know more about your client and his or her history than any other lawyer has known, and perhaps more than his own family has known, to ensure that you are aware of and can use all beneficial information that might come from that knowledge.

Exhibit 2: State Bar Manual at 32–33 (emphasis added).[7] Given this broad range of topics, the State Bar Manual advises habeas counsel that "the information you need from your client cannot be obtained in just one interview," thus "the more conversations you have, the more likely it is that you will win the inmate's trust and uncover additional helpful and highly relevant information." Exhibit 2: State Bar Manual at 33.

Client interviews, though critical, "must serve as the beginning, not the end, of [counsel's] investigation":

---

[7]       This standard essentially mirrors the Texas Court of Criminal Appeals' determination that, in a 1997 trial, capital defense counsel had a duty to interview the client about specific aspects of his social history. *Ex parte Gonzales*, 204 S.W.3d 391, 400–01 (Tex. Crim. App. 2006) (Cochran, J., concurring).

18

> [The client's family] may shed light on mitigating evidence that was not presented at trial, or guilt/innocence phase evidence that was suggested to trial counsel, but not presented. ***They will certainly have things to tell you about your client's background that you can get nowhere else that could contribute substantially to the development of claims*** concerning mental disorders, mental limitations, or drug abuse. You will also want to ask them about their contacts with trial counsel, as part of your investigation into trial counsel's investigation.

Exhibit 2: State Bar Manual at 33–34 (emphasis added).

Habeas counsel must also meet with trial counsel or, at a minimum, obtain trial counsel's files:

> [Y]ou should always, at the first meeting with [trial counsel], request their files. The files and all the notes in them belong to the client, not the lawyer, and you should insist on them being turned over to you . . . . [H]aving access to the file is vital, for it will tell you a lot about what information the lawyers had and what they were doing before, during and after the trial. Be sure that the file you receive includes all notes of the lawyers as well, for those notes are also the property of the client.

Exhibit 2: State Bar Manual at 34.

The above steps are merely preliminary measures: "Your record review, and interviews of your client, his or her family, and trial counsel will give you a pretty good idea of what some of the important issues may be in the case. That will allow you to focus your energy on developing information relevant to those issues." Exhibit 2: State Bar Manual at 34–35. The State Bar Manual subsequently describes three basic methods for investigating the case.

First, habeas counsel must collect a wide variety of records, a lengthy process that begins early in the representation: "It is vital to start gathering records as early in your writ preparation process as possible. Records collection is time consuming and is sometimes contested by agencies who are the custodians of records. It is preferable to deal with these disputes early in the investigation rather than in the last weeks or days before the writ application is due." Exhibit 2: State Bar Manual at 35. The State Bar Manual describes some of the records that should be gathered

in every case:

- Prison records: "Be sure to request all prison records from every previous incarceration of your client in any institution, as well as his or her time on death row . . . . Those records may contain very important information concerning your client's mental and medical condition."  State Bar Manual at 35.

- School Records: "School records are another valuable source of information. Through them you can find out about learning and mental difficulties your client was having throughout school that your client may be too embarrassed to tell you about or does not think are important.  The records may include I.Q. tests or other testing that is quite helpful in learning how your client was able to function as he or she developed."  State Bar Manual at 35.

- Medical and mental health records: "Medical and mental health records should be sought from any care provider who treated your client.  When getting these records, particularly from mental health professionals, make sure you specifically request all the records the care provider has, including handwritten or dictated notes made at or shortly after interviews or times of testing."  State Bar Manual at 35.

- Criminal records of witnesses: "Criminal records of all important witnesses at the trial should be checked in the county of conviction and any counties where they have spent substantial time.  You may find that some non-law enforcement witnesses had good reason to cooperate with the state at the trial, due to pending charges against them.  You may also find that some witnesses had prior convictions that could have been used to impeach their testimony at trial."  State Bar Manual at 35-36.

In addition to these fundamental documents, the State Bar Manual includes a five-page "Investigative Source List," State Bar Manual at Appendix I, which itemizes numerous other sources of relevant documents.

Second, habeas counsel must collect information from all relevant law enforcement agencies:

Always seek access to the district attorney's files and law enforcement agency files regarding the capital offense and any other offenses that you believe will be relevant to any of your claims, including offenses committed by key state's witnesses, such as jailhouse informants . . . .  [I]t [is] important to energetically seek access to the files of every law enforcement agency that may have generated information regarding your client.

Exhibit 2: State Bar Manual at 36.

20

Third, habeas counsel must obviously interview witnesses and, when possible do so in person: "As you begin to focus on the claims you want to pursue, you will identify people who have important information about those claims. Some may have testified at trial. Others may never have been called or perhaps were even unknown at the time of trial. You or your investigator need to interview these people in person, if at all possible." Exhibit 2: State Bar Manual at 37.

The State Bar Manual observed that "it should be clear that the services of an experienced criminal or habeas investigator are invaluable in efficiently and comprehensively gathering the information necessary for a writ application." Exhibit 2: State Bar Manual at 38. "Other experts will likely be needed, too," including mental health and medical experts. Exhibit 2: State Bar Manual at 38.

\* \* \* \*

In sum, both the statute that governed habeas counsel's appointment and the contemporaneous standard of care in capital habeas corpus proceedings mandated that counsel conduct substantial extra-record investigation. As his vouchers reveal, state habeas counsel, Mr. Kent Birdsong, failed to attempt even a small fraction of the necessary investigation. *See* Exhibit 3: Kent Birdsong Voucher (December 12, 2000); Exhibit 4: Kent Birdsong Voucher (January 25, 2001) [also reproduced in Third State Application, as Exhibits 5 & 6].

> c.      **State habeas counsel neglected his duty as post-conviction counsel to investigate Mr. Balentine's case.**

Mr. Birdsong has explained that he did not understand his duties as state habeas counsel. The record confirms that he did not perform them. The scope of Mr. Birdsong's work on behalf of Mr. Balentine is documented in the vouchers he submitted to the courts, and reflected in the nature

and source of the claims he eventually filed in the initial application.  Missing from the record of

Mr. Birdsong's labors is any hint of extra record investigation.  Though he billed for even small

tasks, such as reading a letter from his client, he did not bill a single hour for investigating the case.

Nor did his claims for reimbursement of expenses include any of the inevitable costs associated with

investigation, such as copying fees for obtaining the necessary social history records.  *See*  Exhibit

3:  Kent Birdsong Voucher (December 12, 2000);  Exhibit 4: Kent Birdsong Voucher (January 25,

2001) [also reproduced in Third State Application, as Exhibits 5 & 6].    Although he hired an

investigator, Mr. Birdsong failed to provide the investigator with any guidance or ask the

investigator to perform the necessary investigation.  Unsurprisingly, the final product of Mr.

Birdsong's substandard efforts, though styled as an application for habeas corpus relief, bore little

resemblance to one.

> **(1)    Mr. Balentine's initial state habeas counsel failed to "investigate ... the factual ... grounds for the filing of an application for a writ of habeas corpus."**[8]
>
> > **(a)    Other than one meeting on the eve of filing the habeas application, Mr. Birdsong's review of the case was limited to the four corners of the trial record.**

A review of Mr. Birdsong's billing confirms the record-bound nature of his predominantly

last-minute labor in Mr. Balentine's case.  Mr. Birdsong was appointed as habeas counsel on

October 1, 1999, and filed the application less than 16 months later.  During the first ten-and-a-half

months he represented Mr. Balentine, Mr. Birdsong devoted only ***two hours*** to representing Mr.

Balentine, and they were spent on administrative asks such as correspondence.  *See*  Exhibit 3:

---

[8]    TEX. CODE CRIM. PROC. art. 11.071 § 3(a).

22

Kent Birdsong Voucher (December 12, 2000) [also reproduced in Third State Application, as Exhibit 5]. He waited until two-and-a-half months shy of the initial filing deadline to begin reviewing the case and reading the record. *Id.* Mr. Birdsong obtained the maximum allowable extension of time, 90 days, in which to file that application but then squandered half of it by taking a 40-day hiatus from the case during which he did nothing.[9] Just 36 days before Mr. Balentine's application was due—445 days after he was appointed—Mr. Birdsong met his client for the first and only time. *Id.* The interview lasted just two hours. *Id.*

The totality of Mr. Birdsong's work on behalf of Mr. Balentine was as follows:

| **Activity** | **Time (in hours)** |
| --- | --- |
| Reading the trial transcript | 92.25 |
| Research and Drafting the writ | 74.00 |
| Dictating the writ | 38.00 |
| Proofreading the writ | 27.00 |
| "Make Changes, Proofread and Dictate Writ" | 8.00 |
| Travel to see client | 7.00 |
| Correspondence | 2.5 |
| Client visit | 2.0 |
| Motions | 1.5 |
| Total | 252.25 |

---

[9]   *Compare* Exhibit 3: Kent Birdsong Voucher (December 12, 2000) [also reproduced in Third State Application, as Exhibit 5] at 4, 7 (the period covered by Mr. Birdsong's first voucher ran through December 11, 2000, but his last work on the case was on November 3, 2000) *with* Exhibit 4: Kent Birdsong Voucher (January 25, 2001) [also reproduced in Third State Application, as Exhibit 6] at 5 (Mr. Birdsong's second voucher, covering work performed after December 11, 2000, shows that his next work on the case was on December 13, 2000).

23

*See* Exhibit 3:  Kent Birdsong Voucher (December 12, 2000);  Exhibit 4: Kent Birdsong Voucher

(January 25, 2001) [also reproduced in Third State Application, as Exhibits 5 & 6].

Conspicuously absent from counsel's work on the case are any indicia of the mandatory

extra-record investigation at the core of capital habeas counsel's duties.  The above time records are

precisely what one reasonably expect from capital ***direct appeal*** counsel: Mr. Birdsong read the

record, engaged in some research and writing, and then filed a pleading.  During the course of his

work, he met with the client one time.  Mr. Birdsong has since confirmed that, at the time, he was

unaware that he needed to conduct an investigation and present evidence in order to make a *prima*

*facie* showing for the ineffective assistance of counsel claims he pled.  Exhibit 1:  Kent Birdsong

Affidavit at ¶ 6  [also reproduced in Third State Application, as Exhibit  24].   Thus, Mr. Birdsong

failed in his obligation to "investigate expeditiously . . . the factual . . . grounds for the filing of an

application for a writ of habeas corpus."  Tex. Code Crim. Proc. art. 11.071 § 3(a).

> **(b)** **Mr. Birdsong's record-bound review of the case was supplemented only by 42 hours of an investigator's time, most of which was devoted to a rudderless record review.**

Werner Talley, Mr. Balentine's court-appointed investigator, spent a total of 42 hours on the

case.  Exhibit 5:  Werner Tally Affidavit (June 25, 2003) and Bill (Exhibit A) [also reproduced in

Third State Application, as Exhibit 23 (affidavit) and Exhibit A (Bill)].  Mr. Talley "was instructed

by Kent Birdson[g] . . . to review trial counsel files, the District Attorney's files, and the files of the

trial investigator, Kathy Garrison.  [He] was also instructed by Mr. Birdsong to interview the jurors

and to interview trial counsel."  Exhibit 5:  Werner Tally Affidavit at ¶ 4  [also reproduced in Third

State Application, as Exhibit 23].  Though Mr. Talley performed the requested tasks he was unsure

of the purpose for his document review and unable to appreciate the potential significance of the

documents he read: "Although my billing records . . . reflect that I spent almost 75% of my time in record review, ***Mr. Birdsong did not tell me why I needed to look at all these records, or what I was looking for***." *Id*. at ¶ 7 (emphasis added). Other than the 31.5 hours Mr. Talley spent reviewing records—without any sense of what might be consequential for developing claims for habeas corpus relief—he spent 8.5 hours interviewing jurors. *Id*. at Exhibit A. Mr. Talley performed no other work in the case. *Id*. at ¶ 13.

> Mr. Talley confirms that he was never asked to investigate Mr. Balentine's social history:
>
> ***I was not instructed by Mr. Birdsong . . . to conduct a social history [or] . . . develop mitigating evidence***. As a result, I did not interview family, friends, teachers, ministers, jailers, or others who could provide information about John's life and upbringing. Nor did I collect various records to document John's education, physical health, mental health, incarceration, etc. When I reviewed the various files of the District Attorney, the trial investigator and trial counsel, I was not looking to see if this information had or had not been developed in order to support a claim that trial counsel was ineffective in failing to investigate, develop and present mitigating evidence.

Exhibit 5: Werner Tally Affidavit (June 25, 2003) [also reproduced in Third State Application, as Exhibit 23] at ¶ 12 (emphasis added); *see also* Exhibit 1: Kent Birdsong Affidavit at ¶ 6 [also reproduced in Third State Application, as Exhibit 24] ("I did not know that I needed to conduct a mitigation investigation.").

In sum, the ***entire*** combined extra-record efforts of Mr. Birdsong and Mr. Talley amounted to: (1) Mr. Birdsong's single, last-minute meeting with the client; (2) Mr. Talley's unguided review of the trial files for both the state and the defense; and, (3) eight hours of juror interviews. Juxtaposed with the standard of care reflected in the 1996 State Bar Manual, Mr. Birdsong's exertion was so far below the reasonably necessary investigation that it amounted to a constructive denial of habeas counsel. "State habeas litigation is not the same as a direct appeal," it "concentrates on developing and presenting facts outside the appellate record." Exhibit 2: State Bar Manual at 4.

The absence of an investigation "offer[s] ... clients nothing more than another attempt at a direct appeal." *Id*. This is precisely what Mr. Birdsong offered Mr. Balentine, and most of that direct appeal was appropriated from a brief in a different case.

> **(2)** **Mr. Birdsong filed an application comprised largely of claims cut and pasted from Brittany Holberg's habeas application (which were appropriated from her direct appeal brief), supplemented only by: (1) claims raised and rejected in Mr. Balentine's direct appeal; and, (2) ten pages of perfunctory, unsupported allegations.**

In light of counsel's failure appreciate the distinction between direct appeal and habeas corpus proceedings, and the related absence of a meaningful investigation, it was a forgone conclusion that Mr. Balentine's initial application would lack claims with an extra-record factual basis. Mr. Birdsong filed an application with twenty-one claims for relief, spanning 104 pages, thus it resembled a capital habeas corpus application. But closer scrutiny reveals an empty husk lacking any cognizable, adequately pled challenge to Mr. Balentine's conviction or sentence.

> **(a)** **The vast majority of the initial application was boilerplate briefing lifted from other pleadings in other cases.**

Mr. Birdsong simultaneously represented several death-sentenced prisoners, including Mr. Balenetine and Brittany Holberg. Many of the habeas claims filed in Ms. Holberg's application—which was filed five months before Mr. Balentine's—were appropriated from the direct appeal brief filed on her behalf by a different lawyer. Mr. Birdsong subsequently cut-and-pasted Ms. Holberg's claims into Mr. Balentine's habeas application. Claims copied *verbatim*, or

nearly *verbatim*, from Ms. Holberg's habeas application account for 74 pages,[10] or 71%, of Mr.

Balentine's application:[11]

| ***Balentine* Application** | ***Holberg* Application**[12] | ***Holberg* Direct Appeal**[13] |
|---|---|---|
| Claim 1 | Claim 1 | Point of Errors 44-46-A |
| Claim 2 | Claim 2 | Point of Error 47 |
| Claim 3 | Claim 3 | Point of Error 31 |
| Claim 4 | Claim 4 | |
| Claim 5 | Claim 5 | |
| Claim 6 | Claim 6 | Point of Error 10 |
| Claim 7 | Claim 8 | Points of Error 35–36 |
| Claim 8 | Claim 10 | Point of Error 33 |
| Claim 11 | Claim 12 | Point of Error 29 |
| Claim 12 | Claim 13 | Point of Error 20 |
| Claim 13 | Claim 14 | Point of Error 30 |
| Claim 14 | Claim 15 | Point of Error 32 |

---

[10]     Application for Post Conviction Writ of Habeas Corpus, *Ex parte Balentine,* No. 39-532-D (320th Dist. Ct. Potter County October 24, 2000) at 1–54; 67–86 (hereinafter "First or Initial Application").

[11]     *Compare* Original Post-Conviction Application for Writ of Habeas Corpus, *Ex parte Holberg*, No. WR 68,994-01, 2008 WL 152725 (Tex. Crim. App. Jan. 18, 2008) (hereinafter "Holberg Application"), *with* Mr. Balentine's Initial Application (Balentine Claims 1–8 and 11-14 were cut-and-pasted from Ms. Holberg's application).

[12]     *See* Original Post-Conviction Application for Writ of Habeas Corpus, *Ex parte Holberg*, No. WR 68,994-01, 2008 WL 152725 (Tex. Crim. App. Jan. 18, 2008) (hereinafter "Holberg Application").

[13]     *See Holberg v. State*, 38 S.W.3d 137 (Tex. Crim. App. 2000).

All but two of the claims were copied from Mr. Holberg's direct appeal.[14] Thus, a substantial portion of Mr. Balentine's habeas corpus application was in fact Ms. Holberg's points of error on direct review—and they had been rejected by the Court of Criminal Appeals *before* the filing of Mr. Balentine's application.[15]

Moreover, Mr. Birdsong pasted into Mr. Balentine's application claims from Ms. Holberg's case that were entirely irrelevant. For example, Claim 10 of the Holberg Application alleges that the "definition of mitigating evidence impermissibly restrict[s]" the jury's discretion when sentencing the defendant. *Holberg* Application at 56. Ms. Holberg had argued that the

> definition of mitigating circumstances prevented the jury from reaching Applicant's very substantial evidence of potential for rehabilitation, which was the focus of ***the mitigating evidence the defense produced at the punishment phase***.

*Id*. at 57 (omitting footnote describing Ms. Holberg's sentencing phase evidence) (emphasis added). The same issue appears as Claim 8 in Mr. Balentine's initial application, *Balentine* Initial Application at 47, including the identical text:

> the definition of mitigating circumstances prevented the jury from reaching Applicant's very substantial evidence of potential for rehabilitation, which was the focus of ***the mitigating evidence the defense produced at the punishment phase***.

*Balentine* Initial Application at 48 (emphasis added). Of course, Mr. Balentine's trial counsel ***failed***

---

[14]    *See Holberg v. State*, 38 S.W.3d 137 (Tex. Crim. App. 2000).

[15]    The Court of Criminal Appeals affirmed Ms. Holberg's case on direct appeal on November 29, 2000, Mr. Birdsong filed Mr. Balentine's application for habeas corpus relief on January 22, 2001. That the claims had already been rejected by Texas's highest court should have been apparent to Mr. Birdsong because most of the legal research for which he billed occurred on or after December 13, 2000. Exhibit 4: Kent Birdsong Voucher (January 25, 2001) [also reproduced in Third State Application, as Exhibit 6].

*to present any evidence during the punishment phase.*[16]

In addition to claims copied from the *Holberg* Application, Mr. Birdsong threw in four additional direct appeal issues, two of which were "identical to . . . challenge[s] [Mr. Balentine] made in his direct appeal" and were thus summarily rejected. *See* Third State Application, Exhibit 2 (Findings of Fact and Conclusions of Law) (state exhibit not attached hereto) at 1–2.[17]

Thus, the first 16 claims—or 94 of 104 pages—of Mr. Balentine's application were fourteen defaulted[18] direct appeal points of error cribbed from other pleadings in other cases, some lacking any relevance to Mr. Balentine's case, and two points of error lifted from Mr. Balentine's direct appeal brief. The state courts summarily denied all of these claims *en masse*, without individual

---

[16]     Not only are the two claims *verbatim* copies, except for the deletion of references to the relevant evidence in Ms. Holberg's case, the *Balentine* version of the claim even retains the same formatting error. Both claims switch from fully justified text to left justification at that same point in the text. *Compare Holberg* Application at 62 *with Balentine* Initial Application at 53.

[17]     *Balentine* and *Holberg* are not the only cases in which Mr. Birdsong filed direct appeal issues as habeas claims, nor even the most egregious examples. On December 1, 1999, Mr. Birdsong was appointed to represent Larry Davis in state post-conviction proceedings. Davis was, like Balentine, sentenced to death in Potter County, Texas. Birdsong filed a habeas corpus application in Davis's case on June 17, 2002. The application contained only a *single* record-based claim. That claim had been raised and rejected on direct appeal. As the Attorney General of Texas subsequently described the proceedings: "Davis raised this claim again as his sole claim on state habeas review and made a cursory request for an evidentiary hearing. The Court of Criminal Appeals once again denied relief, adopting the findings of the trial court." Respondent Dretke's Answer with Brief in Support, *Davis v. Dretke*, No. 2:03-cv-00001 (N.D. Tex. Oct. 17, 2003). "[B]ecause the claim had been raised and rejected by the Court of Criminal Appeals on direct appeal, the claim was not cognizable in the state habeas proceeding . . . ." *Id*. Thus, Davis's sole claim in his state habeas corpus application was not even a cognizable one. Davis effectively had no state habeas corpus review at all.

[18]     Mr. Birdsong did not preserve these issues by alleging that direct appeal counsel was ineffective for failing to raise them. Exhibit 1: Kent Birdsong Affidavit at ¶ 8 [also reproduced in Third State Application, as Exhibit 24] ("I did not know that . . . I also needed to run an ineffective-assistance-of-appellate-counsel claim to excuse the procedural default arising from the failure of the direct appeal lawyer to raise" the claims.).

29

consideration, because they had been previously rejected and were procedurally barred as they could have been, or were, raised on direct appeal:

> The United States Supreme Court and/or the Texas Court of Criminal Appeals have rejected the challenges Applicant makes here in his "Grounds for Relief" 1 through 14 to the constitutionality of the Texas death penalty scheme. Additionally, Applicant waived review of many of those complaints by not timely raising them in this Court.

Third State Application, Exhibit 2 (Findings of Fact and Conclusions of Law) (state exhibit not attached hereto) at 1.

Inserting these record-based points of error into Mr. Balentine's habeas corpus application did no more to fulfill habeas counsel's duty than inserting 94 blank pages. It merely provided a facade of post-conviction representation. This mode of post-conviction representation was condemned by the State Bar of Texas Task Force on Habeas Counsel Training and Qualification as the among the most serious deficiencies in post-conviction representation, equal in efficacy to representation by a deceased lawyer: "[the lack of regulation of capital state post-conviction counsel] "resulted in a list containing lawyers who were, at best, unqualified to serve as capital habeas counsel and at worst, lawyers who . . . filed habeas writs copied verbatim from writs filed in other cases, lawyers who filed writs with absolutely no cognizable claims, lawyer who were serving suspensions from the practice of law for neglecting their clients and even lawyers who were deceased." USDC Doc #45, Exhibit A: *State Bar Task Force Report*, p.8. The type of deficient representation afforded to Mr. Balentine is what led to subsequent reforms in Texas, including the creation of a specialized capital post-conviction defender agency.

       **(b)**      **Counsel's failure to investigate doomed his ineffectual attempt to allege extra-record claims, including the IAC claim.**

Of the five remaining claims, three were purely record-bound claims. *Balentine* Initial Application at 95–101. The only extra-record issues, and potentially cognizable habeas corpus claims, were the perfunctory allegations raised in the last three pages of the application. *Balentine* Initial Application at 102–104. First, Mr. Birdsong alleged that trial counsel were ineffective with respect to the punishment phase. The claim is reproduced here *in toto*:

> The record indicates trial counsel informed the court the defense punishment case would take approximately a day. Upon the State resting at punishment the defense announced it would also rest. No evidence was presented on behalf of Applicant at the punishment phase.
>
> Trial consisted of two experienced trial counsel, experience combined indicated over 55 years of legal experience between them. Co-counsel Sherrod was a prior elected District Attorney with numerous capital murders prosecutions under his belt. Sherrod would have been familiar with the State prosecution tactics as well as the State's punishment experts. (CR. 269).
>
> Applicant asserts that trial counsel had a duty to personalize Applicant as best as possible, either through presenting evidence regarding his life; and if that wasn't legally viable then a duty to present a picture of what life would be like for a prisoner serving a life sentence. No request was made for expert assistance, and no evidence was presented even when an ex chairman of the prison board was available in town as well as a practitioner of this court. (Exhibit C)
>
> Applicant reurges the arguments under **Strickland** and argues that harm is shown based on the severity of the sentence imposed. (Death as opposed to life). What's the worse that could have happened?
>
> Applicant prays for appropriate relief.

*Balentine* Initial Application at 102. Additionally, Mr. Birdsong alleged in Claim 21 that "counsel's failure to ask for a continuance to permit additional time for adequate and thorough pretrial investigation" constituted ineffective assistance. *Id*. at 103.

31

Mr. Birdsong confronted an obvious red flag for investigation but did not appreciate that he needed to do more than note his concern:

> It was obvious from the record, particularly volume 26, that trial counsel had failed to call any witnesses on behalf of Mr. Balentine in the punishment phase of the trial. But at the time of my appointment to represent Mr. Balentine, I did not know that I needed to conduct a mitigation investigation, and provide evidence in the form of affidavits or institutional records about Mr. Balentine's . . . social history . . . to make a *prima facie* showing of the ineffectiveness of trial counsel in failing to provide the sentencer with evidence which might militate against the appropriateness of the death penalty.

Exhibit 1:  Kent Birdsong Affidavit at ¶ 6 [also reproduced in Third State Application, as Exhibit 24].  A social history investigation is essential in every capital habeas corpus case: "habeas counsel *must* investigate . . . the client's background."  Exhibit 2:  State Bar Manual at 31 [also reproduced in Third State Application, as Exhibit 3].  Under these circumstances it was all the more compulsory. Yet, Mr. Balentine's claims were not supported with extra-record evidence, Mr. Birdsong wholly failed to allege, much less prove, prejudice from trial counsel's omissions.  As the magistrate judge stated during his initial review of the case, the state habeas application "did nothing to inform the state court of the existence or nature of any specific mitigation or risk-assessment evidence that could have been presented at his trial."  USDC Doc #53:  Magistrate's Report at 34.

Because Mr. Birdsong failed to conduct a professionally reasonable investigation and adequately plead these claims, the trial court made short work of them.  The trial court's fact-findings, for the *entire* petition, consist of one sentence: "Applicant has presented ***no fact*** issue necessary for this Court to resolve."  Third State Application, Exhibit 2 (Findings of Fact and Conclusions of Law)  (state exhibit not attached hereto) at 1 (emphasis added).  The Conclusions of Law disposed of the above ineffectiveness claims based on Mr. Birdsong's failure to plead a claim or present any evidence: "Applicant has not alleged that witnesses who would have benefitted

him were available," and "Applicant makes no specific allegation about evidence which was denied him by reason of counsel's not requesting a continuance."  *Id*. at 2.

Mr. Balentine's ineffective-assistance-of-counsel claim was procedurally defaulted in federal proceedings because none of the "substantial" mitigating evidence available at the time of trial was presented to the state courts.  State habeas counsel has explained that this omission flowed from his lack of familiarity with habeas corpus proceedings:  "at the time of my appointment to represent Mr. Balentine, I did not know that I needed to conduct a mitigation investigation, and provide evidence in the form of affidavits or institutional records about Mr. Balentine's . . . social history . . . to make a *prima facie* showing of the ineffectiveness of trial counsel . . . .."  Exhibit 1:  Kent Birdsong Affidavit ¶ 6 [also reproduced in Third State Application, as Exhibit 24].

It is therefore undisputable that the procedural default that barred review of Mr. Balentine's ineffective-assistance-of-counsel claim was caused by state habeas counsel's deficient performance.

> **2.    Mr. Balentine's first state habeas proceeding was the "initial-review collateral proceeding" within the meaning of *Martinez* in which the claim should have been raised.**

>> **a.    *Martinez* applies to the first proceeding in which a prisoner can obtain relief for a violation of his Sixth Amendment right the effective assistance of counsel.**

Arizona, where *Martinez* arose, does not permit prisoners to raise ineffective assistance of counsel claims on direct appeal, requiring them instead to file such claims in state collateral proceedings.  Martinez sought federal habeas corpus relief claiming ineffective assistance of trial counsel.  The claim was procedurally defaulted because it had not been properly raised in state court.  Martinez argued that he was entitled to the effective assistance of counsel in that state collateral proceeding because it constituted his first opportunity to raise his claim of ineffective assistance of

trial counsel.  Because he had been denied such assistance, Martinez contended, he had established "cause" for any default.  The district court found his claim of ineffective assistance of trial counsel procedurally defaulted, citing *Coleman v. Thompson*, 501 U.S. 722, 755 (1991) (holding that "post-conviction counsel's ignorance or inadvertence does not qualify as cause to excuse a procedural default."). The Ninth Circuit affirmed, and Martinez presented to the Supreme Court the question *Coleman* left open*:* "whether a prisoner has a [constitutional] right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Martinez v. Ryan*, 131 S.Ct. 2960 (2011).

Although the Supreme Court granted *certiorari* to address Martinez's constitutional question, it deferred that issue and instead addressed "whether ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal habeas proceeding." *Martinez*, 132 S.Ct. at 1315.  The Court concluded that "a narrow exception" to the unqualified holding in *Coleman* was necessary "[t]o protect prisoners with a potentially legitimate claim of ineffective-assistance of trial counsel." *Id*. at 1315.  Thus, the Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.*

The Court explained that an exception to *Coleman* was appropriate because when "an initial review-collateral proceeding" provides the first opportunity for raising a claim of ineffective assistance of trial counsel, it is the equivalent of a prisoner's direct appeal, in that "the state habeas court looks to the merits of the claim of ineffective assistance, no other court has addressed the claim, and defendants pursuing first-tier review are generally ill equipped to represent themselves because they do not have a brief from counsel or an opinion of the court addressing their claim of error." *Id.* at 1317 (citations and internal quotation marks omitted).  *Martinez* pointed out that if

direct appeal counsel is ineffective, "the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain adjudication on the merits of his [other] claims." *Id.* Without the effective assistance of counsel in initial-review collateral proceedings, there is a similar risk that prisoners will forfeit claims of ineffective assistance of trial counsel. *Id.* Such claims often cannot be presented adequately without factual investigation and an "understanding of trial strategy." *Id.* When a claim of ineffective assistance of trial counsel cannot be raised on direct appeal, a prisoner in initial-review collateral proceedings

> cannot rely on a court opinion or the prior work of an attorney addressing that claim . . . . The prisoner, unlearned in the law, may not comply with the State's procedural rules or may misapprehend the substantive details of federal constitutional law. . . . [C]onfined to prison, *the prisoner is in no position to develop the evidentiary basis for a claim of ineffective assistance, which often turns on evidence outside the trial record*.

*Id.* (citation omitted) (emphasis added).

The *Martinez* Court recognized that while there are sound practical reasons for adjudicating ineffective assistance of counsel claims in collateral proceedings, doing so deprives the prisoner of constitutionally-guaranteed counsel to help safeguard perhaps the most important trial right:

> Ineffective-assistance claims often depend on evidence outside the trial record. Direct appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the claim. *Ibid.* Abbreviated deadlines to expand the record on direct appeal may not allow adequate time for an attorney to investigate the ineffective-assistance claim. *See* Primus, *Structural Reform in Criminal Defense*, 92 Cornell L.Rev. 679, 689, and n. 57 (2004) (most rules give between 5 and 30 days from the time of conviction to file a request to expand the record on appeal). Thus, there are sound reasons for deferring consideration of ineffective-assistance-of-trial-counsel claims until the collateral-review stage, but this decision is not without consequences for the State's ability to assert a procedural default in later proceedings. By deliberately choosing to move trial-ineffectiveness claims outside of the direct-appeal process, where counsel is constitutionally guaranteed, the State significantly diminishes prisoners' ability to file such claims. It is within the context of this state procedural framework that counsel's ineffectiveness in an initial-review collateral proceeding qualifies as cause for a procedural default.

*Id.* at 1318.  The core concern of *Martinez* is that a prisoner receive an adequate opportunity to

vindicate his Sixth Amendment right to the guiding hand of counsel: "A prisoner's inability to

present a claim of trial error is of particular concern when the claim is one of ineffective assistance

of counsel.  The right to the effective assistance of counsel at trial is a bedrock principle in our

justice system."  *Id.* at 1317.

> **b.     In Texas, *relief* on most extra-record ineffective assistance of counsel claims requiring extensive investigation before they can be pled—like a *Wiggins* claim—is only available in post-conviction proceedings.**

Texas law envisions that the first challenge to trial counsel's effectiveness—where that

challenge relies upon evidence outside the trial record—will take place in state post-conviction

habeas corpus proceedings:

> Experience has taught us that in most instances where the claim of ineffective assistance of counsel is raised, the record on direct appeal is simply not in a shape, perhaps because of the very alleged ineffectiveness below, that would adequately reflect the failings of trial counsel.  Indeed, in a case such as this, where the alleged derelictions primarily are errors of omission de hors the record rather than commission revealed in the trial record, collateral attack may be just the vehicle by which a thorough and detailed examination of alleged ineffectiveness may be developed and spread upon a record.

*Ex parte Duffy*, 607 S.W.2d 507, 513 (Tex. Crim. App. 1980), *overruled on other grounds by*

*Hernandez v. State*, 988 S.W.2d 770 (Tex. Crim. App. 1999).  In fact, as demonstrated below, state

law ***affirmatively precludes relief*** on a claim of ineffective assistance of trial counsel raised on

direct appeal if all the facts necessary to adjudicate the claim are not contained within the four

corners of the appellate record.

An allegation that trial counsel were ineffective is a quintessential example of an extra-

record claim that must be pressed in habeas corpus proceedings.  Under *Strickland v. Washington*,

466 U.S. 668 (1984), the prisoner first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." Second, he must demonstrate prejudice by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In almost all cases, satisfying either prong of the *Strickland* test requires the prisoner to submit evidence from outside the trial record. For example, trial counsel must "make reasonable investigations [or] make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. When assessing trial counsel's performance, courts look not only to the record of the trial but to trial counsel's reasons for their actions: "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* "Whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny. The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court." *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) (footnote omitted). Resolving this question—is the challenged failure to investigate a "strategic judgment call," or a "plain omission"?—requires counsel to explain the rationale for their actions or omissions, which in turn requires the submission of evidence from outside the trial record.

On direct review, Texas courts impose a mandatory presumption, drawn from *Strickland*, that trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Ex parte Varelas*, 45 S.W.3d 637, 629 (Tex. Crim. App. 2001). Thus, except in the unusual situation where the trial record itself contains counsel's explanation for a challenged decision, a convicted defendant who challenges on direct review the effectiveness of his legal representation at trial cannot prevail under *Strickland*. The Court of

37

Criminal Appeals consistently enforces this presumption; it recently reversed a lower court of appeals for failing to recognize that "direct review is usually an inadequate vehicle for raising such a claim":

> For a claim of ineffective assistance of counsel to succeed, the record must demonstrate both deficient performance by counsel and prejudice suffered by the defendant. An ineffective-assistance claim must be "firmly founded in the record" and "the record must affirmatively demonstrate" the meritorious nature of the claim. "Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped." This statement is true with regard to the "deficient performance" prong of the inquiry, when counsel's reasons for failing to do something do not appear in the record. Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it."

*Menefield v. State*, 363 F.3d 591, 592–93 (Tex. Crim. App. 2012) (footnotes omitted). *See also Rylander v. State*, 101 S.W.3d 107, 111 n.1 (Tex. Crim. App. 2003) (reversing lower court's decision on ineffective assistance claim, but emphasizing that the court was not "deciding on this direct appeal whether appellant did or did not receive effective assistance of counsel," and that he was free to submit his ineffective assistance claim "for review on the merits" in a habeas corpus application); *Freeman v. State*, 125 S.W.3d 505, 506–07 (Tex. Crim. App. 2003) (reversing lower court's grant of relief on direct review and noting "[we] have held several times that in cases like this the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel") (citations omitted); *Thompson v. State*, 9 S.W.3d 808, 814–15 (Tex. Crim. App. 1999) (same); *Jackson v. State*, 877 S.W.2d 768, 771–72 (Tex. Crim. App. 1994) (same).

Ineffectiveness claims based on trial counsel's alleged failure to investigate and present evidence require a reviewing court both to assess counsel's pretrial preparation and consider any assertions of strategy by trial counsel. *See Strickland*, 466 U.S. at 691. In Texas, this evidence will

not be in the direct appeal record because of a variety of circumstances identified by the Texas

courts, any one of which would render the record inadequate to evaluate trial counsel's performance:

> [T]he trial record ordinarily does not reflect counsel's reasons for doing or failing to do actions of which the defendant complains. *While expansion of the record may be accomplished in a motion for new trial, that vehicle is often inadequate because of time constraints and because the trial record has generally not been transcribed at this point* . . . . Further, *mounting an ineffective assistance attack in a motion for new trial is inherently unlikely if trial counsel remains counsel during the time required to file such a motion*. Hence, in most ineffective assistance claims, a writ of habeas corpus is essential to gathering the facts necessary to adequately evaluate such claims.

*Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (emphasis supplied); *see also*

*Thompson v. State*, 9 S.W.3d 813–14 ("[i]n the majority of instances, the record on direct appeal is

simply undeveloped and cannot adequately reflect the failings of trial counsel"); *Ex parte Varelas*,

45 S.W.3d at 629 ("[i]n most cases, the record on direct appeal is 'inadequate to develop an

ineffective assistance claim' because 'the very ineffectiveness claimed may prevent the record from

containing the information necessary to substantiate such a claim'") (quoting *Torres*, 943 S.W.2d

at 475); *Ex parte White*, 160 S.W.3d 46, 49 (Tex. Crim. App. 2004) (same).[89]

Likewise, it is rarely possible for a prisoner to show that he was "prejudiced" by any error

of omission by trial counsel, as required by *Strickland*'s second prong, without presenting evidence

from outside the trial record. The claim at issue in this case and in *Martinez*—a claim that trial

counsel failed to investigate and present certain evidence— requires the investigation, presentation

and consideration of substantial evidence from outside the trial record. In order to show that a

---

[89]     In Texas, it is only in habeas corpus proceedings that counsel are provided funding for investigators and experts—funding that is critical to the investigation and presentation of claims of ineffective assistance of counsel. *See* TEX. CODE CRIM. PROC. Art. 11.071, § 3. No comparable funding is provided for counsel on direct appeal. The statutory scheme thus recognizes the essential extra record nature of habeas corpus proceedings.

different outcome was reasonably probable if trial counsel had performed properly, the prisoner or his post-conviction counsel must submit the evidence that trial counsel should have discovered. In a capital case, that evidence often includes extensive social history documents as well as affidavits from witnesses who could have testified at trial. "Claims of ineffective assistance at trial often require investigative work and an understanding of trial strategy." *Martinez*, 132 S.Ct. at 1317. *See Wiggins v. Smith*, 539 U.S.510, 535 (2003) (habeas counsel introduced extensive evidence of the defendant's "troubled history"); *Rompilla v. Beard*, 545 U.S. 374, 391 (2005) (assessing the impact of "the material post-conviction counsel found").

Accordingly, as in *Martinez*, the first and only opportunity for a prisoner to secure relief on the vast majority of ineffective assistance of trial counsel claims in Texas is in state habeas corpus proceedings:

> While defendants in criminal cases in Texas are not legally prohibited from challenging the effectiveness of their trial counsel on direct appeal, such claims typically call for extensive factual development beyond what is disclosed in the appellate record, and thus, *as a practical matter, post-conviction habeas corpus is the first opportunity to raise them*. *Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999).

TCCA Order denying Third Application, *Ex parte Balentine*, No. WR-54,071-03, at Dissenting Statement, 2 n.5 (Tex. Crim. App. June 14, 2011) (Price, J., dissenting, joined by Johnson and Alcala. JJ.) (dissenting from majority's refusal to grant stay of execution pending *Martinez*) (emphasis added).[90] *See also Ex parte Hernandez*, 2012 WL 1060079, at *1 (Tex. Crim. App. Mar. 26, 2012) at *1 (same) (citation omitted). This fact—that relief is unavailable on direct review if the claim requires consideration of evidence from outside the record—has been repeatedly and

---

[90]   The Texas Court of Criminal Appeals' majority did not dispute this conclusion, nor would there have been any basis in Texas law to do so.

consistently reiterated by the Texas Court of Criminal Appeals.

In *Thompson v. State*, the defendant challenged on direct appeal his trial counsel's failure to object to the State's manifest and persistent attempts to elicit inadmissible hearsay.  After discussing *Strickland* and the prisoner's heavy burden of overcoming the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance," the Texas Court of Criminal Appeals held that the record was inadequate to resolve the claim because it was "silent as to *why* . . . trial counsel failed to object." *Thompson*, 9 S.W.3d at 814 (emphasis added).  The opinion contains a strong warning to courts of appeals and litigants regarding the difficulties inherent in adjudicating ineffective assistance claims on direct appeal:

> A substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on direct appeal. Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation. ***In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel****. Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998) . . . .  "Indeed in a case such as this, where the alleged derelictions primarily are errors of omission de hors the record rather than commission revealed in the trial record, collateral attack may be ***the*** vehicle by which a thorough and detailed examination of alleged ineffectiveness may be developed and spread upon a record." *Jackson v. State*, 973 S.W.2d at 957. [Footnotes omitted].

*Id.* at 814–815 (emphasis added).  *See also Bone v. State*, 77 S.W. 3d 828, 835 (Tex. Crim. App 2002) (citing *Jackson* language); *Ex parte Varelas*, 45 S.W.3d at 629–30 ("[i]n most cases, the record on direct appeal is 'inadequate to develop an ineffective assistance claim' because 'the very ineffectiveness claimed may prevent the record from containing the information necessary to substantiate such a claim'") (citations omitted); *Rylander v. State,* 101 S.W.3d 107 (Tex. Crim. App. 2003) (rejecting claim of ineffective assistance of trial counsel requiring non-record evidence; appellant encouraged to raise the claim in habeas corpus); *Mitchell v. State,* 68 S.W.3d 640, 643

41

(Tex. Crim. App. 2002) ("[g]enerally the record on direct appeal will not be sufficient to show the counsel's representation was so deficient as to meet the first part of the *Strickland* standard" . . . [habeas corpus] "usually is the appropriate vehicle to investigate ineffective-assistance claims) (citations omitted); *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App 2011) ("ineffective assistance claims are generally not successful on direct appeal" because the record "is usually inadequately developed and 'cannot adequately reflect the failings of trial counsel," such claims "are more appropriately urged in a hearing on an application for writ of habeas corpus.").

Since *Martinez*, the Texas courts have continued to preclude relief on direct review of claims of ineffective assistance of trial counsel that rest on evidence outside the record. *See e.g. Velez v. State*, ___ S.W.3d ___, 2012 WL 2130890, at *35 (Tex. Crim. App. June 13, 2012) (denying relief on direct appeal because the record is insufficient to show "that counsel's representation was lacking in tactical and strategic decision making.").

The fact that post-conviction review is the exclusive avenue to obtain relief on many ineffective assistance claims was one of the considerations that drove some members of the Texas court to dissent from a holding that Texas law does not require court-appointed capital habeas corpus counsel to perform competently:

> If the defendant's habeas counsel performs deficiently, a meritorious claim [of ineffective assistance of trial counsel] may not be adequately raised or investigated. Applicants only get one shot at habeas corpus relief. If the attorney appointed on his first writ is incompetent, then a defendant, who was deprived of effective assistance of counsel at trial, has *no means* to enforce his constitutional right to affective assistance of counsel at trial.

*Ex parte Graves*, 70 S.W.3d 103, 124–25 (Tex. Crim. App. 2002) (Price, J., dissenting) (emphasis added). *See also Ex parte Rojas*, 2003 WL 1825617, at *1 (Tex. Crim. App. Feb. 12, 2003) (unpublished) (Price, J., dissenting) (Article 11.071 habeas corpus proceeding is the "one

42

opportunity to raise claims not based solely on the record").

The absence of the availability of relief has prompted the Texas court to admonish direct

appeal counsel to refrain from raising ineffective assistance of counsel claims on direct review:

> This case stands for a very simple proposition: As a general rule, one should ***not*** raise an issue of ineffective assistance of counsel on direct appeal.  This is so because a trial record is generally insufficient to address claims of ineffective assistance of counsel in light of the "strong presumption that [trial] counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). [Footnote omitted].
>
> * * * *
>
> A trial record is directed to the issues of guilt/innocence and punishment.  And we review that record with an eye toward the errors allegedly committed in relation to those issues.  However, in order to effectively argue an issue of ineffective assistance of counsel, a record focused on the conduct of trial or appellate counsel should be developed.  Such a record is generally best developed in the context of a hearing held in relation to an application for writ of habeas corpus.

*Jackson v. State*, 877 S.W.2d 768, 772–773 (Tex. Crim. App. 1994) (Baird, J., concurring).

Finally, other Texas entities with expertise in the Texas post-conviction process have

determined that post-conviction is the exclusive route for vindicating most claims of ineffective

assistance of trial counsel.  The State Bar of Texas Task Force on Habeas Counsel Training and

Qualification—comprised of Texas Court of Criminal Appeals judges, trial judges, experienced

defense counsel, and even one of the senior counsel for Respondent in these proceedings (Don

Clemmer)—has recognized that state post-conviction is the lone avenue for securing relief on the

type of claim at issue here:

> Habeas proceedings are the only opportunity available to those sentenced to death to raise post conviction claims of prosecutorial misconduct or ineffective assistance of trial counsel and to present evidence not developed or discovered during trial—including evidence as to the actual innocence of the applicant.

USDC Doc #45, Exhibit A: *State Bar Task Force Report* (also available at:

43

http://www.aclutx.org/files/SBOT%20Task%20Force%20Final%20Report%20Signed.pdf ).

This is not to say—nor does *Martinez* require—that Texas law **mandates** that ineffectiveness claims be raised in state habeas proceedings.  In Texas, a claim that trial counsel was ineffective can be **raised** on direct appeal.  But there is no **remedy** on direct review unless the claim is rests solely upon the paper record—or all necessary evidence is submitted in a motion for new trial, which must be filed within 30 days of judgment,[91] and almost invariably by **trial counsel**.  *Martinez* recognized the substantial inadequacies in this approach.  *Id.* at 1318 ("Abbreviated deadlines to expand the record on direct appeal may not allow adequate time for an attorney to investigate the ineffective-assistance claim.").

The statutory limitations on motions for new trial in Texas criminal cases render litigating most ineffective assistance of counsel claims—particularly claims that require an extensive social history investigation—inherently impossible.  As noted, the defendant must sufficiently investigate every allegation he wishes to raise within 30 days of judgment.  TEX. R. APP. PROC. 21.4. Thereafter, he has just 10 days in which to present any relevant evidence.  TEX. R. APP. PROC. 21.6. While a trial court may extend the 10-day deadline somewhat, *id.*, it must reach a final decision on any issue raised by the defendant no later than 45 days after the motion is filed because Texas law mandates that trial courts rule on a motion for new trial within 75 days of the judgment.  TEX. R.

---

[91]  *See* TEX. R. APP. PROC. 21.4 –  Time to File and Amend Motion, recites:

    (a)    *To File.* The defendant may file a motion for new trial before, but no later than 30 days after, the date when the trial court imposes or suspends sentence in open court.

    (b)    *To Amend.* Within 30 days after the date when the trial court imposes or suspends sentence in open court but before the court overrules any preceding motion for new trial, a defendant may, without leave of court, file one or more amended motions for new trial."

44

App. Proc. 21.8(a) ("Time to Rule. The court *must* rule on a motion for new trial within 75 days

after imposing or suspending sentence in open court.") (emphasis added).

Based on these limitations on motions for new trials in Texas, the Texas Court of Criminal

Appeals itself recognizes the inadequacy of the motion for new trial as a vehicle for adjudicating

ineffective assistance of counsel claims. *Ex parte Torres*, 943 S.W.2d 4 at 475 ("While expansion

of the record may be accomplished in a motion for new trial, that vehicle is often inadequate because

of time constraints and because the trial record has generally not been transcribed at this point.");

*Jackson v. State*, 877 S.W.2d at 773, fn. 3 (addressing difficulties of developing a sufficient record

on a motion for new trial). In this case, as in the great majority of capital cases, the trial transcript

was so voluminous that its preparation was not complete until well after the 30-day deadline for

filing a motion for new trial had passed.[92]

Moreover, the motion for new trial, as is almost universally the case, was filed by trial

counsel.[93]  Trial counsel can hardly be charged with assessing his own effectiveness. *See e.g.*

*Kimmelman v. Morrison*, 477 U.S. 365, 378 (1986) ("Indeed, an accused will often not realize that

he has a meritorious ineffectiveness claim until he begins collateral review proceedings, particularly

if he retained trial counsel on direct appeal.").[94]  The very short time frame for preparing a motion

---

[92]     *Compare* (Pursuant to Tex. R. App. Proc. 21.4, the latest date by which the
Motion for New Trial had to be filed, was on or before May 19, 1999. This is the 30th day from
the date (April 19, 1999) that the trial judge sentenced Balentine to death in open court (RR
26:108-109)) *with*  (Court Reporter filed the Reporter's Record on August 9, 1999 (*see* filed-
stamped date on Reporter Record volumes)).

[93]     *See* (CR 348-351 - On April 23, 1999, lead trial counsel, James Durham, filed the
Motion for New Trial).  On June 9, 1999, the trial judge overruled the Motion for New Trial.
(CR Docket Sheet, p. 380).

[94]     Federal courts have found cause for defaulted claims of ineffective assistance of
counsel claims that could have been raised on direct review when trial counsel also served as

for new trial renders it practically impossible, assuming representation by conflict-free counsel, to read the record (if available) and conduct the sort of investigation necessary to reveal the inadequacies at issue in claims such as those presented here, or in cases like *Wiggins*.  In addition, the absence of a trial transcript forecloses even identifying those omissions of counsel discernible *from the trial record* that might support an ineffective assistance claim.[95]

The ineffectiveness claim at issue in *Martinez*, and the ones at issue herein, rest on evidence outside the trial record, though having the trial record is a prerequisite to adequately pleading the

---

appellate counsel or had control over the content of the appeal.  *Riner v. Owens*, 764 F.2d 1253, 1257 (7th Cir. 1985) ("Since it would be most difficult if not professionally awkward to require a lawyer to argue on appeal his own ineffectiveness . . . we conclude that identity of trial and appellate counsel can constitute sufficient cause to meet the first element of the cause and prejudice standard."); *Alston v. Garrison*, 720 F.2d 812, 816 (4th Cir. 1983) ("We are satisfied with Alston's excuse for failing to raise his ineffectiveness claim at trial and on state appeal. The content of an appeal is heavily controlled by counsel, and where, as here, the defendant's trial lawyer also prosecuted the appeal, it is obvious that ineffective assistance of counsel is not likely to be raised at trial or to appear among the assignments of constitutional error.").

Similarly, federal courts have found cause for defaulted ineffective assistance of counsel claims when trial counsel represented the defendant in his first collateral proceeding. *Stephens v. Kemp*, 846 F.2d 642, 651 (11th Cir. 1988) ("We find 'cause' for petitioner's failure to raise the ineffective assistance issue in his first state habeas petition in the fact that petitioner's trial counsel, whose effectiveness is here challenged, also represented him in the first state habeas proceeding."); *see also Bloomer v. United States*, 162 F.3d 187, 192 (2nd Cir. 1998) ("we need not find that appellate (or, by analogy, habeas) counsel was ineffective in failing to challenge the quality of the representation that he had rendered at trial.  Rather, we effectively excuse the failure to raise that argument on appeal (or here on an initial § 2255 petition) due simply to counsel's inherent conflict of interest.").

[95]      To be entitled to a hearing on a motion for new trial alleging ineffective assistance of counsel, a movant must "allege sufficient facts from which a trial court could reasonably conclude **both** that counsel failed to act as a reasonably competent attorney **and** that, but for counsel's failure, there is a reasonable likelihood that the outcome of his trial would have been different." *Smith v. State*, 286 S.W.3d 333, 340–41 (Tex. Crim. App. 2009) (emphasis in original).  Accordingly, those facts must be developed prior to the 30-day deadline for filing. When direct appeal counsel is appointed who did not participate in the trial proceedings, and no transcript is available for review within the 30-day deadline for filing a motion for new trial, presenting and adjudicating such claims in a motion for new trial is a practical impossibility.

claim. Thus, for *Martinez* purposes, post-conviction review was the "initial review proceeding" in which those claims could meaningfully be asserted.  Any gloss that disregards this reality repudiates the text, spirit, and intent of *Martinez*.

> ### c.    Panels of the Fifth Circuit have adopted divergent approaches to *Martinez*.

Mr. Balentine anticipates that the Respondent will assert, based on conflicted and incomplete Fifth Circuit precedent, that *Martinez* is inapplicable to this case.  In fact, the published orders of Fifth Circuit panels[96] have taken divergent approaches.  Further, because the issue was not raised by the parties in these cases, the court of appeals has yet to address Mr. Balentine's argument that, regardless of whether *Martinez* is inapplicable to the general run of cases, it must apply to cases in which conflicts of interest and other case-specific circumstances render it impossible for a defendant to raise an extra-record ineffective assistance of counsel claim on direct appeal.  Thus, this Court must address the issue in the first instance.

Panels of the Fifth Circuit have adopted two divergent approaches to *Martinez*.  The first looks at how the state in question routes litigation of ineffective assistance of trial counsel claims and whether post-conviction proceedings will be the first ***practical*** occasion to raise such challenges. The second asks whether it is technically possible to raise some claims of ineffective assistance on direct review.  If the answer to that question is "yes," the analysis ends without considering whether state post-conviction proceedings are nonetheless the first and only available proceeding in which the vast majority of such claimants may obtain relief, or even whether it was possible to raise on direct appeal the specific ineffectiveness claim at issue.

---

[96]    The unpublished opinions are not precedent.  Fifth Circuit Rule 47.5.4.

Adopting the second, hyper-technical approach would mean that many Texas litigants—for whom it is impossible to raise an extra-record ineffective assistance of counsel claim on direct review—will be unfairly denied the equitable safety valve established in *Martinez*.  Only the former approach is faithful to *Martinez*, and this Court should embrace it.  The second approach is a plausible reading of *Martinez* only if the courts allow individual litigants, for whom it actually was impossible to raise an ineffective assistance of counsel claim on direct appeal, to show cause for a default under *Martinez*.

In *Lindsey v. Cain*, 2012 WL 1366040, at *1 (5th Cir. Apr. 19, 2012) (unpublished), the first Fifth Circuit decision to address *Martinez*, the panel concluded that "[w]hen a state, like Louisiana, requires that a petitioner raise an ineffective assistance of counsel claim on collateral review," he may invoke *Martinez* to establish cause for a procedural default.  *Id.*  As another member of the court subsequently noted, Louisiana's handling of ineffective assistance of counsel claims is materially indistinguishable from Texas's:

> Louisiana, like Texas, allows a prisoner to raise ineffective assistance of counsel on direct appeal "when the record contains sufficient evidence to decide the issue and the issue is properly raised by assignment of error on appeal." *State v. Brashears*, 811 So.2d 985 (La. App. 5 Cir. 2002).  *See also State v. Williams*, 738 So.2d 640,651-652 (La. App. 5 Cir. 1999) ("Ineffective assistance of counsel claims are most appropriately addressed on application for post conviction relief, rather than on direct appeal, so as to afford the parties adequate opportunity to make a record for review.  However, when an ineffective assistance claim is properly raised by assignment of error on direct appeal and the appellate record contains sufficient evidence to evaluate the claim, the reviewing court may address the ineffective assistance claim in the interest of judicial economy.").

Order, *Ibarra v. Thaler*, ___ F.3d ___, 2012 WL 2620520, at *8 (5th Cir. June 28, 2012) (Graves, J., dissenting) (order denying Mr. Ibarra's motion for a remand to the district court).  The fact that Louisiana courts may sometimes hear claims of ineffective assistance of trial counsel on direct appeal—when deciding such claims does not require resort to evidence outside the appellate

48

record—was not enough to deny the benefit of *Martinez* to Louisiana prisoners.[97]

The first published post-*Martinez* opinion by the Fifth Circuit was *Cantu v. Thaler*, ___ F.3d ___, 2012 WL 1970364 (5th Cir. June 1, 2012).  Ivan Cantu argued that his state habeas counsel's ineffectiveness established cause for the procedural default of his ineffective assistance of trial counsel claim.  *Cantu v. Thaler*, 632 F.3d 157, 166 (5th Cir. 2011), *judgment vacated by*, *Cantu v. Thaler*, 132 S.Ct. 1791 (2012).  Cantu conceded, and Fifth Circuit held, that the argument was foreclosed at the time by *Coleman*.  *Id.*

Cantu raised his cause argument in a petition for *certiorari*.  Petition for Writ of Certiorari, *Cantu v. Thaler*, 132 S.Ct. 1791 (2012) (Mem.), at 21–26.  Noting the pendency of *Martinez*, Cantu argued that "state habeas corpus application was, in fact, '*the one and only appeal*' available to challenge his trial attorneys' performance." *Id.* at 24 (quoting *Thompson v. State*, 9 S.W.3d 808, 813 n.5 (Tex. Crim. App. 1999)) (emphasis in the original); *see also id.* at 25 ("When a Texas defendant is deprived of his federal right to effective assistance of trial counsel, his first and only recourse is to file a state habeas corpus application."); *id.* at 26 ("Cantu was, in fact, deprived of the effective assistance of counsel in his 'one and only appeal' available to challenge trial counsel's performance.").  Cantu urged that post-conviction counsel's ineffectiveness "should constitute cause sufficient to excuse the procedural default of the underlying claim." *Id.* at 26–27.

In response, the Respondent argued that "nothing [the Supreme] Court does in [*Martinez*] will lead to a different result in" Cantu's case.  Respondent's Brief in Opposition, *Cantu v. Thaler*,

---

[97]     A federal district court has also applied *Martinez* to Louisiana, noting Louisiana's "jurisprudential rule . . . that ineffective assistance claims are generally best suited for post-conviction proceedings," and observing that the state court had applied that rule in the petitioner's own case. *Wessinger v. Cain*, 2012 WL 1752683, at *2 (M.D. La. May 16, 2012) (*citing State v. Hamilton*, 699 So.2d 29, 31 (La. 1997), and *State v. Wessinger*, 736 So.2d 162, 195 (La. 1999)).

132 S.Ct. 1791 (2012) (Mem.), at 36.  Respondent alleged that,

> under Texas law, an individual may raise an ineffective-assistance claim on appeal and need not rely on collateral proceedings.  *See Thompson v. State*, 9 S.W.3d 808, 814 n.6 (Tex. Crim. App. 1999).  And while he was entitled to constitutionally effective counsel on appeal, *see Evitts v. Lucey*, 469 U.S. 387, 393-94 (1985), Cantu has not complained of appellate counsel's performance.

*Id*. at 37.

The Supreme Court first considered Cantu's petition—and the Respondent's Opposition—on September 26, 2011, and decided to hold the case for *Martinez*.[98]  The Court revisited Cantu's petition after *Martinez*[99] and—after considering pleadings raising the issue of whether post-conviction proceedings were the first opportunity for Texas litigants to obtain relief on an ineffective assistance of counsel claim—granted *certiorari*, vacated the Fifth Circuit's prior decision, and remanded the case for further consideration in light of *Martinez*.  *Cantu v. Thaler*, 132 S.Ct. 1791 (2012) (Mem.).[100]

---

[98]     *Cantu v. Thaler*, No. 10-11031 (U.S. 2012) (available at http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/10-11031.htm) (the Court considered Cantu's petition its September 26, 2011, conference but took no action until after *Martinez*).

[99]     The Supreme Court considered Mr. Cantu's petition in its March 23, 2012, conference, three days after it issued *Martinez*.  *Cantu v. Thaler*, No. 10-11031 (U.S. 2012) (available at http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/10-11031.htm).

[100]     *Cantu* was not the only Supreme Court case in which the parties briefed the issue of whether post-conviction proceedings are the first opportunity for Texas litigants to obtain relief for a deprivation of the right to the effective assistance of counsel.  The issue was fully joined and briefed by the parties Mr. Balentine's case.

In opposition to Mr. Balentine's petition for *certiorari* and motion for a stay of execution, the Respondent argued that *Martinez* was irrelevant because "[t]he two cases are . . . distinguishable in regards to how claims of ineffective assistance of counsel are presented for review."  Respondent's Brief in Opposition, *Balentine v. Texas*, 132 S.Ct. 1791 (2012) (Mem.), at 12.  Respondent first noted that "Arizona law . . . requires that *all* claims of ineffective assistance of trial counsel must be raised in post-conviction Rule 32 proceedings" and such claims will not be

On June 1, 2012, the Fifth Circuit, in a published opinion, remanded the case for further consideration of Cantu's contention that his state habeas counsel was ineffective and thus he had cause for the default. *Cantu v. Thaler*, ___ F.3d ___, 2012 WL 1970364, at *1 (5th Cir. June 1, 2012). While the panel did not expressly hold that state post-conviction was Cantu's first opportunity to raise his ineffective assistance of trial counsel claim, there would have been no reason to remand the case back to the district court for consideration of Cantu's argument for cause if *Martinez* had no application in Texas. The panel held the case for over a month after the Supreme Court's decision was final, and then—like the *Lindsey* panel—remanded the case to the district court. In the context of cases in which the arguments regarding the applicability had been fully briefed in—and implicitly rejected by—the Supreme Court, the most sensible reading of *Cantu* is that the panel deemed *Martinez* applicable and the remand was to consider whether Cantu's state habeas counsel was in fact ineffective.

Four weeks later, in response to another petitioner's request for a remand to the district court, a divided panel of the Fifth Circuit adopted the opposite position. Relying on the fact that "Texas defendants may first raise ineffectiveness claims before the trial court following conviction via a motion for new trial, ***when practicable***," the panel stated that *Martinez* did not apply to Texas.

---

addressed on direct appeal. *Id*. "In contrast," Respondent asserted, "Texas law has no requirement that ineffective assistance claims be delayed until state habeas and Texas does not restrict the presentation of such claims to an initial state habeas application. Instead, the claims may be raised before direct appeal in a motion for new trial." *Id*. at 13–14. Respondent devoted several pages to arguing that Texas law "effectively provided two bites at the apple" for litigating ineffective assistance of counsel claims." *Id*. at 13–17. Thus, Respondent urged the Court to deny a stay of execution because *Martinez* would have no bearing on Mr. Balentine's case. *Id*. at 17.

At least five Justices implicitly rejected Respondent's arguments and the Court stayed Mr. Balentine's execution pending the resolution of *Martinez*. *Balentine v. Texas*, 131 S.Ct. 3017 (2011) (Mem.). Had the Court found the Respondent's arguments persuasive, there would have been no reason for the Court to block Texas's effort execute Mr. Balentine before *Martinez* was decided.

51

*Ibarra*, 2012 WL 2620520, at *4 (emphasis added). Of course, the operative language here is "when practicable." As described, *supra*, the Texas Court of Criminal Appeals has stated that it most often will not be "practicable" for a convicted defendant to raise on direct appeal a claim of ineffective assistance of trial counsel: "While expansion of the record may be accomplished in a motion for new trial, ***that vehicle is often inadequate*** because of time constraints and because the trial record has generally not been transcribed." *Ex parte Torres*, 943 S.W.2d at 475 (emphasis added); *see also id.* ("mounting an ineffective assistance attack in a motion for new trial is inherently unlikely if trial counsel remains counsel during the time required to file such a motion."). Carried to the extreme, the rationale endorsed by the *Ibarra* majority would deny the benefit of *Martinez* to ***all*** Texas prisoners simply because ***some*** litigants ***might*** be able to raise their ineffective assistance of counsel claims on direct appeal.[101] *Ibarra*, however, did not reach the question of whether *Martinez* applies

---

[101]     Another Fifth Circuit panel, without the benefit of any post-*Martinez* briefing from the parties, concluded in an unpublished opinion that *Martinez* has no application to Texas. In *Gates v. Thaler*, 2012 WL 2305855 (5th Cir. June 19, 2012) (unpublished), the briefing was complete long before *Martinez* was decided. *See Gates v. Thaler*, No. 11-70023 (June 19, 2012) (the last filing prior to the opinion was dated October 26, 2011, five months before the *Martinez* decision). Thus, neither party had briefed *Martinez* or how it might apply in Texas. Nonetheless, the panel anticipated that Mr. Gates "m[ight] contend" that *Martinez* applied to his case, and then proceeded to reject the argument that Gates might have raised. *Id.* at *6. The panel noted that a capital defendant can raise, and the Court of Criminal Appeals will consider, a claim of ineffective assistance of counsel on direct review, citing *Narvaiz v. State*, 840 S.W.2d 415, 434 (Tex. Crim. App. 1992).

        The *Gates* panel was correct, insofar as its analysis went, but that analysis was fundamentally incomplete.  It is true that a capital defendant can raise on direct appeal a claim of ineffective assistance of trial counsel, and that the Court of Criminal Appeals may consider it.  However, what the Court of Criminal Appeals will not do on direct appeal is ***grant relief*** on any ineffective assistance claim that rests on facts outside the appellate record.  This is true of even the most ostensibly record-bound claims, such as complaints about trial counsel's failure to lodge a meritorious objection.  As described, *supra*, even these claims require factual development to establish whether counsel had any strategic reason for not objecting.  Absent such factual development, on direct review the Court of Criminal Appeals will "presume [that trial counsel] . . . rendered adequate assistance and made all significant decisions in the exercise of reasonable

to those Texas prisoners who—because of the circumstances of their case—cannot raise an ineffective assistance of trial counsel claim on direct appeal.  Thus, it does not control the outcome of this case.[102]

There is at least some ambiguity about the current law of the Fifth Circuit.  On the one hand, *Cantu* was the first panel to publish an opinion disposing of a post-*Martinez* Texas case, and the "court [of appeals] adheres strictly to the maxim that one panel of the court cannot overturn another, even if it disagrees with the prior panel's holding."  *In re Caddo-Parrish-Villas South, Ltd.*, 174 F.3d 624, 629 (5th Cir. 1999).  On the other hand, the *Cantu* opinion was opaque and the panel may not

professional judgment."  *Varelas*, 45 S.W.3d at 629.

Thus, the observation that ineffective assistance of counsel claims can be raised on direct appeal in Texas is true to the same extent that it is true that litigants may deliberately by-pass state court remedies and raise claims for relief for the first time in federal habeas corpus proceedings.  Petitioners can indeed raise such claims, and federal courts can consider and deny such claims on the merits.  28 U.S.C. § 2254(b)(2).  However, relief is not available to such litigants, and neither is it available to Texas defendants who seek to raise extra-record ineffective assistance of counsel claims on direct review.

Like *Ibarra*, the *Gates* panel did not address whether *Martinez* applied to litigants who could not raise their claims on direct appeal.

[102]     Additionally, *Ibarra* was not a dispositive opinion but a non-dispositive order denying a remand to the district court.  The case is still pending before the court of appeals on Ibarra's request for a certificate of appealability (COA).  The panel has yet to decide whether to grant COA, whether Ibarra's claim is in fact procedurally defaulted and, if so, whether his other arguments for cause excuse the default.  If there is no default, or if the default is excused on a different basis, then the panel purported to settle a question of law "that cannot affect the rights of the litigants in the case before it."  *C&H Nationwide, Inc. v. Northwest Bank Texas NA*, 208 F.3d 490, 493 (5th Cir. 2000) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971).  That Ibarra himself prematurely requested the remand is of no moment, the court of appeals was obligated to decline the invitation to issue an advisory opinion.  *See e.g. In re Coho Resources, Inc.*, 345 F.3d 338, 345 (5th Cir. 2003) ("we decline [the litigant's] invitation to issue an advisory opinion on the question.").

53

have in fact concluded that *Martinez* applies to all Texas prisoners.[103]  For the reasons described below, however, the Fifth Circuit has yet to authoritatively address all of the *Martinez*-related questions necessary to resolve Mr. Balentine's case.

> **d.**  **Regardless of whether *Martinez* applies to all Texas cases, it binds every federal court adjudicating a case in which post-conviction was "the first occasion to raise a claim of ineffective assistance at trial."[104]  *Martinez* thus applies to Mr. Balentine because several circumstances precluded him from raising his claim on direct appeal.**

*Martinez*'s holding stems from the concern that prisoners have one opportunity to litigate an ineffective assistance of counsel claim.  *Martinez* was thus focused on "initial-review collateral proceedings," which the Court defined as "the ***first occasion*** to raise a claim of ineffective assistance at trial."  *Martinez*, 132 S.Ct. at 1315 (emphasis added).  The court was concerned that,

---

[103]     Mr. Balentine notes that another circuit has already construed *Martinez* to apply to states like Texas.  In Oregon, as in Texas, there is no absolute bar to raising ineffective assistance of counsel claims on direct appeal, but claims that rely on facts outside of the record cannot reasonably be asserted on direct appeal.  *Compare State v. Robinson*, 550 P.2d 758 (Or.App.1976) ("Appellant contends on appeal that his trial counsel was incompetent.  This issue, except in rare instances, is one which can be properly resolved only in a postconviction proceeding in which evidence can be taken.  *See, Turner v. Cupp*, 1 Or.App. 596, 465 P.2d 249 (1970)."), *with Ex parte Torres*, 943 S.W.2d at 475 ("in most ineffective assistance claims, a writ of habeas corpus is essential to gathering the facts necessary to adequately evaluate such claims").

Knowing that it was technically possible to raise at least some ineffective assistance of counsel claims on direct review in Oregon, the Ninth Circuit nonetheless held that *Martinez* applied to Oregon petitioners in § 2254 proceedings: "For the purposes of our review in this case, therefore, *Martinez* instructs that Sexton may establish cause for his procedural default of his new ineffective assistance of trial counsel claims, because the State of Oregon required Sexton to raise them in a collateral proceeding, *State v. Robinson*, 550 P.2d 758 (Or. App. 1976)." *Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012).  The panel nonetheless denied Mr. Sexton's request for a remand to the district in light of *Martinez* based on its determination that trial counsel was not ineffective.  *Id.*

[104]     *Martinez*, 132 S.Ct. at 1315.

> [w]hen an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim. This Court on direct review of the state proceeding could not consider or adjudicate the claim . . . . And if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims.

*Id*. at 1316. "Without the help of an adequate attorney, a prisoner will have . . . difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim." *Id*. at 1317. Thus the *Martinez* Court sought to ensure that litigants would not be barred from federal court if they had been denied access to adequate counsel for their first opportunity to raise an ineffective assistance of trial counsel claim in state court:

> Allowing a federal habeas court to hear a claim of ineffective assistance of trial counsel when an attorney's errors (or the absence of an attorney) caused a procedural default in an initial-review collateral proceeding acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim.

*Id*. at 1318.

The Court ultimately held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id*. The principle that animates *Martinez* is that petitioners should have adequate counsel for "the first occasion" to raise their ineffective assistance of counsel claims. *Martinez* must apply to all prisoners who, due to the circumstances of their individual case, cannot raise their ineffective assistance of counsel claim on direct review. Mr. Balentine is one of them.[105]

---

[105]    *Ibarra* does not control here because Ibarra argued only that, based on the Texas direct review and post-conviction schemes, *Martinez* applied to ***every*** Texas prisoner. The Fifth Circuit rejected that argument: "Ibarra is not entitled to the benefit of *Martinez* for his ineffectiveness claims, as Texas procedures entitled him to review through counselled motions for new trial and direct appeal." *Ibarra*, 2012 WL 2620520, at *4. Ibarra did not argue, and the court did not address, whether the particular circumstances of an individual case would render

Mr. Balentine was sentenced to death on April 19, 1999, (RR 26:108-109);  thus his motion for new trial was due on May 19, 1999, thirty days after he was sentenced.  TEX. R. APP. PROC. 21.4. The trial court was required to finally dispose of the motion by July 5, 1999.  TEX. R. APP. PROC. 21.8(a) ("The court must rule on a motion for new trial within 75 days after imposing or suspending sentence in open court;" because the 75th day was Saturday, July 3, 1999, the trial court had until Monday, July 5, 1999).

One of Mr. Balentine's trial counsel, James Durham, filed a two-page motion for new trial on April 23, 1999.  (CR 348-351; Exhibit 6: Motion for New Trial).  Three days later, on April 26, 1999, Mr. Durham withdrew from the case.  (CR 352-354).  That same day, April 26, 1999, a new lawyer, C.R. Daffern, was appointed to represent Mr. Balentine on appeal.  (CR 357; Exhibit 7: Docket Sheet).  Under the Texas rules, Mr. Balentine had 10 days from the date his motion was filed, until May 3, 1999, to present any relevant evidence in support of it.  TEX. R. APP. PROC. 21.6. On April 20, 1999, Mr. Balentine's other trial lawyer, Randall Sherrod, moved to withdraw from the case. (CR 355-356).  On May 6, 1999, the court granted the motion.  (CR 380; Exhibit 7: Docket Sheet).  On June 9, 1999, the trial court overruled trial counsel's motion for new trial.  (CR 380; Exhibit 7: Docket Sheet).

On July 1, 1999, C.R. Daffern files a Motion to Withdraw from the case.  (CR 366).  On July 8, 1999, the lawyer who filed Mr. Balentine's direct appeal, C.J. McElroy, was appointed to the case.  (CR 380; Exhibit 7: Docket Sheet).   On August 9, 1999, the reporter's record of Mr. Balentine's trial was filed with the district clerk and was made available to counsel of record.  *See*

---

post-conviction the first occasion for raising an ineffective assistance of counsel claim. Likewise Ibarra did not assert, as Mr. Balentine does below, that the trial lawyer's conflict of interest during the motion for new trial rendered him ineffective in those proceedings.

(file-stamped date of August 9, 1999 on Reporter Records Volumes); *see also* (confirmation by telephone call between Assistant District Clerk and Brandt, on July 2, 2012 that Reporter's Record was filed on August 9, 1999, and available that day to counsel of record.).

Thus, Mr. Balentine's motion for new trial was filed by trial counsel, who had a conflict of interest with respect to any ineffective assistance of counsel claim. Moreover, Mr. Balentine remained represented by one of his trial counsel beyond the statutory deadline for submitting evidence in support of the motion. The mandatory statutory deadline for the trial court's final disposition of Mr. Balentine's motion for new trial was on July 5, 1999, but the lawyer who ultimately served as Mr. Balentine's direct appeal counsel was not appointed until 3 days after the deadline. Additionally, the trial record was not available to counsel until more than a month after his appointment. *See* Exhibit 08: Chronology of appointment, withdrawal and substitution of trial and appellate counsel; filing, deadlines and ruling on Motion for New Trial, etc.)

Thus, the very first day that Mr. Balentine was represented by conflict-free counsel with access to the trial record was on August 9, 1999, more than a month after the mandatory deadline for concluding all proceedings related to a motion for new trial in Mr. Balentine's case. It is beyond the realm of possibility that Mr. McElroy could have recognized on the first day of his appointment, without the trial record or conferring with Mr. Balentine, that trial counsel were deficient in their representation *and*, had trial counsel investigated, they would have found evidence of Mr. Balentine's impoverished background, head injuries, mental impairments, and the rest of the mitigating evidence unearthed by federal habeas counsel's extensive social history investigation. But even if such a miraculous epiphany were possible on July 8, 1999, it would have been too late because Texas law provided no basis for introducing new evidence 80 days after the judgement—except in post-conviction proceedings.

Finally, this Court should consider the fact-intensive nature of the ineffective assistance claim at issue.  Clear from the standard of care for social history investigations in capital cases, described throughout this pleading, is that such an investigation cannot be accomplished in 30 days or 40 days (if one includes the 10 days post-filing for presenting evidence in support of the motion). As described, *infra*, some of the few social history records collected by trial counsel's investigator were requested on the eve of trial but did not arrive until afterwards.  Without a professionally adequate social history investigation, a defendant cannot plead an ineffective assistance of counsel claim based on trial counsel's failure to conduct a similar investigation because he must identify all of the mitigating evidence that trial counsel should have discovered.  Likewise, a defendant cannot plead this type claim without access to the trial record because, to show prejudice, he must identify for the court the differences between the trial that was and the trial that should have been, and demonstrate a reasonable probability of a different outcome based on the totality of the evidence. *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (when assessing the prejudice from counsel's omissions, courts must "evaluate the totality of the evidence—'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].'") (quoting *Williams v. Taylor*, 529 U.S. 361, 397–398 (2000)).  Even if it were possible to conduct a professionally reasonable social history investigation in less than 30 days, meeting this burden of pleading without the trial record is impossible.

"[A]n accused will often not realize that he has a meritorious ineffectiveness claim until he begins collateral review proceedings, particularly if he retained trial counsel on direct appeal." *Kimmelman v. Morrison*, 477 U.S. at 378.  Mr. Balentine could not have known that he had a viable ineffective assistance of counsel claim based on trial counsel's failure to adequately prepare for the punishment phase until conflict-free counsel (1) evaluated the trial record; and, (2) investigated Mr. Balentine's social history to ascertain whether there was a sufficient basis for pleading prejudice,

*i.e.* identifying the specific mitigating evidence that should have been discovered and presented.  *See Smith v. State*, 286 S.W.3d at 340–41 (to receive a hearing on a motion for new trial alleging ineffective assistance of counsel, a movant must "allege sufficient facts from which a trial court could reasonably conclude ***both*** that counsel failed to act as a reasonably competent attorney ***and*** that, but for counsel's failure, there is a reasonable likelihood that the outcome of his trial would have been different.") (emphasis in original).

While a motion for new trial might present a theoretically possible avenue for raising some claim of ineffective assistance of trial counsel in some Texas cases, *see Ibarra*, 2012 WL 2620520, at *4, it was simply impossible to file the ineffective assistance claim at issue here under the circumstances of Mr. Balentine's case.  Mr. Balentine was represented by trial counsel during the motion for new trial proceedings, thus an actual conflict of interest precluded presentation of claim.  Alternatively, even if it is true—as Respondent asserted before the Supreme Court—that Texas defendants have two bites at the apple because they can allegedly raise fact-intensive, extra-record ineffectiveness claims either on direct review through a motion for new trial or in post-conviction proceedings, Mr. Balentine was saddled with ineffective counsel for ***both*** proceedings.  An actual conflict of interest rendered trial counsel ineffective during the motion for new trial and, as demonstrated above, Mr. Balentine's state habeas counsel was also ineffective.  Thus, regardless of which proceeding the Fifth Circuit ultimately concludes is the "first occasion" for raising an ineffectiveness claim in Texas, Mr. Balentine can demonstrate cause.

In *Martinez*, the Arizona's Supreme Court's directive that prisoners not raise their Sixth Amendment claims on direct appeal meant that post-conviction proceedings were "the first occasion to raise a claim of ineffective assistance at trial."  Here, the circumstances of the case also meant that post-conviction proceedings were "the first occasion to raise a claim of ineffective assistance at

59

trial." The result is the same: *Martinez* applies to the case at bar. *See e.g. Arthur v. Thomas*, 2012 WL 2357919, slip. at *9 (N.D. Ala. June 20, 2012) (distinguishing, for *Martinez* purposes, between cases in which petitioners receive new counsel for direct appeal).

### B.     Mr. Balentine's underlying ineffective-assistance-of-trial-counsel claim is a substantial one and has sufficient merit to satisfy the predicate showing described in *Miller-El v. Cockrell*, 537 U.S. 322 (2003).

Mr Balentine's social history is replete with "classic mitigation elements"[106] that could have persuaded a juror to answer "yes" to the mitigation special issue. But, as recounted above, the claim has been defaulted at every turn despite undersigned counsel's best efforts to secure review. The claim below, and the Court's refusal to review it, is evidence of the very real and substantial harm from Mr. Birdsong's deficient representation.

Mr. Balentine now faces execution for the third time having been denied one full and fair review of his claim. *See* Third (3rd) Warrant of Execution for August 22, 2012, *State v. Balentine*, No. 39,532-D (320th Dist. Ct. Potter County April 12, 2012). The chain of events that led to this day is plain. Mr. Balentine was saddled with state habeas counsel who "did not know . . . that a state habeas proceeding is not another direct appeal"[107] and did not perform the duties of state habeas counsel. Nor did state habeas counsel appreciate that his actions would also end Mr. Balentine's opportunity for federal habeas corpus review: "I did not having a working knowledge, at the time of my appointment to represent Mr. Balentine, of procedural default law and the complexities of its

---

[106]     USDC Doc #53:  Magistrate's Report  at 29, *Balentine v. Quarterman*, No. 2:03-cv-00039 (N.D. Tex. September 27, 2007).

[107]     Exhibit 1: Kent Birdsong  ¶ 9 [also reproduced in Third State Application, as Exhibit 24].

application to claims as a case made its way through various state and federal court proceedings." Exhibit 1: Kent Birdsong Affidavit at ¶ 8 [also reproduced in Third State Application, as Exhibit 24]. As a result, though his case has been at the center of protracted litigation about federal habeas corpus procedural rules, all habeas corpus review of Mr. Balentine's right to the effective assistance of counsel has been lost through no fault of his own.

Mr. Balentine summarizes here his until-now defaulted ineffective-assistance-of-counsel claim to demonstrate that it has substantial merit.

### 1. The prevailing standard of care at the time of Mr. Balentine's trial mandated that the defense conduct a thorough social history.

There can be no doubt that under the prevailing standard of care at the time of Mr. Balentine's trial, trial counsel had a clear and unequivocal duty to conduct a thorough social history investigation and that their failure to do so, constituted deficient performance.

Authorities of every stripe, Texas Court of Criminal Appeals' opinions, as well as U.S. Supreme Court cases confirm that by the late 1990's, trial counsel's duty to conduct a comprehensive inquiry into the client's life and background when preparing to defend a capital case was well-settled. For example, the State Bar of Texas 20th Annual Advanced Criminal Law Course took place in July of 1994, five years before Mr. Balentine's trial. Materials distributed at the State Bar course included a primer on defending capital cases at the sentencing phase. Exhibit 9: *Capital Sentencing Strategy: A Defense Primer*, July 1994 ("1994 State Bar Materials"). The materials reflect the expectation that defense counsel conduct a searching life history investigation:

> A thorough intergenerational life history ***must*** be developed, incorporating all life history documents and interviews with all first and second degree relatives, friends, [and] peers. As relatives with histories of relevant physical illnesses (diabetes, endocrine/hormonal, and neurological) and mental illnesses are identified, obtain

their medical and life history documents.

Exhibit 9:  1994 State Bar Materials at 17–18 (emphasis added).  The standard of care required that the defense team search for all potentially relevant mitigating circumstances because the then-relatively new mitigation special issue made explicit that "underlying about the circumstances of the underlying offense (or other prior bad acts), the defendant's character, and the defendant's record (read 'history') is relevant to the jury's final determination of the issue."  *Id.* (emphasis in the original).

According to the 1994 State Bar Materials, an appropriate effort in collecting life history documents encompasses: birth certificates; birth records; prenatal records; church records; school records; educational records; childhood photographs; medical records; mental health records; work records; jail, court, and police records for family members; civil proceedings records; marriage records; social service agency records; Texas Youth Commission records; juvenile records; parole and probation records; military records; records from prior offenses (including attorney, jail, prosecution, court, and media records); records related to every co-defendant (including court, prosecution, jail, and attorney records); prison records; and prosecution records.  *Id.* at 18–21.

The 1994 State Bar Materials specifically instructed counsel to inquire into a broad range of topics, including:

A.    sexual and physical abuse;
B.    medical care, education, and nutrition;
C.    difficulty reading, speech impediments;
D.    nightmares, sleep disturbances, fear of the dark;
E.    withdrawal, quietness, shyness;
F.    rocking, biting, head banging during early childhood;
G.    anxiety, nervousness, crying,
H.    superstitions;
I.    fears;
J.    the parents' socio-economic history;
K.    client and family physical illness and disabilities;

62

L.  client and family mental illness and/or mental retardation;
M.  family history of suicide;
N.  a detailed drug and alcohol history, including age first used, frequency, amounts, effects, and so forth.

*Id*. at 17–21.

The 1994 State Bar Materials training resources were hardly cutting-edge material. They merely conformed to the national capital defense norms in place since the mid-1980's. *See e.g.* David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, The Champion, Aug. 1986, at pp. 16–17 ("Upon appointment to a capital case, two concurrent investigations should be begun by separate and distinct investigatory personnel . . . . A social history is a complete chronicle of every event of any significance in the life of the client from birth, or even before, to the present . . . . Without a complete social history, any psychological examination is incomplete and the resulting opinions, conclusions, or diagnoses are subject to severe scrutiny."); *see also id*. at 16 ("[A]ttorneys are not trained in . . . dealing with the psycho-social problems of their clients and explaining these to the jury. Because of this, it is necessary for attorneys in capital cases to recognize at the beginning that the do not have they skills to accomplish the goals of mitigation and to go and seek the assistance of psycho-social professionals who are skilled in these fields. For all practical purposes, the effective use of social workers, psychologists, and psychiatrists is necessary for the effective representation of a capitally-charged defendant.").

Decisions of the Texas Court of Criminal Appeals applying *Strickland* to cases tried in the mid-1990's confirm that the 1994 State Bar Materials accurately described the prevailing standard of care in Texas. For example, in *Ex parte Gonzales*, 204 S.W.3d 391, 393–96 (Tex. Crim. App. 2006), concerned with a trial that occurred in 1997, two years before Mr. Balentine's trial, the CCA held that trial counsel were deficient for not investigating whether there was a history of child abuse.

63

The CCA noted that the Supreme Court had made clear in *Penry v. Lynaugh*, 492 U.S. 302 (1989),

that the pre-1991 Texas sentencing statute violated the Eighth Amendment when it precluded

consideration of mitigating evidence beyond the scope of the special issues.  In a footnote, the court

catalogued numerous cases tried under the former statute in which counsel had investigated and

presented mitigating evidence.  *Gonzales*, 204 S.W.3d at 396 n.32.

In 1991, the Texas capital sentencing "statute was amended to comprise a much broader

range of mitigating evidence, namely, 'all of the evidence, including the circumstances of the

offense, the defendant's character and background, and the personal moral culpability of the

defendant.'" *Id.* at 397 (footnote omitted).  According to *Gonzales*, courts must assess counsel's

preparation for the punishment phase in light of this development.  Relevant mitigating evidence

clearly included "the defendant's childhood and his physical and mental health." *Id.*

Judge Cochran wrote a concurring opinion in *Gonzales* further clarifying the applicable

professional norms.  "[D]efense counsel must fully investigate any and all potential mitigating

circumstances in his client's background which might conceivably persuade a jury not to impose

the death penalty." *Ex parte Gonzales*, 204 S.W.3d at 400 (Cochran, J., concurring) (emphasis

added).  Judge Cochran—like the 1994 State Bar Materials—emphasized that counsel's duty to

investigate encompassed, at a minimum, a duty to inquire into specific areas of potential mitigation:

> Under both current Supreme Court standards and Texas statutes, defense counsel has
> a constitutional duty to seek out all of the 'circumstances of the offense, the
> defendant's character and background, and [any evidence that lessens] the personal
> moral culpability of the defendant[.]'  At a minimum, defense counsel must privately
> quiz his client about any and all positive and negative facts about the defendant's
> upbringing, personality, social interactions, thoughts and feelings....  Like a doctor,
> defense counsel must be armed with a comprehensive check-list of possibilities, and
> forcefully inquire about each topic.  Such topics might include:
>
> 1.      Childhood accidents and injuries;
> 2.      Trips to the emergency room;

3.      Serious illnesses at any time;

4.      Physical abuse to the defendant or any other member of the family;

5.      Any sexual abuse to the defendant or any other member of the family;

6.      Size of the immediate family, and a history of the physical, educational, and emotional background of each member;

7.      The defendant's relationship with and attitudes toward every member of the family;

8.      Drug or alcohol use or abuse by himself and any or all members of the family;

9.      Any mental health treatment of any member of the family, including the defendant;

10.    The cohesiveness of the family;

11.    The family's standard of living and living conditions;

12.    Any and all available school records;

13.    Any record of learning disabilities;

14.    Childhood and adult social relationships with members of the same and opposite sex;

15.    Any marriage, divorce, children, step-children, or surrogate family relationships, and their positive or negative influence upon the defendant;

16.    Any and all awards, honors, or special accomplishments, as well as any and all convictions, arrests, expulsions or suspensions from school, job firings, etc.;

17.    Any and all traumatic experiences;

18.    Any and all especially proud moments;

19.    Membership in religious, social, educational, charitable organizations;

20.    The client's five best and worst memories.

*Id*. at 401.

The Supreme Court has indeed recognized that well before Mr. Balentine's trial the prevailing professional norms required trial counsel to conduct a thorough life history investigation. In *Wiggins v. Smith,* a case that was tried in 1989, the Court found that trial counsel's performance was deficient because counsel failed to investigate a plethora of mitigating evidence that was available at the time of trial. *Wiggins*, 539 U. S. 510 (2003). Drawing upon the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the Supreme Court's stated:

> Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred as 'guides to determining what is reasonable.' *Strickland, supra,* at 688, 104 S.Ct. 2052; *Williams v. Taylor, supra,* at 396, 120 S.Ct. 1495. The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' ABA

65

Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf. *id.,* 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4–55 ('The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing . . . . Investigation is essential to fulfillment of these functions').

539 U.S. at 524-525 (emphasis in original).[108]

Viewing the work of Mr. Balentine's lawyers through this lens, it is plain that his lawyers ceased investigating mitigation when, like Mr. Wiggins' attorneys, they "acquired only rudimentary knowledge of his history from a narrow set of sources." By any measure of effective attorney performance in relation to the sentencing phase of a capital case, Mr. Balentine's lawyers performed deficiently.

> **2.** **Mr. Balentine's initial trial counsel—who departed the case before trial because he was ethically precluded from representing Mr. Balentine—did not conduct any penalty phase investigation during the eight months he represented Mr. Balentine.**

On August 26, 1998, John Balentine was indicted for capital murder in the shooting deaths of three men, one of whom, Mark Caylor, was the brother of Mr. Balentine's estranged girlfriend. When Mr. Balentine was arrested, he confessed to the murders and told officers that Mark Caylor had made threats against him. (RR 22:131-141).

---

[108]    *See also Porter v. McCollum*, 130 S.Ct. 447, 454 (2009) ("It is unquestioned that under the prevailing professional norms at the time of Porter's [1988] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'") (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

The trial court appointed James Durham and Paul Herrmann, to represent Mr. Balentine. Until two days prior to the appointment, Mr. Hermann had been an assistant district attorney, and according to a recusal motion filed by the prosecution, he had participated in the capital murder prosecution against Mr. Balentine. Two weeks before jury selection began, Mr. Herrmann withdrew in response to the state's motion, and the court appointed Randy Sharrod as substitute counsel. (CR 1:9-10; 220).

No life history investigation or any other mitigation or penalty phase-related investigation was conducted during this period of time.

### 3. Other than initiating several record requests a week before trial, the defense did not conduct any life history investigation in preparation for the penalty phase of Mr. Balentine's trial.

In September, 1998, trial counsel sought and the court granted funds for an investigator and expert to "conduct the necessary scientific examinations of the evidence in this case . . . ." CR 1:6, 18, 194. An investigator was retained, but he did not conduct any guilt phase or penalty phase investigation and was later replaced. The defense did not file any requests for, and did not retain, a mitigation specialist or mental health expert to evaluate Mr. Balentine's mental condition or determine whether he suffered from mental or cognitive deficits.

Two weeks before jury selection began, defense counsel retained Kathy Garrison, as the sole investigator for both the guilt and penalty phases of the trial. CR 1:219; Exhibit 10: Kathy Garrison Affidavit [also reproduced in Third State Application, as Exhibit 10]. Ms. Garrison was not provided any investigative reports from the previous investigator, and her only opportunity to confer with trial counsel and Mr. Balentine were "during breaks in the trial and after hours." *Id.* Despite these constraints, trial counsel did not request a continuance.

Ms. Garrison spent most of her time reviewing files and police reports, contacting the state's guilt phase witnesses, and assisting defense counsel during the guilt/innocence phase of the trial. Exhibit 11: Jim Patterson, Investigations: Garrison Bill for Investigative Services [also reproduced in Third State Application, as Exhibit 11]. During the week immediately preceding the beginning of testimony, she spent two days making phone call in an attempt to locate and obtain Mr. Balentine's school and medical records. However, many of these records were not received until after trial was over. Exhibit 10: Kathy Garrison Affidavit [also reproduced in Third State Application, as Exhibit 10]. On Friday of that week, she spent 2 hours and 40 minutes attempting to locate "missing witnesses." Exhibit 11: Jim Patterson, Investigations: Garrison Bill for Investigative Services [also reproduced in Third State Application, as Exhibit 11].

Ms. Garrison did not contact any of Mr. Balentine's immediate family or other relatives, many of whom still lived in Newport, Arkansas where Mr. Balentine grew up.[109] Nor did she interview anyone else (other than Mr. Balentine) who was familiar with his life history, family background, educational background or cognitive and mental development.

From April 12 through April 16 of 1999, Ms. Garrison attended the guilt phase of the trial and assisted the attorneys. Except for the record collection, no life history investigation was conducted, and there was no follow-up to the information contained in the few records that were obtained before or during the trial.

---

[109]    *See* Exhibit 12: Jane McHan Affidavit, with Interview Summary Exhibits A (Clara Smith, mother), B (Eric Smith, half-brother), C (Angelique Watson, mother of John Balentine's son), D (Lynn Rowe, half-brother) [also reproduced in Third State Application, as Exhibit 12]. *See also* Exhibit 13: Jane McHan Affidavit (Social History Affidavit) [also reproduced in Third State Application, as Exhibit 13].

**4.      At the penalty phase of Mr. Balentine's capital trial, defense counsel rested without presenting any evidence.**

The penalty phase began and ended on April 19, 1999.  The state introduced Mr. Balentine's criminal history in support of an affirmative answer to the "future dangerousness" special issue and rested mid-morning.  Thereafter, the defense rested without calling any witnesses.  (RR 26:80; CR 1:379).

The jury instructions included two special issue—the future dangerousness question and the mitigation special issue which asks:

> Do you find from the evidence, taking into consideration all of the evidence, including circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(CR 1:329).

In its closing statement, the prosecutor emphasized Mr. Balentine's criminal record and the circumstances of the crime to support a finding of future dangerousness.  With regard to the second special issue, he argued:  "There are no mitigating circumstances . . . that warrant a life sentence . . . ."  (RR 26:92).

In the defense closing, counsel returned to the same argument it made at the guilt phase—that the inept police investigation raised reasonable doubt about guilt, this time arguing that reasonable doubt about guilt called for a life sentence.

Following penalty phase closing arguments, the jury returned a verdict that required imposition of the death penalty, finding that there was a probability that Mr. Balentine would be a danger in the future and that there were no mitigating circumstances that warranted a life sentence.  (CR 1:328-329).

69

**5.      A life history investigation conducted during Mr. Balentine's federal habeas proceedings revealed "substantial" mitigating evidence that was available during trial and post-conviction proceedings sufficient to show a reasonable probability that but for trial counsel's failure to conduct such an investigation, Mr. Balentine would have been sentenced to life instead of death.**

A life history investigation conducted during Mr. Balentine's federal habeas proceedings revealed an abundance of mitigating factors supporting a life sentence that would have been available at the time of trial and during the initial post-conviction proceedings, but for trial and post-conviction counsel's failure to look for it.  This evidence was summarized by the Magistrate Judge in Mr. Balentine's habeas proceedings:

> The mitigation evidence identified by petitioner was developed during this federal habeas proceeding, and includes the following: (1) Balentine's impoverished background did not meet his basic needs; (2) Balentine's neighborhood was poor, dangerous and filled with racism against African-Americans, and his environment growing up was overflowing with crime, drugs and racial tension; (3) Balentine's mother had limited abilities, married abusive husbands, suffered head injuries in a car wreck resulting in mental problems, and struggled to support her children requiring her to be absent from home in order to work; (4) Balentine's father and stepfather were violent and abusive with his mother, his stepfather was verbally, emotionally and physically abusive with both his wife and the children, and other family members committed acts of violence in his presence; (5) the men in Balentine's life were negative role models, one of which attempted to sexually abuse Balentine when he was seven or eight years old; (6) Balentine suffered an untreated head injury when he was six years old, wet the bed until he was ten years old, and was hit in the head by a rock while mowing the lawn; (7) Balentine suffered from learning problems, including difficulty with his speech, math and reading, demonstrated impulsivity, poor decision making, and difficulty thinking about the consequences of his actions, felt stupid because he was in Special Education and dropped out of high school in the eleventh grade; (8) Balentine's siblings demonstrated learning disabilities that were not properly addressed; (9) Balentine suffered from emotional problems, such as inappropriate emotions, a strange sense of humor, sudden unexplained panic, seeing ghosts, and believing that the ghost of his father sometimes inhabited his body; (10) Balentine's family distrusted official authority, such as the police, whom they regarded as racist and unhelpful, and his family frequently took the law into their own hands to deal with crimes rather than reporting anything to the police; and (11) Balentine developed an exaggerated sense of justice and desire to deal with perceived injustices. Petitioner contends there was mitigation evidence regarding the threats that precipitated these murders that he claims were not adequately investigated and

presented to the jury.

> In addition to the classic mitigation elements identified above, petitioner contends there was positive character evidence available that was not presented at his trial, such as (1) petitioner's skills as a mechanic and handy-man, which he used to help others without compensation, (2) his friendly nature, good sense of humor, and kindheartedness towards others, (3) his respectfulness towards others, (4) his honesty, and (5) his good conduct in class.

USDC Doc #53:  Magistrate Report, at 27-29 (citations omitted).

This evidence tracked the kind of evidence the Supreme Court has repeatedly found to warrant a finding of prejudice in penalty phase ineffective assistance of counsel claims.  *See, e.g., Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000).  During the initial review of this case, the magistrate judge stated that "the omission [of trial counsel to present the mitigating evidence described in the federal habeas petition], if in fact it was an omission, presents a ***substantial*** question."  USDC Doc #53:  Magistrate Report at 31.  Thus, he has already concluded that Mr. Balentine satisfies the second prong of the *Martinez* test.

* * * *

Relieving Mr. Balentine of the Court's prior final judgment and assessing his argument for cause under *Martinez* will not be a futile gesture.

71

IV.   **The unique and extraordinary circumstances of this case compel relief under Fed. R. Civ. P. 60(b)(6).**

A.   **Rule 60(b)(6) relief is available to Mr. Balentine.**

FED. R. CIV. PROC. 60(b) provides in pertinent part:

(b)   Grounds for Relief from a Final Judgment, Order, or Proceeding.  On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
. . . .

(6)   any other reason that justifies relief.

In *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396 (5th Cir. 1981), the Fifth Circuit described the role and purpose of Rule 60(b) in our civil justice system:

The purpose of Rule 60(b) is to delineate the circumstances under which relief may be obtained from the operation of final judgments, whether they are entered by default, *see* Fed.R.Civ.P. 55(C), or otherwise.  By its very nature, the rule seeks to strike a delicate balance between two countervailing impulses: the desire to preserve the finality of judgments and the "incessant command of the court's conscience that justice be done in light of all the facts."  []

In this light, it is often said that the rule should be liberally construed in order to do substantial justice.  []  What is meant by this general statement is that, although the desideratum of finality is an important goal,[110] the justice-function of the courts demands that it must yield, in appropriate circumstances, to the equities of the particular case in order that the judgment might reflect the true merits of the cause.  []  . . . [T]here can be little doubt that Rule 60(b) vests in the district courts power "adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice."  *Klapprott v. United States*, 335 U.S. 601, 614-15, 69 S.Ct. 384, 390, 93 L.Ed. 266 (1949); *Menier v. United States*, 405 F.2d 245, 248 (5th Cir. 1968); *Bridoux v. Eastern Air Lines, Inc.*, 214 F.2d 207, 210 (D.C.Cir.1954).

---

110   Justice Scalia has subsequently clarified that the state's interest in finality should be accorded little weight when assessing the equities of a Rule 60(b) motion: "The mere recitation of [the 60(b)] provisions shows why we give little weight to respondent's appeal to the virtues of finality.  That policy consideration, standing alone, is unpersuasive in the interpretation of a provision whose whole purpose is to make an exception to finality."  *Gonzalez v. Crosby*, 545 U.S. 524, 529 (2005).

Motions under Rule 60(b) are directed to the sound discretion of the district court, and its denial of relief upon such motion will be set aside on appeal only for abuse of that discretion. *Fackelman v. Bell*, 564 F.2d at 736. . . . ***[W]here denial of relief precludes examination of the full merits of the cause, even a slight abuse may justify reversal*.** [] In sum, then, Rule 60(b) is "a grand reservoir of equitable power to do justice in a particular case," *see Menier v. United States*, 405 F.2d at 248, that may be tapped by the district court in the sound exercise of its discretion, and within the strictures inherent in the underlying objectives of the rule.

*Id*. at 401–02 (citations omitted) (emphasis supplied).

The Fifth Circuit "applies Rule 60(b) 'most liberally to judgments in default . . . [because] . . . [t]runcated proceedings of this sort are not favored . . . . Thus, unless it appears that no injustice was done by the judgment, the equities in such cases will militate strongly in favor of relief.'" *Harrell v. DCS Equipment Leasing Corp.*, 951 F.2d 1453, 1459 (5th Cir. 1992) (quoting *Seven Elves*, 635 F.2d at 403) (emphasis supplied); *Halicki v. La. Casino Cruises, Inc.*, 151 F.3d 465, 471 (5th Cir. 1998). In a default case, "[t]he absence of injustice is clear when the movant is unable to show the existence of a defense of sufficient merit to indicate the possibility that the outcome would differ upon retrial." *Seven Elves*, 635 F.2d at 403.

"In simple English," Rule 60(b) vests power in courts "adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klaprott v. United States*, 335 U.S. 601, 615 (1949). The Rule is "simply the recitation of pre-existing judicial power" to set aside judgments which are unfair. *Plaut v. Spendthrift Farm Inc.*, 514 U.S. 211, 234–235 (1995). "Rule 60(b) . . . reflects and confirms the courts' own inherent and discretionary power, 'firmly established in English practice long before the foundation of our Republic,' to set aside a judgment whose enforcement would work inequity." *Id*. at 233–234 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944)).

73

District courts have jurisdiction to consider Rule 60(b) motions in habeas proceedings so long as the motion neither raises a new claim for habeas relief nor "attacks, not the substance of the federal court's resolution of a claim on the merits, but [instead challenges] some defect in the integrity of the federal habeas proceedings." *Gonzalez v. Crosby*, 545 U.S. at 532. Justice Scalia, writing for the *Gonzalez* Court, explained that there is no new habeas claim "when [a petition] merely asserts that a previous ruling which precluded a merits determination was an error—for example, a denial for such reasons as failure to exhaust, ***procedural default***, or statute-of-limitations bar." *Id*. at 532 n. 4 (emphasis added). Thus, the Court determined that Mr. Gonzalez' motion pursuant to Rule 60(b)(6), "which allege[d] that the federal courts misapplied the federal statute of limitations set out in § 2244(d), fits this description." *Gonzalez*, 545 U.S. at 533 (footnote omitted).

The Fifth Circuit has subsequently noted that district courts have jurisdiction to decide 60(b) motions which address the issues specifically identified by the *Gonzalez* Court as within the auspices of Rule 60(b):

> The federal district court's previous denial of [the Petitioner's] claim was not 'on the merits.' That is, the district court did not rule that there were no grounds entitling [the Petitioner] to habeas corpus relief under 28 U.S.C. §§ 2254(a) and (d), but rather denied relief based on procedural default and failure to exhaust, two rulings specifically identified by the [*Gonzalez*] Court as rulings precluding a merits determination. So the district court had jurisdiction to consider [the Petitioner's] Rule 60(b) motion, free of the jurisdictional constraints of AEDPA upon successive petitions.

*Ruiz v. Quarterman*, 504 F.3d 523, 526 (5th Cir. 2007). Because Mr. Balentine seeks to reopen this Court's judgment regarding a procedural default there is no question that this Court has jurisdiction to entertain Mr. Balentine's motion. The Fifth Circuit has already determined that Mr. Balentine raised his ineffective assistance of trial counsel claim in his first federal petition and that a Rule 60(b) motion seeking relief from the procedural default that barred merits review of the claim is not barred

74

by the AEDPA. *Balentine v. Thaler*, 626 F.3d 842, 849 (5th Cir. 2010) ("Thus, Balentine's federal habeas application stated a Sixth Amendment ineffective assistance of counsel claim, and the Rule 60(b) motion does not present a new habeas claim barred by AEDPA.").

To obtain relief from a judgment under Rule 60(b)(6), a movant must show the existence of "extraordinary circumstances." *Gonzalez*, 545 U.S. at 536. The unique circumstances of this case warrant relief under Rule 60(b)(6).

> **B.     The advent of *Martinez*, Mr. Balentine's uncommon due diligence, and the merit of his underlying claims are extraordinary circumstances which, along with the factors identified as relevant by the Fifth Circuit, warrant relief from the judgement procedurally defaulting Mr. Balentine's IAC of trial counsel claim.**

The law of the Fifth Circuit is clear: "[w]e do not hold that a change in decisional law can *never* be an extraordinary circumstance." *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 748 n.6 (5th Cir. 1995) (emphasis in the original). A supervening change in the law, in addition to other factors, can present extraordinary circumstances sufficient for Rule 60(b)(6) relief. *Bailey v. Ryan Stevedoring Co., Inc.*, 894 F.2d 157, 160 (5th Cir. 1990) ("A change in decisional law . . . is not *alone* grounds for relief from a final judgment.") (emphasis added). *See also Ritter v. Smith*, 811 F.2d 1398, 1401 (11th Cir. 1987) (same); *Wisecup v. James*, 790 F.2d 841 (11th Cir. 1986) (same); *Wilson v. Fenton*, 684 F.2d 249, 251 (3d Cir. 1982) (same). Not every change in law relevant to a district court judgment will rise to the level of extraordinary circumstances. *Ritter*, 811 F.2d at 1401 (noting that something more than a "mere" change in law must be present to establish extraordinary circumstances"). However, the Supreme Court has strongly suggested that the combination of a sea-change in the law and, as here, a petitioner's dogged diligence warrants relief pursuant to Rule 60(b)(6).

75

**1.      While not every change in decisional law *alone* is an extraordinary circumstance, *Martinez* was a stunning reversal of two-decades of Supreme Court and homogeneous circuit precedent.**

In *Gonzalez v. Crosby*, the Supreme Court upheld a district court's denial of Rule 60(b)(6) relief premised on a post-judgment Supreme Court decision in a different case that contradicted the district court's application of the statute of limitations to deny Gonzalez's habeas corpus petition. In Gonzalez's habeas corpus proceeding in federal court, the district court, applying Eleventh Circuit precedent interpreting the statute of limitations applicable to habeas corpus petitions (28 U.S.C. § 2244(d)(2)), had held that Gonzalez's state post-conviction application had not been "properly filed" within the meaning of that provision because the state court had dismissed it on procedural grounds and that the pendency of that application therefore did not toll the federal limitations period.  545 U.S. at 527.  Subsequently, the Supreme Court decided *Artuz v. Bennett*, 531 U.S. 4 (2000), and held that a state habeas petition may be "properly filed"—and hence toll the limitations period—even if it is dismissed by the state court on procedural grounds.  545 U.S. at 527.  After *Artuz* was decided, Gonzalez filed a motion for relief from the judgment pursuant to Rule 60(b)(6), which the district court denied.  *Id*.

The Supreme Court upheld the district court's denial on the ground that extraordinary circumstances were not present.  Observing that "not *every* interpretation of the federal statutes setting forth the requirements for habeas provides cause for reopening cases long since final," 545 U.S. at 536 (emphasis added), the Court held that the particular legal decision that Gonzales relied upon to justify granting relief from his judgment did not amount to extraordinary circumstances for two reasons.

First, the *Artuz* decision was not an extraordinary circumstance because the Supreme Court had merely addressed an unsettled legal question of statutory interpretation that differed from the

appellate court's then-prevailing interpretation.  *Id.*; *see also United States ex rel. Garibaldi v. Orleans Parish School Bd.*, 397 F. 3d 334, 338 (5th Cir. 2005) (Supreme Court's resolution of open and unsettled circuit split not in itself an extraordinary circumstance).  Second, Gonzalez's own conduct evidenced that the announcement of *Artuz* was not extraordinary, because Gonzalez failed to pursue review of the limitations issue on appeal and before the Supreme Court, despite the Eleventh Circuit's precedent on the issue having been "at odds with the rule in several other Circuits."  *Gonzalez*, 545 U.S. at 537.  The Court observed that Gonzalez had not filed a *certiorari* petition to challenge the district court's judgment, even though the Supreme Court had granted *certiorari* in *Artuz* before Gonzalez's time for filing a *certiorari* petition had expired.  *Id.* at 537, n.10.  In short, the Supreme Court's mere resolution of an open circuit split on an unsettled legal question of statutory interpretation for which Gonzalez had time to, but did not, take advantage while his federal habeas corpus case was still on direct review was not an extraordinary circumstance warranting relief from his judgment.

Unlike *Artuz*, the change in law wrought by *Martinez* did not simply settle an open question of statutory interpretation or merely extend law in a way that contradicts this Court's prior judgment. It represents a reversal of what was understood by all parties to be settled law—both in all circuits **and** the Supreme Court—regarding the unavailability of the ineffectiveness of state post-conviction counsel to serve as cause for procedurally defaulted habeas corpus claims.  The Supreme Court expressly understood *Martinez* to have carved out an exception to a rule that the Court **itself** had created over twenty years earlier in *Coleman*, *supra*.  *Martinez*, 132 S.Ct. at 1319.

Indeed, the Supreme Court's dramatic departure from settled precedent sparked a particularly heated dissent decrying the Court's disregard for the principle of *stare decisis*.  *See id.* at 1324 (Scalia, J., dissenting) ("today's holding is . . . a repudiation of the longstanding principle governing

procedural default, which *Coleman* and other cases consistently applied"); *id*. at 1325 ("The Court essentially disclaims any need to give full consideration to the principle of *stare decisis* . . . ."); *id*. ("Had the majority seriously considered the relevant *stare decisis* factors . . . it would have had difficulty justifying today's decision."); *id*. ("Equity is not lawlessness, and discretion is not license to cast aside established jurisprudence reaffirmed this very Term."); *id*. at 1327 (the *Martinez* decision "creates a monstrosity").

Moreover, precisely because the Supreme Court had created the controlling law twenty-one years ago, no circuit split was ever possible: Since *Coleman*, ***every*** court of appeals in the nation had concluded that the legal principle that the ineffective assistance of state habeas counsel cannot constitute cause for procedural default is well-established. *See, e.g., In re Goff,* 250 F.3d 273, 276 (5th Cir. 2001) ("[T]he Supreme Court has ***spoken quite explicitly*** on this subject . . . and has ***repeatedly emphasized*** that ineffective assistance of counsel in a post-conviction proceeding cannot serve as cause to excuse default in a federal habeas proceeding.") (emphasis added); *Irving v. Hargett*, 59 F.3d 23, 26 (5th Cir. 1995) (***Supreme Court has "made it clear"*** that because there is no Sixth Amendment right to counsel in state post-conviction proceedings, a petitioner cannot claim ineffective assistance of counsel in such proceedings to excuse default) (citing *Coleman*, 501 U.S. at 752) (emphasis added); *Jones v. Johnson*, 171 F.3d 270, 277 (5th Cir. 1999) ("***The law is well-established*** . . . that such error committed in a post-conviction application [by state habeas counsel], where there is no constitutional right to counsel, cannot constitute cause.") (emphasis added); *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 75 (1st Cir. 2009) (attribution of cause for procedural default to the ineffective assistance of post-conviction counsel "***easily dismissed***") (emphasis added); *Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir. 2007) (errors by counsel in post-conviction proceedings do not constitute cause for a procedural default); *Hull v. Freeman*, 991 F.2d 86, 91 (3d Cir. 1993)

78

(Under *Coleman*, ineffective assistance of post-conviction counsel cannot constitute cause for default); *Smith v. Angelone*, 111 F.3d 1126, 1133 (4th Cir. 1997) (under *Coleman*, federal habeas petitioner cannot claim ineffective assistance of state habeas counsel, or claim that counsel's errors were cause for procedural default); *Byrd v. Collins*, 209 F.3d 486, 516 (6th Cir. 2000) (*Coleman* held that ineffective assistance of post-conviction counsel cannot constitute cause); *Szabo v. Walls*, 313 F.3d 392, 397 (7th Cir. 2002) ("***[I]t is settled as a matter of federal law*** that poor post-conviction lawyering does not relieve a prisoner of what is otherwise a forfeiture under state law.") (emphasis added); *Wooten v. Norris*, 578 F.3d 767, 778 (8th Cir. 2009) ("***It is well established*** that ineffective assistance of counsel during state post-conviction proceedings cannot serve as cause to excuse factual or procedural default.") (emphasis added); *Smith v. Baldwin*, 510 F.3d 1127, 1146-47 (9th Cir. 2007) (attorney ineffectiveness in the post-conviction process is not considered cause for the purposes of excusing the procedural default); *Anderson v. Sirmons*, 476 F.3d 1131, 1141 n.9 (10th Cir. 2007) (ineffective assistance of post-conviction counsel cannot excuse a state procedural bar); *Mize v. Hall*, 532 F.3d 1184, 1191 (11th Cir. 2008) ("even grossly ineffective assistance at the collateral review stage . . . does not constitute cause to excuse a procedural default").

This Court—when rejecting Mr. Balentine's arguments for cause predicated on state habeas counsel's ineffective representation—adopted the magistrate's legal conclusion that Mr. Balentine "cannot overcome the ***overwhelming precedent*** applicable to this argument."  USDC Doc #53: Magistrate Report at 22 (emphasis added).

Thus, the Ninth Circuit has reached the indisputable conclusion that *Martinez*'s disruption of the settled state of affairs is a "remarkable" development that weighs in favor of relieving petitioner from judgment:

> The nature of the intervening change of law at issue here differs from the situations at issue in *Gonzalez* and *Phelps*. Here, ***it was settled law*** that post-conviction counsel's effectiveness was irrelevant to establishing cause for procedural default. *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In *Martinez*, 132 S.Ct. at 1315, however, the Supreme Court "qualifie[d] *Coleman* by recognizing a narrow exception." In our view, these circumstances weigh slightly in favor of reopening Lopez's habeas case. Unlike the "hardly extraordinary" development of the Supreme Court resolving an existing circuit split, *Gonzalez*, 545 U.S. at 536, 125 S.Ct. 2641, the Supreme Court's development in *Martinez* constitutes a ***remarkable***—if "limited," *Martinez*, 132 S.Ct. at 1319—development in the Court's equitable jurisprudence.

*Lopez v. Ryan*, 678 F.3d 1131, 1136 (9th Cir. 2012) (emphasis added).[111]

Accordingly, *Martinez*, unlike *Artuz*, represents not merely the settling of an open circuit split but a jurisprudential sea change in federal habeas corpus. *Vicknair v. Formosa Plastics Corp., Louisiana*, 98 F.3d at 839. In one stroke, *Martinez* wiped clear mountains of uniform precedent affirmatively holding that federal habeas petitioners could ***not*** rest cause arguments on the ineffectiveness of state habeas counsel. *See* authorities cited, *supra*. As a result of this "***radical alteration*** of [the Supreme Court's] habeas jurisprudence," *Martinez*, 132 S.Ct. at 1327 (Scalia, J., dissenting) (emphasis added), constitutional claims which previously could not be reviewed on the merits because of deficient representation by state post-conviction counsel in state habeas corpus

---

[111]    The court held that Lopez was not entitled to 60(b) relief based on several critical circumstances that are not present here. First, Lopez was not diligent in pursuing his claim that state habeas counsel ineffective, in fact he had never raised habeas counsel's deficiencies until after *Martinez* was decided. 678 F.3d at 1136. In fact, had previously argued that state habeas counsel ***was diligent***. *Id*. Second, the federal court's prior rejection of his claim did not rest on a procedural default, so there was little connection between *Martinez* and his case. *Id*. at 1137. Even despite these seemingly fatal equities against reopening the judgment, the court stated that "in some ways, the equitable considerations in this case are close." *Id*.

In light of Mr. Balentine's extraordinary diligence in raising the issue of state habeas counsel's ineffectiveness as cause, and the fact that procedural default was the sole basis for dismissing Mr. Balentine's Sixth Amendment claim, *Lopez* reinforces the conclusion that Mr. Balentine is entitled to equitable relief under Rule 60(b)(6).

proceedings pre-*Martinez* now may receive merits review if state habeas counsel's representation can be shown to have been ineffective.

While not every change in decisional law alone is an extraordinary circumstance, *Martinez*'s "repudiation of the longstanding principle[s] governing procedural default" is undoubtedly a "remarkable" development. But the circumstances here are all the more extraordinary because Mr. Balentine has, since first setting foot in a federal court, vigorously pressed his argument that state habeas counsel's deficient performance should establish cause for his ineffective assistance of counsel claim.

> **2.    The *Gonzalez* Court unanimously identified the petitioner's diligence in advocating for the newly established legal rule as a factor in determining whether a change in the law warrants relief from judgment. Mr. Balentine's uncommon diligence weighs in favor of relief from judgment.**

As discussed, *supra*, the *Gonzales* Court focused on the petitioner's conduct of the litigation when assessing whether the equities warranted relief from the judgment:

> The change in the law worked by *Artuz* is all the less extraordinary in petitioner's case, **because of his lack of diligence in pursuing review** of the statute-of-limitations issue. At the time *Artuz* was decided, **petitioner had abandoned any attempt to seek review** of the District Court's decision on this statute-of-limitations issue . . . . **[P]etitioner neither raised that issue in his application for a COA, nor filed a petition for rehearing of the Eleventh Circuit's denial of a COA, nor sought certiorari review of that denial. [] This lack of diligence confirms that Artuz is not an extraordinary circumstance justifying relief from the judgment in petitioner's case**. Indeed, in one of the cases in which we explained Rule 60(b)(6)'s extraordinary-circumstances requirement, the movant had failed to appeal an adverse ruling by the District Court, whereas another party to the same judgment had appealed and won reversal. *Ackermann*, 340 U.S., at 195, 71 S.Ct. 209. Some years later, the petitioner sought Rule 60(b) relief, which the District Court denied. We affirmed the denial of Rule 60(b) relief, noting that the movant's decision not to appeal had been free and voluntary, although the favorable ruling in the companion case made it appear mistaken in hindsight. *See id.,* at 198, 71 S.Ct. 209.

*Gonzalez*, 545 U.S. at 537–38 (emphasis added).

Likewise, the dissenting Justices identified a petitioner's diligence in seeking relief based on a change in the law, along with the probable merit of the underlying claim, as factors militating in favor of Rule 60(b)(6) relief:

> While this type of supervening change in procedural law may not alone warrant the reopening of a habeas judgment, there may be special factors that allow a prisoner to satisfy the high standard of Rule 60(b)(6). For instance, **when a prisoner has shown reasonable diligence in seeking relief based on a change in procedural law, and when that prisoner can show that there is probable merit to his underlying claims, it would be well in keeping with a district court's discretion under Rule 60(b)(6) for that court to reopen the habeas judgment** and give the prisoner the one fair shot at habeas review that Congress intended that he have.

*Gonzalez*, 545 U.S. at 541–42 (Stevens, J., dissenting).

There can be no question about Mr. Balentine's diligence in pressing his claim that state habeas counsel's ineffectiveness should establish cause for the procedural default of his ineffective assistance of counsel claim. Mr. Balentine acknowledged the default and raised the cause argument in his amended federal petition, before the Respondent even raised the default in question. Unlike Mr. Gonzalez, Mr. Balentine continued to press his argument throughout his appeals. In his petition for a writ of certiorari to the Supreme Court, the ***sole*** issue on which Mr. Balentine sought review was whether the deficiencies of his state habeas counsel should bar review of his Sixth Amendment claim. Respondent cannot credibly contest this history of diligence, his opposition to *certiorari* review was that "distilled to its essence Mr. Balentine's claim is nothing more than an improper allegation of ineffective habeas counsel which cannot serve to excuse a default. *Coleman*, 501 U.S. at 752." *Balentine v. Thaler*, Respondent's Brief in Opposition, No. 09-5128 at 13 (filed with SCOTUS Sept. 11, 2009).

Mr. Balentine's diligence, recounted in detail *supra*, extends far beyond his initial federal habeas corpus proceedings. He filed two subsequent habeas corpus applications in the Texas courts,

a Rule 60(b)(6) motion in this Court that was the subject of protracted litigation on appeal, and—within nine days of the grant of *certiorari* in *Martinez*—he initiated proceedings that led to a stay of execution from the Supreme Court and a hold for the decision in *Martinez*.

The differences between this case and *Gonzalez* could not be more stark. First, once clear of his ineffective state habeas counsel, Mr. Balentine raised the issue before every court to which he applied for relief.

Second, the Supreme Court granted *certiorari* in *Artuz* "only eight days after the Eleventh Circuit denied [Mr. Gonzalez] a COA and well within the 90-day period in which petitioner could have sought *certiorari*." *Gonzalez*, 545 U.S. at 538 n.10. Thus, Gonzalez possessed, but by-passed, the opportunity to raise the *Artuz* issue in his petition for *certiorari* during his first federal habeas proceedings. As the Supreme Court noted, had Gonzalez merely raised the *Artuz* issue, the Court would have treated him like similarly-situated petitioners from the Eleventh Circuit: the Court would have granted his petition, vacated the court of appeals' decision, and remanded for reconsideration in light of *Artuz*. *Id*. (citing *Brown v. Moore*, 532 U.S. 968 (2001)).

Instead, Gonzalez altogether by-passed appeal to the Supreme Court. Thus, his case fell squarely within the rule of *Ackermann v. United States*, 340 U.S. 193 (1950):

> Indeed, in one of the cases in which we explained Rule 60(b)(6)'s extraordinary-circumstances requirement, the movant had failed to appeal an adverse ruling by the District Court, whereas another party to the same judgment had appealed and won reversal. *Ackermann*, 340 U.S., at 195, 71 S.Ct. 209.

*Gonzalez*, 545 U.S. at 537–38. In *Ackermann*, the Supreme Court held that Rule 60(b)(6) relief was not available to a petitioner who

> made a considered choice not to appeal, apparently because he did not feel that an appeal would prove to be worth what he thought was a required sacrifice of his home. His choice was a risk, but calculated and deliberate and such as follows a free choice. Petitioner cannot be relieved of such a choice because hindsight seems to indicate to

him that his decision not to appeal was probably wrong, considering the outcome of [a similar] case.

*Ackermann*, 340 U.S. at 211.

The withholding 60(b)(6) relief from Gonzalez is hardly surprising given these circumstances, but has no bearing on Mr. Balentine's case. In contrast to the deliberate by-pass of appellate review at issue in *Gonzales* and *Ackermann*, at every turn Mr. Balentine raised his argument for excusing the default that precluded review of his ineffective assistance of counsel claim. And, unlike Gonzalez, Mr. Balentine could not have received the benefit of the new rule applicable to his case until after the conclusion of his initial federal habeas proceedings. Because Mr. Balentine did everything he could to raise the issue, but *Martinez* post-dates his initial federal proceedings, Mr. Balentine is faultless for the timing of this motion. Pursuant to both opinions in *Gonzalez*, Mr. Balentine's diligence is an extraordinary circumstance that weighs in favor of Rule 60(b)(6) relief.

### 3.    No court has considered Mr. Balentine's ineffective assistance of counsel claims, both have substantial merit.

This Court should also weigh the fact that no court has considered Mr. Balentine's claims that both his trial counsel and state habeas counsel were ineffective and both, as demonstrated *supra*, have substantial merit. In *Seven Elves*, the Fifth Circuit "delineated factors that should inform the district court's consideration of a motion under Rule 60(b)." *Seven Elves*, 635 F.2d at 402. These factors include, "whether if the judgment was a default or a dismissal in which there was no consideration of the merits the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of judgments, and there is merit in the movant's claim or defense . . . ." *Id. See also Gonzalez*, 545 U.S. at 541–42 (Stevens, J., dissenting) ("special factors that allow a prisoner to satisfy the high standard of Rule 60(b)(6)" include "when [the] prisoner can show that there is probable

84

merit to his underlying claims").

"Dismissal of a *first* federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty." *Lonchar v. Thomas*, 517 U.S. 314, 324 (1996) (emphasis in the original); *see also Slack v. McDaniel*, 529 U.S. 473, 483 (2000) ("The writ of habeas corpus plays a vital role in protecting constitutional rights"). As in *Seven Elves, Inc.*, Mr. Balentine was "denied an adequate opportunity to present [his] case by the gross neglect of [his] attorney." *Seven Elves, Inc.*, 635 F.2d at 400–01. Mr. Balentine's state habeas counsel has admitted under oath that he did not comprehend his duties to his client, and both his contemporaneous time sheets and the state application that he ultimately filed on Mr. Balentine's behalf confirm that he did not perform them. Mr. Balentine has an undeniably strong case, pursuant to *Martinez*, for showing cause for the default of his ineffective assistance of trial counsel claim.

Mr. Balentine's underlying Sixth Amendment claim is equally strong. As described above, Mr. Balentine's lead trial counsel was appointed just two weeks before trial, and the defense investigator was hired at the same time. The absence of a professionally reasonable mitigation investigation was not the product of trial strategy (assuming a trial lawyer could ever reasonably forego such an investigation), and it was well below the contemporaneous standard of care in Texas capital cases. The whole defense case for life consisted of "the defense rests." As this Court noted during Mr. Balentine's initial federal habeas proceedings, there was a "substantial" amount of mitigating evidence available to the defense had it been sought. These troubling circumstances demonstrate that whether Mr. Balentine was sentenced to death in violation of the Sixth Amendment is a substantial question.

85

### 4.      The other *Seven Elves* factors weigh in favor Rule 60(b)(6) relief.

The other factors identified by the Fifth Circuit that "should inform the district court's consideration of a motion under Rule 60(b)," 635 F.2d at 402, all weigh in Mr. Balentine's favor. The first, "that final judgments should not lightly be disturbed," *id*., undoubtedly weighs in favor of relief from judgment.  Mr. Balentine has pursued his claims for eight years and the Supreme Court has recently endorsed his argument for cause.  Mr. Balentine is not a recent convert to the position that his claim was defaulted by ineffective state habeas counsel, and has not newly alighted on this argument in the face of an imminent execution.  *See e.g.*, *Lopez v. Ryan*, 678 F.3d at 1136 ("Until the Supreme Court decided *Martinez*, after Lopez's federal proceedings had become final, Lopez had never pursued the theory that he now advances.  In fact, his theory during his federal proceedings was that his PCR counsel had been ***diligent*** in developing his IAC claim.  That theory is obviously contrary to the position that he takes now.") (emphasis in the original).[112]   Thus, given Mr. Balentine's diligence, and the facial merit of his claim that habeas counsel was in fact ineffective, this Court would not be lightly disturbing its prior judgment.[113]

Second, the Fifth Circuit cautions that "the Rule 60(b) motion is not to be used as a substitute

---

[112]      As described more fully below, Beunka Adams was also a post-*Martinez* convert to arguing that state habeas counsel's ineffectiveness may establish cause for a procedural default.  *Compare Adams v. Thaler*, 421 Fed.Appx. 322, 331 (5th Cir. Mar. 31, 2011) ("Adams . . . cannot overcome the procedural default by claiming that his state habeas counsel was ineffective for failing to raise his claims, and in any event ***Adams has not made this argument***.") (emphasis added), *with Adams v. Thaler*, 679 F.3d 312, 316 (5th Cir. 2012) (arguing for the first time in a post-*Martinez* Rule 60(b)(6) motion that the ineffectiveness of his state habeas counsel establishes cause for the default of his ineffective assistance of trial counsel claim).

[113]      Additionally, subsequent to *Seven Elves*, the Supreme Court held that the concerns about finality explicit in the first *Seven Elves* factor are "unpersuasive in the interpretation of a provision whose whole purpose is to make an exception to finality." *Gonzalez*, 545 U.S. at 529.

for appeal." *Id*. Mr. Balentine raised the issues herein at every conceivable opportunity, including on appeal.

Third, Rule 60(b)(6) "should be liberally construed in order to achieve substantial justice." *Id*. Mr. Balentine was sentenced to death in violation of his Sixth Amendment right to counsel, only to be saddled with another state-appointed lawyer who waived Mr. Balentine's only chance to raise the issue. For eight years he has argued that the ineffectiveness of his state habeas counsel caused the procedural default that has, to date, precluded merits review. The State of Texas, responsible in the first instance for appointing ineffective counsel at both the trial and post-conviction stages of the case,[114] has subsequently devoted considerable resources to thwarting federal review of a substantial

---

[114]    The problem of grossly deficient state habeas counsel, for which the Court of Criminal Appeals was responsible, was well-known by the time of Mr. Balentine's state habeas counsel was appointed on October 1, 1999. In early 1999, former Court of Criminal Appeals Presiding Judge Michael McCormick acknowledged in an interview the facial paucity of the work of some lawyers appointed by his court:

Q.    11.071 writs in some cases have some lawyers filing basically very small, very insignificant writs when they haven't interviewed the witnesses, haven't done an investigation. The court has approved those.

A.    *Oh, there have been some, that if I had been an attorney, I would have been ashamed to file. We see those that were caught in the trap*.

Interview with CCA Presiding Judge Michael J. McCormick, 28 VOICE FOR THE DEFENSE 17 (Jan./Feb. 1999) (emphasis added. *See also Nightline* (ABC News television broadcast, Sept. 15, 2000) (interviewing D. Hendrix, Law Clerk, Court of Criminal Appeals, on the quality of Article 11.071 appeals: "And I'll look through a [habeas] writ, and I'll just think, 'Is this all I'm getting because there wasn't anything else, or is this all I'm getting because someone wasn't putting a lot of time into it?'").

Despite knowing early on that it was saddling death sentenced prisoners with inadequate counsel, the Court of Criminal Appeals took no action to remedy the problem. In 2006, responding to on-going concerns about the quality of representation in capital habeas proceedings, the President of the State Bar of Texas appointed a task force to investigate and make recommendations regarding the training and qualifications of counsel appointed in capital habeas cases. After an extensive investigation, the task force issued a report stating:

Sixth Amendment violation.  Indeed, in the last round of proceedings before the Fifth Circuit, the State of Texas mobilized a small army of specialized lawyers from the Postconviction Litigation Division of the Office of the Attorney General **and** the Solicitor General's Office to defeat Mr. Balentine's bid for federal review of his claim.  Had the State of Texas been willing to appoint just one such qualified lawyer for Mr. Balentine's initial state post-conviction proceedings, this case would have been resolved—on the merits—many years ago.  It would be a bizarre form of justice indeed that permits a state to deprive a capitally charged, and subsequently condemned, citizen of competent counsel throughout his trial and state collateral proceedings, only to deploy numerous highly-trained counsel to ensure that no federal court reviews the proceedings.  Substantial justice will only be achieved when Mr. Balentine gets access to a court in order to litigate the merits of his Sixth Amendment claim.

Fourth, there is no question that his motion was made within a reasonable time.  *Id*.  Mr. Balentine could not have filed this motion prior to *Martinez*, which was only decided this year.

Mr. Balentine has addressed the fifth *Seven Elves* factor (the absence of merits consideration and the merit of his claims), *supra*, the sixth is whether, "if the judgment was rendered after a trial on the merits the movant had a fair opportunity to present his claim or defense."  *Id*.  The

---

Until quite recently, the performance of Texas capital habeas lawyers was neither regulated nor monitored by any court or government agency.  Unfortunately, this resulted in a list containing lawyers who were, at best, unqualified to serve as capital habeas counsel and ***at worst, lawyers who . . . filed habeas writs copied verbatim from writs filed in other cases, lawyers who filed writs with absolutely no cognizable claims***, lawyers who were serving suspensions from the practice of law for neglecting their clients and even lawyers who were deceased.

USDC Doc #45, Exhibit A: *State Bar Task Force Report*, at 8 (emphasis added).  As demonstrated *supra*, the State Bar's description of the "worst" describes ***precisely*** what happened in Mr. Balentine's case.

"overwhelming" pre-*Martinez* precedent thwarted any opportunity for presenting Mr. Balentine's claims.

Finally, there are no "intervening equities that would make it inequitable to grant relief."  In fact, the opposite is true.  In the wake of *Martinez*, the few other petitioners who diligently raised ineffective assistance of state habeas counsel as cause for a procedurally defaulted ineffective assistance of trial counsel claim have been granted consideration of their arguments for cause.  *See Cantu v. Thaler*, 132 S.Ct. 1791 (2012) (Mem.) (vacating the lower court decision and remanding for further proceedings in light of *Martinez*);  *Newbury v. Thaler*, 132 S.Ct. 1793 (2012) (Mem.) (same).  The Fifth Circuit remand the *Cantu* case to the district court for further consideration in light of *Martinez*.  *Cantu v. Thaler*, ___ F.3d ___, 2012 WL 1970364, at *1 (5th Cir. June 1, 2012).  In light of these developments, equity would be best served by allowing Mr. Balentine—undoubtedly the most diligent of all litigants pursuing this issue—the same consideration.

5.    ***Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012), does not control the outcome of Mr. Balentine's case.**

Finally, Mr. Balentine anticipates that Respondent will argue, incorrectly, that this Court must deny Mr. Balentine's motion based on the rejection of a 60(b)(6) motion filed—under dissimilar circumstances—by another litigant seeking to invoke *Martinez*.  *See Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012).  Because the circumstances of *Adams* are not similar to Mr. Balentine's case, the decision does not control the outcome of the required, case-specific analysis of whether to grant equitable relief from judgment under Rule 60(b)(6).

Mr. Adams raised a claim for the first time in a successive application for state habeas corpus relief that his trial and direct appeal counsel were ineffective because his jury sentencing-phase jury

instructions were unconstitutional and the issue was neither objected to at trial nor raised on direct appeal. *Id*. at 315 n.2. The Court of Criminal Appeals barred the claim as an abuse of the writ. *Id*. at 315.

Throughout his first federal habeas proceedings, Adams *never* argued that ineffective representation by *state habeas counsel* should establish cause for the default. Instead, he argued that "the ineffective assistance of *trial* and *appellate counsel* is cause for the default."[115]

When rejecting Adams's argument for cause, the district court erroneously characterized his argument as attacking the efficacy of post-conviction counsel: "Adams's second argument is that assuming the Court finds that this claim was procedurally defaulted, the ineffective assistance rendered by his appellate and state *post-conviction counsel* constitutes cause for his default and he was prejudiced by the inability to raise this claim because it has substantial merit." *Adams v. Thaler*, No. 07-cv-00180-MHS, slip op. at 12 (E.D. Tex July 26, 2010) (emphasis added). Though the argument had not been raised, the district court nonetheless rejected it:

> The problem with this argument is that while the ineffective assistance of appellate counsel can constitute cause for failing to raise the claim on appeal, the ineffective assistance of state post-conviction counsel cannot constitute cause for failing to raise the claim in his initial petition for post-conviction relief, *see In re Goff*, 250 F.3d 273 (5th Cir. 2001), and *Matchett v. Dretke*, 380 F.3d 844, 849 (5th Cir. 2004).

*Id*.

Adams did not thereafter assert the argument for cause that the district court mistakenly injected into the case. Mr. Adams filed a post-judgment motion pursuant to Rule 59(e) of the Federal

---

[115] Petitioner Beunka Adams' Petition For Writ of Habeas Corpus, *Adams v. Thaler*, No. 07-cv-00180-MHS (E.D. Tex) (Document #3), at 25 (emphasis added). *See also* Reply to Director's Response, *Adams v. Thaler*, No. 07-cv-00180-MHS (E.D. Tex) (Document #18), at 4 (citing back to page 25 of Adams's petition where "Mr. Adams asserted his counsel's ineffectiveness as cause.").

Rules of Civil Procedure objecting to the district court's procedural ruling, but he did not raise the issue of ineffective assistance of habeas counsel as cause for the default.[116]

After the district court denied his Rule 59(e) motion, Adams filed an application for a certificate of appealability (COA) in which he requested permission to appeal eleven issues, including five issues that he expressly acknowledged were foreclosed by precedent but that he nonetheless wished to preserve for appellate review.[117]   Though he sought to appeal other issues related to whether his ineffective assistance of trial and direct appeal counsel claims were properly procedurally defaulted, Adams did not seek permission to appeal the issue of whether the ineffective assistance of habeas counsel can establish cause.   Had Adams included the issue, he would have received permission to appeal it because the district court granted COA on all of the issues in the COA application.[118]

On appeal, Adams briefed several issues that he candidly acknowledged were foreclosed by precedent but that he nonetheless wished to preserve for review—presumably in a petition for certiorari to the Supreme Court, the only remaining vehicle for review—in an effort to overturn the existing precedent.[119]

---

[116]     Motion to Alter and Amend Judgment, or, in the Alternative, to Reopen Judgment, *Adams v. Thaler*, No. 07-cv-00180-MHS (E.D. Tex) (Document #26).

[117]     Application for Certificate of Appealability, *Adams v. Thaler*, No. 07-cv-00180-MHS (E.D. Tex) (Document #32), at 6–7.

[118]     Certificate of Appealability, *Adams v. Thaler*, No. 07-cv-00180-MHS (E.D. Tex) (Document #34).

[119]     *See* Appellant's Brief*, Adams v. Thaler*, No. 10-70023 (5th Cir.), at 29 n.36 ("Mr. Adams acknowledges that *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005), holds that no Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof, but wishes to preserve the issue for review."); *id*. at 32 (Mr. Adams acknowledges that the current expression of this Circuit's law is that *Mills* is not

Adams argued on appeal that he had cause for the defaulted ineffective assistance of counsel claims but, as in the district court below, he argued only that "the ineffective assistance of ***trial*** and ***appellate*** counsel is cause for the default."  Appellant's Brief, *Adams v. Thaler*, No. 10-70023 (5th Cir.), at 25 (emphasis added).  Despite briefing several issues squarely foreclosed by precedent in order to preserve them for review on *certiorari*, Adams did not argue that the ineffectiveness of his state habeas counsel could establish cause for the default.   The Fifth Circuit expressly noted that Adams had not raised the issue:

> [Adams] argues that his claims were procedurally defaulted due to the ineffective assistance of his ***trial*** and ***appellate counsel*** in failing to raise the claims at trial and on appeal.  Adams's claim that his counsel was ineffective for not raising the issue at trial and on appeal could have been brought in his first state habeas application. Although Adams was represented by counsel in filing his first application, he cannot overcome the procedural default by claiming that his state habeas counsel was ineffective for failing to raise his claims, and in any event ***Adams has not made this argument***.

*Adams v. Thaler*, 421 Fed.Appx. 322, 331 (5th Cir. Mar. 31, 2011).  Likewise, Adams did not raise the ineffectiveness of state habeas counsel as cause for his defaulted Sixth Amendment claim in his petition for a writ of *certiorari*.

In the wake of *Martinez* and facing an execution date, Adams filed a Rule 60(b)(6) motion arguing that *Martinez* overturned the basis for the district court's decision to dismiss the two ineffectiveness of counsel claims as procedurally defaulted and required that the court re-examine the default ruling.  *Adams v. Thaler*, 679 F.3d at 316.  Adams, for the first time ever, argued that state habeas counsel's ineffectiveness was cause for the default of his ineffective assistance of trial and appellate counsel claims.  However, his motion contained no allegations whatsoever about state

---

applicable to the capital sentencing scheme in Texas . . ., Mr. Adams wishes to preserve the issue for review).

habeas counsel's performance or why it was allegedly deficient.[120]

Adams's argument for relief from judgment was limited to just three grounds: (1) the advent of *Martinez*; (2) that the change in law was not merely substantive but a change that determined whether his claims would receive any federal review; and, (3) that his was a capital case and "death is different."[121]

The district court granted a stay of execution pending disposition of the 60(b)(6) motion, but on the State's appeal the Fifth Circuit dissolved the stay as improper. *Id*. at 320. Although the district court had yet to address the 60(b) motion, the panel held that "in granting the stay, the district court made an implicit determination that it was reasonably likely that Adams's Rule 60(b)(6) motion justified relief from judgment," "[t]hus, in order to assess whether the district court properly exercised its discretion in granting a stay," the panel assessed whether "Adams ha[d] shown a likelihood of success on the merits of his Rule 60(b)(6) motion." *Id*. at 318–19.

After determining that the motion was not barred under *Gonzalez*, the panel summarized the three circumstances proffered by Adams:

> In contending that "extraordinary circumstances" exist to warrant Rule 60(b)(6) relief, Adams first points to the Supreme Court's decision in *Martinez* . . . [and] asserts that *Martinez* represents a "jurisprudential sea change" in federal habeas corpus law . . . . Also, Adams points to the "capital nature of the case and the equitable imperative that the true merit of the cause be heard" as factors that, when combined with *Martinez,* constitute "extraordinary circumstances" and warrant Rule 60(b)(6) relief.

*Id*. at 319.

---

[120]   Petitioner Adams's Motion for Relief From Judgment, *Adams v. Thaler*, No. 07-cv-00180-MHS (E.D. Tex) (Document #39).

[121]   Petitioner Adams's Motion for Relief From Judgment, *Adams v. Thaler*, No. 07-cv-00180-MHS (E.D. Tex) (Document #39), at 6–10.

The panel began its analysis with the observation that "[o]ur precedents hold that '[a] change in decisional law after entry of judgment does not constitute exceptional circumstances and *is not alone* grounds for relief from a final judgment' under Rule 60(b)(6)."  *Id.* (quoting *Bailey v. Ryan Stevedoring Co., Inc.*, 894 F.2d 157, 160 (5th Cir. 1990)).  After addressing *Gonzalez* and subsequent decisions applying *Gonzalez*, the panel held that Adams was not entitled to relief "[b]ecause the *Martinez* decision is simply a change in decisional law and is 'not the kind of extraordinary circumstance that warrants relief under Rule 60(b)(6).'" *Id.* at 320 (quoting *Hernandez v. Thaler*, 630 F.3d 420, 429 (5th Cir. 2011)).

The Court, without explicitly addressing the other circumstances proffered by *Adams*, concluded that "[b]ecause Adams has not made a showing of a likelihood of success on the merits of his Rule 60(b)(6) motion, the district court abused its discretion in granting a stay of his execution pending the resolution of this motion." *Id.*

As the *Adams* panel reaffirmed, the law of the circuit is that "a change in decisional law after entry of judgment . . . *is not alone* grounds for relief from a final judgment under Rule 60(b)(6)." *Id.* at 319.  The circumstances of Mr. Balentine's case—*i.e.* the *additional* grounds for relief from judgment—are materially distinguishable from *Adams*.

First, and most importantly, Adams did—and could not—present the most pivotal factor in the controlling Supreme Court Rule 60(b)(6) jurisprudence: his diligence with respect to pressing the argument that state habeas counsel's ineffectiveness established cause for the default in his case. That Adams abandoned the argument early on—which was only available to him on appeal because the district court had mistakenly injected it into the case—is a critical distinction because Supreme Court precedent all but forecloses 60(b)(6) relief under those circumstances.  As described, *supra*, the diligence with which the litigant pursues his claim was one of the touchstones of the inquiry in

94

*Gonzalez*, and a point on which both the majority and the dissent agreed.  *See Gonzalez*, at 537 (petitioner's "lack of diligence in pursuing review of the statute-of-limitations issue" was evidenced by the fact that he "abandoned any attempt to seek review of the District Court's decision on this statute-of-limitations issue," he "neither raised that issue in his application for a COA, nor filed a petition for rehearing of the Eleventh Circuit's denial of a COA, nor sought certiorari review of that denial.").

The *Gonzalez* Court held that exact same pattern of litigation followed by Adams "confirm[ed] that [the new Supreme Court decision] [wa]s not an extraordinary circumstance justifying relief from the judgment ***in petitioner's case***."  *Id.* at 537 (emphasis added).  The *Gonzalez* Court noted that the petitioner's lack of diligence was a fundamental consideration "in one of the cases in which we explained Rule 60(b)(6)'s extraordinary-circumstances requirement."  *Id.* (citing *Ackermann*, 340 U.S. at 195).  Adams, like Gonzalez and Ackermann, "made a considered choice not to appeal . . . .  His choice was a risk, but calculated and deliberate and such as follows a free choice.  Petitioner cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong, considering the outcome of [a similar] case."  *Ackermann*, 340 U.S. at 211.  Adams chose to appeal numerous other issues squarely foreclosed by precedent, but he declined to take up the issue that ultimately prevailed in *Martinez*.  In so doing, Adams ran head-on into sixty years of Supreme Court precedent foreclosing Rule 60(b)(6) relief.  Adams's failure to pursue the issue on appeal runs contrary to the well-established admonition that "the Rule 60(b) motion is not to be used as a substitute for appeal."  *Seven Elves*, 635 F.2d at 402.  Yet, that is precisely what he did.  Mr. Balentine's record of extraordinary diligence stands in stark contrast to Adams's decision to jettison the issue and materially distinguishes the two cases.

Second, Adams failed to even explain—much less argue the probable merit of—his argument for cause. Adams failed to provide the federal courts with any indication that his state habeas counsel was deficient or that the omission of the Sixth Amendment issues from Adams's first state habeas application was not based on a reasoned judgment. Without any such explanation, the federal courts were left with no basis to assess "whether . . . . there [wa]s merit in the movant's claim or defense." *Id*. *See also Gonzalez*, 545 U.S. at 541–42 (Stevens, J., dissenting) ("special factors that allow a prisoner to satisfy the high standard of Rule 60(b)(6)" may include "when a prisoner has shown reasonable diligence in seeking relief based on a change in procedural law, and ***when that prisoner can show that there is probable merit to his underlying claims***") (emphasis added). This too was a fatal flaw in Adams's case. Mr. Balentine, on the other hand, has extensively documented state habeas counsel's failings and secured an affidavit in which state counsel acknowledged his errors and omissions.

Third, Adams's underlying claim was not particularly compelling. His complaint was that trial and appellate counsel failed to secure review of an allegation that the Texas jury instructions allowed him to be sentenced to death in violation of *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), because they did not require requisite level of intent. However, (1) there was no record of why trial counsel failed to request additional instructions, even assuming that one was warranted; and, (2) it is far from clear that the Texas instructions were actually flawed, and so it was unlikely that Adams could show prejudice. Mr. Balentine has pled a far more compelling Sixth Amendment violation.

Fourth, Adams essentially proffered just one special circumstance in addition to the change in the law. Though he argued that the change in law was not merely substantive but a change that determined whether his claims would receive any federal review, this was equally true of the change

in law at issue in *Gonzalez* (which involved the statute of limitations) and thus offered no meaningful distinction from Gonzalez's unsuccessful bid for relief.  Thus, Adams's lone factor ground for relief, in addition to the change in law, was that he was under a death sentence.  While this is an important fact, it was clearly not enough to warrant relief.

In short, the facts of *Adams* were indistinguishable from a line of Supreme Court precedent that forecloses Rule 60(b)(6) relief when the petitioner by-passes appeal.  Moreover, his motion was facially deficient in that it failed to allege meaningful grounds for Rule 60(b)(6) relief in addition to the change in law wrought by *Martinez*.  It has no bearing on the dramatically different set of equities here and whether *Martinez* is "an extraordinary circumstance justifying relief from the judgment ***in [Mr. Balentine's] case***."  Gonzalez, 545 U.S. at 537.

## V.        Conclusion.

To date, the ineffective performance of Mr. Balentine's state post-conviction lawyer has denied Mr. Balentine the ability to seek redress for the deprivation of his right to effective counsel in the proceeding that determined whether he should be put to death.  Mr. Balentine has diligently pressed this issue for the last eight years.  *Martinez* and Rule 60(b)(6) give this Court the authority to review the ineffective assistance of trial counsel claim Mr. Balentine pled in 2004.  Mr. Balentine respectfully asks this Court to exercise its authority and grant him relief from its prior judgment defaulting federal review of his trial counsel's failure to present his jury with a case for life.

Respectfully submitted,

_____
Lydia M. V. Brandt
THE BRANDT LAW FIRM, P.C.
Texas Bar No. 00795262
P.O. Box 850843
Richardson, Texas 75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

COUNSEL FOR PETITIONER, BALENTINE

## CERTIFICATE OF CONFERENCE

This certifies that on July 12, 2012, I conferred with Tomee Heining, Assistant Attorney General, who has authority to act on behalf of Katherine Hayes, Assistant Attorney General, counsel for Respondent, Thaler.  Ms. Heining states that Respondent is opposed to this motion.

_____
Lydia M.V. Brandt, Esq.

## CERTIFICATE OF SERVICE

This certifies that on July 12, 2012, I electronically filed the foregoing document with the clerk of court for the US District Court Northern District Texas using the electronic case filing system of the court. The electronic case filing system sent a notice of electronic filing to the following attorney of record, who has consented in writing to accept this notice as service of this document by electronic means:

> Katherine Hayes, Assistant Attorney General
> Attorney General's Office
> P.O. Box 12548, Capitol Station
> Austin, TX 78711-2548

*Lydia M.V. Brandt*

_____

Lydia M.V. Brandt, Esq.
THE BRANDT LAW FIRM, P.C.
Texas Bar No. 00795262
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

cc:　　John Balentine #999315
　　　　Polunsky Unit
　　　　Texas Department of Criminal Justice
　　　　3872 FM 350 South
　　　　Livingston, TX 77351-8580

**EXHIBITS**

Exhibit 1:          Kent Birdsong Affidavit [also reproduced in Third State Application, as Exhibit 24]

Exhibit 2:          State Bar of Texas, Texas Criminal Appellate Manual (3rd ed. 1996) ("State Bar Manual") [also reproduced in Third State Application, as Exhibit 3]

Exhibit 3:          Kent Birdsong Voucher (December 12, 2000) [also reproduced in Third State Application, as Exhibit 5]

Exhibit 4:          Kent Birdsong Voucher (January 25, 2001) [also reproduced in Third State Application, as Exhibit 6]

Exhibit 5:          Werner Tally Affidavit (affidavit) and Bill (Exhibit A)  (June 25, 2003) [also reproduced in Third State Application, as Exhibit 23 (affidavit) and Exhibit A (Bill)]

Exhibit 6:          Motion for New Trial filed by James Durham

Exhibit 7:          Docket Sheet, pages 376-382, *State v. Balentine*, No. 39,532-D (320th Dist. Ct. Potter County 1998-1999) (dates of appointment, withdrawal, and substitution of counsel; filing and overruling of M/New Trial; etc.)

Exhibit 8:          Chronology (appointment, withdrawal and substitution of trial and appellate counsel; filing, deadlines and ruling on Motion for New Trial, etc.)

Exhibit 9:          *Capital Sentencing Strategy: A Defense Primer*, July 1994 ("1994 State Bar Materials")

Exhibit 10:        Kathy Garrison Affidavit [also reproduced in Third State Application, as Exhibit 10]

Exhibit 11:          Jim Patterson, Investigations:  Garrison Bill for Investigative Services  [also reproduced in Third State Application, as Exhibit 11]

Exhibit 12:          Jane McHan Affidavit, with Interview Summary Exhibits A (Clara Smith, mother), B (Eric Smith, half-brother), C (Angelique Watson, mother of John Balentine's son), D (Lynn Rowe, half-brother) [also reproduced in Third State Application, as Exhibit 12]

Exhibit 13:          Jane McHan Affidavit (Social History Affidavit) [also reproduced in Third State Application, as Exhibit 13]