CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

2017 SEP 29   PM 4: 52

DEPUTY CLERK *VLS*

| | | |
|---|---|---|
| JOHN LEZELL BALENTINE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | No. 2:03-CV-39-J-BB |
| LORIE DAVIS, Director, | § | **Capital Litigant** |
| Texas Department of Criminal Justice | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## REPORT AND RECOMMENDATION
## ON MOTION FOR RELIEF FROM JUDGMENT

John Lezell Balentine asserts in his *Motion for Relief from Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6)* ("Motion," doc. 112) that the Court should reopen this case and reach the merits of his claim that he was denied the effective assistance of counsel because his trial attorney failed to adequately investigate and present mitigating evidence at the punishment phase of his trial in accordance with *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).[1]  Respondent Lorie Davis opposes relief, arguing that the extraordinary circumstances required to obtain relief from a judgment under Rule 60(b)(6) are not present and Balentine's claim remains procedurally barred.  Following an evidentiary hearing, the Court finds Balentine has not shown that his claim comes within an exception to procedural bar and that he has not shown he is entitled to relief under Rule 60(b) of the Federal Rules of Civil Procedure.

---

[1] Balentine refers to this as his "*Wiggins* claim."

## OVERVIEW

The merits of Petitioner Balentine's federal habeas petition were addressed in a Report and Recommendation filed September 27, 2007 (R&R, doc. 53).  Balentine made several claims including ineffective assistance of trial and appellate counsel in failing to effectively litigate Fourth Amendment claims regarding a consensual search, and the failure to effectively litigate a confession Balentine had given.  Balentine also raised substantive Fourth Amendment issues and asserted a claim that trial counsel failed to present any evidence during punishment.

Balentine's argument against application of a procedural bar for failure to exhaust focused primarily on allegations that Texas postconviction remedies do not ensure effective assistance of counsel for condemned state habeas petitioners.  While this Court acknowledged that a death penalty petitioner who had ineffective assistance of trial counsel claims would not be able to present or obtain a ruling on these claims federally unless they had been presented to the state habeas court, Petitioner's grounds seven and eight relating to trial counsel's failure to present mitigating evidence were found to be procedurally barred under then-binding Fifth Circuit law.  (R&R, pp. 33-39.)

The Court is now presented with the issue of whether Petitioner's Rule 60(b) motion should be granted in order that Petitioner may present an ineffective assistance of trial counsel claim for failure to effectively investigate and/or present mitigation evidence.  As will be discussed in greater detail subsequently, Petitioner's first federal habeas counsel and now his present federal habeas counsel have obtained a great deal of mitigation evidence.  The evidence obtained by Petitioner's initial federal habeas counsel was detailed at pages 28 and 29 of the Report and Recommendation. The additional mitigation evidence presented at the evidentiary hearing held in October 2016 and

January 2017 was similar to that originally developed by federal habeas counsel with the addition of several experts.

While the central issue now presented centers on mitigation evidence, that issue must be considered in the context of the overall representation provided by state trial counsel. The undersigned finds a fair evaluation of trial counsel's representation must include counsel's trial strategy. The focus of Balentine's defense was (1) try to suppress the confession and (2) vigorously defend the case to the point that the State might entertain an offer of life imprisonment instead of the death penalty. *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), teaches us not to second-guess trial counsel's strategy and for good reason. Defense counsel must evaluate the case and choose the strategy they think is most likely to succeed. Focusing on one theory means other potential theories will receive less attention. This does not mean counsel should not consider all viable options, but counsel must choose wisely where to spend his time.

The Court is now presented with a case where counsel's trial strategy was not only a viable one, but counsel's strategy was successful. It is true the confession was not ruled inadmissible, but counsel's strategy to obtain an offer of life imprisonment was successful. The only reason that counsel's strategy did not resolve the case was because the petitioner Balentine rejected the offer of life.

The Court will turn now to the merits of Balentine's Rule 60(b) motion and the issue of mitigating evidence.

## I. HISTORY

This Court previously denied Balentine's Rule 60(b) motion, but the motion was remanded to this Court after a history of litigation in the appellate court and the United States Supreme Court.

Petitioner was convicted and sentenced to death for the capital murder of three teenagers while they slept. *State v. Balentine*, No. 16,877-E (108th Dist. Ct., Potter Co., Tex., Apr. 21, 1999). No mitigation evidence concerning Petitioner's background, childhood, or family was presented at his trial, and no witnesses were called by the defense at the punishment phase.[2] (Vol. 26, State Court Reporter's Record "RR") at 80.)  The Texas Court of Criminal Appeals ("TCCA") affirmed the conviction and death sentence, *Balentine v. State*, 71 S.W.3d 763 (Tex. Crim. App. 2002).  No petition for writ of certiorari was filed with the United States Supreme Court.

Petitioner filed a state application for writ of habeas corpus on January 22, 2001.  In his twentieth claim, he alleged he was denied the effective assistance of counsel under the Sixth and Fourteenth Amendments because trial counsel did not call any punishment witnesses. (SHR at 127.) The application was denied by written order on December 4, 2002. *Ex parte Balentine*, 54,071-01 (Tex. Crim. App. Dec. 4, 2002) (unpublished).

Petitioner filed his federal petition for writ of habeas corpus (Pet., doc. 21) in this Court on December 1, 2003, and his first amended petition (Am. Pet., doc. 27) on August 19, 2004.  The eighth claim in the amended federal petition asserted that petitioner's Eighth and Fourteenth Amendment rights to individualized sentencing under the "Lockett Doctrine" were violated because, among other things, trial counsel failed to present any mitigating and risk-assessment evidence at trial.  (Am. Pet. at 137-151); *see also Lockett v. Ohio,* 438 U.S. 586 (1978).  This claim has been construed to assert a violation of his Sixth Amendment right to the effective assistance of counsel,

---

[2] As set out later, trial counsel did develop evidence favorable to petitioner through cross-examination of the state's witnesses.

and relies upon evidence and arguments that were not presented to the state court.[3]  Respondent's

answer (Ans., doc. 37) asserted this claim was unexhausted and procedurally barred.  Oral argument

was heard, and post-argument briefs were filed (doc. 51, 52) focusing largely on whether this claim

was procedurally barred from federal habeas review.    The Magistrate Judge's Report and

Recommendation to deny relief based upon the claims being procedurally barred (R&R, doc. 53) was

adopted by the District Judge on March 31, 2008.  *Balentine v. Thaler*, 2008 WL 862992 (N.D. Tex.,

2008) (doc. 66), and a certificate of appealability ("COA") on this issue was denied.  *Balentine v.*

*Thaler*, 2008 WL 2246456 (N.D. Tex., May 30, 2008) (doc. 77).   The United States Court of

Appeals for the Fifth Circuit also denied a COA on this issue, *Balentine v. Thaler*, No. 08-70014,

324 Fed. App'x 304 (5th Cir.), *cert. denied*, 558 U.S. 971 (2009).

On June 22, 2009, the state court set Balentine's execution for September 30, 2009.  *State*

*v. Balentine*, No. 39,532-D (320th Dist. Ct., Potter Co., Tex. 2009).  On August 21, 2009, Petitioner

filed a second or subsequent habeas application in state court to exhaust his *Wiggins* claim, with a

motion for stay of execution.  On September 22, 2009, the state court dismissed the subsequent

application as an abuse of the writ and denied the motion for stay of execution.  *Ex parte Balentine*,

Nos. WR-54071-01, WR-54071-02, 2009 WL 3042425 (Tex. Crim. App.), *cert. denied*, 558 U.S.

1003, 130 S. Ct. 520, 175 L. Ed. 2d 368 (2009).

On September 23, 2009, Petitioner filed his first Rule 60(b) motion in this court (doc. 85),

along with a motion for stay of execution (doc. 86).  On September 28, 2009, this court denied Rule

60(b) relief as well as the requested stay of execution (doc. 89).  On September 29, 2009, the Court

---

[3] Balentine did not rely on the twentieth claim that he presented in his original state habeas proceeding.  (Rec., doc. 53, at 29-35.)

of Appeals granted a stay of execution. *Balentine v. Thaler*, No. 09-70026 (5th Cir. 2009). The Court of Appeals initially reversed the denial of Rule 60(b) relief, but ultimately affirmed the district court's ruling. *Balentine v. Thaler*, 626 F.3d 842 (5th Cir. 2010). A petition for rehearing en banc was denied in a split decision. *Balentine v. Thaler*, ,629 F.3d 470 (2010). The Supreme Court denied the petition for writ of certiorari. *Balentine v. Thaler*, 564 U.S. 1006, 131 S. Ct. 2992, 180 L. Ed. 2d 824 (2011).

On March 31, 2011, the state court set another execution date, this time for June 15, 2011. On June 13, 2011, Balentine filed a motion to stay this execution in state court with his second successive state habeas application presenting his *Wiggins* claim and a claim that state habeas counsel was ineffective for failing to properly raise the *Wiggins* claim in his initial state habeas application. The TCCA denied relief under the Texas abuse-of-the-writ doctrine. *Ex parte Balentine*, No. WR-54,071-03 (Tex. Crim. App. June 14, 2011). Balentine also filed a petition for writ of certiorari with a motion for stay of execution. The Supreme Court granted the motion for stay of execution, *Balentine v. Texas*, 564 U.S. 1014, 131 S. Ct. 3017, 180 L. Ed. 2d 841 (June 15, 2011), which stay expired on the denial of certiorari. 566 U.S. 904, 132 S. Ct. 1791, 182 L. Ed. 2d 616 (2012).

On April 13, 2012, the state court set the most recent execution date of August 22, 2012. On July 12, 2012, Balentine filed the instant Rule 60(b) Motion with exhibits (docs. 112-114), relying on *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (Mar. 20, 2012). The district court adopted the recommendation of the undersigned (doc. 122) that Rule 60(b) relief be denied, and granted a COA. *Balentine v. Thaler,* No. 2:03-CV-039-J, 2012 WL 3263908 (N.D. Tex. Aug. 10, 2012); (Doc. 128). The Court of Appeals affirmed, but the Supreme Court vacated the judgment

and remanded the case to the Court of Appeals for further consideration in light of *Trevino v. Thaler,*
___ U.S. ____, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013), *Balentine v. Thaler,* ___ U.S. ____, 133
S. Ct. 2763, 186 L. Ed. 2d 214 (2013), which later remanded the case to this Court. *Balentine v.
Stephens,* 553 Fed. App'x 424 (5th Cir. 2014).

## II. MOTION

Balentine moves to reopen the final judgment under Fed. R. Civ. P. 60(b), arguing the
exception to a procedural bar created in *Martinez v. Ryan* allows this Court to reach the merits of his
*Wiggins* claim. Balentine argues this change in the law, combined with his extraordinary diligence
and the merits of this claim, authorize Rule 60(b) relief. (Motion, doc. 112.) Respondent argues the
extraordinary circumstances required for relief under Rule 60(b)(6) do not exist and that Balentine's
claim does not come within the *Martinez* exception. (Response, doc. 117.) On October 25-27, 2016
and January 23, 2017, the undersigned conducted an evidentiary hearing on whether the claim comes
within the *Martinez* exception and warrants Rule 60(b) relief. Specifically, the Court wanted to hear
"(1) whether exceptional circumstances exist to warrant Rule 60(b) relief, (2) whether Balentine has
set forth a substantial claim of ineffective assistance of trial counsel and (3) whether such claim was
not properly presented to the state court because of the ineffective assistance of state habeas
counsel." (Order, doc. 158, at 9.) Following this hearing, both parties filed their post-hearing briefs
on March 13, 2017. (Resp. Br., doc. 286; Pet. Br., doc. 287.)

## III. ANALYSIS

### A. Jurisdiction

Rule 60(b) of the Federal Rules of Civil Procedure authorizes the district court to relieve a
party from a final judgment, order, or proceeding. Under the Antiterrorism and Effective Death

Penalty Act of 1996 (the "AEDPA"), 28 U.S.C. § 2254, however, this court has no jurisdiction to authorize a successive habeas proceeding. *See* 28 U.S.C. § 2244(3)(A). A second or successive habeas corpus claim presented under section 2254 can only be authorized by the Court of Appeals under section 2244(b). A Rule 60(b) motion does not contain a habeas corpus "claim," and thus should not be construed as a "second or successive" petition under section 2244, when the motion "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings." *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005) (footnote omitted); *Adams v. Thaler*, 679 F.3d 312, 319 (5th Cir. 2012). A petitioner does not make a "habeas corpus claim . . . when he merely asserts that a previous ruling which precluded a merits determination was in error—for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar." *Adams*, 679 F.3d at 319 (quoting *Gonzalez*, 545 U.S. at 532 n.4).

As in *Adams*, Balentine's motion challenges this court's prior determination that his claims were procedurally defaulted and respondent has conceded that Balentine's Rule 60(b)(6) motion should not be construed as an improper successive habeas petition. (Resp. at 10.) It is, therefore, properly before this district court. This court has jurisdiction to consider the Rule 60(b) Motion.

### B. Rule 60(b)

Rule 60(b)(1) through (5) of the Federal Rules of Civil Procedure authorize the district court to grant relief for certain enumerated reasons. Rule 60(b)(6) is a general, catch-all provision allowing equitable relief. Although the United States Court of Appeals for the Fifth Circuit has described it as a powerful rule, they have cautioned it is a limited one.

> Rule 60(b)(6) is a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses, but we have also narrowly circumscribed its availability, holding that Rule 60(b)(6) relief will be granted only if extraordinary circumstances are present.

*Balentine v. Thaler*, 626 F.3d at 846 (citing *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir.1995)). "Such [extraordinary] circumstances will rarely occur in the habeas context." *Gonzalez*, 545 U.S. at 535.

In *Adams*, the Court of Appeals held that the Supreme Court's decision in *Martinez* could not alone support Rule 60(b) relief. "Our precedents hold that '[a] change in decisional law after entry of judgment does not constitute exceptional circumstances and is not alone grounds for relief from a final judgment' under Rule 60(b)(6)." 679 F.3d at 319 (citing *Bailey v. Ryan Stevedoring Co.*, 894 F.2d 157, 160 (5th Cir.1990), and *Batts*, 66 F.3d at 747-48). "This rule applies with equal force in habeas proceedings" under the AEDPA. *Id.* (citing *Hernandez v. Thaler*, 630 F.3d 420, 430 (5th Cir.2011), and *Hess v. Cockrell*, 281 F.3d 212, 216 (5th Cir.2002)). In *Buck v. Davis,* ___ U.S. ____, 137 S. Ct. 759, 780, 197 L. Ed. 2d 1 (2017), the Supreme Court held that a significant element of the extraordinary circumstances that the court may consider in determining whether to grant relief under Rule 60(b)(6) is whether the claim previously found unreviewable would be entitled to the benefit of *Martinez* and *Trevino*. "If they would not, his claim would remain unreviewable, and Rule 60(b)(6) relief would be inappropriate." *Id.* (citing 11 Wright & Miller, Federal Practice and Procedure § 2857 (showing "a good claim or defense" is a precondition of Rule 60(b)(6) relief).

Balentine argues that the intervening decision in *Martinez*, combined with the unique facts of his case including his "uncommon due diligence, and the merit of his underlying" ineffective assistance claim constitute the "extraordinary circumstances" that warrant Rule 60(b) relief. (Mot.

at 1-3, 75-97.)  (Pet. Br. at 33 (citing *Diaz v. Stephens,* 731 F.3d 370, 377 (5th Cir. 2013)).)

Acknowledging that a change in decisional law does not "alone" constitute the type of extraordinary circumstances warranting relief, Balentine seeks to distinguish his case from *Gonzalez* and *Adams* by showing a long history of diligence in attempting to avoid the procedural obstacles created by the failure of his state habeas counsel to investigate and present his *Wiggins* claim in the initial state habeas proceeding and that the claim has merit and warrants relief.  (Mot. at 1-2, 5-14, 75, 86-98.) He also argues that since equity controls the Rule 60(b) proceedings, and since the new exception created by the Supreme Court in *Martinez* is an equitable exception, it would be inequitable to deny him the benefit of this *Martinez* exception and continue to refuse to consider the merits of the claim. (Pet. Br. at 30-40.)

Two related procedural determinations are presented: (1) whether Rule 60(b) warrants relief and (2) whether the *Martinez* exception to a procedural bar applies to Balentine's claim.  If Balentine's claim comes within the *Martinez* exception and would warrant relief from his death sentence, that would be a factor supporting Rule 60(b) relief.  If the claim lacks merit, however, reopening this case would be futile and relief under Rule 60(b) would be inappropriate.  These issues are considered together.

This Court granted an evidentiary hearing on both of these procedural issues.  In fact, the memorandum opinion and order granting a hearing instructed the parties to be prepared to present evidence on the merits of the underlying claim at this hearing.  The specific language is set out below:

> Although this hearing is set for the purpose of examining the exception to procedural bar, the parties shall also come prepared to ***present evidence and argue the merits of the claim that trial counsel provided ineffective assistance***.  The

evidence needed to show that the underlying claim of ineffective assistance of trial counsel is a substantial one and, therefore, comes within the exception to procedural bar created in *Martinez* will likely be the same evidence needed to prove the merits of that claim.  To the extent that the same evidence may prove both the exception to procedural bar and that the claim should be granted on its merits, the parties should come to the hearing fully prepared to present that evidence and argue whether the limitation of § 2254( e )(2) would prevent the Court from considering such evidence for that purpose as well.  ... In other words, ***this hearing should be considered the parties one and only opportunity to prove both the exception to procedural bar and the merits of the claim***.  The Court does not, at this time, intend to schedule a separate hearing on the merits of the claim that trial counsel provided ineffective assistance should it find that the claim falls within the exception to procedural bar.

(Mem. Op., doc. 158, at 8-9) (emphasis added) (internal citations omitted).

A full and fair opportunity was provided to the parties for consideration of the Rule 60(b) motion, the *Martinez* exception and the merits of the claim that trial counsel provided ineffective assistance.  In order to determine whether Rule 60(b) relief is warranted, the undersigned will review the evidence presented at the hearing regarding whether the underlying claim of ineffective assistance is substantial and whether the claim was not presented to the state court because of the ineffective assistance of state habeas counsel.

## C.  Exception to Procedural Bar

Balentine complains that his Sixth Amendment right to effective assistance of counsel was violated by trial counsel's failure to investigate and present substantial mitigating evidence at the punishment phase of the trial and that "[t]rial counsel simply rested without presenting a case for sparing Mr. Balentine's life." (Mot. at 1.)  Respondent asserts that the claim is not substantial under *Martinez* because it lacks merit, and that Balentine has not shown state habeas counsel to have been ineffective in failing to present this claim.  (Resp. Br. at 16-18.)

### 1. <u>Standard of Review</u>

In determining whether a claim is substantial under *Martinez,* this court must apply the familiar two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. at 692. *See Segundo v. Davis,* 831 F.3d 345, 350-51 (5th Cir. 2016) (the inmate had not shown substantiality under *Martinez* in that is "IATC claim lacked merit—because he can demonstrate neither deficient performance nor prejudice under *Strickland*"), *cert. denied,* 137 S. Ct. 1068, 197 L. Ed. 2d 188 (2017); *Canales v. Stephens,* 765 F.3d 551, 568 (5th Cir. 2014) (inmate had not shown substantiality under *Martinez* because he did not satisfy the prejudice prong of *Strickland*). The first prong of *Strickland* requires the defendant to show that counsel's performance was deficient. *Id.* at 687. The second prong of this test requires the defendant to show prejudice resulting from counsel's deficient performance. *Id.* at 694. The court need not address both prongs of the *Strickland* standard if the complainant has made an insufficient showing on one. *Id.* at 697.

In measuring whether counsel's representation was deficient, a petitioner must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88; *Lackey v. Johnson,* 116 F.3d 149, 152 (5th Cir. 1997). "It is well settled that effective assistance is not equivalent to errorless counsel or counsel judged ineffectively by hindsight." *Tijerina v. Estelle,* 692 F.2d 3, 7 (5th Cir. 1982). A court reviewing an ineffectiveness claim must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence or that, under the circumstances, the challenged action might be considered sound trial strategy. *Gray v. Lynn,* 6 F.3d 265, 268 (5th Cir. 1993); *Wilkerson v. Collins,* 950 F.2d 1054, 1065 (5th Cir. 1992). There are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Richter,* 562 U.S.

106.  In *Richter,* the Supreme Court noted the "wide latitude counsel must have in making tactical decisions" and the need to avoid judicial second-guessing. *Id.* (quoting *Strickland,* 466 U.S. at 689). "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id.* at 110.

To satisfy the second prong of the *Strickland* test, the petitioner must show that counsel's errors were so egregious "as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.  The test to establish prejudice under this prong is whether "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability under this test is "a probability sufficient to undermine confidence in the outcome." *Id.*

### 2. Analysis

Represented by experienced death penalty attorneys at the federal hearing, Balentine called trial counsel Paul Hermann and Randy Sherrod, state habeas counsel Kent Birdsong, psychologist Gilda Kessner, mitigation investigator Jane Bye, psychologist Daniel Martell, psychologist David Lisak, trial investigator Kathy Garrison and mitigation expert Russell Stetler.  Respondent called psychologist Randall Price.  The Court also received stipulations regarding the testimony of Darrell Dewey and Werner Talley.  Numerous documents from each party were admitted.

The hearing proceeded on October 25, 2016, but was recessed from October 27, 2016, to January 23, 2017, in order to receive evidence from certain of Balentine's witnesses who were not available in October.  Following this hearing and the preparation of a transcript, the Court allowed further briefing by the parties.

Attorney Jim Durham was lead counsel and Paul Herrmann was the original co-counsel.  At

the hearing, Mr. Herrmann, testified regarding counsel's trial strategy on punishment.

A.    Our strategy was -- I can tell you what my strategy was, and -- and Durham
I don't think argued with it.  Now, he was lead counsel, but my strategy-- and
I expressed this all the time -- was to make the case as hard as we could for
the State, to put some of these issues in question, for example, the search and
things like that in question enough that they would make us a life offer.  That
was our goal.  And Durham was an exceptionally hard attorney to deal with,
so he was a good person to have on my side on that, because they don't like
to deal with him in trial.  Nobody does.  Durham was very difficult to deal
with in trial.

Q.    When you say "they," you mean the prosecutor?

A.    The prosecution.  [Durham] was probably everybody's least favorite attorney
to go up against because he was exceptionally difficult --

Q.    When you say --

A.     -- in trial.

Q.     -- "difficult," was that -- what do you mean by that?

A.    He didn't let you get away with -- first off, he was very smart.

Q.    Okay.

A.    And he objected to everything.  He was irascible and irritating and poked
everything.  And so nobody wanted to try a case against him, and so he was
perfect for that strategy that we had, because I knew -- I knew they didn't
want to try a case against him, because he's just so -- is so unpleasant.  And
-- and if we could put enough problems on the table, we were hoping that we
would get a life offer on the case.  That was what we thought was the best
case scenario.

(1 Tr. at 30-31.)

Attorney Herrmann was replaced by counsel Randy Sherrod, who testified the defense

succeeded in getting an offer from the State of a plea-bargain to drop the death penalty in exchange

for a guilty plea to a life sentence, but Balentine declined the offer. Mr. Sherrod said lead counsel Durham was excited to bring Balentine the good news that they had gotten him an offer of a life sentence and that he needed to take it, but Balentine refused. Mr. Durham then got upset and left Mr. Sherrod to talk with Balentine, who explained the reasons Balentine gave for rejecting the offer.

> And he told me, he said, "With my background and the fact that I killed three Aryan Nation kids, they're going to try to stick a shiv in me every day." And he basically told me that he would rather be on death row where he wouldn't have to worry about that, and he said something to the effect of, "Who in the hell wants to spend their life until they're fifty or sixty years old in the penitentiary?" And he said, "I want the death penalty."

(Volume 1, Transcript of the Evidentiary Hearing, ("1 Tr.") at 126.) Defense counsel had trial witnesses available to testify at the punishment stage, but Balentine told them to not call any punishment witnesses. (1 Tr. at 102, 108-109, 124-28, 142, 147, 156-57; 3 Tr. at 88-89, 111-12.) The available witnesses were then released in accordance with Balentine's instructions and were not presented to the jury.

### a. Rejection of Plea Offer and Instructions to Not Call Punishment Witnesses

In his post-hearing brief, Balentine argues this Court cannot consider the reason that Balentine gave to his attorney regarding why he declined the State's offer, that he did not want a life sentence but would prefer a death sentence, and his instructions to counsel to not present any punishment witnesses, because there was no colloquy in the trial record to support these statements nor was there a sufficient mitigation investigation to prove that he knowingly and intelligently waived his rights to present such evidence. (Pet. Br. at 66-81.) He specifically challenges the evidence before the Court regarding these reasons and instructions, arguing the Court should not believe attorney Sherrod's testimony regarding Balentine's instructions to counsel because (1) Mr.

Sherrod argued for a life sentence, and the instructions (2) were not supported by a colloquy on the record, (3) were not fully disclosed to the defense investigator, and (4) were not supported by notes in the file. (Pet. Br. at 76.)

In Respondent's post-hearing brief, she notes that the United States Court of Appeals for the Fifth Circuit has rejected the argument that the client's instruction had to be reflected by a sufficient colloquy on the record as barred by the nonretroactivity doctrine of *Teague v. Lane,* 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). (Resp. Br. at 14 (citing *Shore v. Davis,* 845 F.3d 627 (5th Cir. 2017).) She also argues that Balentine forfeited any complaint that trial counsel was ineffective for failing to investigate and present mitigation evidence by instructing them to not present witnesses at the punishment stage. (Resp. Br. at 10-14, 18.)

### 1. Jury Argument

Counsel for Balentine cross-examined Mr. Sherrod regarding his jury argument at the punishment stage. Mr. Sherrod said he was personally opposed to the death penalty and, even though Balentine did not want him to argue against it, he could not help but make an appeal to the jury in closing argument to not sentence Balentine to death. (1 Tr. at 126-128.) Mr. Sherrod explained, "I think there's a difference in putting up people that the [client] tells you not to versus at least standing up during argument and making some argument on behalf of your client. I didn't ask him on that. I just did it." (1 Tr. at 128.)

Although an argument for life may have not been consistent with Balentine's statement that he wanted the death penalty over life in prison, Mr. Sherrod's argument did not violate ***an express*** instruction from Balentine. Balentine told Mr. Sherrod he did not want to call any witnesses. That instruction was not violated. Balentine also told Mr. Sherrod he did not want to plead to a life

sentence. While that statement could be construed as an implied instruction not to not argue against the death penalty, it was not an unequivocal instruction.

In any event, it is unnecessary for this Court to resolve any conflict counsel may have labored under between his duty to his client's wishes and his duty to represent him effectively because Balentine does not complain in his habeas petition that trial counsel violated Balentine's instruction in arguing for a life sentence. In fact, Balentine's federal habeas counsel takes the position that the Court should not consider such instructions for any purpose. He simply presents this ethical issue as a reason to disbelieve counsel's testimony. The Court is not persuaded. Balentine has not established any reason to question Mr. Sherrod's credibility. Mr. Sherrod's testimony that Balentine rejected the plea offer and instructed counsel to not call the available witnesses at the punishment stage of his trial is supported by the testimony of investigator Kathy Garrison. (3 Tr. at 85-90, 110-112.) But even if it were not independently corroborated by other testimony, the Court would find Mr. Sherrod's testimony to be credible.

Balentine has not shown that Mr. Sherrod's argument to the jury for a life sentence proves that Balentine did not instruct counsel to not call punishment witnesses because he preferred a death sentence.

## 2. Failure to Notify Others

Regarding counsel's failure to inform other members of the defense team, the evidence before this Court does not show an improper withholding of information about Balentine's rejection of the plea offer or instructions to not call punishment witnesses. Both lead counsel and the investigator were present when Balentine rejected the State's offer. (3 Tr. at 85-87.) Mr. Sherrod testified he immediately informed lead counsel about Balentine's explanation for rejecting the plea

offer and that, in fact, Balentine had persuaded Sherrod that "if I were in his shoes, that's the same thing I would do." (1 Tr. at 127.)

As acknowledged by Balentine, "[a]fter the state rested and before the defense proceeded with their case, the state offered Mr. Balentine the opportunity to plead guilty to a life sentence and, in exchange, the State would not pursue a death sentence." (Pet. Br. at 14-15 (citing 1 Tr. at 125-26).)

> After Mr. Balentine rejected the state's offer, the defense alerted the court that Mr. Balentine had made this decision:
>
>> MR. DURHAM: Your Honor, earlier in the day, the State of Texas has approached defense counsel and offered to waive the death penalty in return for a plea of guilty and a life sentence. This offer has been tendered to the Defendant and he has rejected it to us. We feel that needs to be put on the - - the offer and rejection needs to be put on the record.

(Pet. Br. at 15-16 (citing 23 RR at 12).) This confirms Mr. Sherrod's testimony that, although Balentine's decision to reject the plea offer was made known to the Court, his reasons for rejecting the offer were not. (1 Tr. at 161.)

As noted above, investigator Garrison also testified that Balentine rejected the plea offer and instructed counsel to not call the available witnesses at the punishment stage of his trial. (3 Tr. at 85-90, 110-112.) Trial counsel has not been shown to have withheld information regarding these matters from a person that should have received it at the time. Balentine has not established any failure to notify others that would prove he did not reject a plea offer, did not instruct counsel to not call punishment witnesses, or did not prefer a death sentence to a life sentence.

### 3. Lack of Notes

Regarding the lack of notes of Balentine's rejection of the plea offer or instructions to counsel, Balentine has not shown that the absence of notes memorializing the conversations occurring during the course of the trial is proof such conversations did not occur. The fact that there are no notes of the plea offer or its rejection does not prove that the offer was not made or rejected. In fact, Balentine acknowledges the State's plea offer and his rejection of it. (Pet. Br. at 15-16.)

Similarly, the absence of notes in the file regarding Balentine's instructions to not call the available punishment witnesses does not prove that no such instructions were given. The evidence before this Court supports the fact that such instructions were made and followed . (1 Tr. at 102, 108-109, 124-28, 142, 147, 156-57; 3 Tr. at 88-89, 111-12.) Balentine has not shown the absence of notes disproves Mr. Sherrod's testimony.

### 4. Colloquy

Regarding the lack of a colloquy with Balentine on the record, binding circuit precedent forecloses this as a sufficient basis to prevent consideration of Balentine's instructions to counsel. In *Shore,* the Texas death row inmate complained he was denied his constitutional right to present mitigation evidence to the jury under *Lockett v. Ohio,* 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), and that his trial counsel was constitutionally deficient for failing to conduct an adequate mitigation investigation, to present evidence of Shore's brain damage, and to represent Shore during the punishment phase of his trial. 845 F.3d at 632-33. The Court of Appeals held that Shore waived his right to present mitigating evidence by instructing counsel not to argue against the death penalty and that his complaints that trial counsel were ineffective were foreclosed by his instructions to counsel.

A defendant cannot raise a *Strickland* claim based on counsel's compliance with his instructions. *See United States v. Masat,* 896 F.2d 88, 92 (5th Cir. 1990) ("[A defendant cannot] avoid conviction on the ground that his lawyer did exactly what he asked him to do."); *Autry v. McKaskle,* 727 F.2d 358, 361 (5th Cir. 1984) ("By no measure can [a defendant] block his lawyer's efforts and later claim the resulting performance was constitutionally deficient."). If a defendant instructs his attorney not to present mitigation evidence, the failure to present this evidence does not give rise to a *Strickland* claim. *Sonnier v. Quarterman,* 476 F.3d 349, 362 (5th Cir. 2007). Such an instruction also bars the defendant from raising a *Strickland* claim based on failure to investigate mitigation evidence. [*Schriro v. Landrigan,* 550 U.S. 465, 475-76 (2007).]

*Id.* at 633.

At Balentine's trial, defense counsel announced that Balentine had rejected the state's offer, but did not reveal his reasons for doing so. Attorney Sherrod testified the plea offer and the rejection would be what they would put on the record, but "we didn't go into the facts of what he told us in front of the judge or anybody else." (1 Tr. at 160-162.) It is not clear to this Court how counsel should otherwise have responded in that situation without revealing privileged, confidential information from their client, or how they could have done anything differently at the trial. Clearly, none of those present at the time of the announcement, the defense counsel, the prosecutor or the judge, appear to have considered it necessary or appropriate to conduct a colloquy of the defendant on the record at the time. This Court interprets the binding circuit precedent to not impose such a requirement retroactively.

### 5. Knowing and Voluntary Waiver

Balentine does make a reasonable argument that any decision not to accept a life sentence and/or instruction that no punishment witnesses be called was not a competent decision because Balentine was either ill informed or was not adequately informed. However, this argument is foreclosed by circuit precedent and is in conflict with the evidence before this Court.

In *Shore,* the Court of Appeals also rejected the inmate's argument that the waiver was invalid because Shore could not have knowingly waived the right to present evidence of brain damage when he was not aware of that evidence. *Id.* at 632. The Court of Appeals held that this argument was barred by the nonretroactivity doctrine.

> The Supreme Court's decision in *Teague* bars federal courts from applying new constitutional rules to upset state convictions on collateral review. [*Teague,* 489 U.S. at 310]; *see also* 28 U.S.C. § 2254(d)(1). Shore's argument depends on a proposed rule of constitutional law requiring that a waiver of the right to present mitigation evidence be made knowingly and on the record. The district court correctly observed that the Supreme Court has never imposed such a requirement. *Shore,* 2016 WL 687563, at *10 (quoting [*Landrigan,* 550 U.S. at 479]). It is undebatable among jurists of reason that to create such a new requirement and impose it here would violate *Teague.*

*Id.* This holding impacts Balentine's argument that this Court cannot consider his decision to reject the life sentence, his instructions that no witnesses be called in the punishment stage, and his reasons for doing so, because he did not knowing and voluntary waive these rights. Circuit precedent makes it clear that no colloquy showing such a knowing and voluntary waiver is required to be in the trial record. Balentine has not otherwise proven such a lack of voluntariness, and it is not clear that any such proof short of a showing that he was not competent, even if it were presented, could prevent this Court from considering his decisions and instructions to counsel.

Further, the rule in *Shore* is supported by *Schriro v. Landrigan,* 550 U.S. 465, 479 (2007), which held that it has "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence" in mitigation of a death sentence. (Pet. Br. at 70-73.) Balentine attempts to distinguish this by arguing that circuit precedent imposes a requirement that any such instruction be knowing and informed before trial counsel may follow it. (Pet. Br. at 67-70.) His argument is unpersuasive.

Balentine cites *Autry v. McKaskle,* 727 F.2d 358, 362 (5th Cir. 1984), in support of his argument for imposing such a "knowing" requirement.[4] (Pet. Br. at 67.)  In *Autry,* the Court of Appeals refused to find trial counsel ineffective in following the defendant's instructions to not call punishment witnesses if he were found guilty, holding that doing so did not "render his counsel constitutionally ineffective for not seeking an inquiry into competency before abiding the client's decision." 727 F.2d at 362.  Balentine does not identify any evidence that he was incompetent to give such an instruction or that his attorneys had any reason to doubt his competency.  In fact, the testimony before this Court was to the contrary.  (1 Tr. at 126-29, 193, 197-98; 3 Tr. at 15-16.)

In light of the language in *Shore* rejecting the argument "that a waiver of the right to present mitigation evidence be made knowingly and on the record," 845 F.3d at 632, this Court finds that circuit precedent does not support the imposition of such a rule.  In fact, the evidence before this Court is similar to the evidence in *Autry* where he had rejected a plea bargain and trial counsel testified that Autry explained that, if he was found guilty, he wanted the death sentence.

Even if the case law cited above did not foreclose Balentine's objections to this Court considering this evidence, Balentine's currently asserted reasoning for not calling punishment witnesses is in conflict with his trial decision to reject an offer of life imprisonment.  While not stipulating that he instructed counsel to not call these witnesses, Balentine argues such instruction should not be recognized to have occurred and should not have allowed his attorneys to not present mitigating evidence because such an instruction would have been limited to particular mitigation

---

[4] Balentine also references the language in *Dowthitt v. Johnson,* 230 F.3d 733, 748 (5th Cir. 2000) that trial counsel "will not be deemed ineffective for following their client's wishes, so long as the client made an informed decision." (Pet. Br. at 67.) *Dowthitt,* however, merely cites *Autry* and does not expand on its holding that allows counsel to follow a client's instructions unless there is a question regarding the client's competency.

witnesses and was not based upon a complete mitigation investigation. (Pet. Br. at 66-81.) Balentine also argues that Mr. Sherrod's testimony regarding the reasons for Balentine's decision should not be credited because there is a more reasonable explanation. Balentine argues the evidence shows it was not because he did not prefer a life sentence but because he merely acquiesced to the fatalistic judgment of counsel that the available punishment witnesses would not be able to obtain a life sentence. (Pet. Br. at 78-81.) Such reasoning would not, however, explain Balentine's rejection of the State's offer of a life sentence.

Had Balentine preferred a life sentence and agreed with attorney Sherrod's advice that the only way to get it was to take the plea offer because the available witnesses would not keep him from getting the death penalty, such would not be consistent with Balentine's decision to reject the offer of a life sentence. Although Balentine argues he may have thought he had a chance of acquittal, there is no evidence that he did have such a belief. Further, in reality, once the confession was admitted, he had no realistic chance of acquittal. Stated differently, after the defense was unsuccessful in challenging the confession, Balentine effectively faced two outcomes, life in prison or the death penalty. He had no other viable option and Balentine has not presented a more credible reason for rejecting that offer and instructing counsel to not call those witnesses than that reflected in the testimony of trial counsel Sherrod, that he preferred death row to a sentence of life in prison, particularly in general population.[5]

Balentine does not dispute that he rejected the State's offer of a life sentence. (Pet. Br. at 15-

_____

[5] The undersigned does not consider Balentine's reasoning as necessarily expressing a desire to be immediately executed, but as bearing on his anticipated quality of life under the alternatives he was facing. He appears to have been choosing to avoid the general population where he may be in constant fear of reprisals from white supremacist prison gangs until he was in his fifties or sixties and choosing instead a more solitary confinement on death row while he would wait during whatever expected period he would have for his state and federal appeals and postconviction reviews. This does not necessarily appear to be an unreasonable choice under the circumstances presented.

16 (quoting 23 RR at 12 and 1 Tr. at 38).)  He also does not dispute the defense had witnesses available to testify at the punishment stage, but no witnesses were called.  (Pet. Br. at 16-17.) Attorney Sherrod's testimony regarding the State's offer, Balentine's rejection of the offer, Balentine's reasons for rejecting the offer, his instructions to not call the witnesses, and Mr. Sherrod's confidence that Balentine fully understood the situation at trial and was capable of making those decisions was clear.[6] (1 Tr. at 124-129, 139-147, 156-166.) Mr. Sherrod's testimony on these matters was credible, was not impeached during cross-examination, and was largely confirmed by investigator Garrison.  (3 Tr. at 88, 111-12.)

Balentine has presented no alternate theory capable of explaining both his rejection of the State's offer and his instruction to not call any punishment witnesses.  The Court concludes Balentine instructed counsel to not call the available punishment witnesses because he did not want a life sentence, and this forecloses his complaint against trial counsel for failing to present mitigation witnesses at the punishment stage of his trial.

Balentine's rejection of a life sentence and his instructions to not call any punishment witnesses eliminates the necessity to address trial counsel's effectiveness in the investigation and presentation of mitigating evidence.  The Court will, however, address that issue, but only in the alternative.

### b. Alternate Analysis of Complaint Against Trial Counsel

Even if Balentine's complaint were not foreclosed by his instructions to counsel, Balentine

---

[6] While the timing of the State's offer and Balentine's rejection of it is not entirely clear, it appears to have happened after the State's case in chief in the guilt/innocence stage and after the trial court had admitted Balentine's confession.  But even if Balentine believed incorrectly that this admission was a trial error that would be overturned on appeal, that would not undermine his expressed reasoning for rejecting the State's offer, *i.e.*, that he preferred to stay on death row during that time rather than in the general prison population with a life sentence.

has not shown his ineffective assistance of trial counsel claim would have merit.

One troubling aspect of this case experienced by this Court when the case was decided in 2007 was that it was unknown whether trial counsel had conducted any mitigation investigation at all and why no witnesses were presented at punishment. The original Report and Recommendation in this case noted the undersigned's concern about the fact trial counsel called no witnesses at the punishment phase and no mitigation evidence concerning Balentine's background, childhood, or family was presented at his trial. "While this omission, if in fact it was an omission, presents a substantial question, it does not necessarily compel a finding of deficient performance if counsel's actions were based upon a reasonable tactical decision." (R&R, doc. 53, at 31-32 (citing *Darden v. Wainwright,* 477 U.S. 168, 185-87, 106 S.Ct. 2464, 2473-74, 91 L.Ed.2d 144 (1986)).) The Report then noted the lack of available information needed to resolve that concern.

> The record before this Court does not reflect the extent of trial counsel's investigation or knowledge of mitigation evidence at the time of trial. We only know none was presented. Therefore, a review of the merits of this claim would require this Court to allow further discovery, and/or hold an evidentiary hearing to hear testimony from trial counsel and defense investigators regarding the extent of the defense investigation in preparation for the punishment phase of petitioner's trial, whether any mitigation evidence was obtained, and, if so, why it was not presented.

(R&R at 32.) The Report then noted the legal prohibitions against conducting such an evidentiary hearing on the issue because the claim was unexhausted and procedurally barred from review. (R&R at 32-33.) Since that time, however, changes in the law have allowed this Court to conduct an evidentiary hearing and discover the reason for the lack of punishment witnesses.

Although no mitigation witnesses were called in the punishment phase, we now know this is not a case where no mitigation investigation was conducted. Investigator Garrison interviewed Balentine, contacted mitigation witnesses and obtained records and evidence to present at the

punishment phase of the trial. Garrison contacted Balentine's mother in Arkansas who refused to attend and testify at the trial even though she came to visit Balentine in the jail shortly before and after the trial. (3 Tr. at 67-73; 101.) Garrison also tried to contact as many of Balentine's family, his brothers and sisters, as she could, but some of them hid from her, or fled Amarillo, and for some she didn't have information on where they were. (3 Tr. at 101-102.) Garrison also tried but could not identify any doctor in the area willing to administer an MRI to Balentine. (1 Tr. at 85-86, 92-93; 3 Tr. at 53, 61, 109-110.)

Balentine argues Garrison could not possibly have conducted an adequate mitigation investigation in the short time she was provided. Balentine asserts a proper mitigation investigation requires much more time to develop a relationship with the defendant, to build trust so that the intimate details of his history and background can be learned, to locate and interview members of the defendant's family, neighbors, friends, relatives, and teachers, and to gather educational, medical, psychological, social service, probation, and placement records. (Pet. Br. at 1-2.) Balentine argues Garrison never left Amarillo, conducted only three interviews, did not obtain a mental health evaluation, did not follow up on certain leads, and sent record requests so late that some records did not arrive until after the trial. (Pet. Br. at 52-54.)

Balentine presents a reasonable point. The first investigator did little or no investigation, resulting in Garrison's appointment. While Balentine complains his trial counsel never sought a continuance, Mr. Sherrod's testimony was that the trial judge told him the case would be tried as scheduled. Even then, much of the mitigation evidence gathered by federal habeas counsel such as the witness statements was the same type investigation conducted by Garrison, who contacted as many potential witnesses as she could based on the information obtained from Balentine. The most

significant difference between the mitigation evidence Garrison obtained and the evidence presented at the evidentiary hearing were the experts, Dr. Kessner, Jane Bye, Drs. Lisak and Martel, and Mr. Russell Stetler. (Pet. Br. at 21.)

The question presented is whether, had trial counsel had all of the mitigation evidence we now know about available, and had counsel not been instructed to not call any punishment witnesses, would he have used this evidence at trial and, if so, was Balentine prejudiced because it was not used. The expert mental health witnesses are double-edged swords. Would their testimony regarding Balentine's deficiencies have persuaded the jury such was an adequate basis to explain the triple homicide of three teenagers to the extent Balentine's life should be spared or would it have caused the jury to determine that he was a significant threat of future dangerousness?

A valid punishment strategy, had Balentine allowed it, would have been to use the witnesses Garrison had secured, humanize Balentine with the testimony of those witnesses and focus on the "residual doubt" witnesses to present the animosity between at least one of the victims and Balentine, the threats that had been made against Balentine, and attempt to minimize the cold-blooded nature of the triple homicide. While the undersigned has doubts such would have been successful, it would have been a reasonable strategy.

Investigator Garrison testified she met with Balentine, established a good relationship, and received helpful information about his background, family history, names and ages of family members, what his mother did for a living, family doctor, medical history, employment history, criminal history, alcohol and marijuana use, and contact information. (3 Tr. at 15-21, 95-96.) Balentine also told her about the threats that were made against him by the victims and the victims friends. (3 Tr. at 22.) She obtained authorizations and ordered prison records, medical records,

educational records, hospital records, mental health records and employment records. (3 Tr. at 44-50, 96, 103-108.) She called doctors, schools, hospitals, former employers and family members. (3 Tr. at 57-60.) She looked for a mental health expert to perform an evaluation of Balentine and get an MRI but could not obtain anyone. (3 Tr. at 60-61, 109-110.) She located mitigation witnesses, served subpoenas and gathered the witnesses for trial. (3 Tr. at 64-66, 98-100.) She spoke with Balentine's mother, who refused to come to Amarillo for the trial. (3 Tr. at 67-70, 72.) She also attempted to contact other family members but some hid from her and others could not be located. (3 Tr. at 101-103.) She also testified that at the time of trial mitigation specialists were not very available in capital murder trials in Amarillo. (3 Tr. at 94-95.) Mr. Sherrod testified on cross-examination that Garrison was a very good investigator, had experience in capital murder cases, worked very hard on the mitigation investigation of Balentine's case, gathered witnesses to present in the punishment phase, and never told trial counsel that she did not have enough time to complete her investigation. (1 Tr. at 59-60, 117, 155-156.)

Several witnesses were available to testify at the punishment stage when they were informed they would not be called. These witnesses could offer testimony not only regarding any "residual doubt" about Balentine's guilt, but also that Balentine had "had done good things for" those people, and had helped them. (3 Tr. at 66, 85.) These witnesses knew about Balentine's acts of kindness, his family and his background and may have been able to offer testimony regarding these things as well as the threats to Balentine and his family. (3 Tr. at 76, 98-100.) Balentine raises questions regarding the sufficiency of the mitigation investigation, challenges the explanations offered by the trial investigator, and raises some doubt about what the available witnesses would have been able

to say to the jury.[7] But he has not proven what those witnesses could have said if called. This is because, even if Balentine's instruction to counsel would not bar him "from raising a *Strickland* claim based on failure to investigate mitigation evidence," *Shore,* 845 F.3d at 633, it surely prevented the court and jury from hearing those witnesses at trial. Those instructions have also effectively prevented this Court from knowing what that evidence would have been at trial, and how any additional investigation or witnesses may have improved the defense.

As previously stated, federal habeas counsel developed considerable mitigation evidence, particularly regarding Balentine's mental health and childhood development. Balentine condemns trial counsel's lack of mental health expert assistance in developing the mitigation case for trial and the short time period that the trial investigator was given to develop such evidence. Had Balentine not instructed counsel to reject the offer of life and present no witnesses at punishment, the issue before the Court could be closer and a more difficult one depending on what evidence was presented.[8] Were the Court to reach the issue, the question is whether the mitigation investigation

---

[7] Regarding Therry Rucker, Garrison testified that "their families had been very, very close in Arkansas, and so he was going to be able to talk about some of that. And further than that, I don't know; I've forgotten." (3 Tr. at 99.) Garrison couldn't remember anything about what Tom Brady or Tim Austin knew. Regarding Angie Allen and the Nizzas, Garrison first said that they may have been able to testify about Balentine's family history (3 Tr. at 100), but later testified that Allen did not provide much family history evidence. (3 Tr. at 114-18.) Some of these people may also have been able to testify about the threats made against Balentine and his family members.

There may have been other witnesses. (1 Tr. at 108, 109.) But of these six identified witnesses, three or four of them may have been able to testify regarding Balentine's family history. Without knowing what Balentine prevented counsel from presenting, it would be difficult to say that new evidence would have changed the outcome of the trial.

[8] Balentine's argument focuses on the sufficiency of the mitigation ***investigation***, but without a corresponding deficiency in ***presentation*** such a complaint could not show the prejudice prong under *Strickland.* Even if trial counsel's investigation was deficient, that would not seem to make any difference if the defendant instructed his counsel that he did not want a life sentence and not to present any mitigation evidence. The United States Court of Appeals for the Fifth Circuit has rejected a complaint of inadequate investigation as an independent basis for relief when the inmate instructed counsel to not present witnesses in the punishment phase of his trial.

In his federal habeas petition, Amos argues *inter alia* that his lawyers' failure to conduct a reasonable investigation into Amos' background and character constitutes ineffective assistance of counsel because a reasonable investigation would have led to substantial, mitigating information that could

by trial counsel was constitutionally sufficient even if it was not as expansive as federal habeas counsel has presented.  While this Court would always prefer to see an error free and blameless trial, such an expectation is unrealistic.  There are always deficiencies.  The challenge before this Court is to determine whether the complained of conduct constitutes ineffective assistance under *Strickland* and deprived Balentine of his Sixth Amendment rights.

The mitigation evidence developed by Garrison was what is generally considered to be mitigation evidence, such as Balentine's poverty, racial discrimination, disadvantaged adolescence, unstable family, lack of parental stability, and juvenile issues with the criminal justice system.  The major difference between Garrison's investigation and the subsequent investigation was the expert witnesses and mental health experts, which was double-edged.  Balentine has not shown the prejudice required under *Strickland.*

In order to prevail on a claim that trial counsel was ineffective for failing to conduct a sufficient mitigation investigation and presentation, a habeas petitioner must do more than complain that the presentation at trial could have been better.  *See Strickland,* 466 U.S. at 689.  In order to avoid the "distorting effects of hindsight," the United States Court of Appeals for the Fifth Circuit

---

then have been introduced during the punishment phase of his trial. In rejecting this claim, the district court first noted the state habeas court's factual finding that Amos strongly opposed having any witnesses testify on his behalf during the punishment phase of his trial. The district court determined in light of this fact that counsels' failure to investigate what witnesses might have said on Amos' behalf at the punishment phase of his trial could not have prejudiced Amos:  He would not have permitted those witnesses to testify anyway, so what they might have said is academic.  Thus, concluded the court, Amos could not establish with reasonable probability that, but for his attorneys' failure to interview Amos' family and friends, the outcome of his punishment phase would have been different; ergo no prejudice; ergo no merit to his claim of ineffective assistance of counsel.  Albeit unnecessary, the district court also concluded that Amos failed to establish that his counsels' performance was deficient; ergo no cause; ergo no merit to his ineffective assistance claim.  We agree on both scores.

*Amos v. Scott,* 61 F.3d 333, 348 (5th Cir. 1995) (footnote omitted); *Brawner v. Epps,* 439 F. App'x 396, 403 (5th Cir. 2011) (holding a court may deny relief "based solely on a petitioner's failure to meet either prong of the [*Strickland*] test.").

has cautioned: "We must be particularly wary of arguments that essentially come down to a matter of degrees.  Did counsel investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second-guessing." *Carty v. Thaler,* 583 F.3d 244, 258 (5th Cir. 2009) (quoting *Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir. 2000)); *see also Ward v. Stephens,* 777 F.3d 250, 265 (5th Cir.), *cert. denied,* 136 S. Ct. 86, 193 L. Ed. 2d 76 (2015).

While Balentine has shown additional investigation and mitigation evidence could have been obtained, his argument comes down to a matter of degrees.  Assuming the additional evidence and witnesses developed by federal habeas counsel would have improved the available case for a life sentence at trial, that still does not establish a claim of ineffective assistance of trial counsel.  Balentine argues that the defense team did not begin the mitigation investigation soon enough, did not try hard enough to get the mother to testify, did not meet long enough with Balentine, did not gather enough records in time, and did not find and bring enough punishment witnesses to the trial.  This argument, however, relies upon precisely the sort of judicial second-guessing that *Strickland* was intended to avoid.  Therefore, even if this claim were not completely foreclosed by Balentine's decision to reject the plea offer of a life sentence and instruct counsel to not call any punishment witnesses because he preferred the death penalty, Balentine has not shown that his claim would otherwise satisfy both prongs of the *Strickland* standard necessary to show substantiality.

### c. State Habeas Counsel

Balentine's claim of ineffective assistance of trial counsel is foreclosed by Balentine's instructions to counsel, has no merit, and is not substantial under *Martinez.*  Accordingly, Balentine's state habeas counsel was not ineffective in failing to present it.  To satisfy this element of *Martinez,* Balentine must show more than that his state habeas counsel engaged in some deficient conduct.  He

must show that counsel failed to present a claim of ineffective assistance of trial counsel found to be substantial. *See Segundo v. Davis,* 831 F.3d 345, 350-51 (5th Cir. 2016) (agreeing with the district court that "habeas counsel was not ineffective in failing to raise a meritless claim").  While a state habeas counsel might not always be found ineffective in failing to present a claim that is later found to have merit, such counsel could not be found ineffective for failing to present a meritless claim. *See Garza v. Stephens,* 738 F.3d 669, 676 (5th Cir. 2013) (agreeing with the district court that "habeas counsel was not ineffective in failing to raise [a] claim at the first state proceeding" because "there was no merit to [the petitioner's] claim"); *Beatty v. Stephens,* 759 F.3d 455, 466 (5th Cir. 2014).  Because Balentine's claim of ineffective assistance has no merit because of his rejection of the plea offer and instructions not to call witnesses, his state habeas counsel could not have been ineffective in failing to present it.

Balentine has not satisfied either of these elements of *Martinez* to bring this claim within this exception to procedural bar.

## D. Conclusion

The deficiencies alleged by Balentine only concern the sentence he received.  All of the mitigation evidence and expert testimony developed by Balentine's state court trial counsel and which has been developed by Balentine's federal court habeas counsel goes to the question of punishment.  Stated more directly, such evidence goes to the issue of whether Balentine should have been sentenced to death or to imprisonment for life.

Even if Balentine were to ultimately prevail on the merits of his claim, his capital murder conviction would not be set aside.  Instead, he would be entitled, at most, to second punishment hearing.  The irony presented is that the maximum relief Balentine can obtain, short of executive

clemency, is a life sentence, which we have now learned, as a result of the evidentiary hearing, was

a sentence he was offered and rejected during the state trial court proceedings.

Balentine's claim has no merit and does not come within the *Martinez* exception to

procedural bar.  Therefore, this Court's original determination of procedural bar remains correct.

This precludes granting relief under Rule 60(b).  As observed by the Supreme Court in *Buck*, if the

exception to procedural bar created in *Martinez* does not apply and the claim remains

"unreviewable," "Rule 60(b)(6) relief would be inappropriate."  137 S. Ct. at 780.

Accordingly, Balentine's motion for relief under Rule 60(b)(6) should be denied.

## IV

For the reasons set forth above, it is the **RECOMMENDATION** of the United States

Magistrate Judge to the United States District Judge that petitioner John Lezell Balentine's *Motion*

*for Relief from Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6)* (doc. 112), be

**DENIED**.

## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and

Recommendation to each party by the most efficient means available.

**IT IS SO RECOMMENDED.**

**ENTERED** this 2nd day of September, 2017.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## \* <u>NOTICE OF RIGHT TO OBJECT</u> \*

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before <u>thirty (30) days</u> after this recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).