IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| JOHN LEZELL BALENTINE, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | 2:03-CV-00039 |
| | § | **Capital Litigant** |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

---

# RESPONDENT'S EXHIBITS – VOLUME 2
## (RX-78 to end)

---

JAY CLENDENIN
Assistant Attorney General
SBOT 24059589

NATHAN TADEMA
Assistant Attorney General
SBOT 24044285

KATHERINE D. HAYES
Assistant Attorney General
*Lead Counsel for Respondent*
SBOT 00796729
katherine.hayes@oag.texas.gov

Office of the Attorney General of Texas
Criminal Appeals Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1400; (512) 320-8132 fax

ATTORNEYS FOR RESPONDENT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

JOHN LEZELL BALENTINE,　　　§
　　　　　Petitioner,　　　　　§
　　　　　　　　　　　　　§
v.　　　　　　　　　　　　§　　　　　2:03-CV-00039
　　　　　　　　　　　　　§　　　　**Capital Litigant**
LORIE DAVIS, Director,　　　　§
Texas Department of Criminal Justice, §
Correctional Institutions Division,　§
　　　　　Respondent.　　　　§

## RESPONDENT'S AMENDED EXHIBIT LIST

| Trial Counsel's Motions for Investigative and Expert Assistance | |
|---|---|
| 1 | Defendant's Motion for the Appointment and Payment of an Investigator and/or Expert Witness, and Order granting (Sept. 10, 1998) |
| 2 | Motion to Remove Court Appointed Investigator (March 8, 1999) |
| 3 | Defendant's Motion for the Appointment of Kathy Garrison as Investigator and Payment of an Investigator and/or Expert Witness (March 8, 1999) |
| 4 | Pre-trial Motion No. 19: Motion to Proceed Ex Parte, and Ex Parte Motion for Funds for Expert Assistance [MRI and Neurological Examination] (Feb. 11, 1999), and notation Order granted |
| 5 | Ex Parte Motion No. E1: Motion for the Assistance of a Psychiatrist on the Issues of Mitigation, and Future Dangerousness, and Order granting (Feb. 23, 1999) |
| 6 | Ex Parte Motion No. E2: Motion for the Appointment of an Expert Witness [Linguistics], and Order granting (Feb. 23, 1999) |
| 7 | Motion for Appointment and Payment of a Jury Selection Specialist (Feb. 25, 1999), and Order granting (March 22, 1999) |
| 8 | Motion for Funds for Expert Witness [voluntariness of confession] (unsigned, undated) (4 pgs) |

| Evidence Relevant to the Defense Team's Investigation | |
|---|---|
| 9 | Balentine's custodial statement (July 25, 1998) - transcript |
| 9A | Balentine's custodial statement (July 25, 1998) - audio recording |
| 10 | Synopsis IR # 98-6273 |
| 11 | "Interview Form for Clients in Criminal Cases" (Aug. 8, 1998) |
| 12 | Letter from James D. Durham, Jr. (Sept. 28, 1998) |
| 13 | "Balentine - Memo" |
| 14 | "Questions" list |
| 15 | "Evidence (Things to Do)" list |
| 16 | Balentine's testimony at pre-trial hearing (Feb. 23, 1999) |
| 17 | Handwritten notes from Kathy Garrison's interview of Balentine (March 25, 1999) |
| 18 | Handwritten notes from Kathy Garrison's interview of Balentine (March 28, 1999) |
| 19 | Attorney representation letter, authorizations for release of records, and affidavit for business records |
| 20 | Records request to Allbright Elementary (April 1, 1999) |
| 21 | Records request to Castleberry Elementary (April 1, 1999) |
| 22 | Records request to Newport Middle School/Jr. High (April 1, 1999) |
| 23 | Records request to Newport High School (April 1, 1999) |
| 24 | Records request to Dr. Roger Green (April 1, 1999) |
| 25 | Records request to Harris Hospital (April 1, 1999) |
| 26 | Records request to Newport Hospital (April 1, 1999) |
| 27 | Records request to Arkansas Dept. of Corrections - Medical Records (April 5, 1999) |
| 28 | Records request to Arkansas Dept. of Corrections Mental Health Division (April 5, 1999) |

| 29 | Records request to Concord Neighborhood Corporation/Applebee's (April 5, 1999) |
| 30 | Records request to Love's Country Stores, Inc. (April 5, 1999) |
| 31 | Records request to Newport Country Club (April 6, 1999) |
| 32 | Records request to Newport Elderly Home (April 6, 1999) |
| 33 | Records request to Curtner Lumber Company (April 7, 1999) |
| 34 | Newport Special School District records |
| 35 | Newport Hospital & Clinic records |
| 36 | Memo from Dr. John D. Ashley (April 14, 1999) |
| 37 | Arkansas Dept. of Corrections - Mental Health Division records |
| 38 | Arkansas Dept. of Corrections - incarceration records |
| 39 | Love's Country Stores, Inc. - employment records |
| 40 | Curtner Lumber Company - employment records |
| 41 | Letters to/from Mark Caylor, Sr. (Dec. 1998 to March 1999) |
| 42 | Handwriting analysis and writing sample |
| 43 | Handwritten notes from Kathy Garrison's interview of Clara Smith (April 5, 1999) |
| 44 | Typed report and handwritten notes of Kathy Garrison's interview of Tarence Gardner (March 21, 1999) |
| 45 | Affidavit of Eric Ontario Smith (1st statement to police Jan. 28, 1998) |
| 46 | Affidavit of Eric Ontario Smith (2nd statement to police Sept. 2, 1999) |
| 47 | State's subpoena of Eric Ontario Smith |
| 48 | Handwritten note, receipt, and record search re: Therry Rucker |
| 49 | Typed report and handwritten notes of Kathy Garrison's interview of Betty and Andy Carlson (March 21, 1999) |
| 50 | Typed report and handwritten notes of Kathy Garrison's interview of Tony Hernandez  (March 21, 1999) |

| 51 | Typed report and handwritten notes of Kathy Garrison's interview of C.L. Borden (April 6, 1999) |
|----|---|
| 52 | Typed report and handwritten notes of Kathy Garrison's interview of April Ryan (March 23, 1999) |
| 53 | Affidavit of April Dawn Ryan (1st statement to police Jan. 22, 1998) |
| 54 | Affidavit of April Dawn Ryan (2nd statement to police Jan. 23, 1998) |
| 55 | Excerpts from Letters from Balentine to April Ryan (1998-99) |
| 56 | Handwritten note re: investigation of gang signs/activity |
| 57 | Letter signed by Markie Caylor |
| 58 | Five photographs of spray paint/gang markings and handwritten note explaining the same |
| 59 | List from Kathy Garrison's file of "People Who Heard V. Make Threats" |
| 60 | Typed report and handwritten notes of Kathy Garrison's interview of Angie Allen (March 23, 1999) |
| 61 | Affidavit of Angelique Allen (statement to police Jan. 26, 1998) |
| 62 | Affidavit of Terri Lynn Nizza (statement to police Jan. 22, 1998) |
| 63 | Affidavit of Julie Ann Nizza (statement to police Jan. 21, 1998) |
| 64 | Affidavit of Timothy Scott Austin (statement to police Jan. 22, 1998) |
| 65 | Affidavit of Justin Oehlert (statement to police Jan. 21, 1998) |
| 66 | Affidavit of Christopher Caylor (statement to police Jan. 21, 1998) |
| 67 | Affidavit of Misty Charlene Caylor (statement to police Jan. 21, 1998) |
| 68 | Affidavit of Kelly Moon (statement to police Jan. 21, 1998) |
| 69 | Affidavit of Christina Ann George (statement to police Jan. 26, 1998) |
| 70 | Affidavit of Shonda Rebecca Johnson (statement to police Jan. 21, 1998) |
| 71 | Affidavit of Michael Duane Means (statement to police Jan. 23, 1998) |

| 72 | Defendant's Applications for Subpoenas (April 12 & 13, 1999) |
| 73 | Defendant's Application for Subpoenas (April 19, 1999), and returns of service |
| 74 | Trial counsel's statement to the court about having witnesses available for punishment |
| 75 | Excerpts from Kathy Garrison's files |
| 76 | Excerpts from trial counsel files |
| 77 | Excerpts from Randy Sherrod's files |
| 78 | Billing records of James D. Durham, Jr. |
| 79 | Billing records of Paul Herrmann |
| 80 | Billing records of Randall Sherrod |
| 81 | Billing records of Kathy Garrison (April 21, 1999) |
| 81A | Typed version of Kathy Garrison's billing records |
| 82 | Billing records of Kathy Garrison (June 2, 1999) |
| 83 | Affidavit of Kathy Garrison (Jan. 18, 2001) |
| 84 | Death certificate – James David Durham, Jr. (Nov. 19, 2006) |
| **Balentine's Convictions, Extraneous Offenses, and Prior Bad Acts** | |
| 85 | State's Amended Notice Pursuant to Article 37.07 of the Texas Code of Criminal Procedure and Rules 404(b) and 609 Texas Rules of Evidence (March 15, 1999) |
| 86 | Evidence of Balentine's burglary and theft of property (April 1982) |
| 87 | Evidence of Balentine's burglary and theft of property (July 1983) |
| 88 | Evidence of Balentine's burglary and attempted theft (Dec. 1986) |
| 89 | Evidence of Balentine's aggravated robbery (Nov. 1989) |
| 90 | Evidence of Balentine's charges for carnal abuse (Oct. 1996) |
| 91 | Evidence of Balentine's residential burglary, aggravated assault, kidnapping, robbery, and terroristic threats (Nov. 1996) |

| Trial Counsel's Motions for Discovery or to Limit the State's Evidence | |
|---|---|
| 92 | Defendant's Request for Evidence (Feb. 11, 1999) |
| 93 | Pre-trial Motion No. 3: Motion for Discovery and Inspection of Reports, Notes or Records (Feb. 11, 1999), and Order granting |
| 94 | Pre-trial Motion No. 5: Motion for Discovery of Punishment Evidence (Feb. 11, 1999), and Order granting |
| 95 | Pre-trial Motion No. 6: Motion to Discover State's Extraneous and/or Unauthorized Acts of Misconduct to be Offered at Guilt or Punishment (Feb. 11, 1999), and Order granting |
| 96 | Pre-trial Motion No. 7: Motion for Discovery of Evidence of Prior Convictions to be Used for Impeachment (Feb. 11, 1999), and Order granting |
| 97 | [Pre-trial] Motion No. 8: Motion in Limine – Character of Complainant – Victim Impact (Feb. 11, 1999), and Order granting |
| **Trial Counsel's Motions to Preclude the Death Penalty** | |
| 98 | Pre-trial Motion No. 12: Motion to Declare the Texas Capital Sentencing Scheme Unconstitutional and to Preclude Imposition of the Death Penalty (Feb. 11, 1999), and Order denying |
| 99 | Pre-trial Motion No. 13: Defendant's Motion to Exclude the Death Penalty on Grounds that the Death Penalty is Administered in a Racially Discriminatory Manner (Feb. 11, 1999), and Order denying |
| 100 | Pre-trial Motion No. 14: Motion to Preclude Imposition of the Death Penalty (Feb. 11, 1999), and Order denying |
| 101 | Pre-trial Motion No. 15: Motion to Preclude Prosecution from Seeking the Death Penalty (Feb. 11, 1999), and Order denying |
| 102 | Pre-trial Motion No. 16: Defendant's Motion to Quash and Set Aside the Indictment (Feb. 11, 1999), and Order denying |
| 103 | Pre-trial Motion No. 17: Second Motion to Set Aside the Indictment (Unconstitutionality of Statute) (Feb. 11, 1999), and Order denying |
| 104 | Pre-trial Motion No. 18: [Motion] to Hold Unconstitutional V.A.C.C.P. Article 37.071 § 2(e) and (f) – Burden of Proof and Mitigation (Feb. 11, 1999), and Order denying |

| | **Trial Counsel's Motions re: Voir Dire and the Jury Charge at Punishment** |
|---|---|
| **105** | Pre-trial Motion No. 10: [Motion] to Voir Dire on Parole Law – 40 Year Minimum (Feb. 11, 1999), and Order denying |
| **106** | Defendant's Special Requested Charge as to Punishment (April 19, 1999), and Order denying |
| **107** | Pre-trial Motion No. 2: Objection to Prohibition on Informing Jurors that if a Single Juror "Holds Out" for Life, the Defendant Will Receive a Sentence of Life Imprisonment by Operation of Law (Feb. 11, 1999), and Order denying |
| | **Evidence Relevant to State Habeas Counsel's Representation** |
| **108** | Motion for Authorization to Expend Funds for Investigator (Feb. 9, 2000), and Order granting |
| **109** | Attorney Application to Visit TDCJ Offender (Dec. 19, 2000) |
| **110** | Application for Subpoena(s) and Duces Tecum (Jan. 16, 2001) |
| **111** | Excerpts from Werner Talley's file |
| **112** | Ineffective assistance of counsel claims (Nos. 20 & 21) raised in Balentine's Original Post-conviction Application for Writ of Habeas Corpus, and exhibits in support (Jan. 22, 2001) |
| **113** | Billing records of Werner Talley (Dec. 5, 2000) |
| **114** | Billing records of Kent Birdsong (Dec. 18, 2000) |
| **115** | Billing records of Kent Birdsong (Jan. 25, 2001) |
| **116** | Affidavit of Kent Birdsong (June 12, 2011) |
| | **Evidence developed during federal habeas review** |
| **117** | Handwritten notes of Dr. Gilda Kessner's interview with Balentine (Sept. 18, 2003) |
| **118** | Typed report of Jane McHan's interview with Balentine (March 17, 2004) |
| **119** | Handwritten notes of Dr. Gilda Kessner's interview with Balentine (July 12, 2004) |

| 120 | Dr. Gilda Kessner's testing data |
|---|---|
| 121 | Handwritten notes of Dr. Daniel Martell's structured neuropsychological examination of Balentine (July 20 & 21, 2016) |
| 122 | Dr. Daniel Martell's testing data |
| 123 | Handwritten notes of Dr. David Lisaks' interview of Balentine (Aug. 1, 2016) |
| 124 | Document entitled "Balentine Trauma" |
| 125 | Report of J. Randall Price, Ph.D. (Oct. 14, 2016) |

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE McFARLAND
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

JAY CLENDENIN
Assistant Attorney General
Criminal Appeals Division
State Bar No. 24059589

NATHAN TADEMA
Assistant Attorney General
Criminal Appeals Division
State Bar No. 24044285

 s/ Katherine D. Hayes*
KATHERINE D. HAYES
*Attorney-in-charge         Assistant Attorney General

-8-

Criminal Appeals Division
State Bar No. 00796729

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1400; (512) 320-8132 fax
katherine.hayes@texasattorneygeneral.gov

ATTORNEYS FOR RESPONDENT


## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2016, I electronically filed this

Respondent's Amended Exhibit List using the ECF system. A "Notice of

Electronic Filing" was generated and sent to Petitioner's counsel of record:

Lydia Brandt
**lydiabrandt566@gmail.com**

Peter Walker
**Peter_Walker@fd.org**

James Moreno
**James_Moreno@fd.org**

Shawn Nolan
**Shawn_Nolan@fd.org**

Elizabeth Hadayia
**Elizabeth_Hadayia@fd.org**

 s/ Katherine D. Hayes
KATHERINE D. HAYES
Assistant Attorney General
Criminal Appeals Division

-9-

# Attorney Fees Expense Claim

| Defendant/Child Name | John Balentine | | |
|---|---|---|---|

| ☐ Juvenile  ☐ Family Matters | Court | Attorney Name & Address |
|---|---|---|
| ☐ Misdemeanor  (Specify) | 320 | James D. Durham Jr |
| ☐ Felony | Cause # | 1008 W. 10th |
| ☒ Capital | 39532 | Amarillo Tx 79101 |
| ☐ Appeal | | |
| ☐ Investigation/Expert | | |

| SS# | ███████ | Phone |
|---|---|---|
| TBC# | 06284000 | Fax |

| Type of Service | Hours/Days | Hourly Rate | Fixed Rate | Amount to be Paid |
|---|---|---|---|---|
| Non Issue/Docket Call Appearance | | $35-75 | $100-200 | $ |
| Motion Hearing | | $35-75 | $200-400 | $ |
| Guilty/True Plea | | $35-75 | $300-400 | $ |
| Detention Hearing | | $35-75 | $100-200 | $ |
| Non Jury Trial | | $35-75 | $500-750 | $ |
| Jury Trial | 19 | $35-75 | $500-1000 | $ 13,500 |
| Out of Court Preparation | 250 | $35-75 | | $ 18,750 |
| Expenses (Attach Itemization) | | | | $ 2164.95 |
| | | | Total | $ 34,414.95 |

I certify that I have performed the services and incurred the expenses listed above in representing the Defendant/Child in accordance with C.C.P. 26.05, T.F.C. § 51.10 or other Texas statutes. I have not received nor will I receive any other payment for representing such person.

Attorney

Approved and Ordered paid from the General Fund.

Date: 4/26/99

Judge

EXHIBIT
RX-78

# JAMES D. DURHAM, JR.

ATTORNEY AT LAW
(SBN# 06284000)

1008 West 10th Avenue ● Amarillo, Texas 79101-3113 ● (806) 373-3054 ● FAX (806) 373-7328

**JAMI K. WATSON**
Attorney at Law
Associate

EXECUTIVE ASSISTANT
Carol Thomas

April 23, 1999

Honorable Don Emerson
Judge, 320th District Court
Potter County Courts Bldg.
Amarillo, Texas 79101

Re:    Cause No. 39,532-D
       The State of Texas vs. John Lezell Balentine

August 8, 1998 through April 19, 1999

| | | |
|---|---|---|
| Court Days - Nineteen (19) at $1,00.00 per day: | | $19,000.00 |
| August 8, 1998; March 11, 1999; March 12, 199; | | |
| March 19, 1999; March 22, 1999; March 26, 1999; | | |
| March 29, 1999; March 30, 1999; March 31, 1999; | | |
| April 1, 1999; April 5, 1999; April 6, 1999; | | |
| April 7, 1999; April 12, 1999; April 13, 1999; | | |
| April 14, 1999; April 15, 1999; April 16, 1999; | | |
| April 19, 1999 | | |
| Two-Hundred Fifty (250) hours at $150.00 per hour: | | $37,500.00 |

Expenses to date:

| | | | |
|---|---|---|---|
| 1. | Airline ticket for Neil Hirschhorn | $ | 472.00 |
| 2. | Clothing for Defendant from Whispers | $ | 425.22 |
| 3. | Enlargements made at Kinkos | $ | 404.48 |
| 4. | Copies of medical records | $ | 6.75 |
| 5. | Copies - 2,130 copies at $.05 per page | $ | 106.50 |
| 6. | Consultation with Neil Hirschhorn | $ | 750.00 |

*2164.95*

**TOTAL FEE:**                                                **$58,664.95**

Sincerely,

FILED
CINDY GROOMER
DISTRICT CLERK
1999 APR 23 PM 4:44
POTTER COUNTY, TEXAS
BY _____ DEPUTY

James D. Durham, Jr.

JDD/sde

2

Durham billing records  Page 3 of 11

## WHISPERS 15659

34th & Western
Fleetwood Shopping Center
(806) 359-9634

Date 4-8 19 99

Name _____
Address _____

| | CHECK | CASH | MC/VISA | AMEX/DISC | CLERK |
|---|---|---|---|---|---|

| QUAN. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| TIE | 04370-23 | | 7.99 |
| MSH | 03366-135 | | 14.99 |
| MSH | 04261-4 | | 6.99 |
| MSH | 04251-304 | | 7.99 |
| MB2 | 04352-2 | | 59.99 |
| MB2 | 04352-3 | | 59.99 |
| MB2 | 04370-22 | | 8.99 |
| MB2 | 04386-6 | 2  4.99 | 21.50 |
| MSH | 03363-557 | 7.90 | 1.60 |
| SH | 04246-1 | 25 | 6.25 |
| | | | 39.81 |
| | | TAX | 32.41 |
| | | TOTAL | 425.2 |

ALL SALES FINAL — NO REFUND OR EXCHANGE

## WHISPERS 15658

34th & Western
Fleetwood Shopping Center
(806) 359-9634

Date 4-8 19 99

Name _____
Address _____

| | CHECK | CASH | MC/VISA | AMEX/DISC | CLERK |
|---|---|---|---|---|---|

| QUAN. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| MPA | 03257-303 | | 14.99 |
| MPA | 04032-157 | | 12.99 |
| MPA | 04346-2 | 50% 15.99 | 8.00 |
| MPA | 04312-4 | 75% 16.99 | 4.25 |
| MPA | 04032-149 | | 13.99 |
| MSH | 03366-143 | | 7.99 |
| MPA | 00645-277 | | 21.99 |
| TIE | 04382-7 | | 7.99 |
| TIE | 03361-53 | | 8.99 |
| TIE | 04370-10 | | 7.99 |
| TIE | 04032-150 | | 7.99 |
| TIE | 01126-105 | | 7.99 |
| TIE | 01126-105 | | 9.99 |
| TIE | 01126-103 | | 9.99 |
| | | Sub TAX | 145.13 |
| | | TOTAL | |

ALL SALES FINAL — NO REFUND OR EXCHANGE



**CROWN**
OF TEXAS
**TRAVEL CENTER**

Telephone (806) 376-1340 • (800) 658-2078
2701 East 3rd Street • Amarillo, Texas 79104

LES PERS
STOMER NBR: 310040

ITINERARY/INVOICE NO. 0064290

TQEPSY

DATE: 22 MAR 99
PAGE: 01

TO: JAMES DURHAM
    1008 WEST 10TH
    AMARILLO TEXAS

IR: HIRSCHHORN/NEIL

| DATE | DEPARTURE / ARRIVAL CITY | FLT / F | TIMES | FLY / MEAL | AMOUNT |
|------|--------------------------|---------|-------|------------|--------|
| MAR 99 — WEDNESDAY | | | | | |
| AIR | AMERICAN AIRLINES  FLT:746 | | ECONOMY | SNACK/BRUNCH | |
|  | LV DENVER | | 1145A | EQP: SUPER 80 | |
|  | | | | 01HR 51MIN | |
|  | AR DALLAS FT WORTH | | 236P | NON-STOP | |
|  | ARRIVE: TERMINAL C | | | REF: TQEPSY | |
|  | HIRSCHHORN/NEIL   SEAT-26B | | | | |
| AIR | AMERICAN AIRLINES  FLT:1779 | | ECONOMY | | |
|  | LV DALLAS FT WORTH | | 341P | EQP: FOKKER 100 | |
|  | DEPART: TERMINAL A | | | 01HR 12MIN | |
|  | AR AMARILLO | | 453P | NON-STOP | |
|  | | | | REF: TQEPSY | |
|  | HIRSCHHORN/NEIL   SEAT-13B | | | | |
| 5 APR 99 — MONDAY | | | | | |
| AIR | AMERICAN AIRLINES  FLT:1686 | | ECONOMY | | |
|  | LV AMARILLO | | 620A | EQP: FOKKER 100 | |
|  | | | | 01HR 02MIN | |
|  | AR DALLAS FT WORTH | | 722A | NON-STOP | |
|  | ARRIVE: TERMINAL A | | | REF: TQEPSY | |
|  | HIRSCHHORN/NEIL   SEAT-19D | | | | |
| AIR | AMERICAN AIRLINES  FLT:1141 | | ECONOMY | CONT BKFST | |
|  | LV DALLAS FT WORTH | | 810A | EQP: SUPER 80 | |
|  | DEPART: TERMINAL C | | | 01HR 59MIN | |
|  | AR DENVER | | 909A | NON-STOP | |
|  | | | | REF: TQEPSY | |
|  | HIRSCHHORN/NEIL   SEAT-28F | | | | |

```
IR TICKET     AA7627334005      HIRSCHHORN NEIL
LEC TKT                         BILLED TO ██████████      472.00*
                                                          ----------
                                SUB TOTAL                 472.00
                                NET CC BILLING            472.00*
                                                          ----------
                                TOTAL AMOUNT DUE           0.00
```

TICKETS HAVE VALUE. IF UNUSED, PLEASE RETURN FOR CREDIT OR REFUND.

4

Durham billing records  Page 4 of 11

```
Kinko's                (806) 359-7684
3801 Olsen Blvd #2
Amarillo,        TX 79109

    QTY    PRICE    DISC       AMT
    17      3.49    0.00      59.33
OVERSIZE FULL SERVE 24 X 36
    17     15.00    0.00     255.00
AUX MOUNTING 24 X 36

SUB   314.33  TX    25.93  TOT  340.26
                    CHECK SALE  340.26
                           CHG    0.00

CW 105 TR    697445 RG 3  04/15/99 19:28
       Visit us @ http://www.kinkos.com
```

```
Kinko's                (806) 359-7684
3801 Olsen Blvd #2
Amarillo,        TX 79109

    QTY    PRICE    DISC       AMT
    17      3.49    0.00      59.33
OVERSIZE POSTER/BAN 18 X 24 WHITE CARD

SUB   59.33  TX     4.89  TOT   64.22
                    CHECK SALE   64.22
                           CHG    0.00

CW  81 TR    697251 RG 3A 04/15/99 15:14
       Visit us @ http://www.kinkos.com
```

2.25    9/25    Motion for Ex. Trial        1.25
        9/27    Visit @ Ct. House w/ Herman  1.00

2.00    11-11   Conference
                Pistol was auto
                Ck into location of wound

1.00    11-18   Review

        11-25   File work

10      +2   2    2
             10   2
             15   2
             21   2
             30   2

10      Jan. Prep-trial 10

15      Feb. invest. review  15 hr

        March.

                                41.5

/ File

Ballentina
1-6

Jury  Voire Dire          4.5
Conf w/ Paul b
          Daniel 1-7        1.25

Voir Dire   1-8        2.10
          1-9           .50

          1-11          2.75

Ct.

| | | | | |
|---|---|---|---|---|
| 3-22 | 5 hr. | Jury | Ct | ~~45.~~ 41.5 |
| 3-11 | 8 hr. | Motion | | |
| 3-12 | 4 hr | Motion | | 63.5 |

②ⁿᵈ

| | | | |
|---|---|---|---|
| Motion | Bond | 2 hr. | Ct. |
| Motion | Bond | 1 hr | Ct. |
| Disqualf | 2 hr. | | Ct. |

March

| | | | |
|---|---|---|---|
| 23 | 8 hr. | ~~Ct.~~ | |
| 24 | 8 hr | | |
| 20 | 2 hr | | |
| 19 | 6 hr. | Ct. | |
| 22 | 4 hr. | | |
| 24 | 8 to 9 | 13 hr. | 91.5 |
| 25 | 8.5 – 10 | 13.5 | 108.5 |
| 26 | 9 – 5  8 | | 118.0 |
| | 6-9  8-1 – 5-6  5 ⟩ 13 | | 13|
| 27 | 1-4  3 hr. | | 134 |
| 28 | 1-6  5 hr. | | 139 |
| 29 | 7 – 5 10 h | 7 hr Ct | 149 |
| 30 | 9 – 12  5-7  5 | 3 h Ct | 154 |
| 31 | 9-12  1 – 4 | 1 hr | 161 |
| 4/1 | 9-12  1 – 4 | 7 hr | 168 |

4/2   Review        2hr            170
4/3                 4hr            174

4/5   9-12     (8hr) ct.           182
      1-5

4/4   9-12     (3)              ) ct
      1-2     (1)                        189
      4-7      3

4-7   9-10.5   (1.5) ct.
      2-3.5   (1.5) ct.            195
      6-9      3

4-9   Round                       197
      2.h

4-10  Statement fil              205
      11:A      ) 8
      to 7 P

4-12  8-12     4 (3)
      1-6      5 (4.5)
4-13  8-12     4 (3)
      1-7      6 (4)
4-14  8-12     4 (3)
      1-6      5 (2)
4-15  8-11     3 (1)              239
      1-4      3 (2)              248
4-16  8-5      9 (3)

4-19   9-11 @                          250


Copies      2130 @ .05         106.50
Medical Records   6.75              6.75
Air Fare
(Hirschan)   472.00             472.00
Clothes
(Ballentine)   425.22           425.22
1 Kinkos      404.00            404.00
                            #  1,414.57
Daysin @ 12   @ 1,000         12,000.00
1 days      250.00 @ 150      37,500
                            50,974.57


2 50 0
1 2 50
/37 50

## ATTORNEY FEES EXPENSE CLAIM

UNDER ARTICLE 26.05, CODE OF CRIMINAL PROCEDURE AS AMENDED

| INSTRUCTIONS | COURT NUMBER |
|---|---|
| 1. SHOW ONLY ONE DEFENDANT AND TYPE OF CASE PER CLAIM.<br>2. BEFORE PAYMENT CAN BE AUTHORIZED, EACH ITEM MUST BE COMPLETED LEGIBLY IN INK.<br>3. FOR INVESTIGATIONS, PAID BILLS MUST BE SUBMITTED BY THE ATTORNEY FOR EXPENSES CLAIMED.<br>4. FORWARD COMPLETED CLAIM TO THE PRESIDING JUDGE FOR APPROVAL. | |

### COURT APPEARANCE INFORMATION

| DEFENDANT | CASE NUMBERS |
|---|---|
| | |

| | TYPE OF CASE | NUMBER OF COURT DAYS AND HOURS | RATE | MINIMUM | MAXIMUM | AMOUNT |
|---|---|---|---|---|---|---|
| ☐ STANDARD APPOINTMENT | ☐ NON ISSUE APPEARANCE | | $ | $ 50 | $ 150 | $ |
| | ☐ MOTION HEARING | | | 75 | 150 | |
| ☑ CAPITAL | ☐ 1ST DEGREE TRIAL | | | 175 | 275 | |
| | ☐ 2ND DEGREE TRIAL | | | 150 | 250 | |
| ☐ HABEAS CORPUS | ☐ 3RD DEGREE TRIAL | | | 150 | 250 | |
| | ☐ HABITUAL TRIAL | | | 175 | 275 | |
| | ☑ CAPITAL TRIAL | 19 days | | 375 | 500 | |
| ☐ PROBATION REVOCATION | ☐ 2ND CHAIR - CAPITAL TRIAL | | | 250 | 300 | |
| | ☐ TRIAL APPEARANCE *(When Case not reached due to Court in trial)* | | | 50 | 150 | |
| | ☐ INVESTIGATION *(See Attorney General Opinion C-712)* | | | · | 500 | · |
| APPEALS | ☐ NON CAPITAL APPEAL | | | 350 | 1,500 | |
| | ☐ CAPITAL APPEAL | | | $50/HR | 15,000 | |
| | ☑ OUT OF COURT PREPARATION | 250 | | $25/HR | $35/HR | #1414.57 |
| | *Expenses (attached)* | 250 | | | | |
| | TOTAL | $ | | | TOTAL | $ |

DATES IN COURT (Enter Type of Case followed by Dates. EXAMPLE: 1st Degree - 9/12, 9/13, 9/14/85)

*Captial   8/8/98;  3/22/99;  3/11/99;  3/12/99;  3/19/99; 3/26/99*
*3/29/99  3/30/99      3/31/99;  4/1/99;  4/5/99*
*4/6/99   4/7/99    4/12/99   4/13/99  4/14/97*
*4/15/99   4/16/99   4/19/99*

### PERSONAL INFORMATION

| SOCIAL SECURITY NUMBER | TELEPHONE NUMBER | | BAR CARD NUMBER | |
|---|---|---|---|---|
| MAILING ADDRESS | *(Number)* | *(Street)* | *(Suite)* | *(City)* | *(State)* | *(Zip Code)* |

### CERTIFICATION

I, _____, Attorney at Law, swear or affirm to the Court and to the County Auditor, that I have no other claim against the County for fees on any of the dates set out above, and that this statement is made so that the County Auditor may rely on this information to avoid payments which cannot be made due to Section 4 of Article 26.05, Code of Criminal Procedure, which relates to Article 51.10 of the Family Code and that the fees authorized by the Court in the above-mentioned case do not exceed the maximum amount permitted under Federal Laws and Regulations, and the Executive Orders and Regulations issued thereunder. I further swear or affirm that I have not received nor will I receive any other moneys or anything else of value for representing the accused.

_____
Attorney at Law (Signature)

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS, THE _____ DAY OF _____ A.D., 19 _____

Approved: _____

_____
Presiding Judge (Signature)

_____
Notary Public (Signature)

COURT NUMBER

DISTRICT CLERK

# ATTORNEY FEES EXPENSE CLAIM

UNDER ARTICLE 26.05, CODE OF CRIMINAL PROCEDURE AS AMENDED
and ARTICLE 51.10 (B, FAMILY CODE

## INSTRUCTIONS

1. SHOW ONLY ONE DEFENDANT AND TYPE OF CASE PER CLAIM.

2. BEFORE PAYMENT CAN BE AUTHORIZED, EACH ITEM MUST BE COMPLETED LEGIBLY IN INK.

3. CHECK THE TYPE OF SERVICE PROVIDED IN THE APPROPRIATE BOX(es).

4. FILL IN THE NUMBER OF HOURS EXPENDED FOR EACH TYPE OF SERVICE PERFORMED. FAILURE TO SET OUT HOURS EXPENDED WILL RESULT IN PAYMENT ON THE FIXED DAILY RATE. YOU MAY CLAIM THE FIXED DAILY RATE AND OUT OF COURT HOURS SPENT IN CASE PREPARATION.

5. FORWARD COMPLETED CLAIM TO THE PRESIDING JUDGE FOR APPROVAL.

## COURT APPEARANCE INFORMATION

DEFENDANT: John Lezell Balentine

CASE NUMBER(S): 39532-D

| TYPE OF SERVICE | HOURLY RATE* | FIXED RATE | HOURS | AMOUNT· |
|---|---|---|---|---|
| **I. IN COURT:** | | | | |
| **UNCONTESTED PROCEEDINGS:** | | | | |
| ☐ Guilty Plea | $35–$70 | $200/Day | | $ |
| ☐ Juvenile Stipulation | $35–$70 | $200/Day | | $ |
| ☐ Probation Revocation | $35–$70 | $200/Day | | $ |
| ☐ Other (Specify below) | $35–$70 | $200/Day | | $ |
| **CONTESTED PROCEEDINGS:** | | | | |
| ☐ Non-Jury Trial | $35–$70 | $200/Day | | $ |
| ☐ Juvenile Hearing | $35–$70 | $200/Day | | $ |
| ☐ Juvenile Detention Hearing | $35–$70 | $100/Day | | $ |
| ☐ Probation Revocation | $35–$70 | $200/Day | | $ |
| ☑ Motion Hearings | $35–$70 | $ 75/Day | 7 hrs | $ |
| ☐ Other (Specify below) | $35–$70 | | | $ |
| **JURY TRIAL:** | | | | |
| ☐ Criminal | $35–$70 | $250–$500/Day* | | $ |
| ☐ Juvenile | $35–$70 | $250–$500/Day* | | $ |
| **APPEAL:** | | | | |
| ☐ Criminal | $35–$70 | $400 | | $ |
| ☐ Juvenile | $35–$70 | $400 | | $ |
| **II. OUT OF COURT:** | | | | |
| ☑ Case preparation | $25–$35 | N/A | 150 hrs | $ |
| *to be set by Court | | TOTAL | | $ 5500 00 |

OTHER: (Specify type of service performed)

See attached

## PERSONAL INFORMATION

SOCIAL SECURITY NUMBER ■■■■  ■■■■  BAR CARD NUMBER

MAILING ADDRESS (Number) (Street) (Suite) (City) (State) (Zip Code)
500 S. Taylor Suite 504 Lobby Box 257 Amarillo Tx 79801

## CERTIFICATION

I, ___ , Attorney at Law, certify that I performed the above listed services in representing the Defendant/Child in the case(s) hereinabove set out. I further certify that I have not received, nor will I receive any other moneys or anything else of value for representing the accused.

PAUL HERRMANN

Attorney at Law (Signature)

FILED
POTTER CLERK
2006 JAN 6 A 9:52
POTTER COUNTY, TEXAS
BY___ DEPUTY

The foregoing Attorney Fees Expense Claim is hereby APPROVED and payment ordered from the General Fund of Potter County.

Approved: ___   Presiding Judge (Signature)   Date

**EXHIBIT**

tabbies RX-79

CLERK

32
39523-D

# JOHN LEZELL BALENTINE

| | | |
|---|---|---|
| 9/1/98 | Arraignment of defendant, meet with defendant | 2hrs |
| 9/18/98 | Transcribe file | 6hrs |
| 9/15/98 | Review and transcribe file | 6hrs |
| 10/6/98 | Work on file, organization of file | 3hrs |
| 10/13/98 | Read file, visit crime scene, look at State's file | 4hrs |
| 11/6/98 | Review law on voir dire | 8hrs |
| 11/11/98 | Review voir dire questionnaire, work on voir dire | 3hrs |
| 11/20/98 | Review law on suppression of confession | 2hrs |
| 11/30/98 | Review file | 1hr |
| 12/3/98 | Research experts | 3hrs |
| 12/10/98 | Contact several experts and review file | 4hrs |
| 1/21/98 | Review State's file, and prepare voir dire | 3hrs |
| 1/7/99 | Review file, meet with Jim Durham | 2hrs |
| 1/8/99 | Transcribe file, organize file IR's into readable form | 3hrs |
| 1/12/99 | Visit crime scene, review file | 3hrs |
| 1/13/99 | Meet with witnesses, review file, meeting with James Durham | 3hrs |
| 1/ 15/99 | Re- transcribe IR, witnesses statements | 6hrs |
| 1/16/99 | Re-transcribe IR, witnesses statements | 6hrs |
| 1/19/99 | Talk with defendant on phone | 1hr |
| 1/22/99 | Prepare motion to reduce bond, motion to suppress and motion to transfer venue | 3hrs |
| 1/26/99 | Phone call with defendant | .5hrs |
| 1/27/99 | Met with defendant in jail, and review case | 2.5hrs |
| 1/27/99 | Prepare for Motion to Reduce Bond | 2hrs |
| 1/29/99 | Motion to Reduce Bond Hearing, meet with client | 2hr |
| 2/2/99 | Prepare motions on case | 9hrs |
| 2/3/99 | Prepare motions on case | 9hrs |
| 2/6/99 | Prepare motions on case | 4hr |
| 2/3/99 | Meet with expert, prepare file | 3hrs |
| 2/18/99 | Prepare motions | 4hrs |
| 2/19/99 | Prepare exparte motions | 3hrs |
| 2/24/99 | Review confession evidence | 9hrs |
| 2/23/99 | Motion to reduce bond hearing | 2hrs |
| 2/25/99 | Meet with defendant in jail, sign waiver | 2hrs |
| 2/25/99 | Prepare motion to withdraw, statement of facts, and Brief on recusal | 11hrs |
| ➤ 2/26/99 | Hearing on recusal | 3hrs |
| 3/2/99 | Prepare motion to suppress, review law | 5hrs |
| 3/3/99 | Prepare for trial, view photo, work on closing argument | 9hrs |
| 3/4/99 | Work on closing argument, review experts | 5hrs |

1

2

# Attorney Fees Expense Claim

| Defendant/Child Name | John Balentine | | |
|---|---|---|---|

| | Court | Attorney Name & Address |
|---|---|---|
| ☐ Juvenile  ☐ Family Matters<br>☐ Misdemeanor _____ (Specify)<br>☐ Felony<br>☑ Capital<br>☐ Appeal<br>☐ Investigation/Expert | 320<br>Cause #<br>39532 | Randall Sherrod<br>817 S. Polk #204<br>Amarillo Tx 79101 |

| SS# ▓▓▓▓▓▓▓▓ | Phone |
|---|---|
| TBC# 18252500 | Fax |

| Type of Service | Hours/Days | Hourly Rate | Fixed Rate | Amount to be Paid |
|---|---|---|---|---|
| Non Issue/Docket Call Appearance | | $35-75 | $100-200 | $ |
| Motion Hearing | | $35-75 | $200-400 | $ |
| Guilty/True Plea | | $35-75 | $300-400 | $ |
| Detention Hearing | | $35-75 | $100-200 | $ |
| Non Jury Trial | | $35-75 | $500-750 | $ |
| Jury Trial | 19 | $35-75 | $500-1000 | $ 13,500 |
| Out of Court Preparation | 163 | $35-75 | | $ 12,225 |
| Expenses (Attach Itemization) | | | | $ 24 |
| | | | Total | $ 25,749 00 |

I certify that I have performed the services and incurred the expenses listed above in representing the Defendant/Child in accordance with C.C.P. 26.05, T.F.C. §51.10 or other Texas statutes. I have not received nor will I receive any other payment for representing such person.

_____
Attorney

Approved and Ordered paid from the General Fund.

Date: ___4/26/99___

_____
Judge

DISTRICT GROOM
'99 APR 26 P 4:49
POTTER COUNTY, TEXAS
BY _____ DEPUTY

EXHIBIT
RX-80

1

Rhodes & Sherrod, L.L.P
817 S. Polk, Suite  204
Amarillo TX 79101


Invoice submitted to:
John Balentine



April 20, 1999
In Reference To:capital murder 3/8/99
              Need to put address in as soon as we
              receive info
Invoice #10945

        Professional Services

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 3/8/99 | Case prep.<br>Discussed Capital Murder with<br>Judge Emerson.....discussed case<br>with Jim Durham | 0.42<br>200.00/hr | 84.00 |
| 3/10/99 | Case prep.<br>Meeting with Jim Durham on case | 1.25<br>200.00/hr | 250.00 |
|  | Case prep.<br>Reviewed file for Pre-Trial<br>Hearings | 1.75<br>200.00/hr | 350.00 |
|  | Case prep.<br>Met with Jim Durham....discussed<br>case and Motions | 0.83<br>200.00/hr | 166.00 |
| 3/11/99 | Case prep.<br>Pre-trial Hearings | 8.00<br>200.00/hr | 1,600.00 |

COPY GROUP 0
DISTRICT CLERK

'99 APR 26  P 4 49

POTTER COUNTY, TEXAS

BY___ _____ DEPUTY

2

John Balentine                                                    Page    2

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 3/12/99 | Case prep.<br>2nd day of Pre-trial Hearings | 5.00<br>200.00/hr | 1,000.00 |
| 3/13/99 | Case prep.<br>Brief and Argument...Pre-Trial<br>Motions....expectation | 2.00<br>200.00/hr | 400.00 |
| 3/21/99 | Case prep.<br>Reviewed reports....3&1/2 hours at<br>home | 3.50<br>200.00/hr | 700.00 |
| 3/22/99 | Case prep.<br>Brief....Legal Assistant, Carol | 1.50<br>60.00/hr | 90.00 |
|  | Case prep.<br>Jury Panel....8:30am-12:00noon &<br>1:30pm-3:30pm;  Reviewed reports(4<br>hours) | 9.50<br>200.00/hr | 1,900.00 |
| 3/24/99 | Case prep.<br>Carol and RLS met with Durham at<br>his office(1:30-5:30) | 4.00<br>200.00/hr | 800.00 |
|  | Case prep.<br>Durham's office reviewed my<br>questions...7:00pm-10:00pm | 2.00<br>200.00/hr | 400.00 |
|  | Case prep.<br>Met in Jim Durham's<br>Office(2:00-5:00)...Legal<br>Assistant, Carol | 3.00<br>60.00/hr | 180.00 |
| 3/25/99 | Case prep.<br>Jury Panel excused...<br>8:30am-10:00am;  Meeting with<br>Investigator 11:30am-12:30pm;<br>Jury selection meeting with<br>expert...5:30pm-8:00pm;  Worked<br>Voir Dire 9:30 pm- 10:30pm | 6.00<br>200.00/hr | 1,200.00 |

3

John Balentine                                                   Page   3

|         |                                                    | Hrs/Rate    | Amount    |
|---------|----------------------------------------------------|-------------|-----------|
| 3/26/99 | Case prep.<br>Voir Dire 2nd Jury Panel(8:30 am-4:30 pm) | 8.00<br>200.00/hr | 1,600.00 |
| 3/27/99 | Case prep.<br>Reviewed Incident Report and Affidavit files | 8.50<br>200.00/hr | 1,700.00 |
| 3/28/99 | Case prep.<br>Case preparation on Sunday           | 4.00<br>200.00/hr | 800.00 |
| 3/29/99 | Case prep.<br>Jury Voir Dire(8:30-12:00 &1:15-4:00) | 6.25<br>200.00/hr | 1,250.00 |
|         | Case prep.<br>File review                          | 0.33<br>200.00/hr | 66.00 |
| 3/30/99 | Case prep.<br>Jury selection(1:00-2:45)...Legal Assistant, Carol | 1.75<br>60.00/hr | 105.00 |
|         | Case prep.<br>Individual Jury Voir Dire(8:30-2:45) | 6.25<br>200.00/hr | 1,250.00 |
| 3/31/99 | Case prep.<br>Individual Jury Voir Dire(1:00-4:30) | 3.50<br>200.00/hr | 700.00 |
| 4/1/99  | Case prep.<br>Individual Jury Voir Dire(8:30-12:00, 1:00-3:10) | 5.67<br>200.00/hr | 1,134.00 |
|         | Case prep.<br>Reviewed Victim's background         | 1.50<br>200.00/hr | 300.00 |
| 4/2/99  | Case prep.<br>Call from and to Kathy Garrison...call to Carol in Durham's office(3/31/99)..call to Mr. Ofshea(4/1/99)...Legal Assistant, Carol | 0.58<br>60.00/hr | 34.80 |

4

John Balentine                                              Page    4

|  | | Hrs/Rate | Amount |
|---|---|---|---|
| 4/6/99 | Case prep.<br>Preparation of Motion....Legal<br>Assistant, Carol | 0.50<br>60.00/hr | 30.00 |
|  | Case prep.<br>Met with Durham....final jury<br>selection(4:00p-7:00p) | 3.00<br>200.00/hr | 600.00 |
| 4/7/99 | Case prep.<br>Final Jury Selection(9:00-11:30) | 2.50<br>200.00/hr | 500.00 |
|  | Case prep.<br>Reviewed police<br>reports....telephone conversation<br>with Mr. Ofshea...confession expert | 2.00<br>200.00/hr | 400.00 |
| 4/10/99 | Case prep.<br>Case preparation over the weekend | 3.00<br>200.00/hr | 600.00 |
| 4/12/99 | Case prep.<br>Trial(8:30-5:00) | 7.50<br>200.00/hr | 1,500.00 |
|  | Case prep.<br>Case preparation at home | 2.00<br>200.00/hr | 400.00 |
| 4/13/99 | Case prep.<br>Trial(8:30-5:00) | 7.50<br>200.00/hr | 1,500.00 |
|  | Case prep.<br>Case preparation at home | 1.75<br>200.00/hr | 350.00 |
| 4/14/99 | Case prep.<br>Trial(8:30-4:00)...released early<br>because of weather | 6.50<br>200.00/hr | 1,300.00 |
|  | Case prep.<br>Case preparation ...Durham's Office | 1.25<br>200.00/hr | 250.00 |
| 4/15/99 | Case prep.<br>Trial(8:30-4:00)...worked through<br>lunch | 7.50<br>200.00/hr | 1,500.00 |

John Balentine                                                    Page   5

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 4/16/99 | Case prep.<br>Trial...(8:30-11:45 .....1:45-4:30) | 6.00<br>200.00/hr | 1,200.00 |
| 4/17/99 | Case prep.<br>Case preparation at home | 3.00<br>200.00/hr | 600.00 |
| 4/18/99 | Case prep.<br>Case preparation at home | 3.50<br>200.00/hr | 700.00 |
| 4/19/99 | Case prep.<br>Trial(8:30-5:30) | 9.00<br>200.00/hr | 1,800.00 |
|  | Case prep.<br>Preparation of Charge, Legal<br>Assistant, Carol | 1.00<br>60.00/hr | 60.00 |

Total Professional Services Rendered  162.58   $31,349.80

Expenses:

|  |  | Qty/Price | |
|---|---|---|---|
| 4/19/99 | copies<br>copies | 96<br>0.25 | 24.00 |

Total Expenses                                          $24.00

Total amount of this bill                        $31,373.80

Balance due                                      $31,373.80

John Balentine                                           Page    6

<div align="center">Attorney summary</div>

| Attorney | Hours | Rate | Amount |
|----------|------:|-----:|-------:|
| Randy L. Sherrod | 154.25 | 200.00 | $30,850.00 |
| 1 McRoberts | 8.33 | 60.00 | $499.80 |



ECKERD DRUG
## STORE #3326

** ECKERD DRUG #3326 PH. 379-6194 **
** 2012 S. WASHINGTON, AMARILLO **

ASSOC #R491  REG #007  DRAWER #1
TRANS 01877  TYPE 11  STORE #3326

952853  EXP PHOTO F *T   13.77
726269  KODAK FILM  *T    9.49 SALE
942037  NESTEA ICE  .N    1.09

    TX 8.25% TAX          1.92
    TOTAL               26.27
    CHARGE              26.27

    EXPIRATION DATE. 10/01  25.17
    AUTHORIZATION #:  41

    CHANGE                .00
    MARCH 26. 1999       1:05 PM

---

Zalentine

HASTINGS ENTERTAINMENT # 9604
2001 S. GEORGIA
AMARILLO, TX 79109
16-352-0654   03/27/1999   15:25
HELENA M. TRANS# 509619 TERM# 3

2 GHETTO D (R)          15.49

TOTAL                  $15.49

                        $1.28

TOTAL       $16.77

                EXP.: 10/01
                    $16.77

AMDE DUE                $0.00

3% HARDBACK BEST SELLERS* 49CENT VIDEO
***** WE BUY AND SELL USED CD'S *****
New Online Shopping! Visit our
website at www.hastings-ent.com

---

Kinko's          (806) 359-9684
3801 Olsen Blvd #2
Amarillo,        TX 79109

     QTY    PRICE    DISC    AMT
      6      2.98    0.00   17.88
COLOR 11 X 17 SINGLE SIDE

2DISC         10.00          -1.79
SUB   16.09  TX   1.33  TOT  17.42
                American Express  17.42
                         CHG   0.00
    CUSTOMER ID  GARRISON LEGAL SERV

*Your American Express discount has
         been applied.

                  APPROVE  606220
I agree to pay the above amount
according to the card issuer agreement.
Sign Here: X _____

CW  13 TR   695D013 RG 34 04/11/99 10:52
    Visit us @ http://www.kinkos.com

---

Kinko's          (806) 359-9684
3801 Olsen Blvd #2
Amarillo,        TX 79109

     QTY    PRICE    DISC     AMT
     978     0.25    0.00   244.50
FS S/S F1 Prc Special Price
     170     0.05    0.00     8.50
AUX OTHER STAPLING HAND

2DISC         10.00          -0.85
SUB  252.15  TX  20.80  TOT 272.95
                American Express  272.95
                         CHG   0.00
    CUSTOMER ID  GARRISON LEGAL SERV.

*Your American Express discount has
         been applied.

                  APPROVE  521397
I agree to pay the above amount
according to the card issuer agreement.
Sign Here: X _____

CW  81 TR   697278 RG 3  03/24/99 16:10
    Visit us @ http://www.kinkos.com

---



# Sage Publications, Inc.

CORWIN PRESS, INC.
A Sage Publications Company

Pine Forge Press
A Sage Publications Company

2455 Teller Road
Thousand Oaks
California 91320

Phone (805) 499-9721
Fax (805) 499-0871
E-mail: info@sagepub.com

**CANADA UPS PARCELS ONLY**

PACKAGES: ___ WEIGHT: ___ lbs.
TERMS: C.I.F. + GST
SHIPPER
SIGNATURE

THIS INVOICE CONTAINS BOOKS, JOURNALS,
AND/OR NEWSLETTERS MADE IN USA OR
OTHER DUTY-FREE COUNTRIES OF ORIGIN.

# INVOICE

ORIGINAL

| | | 03-23-99 | NET 30 | UPS 2ND DAY |
|---|---|---|---|---|

SHIP TO

KATHY GARRISON

AMARILLO TX

KATHY GARRISON

AMARILLO TX

THANK YOU FOR YOUR ORDER

| 4906 | WRIGHTSMAN: CONFESSIONS IN THE COURTROOM (PAPER) | 17.95 | 17.95 |
|---|---|---|---|

|  | |
|---|---|
| SUB TOTAL : | 17.95 |
| SALES TAX : | 0.00 |
| SHIPPING & HANDLING : | 9.00 |
| CASH RECEIVED : | -26.95 |

**INVOICE NUMBER**
3261170

Please make checks payable to Sage Publications
Inc. and return a copy of this invoice with your
remittance.

Federal ID# 95-2454902    Canadian GST# 12378 6448 RT

**PLEASE PAY
THIS AMOUNT BY** 04-22-99 ➡

U.S. $
0.00

Kathy Garrison-billing recs  April 21, 1999  Page 8 of 10

8

12.

PAYMENTECH

S A L E S   D R A F T

STEAK & ALE 4421
2915 INTERSTATE 40W
AMARILLO, TX 79102

Merchant: 5741044215
Term ID: 386741044215001
Date: 04/14/99 12:38
Acct:

K GARRISON

Exp: 10/01 Batch: 6  Shift: 1
Card type: AMEX Tran: 106

AMOUNT:     $25.92

TIP:            4.0

TOTAL:         $29.92  Rucker
                        $12.00

I agree to pay above total amount
according to card issuer agreement.

APPROVAL: 626827

TERMINAL: 1      SERVER: 119

TOP COPY-MERCHANT    BOTTOM COPY-CUSTOMER

NO.39,532-D

| THE STATE OF TEXAS | IN THE 320TH DISTRICT CT |
|---|---|
| VS. | IN AND FOR |
| JOHN L. BALENTINE | POTTER CO. TEXAS |

### ORDER FOR PAYMENT OF COURT
### APPOINTED INVESTIGATION

TO THE HONORABLE JUDGE OF SAID COURT:

On this _____ day of April, 1999 came on to be heard Defendant's

Motion for Payment of the Court Appointed Investigator in the above styled and

numbered cause.

It is ORDERED that the County Auditor pay to Jim Patterson Investigations,

Social Security # ████, ████████ Amarillo, Texas, 79106 the sum of

$ 744.15 for Investigation Fee's in this matter.

_____
JUDGE PRESIDING

FILED
CINDY GROOME
DISTRICT CLERK

1999 APR 26  P 4: 50

POTTER COUNTY, TEXAS

BY _____ R... DEPUTY

Copy - Auditor

Kathy Garrison-billing recs  April 21, 1999  Page 10 of 10

10

JIM PATTERSON, PRIVATE INVESTIGATIONS

AMARILLO, TX 79106
(806) ▮▮▮▮▮
TAX I.D # ▮▮▮▮▮▮

April 21,1999

Honorable Don Emerson
320th District Court
Potter County
Amarillo, TX

In re:  State of Texas vs. John L. Balentine # 39,532-D
Attorney: Jim Durham

Investigation:
3-11-99 through 4-19-99
179 hrs. 20 mins @$40 per hour        $7173.20
Expenses to date, excluding phone
charges:                              $ 570.95

Total Due:                            $7744.15

Thank you,

Kathy Garrison, Inv.

FILED
CINDY GROOME:
DISTRICT CLERK

1999 APR 26  P 4: 50

POTTER COUNTY, TEXAS

BY_____ DEPUTY


EXHIBIT
webster
RX-81

Kathy Garrison-billing recs  April 21, 1999   Page 1 of 10

1

Ballentine

Jim - 373-3054 / 416 / 376

Early - 655-7364 Home

376-4447 - Off.

FAX - 373-8162

Mell - 6670

678-6670

PCCA - 335-2406 Bradley / Abner - 353-3262 home phone

ISABEL - Soc. Prosecutor Cert. Jim 678-3054

3 11 Read
3 12 Read
3 17 Read
3 18 4:00 P.M. Rev. Case File 6:00 P.M. 2
3 19 2:00 - Call Randy - Do Comp. Stuff 5:15 P.M. 3 15
3 20 1:00 P.M. - Comp. work - find file 4:30 P.M. 3 30
3 21 End 6:30 P.M.
8:45 - Attny Conf. April Ryan - Comp Rec 9:50 P.M. 1 15
3 22 7:50 AM - April Ryan Called - 357-2551 - ... off at 3:30 - kids ... 6:30 P.M. appt.) 10:30 AM To ... Order ... from Judge ... D.A. for pics 12:45 P.M. 2 15
6:15 Appt. w/ April - PAGOR - Dec. 379-1475 10:30 ... 11:50 AM 5 35
3 23 9:15 AM To comp - letters 10:30 AM 1 15
12:30 P.M. 815 - 449-0721 ... 785-495-0874
Appleseed - 351-2810 - Angie Allen ... Dom. Wed.
Conf. Jim. 1:50 P.M. 2:30 P.M. 2 40
7:15 - Angie Allen 8:00 P.M. 45
8:40 P.M. Call Randy - 8:45 - Call ... re ... - left message
... - Reached Randy 8:55 P.M. - make arrange ...
A.M. c. 9:30 - Also, meet w/ ... 8:00 P.M. Wed P.M.
Call Me-Hernandez 379-9621 - Comp Searches 10:00 P.M. 1 20
3 24 10:00 Call Randy - ... left msg. - 3 ... Call 1:15 P.M. - To ... 1:30 10
2:30 P.M. Comp. Searches End 3:40 P.M. 1 5
3:50 P.M. Called P.D. Housing / Media / not emp. there - called home, no answer - 4:00 P.M. 10
7:30. Conf w/ Randy & Jim - re div., ... 10:15 P.M. 2 45
10:23 P.M. Read letters 1:30 A.M. 3 05
3 25 11:45 - Conf Randy - ... photos ... 12:30 P.M. 45
1:15 To ... 4:00 P.M. 3 45
4:15 Called Randy - to ... 4:30 - Jim - ... 05
8:25 - To Scene, ... measure, etc. 8:55 P.M. 30
3 26 9:30. To scene - photo. 9:50 A.M. 20
11:00 To ... to Jim & R ... need photos, ... 30
... Rickwood ... 11:30 A.M.
11:50 AM - Prep. ... 55. 12:10 20
12:55 - Prep photo 1:15 20
Read letters 2:15 1 00
3:15 - Prep. C. Scene ... Crime Photos ... Richwood 5:35 2 ...
4:50 Read ... letters 3 ... 15 ... 4 63

FILED FOR RECORD ... POTTER COUNTY, TEXAS ... DEPUTY

Newport, Ark.
870.

3/27 10:00 Am Play Pics - Sort-Sel master P1997 - Review Rel's, Read Ryan letters - 4:00 P.M. 6.00

3 28 1:30 - Begin glth. photos, etc. Get Mitchell - Call Randy - Read [illegible]
3 28 PCCF - Arrive 3:10 - [illegible] - leave 5:15 - Conf Randy 5:30 2.30
7:15 - List [illegible] - [illegible] info for [illegible] 9:50 Pm 2.35
3 29 11:00 Read video/photos, etc 1:30 PM 2.30
[illegible] - Towthorn - [illegible] ALL'S, [illegible], [illegible] logs [illegible] 2.30
9:45 P.M. Begin review of material - 12:15 A.M. 3.15
3 30 Call Gene Fristoe - Gang Expert - Get Newport Adds. 15
4:45 P.M. Call Randy / Conf .10
3 31 10:00 A.M. Newport High School - 870-523-1321
Castleberry 870-523-1351 [illegible] 870-523-1316
Newport Middle 523-1346 Newport Hosp. 870-523-6721
Harris Hosp. 870-523-8911 - Fx 523-0345
Newport High School - 870-523-1321 Fx - 523-1388 10:50 A.M. 50
12:05 P.M. Call Randy - Call these places for faxes & info
Al Green - 870-523-5852

Add. copies to Jim - re [illegible], V letter, V's IR's, etc - April 1 - 1:15 P.M. 1 10
7:30 P.m. Ryan letters - Comp Search [illegible] List [illegible] 10:30 P.M. 3 00
4 1 10:30 A.M. [illegible] letter, fax release [illegible] - called [illegible] 373-[illegible]
got Melinda's no. 373-0639 - [illegible] weekend [illegible]
11:30 A. Middle School - Fax 870-523-1388 - [illegible] - [illegible], but
Vicki [illegible] Counselor - Scheduling [illegible] - [illegible] 3:30 5 00
8:35 P.M. Cont. - [illegible] 10:40 2.05
4 2 10:20 A.M. to DA's office - check file 12:40 A.M. 2.20
1:15 Finish Photos - Ordered [illegible] 3:45 Pm 2.30
4 3 11:05 Call Melinda 373-0639 - [illegible] 2:05 P.M. 3 00
Call Randy - 2:20 P.M.
4 4 3:55 P.M. - Call [illegible], Mom's, [illegible] - No answer, [illegible] 5:30 P.M. 1 35
4 5 10:00 A.M. Call Newport H.S. Records - Call Newport H.S. 870-523-132[illegible]
[illegible] Henderson - 21[illegible] 257-6632 - [illegible] 10:50 A.M. 50
[illegible] 371-0915 - [illegible] Expert - [illegible] 655-6225 [illegible]
[illegible] Taylor-[illegible] - New York - Schenectady, N.Y. - Psychologist [illegible]
Gang Counselor - [illegible] Gang Inj. [illegible] - Comp [illegible] Expert -
[illegible] Youth Svcs - 501-682-9[illegible]
ADC - Dale Ramsey - Red Clerk - 870-[illegible] 1[illegible]
Faxed ADC for meds, mental Health - [illegible], faxed, [illegible]
others [illegible] - find Gang Expert - [illegible] - [illegible] 7:40 P.M. 7 40
8:25 P.M. [illegible] - Call Borden - Call [illegible], [illegible]
Conf Randy - 10:15 P.M. 1 55
50 30 min [illegible] 40

1999

Tues 4 6 3:50 - Conf w/ Atty's, Durham's office - Strategy at Durham office — 8:15 P.M. — 3.53

9:00 - w/ Randy [illegible] - [illegible] comp. locate wits. [illegible] — 11:53 P.M. — 2.30

4 7 9:00 A.M. Ct - Jury Sel. - to Durham, [illegible] tape & trans. Confession ([illegible] for [illegible]) To office. 11:20 - [illegible] Sub names - get tapes. [illegible] A [illegible] - [illegible] summons - Get rid of [illegible] 2:45 — 4:45 · 405-302-6232 →

[illegible] 's re A [illegible] - Consent - Applebee's - do not want to Rel[ease] decedent's sign. diff. a [illegible] + [illegible] PDC add's, & crim. check [illegible] 9:30 P.M. — 7.00

4 8 5:30 A.M. Ask about Caylor, Sr. → Coyle - Conf. - Prepare list [illegible] wit - [illegible] - Sub. Duces Tecum - [illegible] on U.S. - [illegible]
[illegible] of A [illegible] → Threats — Misty - Kid — Ockleat -

Chris Caylor - Mom's - Justin Ockleat - locate Brains
Chris's Mom -
The 2 officers - Chris acted weird - Amos 202 — Call Rickie Jones - [illegible] Psych Eval — Chadwick · 423 - Silen[illegible]
Jeff Cone - 373-3177 - 2:15 P.M. - [illegible] - 2:30
[illegible] re: [illegible] · 2:[illegible] April not at work today -

2:45 · Jeff Cone - Ans. Svc. - Dr. John Ashley - 870-523-3515 - 2:48 P.M.
3:20 P.M. Cone's office - not [illegible] - Dr. Cone said no -
[illegible] - who does MRI's - April - no [illegible] - [illegible] Caylor letter
Dr. Ashley's off. 870-523-3515 - Mrs. Ashley, only [illegible] Ronnie & Henry. [illegible] kept records 5 yrs.
do not have fax machine - mail to [illegible] Dogwood Drive Newport 72112 - 5:30 P.M. — 3.[illegible]

7:30 P.M. To [illegible] - — 10:30 A.M. — 3.00
4 9 1:00 P.M. Newport Jr. High - Called Joan Wright - 870-523-1346
[illegible] A Jim re witness [illegible] P.M. -
[illegible] - talked w/ counselor in H.S. - have nothing - 2:05 P.M. — 1.05
4 10 1:00 P.M. - look for [illegible], Moye, [illegible] — 3:40 P.M. — 2.40
4 11 [illegible] - Rpts. 1711 Jim Austin 354-2616 - 4215 S. Weston — 5:30 P.M. — 1.30
7:30 P.M. - writing rpt. 11:30 P.M. 4:15 — 4.00
4 12 8:45 - Court - 12:20 - Lunch 1:30 - Crt - 5:20 Conf w/ Randy & Jim, 5:45 P.M. — 8.[illegible]
6:00 P.M. [illegible] from ARK - [illegible] 6:30 to office - call NWS re temp. left message - [illegible] Re-scan [illegible] - [illegible] — 10.00

4 13 8:30 - Assist Attys. — 5:00 P.M. — 7.30

4 14 8:30 · To Court - 11:45 - Lunch - 2:15 - Drop off [illegible] Photos - 10 min. 10 1:15 Conf - [illegible],
to Jim's off. - conf / Atty's 6:30 5:15 To office 7:40 P.M. Call [illegible] re-creation
for 9:00 A.M./10:00 A.M. - wants 2:00, better for them — 8:00 P.M. 20 — 9.00
4 15 5:30 To court - Lit. office - 3:45 12:15 - Lunch 1:30 - Begin re-creating [illegible]
Crime - Assist Atty's 4:00 — 2.50
4 16 8:30 - To court - [illegible] Args - 11:50 - Jury [illegible] 12:00 - Int. [illegible] 1:15 P.M. 4:15 Wait - — 10:15
4:00 Jury in - Guilty Cap Murder - Conf. w/ Randy, get 3 [illegible] Issued — 5:30 P.M. — 1.30
4 17 11:30 Begin serving subs - Find missing witnesses - — 6:00 P.M. — 6.30
4 18 9:20 A.M. office - To ACJ - [illegible] - [illegible] Durham [illegible] for [illegible] - [illegible] — 8[illegible] — 12.0



*Total Expenses / Receipts $14.70*

*Ballentine*

**ECKERD DRUG STORE #3326**

TX 3.21% TAX        .27
TOTAL              3.89
CASH              10.00
CHANGE             6.20

THE PHOTO STORE

SALES RECEIPT

6.5 x 5" Gloss Proc   390   0.30   117.00
SUB-TOTAL          117.00
SALES TAX            9.65
TOTAL        $    126.65
CHARGE            126.65

---

**AUDIO REFINERY**

1747 AVONDALE
AMARILLO, TEXAS 79106
(806) 355-0072

Name: Garrison Legal Services    Date: 4/7/99
Address:                          Phone:

| Quantity | Description | Price | Amount |
|----------|-------------|-------|--------|
| 2 | Cassette Dubs | 6 ea | 12 |
|   | (Balentine) |  |  |
|   |  |  |  |
|   |  |  |  |
|   | Pol Carl |  |  |
|   |  |  |  |
|   |  |  |  |
|   |  |  |  |
|   |  |  |  |
|   |  |  |  |
|   |  |  |  |
|   |  |  |  |
|   |  | Sub-Total | 12 |
|   |  | Tax | 99 |
|   |  | TOTAL | 12.99 |

| | | | |
|---|---|---|---|
| 3 11 | Read | | |
| 3 12 | Read | | |
| 3 17 | Read | | |
| 3 18 | 4:00 p.m. Rev[iew] Case File                                           6:00 p.m. | 2 | |
| 3 19 | 2:00 - Call Randy  –   Do Comp[uter] stuff  5:15 p.m. | 3 | 15 |
| 3 20 | 1:00 p.m. - Comp[uter] work   find _____                     4:30 p.m. | 3 | 30 |
| | End 6:30 p.m. | | |
| 3 21 | 8:45 - Attempt Cont[act] April Ryan -- Comp[uter] Res[earch] 9:50 p.m. | 1 | 05 |
| 3 22 | 7:50 a.m. - April Ryan Called - 358-2551 Love's off at 3:30 - kids until 5:00 p.m. | | |
| | 6:30 p.m. Appt.[Appointment] 10:30 a.m. to Crths [Courthouse] for Order - | | |
| | no from Judge  – to D.A. [District Attorney] for pics [pictures]   12:45 p.m. | 2 | 15 |
| | 6:15 Appt. [Appointment] w/ April – PAG[er] or DIG[ital] 379-1415 | | |
| | 10:30 Rev[iew] letters   11:50 a.m. | 5 | 35 |
| 3 23 | 9:15 a.m. To _____ letters            10:30a.m. | 1 | 15 |
| | 12:30 p.m.          805-449-0721         Conf.   fax  805-499-0871 | | |
| | Applebees 351-2810   Angie Allen - to work tomorrow 10 a.m. Wed. | | |
| | Conf[er] Jim.   1:50 p.m.                              2:30 p.m. | 2 | 00 |
| | 7:15 – Angie Allen                                  8:00 P.M. | | 45 |
| | 8:40 p.m. Call Randy - 8:45 - Call the Means - re Scene  - left message | | |
| | _____ ran _____ – Reached Randy 8:55 p.m. - make arrangmt [arrangement] for Jail | | |
| | Δ [defendant] Rev[iew] case tomorrow | | |
| | A.M. c. 9:30 –  Also, meet w/ Jury spec[ialist] 8:00 p.m. Wed PM | | |
| | Call Mr. Hernandez 379-9621  – Comp[uter] Searches   10:00 p.m. — | 1 | 20 |
| 3 24 | 10:00 Call Randy – _____: Left mess[age] - 03  RA [Randy] Call 1:15 p.m. – | | |
| | To Jim's re. Jury Ques[tionnaires]    1:20 | | 10 |
| | 2:20 p.m. Comp[uter] searches                 End 3:40 P.M. | | 10 |
| | 3:50  RA [Randy] Called P[alo] D[uro] Housing\Means\ not empl[oye]d there – | | |
| | called home, _____ | | 10 |
| | Answer – 4:00 p.m. | | |
| | 7:30 Conf[er] Randy & Jim - re _____ wit's [witnesses], jurors, etc.   10:15 p.m. | 2 | 45 |
| | 10:25 p.m. Read letters                     1:30 a.m. | 3 | 05 |
| 3 25 | 11:45 Conf[er] Randy - to Int[erview] Δ [defendant] - places to go – | | |
| | House, photos       12:30 pm | | 45 |
| | 1:18 To Crthouse [Courthouse] Int[erview] Δ [defendant] – 4:00 p.m. | 3 | 45 |
| | 4:15 Called Randy – to Fax stuff to me – 4:20 Jim – Mrs. Means will call you | | 05 |
| | 8:25 To _____, Rev[iew] - rough measure[ments], etc. 8:55 p.m. | | 30 |
| 3 26 | 9:30 To _____ – photo –               9:50 a.m. | | 20 |
| | 11:00  To Crthouse [Courthouse] - to Jim & Randy- need photos, tapes, etc. | | |
| | To DA's office – no knowledge | | |
| | Called S[pecial] C[rimes] ➡ _____ ➡Rickwartz. lunch to call me w/ info – | | |
| | Eckerd's 11:20 a.m. | | 30 |

EXHIBIT
RX-81A

| | | | |
|---|---|---|---|
| | 11:50 AM – Prip Rel's [_____] Call for SS [social security] Randy's office  12:10<br>12:55 - p/up [pick up] photos          1:15<br>Read letters                      2:15<br>3:15 - p/up [pick up] C[rime] Scene video - Spc [special] Crimes –<br>          Photos at _____ _____ Rickwartz _____ 3:35          20<br>4:50 Read A[pril] Ryan letters | 1 | 20<br>20<br>00 |
| | | 37.15 min          29 | 3 | 95 |
| 3/27 | 10:00 a.m.  P/up Pics [Pick up pictures] - Sort  - get Master P 1987<br>          Review Rel's [_____] Read Ryan letters   4:00 p.m. | 6 | 50 |
| 3 25<br>3 28 | 1:30 - Begin gather[ing] photos, etc. Get Master P - Call Randy -rev[iew] pic[tures]-to<br>PCC7 [Potter County Correctional Facility 7] - arrive 3:10 - Perm[ission] to<br>          Int[erview] Δ [defendant] - leave 5:15 -  Conf[er] Randy 5:30<br>7:15 -List all threats- re Real Harm - info for no's, adds [numbers, addresses] 9:30 p.m. | 2<br>2 | 30<br>35 |
| 3 29 | 11:00 Rev'd [reviewed] video/photos, etc.          1:00 p.m.<br>3:00 - To courthouse to court w/att[orne]ys, get gang info, get releases ➜<br>          Δ [defendant] notary, CH V's [criminal histories victims], logs, _____ 5:30 p.m. | 2 | 00 |
| 3 30 | 9:05 p.m. Begin review of material –          12:15 a.m.<br>12 p.m. 3rd Call Gene Fristoe – Gang Expert – get Newport Adds [addresses]<br>4:45 p.m. Call Randy/Conf[er]          4:55 p.m. | 3 | 15<br>15<br>10 |
| 3 31 | 10:00 a.m. Newport High School – 870-523-1321<br>Ele[mentary] Castlebury 870-523-1351   Ele[mentary] Allbright 870-523-1316 | | |
| | Newport Middle 523-1346          ✔Newport Hosp[ital] 870-523-6721<br>✔Harris Hosp[ital] 870-523-8911 – fx [fax] 523-0345<br>Newport High School - 870-523-1321      fx [fax] 623-1388          10:50 A.M.<br>12:05 Call Randy – Call these folks for faxes &  info<br>✔Dr. Green – 870-523-9852 – | | 50 |
| 4 1 | Del[iver] copies to Jim – all CC H's [criminal histories], V[ictim's] letter,<br>          V's IR's [victim incident reports], etc – April i___ 1:15 p.m.<br>7:30 p.m. Ryan letters – Comp[uter] search Wits [Witnesses] –<br>          List Wits [Witnesses] re Conf [_____] of Evidence 10:30 p..m.<br>10:30 a.m.  P/up [Pick up] Durham letters, fax releases Ark[ansas] –<br>          called Mrs. Means 373-8240<br>Get Melinda's no. 373-0639 – to get into scene this weekend – 170 S. Buchanon<br>11:30 N. Middle School - Fax 870-523-1388 – Mr. Joe Craven - rcds [records], but | 1<br>3 | 10<br>00 |
| | Vicki [Williams] Counselor - Scheduling Rcds [Records] - spoke w/sec[retary] 3;30 | 5 | 00 |
| 4 2 | 8:35 p.m. Cont[act] Sherrod  iusts [instructions]          10:40<br>10:20 a.m.  to D.A.'s [District Attorney's] Office – check file          12:40 p.m.<br>1:15    Finish Photos – Ordered for attys [attorneys]          3:45 p.m. | 2<br>2<br>2 | 05<br>25<br>30 |

| | | | |
|---|---|---|---|
| 43 | 11:05 - Call Melinda - 373-0639 – To house - To Scene      2:05 p.m.<br>Call Randy -                                         2:20 p.m. | 3 | 00 |
| 44 | 3:55 p.m. – Call Bain's, Moon's, Caylor, etc. – No answers, moved, people have<br>          there no's [numbers], now                        5:30 p.m. | 1 | 35 |
| 45 | 10:00 a.m. Rcd [Received] Newport H.S. Records – Call Newport H.S. 870-523-1321 | | |
| | Det[ective] Hendrixson - 214-257-6632 – left mess[age] - 10:50 a.m.<br>Bonnie 371-0915 – left mess[age] re Expert – Bruce Tiffon 655-6225<br>          - girl in N. York?<br>Lisa Taylor - Austin – New York – Schenectady, NY – Psychologist ___<br>Gang Counselor ➜ Texas Gang Inj[ury] Case – Comp[uter] Look Expert<br>Ark[ansas] Youth Svcs [Services] - 501-682-9800 | 5 | 00 |
| | ADC [Arkansas Department of Corrections] - Gale Ramsey – Rcd [Records] Clerk<br>          870-247-1800 - Main No.<br>Faxed ADC for meds, mental health – Emp's [Employers] known, faxed,<br>          get info re others/orgs [organizations] - find Gang Expert - Email everyone<br>          – Break 7:40 P.M. | 7 | 00 |
| | 8:20 p.m. Resume – Call Borden. Call M___, get rcds [records], etc | 1 | 55 |
| | Conf[er] Randy –                        10:15 p.m. | | |
| |                               50.20 min. | 50 | 20 |
| | **1999** | | |
| 46 | 3:50 - Conf[er] w/Atty's Durham's office - Strategy at Durham's office  8:15 a.m. | 3 | 55 |
| | 9:00 - Randy assigns - try ___ locate wits [witnesses] to tie in w/∆ [defendant] | 2 | 30 |
| 47 | 9:00 a.m. - Ct [court] - Jury Selec[tion] - to Durham, ___ tape of trans[cribed]<br>confession (ask for 911's, ___ etc)<br>To office 11:20 - gather sub[poena] names - get tapes Take ___ to Randy 2:45<br>Conf[er] ___ Get rest of file     4:45        405-302-6732? | | |
| | Becky at Love's re ∆ emp[loyment] – ___ - Applebee's - do not want to rel[ease]<br>because ∆'s sign[ature] diff[erent] on their app[lication]  Ran PDC add[resses] &<br>crim[inal] checks to locate - 9:30 p.m. | 8 | 00 |
| 48 | 8:30 a.m. Ask about Caylor, Sr. ➜Coyle –   Conf[er]    Prepare & list ___ wit[nesses]<br>Steve Powers - Sub Deuces Tecum all on V's IR's [victims incident reports]<br>no ties of ∆'s to ➜ threats      Misty - kid - Ocklert | | |
| | Chris Caylor - ___ s Justin Ocklert - locate Bains<br>Chris's mom -           Call Richie Jones re Psych Gang<br>The 2 officers - Chris acted weird – Amos 202  Chadwick #423 - Silencer<br>Jeff Cone 373-3177 - 2:15 p.m. -- will call 2;30<br>Call April re: Gene & Ronnie     2:40 April not at work today | | |

| | | | |
|---|---|---|---|
| | 2:45 - Jeff Cone - ans[wering] ser[vice]    Dr. John Ashley 870-523-3515   2:48 p.m.<br>3:20 p.m. Cone's office – not int'd [interested] Dr. Cone said No –<br>[illegible] who does MRI's    April - no know Ronnie/Gene - pled up Caylor letter<br>Dr. Ashley's off. 870-523-3515 – Mrs. Ashley, only Ronnie & Henry -  only kept recs<br>5 yrs   do not have fax machine – mail to 2 Dogwood Drive Newport 72112  5:30 p.m. | 8 | 00 |
| 4 9 | 7:30 p.m. To Int's [Interviews?]                12:30 a.m.<br>1:00 p.m. Newport Jr. High - Called Joan Wright 870-523-1346<br>Rpt [report] verbally to Jim re witnesses last p.m.<br>Dickie Wms [Williams] - talked w/counselor in [High School] - have nothing 2:05p.m. | 8<br><br><br>1 | 00<br><br><br>05 |
| 4 10 | 1:00 PM - look for Brady, Paco, Moya, _____ , San Jac ____          3:40 pm | 2 | 45 |
| 4 11 | 4:00 Rpts [reports]  1411 Tim Austin 354-2616  4215 S. Western    5:30 p.m.<br>7:30 p.m.  Writing rpts [reports]    11:30 p.m. | 1<br>4 | 30<br>00 |
| 4 12 | 8:45 - Court - 12:20 lunch -  1:30 Crt [Court]    5:20 Conf[er] w/Randy & Jim  5:45<br>6:00 p.m. To office - call NWS [National Weather Service] re temp[erature] - left<br>message 6:45 - Rescan IR's [incident reports] - mark, review | 10 | 00 |
| 4 13 | 8:30   Assist Atty's                              5:00 p.m. | 7 | 30 |
| 4 14 | 8:30 - To court  11:45 Lunch   Drop off/ P/up [Pick up] Photos - 10 min<br>1:15 Conf[er] - State rests, to Jim's off[ice] conf[er] Atty's 6:30  5.5<br>To office 2:40 p.m.  Call Means - set up re-creation<br>for 9:00 a.m./10:00 a.m. – wants 2:00  better for them  8:00 PM | 9 | 00 |
| 4 15 | 8:30  To court - Life offer—3.45  12:15 Lunch       1:30 Begin [illegible] /re-creates, put<br>on our case  - Assist Atty's [Attorneys] 4:30 | 2 | 50 |
| 4 16 | 8:40 - To court - Final Arg's [arguments] - 11:30 Jury out   12:00 Int[erview]<br>Theory Rucker  1:15 p.m.   Wait – 4:00 July in – Guilty Cap Murder -<br>Conf[er] w/Randy, get Sub[poenas] issued 5:30 p.m. | 1 | 30 |
| 4 17 | Begin serving subs [subpoenas] - Five missing witnesses    - 6:00 p.m. | 6 | 30 |
| 4 18 | 9:20 a.m. ____ office. To CC7 [ _____ ] Int[erview] ∆ -<br>San Jacinto re: Ingram   Durham's for pics - put together | 7 | 30 |
| | All V's w/∆ knowing - Call Randy                2:00 p.m.<br>5:00 p.m. | 4 | 00 |
| 4/19 | 8:45 - Crt [Court] - [illegible]  10:30 To off[ice] call all wits [witnesses] for 1:00<br>Arrange p/up [pick up] Tony Brady, Angie Allen, Tim Austin, Nizzias  12:30<br>1:00 To court ____ & rev[iew] St's [statements] w/wit's [with witnesses] 1.50<br>Def[ense] rests/close  2:50    Jury out 2:50 p.m.  Death 5:15 p.m. | 5 | 35 |
| |                              9.75<br>37.15                       10.15<br>50.20<br>81.30 | | |
| | 10.15<br>178.  80 =<br>179.20 | | |

**JIM PATTERSON, PRIVATE INVESTIGATIONS**

AMARILLO, TX 79106

(806) ██████

TAX I.D # ██████

June 2, 1999

Honorable Don Emerson
320th District Court
Potter County
Amarillo, TX

In re:  State of Texas vs. John Balentine # 39,532-D
Attorney: James Durham

Final Expenses:
    Phone:                         $ 34.65
    Smart Corp. ADC Medical copies    $ 99.86

Total Due:                      $134.51

Thank you,

*Kathy Garrison*

Kathy Garrison, Inv.

259736


EXHIBIT
RX·82

1

Kathy Garrison-billing recs June 2, 1999   Page 2 of 6

**HARD 3 PLY FORM**

STAPLE HERE

**SMART**
CORPORATION

P.O. BOX 1812 • ALPHARETTA, GA 30005-9901
FEDERAL TAX I.D. NO. 95-3313004

RETAIN ... PORTION FOR YOUR RECORDS – CUSTOMER COPY

259737

| | | Approved By | | Date |
| | | Title | | Amount |
| | | Thru | | Phone |

**SHIP TO**
Requested by Kathy Garrison
Account Name Garrison Legal Services
Address P.C. Box 1574
City Amarillo State TX Zip 79105

**BILL TO**
Account Name
Address
City State Zip

| INVOICE DATE | SITE NUMBER | AREA NUMBER | REP NUMBER |
|---|---|---|---|
| 4/26/99 | 05136 | HCHICO | 091T |

PLEASE SEE REVERSE SIDE
FOR IMPORTANT INFORMATION   **INVOICE R 6840271**

Copies From CMS
Patient Name Ballentine John
ured Name
Employer Name [14] DOB 1/30/69

| [1] Claim # | [2] Policy # |
| [10] Plan # | [7] Group # |
| [5] Case # | [6] Provider # |
| [4] File | [13] Subscriber # |
| [3] SS# | |
| [12] Other ID # | |

Basic Fee ___ 20.00
Per Page ___ Micro 15 Paper ___
Page Count ___ 3912 Micro ___ Paper ___

1. Photocopy Charge ........... 73.00
2. Facility's Retrieval/ Search Fee ........... 9.00
3. Special Processing Fee ........... 
4. Shipping / Handling (1.386) 13.86
5. Sub Total ........... 95.86
6. Sales Tax ........... 

TOTAL CHARGES 95.86

Minus Payment ........... ( )

BALANCE DUE ........... 

PLEASE TEAR STUB ALONG THE PERFORATION AND
REMIT THIS PORTION WITH YOUR PAYMENT.
THANK YOU.

Check # ___
Payment Amount $ ___

**INVOICE R 6840271**



**NTS COMMUNICATIONS**

| CUSTOMER NAME | | CUSTOMER NUMBER | INVOICE DATE | PAGE |
|---|---|---|---|---|
| GARRISON LEGAL SERVICES | | ▮▮▮▮ | Apr 29,1999 | 2 |

## Detail of Long Distance Calls

### Calls from 373-6204

| No. | Date | Time | Place | | Area/Number | Rate | Minutes | Amount | Travel | Sur |
|---|---|---|---|---|---|---|---|---|---|---|
| 48 | Apr 8 | 11:23A | BOSTON | MA | 6173676363 | D | 0.80 | 0.11 | | |
| 49 | Apr 8 | 2:46P | NEWPORT | AR | 8705233515 | D | 1.15 | 0.16 B | | |
| 50 | Apr 8 | 2:48P | PLANO | TX | 9725275355 | D | 2.65 | 0.37 Roach | | |
| 51 | Apr 8 | 5:11P | NEWPORT | AR | 8705233515 | E | 4.05 | 0.48 B | | |
| 52 | Apr 8 | 6:35P | ALLEN | TX | 9723986891 | E | 0.85 | 0.10 | | |
| 53 | Apr 9 | 1:01P | NEWPORT | AR | 8705231346 | D | 0.90 | 0.13 B | | |
| 54 | Apr 9 | 2:00P | NEWPORT | AR | 8705231346 | D | 2.55 | 0.36 B | | |
| 55 | Apr 9 | 2:21P | COLUMBIA | SC | 8037992000 | D | 1.80 | 0.25 R | | |
| 56 | Apr 9 | 2:28P | COLUMBIA | SC | 8037650650 | D | 1.35 | 0.19 R | | |
| 57 | Apr 9 | 4:42P | ALLEN | TX | 9723986891 | D | 110.50 | 13.56 —R | | |
| 58 | Apr 11 | 3:16P | SAN JON | NM | 5055762315 | N | 0.70 | 0.06 | | |
| 59 | Apr 11 | 3:19P | INFRMATION | NM | 5055551212 | D | 0.98 | 0.60 | | |
| 60 | Apr 12 | 2:05P | TUCSON | AZ | 5207985282 | D | 2.85 | 0.40 | | |
| 61 | Apr 12 | 3:44P | WATERBURY | CT | 2035969030 | D | 5.00 | 0.70 | | |
| 62 | Apr 12 | 9:56P | LUBBOCK | TX | 8067465382 | E | 4.20 | 0.50 | | |
| 63 | Apr 13 | 12:11P | SHAMROCK | TX | 8062562140 | D | 4.60 | 0.64 | | |
| 64 | Apr 13 | 12:18P | INFRMATION | TX | 8175551212 | D | 0.43 | 0.50 | | |
| 65 | Apr 13 | 12:18P | INFRMATION | TX | 2545551212 | D | 0.53 | 0.50 | | |
| 66 | Apr 13 | 2:38P | INFRMATION | TX | 2545551212 | D | 0.53 | 0.50 | | |
| 67 | Apr 13 | 2:39P | GATESVILLE | TX | 2548656593 | D | 2.90 | 0.40 | | |
| 68 | Apr 13 | 2:43P | INFRMATION | TX | 2545551212 | D | 0.58 | 0.50 | | |
| 69 | Apr 13 | 2:48P | COPPERASCV | TX | 2545473605 | D | 1.80 | 0.25 | B | |
| 70 | Apr 13 | 3:14P | MISSOULA | MT | 4067215559 | D | 14.55 | 2.03 – B | | |
| 71 | Apr 14 | 12:40P | SHAMROCK | TX | 8062562140 | D | 4.35 | 0.61 | | |
| 72 | Apr 20 | 11:48A | FLS CHURCH | VA | 7034426600 | D | 0.65 | 0.09 – | | |
| 73 | Apr 22 | 12:04P | SAN DIEGO | CA | 6192361234 | D | 0.90 | 0.13 | | |
| 74 | Apr 22 | 12:06P | SAN DIEGO | CA | 6192382960 | D | 0.50 | 0.07 | | |
| 75 | Apr 22 | 12:09P | HOUSTON | TX | 7136503005 | D | 2.80 | 0.39 –Roach | | |
| 76 | Apr 22 | 12:56P | INFRMATION | TX | 5125551212 | D | 0.62 | 0.50– | | |
| 77 | Apr 22 | 2:20P | HOUSTON | TX | 7136503005 | D | 2.95 | 0.41 Roach | | |
| 78 | Apr 22 | 2:46P | SAN DIEGO | CA | 6192361234 | D | 2.75 | 0.38 | | |
| 79 | Apr 22 | 2:54P | HOUSTON | TX | 7136503005 | D | 3.50 | 0.49 –Roach | | |
| 80 | Apr 22 | 5:16P | BUDA | TX | 5123121039 | E | 1.90 | 0.23 | | |
| 81 | Apr 23 | 1:42P | HOUSTON | TX | 7136503005 | D | 0.50 | 0.07 –C– | | |
| 82 | Apr 23 | 1:43P | ALDINE | TX | 2814499714 | D | 0.50 | 0.07 R– | | |
| 83 | Apr 27 | 12:02P | COLUMBIA | SC | 8038987617 | D | 0.95 | 0.13 –R | | |
| 84 | Apr 27 | 1:01P | GREENVILLE | SC | 8642325832 | D | 1.55 | 0.22 –R | | |
| 85 | Apr 28 | 2:18P | PANAMACITY | FL | 8507844422 | D | 0.50 | 0.07 – J.Graham | | |
| | | | | | | | 356.59 | 57.62 | | |

### Calls from 374-6501 FAX

| No. | Date | Time | Place | | Area/Number | Rate | Minutes | Amount | Travel | Sur |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Apr 1 | 12:07P | NEWPORT | AR | 8705231388 | D | 1.75 | 0.24 | | |
| 2 | Apr 1 | 12:10P | NEWPORT | AR | 8705231388 | D | 1.80 | 0.25 | B | |
| 3 | Apr 1 | 12:12P | NEWPORT | AR | 8705231388 | D | 1.75 | 0.24 | | |
| 4 | Apr 1 | 12:14P | NEWPORT | AR | 8705231388 | D | 1.65 | 0.23 | | |
| 5 | Apr 1 | 12:17P | NEWPORT | AR | 8705233583 | D | 1.65 | 0.23 | | |

*Balentine* $4.35          259 *Roach.* $16.15



**NTS**
**COMMUNICATIONS**

| CUSTOMER NAME | CUSTOMER NUMBER | INVOICE DATE | PAGE |
|---|---|---|---|
| GARRISON LEGAL SERVICES | ▇▇▇▇▇ | Apr 29, 1999 | 3 |

## Detail of Long Distance Calls

### Calls from 374-6501 FAX

| No. | Date | Time | Place | | Area/Number | Rate | Minutes | Amount | Travel | Sur |
|---|---|---|---|---|---|---|---|---|---|---|
| 6 | Apr 1 | 12:19P | NEWPORT | AR | 8705230345 | D | 1.70 | 0.24 | B | |
| 7 | Apr 1 | 12:21P | NEWPORT | AR | 8705234437 | D | 1.65 | 0.23 | B | |
| 8 | Apr 1 | 3:28P | BOSTON | MA | 6173676858 | D | 1.75 | 0.24 | | |
| 9 | Apr 5 | 3:01P | PINE BLUFF | AR | 8702470805 | D | 2.40 | 0.33 | B | |
| 10 | Apr 5 | 3:27P | BRITTON | OK | 4057499145 | D | 1.65 | 0.23 | | |
| 11 | Apr 5 | 3:39P | PINE BLUFF | AR | 8702479250 | D | 1.45 | 0.20 | B | |
| 12 | Apr 5 | 5:40P | LINCOLN | NE | 4024216329 | E | 1.80 | 0.22 | B | |
| 13 | Apr 7 | 1:35P | NEWPORT | AR | 8705236435 | D | 2.75 | 0.38 | B | |
| 14 | Apr 8 | 3:48P | DALLAS | TX | 2147440586 | D | 0.60 | 0.08 | | |
| 15 | Apr 9 | 12:50P | HOUSTON | TX | 7136506221 | D | 3.00 | 0.42 | Roach | |
| 16 | Apr 9 | 12:53P | ADDISON | TX | 9729600077 | D | 0.55 | 0.08 | Roach | |
| 17 | Apr 9 | 2:21P | GREENVILLE | SC | 8644557855 | D | 1.85 | 0.26 | Roach | |
| 18 | Apr 12 | 2:11P | PLANO | TX | 9725275266 | D | 6.30 | 0.88 | Roach | |
| 19 | Apr 13 | 3:16P | COPPERASCV | TX | 2545474943 | D | 1.25 | 0.17 | | |
| 20 | Apr 15 | 2:16P | SAN DIEGO | CA | 6192329998 | D | 3.90 | 0.54 | | |
| 21 | Apr 23 | 6:01P | KEMAH | TX | 2815350384 | E | 0.80 | 0.10 | Roach | |
| 22 | Apr 26 | 1:08P | WASHINGTON | DC | 2028721031 | D | 0.90 | 0.13 | | |
| 23 | Apr 27 | 11:29A | GREENVILLE | SC | 8644557855 | D | 1.95 | 0.27 | R | |
| 24 | Apr 27 | 2:18P | GREENVILLE | SC | 8642426560 | D | 0.85 | 0.12 | R | |
| 25 | Apr 28 | 3:41P | HOUSTON | TX | 7136506221 | D | 11.85 | 1.65 | R | |
| 26 | Apr 28 | 3:54P | ADDISON | TX | 9729600077 | D | 6.25 | 0.87 | R | |
| | | | | | | | 63.80 | 8.83 | | |

| | Travel | Dir Assist | Long Distance |
|---|---|---|---|
| ANI: 373-6204 | | 13.10 | 44.52 |
| ANI: 374-6501 FAX | | | 8.83 |
| | | 13.10 | 53.35 |

### Detail of Other Charges

| Charge Description | | Amount | Total |
|---|---|---|---|
| FCC Mandated PICC - 8063736204 | 4/05/99 | 0.53 | |
| FCC Mandated PICC - 8063746501 | 4/05/99 | 2.25 | |
| | | | 2.78 |

### Federal/State/Local Tax Summary

| | Amount | Total |
|---|---|---|
| FCC Mandated USF Charge | 3.29 | |
| Tif Reimbursement | 0.91 | |
| Federal Excise Tax | 2.20 | |
| State Telecommunications Tax | 4.15 | |
| State Sales Tax | 0.44 | |
| 911 Equalization Surcharge | 0.08 | |
| Poison Control Surcharge | 0.08 | |
| City Telecommunications Tax | 0.68 | |
| Texas Universal Service Fund | 0.59 | |
| Gross Receipts Assessment | 0.04 | |
| | | 12.46 |

*Balentine* #1.60     **25976** *Roach* #4.65

Kathy Garrison-billing recs June 2, 1999   Page 4 of 6

 **NTS COMMUNICATIONS**

| CUSTOMER NAME | CUSTOMER NUMBER | INVOICE DATE | PAGE |
|---|---|---|---|
| GARRISON LEGAL SERVICES | ▮▮▮▮▮ | Apr 29,1999 | 1 |

## Detail of Long Distance Calls

Calls from 373-6204

| No. | Date | Time | Place | | Area/Number | Rate | Minutes | Amount | Travel | Sur |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Mar 31 | 10:09A | INFRMATION | AR | 8705551212 | D | 0.52 | 0.60 - ᵦ | | |
| 2 | Mar 31 | 10:09A | INFRMATION | AR | 8705551212 | D | 0.65 | 0.60 - ᵦ | | |
| 3 | Mar 31 | 10:10A | INFRMATION | AR | 8705551212 | D | 0.90 | 0.60 - ᵦ | | |
| 4 | Mar 31 | 10:11A | INFRMATION | AR | 8705551212 | D | 0.53 | 0.60 - ᵦ | | |
| 5 | Mar 31 | 10:14A | NEWPORT | AR | 8705231321 | D | 3.35 | 0.47 ~ ᵦ | | |
| 6 | Mar 31 | 10:19A | NEWPORT | AR | 8705231351 | D | 9.50 | 1.32 - ᵦ | | |
| 7 | Mar 31 | 11:45A | DALLAS | TX | 2149799007 | D | 1.30 | 0.18 | | |
| 8 | Mar 31 | 12:05P | NEWPORT | AR | 8705236721 | D | 6.60 | 0.92 - ᵦ | | |
| 9 | Mar 31 | 12:13P | NEWPORT | AR | 8705238911 | D | 3.35 | 0.47 - ᵦ | | |
| 10 | Mar 31 | 12:17P | INFRMATION | AR | 8705551212 | D | 0.07 | 0.60 - ᵦ | | |
| 11 | Mar 31 | 12:17P | INFRMATION | AR | 8705551212 | D | 0.47 | 0.60 - ᵦ | | |
| 12 | Mar 31 | 12:18P | NEWPORT | AR | 8705239852 | D | 9.65 | 1.35 - ᵦ | | |
| 13 | Mar 31 | 2:23P | WHEELER | TX | 8068265900 | D | 2.05 | 0.29 | | |
| 14 | Apr 1 | 10:30A | ADDISON | TX | 9725039911 | D | 2.50 | 0.35 - ᵣ | | |
| 15 | Apr 1 | 11:21A | NEWPORT | AR | 8705231346 | D | 3.90 | 0.54 - ᵦ | | |
| 16 | Apr 1 | 11:37A | NEWPORT | AR | 8705231351 | D | 1.30 | 0.18 - ᵦ | | |
| 17 | Apr 1 | 3:27P | BOSTON | MA | 6173676363 | D | 0.60 | 0.08 | | |
| 18 | Apr 5 | 11:16A | NEWPORT | AR | 8705231321 | D | 7.30 | 1.02 - ᵦ ⟨.⁸⁷⟩ | | |
| 19 | Apr 5 | 11:40A | INFRMATION | TX | 7135551212 | D | 1.75 | 0.50 | | |
| 20 | Apr 5 | 11:43A | INFRMATION | TX | 7135551212 | D | 1.05 | 0.50 | | |
| 21 | Apr 5 | 11:45A | DALLAS | TX | 2142756632 | D | 0.95 | 0.13 | | |
| 22 | Apr 5 | 12:54P | INFRMATION | | 5015551212 | D | 0.62 | 0.60 - ᵦ | | |
| 23 | Apr 5 | 12:56P | LITTLEROCK | AR | 5016829800 | D | 3.15 | 0.44 - ᵦ | | |
| 24 | Apr 5 | 1:03P | PINE BLUFF | AR | 8702471800 | D | 1.15 | 0.16 - ᵦ | | |
| 25 | Apr 5 | 1:24P | PINE BLUFF | AR | 8702471800 | D | 16.65 | 2.32 - ᵦ | | |
| 26 | Apr 5 | 2:38P | PINE BLUFF | AR | 8702472600 | D | 6.35 | 0.89 - ᵦ | | |
| 27 | Apr 5 | 3:29P | PINE BLUFF | AR | 8702472600 | D | 1.55 | 0.22 - ᵦ | | |
| 28 | Apr 5 | 3:31P | PINE BLUFF | AR | 8702477365 | D | 1.85 | 0.26 - ᵦ | | |
| 29 | Apr 5 | 3:43P | LINCOLN | NE | 4024212551 | D | 1.15 | 0.16 - ᵦ | | |
| 30 | Apr 5 | 3:48P | INFRMATION | NE | 4025551212 | D | 0.80 | 0.60 - ᵦ | | |
| 31 | Apr 5 | 4:53P | LINCOLN | NE | 4024760086 | D | 2.00 | 0.28 - ᵦ | | |
| 32 | Apr 5 | 4:56P | LINCOLN | NE | 4024212551 | D | 2.90 | 0.40 ᵦ | | |
| 33 | Apr 5 | 5:55P | INFRMATION | AR | 8705551212 | D | 0.53 | 0.60 - ᵦ | | |
| 34 | Apr 5 | 5:56P | INFRMATION | AR | 8705551212 | D | 0.90 | 0.60 - ᵦ | | |
| 35 | Apr 5 | 5:57P | INFRMATION | AR | 8705551212 | D | 0.58 | 0.60 - ᵦ | | |
| 36 | Apr 5 | 5:58P | INFRMATION | AR | 8705551212 | D | 0.68 | 0.60 ᵦ | | |
| 37 | Apr 5 | 5:59P | INFRMATION | AR | 8705551212 | D | 0.42 | 0.60 ᵦ | | |
| 38 | Apr 5 | 6:00P | INFRMATION | AR | 8705551212 | D | 1.12 | 0.60 ᵦ | | |
| 39 | Apr 5 | 9:05P | NEWPORT | AR | 8705232597 | E | 29.20 | 3.49 ᵦ | | |
| 40 | Apr 5 | 9:46P | NEWPORT | AR | 8705234624 | E | 16.85 | 2.02 ᵦ | | |
| 41 | Apr 6 | 10:46P | INFRMATION | AR | 8705551212 | D | 0.43 | 0.60 ᵦ | | |
| 42 | Apr 7 | 1:09P | NEWPORT | AR | 8705236721 | D | 2.30 | 0.32 ᵦ | | |
| 43 | Apr 7 | 1:14P | NEWPORT | AR | 8705238097 | D | 1.60 | 0.22 ᵦ | | |
| 44 | Apr 7 | 1:16P | NEWPORT | AR | 8705238904 | D | 5.20 | 0.72 ᵦ | | |
| 45 | Apr 7 | 1:22P | NEWPORT | AR | 8705238968 | D | 3.60 | 0.50 ᵦ | | |
| 46 | Apr 7 | 1:28P | NEWPORT | AR | 8705236701 | D | 3.10 | 0.43 ᵦ ⟨⁊.⁵⁷⟩ | | |
| 47 | Apr 7 | 4:40P | OKLA CITY | OK | 4053026732 | D | 2.45 | 0.34 | | |

*Balentine - ⁎28.70.*   259740

Kathy Garrison-billing recs June 2, 1999   Page 5 of 6

5

NO.39,532-D

THE STATE OF TEXAS                    IN THE 320TH DISTRICT CT

VS.                                   IN AND FOR

JOHN BALENTINE                        POTTER CO. TEXAS

### ORDER FOR PAYMENT OF COURT
### APPOINTED INVESTIGATION

TO THE HONORABLE JUDGE OF SAID COURT:

On this ___3rd___ day of June, 1999 came on to be heard Defendant's

Motion for Payment of the  Court Appointed Investigator in the above styled and

numbered cause.

It is ORDERED that the County Auditor pay to Jim Patterson Investigations,

Social Security # ██████, ████████████ Amarillo, Texas, 79106 the sum of

$134.51  for Investigation Expenses in this matter.

JUDGE PRESIDING

CINDY GROOMS
DISTRICT CLERK

M99 JUN -3 P 2 36

POTTER COUNTY TEXAS

BY _____ DEPUTY

259735

*Copy to Auditor*

Kathy Garrison-billing recs June 2, 1999   Page 6 of 6

6

*E.*

NO. 73,490

| EX PARTE | § | IN THE CRIMINAL COURT |
| | § | |
| | § | OF APPEALS |
| | § | |
| JOHN LEZELL BALENTINE | § | AUSTIN, TEXAS |

### AFFIDAVIT OF KATHY GARRISON

| STATE OF TEXAS | § |

BEFORE ME, the undersigned authority, on this day personally appeared KATHY GARRISON, to me well known and who, having been by me first duly sworn upon oath stated:

"My name is Kathy Garrison. I am a private investigator working for Patterson Investigations. I have done this for over twelve years.

"I have been court appointed to assist Trial Counsel and Writ Counsel on death penalty cases more than twenty times.

"I have been appointed as an investigator on many more felony matters. I have attended several seminars for death penalty investigations and mitigation specialties.

"Regarding the John Balentine Capital Murder case, I was called in early March to take over for another investigator. I was provided nothing from his files, so I am not sure what he did or didn't do.

"I wanted to learn the case as quickly as possible, to locate and interview witnesses, to procure records and documentation for my client as quickly as could be allowed given the time I had. I was only able to confer with Trial Counsel and John during breaks in trial and after hours. It was a severe disadvantage to be given essentially thirty days (March 11th to April 12th) to investigate the witnesses, investigate any potentially mitigating evidence and confer with Counsel and Applicant.

"Much of the information I requested did not arrive until after the trial. Some of it was helpful for us, some not. Either way, it was too late for John Balentine to use.

Page -1-



"My only question is this–would John have taken the plea bargain for life had he known what I was able to learn after the jury returned the verdict. "

THIS STATEMENT IS TRUE AND CORRECT.

SIGNED this _13_ day of _January_, 2001.

_Kathy Garrison_
KATHY GARRISON

SUBSCRIBED AND SWORN TO BEFORE ME on this _13_ day of _January_, 2001, to certify which witness my hand and seal of office.

_Kelly C. Angel_
Notary Public, State of Texas

KELLY C. ANGEL
NOTARY PUBLIC,
STATE OF TEXAS
My Commission Expires 5-3-2001

Page -2-

000161

2

Case 2:05-cv-00329-GW-PLA  Document 564-5  Filed 03/22/10  Page 53 of 603  Page ID #:10467

CERTIFICATION OF VITAL RECORD

# CITY OF AMARILLO, TEXAS

**STATE OF TEXAS** | **CERTIFICATE OF DEATH** | **STATE FILE NUMBER**

1 LEGAL NAME OF DECEASED (Include AKA's if any) (First, Middle, Last)
James David Durham, Jr.

4 DATE OF DEATH – ACTUAL OR PRESUMED
Nov. 19, 2006

2 SEX: Male
3 DATE OF BIRTH: May 14, 1941
5 AGE-Last Birthday (Years): 65
6 UNDER 1 YR
7 UNDER 1 DAY
8 BIRTHPLACE (City & State or Foreign Country): Paris, TX

9 SOCIAL SECURITY NUMBER
8 MARITAL STATUS AT TIME OF DEATH: ☒ Married ☐ Widowed ☐ Divorced ☐ Never Married ☐ Unknown
9 SURVIVING SPOUSE (if wife, give name prior to first marriage): Carla Hall

10a RESIDENCE STREET ADDRESS
1700 S. Harrison

10b COUNTY: Potter
10c STATE: Texas
10d ZIP CODE: 79102
10e CITY OR TOWN: Amarillo
10g INSIDE CITY LIMITS: ☒ Yes ☐ No

11 FATHER'S NAME
James David Durham, Sr.

16 MOTHER'S NAME PRIOR TO FIRST MARRIAGE
Ruby Bartlett

12 PLACE OF DEATH (CHECK ONLY ONE)
13 DEATH OCCURRED IN A HOSPITAL: ☐ Inpatient ☐ DEAD-Admitted ☐ DOA
IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL: ☐ Hospice Facility ☐ Nursing Home ☐ Decedent's Home ☐ Other (Specify)

14 COUNTY OF DEATH: Potter  Amarillo, 79102
15 CITY/TOWN TOP 10 (Include the birth plan, physician etc)
16 FACILITY NAME (If not institution, give street & number, plus street & zip code): 1700 S. Harrison

17 INFORMANT'S NAME & RELATIONSHIP TO DECEASED
Carla Durham (wife)

18 MAILING ADDRESS OF INFORMANT (Street and Number, City, State, Zip Code)
1700 S. Harrison, Amarillo, TX 79102

19 METHOD OF DISPOSITION: ☒ Burial ☐ Cremation ☐ Donation ☐ Entombment ☐ Removal From State ☐ Other (Specify)

20 SIGNATURE AND LICENSE NUMBER OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH
_Tracy Trevathan_ 12393

21

23a PLACE OF DISPOSITION (Name of cemetery, crematory, other place)
Memory Gardens Cemetery
23b LOCATION (City, Town, and State)
Amarillo, TX

24 NAME OF FUNERAL FACILITY
Schooler-Gordon Funeral Directors
25 COMPLETE ADDRESS OF FUNERAL FACILITY (Street and Number, City, State, Zip Code)
5400 Bell Ave, Amarillo, TX 79108

26 CERTIFIER (Check only one)
☐ Certifying Physician - To the best of my knowledge, death occurred due to the cause(s) and manner stated.
☐ Medical Examiner/Justice of the Peace – On the basis of examination, and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner stated.

27 SIGNATURE OF CERTIFIER
_A. Herman_
28 DATE CERTIFIED (mm/dd/yyyy): 11/21/06
29 LICENSE NUMBER: TX E0443
30 TIME OF DEATH (Actual or presumed): 7:10 PM

31 PRINTED NAME, ADDRESS OF CERTIFIER (Street and Number, City, State, Zip Code)
ANDREW STENHOUSE, MD 1301 COULTER, STE 404 AMARILLO, TX 79106
32 TITLE OF CERTIFIER
PHYSICIAN

33 PART I ENTER THE CHAIN OF EVENTS - DISEASES, INJURIES, OR COMPLICATIONS - THAT DIRECTLY CAUSED THE DEATH. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. Enter only one cause on each line.

| CAUSE OF DEATH | | Approximate interval: Onset to death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | a. SEPSIS SECONDARY TO INFECTED GANGRENE  Due to (or as a consequence of): | WEEKS |
| Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST | b. SEVERE PERIPHERAL VASCULAR DISEASE  Due to (or as a consequence of): | MONTHS |
| | c. DIABETES MELLITUS INSULIN DEPENDENT  Due to (or as a consequence of): | YEARS |

34 PART 2 ENTER OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART 1.
LIVER MASS ... MONTHS

34a WAS AN AUTOPSY PERFORMED? ☐ Yes ☒ No
35 WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? ☐ Yes ☐ No

35 MANNER OF DEATH: ☒ Natural ☐ Accident ☐ Suicide ☐ Homicide ☐ Pending investigation ☐ Could not be determined

37 DID TOBACCO CONTRIBUTE TO DEATH: ☐ Yes ☐ No ☐ Probably ☐ Unknown

38 IF FEMALE: ☐ Not pregnant within past year ☐ Pregnant at time of death ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to 1 year before death ☐ Unknown if pregnant within the past year

39 IF TRANSPORTATION INJURY, SPECIFY: ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (Specify)

40a DATE OF INJURY (Mo/Day/Yr)
40b TIME OF INJURY
40c INJURY AT WORK? ☐ Yes ☐ No
40d PLACE OF INJURY (e.g., Decedent's home, construction site, restaurant, wooded area)
40 COUNTY OF INJURY

40a LOCATION (Street and Number, City, State, Zip Code)

41 DESCRIBE HOW INJURY OCCURRED

45 REGISTRAR FILE NO: 02 02058
45a DATE RECEIVED BY LOCAL REGISTRAR: NOVEMBER 22, 2006
45b REGISTRAR: _Donna DeLight_

404576

STATE OF TEXAS
COUNTIES OF POTTER AND RANDALL } SS  CERTIFIED COPY OF VITAL RECORDS
CITY OF AMARILLO

This is to certify that this is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Sec. 191.051, Health and Safety Code.

ISSUED  MAY 2 9 2007

_Donna DeLight_
DONNA DeLIGHT, ST. REGISTRAR
OFFICE OF VITAL STATISTICS
CITY OF AMARILLO

This copy not valid unless prepared on engraved border displaying seal and signature of Registrar. LAMINATION MAY VOID CERTIFICATE.

VS-112 REV 1/2006

**EXHIBIT**
**RX-84**

NO. 39,532-D

| THE STATE OF TEXAS | ) | IN THE 320TH DISTRICT COURT |
|---|---|---|
| VS. | ) | IN AND FOR |
| JOHN LEZELL BALENTINE | ) | POTTER COUNTY, TEXAS |

**AMENDED NOTICE PURSUANT TO ARTICLE 37.07
OF THE TEXAS CODE OF CRIMINAL PROCEDURE
AND RULES 404(b) AND 609 TEXAS RULES OF EVIDENCE**

The State of Texas hereby gives the Court and Counsel for the Defendant formal written

notice that the State intends to introduce, during the guilt/innocence and punishment phases of

the above-styled and numbered cause, evidence of all other crimes, wrongs and acts committed

by the Defendant for all purposes permitted by Rules 404(b) and 609 of the Texas Rules of

Evidence and Article 37.07 of the Texas Code of Criminal Procedure. These crimes, wrongs and

acts are documented in the State's file, which has been made available to defense counsel. They

include, but are not limited to, the following:

1. On or about the 3rd day of October, 1996, in Jackson County, Arkansas, the defendant committed the offense of Carnal Abuse against A██ M███ a minor;

2. On or about the 9th day of November, 1996, in Jackson County, Arkansas, the defendant committed the offenses of Residential Burglary, Aggravated Assault, Kidnaping, Robbery, Terroristic Threatening, and Battery against Rosa Miller;

3. On the 4th day of March, 1985, in Cause No. J-83-13 of the Juvenile Court of Jackson County, Arkansas, the defendant was adjudicated of delinquent conduct, to wit: Burglary and Theft of Property;

4. On the 3rd day of April, 1997, in Cause No. CR-87-6 of the Circuit Court of Jackson County, Arkansas, the defendant was convicted of Burglary and Attempted Theft of Property;

5. On or about the 12th day of June, 1990, in Cause No. CR-89-66 of the Circuit Court of Jackson County, Arkansas, the defendant was convicted of the offense of Robbery;

6. On or about the 23rd day of November, 1997, in Potter County, Texas, the defendant committed the offense of Assault against Misty Caylor;

FILED
GROOMER
DISTRICT CLERK

'99 MAR 15 P 2:07

POTTER COUNTY, TEXAS

226

BY_____ DEPUTY

**EXHIBIT
RX-85**

7. On or about the 10th day of January, 1998, in Potter County, Texas, the defendant committed the offense of Assault against Misty Caylor;

8. On or about the 31st day of July, 1998, in Harris County, Texas, the defendant committed the offense of Assault against Thad Olive;

9. On or about the 23rd day of July, 1998, in Harris County, Texas, the defendant committed the offenses of driving without taillights at night and false identification to a peace officer, namely Officers Green and Richards.

Respectfully Submitted,

John Coyle
Assistant 47th District Attorney
SBN 00790521
501 S. Fillmore, Suite 1A
Amarillo, Texas 79101
(806) 379-2325
fax: (806) 379-2823

## CERTIFICATE OF SERVICE

On this the 15th day of ___March___, 1999, a true and correct copy of the foregoing was sent by U.S. mail to JAMES DURHAM, the attorney for the defendant.

JOHN COYLE

227

RS-6
Rev. 5-1-82

MAR 12 1984

*Judy Hout*

*Geneva Leland*
COUNTY CLERK

DEPARTMENT OF HUMAN SERVICES
DIVISION OF YOUTH SERVICES
RELEASE AGREEMENT/STATUS CHANGE

| | | | | |
|---|---|---|---|---|
| Student Name | Balentine, John L. | Committing Offense | Burglary, Theft of Property | |
| I.D. Number | BAL 013169 1 JC | Committing County | Jackson | |
| Date of Birth | /69 R/S B/M | Date Received I/C | 9/14/83 | |
| Type of Release | | Tentative Release Date | 3/9/84 | |

☐ Parole

☒ Discharge   Maximum Benefits Achieved
                Reason

CONDITIONS OF RELEASE

1. Youth will remain in the care and custody of and reside with his mother, Clara Smith, Rt. 3 Box 15, Newport, AR 72112.
2. Youth will enroll in public school and attend on a regular basis with no unexcused absences.
3. Youth will obey all state and local laws.
4. Youth will contact Jana Duncan   within three (3) working days of release, address and telephone number below.

| Jana Duncan | PO Box 112 | Magness, AR 72553 |
|---|---|---|
| (Name) | (Street) | (City,State) |

Telephone:  799-3272

is the Reintegration Services Counselor assigned to you. He is the official representative of this agency and you are expected to take his advice and cooperate fully with him in carrying out the above agreement.

I hereby agree to the conditions of release as listed above.

*John Balentine*   2-28-84
Student's Signature          Date

I hereby agree to the conditions of release as listed above.

*Clara Balentine Smith*   3-9-84
Parent, Custodian, Guardian          Date

I hereby certify that all criteria for Release has been met.

*Gary Lynch*   2-28-84
Counselor          Date

(Check One)
I/C   ☐
AYSC  ☐
ITU   ☐
PBYSC ☒

Recommended   ☒ Yes   ☐ No

*Barbara Street, Asst.*
Treatment Director

☒ Approved
☐ Disapproved

*Webb Ferrell Jr.*   3-9-84
Superintendent          Date

[CHANGE OF STATUS TO BE COMPLETED UPON RELEASE]

*John L. Balentine*, I.D. BAL 013169 1JC is hereby released,

effective   March 9, 1984   on   Discharge   status.

*Webb Ferrell Jr. Superintendent*   3-9-84
Signature          Title Sm          Date


EXHIBIT
RX-86

1

JOHN BALLENTINE AGE 14     J-82-14
     AND
FR▮▮▮▮BALLENTINE AGE 12     J-82-15

A juvenile court hearing was held on July 7, 1982 at
1:30 P.M. in the courtroom with the Honorable Judge Phil
Hout presiding.  The boys mother waived her right to attorney.

John and Fr▮▮▮pled guilty to breaking and entering
J & S. Agri Company and stealing.  (Burglary and theft of
property) They stole money, pistols, knives and 2 motorcycles.
Almost all items were recovered, but they wrecked a motorcyle
and did $275.00 damages to it.

The court found them to be delinquent juveniles and placed
them on one year's probation.  They are to report to Ted
Powell, Juvenile Probation Officer during the first week
in each month for a year.  They are to pay $475.00 in damages
to J & S Agri within one year.  Monthly payments or weekly
payments either one.

Judge Hout waived the court costs on these boys, since
they have a large sum to repay for damages.

FILED

JUN 1 7 1982

_Glenn Island_ Clerk

## IN THE JUVENILE COURT OF JACKSON COUNTY, ARKANSAS

IN THE MATTER OF ___JOHN BALLENTINE___,
A Juvenile · · · · · · · · · · · · · · · · ·...NO. __J-82-14__·

### P E T I T I O N

TO THE JUDGE OF THE JUVENILE COURT:

NOW COMES ___DET. LARRY COOK___, the Petitioner,

of ___JACKSON___ County, Arkansas, and presents this peti-

tion on behalf of the State of Arkansas against ·JOHN BALLENTINE

_____, a juvenile, who is now alleged to be

subject to an adjudication of this Court as (dependent-neglected)

(delinquent) (in need of supervision).  In support of this peti-

tion, the petitioner alleges the following:

BURGLARY AND THEFT OF PROPERTY

(1) ___JOHN BALLENTINE___ is _13_ years of age
                (name of juvenile)
and resides at ___BOX 15, ROBINSON ADDITION___, ___NEWPORT___,
                (street)                        (city)
___JACKSON COUNTY___, Arkansas, in the custody of _____

_____

(2) The parents, guardian, custodian, nearest ascertain-

able relative of the juvenile, and their addresses, are as follows:

1. Mr. Ballentine       Box 15, Robinson Add.  Newport,   Arkansas
   (name)               (address)              (city)     (state)
2. Mrs. Ballentine      Box 15, Robinson Add.  Newport,   Arkansas
   (name)               (address)              (city)     (state)
3. _____     _____      _____    _____
   (name)               (address)              (city)     (state)
4. _____     _____      _____    _____
   (name)               (address)              (city)     (state)

(3) ___JOHN BALLENTINE___ is alleged to be subject

to an adjudication by this Court by reason of the existence of

the following specific facts:  That Mr. John Ballentine realated to
this officer that he and his younger brother, Fr▇▇▇ Ballentine, did enter
J.&S. Agri by cutting a hole in the side of the building with tin snips, on
April 28th, 1982 at approximately 7:30 P.M.  That he and his brother did enter
the business and removed money from the cash register, two (2) .25 caliber

1

3

2

pistols, which they loaded before they left the building, approximately six (6) knifes, several necklaces and key chains. They serviced two motor cycles and left the building, wrecking one. The estimated cost of damage was $275.00. The cost of property stolen was $775.00.

WHEREFORE, it is prayed that this case be set for a hearing on some day and date and at a time and place to be fixed by the Court; that the Court issue a summons to the parties named herein; attaching a copy of this petition, and requiring the persons named herein who have the custody and control of the juvenile to appear personally before this Court and to bring the juvenile before this Court, at the time and place stated and directed by the Court as the time and place for the hearing of this case and that the parents and guardian of the juvenile be notified of the pendency of this case and of the time and place appointed by the Court for the hearing thereof.

It is further prayed that this Court, by order endorsed on the summons, authorize the officer serving the same to at once take the juvenile into custody.

It is further prayed that upon a final hearing hereof, and subject to an adjudication by this Court, such disposition of the care, control, and custody of the juvenile be ordered by this Court as appears just and proper.

*Larry Cook*
PETITIONER

NEWPORT POLICE DEPARTMENT
(address)
JACKSON          County, Arkansas
6/17/82
(date)

VERIFICATION

I, _____LARRY COOK_____, the petitioner

in the above case, certify and affirm under oath that the allegations

3

contained in this petition are true to the best of my knowledge, information and belief.

_Larry Cook_
PETITIONER

Subscribed and sworn before me this _17th_ day of

_June_, 19_82_.

_Deborah Cissell_
NOTARY PUBLIC

MY COMMISSION EXPIRES:

_2/15/83_

(SEAL)

# NEWPORT POLICE DEPARTMENT
## INCIDENT REPORT

NO. IR-82-282     Felony     C.L.S. NO. 40-82-88

Classification

(PRINT OR TYPE)

| 1 COMPLAINANT'S NAME (Firm name if business) | 2 AGE | DESCENT | SEX | DOB | 3 PHONE (Business) |
|---|---|---|---|---|---|
| | 41 | Cau. | M | | |

| 4 COMPLAINANT'S ADDRESS | 5 CITY | 6 PHONE (Residence) |
|---|---|---|
| | Newport, Arkansas | |

7 COMPLAINANT'S BUSINESS, EMPLOYMENT OR SCHOOL

J & S Agri & Honda Sales

8 TYPE OF OFFENSE OR INCIDENT

Burglary & T.O.P

9 PLACE WHERE OFFENSE OCCURRED

511 Malcolm St.

10 TYPE OF BUILDING (Residence, Store, Bank, etc.)

Store

11 REPORTED BY     PHONE

Ptl. Blair

12 REPORTED TO

Police Dept.

13 DAY, DATE AND TIME OF OFFENSE

April 28, 1982  10:02 P.M.

14 DAY, DATE AND TIME OF REPORT

April 28, 1982  10:35 P.M.

15 BODILY INJURIES TO     HOSPITAL?

None     None

16 HOW REPORTED (In person, phone, on view, other)

Radio

17 M/O (How done - force used - at what point - with what tool or weapon - other acts or trade marks)

Subject's cut hole in back of store to gain entry

17A EXACT WORDS USED BY OFFENDER

None

18 VEHICLE INVOLVED IN OFFENSE (Year - color - make - model - auto license no. - year - state)     Complainant's ☐   Suspect's ☐

1981 XL-805 Honda

| 19 DIRECTION OF FLIGHT STREET OR ROAD | ☐ N ☒ E ☐ S ☐ W ☐ AUTO ☐ FOOT ☐ UNK. ☒ OTHER | 20 WILL COMPLAINANT PROSECUTE? ( YES ) / NO | 80A AMOUNT OF PROPERTY LOSS? — 0 — / LESS THAN $100.00/or $ .00 |
|---|---|---|---|

| 21 NAME AND ADDRESS OF SUSPECT(S) OR AGE | DESCENT | SEX | DESCRIPTION | 22 CIRCLE IF SUSPECT IS |
|---|---|---|---|---|
| 1  John Balentine | Blk. | M | | Employee - Relative - Acquaintance |
| 2  Fr███ Balentine | Blk. | M | | |

| 23 WITNESS NAME | BEST CONTACT ADDRESS | AGE | BEST PHONE | OTHER PHONE | PARENT OR GUARDIAN? |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |

23 NARRATIVE (Write in any available details not covered above)

On April 28, 1982 at approx. 10:02 P.M. while on routine patrole, Ptl. Blair observed two Black Males traveling South on State Street, on what appeared to be a new Motor Cycle. The Motor Cycle ran off the road at State and Dill, after the Motor Cycle Wrecked, both subject's fled on foot. One suspect was apprehended a short time later. This Investigator determined that the suspect in custody was a John Balentine B/M age 11, futher investigation revealed the other suspect was a Fr███ Balentine B/M age 18, that both suspect's had Burglarized J & S Agri & Honda Sales.

NOTE: See Case File #40-82-88 for futher details.

25 INVESTIGATING OFFICER(S) Det. Larry Cook     26 REPORT MADE BY Larry Cook     DATE 4-28-82

| 27 CASE FILED | 28 THIS CASE IS | | | | 29 APPROVED BY |
|---|---|---|---|---|---|
| Yes ☒ No ☐ | Cleared by arrest ☒ | Unfounded ☐ | Inactive ☐ | Other ☐ | 30 ADDITIONAL PAGE(S) USED? (YES) NO |

# NEWPORT POLICE DEPARTMENT
## SUPPLEMENTARY REPORT
### (OR ADDITIONAL PAGE ☐)

NO. IR-82-282      Felony      C.I.S. NO. 40-82-88

Classification

| Name of Complainant | Address | Phone No. |
|---|---|---|
| E███ Johnson | Newport, Arkansas | ███ |

Offense

## Burglary & Theft Of Property

DETAILS OF OFFENSE, PROGRESS OF INVESTIGATION, ETC.:
(Investigating Officer must sign)

### ITEM'S RECOVERED

| | |
|---|---|
| 1981 XL -805 Honda Srl.#HD0402CK204199 | $725.00 |
| 1981 XL -805 Honda Srl.#HD0407CK204196 | 725.00 |
| Quarters & Dimes | 19.25 |
| Bill's 10's 5's 1's | 51.00 |
| One Box of 25 Cal. Automatic Shell's | 10.90 |
| Two Nickel Key Chains | 20.00 |
| Six Coin's Neckless | 44.00 |
| One Cadet Buck Knife | 21.00 |
| One White Buck Knife | 27.00 |
| One Prince Buck Knife | 28.00 |
| One Folding Hunting Buck Knife | 35.00 |
| One Colt Buck Knife | 29.00 |
| One Mustang Buck Knife | 32.00 |
| One Bicentenial Buck Knife Srl.#3000 | 300.00 |
| One Case Boot Knife | 37.50 |
| One 25 Cal. Automatic Pistol Srl.#M62550 | 57.50 |
| One 25 Cal. Automatic Pistol Srl.#189508 | 129.50 |
| Three Quarts of Oil | 3.90 |
| Total Property Recovered | $2,295.55 |

### ITEM' STILL MISSING

| | |
|---|---|
| One Ranger Buck Knife | 33.00 |
| One Trapper Buck Knife | 19.00 |
| One Muskrat Buck Knife | 20.00 |
| One Bird Buck Knife | 22.00 |
| One Rancker Buck Knife | 24.00 |
| One Knight Buck Knife | 28.00 |
| Twenty Five Case Knife's assorted kind's | 375.00 |

25 INVESTIGATING OFFICER(S) Det. Larry Cook    26 REPORT MADE BY Missing   $521.00 DATE

27 CASE FILED     28 THIS CASE IS     29 APPROVED BY

Yes ☒ No ☐   Cleared by arrest ☒   Unfounded ☐   Inactive ☐   Other ☐

30 PAGE NUMBER 2 OF 2 PAGES

Newport Police Department
Criminal Investigation Section

| | |
|---|---|
| CASE NUMBER: | 40-89-82 |
| DATE & TIME OF INVESTIGATION: | 4/28/82 at 10:35 P.M. |
| OFFENSE: | BURGLARY/T.O.P. |
| LOCATION: | J & S AGRI AND<br>HONDA SALES<br>511 MALCOLM, NEWPORT, AR |
| DATE & TIME OCCURRED: | 4/28/82 at approximately<br>10:02 P.M. |
| VICTIM: | E████ JOHNSON |
| LOSS: | APPROXIMATELY $775.00 |
| DEFENDANTS: | JOHN BALLENTINE, B/M<br>D.O.B. ████'69<br>FR████ BALINTINE, B/M<br>D.O.B. ████'70 |

INVESTIGATION:

     On the 28th of April, 1982 at approximately 10:02 P.M., while
on routine patrol, Ptl. Blair observed two black males traveling ·
South on State Street, on what appeared to be a new motorcycle.
The motorcycle ran off of the roadway at State and Dill. After the
motorcycle wrecked the two subjects fled on foot. One suspect was
apprehened a short time later. The subject was identified as a
John Ballentine. Further investigation reveiled that the other
subject involved was a Fr████ Ballentine, brother to John.

     Upon questioning John Ballentine, John related the following
information: (See Attached Statement) Mr. Ballentine advised that
at approximately 7:30 P.M., on the 28th of April, 1982, he and his
brother entered the rear of J & S Agri. Entry was gained by taking
tin snips and cutting a hold in the side of the building. After
entering the building, Mr. Ballentine stated that they removed the
money from the cash register which was more or less dime and quarters,
and a few bills. · Also, they removed two .25 caliber automatic pistols
which they loaded before they left the building. Also taken were
several knifes from a display case. And several necklaces and key
chains. They serviced two motorcycles on the inside and then pushed
them out into the alley where they suceeded in getting one of the
motorcycles running. They left the other motorcycle sitting in the
alley because it would not start. John Ballentine further stated
that at the time they crossed State Street and Malcolm they observed
an officer and John stated that he panicked and fell off of the
motorcycle causing the cycle to wreck and that's when they fled on
foot.

                                             Page 1.

At approximately 1:28 A.M. on the 29th of April, 1982, Mrs. Ballentine brought the other subject to the Police Department, which was identified as a Fr█████ Ballentine.  Upon talking to Fr█████Ballentine, Fr█████ related the following information: (See Attached Statement) Fr████ stated that at approximately 7:30 P.M. on the 28th of April, 1982, he and his brother were walking in front of J & S Agri when they observed the motorcycles on the inside of the building.  At this time they decided to enter the building and walked around to the back.  Upon looking over the back of the building they determined that they needed some tools to get in.  Fr████ stated that they went into the shop there next to the J & S Agri, which is a garage type building and removed a pair of tin snips and a vise grip and a screwdriver.  According to Fr████ they took the screws loose from the metal building, then took the tin snips and cut a hole and then gained entry to the building.

After entry was gained, Fr████ stated that they removed the money from the cash register and he said that he put approximately six knifes in his pocket and that John got three or four knifes and put them in his pocket along with some key chains and necklaces and then they got .25 caliber auotmatic pistols.  That they then attempted to steal a three wheeler but could not get it out the back door, then they took the three wheeler back and got two small Hontas and put batteries on them, serviced them with gas and oil, which they found inside the building.  They took the oil in the motorcylces outside in an alley.  Fr████ stated that only one motorcycle would start and that he and his brother got on that motorcycle and went down the alley to State Street, crossed State Street over to Malcolm and headed South on State when they observed an officer coming down State Street.  That John was on the back of the motorcylce and apparently tried to get off causing the motorcycle to wreck.  That they then fled on foot.  According to Fr████ that he kept on running from the time he left that area until he got to Remmel Park, and that at this time he had a box of .25 caliber shells and that he hid them tere in the park.  That he started to leave the pistol but then decided to take it with him.  That he then left there and went to his aunt's house, who lives in the 800 block of Remmel.  That's where he was picked up by his mother and brought to the Police Department.

This investigator went to J & S Agri and Honda Sales and determined the point of entry to be the same location as both John and Fr████ indicated.  That the tools taken from the garage next door were found at the entry point.  Also, this investigator went into the alley indicated bv Fr████ to be the area they serviced the motorcycles with oil, and this investigator found two empty cans of oil, and one full can of oil and also several wrenches that belonged to the motorcycle.  Also, at that area, a motorcycle was found in the weeds this being the one that would not start.  The trail leaving the scene indicated the direction of travel to be the same told to this investigator by both Fr████ and John.  The East down the alley to State and State across Malcolm, heading South on State.

A supplemental report was made indicating the items recovered from Fr████ and John Ballentine, also a list was made of the items

Page 2.

that were still missing and could not be found.  According to both
subjects they indicated that they did not take these other items
listed to be missing.

No further information at this time.

DET. LARRY COOK
CRIMINAL INVESTIGATION SECTION
NEWPORT POLICE DEPARTMENT
INVESTIGATING OFFICER

Page 4

NEWPORT POLICE DEPARTMENT
CRIMINAL INVESTIGATION SECTION

| | |
|---|---|
| SUBJECT: | INTERVIEW |
| DATE: | 4/29/82 |
| TIME: | 10:30 A.M. |
| PERSON INTERVIEWED: | JOHN BALLENTINE, B/M |
| | D.O.B. ███/69 |
| ADDRESS: | BOX 15, ROBINSON ADDITION |
| LOCATION OF INTERVIEW: | C.I.D. ROOM, CITY HALL |
| OFFICER INTERVIEWING: | DET. LARRY COOK |
| CASE NUMBER: | 40-89-82 |

<u>INTERVIEW:</u>

lc:   Okay, John I had you up here last night, is that correct?
jb:   Yes sir.
lc:   And I advised you of your Miranda Warning, and you advised
      me that you understood what I told you, and that you wanted
      to talk to me and give me a statement, is that correct?
jb:   Yes sir.
lc:   Okay, John, would you just start from the time that you and
      your brother came to town last night, and you ended up at
      J.& S. Agri and Honda Sales, and tell me what time you entered
      the building?
jb:   About 7:30.
lc:   How did you get into the building?
jb:   We had some wire-plyers and we got some wire cutters out of
      a purple looking car, all smashed up.
lc:   Okay, you talking about that car sitting there behind the
      liquor store, that's where you got the cutters?
jb:   Yes sir.  We took the screws out, out of that building, we
      didn't have to use nothing else.
lc:   Okay, you say you gained entry by taking the screws out of
      that metal building?
jb:   Yes sir.
lc:   Okay, after you got inside the building, what did you do?
jb:   Walked around, looked at the motorcycles but they wouldn't
      fit through the door, the three wheeler's wouldn't, so we
      put them back and got the motorcycle.
lc:   Okay, so you were gonna take some three wheelers to start
      with?
jb:   Yes sir.
lc:   But they wouldn't fit through the back door, is that right?
jb:   Yes sir.
lc:   So you went back and got you two little motorcycles and pushed
      them outside, is that right?
jb:   Yes sir.
lc:   Where did you get the gas, to go in them?

Page 1.

```
jb:  Out behind the building.
lc:  And you put gas in both of them?
jb:  Yes sir.
lc:  Where did you get the oil at?
jb:  Out the building too.
lc:  And you waited until you got out in the alley before you put
     the oil in them?
jb:  Yes sir.
lc:  While you two were in the building, what all did yall take
     out of that building?
jb:  Ah. . .
lc:  Or, what all did you take out of it yourself?
jb:  Well, I got some money, gun. . .
lc:  Where did you get the money?
jb:  Out of the cash register, I know how to work one.
lc:  How much money was in there?
jb:  I don't know, bout, bout five tens and let me see about three
     three tens, one five, no twenties.
lc:  No twenties, how much change was in it?
jb:  I don't know, I ain't counted it, a whole bunch of dimes, and
     about six quarters.
l:   Quarters and dimes all you took?
jb:  We left the pennies and nickles alone.
lc:  After you got the money out of there, is that when you got the
     gun?
jb:  Yes sir.
lc:  What kind of gun did you get?
jb:  A .25.
lc:  A .25 automatic?
jb:  Yes sir.
lc:  Are you familiar with a .25 automatic?
jb:  Yes sir.
lc:  Is that why you took that particular gun?
jb:  Yes sir.
lc:  Which one of the guns did you get?
jb:  The black one.
lc:  And what did you do when you got the gun?
jb:  Loaded it?
lc:  Why did you load it?
jb:  I don't know, in case.
lc:  In case what?
jb:  Ah. .
lc:  Why did you load that gun?
jb:  In case we got caught or something, I went ahead and put it
     on safety  and wait.
lc:  Wait for what?
jb:  Wait  for if we get into trouble.
lc:  What were you gonna do with it?
jb:  I don't know.  Just on safety.
lc:  Now be truthful with me now, I want you to tell me the truth.
     I want you to tell me exactly what was going through your mind
     and why you loaded that gun, and why you took a gun with you?
jb:  I like guns is one reason, and ah, I was gonna use it to go
     hunting.
lc:  Do you think you could have shot a officer?
jb:  No, I can't shoot nobody.
lc:  What if an officer had gotten you cornered there, and you didn't
     have anyplace to go?
```

Page 2

```
jb:  Give up if I did.
lc:  You'd give up?
jb:  Yes sir.
lc:  Okay, after you got those guns loaded and got the motorcycles
     out, you say you went over in the alley over there?  That's
     where you put the oil in them?
jb:  Yes sir.
lc:  What happened over there in the alley?
jb:  Nothing, just a man come out the door, and I didn't say nothing.
lc:  A man came out the door, did he talk to you?
jb:  No, he didn't say nothing.   The Police came by.
lc:  The Police passed by while you were in the alley with the motorcycle?
jb:  Yes sir.
lc:  What kind of Police was it?
jb:  It was a white, a State Trooper.
lc:  Okay, when you got over in the alley, did you get both of the
     motorcycles running?
jb:  No sir.
lc:  Just got one running?
jb:  Yes sir.
lc:  And the other one wouldn't start?
jb:  Yes sir.
lc:  After you left there which way did you go?
jb:  We went straight down the alley and turned on a . . .
lc:  State Street?
jb:  Yes sir, State Street, and we crossed it on red, and the Police
     standing right there, and they turned around, and I jumped and
     ran around the laundry mat, they come around the other way,
     and I headed around the building, I seen them but they did't
     see me, and they left, and I got out, and then they turned
     around and came back, they saw me when I turned around and they
     told me to stop, and I was in a ditch, and they told me to
     stop, and I got up and I had my hands over my head, and they
     told me to get back down, so I got back down.
lc:  Okay.  When you were going across that intersection, and you saw
     the Police car turn around, you jumped off of the motorcycle?
jb:  Yes sir.
lc:  And you caught your breeches leg in the motorcycle and it drug
     you down the highway?
jb:  Yes sir.
lc:  At that time did you have a big knife, a scabert wrapped around
     you?
jb:  Yes sir.
lc:  And you say that the knife fell out them when you fell off of
     the motorcycle?
jb:  Yes sir.
lc:  Where did you have the gun?
jb:  In my hand like this, with the, like this right here, and then
     went I got, fell, it went like this.
lc:  So you lost you gun and knife both when you fell off?
jb:  Yes sir.  When it started dragging me.
lc:  And after the motorcycle wrecked, you jumped up and took off
     running, and the officer apprehended you around behind the
     laundry mat, in that area?
jb:  Judy's, yes sir.
lc:  Is this statement true and correct to the best of your knowledge?
jb:  Yes sir.
```

END OF INTERVIEW

Balentine #1 Crim Hx 04-1982  Page 13 of 13

FILED

MAR 6 1985

IN THE JUVENILE COURT OF JACKSON COUNTY, ARKANSAS ~~~~~~ ~~~~~~
COUNTY, CLERK

IN THE MATTER OF Fr█████ BALENTINE,
A JUVENILE, AND JOHN BALENTINE, A
JUVENILE

NO. J-83-13

## JUDGMENT

Now on this 4th day of March, 1985, the above styled case comes on for sentencing, with the juveniles, Fr█████ and John Balentine, being present in court, and being represented by their attorney, B. Richard Allen, and with their mother, Mrs. George Smith, and their grandmother, Mrs. Cravens. The juveniles previously entered pleas of guilty in January, 1985, at which time sentencing was deferred to receive a predisposition report before sentencing, which was submitted February 25, 1985, and this case is submitted for sentencing upon said reports, recommendation of the Deputy Prosecuting Attorney, Harold Erwin, statement of the juvenile's attorney, B. Richard Allen, the record and other proof, matters and things and, from all of which the Court finds:

(1) That Fr█████ Balentine and John Balentine are delinquents under the Arkansas Juvenile Code and are subject to the proper disposition thereunder.

(2) That Fr█████ Balentine and John Balentine should be sentenced to the Arkansas Department of Youth Services until age 18 and imposition of such sentence should be suspended upon the following conditions:

(a) Good behavior until each reaches age 18.

(b) Payment of all restitution due herein within one year and payment of all costs within six (6) months.

(c) That each remain in school at all times and maintain passing grades.

(d) Maintain close supervised probation under the guidance of the Juvenile Probate Officer until age 18 or until determined subject supervised probation is no longer necessary.

IT IS, THEREFORE, BY THE COURT CONSIDERED, ORDERED AND ADJUDGED that Fr█████ Balentine and John Balentine, juveniles, are delinquents under the terms of the Arkansas Juvenile Code and each are sentenced to the Arkansas Department of Youth Services until age 18 with the imposition of such sentence being suspended on the following conditions:

Book 8
Pages 175-171


EXHIBIT
RX-87

1

- 2 -

(a) Good behavior until each reaches age 18; (b) Payment of all restitution due herein within one year and payment of all costs within six (6) months; (c) That each remain in school at all times and maintain passing grades; and (d) Maintain close supervised probation under the guidance of the Juvenile Probate Officer until age 18 or until determined subject supervised probation is no longer necessary.

IT IS SO ORDERED.

Hon. Stanley Montgomery
Juvenile Referee

IN THE JUVENILE COURT OF JACKSON COUNTY, ARKANSAS

IN THE MATTER OF *John and ██████ Balentine* .............. No. *J-83-13*
A Juvenile ...........................................

## P E T I T I O N

TO THE JUDGE OF THE JUVENILE COURT:

NOW COMES Detective Steve Templeton, the Petitioner,

of Jackson County, Arkansas, and presents this

petition on behalf of the State of Arkansas against John & Fr██

Balentine, a juvenile, who is now alleged to be sub-

ject to an adjudication of this Court as (dependent-neglected)

(delinquent) ~~(family in need of supervision)~~. In support of this peti-

tion, the petitioner alleges the following: Burglary and Theft of

Property (2 counts)

FILED

JUL 29 1983

*Steven Leland*
COUNTY CLERK

(1) Balentines are ██ 11 & 14 years of age

resides at Roberts Addition, Newport,

_____, Arkansas, in custody of Clara

Smith

(2) The parents, guardian, custodian, nearest ascertain-

able relative of the juvenile, and their addresses, are as

follows:

1. *Clara Smith Robinson Addn Newport An*
   (name)        (address)        (city)        (state)

2. _____
   (name)        (address)        (city)        (state)

3. _____
   (name)        (address)        (city)        (state)

(3) The Balentines are is alleged to be subject to

an adjudication by this Court by reason of the existence of

the following specific facts: On 7-18-83 broke into Unit #3 of the
Newport High School JROTC building by smashing a window and taking a
Beeman Military Pellet Rifle, three (3) Daisey rifles, thirty (30)
Army Green short sleeve shirts and 19 pair of military fatigues with
a total value of $437.06.

WHEREFORE, it is prayed that this case be set for a hearing on some day and date and at a time and place to fixed by the Court; that the Court issue a summons to the parties named herein, attaching a copy of this petition, and requiring the persons named herein who have the custody and control of the juvenile to appear personally before this Court and to bring to juvenile before this Court, at the time and place stated and directed by the Court as the time and place for the hearing of his case and that the parents and guardian of the juvenile be notified of the pendency of this case and of the time and place appointed by the Court for the hearing thereof.

It is further prayed that this Court, by order endorsed on the summons, authorize the officer serving the same to at once take the juvenile into custody.

It is further prayed that upon a final hearing hereof, and subject to an adjudication by this Court, such disposition of the care, control, and custody of the juvenile be ordered by this Court as appears just and proper.

                                    _____
                                          PETITIONER

                                    Det. Newport Police Dept
                                          (address)

                                    Jackson  County  Arkansas

                                    _____7-27-83_____
                                            (date)


VERIFICATION

I, _____, the petitioner in the above case, certify and affirm under oath that the allegations contained in this petition are true to the best of my knowledge information and belief.

Subscribed and sworn before me this 29 day

of July 19 8 2.

Verneal Henderson
(Notary Public)

My commission expires: 4 - 9. - 85
(date)

STATEMENT

FROM

NEWPORT SPECIAL SCHOOL DISTRICT, NEWPORT, AR

July 21, 1983.    19

TO  Newport Municipal Court

ADDRESS  City Hall, Newport, AR  72112

CITY _____    STATE _____

TERMS _____

| | | | | |
|---|---|---|---|---|
| Damages for Break-in | | | | |
| on July 18, 1983 at the | | | | |
| JROTC  Building at Newport | | | | |
| High School | | | | |
| Total as per | 437.06 | | | |
| attached bill | | | | |

GRAYLINE FORM 51849                                    U.S.A.

Balentine #2 Crim Hx 07-1983  Page 6 of 13

6

CRIMINAL INVESTIGATION SECTION
NEWPORT POLICE DEPARTMENT

INVESTIGATOR'S SUMMARY:

CASE NUMBER:                                          40-80-83

OFFICER:                                        · DET. SGT. STEVEN TEMPLETC

On 7-19-83, at 8:30 AM, Police Department was notified of a burglary at the
ROTC Building at the Newport High School.  The report was made to Police Department
by Sgt. Bobby Brown.  Myself and Ptl. Paula Breckenridge went to the ROTC units at
the high schools, and found entrance had been gained into units by breaking open the
window, removing the wooden stick, then sliding the window open, then unlocking the
door from the inside.  Two buildings were gone through; total of five rifles were
missing, along with some clothing.  At this time, two of the rifles are Beeming .22
Caliber Military pellet rifles, and the other three are Daisey Model 881, Air Rifles.
In unit four, where four of the rifles were taken, a hack saw, screw driver were
employed to remove the locks in order to gain access to the building and once on the
inside, to gain access into the inner vault where the guns were kept.

On 7-19-83, Sheriff Donald Ray observed a young white/male named, S███ O████,
15 years of age, crossing the road caring, what appeared to be, one of Beeming pellet
rifles.  Sheriff Ray picked the juvenile up, and notified me.  Upon being advised
of his miranda warnings, and questioned, his statement led to the arrest of John
Balentine and Fr███ Balentine, ages 14 and 13 respectively.

Two of the Beeming Air Rifles which were taken by S███ O████, which were
taken during the burglary, as well as, two of the Daisey Model 881 Air Rifles, taken
by John and Fr███ Balentine; as well as, two bicycles that were stolen the same night,
by John and Fr███ Balentine, to ride back to their house at Robinson Addition.  They
stated to the officers, also, that the third rifle, Daisey Model 881 was dropped on
the levee as they were riding it back toward Robenson Addition.  Finger prints were
taken from the area.

After being advised of their miranda warnings, John and Freddy Balentine
admitted to the break in, as did S███ O████.  Admitted to climbing over the fence,
then gaining access to the buildings where they took the rifles.  Evidence that has
been uncovered so far, is two Beeming Air Rifles, serial number 294871 and serial
number 294878.  On 7-20-83, the two Daisey Model Air Rifles and the two Beeming
pellet rifles were returned to Sgt. Bobby Brown of the high school.  Also present
during the questiong was Lt. Jerry Long.

NEWPORT POLICE DEPARTMENT
CRIMINAL INVESTIGATING SECTION

SUBJECT:                              INTERVIEW

DATE & TIME:                          7-19-83 at 9:45 PM

PERSON INTERVIEWED:                   John Balentine  B/M
                                      DOB████-69
ADDRESS & PHONE NUMBER:               ROBINSON ADDITON

LOCATION OF INTERVIEW:                CID ROOM; CITY HALL

OFFICER INTERVIEWING:                 DET. SGT. STEVEN TEMPLETON
                                      LT. JERRY LONG
CASE NUMBER:                          40-80-83

INTERVIEW:

st: Okay, John I read you your rights while ago, do you understand those?
jb: Yes sir.
st: Did I explain them to you alright?
jb: Yes sir.
st: Do you understand what they all are?
jb: Yes sir.
st: Do you want to make a statement, do you want to tell me what happened?
jb: Yes sir.
st: Okay, I want you to start from the beginning and tell me what day it was and
    who you were with?
jb: It was the 20th day, I was along the street and we
st: The 20th?
jb: The 20th, I said the 20th.
st: Today's just the 19th.  Was it Monday, or Sunday?
jb: It was Monday.
st: Okay, what time Monday?
jb: About, about 8:30.
st: At night?
jb: Um'huh.
st: Okay, who were you with?
jb: S███ O████
st: Who else?
jb: And Fr███ Balentine.
st: Fr███, your brother?
jb: Yes sir.
st: Okay, you and S███ C████ pretty good friends?
jb: Yes sir.
st: Okay, where were ya'll at, where were ya'll going?
jb: We was just walking around, and he said, Let's go rob the ROTC Band Building.
st: Who said that?
jb: S███ O████.  He said they had machine guns and some beebe pellet guns and some
    rifles.
st: Has he been in ROTC?
jb: I don't know...just in the night.  Yea, he is in ahh, just a, I seen his uniform.
st: Okay, where did ya'll go to then?
jb: Okay, we just walked around over to the school, and we climbed over the gate
    and stuff, and then we ran...
st: What gate did ya'll climb over?

Page 1.

Balentine #2 Crim Hx 07-1983  Page 8 of 13

8

CONT. OF JOHN BALENTINE                           PAGE TWO

jb: The one by the Jr. h building, the uh, the side, t one on the side of the uhh, -pause- the one on une side of the, the, gym; our gym.
st: Okay, so the three of ya'll climbed over?
jb: Yes sir.
st: Okay, what did ya'll do then?
jb: We went around there looking for that building.
st: Did ya'll find it?
jb: Yes sir.
st: What did ya'll do then?
jb: We got into it, got the stuff and go down by O███'s house.
st: Which building did ya'll go into first?
jb: It was that building that was open, the main office.
st: The main office.  What do you mean, it was open?
jb: The doors were just unlocked.  All the doors in there were unlocked.
st: No, there wasn't no doors unlocked.  Ya'll had to use some screw drivers, and try to saw a lock off, and pry some        to get into one of them.
jb: Yea.
st: Which building was that, now?
jb: That gun, the gun room.
st: Okay, that's right.  How did ya'll get in Sgt. Brown's office?
jb: His office...uh; S███, uh, broke the window and cut his hands.  I climbed through.
st: What did S███ break the window with?
jb: Uh, a rock.
st: Why did he break the window?
jb: I don't know, 'cause he couldn't get no way out, uh, in.
st: Did he open the glass?
jb: Um'huh.
st: Did he have to take something off of it to open it with?
jb: Nun'huh.
st: Did he reach inside and...
jb: Yea, he removed the stick.
st: Okay, he removed the stick, now who climbed through the window?
jb: I did.
st: Then what did you do when you got on the inside?
jb: I unlocked the door.
st: And let them in?
jb: Yes sir.
st: Okay, so you and S███ O███, and F███, your brother, were inside; what did ya'll take out of the office first?
jb: Let's see we took, uh, a saw, just a saw and a hammer.
st: A saw and a hammer?  Did ya'll get a gun out of that office?
jb: Oh no, 'cause, I mean, S███ did.  He got the gun over there, look like it.
st: The one right behind me?
jb: Yes sir.
st: How many more guns did ya'll get that look like that one?
jb: Four.
st: They all look like that one?
jb: No, just two.
st: Okay, who took those guns?  You got this one gun out of that office?
jb: Um'huh.
st: Then where did ya'll go after that?
jb: We went down to the main office where all the bars was.  But, it was locked up.
st: How did ya'll get in?
jb: Uh, he sawed the lock off.
st: On the outside?
jb: Yes sir.
st: Okay, what did ya'll do when ya'll were on the inside?
jb: Okay, we looked everywhere around for the gun there was, there was a steel door and, uh, I sawed it half way off, and then Steve beat the rest of it off.
st: Okay, what ya'll take out of that building?
jb: Uh, the guns and stuff.

Balentine #2 Crim Hx 07-1983 Page 9 of 13

9

PAGE THREE

st: How many guns did ya'll take out of there?
jb: Four.
st: Three or four?
jb: Four.
st: How many guns did ya'll get all together?
jb: Four.
st: Okay, now if you got this one out of the other office?
jb: Uh, we got three out of the other office.
st: What kind were they?
jb: It was two high powered rifles...not rifles, but, pellet guns.
st: I want you to tell me the truth, now, how manu guns did ya'll take?  I want you to think real hard.
jb: Pause...It might have been five, but I only seen, only two at home.  I let one of my friends keep them...I think I dropped one?  Yea!  I dropped one on the way home and it was over there by the levve.  We're going by that levee.
st: What levee?
jb: The one behind McDonalds.
st: McDonalds?  On which...
jb: Over there by the golf course.
st: On that little road by the golf course?
jb: Yes, but we was on top of the levee.
st: Could you take us by there and show us where it was after a while?
jb: Hummm?
st: Could you take us over there and show us where it was?
jb: Yes sir.
st: Okay, so that means that you got four guns out of that one gun, which means you got five guns, right?
jb: Um'huh.
st: Okay, who kept what guns?  Did ya'll get any uniforms out of there?
jb: Nope.  We didn't touch no uniforms, we just looked at them.
st: You just looked at the uniforms?
jb: Yes sir.
st: So, if there is any uniforms missing, ya'll didn't take them?
jb: No sir.
st: Okay, who took the other gun that looks like this one here?
jb: S▊ o▊.
st: He kept two of them?
jb: Yeap.
st: How many guns did you and Fr▊ take home?
jb: We only took two, 'cause we dropped one.
st: Okay, what did they look like?
jb: Pellet rifles, about, look almost like that, but, they was pump.  They got long pump on them 'bout like that.
st: Okay, where did S▊ go when ya'll left?
jb: We took him home, and we went to our own home.
st: How did ya'll take him home?
jb: We took the golf cart.
st: What golf cart?
jb: We went through the golf course behind his yard.
st: In his yard?
jb: Uh'huh.
st: Is that how ya'll got over there?
jb: There, no we was walking, when we, over to his house?
st: Yes, when ya'll picked him up at his house, ya'll got into the golf cart?
jb: Nooo, we ahh, me and Fr▊ and ah, we was seeing S▊, we was just walking right home, then uhh, S▊ and uh, we had saw S▊ riding on his bike.
st: Okay.
jb: A friend's bike, he had sold his.
st: Okay, so how did you and Fr▊ get home?
jb: Humm?

CONT. OF JOHN BALENTINE                              PAGE FOUR
st: How did you and █████ get home?
jb: We ride bikes.
st: Did you leave your bikes over at S████'s house?
jb: Nope.
st: Where did you leave them at?
jb: At our house.
st: Ya'll walked all the way back to Robinsons Addition?
jb: We rode bikes out there.
st: Whose bikes did ya'll ride?
jb: I don't Know.
st: Where did ya'll get them at?
jb: I don't know, it was too dark.
st: Where are the bicycles at now?
jb: At our house.
st: Did you get them from over on Congress St?  Over there behind the Four-Way Stop,
    you know, over there by that housing addition right behind McDonalds?
jb: Hunt'huh.
st: On Congress, back in there?
jb: No.
st: Where did you get the bikes from?
jb: Close to Combo, and Ed's Thriftway.
st: You got the bikes from over around Dill St?
jb: Yes sir.
st: When did you get them?
jb: Same night, we had to get away home.
st: Okay, what kind of bikes are they?
jb: BMX.
st: What kind?
jb: B.M.X.
st: Were they both just the same?
jb: Hunt'huh.
st: Did you get them both from the same house?
jb: Hunt'huh.
st: From two different houses?
jb: Yes sir.
st: Okay, go on down, where did you get the other bike from?
jb: One bike was right in front of Combo's, and the other bike was later on, down the
    street, about two blocks, one block away from where we got the other one.
st: On the next street down, on Congress?
jb: Uh'huh.
st: Okay, did ya'll work on CETA program this summer?  You didn't?
jb: Hunt'huh.
st: Okay, if we got back out to your house, are those two rifles going to be there?
jb: Yes sir.
st: We can pick them up?
jb: Yes sir.
st: And the bicycles?
jb: Yes sir.
st: Both bikes are still there?
jb: Yes sir.
st: Okay.
jb: But they ain't got the same wheels on them, Fr██got his wheels on a different
    bike.  We changed the wreels, uh, wheels around.
st: Okay, John, is this statement true and correct?  Are you telling me the truth?
jb: Yes sir.
st: Even about S███?
jb: Yes sir.
END OF INTERVIEW

                              DET. SGT. STEVEN TEMPLETON
                              CRIMINAL INVESTIGATION SECTION
                              NEWPORT POLICE DEPARTMENT/INVESTIGATING OFFICER

# NEWPORT POLICE DEPARTMENT
## INCIDENT REPORT

NO. IR-83-427          Burglary and TOP          C.I.E. NO. 40-80-83
Classification

(PRINT OR TYPE)

| 1 COMPLAINANT'S NAME (Firm name & business) | 2 AGE | DESCENT | SEX | DOB | 3 PHONE (Business) |
|---|---|---|---|---|---|
| SGT. BOBBY BROWN | | CAUC. | M | | 523-2751 |

| 4 COMPLAINANT'S ADDRESS | 5 CITY | 6 PHONE (Residence) |
|---|---|---|
| 1101 HIGHLAND DRIVE | NEWPORT | 523-9156 |

| 7 COMPLAINANT'S BUSINESS, EMPLOYMENT OR SCHOOL | 8 TYPE OF OFFENSE OR INCIDENT |
|---|---|
| NEWPORT HIGH SCHOOL | BURGLARY |

| 9 PLACE WHERE OFFENSE OCCURRED | 10 TYPE OF BUILDING (Residence, Store, Bank, etc.) |
|---|---|
| ROTC BUILDING UNITS 3&4 | EDUCATIONAL |

| 11 REPORTED BY | PHONE | 12 REPORTED TO |
|---|---|---|
| SAME AS ABOVE | SAME | NEWPORT POLICE DEPT. |

| 13 DAY, DATE AND TIME OF OFFENSE | 14 DAY, DATE AND TIME OF REPORT |
|---|---|
| MON. 07-18-83   AFTER 4:30PM | TUESDAY  07-19-83  8:30am |

| 15 BODILY INJURIES TO | HOSPITAL? | 16 HOW REPORTED (in person, phone, on view, other) |
|---|---|---|
| NONE | | PHONE |

17 M/O (How done - force used - at what point - with what tool or weapon - other acts or trade marks)

ENTRY GAINED THROUGH BROKEN WINDOW IN UNIT #3.

17A EXACT WORDS USED BY OFFENDER

UNKNOWN

18 VEHICLE INVOLVED IN OFFENSE (Year - color - make - model - auto license no. - year - state)          Complainant's ☐   Suspect's ☐

UNKNOWN

| 19 DIRECTION OF FLIGHT STREET OR ROAD | ☐N ☐E ☐S ☐W ☐AUTO ☐FOOT ☒UNK. ☐OTHER | 20 WILL COMPLAINANT PROSECUTE? ☒ YES ☐ NO | 20A AMOUNT OF PROPERTY LOSS $1500.00 -—0-— / LESS THAN $100.00/or \$ .00 |
|---|---|---|---|

| 21 NAME AND ADDRESS OF SUSPECT(S) OR AGE | DESCENT | SEX | DESCRIPTION | 22 CIRCLE IF SUSPECT IS |
|---|---|---|---|---|
| NONE    John Balentine b/m 14 Robinson addition | | | | Employee · Relative · Acquaintance |
| NONE    Fr   Balentine b/m 13 Robinson addition | | | | |

| 23 WITNESS NAME X | WITNESS ADDRESS X | AGE X | BIRTHDATE X | OTHER PHONE X | PARENT OR GUARDIAN? X |
|---|---|---|---|---|---|
| 1 NONE    S         O        w/m 15 | | / Newport | | | |
| 2 NONE | | | | | |

23 NARRATIVE (Write in any available details not covered above)

ADVISED BY SGT. BROWN OF THE NEWPORT HIGHT SCHOOL ROTC, THAT SOME UNKNOWN PERSON OR PERSONS HAD BROKE INTO THE ROTC BUILDINGS. ENTRY HAD BEEN GAINED INTO UNIT #3, BY BREAKING THE FRONT RIGHT WINDOW OUT. THERE WAS A BEEMEN MILITARY PELLET RIFLE MISSING, WHICH WAS IN THE FRONT OFFICE, BY THE FRONT DOOR. SGT. BROWN HAD SOME TOOLS TAKEN FROM THE TOOL BOX. THESE TOOLS WERE THEN USED TO GAIN ENTRY INTO THE ARMS ROOM, & UNIT #4. THE LOCK ON THE OUTSIDE DOOR WAS CUT OFF AT THE CHAIN.

| 25 INVESTIGATING OFFICER(S) Det. Sgt. S.Templeton | 26 REPORT MADE BY Ptl. P. Breckenridge  7-18-83 |
|---|---|

| 27 CASE FILED | 28 THIS CASE IS | 29 APPROVED BY |
|---|---|---|
| Yes ☒  No ☐ | Cleared by arrest ☒  Unfounded ☐  Inactive ☐  Other ☐ | 30 ADDITIONAL PAGE(S) USED? YES ☐ NO ☒ |

Balentine #2 Crim Hx 07-1983  Page 12 of 13

**NEWPORT POLICE DEPARTMENT**
**SUPPLEMENTARY REPORT**
**(OR ADDITIONAL PAGE ☒)**

NO. IR-83-427     Burglary and TOP     C.I.S. NO. KOFEO 40-90-8

Classification

Name of Complainant        Address        Phone No.

SGT. BOBBY BROWN     1101 HIGHLAND DR. NEWPORT     523-2751

Offense

BURGLARY

DETAILS OF OFFENSE, PROGRESS OF INVESTIGATION, ETC.
(Investigating Officer must sign)

THE LOCK WAS FOUND LAYING UNDER UNIT #2. THE DOOR TO THE ARMS ROOM WAS

OPEN, & THE HASP HAD BEEN KNOCKED OFF. ALL THE TOOLS THAT WERE USED

TO GAIN ENTRY WERE LAYING IN THE FLOOR IN THE DOORWAY TO THE ARMS

ROOM. THERE WERE 3 DAISEY AIR RIFLES MISSING OUT OF THE ARMS ROOM.

IN THE SUPPLY ROOM THERE WAS A BOX OF NEW SHORT SLEEVE SHIRTS IN THE

FLOOR. SGT. BROWN ADVISED THAT APPROX. 30 SHIRTS ARMY GREEN SIZE 13½

WERE MISSING. THERE WAS ALSO ABOUT 19 PAIRS OF FATIGUES MISSING.

SGT. TEMPLETON TRIED TO GET FINGERPRINTS FROM THE BROKEN WINDOW

AND ALSO OFF THE HACK SAW, WHICH WAS FOUND IN THE DOORWAY OF THE ARMS

ROOM.

INVESTIGATING OFFICER(S) PTL. BRECKENRIDGE & #175    28 REPORT MADE BY PTL. BRECKENRIDGE    DATE 7- 1- 3

CASE FILED    Yes ☒   No ☐    Cleared by arrest ☒    28 THIS CASE IS   Unfounded ☐   Inactive ☐   Other ☐    29 APPROVED BY

30 PAGE NUMBER ___ OF ___ PAGES

FILED

AP 3 2 21 PM '87

IN THE CIRCUIT COURT OF JACKSON COUNTY, ARKANSAS

BOOK ____ PAGE ____

State of Arkansas
vs.
John Balentine

*CR-87-6*

Case No. ~~CR-86-177~~

### JUDGMENT

On April 3, 1987, comes the State of Arkansas, by Stanley Montgomery, Deputy Prosecuting Attorney, and comes the defendant, in person and by his attorney, B. Richard Allen; and the defendant being informed by the Court of the nature of the charges, a previous plea of not guilty is withdrawn and a plea of guilty, which the Court finds is freely and voluntarily made, is entered herein, pursuant to a negotiated plea, and the Court further finds that the defendant is guilty of the offenses of Count I, Burglary, and Count II, Attempted Theft of Property, a Class C felony.

Whereupon, the Court doth ask the defendant if there is any legal cause why Judgment should not be pronounced against him and the defendant replying in the negative, the Court doth sentence the defendant to a term of five (5) years in the Arkansas Department of Correction on each count, said sentences to run concurrently, and the defendant is to receive credit for _125_ days spent in the Jackson County Detention Center, awaiting trial. The Court further orders that the defendant pay Court Costs in the sum of $104.75, to be made within a period of five (5) years of the date of this Judgment.

This Judgment having been made on April 3, 1987, is entered now for then.

County of Jackson
State of Arkansas

I, Pam Graham, Circuit Clerk and Ex-Officio Recorder in and for the said county and state do hereby certify that the foregoing is a full, true and correct copy of the original as the same appears of record in my office in Book __ Page __

Witness my hand and seal on this ____ day of _____ 19__

_____ Clerk & Recorder
_____ Deputy Clerk

_____ JUDGE

_4-3-87_ DATE

EXHIBIT
RX-88

1

APPROVED AS TO FORM:

B. RICHARD ALLEN, Attorney for
Defendant

G. STANLEY MONTGOMERY, Deputy
Prosecuting Attorney

2

N° 14 **BENCH WARRANT**

CASE NO. *Cr 87-6*

THE STATE OF ARKANSAS: To any Sheriff, Constable, Coroner, Policeman, in this State:

YOU ARE COMMANDED forthwith to arrest ___John Balentine___

_____and bring ___him___ before the Jackson County Circuit Court for the

offense of ___Burglary and Criminal Attempt Theft of Property___

___Class B Felony 41-2002; Class C Felony 41-701___

or if the Court be adjourned for the Term, that you deliver ___John Balentine___ to the Jailer of Jackson County.

BOOK _____ PAGE _____

FILED
DON DANIELS
CHANCERY-CIRCUIT CLERK
Jan 28 11 34 AM '87
RECORDED

Attorney Requesting Bench Warrant:

___Stanley Montgomery, Deputy Prosecuting Attorney___

WITNESS my hand and the seal of said Court this day: ___January 28, 1987___

**DON DANIELS**
Circuit, Chancery, and Criminal Clerk

By: _____, D. C.

_____ CLERK

SHERIFF'S RETURN:

I have this day duly served this Bench Warrant by. *Reading & Shawing the Same*

) Upon the within named persons and I have stated the substance there to the
) within named *John Balentine*

FEES: _____ SHERIFF

SERVICE $_____

MILEAGE $_____  DATE OF SERVICE: *1-28/87*

RETURN $_____  *3:05 P.M.*

TOTAL $_____

By *_____*, D. S.

Balentine #3 Crim Hx 12-1986  Page 3 of 13

3

CK-87-6

STATE OF ARKANSAS

JOHN BALENTINE

IN THE CIRCUIT COURT OF _____Jackson_____ COUNTY, ARKANSAS

## INFORMATION

Comes Jim Stallcup, Prosecuting Attorney in and for the Third Judicial Circuit of Arkansas of which _____Jackson_____ County is a part, duly elected, qualified and acting, upon information, in the name and by the authority of the State of Arkansas accuses _____John Balentine_____ of the crime of: BURGLARY AND CRIMINAL ATTEMPT THEFT OF PROPERTY committed as follows to-wit: The said _____John Balentine_____ in the County and State aforesaid on the 20th day of December 1986

COUNT I
did, enter or remain unlawfully in an occupiable structure of another person, Wal-Mart, with the purpose of committing therein any offense punishable by imprisonment.

COUNT II
did, purposely engage in conduct that constitutes a substantial step in a course of conduct intended to culminate in the commission of an offense, Theft of Property, whether or not the attendant circumstances are as he believes them to be; said property having a value of more than $2,500.00.

(Burglary, a Class B Felony 41-2002 and Criminal Attempt Theft of Property 41-701, a Class C Felony)

against the peace and dignity of the State of Arkansas.

Jim Stallcup, Prosecuting Attorney

By_____
Deputy Prosecuting Attorney

Balentine #3 Crim Hx 12-1986  Page 4 of 13

4

STATE OF ARKANSAS
COUNTY OF ___Jackson___

## AFFIDAVIT

Comes now ___Det. Lt. Steven Templeton___ and after being sworn states on oath:

that I am a detective with the Newport Police Department and I have investigated the offenses committed by the defendant on the date mentioned in the information.  The defendant was caught inside the Wal-Mart store by Captain Jerry Long and Lt. David Stewart while attempting to steal firearms and other merchandise totalling approximately $10,500.00.  The defendant confessed to breaking into Wal-Mart without permission and was going to take the items and sell them for money.

_Lt. Steven Templeton_
Affiant

Sworn and subscribed to before me this __22nd__ day of _____December_____, 19 86.

_Bobbie Doe_
Notary Public

My Commission Expires: __4-16-94__

It is hereby found that there is probable cause to confine the person or persons named as defendant on the reverse side of this information, to be held for trial or released on bond in the amount of $ _____ to assure appearance in court on _____

Dated this _____ day of _____, 19___

_____
Magistrate or Municipal Judge

Balentine #3 Crim Hx 12-1986  Page 5 of 13

NEWPORT POLICE DEPARTMENT
NEWPORT, ARKANSAS–72112

## WARNING AND WAIVER OF RIGHTS

Place: Newport Police Dept.
CID Office

Date: 12-20-86

## WARNING

BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

- You have a right to remain silent.
- Anything you say can be used against you in court.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you    at no cost to you    before any questioning if you  wish.
- If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

I have read this statement of my rights (This statement of my rights has been read to me) and I understand what my rights are.

| 12-20-86 | 4:19 Am | John Balentine |
|----------|---------|----------------|
| (Date)   | (Time)  | (Signature)    |

## WAIVER

I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

| 12-20-86 | 4:19 Am | John Balentine |
|----------|---------|----------------|
| (Date)   | (Time)  | (Signature)    |

Witnessed by: Steven Tegeton

Title: Lieutenant, CID

Witnessed by: _____

Title: _____

CRIMINAL INVESTIGATION DIVISION
NEWPORT POLICE DEPARTMENT

SUBJECT:                          INTERVIEW

DATE & TIME:                      12-20-86 at 4:33 AM

PERSON INTERVIEWED:               JOHN BALENTINE  B/M
                                  DOB ████-69
ADDRESS & PHONE NUMBER:           RT. 3, BOX 15
                                  NEWPORT, ARKANSAS
LOCATION OF INTERVIEW:            CID ROOM:  CITY HALL

OFFICER INTERVIEWING:             DET. LT. STEVEN TEMPLETON

CASE NUMBER:                      40-151-86


<u>INTERVIEW</u>

st: John, how old are you?
jb: Seventeen.
st: Where do you work?
jb: Newport Country Club.
st: Okay, and you were caught inside the Wal-Mart store here in
    Newport tonight, is that correct?
jb: Yes sir.
st: Alright, was there anybody else involved with you in this?
jb: No sir.
st: Okay, when did you first start thinking about getting into
    the Wal-Mart store?
jb: About 10:30 tonight.
st: Were you at work?
jb: No, I was walking from work.
st: Where were you at?

jb: I was on Remmel by the school.
st: You decided about 10:30, why did you, why the Wal-Mart store?
jb: I really can't say.  I guess cause the store was bigger and
    more value.
st: Okay, had a lot more stuff in it?
jb: Yea.
st: What were you going to try to do?  What was the purpose?
    Why were you going to get in there?
jb: To try to steal something, enough stuff so I can get away.
st: Did you have anything in particular in mind that you was
    going to take?
jb: No sir.
st: How did you get in the store?
jb: Uh, vent.
st: Where at?
jb: On top of the roof.
st: Alright, the officers found a coat and cap, a stocking
    cap on the roof, by another, by an air shaft that was different
    from the one that you went down, would that be right?
jb: No, they both was the same.


Balentine #3 Crim Hx 12-1986 Page 7 of 13

7

CONT. OF JOHN BALLANTINE                              ( PAGE TWO

st: Both were the same?
jb: Same air vent.
st: Can you describe the coat?
jb: Coat, yea, a black with uh, sort of like material with leather.
st: Okay, what kind of cap was it?
jb: A Newport High School cap, football.
st: Alright, they also found...
jb: No.
st: Yea, they did.
jb: It ain't mine.
st: Who's is it?
jb: I don't know, I ain't never seen it.
st: Didn't this come out of Lenny's car?  Your brother...
jb: No sir, he don't carry nothing like that in his car.  That's
    brand new.
st: No, it's not new.
jb: I don't know where it come from?
st: You've never seen this one before?
jb: No sir, I ain't never seen it before.
st: What did you do, describe how you got in?
jb: -No sound-
st: How did you get in the air shaft?
jb: With a crow bar.
st: The one that was on the floor that fell through?
jb: Yea.  I dropped that down the shaft before it would fall.
st: Okay, did you have a little short knife that fit this scaberdt?
jb: Yes sir.
st: That you left back in the gun department?
jb: Yes sir.
st: What did you use it for?
jb: For that, wait a minute, yea, I cut open them uh, them uh,
    them two sets.
st: The wire cutters?
jb: Yea.
st: What did you do with the wire cutters?
jb: I used them to open the gun case, cabinet.
st: Okay, you had a camaplogue stocking put on your head when you
    were caught, where did you get that from?
jb: Out of the store.
st: What was the first thing you did when you got down on the
    inside?
jb: Look for a stocking to put on my face.
st: Okay, and you found that camaplogue one and you...
jb: Yes sir.
st: Then what did you do?
jb: I looked around and I didn't see nothing, but, the gold, I
    didn't want that, so, I took the guns, because guns be use
    than the gold.
st: You looked at the gold.  So, you went to the jewelry department
    first?
jb: I just walked around, I just...
st: Alright, what did you do with the guns?
jb: I put them in a sleeping bag.
st: That you got off the rack?
jb: Yea.
st: How did you get into the gun cabinets?
jb: The sliding door had a little bitty steel on it, I took the
    wire cutters and bent it down and scoot this door back, to
    get pressure off the lock, so, the window won't break.

CONT. OF JOHN BALLINE                        PAGE THREE

st: Then you just started loading them up?
jb: Loading them up?
st: The guns.
jb: Talking about putting them in...
st: Yea, putting them in a sleeping bag?
jb: Yea, putting them in the sleeping bag.
st: How come you to quit loading everything up?
jb: 'Cause I heard people talking.
st: What did you do when you heard people talking?
jb: I laid the gun down.
st: The loaded one?
jb: Yes sir, I laid it down.
st: What, did you load the pistol?
jb: That was before, before I heard them.
st: What kind of gun was it that was loaded?
jb: A nine milimeter.
st: And when you heard the people, you laid it down?
jb: Yes sir.
st: What did you do then?
jb: I went and hid.
st: And that's when they found you?
jb: Yes sir.
st: How, there wasn't anyone else in the store with you?
jb: Nobody else in there with me.
st: How were you planning on getting out?
jb: Through the air shaft.
st: The same way you got in?
jb: Yes sir, that's why I didn't break in too close to the window,
    'cause I'm going to have to get a latter or something, they
    might have a latter in the back, a latter so they can change
    the light bulbs.
st: And that's how, you were going to climb up there?
jb: With the latter.
st: And then what to get the stuff out?
jb: I just through it over.
st: You told me a while ago that you was maybe use a rope or some-
    thing?
jb: Yea, a rope if I couldn't find that latter.  That rope, I
    wasn't thinking about that latter, then I thought about it.
st: What were you going to do with all that stuff once you got
    it on the roof?
jb: I was going to hide it and come back about a week later.
st: Do you know where?  Tell me where you were going to hide it at?
jb: Over there by them transfer truck trailers.
st: There by Wal-Mart?
jb: Yes sir.
st: You weren't going to get Peanut, your brother?
jb: No sir.
st: He didn't bring you there to the store?
jb: No.
st: If we went and picked him up, he would tell us that he didn't
    have nothing to do with it?
jb: Yes sir.
st: But, you told me a while ago that you would probably go get
    him though to bring you back to go pick up the stuff later?
jb: Yea, depends on how he feels about it.
st: Does Peanut have some stolen guns right now?
jb: No sir.

CONT. OF JOHN BALENTINE                    PAGE FOUR

```
st: Are you sure about that?
jb: Yes sir....I, I don't know, I don't really see him that much,
    see him about once a week.
st: How old is Lenny?
jb: Twenty-one.  I don't even see him that much, I only see him
    when my momma go get the baby while he here.  Or when he come
    looking for me.
st: Isn't true though John, that you had planned this out last
    week and told Lenny about it?
jb: No sir.
st: Okay, you said that you thought about this about 10:30 and
    you left off walking from your grandmother's house about
    12:00 or 12:15, is that right?
jb: Yes sir.
st: Where does your grandmother live?
jb: Remmel, Remmel in front of Roy McAllister.
st: And you got to Wal-Mart about what time?
jb: One.
st: Did it take you a while to get in?  How did you get up on
    the roof out back?  How did you get up on the roof?
jb: I climbed the post, I don't know the name of, over there
    by the Safeway.
st: You climbed the what?
jb: The post over there by Safeway, where the street light beside.
st: The telephone poll?
jb: The one with the sign, I think it said Angela's, Angela's.
st: Okay, and you just climbed, you just stepped over on the roof
    when you got to the top and walked around?
jb: Yea.
st: Okay, Angela's Fashions?
jb: Yes sir.
st: Where did you get the crow bar from?
jb: I found it over my grandmother house.  I had it about a week.
    Then she asked me to use it to take some nails out of a board
    for her.
st: Okay, John is this statement true?
jb: Yes sir.
END OF INTERVIEW
```

                              DET. LT. STEVEN TEMPLETON
                              CRIMINAL INVESTIGATION DIVISION
                              INVESTIGATING OFFICER

CRIMINAL INVESTIGATION DIVISION
NEWPORT POLICE DEPARTMENT

INVESTIGATOR'S NOTES

CASE NUMBER:                40-151-86

OFFICER:                    DET. LT. STEVEN TEMPLETON


On Saturday, December 20, 1986, at 1:41 AM, the Newport Police Department was notified by Operator Number Two at Alarm Specialist of an alarm going off in Wal-Mart. Lt. David Stewart arrived on the scene and the radio operator, Genise Bise, notified Steve Smith, Manager of Wal-Mart, who arrived approximately ten minutes later. Upon entering the Wal-Mart, it was determined that entry had been gained by going through the ceiling through an air conditioner on the roof. The grate was kicked open and the merchandise was disturbed directly underneath, showing entrance into the store. Lt. Stewart heard, what appeared to be a slide on a shotgun or pistol, at which time he notified the police department and advised that he needed assistance.

Captain Jerry Long, Lt. David Stewart, Ptl. Johnny Long and Officer Doug Cash, of the Diaz Police Department, proceded to conduct a search of the interior of the Wal-Mart store. A short time later, in the sporting goods section, the officers found a black male, identified as John Balentine, who was wearing a camouflage hat, approximately twenty feet from the gun counter, attempting to hide behind some sporting clothing. He was taken into custody and transported by Ptl. Kim Hubbard to the Jackson County Detention Center, while a thorough search was conducted of the interior of the store for additional signs of entry.

In the sporting goods section of the store, it was noted that the gun cabinet had been forced open and a large number of weapons, including cross bow, Crossman Air rifle, revolvers, semi-automatic pistols and shotguns and rifles were placed in sleeping bags on the floor. Approximately two isles towards the front of the store located on the end of the isle toward the gun counter was a loaded Lama nine milimeter semi-automatic pistol which had jammed. This apparently was the sound heard by Lt. Stewart as he entered the store; the suspect, when questioned, admitted to have loaded and it jammed on him and he put it down when he heard the officers approaching.

The scene was processed for fingerprints by Det. James Duvall and this Investigator photographed the interior, showing the sporting goods section, the sleeping bags in the floor, the weapons, the gun cabinet and the grate out of the ceiling where entrance was gained to the inside of the store and a crow bar that was used.

PAGE TWO

Also, this Investigator retained a double blade knife that was left by the suspect in the sporting goods section on the counter. The knife fit the holster that the suspect had on him, a knife sheath that he had on his side when taken into custody. Also, Ptl. Johnny Long and Ptl. Guy Scudder, when examining the roof, found where entrance had been gained into the air conditioner duct system on the roof. Also found on the roof was a Newport High School Greyhound toboggan and a black jacket, which the suspect had left on the roof.

At the Newport Police Department, this Investigator advised John Balentine of his Miranda Warnings and obtained a signed waiver, at which time, John Balentine was questioned, regarding the break-in. John Balentine advised this Investigator that he acted alone in the burglary and the clothing found by the officers on the roof, the toboggan and jacket were his. He also admitted that the knife, found by this Investigator in the sporting goods section of the store, belonged to him. When asked by this Investigator what he was going to do first when he got into the store, he advised that he went to the jewelry section where he was going to take some gold, but, decided against it and decided that he could get more by selling the guns. At which time, he went to the sporting goods section, using his knife and a pair of pliers, which he used to breaking and gain entry into the locked gun cabinet. He then went and obtained the sleeping bags and was in the process of loading the guns and cross bows and other items when he heard voices at the front part of the store. He advised that he had loaded the pistol, but, when he had heard the voices, he laid it down where it was found by this Investigator and then went to hide. He advised that the camouflage toboggan that he had on, he had taken from the sporting goods section and he had on to hide his face. It was then that the officers found him and he was taken into custody.

A list was compiled by Det. Duvall and Jim Elliot, employee of Wal-Mart store. The fire arms that were being used and taken amounted to approximately $10,580.00 worth of merchandise.

For additional details, see attached list of itemized merchandise.

The suspect, John Balentine, advised that he was going to go back through the roof and use a rope to pull the items up and then he was going to hide the items and come back later and pick them up.

# NEWPORT POLICE DEPARTMENT
## INCIDENT REPORT

NO. IR-86-557

Classification

C.J.S. NO. 40-151-86

(PRINT OR TYPE)

| 1 COMPLAINANT'S NAME (Firm name if business) | | 2 AGE | DESCENT | SEX | DOB | 3 PHONE (Business) |
|---|---|---|---|---|---|---|
| Wal-Mart | | | | | | 523-6534 |

| 4 COMPLAINANT'S ADDRESS | 5 CITY | 6 PHONE (Residence) |
|---|---|---|
| Village Mall | Newport, Arkansas | |

| 7 COMPLAINANT'S BUSINESS, EMPLOYMENT OR SCHOOL | 8 TYPE OF OFFENSE OR INCIDENT |
|---|---|
| Wal-Mart | Burglary |

| 9 PLACE WHERE OFFENSE OCCURRED | 10 TYPE OF BUILDING (Residence, Store, Bank, etc.) |
|---|---|
| Village Mall | Business |

| 11 REPORTED BY | PHONE | 12 REPORTED TO |
|---|---|---|
| Alarm Specialist | | Newport Police Dept |

| 13 DAY, DATE AND TIME OF OFFENSE | 14 DAY, DATE AND TIME OF REPORT |
|---|---|
| 12-20-86    0161 | 12-21-86    1:30 PM |

| 15 BODILY INJURIES TO | HOSPITAL? | 16 HOW REPORTED (In person, phone, on view, other) |
|---|---|---|
| N/A | | Phone |

17 M/O (How done - force used - at what point - with what tool or weapon - other acts or trade marks)
Went thru vehts in roof.

17A EXACT WORDS USED BY OFFENDER
N/A

18 VEHICLE INVOLVED IN OFFENSE (Year - color - make - model - auto license no. - year - slate)    Complainant's ☐    Suspect's ☐
N/A

| 19 DIRECTION OF FLIGHT | ☐ N   ☐ E   ☐ S   ☐ W | 20 WILL COMPLAINANT PROSECUTE? | 20A AMOUNT OF PROPERTY LOSS |
|---|---|---|---|
| STREET OR ROAD | ☐ AUTO   ☐ FOOT | (YES)   /   NO | $10,580 — 6 — / LESS THAN $500.00 or $ .00 |
| | ☐ UNK.   ☐ OTHER | | |

| 21 NAME AND ADDRESS OF SUSPECT(S) OR AGE | DESCENT | SEX | DESCRIPTION | 22 CIRCLE IF SUSPECT IS |
|---|---|---|---|---|
| 1 John Balentine.  b/m  dob ███-69 | | | | Employee - Relative - Acquaintance |
| 2 | | | | |

| 23 WITNESSES NAME | BEST CONTACT ADDRESS | AGE | BEST PHONE | OTHER PHONE | PARENT OR GUARDIAN? |
|---|---|---|---|---|---|
| 1 See case file | | | | | |
| 2 | | | | | |

23 NARRATIVE (Write in any available details not covered above)

SEE CASE FILE

| 25 INVESTIGATING OFFICER(S) | 26 REPORT MADE BY | DATE |
|---|---|---|
| DET.LT.TEMPLETON | BOBBIE POE | 12-22-86 |

| 27 CASE FILED | | | 28 THIS CASE IS | | | 29 APPROVED BY |
|---|---|---|---|---|---|---|
| Yes ☐  No ☐ | Cleared by arrest ☐ | | Unfounded ☐ | Inactive ☐ | Other ☐ | 30 ADDITIONAL PAGE(S) USED?   YES ☐   NO ☐ |

JUDGMENT AND COMMITMENT ORDER

IN THE CIRCUIT COURT OF _JACKSON_ COUNTY, ARKANSAS
_THIRD_ DISTRICT _____ DIVISION _____

On _June 12 1990_ the defendant personally appeared before the Court with legal counsel and, having been informed by the Court of the nature of the charge(s), of his constitutional and legal rights, of the effect of a guilty plea upon those rights, and of his right to make a statement before sentencing, the Court made the following findings: (check one applicable)

☐ Defendant voluntarily, intelligently, and knowingly entered a plea of ☐ guilty or ☐ Nolo Contendere to the charge(s) herein enumerated and acknowledged factual bases for charge(s):

☐ Defendant is found guilty of said charge(s) by the Court, sitting as trier of fact:

☒ Defendant was found guilty at jury trial.

| CHANGE OF VENUE FROM: | DEFENDANT'S FULL NAME | DATE OF BIRTH | RACE | SEX | SID NUMBER |
|---|---|---|---|---|---|
| N/A | JOHN LEZELL BALENTINE | 69 | B | M | |

| DEFENDANT'S ATTORNEY | | PROSECUTING ATTORNEY OR DEPUTY |
|---|---|---|
| HENRY H. BOYCE | ☐ PV  ☐ AP  ☒ PD  ☐ SELF | JIM STALLCUP |

There being no legal cause shown by the defendant, as requested, why judgment should not be pronounced against him, a judgment of conviction is hereby entered against the defendant on each charge enumerated and court costs assessed. The County Sheriff is hereby ordered and directed to transport the defendant to ☐ The Arkansas Department of Correction or ☐ _____ County Jail, where he is sentenced to hard labor for the term specified on each charge.

| STATUTE NO. | OFFENSE | OFFENSE DATE | DOCKET NO | COUNTS | F/M | CLASS | SENTENCE | SUSPENDED |
|---|---|---|---|---|---|---|---|---|
| 5-12-102 | Robbery | 11-10-89 | E289-66 | 1 | F | B | 5 yrs | -0- |
| | | | | | | | | |

If consecutive, explain:

TIME TO SERVE AT A.D.C.: _5_

OTHER SENTENCING PROVISIONS
☐ HABITUAL (5-4-501)
☐ FIREARM (5-4-505/16-90-120)
☐ DEADLY WEAPON (16-90-121)
☐ OTHER: _____

EXPLANATORY NOTES: _Not sentenced under Act 378_

| OTHER: FINE | $ _____ | ☐ DEATH PENALTY |
|---|---|---|
| RESTITUTION | $ _____ | |
| COURT COSTS | $ _____ | EXECUTION DATE: _____ |

☒ DEFENDANT INFORMED OF RIGHT TO APPEAL      BOND PROVISIONS: _$5,000.00_
JAIL TIME CREDIT: _179 DAYS_ OR ☐ NONE

| DATE | CIRCUIT JUDGE (Print or Type) | CIRCUIT JUDGE (Signature) |
|---|---|---|
| 6/12/90 | HAROLD S. ERWIN | |
| DATE | I certify this is a true and correct record of this Court with short report of circumstances attached. | CIRCUIT CLERK/DEPUTY (SEAL) |
| 6-12-90 | Don Danish | |
| DATE | I acknowledge receipt of judgment. | DEFENDANT (Signature) |
| 6/12/90 | | |

SHERIFF'S RETURN

| DATE REL. ON APPEAL BOND | DATE RET. TO CUSTODY | I certify the defendant named within was delivered to: ☐ The A.D.C. or ☐ _____ County Jail | DATE |
|---|---|---|---|

DISTRIBUTION: White: Court File, Blue: ADC, Yellow: Sheriff's Return, Pink: Defendant, Gold: Trial Prosecutor  ☒

JURY TRIAL     ☒
BENCH TRIAL    ☐
NON-TRIAL      ☐

AJD #15 2/12/87
4955

EXHIBIT
RX-89

1

w ██████ 0 ██████
B/m d.o.b. ██████ 70
12-28-89
11:30 A.M.

I was there when those
white people were Attacked.
It was back in november,
I believe it was november
20 th. in Newport. AR.

had been at the Me And John Valentine
Arcade At the old Mc-
Callister grocery store. We
were walking And John
Valentine spotted A man
And women walking. John
Valentine picked up A King
Cobra 40 oz. beer bottle And
started walking to ward This
couple. We got in front
of Them And when the
man And women walked between
us John Valentine hit the
man in the head with
the beer bottle. The beer
bottle broke when he
hit him in The head
with it.

W
.
O
.
(no)

2

-2-

And said

John told the white woman you better not say anything bitch. The women looked at me and I was as scared as she was.

The man went down when John hit him with the bottle; That is when John grabbed the white dude by the back of his coat. The woman had a small change purse. I bent down to touch the man after John told me to but I was afraid to. We got 40 to 50¢ and a pack of cigaretts. We ran down toward the levy and back towards the basketball court. John thought it was funny. John Valentine hit the man with the beer bottle. John ended up with the cig arette

W
.
O
Cao

-3-

And The money. noone
promised me Anything to
give this statement. I
gave it voluntarily.

12-28-89
11:43
A.M.

X    W█████O█

C.R. Bull

4

Case # 1228089
1-31-69
N⁰  178

# BENCH WARRANT

CASE NO. _CR. 19-66_

THE STATE OF ARKANSAS: To any Sheriff, Constable, Coroner, Policeman, in this State:

YOU ARE COMMANDED Forthwith to arrest_____ John Balentine _____

_____ and bring _____ Him _____ before the Jackson County Circuit Court for the offense of

_____ Aggravated Robbery _____

or if the Court be adjourned for the Term, that you deliver_____ John Balentine _____

to the Jailer of Jackson County.

Attorney Requesting Bench Warrant:
  Stanley Montgomery

WITNESS my hand and the seal of said Court this day: _____ Dec. 14th, 1989

DON DANIELS                                                    CLERK
Circuit and Criminal Clerk

By: _____ , D.C.

SHERIFF'S RETURN:

I have this day duly served this Bench Warrant by:

(          )

(          ) Upon the within named persons and I have stated the substance there to the

(          ) within named _____

FEES:                                                          SHERIFF

SERVICE   $ _____        By: _____ D.S.

MILEAGE  $ _____        DATE OF SERVICE: _12-15-89_

RETURN   $ _____

TOTAL    $ _____

STATE OF ARKANSAS)
                 )
COUNTY OF JACKSON)

### AFFIDAVIT

Comes now Steven Templeton and after being sworn states on oath:

That I am a detective with the Newport Police Department and I am one of the investigating officers on this case. On November 20, 1989, J██████ Moss and his wife R████ , were walking home on Remmel Ave. in Newport. They were attacked from behind by two black males. One of the black males struck J████ Moss in the head with a bottle, knocking him down and leaving him semiconcious. The other black male went through all of his pockets and jacket, looking for a wallet. J████ Moss did not have any money, so the two black males stole a pack of cigarettes from him and fled. While the second black male was going through his pockets, the first stood over him with a stick, threatening to hit him in the head again, if his wife interfered. On December 14, 1989 J██████ Moss identified W██████ O████ from a photographic lineup, and R████ Moss identified both W██████ O████ and John Balentine from a photographic lineup. O████ was identified as the one who went through J████ Moss' pockets, and Balentine was identified as the one who struck J████ Moss.

_____
                        AFFIANT

Sworn and subscribed to before me this _14 th_ day of

December, 1989.

_Michelle Wilkin Stewart_
NOTARY PUBLIC

My Commission Expires:

_8-9-96_

MICHELLE WILKIN STEWART
NOTARY PUBLIC
JACKSON COUNTY, ARKANSAS

I hereby find that this sworn affidavit demonstrates reasonable
and probable cause for the issuance of a warrant of arrest for
William Otis and John Balentine for the offense of Aggravated
Robbery.

Dated and signed December ____14____, 1989.

_____
Judge



MAX JONES
*Chief of Police*

CAPT. JERRY LONG
*Uniform Patrol Division*

LT. STEVEN TEMPLETON
*Criminal Investigation*

# CITY OF NEWPORT
## POLICE DEPARTMENT
SECOND AND WALNUT STREETS
Phone (501) 523-2721
NEWPORT, ARKANSAS 72112

Photo Lineup for Case #1228089

1.
2.
3. John Balentine
4.
5.
6.

CRIMINAL INVESTIGATION DIVISION

NEWPORT POLICE DEPARTMENT

PHOTO IDENTIFICATION SHEET

CID CASE NUMBER _122080 89_

INVESTIGATOR _Lt. Steven Templeton_

DATE _12-14-89_          TIME _10:15 AM_

WITNESS VIEWING PHOTO LINE-UP ██████████ _mass_

PHOTO NUMBER _#4_

CRIMINAL INVESTIGATION DIVISION

NEWPORT POLICE DEPARTMENT


PHOTO IDENTIFICATION SHEET


CID CASE NUMBER #128089

INVESTIGATOR Lt. Steven Templeton

DATE 12-14-89        TIME 10:10 AM

WITNESS VIEWING PHOTO LINE-UP ██████ Mann

PHOTO NUMBER #3 + #4

CRIMINAL INVESTIGATION DIVISION
NEWPORT POLICE DEPARTMENT

SUBJECT:                    Interview

DATE & TIME:                12/14/89
                            10:22 a.m.
PERSON INTERVIEWED:         R█████ Moss, W/F
                            DOB:  8/3/56
ADDRESS & PHONE NUMBER:     ████████████ Newport

LOCATION OF INTERVIEW:      CID Office

OFFICER INTERVIEWING:       Lt. Steven Templeton

CASE NUMBER:                1228089

INTERVIEW:

st:  Alright Rachel, you're J.█████ Moss's hus, wife?
rm:  Yeah.
st:  I'll get that right in a minute.  Alright I believe you and
     your husband were walking home on Monday, November 20 and
     Jimmy got assaulted.  Is that correct?
rm:  Right.
st:  Tell me what you saw.
rm:  Well we's walking past McAllister's, went on past the store,
st:  About what time was this?
rm:  It was in between 6:15 and 6:30.
st:  It was right after you got off work?
rm:  Cause I was just getting off work, yeah.
st:  And you work at the Newport Fish Market?
rm:  Yeah.
st:  For Dale Howard?
rm:  Right.
st:  Ok, what happened?
rm:  Anyway we's walking past to the store, got to the store and
     we noticed two guys crossing the street, over to the side
     where we got.  We got on the other side.
st:  Ok, what were they dressed like? What were they wearing?
rm:  There was one real tall.  One had light, like knee knocker
     shorts on,
st:  Uh huh.
rm:  whatever they call them.  They was light colored.  I can't
     really say.  They might have been yellow.  They was just a
     bright color.  And there was a short black guy with him.  He
     had a khaki jacket on, some kind of, the faded out blue
     jeans like they wear now, you know, like the kids
st:  Uh huh.
rm:  are wearing now.  And neither one of em had a hat on.

```
st:  Ok, what happened when y'all approached em?
rm:  Well they, when they first come across the street they was
     walking behind us.
st:  Uh huh.
rm:  You know they was far back for a little bit and then as me
     and J____ kept on walking we noticed you know, they kept
     getting closer.  And I just happened to look back and you
     know they was coming up, but I just kept on walking and
     about then they, bing right up side J____'s head.
st:  Ok now which one hit J____?
rm:  The short one.
st:  Alright you got a good look at both of em?
rm:  Yeah.
st:  Alright what did they say and do after they hit J____?
rm:  Ok,
st:  What did they hit him with first?
rm:  Some kind of bottle.
st:  Ok.
rm:  It was a clear bottle.
st:  Did it break?
rm:  Yeah.
st:  Hit him hard enough in the head to break it?
rm:  Yeah.
st:  Ok, what happened next?
rm:  J____ fell and I just happened to turn around and the short
     black dude and some tall black dude checked J____'s pockets.
st:  Ok, what were you doing during all this?
rm:  I was standing there right beside the short one.  The short
     one was talling the tall one to check his
st:  Well go ahead and say it? ___. ___
rm:  Do I say it?
st:  Yeah.
rm:  check his fucking pockets.  And the tall one, after
     -Inaudible- so he did.  So he checked J____'s front
     pockets.  He said, and I was saying he ain't got no
     money.  He ain't got no money.  And he was telling me
     to shut my fucking mouth.  And, but I didn't, that's
     where they's gonna hit him again.  He said so,
st:  Did they have any, did they have anything else in their
     hand after that bottle broke?
rm:  A stick.
st:  Which one had the stick?
rm:  The short one.
st:  Ok, did he threaten to hit you or J____ with it?
rm:  No.  He didn't threaten to hit me.  He said he was gonna
     hit J____ again.
st:  Ok, was J____ bleeding?
rm:  Yeah.
st:  Cut? Where was he bleeding at?
rm:  His head and the big ole gash on his back.  Right whe, right
     behind his shoulder blade there.
st:  Ok, tell me what happened.
rm:  He said wll check his back pockets.  Checks his back and his
     back and his back pockets.  And I was stilling saying he, we
```

```
        don't have any money.  He doesn't have any money.  He kept
        He kept telling me to shut my fucking mouth.  So he told the
        tall one, he said well check his fucking back pockets right
        now.  So he act like he was checking which I don't think he
        did, but he said he's clean man.  He's clean.  All the time
        he, the tall one was saying let's go man.  Let's go.
        And then after that they run off.  Run right back over
        towards the store.
st:     Ok, where did y'all go to?
rm:     Home.
st:     Did you call Dale
rm:     I got J█████ home and I called Dale.
st:     Then y'all, after Dale came down there, y'all came up to
        the PD.
rm:     I come up and I talked to Johnny Long.
st:     Ok.  Now then you said that you recognized one of em
        later on.  He came in the fish market.
rm:     Yeah.
st:     The tall one.  You recognized him.
rm:     The tall one.
st:     What day was that? Do you remember?
rm:     It was about two weeks ago.
st:     One day last week?
rm:     Week and a half, week and a half, two weeks.
st:     About the 4th or 5th of December?
rm:     Yeah it's been just recently.
st:     So it'd been about this time, about a week ago Monday or
        Tuesday?
rm:     Yeah.
st:     Been the early part of last week?
rm:     Right.
st:     Alright was the other guy with him? The short one?
rm:     There was a short one with him, yeah.
st:     Ok, now who did, when you saw the tall one, you immediately,
        did you know his name?
rm:     No.  Not right off the bat, no.
st:     But you knew it was the same one that you saw
rm:     That was with the short one that hit J█████.
st:     Ok, when did you learn what his name was?
rm:     Well the day they come in the fish market.
st:     Did you ask somebody what his name was?
rm:     He talked to a girl.  Me and Dale did.
st:     Now then you identified, I made a photo lineup here of
        six photographs and you identified photo #3 as being the
        short one and photo #4 as being the tall one.
rm:     Right.
st:     And you learned, since have learned what's number 4's name?
rm:     O███.
st:     W██████ O███?
rm:     Yeah W██████ O███.  I just know it was O███.
st:     Ok.  Is everything you told me in this statement true
        R█████?
rm:     Yes sir.
END OF INTERVIEW
```

LT. STEVEN TEMPLETON
CRIMINAL INVESTIGATION DIVISION
NEWPORT POLICE DEPARTMENT

IN THE CIRCUIT COURT OF JACKSON COUNTY, ARKANSAS

STATE OF ARKANSAS, PLAINTIFF

VS. NO. CR. 89-_____

W█████ D███ and JOHN BALENTINE, DEFENDANTS

INFORMATION

Comes Jim Stallcup, Prosecuting Attorney in and for the Third Judicial Circuit of Arkansas of which Jackson County is a part, duly elected, qualified and acting, upon information, in name and by the authority of the State of Arkansas accuses W█████ D███ and JOHN BALENTINE of the crime of AGGRAVATED ROBBERY committed as follows, to wit:  the said W█████ D███ and JOHN BALENTINE in the County and State aforesaid on or about the 20th day of November, 1989 did

WITH THE  PURPOSE OF  COMMITTING A FELONY OR MISDEMEANOR THEFT OR RESISTING  APPREHENSION  IMMEDIATELY  THEREAFTER,  EMPLOYED  OR THREATENED  TO  IMMEDIATELY  EMPLOY  PHYSICAL FORCE UPON ANOTHER, J██████MOSS, AND THAT JOHN  BALENTINE WAS  ARMED WITH  A DEADLY WEAPON OR  REPRESENTED BY WORDS OR CONDUCT THAT HE WAS ARMED WITH A DEADLY WEAPON; OR  INFLICTED OR  ATTEMPTED TO  INFLICT DEATH OR SERIOUS PHYSICAL INJURY UPON ANOTHER PERSON, J██████MOSS

against the peace and dignity of the State of Arkansas.

_Jim Stallcup_
---------------------------
JIM STALLCUP, PROSECUTING ATTORNEY


By_Stanley Montgomery_
Deputy Prosecuting Attorney

(The State  of Arkansas  will offer  at trial all lesser included offenses)

(The statutory authority for AGGRAVATED ROBBERY is Ark. Code Ann. 5-12-103  and the penalty is 10 to 40  years or life )

Balentine #4 Crim Hx 11-1989 Page 16 of 17

# NEWPORT POLICE DEPARTMENT
## INCIDENT REPORT

NO. IR-89-572          1174          C.I.S. NO. 1299089
                       Classification

(PRINT OR TYPE)

| 1 COMPLAINANT'S NAME (Firm name if business) | 2 AGE | DESCENT | SEX | DOB | 3. PHONE (Business) |
|---|---|---|---|---|---|
| J███ Moss | 37 | W | M | ███ | 523-9597 |

| 4 COMPLAINANT'S ADDRESS | 5 CITY | 6 PHONE (Residence) |
|---|---|---|
| ███████ | Newport | |

| 7 COMPLAINANT'S BUSINESS, EMPLOYMENT OR SCHOOL | 8 TYPE OF OFFENSE OR INCIDENT |
|---|---|
| Howard's Fish Fish Market | Assault |

| 9 PLACE WHERE OFFENSE OCCURRED | 10 TYPE OF BUILDING (Residence, Store, Bank, etc.) |
|---|---|
| McAllister Gro | |

| 11 REPORTED BY | PHONE | 12 REPORTED TO |
|---|---|---|
| J███ Moss | ███ | HPD |

| 13 DAY, DATE AND TIME OF OFFENSE | 14 DAY, DATE AND TIME OF REPORT |
|---|---|
| 11/20/89   6:30 p.m. Monday | Monday 11/20/89   9:22 p.m. |

| 15 BODILY INJURIES TO | HOSPITAL? | 16 HOW REPORTED (In person, phone, on view, other) |
|---|---|---|
| Head and Mid Back | | Person |

17 M/O (How done - force used - at what point - with what tool or weapon - other acts or trade marks)
See Narrative

17A EXACT WORDS USED BY OFFENDER

18 VEHICLE INVOLVED IN OFFENSE (Year - color - make - model - auto license no. - year - state)          Complainant's ☐   Suspect's ☐

| 19 DIRECTION OF FLIGHT STREET OR ROAD | ☐ N   ☐ E   ☐ S   ☐ W | ☐ AUTO  ☐ FOOT   ☐ UNK.  ☐ OTHER | 20 WILL COMPLAINANT PROSECUTE? (YES) / NO | 20A AMOUNT OF PROPERTY LOSS? — 0 — / LESS THAN $100.00/or $          .00 |
|---|---|---|---|---|

| 21 NAME AND ADDRESS OF SUSPECT(S) OR AGE | DESCENT | SEX | DESCRIPTION | 22 CIRCLE IF SUSPECT IS |
|---|---|---|---|---|
| 1 | B | M | | Employee - Relative - Acquaintance |
| 2 | | | | |

| 23 WITNESSES NAME | BEST CONTACT ADDRESS | AGE | BEST PHONE | OTHER PHONE | PARENT OR GUARDIAN? |
|---|---|---|---|---|---|
| 1 Rachel Moss | Same | 33 | 9597 | | |
| 2 | | | | | |

23 NARRATIVE (Write in any available details not covered above)

Subject was walking from Howard's Fish Market and X got to McAllister's and two black males hit him from behind and knocked him out.  Subjects went the pockets.  Black male 5'3 wearing black sweater, blue jeans, mustache mustache, and
Black male 5'4, wearing knee X knocked shorts, light color with a windbreaker, dar colored with hightop white tennisshoes.

| 25 INVESTIGATING OFFICER(S) | 26 REPORT MADE BY | DATE |
|---|---|---|
| J D Long | Kim Evins | 11/20/89 |

| 27 CASE FILED | | 28 THIS CASE IS | | 29 APPROVED BY |
|---|---|---|---|---|
| Yes ☐   No ☐ | Cleared by arrest ☐ | Unfounded ☐   Inactive ☐   Other ☐ | | 30 ADDITIONAL PAGE(S) USED?   YES   NO |

Balentine #4 Crim Hx 11-1989  Page 17 of 17

17

## JACKSON COUNTY SHERIFF'S OFFICE

615 2ND STREET, NEWPORT, AR 72112
TEL:501-523-5842 FAX:501-523-7418

Subject Name: BALENTINE, JOHN LEZELL

Alias: BOB BROKER

ID#:

SSN: ▮▮▮▮

DLN: 4▮▮▮▮

Address: ▮▮▮REMMEL AVE.

City: NEWPORT

State: AR

Zip: 72112

Phone: ▮▮▮▮

Occupation: MECHANIC

Sex: M

DOB: ▮▮/69

Height: 70

Weight: 170

Hair: BLACK

Eyes: BROWN

SMT: SCAR UPPER LIP



BALENTINE, JOHN LEZELL

Notes: OTHER DOB: 01/31/69    01/30/67    SSN: ▮▮▮▮

Number of charges: 1

Last Charged: 10/15/96

Charge: CARNAL ABUSE 3RD DEGREE

Outstanding warrants:
1) Fail to Appear Circuit Court on the above charge.
2) Residential Burglary / Terroristic Threat 1st Deg. / Battery 3rd Deg.
   Agg. Assault
   Kidnapping
   Robbery

Balentine #5 Crim Hx 10-1996  Page 1 of 30


EXHIBIT
RX-90

1

JACKSON COUNTY SHERIFF'S OFFICE
ARREST & BOOKING REPORT                                    CASE NO. _____

NAME Balentine, John Lezell          RACE Black          SEX Male

NICKNAME OR ALIAS Bob Broker

ADDRESS ████ Remmel Ave.    Newport    AR.    Jackson
              (STREET)         (CITY)      (STATE)    (COUNTY)

TELEPHONE #  HOME ████████████    WORK ( . . )

OCCUPATION Mechanic          EMPLOYER Unemployed

PLACE OF BIRTH Newport, AR.     D.O.B. ████ 1 69    AGE 28

HEIGHT 170   WEIGHT 5'-10"   HAIR Black   EYES Brown   COMPLEXION light

MARRIED _____ SINGLE ✓ OTHER _____

SPOUSE'S NAME _____

ADDRESS _____
         (STREET)        (CITY)         (STATE)       (COUNTY)

RELATIVES:  FATHER James Balentine  ADDRESS D.C.

            MOTHER Carrie Smith   ADDRESS Robinson Addition, Newport, AR

BROTHERS Freddie Balentine   ADDRESS _____

_____ Lynn Balentine   ADDRESS _____

_____   ADDRESS _____

SISTERS Doris Balentine   ADDRESS Houston, TX

_____ Joan Ann Balentine   ADDRESS Houston, TX

_____   ADDRESS _____

SCARS/MARKS/TATTOOS Scar on upper lip

SOCIAL SECURITY # ████████████   DRIVERS LICENSE # ████████████

F.B.I. NUMBER 669251FA1      S.I.D. NUMBER AR 565835

OTHER Alias DOB: ████ /69 ████ /67 SSN: ████████████

DATE OF ARREST 10-15-96      TIME OF ARREST    3:40    ( P )M

PLACE OF ARREST Newport, AR.

CHARGE(S) Carnal Abuse 3rd Degree   Warrant #1484  Tracking #411221

COMMENTS (IF ANY) _____

_____

_____

BOOKING OFFICER Sgt. D. Lucas    ARRESTING OFFICER(S) Sgt. D. Lucas

2



FEDERAL BUREAU OF INVESTIGATION, UNITED STATES DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20537

PRIVACY ACT OF 1974 (P.L. 93-579) REQUIRES THAT FEDERAL, STATE, OR LOCAL AGENCIES INFORM INDIVIDUALS WHOSE SOCIAL SECURITY NUMBER IS REQUESTED WHETHER SUCH DISCLOSURE IS MANDATORY OR VOLUNTARY, BASIS OF AUTHORITY FOR SUCH SOLICITATION, AND USES WHICH WILL BE MADE OF IT

| JUVENILE FINGERPRINT | | | DATE OF ARREST | ORI | |
|---|---|---|---|---|---|
| SUBMISSION | YES | | MM DD YY | CONTRIBUTOR | ARO340000 |
| | | | 10 15 96 | ADDRESS | SO NEWPORT, AR |
| TREAT AS ADULT | YES | | | REPLY YES DESIRED? | |

| SEND COPY TO: (ENTER ORI) | DATE OF OFFENSE | PLACE OF BIRTH (STATE OR COUNTRY) | COUNTRY OF CITIZENSHIP |
|---|---|---|---|
| | MM DD YY 10 03 96 | Newport, AR | United States |

| MISCELLANEOUS NUMBERS | SCARS, MARKS, TATTOOS, AND AMPUTATIONS |
|---|---|
| | Scar upper lip |

RESIDENCE/COMPLETE ADDRESS: 918 Remmel Avenue    Newport, AR.

OFFICIAL TAKING FINGERPRINTS NAME OR NUMBER: Det. Charles Vaugh    LOCAL IDENTIFICATION/REFERENCE: OA96-89

EMPLOYER/ADDRESS: Self employed    OCCUPATION: Mechanic

ACA 5-14-106
Carnal Abuse in the Third Degree

FD-249 (Rev. 10-1-93)

4



JACKSON COUNTY CRIMINAL INVESTIGATION SECTION

LEFT HAND PALM PRINT

NAME
D.O.B.
SSN #
CASE #



No    b/m
     1507    69

DoB ████

## A L I A S
# BENCH WARRANT

CASE NO. __CR-96-174__

W 9684293517

THE STATE OF ARKANSAS: To any Sheriff, Constable, Coroner, Policeman, in this State:

YOU ARE COMMANDED Forthwith to arrest____John Balentine_____

_____ and bring ___Him_____ before the Jackson County Circuit Court for the offense of
__Failure to Appear in Circuit Court__ (Carnal Abuse)

or if the Court be adjourned for the Term, that you deliver____John Balentine____

to the Jailer of Jackson County.

Attorney Requesting Bench Warrant:  Honorable Harold S. Erwin in open Court.

WITNESS my hand and the seal of said Court this day:  November 25, 1996

PAM GRAHAM                                    _Pam Graham_____, CLERK
Circuit and Criminal Clerk

By:_____, D.C.

SHERIFF'S RETURN:

I have this day duly served this Bench Warrant by:

(          )

(          ) Upon the within named persons and I have stated the substance there to the

(          ) within named _____

_____

FEES:                                  _____ SHERIFF

SERVICE  $ _____        By:_____ D.S.

MILEAGE  $ _____        DATE OF SERVICE: _____

RETURN   $ _____

TOTAL    $ _____

IN THE CIRCUIT COURT OF JACKSON COUNTY, ARKANSAS

STATE OF ARKANSAS, PLAINTIFF

VS. NO. CR.-96- _____

JOHN-LEZELL BALENTINE, DEFENDANT

## INFORMATION

Comes Jim Stallcup, Prosecuting Attorney in and for the
Third Judicial Circuit of Arkansas of which Jackson County is a
part, duly elected, qualified and acting, upon information, in
name and by the authority of the State of Arkansas accuses
JOHN LEZELL BALENTINE of the crime of CARNAL ABUSE IN THE THIRD
DEGREE committed as follows, to wit: the said JOHN LEZELL
BALENTINE in the County and State aforesaid on or about the
3RD day of OCTOBER, 1996 did:

COUNT ONE: BEING TWENTY (20) YEARS OLD OR OLDER, HE ENGAGED IN
           SEXUAL INTERCOURSE OR DEVIATE SEXUAL ACTIVITY WITH
           ANOTHER PERSON NOT HIS SPOUSE WHO IS LESS THAN SIXTEEN
           (16) YEARS OLD.

against the peace and dignity of the State of Arkansas.

JIM STALLCUP, PROSECUTING ATTORNEY

by _____
   Deputy Prosecuting Attorney

(The statutory authority for CARNAL ABUSE IN THE THIRD DEGREE is
Ark. Code Ann. 5-14-106 and the penalty is UP TO 6 years and/or
fine up to $10,000.00.)

STATE OF ARKANSAS)

COUNTY OF JACKSON)

### AFFIDAVIT

Comes now, Sergeant David Lucas, and after being sworn states on oath: That I am an investigator with the Jackson County Sheriff's Department and I am one of the investigators on this case.

On Friday, October 4, 1996 at approximately 8:00 P.M. Sergeant Richard Morris of the Jackson County Sheriff's Office was contacted by Mr. R████ M████ of ███████████ Newport. Mr. M████ stated that he had learned that his daughter, A████ M████, who is fifteen (15) years old has been seeing and has had sex on several occasions with John Balentine, who is Twenty Seven (27) years old.

On Monday, October 7, 1996 at approximately 10:40 A.M. Mr. and Mrs. M████ brought A████ to my office. At that time I conducted an interview with A████ and learned that all of the sexual encounters that she had with John Balentine were all consentual.

During the interview A████ stated that she had been seeing John for approximately 3 weeks. She stated that John knew that she was only fifteen years old but continued to see her. A████ stated that she and John Balentine had engaged in sexual intercourse at least ten (10) times. She said that every time they had sex was at his mothers residence in the Robinson Addition Community.

On Tuesday, October 15th John Balentine was located and brought to the Sheriff's Office. At approximately 2:54 P.M. I advised John Balentine of his Miranda Rights in the presence of Detective Charles Vaughn of the Sheriff's Office. At that time Balentine stated that he understood his rights and agreed to waive them and speak with me.

During the interview Balentine stated that he had infact been seeing A████ He stated that he had been seeing her for approximately three weeks, and during this time he has had sexual intercourse with her on several occasions. Balentine stated that he was aware of her age but that it was mainly her idea and that she presented "it" to him and he "was just being a man and took her up on it". Balentine stated that the last time he had intercourse with A████ M████ would have been on approximately the 3rd of October.

At this time the Jackson County Sheriff's Office respectfully request that this Affidavit be issued for a Warrant of Arrest for John Lezell Balentine. Charging him with Carnal Abuse in the Third Degree, in violation of Ar. Code Ann. 5-14-106.

_(signature)_
AFFIANT

Sworn and subscribed to before me this 16TH day of OCTOBER, 1996.

_(signature)_
NOTARY PUBLIC

My commission expires

2-3-06

OFFICIAL SEAL
ELLEN L. TARNO
NOTARY PUBLIC - ARKANSAS
JACKSON COUNTY
MY COMMISSION EXPIRES: 02-03-2006

I here by find that this sworn affidavit demonstrates reasonable and probable cause for the issuance of a warrant of arrest for JOHN LEZELL BALENTINE, for the offense of CARNAL ABUSE IN THE THIRD DEGREE.

Dated and signed _October 16_, 19_96_.
Time: _11:15_ _P_.M.

_(signature)_
JUDGE

Balentine #5 Crim Hx 10-1996  Page 10 of 30

CRIMINAL INVESTIGATION DIVISION
INVESTIGATORS REPORT

OFFICER & BADGE #:  SERGEANT DAVID LUCAS #405

DATE: OCTOBER 16, 1996

CASE #: JA96-89

OFFENSE: CARNAL ABUSE IN THE THIRD DEGREE (ACA 5-14-106)

DATE/TIME OF OFFENSE: SEPTEMBER 1996

VICTIM(S):

NAME: A█████

AGE: 15     SEX: F     RACE:  W     DOB: ████

ADDRESS: ███████ NEWPORT, AR. ████

PHONE: ████████

SUSPECT(S):

NAME:  JOHN LEZELL BALENTINE

AGE: 27     SEX: M     RACE: B     DOB: ████ 69

ADDRESS: ████ REMMEL AVENUE  NEWPORT, AR. 72112

PHONE: ████████

PAGE 1

CRIMINAL INVESTIGATION DIVISION
INVESTIGATORS REPORT

NARRATIVE:

On Friday, October 4, 1996 at approximately 8:00 P.M. Mr.
R█████ M█████ came to the Sheriff's Office and spoke with
Sergeant Richard Morris, in reference to his daughter, A███

According to R█████ M█████, A██ left school Wednesday
morning the 2nd and has been gone since.  On Friday night the
4th she called her parents and stated that she wanted to come
home and that she was at McDonalds Restaurant.
    Mr. M█████ stated that after he had A██ back at home he
learned that she has been staying at John Balentine's
residence at Robinson Addition since Wednesday night.  A██
also admitted to him that she has had sexual intercourse with
John Balentine on several occasions.  A██ is fifteen (15)
years old and John Balentine is twenty seven (27) years old.
    Mr. M█████ stated that at first A██ had indicated to him
that she was intimidated into having sex with Balentine, but
during the course of the preliminary report it was evident to
Sgt Morris the this was not the case.  According to a
statement that A██ made to Sgt. Morris the acts were
consentual and that she had started to leave the residence
numerous times, but that she elected to stay.

A██'s parents took her to Harris Hospital where a Sexual
Assault Evidence Collection Kit was conducted.  The kit was
released to Sgt. Morris, were it remained in his care and
control until he released it to me at 8:00 A.M. on the 7th.

On Monday, October 7th at approximately 10:40 A.M. Mr.
and Mrs. M█████ brought A██ to my office.  At that time I
conducted an interview with A██
    During this interview A██ stated that she had been seeing
John Balentine for approximately three (3) weeks.  She stated
that John knew that she was just fifteen years old, but
continued to see her.  She said that she and John had engaged
in sexual intercourse on at least ten (10) occasions.  She
stated that every time that they had sex, they were at John's
mothers residence in the Robinson Addition Community.

On Tuesday, October 8th at 5:30 P.M. I turned the
Evidence Kit over to Investigator Ray Harrison of the Drug
Task Force.  Inv. Harrison stated that he was going to the
Crime Lab and that he would take the kit for me.  Inv.
Harrison turned the kit into the Evidence Receiving Section
of the Crime Lab on Wednesday the 9th at 12:51 P.M.

On Tuesday, October 15th John Balentine was located and
brought to the Sheriff's Office.  At approximately 2:54 P.M.
I advised John Balentine of his Miranda Rights in the
presence of Detective Charles Vaughn of the SHeriff's Office.
At that time Balentine stated that he understood his rights
and agreed to waive them and speak with me.

PAGE 2

CRIMINAL INVESTIGATION DIVISION
INVESTIGATORS REPORT

During this interview John Balentine stated that he has
infact been seeing A███ M███    He stated that they had been
seeing each other for approximately three (3) weeks and
during that time he has had sexual intercourse with her on
several occasions.  Balentine stated that he was aware of her
age but that it was mainly her idea.  He said the "She
presented "It" to him and that he was just being a man and
took her up on it".  Balentine said that the last time he and
A███ had sexual intercourse would have been on approximately
the 3rd of October.

After the interview was completed, John Balentine was
booked into the Jackson County Detention Center for the
charge of Carnal Abuse in the Third Degree.

On Wednesday, October 16th at approximately 11:15 A.M. a
Probable Cause Affidavit was signed by Newport Municipal
Judge, Ronald Winningham and a Warrant was issued and
subsequently served on John Lezell Balentine for Carnal Abuse
in the Third Degree.

Sgt. David Lucas

Sergeant David Lucas #405
Criminal Inv. Division
Jackson Co. Sheriff's Dept.

PAGE 3

Balentine #5 Crim Hx 10-1996  Page 13 of 30

13

*Newport AR.*
*523-4264*

### Jackson County Sheriff's Dept.
### MIRANDA RIGHTS FORM

NAME: _John Lezell Balentine_     DOB: �_____ -65_

PLACE: _Jackson Co. Sheriffs Dept._

DATE: _10-15-96_     TIME: _2:54 P.M._

Before asking you any questions, I want to advise you of your rights.

1. Do you understand that you have the right to remain silent?
   RESPONSE: _Yes J.L.B_

2. Do you understand that anything you say may be used against you, in a court of law?
   RESPONSE: _Yes J.L.B_

3. Do you understand that you have the right to talk to an attorney before any questioning and to have an attorney present with you during questioning?
   RESPONSE: _Yes J.L.B_

4. Do you understand that, if you cannot afford to hire an attorney, one will be appointed by the court for you prior to any questioning, at no cost to you?
   RESPONSE: _Yes J.L.B_

5. Do you understand that if you decide to answer questions now, you can decide to stop answering questions at any time and that you can stop answering questions at any time until you talk to an attorney?
   RESPONSE: _Yes J.L.B_

I UNDERSTAND THE RIGHTS LISTED ABOVE.

SIGNED: X _John L. Balentine_

WITNESSES: _Sgt. David Burns_     _Detective C. Vaughn_

### WAIVER OF RIGHTS

NO PROMISES OR THREATS HAVE BEEN USED AGAINST ME TO INDUCE ME TO WAIVE THE RIGHTS LISTED ABOVE. WITH FULL KNOWLEDGE OF MY RIGHTS, I HEREBY VOLUNTARILY, KNOWINGLY AND INTELLIGENTLY WAIVE THEM AND AGREE TO ANSWER QUESTIONS.

SIGNED: _John L. Balentine_

WITNESSES: _Sgt. David Burns_     _Detective C. Vaughn_

Balentine #5 Crim Hx 10-1996  Page 14 of 30

14

JACKSON COUNTY SHERIFF DEPARTMENT
NEWPORT, ARKANSAS

SUBJECT:                    PERSONAL INTERVIEW

DATE OF INTERVIEW:         OCTOBER 15,1996  3:00P.M.

PERSON BEING INTERVIEWED:  JOHN BALENTINE  B/M  DOB ███/69
                           ████ REMMEL AVE, NEWPORT, AR. 72112
                           ████████

PLACE OF INTERVIEW:        JACKSON COUNTY SHERIFF'S DEPARTMENT   CID ROOM
                           SGT. DAVID LUCAS
                           DET. CHARLES VAUGHN  JCSO

CNN:                       JA96-89

---

DL:  STATE YOUR NAME FOR ME PLEASE.
JB:  JOHN BALENTINE.
DL:  O.K. JOHN, WE BROUGHT YOU IN HERE TODAY FOR A COUPLE OF REASONS.  ONE IS I NEED TO TALK
     TO YOU ABOUT A CASE THAT I'M WORKING ON AND UH, THE OTHER ONE WAS ON SOME CHILD SUPPORT
     STUFF OUT OF WOODRUFF COUNTY, WHICH THEY'RE CHECKING ON THAT FOR US NOW,O.K?  BEFORE I
     STARTED ASKING YOU ANY QUESTIONS, I READ YOU THIS PIECE OF PAPER I'M HOLDING UP IN FRONT
     OF YOU, WHICH ARE YOUR MIRANDA RIGHTS.  YOU'LL NOTICE THERE ARE FIVE RIGHTS LISTED WITH
     THE RESPONSE OF YES AND THE INITIALS JLB.  ARE THOSE YOUR INITIALS?
JB:  YES SIR.
DL:  DID YOU PLACE THEM THERE?
JB:  YES SIR.
DL:  SO YOU DO UNDERSTAND YOUR RIGHTS?
JB:  YES SIR.
DL:  AT THE BOTTOM OF THAT IS A WAIVER OF THOSE RIGHTS, WHICH BASICALLY SAYS THAT I AIN'T MADE
     NO THREATS OR PROMISES TOWARD TO YOU TO GET YOU TO TALK TO ME TODAY, CORRECT?
JB:  YES SIR.
DL:  AND IT'S SIGNED JOHN L. BALENTINE, DID YOU PLACE THAT SIGNATURE THERE?
JB:  YES SIR.
DL:  AND YOU ARE WILLING TO SPEAK WITH ME TODAY, CORRECT?
JB:  YES SIR.
DL:  O.K.  ALL RIGHT JOHN THE REASON I WANT TO TALK TO YOU, THERE'S BEEN SOME ALLEGATIONS MADE
     ABOUT YOU OR AGAINST YOU, BY A GIRL AND I'M GOING TO BE HONEST WITH YOU, I THINK THEY
     CAME IN TRYING TO GET ME TO TRY AND ARREST YOU FOR RAPE AND I TOLD THEM, AIN'T NO WAY.
     AIN'T NO WAY.  YOU KNOW A███████?
JB:  YEAH, SHE LIVE ACROSS THE STREET.
DL:  LIVES ACROSS THE STREET FROM YOU?  A FIFTEEN YEAR OLD?
JB:  YEAH.
DL:  O.K.  SHE'S SAYING THAT YOU AND HER WERE KIND OF BOYFRIEND AND GIRLFRIEND KIND OF LIKE
     FOR A LITTLE WHILE, FOR ABOUT TWO OR THREE WEEKS.  SHE HAD SEX WITH YOU A FEW TIMES.
     THEY TRIED TO GET ME TO ARREST YOU FOR RAPE, THAT AIN'T RAPE.  I KNOW THE LITTLE GIRL
     CONSENTED.  I KNOW SHE CONSENTED TO HAVE SEX WITH YOU.  IT WAS PROBABLY HER IDEA.  I'M
     A PRETTY GOOD GUESSER AIN'T I?
JB:  I AIN'T GOING TO MESS WITH HER, SHE HAD ANOTHER BOYFRIEND.
DL:  WHO'S HER OTHER BOYFRIEND?
JB:  I DON'T KNOW HIS NAME.  I KEEP FORGETTING IT.  UH, LET ME TALK TO YOU FOR A MINUTE AND
     I'LL THINK OF IT, BUT HE HAS SOME CRAZY NAME, I DON'T HIS, I JUST KNOW HIM BY HIS
     NICKNAME.
DL:  DO YOU RECALL THE LAST TIME SHE WAS WITH YOU, WAS OUT AT YOUR MAMA'S AND YOU HAD DROPPED HE
     OFF BACK BEHIND PRICE CHOPPER, I BELIEVE SHE SAID.  THAT WAS ON A LAST WEDNESDAY, A WEEK AG

PAGE 2

CONT:
DL: I THINK. LET'S SEE.
JB: NO SHE CALLED AND TOLD ME TO COME AND GET HER.
DL: YOU WAS AT HER MAMA'S, OR SHE WAS YOUR MAMA'S.
JB: SHE CALLED AND TOLD ME TO COME AND GET HER.
DL: FROM SCHOOL?
JB: NO,
DL: YOU PICKED HER UP AT SCHOOL.
JB: I DON'T GOT NO WAY OF PICKING HER UP. I LEFT AND WENT OUT TO MY MAMA'S HOUSE AT SIX-THIRTY TO WORK ON MY CAR AND UH, AND NOBODY LEFT THEIR CAR OUT THERE. SHE CALLED ME ABOUT TWO O'CLOCK WHEN I MADE IT HOME. TOLD ME TO COME PICK HER UP.
DL: I'M GOING TO BE HONEST WITH YOU, JOHN, I DON'T GIVE A SHIT IF YOU HAD SEX WITH THE LITTLE GIRL OR NOT. MATTER OF FACT, SHE DON'T LOOK FIFTEEN TO ME. I'D PROBABLY DONE THE SAME THING IF IT WAS ME.
JB: I AIN'T MESSED WITH HER, I KNEW HOW OLD SHE WAS. I AIN'T MESSED WITH HER. SHE HAD ANOTHER LITTLE BOYFRIEND I CAN'T EVEN THINK OF HIS NAME.
DL: IT WILL HELP YOU OUT IF YOU GIVE ME A NAME.
JB: HIS LAST NAME IS UH, DAMN. K█████ WOULD KNOW IT, K█████ TOLD ME. E█████, HIS FIRST NAME IS E█████. I CAN'T THINK OF HIS LAST NAME.
DL: E█████?
JB: YEAH.
DL: I HAD E█████ IN HERE BEFORE.
JB: HIS LAST, HIS FIRST NAME IS E█████. I CAN'T THINK OF HIS LAST NAME.
CV: WHERE DOES HE STAY AT?
JB: I DON'T EVEN KNOW HIM. HE'S A KID. HE'S A SCHOOL KID.
DL: ISN'T THAT MR. B█████S GRAND SON?
JB: I DON'T KNOW. I AIN'T NEVER SEEN HIM OVER TO MR. █████'S HOUSE. HE COME OVER TO THE HOME ONE TIME, I CAN'T THINK OF HIS LAST NAME, THOUGH.
DL: I MIGHT BE ABLE TO HELP YOU.
CV: SHE DID STAY OUT AT YOUR MOTHER'S HOUSE, IN ROBINSON ADDITION.
JB: SHE DID STAY, I JUST WENT AND PICKED HER UP.
DL: WHERE DID YOU PICK HER UP AT?
JB: OVER THERE BY WAL-MARTS.
DL: WHY WOULD THIS GIRL BE LYING ON YOU MAN.
JB: PROBABLY CAUSE SHE LOVE MY DUDE, I DON'T KNOW.
CV: THAT DUDE LYING ON YOU?
DL: DON'T MAKE NO SENSE JOHN. I MEAN I'M TELLING YOU RIGHT OUT FRONT, YOU DIDN'T RAPE THE GIRL. SHE SAID SHE SLEPT WITH YOU. IF SHE SLEPT WITH YOU, I DON'T REALLY CARE. I'M JUST TRYING TO AVOID GETTING A RAPE WARRANT FOR YOU. CAUSE WHAT IS GOING TO HAPPEN, YOU ALREADY GOT WHAT WE CALL A SEXUAL ASSAULT COLLECTION KIT, ALOT OF PEOPLE CALL THEM RAPE KITS, DONE ON HER AND IT'S AT THE CRIME LAB NOW. AND THAT WILL COME BACK SAYING THERE IS SEMAN AND HAIR AND ALL KINDS OF STUFF AND WHAT THAT IS GOING TO DO IS, IS THAT IS GOING TO GET A COURT ORDER ON WE WILL GET A BLOOD SAMPLE FROM YOU AND WE WILL GET HAIR SAMPLES FROM YOU AND THE CRIME LAB WILL MATCH IT ALL UP AND THE PROSECUTOR WILL GIVE ME A RAPE WARRANT. I MEAN I'M JUST TRYING TO GET, BE ABLE TO LET THE PROSECUTOR KNOW THAT IT AIN'T A RAPE. CAUSE I KNOW THE OLD GIRL IS PROBABLY THE ONE THAT INSTIGATED MOST OF IT. THERE AIN'T NO DOUBT IN MY MIND. NONE WHATSOEVER, I'VE SEEN THIS TOO MANY TIMES, A LITTLE GIRL COMES IN HERE SLEEPS WITH A GUY, GETS CAUGHT BY HER MAMA AND DADDY AND THEY START SCREAMING RAPE, SO THEY DON'T GET IN TROUBLE. NOW AIN'T THAT RIGHT?
JB: YEAH.
DL: THEY DO IT ALL THE TIME. I AIN'T GOING TO CHARGE SOMEBODY FOR A RAPE, WHEN I KNOW FOR A FACT THAT IT WAS A CONSENTUAL ACT. AND THE ONLY WAY YOU CAN HELP ME HELP YOU OUT OF A RAPE CHARGE IS TO BE ONE HUNDRED PERCENT HONEST WITH ME. YOU CAN ASK ANYBODY IN THIS TOWN THAT KNOWS ME, THERE IS ALOT OF THEM KNOWS ME, I USE TO WORK AT THE POLICE DEPARTMENT AND NOW I WORK AT THE SHERIFF'S DEPARTMENT AND THERE IS A TON OF PEOPLE OUT THERE THAT KNOWS ME AND THEY KNOW I'M A STAIGHT FORWARD GUY. I'M ON THE UP AND UP.
JB: YOU KNOW THAT GREY HOUSE THAT I WAS OVER?
DL: UH HUH, (YES).
JB: SHE CALLED THAT GIRL TODAY AND TOLD HER THAT YOU ALL WOULD BE OVER TO GET ME.
DL: THERE AIN'T NO DOUBT IN MY MIND ABOUT THAT, SHE PROBABLY DID.

PAGE 3

CONT:

JB: CAUSE UH, WHEN HER MAMA WENT OVER TO MR. B███████'S AND CALLED WE HEARD IT, WELL I DIDN'T HEAR IT OVER THE SCANNER, I TOLD HER THEY WOULD BE OVER HERE IN A MINUTE. SHE SAID YOU AIN'T GOING TO LEAVE AND I SAID UH UH,(NO). I AIN'T DID NOTHING.

DL: WELL, I'M JUST TELLING YOU UP FRONT, THE ONLY WAY I CAN SAVE YOU FROM A RAPE CHARGE IS FOR YOU TO BE ONE HUNDRED PERCENT HONEST WITH ME. I AIN'T GOING TO JACK YOU AROUND. I MEAN IF THE GIRL IS SCREAMING RAPE, I KNOW IT AIN'T NO RAPE, I KNOW THAT SHE CONSENTED.

JB: I MESSED WITH THE GIRL, BUT IT WASN'T THEN.

DL: WHEN WAS IT? BOUT THREE OR FOUR WEEKS AGO MAYBE?

JB: THREE OR FOUR WEEKS AGO, I CAN'T REMEMBER WHEN IT WAS.

DL: IT AIN'T BEEN MORE THAT A MONTH AGO HAS IT?

JB: WHEN WAS THE FAIR AT JONESBORO? THAT WAS A MONTH AGO.

DL: ABOUT A MONTH AGO? YEAH ABOUT A MONTH AGO.

JB: BECAUSE THEY WERE SUPPOSE TO BE GOING TO THE FAIR AND THEY DIDN'T.

DL: THIS WAS OUT AT YOUR MAMA'S? WHERE WAS IT AT?

JB: I MET THEM AT EXXON.

DL: WHERE DID YOU MESS WITH HER AT?

JB: I MESSED WITH, OUT AT MY MAMA'S.

DL: OUT AT YOUR MAMA'S?

JB: YEAR.

DL: SHE INSTIGATE IT?

JB: IT WAS HER IDEA.

DL: IT WAS HER IDEA TO GET IN THE BED AND SLEEP WITH YOU.

JB: YEAP.

DL: HOW MANY TIMES WE TALKING ABOUT? SHE SAYS TEN TIMES.

JB: TEN TIMES?

DL: SHE SAID TEN TIMES, OVER A PERIOD OF ABOUT FOUR WEEKS. ABOUT A MONTH.

JB: I SAY ONE TIME.

DL: COME ON NOW, YOU FUCKED THAT GIRL MORE THAT ONCE.

JB: I COULD HAVE.

DL: I AON'T GOING TO SLEEP WITH NO GIRL JUST ONE TIME, FORGET IT.

JB: IT WAS ONE TIME, I THOUGHT HER DADDY HAD BEEN MESSING WITH HER. I AIN'T MESSED WITH HER NO MORE. CAUSE IT WAS TOO BIG.

DL: SHE WAS TOO BIG, OR YOU WERE TOO BIG?

JB: SHE WAS TOO BIG.

DL: SHE WAS TOO BIG FOR YOU?

JB: YEAP. I THOUGHT HER DADDY WAS, I THOUGHT HER DADDY BEEN MESSING WITH HER. YOU CAN CALL ██████ AND ASKED EVERYTHING I TELL YA. THAT GIRL HOUSE I WAS AT, I TELL HER EVERYTHING I TELLIN YOU NOW, SHE CAN TELL YA. SHE WILL TELL YOU. I SAID THE SAME THING TO HER. SHE STOOD LOOKED AT ME AND I SAID I THOUGHT ABOUT THAT TOO. I AIN'T LYING, I THOUGHT HER DADDY BEEN MESSING WITH HER. CAUSE I MESSED WITH SOME THIRTY YEAR OLD WOMAN THAT WASN'T THAT BIG.

CV: JOHN, YOU MEAN THAT BIG, HUH?

JB: THAT BIG. BIG WHERE YOU FELT NOTHING.

CV: HU H?

JB: THAT BIG WHERE YOU FELT NOTHING.

DL: THAT'S DAMN.

JB: NO BOTTOM LIKE SHE HAD A HYSTERECTOMY.

DL: NO BOTTOM, NO SIDES, HUH?

JB: NO BOTTOM , NO SIDES.

DL: WELL SHE SAYS SHE SLEPT WITH YOU TEN TIMES. YOU SAY YOU SLEPT WITH HER ONE TIME. THERE IS GOING TO BE SOMEWHERE IN BETWEEN ONE AND TEN TIMES. AND I'M A MAN TOO.

JB: I ONLY MESSED WITH HER ONCE.

DL: SHOOT ME STRAIGHT.

JB: I ONLY MESSED EIHT WITH HER ONCE. IT DIDN'T FEEL RIGHT, SO.

CV: ONE TIME?

JB: YEAH.

CV: HOW MANY TIMES?

JB: WHAT?

DL: NOW JOHN.

JB: THAT'S ALL IT WAS, ONCE.

PAGE 4

CONT:
CV:   JOHN, IF I WOULD HAVE..
JB:   I WOULD GET A HEADACHE, THAT'S THE WAY I AM, IF IT DON'T FEEL RIGHT TO ME THE FIRST TIME,
      I GET A HEADACHE AND I GOTTA GO.
DL:   SO YOU SAY YOU HAD SEX WITH HER ONE TIME?
JB:   YEAP.
DL:   ABOUT A MONTH AGO?  YOU SAY IT WAS BACK DURING WHEN THE FAIR WAS IN JONESBORO?
JB:   YEAH.
DL:   SHE WAS SUPPOSE TO HAVE WENT TO THE FAIR?
JB:   UH HUH,(YES).
DL:   WHO WAS SHE SUPPOSE TO GO WITH?
JB:   HER SISTER AND ANOTHER FRIEND, THAT DRIVES A CREME COLORED MUSTANG.
DL:   O.K.  WHERE DID YOU MEET HER AT?
JB: . AT EXXON.
DL:   O.K.  TELL ME WHAT HAPPENED.
JB:   WELL, THEY TOLD ME, THEY CALLED, WELL, NO I WAS, I WAS, MY COUSIN SH███TOLD ME TO GET HER
      I WAS DRIVING, I WAS FIXING HER CAR AND I WAS BRINGING IT BACK.  THEY STOPPED ME OVER THERE
      BY NEWPORT HOSPITAL AND TOLD ME T MEET THEM AT EXXON.
DL:   HER AND HER SISTER?
JB:   YEAH.
DL:   O.K.
JB:   AND THE OTHER GIRL, ABOUT SIX.  I WENT UP TO EXXON AT SIX, SHE GOT IN THE CAR WITH ME,
      THEY GOT IN THE CAR WITH THEM, THEY LEFT AND WE LEFT.
DL:   THEN WHEN YOU ALL LEFT, WHERE DID YOU GO?
JB:   WE WENT OUT TO MY MAMA'S HOUSE.
DL:   O.K.
JB:   WE WENT TO TUCKERMAN FIRST.
DL:   YOU WENT TO TUCKERMAN FIRST, WHAT DID YOU DO IN TUCKERMAN?
JB:   JUST RODE TO TUCKERMAN.
DL:   WHAT DID YOU DO IN TUCKERMAN, JOHN?
JB:   BOUGHT HER SOME LIQUOR.
DL:   O.K.  YOU BOUGHT HER SOME LIQUOR?
JB:   NO, I BOUGHT HER SISTER AND FRIENDS SOME LIQUOR.
DL:   I THOUGHT YOU JUST PICKED HER UP.
JB:   NO, THEY WAS AT PRICE CHOPPER WAITIN ON ME TO COME BACK.
DL:   THEY SAT AT PRICE CHOPPER WHILE YOU WENT ALL THE WAY TO TUCKERMAN TO BUY LIQUOR?
JB:   NO, THEY DIDN'T SIT THERE, I DON'T KNOW, THEY RODE AROUND FOR A MINUTE.
DL:   WHAT DID YOU BUY THEM?
JB:   UH, I'M TRYING TO THINK, SOME WINE COOLERS, NOT WINE.
DL:   WHINE COOLERS?
JB:   YEAH.
DL:   WHY DIDN'T YOU JUST GO IN PRICE CHOPPER AND GET THEM, THEY SELL THEM THERE?
JB:   CAUSE I DIDN'T WANT NOBODY TO SEE THE GIRL IN THE CAR WITH ME.
DL:   O.K.  YOU WENT TO TUCKERMAN AND BOUGHT SOME WINE COOLERS OR SOMETHING AND YOU CAME BACK.
      AND THEN WHAT HAPPENED?
JB:   I DON'T KNOW WHERE THEY WENT.  WE WENT OUT TO MY MAMA'S HOUSE.
DL:   YOU WENT OUT TO YOUR MAMA'S HOUSE, WHAT HAPPENED AT YOUR MAMA'S HOUSE?WHAT DID YOU DO OUT
      THERE?
JB:   WE SAT AROUND AND TALKED FOR A LITTLE WHILE AND I ASKED HER WHAT SHE WANTED TO DO AND SHE
      SAID WHATEVER YOU WANT TO DO.   I SAID GET NAKED AND LET'S GO TO BED.
DL:   THAT'S WHAT YOU SAID YOU WANTED TO DO?
JB:   YEAP.
DL:   O.K. AND WHAT'D SHE SAY?
JB:   O.K.
DL:   SHE SAID O.K. THAT QUICK? AND YOU ALL WENT INT HE BEDROOM AND GOT NAKED AND DID YOUR THING?
JB:   YEAP.
DL:   JUST ONE TIME?
JB:   ONE TIME.
DL:   AND THAT IS THE ONLY TIME YOU HAVE BEEN WITH THIS GIRL?
JB:   YEAP.

PAGE 5

CONT:

DL:   AND YOU AIN'T BEEN WITH HER SINCE THEN?  SO ALL THE OTHER NINE TIMES THAT SHE TELLS ME ABOUT, SHE IS LYING?

JB:   YES SIR.

DL:   O.K.

JB:   THEN SHE WENT BACK, WELL LET ME SEE.  THE REASON SHE RAN AWAY.

DL:   THAT'S WHEN YOU PICKED HER UP AT THE SCHOOL, RIGHT?  OR AFTER SCHOOL.

JB:   YEAH, UH, SHE TOLD ME SOMETHING ABOUT HER DADDY, HAD PUNCHED HER AND THEN WHOOPED HER, THEN HER MAMA WHOOPED HER AND SHE CAME AND ASKED ME FOR TO PICK HER UP, I WAS LIKE, I THOUGHT SHE WAS PLAYING.  I SAY YEAH.  SO I WENT TO THE SCHOOL AND SHE WAS THERE WITH HER CLOTHES AND EVERYTHING.

DL:   AND YOU PICKED HER UP?

JB:   YEAP.

DL:   AND WHERE DID YOU GO AFTER THAT?

JB:   I TOOK HER TO A PAY PHONE.

DL:   YOU DIDN'T GO OUT TO YOUR MAMA'S?

JB:   UH HUH.  I WENT OUT THERE THAT MORNING AND WHEN S███ B████████ SEEN ME AND I WAS OUT THERE WORKING ON A CAR.

DL:   O.K.  WAS UH, PEEWEE WITH YOU?

JB:   PEEWEE?

DL:   OR J███ D████? WHEN YOU DROPPED HER OFF?  OVER THERE BEHIND PRICE CHOPPER?

JB:   J███ D████ IS THE ONE WHO WENT AND GOT HER.

DL:   WENT AND GOT HER FROM WHERE?

JB:   HUH?

DL:   WENT AND GOT HER FROM WHERE?

JB:   MY MAMA HOUSE.

DL:   AT YOUR MOMS HOUSE AND TOOK HER AND DROPPED HER OFF?

JB:   YEAH.

DL:   AWHILE AGO YOU SAID YOU DROPPED HER OFF.

JB:   I SAID I WENT AND PICKED HER UP FROM SCHOOL AND DROPPED HER OFF AT A PAY PHONE.  AND THEN SHE ENDED UP AT MY MAMA'S HOUSE.

DL:   WHAT AREN'T YOU TELLING ME JOHN?  SHOOT ME STRAIGHT JOHN?

JB:   SHE CALLED ME BACK AND SHE SAID SHE ASKED ME.

DL:   I TELL YOU WHAT JOHN, LET'S JUST WIPE THE SLATE CLEAN AND START ALL OVER.  O.K?  I BEEN AROUND LONG ENOUGH MAN, I BEEN AROUND A LONG TIME.  JUST TELL ME WHAT HAPPENED.  JUST SHOOT HER STRAIGHT.  THAT'S ALL I'M ASKING.  I JUST DON'T WANT TO HAVE TO GET A RAPE WARRANT FOR YOU.

JB:   SHE'S GOING TO GET A WARRANT ANYWAY.

DL:   BUT YOU DON'T WANT NO RAPE WARRANT.  YOU DON'T WANT NO Y'S STUCK ON YOU MAN.

JB:   Y,B,C.

DL:   YOU DON'T WANT NO Y STUCK ON YOU.

JB:   WHERE WILL I GO DOWN AT?

DL:   WHAT DO YOU MEAN GO DOWN?

JB:   I DON'T WANT TO GO TO THE PEN.

DL:   I AGREE.  NOBODY SAID YOU ARE GOING TO GO TO THE PEN.  YOU DIDN'T HEAR ME SAY YOU WAS GOING TO THE PEN, DID YOU?  YOU DIDN'T HEAR CHARLES SAY ANYTHING ABOUT GOING TO THE PEN, DID YOU?

JB:   NO, BUT THE PROSECUTING ATTORNEY WILL.

DL:   YOU DON'T KNOW THAT.

JB:   HE CAN'T STAND ME.

DL:   YOU DON'T KNOW THAT.

JB:   IT'S LIKE THIS, THEY GOING TO LOOK AT ME LIKE THIS, HE'S TWENTY-SEVEN, SHE'S FIFTEEN, HE SHOULD HAVE KNEW BETTER AND MESSING WITH HER.

DL:   BUT, GET THIS, I WORKED WITH THIS PROSECUTOR A LONG TIME, ONE THING HE'S GOING TO LOOK AT, HE MAY NOT LIKE YOU , BUT YOU SHOOT ME ONE HUNDRED PERCENT STRAIGHT, YOU COOPERATE WITH ME, THAT IS GOING TO GO A LONG WAY IN THE JUDGES EYES.  CAUSE YOU KNOW THE BOTTOM LINE IS WHATEVER THE JUDGE THINKS.  IT DON'T MATTER WHAT I THINK, WHAT CHARLES THINKS, WHAT YO THINK, OR WHAT THE PROSECUTOR THINKS.  IT MATTERS WHAT THE JUDGE THINKS.

JB:   I AIN't GOING TO GET PROBATION.

Balentine #5 Crim Hx 10-1996  Page 19 of 30

PAGE 6

CONT:
DL:  FIRST TIME FOR EVERYTHING, MAN.
JB:  SHOOT.
DL:  I CAN TELL YOU RIGHT NOW, YOU KNOW WHAT YOU ARE LOOKING AT?
JB:  WHAT?
DL:  YOU ARE LOOKING AT A LITTLE OLD CARNAL ABUSE.  CARNAL ABUSE AIN'T SHIT, COMPARED TO RAPE.
JB:  WHAT THEY CALL, SECOND TIME, THIRD TIME?
DL:  WHAT SECOND TIME, THIRD TIME?
JB:  DIDN'T THEY MAKE THAT UH, THAT HABITUAL.
DL:  I AIN'T GOING TO FILE NO HABITUAL ON YOU.
JB:  AM I GOING TO GET TO GO HOME TONIGHT?
DL:  NO.  IT DON'T LOOK LIKE IT.  BUT, THE STRAIGHTER YOU ARE WITH ME, THE BETTER OFF I STAND
     TO BE ABLE TO GO TO THE PROSECUTOR AND SAY THE MAN IS SHOOTING ME STRAIGHT.
JB:  HOW MUCH, SO I HAVE TO GO TO COURT TOMORROW AND GET A BOND SET THEN, DON'T I?
DL:  UH, WHAT'S TOMORROW, WEDNESDAY?  IT WILL BE FRIDAY.  YOU SEE YOU SHOOT ME STRAIGHT AND
     COOPERATE WITH ME AND I CAN GO TO THE JUDGE OR I CAN GO TO THE PROSECUTOR AND I CAN SAY,
     HEY, HE'S COOPERATING.
JB:  NO, I'M GOING TO BE HONEST WITH YOU, ME AND THAT GIRL DIDN'T HAVE NO SEX NO TEN TIMES.
DL:  HOW MANY TIMES?
JB:  MAYBE FOUR OR FIVE.
DL:  MAYBE FOUR OR FIVE?
JB:  IT AIN'T BEEN NO TEN TIMES.
DL:  I DIDN'T THINK IT WAS TEN TIMES.
JB:  CAUSE I DON'T SEE TEN TIMES.
DL:  SHE TOLD ME TEN TIMES, BUT I DON'T THINK IT WAS TEN TIMES.
JB:  I SEE FIVE.
DL:  FIVE TIMES?
JB:  YEAH.
DL:  DO YOU SEE ANYMORE THAN FIVE TIMES?
JB:  NOPE, SHE WASN'T GONE THAT LONG.
DL:  HOW LONG HAVE YOU BEEN SEEING HER?  ABOUT A MONTH?
JB:  MAYBE TWO OR THREE WEEKS.
DL:  TWO OR THREE WEEKS, THREE WEEKS AT THE MOST?
JB:  YEAH.
DL:  SHE TOLD ME ABOUT THREE WEEKS, SHE ALSO TOLD ME THAT TEN TIMES, BUT I THINK THAT WAS
     EXAGGERATED.  YOU SAY FIVE TIMES, I BELIEVE YOU FIVE TIMES.  DO YOU SEE ANYMORE THAT FIVE?
JB:  HUH UH, (NO).
DL:  HUR?
JB:  HUH UH, (NO).  I SEE JAIL.
DL:  DON'T WORRY ABOUT THAT.  I CAN TELL YOU RIGHT NOW, I AON'T GOING TO FILE NO HABITUAL.  HOW
     HOW MANY CONVICTIONS YOU GOT?  YOU GOT THE DEAL AT WAL-MART.
JB:  AND I GOT THE DEAL WITH S████ T████.
DL:  WHAT WAS THE DEAL WITH S████-T████?
JB:  R████ MOSS AND SOMEBODY ELSE DID AND THEY CHARGED ME FOR IT.
DL:  WHAT DID THEY CHARGE YOU WITH?
JB:  ROBBERY.
DL:  ROBBERY?  SO YOU GOT TWO CONVICTIONS.  THAT AIN'T EVEN ENOUGH FOR A HABITUAL, YOU HAVE GOT
     TO HAVE THREE.
JB:  SO THIS WOULD BE MY THIRD ONE?
DL:  YOU AIN'T CONVICTED YET.
JB:  I DON'T KNOW WHAT I HAVE TO GO THROUGH THIS FOR.
DL:  TALK TO ME MAN.
JB:  I JUST SAID I DON'T EVEN WANT TO GO THROUGH THIS.
DL:  I KNOW.
JB:  I WAS AT THE WRONG PLACE AT THE WRONG TIME.
DL:  I AGREE.  YOU LET YOUR LITTLE HEAD DO THE THINKING FOR YOUR BIG HEAD.  THAT'S THE SAYING
     I GOT.  AIN'T THAT RIGHT?
JB:  YEAP.
DL:  I KNOW IT'S HARD.  IT'D BE HARD FOR ME TO PASS IT UP.

PAGE 7

CONT:
JB:   DON'T WORRY, I AIN'T GOING TO GET CRAZY ON YOU. I'M TRYING TO ADJUST.
DL:   I KNOW.
JB:   TRYING TOADJUST TO GOING BACK THERE.
DL:   YOU SEE ANOTHER THING, WHEN YOU COOPERATE, THAT HAS TO DO WITH ALOT OF WHAT THEY ARE
      GOING TO SET YOUR BOND AT TOO.
JB:   SHOOT.  EVERYTIME I BEEN UP THERE, I NEVER HAD A BOND LOWER THAN TWENTY-FIVE THOUSAND.
DL:   YOU AIN'T?  I BET YOU GET ONE LOWER THAT TWENTY-FIVE THOUSAND THIS TIME.
JB:   I HAD ONE FIVE THOUSAND AND COULDN'T MAKE IT.  AND ERVIN SET THAT.  AFTER I WENT TO TRIAL
      ON APPEAL BOND.
DL:   WELL,
JB:   WHAT CLASS IS CARNAL ABUSE?
DL:   I THINK IT IS A D.  ISN'T IT A D?
CV:   I THINK SO.
DL:   LET'S SEE, THAT'S GOING TO BE A FIVE.  IT'S A D.
JB:   WHAT DOES THAT CARRY, THREE TO SIX?
DL:   THREE TO UH, YEAH THREE TO SIX.
JB:   SHIT.
DL:   UP TO SIX.  IT CAN BE ANYWHERE FORM PROBATION TO SIX YEARS.
JB:   I CAN DEAL WITH IT.
DL:   YOU CNA DEAL WITH THAT EASY.
JB:   LET'S TALK ABOUT IT.
DL:   ALL RIGHT.  TELL ME ALL ABOUT IT.
JB:   THAT ASS WASN'T WORTH THAT GOOD.  THAT ASS WASN'T WORTH THAT.
DL:   THAT ASS WASN'T WORTH THAT, WAS IT?
JB:   HELL NO.  GOING DOWN THERE SLINGING THEM.
DL:   WAS IT STILL TAHT BIG.  IT WASN'T THAT BIG WAS IT?
JB:   SAY WHAT?
DL:   WAS IT GOOD?
JB:   HELL NO, I TOLD YOU I DIDN'T FEEL THAT SHIT.  DON'T MAKE ME GO BACK AND SEE.
DL:   NOW, TELL ME ALL ABOUT IT.
JB:   ALL RIGHT THEN.
DL:   YOU BEEN SEEING HER ABOUT THREE WEEKS.
JB:   YEAP.  BEEN TALKING TO HER AT HER WINDOW.  SHE TOLD ME TO COME PICK HER UP FROM SCHOOL.
      SHE MISSED SCHOOL, ONCE, TWICE, HELL I DON'T KNOW.
DL:   SHE SKIPPED SCHOOL TO COME AND SEE YOU?
JB:   I THINK SHE DID IT ONCE.  ANOTHER TIME, HER MAMA KEPT HER FORM SCHOOL, SHE HAD HER BABYSIT.
      BUT, WE DIDN'"T MESS AROUND THEN.
DL:   MOST OF THE TIME WHEN YOU MESSED AROUND, WAS IT OUT AT YOUR MAMA'S OUT IN ROBINSON ADDITION?
JB:   YEAH, THAT WHERE I TAKE HER.
DL:   THAT'S WHERE YOU ALWAYS TAKE HER, OUT THERE.
JB:   YEAH,  IT WAS THE SAFEST PLACE.
DL:   SAFE, WHERE NOBODY AROUND?
JB:   YEAH, NOBODY SEE US.
DL:   ALL OF IT WAS CONSENTUAL, RIGHT?
JB:   YEAH, WAS NEVER NO FORCE.
DL:   WASN'T NEVER NO FORCE, SHE NEVER TOLD YOU TO QUIT, OR DON'T OR STOP, OR ANYTHING?
JB:   SHE TOLD ME NOT TO STOP.
DL:   SHE TOLD YOU NOT TO STOP?
JB:   YEAH.
DL:   O.K. WAS IT ALL JUST INTERCOURSE OR WAS THERE ORAL SEX INVOLVED?
JB:   NO ORAL SEX.
DL:   YOU DIDN'T GET NO BLOWJOB?
JB:   HUH UH,(NO).
DL:   COME ON MAN.
JB:   NOT NONE.  I TOLD HER NEVER TO DO THAT, I WAS MAD.
DL:   O.K.
JB:   SHE DIDN'T TELL YOU?
DL:   UH HU, (NO).

PAGE B

CONT:
JB:   ASK HER.  NEXT TIME YOU TALK TO HER.
DL:   HOW MANY, YOU BEEN SEEING HER FOR ABOUT THREE WEEKS, RIGHT?
JB:   UH HUH.
DL:   SHE USE TO CALL YOU AND TELL YOU TO PICK HER UP AND YOU'D TALK TO HER AND YOU'D PICK HER
      UP AFTER SCHOOL.  OR DO IT BEFORE SCHOOL?
JB:   BEFORE SCHOOL.  I ONLY PICKED HER UP FROM SCHOOL ONCE.
DL:   JUST THE ONE TIME?
JB:   YEAP.
DL:   AND YOU WENT OUT TO YOUR MAMA'S AT THE ROBINSON ADDITION?
JB:   UH HUH, (YES).
DL:   O.K. AND THE OTHER TIMES YOU'D TALK TO HER THROUGH THE WINDOW AND STUFF?
JB:   YEAH.
DL:   WHEN WOULD YOU ALL NORMALLY GET TOGETHER?
JB:   NORAMALLY GET TOGETHER?
DL:   HOW WOULD YOU ALL GET TOGETHER, LET ME PUT IT THAT WAY? WERE HER MOM AND DAD EVER HOME AND
      SHE'D JUST CRAWL OUT THE WINDOW OR WHAT?
JB:   NO SHE NEVER DID COME OUT.  MOST OF THE TIME SHE BE OUTSIDE.
DL:   MOST OF THE TIMES SHE JUST ALREADY OUTSIDE.
JB:   SEE, THE FIRST TIME WE HAD SEX I TOOK HER OUT TO MY MOM'S HOUSE THAT WAS WHEN THEY WAS
      SUPPOSE TO HAVE HAD, TONY AND MAMA WAS GOING TO JONESBORO AND THEN THEY CHANGED AND SAID
      THEY WEREN'T GOING TO LEAVE NEWPORT THAT'S WHEN .
DL:   THAT'S WHEN THEY WERE SUPPOSE TO GO TO THE FAIR?
JB:   YEAH.  THEY DIDN'T GO.  THE SECOND TIME, I GUESS YOU CAN SAY WHEN SHE RAN AWAY.
DL:   O.K..
JB:   BUT IT WASN'T MY IDEA FOR HER TO RUN AWAY.
DL:   I'M NOT SAYING IT WAS.  I KNOW IT WASN'T.
JB:   IT WAS MORE OR LESS HER PARENTS IDEA CAUSE.
DL:   SHE WAS HAVING PROBLEMS WITH HER MOM AND DAD AND SHE DECIDES TO GO.
JB:   WELL, IF YOU WAS A GIRL AND YOUR DADDY SOCKED YOU IN YOUR CHEST A COUPLE TIMES, WHAT WOULD
      YOU DO?
DL:   I'D GET GONE.
JB:   AND UH, THE CLOSEST PERSON TO YOU WOULD BE THE ONE YOU TALK TO THE MOST, THAT WOULD BE THE
      ONE YOU ASK TO COME AND GET YOU.
DL:   I AGREE.
JB:   SO THAT WHAT HAPPEN.
DL:   O.K.  HOW MANY TIMES HAVE YOU SLEPT WITH THIS GIRL?  SHE SAYS TEN.
JB:   O.K.  THE NIGHT AT THE FAIR, THAT NIGHT AT MY MAMA'S, SECOND NIGHT AT MY MAMA'S, AND THAT
      WAS IT.
DL:   AWHILE AGO, YOU SAID YOU COULD SEE FIVE.
JB:   I COULD, BUT SHE DIDN'T STAY OUT THERE MORE THAN THREE DAYS AND THAT THIRD DAY I WENT TO
      NEPORT.
DL:   THE LAST DAY WAS, LAST THURSDAY.
JB:   SHE ONLY STAY GONE THREE DAYS.  DIDN"T SHE STAY GONE THREE DAYS?
DL:   TWO OR THREE.
JB:   I KNOW WE NEVER DID HAVE SEX TWICE IN THE SAME DAY.
DL:   WHEN WAS THE LAST TIME YOU HAD SEX WITH HER? LAST THURSDAY. ONE DAY LAST WEEK, WEEK BEFORE
      LAST, WHEN WAS THAT CHARLES?
CV:   WEEK BEFORE LAST, I THINK.
DL:   YEAH, WEEK BEFORE LAST.  THE FIRST WEEK.  AROUND THE THIRD.
JB:   SHE JUST CAME HOME LAST FRIDAY?
DL:   YEAH.
JB:   I THOUGHT IT WAS A WEEK.  A WHOLE WEEKEND WENT BY.
DL:   WELL, IT HAS, SEE THE CALENDER UP ON THE WALL, SHE CAME HOME ON THE FOURTH.  TODAY IS THE
      FIFTEINTH.  SHE WENT HOME ON THE FOURTH, THAT FRIDAY, THE FOURTH.
JB:   AND SHE LEFT THAT WEDNESDAY.
DL:   AND SHE LEFT THE SECOND THAT WEDNESDAY.  AND YOU SLEPT WITH HER ON THE THIRD.
JB:   THE SECOND AND THE THIRD.
DL:   THE SECOND AND THE THIRD?
JB:   YEAH.

PAGE 9

CONT:
```
DL:   BOTH DAYS?
JB:   YEAH.
DL:   O.K. SO THAT'S TWO.  AND ONCE AT THE FAIR?
JB:   YEAH.  THAT'S IT.
DL:   THREE TIMES?
JB:   YEAP.  THAT'S IT.
DL:   IS THAT ALL YOU CAN REMEMBER.
JB:   I THOUGHT MORE TIMES THAN THAT, BUT HELL I MOVE AROUND SO MUCH, I CAN'T KEEP COUNT.
DL:   I DON'T COUNT HOW MANY I SLEEP WITH MY OLD LADY EITHER, YOU KNOW, I COULDN'T TELL YA.
JB:   I CAN'T EITHER.
DL:   DO YOU THINK IT WAS MORE THAT FIVE?
JB:   IT WASN'T THAT MANY DAMN TIMES.
DL:   LESS THAN FIVE?
JB:   IT WAS LESS THAN FIVE.
DL:   LESS THAN FIVE.  YOU SAY ABOUT THREE?
JB:   SHOOT THAT'S ALL I CAN COUNT.
DL:   O.K.
JB:   CAUSE WHEN SHE WAS OUT THERE, I STAYED AT SOMEBODY ELSE HOUSE.
DL:   O.K. ALL RIGHT JOHN, I'M GOING TO ASK YOU ONE MORE QUESTION, YOU DIDN'T RAPE THIS GIRL
      DID YOU?
JB:   NO SIR.
DL:   IT WAS A CONSENTUAL?
JB:   IT WAS ALL HER IDEA.
DL:   IT WAS ALL HER IDEA?
JB:   MORE OR LESS.
DL:   MORE OR LESS.
JB:   I JUST ASKED.
DL:   YOU JUST ASKED AND SHE SAID O.K.
JB:   UH HU H.
DL:   AT LEAST THREE TIMES, THAT YOU CAN REMEMBER?
JB:   YEAH.
DL:   AND THAT WAS OVER A PERIOD OF THREE WEEKS?
JB:   YEAP.
DL:   O.K.  O.K.  IS THERE ANYTHING ELSE YOU CAN TELL ME ABOUT THIS CASE THAT WILL HELP ME OUT?
JB:   THAT'S EVERYTHING.
DL:   THAT'S EVERYTHING YOU CAN REMEMBER?
JB:   THAT'S EVERYTHING.
DL:   HAVE YOU SEEN HER ANY SINCE THEN? SINCE SHE CAME HOME, OTHER THAT HER BEING OUT IN HER YARD,
      OR ANYTHING ELSE.  YOU AIN'T TALKED TO HER OR ANYTHING?
JB:   UH HUH, (NO). NO OTHER THAN WHAT SHE TOLD ME THAT MICHELE TELL ME.
DL:   WHAT DID SHE TELL MICHELE TO TELL YOU?
JB:   SHE TOLD MICHELE.
DL:   SHE TOLD MICHELE THAT WE WERE LOOKING FOR YOU?
JB:   YEAP AND THAT SHE WAS GOING TO LEAVE TONIGHT.
DL:   SHE WAS GOING TO LEAVE.
JB:   SHE WAS GOING TO LEAVE BY HERSELF AND TOLD MICHELE TO HAVE ME OVER TO HER HOUSE TONIGHT
      AND WHEN SHE GOT READY TO GO, SHE WAS GOING TO COME OVER THERE.
DL:   O.K.  YOU KNEW THIS GIRL WAS FIFTEEN.  CAUSE YOU ASKED HER HOW OLD SHE WAS, RIGHT?
JB:   I NEVER DID ASK HER HOW OLD SHE WAS.
DL:   SHE TOLD ME YOU DID.
JB:   NO I DIDN'T.
DL:   THE FIRST TIME YOU ALL MET.
JB:   THE FIRST TIME WE MET IT WAS A LONG, LONG TIME AGO AND SHE WAS AT MY AUNT GLORIA'S HOUSE.
DL:   WHAT I'M TRYING TO GET TO, IS YOU KNEW HOW OLD THIS GIRL WAS, BUT WHAT MADE YOU  SLEEP
      WITH HER ANYWAY.  I'M JUST TRYING TO GET AN IDEA HERE.
JB:   MORE OR LESS, YEAH YOUCAN SAY I KNEW HOW OLD SHE WAS.
DL:   YOU JUST COULDN'T PASS IT UP.
JB:   NO, I COULDN'T PASS IT UP.
DL:   YOU WAS JUST BEING A MAN.
```

PAGE 10

CONT:
JB:   YEAH, AND IT WAS PRESENTED TO ME ON A GOLD PLATTER.
DL:   I CAN UNDERSTAND THAT.  BELIEVE ME I CAN UNDERSTAND THAT.
JB:   I ASK HER IF SHE WAS A VIRGIN AND SHE SAID NO.
DL:   AND SHE SAID NO?
JB:   SHE SAID NO.
DL:   O.K.  THE BOTTOM LINE IS SHE OFFERED IT TO YOU AND YOU JUST BEING A MAN, TOOK HER UP ON IT.
JB:   YEAH.
DL:   O.K.
JB:   I NEVER THREATENED HER?
DL:   I BELIEVE YOU, I BELIEVE YOU.  IS THAT PRETTY MUCH EVERYTHING?
JB:   YEAP.
DL:   O.K.
JB:   CAN I GET SOME PACKS OF CIGARETTES?  CAN I GET SOME CIGARETTES BEFORE I GO BACK THERE?
DL:   YEAH HANG ON JUST A SECOND.  BE END OF INTERVIEW.

TRANSCRIBED BY:  MARGIE HILL

JACKSON COUNTY SHERIFF DEPARTMENT
NEWPORT, ARKANSAS

SUBJECT:                        PERSONAL INTERVIEW

DATE OF INTERVIEW:              OCTOBER 7, 1996  10:40 A.M.

PERSON BEING INTERVIEWED:       A███ M███  W/F  DOB: ████
                                                █████ NEWPORT, AR. ████
                                █████████████

PLACE OF INTERVIEW:             JACKSON COUNTY SHERIFF'S DEPARTMENT  CID ROOM
                                SGT. DAVID LUCAS
                                DET. CHARLES VAUGHN  JCSO

CNN:

---

DL:   STATE YOUR NAME PLEASE.
AM:   A███ M███.
DL:   O.K A██, I'M GOING TO NEED YOU TO SPEAK UP FOR ME SO THE TAPE CAN PICK IT UP, O.K? ALL
      RIGHT AMY WE GOT TO TALKING A LITTLE BIT AWHILE AGO.  YOU CAME IN WITH YOUR PARENTS,
      CORRECT?
AM:   YES.
DL:   O.K. YOU ALL CAME UP HERE THE OTHER NIGHT, UH I BELIEVE IT WAS THE FOURTH, WHICH WAS
      FRIDAY NIGHT AND TALK WITH SGT. DICKIE MORRIS ABOUT AN INDIVIDUAL, CORRECT? OR YOUR DAD
      DID, MAYBE, I DON'T KNOW IF YOU WERE HERE OR NOT.
AM:   NO, I WASN'T HERE.
DL:   YOU WEREN'T HERE, IT WAS JUST YOUR DAD?
AM:   YES.
DL:   O.K. DO YOU KNOW WHAT YOUR DAD TALKED TO HIM ABOUT?
AM:   NO.
DL:   O.K. YOU ARE HERE TODAY TO TALK TO ME ABOUT AN INDIVIDUAL BY THE NAME OF JOHN BALENTINE,
      CORRECT?
AM:   YES.
DL:   O.K., WHO IS JOHN BALENTINE?
AM:   ONE OF OUR NEIGHBORS.
DL:   HE LIVES OUT THERE AT CROSSROADS TOO?
AM:   YES.
DL:   WHERE DOES HE LIVE?
AM:   JUST RIGHT ACROSS THE STREET.
DL:   O.K. YOU DON'T KNOW THE HOUSE NUMBER?  O.K.  IF YOU WILL, START FROM THE VERY BEGINNING
      AND TELL ME EVERYTHING THAT'S TOOK PLACE.
AM:   AT FIRST I WAS OUTSIDE SITTIN IN MY YARD AND HE CAME UP AND WAS TALKING TO ME.  HE ASKED
      ME HOW OLD I WAS AND I TOLD HIM I WAS FIFTEEN.
DL:   O.K. LET ME INTERUPT YOU FOR JUST A SECOND.  WHENEVER YOU TALK ABOUT SOMEBODY, I NEED A NAM'
AM:   O.K. WELL JOHN LEFT AND THEN LATER HE CAME BACK, HE FOLLOWED ME AND DIDN'T SAY NOTHING.
      THEN HE WROTE ME A LETTER.  AND HE HAD HIS LITTLE SON JACK, BRING IT OVER TO ME.  AND I
      READ IT AND WROTE HIM A LETTER BACK.  AND THEN I GUESS I STOPPED TALKING TO HIM FOR A LITTLE
      WHILE AND THEN A COUPLE OF DAYS LATER I CALLED HIM AT SCHOOL AND HE TOLD ME THAT IF I EVER
      WANTED HIM TO PICK ME UP FROM SCHOOL HE WOULD, SO I CALLED HIM AND TOLD HIM TO COME PICK
      ME UP.  AND HE DID AND HE TOOK ME TO HIS MAMA'S HOUSE AND THEN HE LEFT.  AND THEN HE CAME
      BACK A LITTLE WHILE LATER AND WE WENT TO ONE OF THE BACK BEDROOMS AND WE HAD SEX.
DL:   WHERE AT?
AM:   IN HIS LITTLE BROTHERS ROOM.
DL:   THIS WAS AT HIS HOUSE?
AM:   AT HIS MAMA"S HOUSE.

PAGE 2

CONT:
DL:   OUT AT ROBINSON ADDITION?
AM:   UH HUH, (YES)
DL:   O.K.
AM:   AND THEN WE WENT BACK IN THE LIVING ROOM AND WATCHED T.V. AND HE TOOK ME BACK TO SCHOOL
      IN TIME FOR THE BUS.  THEN I WENT HOME AND I DON'T KNOW THEN, BUT A COUPLE OF TIMES HE'S
      SNUCK IN MY BEDROOM WINDOW AND HID IN MY CLOSET OR UNDER MY BED OR BEHIND ONE OF MY CHAIRS
      IN MY ROOM.  AND ONE TIME HE WAS SITTIN IN THAT AND I DIDN'T KNOW HE WAS IN THERE, HE TOLD
      ME ABOUT IT, HE SAID MY CLOSET DOORS WERE OPEN, HE WAS SITTIN ON A DESK  WAS IN IT AND HE
      SAID HE WAS SITTIN RIGHT THERE WHEN MY MAMA COULD SEE HIM AND SHE WALKED IN, SHE, I DON'T
      KNOW WHAT SHE WAS DOING IN THERE AND THEN SHE LEFT.  AND HE SAID HE WAS SURPRISED SHE DIDN'T
      SEE HIM.  HE JUST DONE THAT A COUPLE OF TIMES.  I DON'T KNOW HOW MANY.
DL:   WHAT WAS HE DOING IN THERE, JUST WAITING ON YOU TO COME HOME?
AM:   I GUESS.
DL:   O.K.
AM:   AND THEN MONDAY, OH, WEDNESDAY I DON'T REMEMBER THE DATE, BUT A COUPLE OF WEEKS AGO ON A
      WEDNESDAY, I STAYED HOME FROM SCHOOL AND I WAS IN MY BEDROOM CLEANING AND MY BROTHERS WERE
      STILL ASLEEP AND SOME HOW HE GOT IN MY BACK DOOR AND SCARED ME.  AND HE STAYED ALL DAY AND
      WATCHED, WE WATCHED T.V.
DL:   DID YOU HAVE SEX THAT DAY?
AM:   MM,MM,  (NO).  THEN HE LEFT AND MY MAMA CAME HOME, JUST LIKE THIRTY MINUTES AFTER HE LEFT.
      AND THEN A COUPLE DAYS LATER, I THINK IT WAS MONDAY, IT WAS MONDAY, HE CAME AND PICKED ME
      UP FROM SCHOOL AND TOOK ME TO HIS MAMA'S HOUSE AND THE SAME THING HAPPENED.  AND THEN HE
      TOOK ME BACK TO SCHOOL IN TIME FOR THE BUS AND THEN WEDNESDAY HE CAME AND PICKED ME UP
      AND I STAYED AT HIS MAMA'S HOUSE AND THE SAME THING HAPPENED ALL THREE DAYS.  AND THEN
      FRIDAY, HE LEFT ABOUT TWO O'CLOCK MAYBE IT WAS ABOUT TWO-FIFTEEN AND HE WENT BACK TO HIS
      GIRLFRIENDS HOUSE AND HE LOCKED ME IN HIS MAMA'S HOUSE AND TOLD ME NOT TO ANSWER THE PHONE
      OR THE DOOR OR ANYTHING BECAUSE THEY WERE OUT THERE LOOKING FOR HIM.
DL:   WHO WAS LOOKING FOR HIM?
AM:   HE SAID THE POLICE WERE OUT THERE LOOKING FOR HIM AND MY MOM AND DAD HAD BEEN OUT THERE.
      SO I CALLED MY MOM AND I TALKED TO HER AND I TOLD HER I WAS COMING HOME AND THEN I CALLED
      MY AUNT AND I TOLD HER I WAS COMING HOME AND I WAITED UNTIL ABOUT EIGHT-THIRTY, NINE O'CLOCK
      THAT'S WHEN MY MOM AND I, WHEN HE GOT THERE, I TOLD HIM I WAS LEAVING AND HE GOT, HE
      GRABBED A BUNCH OF MY STUFF AND PUT IT IN THAT CAR, HE DIDN'T GET ALL OF IT.  STILL ALOT
      OF STUFF STILL AT HIS MAMA'S HOUSE I GUESS, IF HE HASN'T DUMPED IT. AND HE DROPPED ME OFF
      SOMEWHERE CLOSE TO WAL-MART HE SAYS, BUT I DON'T REMEMBER IT.  SOME HOW I ENDED UP AT
      MCDONALD'S AND THEN I ENDED UP AT HOME.  AND THAT'S IT.
DL:   YOU SAY HE WROTE YOU A LETTER, WHAT DID THE LETTER SAY?
AM:   I DON'T REMEMBER.  I HAVE THEM.
DL:   DO YOU HAVE IT.
AM:   I DID, BUT I DON'T KNOW WHERE I PUT EM.
DL:   HOW MANY LETTERS DID HE WRITE?
AM:   ABOUT FOUR OR FIVE.
DL:   FOUR OR FIVE.  HOW OLD IS JOHN?
AM:   TWENTY-SEVEN.
DL:   TWENTY-SEVEN?  AND YOU'RE/
AM:   FIFTEEN.
DL:   FIFTEEN?  DID HE KNOW HOW OLD YOU WAS?
AM:   UH HUH, (YES).  HE ASKED ME THE FIRST DAY HE EVER TALKED TO ME, OLD I WAS.
DL:   WHAT DID HE SAY WHEN YOU TOLD HIM WAS FIFTEEN?
AM:   NOTHING HE JUST ASKED ME IF I KNEW HOW OLD HE WAS?  HE NEVER SAID ANYTHING.
DL:   O.K.  WOULD IT BE FAIR TO SAY, FOR A PERIOD OF TIME, YOU AND JOHN WERE PRETTY MUCH LIKE
      BOYFRIEND AND GIRLFRIEND?
AM:   UH HUH, (YES).
DL:   DURING THAT PERIOD OF TIME, HOW LONG ARE WE TALKING?  TWO, THREE WEEKS?
AM:   YES.
DL:   MAYBE A MONTH AT THE MOST.
AM:   YES.
DL:   I THINK YOUR MOM SAID ABOUT A MONTH.

PAGE 3

CONT:

DL: DURING THAT PERIOD OF TIME, HOW MANY TIMES HAVE YOU AND JOHN HAD INTERCOURSE?
AM: JUST ABOUT TEN TIMES.
DL: ABOUT TEN TIMES. O.K. HAD YOUR MOM TAKE YOU TO THE HOSPITAL THE OTHER NIGHT AND HAD A SEXUAL ASSAULT KIT DONE YOU, RIGHT?
AM: UH HUH,(YES).
DL: WHEN YOU ALL HAD SEX, WOULD HE WEAR A CONDOM?
AM: NO.
DL: HE WOULDN'T? DID HE EJACULATE?
AM: HUH?
DL: DID HE EJACULATE?
AM: I ASKED HIM IF HE WOULD AND HE SAID NO BECAUSE THEY BROKE HIM OUT.
DL: HE DID EJACULATE?
AM: HUH?
DL: DID HE EJACULATE? HE FINISHED? O.K. WOULD HE PULL IT OUT OR LEAVE IT IN?
AM: HE PULLED IT OUT.
DL: HE NEVER EJACULATED INSIDE YOU?
AM: UH HUH, (YES).
DL: HE DID? O.K. WHEN WAS THE LAST TIME, YOU AND HIM HAD SEX?
AM: THURSDAY NIGHT.
DL: THURSDAY NIGHT? AND YOU HAD THE RAPE KIT DONE WHEN?
AM: FRIDAY.
DL: FRIDAY.
AM: NO SATURDAY MORNING, ABOUT TWO O'CLOCK.
DL: HAD YOU TAKEN A SHOWER OR ANYTHING?
AM: THEY WOULDN'T LET ME.
DL: I MEAN FROM THE LAST TIME YOU ALL HAD SEX TO WHENEVER THE KIT WAS TAKEN? HAD YOU TAKEN A SHOWER ANY TIME IN BETWEEN? WAS IT ALWAYS JUST INTERCOURSE, OR ANYTHING ELSE?
AM: HUH UH, (NO).
DL: NO ORAL SEX OR ANYTHING LIKE THAT?
AM: NO.
DL: YOU CAN BE HONEST WITH ME.
AM: NO.
DL: JUST ABOUT TEN TIMES? AND YOU WNAT HIM ARRESTED, CORRECT?
AM: UH HUH, (YES).
DL: O.K. I AM GOING TO ASK YOU THIS. I ASKED YOU AWHILE AGO. NOW THE TAPES GOING ON AND I WANT TO ASK YOU AGAIN. ACCORDING TO YOU, YOU AND JOHN WERE, YOU COULD SAY BOYFRIEND AND GIRLFRIEND FOR A PERIOD OF TWO TO THREE WEEKS, POSSIBLY A MONTH. YOU HAD SEX ABOUT TEN TIMES. ALL CONSENTUAL, CORRECT?
AM: UH HUH, (YES).
DL: O.K. WHAT HAPPENED BETWEEN THEN AND NOW TO MAKE YOU WANT HIM ARRESTED?
AM: JUST.
DL: YOU FOUND OUT HE WAS SEEING ANOTHER GIRL?
AM: NO, IT'S JUST THE WAY HE'S BEEN TALKING ABOUT ME AND TELLING HIS FRIEND STUFF ABOUT ME.
DL: HE JUST MADE YOU MAD?
AM: UH HUH, YEAH. CAUSE I DIDN'T THINK HE WAS LIKE THAT, HE DIDN'T ACT LIKE THAY TYPE OF A PERSON HE TOLD THEM THAT I BELIEVED EVERYTHING HE SAID. AND THAT I WAS JUST SO EASY TO GET WITH. HE CALLED ME A WHITE WHORE.
DL: HE CALLED YOU WHAT?
AM: A WHITE WHORE.
DL: EVERYTIME YOU ALL HAD SEX, HAS IT BEEN OUT AT HIS MOTHERS?
AM: UH HUH, (YES).
DL: OR HAS IT EVER BEEN AT YOUR HOUSE OR HIS HOUSE?
AM: I THINK ONCE AT MY HOUSE.
DL: ONCE AT YOUR HOUSE?
AM: ONE OF THE NIGHTS THAT HE SNUCK IN.
DL: IS JOHN MARRIED?
AM: UH UH, NO, HE'S GOT THREE KIDS.
DL: THEY LIVE WITH HIM?
AM: HUH UH, (NO)

PAGE 4

CONT:
DL: HE LIVES BY HIMSELF?
AM: NO HE LIVES WITH HIS GIRLFRIEND.
DL: WHO'S HIS GIRLFRIEND?
AM: ▮▮▮CHILDRESS. M▮▮▮▮CHILDRESS.
DL: M▮▮▮CHILDRESS?
AM: SHE'S GOT A KID, HE'S GOT ONE OF HIS KIDS LIVING WITH HIM AND IT'S HERS AND HIS.
DL: O.K.  AND HE KNEW YOU WAS FIFTEEN, CORRECT?
AM: YES.
DL: ALL RIGHT A▮▮, IS THERE ANYTHING ELSE THAT'S TOOK PLACE BETWEEN YOU AND JOHN THAT WE HAVEN'T DISCUSSED?
AM: UH HUH, (NO).
DL: THAT'S PRETTY MUCH IT?
AM: WELL, HE'S TOLD ME THAT WE WAS GOING TO TEXAS. OR HE TOLD HIS GIRLFRIEND THAT OR SOMETHING, I DON'T KNOW, SOMEHOW THAT GOT BROUGHT UP.
DL: O.K.  LET ME ASK YOU ONE MORE THING.  I BELIEVE WHEN YOUR MOTHER TOOK YOU TO THE HOSPITAL, AND HAD THE RAPE KIT DONE, UH, SHE ALSO REQUESTED THAT THEY DO A TOXICOLOGY REPORT OR A DRUG TEST, CORRECT?
AM: UH HUH, (YES).
DL: AND YOU TESTED POSITIVE FOR METHYPHEDIMINES AND COCAINE?
AM: COCAINE.
DL: O.K.  NOW RIGHT HERE, I NEED YOU TO BE VERY HONEST WITH ME.  O.K?  I MEAN, I DON'T CARE, BUT I NEED Y OU TO BE HONEST WITH ME.  WHERE DID THE METHYPHEDIMINES AND COCAINE COME FROM?
AM: I DON'T KNOW.  CAUSE I DON'T REMEMBER EVER TAKING ANYTHING.  HE JUST COOKED SOME, SOMETHING. FENCH FRIES AND STUFF OR SOMETHING LIKE THAT AND THAT'S ALL, I ATE THEM.
DL: O.K.  I THINK WHEN DICKIE MORRIS, WHEN DETECTIVE, OR SGT. MORRIS CALLED ME THE OTHER NIGHT, HE SAID SOMETHING ABOUT A PARTY OR SOMETHING, WHERE A C▮▮▮BAKER WAS AT AND SOMEONE ELSE.
AM: S▮▮▮BURNS.
DL: S▮▮▮BURNS?
AM: UH HUH, (YES).
DL: O.K. TELL ME ABOUT THAT PARTY.
AM: I DON'T KNOW IT'S JUST WHAT PEOPLE TOLD ME.
DL: WHERE WAS IT AT?
AM: AT A HOTEL OR SOMETHING.
DL: ONE OF THE MOTELS HERE IN TOWN?
AM: YEAH.
DL: DO YOU KNOW WHEN IT WAS?  DID YOU GO TO IT?
AM: I GUESS SO.  MY SISTER AND ▮▮▮▮ H▮ WERE THERE AND THEY WERE THE ONES THAT TOLD ME I SLEPT WITH THEM, BUT I DON'T REMEMBER.  I DON'T THINK I DID.
DL: A▮▮DO YOU HAVE A DRINKING PROBLEM?
AM: UH HUH, (NO).
DL: HOW DO YOU DON'T REMEMBER THEN?
AM: THEY SAID I WAS DRUNK, BUT I DIDN'T, I REMEMBER SLEEPING, BUT THAT'S IT.
DL: ARE YOU BEING HONEST WITH ME?
AM: UH HUH, (YES).  I REMEMBER SEEING THEM THERE, BUT I DIDN'T DO NOTHING WITH THEM.
DL: YOU REMEMBER SEEING WHO?
AM: C▮▮▮ AND S▮▮.
DL: BUT YOU DON'T REMEMBER WHEN IT WAS?
AM: UH HUH, (NO).
DL: YOU SURE?
AM: YEAH, I THINK IT WAS ON A FRIDAY NIGHT THOUGH.  CAUSE IT WAS A WEEKEND.  IT WAS THE NIGHT THAT ME AND M▮▮▮ AND M▮▮▮WENT RIDING AROUND.  IT WAS THE SAME NIGHT I WAS WITH JOHN.
DL: DO YOU REMEMBER WHEN THAT WAS?
AM: A COUPLE OF WEEKS AGO.
DL: WAS THERE DRUGS PRESENT AT THAT PARTY?
AM: HUH UH, (NO), NOT THAT I KNOW OF.
DL: NOT THAT YOU KNOW OF.

Balentine #5 Crim Hx 10-1996  Page 28 of 30

28

PAGE 5

CONT:

DL:   CHARLES, YOU GOT ANY QUESTIONS?

CV:   DO YOU REMEMBER WHAT ROOM THEY, AT THE MOTEL.

AM:   NO, I REMEMBER, BUT THE GUY THAT OWNED IT OR WHATEVER, TAHT RUNS IT HE KEPT TELLING US
      THAT WE HAD TO LEAVE AND HE SHUT ALL THE PHONES OFF UNTIL WE LEFT.

DL:   DO YOU KNOW WHAT MOTEL IT WAS?

AM:   THE ONE OVER THERE BY UM, KELLEY'S RESTUARANT WAS.

DL:   OVER BY THE LAKE?

AM:   UH HUH, (YES).   BUT THAT'S ALL I REMEMBER.

DL:   O.K.

CV:   AT THE TIMES THAT YOU WERE AT HIS MOTHER'S HOUSE, WAS ANY OF HIS BROTHERS OR SISTERS, OR
      MOTHER THERE?

AM:   UH HUH, (YES).   HIS MOM WAS THERE, HIS LITTLE BROTHER. SHE SEEN ME A COUPLE OF TIMES.
      HIS LITTLE BROTHER SEEN ME ONCE I THINK.

CV:   WAS HIS MOTHER THERE DURING THE DAYTIME?

AM:   UH, FRIDAY SHE WAS, SHE STAYED THERE ABOUT FORTY-FIVE MINUTES AND THEN SHE LEFT.

CV:   DID YOU STAY AT HIS HOUSE?

AM:   HIS MAMA'S HOUSE.

CV:   I MEAN IN THE HOUSE?

AM:   YEAH.   I NEVER LEFT THE HOUSE.

DL:   IS THERE ANYTHING ELSE WE CAN TALK ABOUT, A█████, THAT WE HAVEN'T DISCUSSED?  THAT'S PRETTY
      MUCH IT?  BE END OF INTERVIEW.


TRANSCRIBED BY:  MARGIE HILL

| VICTIM'S NAME: LAST, FIRST, MIDDLE (FIRM or BUSINESS) | | | | | | RES. ADDRESS | | RES. PHONE |
| M███ A███ | | | | | | █████ NEWPORT, ARK | MESSAGE | ██████ |
| OCCUPATION | | RACE-SEX | AGE | DOB | | BUSINESS ADDRESS (SCHOOL IF JUVENILE) | | BUS. PHONE |
| STUDENT | | W/F | 15 | ████ | | NEWPORT SCHOOL SYSTEM | | |
| PERSON REPORTING CRIME OR INCIDENT | | | | HOME ADDRESS | | | | HOME PHONE |
| R███ M███ (FATHER) | | | | SAME AS ABOVE | | | | |
| CRIME | | | | | | LOCATION OF OCCURRENCE | | |
| CARNAL ABUSE 3rd Balentine 5-14-06 | | | | | | CLARA SMITH RESIDENCE (ROBINSON ADDITION) | | |
| DATE AND TIME OCCURRED | | | DATE AND TIME REPORTED | | LIGHT CONDITIONS | | WEATHER CONDITIONS | |
| APPROX. LAST 3 WEEKS | | | 10-4-96   8:00 P.M. | | | | | |

| TYPE OF PREMISES WHERE OCCURRED | ☐ SCHOOL | ☐ CHURCH | ☐ TAVERN OR LIQUOR STORE | ☐ CLEANING STORE | ☐ SUPERMARKET | ☐ GAS STATION |
| | ☐ RESTAURANT | ☐ LAUNDROMAT | ☐ APPLICANCE STORE | ☐ SMALL RETAIL STORE | ☐ OFFICE | ☐ RESIDENCE GARAGE |
| | ☐ HOUSE | ☐ APARTMENT | ☐ WAREHOUSE | OTHER: SPECIFY | | |

VEHICLE USED IN CRIME OR METHOD OF TRANSPORTATION (YEAR, MODEL, COLOR, LIC.#, ETC.)

DESCRIBE WEAPON, INSTRUMENT, EQUIPMENT, TRICK, DEVICE OR FORCE USED

| SUSPECT #1 (LAST, FIRST, MIDDLE) | RACE/SEX | AGE | HT. | WT. | HAIR | EYES | DOB OR APPROX AGE | ARRESTED |
| BALENTINE JOHN | B/M | 26-27 | | | | | | ☐ YES   ☐ NO |

(ADDRESS, CLOTHING AND OTHER IDENTIFYING CHARACTERISTICS)

John's Mother.   Clara Mae Smith → 132 JA. 371   ████████

| EVIDENCE COLLECTED | EVIDENCE TURNED OVER TO |

(CASE HISTORY, ADDITIONAL FACTS, ADDITIONAL SUSPECTS, METHOD OF OPER., DESCRIPTION OF STOLEN PROP., AND SERIAL #, ETC.)

According to R███ M███, father of A███ M███, A███ left school wednesday morning the 2nd and has been gone since. On friday night the 4th she call her parents and stated that she wanted to come home and that she was at McDonalds Rest. R███ stated that after he had A███ back home he learned that she has been staying at John Balentine's residence at Robinson Add. since wednesday night. A███ has also admitted to having sexual intercourse with John several times since they have been together. A███ is 15 years of age and John is approximately 26 years of age. R███ stated that at first A███ had indicated that she was intimidated into having sex with John, but during the course of the preliminary report it is evident to this officer that this is not the case. According to the statement that A███ made to this officer the acts were consentual and that she had numerous times to leave the residence but that she elected to stay.

After the preliminary report A███ and her parents were advised to return to the S.O. monday the 7th and talk with investigator Lucas.   Rape kit was done at parents insistance friday night the 4th and in control of this officer.
    Sgt. Dickie Morris                                          Sgt. Dickie Morris   406

| OFFICER ASSIGNED | OFFICER MAKING REPORT | PAGE TWO USED |
| | 10-5-96 | YES ☐   NO ☐ |
| | DATE REPORT COMPILED | |
| VALUE OF LOSS | | |

№ 1514   **BENCH WARRANT**

CASE NO. _____

THE STATE OF ARKANSAS: To any Sheriff, Constable, Coroner, Policeman, in this State:

YOU ARE COMMANDED Forthwith to arrest___ John Lezell Balentine _____

_____ and bring ___him___ before the Jackson County Circuit Court for the offense of

Residential Burglary; Aggravated Assault; Kidnapping; robbery; Terroristic Threatening

in the First Degree; and Battery in the Third Degree

or if the Court be adjourned for the Term, that you deliver___ John Lezell Balentine ____

to the Jailer of Jackson County.

COPY

Attorney Requesting Bench Warrant:

___ Jim Stallcup, Prosecuting Attorney _____

WITNESS my hand and the seal of said Court this day: _____ November 27, 1996 ____

PAM GRAHAM   _____ Pam Graham _____ CLERK
Circuit and Criminal Clerk

By: _Velma Turner_____, D.C.

SHERIFF'S RETURN:

I have this day duly served this Bench Warrant by:

(          )

(          ) Upon the within named persons and I have stated the substance there to the

(          ) within named _____

FEES:                                    _____ SHERIFF

SERVICE  $ _____       By: _____ D.S.

MILEAGE  $_____        DATE OF SERVICE: _____

RETURN   $_____

TOTAL    $_____



1

**STATE OF ARKANSAS**

**CRIMINAL INFORMATION**

This criminal information cover sheet or the standard criminal information form is required by Supreme Court Administrative Order Number 8 to be completed for every defendant and filed by the prosecutor. The data contained herein shall not be admissible as evidence in any court proceeding or replace or supplement the filing and service of pleadings, orders, or other papers as required by law or Supreme Court rule. Instructions are located on the back of the form.

| County | JACKSON | District | THIRD | Case Number | CR-96- |
|---|---|---|---|---|---|
| Judge | HAROLD ERWIN | Division | CRIMINAL | Filing Date | 11/2?/96 |

Style of Case   STATE OF ARKANSAS VS JOHN LEZELL BALENTINE

Prosecutor Providing Information   G. STANLEY MONTGOMERY, DPA

| Is this an Amended Information? | ☐ Yes | Is D being charged as a Habitual? | ☐ Yes |
|---|---|---|---|
| If yes, are you | | Are multiple D's charged in the information? | ☐ Yes |
| Adding Offense(s)? | ☐ Yes | | |
| Dropping Offense(s)? | o Yes | | |
| Changing Offense(s)? | ☐ Yes | | |

| Defendant's Full Name | Date of Birth | Race | Sex | SID # | Arrest Date |
|---|---|---|---|---|---|
| JOHN LEZELL BALENTINE | ██/69 | B | M | AR565835 | |

| Address (Street, City, State, Zip) | SS# | Driver's License No. |
|---|---|---|
| ██REMMEL AVENUE NENPORT, ARKANSAS ████ | ██████ Arrest Tracking # | ████████ Prosecutor's File # CR-96- |

| Alias 1 | Alias 2 | Alias 3 |
|---|---|---|
| | | |

The attached information accuses the above named defendant of the following crime(s):

| Code # | Offense | A/S/C | Offense Date | Counts | F/M | Class |
|---|---|---|---|---|---|---|
| 5-39-201 | RESIDENTIAL BURGLARY | | 11/09/96 | 1 | F | B |
| 5-13--204 | AGGRAVATED ASSAULT | | 11/09/96 | 1 | F | D |
| 5-13-301 | TERR THREATENING 1ST DEGREE | | 11/09/96 | 1 | F | D |
| 5-12-102 | ROBBERY | | 11/09/96 | 1 | F | B |
| 5-11-102 | KIDNAPPING | | 11/09/96 | 1 | F | Y |
| 5-13-203 | BATTERY THIRD DEGREE | | 11/09/96 | 1 | M | A |

_____
Circuit Clerk/Deputy Clerk

_____
Prosecuting Attorney/Deputy Prosecuting Attorney

Balentine #6 Crim Hx 11-1996 Page 2 of 25

2

IN THE CIRCUIT COURT OF JACKSON COUNTY, ARKANSAS

STATE OF ARKANSAS, PLAINTIFF

VS. NO. CR.-96- _____

JOHN LEZELL BALENTINE, DEFENDANT


### INFORMATION

    Comes Jim Stallcup, Prosecuting Attorney in and for the Third Judicial Circuit of Arkansas of which Jackson County is a part, duly elected, qualified and acting, upon information, in name and by the authority of the State of Arkansas accuses JOHN LEZELL BALENTINE of the crime(s) of RESIDENTIAL BURGLARY, AGGRAVATED ASSAULT, KIDNAPPING, ROBBERY, TERRORISTIC THREATENING IN THE FIRST DEGREE, and BATTERY IN THE THIRD DEGREE committed as follows, to wit: the said JOHN LEZELL BALENTINE in the County and State aforesaid on or about the 9TH day of NOVEMBER, 1996 did:

COUNT ONE: ENTERED OR REMAINED UNLAWFULLY IN A RESIDENTIAL OCCUPIABLE STRUCTURE OF ANOTHER PERSON, TO WIT, THE RESIDENCE OF ROSA MILLER, WITH THE PURPOSE OF COMMITTING THEREIN AN OFFENSE PUNISHABLE BY IMPRISONMENT, TO WIT, ROBBERY AND KIDNAPPING.

against the peace and dignity of the State of Arkansas.

COUNT TWO: UNDER CIRCUMSTANCES MANIFESTING EXTREME INDIFFERENCE TO THE VALUE OF HUMAN LIFE, HE PURPOSELY ENGAGED IN CONDUCT THAT CREATED A SUBSTANTIAL DANGER OF DEATH OR SERIOUS PHYSICAL INJURY TO ANOTHER PERSON, TO WIT, ROSA MILLER.

against the peace and dignity of the State of Arkansas.

COUNT THREE: WITH THE PURPOSE OF TERRORIZING ANOTHER PERSON, HE THREATENS TO CAUSE DEATH OR SERIOUS PHYSICAL INJURY TO ANOTHER PERSON, TO WIT, ROSA MILLER.

against the peace and dignity of the State of Arkansas.

3

COUNT FOUR: WITH THE PURPOSE OF COMMITTING A FELONY OR
MISDEMEANOR THEFT OR RESISTING APPREHENSION
IMMEDIATELY THEREAFTER, HE EMPLOYS OR THREATENS TO
IMMEDIATELY EMPLOY PHYSICAL FORCE UPON ANOTHER, TO
WIT, ROSA MILLER.

against the peace and dignity of the State of Arkansas.

COUNT FIVE: WITHOUT CONSENT, HE RESTRAINS ANOTHER PERSON SO AS TO
INTERFERE SUBSTANTIALLY WITH HIS LIBERTY WITH THE
PURPOSE OF: HOLDING HIM FOR RANSOM OR REWARD, OR FOR
ANY OTHER ACT TO BE PERFORMED OR NOT PERFORMED FOR
HIS RETURN OR RELEASE: OR USING HIM AS A SHIELD OR
HOSTAGE; OR FACILITATING THE COMMISSION OF ANY FELONY
OR FLIGHT THEREAFTER; OR INFLICTING PHYSICAL INJURY
UPON HIM, OR OF ENGAGING IN SEXUAL INTERCOURSE,
DEVIATE SEXUAL ACTIVITY, OR SEXUAL CONTACT WITH HIM;
OR TERRORIZING HIM OR ANOTHER PERSON; OR INTERFERING
WITH THE PERFORMANCE OF ANY GOVERNMENTAL OR POLITICAL
FUNCTION.

against the peace and dignity of the State of Arkansas.

COUNT SIX: WITH THE PURPOSE OF CAUSING PHYSICAL INJURY TO ANOTHER
PERSON, HE CAUSES PHYSICAL INJURY TO ANY PERSON; OR HE
RECKLESSLY CAUSES PHYSICAL INJURY TO ANOTHER PERSON.

against the peace and dignity of the State of Arkansas.

JIM STALLCUP, PROSECUTING ATTORNEY

By
Deputy Prosecuting Attorney

(The statutory authority for RESIDENTIAL BURGLARY is Ark. Code
Ann. 5-39-201 and the penalty is 5 to 20 years and/or fine up to
$15,000 and for AGGRAVATED ASSAULT is Ark. Code Ann. 5-13-204 and
the penalty is UP TO 6 years and/or fine up to $10,000 and for
TERRORISTIC THREATENING IN THE FIRST DEGREE is Ark. Code Ann. 5-
13-301 and the penalty is UP TO 6 years and/or fine up to $10,000
and for ROBBERY is Ark. Code Ann. 5-12-102 and the penalty is 5
to 20 years and/or fin up to $15,000 and for KIDNAPPING is Ark.
Code Ann. 5-11-102 and the penalty is 10 to 40 years or LIFE and
for BATTERY IN THE THIRD DEGREE is Ark. Code Ann. 5-13-203 and
the penalty is UP TO 1 year and/or fine up to $1,000.)

Balentine #6 Crim Hx 11-1996 Page 4 of 25

4

STATE OF ARKANSAS)

COUNTY OF JACKSON)

### AFFIDAVIT

Comes now, Sergeant David Lucas, and after being sworn states on oath: That I am an investigator with the Jackson County Sheriff's Department, and I am one of the investigators on this case.

On Friday, November 8, 1996 at approximately 11:50 A.M. the Jackson County Sheriff's Office was contacted by the Woodruff County Sheriff's Office.
We were advised that John Balentine had walked away from court and was thought to be headed to Newport. After an extensive search of the area, Balentine was not located.

On Saturday, November 9, 1996 at approximately 8:34 P.M. the Searcy Police Dept. sent a message to the Newport Police Dept. requesting that we check with the Diaz Police Dept. to see if they had any report of a kidnapping. They advised that Rosa Miller was in Searcy at a gas station advising that she had been kidnapped from her residence at 2737 Carr Circle in Diaz, by a John Balentine. They also advised that one of their officers was in pursuit of a blue Ford Probe owned by Ms. Miller.

In a report from Searcy Police Dept. Officer, Terry Dillon, he states that he turned around on a blue Ford Probe, matching the description of Ms. Millers vehicle. He stated that as he attempted to make a traffic stop on the vehicle, it accelerated and a pursuit ensued. After a short pursuit the driver of the vehicle lost control and wrecked. Officer Dillon stated that a black male exited the vehicle and then fled on foot evading arrest.

Diaz Police Officer Rick Green, assisted by Sheriff's Deputy Terry Tackett went to the residence of Rosa Miller. Upon their observation they discovered some articles scattered in Ms. Millers driveway. They also discovered that the back window of the residence had been broken out a screw driver was laying on the ground next to the window screen. The scene was then photographed and any items considered as evidence was collected.

I conducted an interview with Ms. Rosa Miller on November 24th at approximately 3:30 P.M.
During the interview Ms. Miller stated that at approximately 7:00 P.M. on the night of November 9th she was cleaning her house. She stated that she heard a noise in her back bedroom and upon checking she discovered that the window in her back bedroom had been broken out and laying in the floor was a blue jean jacket. She said that she then attempted to call the Police Dept. but none of her phones would work. She stated that she then became scared and at that point she got dressed and picked

up her purse and a baseball bat and went outside to get into her car to go to the police dept. .

Ms. Miller stated that as she got close to her vehicle a black male came running from the side of her house and then grabbed her and began choking her. Ms. Miller stated that during the struggle she could see that her attacker was John Balentine. She stated that he kept chocking her and threatening her with a box cutter. She stated that at one time she blacked out from being choked and that when she came to Balentine forced her into her car and made her set on the passenger side while he drove.

Miller stated that Balentine kept telling her that he had to get out of the State and that things had not gone the way he had planed them. She stated that as they got to Searcy Balentine said that he needed to find a quit place to tie her up, she said that he had a piece of extension cord. Miller said that Balentine stopped at a store and was wanting to get a pack of cigarettes and when she promised him that she would not get out of the car, he got out and went into the store. Miller stated that at that time she got out of the car and ran across the street and asked the person working to call the police.

I showed Rosa Miller a photo line-up consisting of six (6) different but similar photos. At that time Ms. Miller identified photo #6 as the photo of the person that had abducted her from her residence. Photo #6 is known to me as that of John Lezell Balentine.

I asked Ms. Miller how she knew Balentine and she stated that they both used to work at Regional Health Care in Newport.

I then showed her some items that was taken out of her vehicle. The first item was a black Chicago Bulls cap, Miller stated that Balentine was wearing this cap during this incident. She also identified a pair of white gloves with blood as being Balentine's. She stated that the blood was from Balentine as he cut himself when he broke her window.

At this time the Jackson County Sheriff's Office respectfully requests that this Affidavit be issued for a Warrant of Arrest for John Lezell Balentine. The charges requested are Kidnapping ACA 5-11-102 a class Y Felony, Residential Burglary aca 5-39-201 a class B Felony, Robbery ACA 5-12-102 a class B Felony, Aggravated Assault ACA 5-13-204 a class D Felony, Terroristic Threatening in the First Degree ACA 5-13-301 a class D Felony, and Battery in the Third Degree ACA 5-13-203 a class A Misdemeanor.

AFFIANT

Sworn and subscribed to before me this 26TH day of NOVEMBER, 1996.

_Ellen Tarno_
NOTARY PUBLIC

My commission expires:

2-3-06

OFFICIAL SEAL
ELLEN L. TARNO
NOTARY PUBLIC - ARKANSAS
JACKSON COUNTY
MY COMMISSION EXPIRES: 02-03-2006

I here by find that this sworn affidavit demonstrates reasonable and probable cause for the issuance of a warrant of arrest for JOHN LEZELL BALENTINE, for the offense(s) of RESIDENTIAL BURGLARY, KIDNAPPING, AGGRAVATED ASSAULT, ROBBERY, TERRORISTIC THREATENING IN THE FIRST DEGREE, and BATTERY IN THE THIRD DEGREE.

Dated and signed _November 26_, 1998.
Time: _4:50_ _P_.M.

_JUDGE_



Mugshot Query Return

| SSN | Last Name | First Name | City | State | DOB | Sex |
|---|---|---|---|---|---|---|
| | | | NEWPORT | AR | /64 | M |
| | BALENTINE | JOHN | NEWPORT | AR | /69 | M |
| | | | TUCKERMAN | AR | 64 | M |
| | | | NEWPORT | AR | 60 | M |
| | | | NEWPORT | AR | 58 | M |
| | | | NEWPORT | AR | 61 | M |

Printed 11/23/96                                                Page      1

Balentine #6 Crim Hx 11-1996  Page 9 of 25

9

JACKSON COUNTY SHERIFF DEPARTMENT
NEWPORT, ARKANSAS

SUBJECT:                          PERSONAL INTERVIEW

DATE OF INTERVIEW:                11/24/96    at 3:22p.m.

PERSON BEING INTERVIEWED:         ROSA MILLER  W/F  DOB
                                  ████████████████        AR

PLACE OF INTERVIEW:               JACKSON COUNTY SHERIFF'S DEPT. C.I.D. OFFICE

OFFICER CONDUCTING INTERVIEW:     DAVID LUCAS

CNN:                              JA 96-101

---

DL:  State your name please.
RM:  Rosa Miller
DL:  Ok, Ms. Miller, before we got to talking today, this afternoon, I showed you this
     photo line up that I ahve in front of me that has six different photographs on them
     numbered one thru six, I showed this photograph line up to you and you picked out one
     photograph in particular on this spread sheet, can you tell me what number that photogra
     is?
RM:  429157848
DL:  Ok, right above that photograph is another number, which number is that?
RM:  six
DL:  Number six, ok, who do you identify that photograph as?
RM:  John Balentine
DL:  Ok, and John Balentine is the one that assaulted and kidnapped you on October 9th, I
     believe?
RM:  Yes
DL:  Ok, If you will, what I want you to do is just think back to October the 9th and just
     tell me everything that took place, ok, leading up to the contact that you had with
     John, all the way until you havn't seen him again.
RM:  Ok, well, I was cleaning house and I had just gotten finished vaccuming, just turned
     it off.
DL:  About what time was this?
RM:  Seven o'clock, because I looked at my clock in the kitchen thinking, you know, I better
     hurry up and get in the bath tub, well I looked at the clock again and it was 7:10 and I heard, and the reason I know so percisely is
     because like I said, I was pilfering, just got done vaccuming, I was cleaning house,
     and I was kind of in a hurry to get all this stuff finished, I heard this real loud
     crashing sound that came from the back of my house, I was in the living room, well, I
     just stood there, scard to death, couldn't move, finally, I started sneaking back to
     the back of the house, and in my back bedroom, I looked and the window was busted out,
     glass everywhere, junk everywhere, but any way, uh,  and I thought, well, I better call
     the police because I have to report this to the police or the insurance company won't
     fix my window, so, uh, and then I think, well, uh, what happend, who done this, and
     then I got to thinking, I had saw a bunch of little kids playing behind my house earlier
     that day, and so, I went in my bedroom to the phone to call the police, but the phone
     didn't work, well, I went into the living room to use that phone and that phone wouldn't
     work, well, call me dumb, I don't know, it didn't dawn on me that anything was wrong,

PAGE 2

RM: I just kept thinking I had to go tell the police so I could report my window, so I walked back into that room and I saw a coat, there was a blue coat, there was a blue jean jacket laying in the floor.

DL: Not your jacket?

RM: No, no, never seen it before.

DL: I'm going to show you a jacket that I have in my possession, ok.

RM: That's it.

DL: This the jacket?

RM: Yes

DL: Ok, to you know whose jacket that is?

RM: John Balentine told me it was his.

DL: Ok

RN: Because on the way to Searcy it dawned on him he had left it in my room, and he said oh, it don't matter, it wasn't my coat anyway, and then he said, uh, and I didn't leave any hair or anything on it where they could prove that it was mine.

DL: Ok, go ahead.

RM: Uh, so, any way, I thought, well, I've got to go report this to the police, I was thinking, when I saw that coat I was thinking, yes, that was what happened, there is some little children trying to blame this on this certain little boy in the neighborhood, is what ran through my mind, I think, if I'd really stop and thought about this I would have thought, now this is ignorant, that stuff you know, a possibility it wouldn't happen, but I think, I could be wrong, but I think I was trying to convince myself that, that's what happened. cause really i didn't want to think about anything else.

DL: Right.

RN: And to be truthful with you, I never thaought anybody would be outside waiting on me. But you know, I didn't want to think that. I don't think. Well anyway, I went and I was in my old long red thick robe, so I went in there and put some clothes on and I got my purse, my keys, and my baseball bat. Don't ask me why, but I did, maybe subconsciencly I did know somebody's out there. But even if I did, you know, I had to get out and try to get help. But anyway, I went outside and I was midway between my house and the car and I turned to my left and I could see something. And I turned around, I looked and there was this man running towards me from around my house. So, I rared back the bat and i swung and I hit him and I tried to hit him again and if I'd got that second shot in, he would have been high-pitched for a long time, but he was already on my throat. He went for the throat and he stayed on that throat.

DL: Choking you?

RM: Yes, yes, thought he would rip out my windpipe, my gozzle, but anyway we ended up in was in front of my house then, but we ended up in the street, in the middle of the street, in fornt of my mailbox, out there in the road. Him down there on top, no before, before he put me down there, he was screaming at me to shut up bitch, shut up

DL: Those were his exact words?

RM: Yes, yes.

DL: O.K.

RM: Uh, and he was saying, shut up screaming. And I didn't really realize I was screamin; till he said that. Well of course, I was trying to scream some more, but he tightene up more, I couldn't do nothing, I couldn't make no sound at all. And then I ended up down in the middle of the road. He was down, I was down there and he was on top of m On my throat, never did let up on my throat and I kept thinking, Oh my god, what have I done and I kept looking up at this man and I kept thinking do I know him, what have I done to him, what have I done that was so bad. Well, he gets me up, by my throat of course, and uh, and I'm still scuffling with him. Don't ask me why, but in my mind I remember someone saying that when a man, when someone is assaulting you that just drop down and put all your weight down. Just drop down. I tried that, it didn' work, he had my throat and I couldn't drop nowhere. I couldn't reach anything to do anything. But anyway, we ended up to the car, to my car. And he had me up against i and it kept getting tighter on my throat, I didn't think it was possible. I thought, oh my god, it's worse. And anyway, the next thing that I remember, I was in front of my house. Right in front of my door. And I was standing up and I was looking when I looked up and all I could see was sky and I remember thinking, good this is a dream a then I turned my head forward and there he was on my throat and I thought, no this is

PAGE 3
CONT

RM: for real. But anyway that was then, he had my throat and my arm, because I had a terrible bruise on my arm and he drug me over to the car. And as we were going, this man said, shut up. Oh, I forgot to tell you something. When he had me down on the street, he was hollering, well, not hollering, but he was saying shut up bitch, shut up, he said, do you want me to kill you? Do you want to die, shut up. And that when I was think, what have I done to him. Well anyway back to the uh, when he was dragging me to the car, after I woke up from being blacked out, that's why I realized I had blacked out, because I did not remember how I had gotten to the front of the house. The last thing I remember I was saying, Oh my god it's worse, but uh, anyway he was saying, shut up Rose and I thought, this man knows my name. So I stopped and and i was looking, and he said Rose I don't want to hurt you, but I will, I will cut you up. And I looked at him and I was still trying to recognize him, I still didn't know who it was.

DL: Did he have a weapon, that you could see?

RM: Well, Yeah, he did, but I didn't see that until he opened, o.k. I stood there thinkin who is this, and he said yeah, you know me. And I was looking at him and I still didn't recognize him, he had on a black cap and his hair was real real short too, it is shorter, I noticed that when we were in the car, but anyway, oh and I said, who are you, what are you doing? But anyway, he opened the door up and he has me by r hair with one hand and he's opening the door up with the other, but anyway, he is shoving me in the car from the drivers side, by my hair. Here, I am saying, what are you doing, you know, just take the car, or I'll drive you know anything I thought would help me, but no, huh uh, he was going to drive, and I was going, anyway he kept shoving me in that car and uh, as he was shoving me in the car, I reached over and I unlocked my door from the passenger side, I thought, now as soon as he lets go of my hair, I'm gone, but he never let go.

DL: Never let go?

RM: He never let go of my hair, and he had on a little bit of my collar, not much, but mostly my hair. And this is with his right hand because the reason I say with his right hand is because he threw my purse in the back in the car and he still had my hai And uh, then as he was shoving me over more, he kept, he handed me the key and told me to put them in the ignition and when he handed me my keys, I saw a box cutter.

DL: O.k. Where did he have the box cutter?

RM: He had it in the same hand that he had the keys in. because that's how I saw it. So I put the keys in the ignition, anyway, he got to screaming and hollering at me, turn that light out, turn that light out, and I said I can't. It's the kind that fades out eventually, it don't shut off real quick, he reached up and ripped it out. Well, o.k. so, anyway, he's telling me, he's in the seat now and he's telling me and he's still got my hair and he's telling me to get in the back seat, he releases it about midway and I'm getting in the back seat, but then he gets real angry because he finds the door was unlocked because he knew I was trying to get out, but anyway I'm sitting back there, but I saw him, when that light was on and I realized then it was John. Now as far as his name, I did not know if it was John Balentine, or John Valentine, I did not know which one for sure, but I knew John was correct. But the reason I knew that was that I did payroll there, I do payroll there, but anyway, I also knew that he was Kerry Mae Smith's son.

DL: You all work together at Regional, right?

RM: Yes, yeah. Well anyway, I was in the back seat and he was starting the car up and he's starting, he tells me, he said, he's hollering at me, and he said how much money do you have? And he said, and you better not lie to me either and here I am back there saying, John, what are you doing, why are you doing this? Why are you hurting me, you don't have to hurt me, and he is hollering, how much money do you have, and he said, and you better not lie to me. So, here I am trying to figure out exactly how much money I've got and I said well seventeen dollars, I said I got a ten and seven ones. Well, come to find out, I didn't have but seven dollars, I had gotten gas earlier that day, ten dollars worth, but anyway, he is backing out and I am asking him John why are you doing this to me? And uh, anyway he is driving down the street and I

PAGE 4
CONT:

RM: said Rose, I have uh, I'm gong to say exactly what he said. He said Rose I have
fucked my life up real bad, he said I've got my mama and my girlfriend in jail, put in
jail, and he said, I've gotto get out of the state now.  He said I want to go to Texas
And I said, Texas, I said I don't know how to get back from Texas, but see he told me
earlier, before that right before that, I don't want to hurt you , but I've got to
get out of town.  And you know he had almost killed me already, but he don't want to
hurt me, he was going to cut me up and all this good stuff, but anyway, he said, now
get this, he said you can get there and back in two days and he said, and you can
be at work Monday.  I thought that was kind of ironic.  But anyway, I said John,
pick somewhere closer, I don't know how to get back home from Texas.  And he hollered
a little bit, but anyway I said what about Jacksonville?  I said go to Jacksonville,
I know how to get back home from Jacsonville.  And he said, all right, all right, we
will go to Little Rock, I have a cousin in Little Rock, I'll call him, when we get to
Jacksonville, I'll let you go.  I said, o.k., o.k.  Well we go to the Y, we go to the
Y and uh, he made three circles, he made three circles around that Y, the second one
he hollers back at me, don't you move, don't you move a inch he said, don't you move
at all, but he thought there was a vehicle behind him and he was perinoid and he was
hollering at me not to move at all, but anyway he wanted cigarettes and he said this
third time around, he said but if I went up here and got cigarettes, you would run
away, and I said well now John, you know I didn't want to say no, he would know I
was lying and i didn't want to say yes cause then he'd hurt me. I just said well John
he said yeah you would, he said, I can wait, I don't need them right now.  Well that
third time around, he uh, went through the red light and then he turned rightand it
just seemed like we kept going farther and farther out in the boonies out in the
woods and to be blunt with you, I was scared to death, I just knew he was going to
take me out there and do something to me and leave me in those woods.  and I said,
John, what are you doing, you said you promised that you weren't going to hurt me,
why are we going out here?  And he got mad, he said now you are getting scared, you
get scared, you'll get nervous, you get nervous, you'll do something stupid and he sa
and you don't want to make me nervous.  You know, blah, blah, blah, and then we drove
by a house, I seen a house on the left hand side and I said no, I'm not really scared
I said I just didn't see the freeway cause he said we were going to the freeway.  I s
no, no I'm not scared I said I just didn't see the freeway and then he got to talking
about how he was getting nervous and I didn't want to make him nervous.  And how I wa
getting scared and I said, no, I'm fine.  And then eventually I seen this road, the
back road that use to take you to the freeway, we came upon it and I said I know
where I am now, I saw that road and then he got to making some kind of remark about h
I didn't know where I was and talking about you never been out there and I didn't kno
my way around.  And so anyway, we turned left and we go upon the freeway and uh, he's
talking about he's bleeding, he said real bad, bleeding real bad and I said, from wha
John?  Well anyway, he pulls up his shirt and he said he cut it from my window when h
was trying to get in my window.  Well he pulls up his shirt and tells me to look and
look and right back here he had a real long cut, but it wasn't bleeding, so I told hi
no, it's not bleeding.  And he said his hand was bleeding, but uh, anyway we went on
and uh, and he was talking about how things weren't going as he planned and I said
what do you mean John?  He said well, he said I was going to shut you up in the trunk
or I was going to tie you up in the back.  And I said you don't have to tie me up, I
said you don't have to hurt me, and uh, I said uh, no then he said uh, right before
that he told me to uh, no after that, turn the radio on a certain station so here I
am in the back seat and I'm having to lean over and put this certain station on the
radio.  So I do that and I lean back and uh, I said John, do you think I could sit in
the front seat?  The reason I wanted that, I figured I'd be closer to an exit.  And h
got mad and he said, no you can not, he said you already tried to open that door  and
unlock it and get out, no, I don't trust you, you're not getting up here, and blah, b
blah, and I said that's fine it's all right, i said I'm fine and then he uh, got to
talking about things, uh, like how kidnapping was a life sentence and uh just things
like that.  Nothing drastic, he would just mention it and lay off of it.  And talking
about how things weren't going how he planned.  And he was driving and listening to
the radio and then he said uh, do you want up here, do you want up in the front/

13

PAGE 5
CONT:

RM: And I said well John what ever you think. I said I fine here, but whateaver you say. He said no, then he said yeah come o n go ahead and get up here, he siad but you keep your hands where I can see them at all times and i said o.k., so I got up front and ul he uh asked me, he was talking about how he had this cousin in Little Rock that uh, wl he got there he was going to call and he said he was going to turn the car around so that I would be headed back in this direction is what he said. And uh, how much it cost to fill my car up and I told him about fifteen dollars and he said that sounds about right, my cousin's got a Saturn and it takes about that much to fill it up. And he was and uh, he was sitting there and he looked sideways at me and continues driving and I said what John and he said, nothing, nothing, and uh, he looked at me again, kind of weird and driving and I said John what? And he said, how old are you? I said I'm thiryt-nine and he said that's not old and I said trying to make light of it, and I said are trying to say I'm old and he said no that's not old. And then he looked at me and he said do you remember the first time you saw me and I said well John, i guess when you worked at regional and he said no, no that wasn't it. He said he and his girlfriend came to Newport Hospital and I was working the switchboard, he said they came in there and asked for a room of someone and he asked me, how many jobs I was working and he said his girfriend got mad and that he told her to leave me alone. And I said, well John, I really don't remember and I thought to myself uh, I don't like the way this is going, I don't like this. But, with him, I don't know why but, I thought as long as I kept him talking a little bit he couldn't think, he could think things out does that make sense?

DL: Yeah.

RM: Well, one at one point he got mad and told me I was talking too damn much.. I'm sure was. So of course I would quiet down a little bit and just talk every once in awhile but I didn't want him to think, because he kept talking about how kidnapping was a life sentence. And then he got to talking about and then he mentioned that again. An I saidJohn, I said I can fix my window and I said the cars not hurt and he said what about your neck? I said well, it hurts a little bit, but I said nothing drastic has happened, I can fix my window. I don't think I said it in those words, but that's what I was talking about, you know, that whatever he had done it wasn't beyond fixing I was trying, to be truthful, I was applying you know, I can fix my window and just take my butt back home. No big deal. Well, anyway he alking about the things weren't going the way he planned and then right out of the blue he said, man my side hurts. And I said from what? And he said from your damn bat. I said oh. He was talking about from where I had hit him. And I said, well John, I said what would you have do In my position and he laughed and he said, I don't know, I'm not a woman. And he sai you were trying to see me throught that window, weren't you? Out there, you see I t looking through the window out there in the dark, you know I couldn't see anything. But he thought, he was making fun of me because he thought I was trying to see him through that window. And I said, no not really, I said I couldn't see anything anyt and he laughed and he got to talking about how no one had saw him, no one had heard r or anything like that and uh, anyway we see some lights up ahead and he said, have we past Searcy? And I said John I don't really know, I said I really wasn't paying attention. He said yeah I think we have and I said maybe this is it up here and he said no, but I want some cigarettes, well we drove on and it was Searcy so he pulls the ramp and he stops and uh, he said we're going to have to go find a quiet place, and I said for what John and he said to tie you up and I looked and in his lap, was an extention cord, which I did not know he even had and so I won't forget this, I'm going to tell you something else, that happened. Midway from there I saw him move h was driving with his left hand and I saw him move his right hand over to his left si and between his legs I heard a click and then he slipped something in his pocket. so I'm assuming it was that box cutter. And something else, he, he was driving and he did not have those gloves on, then all of a sudden he had on those white gloves and I'm still in the back seat then. And I saidJohn what are you putting them on for, w do you need them for? And then he got mad again and said there you go getting scare again and just stuff like that. He said my hands bleeding and I said oh, o.k. Well

PAGE 6
CONT:

RM: pulls it off and shows me, I think it was his left hand, it did have a little bit of blood. And then later on I looked and he didn't have those gloves on, but between the woods and those gloves needless to say I was really, really, scared. But anyway back to the cord, we were stopped and he said we had to find a quiet place to uh he had to find a quiet place and I asked him why and he said to tie me up and I said John you don't have to tie me up. I said what am I going to do? And he said uh, you can run and go find a cop. I said John I don't see no cops, i don't see no policeman, where am I going to go find one? You know like that and uh well anyway, he pulled out,. no and I told him, we had a pact remember, in other words he was going to let me go when we got to Jacksonville, well anyway he turns left and we continure just keep going out of town, go past Wal-Marts, through the light and we keep going and we stop because there this train going across the road and we're sitting there a couple of minutes and all of sudden he tells me to lean forward and he said is your door still locked and he checked. He was checking on me , he didn't trust me, but the door was still locked, but if that door had not been locked at that time, I would have been in deep deep trouble. He was trying me, he was trying to see, but anyway it was still light, well he makes a U-turn after he checks the door, he makes a U-turn and it is at this car wash and goes back on that highwaya nd goes back towards Searcy. Well we're driving down through Searcy and he says, you want to go in and get the cigarette and you can imagine what is racing through my mind. But I say well John whatever you think and I said whatever you say, whatever you tell me to.do and he said well, what about your neck. He is still worried about my neck because it was scratched up and bruised and all this stuff and I said well I pull my collar up a little bit and I said whatever you think and I drop it and I don't say any more about it. Well he has got my purse in his lap at that time, handing my billfold to get my money out because he is wanting some cigarettes, well we are driving a little bit more and he said this is White County like he is upset over it and I said well John you know, what does that what do you mean? He said it's dry. He had booze on his mind. But anyway all of a sudden he pulls off the highway to this little Quick Mart.It was an older one because it was bricks, big white bricks and there wasn't anyone around except the lady that was working behind the counter. Well he pulls up and he says get in the back seat. I said o.k. So here I am trying to get in the back seat and he said uh, what kind of soda do you want, and I said oh, get me a coke. So he went in to get coke and cigarettes and I was still getting in the back seat when he shut the door. .I got in the back seat and I watched him go inside and as soon as he was in front of that counter away from those windows where he could not see the car, .I grabbed my purse an got the hell out of there. And I ran and it just so happened there was a red light o so the vehicle weren't going you know both ways, so I just ran through the red light and went on the opposite side of the street and ran down the street to another Quick Mart and ran in there and asked her to call the police because I had been kidnapped so then I huddled behind the counter over away from the window and they took informat and so forth and then she let me hide in her little office and I sat back there and t Searcy Police came. And uh, he was having me write out something, which I wrote two pages, I'm surprised I could write at all, but in a way I think that was good becaus it kept my mind focused a little anyway. But anyway he went outside uh, to do someth but when he would come back, I could hear on his radio where the police were chasing John, in my car of course, to make a long story short he wrecked it, He wrecked my vehicle. But the policeman, he came back in and he asked me to go with him and he opened the door open and he asked me if there were any bones broken and I said no sir there isn't, so I got in the car and he took me to the police station and he tak me to the room, do you want to hear all of this stuff or just the part about John?

DL: Just go ahead.

RM: Just, o.k. he takes me into the room and he said the phones were messed up and he h to go out to different places to make calls and so forth, but uh, I don't mean to slander, but I'm going to say this because I don't think it was right. He calls Dia Police and tells them that Rosa M. Miller is here and says that she had been assault and kidnapped that they needed to go and check my house,see what was going on. Now window was busted out, but this policeman goes, drives up to my driveway and calls back and tells them that he does not see anything out of the ordinary. He saw some

15

PAGE 7
CONT:

RM: lipstick in my driveway, but everything else was o.k.  And I said, did he, did he even go behind my house and look at the window?  Did he even try to check to see if it was busted out?  But he hadn't.  He just drove up there and looked and drove out.  But anyway they called, they called them back from what I understood and then they did go and look and sure enough it was busted out just like I said it was, but I don't understand well, I don't understand why he'd just sit there on his butt in his vehicle he didn't even get out and check the doors.  But anyway I guess that's it.

DL: From that point on, that's when Diaz so called involved.  And then it rocked on for about two weeks and then you came to Chief Deputy Sykes here at the police department correct?

RM: Yes.

DL: O.k.  I've got a couple of questions for you Ms. Miller.  First off just go over how you know John Balentine, tell me again.

RM: how I know him?

DL: Yeah.

Rm: I don't know him personally.

DL: You and him have never been boyfriend and girlfriend?

RM: NO, NO,

DL: You have never been out on a date or anything like that?

RM: No, No.

DL: You just know him as a co-worker?

RM: Yes, and that and when L saw him in person or something it was hi and get gone, but I will tell you something while I thinking about it, he was also mad because see Mont ago he was at work at regional health care, I don't know why he was there but anyway I was coming back from the facility to the office and he stopped me and asked me for two dollars and I said no, I don't have two dollars and I kept on going, it made me mad I mean who did he think he was to be asking me for money?  But anyway he mentione that in the car.  He was mad, he said here I helped you move and you wouldn't even give me two dollars.  And I said well John maybe I didn't have two dollars, but how I know John Balentine and it is not personal that I know him.  I lived on Logan street Jimmy Shaw and Charles Robinson they work at Regional Health Care, they are matainanc people, but they were moving me from Logan Street to Behind Hardee's on grace street.  Well, John was working there at the time and they got him to help them move me.  But I didn't do it, I don't know him.  And another thing is when I would come home from work, I'd get out of my car and would hear someone holler at me and I would look down the street and it would be John.  He would be down the street visiting someone.  He would be at someone elses house.

DL: Do you know whose house it was?

RM: NO, I don't, I just know it was like two or three houses down on the opposite side so I would wave and go back in the house.  And then uh, other times Like I would come out of the house to go to my car and the same thing would happen.  I mean it wasn't like it would happened alot, but it did happen two or three times.  But no, I didn't want to know him and I did not know him, not perosnally.

DL: Did you ever see what color this box cutter was?

RM: It looked silver to me.

DL: SIlver?

RM: And the reason I say that is when the light was on, that's when I saw it when he was handing me the keys.  But it looked silver.  And the reason I know it was a box cutt is how I know there is box cutters is because when I worked at Price Chopper, the gu there uses box cutters. And another thing, they click when they shut too.

DL: You say he mentioned a, did he have a cousin in Little Rock, did he ever mention his name?

RM: No.  No names.

DL: What about his girlfriend, do you know his girlfriends name?

RM: Not from him, but uh, I heard it later.

DL: O.K. what name did you

RM: Lisa Childers.

DL: Lisa Childers?

PAGE 8
CONT:

RM: There was something else I wanted to tell ya, I can't remember what, but I will think of it. Go ahead. Oh, I know what it was. He also was talking about how he had saw my car in different places. He said he has saw my car coming back from Batesville, from Oil Trough, in that area, you know coming and going and he had saw my car in different other areas you know coming and going and he said that the reason he said that no one would know this or even think anything if they saw my car in different places. And also he said the reason he chose me was because I lived by myself.

DL: Other than your car, did he take anything else from you? Did he steal anything out of your purse? Or did he get your money or anything?

RM: No, no, well he got my money yes.

DL: He did get your money?

RM: Yeah, well while we were in Searcy he handed me my billfold cause he was going through it, he said do you have a gun in there? Let me look and then he handed me my billfold and I get my money out, but yes, he took my money.

DL: When he got out of the car in Searcy to get cigarettes, did he take the keys out of the car?

RM: I don't know.

DL: You don't recall?

RM: I never did look, when.

DL: All that probably wasn't on your mind.

RM: No, you want me to tell you what was on my mind? Grabbing that purse and credit cards and getting the hell out of there.

DL: I want to show you a couple of things, you said he was wearing a cap, correct?

RM: Black, a black cap.

DL: Did it have any writing on it?

RM: BULLS.

DL: Excuse me?

RM: BULLS. It was red.

DL: Chicago Bulls?

RM: I just remember BULLS.

DL: I'm going to show you a cap.

RM: It was black and had red stuff up on the front. Yes, yes.

DL: Is that the cap?

RM: Yes.

DL: O.k. You also mentioned that he had on at one time you noticed a pair of gloves, correct?

RM: Yes.

DL: I'm going to show you some gloves.

RM: Yes, that's it.

DL: O.K. You also mentioned that he had an extention cord.

RM: Yes he did.

DL: Is this the extention cord? It looks like the extention cord?

RM: Yes.

DL: o.k., all right.

RM: Let me see that cord again. Yes, because I remember it being cut roughly on.

DL: What type of car do you own?

RM: I owned a ninty-three Ford Probe.

DL: What color?

RM: Metallic Blue.

DL: O.k., all right. I already showed you the jacket, correct?

RM: Yes sir.

DL: And that is the jacket that you remember?

RM: Uh huh, (yes). It was. He also told me that if he got in a chase, he was going to wreck my car and try to kill his self.

DL: O.k. Ms. Miller is there anything else that took place that night that we haven't Discussed, taht we need to talk about?

RM: No sir I don't believe so. Nothing that I can think of off hand, but there is one other thing, I asked him, I said well John, I said what if I hadn't came out, what i I would have just waited till someone had come to visit me and he looks at me and he

PAGE 9
CONT:

RM: said I was coming in through that window, but he told me that the reason he didn't
he tried, he attempted to come through there, because he cut his self.  But did I
also say that he cut my phone wires?

DL: Yeah you said you tried to use the phone, but it didn't work.

RM: He cut them, he told me he cut them, he also said that he was thinking about trying
to cut me electricity off.

DL: O.k.

RM: But he informed me that he was coming through that window.

DL: O.k. o.k.  Also believe that during the uh, course of this interview, you said some-
thing about he had mentioned he needed to get to Texas?

RM: Yes he wanted to go to Texas.

DL: Did he, did he say where at in Texas?

RM: huh uh, (no).  Just out of State to Texas.

DL: O.k. o.k.

RM: He also asked me if he heard a gun shot.

DL: If you heard a gunshot?

RM: Yeah.  I guess he thought I was shooting out the window or something.

DL: So that is pretty much everything that took place that night?

RM: UM, let's see.  Left hand, my notes.

DL: You jotted them notes down during this last two weeks, so you wouldn't forget none o
it?

RM: Yes, I wanted to recall, I didn't want to forget anything.  Not that you forget, the
I don't know things happen in such a way.  Let's see.  oh, He was talking about how
uh, when we first getting on the street, talking about how they had just sentenced
him to six months in jail, for none child support.  And I said John, I said why didn
you just do it I said this ain't right and he got mad and telling about how he lost
fifty pounds all ready and all that good stuff.

DL: Did he tell you where he got sentenced to jail at?

RM: No. He didn't.  And he was talking about how he just walked out.  And also he wa.
telling me in the vehicle between Newport and Searcy, he would look at me and he
would say you don't know me.  You don't know me, like I'm a terrible bad person, you
don't know me and for what I had saw of him wasn't him. Oh, something else, not that
I really think that this would be important, but while, yes, while I was cleaning
house, I uh, I took some shelfs from my house to my shed by my house out behind my
house and he told me that he was behind my shed then, he even told me what I had on.

DL: So he was watching you?

RM: Yes.  So he was hiding behind my shed even then.  And something else, when I came ba
from the shelves, from taking the shelves back, I was in the living room and I kept
hearing a loud tapping noise, I mean loud and I thought well what is that so I go
back and I follow and it is from my window and I thought the wind was blowing and th
blinds were tapping on the window so I just go back and clean the house.  But you
know, I could be wrong, but it sounded like he was tapping that window trying to get
me close up there, don't it?

DL: It's a possibility.

RM: I didn't think about that until later, but I heard that tapping, but it was too loud
Really for the wind, but I didn't think about it.  But that was before he broke it o

DL: Is that everything?

RM: I believe that's everything.

DL: O.K.  Be the end of interview.  The time now is 4:06 P.M.

TRANSCRIBED BY:  Margie Hill

CRIM1      INVESTIGATION DIVISION
IN  STIGATORS REPORT

OFFICER & BADGE #:  SERGEANT DAVID LUCAS #405

DATE: NOVEMBER 22, 1996

CASE #: JA96-101

OFFENSE: RESIDENTIAL BURGLARY / AGGRAVATED ASSAULT /
         TERRORISTIC THREATENING 1ST DEG. / ROBBERY /
         KIDNAPPING / BATTERY THIRD DEG.

DATE OFFENSE: NOVEMBER 9, 1996

VICTIM(S):

NAME: ROSA MILLER

AGE: 39    SEX: F    RACE:  W    DOB: ██████

ADDRESS: ███████████████████ AR.

PHONE: ███████████     --

SUSPECT(S):

NAME: JOHN LEZELL BALENTINE

AGE: 27    SEX: M    RACE:  B    DOB: ██████/69

ADDRESS: ████ REMMEL AVE.   NEWPORT, AR. ████████

PAGE 1

CRIME INVESTIGATION DIVISION
INVESTIGATORS REPORT

NARRATIVE:

On Friday, November 22, 1996 Ms. Rosa Miller came to the
Jackson County Sheriff's Office to speak with Chief Deputy
Jerry Sykes.

Ms. Miller spoke with Chief Sykes in reference to an
incident that had occurred to her on November 9th, in which
John Balentine had kidnaping her and stole her car.

Ms. Miller was upset due to the fact that the case was
not being handled right by the Diaz Police Dept. and she felt
that they were not acting on it quick enough.

At that time Ms. Miller requested that the Jackson County
Sheriff's Dept. take over the investigation of the case.
Chief Sykes called me into his Office and at that time he
requested that I take the case.

At approximately 4:12 P.M. I went to the Diaz Police Dept
and made contact with Lt. Jesse Braswell. I advised him that
Ms. Miller had requested that the S.O. take over the case and
I requested that he hand over the case file and any evidence
in the case.

Lt. Braswell gave me the case file and released to me
items that he had recovered from Ms. Millers vehicle (SEE
CHAIN OF CUSTODY FORM).

At approximately 7:25 P.M. Officer Rick Green of the Diaz
P.D. came by my residence and released other items of
evidence to me (SEE CHAIN OF CUSTODY FORM).

At that time I began the investigation from the beginning
and the case developed as follows.

On Friday, November 8, 1996 at approximately 11:50 A.M.
the Jackson COunty Sheriff's Office was contacted by the
Woodruff County Sheriff's Office.

We were advised that John Balentine had walked away from
court and was thought to be headed towards Newport.

After an extensive search of the area, including
Balentines home, Balentine was not located.

On Saturday, November 9th at approximately 8:34 P.M. the
Searcy Police Dept. sent a message to the Newport Police
Dept. requesting that we check with Diaz to see if they had
received a report of a kidnapping.

Searcy advised that Rosa Miller was in Searcy at a gas
station saying that she had been kidnaping from her residence
at 2737 Carr Circle by a John Balentine. They also advised
that one of their officers was in pursuit of a blue Ford
Probe owned by Ms. Miller.

In a report from Searcy Police Officer, Terry Dillon, he
stated that as he was in route to the station where Ms.
Miller was at he meet a blue Ford Probe that matched the
description of Millers vehicle. He stated that he turned
around on the vehicle and attempted to make a traffic stop.

PAGE 2

CRIMINAL INVESTIGATION DIVISION
INVESTIGATORS REPORT

At that point the vehicle accelerated and a pursuit ensued.
After a short pursuit the driver of the vehicle lost
control and wrecked.  Officer Dillon stated that a black male
exited the vehicle and fled on foot evading arrest.

While all of this was occurring Diaz Officer Rick Green,
assisted by Sheriff's Deputy Terry Tackett went to the
residence of Rosa Miller.
Upon their arrival they discovered that there were some
articles from a females purse scattered in the driveway.
They also discovered that a window at the rear of the
residence had been broken out and a screw driver laying on
the ground next to the window screen.
The scene was then photographed and any items considered
as evidence was collected.

I conducted an interview with Ms. Rosa Miller on November
24th at approximately 3:30 P.M.
During this interview Ms. Miller stated that at
approximately 7:00 P.M. on the night of November 9th she was
cleaning her house.  She stated that she heard a noise in her
back bedroom and upon checking she noticed that the window
had been broken out and laying in the bedroom floor was a
blue jean jacket.
She said when she saw this she went to her phone and
attempted to call the police, but her phones were not
working.  She said at that point she became scared so she got
dressed and picked up a baseball bat and her purse, and went
outside to get in her car to go to the police dept.

Ms. Miller stated that as she got close to her car a
black male came running from the side of her house, grabbed
her and began choking her.  Miller stated that during the
struggle she could see that her attacker was John Balentine.
She said that he kept choking her and threatening her with a
box cutter.  She said at one point she blacked out due to
being choked, and when she came to Balentine forced her into
the passenger seat of her car and he got into the drivers
seat and drove away.

Ms. Miller said that while they were driving, Balentine
kept saying that he had to get out of the State.  She said
when they arrived in Searcy, Balentine said that he had to
fine a quit place to tie her up.  At that point she noticed
that he had a piece of extension cord.
Miller said that Balentine stopped at a store and was
wanting to get a pack of cigarettes, and when she promised
him that she would not get out of the car, he got out and
went into the store.
At that point Ms. Miller got out of the car and ran
across the street to another store and asked the clerk to
call the police.

I showed Rosa Miller a photo line-up consisting of six

PAGE 3

CRIMINAL INVESTIGATION DIVISION
INVESTIGATORS REPORT

different but similar photos.  At that time she identified
photo number 6 as the photo of the person that had abducted
her from her residence.  Photo number six is known to me as
that of John Lezell Balentine.

I asked her how she knew Balentine and she stated that
they both used to work at Reginial Health Care in Newport.

On November 26, 1996 at approximately 4:00 P.M. a Affidavit
of Probable Cause was signed by Newport Municipal Judge
Ronald Winningham and a Warrant of Arrest was issued.  The
Warrant for Balentine is for Residential Burglary,
Kidnapping, Aggravated Assault, Robbery, Terroristic
Threatening in the First Degree, and Battery in the Third
Degree.

John Lezell Balentine has fled the State of Arkansas and
his wereabout are unknown at this time.  The Warrant has been
entered into NCIC.

Sgt. David Lucas

Sergeant David Lucas #405
Criminal Inv. Division
Jackson Co. Sheriff's Dept.

PAGE 4

# OFFENSE REPORT

NO. _____                    KIDNAPPING                    NO. 96-11-014
                                        Classification

| 1 COMPLAINANT'S OR VICTIM'S NAME [Firm name if business] | | 2 AGE | DESCENT/RACE | SEX | DOB | 3 PHONE [Business] |
|---|---|---|---|---|---|---|
| Rosa Miller | | 39 | white | F | | |

| 4 COMPLAINANT'S OR VICTIM'S ADDRESS | 5 CITY | STATE | 6 PHONE [Residence] |
|---|---|---|---|
| | | Ar | |

| 7 COMPLAINANT'S OR VICTIM'S BUSINESS, EMPLOYMENT OR SCHOOL | 8 OBJECT OF ATTACK [Burglary, theft, assault, etc.] |
|---|---|
| Regional Healthcare | Kidnapping |

| 9 PLACE WHERE OFFENSE OCCURRED | 10 TYPE OF BUILDING [Residence, store, bank, etc.] |
|---|---|
| Diaz, Ar | Residence |

| 11 REPORTED BY | PHONE | 12 REPORTED TO | OFFICER'S ARRIVAL TIME |
|---|---|---|---|
| Complainant | | Diaz Police Dept. | |

| 13 DAY, DATE AND TIME OF OFFENSE | 14 DAY, DATE AND TIME OF REPORT |
|---|---|
| Saturday 11/9/96   approx 7:10pm | Sunday  11/10/96   1:30am |

| 15 BODILY INJURIES TO | HOSPITAL? | 16 HOW REPORTED [In person, phone, on view, other] |
|---|---|---|
| neck and arm of complainant | | phone  via  Searcy P.D. |

17 M/O [How done - force used - at what point - with what tool or weapon - other acts or trade marks]

Subject was force to go with suspect,subject was threatened with a box cutter

17A EXACT WORDS USED BY OFFENDER

| 18 VEHICLE INVOLVED IN OFFENSE [Year - color - make - model - auto license no. - year - state] | Complainant's ☐ | Suspect's |
|---|---|---|
| (1992 or 1993) Blue Ford Probe 2 door | | |

| 19 DIRECTION OF FLIGHT STREET OR ROAD | ☐ N. ☐ E. ☒ S ☐ W   ☒ AUTO ☐ FOOT   ☐ UNK. ☐ OTHER | 20 WILL COMPLAINANT PROSECUTE? yes |
|---|---|---|

| 21 NAME AND ADDRESS OF SUSPECT(S) - OR AGE DESCENT SEX DESCRIPTION | | | | | 22 CIRCLE IF SUSPECT IS |
|---|---|---|---|---|---|
| John Balentine | B/M 132 | Jackson  371 | Newport, Ar. | | Employee - Relative - Acquaintance |
| D.O.B. | -69 | 5'9" | 170 lbs  black hair  brown eyes | | |

| 23 WITNESSES NAME, | BEST CONTACT ADDRESS | AGE | BEST PHONE | OTHER PHONE | PARENT OR GUARDIAN |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |

24 NARRATIVE [Write in any available details not covered above]

Rosa Miller states when she left her residence to get in her car,
John Balentine grabbed her and forced her into her vehicle,and
was threatening her with a box cutter. Balentine had gained entry
into the residence via the south window on the west side of the
residence. It appears Balentine cut himself while gaining entry
and also left his jacket in the bedroom where he gained entry.
There is also blood on the complainants shirt which is believed
to be Balentines. Balentine also cut the complainants phone
lines. There was a screwdriver found at the residence which was
used to pry the screen off the window. Several items out the
complainants purse was found on the driveway of the residence,and
a spot of blood was found on the front step. The blood is believed
to be Balentines. A button was also found on the driveway where it was
torn from the complainants shirt.

| 25 INVESTIGATING OFFICER(S) R. Green 804/T. Tackett 411 | 26 REPORT MADE BY R. Green | DATE 11/9/ |
|---|---|---|

| 27 CASE FILED | 28 THIS CASE IS | 29 APPROVED BY |
|---|---|---|
| Yes ☐  No ☐  Cleared by arrest ☐ | Active ☐  Unfounded ☐  Inactive ☐  Other ☐ | |

FORM OR-3
PRINT GROUP A                    Use supplementary report for additional information not covered above.

# OFFENSE REPORT

NO. _____                      KIDNAPPING                      NO. 96-11-014
                                 Classification

| 1 COMPLAINANT'S OR VICTIM'S NAME (Firm name if business) | | 7 AGE | DESCENT/RACE | SEX | DOB | 3 PHONE (Business) |
|---|---|---|---|---|---|---|
| ROSA MILLER | | 39 | WHITE | F | ▮▮▮ | _____ |
| 4 COMPLAINANT'S OR VICTIM'S ADDRESS | | 5 ▮ | | | STATE | 6 PHONE (Residence) |
| ▮▮▮▮▮▮▮▮ | | | | | AR | ▮▮▮▮▮▮ |

| 7 COMPLAINANT'S OR VICTIM'S BUSINESS, EMPLOYMENT OR SCHOOL | 9 OBJECT OF ATTACK (Burglary, theft, assault, etc.) |
|---|---|
| REGIONAL  HEALTHCARE | KIDNAPPING |
| 9 PLACE WHERE OFFENSE OCCURRED | 10 TYPE OF BUILDING (Residence, store, bank, etc.) |
| DIAZ | RESIDENCE |
| 11 REPORTED BY          PHONE | 12 REPORTED TO          OFFICER'S ARRIVAL TIME |
| COMPLAINANT  ▮▮▮ | DIAZ  P.D. |

| 3 DAY, DATE AND TIME OF OFFENSE | 11 DAY, DATE AND TIME OF REPORT |
|---|---|
| SAT  11/9/96   APPROX   7:10 PM | SUN 11/10/96      11:30 AM |
| 5 BODILY INJURIES TO          HOSPITAL? | 16 HOW REPORTED (in person, phone, on view, other) |
| NECK AND ARM OF COMPLAINANT | PHONE VIA SEARCY P.D. |

7 M/O (How done - force used - at what point - with what tool or weapon - other acts or trade marks)
Subject was force to go with Suspect, Subject was threatened

7A EXACT WORDS USED BY OFFENDER
with a boxcutter.

| 8 VEHICLE INVOLVED IN OFFENSE (Year - color - make - model, auto license no., year - state) | | | | Complainant's ☒ Suspect's ☐ |
|---|---|---|---|---|
| (1992 or 1993) BLUE FORD PROBE 2 DR | | ▮▮▮▮▮▮ | | |
| 9 DIRECTION OF FLIGHT | ☐ N ☐ E ☒ S ☐ W | 20 VEH. COMPLAINANT PROSECUTE? | | |
| STREET OR ROAD | ☐ AUTO ☒ FOOT ☐ UNK. ☐ OTHER | Yes | | |

| 11 NAME AND ADDRESS OF SUSPECT(S) - OR AGE  DESCENT  SEX  DESCRIPTION | | | | 22 CIRCLE IF SUSPECT IS |
|---|---|---|---|---|
| 1  JOHN   BALENTINE  B/M   132 Jackson 371 NewPort, AR | | | | Employee - Relative - Acquaintance |
| 2                        DOB ▮▮▮ 69  5'9"  190 lbs  Black hair  Brown eyes | | | | |

| 23 WITNESSES NAME | BEST CONTACT ADDRESS | AGE | BEST PHONE | OTHER PHONE | PARENT OR GUARDIAN? |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |

24 NARRATIVE (Write in any available details not covered above)

ROSA MILLER STATES WHEN SHE LEFT HER RESIDENCE TO GET IN HER
CAR, JOHN BALENTINE GRABBED HER AND FORCED HER INTO HER
VEHICLE, AND WAS THREATENING HER WITH A BOX CUTTER.
BALENTINE HAD GAINED ENTRY INTO THE RESIDENCE VIA THE
SOUTH WINDOW ON THE WEST SIDE OF THE RESIDENCE. IT APPEARS
BALENTINE CUT HIMSELF WHILE GAINING ENTRY, AND ALSO LEFT HIS
JACKET IN THE BEDROOM WHERE HE GAINED ENTRY. THERE IS ALSO
BLOOD ON THE COMPLAINANTS SHIRT WHICH IS BELIEVED TO BE BALENTINE.
BALENTINE ALSO CUT THE COMPLAINANTS PHONE LINES. THERE WAS A

| 25 INVESTIGATING OFFICER(S) R. GREEN 504 / T. TACKETT 411 | 26 REPORT MADE BY  R. Gre_____ | DATE 11/9/96 |
|---|---|---|

| 27 CASE FILED | 28 THIS CASE IS | Active ☒ | 29 APPROVED BY |
|---|---|---|---|
| Yes ☒  No ☐ | Cleared by arrest ☐  Unfounded ☐  Inactive ☐  Other ☐ | | |

FORM P-2
PRICE GROUP A                     Use supplementary report for additional information not covered above.

STATEMENT OF:

Date: 11/9/96   Page No. 1

Rick Green DIAZ P.D. 804

I live at: ███████████████████████ AR

SCREWDRIVER FOUND AT THE RESIDENCE WHICH WAS USED
TO PRY THE SCREEN OFF OF THE WINDOW. SEVERAL ITEMS
OUT THE COMPLAINANTS PURSE WAS FOUND ON THE DRIVEWAY
OF THE RESIDENCE. AND A SPOT OF BLOOD WAS FOUND
ON THE FRONT STEP. THE BLOOD IS BELIEVED TO BE
BALENTINES. A BUTTON WAS ALSO FOUND ON THE DRIVEWAY
WHERE IT WAS TORN FROM THE COMPLAINANTS SHIRT.

_Rick Green 804_
Signature

Balentine #6 Crim Hx 11-1996  Page 25 of 25

CAUSE NO: 39532-D

THE STATE OF TEXAS                         §           320 District COURT

v.                                         §
                                           §
John Balentine                             §
AKA John Lezell B Smith                    §           POTTER COUNTY, TEXAS
                DEFENDANT'S REQUEST FOR EVIDENCE

NOW COMES John Balentine, Defendant in the above entitled and numbered cause, would state as follows:

I.

Defendant requests notice of intent from the State to introduce other crimes, wrongs or acts in its case in chief such evidence other than that arising in the same transaction. Defendant requests notice of intent from the State to introduce an extraneous crime or bad act whether or not it resulted in a final conviction in a court of record or a probated or suspended sentence, adjudication of delinquency, his general reputation, his character, an opinion regarding his character, or the circumstances of the offense for which he is being tried. Defendant requests notice of convictions or crimes the State may use to impeach the following witnesses:

the defendant

Defendant respectfully requests that these notices be given.

Respectfully requested,

JAMES D. DURHAM, JR.              PAUL HERRMANN
1008 W. 10th Ave.                 500 S. Taylor, Ste. 504, LB257
Amarillo, Texas 79101            Amarillo, TX 79101
(806) 373-3054                    806·342-4242
SBN 06284000                      SBN 095418108
Attorney for Denfendant          Attorney for Defendant

Certificate of Service

As Attorney of Record for Defendant, I do hereby Certify that a true and correct copy of the above and foregoing document was this date provided to the Attorney for the State.

Date: 2/11/99

Attorney for Defendant

FILED
CINDY GROOMER
DISTRICT CLERK

1999 FEB 11  P 2: 55

POTTER COUNTY, TEXAS

BY _____ DEPUTY   135

EXHIBIT
RX-92

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

PRE-TRIAL MOTION NO. ___3___

**MOTION FOR DISCOVERY AND**
**INSPECTION OF REPORTS, NOTES OR RECORDS**

COMES NOW Defendant and moves the Court, pursuant to Article 39.14 of the Texas Code of Criminal Procedure, to order the district attorney to permit defense counsel to inspect and copy or photograph the following items which are in the possession, custody, or control of the State or any of its agencies:

1. reports or records of Defendant made by any psychiatrist or psychologist; and

2. reports or notes of any interview of Defendant by a psychiatrist or psychologist.

In support of this Motion, Defendant states that disclosure of the requested items and any other items of favorable evidence in the possession, custody or control of the State, or any of its agencies, is necessary to protect Defendant's Fourteenth Amendment right to due process. This evidence falls under the *Brady* rule and could be exculpatory and, therefore, should be provided to Defendant for examination and/or photocopying. It is the Defendant's good faith belief, based on Defendant's investigation of the case, that the above-mentioned items of evidence are or may be in possession of the prosecution.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Court grant this Motion.

Respectfully submitted,

FILED
CINDY GROOMER
DISTRICT CLERK

1999 FEB 11 P 2: 54

POTTER COUNTY, TEXAS

BY _____, DEPUTY

Page 1

29

EXHIBIT
RX-93

James D. Durham, Jr.
1008 W. 10th Ave.
Amarillo, Texas 79101-3113
(806) 373-3054
Fax# (806) 373-7328

Paul Herrmann
500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas 79101
(806)  342-4242
Fax# (806) 371-0780

_____
James D. Durham, Jr.
State Bar No. 06284000
Attorney for Defendant

_____
Paul Herrmann
State Bar No.09541810
Attorney for Defendant


### CERTIFICATE OF DELIVERY

     I, the undersigned, hereby certify that on _____,1999,
a true and correct copy of the foregoing document was delivered
in accordance with the Texas Rules of Appellate and Criminal
Procedure to the Office of the District Attorney in and for
Potter County, Texas.

Page 2

30

2

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

### ORDER ON PRE-TRIAL MOTION NO. 3
### (DEFENDANT'S MOTION FOR
### DISCOVERY AND INSPECTION OF REPORTS, NOTES OR RECORDS)

On _____, 1999, came on to be heard Defendant's Motion for Discovery and Inspection of Reports, Notes or Records, and after due consideration, the Court is of the opinion, and it is hereby ORDERED, that said Motion is:

_____ GRANTED.

_____ DENIED, to which ruling Defendant timely objects.

SIGNED _____, 1999.

_____
Judge Presiding

FILED
CINDY GROOMER
DISTRICT CLERK

'99 MAR 23 A 10: 19

POTTER COUNTY, TEXAS

BY _____ DEPUTY

ORDER NO. 12
ON MOTION FOR DISCOVERY: REPORTS, NOTES, RECORDS

Page 1

253492

31

3

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### PRE-TRIAL MOTION NO.    5
### MOTION FOR DISCOVERY OF PUNISHMENT EVIDENCE

COMES NOW Defendant and moves this Court to order the Potter County Criminal District Attorney to disclose the following:

1. The names of witnesses, or identification of tangible evidence, related to any unadjudicated offenses which the State intends to offer in the punishment hearing of this cause;

2. Copies of any documents the State expects or intends to be offered in the punishment hearing in this cause which purport to represent criminal adjudications;

3. The names and present locations of any witnesses whom the State intends to call to testify about the bad reputation and/or character of the Defendant, or any characteristics which might be relevant to the jury's consideration of the special issues on punishment in this cause;

4. The names and present locations of any witnesses who might testify in the punishment hearing in this cause regarding evidence of the Defendant's intent to kill, attempt to kill, or contemplation that life would be taken relevant to the instant offense;

5. The names and present locations of any expert witnesses whom the State intends to call in the punishment hearing in this cause, and a summary of the expected nature of the expert's testimony;

6. The names and locations of any witnesses whom the State intends to call to testify about the Defendant's propensity for violence or that Defendant poses a threat to society;

7. Any statement, either oral or written, made by or attributed to the Defendant, and which the State intends to offer in the punishment phase of the trial, which reflect upon the desire to kill another or the ability to kill another; and

8. Any evidence whether written or oral, relating to any efforts (or lack of effort) by the Defendant to rehabilitate himself, or expressions of remorse (or lack of remorse) related to the instant offense alleged to have been committed by the Defendant.

FILED
CINDA ROEDER
DISTRICT CLERK

1999 FEB 11  P 2: 55

POTTER COUNTY, TEXAS

BY _____, DEPUTY



EXHIBIT
RX-94

Defendant would show the Court that the above-requested information is in the possession or control of the State of Texas and its agents. The Defendant has no means by which to obtain the information to properly prepare to defend this cause in the punishment hearing.

Texas statutes provide that the prosecution and the defense may present any relevant evidence for the jury to consider in determining the proper answers to the punishment issues, and may present any arguments for or against the imposition of the death penalty. To properly prepare and test any evidence offered by the State in support of affirmative answers to the punishment special issues, Defendant must be able to investigate and test the competency of said evidence.

WHEREFORE, premises considered, Defendant prays that the Court grant this motion.

Respectfully submitted,

Paul Herrmann
500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas  79101
(806)342-4242

Paul Herrmann
State Bar No.09541810
Attorney for Defendant

James D. Durham, Jr.

Attorney for Defendant
1008 W. 10th Avenue
Amarillo, Texas 79101-3113
(806) 373-7328
State Bar No. 06284000

Page 2

39

2

## CERTIFICATE OF DELIVERY

    I, the undersigned, hereby certify that on _____ ,1999, a true and correct copy of the foregoing document was delivered in accordance with the Texas Rules of Appellate and Criminal Procedure to the Office of the District Attorney in and for Potter County, Texas.

Page 3

**40**

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

## ORDER ON PRE-TRIAL MOTION NO. __5__
### (DEFENDANT'S MOTION FOR
### DISCOVERY OF PUNISHMENT EVIDENCE)

On _____, 1999, came on to be heard Defendant's Motion for Discovery of Punishment Evidence and, the Court having heard the evidence and argument of counsel, IT IS ORDERED that said motion is hereby:

_____ GRANTED.

_____ DENIED, to which ruling of the Court the Defendant timely objected.

SIGNED _____, 1999.

_____
Judge Presiding

ORDER NO. 17
ON MOTION FOR DISCOVERY OF PUNISHMENT EVIDENCE

JUDY GROOME
DISTRICT CLERK

1999 MAR 23  A 10: 19

POTTER COUNTY, TEXAS

BY _____ DEPUTY

Page 1

41

253494

4

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

PRE-TRIAL MOTION NO. 6

MOTION TO DISCOVER STATE'S EXTRANEOUS
AND/OR UNADJUDICATED ACTS OF MISCONDUCT
TO BE OFFERED AT GUILT OR PUNISHMENT

COMES NOW Defendant and makes this Motion to Discover State's Extraneous and/or Unadjudicated Acts of Misconduct to be Offered at Guilt or Punishment, and as grounds therefore would respectfully show the Court as follows:

I

If the Defendant does not have sufficient time in order to investigate any and all extraneous and/or unadjudicated acts of misconduct that the State may present at trial in this cause, Defendant will be denied his rights in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as Article 1, §10, §13, §15 and §19 of the Texas Constitution.

In order for Defendant's counsel to effectively investigate and defend against any and all extraneous and/or unadjudicated acts of misconduct that the State may present at trial in this cause, counsel is entitled to discovery of such acts with sufficient notice. Granting Defendant's request for discovery will avoid any last minute investigation which may hinder Defendant's counsel from properly conducting voir dire and other responsibilities during trial. In this way, Defendant may be afforded effective assistance of counsel.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this court require the State to disclose any and all extraneous and/or unadjudicated acts of misconduct to Defendant's counsel on or before _____, 1999.

FILED
CHRIS DOPPER
DISTRICT CLERK

1999 FEB 11 P 2: 55

POTTER COUNTY, TEXAS

BY _____, DEPUTY

42

Page 1



EXHIBIT
RX-95

Respectfully submitted,

James D. Durham, Jr.                    Paul Herrmann
1008 W. 10th Ave.                       500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas 79101-3113              Amarillo, Texas 79101
(806) 373-3054                          (806) 342-4242
Fax # (806) 373-7328                    Fax # (806) 371-0780

_____                 _____
James D. Durham, Jr.                     Paul Herrmann
State Bar No. 06284000                   State Bar No. 09541810
Attorney for Defendant                   Attorney for Defendant


## CERTIFICATE OF DELIVERY

    I, the undersigned, hereby certify that on _____ 2/11 _____,
1999, a true and correct copy of the foregoing document was
delivered in accordance with the Texas Rules of Appellate and
Criminal Procedure to the office of the District Attorney in and
for Potter County, Texas.

_____
James D. Durham, Jr.
Attorney for Defendant


Page 2

**43**

2

NO. 39,532-D

| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
|---|---|---|
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

ORDER ON PRE-TRIAL MOTION NO.   6
(DEFENDANT'S MOTION TO DISCOVER
STATE'S EXTRANEOUS AND/OR UNADJUDICATED ACTS
OF MISCONDUCT TO BE OFFERED AT GUILT OR PUNISHMENT)

On ___3/22___ , 1999, came on to be heard Defendant's Motion to Discover State's Extraneous and/or Unadjudicated Acts Of Misconduct to be Offered at Guilt or Punishment, and after due consideration, the Court is of the opinion, and it is hereby ORDERED, that said Motion is:

___✓___ GRANTED, and the State is hereby ORDERED to disclose all relevant conduct of the Defendant that it intends to offer against the Defendant an or before ___3/27___ , 1999, or such evidence will not be admitted before this jury.

_____ DENIED, to which ruling Defendant timely notes his objection.

SIGNED ___3/22___ , 1999.

_____
Judge Presiding

FILED
CINDY GROOMER
DISTRICT CLERK

1999 MAR 23  A 11: 19

POTTER COUNTY, TEXAS

BY_____ DEPUTY

ORDER NO. 14
ON MOTION FOR DISCOVERY, EXTRANEOUS/UNADJUDICATED                    PAGE 1

253495

44

3

NO. 39,532-D

| THE STATE OF TEXAS | § | IN THE 320ᵀᴴ DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### PRE-TRIAL MOTION NO. 7
### MOTION FOR DISCOVERY OF EVIDENCE OF
### PRIOR CONVICTIONS TO BE USED FOR IMPEACHMENT

COMES NOW Defendant pursuant to Rule 609 (a) & (f) of the Texas Rules of Criminal Evidence and files this motion to require the State to disclose any evidence it has concerning prior convictions which it intends to offer as impeachment of the Defendant.

Since such evidence is only admissible for attacking the credibility of said witness, and only if such prior conviction was a felony or involved moral turpitude, the defendant requests the State to advise the Defendant of the State's intent to use such evidence prior to trial in order that Defendant may be given a full opportunity to contest the introduction of such evidence.

WHEREFORE, premises considered, Defendant respectfully requests the Court to require the State to disclose any evidence concerning prior convictions it intends to offer in this case as impeachment of a witness. Defendant further prays that after said disclosure, the Court exclude the proffered evidence of prior convictions and rule same inadmissible in the trial of this cause. In the alternative, Defendant requests that the Court hold a hearing prior to the trial of this cause to determine the admissibility of the testimony concerning said matter, and that after said hearing, the Court exclude the proffered evidence of said matters. In the alternative, if the Court permits the introduction of said testimony, Defendant requests that the Court inquire of the State the purpose for its admission and, thereafter, that the Court instruct the jury that said evidence was admitted for said limited purpose and that said evidence may only be considered for the purpose for which it was admitted.

CINDY GROOMER
DISTRICT CLERK

1999 FEB 11 P 3: 23

POTTER COUNTY, TEXAS

BY _____ DEPUTY   **45**



EXHIBIT
RX-96

Respectfully submitted,

James D. Durham, Jr.
1008 W. 10th Ave.
Amarillo, Texas 79101-3113
(806) 373-3054
Fax # (806) 373-7328

Paul Herrmann
500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas 79101
(806) 342-4242
Fax # (806) 371-0780

_____
James D. Durham, Jr.
State Bar No. 06284000
Attorney for Defendant

_____
Paul Herrmann
State Bar No. 09541810
Attorney for Defendant

## CERTIFICATE OF DELIVERY

I, the undersigned, hereby certify that on _____,
1999, a true and correct copy of the foregoing document was
delivered in accordance with the Texas Rules of Appellate and
Criminal Procedure to the office of the District Attorney in and
for Potter County, Texas.

_____
James D. Durham, Jr.
Attorney for Defendant

Page 2

**46**

2

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### ORDER ON PRE-TRIAL MOTION NO. 7
### (DEFENDANT'S MOTION FOR DISCOVERY OF
### EVIDENCE OF PRIOR CONVICTIONS FOR IMPEACHMENT)

On _____, 1999, came on to be heard
Defendant's Motion for Discovery of Evidence of Prior convictions
for Impeachment, and the Court having heard the evidence and
argument of counsel, IT IS ORDERED that said motion is hereby
_____ GRANTED.

_____ DENIED, to which ruling of the Court the Defendant
timely objected.

SIGNED _____8/22/99_____, 1999.

_____
Judge Presiding

ORDER NO. 16
ON MOTION FOR DISCOVERY, PRIOR CONVICTIONS, IMPEACH

**253496**

FILED
CINDY GROOMER
DISTRICT CLERK

1999 MAR 23  A 11: 19

POTTER COUNTY, TEXAS          Page 1

BY_____, DEPUTY          47

3

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| v. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### MOTION NO. 8
### MOTION IN LIMINE - CHARACTER OF COMPLAINANT - VICTIM IMPACT

COMES NOW the Defendant and moves in limine before trial for an order instructing the District Attorney, his representatives and witnesses, to refrain from making any direct or indirect reference whatever, at trial before the jury to irrelevant personal characteristics of the deceased or to the emotional impact of the death of the deceased on friends and family.

In Booth v. Maryland, 107 S.Ct. 2529, 2533 (1987), the Supreme Court held that evidence which emphasized the personal qualities of the victim, the emotional impact of the crime on the family of the victim, and the family members' opinions and characteristics of the crime and the defendant, was irrelevant to the capital sentencing decision and created a constitutionally unacceptable risk that the jury would impose the death penalty in an arbitrary and capricious manner.

In South Carolina v. Gathers, 109 S.Ct. 2207, 2211 (1989), the Court agreed that the trial court committed reversible error in placing before the jury personal characteristics of the victim which were irrelevant to the circumstances of the crime.

III

It has long been recognized in Texas that it is error for the State to raise in the first instance the peaceable character of the deceased. Armstrong v. State, 718 S.W.2d 686, 695 (Tex.Cr.App. 1985).

IV

Because it is irrelevant and therefore inadmissible, the Defendant moves in limine that the District Attorney, his representatives and witnesses, refrain from direct or indirect reference to the

FILED
THIS DAY OF

DISTRICT CLERK

POTTER COUNTY, TEXAS

BY _____ DEPUTY

48


EXHIBIT
RX-97

following matters, at voir dire, in the opening or closing statements, in the evidence portion of the trial, and otherwise:

1. Evidence or assertions that the deceased was peaceable, law-abiding, truthful, honest, a good person, a good family member, a good provider, or possessed positive personal qualities;

2. Evidence or assertions about the deceased's personal characteristics which are irrelevant to the guilt or innocence of the Defendant or to his punishment;

3. Evidence or assertions about the emotional impact of the crime on the family of the deceased;

4. Evidence or assertions of the deceased's family members' opinions or characteristics of the alleged offense; and/or

5. Evidence or assertions of the deceased's family members' opinions and characteristics of the Defendant.

V

Any ordinary objection during the course of trial, even sustained with proper instructions to the jury, will not remove the harmful effect of this inadmissible evidence, in view of its highly prejudicial content.

WHEREFORE, the Defendant prays that the Court order and instruct the District Attorney, his representatives and his witnesses, not to elicit or give testimony respecting, allude to, cross-examine respecting, mention, or refer to any of the matters specified above, in the presence and hearing of the jury until a hearing has been held outside the presence of the jury to determine the relevance and admissibility of these matters.

Page 2

**49**

2

Respectfully submitted,

James D. Durham, Jr.                     Paul Herrmann
1008 W. 10th Ave.                        500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas 79101-3113               Amarillo, Texas 79101
(806) 373-3054                           (806) 342-4242
Fax # (806) 373-7328                     Fax # (806) 371-0780


James D. Durham, Jr.                     Paul Herrmann
State Bar No. 06284000                   State Bar No. 09541810
Attorney for Defendant                   Attorney for Defendant


## CERTIFICATE OF DELIVERY

   I, the undersigned, hereby certify that on _____,
1999, a true and correct copy of the foregoing document was
delivered in accordance with the Texas Rules of Appellate and
Criminal Procedure to the office of the District Attorney in and
for Potter County, Texas.


James D. Durham, Jr.
Attorney for Defendant

Page 3

**50**

3

NO. 39,532-D

| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### ORDER NO. 8
### ORDER ON DEFENDANT'S MOTION IN LIMINE –
### CHARACTER OF THE COMPLAINANT – VICTIM IMPACT

On _____, 1999, came on to be heard the
Defendant's Motion in Limine – Character of the Complainant –
Victim Impact, and after due consideration, the Court is of the
opinion, and it is hereby ORDERED, that said Motion is:

_____ GRANTED as to guilt/innocence

_____ DENIED, to which ruling Defendant timely excepts.

SIGNED _____3/22/99_____, 1999.

_____
Judge Presiding

FILED
CINDY GROOMER
DISTRICT CLERK

1999 MAR 23 A 11: 19

POTTER COUNTY, TEXAS
BY _____ DEPUTY

253497

51

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### PRE-TRIAL MOTION NO. 12
### MOTION TO DECLARE THE TEXAS CAPITAL
### SENTENCING SCHEME UNCONSTITUTIONAL AND
### TO PRECLUDE IMPOSITION OF THE DEATH PENALTY

Comes now the Defendant, who challenges the constitutionality of the Texas death penalty on the following constitutional grounds.

I

**THE STATUTORY "PENRY" SPECIAL ISSUE IN TEX. CODE CRIM. PRO. ARTS. 37.071 & 37.0711 IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE.**

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. See, e.g., Walton v. Arizona, 110 S. Ct. 3047, 3055 (1990) (State's "method of allocating the burdens of proof" during capital sentencing phase cannot "lessen the State's burden...to prove the existence of aggravating factors"). In order to understand why Walton applies to the statutory "Penry" special issue, this Court must recognize that this special issue is a conduit for aggravating (as well as mitigating) factors. By asking jurors to determine whether there are "sufficient...mitigating circumstances," TEX. CODE CRIM. PRO. Art. 37.071, § 2(e), the statutory special issue in effect tells jurors to consider any possible aggravating factors that may outweigh the mitigating factors present in the case. Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute. Cf. Johnson v. Texas, 113 S. Ct. 2568 (1993) (describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances). Because the statute

Page 1

CINDY GROOMER
DISTRICT CLERK

1999 FEB 11 P 2: 55

POTTER COUNTY, TEXAS

BY_____, DEPUTY

60



EXHIBIT

RX-98

is silent about whether the State or the defense has the burden of proof on aggravating factors, and, moreover, because the language of the special issue implies that the burden to disprove aggravating circumstances in on the defense, the statute is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

## II

**THE STATUTORY "PENRY" SPECIAL ISSUE IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT PERMITS THE VERY TYPE OF OPEN-ENDED DISCRETION CONDEMNED BY THE UNITED STATES SUPREME COURT IN FURMAN V. GEORGIA.**

In Furman v. Georgia, 408 U.S. 238 (1972), in which the Supreme Court struck down capital punishment as it then was being administered, the chief constitutional infirmity that the controlling members of the Court pointed to in their respective concurring opinions was arbitrariness. In particular, the Court condemned the open-ended, unstructured discretion that was given to capital sentencing juries. See also Gregg v. Georgia, 428 U.S. 153 (1976); Spaziano v. Florida, 468 U.S. 447, 460-64 (1984).

In the years following the Supreme Court's decision in Penry v. Lynaugh, 109 S. Ct. 2934 (1989), the Texas Legislature enacted a new capital sentencing scheme that sought to cure the constitutional defect in the former capital sentencing scheme identified by the Court in Penry. The new statutory "Penry" special issue contained in TEX. CODE CRIM. PRO. Arts. 37.071 & 37.0711 (Vernon 1994), provides as follows:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Five members of the Supreme Court have, directly or indirectly, condemned an open-ended, unstructured capital sentencing instruction -- such as Texas' statutory "Penry" special

Page 2

61

issue -- as violative of the Eighth and Fourteenth Amendments to the United States Constitution.  See Penry v. Lynaugh, 109 S. Ct. 2934, 2969 (1989) (Scalia, J., dissenting, joined by Rehnquist, C.J., White, J., & Kennedy, J.) ("In holding that the jury had to be free to deem Penry's mental retardation and sad childhood for whatever purpose it wished, the Court has come full circle, not only permitting but requiring what Furman once condemned."); Graham v. Collins, 113 S.Ct. 892, 903-15 (1993) (Thomas, J., concurring) ("Penry reintroduces the very risks that we had sought to eliminate through the simple directive that States in all events provide rational standards for capital sentencing.").   In dicta, Justice Thomas has explicitly suggested that the type of sentencing scheme in operation at Appellant's trial violates Furman.  See Graham, 113 S.Ct. at 913 n. 9 (discussing the present Texas capital sentencing statute).

Rather than submit such an open-ended, unstructured sentencing issue, the Eighth Amendment requires a trial court in the sentencing phase of a capital case to instead submit a charge that adequately structures the jury's sentencing discretion regarding mitigating and aggravating factors.  Cf. Gregg v. Georgia, 428 U.S. 153 (1976) (discussing Georgia's post-Furman capital sentencing statute).   Unless such an instruction is submitted in this case, a death sentence returned by Defendant's jury would violate the Eighth and Fourteenth Amendments.

### III

**TEXAS' STATUTORY CAPITAL SENTENCING SCHEME IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT DOES NOT PERMIT MEANINGFUL APPELLATE REVIEW.**

As discussed above, the pivotal sentencing issue in Texas capital cases -- the statutory "Penry" special issue -- does not specify the types of mitigating or aggravating factors relevant to a capital sentencing jury's deliberations during the punishment phase.   Rather, the jury is simply asked whether there is "sufficient mitigating circumstance or circumstances" to warrant a

62

3

life sentence rather than a death sentence.  See TEX. CODE CRIM. PRO. Arts. 37.071 & 37.0711 (Vernon 1994).  In a larger sense, however, the "Penry" special issue requires Texas juries to perform the same functions that other states' post-Furman capital sentencing juries perform: (i) the threshold findings of particular aggravating and mitigating circumstances; and (ii) the balancing process, whereby jurors determine whether the mitigating factors outweigh aggravating factors.  Cf. Gregg v. Georgia, 428 U.S. 153 (1976) (discussing Georgia's post-Furman statute).

Defendant contends that Texas' unstructured sentencing scheme is unconstitutional because it does not permit meaningful appellate review, which is not only required by a Texas statute[1] but also is a prerequisite to a constitutionally implemented capital sentencing scheme.[2]  Because the second statutory special issue is open-ended and unstructured -- i.e., not enumerating a list of mitigating and aggravating factors and not requiring jurors to make specific "findings" in this regard -- the Court of Criminal Appeals has no way to know which aggravating and mitigating factors that jurors considered.  Thus, the appellate court has no way to know how or whether the jury considered all of the constitutionally relevant mitigating evidence offered at trial.  In this way, meaningful appellate review is impossible.  The Supreme Court has recognized that an appellate court is in a virtually impossible position to review a jury's consideration of mitigating and aggravating evidence without knowing which factors the jury in fact considered.  See Sawyer v. Whitley, 112 S. Ct. 2514, 2522-23 (1992) (noting "how difficult [a] task" a reviewing court faces in "assess[ing] how jurors" reacted to mitigating and aggravating evidence "particularly considering the breadth of those factors that a jury...must be allowed to consider" without knowing how jurors

---

[1] See TEX. CODE CRIM. PRO. Art. 44.251 (Vernon 1994).

[2] See Gregg v. Georgia, 428 U.S. 153, 195, 206 (1976); Parker v. Dugger, 498 U.S. 308, 321 (1991); Jurek v. Texas, 428 U.S. 262, 276 (1976); see also Stringer v. Black, 112 S. Ct. 1130, 1136 (1992).

Page 4

63

4

actually considered the totality of the evidence).[3] Because the Court of Criminal Appeals is required by statute and by the Constitution to review the sufficiency of the evidence supporting a jury's negative answer to the statutory "Penry" special issue, the open-ended and unstructured nature of Arts. 37.071 & 37.0711, which prevents meaningful appellate review, renders the Texas capital sentencing statute unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

IV

**ARTICLE 37.071'S SECOND SPECIAL ISSUE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The second statutory special issue contained in TEX. CODE CRIM. PRO. Art. 37.071, § 2(b) (Vernon 1994) reads as follows:

> [I]n cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

Defendant contends that this statutory special issue is facially unconstitutional because of the statute's use of the language "or *anticipated that a human life would be taken.*" Such language -- which permits a capital sentencing jury to impose a death sentence based a finding that the defendant found guilty under the "law of the parties" simply "anticipated" that death might occur -- violates the Eighth Amendment principle announced by the Supreme Court in Tison v. Arizona, 481 U.S. 137 (1987), and Enmund v. Florida, 458 U.S. 782 (1982).

---

[3] Sawyer did not address the exact issue in this case. Rather, the Court was speaking of the difficulty of an appellate court's attempted hypothetical re-creation of a capital sentencing phase involving evidence that trial counsel failed to introduce. However, for purposes of the present case, the Court's discussion is highly apposite. The point both in Sawyer and in this case is that without actually knowing whether and how a particular jury considered evidence during a capital sentencing phase, an appellate court cannot accurately assess the jury's decision-making.

Page 5

V

**THE TEXAS CAPITAL SENTENCING STATUTE'S DEFINITION OF "MITIGATING EVIDENCE" IS UNCONSTITUTIONAL BECAUSE IT LIMITS THE EIGHTH AMENDMENT CONCEPT OF "MITIGATION" TO FACTORS THAT RENDER A CAPITAL DEFENDANT LESS MORALLY "BLAMEWORTHY" FOR COMMISSION OF THE CAPITAL MURDER.**

The present Texas capital sentencing statute defines "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." TEX. CODE CRIM. PRO. Arts. 37.071, § 2(e)(4) & 37.0711, § 3(f)(3) (Vernon 1994). This definition of "mitigating evidence" is unconstitutionally narrow. The Supreme Court has held that constitutionally relevant mitigating evidence is not simply that type of mitigating evidence that relates to a capital defendant's moral culpability or blameworthiness for the crime,[4] but also includes any mitigating evidence relevant to a defendant's character, history, or circumstances of the crime that militates in favor of a life sentence. See, e.g., Skipper v. South Carolina, 476 U.S. 1 (1986). Numerous types of constitutionally relevant mitigating evidence thus have nothing to do with a capital defendant's moral culpability or blameworthiness -- such as a history of positive character traits, kindness shown toward children, or artistic talent.[5] Although the statutory "Penry" special issue speaks of "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant," Art. 37.071, §2 (e), the statute's separate definition of "mitigating evidence" limits jurors' consideration of such evidence to those mitigating factors that specifically implicate the defendant's moral blameworthiness.

---

[4] "Blameworthiness" and "culpability" are exact synonyms. See WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 353 (1989).

[5] Put another way, a capital defendant who has tremendous artistic talent is no less morally culpable or blameworthy for committing a horrible, senseless capital murder crime than a capital defendant who committed an identical crime but who does not possess such artistic talent. However, a rational jury may be less willing to sentence the talented capital defendant to death because his talents are a redeeming quality.

Page 6

Therefore, the statute's limited definition of "mitigating evidence" violates the Eighth and Fourteenth Amendments to the United States Constitution.

<div align="center">VI</div>

**THIS COURT MUST PRECLUDE THE IMPOSITION OF THE DEATH PENALTY ON DEFENDANT BECAUSE, AS PRESENTLY ADMINISTERED IN TEXAS, CAPITAL PUNISHMENT IS CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 13 OF THE TEXAS CONSTITUTION.**

## A. Federal constitutional claim

Rather than engage in a lengthy exposition about why capital punishment is _per se_ unconstitutional as it is presently administered, Defendant adopts the arguments of Justice Harry Blackmun recently made in his dissent from denial of certiorari in the Texas capital case of _Callins v. Collins_, No. 93-7054, ___ U.S. ___, 62 U.S.L.W. 3546 (U.S. Feb. 22, 1994). Justice Blackmun, who dissented in _Furman_ and who voted in the majority in the 1976 cases affirming various states' post-_Furman_ death penalty statutes, _see_, _e.g._, _Jurek v. Texas_, 428 U.S. 262 (1976), did not condemn capital punishment in the abstract as a cruel and unusual method of punishment that offends "evolving standard of decency." _Cf._ _Gregg v. Georgia_, 428 U.S. 153, 227-41 (1976) (Brennan & Marshall, JJ., dissenting). Rather, Justice Blackmun contended, _inter alia_, that capital sentencing procedures employed in the post-_Furman_ era are _per se_ unconstitutional because they are the product of paradoxical constitutional commands: on the one hand, jurors must be free to consider any and all types of constitutionally relevant mitigating evidence, while, on the other hand, there must be "structured discretion" in sentencing, as required by Furman. _See_ _Callins_, _supra_, slip op., at 2 ("Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death ... can never be achieved without compromising an equally essential component of fundamental fairness -- individualized sentencing.").

Page 7

66

7

Thus the death penalty as presently administered in Texas is per se unconstitutional under the Eighth and Fourteenth Amendments. In particular, the present Texas capital sentencing scheme, including the statutory "Penry" special issue, is unconstitutional because it permits the very type of open-ended discretion condemned by the Supreme Court in Furman. Accordingly, this Court should preclude the State from seeking the death penalty against Defendant, at least so long as the present capital sentencing scheme remains in effect.

**B.  Texas constitutional claim**

Although Defendant has cited federal Eighth Amendment authority supra, Defendant intends that this Court should separately consider Defendant's claim under the Texas and U.S. Constitutions.  The Court can and should interpret the Texas Constitution in a more expansive manner than the federal Constitution.  See, e.g., Parrish v. State, ___ S.W.2d ___, No. 0490-91, (Tex.Crim.App. Jan. 26, 1994); Richardson v. State, ___ S.W.2d ___, No. 901-92 (Tex.Crim.App. Oct. 27, 1993); Heitman v. State, 815 S.W.2d 681 (Tex.Crim.App. 1991); see also Ex parte Herrera, ___ S.W.2d ___, 1993 Tex.Crim.App. LEXIS 100 at *2 (Tex.Crim.App. May 11, 1993) (Maloney, J., dissenting, joined by Baird, Clinton & Overstreet, JJ.); Judge Rusty Duncan, *Terminating the Guardianship: A New Role for State Court*, 19 ST. MARY'S L.J. 809 (1988).

Particularly noteworthy is the fact the Texas Constitution proscribes "cruel or unusual punishments," while the U.S. Constitution proscribes "cruel and unusual punishments." Obviously, the Texas Constitution, based on its plain language, was intended offer broader protections than the U.S. Constitution. Cf. People v. Anderson, 493 P.2d 880, 883-87 (Cal. 1972) (attributing textual significance to similar state constitutional proscription against "cruel or unusual punishments").

VII

**ART. 37.071'S "10-12 RULE" (REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE**

Page 8

67

FIRST OR SECOND SPECIAL ISSUES AND AT LEAST TEN "YES" VOTES FOR THE JURY TO RETURN AN AFFIRMATIVE ANSWER TO THE THIRD SPECIAL ISSUE) VIOLATES THE EIGHTH AMENDMENT PRINCIPLE IN MILLS V. MARYLAND.

Defendant contends that the "10-12 provision" in Art. 37.071, § 2(d)(2) & § 2(f)(2), violates the constitutional principles discussed in Mills v. Maryland, 486 U.S. 367 (1988); see also McCoy v. North Carolina, 494 U.S. 294 (1990). The "10-12 provision" requires that, in order for the jury to return answers to the special issues that would result in a life sentence, (i) at least ten jurors must vote "no" in answering the first special issue, (ii) at least ten jurors must vote "no" in answering the second special issue, or (iii) at least ten jurors must vote "yes" in answering the third special issue.[6] Defendant contends that this "10-12 provision" violates the Eighth and Fourteenth Amendments because there is a reasonable possibility that, under the present Texas capital sentencing scheme, all twelve jurors in a capital case could believe that a life sentence would be appropriate under state law, but, because at least ten jurors could not collectively agree on their answer to any one of the special issues, the jury could not return a life sentence.

As an illustration, consider the following hypothetical circumstance: at trial, four of the twelve jurors conclude that, as consequence of a capital defendant's positive character traits, he would not pose a future threat to society; thus, those jurors individually vote to answer the first special issue negatively.[7] Assume that those four jurors also believe, however, that the defendant possessed the requisite *mens rea* under the second special issue (the "parties" special issue) and that there is insufficient

---

[6] There are equivalent "10-12" provisions in Art. 37.0711, which contains four special issues. This motion applies equally to the constitutional infirmity in Art. 37.0711.

[7] Of course, a "no" answer to the "future dangerousness" special issue — a finding that a capital defendant does not pose a future threat to society — is a constitutionally recognized mitigating factor. See Franklin v. Lynaugh, 487 U.S. 164 (1988); Skipper v. South Carolina, 476 U.S. 1 (1986).

Page 9

**68**

9

mitigating evidence as a whole to result in an affirmative answer to the third special issue (the "Penry" special issue).

Further suppose that four other jurors believe that the same capital defendant did not possess the requisite *mens rea* under the second special issue and, thus, those four jurors individually vote to answer the parties special issue negatively.[8] Assume, however, that those four jurors believe that the capital defendant does pose a future danger to society and that those four jurors also believe that the defendant's mitigating evidence, as a whole, is insufficient to result in a "no" vote to the statutory "Penry" special issue.

Finally, suppose that the four remaining members of the jury conclude, as a result of the capital defendant's mitigating evidence of a troubled childhood,[9] that the statutory Penry special issue should be answered affirmatively. However, for whatever reason, assume that those four jurors also believe that the capital defendant would pose a future threat to society and also that the defendant possessed the requisite *mens rea* under the "parties" special issue. Thus, those four remaining jurors only vote in the defendant's favor on the third special issue.

Such a breakdown is graphically illustrated as follows:

| | 1st SPECIAL ISSUE | 2nd SPECIAL ISSUE | 3rd SPECIAL ISSUE |
|---|---|---|---|
| Juror 1: | NO (life) | YES (death) | NO (death) |
| Juror 2: | NO (life) | YES (death) | NO (death) |
| Juror 3: | NO (life) | YES (death) | NO (death) |
| Juror 4: | NO (life) | YES (death) | NO (death) |
| Juror 5: | YES (death) | NO (life) | NO (death) |
| Juror 6: | YES (death) | NO (life) | NO (death) |
| Juror 7: | YES (death) | NO (life) | NO (death) |
| Juror 8: | YES (death) | NO (life) | NO (death) |
| Juror 9: | YES (death) | YES (death) | YES (life) |
| Juror 10: | YES (death) | YES (death) | YES (life) |
| Juror 11: | YES (death) | YES (death) | YES (life) |
| Juror 12: | YES (death) | YES (death) | YES (life) |

---

[8] A capital defendant's lack of such a *mens rea* is, of course, a constitutionally relevant circumstance. Cf. Tison v. Arizona, 481 U.S. 137 (1987).

[9] Of course, the second ("Penry") special issue also implicates a potentially limitless range of mitigating factors, including "troubled background" evidence. See Penry v. Lynaugh, 492 U.S. 302 (1989).

Page 10

**69**

Hypothetically, all twelve members of the jury in such a case individually agree that *one of the three statutory mitigating factors* has been established and that, under state law, a life sentence is appropriate.  That is, all twelve jurors could have believed that a mitigating factor exists which, under state law, should have caused the capital defendant to be sentenced to life. However, Texas law forbids the imposition of a death sentence *only if* ten members of a capital sentencing jury agree collectively as to *which* statutory mitigating factor has been established; because such jurors could disagree about which of the three factors has been established, however, they are left without guidance as to how to proceed.   In the absence of such guidance, there is a constitutionally unacceptable risk that Texas capital sentencing juries may feel coerced by a "majority rules" mentality into returning answers to the special issues that would result in a death sentence.  A death sentence imposed by a jury so instructed is too likely a product of arbitrary decision-making for the Constitution to tolerate.  <u>See McKoy v. North Carolina</u>, <u>supra</u>; <u>Mills v. Maryland</u>, <u>supra</u>.

### VIII

**THE TEXAS CAPITAL SENTENCING STATUTE'S FAILURE TO INFORM THE JURY THAT A SINGLE HOLDOUT JUROR ON ANY SPECIAL ISSUE WOULD RESULT IN AN AUTOMATIC LIFE SENTENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Texas capital sentencing statutes provide that a deadlocked jury (even based on a single holdout juror) during the capital sentencing phase requires the trial court to automatically sentence the defendant to life.  <u>See</u> TEX. CODE CRIM. PRO. Arts. 37.071, § 2(g) & 37.0711, § 3(g) (Vernon 1994).  However, the jury cannot be informed of this provision of the law.  <u>See</u> Arts. 37.071, § 2(a) & 37.0711, § 3(i).  Such a denial of this aspect of the law violates the Eighth and Fourteenth Amendments to the United States Constitution.  <u>See</u> <u>State v. Williams</u>, 392 So.2d 619, 631 (La. 1980) (on rehearing); <u>State v. Ramseur</u>, 524 A.2d 188, 284 (N.J. 1987).  <u>Kubat v. Thieret</u>, 867 F.2d 351, 369-73 (7th Cir.),

11

<u>cert.</u> <u>denied</u>, 493 U.S. 874 (1989); <u>see</u> <u>also</u> <u>Andres v. United</u>
<u>States</u>, 333 U.S. 740, 752 (1948) (federal capital case).

IX

**IN VIEW OF THE MANY DIFFERENT CAPITAL SENTENCING SCHEMES
THAT HAVE BEEN IN OPERATION IN TEXAS SINCE 1989, THE
TEXAS DEATH PENALTY HAS BEEN ARBITRARILY IMPOSED AND,
THUS, IS UNCONSTITUTIONAL UNDER THE EIGHTH AMENDMENT AND
EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND
ANALOGOUS PROVISIONS IN THE TEXAS CONSTITUTION.**

**A. Background**

In order to understand the basis of this claim, this Court
should recognize the large number of different capital sentencing
schemes that have been operation in Texas capital cases since the
early 1970s when the modern, "post-<u>Furman</u>" death penalty statutes
were enacted.[10] Of the many hundreds of persons sentenced to death
in Texas since the "modern" capital sentencing statute was enacted,
the vast majority were sentenced under jury instructions that
simply tracked the unadorned "special issues" contained in TEX. CODE
CRIM. PRO. Art. 37.071 (Vernon's 1989) verbatim. <u>See</u> <u>generally</u> P.M.
McClung, JURY CHARGES FOR TEXAS CRIMINAL PRACTICE 75-78 (rev. ed. 1981).
After the landmark decision in <u>Penry v. Lynaugh</u>, 492 U.S. 302
(1989), however, the consistency in Texas capital sentencing
instructions quickly disappeared, both as a result of legislative
action and unsupervised judicial improvising by trial courts. <u>See</u>
<u>generally</u> Peggy M. Tobolowsky, *What Hath <u>Penry</u> Wrought?: Mitigating
Circumstances and the Texas Death Penalty*, 19 AMER. J. CRIM. L. 345
(1992).

Roughly speaking, the various types of Texas capital
sentencing instructions in the post-<u>Furman</u> era can be broken down
into seven different categories, although at least two categories
contain sub-categories:

(i) The unadorned "special issues" in the pre-1991 version of
Article 37.071(b). That statute was in effect for all capital
murder trials from January 1, 1974 until the date on which <u>Penry</u>

---

[10] <u>See</u> Michael Kuhn, Note, *House Bill 200: The Legislative Attempt to Reinstate Capital
Punishment in Texas*, 11 HOUSTON L. REV. 410 (1974); <u>see also</u> David Crump, *Capital Murder: The
Issues in Texas*, 14 HOUSTON L. REV. 531, 532-33 & nn. 7-8 (1977); Stephen W. MacNoll, Note,
*A Constitutional Analysis of the Texas Death Statute*, 15 AMER. J. CRIM. L. 69, 79-81 (1988).

Page 12                                                              **71**

was decided on June 26, 1989.  For capital murders committed before September 1, 1991, it also was in effect for many cases tried from June 26, 1989 until August 30, 1993, when Art. 37.071 was amended (discussed supra).[11]

(ii)  The 1991 version of the statute.  This version of the sentencing instructions has been applied in all capital murder trials for murders committed on or after September 1, 1991.[12]

---

[11] That statute, in pertinent part, reads as follows:

(b)  On conclusion of the presentation of the evidence, [at the sentencing phase of a capital murder trial] the
court shall submit the following three issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.
. . .

(e)  If the jury returns an affirmative finding on each issue
submitted under this article, the court shall sentence the defendant to death...

There have been countless trials at which such instructions were submitted, both before and after Penry.  See, e.g., Stewart v. State, 686 S.W.2d 118, 121-124 (Tex.Crim.App. 1984); see also State v. McPherson, 851 S.W.2d 846, 849 & n. 8 (Tex.Crim.App. 1992) (collecting cases).

[12] Simply put, that amended statute eliminated the "deliberateness" and "provocation" special issues and added two new special issues, one of which was directly in response to Penry.
The first new special issue asked:

[I]n cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

See Art. 37.071, §2(b)(2) (Vernon 1992).

The new "Penry issue" asks:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating or circumstances to warrant that a sentence of life imprisonment rather than a death sentence should be imposed.

See Art. 37.071, § 2(e) (Vernon 1992).

Page 13

**72**

(iii) The pre-1991 statute with an extra-statutory "Quinones"-type instruction.[13]   This version of the sentencing instructions was applied at a number of Texas capital murder trials both before and after Penry was decided.   There have been several versions of this extra-statutory charge, each containing material differences.[14]

(iv) The pre-1991 statute with an extra-statutory "Penry"-type "fourth special issue."[15]   This version of the sentencing instructions has been applied in at least one trial after Penry for a capital murder committed before September 1, 1991.

(v) The pre-1991 statute with a "nullification" instruction.[16] This version of the sentencing instructions has been applied at a large number of trials after Penry for capital murders committed before September 1, 1991.   There have been several different versions of this extra-statutory instruction, each containing material differences.[17]

---

[13] In Quinones v. State, 592 S.W.2d 933, 947 (Tex.Crim.App. 1980), this Court held that it was not error for the trial court to have refused to submit the following extra-statutory instruction to the capital defendant's sentencing jury: "Evidence presented in mitigation of the penalty may be considered should the jury desire, in determining the answer to any of the special issues."

[14] Compare the instruction in the instant case, supra note, with Boggess v. State, 855 S.W.2d 645, 647 (Tex.Crim.App. 1991); Fuller (Tyrone) v. State, 827 S.W.2d 919, 937 (Tex.Crim.App. 1992), Rios v. State, 846 S.W.2d 310, 315-16 (Tex.Crim.App. 1992); Satterwhite v. State, 858 S.W.2d 412, 425 (Tex.Crim.App. 1993).

[15] See, e.g., State v. McPherson, 851 S.W.2d 846 (Tex.Crim.App. 1992).

[16] See, e.g., San Miguel v. State, ___ S.W.2d ___, 1993 Tex.Crim.App. LEXIS 110 at *7 (Tex.Crim.App. May 26, 1993); Fuller (Aaron) v. State, 829 S.W.2d 191, 209 & n. 5 (Tex.Crim.App. 1992). The proto-typical "nullification" instruction was in Fuller, which read as follows:

> When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented at both phases of the trial. A mitigating circumstance may be any aspect of the defendant's character and record or circumstances of the crime which you believe makes a sentence of death inappropriate in this case. If you find there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the Special Issues. If you determine, in consideration of this evidence, that a life sentence, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer at least one of the Special Issues under consideration "No."

Fuller, 829 S.W.2d at 209 n.5.

[17] Compare the instruction in supra note, with Blue v. State, No. 72,912, unpublished slip op. at 9 (Tex.Crim.App. September 23, 1992). The instruction in Blue read as follows:

> In answering the Special Issues you shall consider: (1) all evidence offered by either party at the guilt/innocence phase of the trial regarding the defendant's individual participation in the commission of the Capital Murder; and (2) all evidence offered by either party at the punishment phase of the trial, whether it be aggravating or mitigating evidence. If the mitigating evidence persuades you that the defendant should not be sentenced to death, then you shall answer one or more of the Special Issues "No."

73

14

(vi) The pre-1991 statute in which "deliberately" is broadly defined.[18] This version of the sentencing instructions has been applied in at least two trials since Penry was decided for capital murders committed before September 1, 1991.

(vii) The 1993 version of the statute as applied to all crimes committed on or before August 30, 1991.[19] This version of the statute will apply to any trial or re-trial that commences after August 29, 1993, for capital murders committed on or before August 30, 1991.

## B. Argument

### (i) Federal constitutional grounds

In numerous cases, the Supreme Court has stated, in keeping with our nation's federalism, that "we are unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." Spaziano v. Florida, 468 U.S. 447, 464 (1984) (citing cases). The Court has stated, however, that *within* a single state, there must be consistency in the treatment of capital defendants who are subject to the death penalty. Id. at 460 ("If a State has determined that death should be an available for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not.") (citing cases). Thus, "'each distinct [state] system must be examined on an individual basis.'" See Pulley v. Harris, 465 U.S. 37, 45 (1984) (quoting Gregg v. Georgia, 428 U.S. 153, 195 (1976) (joint opinion of Stewart, Powell & Stevens, JJ.)).

In Furman v. Georgia, 408 U.S. 238 (1972), the chief constitutional infirmity that the controlling members of the Court identified in their respective concurring opinions was

---

See Blue v. State, supra, at 9.

[18] See, e.g., Martinez v. State, ___ S.W.2d ___, 1993 Tex.Crim.App. LEXIS 119 at *15-*18 (Tex.Crim.App. 1993).

[19] See Art. 37.0711 (Vernon 1993). This version of the statute contains all three of the "old" special issues. See id. § 3(b)(1)-(b)(3). It further provides that, if the jury returns affirmative answers to all three special issues, then the trial court should further submit to jurors the new, Penry-type special issue enacted in the 1991 amendment. This version of the statute instructs jurors that "[i]f a defendant is convicted of an offense under Section 19.03(a)(6), Penal Code, the court shall submit the [special] issues ... only with regard to the conduct of the defendant in murdering the deceased individual first named in the indictment."

Page 15                                                                                    **74**

*arbitrariness.* See *id.* at 274 (Brennan, J., concurring) ("In determining whether a punishment comports with human dignity, we are aided...by...[a] second principle inherent in [the Eighth Amendment Cruel and Unusual Punishments] Clause -- that the State must not arbitrarily inflict punishment."); *id.* at 309 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual."); see also *Spaziano*, 468 U.S. at 460.

In *Godfrey v. Georgia*, 446 U.S. 420 (1980), the Supreme Court held that states can impose the death penalty for certain crimes without running afoul of our constitutional prohibition against cruel and unusual punishment, but only if the manner in which the penalty is selected "provide[s] a meaningful basis for distinguishing the few cases in which [the penalty] imposed from the many cases in which it is not." *Id.* at 427... As pointed out by Justice Stevens, "this Court's decisions have made clear that States may impose this ultimate sentence only if they follow procedures that are designed to assure reliability in sentencing determinations. *Barclay v. Florida*, 463 U.S. 939, 958-59 (1983) (Stevens, J., concurring). Part of the requirement of reliability is "`that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case.'" *Id.* at 954...(quoting *Proffitt v. Florida*, 428 U.S. 242, 251 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)) (internal quotations omitted).

The above discussion of the various sentencing schemes concurrently[20] in operation in Texas, "a distinct system," *Gregg*, 428 U.S. at 195, amply demonstrate that the present Texas death penalty system is being implemented in an "arbitrary" manner. At least seven categories of similarly situated capital defendants have been treated disparately. Put another way, it is certainly

---

[20] Although after August 29, 1993, all trials will be tried under either Art. 37.071 and Art. 37.0711, the pre-1991 version of Art. 37.071 was still in operation in many cases up until August 30, 1993. Moreover, *on appeal*, the pre-1991 version of Art. 37.071 will still be in operation in the foreseeable future in this Court's sufficiency-of-the-evidence analyses regarding juries' affirmative answers to the special issues.

conceivable that, *ceteris paribus*, a single hypothetical Texas capital defendant would be given a different sentence depending on which of the seven different sentencing schemes was in operation at his trial. This is quintessential arbitrariness of the very type condemned in Furman.

Defendant recognizes that the Texas Legislature was certainly justified in amending Art. 37.071(b) as it did in 1991 since Penry certainly appeared to require such. See Shelley Clarke, Note, *A Reasoned Moral Response: Rethinking Texas' Capital Sentencing Statute After Penry v. Lynaugh*, 69 TEX. L. REV. 407 (1990). If that were the only other scheme concurrently in operation with the pre-1991 version of Art. 37.071, in all likelihood Defendant would never have brought this claim. But that is not what happened in the wake of Penry.

Rather, numerous trial courts throughout this state and the Texas Legislature have haphazardly created, in addition to the prevailing pre-1991 capital sentencing scheme, a total of at least six new, distinct capital sentencing schemes that have governed similarly or identically situated Texas capital defendants. Particularly noteworthy is the Texas Court of Criminal Appeals' failure to impose uniformity among the practices adopted by the trial courts. Nor is the Legislature free from its share of the blame. By waiting until August 30, 1993, to amend Art. 37.071 as it applies to trials or retrials of capital defendants who committed their crimes before September 1, 1991, the Legislature has sowed the seeds of arbitrariness and inconsistency. Under both identical and analogous circumstances, other States have not dealt with seemingly sweeping invalidations of their post-Furman death penalty statutes in such a chaotic manner. See OREGON REVISED STATUTES, § 163.150 (as amended July 24, 1989); State v. Wagner, 786 P.2d 93, 99-100 (Ore. 1990); cf. OHIO REVISED CODE §§ 2929.02-06 (as amended 1981); State v. Melchior, 381 N.E.2d 195, 200 (Ohio 1978); David J. Benson, *Constitutionality of Ohio's New Death Penalty Statute*, 14 TOLEDO L. REV. 77 (1982).

In sum, the Texas courts and the Texas Legislature, without any discernible rational basis, have haphazardly turned Texas'

Page 17

**76**

capital sentencing scheme into a patch-work quilt. Because similarly situated Texas capital defendants have been unjustifiably sentenced to death under radically different sentencing schemes, this Court should preclude the imposition of the death penalty in this case.

(ii) State constitutional grounds

> "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted."

TEX. CONST. ART. I, § 13

Defendant adopts all of the arguments made _supra_ with respect to his state constitutional claim. Although Defendant has primarily cited federal Eighth Amendment authority herein, he intends that this Court should separately consider his claim under the Texas and U.S. Constitutions. As the Court of Criminal Appeals has noted, it can and should interpret the Texas Constitution in a more expansive manner than the federal Constitution. _See, e.g., Richardson v. State_, ___ S.W.2d ___, No. 901-92 (Tex.Crim.App. Octo. 27, 1993); _Heitman v. State_, 815 S.W.2d 681 (Tex.Crim.App. 1991); _Ex Parte Hererra_, ___ S.W.2d ___, 1993 Tex.Crim.App. LEXIS 100 at *2 (Tex.Crim.App. May 11, 1993) (Maloney, J., dissenting, joined by Baird, Clinton & Overstreet, JJ.); _see also_ Judge Rusty Duncan, _Terminating the Guardianship: A New Role for State Court_, 19 ST. MARY'S L.J. 809 (1988).

Particularly noteworthy is the fact the Texas Constitution proscribes "cruel or unusual punishments," while the U.S. Constitution proscribes "cruel _and_ unusual punishments." Obviously, despite apparent implicit claims to the contrary by courts and commentators,[21] the Texas Constitution, based on its plain language, was intended offer broader protections than the U.S. Constitution. _Cf._ _People v. Anderson_, 493 P.2d 880, 883-87 (Cal. 1972) (attributing textual significance to state

---

[21] _See, e.g., Livingston v. State_, 542 S.W.2d 655, 662 (Tex.Crim.App. 1976) (mistakenly treating Texas constitutional provision as if it proscribes "cruel _and unusual_ punishment"); Peter Linzer, _Symposium on the Texas Constitution_, 68 TEX. L. REV. 1573, 1592 & nn. 133-34 (1988) (treating Art. I, § 13 as identical to Eighth Amendment).

Page 18

constitutional proscription against "cruel or unusual punishments"). Because Defendant's primary argument here is that the many sentencing schemes operating concurrently inject arbitrariness into the Texas capital sentencing scheme, at the very least Defendant's death sentence is "unusual."

X

**TEXAS LAW'S REFUSAL TO INSTRUCT THE JURY ON PAROLE LAW DURING THE PUNISHMENT PHASE VIOLATES A CAPITAL DEFENDANT'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Texas law prohibits capital jurors from being informed that a defendant convicted of capital murder and given a life sentence must serve at least 40 years before being eligible for parole. See TEX. CODE CRIM. PRO. Art. 42.18. Failure to include an instruction accurately informing the jurors about a capital defendant's potential parole eligibility if he were to be sentenced to prison for life would violate a capital defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution. The right to have a capital sentencing jury accurately informed of the meaning of its "life imprisonment" alternative stems from the Eighth Amendment bar against arbitrary and capricious infliction of the death penalty as well as the due process clause. As the joint opinion of Justices Stewart, Powell, and Stevens put it in Gregg v. Georgia:

> [i]f an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never have made a sentencing decision.

453 U.S. 153, 190 (1976).

Since Gregg, the Court has implemented this fundamental constitutional principle in three interrelated ways:

1. by prohibiting procedures which needlessly undermine the reliability of the capital sentencing process, e.g., Beck v. Alabama, 447 U.S. 625 (1980); Caldwell v. Mississippi, 472 U.S. 320 (1985);

Page 19

**78**

19

2. by requiring that the sentencing authority consider all relevant evidence why death should not be imposed in a particular case, Lockett v. Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455 U.S. 104 (1982); Skipper v. South Carolina, 476 U.S. 1 (1986); and

3. by setting aside death sentences whenever the defendant has been deprived of a fair opportunity to rebut the prosecution's case for death, Gardner v. Florida, 430 U.S. 348 (1977).

A trial court's failure to instruct a capital defendant's jury that he would have to serve a minimum of 40 years in prison if convicted of capital murder but sentenced to life imprisonment would violate federal constitutional principles in each of these three areas.

This conclusion is strengthened by research demonstrating that jurors often carry distorted perceptions of parole eligibility into the jury room, and that those misperceptions can "shift the balance" and result in the imposition of death. See Bowers, *Capital Punishment & Contemporary Values: People's Misgivings and the Court's Misperceptions*, 27 LAW AND SOC. REV. 157 (1993) (summarizing recent survey data from Florida, Georgia, Nebraska, New York, and South Carolina, and concluding that "both citizen and juror grossly underestimate the time that will usually be served by murderers not sentenced to death"); Paduano & Stafford-Smith, *Deadly Error: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty*, 18 COLUM. HUMAN RIGHTS L. REV. 211, 222 n. 33 (1987) (randomly selected capital jury veniremen in Cobb County, Georgia, believed, on average, that "life sentence" meant imprisonment for 8.1 years), id. at 223-225 n.35 (summarizing results of county-wide survey in Georgia and of jury venire survey in Mississippi that both showed that estimates of anticipated "life sentence" duration averaged ten years or less); Hood, *The Meaning of "Life" for Virginia Jurors and its Effect on Reliability in Capital Sentencing*, 75 VA. L. REV. 1605, 1624 n. 101 (1989) (median estimate by jury-eligible residents of Prince Edward County, Virginia, of time that capital murderer would actually spend in prison on "life imprisonment" sentence was 10 years); Dayan, et al., *Searching for an Impartial Sentencer Through Jury Selection in Capital Trials*, 23 LOY. L.A. L. REV. 151, 171 (1989).

Nearly two decades before Gregg, the New Jersey Supreme Court observed, "That death should be inflicted when a life sentence is appropriate is an abhorrent thought." State v. White, 142 A.2d 65, 76 (N.J. 1958).   A death sentence that results from jurors' misperceptions about parole, particularly when they are specifically charged to determine the defendant's "future dangerousness," is equally abhorrent.

"When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process." Walton v. Arizona, 497 U.S. 639, 653 (1990) (emphasis added).   In this case, a critical "facet of the sentencing process" about which the jury must be instructed is the meaning and effect of the jury's non-death alternative of life imprisonment.

California v. Ramos, 463 U.S. 992 (1983), does not require a different result.   In upholding against Eight Amendment challenge California's decision to provide sentencing juries with accurate information concerning the governor's power to commute a life-without-parole sentence, the Ramos Court noted the "elementary" fact that states remained free to prohibit consideration of defendant' parole eligibility if that prohibition provided "greater protection[]...than the Federal Constitution requires." 463 U.S. at 1013-1014 (emphasis added).   But given the Court's emphasis on the accuracy of the challenged commutation instruction, id. at 1009, Ramos cannot be read to endorse concealing crucially important sentencing information which, if known, might lead sentencing juries to choose life instead of death.   Ramos also arguably militates in favor a trial court's submission of an instruction accurately informing a capital sentencing of the applicable parole law. See also Caldwell v. Mississippi, 472 U.S. 320, 341-343 (1985) (O'Connor, J., concurring).

The foregoing establishes that both Eighth and Fourteenth Amendments require that Defendant's jury must be adequately instructed with respect to the fact that he would be required to serve at least thirty-five years in prison if they chose not to sentence him to death.

Page 21

**80**

Respectfully submitted,

James D. Durham, Jr.
1008 W. 10th Ave.
Amarillo, Texas 79101-3113
(806) 373-3054
Fax # (806) 373-7328


James D. Durham, Jr.
State Bar No. 06284000
Attorney for Defendant

Paul Herrmann
500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas 79101
(806) 342-4242
Fax # (806) 371-0780


Paul Herrmann
State Bar No. 09541810
Attorney for Defendant

## CERTIFICATE OF DELIVERY

I, the undersigned, hereby certify that on _____,
1999, a true and correct copy of the foregoing document was
delivered in accordance with the Texas Rules of Appellate and
Criminal Procedure to the office of the District Attorney in and
for Potter County, Texas.


James D. Durham, Jr.
Attorney for Defendant

Page 22

81

22

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### ORDER ON PRE-TRIAL MOTION NO. 12
### (DEFENDANT'S MOTION TO DECLARE
### SENTENCING SCHEME UNCONSTITUTIONAL)

IT IS ORDERED that Defendant's *Motion to Declare the Texas Capital Sentencing Scheme Unconstitutional and Motion to Preclude Imposition of the Death Penalty* is hereby

_____ GRANTED.

_____ DENIED, to which ruling of the Court Defendant respectfully objects.

Signed _____3/22____, 1999.

_____
Judge Presiding

FILED
CINDY GROOMER
DISTRICT CLERK

1999 MAR 23  A 11: 19

POTTER COUNTY, TEXAS

BY_____ DEPUTY

ORDER NO. 5
ON MOTION TO DECLARE SENTENCING SCHEME UNCONSTITUTIONAL

Page 1

253500

82

23

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

PRE-TRIAL MOTION NO. 13
**DEFENDANT'S MOTION TO EXCLUDE THE PENALTY OF DEATH
AS A POSSIBLE PUNISHMENT ON GROUNDS THAT THE DEATH
PENALTY IS ADMINISTERED IN A RACIALLY DISCRIMINATORY MANNER**

Defendant respectfully moves this Court to preclude imposition of the death penalty in this case, by instructing the jury to return such answers to the special issue questions as may be necessary to result in the imposition of a sentence of life imprisonment. Because the imposition of the death penalty in this case would be influenced by racial discrimination, and because the death penalty is administered generally in a racially discriminatory manner, its imposition in this case would be unconstitutional under the Eighth Amendment, the Equal Protection and Due Process clauses of the Fourteenth Amendment, and under Article I, Sections 13, 19, 27, and 29 of the Texas Constitution.

In Furman v. Georgia, 408 U.S. 238 (1972), the Supreme Court invalidated the death penalty under the vast majority of statutes in effect in the country. The five concurring Justices in the majority agreed that the death penalty was being imposed in an "arbitrary" manner. As Justice Thomas recently noted, the principal motivating factor of the Furman majority in finding that the death penalty was being arbitrarily imposed was a special concern about racial discrimination. See Graham v. Collins, 113 S. Ct. 892, 904-05 (1993) (Thomas, J., concurring) (discussing Furman).[1] Twenty years later, it is beyond dispute that if the

_____

[1] See, e.g., Furman, 408 U.S. at 242 (Douglas, J., concurring) ("It would seem to be incontestable that the death penalty inflicted on one defendant is "unusual" if it discriminates against him by reason of his race, religion, wealth, social position, or class, or if it is imposed under a procedure that gives room for the play of such prejudices."); id., at 310 (Stewart, J., concurring) ("If any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race."); id. at 364 (Marshall, J., concurring) ("[C]apital punishment is imposed

Page 1



POTTER COUNTY, TEXAS
BY _____, DEPUTY

**EXHIBIT**
RX-99

imposition of the death penalty results even in part from the constitutionally impermissible factor of racism, the death penalty is certainly "arbitrary" within the meaning of Furman.

A decade and a half after Furman was decided, a slim majority of the Court in McCleskey v. Kemp, 481 U.S. 279 (1987), refused to find that a single statistical study of the post-Furman death penalty as administered in Georgia, standing alone, was sufficient to warrant a finding that the death penalty violated the Fourteenth Amendment. The Baldus Study at issue in McCleskey relied upon the a multiple-regression analysis of post-Furman Georgia capital cases; the study demonstrated a strong correlation between race and death sentences in Georgia. The Court held, however, that the defendant must offer "evidence specific to his own case that would support an inference that racial consideration played a part in his sentence." Id. at 292-293.

Although Defendant believes that the McCleskey majority was mistaken, his case is distinguishable from McCleskey. The Texas sentencing scheme is distinguishable from Georgia's capital sentencing scheme at issue in McCleskey, in view of the pivotal role that the "future dangerousness" special issue has played in the capital sentencing determination in Texas in the post-Furman era. As Defendant has noted in a separate objection to this Court, that question is inherently racially biased, at least when asked of white jurors who sit in judgment of African-American capital defendants.

Over two decades after Furman, there is no question that invidious racial bias is still manifest in the administration of the death penalty. There are numerous studies, both nationally and

---

discriminatorily against certain identifiable classes of people."). Even two of the dissenting Justices in Furman commented on racial discrimination. Chief Justice Burger, noting that statistics had been cited which showed that the death penalty had been imposed in a racially discriminatory manner, stated that "if a statute authorizes the discretionary imposition of a particular penalty for a particular crime is used primarily against defendants of a certain race ... the Equal Protection Clause of the Fourteenth Amendment forbids continued enforcement of that statute." Id. at 389 n. 12 (Burger, C.J., dissenting). Justice Powell also suggested that an Equal Protection argument "might well be made" if a defendant could demonstrate that members of his race were being singled out for more severe punishment than others charged with the same offense." Id. at 449 (Powell, J., dissenting).

Page 2

in Texas, which conclude that the death penalty is administered in a racially biased manner. Many of these studies were conducted after the Supreme Court's decision in <u>McCleskey v Kemp</u>.[2] In 1990, the United States General Accounting Office surveyed various studies on racism and the death penalty and concluded that the studies show "a pattern of evidence indicating racial disparities in the charging, sentencing, and imposition of the death penalty after the <u>Furman</u> decision" and that "race of victim influence was found at all stages of the criminal justice system."[3] The studies recounted in the GAO survey make it clear that discrimination based on race remains widespread and systematic in the imposition of the death penalty in the United States; in particular, such racism manifests itself most vividly in the category of the race of capital murder victims. For example, of the 210 persons executed between January 1977 and July 1993, only a small fraction killed non-whites, despite the fact that non-white victims of murders are roughly equal in number of the percentages of white victims.[4]

---

[2] <u>See, e.g.</u>, Alan Widmayer & James Marquart, "Capital Punishment and Structured Discretion: Arbitrariness and Discrimination After Furman," <u>in</u> Correction Theory and Practice 178-96 (1992); Jonathen R. Sorensen & James Marquart, Prosecutorial and Jury Decision-Making in Post-<u>Furman</u> Texas Capital Cases, 18 N.Y.U. REV. L. & SOC. CH. 743 (1990-91); United States General Accounting Office, DEATH PENALTY SENTENCING: RESEARCH INDICATES PATTERN OF RACIAL DISPARITIES (1990); David C. Baldus, et al., EQUAL JUSTICE AND THE DEATH PENALTY: A LEGAL AND EMPIRICAL ANALYSIS (1990); Sheldon Eckland-Olson, Structured Discretion, Racial Bias, and the Texas Death Penalty, 69 SOC. SCI. Q. 853 (1988); Jonathan R. Sorenson, "The Effects of Legal and Extra-legal Factors on Prosecutorial and Jury Decision Making in Post-<u>Furman</u> Texas Capital Cases," unpublished Ph.D. dissertation, Sam Houston State University, Huntsville, Texas, 1990 (study based on Texas capital murder statistics from 1974-88); David C. Baldus et al., Arbitrariness and Discrimination in the Administration of the Death Penalty, 15 STETSON L. REV. 133 (1986); Samuel R. Gross, Race and the Judicial Evaluation of Discrimination in Capital Sentencing, 18 U.C. DAVIS L. REV. 1275 (1985); David C. Baldus et al., Monitoring and Evaluating Contemporary Death Sentencing Systems: Lessons from Georgia, 18 U.C. DAVIS L. REV. 1375 (1985); Samuel R. Gross & Robert Mauro, Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization, 37 STAN. L. REV. 27 (1984); David C. Baldus et al., Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience, 74 J. CRIM. L. & CRIMINOLOGY 661 (1983); William Bowers, The Pervasiveness of Arbitrariness and Discrimination under Post-<u>Furman</u> Capital Statutes, 74 J. CRIM. L. & CRIMINOLOGY, 1067 (1983); Raymond Paternoster, Race of the Victim and Location of Crime: The Decision to Seek the Death Penalty in South Carolina, 74 J. CRIM. L. & CRIMINOLOGY 754 (1983); William Bowers & Glenn Pierce, Arbitrariness and Discrimination under Post-<u>Furman</u> Capital Statutes, 26 CRIME & DELINQ. 563 (1980).

[3] U.S. General Accounting Office, DEATH PENALTY SENTENCING, at 5-6 (1990).

[4] <u>See</u> NAACP Legal Defense and Educational Fund, "Death Row, USA," Summer 1993 (listing race of executed persons and their victims).

Page 3

85

3

Numerous specific studies on the existence of systemic racial discrimination in the post-Furman Texas death penalty have been undertaken.[5] Such studies, based on aggregate data of the race of Texas capital murders and their victims, overwhelmingly point to the existence of racial discrimination in the Texas death penalty. Such racism, the leading studies conclude, is considerably more pronounced in the exercise of prosecutorial (as opposed to jury) discretion. Furthermore, such racism manifests itself more in the race of the victim rather than the race of the defendant.[6]

---

[5] See Texas Judicial Council, "Capital Murder Study" (unpublished, 1976 & 1977) (capital murder data on race of defendants, victims, and jurors for the first 74 post-Branch capital murder indictments); William J. Bowers & Glenn L. Pierce, Arbitrariness and Discrimination under Post-Furman Capital Statutes, 26 CRIME & DELINQ. 563, 596 (1980) (study based on Texas homicide data from 1973-78); Jim Henderson, & Jack Taylor, Killers of Dallas Blacks Escape the Death Penalty, DALLAS TIMES HERALD, November 17, 1985, at A1, A16; Ronnie Dugger, The Numbers on Death Row Prove that Blacks Who Kill Whites Receive the Harshest Judgment, TIME, Spring 1988, Special Issue, at 88 (discussing University of Texas Law Professor Ed Sherman's analysis of Harris and Dallas County, Texas, death penalty data from 1978-80); Sheldon Eckland-Olson, Structured Discretion, Racial Bias, and the Texas Death Penalty, 69 Soc. SCI. Q. 853 (1988) (study based on Texas capital murder statistics from 1974-88); Jonathan R. Sorenson, "The Effects of Legal and Extra-legal Factors on Prosecutorial and Jury Decision Making in Post-Furman Texas Capital Cases," unpublished Ph.D. dissertation, Sam Houston State University, Huntsville, Texas, 1990 (study based on Texas capital murder statistics from 1974-88); Jonathen R. Sorensen & James Marquart, Prosecutorial and Jury Decision-Making in Post-Furman Texas Capital Cases, 18 N.Y.U. REV. L. & SOC. CH. 743 (1990-91) (study based on Texas capital murder statistics from 1980-86); Alan Widmayer & James Marquart, "Capital Punishment and Structured Discretion: Arbitrariness and Discrimination After Furman," in Correction Theory and Practice 178-96 (1992) (capital murder statistics from Harris County, Texas, from 1980-88).

[6] See, e.g., Widmayer & Marquart, supra, at 187 (capital murder of white victim five times more likely to result in death penalty than capital murder of African-American victim and over three times more likely to receive death penalty than capital murder of Hispanic victim); Eckland-Olson, supra, at 858-61, 871 (white-victim cases are 51% of capital murders in Texas, but represent 85% of all Texas death penalty cases; black-victim cases are 23.4% of Texas capital murders, but represent only 3.6% of all Texas death penalty cases; Hispanic-victim cases are 23.4% of Texas capital murders, but only 8.9% of all Texas death penalty cases); Sorenson & Marquart, supra, at 765-72 (capital murder of white victim five times as likely to result in death penalty than capital murder of African-American victim and over three times as likely to result in death penalty as capital murder of Hispanic victim). Such findings are consistent with similar statistical studies in other Southern death penalty jurisdictions. See McCleskey v. Kemp, 481 U.S. 279 (1987) (discussing statistical study of post-Furman study of Georgia death penalty); see generally Samuel R. Gross & Robert Mauro, Death and Discrimination: Racial Disparities in Capital Sentencing (1989).

The conclusion that racism manifests itself more in the race of the victim than in the race of the defendant has a racially invidious explanation: the race of the victim is the determinative factor in the vast majority of Texas cases, both those involving white and minority defendants. See Widmayer & Marquart, supra, at 187; Marquart & Sorenson, supra, at 764-65. Texas cases in which prosecutors do not seek capital murder charges or a death sentence against a minority defendant who has murdered a minority victim have had nothing to do with racial enlightenment. As a leading researcher on racism in the Texas death penalty has observed, Texas "[p]rosecutors seek capital punishment in cases where they are most likely to win, which may lead to a process of case typification. In other words, prosecutors choose cases

Page 4

86

4

University of Texas Professor Eckland-Olson's study using data from 1974-83 revealed that only 51% of all Texas capital murders during those years involved white victims, yet 85% of all death sentences were for the capital murder of whites; conversely, 23.4% of all Texas capital murders involved black victims, but such murders resulted in only 3.6% of all death sentences.[7] Similarly, Professors Sorenson and Marquart have concluded that, all other things being equal, a Texan who commits the capital murder of a white person is over five times as likely to be sentenced to death than a Texan who commits a capital murder of an African-American.[8] See also Ed Tims et al., *A Pattern of Exclusion*, DALLAS MORNING NEWS, December 21, 1986.

Particularly notable among such statistics is the extremely large number of African-Americans on Texas' death row who murdered white women in the course of a rape, as contrasted to the paucity of black-on-black murders in the course of a rape.[9] Similarly, although scores of African-Americans in Texas have been sentenced to death for murdering whites in the course of a simple robbery -- there are virtually no African-Americans on Texas' death row who murdered other African-Americans under such circumstances. Yet the statewide percentages of black-on-black robbery-murders and rape-murders are roughly equivalent to the statewide percentages of

---

involving the killing of whites, especially by blacks, because these cases fit the category of crimes that elicits the most fear from white jurors who identify with the victims." Sorenson, *supra*, at 14. The current District Attorney of Dallas County, Texas, John Vance, has openly admitted that such case typification occurs in Texas. See Ray F. Herndon, *Race Tilts the Scales of Justice*, DALLAS TIMES-HERALD, August 19, 1990, at A1, A22.

[7] See Eckland-Olson, *supra*, at 858-60.

[8] See Sorenson & Marquart, *supra*, at 765-72.

[9] Black-on-white rape-murders have resulted in dozens of Texas death sentences since 1974. There have been only a handful of cases where a person received the death penalty for murdering an African-American woman in the course of a rape. See, e.g., Granviel v. State, 723 S.W.2d 141 (Tex.Crim.App. 1986) (rape and murder of multiple persons, including two-year old child). In this sense, the post-*Branch* Texas death penalty strongly resembles the pre-*Branch* death penalty. See Rubert C. Koeninger, *Capital Punishment in Texas, 1924-68*, 15 CRIME & DELINQ. 132, 138-39 (1969). Counsel has identified only one post-*Furman* Texas capital case involving a white-on-black rape; however, in that case, the prosecutors did not charge the defendant with murder in the course of a rape, but instead charged him with murder in the course of a robbery. See Vigneault v. State, 600 S.W.2d 318 (Tex.Crim.App. 1979).

Page 5

87

black-on-white robbery-murders and rape-murders.[10] There has, thus, been a clear pattern of racially-biased minority-victim devaluation in Texas death penalty cases. Finally, it is notable that, with the rarest of exceptions, whites in Texas[11] do not receive death sentences for the capital murders of blacks.[12]   The obvious explanation for each of these trends is that Texas prosecutors, the overwhelming majority of whom are white, do not believe that such crimes warrant the ultimate punishment.[13]

---

[10] See Eckland-Olson, _supra_, at 861-63 (Texas capital murder data from 1973-83). Professor Eckland-Olson's data reveal remarkable disparities in this regard.  Statewide between 1974-83, 12.8% of all capital murders were black-on-white robbery-murders, while 8.9% were black-on-black robbery-murders.  Yet 18.2% of persons on Texas' death row population were blacks who murdered whites during a robbery, while only 1.2% of Texas' death row population were blacks who killed blacks during a robbery.  That is, proportionally speaking, black-on-white robbery-murders were _overrepresented_ by almost 50%, while black-on-black robbery-murders were _underrepresented_ by almost 800%.  Gross disparities were also evident with respect to the statistics regarding murders in the course of a rape.  Statewide between 1974-83, 1.1% of all capital were black-on-white rape-murders, while 1.0% were black-on-black rape-murders.  Yet 5.3% of Texas' death row population were blacks who murdered whites during the course of a rape, while only 0.4% were blacks who killed blacks during the course of a rape.  That is, proportionally speaking, black-on-white rape-murders were _overrepresented_ by 500%, while black-on-black rape-murders were _underrepresented_ by over 200%.

[11] That phenomenon is not limited to Texas.  See Michael L. Radelet & Michael Mello, _Executing Those Who Kill Blacks: An Unusual Case Study_, 37 MERCER L. REV. 911 (1986).

[12] For instance, of the first seventy-four capital murder indictments filed in Texas after _Furman_, five were cases where whites killed blacks.  None of those five cases resulted in a death sentence.  See Appendix to "Capital Murder Study," Texas Judicial Council, _supra_. Sorenson and Marquart's data covering Texas capital murders from 1980-86 show that the a white who committed the capital murder of an African-American during those years had, statistically speaking, _no_ chance of receiving the death penalty, while an African-American who committed a capital murder of a white stood a 25% chance of receiving the death penalty. See Sorenson & Marquart, _supra_, at 765.

Research reveals that there is only one white person currently on Texas' death row who received a death sentence for killing an African-American.  See Vigneault v. State, _supra_.  Notably, that case involved especially horrific facts.  See id. (murder committed during course of robbery, rape, and kidnapping; defendant shot female victim point-blank in head while he forced her to perform oral sodomy).  In another post-_Furman_ white-on-black capital case, which also involved egregious facts, see Brasfield v. State, 600 S.W.2d 288 (Tex.Crim.App. 1980) (murder in course of kidnapping and anal rape of male child), the Texas Court of Criminal Appeals amazingly held that the defendant's death sentence should be reformed to a life sentence because there was insufficient evidence that he posed a "future threat to society."

[13] The pervasiveness in racism in the Texas death penalty is also evident in the actions of defense lawyers.  See, e.g., Ex Parte Guzmon, 730 S.W.2d 724 (Tex.Crim.App. 1987) (white capital defense lawyer repeatedly referred to Mexican client as a "wet back" in front of all-white jury); see also A Different Approach, NATIONAL LAW JOURNAL, June 11, 1990, at 34. In Guzmon, that same attorney failed to challenge the prosecution's selection of jurors who unabashedly stated that they did not believe that illegal aliens deserved the same level of constitutional protections as U.S. citizens.  One of those jurors, who later served as foreman of Guzmon's jury, was asked whether, in view of Guzmon's illegal alien status, he

It should also be generally noted that the demographics of Texas' death row population have changed since Furman, but not dramatically: in the pre-Furman era, racial minorities comprised roughly two-thirds of condemned persons, while whites comprised roughly one-third; in the post-Furman era, racial minorities comprise roughly three-fifths, while whites comprise roughly two-fifths of condemned persons.[14]

Also noteworthy about Texas capital juries is the racial effect of "death qualification" of jurors. See Marilyn D. McShane et al., *Eligibility for Jury Service in [Texas] Capital Trials: A Question of Potential Exclusion and Bias*, TEXAS BAR JOURNAL, April 1987, at 365. McShane and her colleagues randomly selected 2000 Texans and questioned them extensively on their views on capital punishment, in order to simulate questions typically asked during voir dire in a Texas capital case. Minorities consistently showed the weakest support for the death penalty, while white Texans, as a group, showed a stronger support for capital punishment. See also Terry Williams, *Blacks, Hispanics Still Feel Brunt of Racial Bias*, HOUSTON POST, March 17, 1993, at p.A1 (public opinion poll showing that white Texans favor the death penalty considerably more than African-American Texans).

The foregoing establishes that the administration of the death penalty generally in Texas is impermissibly influenced racial discrimination, especially in cases such as Defendant's (a crime by an African-American person against Caucasian persons). It also demonstrates a substantial risk that racial discrimination will

---

would "be able to make a fair decision in this case." The jury foreman candidly admitted that "I would have to struggle with it." See id. at 726-727. Guzmon's lawyer permitted him to serve on the jury nonetheless.

[14] Between 1924-68, Texas' death row population included at least 314 African-Americans and Hispanics and at least 146 whites. See Rubert C. Koeninger, *Capital Punishment in Texas, 1924-68*, 15 CRIME & DELINQ. 132-35 (1969). As of the Summer of 1992, Texas' death row population included 157 whites and 199 minorities including African-Americans, Hispanics, Native Americans, and Asians. See NAACP Legal Defense Fund, Death Row U.S.A. (Summer 1992). Although African-Americans have significantly decreased as a proportion of minorities on death row in the post-Furman era, their percentage on death row (36%) is still over three times their respective percentage of Texas' population (12%).

influence the jury in this case to impose a death sentence. This risk is incompatible with the commands of the federal constitution, and with the constitution of Texas whose analogous provisions provide <u>greater</u> protection than their federal counterparts.

WHEREFORE, Defendant respectfully moves this Court to preclude imposition of the death penalty in this case, by instructing the jury to return such answers to the special issue questions as may be necessary to result in the imposition of a sentence of life imprisonment. At the very minimum, Defendant requests an evidentiary hearing at which he may introduce further evidence of the racially discriminatory nature of the Texas death penalty.


Respectfully submitted,

Paul Herrmann
500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas  79101
(806)342-4242


Paul Herrmann
State Bar No.09541810
Attorney for Defendant

James D. Durham, Jr.

Attorney for Defendant
1008 W. 10th Avenue
Amarillo, Texas 79101-3103
(806) 373-7328
State Bar No. 06284000

Page 8

90

8

## CERTIFICATE OF DELIVERY

I, the undersigned, hereby certify that on _____ ,1999,
a true and correct copy of the foregoing document was delivered in
accordance with the Texas Rules of Appellate and Criminal Procedure
to the Office of the District Attorney in and for Potter County,
Texas.

Page 9

91

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### ORDER ON PRE-TRIAL MOTION NO. 13
### (DEFENDANT'S MOTION TO EXCLUDE DEATH PENALTY)

IT IS ORDERED that Defendant's Motion to Exclude the Penalty of Death as a Possible Punishment is ~~GRANTED.~~

OVERRULED, to which ruling Defendant respectfully objects.

Signed _____3/22_____, 1999.

_____
Judge Presiding

FILED
CINDY GROOMER
DISTRICT CLERK

1999 MAR 23 A 11: 19

POTTER COUNTY, TEXAS

BY _____ DEPUTY

ORDER NO. 6
ON MOTION TO EXCLUDE DEATH PENALTY                Page 1                Page 1

**253501**

92

10

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| V | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### PRE-TRIAL MOTION NO. 14
### MOTION TO PRECLUDE IMPOSITION OF THE DEATH PENALTY

Defendant respectfully moves this Court to preclude imposition of the death penalty in this case, by instructing the jury to return such answers to the special issue questions as may be necessary to result in the imposition of a sentence of life imprisonment.  In view of the many different capital sentencing schemes that have been in operation in Texas since 1989, the death penalty in Texas is being arbitrarily imposed and, thus, its imposition in this case would be unconstitutional under the Eighth Amendment, the Equal Protection clause of the Fourteenth Amendment, and analogous provisions in the Texas Constitution.

> "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and *unusual* punishments inflicted."

U.S. CONST. AMEND. VIII.

In order to understand the basis of this objection, this Court should recognize the large number of different capital sentencing schemes that have been operation in Texas capital cases since the early 1970s, when the modern, "post-Furman" death penalty statutes were enacted.[1]  Of the many hundreds of persons sentenced to death in Texas since the "modern" capital sentencing statute was enacted,[2] the vast majority were sentenced under jury instructions

---

[1] See Michael Kuhn, Note, *House Bill 200: The Legislative Attempt to Reinstate Capital Punishment in Texas*, 11 HOUSTON L. REV. 410 (1974); see also David Crump, *Capital Murder: The Issues in Texas*, 14 HOUSTON L. REV. 531, 532-33 & nn.7-8 (1977); Stephen W. MacNoll, Note, *A Constitutional Analysis of the Texas Death Statute*, 15 AMER. J. CRIM. L. 69, 79-81 (1988).

[2] Applicant is aware of no source that collects all of the capital trials that have occurred in Texas since the post-Furman

MOTION TO PRECLUDE IMPOSITION OF DEATH PENALTY
Page 1

FILED
CINDY GROOMER
DISTRICT CLERK

POTTER COUNTY, TEXAS

BY _____, DEPUTY

93



EXHIBIT
RX-100

1

that simply tracked the unadorned "special issues" contained in Article 37.071(b) verbatim. See generally P.M. McClung, JURY CHARGES FOR TEXAS CRIMINAL PRACTICE 75-78 (rev. ed. 1981). After the landmark decision in Penry v. Lynaugh, 492 U.S. 302 (1989), however, the consistency in Texas capital sentencing instructions quickly disappeared, both as a result of legislative action and unsupervised judicial improvising by trial courts. See generally Peggy M. Tobolowsky, *What Hath Penry Wrought?: Mitigating Circumstances and the Texas Death Penalty*, 19 AMER. J. CRIM. L. 345 (1992).

Roughly speaking, the various types of Texas capital sentencing instructions in the post-Furman era can be broken down into seven different categories, although at least two categories contain sub-categories:

> (i) The unadorned "special issues" in the pre-1991 version of Article 37.071(b). That statute was in effect for all capital murder trials from January 1, 1974 until the date on which Penry was decided on June 26, 1989. For capital murders committed before September 1, 1991, it also was in effect for many cases tried from June 26, 1989 until August 30, 1993, when Art. 37.071 was amended (discussed supra).[3]

_____

statute was enacted. An informed estimate of that number is approximately 750. See James M. Marquart et al., *Gazing Into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 LAW & SOC. REV. 449 (1989) (as of end of 1988, approximately 600 capital murder trials in Texas at which the State sought the death penalty); Sean Fitzgerald, Note, *Walking a Constitutional Tightrope: Discretion, Guidance, and the Texas Capital Sentencing Scheme*, 28 HOUSTON L. REV. 663 (1991); see also NAACP Legal Defense Fund, *Death Row U.S.A. Reporter, 1976-93* (Texas' death row has grown by approximately 20-50 inmates per year since 1973).

[3] That statute, in pertinent part, reads as follows:

(b) On conclusion of the presentation of the evidence, [at the sentencing phase of a capital murder trial] the court shall submit the following three issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable

MOTION TO PRECLUDE IMPOSITION OF DEATH PENALTY                    Page 2

94

(ii) The 1991 version of the statute. This version of the sentencing instructions has been applied in all capital murder trials for murders committed on or after September 1, 1991.[4]

expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

....

(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death....

There have been countless trials at which such instructions were submitted, both before and after Penry. See, e.g., Stewart v. State, 686 S.W.2d 118, 121-124 (Tex.Crim.App. 1984); see also State v. McPherson, 851 S.W.2d 846, 849 & n. 8 (Tex.Crim.App. 1992) (collecting cases).

[4] Simply put, that amended statute eliminated the "deliberateness" and "provocation" special issues and added two new special issues, one of which was directly in response to Penry. The first new special issue asked:

[I]n cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

See Art. 37.071(b)(2) (Vernon 1992).

The new "Penry issue" asks:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating or circumstances to warrant that a sentence of life imprisonment rather than a death sentence should be imposed.

MOTION TO PRECLUDE IMPOSITION OF DEATH PENALTY                    Page 3

**95**

3

(iii) The pre-1991 statute with an extra-statutory "Quinones"-type instruction.[5] This version of the sentencing instructions was applied at a number of Texas capital murder trials both before and after Penry was decided. There have been several versions of this extra-statutory charge, each containing material differences.[6]

(iv) The pre-1991 statute with an extra-statutory "Penry"-type "fourth special issue."[7] This version of the sentencing instructions has been applied in at least one trial after Penry for a capital murder committed before September 1, 1991.

(v) The pre-1991 statute with a "nullification" instruction.[8] This version of the sentencing

---

See Art. 37.071(e) (Vernon 1992).

[5] In Quinones v. State, 592 S.W.2d 933, 947 (Tex.Crim.App. 1980), this Court held that it was not error for the trial court to have refused to submit the following extra-statutory instruction to the capital defendant's sentencing jury: "Evidence presented in mitigation of the penalty may be considered should the jury desire, in determining the answer to any of the special issues."

[6] Compare Boggess v. State, 855 S.W.2d 645, 647 (Tex.Crim.App. 1991); Fuller (Tyrone) v. State, 827 S.W.2d 919, 937 (Tex.Crim.App. 1992), Rios v. State, 846 S.W.2d 310, 315-16 (Tex.Crim.App. 1992); Satterwhite v. State, 858 S.W.2d 412, 425 (Tex.Crim.App. 1993).

[7] See, e.g., State v. McPherson, 851 S.W.2d 846 (Tex.Crim.App. 1992).

[8] See, e.g., San Miguel v. State, ___ S.W.2d ___, 1993 Tex.Crim.App. LEXIS 110 at *7 (Tex.Crim.App. May 26, 1993); Fuller (Aaron) v. State, 829 S.W.2d 191, 209 & n. 5 (Tex.Crim.App. 1992). The proto-typical "nullification" instruction was in Fuller, which read as follows:

When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented at both phases of the trial. A mitigating circumstance may be any aspect of the defendant's character and record or circumstances of the crime which you believe makes a sentence of death inappropriate in this case. If you find there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the Special Issues. If you determine, in consideration of this evidence, that a life sentence,

instructions has been applied at a large number of trials after <u>Penry</u> for capital murders committed before September 1, 1991.   There have been several different versions of this extra-statutory instruction, each containing material differences.[9]

(vi) The pre-1991 statute in which "deliberately" is broadly defined.[10]   This version of the sentencing instructions has been applied in at least two trial since <u>Penry</u> was decided for capital murders committed before September 1, 1991.

(vii) The 1993 version of the statute as applied to all crimes committed on or before August 30, 1991.[11]   This version of the statute will apply to any trial or re-trial that commences after August 29, 1993, for capital

---

rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer at least one of the Special Issues under consideration "No."

<u>Fuller</u>, 829 S.W.2d at 209 n.5.

    [9] <u>Compare</u> the instruction in <u>supra</u> note, <u>with</u> <u>Blue v. State</u>, No. 72,912, unpublished slip op. at 9 (Tex.Crim.App. September 23, 1992).   The instruction in <u>Blue</u> read as follows:

    In answering the Special Issues you shall consider: (1) all evidence offered by either party at the guilt/innocence phase of the trial regarding the defendant's individual participation in the commission of the Capital Murder; and (2) all evidence offered by wither party at the punishment phase of the trial, whether it be aggravating or mitigating evidence.  If the mitigating evidence persuades you that the defendant should not be sentenced to death, then you shall answer one or more of the Special Issues "No."

See <u>Blue v. State</u>, <u>supra</u>, at 9.

    [10] <u>See, e.g.</u>, <u>Martinez v. State</u>, ___ S.W.2d ___, 1993 Tex.Crim.App. LEXIS 119 at *15-*18 (Tex.Crim.App. 1993).

    [11] <u>See</u> Art. 37.0711 (Vernon 1993).  This version of the statute contains all three of the "old" special issues.  <u>See</u> <u>id.</u> (b)(1)-(b)(3).  It further provides that, if the jury returns affirmative answers to all three special issues, then the trial court should further submit to jurors the new, <u>Penry</u>-type special issue enacted in the 1991 amendment.

murders committed on or before August 30, 1991 -- such as
Defendant's trial.

(i) Federal constitutional grounds

In numerous cases, the Supreme Court has stated, in keeping
with our Nation's federalism, that "we are unwilling to say that
there is any one right way for a State to set up its capital
sentencing scheme." Spaziano v. Florida, 468 U.S. 447, 464 (1984)
(citing cases).  The Court has stated, however, that *within* a
single state, there must be consistency in the treatment of capital
defendants who are subject to the death penalty.  Id. at 460 ("If
a State has determined that death should be an available for
certain crimes, then it must administer that penalty in a way that
can rationally distinguish between those individuals for whom death
is an appropriate sanction and those for whom it is not.") (citing
cases).  Thus, "`each distinct [state] system must be examined on
an individual basis.'"  See Pulley v. Harris, 465 U.S. 37, 45
(1984) (quoting Gregg v. Georgia, 428 U.S. 153, 195 (1976) (joint
opinion of Stewart, Powell & Stevens, JJ.)).

In Furman v. Georgia, 408 U.S. 238 (1972), the chief
constitutional infirmity that the controlling Members of the Court
pointed to in their respective concurring opinions was
*arbitrariness*.  See id. at 274 (Brennan, J., concurring) ("In
determining whether a punishment comports with human dignity, we
are aided...by...[a] second principle inherent in [the Eighth
Amendment Cruel and Unusual Punishments] Clause -- that the State
must not arbitrarily inflict punishment."); id. at 309 (Stewart,
J., concurring) ("These death sentences are cruel and unusual in
the same way that being struck by lightning is cruel and
unusual."); see also Spaziano, 468 U.S. at 460.

The above discussion of the various sentencing schemes
concurrently[12] in operation in Texas, "a distinct system," Gregg,

---

[12] Although after August 29, 1993, all trials will be tried
under either Art. 37.071 and Art. 37.0711, the pre-1991 version of
Art. 37.071 was still in operation in many cases up until August
30, 1993.  Moreover, *on appeal*, the pre-1991 version of Art. 37.071

98

6

428 U.S. at 195, amply demonstrate that the present Texas death penalty system is being implemented in an "arbitrary" manner. At least seven categories of similarly situated capital defendants have been treated disparately. Put another way, it is certainly conceivable that, all other things being equal, a single hypothetical Texas capital defendant would be given a different sentence[13] depending on which of the seven different sentencing schemes was in operation at his trial. This is quintessential arbitrariness -- the very type condemned in Furman.

Defendant recognizes that the Texas Legislature was certainly justified in amending Art. 37.071(b) as it did in 1991; indeed, Penry certainly appeared to require such. See Shelley Clarke, Note, A Reasoned Moral Response: Rethinking Texas' Capital Sentencing Statute After Penry v. Lynaugh, 69 TEX. L. REV. 407 (1990). If that were the only other scheme concurrently in operation with the pre-1991 version of Art. 37.071, in all likelihood the constitution could tolerate that disparity. But that is not what happened in the wake of Penry.

Rather, numerous trial courts throughout this state and the Texas Legislature have haphazardly created, in addition to the prevailing pre-1991 capital sentencing scheme, a total of at least six new, distinct capital sentencing schemes that have governed similarly or identically situated Texas capital defendants. Particularly noteworthy is the failure of the Texas Court of Criminal Appeals to impose uniformity among the practices adopted by the trial courts. Nor is the Legislature free from its share of the blame. By waiting until August 30, 1993, to amend Art. 37.071 as it applies to trials or retrials of capital defendants who committed their crimes before September 1, 1991, the Legislature

---

will still be in operation in the foreseeable future in the Court of Criminal Appeals' sufficiency-of-the-evidence analyses regarding juries' affirmative answers to the special issues.

[13] Of course, in a Texas capital case, where a defendant has been found guilty of capital murder, the only sentencing options are a life sentence and a death sentence.

has sowed the seeds of arbitrariness and inconsistency.  Under both
identical and analogous circumstances, other States have not dealt
with seemingly sweeping invalidations of their post-Furman death
penalty statutes in such a chaotic manner.  See OREGON REVISED
STATUTES, § 163.150 (as amended July 24, 1989); State v. Wagner, 786
P.2d 93, 99-100 (Ore. 1990); cf. OHIO REVISED CODE §§ 2929.02-06 (as
amended 1981); State v. Melchior, 381 N.E.2d 195, 200 (Ohio 1978);
David J. Benson, *Constitutionality of Ohio's New Death Penalty
Statute*, 14 TOLEDO L. REV. 77 (1982).

Fetterly v. Paskett, 997 F.2d 1295 (9th Cir. 1993), presents
an analogous situation to the instant case.  In that case, the
Ninth Circuit condemned an instance of "Furman arbitrariness"
within a single state's capital sentencing system.  In particular,
the court in dicta stated that a federal constitutional violation
occurred when the Idaho Supreme Court's refusal to apply the clear
mandate of state capital sentencing law, which governed the
weighing of aggravating factors against mitigating factors, to all
similarly situated capital defendants.  The court's reasoning
should be applied to Texas' experience:

> In Godfrey v. Georgia, 446 U.S. 420, 100 S. Ct. 1759, 64
> L.Ed.2d 398 (1980), the Supreme Court held that states
> can impose the death penalty for certain crimes without
> running afoul of our Constitutional prohibition against
> cruel and unusual punishment, but only if the manner in
> which the penalty is selected "provide[s] a meaningful
> basis for distinguishing the few cases in which [the
> penalty] imposed from the many cases in which it is not."
> Id. at 427...As pointed out by Justice Stevens, "this
> Court's decisions have made clear that States may impose
> this ultimate sentence *only if they follow procedures*
> that are designed to assure reliability in sentencing
> determinations. Barclay v. Florida, 463 U.S. 939, 958-
> 59, 103 S.Ct. 3418, 3429, 77 L.Ed. 1134 (1983) (Stevens,
> J., concurring) (emphasis added).   Part of the
> requirement of reliability is "`that the [aggravating and
> mitigating] reasons present in one case will reach a
> similar   result   to   that   reached   under   similar
> circumstances in another case.'" Id. at 954...(quoting
> Proffitt v. Florida, 428 U.S. 242, 251, 96 S. Ct. 2960,
> 2966, 49 L.Ed.2d 913 (1976) (opinion of Stewart, Powell,
> and   Stevens,   JJ.))   (internal   quotations   omitted).
> Because Fetterly may not have been sentenced to death as

prescribed by Idaho Code § 19-2515(c), this goal of
similar sentences in similar cases may not have been
met...

_Fetterly_, 997 F.2d at 1299.

Although Texas' experience is different in that it involves a
global violation of all Texas capital defendants' rights to be free
from arbitrary, inconsistent capital sentencing procedures, while
Idaho apparently only violated one or a few defendant's rights,
_Fetterly_'s reasoning applies equally to Texas. The bottom line is
that Texas courts and the state Legislature, without any
discernible rational basis, have haphazardly turned Texas' capital
sentencing scheme into a patch-work quilt. Because similarly
situated Texas capital defendants -- including Defendant -- have
been unjustifiably sentenced to death under radically different
sentencing schemes, this Court must prevent the State from seeking
a death sentence and ensure that Defendant receives a sentence of
life imprisonment.

**(ii) State constitutional grounds**

"Excessive bail shall not be required, nor excessive
fines imposed, nor cruel _or_ _unusual_ punishments
inflicted."

TEX. CONST. ART. I, § 13

Defendant adopts all of the
arguments made _supra_ with respect to his state
constitutional claim. Although Defendant has primarily
cited federal Eighth Amendment authority herein, he
intends that this Court should separately consider his
claim under the Texas and U.S. Constitutions. As the
Texas Court of Criminal Appeals has noted, the Texas
Constitution may properly provide greater protections
than its federal counterpart. See, _e.g._, Richardson v.
State, ___ S.W.2d ___, No. 901-92 (Tex.Crim.App. Octo.
27, 1993); Heitman v. State, 815 S.W.2d 681
(Tex.Crim.App. 1991); Ex Parte Hererra, ___ S.W.2d ___,
1993 Tex.Crim.App. LEXIS 100 at *2 (Tex.Crim.App. May 11,

1993) (Maloney, J., dissenting, joined by Baird, Clinton & Overtstreet, JJ.); see also Judge Rusty Duncan, *Terminating the Guardianship: A New Role for State Court*, 19 St. Mary's L.J. 809 (1988).

Particularly noteworthy is the fact the Texas Constitution proscribes "cruel or unusual punishments," while the U.S. Constitution proscribes "cruel *and* unusual punishments." Obviously, despite apparent implicit claims to the contrary by courts and commentators,[14] the Texas Constitution, based on its plain language, was intended offer broader protections than the U.S. Constitution. Cf. People v. Anderson, 493 P.2d 880, 883–87 (Cal. 1972) (attributing textual significance to state constitutional proscription against "cruel or unusual punishments"). Because Defendant's primary argument here is that the many sentencing schemes operating concurrently inject arbitrariness into the Texas capital sentencing scheme, at the very least Defendant's death sentence, if imposed, would be "unusual."

WHEREFORE, Defendant respectfully moves this Court to preclude imposition of the death penalty in this case, by instructing the jury to return such answers to the special issue questions as may be necessary to result in the imposition of a sentence of life imprisonment, or by forbidding the State to proceed at punishment and imposing a sentence of life imprisonment.

---

[14] See, e.g., Livingston v. State, 542 S.W.2d 655, 662 (Tex.Crim.App. 1976) (mistakenly treating Texas constitutional provision as if it proscribes "cruel *and* unusual punishment"); Peter Linzer, *Symposium on the Texas Constitution*, 68 Tex. L. Rev. 1573, 1592 & nn. 133–34 (1988) (treating Art. I, § 13 as identical to Eighth Amendment).

MOTION TO PRECLUDE IMPOSITION OF DEATH PENALTY                    Page 10

102

Respectfully submitted,

Paul Herrmann
500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas   79101
(806) 342-4242

_____
Paul Herrmann
State Bar No.09541810
Attorney for Defendant

James D. Durham, Jr.

_____
Attorney for Defendant
1008 W. 10th Avenue
Amarillo, Texas 79101-3113
(806) 373-7328
State Bar No. 06284000


## CERTIFICATE OF DELIVERY

I, the undersigned, hereby certify that on 2/11,1999,
a true and correct copy of the foregoing document was delivered in
accordance with the Texas Rules of Appellate and Criminal Procedure
to the Office of the District Attorney in and for Potter County,
Texas.

MOTION TO PRECLUDE IMPOSITION OF DEATH PENALTY                 Page 11

**103**

11

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| V | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### ORDER ON PRE-TRIAL MOTION NO. 14
### (DEFENDANT'S MOTION TO PRECLUDE DEATH PENALTY)

IT IS ORDERED that Defendant's Motion to Preclude the Imposition of the Death Penalty (on grounds of arbitrariness and capricious administration and imposition in violation of the federal and state constitutions) is GRANTED / OVERRULED, to which ruling Defendant respectfully objects.

Signed _____, 1999.

_____
Judge Presiding

ORDER ON MOTION TO PRECLUDE DEATH PENALTY                    Page 1

253502

104

12

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

## PRE-TRIAL MOTION NO. 15
## MOTION TO PRECLUDE
## PROSECUTION FROM SEEKING THE DEATH PENALTY

COMES NOW Defendant and files this Motion to Preclude Prosecution from Seeking the Death Penalty, and as grounds therefore would show this Honorable Court as follows:

A. Background.

In view of the many different capital sentencing schemes that have been in operation in Texas in the post-Furman era,[1] the Texas death penalty has been arbitrarily imposed and, thus, is unconstitutional under the Eighth and Fourteenth Amendments. In order to understand the basis of this claim, this Court should recognize the large number of discrete capital sentencing schemes that have been in operation in Texas capital cases since the early 1970's, when the modern death penalty statutes were enacted in the wake of the Supreme Court's decision in Furman.[2] At a capital murder trial in 1994, a capital defendant's sentencing jury will be instructed pursuant to TEX. CODE CRIM. PRO. Art. 37.071 (Vernon's 1993). As discussed below, this is one of many different capital sentencing schemes in operation in Texas since 1973.

Of the many hundreds of persons sentenced to death in Texas since the "modern" capital sentencing statute was enacted,[3] the

---

[1] See Furman v. Georgia, 408 U.S. 238 (1972).

[2] See Michael Kuhn, Note, House Bill 200: The Legislative Attempt to Reinstate Capital Punishment in Texas, 11 Houston L. Rev. 410 (1974); see also David Crump, Capital Murder: The Issues in Texas, 14 Houston L. Rev. 531, 532-33 & nn.7-8 (1977); Stephen W. MacNoll, Note, A Constitutional Analysis of the Texas Death Statute, 15 Amer. J. Crim. L. 69, 79-81 (1988).

[3] Defendant is aware of no source that collects all of the capital trials that have occurred in Texas since the post-Furman statute was enacted. An informed estimate of that number is approximately 750. See James M. Marquart et al., Gazing Into the Crystal Ball:

MOTION TO PRECLUDE DEATH PENALTY

Page 1

CINDY GROOMER
DISTRICT CLERK
POTTER COUNTY, TEXAS
BY_____, DEPUTY 105


EXHIBIT
RX-101

1

vast majority were sentenced under jury instructions that simply asked the unadorned "special issues" contained in the original version TEX. CODE CRIM. PRO.  Article 37.071(b) (Vernon's 1989). See generally P.M. McClung, JURY CHARGES FOR TEXAS CRIMINAL PRACTICE 75-78 (rev. ed. 1981).  After the landmark decision in Penry v. Lynaugh, 492 U.S. 302 (1989), however, the consistency in Texas capital sentencing instructions quickly disappeared, both as a result of legislative action and unsupervised judicial improvising by the courts. See generally Peggy M. Tobolowsky, *What Hath Penry Wrought?: Mitigating Circumstances and the Death Penalty,* 19 AMER. J. CRIM. L. 345 (1992).  In 1991, the Texas Legislature enacted an amended, post-Penry version of Article 37.071, which modified the "special issue" format.  That statute applies to all crimes committed on or after September 1, 1991; under the 1991 version of the statute, the old version of Article 37.071 applied to all crimes committed before September 1, 1991. See TEX. CODE CRIM. PRO. ART. 37.071 (Vernon 1992).  Again in 1993, the Texas Legislature enacted yet another amended version of Article 37.071. That statute, which became effective September 1, 1993, amended the "special issue" format applicable to all crimes committed before September 1, 1991.  See TEX. CODE CRIM. PRO. ART. 37.0711 (Vernon 1993).

Roughly speaking, the various types of Texas capital sentencing instructions in the post-Furman era can be broken down into seven different categories, although at least two categories contain sub-sets:

1.    The unadorned "special issues" in the pre-1991 version of Article 37.071. That statute was in effect for all capital murder trials from January 1, 1974, until the date on which Penry was decided on June 26, 1989.  For capital murders committed before September 1, 1991, it also was in effect for many cases tried from June 26,

---

*Can Jurors Accurately Predict Dangerousness in Capital Cases?,* 23 Law & Soc. Rev. 449 (1989)(as of end of 1988, approximately 600 capital murder trials in Texas at which the State sought the death penalty); Sean Fitzgerald, Note, *Walking a Constitutional Tightrope: Discretion, Guidance, and the Texas Capital Sentencing Scheme,* 28 Houston L. Rev. 663 (1991); see also, NAACP Legal Defense Fund, *Death row U.S.A. Reporter,* 1976-93 (Texas' death row has grown by approximately 20-5- inmates per year since 1973).

MOTION TO PRECLUDE DEATH PENALTY                                              Page 2

1989, until August 30, 1993, when Art. 37.071 was amended (discussed _supra_."[4]

2.   The 1991 amended version of the statute.  This version of the sentencing instructions has been applied in all capital murder trials for murders committed on or after September 1, 1991.  This version of the statute is applicable to Defendant's case."[5]

---

[4]That statute, in pertinent part, reads as follows:

(b)   On conclusion of the presentation of the evidence, [at the sentencing phase of a capital murder trial] the court shall submit the following three issues to the jury:

(1)   whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2)   whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3)   if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

(c)   If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death.....

There have been countless trials at which such instructions were submitted, both before and after _Penry_. _See_, e.g., _Stewart v. State_, 686 S.W.2d 118, 121-124 (Tex.Crim.App. 1984); _See also State v. McPherson_, 851 S.W.2d 846, 849 & n. 8 (Tex.Crim.App. 1992) (collecting cases).

[5]Simply put, that amended statute eliminated the "deliberateness" and "provocation" special issues and added two new special issues, one of which was directly in response to _Penry_.
The first new special issue asked:

[I]n cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

_See_ Art. 37.071(b)(2) (Vernon 1992),

The new "_Penry_" issue asks:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating or circumstances to warrant that a sentence of life imprisonment rather than a death sentence should be imposed.

_See_ Art. 37.071(e) (Vernon 1992).

MOTION TO PRECLUDE DEATH PENALTY                                    Page 3

3. The pre-1991 statute with an extra-statutory "Quinones"-type instruction.[6] This version of the sentencing instructions was applied at a number of Texas capital murder trials both before and after Penry was decided."[7] There have been several versions of this extra-statutory charge, each containing material differences."[8]

4. The pre-1991 statute with an extra-statutory "Penry"-type "fourth special issue."[9] This version of the sentencing instructions has been applied in certain trials after Penry for a capital murder committed before September 1, 1991.

5. The pre-1991 statute with a "nullification" instruction."[10] This version of the sentencing instructions has been applied at a large number of trials after Penry for capital murders committed before September 1, 1991. There have been several different

---

[6] In Quinones v. State, 592 S.W.2d 933, 97 (Tex.Crim.App. 1980), the Court held that it was not error for the trial court to have refused to submit the following extra-statutory instruction to the capital defendant's sentencing jury: "Evidence presented in mitigation of the penalty may be considered should the jury desire, in determining the answer to any of the special issues."

[7] See Tr. at 117-18. The trial court instructed the jury that "[i]n determining each of the[] [special] [i]ssues, you may take into consideration all the evidence submitted to you in the trial of this case, whether aggravating or mitigating in nature.......

[8] Compare the instruction in the instant case, supra note, with Boggess v. State, 855 S.W.2d 645, 647 (Tex.Crim.App. 1991); Fuller (Tyrone) v. State, 827 S.W.2d 919, 937 (Tex.Crim.App. 1992), Rios v. State, 846 S.W.2d 310, 315-16 (Tex.Crim.App. 1992); Satterwhite v. State, 858 S.W.2d 412, 425 (Tex.Crim.App. 1993).

[9] See, e.g., State v. McPherson, 851 S.W.2d 846 (Tex.Crim.App. 1992).

[10] See, e.g., San Miguel v. State, ___ S.W.2d ___, 1993 Tex.Crim.App. LEXIS 110 at *7 (Tex.Crim.App. May 26, 1993); Fuller (Aaron) v. State, 829 S.W.2d 191, 209 & n. 5 (Tex.Crim.App. 1992). The proto-typical "nullification" instruction was in Fuller, which read as follows:

When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented at both phases of the trial. A mitigating circumstance may be any aspect of the defendant's character and record or circumstances of the crime which you believe makes a sentence of death inappropriate in this case. If you find there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the Special Issues. If you determine, in consideration of this evidence, that a life sentence, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer at least one of the Special Issues under consideration "No."

Fuller, 829 S.W.2d at 209 n.5,

MOTION TO PRECLUDE DEATH PENALTY                                    Page 4

108

versions of this extra-statutory instruction, each containing material differences.[11]

6. The pre-1991 statute in which "deliberately" is broadly defined.[12] This version of the sentencing instructions has been applied in certain trials since <u>Penry</u> was decided for capital murders committed before September 1, 1991.

7. The 1993 version of the statute as applied to all crimes committed on or before August 30, 1991.[13] This version of the statute will apply to any trial or re-trial that commences after August 29, 1993, for capital murders committed on or before August 30, 1991.

Note that the above categories of cases reveal three significant contradictions in the Court of Criminal Court's capital sentencing jurisprudence during the last two decades: First, there is the contradiction between <u>Quinones v. State</u>, <u>supra</u>, and its progeny and the many recent cases in which the Court has given its imprimatur to the very instruction rejected in <u>Quinones</u>. <u>See</u>, <u>e.g.</u>, <u>Fuller (Tyrone) v. State</u>, <u>supra</u>. Second, there is the contradiction between <u>Stewart v. State</u>, 686 118, 121-24

---

[11]<u>Compare</u> the instruction in <u>supra</u> note, <u>with</u> <u>Blue v. State</u>, No. 72,912, unpublished slip op. at 9 (Tex.Crim.App. September 23, 1992). The instruction in <u>Blue</u> read as follows:

In answering the Special Issues you shall consider: (1) all evidence offered by either party at the guilt/innocence phase of the trial regarding the defendant's individual participation in the commission of the Capital Murder; and (2 )All evidence offered by either party at the punishment phase of the trial, whether it be aggravating or mitigating evidence. If the mitigating evidence persuades you that the defendant should not be sentenced to death, then you shall answer one or more of the Special Issues "No."

See Blue v. State, supra, at 9.

[12]<u>See</u>, <u>e.g.</u> <u>Martinez v. State</u>, ___ S.W,2d ___, 1993 Tex.Crim.App. LEXIS 119 at *15-*18 (Tex.Crim.App. 1993).

[13]<u>See</u> Art. 37.0711 (Vernon 1993). This version of the statute contains all three of the "old" special issues. <u>See</u> <u>id</u>. (b)(1)-(b)(3). It further provides that, if the jury returns affirmative answers to all three special issues, then the trial court should further submit to jurors the new, <u>Penry</u>-type special issue enacted in the 1991 amendment. This version of the statute instructs jurors that "[i]f a defendant is convicted of an offense under Section 19.03(a)(6), Penal Code, the court shall submit the [special] issues...only with regard to the conduct of the defendant in murdering the deceased individual first named in the indictment."

MOTION TO PRECLUDE DEATH PENALTY                                    Page 5

(Tex.Crim.App. 1980), and at least one case in which the Court has given its imprimatur to an extra-statutory charge specifically permitting jurors to consider specific mitigating evidence. See McPherson v. State, supra. Also relevant in this regard are the many recent cases in which the Court of Criminal Appeals has given its stamp of approval to "nullification" instructions. See, e.g., Fuller (Aaron) v. State, supra. Finally, there is the contra-diction between the Court's consistent refusal to require trial courts to define "deliberately" as used in the first special issue, see, e.g., Russell v. State, 665 S.W.2d 771, 779-80 (Tex.Crim.App, 1983), and the Court's imprimatur of a trial judge's extra-statutory definition of the term in Martinez v. State, supra.

B. **Argument.**

In numerous cases, the United States Supreme Court has stated, in keeping with our nation's federalism, that "we are unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." Spaziano v. Florida, 468 U.S. 447, 464 (1984) (citing cases). The Court has stated, however, that *within* a single state, there must be consistency in the treatment of capital defendants who are subject to the death penalty. Id. at 460 ("If a State has determined that death should be an available for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not.") (citing cases). Thus, "'each distinct [state] system must be examined on an individual basis."' See Pulley v. Harris, 465 U.S. 37, 45 (1984) (quoting Gregg v. Georgia, 428 U.S. 153, 195 (1976) (joint opinion of Stewart, Powell & Stevens, JJ.).

In Furman v. Georgia, 408 U.S. 238 (1972), the chief constitutional infirmity that the controlling members of the Court pointed to in their respective concurring opinions was *arbitrariness.* See id. at 274 (Brennan, J., concurring) ("In determining whether a punishment comports with human dignity, we are aided...by...[a] second principle inherent in [the Eighth Amendment Cruel and Unusual Punishments] Clause -- that the State

MOTION TO PRECLUDE DEATH PENALTY                                    Page 6

must not arbitrarily inflict punishment."); id. at 309 (Stewart, J., concurring) ("'These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual."); see also Spaziano, 468 U.S, at 460.

The above discussion of the various sentencing schemes concurrently[14] in operation in Texas, "a distinct system," Gregg, 428 U.S. at 195, amply demonstrate that the present Texas death penalty system is being implemented in an "arbitrary" manner. At least seven categories of similarly situated capital defendants have been treated disparately. Put another way, it is certainly conceivable that, ceteris paribus, a single hypothetical Texas capital defendant would be given a different sentence[15] depending on which of the seven different sentencing schemes was in operation at his trial. This is quintessential arbitrariness -- the very type condemned in Furman.

Defendant recognizes that the Texas Legislature was certainly justified in amending Art. 37.071(b) as it did in 1991; indeed, Penry certainly appeared to require such. See Shelley Clarke, Note, A Reasoned Moral Response: Rethinking Texas' Capital Sentencing Statute After Penry v. Lynaugh, 69 Tex. L. Rev. 407 (1990). If that were the only other scheme concurrently in operation with the pre-1991 version of Art. 37.071, in all likelihood Defendant would never have made this claim. But that is not what happened in the wake of Penry.

Rather, the Texas Legislature and numerous trial courts throughout this state have haphazardly created, in addition to the prevailing pre-1991 capital sentencing scheme, a total of at least six new, distinct capital sentencing schemes that have governed

---

[14]Although after August 29, 1993, all trials will be tried under either Art. 37.071 and Art. 37.0711, the pre-1991 version of Art. 37.071 was still in operation in many cases up until August 30, 1993. Moreover, on appeal, the pre-1991 version of Art. 37.071 will still be in operation in the foreseeable future in the sufficiency-of-the-evidence analyses regarding juries' affirmative answers to the special issues.

[15]Of course, in a Texas capital case, where a defendant has been found guilty of capital murder, the only sentencing options are a life sentence and a death sentence.

similarly or identically situated Texas capital defendants.
Particularly noteworthy is the Court of Criminal Appeal's failure
to impose uniformity among the practices adopted by the trial
courts. Nor is the Legislature free from its share of the blame.
By waiting until August 30, 1993, to amend Art. 37.071 as it
applies to trials or retrials of capital defendants who committed
their crimes before September 1, 1991, the Legislature has sowed
the seeds, of arbitrariness and inconsistency. Under both
identical and analogous circumstances, other States have not dealt
with seemingly sweeping invalidations of their post-Furman death
penalty statutes in such a chaotic manner. See OREGON REVISED
STATUTES, § 163.150 (as amended July 24, 1989); State v. Wagner,
786 P.2d 93, 99-100 (Ore. 1990); cf. OHIO REVISED CODE §§ 2929.02-
06 (as amended 1981); State v. Melchior, 381 N.E.2d 195, 200 (Ohio
1978); David J. Benson, *Constitutionality of Ohio's New Death
Penalty Statute*, 14 TOLEDO L. REV. 77 (1982).

Fetterly v. Paskett, 997 F.2d 1295 (9th Cir. 1993), presents
an analogous situation to the instant case. In that case, the Ninth
Circuit condemned an instance of Furman arbitrariness" within a
single state's capital sentencing system. In particular, the court
in dicta stated that a federal constitutional violation occurred
when the Idaho Supreme Court's refusal to apply the clear mandate
of state capital sentencing law, which governed the weighing of
aggravating factors against mitigating factors, to all similarly
situated capital defendants. The court's reasoning is cogent and
should be applied to Texas' experience:

Godfrey v. Georgia, 446 U.S. 420, 100 S. Ct. 1759, 64 L.Ed.2d
398 (1980), the Supreme Court held that states can impose the death
penalty for certain crimes without running afoul of our
Constitutional prohibition against cruel and unusual punishment but
only if the manner in which the penalty is selected "provide[s] a
meaningful basis for distinguishing the few cases in which [the
penalty] imposed from the many cases in which it is not." Id. at
427... As pointed out by Justice Stevens, "this Court's decisions
have made clear that States may impose this ultimate Sentence *only*

MOTION TO PRECLUDE DEATH PENALTY                                    Page 8

112

8

*if they follow procedures* that are designed to assure reliability
in sentencing determinations. <u>Barclay v. Florida</u>, 463 U.S. 939,
958-59, 103 S.Ct. 3418, 3429, 77 L.Ed. 1134 (1983) (Stevens, J.,
concurring) (emphasis added). Part of the requirement of
reliability is "'that the aggravating and mitigating] reasons
present in one case will reach a similar result to that reached
under similar circumstances in another case.'" <u>Id</u>. at 954...
(quoting <u>Proffitt v. Florida</u>, 428 U.S. 242, 251, 96 S.Ct. 2960,
2966, 49 L.Ed.2d 913 (1976) (opinion of Stewart, Powell, and
Stevens, JJ,)) (internal quotations omitted). Because <u>Fetterly</u> may
not have been sentenced to death as prescribed by Idaho Code §19-
2515(c),this goal of similar sentences in similar cases may not
have been met...<u>Fetterly</u>, 997 F.2d at 1299.

Although Texas' experience is different in that it involves a
global violation of all Texas capital defendants' rights to be free
from arbitrary, inconsistent capital sentencing procedures, while
Idaho apparently only violated one or a few defendant's rights,
<u>Fetterly</u>'s reasoning applies equally to Texas. The bottom line is
that Texas courts and the state legislature, without any
discernible rational basis, have haphazardly turned Texas' capital
sentencing scheme into a patchwork quilt because similarly situated
Texas capital defendants have been unjustifiably sentenced to death
under radically different sentencing schemes, this Court must
vacate Defendant's death sentence.[16]

---

[16]Defendant adopts all of the arguments made <u>supra</u> with respect to a state
constitutional claim. Although Defendant has primarily cited federal Eighth Amendment
authority herein, he intends that this Court should separately consider his claim under the
Texas and U.S. Constitutions. As the Court of Criminal Appeals has noted, it can and should
interpret the Texas Constitution in a more expansive manner than the federal Constitution.
<u>See</u>, <u>e.g.</u>, <u>Richardson v.State</u>, ___ S.W.2d. No. 901-92 (Tex.Crim.App. Octo. 27,1993); <u>Heitman
v. State</u>, 815 S.W.2d 681 (Tex.Crim.App. 1991); <u>Ex Parte Hererra</u>, ___ S.W.2d ___ 1993
Tex.Crim.App. LEXIS 100 at *2 (Tex.Crim.App. May 11, 1993) (Maloney, J., dissenting, joined
by Baird, Clinton & Overstreet, JJ.); <u>see also</u> Judge Rusty Duncan, *Terminating the
Guardianship: A New Role for State Court*, 19 ST. MARY'S L.J. 809 (1988).

Particularly noteworthy is the fact the Texas Constitution proscribes "cruel or
unusual punishments," while the U.S. Constitution proscribes "cruel and unusual
punishments." Texas Const. Art. 1, § 13. Obviously, despite apparent implicit claims to
the contrary by courts and commentators, the Texas Constitution, based on its plain
language, was intended offer broader protections than the U.S. Constitution. <u>Cf</u>. <u>People
v. Anderson</u>, 493 P.2d 880, 883-87 (Cal. 1972) (attributing textual significance to state
constitutional proscription against "cruel or unusual punishments"). Because Defendant's

MOTION TO PRECLUDE DEATH PENALTY                                      Page 9

## CONCLUSION

In conclusion, this Court should hold that the State of Texas cannot constitutionally seek the death penalty against Defendant.

Respectfully submitted,

Paul Herrmann
500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas   79101
(806) 342-4242

_____
Paul Herrmann
State Bar No.09541810
Attorney for Defendant

James D. Durham, Jr.

_____
Attorney        for        Defendant
1008 W. 10th Avenue
Amarillo, Texas 79101-3113
(806) 373-7328
State Bar No. 06284000

## CERTIFICATE OF DELIVERY

I, the undersigned, hereby certify that on _____, 1999, a true and correct copy of the foregoing document was delivered in accordance with the Texas Rules of Appellate and Criminal Procedure to the Office of the District Attorney in and for Potter County, Texas.

primary argument here is that the many sentencing schemes operating concurrently inject arbitrariness into the Texas capital sentencing scheme, at the very least a Defendant's death sentence is 'unusual.'

MOTION TO PRECLUDE DEATH PENALTY                                Page 10

**114**

10

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### ORDER ON PRE-TRIAL MOTION NO. 15
### (DEFENDANT'S MOTION TO
### PRECLUDE PROSECUTION FROM SEEKING THE DEATH PENALTY)

On _____, 1999, came on to be heard the Defendant's Motion to Preclude Prosecution from Seeking the Death Penalty, and after due consideration, the Court is of the opinion, and it is hereby ORDERED, that said Motion is:

_____ GRANTED.

_____ DENIED, to which ruling Defendant timely excepts.

SIGNED _____3/22/99_____, 1999

_____
Judge Presiding

ORDER ON MOTION TO PRECLUDE DEATH PENALTY

253503

FILED
CINDY GROOMER
DISTRICT CLERK

1999 MAR 23  A 10: 19

POTTER COUNTY TEXAS          Page 1

BY_____ DEPUTY  115

11

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

PRE-TRIAL MOTION NO. __16__
DEFENDANT'S MOTION TO QUASH
AND SET ASIDE THE INDICTMENT

Comes now Defendant prior to Defendant's announcement of ready and moves that the indictment filed against Defendant be dismissed by virtue of the authority of the Fifth and Sixth Amendments to the United States Constitution and Articles 27.02, 27.03, 27.08 and 27.09, C.C.P. for the following reasons:

I

The statute upon which this prosecution is based, namely §19.03(a)(2) P.C., is unconstitutional and violates the Eighth Amendment to the United States Constitution and Article I, §13 of the Texas Constitution, in that the statute inflicts a cruel and unusual punishment. Death would not and could not be a proper punishment for this type of offense.

II

The application of the capital murder statutes of Texas have no measurable qualitative or quantitative influence on the incidence of criminal homicide, and more specifically the types of criminal homicide listed in §19.03 P.C., and has not been shown to be a deterrent to such conduct. Consequently, such statutes constitute a cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article I, §13 of the Texas Constitution.

III

The special questions contained in Article 37.071 C.C.P. do not adequately limit the jury's discretion on the issue of the appropriate punishment. The two questions which are asked do not channel the jury's consideration and permit arbitrary and wanton imposition of the death penalty.

CINDY GROOMER
DISTRICT CLERK

1999 FEB 11  P 2:55

POTTER COUNTY, TEXAS   Page 1

BY _____, DEPUTY   **116**

EXHIBIT
RX-102

1

### IV

The requirement that the jury must answer the second statutory question in Article 37.071 C.C.P., concerning whether there is a probability that the accused will commit criminal acts of violence that would constitute a continuing threat to society, violates the constitutional requirement that the prosecution must prove its case beyond a reasonable doubt.   In re Winship, 397 U.S. 358 (1970).

### V

The first statutory question in Article 37.071 C.C.P. is so vague as to be meaningless because of the difficulty in predicting future conduct with any degree of exactitude and beyond a reasonable doubt.  Therefore, such procedure amounts to cruel and unusual punishment.

### VI

The Texas capital murder statutes, and specifically the first question under Article 37.071 C.C.P. that concerns the "probability" that the accused will or will not do certain acts in the future, is void for vagueness and is cruel and unusual punishment in providing that an accused must be executed on the basis of "probable" future conduct.

### VII

The capital murder statute of Texas is unconstitutional in that it shifts the burden of proof to the accused in the case of the special questions of Article 37.071 C.C.P., by requiring that ten jurors must answer an issue "yes" or, in the appropriate case, "yes" for there to be a legal agreement that will constitute a res judicata decision on the issues presented.  This constitutes an impermissible shifting of the burden of proof and cruel and unusual punishment, in violation of the Fifth and Eighth Amendments to the United States Constitution; Article I, §19, of the Texas Constitution; Article 1.09 C.C.P.; and §2.01 P.C.

### VIII

The capital murder statute of Texas is unconstitutional in that the special issue inquiring into the "deliberateness" of an accused's acts and conduct in causing death with a "reasonable

Page 2

**117**

expectation that death would occur", has been deleted from the capital murder statute which became effective September 1, 1991, and as such, said deletion broadens rather than narrows the sentencer's discretion in whether or not to impose the death sentence against a particular defendant.

### IX

Article 37.071(e) C.C.P., as amended September 1, 1991, improperly shifts the burden of proof in violation of the Fifth and Fourteenth Amendments to the United States Constitution and in violation of the Texas Constitution in that the statute fails to provide the jury with an instruction or equivalent guidance as to who actually carries a burden of proof on the issue of mitigating circumstances.  Since the statute clearly establishes that the State bears the burden of proof in securing an affirmative answer to the issue of future dangerousness or party responsibility, the statute's failure to assign the burden of proof to the State shifts persuasive responsibilities onto the shoulders of a defendant by implication.  In practical terms, a "tie" could conceivably go to the State, resulting in the imposition of a death sentence. Moreover, the requirement that the Defendant bear the responsibility of securing at least ten affirmative votes in order to avoid the sentence of death indicates an additional burden of proof attributable to the defendant in violation of the constitutional mandates discussed above and in violation of In re Winship, 397 U.S. 358 (1970).

### X

The instruction regarding "mitigating evidence" in Article 37.071(f)(4) C.C.P. is overly broad and vague and fails to instruct the jury that mitigating evidence per se must be in reduction of a defendant's moral blame worthiness, rather than allowing a jury to interpret and define "mitigating evidence" without appropriate, narrowing instructions, in violation of constitutional mandates as evidenced by Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954 and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869.

### XI

Page 3

**118**

3

Article 37.071 C.C.P. is unconstitutional in that there is a failure to instruct the jury that the existence of mitigating evidence can be utilized only as mitigating against imposition of the death sentence and not as an aggravating feature militating in favor of the death penalty.

WHEREFORE, premises considered, the Defendant respectfully prays that the Court grant this motion in all things.

Respectfully submitted,

Paul Herrmann
500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas 79101
(806) 342-4242


Paul Herrmann
State Bar No.09541810
Attorney for Defendant

James D. Durham, Jr.


Attorney for Defendant
1008 W. 10th Avenue
Amarillo, Texas 79101-3113
(806) 373-7328
State Bar No. 06284000

## CERTIFICATE OF DELIVERY

I, the undersigned, hereby certify that on _____,1999, a true and correct copy of the foregoing document was delivered in accordance with the Texas Rules of Appellate and Criminal Procedure to the Office of the District Attorney in and for Potter County, Texas.


Page 4

119

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320HT$^B$ DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

### ORDER ON PRE-TRIAL MOTION NO. __16__
### (DEFENDANT'S MOTION TO QUASH AND SET ASIDE INDICTMENT)

On _____, 1999, came on to be heard Defendant's Motion to Quash and Set Aside the Indictment.  The Court, after having considered the motion and argument of counsel, finds that:

____ the motion is well taken and should be granted.  IT IS THEREFORE ORDERED that the indictment in the above entitled and numbered cause is quashed and set aside upon the ground stated in Defendant's Motion to Quash and Set Aside Indictment.

____ the motion should be denied.  IT IS THEREFORE ORDERED that Defendant's Motion to Quash and Set Aside Indictment is hereby DENIED, to which action of the Court the Defendant duly objected.

SIGNED _____, 1999.

_____
Judge Presiding

FILED
ANDY GROOM
DISTRICT CLERK

1999 MAR 23  A 11: 19

POTTER COUNTY, TEXAS

BY _____ DEPUTY

Page 1

ORDER NO. 7
ON MOTION TO QUASH AND SET ASIDE INDICTMENT

253504

120

5

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### PRE-TRIAL MOTION NO. 17
### SECOND MOTION TO SET ASIDE THE
### INDICTMENT (UNCONSTITUTIONALITY OF STATUTE)

NOW COMES Defendant and moves to set aside the indictment, and for good cause shows the following:

#### I

The Texas capital punishment scheme, which limits the jury to consideration of the special issues, does not permit the jury to consider and give effect to all the mitigating circumstances which exist concerning Defendant, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and Article 1, §§10, 13 and 19 of the Texas Constitution.  See, Penry v. Lynaugh, 109 S.Ct. 2934 (1989); Eddings v. Oklahoma, 455 U.S. 104 (1982); and Lockett v. Ohio, 438 U.S. 586 (1978).

#### II

The Texas capital punishment scheme unconstitutionally chills Defendant's ability to present relevant mitigating evidence to the jury, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and Article I §§10, 13 and 19 of the Texas Constitution.

#### III

The unconstitutional chilling effect (described in Paragraph II above) denies Defendant the effective assistance of counsel, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I §10 of the Texas Constitution.

#### IV

The Texas death penalty scheme gives prosecutors unfettered discretion in deciding whether to seek the death penalty in any particular case in violation of the Eighth and Fourteenth

FILED

1999 FEB 11  P 2: 55

Page 1

POTTER COUNTY, TEXAS

BY_____.DEPUTY   **121**



EXHIBIT
RX-103

Amendments to the United States Constitution and Article I §§10, 13 and 19 of the Texas Constitution.

<div align="center">V</div>

Article 37.071 of the Texas Code of Criminal Procedure mandates that "jury should return a special verdict of 'yes' or 'no' on each issue submitted." It further requires the Court to instruct the jury that it may not answer "yes" unless it agrees unanimously, and that it may not answer "no" unless ten or more jurors agree.  The article mandates a life sentence if the jury is unable to agree on a special issue. And the article provides that nobody inform jurors that a failure to agree on a special issue will result in a life sentence.   These provisions considered together violate the Eighth and Fourteenth Amendments of the United States Constitution and Article I §§10, 13 and 19 of the Texas Constitution for the following reasons:

1.   Informing a juror that he shall answer the questions "yes" or "no" might reasonably cause this juror to shift his position to satisfy the requirements of the 12-0 rule.

2.   The statutory prohibition against informing jurors of the impact of his individual vote relieves him of psychological responsibility for the jury's collective decision to impose death as punishment.

3.   The statutory prohibition fails to provide the jury with accurate information concerning the sentencing process in Texas.

4.   The statutory ten-vote prerequisite to a "no" response establishes an artificial numerical threshold which bears no relationship to conditions required by Texas law for assessment of a life sentence.   See Clary Voting for Death: Lingering Doubts About the Constitutionality Texas' Capital Sentencing Procedure, 19 St.M.L.J. 353, 374-75 (1987).

<div align="center">VI</div>

Under the Texas law, a capital jury may not be informed that Defendant would have to serve at least 35 in prison before becoming eligible for parole on a life sentence.  Without such information, a jury will not have an accurate and proper understanding of the

parole system in Texas.  That is, the jury will be required to predict the Defendant's future danger to society without knowing how long he will have to be incarcerated.  Such an uninformed prediction promotes arbitrary, capricious and standardless sentencing in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I §§10, 13 and 19 of the Texas Constitution, and fails to promote the concept of individualized sentencing required by those constitutional provisions.

The Texas capital punishment scheme is unconstitutional in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article 1, §§ 10, 14 and 19 of the Texas Constitution, because it does not provide for the possibility of a life sentence without parole, which virtually insures that the jury will impose a death sentence.

### VIII

The Texas death penalty scheme is a mandatory one, in violation of the Eighth and Fourteenth Amendments of the United States Constitution, and Article I, §§10, 14 and 19 of the Texas Constitution.

### IX

The Texas death penalty scheme is unconstitutional in violation of the Eighth and Fourteenth Amendments of the United States Constitution, and Article I §§10, 14 and 19 of the Texas Constitution, because it does not define the various terms and phrases used in the three special issues in ways that would permit the jury to give full mitigating significance to those terms.

### X

The procedure by which the death penalty is imposed in Texas denies the Defendant protection from cruel and unusual punishment. A close analysis of the statute reveals that the system for imposition of the death penalty permits arbitrary and unchecked discrimination amounting, to a denial of equal protection under the law.  Pursuant to the provisions of the Texas statutes, two persons could commit capital offenses under similar circumstances, yet one

could receive the death penalty and the other life imprisonment. The special issue submission pursuant to Article 37.071 provides no real standard for the guidance of juries in death penalty cases. Turning to the issues themselves, one can readily see that they are couched in nebulous terms that defy a realistic answer.

There is no properly defined policy for assisting jurors with the life and death question. The only guidance which the Court gives the jury under Article 37.071, concerning capital punishment, is simply to submit these three rather meaningless issues, affirmative answers to which result in a mandatory death sentence. Consequently, the Defendant is not adequately protected from jurors acting arbitrarily and with caprice in arriving at the awesome decision between life and death.

### XI

The Defendant has a right to be free from punishment imposed arbitrarily and capriciously in violation of the due process clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States, and Article 1 §§13 and 19 of the Texas Constitution. The special issues procedure set out in Article 37.071 allows total discretion to a jury to make unfavorable findings against a defendant, and such findings may be based on any prejudices the jury may have, individually or as a whole.

### XII

Article 37.071 is so vague and indefinite as to be incapable of interpretation by reasonable men and is therefore facially void as violating the Defendant's rights to due process and due course of law and fundamental fairness guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States, and Article I §§10, 13 and 14 of the Texas Constitution.

### XIII

The statutes upon which said prosecution is based are violative of the Eighth Amendment to the United States Constitution, and Article 1 §§13 and 19 of the Texas Constitution in that the death penalty is not a deterrent to future homicides.

### XIV

Page 4

124

4

Article 37.071 is violative of the Fifth, Eighth and Fourteenth Amendments of the United States Constitution, and Article I §§10, 13 and 19 of the Texas Constitution, in that questions number one and three have already been answered by the jury in convicting the Defendant, and that whether there is a "probability" the Defendant would commit violent criminal acts in the future is a vague and indefinite inquiry because there is always some mathematical probability that any person might commit a violent act in the future and the statute provides no guidelines or other statutory limitations upon the factors to be considered by the jury in making that determination.

XV

Death by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I §§10, 13 and 19 of the Texas Constitution.

XVI

Capital punishment per se is violative of the Eighth Amendment protection against cruel and unusual punishment and the Fourteenth Amendment right to due process of law. The death penalty cannot be justified as furthering any of the accepted purposes of punishment.

XVII

The Texas death penalty scheme does not provide for meaningful appellate review because it does not require a proportionality review in violation of the Eighth and Fourteenth Amendments of the United States Constitution, and Article I §§10, 13 and 19 of the Texas Constitution.

XVIII

Interpreting Article 35.13 of the Texas Code of Criminal Procedure to require peremptory challenges to be made prior to examination of the entire jury panel in capital cases only denies the right to effective assistance of counsel, a fair and impartial jury, due process, due course, and equal protection under the laws as guaranteed by the United States and Texas Constitutions.

### XIX

The death penalty in Texas is, and for many years has been, administered in a manner that purposefully discriminates against members of the minority race in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I §§ 10, 13 and 19 of the Texas Constitution.

### XX

The Texas death penalty scheme does not properly narrow the class of persons eligible for the ultimate punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I §§10, 13 and 19 of the Texas Constitution.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully prays that this Honorable Court set aside the indictment herein and dismiss said cause, and for such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Paul Herrmann
500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas   79101
(806) 342-4242

Paul Herrmann
State Bar No.09541810
Attorney for Defendant

James D. Durham, Jr.

Attorney for Defendant
1008 W. 10th Avenue
Amarillo, Texas 79101-3113
(806) 373-7328
State Bar No. 06284000

Page 6

**126**

## CERTIFICATE OF DELIVERY

    I, the undersigned, hereby certify that on 2/11 ,1999, a true and correct copy of the foregoing document was delivered in accordance with the Texas Rules of Appellate and Criminal Procedure to the Office of the District Attorney in and for Potter County, Texas.

7

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

### ORDER ON PRE-TRIAL MOTION NO. 17
### (DEFENDANT'S SECOND MOTION TO SET ASIDE
### THE INDICTMENT (UNCONSTITUTIONALITY OF STATUTE))

On _____, 1999, came on to be heard the Defendant's Second Motion to Set Aside the Indictment (Unconstitutionality of Statute), and after due consideration, the Court is of the opinion, and it is hereby ORDERED, that said Motion is:

_____ GRANTED.

_____ DENIED, to which ruling Defendant respectfully objects.

SIGNED _____, 1999.

_____
Judge Presiding

ORDER NO. 8
ON SECOND MOTION TO SET ASIDE INDICTMENT

CINDY GROOMER
DISTRICT CLERK

1999 MAR 23  A II: 17

POTTER COUNTY, TEXAS

BY _____ DEPUTY

Page 1

128

253505

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

### PRE-TRIAL MOTION NO. 18
### TO HOLD UNCONSTITUTIONAL V.A.C.C.P.
### ARTICLE 37.071 §2(e) AND (f) - BURDEN OF PROOF AND MITIGATION

Defendant makes this Motion to Hold Unconstitutional V.A.C.C.P. Article 37.071 §2(e) and (f) - Burden of Proof and Mitigation, and as grounds therefore would show the Court as follows:

I

Effective September 1, 1991, a jury which has convicted a defendant of capital murder, in which the State is seeking the death penalty, shall be charged as follows:

### Article 37.071 §2

(e) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

(1) shall answer the issue "yes" or "no";

(2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree.

II

This statute is unconstitutional for several reasons. It impermissibly shifts the burden of proof on mitigation to the defendant in violation of Article I §10 of the Texas Constitution. Because the statute demands the defense produce "sufficient" mitigation,

FILED
1999 FEB 11 P 2:55
POTTER COUNTY, TEXAS
BY_____, DEPUTY

PRE-TRIAL MOTION NO.
TO DECLARE BURDEN OF PROOF UNCONSTITUTIONAL

Page 1

**129**



EXHIBIT
RX-104

1

the burden is shifted to Defendant.  Further because the statute is not specific about the exact burden of proof, it provides no meaningful guidance to the jury called upon to make this life and death decision.  As a result, the death penalty is imposed in a wanton and freakish manner, in violation of Defendant's rights to due process and to protection from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, as well as Article 1 §13 of the Texas Constitution.

<div align="center">III</div>

This statute is unconstitutional because it fails to require that mitigation be considered.  A juror is required to consider all mitigation.  After the juror has considered the mitigation, it is then up to the juror to determine what effect to give the mitigation.   Failure to mandate consideration of mitigating evidence makes this statute unconstitutional, in violation of the Eighth Amendment.

Capital murder statutes that have survived constitutional scrutiny all require that the jury be told that it must consider all mitigating evidence.  E.g., *Johnson v. Texas*, 113 S.Ct. 2658 (1993); *Boyde v. California*, 494 U.S. 370 (1990); *Blystone v. Pennsylvania*, 494 U.S. 299 (1990).

<div align="center">IV</div>

<div align="center">STATE LAW VIOLATIONS</div>

The infirmities in the statute discussed above also violate state constitutional law.  Under the "due course of law" provision of the Texas Constitution, Article I §10, the citizens of this state are guaranteed that any punishment for an offense will be in accordance with the law.  *McFarlane v. State*, 254 S.W.2d 136, 136 (Tex.Crim.App. 1953).  When the burden of proof is shifted to the Defendant, the State's burden has essentially been reduced.  See e.g., *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Crim.App. 1983) overruled in part, *Lawrence v. State*, 700 S.W.2d 208 (Tex.Crim.App. 1985), and *Elliott v. State*, 858 S.W.2d 478, 487-488 (Tex.Crim.App. 1993).  Such a punishment, based on a reduced burden, is not in accordance with Texas law and is therefore unconstitutional.

2

WHEREFORE, PREMISES CONSIDERED, Defendant prays this court will hold this statute unconstitutional, and for such other relief as Defendant may be entitled.

Respectfully submitted,

James D. Durham, Jr.                     Paul Herrmann
1008 W. 10th Ave.                        500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas 79101-3113               Amarillo, Texas 79101
(806) 373-3054                           (806) 342-4242
Fax# (806) 373-7328                      Fax# (806) 371-0780


James D. Durham, Jr.                     Paul Herrmann
State Bar No. 06284000                   State Bar No.09541810
Attorney for Defendant                   Attorney for Defendant


### CERTIFICATE OF DELIVERY

I, the undersigned, hereby certify that on ____2/11/99____, 1999, a true and correct copy of the foregoing document was delivered in accordance with the Texas Rules of Appellate and Criminal Procedure to the office of the District Attorney in and for Potter County, Texas.


James D. Durham, Jr.
Attorney for Defendant

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

### ORDER ON PRE-TRIAL MOTION NO. ___18___
### (TO HOLD UNCONSTITUTIONAL V.A.C.C.P.
### ARTICLE 37.071 §2(e) AND (f) - BURDEN OF PROOF AND MITIGATION)

On _____, 1999, came on to be heard Defendant's Motion to Hold Unconstitutional V.A.C.C.P. Article 37.071 §2(e) and (f) - Burden of Proof and Mitigation, and after due consideration, the Court is of the opinion, and it is hereby ORDERED, that said Motion is:

_____ GRANTED.

___/____ DENIED, to which ruling Defendant timely excepts.

SIGNED _____, 1999.

_____
Judge Presiding

FILED
CINDY GROOMER
DISTRICT CLERK

1999 MAR 23  A 11: 17

POTTER COUNTY, TEXAS
BY _____ DEPUTY

ORDER ON PRE-TRIAL MOTION NO. 55
(TO DECLARE BURDEN OF PROOF UNCONSTITUTIONAL)

253506

Page 132

4

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

### PRE-TRIAL MOTION NO. __10
### TO VOIR DIRE ON PAROLE LAW - 40 YEAR MINIMUM

Defendant makes this Motion to Voir Dire on Parole Law - 40 Year Minimum, and as grounds therefore would show the Court as follows:

I

If Defendant is convicted of capital murder, Defendant will be forced to serve a minimum of forty calendar years before Defendant will be eligible for parole. The jury has a right to know this information in answering the special issues. Further, Defendant has a right to know how this information will effect the jurors' answers to the special issues. These questions are necessary in order to allow Defendant to intelligently exercise Defendant's peremptory challenges, as well as to have the effective assistance of counsel. This request is made on the basis of the Sixth Amendment to the United States Constitution, as well as Article I §§10 and 15 of the Texas Constitution, and V.A.C.C.P. 36.79.

II

Defendant would ask the following questions of each venireman:

1. Would the minimum length of time a defendant could serve in prison before he could be paroled be something you would want to know in answer the special issues?

2. On which special issue would this be important?

3. How would a 40-year minimum sentence be important to you in answering the special issues?

4. Would you be more likely, or less likely, generally, to view a defendant as a continuing threat to society if you knew he would not be paroled for a minimum of forty years?

PRE-TRIAL MOTION
TO PERMIT VOIR DIRE, PAROLE LAW

FILED
CAROLYN CROTCHER
DISTRICT CLERK

1999 FEB 11 P 2: 55

POTTER COUNTY, TEXAS

BY_____ DEPUTY

Page 1

56



EXHIBIT
RX-105

WHEREFORE, PREMISES CONSIDERED, Defendant requests that Defendant be allowed to ask these specific questions of each prospective juror, and any follow-up question which may be necessary based on the venireman's responses.

Respectfully submitted,

James D. Durham, Jr.
1008 W. 10th Ave.
Amarillo, Texas 79101-3113
(806) 373-3054
Fax# (806) 373-7328

Paul Herrmann
500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas 79101
(806)  342-4242
Fax# (806) 371-0780

James D. Durham, Jr.
State Bar No. 06284000
Attorney for Defendant

Paul Herrmann
State Bar No. 09541810
Attorney for Defendant

## CERTIFICATE OF DELIVERY

I, the undersigned, hereby certify that on _2/11/99_, 1999, a true and correct copy of the foregoing document was delivered in accordance with the Texas Rules of Appellate and Criminal Procedure to the office of the District Attorney in and for Potter County, Texas.

James D. Durham, Jr.
Attorney for Defendant

PRE-TRIAL MOTION
TO PERMIT VOIR DIRE, PAROLE LAW

Page 2

57

2

NO. 39532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

On _____, 1999, came on to be heard Defendant's Motion to Voir Dire on Parole Law - 40 Year Minimum, and after due consideration, the Court is of the opinion, and it is hereby ORDERED, that said Motion is:

_____ GRANTED.

_____ DENIED, to which ruling Defendant timely excepts.

SIGNED _____3/22_____, 1999.

_____
Judge Presiding

ORDER ON PRE-TRIAL MOTION No. 10
(TO PERMIT VOIR DIRE, PAROLE LAW)

253499

FILED
CINDY GROOMER
DISTRICT CLERK

1999 MAR 23  A 11: 18

POTTER COUNTY, TEXAS   Page 1

BY _____ DEPUTY   58

3

FILED
320th DISTRICT COURT
POTTER COUNTY, TEXAS

19___ day of ___April___ 19 98

at ___ o'clock___ M

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

## DEFENDANT'S SPECIAL REQUESTED CHARGE AS TO PUNISHMENT

MEMBERS OF THE JURY:

By verdict returned in this case you have found the defendant, John Balentine, guilty of the offense of capital murder, which was alleged to have been committed on or about January 21, 1998, in Potter County, Texas. In order for the Court to assess the proper punishment, it is necessary now for you to determine, from all the evidence in the case, the answers to certain questions called "Special Issues" in this charge. The court instructs you in answering these "Special Issues" as follows:

The mandatory punishment for the offense of capital murder of which you found the defendant guilty is death or confinement in the Texas Department of Criminal Justice, Institutional Division for life.

The State must prove Special Issue No. 1 submitted to you beyond a reasonable doubt, and you shall return a Special Verdict of "Yes" or "No" on Special Issue No. 1.

In deliberating on Special Issue No. 1 you shall consider all the evidence at the guilt or innocence stage of this trial, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

You may not answer Special Issue No. 1 "Yes" unless you agree unanimously.

You may not answer Special Issue No. 1 "No" unless ten (10) or more jurors agree.

Members of the jury need not agree on what particular evidence supports a negative answer to Special Issue No. 1.

You are further instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering all of the evidence before you and in answering Special Issue No. 1.

It is not required that the State prove Special Issue No. 1 beyond all possible doubt; it is only required that the State's proof excludes all "reasonable doubt" concerning the defendant.

Defendant's Special Requested Charge
As to Punishment

Page 1 of 8
**256199**

**315**

EXHIBIT
RX-106

1

A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.

Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, by the evidence presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence, or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any, thereafter give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence is an appropriate response to the personal culpability of the defendant, a negative finding should be given to that special issue under consideration.

You are instructed that if you return an affirmative finding, that is a "Yes" answer, to Special Issue No. 1, and only then, are you to answer Special Issue No. 2.

You are instructed that in answering Special Issue No. 2, you shall answer the issue "Yes" or "No".

You may not answer Special Issue No. 2 "No" unless you agree unanimously, and you may not answer Special Issue No. 2 "Yes" unless ten (10) or more of you agree to do so.

You need not to agree on what particular evidence supports an affirmative finding on Special Issue No. 2.

In answering Special Issue No. 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

You are again instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering all of the evidence before you in answering Special Issue No. 2.

Should you return an affirmative finding on Special Issue No. 1 and a negative finding on Special Issue No. 2, the Court will sentence the defendant to death. Should you return a negative finding on Special Issue No. 1, the Court will sentence the

defendant to confinement in the Texas Department of Criminal Justice Institutional Division, for life.

Under the law applicable in this case, the defendant, if sentenced to a term of life imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages I misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned on a life sentence might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole until the actual calendar time served, without consideration of good conduct time, equals forty (40) calendar years. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend o decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

During you deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice or of the Governor, or how long the defendant would be required to serve to satisfy a sentence of life imprisonment.

During your deliberations upon the following "Special Issues," you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

In arriving at the answers to the "Special Issue" submitted, it will not be proper for you to fix the same by lot, chance, or any other method than by a full, fair and free exchange of the opinion of each individual juror.

You are further instructed that if there is any evidence before you in this case regarding the defendant not having committed an offense or offenses other than the offense alleged against him in the indictment, you cannot consider this evidence for any

Defendant's Special Requested Charge
As to Punishment

Page 3 of 8

**256201**

**317**

3

purpose unless you find and believe there is clear proof, beyond a reasonable doubt, that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the answers to the "Special Issues."

You are instructed that the defendant may testify in his own behalf if he chooses to do so, but if he elects not to do so, that fact cannot be taken by you as a circumstance against him nor prejudice him in any way. The defendant has elected not to testify in the punishment stage of this trial, and you are instructed that you cannot and must not refer to or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever.

After reading of this charge, you shall not be permitted to separate from each other, nor shall you talk with anyone not of your jury. After argument of this charge, you shall not be permitted to consider your answers to the "Special Issues" submitted to you. It is he duty of your presiding juror to preside in the jury room and vote with you on the answers to the "Special Issues" submitted.

You are the exclusive judges of the facts proved, the credibility of the witnesses, and the weight to be given to their testimony, but you are bound to receive the law from the Court which has been given you and you are bound thereby.

_____
DON R. EMERSON, Presiding Judge

## Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, JOHN BALENTINE, would commit criminal acts of violence that would constitute a continuing threat to society?

## Answer

We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "Yes".

_____
Foreperson of the Jury

## OR

Defendant's Special Requested Charge
As to Punishment

Page 4 of 8

**256202**

**318**

4

We, the jury, because at least ten (10) jurors have a reasonable doubt as to the probability that the defendant, JOHN BALENTINE, would commit criminal acts of violence that would constitute a continuing threat to society, determine that the answer to this Special Issue is "No".

_____
Foreperson of the Jury

In the event that the jury has answered "Special Issue" No. 1 in the affirmative, and only then, shall the jury answer "Special Issue" No. 2 to be found following.

## Special Issue No. 2

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than death sentence be imposed?

## Answer

We, the jury, unanimously find that the answer to this Special Issue is "No".

_____
Foreperson of the Jury

## OR

We, the jury, because at least ten (10) jurors find that there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment rather than a death sentence be imposed find that the answer to this "Special Issue" is "Yes".

_____
Foreperson of the Jury

## Verdict

We, the jury, return in open court the above answers to the "Special Issues" submitted to us, and the same is our verdict in this case.

_____
Foreperson of the Jury

Defendant's Special Requested Charge
As to Punishment                                    Page 5 of 8                                    **319**

**256203**

Respectfully Submitted:

JAMES D. DURHAM, JR.
SBN:  06284000
1008 W, 10th Avenue
Amarillo, Texas 79101-3113
(806) 373-3054
(806) 373-7328 Facsimile
Attorney for Defendant

RANDALL L. SHERROD
SBN: 18252500
817 S. Polk, Suite 204
Amarillo, Texas 79101
(806) 376-4447
(806) 373-8162 Facsimile
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Defendant's Special Requested Charge As To Punishment has been delivered to the Potter County District Attorney's Office, Potter County Courts Building, Amarillo, Texas 79101, on this the _____ day of _____, 1999.

_Randall L. Sherrod_
Randall L. Sherrod

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

## **ORDER**

On this the ___19___ day of April, 1999, came on to be considered Defendant's

Special Requested Charge As To Punishment, and the Court took the following action:

(GRANTED)         (DENIED).

_____
JUDGE PRESIDING

FILED
320th DISTRICT COURT
POTTER COUNTY, TEXAS

19 ___ day of _____ 19____

at ___11:45___ o'clock ___ M

_____
Judge

**256206**

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

### PRE-TRIAL MOTION NO. 2

### OBJECTION TO PROHIBITION ON INFORMING JURORS THAT IF A SINGLE JUROR "HOLDS OUT" FOR LIFE, THE DEFENDANT WILL RECEIVE A SENTENCE OF LIFE IMPRISONMENT BY OPERATION OF LAW

Defendant respectfully objects that defense counsel should be permitted to inform jurors that, under Texas law, if even a single juror "holds out" for life imprisonment, the defendant will receive a sentence of life imprisonment rather than the death penalty. Because the effect of denying the jurors such accurate information is to mislead and misinform them about their role in the sentencing process, and about the true operation of that law, this provision violates Defendant's rights under the Eighth, and Fourteenth Amendments to the U.S. Constitution and under the Constitution of the State of Texas.

A number of other jurisdictions have addressed this very issue and have found a constitutional violation under indistinguishable circumstances. See, e.g., State v. Williams, 392 So.2d 619, 631 (La. 1980) (on rehearing). In Williams, the court stated:

> In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality...*Instead, the members of the sentencing body were left free to speculate as to what outcome would be in the event there was no unanimity.* Under these circumstances, individual jurors could rationally surmise that in the event of a disagreement a new sentencing hearing, and perhaps a new trial, before another jury would be required.

Williams, 392 So.2d at 631 (emphasis added). Such a risk of speculation and confusion was properly held to be a constitutional violation by the Louisiana Supreme Court. Id. Citing Williams with approval, the New Jersey Supreme Court has added:

FILED
CINDY GUAJARDO
DISTRICT CLERK

1999 FEB 11 P 2: 54

POTTER COUNTY, TEXAS

BY _____ DEPUTY

Page 1

25



EXHIBIT
RX-107

> The entire system of capital punishment depends on the belief that a jury representing the conscience of the community will responsibly exercise its guided discretion in deciding who shall live and who shall die. *To hide from the jury the full range of its sentencing options, thus permitting its decision to be based on uniformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by the modern death penalty jurisprudence.*

State v. Ramseur, 524 A.2d 188, 284 (N.J. 1987) (emphasis added). See also Kubat v. Thieret, 867 F.2d 351, 369-73 (7th Cir.), cert. denied, 493 U.S. 874 (1989). As the Court stated in Kubat:

> Kubat's jurors were never told that he would not be sentenced to death. . . . [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

867 F.2d at 373. See also Andres v. United States, 333 U.S. 740, 752 (1948) (federal capital case) (addressing essentially identical claim and ordering a new trial).

This provision of Texas' capital punishment scheme violates the Eighth and Fourteenth Amendments in two ways:

First, this prohibition violates the principle underlying Caldwell v. Mississippi, 472 U.S. 320, 240 (1985). As the Supreme Court stated in Dugger v. Adams, 489 U.S. 401, 407 (1989), a Caldwell violation occurs when jurors are "*improperly [informed of] the role assigned to the jury by local law.*" Jurors in Texas are not told that even one holdout juror results in an automatic life sentence.

Second, it violates the Eighth Amendment principle announced in Mills v. Maryland, 486 U.S. 367 (1988) -- that a death sentence is unconstitutional if individual jurors are led to believe that their votes in favor of a life sentence are meaningless unless a certain numbers of other jurors are persuaded to vote along with the juror (in the case of Texas, at least nine other jurors, for a total of ten).

Page 2

**26**

WHEREFORE, Defendant objects to the state-law prohibition on informing jurors accurately that a single "holdout" juror for life imprisonment requires the Court to impose life.

Respectfully submitted,

James D. Durham, Jr.
1008 W. 10th Ave.
Amarillo, Texas 79101-3113
(806) 373-3054
Fax# (806) 373-7328

Paul Herrmann
500 S. Taylor, Suite 504, LB. 257
Amarillo, Texas 79101
(806) 342-4242
Fax# (806) 371-0780

James D. Durham, Jr.
State Bar No. 06284000
Attorney for Defendant

Paul Herrmann
State Bar No.09541810
Attorney for Defendant

## CERTIFICATE OF DELIVERY

I, the undersigned, hereby certify that on ___2/11___ ,1999, a true and correct copy of the foregoing document was delivered in accordance with the Texas Rules of Appellate and Criminal Procedure to the Office of the District Attorney in and for Potter County, Texas.

NO. 39,532-D

| THE STATE OF TEXAS | § | IN THE 320th DISTRICT COURT |
|---|---|---|
| | § | |
| V. | § | IN AND FOR |
| | § | |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

### ORDER ON PRE-TRIAL MOTION NO. 2
### (DEFENDANT'S OBJECTION TO PROHIBITION ON INFORMING JURORS THAT IF A SINGLE JUROR "HOLDS OUT" FOR LIFE, THE DEFENDANT WILL RECEIVE A SENTENCE OF LIFE IMPRISONMENT BY OPERATION OF LAW)

IT IS ORDERED that Defendant's Objection to Prohibition on Informing Jurors That If a Single Juror "Holds Out" for Life, the Defendant Will Receive a Sentence of Life Imprisonment by Operation of Law is:

_____ SUSTAINED.

_____ OVERRULED, to which ruling Defendant respectfully objects.

Signed _____3/22/99_____, 1999.

_____
Judge Presiding

CINDY GROOMS
DISTRICT CLERK

1999 MAR 23  A 11: 19

POTTER COUNTY, TEXAS

BY _____ DEPUTY

ORDER NO. 44
OBJECTION TO PROHIBITION AGAINST "HOLD OUT" INFORMATION                 Page 1

253491

28

4

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| VS. | § | IN AND FOR |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

## MOTION FOR AUTHORIZATION TO EXPEND FUNDS FOR INVESTIGATOR

This Motion for Authorization to Expend Funds for Investigator is filed by JOHN BALENTINE, Defendant, and shows the following:

1.    Defendant has been convicted by indictment with Capital Murder.

2.    The Court has found Defendant to be indigent and without funds to hire counsel and Kent Birdsong was appointed for the purpose of representing the Defendant on writ of habeas corpus under Article 11.071, V.A.C.C.P. for representation in this cause.

3.    Kent Birdsong will be required to employ a private investigator to complete preparations for the writ of habeas corpus in this case.

4.    Kent Birdsong requests the Court authorization of the amount of $2,000.00 for 50 hours of work at $40.00 an hour for an investigator.

5.    Defendant requests the Court authorization of the expenditure of funds for an investigator in this case as provided by Article 26.05 of the Code of Criminal Procedure.

Defendant prays that the Court authorize the expenditure of funds for investigation in this cause.

FILED
CINDY GROOMER
DISTRICT CLERK

2000 FEB -9 P 4: 18

POTTER COUNTY, TEXAS

282309

EXHIBIT
RX-108

NO. 39,532-D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
| VS. | § | IN AND FOR |
| JOHN BALENTINE | § | POTTER COUNTY, TEXAS |

## ORDER ON MOTION FOR AUTHORIZATION TO EXPEND
## FUNDS FOR INVESTIGATOR

On _____, 2000, the Court heard the Motion of JOHN

BALENTINE for Authorization to expend funds.

The Court finds that the motion should be GRANTED and ORDERS that counsel for

Defendant be authorized to expend up to $ _____ for investigation in this cause.

SIGNED on _February 9_, 2000.

_____
JUDGE PRESIDING

FILED
CINDY GROOMER
DISTRICT CLERK

2000 FEB -9 P 4: 18

POTTER COUNTY, TEXAS

282311

# ATTORNEY APPLICATION TO VISIT
## TDCJ OFFENDER

**INSTITUTION:  TDCJ TERRELL UNIT**

I, _Kent Birdsong_, a licensed attorney in the State of _H._, with offices in _Amarillo_ will be visiting offender _Balentine, Johne Dennis Larry_ TDCJ # _999315 + 99516_ on (day/date) _12-19_, 20_00_ affirm that my visit with this offender is for the purpose of assisting me in matters related to the attorney-client or attorney-witness relationship and for no other purpose. I agree that any tape recording made by me will be used only to assist this relationship.

_____
(Signature)

_02333630_
(State Bar No.)

cc:  Offender's file

**EXHIBIT**
RX-109

REQUEST FOR ATTORNEY / INMATE VISIT

DATE: 12-6-00   PREPARED BY: Mc Cardle   LAY-IN: _____

NAME OF INMATE: Balentine John   TDCJ-ID # 999,315
INMATE HOUSING: 12AD49   RACE/STATUS B·D1
NAME OF INMATE: Davis Larry   TDCJ-ID # 999.316
INMATE HOUSING: 12BC.33   RACE/STATUS B·D1
NAME OF INMATE: _____   TDCJ-ID # _____
INMATE HOUSING: _____   RACE/STATUS _____
NAME OF INMATE: _____   TDCJ-ID # _____
INMATE HOUSING: _____   RACE/STATUS _____
NAME OF INMATE: _____   TDCJ-ID # _____
INMATE HOUSING: _____   RACE/STATUS _____

NAME OF PERSON CALLING: Kelly (Secretary)

ATTORNEY NAME: Birdsong Kent
LAST   FIRST   MI
ADDRESS: 301 E. 7th Ave   CITY: Amarillo   STATE: TX

OTHERS: _____

TELEPHONE#: 806.371.9333   BAR CARD #: 02833630

ACTIVE AND IN GOOD STANDING (CIRCLE ONE): YES  NO

DATE OF VISIT: Dec 19, 2000   TIME OF VISIT: 10:00 AM

_____   APPROVED (CIRCLE ONE): YES  NO
WARDEN'S SIGNATURE

VISIT COMPLETED: _____   _____   _____
DATE   TIME   INITIALS

Dr. Gilda Kessner - expert disclosure  Page 178 of 872

2

NO. 39,532-D

| THE STATE OF TEXAS | § | IN THE 320TH DISTRICT COURT |
|---|---|---|
| | § | |
| VS. | § | IN AND FOR |
| | § | |
| JOHN LEZELL BALENTINE | § | POTTER COUNTY, TEXAS |

## APPLICATION FOR SUBPOENA(S) AND DUCES TECUM

TO THE CLERK OF SAID COURT:

COMES NOW, the Defendant, JOHN LEZELL BALENTINE, by and through his attorney of record, KENT BIRDSONG, and make application for issuance of subpoena(s) for the following named person(s) to compel him/her attendance as a witness for Defendant, place of residence, of said witness(s), where known, appears opposite the respective names, as follows, to-wit:

**WITNESS(S)**



Sheriff Mike Shumate, ATTN: Christy Phillips, Custodian of Record to Potter County to be served at the Potter County Sheriff's Office, at 608 S. Pierce, Amarillo, Potter County, Texas.

Said above named witness is further commanded to produce at said time and place set forth: Any and all records, disciplinary, medical, visitation lists, including booking documentation pertaining to John Lezell Balentine, Date of Birth: January 30, 1969, from the dates of July 31, 1998 until June 11, 1999.

Said person(s) is/are (a) witness(es) in behalf of the Defendant in the above entitled and numbered cause, and it is believed by the Defendant's attorney that the said testimony of said witness(es) is material for the Defendant at a hearing of said case.

Applicant prays that the said subpoena be made returnable INSTANTER, to the Law Office of Kent Birdsong, Attorney for Defendant, at 301 East 7th Avenue, Amarillo, Texas.

Kent Birdsong, Attorney for Defendant

SUBSCRIBED AND SWORN TO BEFORE ME by KENT BIRDSONG

on _____ 16 , 2001.

KELLY C. ANGEL
NOTARY PUBLIC,
STATE OF TEXAS
My Commission Expires 5-3-2001

Notary Public, State of Texas

FILED
DISTRICT CLERK
2001 JAN 16 8:58
POTTER COUNTY, TEXAS
BY _____ DEPUTY

EXHIBIT
RX-110

---

### POTTER COUNTY SHERIFF'S OFFICE
### CORRECTIONS DIVISION

### INTERNAL INCIDENT REPORT/SUPPLEMENT

**CLASSIFICATION:** OTHER ASSAULTS-SIMPLE          IR#: 99-02828/99C-0131

---

#### NARRATIVE

OFFICER REPORTING C/O R.BOUSQUET 916/184. ON 2-21-99 I WAS ASSIGNED TO WORK E-POD AT THE POTTER COUNTY DETENTION CENTER AT 9710 N.E 10TH IN AMARILLO,TEXAS. AT APPROX. 0015 I WAS RETURNING TO E-POD FROM CELL 175 IN WHICH I HAD JUST ESCORTED A DISRUPTIVE INMATE TO. AS I RETURNED TO E-POD I IMMEDIATLY NOTICED SEVERAL DEPUTY/OFFICERS INCLUDING CONNOR #888, MAXWELL #963, AND MASHBURN #953 IN THE CELL OF INMATE BALENTINE,JOHN LEZELL B/M ███████ ASO# 106798, CHARGED WITH CAPITAL MURDER MULTIPLE, HOUSED IN E-7. AS SOON AS I ENTERED THE CELL, I HEARD DEPUTY CONNOR TELL BALENTINE THAT IF HE REFUSED TO PLACE HIS HANDS BEHIND HIS BACK, SO HANDCUFFS COULD BE APPLIED, HE WOULD BE SPRAYED WITH CHEMICAL AGENTS. AFTER A BRIEF PERIOD BALENTINE STILL HAD NOT COMPLIED WITH DEPUTY CONNOR'S ORDERS SO HE WAS THEN SPRAYED. ALL THE ABOVE STATED OFFFICERS THEN TOOK HOLD OF BALENTINE AND PLACED HIM FACE DOWN ON HIS BUNK IN ORDER TO GET HIS HANDS BEHIND HIS BACK SO HANDCUFFS COULD BE APPLIED. BALENTINE DID STRUGGLE FOR APPROX. 2 MINUTES DESPITE ORDERS TO STOP RESISTING. AFTER THE RESTRAINTS WERE APPLIED DEPUTY CONNOR AND MYSELF ESCORTED BALENTINE TO VIOLENT CELL #1 IN THE INFIRMARY AND NOTIFIED MEDICAL OF BALENTINES CONDITION. THIS ESCORT DID GO WITHOUT FURTHER INCIDENT. NO FURTHER DETAILS AT THIS TIME.

E.O.R.

*R. Bousquet 916/184*

C/O R.BOUSQUET 916/184

*THIS WILL BE*
*AN THE EXHIBIT*
*FOR TIME IND.*
*Punishment*
*witness argent*
*IAC*



EXHIBIT
RX-III

## INMATE NOTIFICATION OF RULES VIOLATION

### AND REVIEW BOARD HEARING

This is to notify _John Lozell Bolentine_____, at least 24 hours in advance, that you have been accused of violating the following rules on _2-21_____, 19 _99_

1. _All Asst oHcl/Smlle_____

2. _____

3. _____

You are notified that you may present witnesses on your behalf at the Review Board Hearing.

The Review Board Hearing will be held on ___Monday_____, ___02-22___
                               Day of Week            Date

19 _99_, at _0800_ (a.m.)/p.m.

_R. Conie 067_____
   Notifying Officer's Signature

_2-21_, 19 _99_                _0700_ (a.m.)/p.m.
Date of Notification              Time of Notification

I, _John Lozell Bolentine_____, hereby do/do not waive my
24 hour notice and also acknowledge my receipt of this form from the Correction's Staff.

x _John Bolentine_____    _2-21-99_, 19___
      (Inmate's Signature)             Date

                                    _0700_  a.m./p.m.
                                      Time

S224

_1-7_

This hearing is on inmate _Balentine, John_ , Potter County I.D. # _106798_ .
Subject was committed to Potter County Corrections on _07-31_ , 19 _98_ .
To serve _Not Sentenced_ and $ _____ in fines and court cost.
On _02-21_ , 19 _98_ , the above named inmate was charged with
violating the following rules and/or regulations.
1. _Assault / Simple_                                    _highest_   ✓

2. _____

3. _____

Inmate _Balentine, John_ has been notified 24 hours prior to this hearing of
his charges and wishes to state that (he)(~~she~~), (did)(~~did not~~) commit the violation(s).

We, the undersigned members of the Board, have determined individually and unanimously
that inmate _Balentine, John_ , I.D.# _106798_ (did)(~~did not~~) commit the
violation(s).

The following disciplinary action is to be taken at the recommendation of the Board:
1. _30 days L.O_              starting _02-22-99_ ending _03-21-99_
2. _30 days L.O.P_           starting _02-22-99_ ending _03-21-99_
3. THAT NO ACTION BE TAKEN (     )

Signed and dated this _22nd_ day of _February_ , 19 _99_ .

_Dep. Tom Wall 072_
**Review Board Member**

_Potter 915_
**Review Board Member**

_Dep David Dove 918/99_
**Review Board Member**

_____
**Review Board Member**

I have reviewed the decision of the Board and (agree)(disagree) with the action taken.


_____
**Corrections Lieutenant**

_____
**Corrections Captain**


_____
**Chief Deputy**

I have reviewed the decision of the Board and (agree)(disagree) with the action taken.


Jimmy Don Boydston, Sheriff Potter County

I recommend that the following action be taken: _____

_____   _____

--------------------------------------------------------------------------

**Details of Report:** Officer reporting Deputy Richard L Conner #888
On 02-21-99 I was assigned to work B-Pod at the Potter County Detention Center
located at 9710 NE 10th Amarillo, Tx 79111. After shift change and continuing
through the beginning of the shift I could hear 2 inmates in the isolation
cells of E-Pod yelling back and forth. Inmate L███████, H███████ B/M Dob
███████ ASO #████ charged with Murder #37821-C bond set at $600,000.00
housed in E-4 was yelling to inmate Balentine, John Lezell B/M Dob
ASO #106798 charged with Capital Murder Multiple #39532-D housed in E-7.
Deputy Bousquet #916 and Deputy Maxwell #963 had to speak to L███████ and
Balentine several times during the beginning of the shift. At 0005 hrs Deputy
Bousquet placed L███████ in handcuffs and escorted him to cell #175 to prevent
him from breaching the security of the facility and allow him time to cool
down. See in house IR #99C-0130 for further details. After Deputy Bousquet
left with L███████ Balentine became verbally aggressive and began shouting
through the door at Deputy Maxwell. Deputy Maxwell had to go speak to
Balentine in attempt to keep him from causing a disturbance in the facility.
Shortly after Deputy Maxwell left E-7 cell door area Balentine began yelling
again and I heard a loud banging noise like someone trying to kick the door
open. Deputy Mashburn #953, Deputy Maxwell, Deputy Sanders and I entered cell
E-7 and ask Balentine to stop kicking the door, quiet down and rack up.
Balentine took an aggressive stance, moved over to the toilette and stated he
was not going to rack up. I again ask Balentine to get on his rack and keep
the noise down. Balentine replied he was not going to rack up and no one was
going to put him on his rack. Balentine stance was aggressive, his hands were
clenched in a fist and the muscles of his jaw were tense. I reminded Balentine
according to the rules and regulation rack-up time was at 2230hrs and he would
be required to abide by them. Balentine stated "fuck your rules and fuck
getting on by rack, no one here is going to put me on my rack". I ask
Balentine to turn around and place his hands behind his back. Balentine stated
" fuck getting on my rack Fuck being handcuffed, no one is putting me on my
rack and no one is putting me in handcuffs and I said Putting me." I then
asked Balentine to turn around and place his hands behind his back. Balentine
then stated fuck this shit. I again asked Balentine to turn around and place
his hands behind his back. Balentine remained silent but continued with the
aggressive stance and resistive mannerisms. After several minutes I again told
Balentine to turn around and place his hands behind his back. Balentine
remained silent but continued the aggressive stance and resistant mannerisms.
After several seconds I raised my pepper spray and administered a one second
stream to the center of Balentines face area. As Balentine reacted to being
sprayed officers placed hands on Balentine and began physically handcuffing
him. Balentine physically resisted being cuffed and became violently
aggressive towards the officers. After several minutes Balentine was
handcuffed and Deputy Bousquet and I escorted Balentine to Violent #1 cell on
the medical unit. Balentine was left in V-1 cell until the officers could be
decontaminated, checked for injuries and the facility could be checked for
security due to the incident. After insuring the unit was secure I returned to
the infirmary and assisted EMT Dep Jackson with decontaminating Balentine. Dep
Jackson sprayed cold water into Balentines face until he advised the burning
had stopped. Deputy Jackson then exchanged coveralls for Balentine placing him
into clean coveralls. Balentine was left in V-1 so he could be monitored
closely by medical. Nothing further this incident.

Deputy Richard L Conner #067

*[signature]*

CALL-IN # 379-2924 (USE OF FORCE REPORTS ONLY)
OFFENSE REPORT

===================================   =========================
Date Reported: 02-21-99    IR#: 99-02828    PCCC IR#: 99C-0131    District: EAST
----------------------------------------------------------------
**Offense as reported:** USE OF FORCE                    **Code:** ASR
----------------------------------------------------------------
Location of occurance: 9710 NE 10TH
----------------------------------------------------------------
City: AMARILLO          Zip: 79111     Date: 02-21-99    Time: 0005
----------------------------------------------------------------
Officer: R.CONNER #067     Arrest: N          Juv Involved: N
----------------------------------------------------------------
Domestic Violence: N            Investigator Assigned:
================================================================
PERSON Involved in Case
================================================================
Person #:          Involvement with Case: Complainant
----------------------------------------------------------------
**Business** as Complainant: Potter County Sheriff's Department
----------------------------------------------------------------
Address: 608 S. Pierce                    **Phone: 806-379-2900**
----------------------------------------------------------------
City: Amarillo          St: Texas       Phone: Same
================================================================
PERSON Involved in Case
================================================================
**Person #:** 2          **Involvement with Case:** SUSPECT
----------------------------------------------------------------
Last: BALENTINE        First: JOHN        Middle: LEZELL
----------------------------------------------------------------
S: M      DOB: ██████  B  ASO#: 106798   DL#:          DL St:
----------------------------------------------------------------
Address:                                  Phone:
----------------------------------------------------------------
City:              St:          Phone:
----------------------------------------------------------------
Ht:      Wt:      Hair:      Eyes:      Skin:
----------------------------------------------------------------
Business Address:               Bus. Ph.:
================================================================
PERSON Involved in Case
================================================================
Person #:          Involvement with Case:
----------------------------------------------------------------
Last:              First:            Middle:
----------------------------------------------------------------
S:      DOB:      R:      ASO#:       DL#:          DL St:
----------------------------------------------------------------
Address:                                  Phone:
----------------------------------------------------------------
City:              St:          Phone:
----------------------------------------------------------------
Ht:      Wt:      Hair:      Eyes:      Skin:
----------------------------------------------------------------
Business Address:               Bus. Ph.:
================================================================
Summary of Details of Report: Inmate became irate and refused to follow oral
directive. Inmate became aggressive with officers. Pepper spray was used to
gain compliance, inmate was moved to Violent cell to insure security of the
facility and safety for the officers.

POTTER COUNTY SHERIFF'S OFFICE
CORRECTIONS DIVISION

INTERNAL INCIDENT REPORT/SUPPLEMENT

**CLASSIFICATION:** Other Assault/Simple          **IR#:** 99-02828/99C-0131
--------------------------------------------------------------------
NARRATIVE

Officer reporting: Dep/CO Krista Maxwell 963/187
Supplement to IR#99-02828
Beginning Details: On Sunday, 02-21-99, I was assigned to work E-pod at the
Potter County Detention Center, 9710 NE 10th, Amarillo, TX, 79111, with
C.O. Bousquet #916. At approximately 0009 hrs, I went to cell #E-7 to tell
BALENTINE, John Lezell (B/M, DOB ███████, ASO #106798, charged with Capital
Murder Multiple) it was time for him to get into his rack.  Balentine became
irate and stated he would not get into his rack. Dep. Conner #888, Dep/CO
Mashburn #953, CO Sanders #989, CO Bousquet #916 returned to Balentine's cell
with me.  Dep Conner and Dep/CO Mashburn stepped into the cell with Balentine.
Dep Conner told Balentine it was time for him to get into his rack.  Balentine
would not comply and became belligerent and irate.  Balentine then stated, "I
haven't had to be on my rack since I've been here, and I'm not going on my
rack." Dep Conner told Balentine that the rules and regulations stated that
all inmates are to be on their racks at 2230 hrs and he needed to rack up.
Balentine then directed his comments toward Dep Conner and stated, "Fuck your
rules, and fuck getting on my rack.  No one can make me rack up and no one is
putting handcuffs on me, and I said put!"  Dep Conner told Balentine to put
his hands behind his back so he could handcuff him.  Balentine would not
comply.  Dep Conner then warned Balentine approximately 3 times to comply or
he would be sprayed with pepper spray.  Balentine would not comply so Dep
Conner sprayed a 1 second burst of pepper spray into Balentines face.  I then
told Balentine to get onto his knees and he would not comply.  Officers then
took hold of Balentine in order to handcuff him.  Once Balentine was
handcuffed he was escorted to V-1 in medical by Dep Conner and CO Bousquet.  I
then made a walk through in my pod to ensure the security had not been
breached during this incident.  Refer to IR# 99C-0130 in reference to details
prior to this incident.  Nothing further at this time.
****************************EOR****************************************

*Dep Krista Maxwell 963/187*

DEP/CO KRISTA MAXWELL #963/187

JTTER COUNTY SHERIFF'S OFF..E
CORRECTIONS DIVISION

INTERNAL INCIDENT REPORT/SUPPLEMENT

CLASSIFICATION: USE OF FORCE                    IR#: 99-02828

### NARRATIVE

ON SUNDAY 02-21-99,I,C/O SANDERS,WAS ASSIGNED TO WORK C-POD WITH DEPUTY C/O
MASHBURN AT THE PCDC, 9710 N.E.10TH, AMARILLO, TEXAS 79111. AT APPROX.
0005HRS. DEPUTY C/O MASHBURN AND I NOTICED THAT DEPUTY CONNER AND DEPUTY C/O
MAXWELL WERE HAVING PROBLEMS WITH THE INMATE IN E-7, BALENTINE,JOHN LEZELL,
B/M, A.S.O.#106798, D.O.B._____ CHARGED WITH CAPITAL MURDER MULTIPLE WITH
A $3 MILLION BOND. DEPUTY CONNER OPENED THE CELL DOOR AND INSTRUCTED BALENTINE
TO GET ON HIS RACK. BALENTINE VERBALLY REFUSED TO GET ON HIS RACK. AT THAT
TIME BALENTINE TOOK A POSITION NEAR THE TOILET WITH HIS BACK AGAINST THE
SHOWER WALL. DEPUTY CONNER THEN INSTRUCTED HIM AGAIN TO GET ON HIS RACK, AT
THAT TIME BALENTINE BECAME VERBALLY ABUSIVE. DEPUTY CONNER THEN INSTRUCTED
BALENTINE TO FACE THE WALL AND PLACE HIS HANDS BEHIND HIS BACK. BALENTINE
REFUSED AND BACKED AGAINST THE WALL. DEPUTY CONNER THEN INSTRUCTED BALENTINE
TO COMPLY OR HE WOULD SPRAY HIM WITH O.C. SPRAY. BALENTINE REFUSED TO COMPLY.
AT THAT TIME DEPUTY CONNER DELIVERED A BURST OF O.C. SPRAY TO BALENTINE'S
FACE. THEN DEPUTY CONNER AND DEPUTY C/O MASHBURN TOOK BALENTINE'S ARMS AND
TRIED TO ASSIST HIM TO THE FLOOR. BALENTINE BEGAN PHYSICALLY RESISTING. I
PLACED MY RIGHT HAND ON BALENTINE'S RIGHT SHOULDER AS BALENTINE REFUSED TO
PLACE HIS HANDS BEHIND HIS BACK. WE THEN PLACED HIM FACE DOWN ON HIS RACK. I
PLACED THE CUFFS ON BALENTINES RIGHT WRIST. AT THAT TIME C/O BOUSQUET ASSISTED
IN CUFFING BALENTINES LEFT WRIST. THEN DEPUTY CONNER AND C/O BOUSQUET ESCORTED
BALENTINE TO MEDICAL AND I EXITED THE CELL AND BEGAN TO DECONTAMINATE
MYSELF. NONE FURTHER AT THIS TIME.

*C.O. Donald Sanders #989/172*

C.O. Donald Sanders #989 / 172

Potter County Detention Center
Custody Reassessment Scale
Page 1 of 2

| Inmate Name: Balentine, John Lezell | ASO# 106798 | D.O.B.: |
| Reassessment Date: 1-15-99 | | |

## 1. CUSTODY EVALUATION   Circle Reassessment Reason:   Routine   Disciplinary   Other: _____

**A. Severity of Current Offense/Conviction:**
(Use Severity of Offense Scale and Rate Most Serious
Offense/Conviction, Including Any Detainers/Warrant)

| | |
|---|---|
| Low | 0 |
| Moderate | 1 |
| High | 4 |
| Highest | 6   Score  6 |

**B. Serious Offense History:**
(Use Severity of Offense Scale and Rate Most Serious
Prior Conviction)

| | |
|---|---|
| None or Low | 0 |
| Moderate | 1 |
| High | 3 |
| Highest | 6   Score  0 |

**C. Escape History:**
(Excluding Current Offense if Scored in Item A)

| | |
|---|---|
| No Offenses for Escape, Escape Attempts, or Unauthorized Absences | 0 |
| Unauthorized Absences From Community Corrections Facility or Assigned Programs | 3 |
| Offenses for Escape from (Secured) Custody, from Felony Arrest or Jail, or Attempt of Same | 7   Score  7 |

**D. Number of Disciplinary Convictions:**
(Since Last Classification Assessment)

| | |
|---|---|
| None | 0 |
| One | 2 |
| Two | 4 |
| Three or More | 6   Score  2 |

**E. Most Serious Disciplinary Conviction:**
(Since Last Classification Assessment. Use Disciplinary Scale)

| | |
|---|---|
| None | 0 |
| Low | 1 |
| Moderate | 2 |
| High | 5 |
| Highest | 7   Score  2 |

**F. Prior Felony Convictions:**
(Excluding Current Offense)

| | |
|---|---|
| None | 0 |
| One | 1 |
| Two or More | 2   Score  0 |

**G. Alcohol and/or Drug Abuse:**

| | |
|---|---|
| No Social, Economic, Legal Problems Due To Abuse | 0 |
| Abuse Resulting In Social, Economic, Legal Problems | 1 |
| Abuse Resulting In Assaultive Behavior | 3   Score  0 |

| SUBTOTAL   SCORE 13 | SUBTOTAL   SCORE 0 |
| (Add A, B, and C Scores) A TOTAL SCORE OF 7 OR HIGHER IN ITEMS A, B, and C AUTOMATICALLY ASSIGN TO MAXIMUM CUSTODY | (Add D, E, F, and G Scores) |

| TOTAL COMPREHENSIVE CUSTODY |
| (Add A-G Scores)   SCORE 13 |

Form:cus\reassess\scale

g:\wpfiles\class

Potter County Detention Center
Custody Reassessment Scale
Page 2 of 2

**2. SCALE SUMMARY and RECOMMENDATIONS**

**A. Custody Classification Chart:**

| | |
|---|---|
| 7 or More Points on Items A, B, and C | MAXIMUM |
| 11 or More Points on Items A through G | MAXIMUM |
| | |
| 6 to 10 Points on Items A through G | MEDIUM |
| 5 or Fewer Points on Items A through G | |
| With Detainer/Warrant | MEDIUM |
| | |
| 5 or Fewer Points on Items A through G | MINIMUM |

**B. Based On the Custody Classification Chart, Circle the Custody Level:**

MAXIMUM          MEDIUM          MINIMUM

**C. Circle All The Special Management Concerns Which Apply:**

| | |
|---|---|
| Protective Custody | Psychological Impairment |
| Escape Threat | Mental Deficiency |
| Serious Violence Threat | Known Gang Affiliation |
| Substance Abuse | Known Management Problem |
| Suspected Drug Trafficker | Suicide Risk |
| Medical | Physical Impairments |
| Other _____ | Juvenile |

**D. Circle Whether Override Of Scale Custody Level Is Recommended:**
(If "YES" is circled, provide a written explanation)          YES          No

WRITTEN EXPALNATION OF OVERRIDE: _____
_____
_____

**E. Circle The Recommended Custody Level:**
MAXIMUM          MEDIUM          MINIMUM

**F. Signature Of Reassessment Staff Member and Date Reassessment Completed:** *Rep Pl 1-7-99*

**G. Supervisory Review Of Override:**
Circle Whether Override Of Custody Level Is Approved or Disapproved
(If "DISAPPROVED" is circled, provide a written explanation)          DISAPPROVED          APPROVED
WRITTEN EXPLANATION OF DISAPPROVAL: _____
_____
_____

Circle Final Custody Level:          MAXIMUM          MEDIUM          MINIMUM

Signature Of Supervisor and Date Of Override Review: _____

**H. Recommended Housing Assignment:** _E-7_

FORM:cus\reaassess\sum

g:\wpfiles\class

Potter County Detention Center
Custody Reassessment Scale
Page 1 of 2

Inmate Name: _Balentine   John_   ASO# _106728_   D.O.B. [redacted]

Reassessment Date: _2-1-99_

## 1. CUSTODY EVALUATION   Circle Reassessment Reason:   (Routine)   Disciplinary   Other

**A. Severity of Current Offense/Conviction:**
(Offense/Conviction including any Detainer/Warrant):

| | | |
|---|---|---|
| Low | 0 | |
| Moderate | 1 | |
| High | 3 | |
| Highest | 6 | Score  **6** |

**B. Serious Offense History:**
(Use Severity of Offense Scale and Rate Most Serious Prior Conviction)

| | | |
|---|---|---|
| None or Low | 0 | |
| Moderate | 1 | |
| High | 3 | |
| Highest | 6 | Score **0** |

**C. Escape History:**
(Excluding Current Offense if Scored in Item A)

| | | |
|---|---|---|
| No Offenses for Escape, Escape Attempts, or Unauthorized Absences | 0 | |
| Unauthorized Absences From Community Corrections Facility or Assigned Programs | 3 | |
| Offenses for Escape from (Secured) Custody, from Felony Arrest or Jail, or Attempt of Same | 7 | Score **7** |

**D. Number of Disciplinary Convictions:**
(Since Last Classification/Assessment)

| | | |
|---|---|---|
| None | 0 | |
| One | 2 | |
| Two | 4 | |
| Three or More | 6 | Score **0** |

**E. Most Serious Disciplinary Conviction:**
(Since Last Classification Assessment. Use Disciplinary Scale)

| | | |
|---|---|---|
| None | 0 | |
| Low | 1 | |
| Moderate | 2 | |
| High | 5 | |
| Highest | 7 | Score **0** |

**F. Prior Felony Convictions:**
(Excluding Current Offense)

| | | |
|---|---|---|
| None | 0 | |
| One | 1 | |
| Two or More | 2 | Score **0** |

**G. Alcohol and/or Drug Abuse:**

| | | |
|---|---|---|
| No Social, Economic, Legal Problems Due To Abuse | 0 | |
| Abuse Resulting In Social, Economic, Legal Problems | 1 | |
| Abuse Resulting In Assaultive Behavior | 3 | Score **0** |

| SUBTOTAL   SCORE   **13** | SUBTOTAL   SCORE   **0** |
|---|---|
| (Add A, B, and C Scores) A TOTAL SCORE OF 7 OR HIGHER IN ITEMS A, B, and C AUTOMATICALLY ASSIGN TO MAXIMUM CUSTODY | (Add D, E, F, and G Scores) |

| TOTAL COMPREHENSIVE CUSTODY |
|---|
| (Add A-G Scores)   SCORE   **13** |

Form:cus\reasscss\scale

g:\wpfiles\class

Potter County Detention Center
Custody Reassessment Scale
Page 2 of 2

## 2. SCALE SUMMARY and RECOMMENDATIONS

**A. Custody Classification Chart:**

| | |
|---|---|
| 7 or More Points on Items A, B, and C | MAXIMUM |
| 11 or More Points on Items A through G | MAXIMUM |
| | |
| 6 to 10 Points on Items A through G | MEDIUM |
| 5 or Fewer Points on Items A through G | |
| With Detainer/Warrant | MEDIUM |
| | |
| 5 or Fewer Points on Items A through G | MINIMUM |

**B. Based On the Custody Classification Chart, Circle the Custody Level:**

MAXIMUM          MEDIUM          MINIMUM:

**C. Circle All The Special Management Concerns Which Apply:**

| | |
|---|---|
| Protective Custody | Psychological Impairment |
| Escape Threat | Mental Deficiency |
| Serious Violence Threat | Known Gang Affiliation |
| Substance Abuse | Known Management Problem |
| Suspected Drug Trafficker | Suicide Risk |
| Medical | Physical Impairments |
| Other _____ | Juvenile |

**D. Circle Whether Override Of Scale Custody Level Is Recommended:**
(If "YES" is circled, provide a written explanation)          YES          No

WRITTEN EXPALNATION OF OVERRIDE: _____

_____

**E. Circle The Recommended Custody Level:**
MAXIMUM          MEDIUM          MINIMUM

**F. Signature Of Reassessment Staff Member and Date Reassessment Completed:** _____ 2-1-19

**G. Supervisory Review Of Override:**
Circle Whether Override Of Custody Level Is Approved or Disapproved
(If "DISAPPROVED" is circled, provide a written explanation)          DISAPPROVED          APPROVED
WRITTEN EXPLANATION OF DISAPPROVAL: _____

_____

Circle Final Custody Level:          MAXIMUM          MEDIUM          MINIMUM

**Signature Of Supervisor and Date Of Override Review:** _____

**H. Recommended Housing Assignment:** E - 7

FORM:cus\reassess\sum

r:\wp5\lgl\jbm

Excerpts from Werner Talley's file  Page 11 of 20

Potter County Detention Center
Custody Reassessment Scale
Page 2 of 2

**2. SCALE SUMMARY and RECOMMENDATIONS**

**A. Custody Classification Chart:**

7 or More Points on Items A, B, and C                MAXIMUM
11 or More Points on Items A through G               MAXIMUM

6 to 10 Points on Items A through G                  MEDIUM
5 or Fewer Points on Items A through G
With Detainer/Warrant                                MEDIUM

5 or Fewer Points on Items A through G               MINIMUM

**B. Based On the Custody Classification Chart, Circle the Custody Level:**

MAXIMUM          MEDIUM          MINIMUM

**C. Circle All The Special Management Concerns Which Apply:**

Protective Custody                    Psychological Impairment
Escape Threat                         Mental Deficiency
Serious Violence Threat               Known Gang Affiliation
Substance Abuse                       Known Management Problem
Suspected Drug Trafficker             Suicide Risk
Medical                               Physical Impairments
Other _____        Juvenile

**D. Circle Whether Override Of Scale Custody Level Is Recommended:**
(If "YES" is circled, provide a written explanation)          YES          NO

WRITTEN EXPLANATION OF OVERRIDE: _____

_____

**E. Circle The Recommended Custody Level:**
MAXIMUM          MEDIUM          MINIMUM

**F. Signature Of Reassessment Staff Member and Date Reassessment Completed:** Peep 191. 4-3-99

**G. Supervisory Review Of Override:**
Circle Whether Override Of Custody Level Is Approved or Disapproved
(If "DISAPPROVED" is circled, provide a written explanation)          DISAPPROVED          APPROVED
WRITTEN EXPLANATION OF DISAPPROVAL: _____

_____

Circle Final Custody Level:     MAXIMUM          MEDIUM          MINIMUM

Signature Of Supervisor and Date Of Override Review: _____

**H. Recommended Housing Assignment:** E-7

FORM:cus\reassess\sum

g:\wp\flky\klass

Excerpts from Werner Talley's file  Page 12 of 20

Potter County Detention Center
Custody Reassessment Scale
Page 1 of 2

Inmate Name: Balentine, John Lezell    ASO# 166798    D.O.B.: ▮▮▮▮

Reassessment Date: 4-15-99

## 1. CUSTODY EVALUATION — Circle Reassessment Reason: (Routine)  Disciplinary   Other: _____

**A. Severity of Current Offense/Conviction:**
(Use Severity of Offense Scale and Rate Most Serious Offense/Conviction, Including Any Detainer/Warrant)

| | |
|---|---|
| Low | 0 |
| Moderate | 1 |
| High | 3 |
| Highest | 6    Score  6 |

**B. Serious Offense History:**
(Use Severity of Offense Scale and Rate Most Serious Prior Conviction)

| | |
|---|---|
| None or Low | 0 |
| Moderate | 1 |
| High | 3 |
| Highest | 6    Score  0 |

**C. Escape History:**
(Excluding Current Offense if Scored in Item A)

| | |
|---|---|
| No Offenses for Escape, Escape Attempts, or Unauthorized Absences | 0 |
| Unauthorized Absences From Community Corrections Facility or Assigned Programs | 3 |
| Offense for Escape from (Secured) Custody, from Felony Arrest or Jail, or Attempt of Same | 7    Score  7 |

**D. Number of Disciplinary Convictions:**
(Since Last Classification Assessment)

| | |
|---|---|
| None | 0 |
| One | 2 |
| Two | 4 |
| Three or More | 6    Score  2 |

**E. Most Serious Disciplinary Conviction:**
(Since Last Classification Assessment. Use Disciplinary Scale)

| | |
|---|---|
| None | 0 |
| Low | 1 |
| Moderate | 2 |
| High | 5 |
| Highest | 7    Score  7 |

**F. Prior Felony Convictions:**
(Excluding Current Offense)

| | |
|---|---|
| None | 0 |
| One | 1 |
| Two or More | 2    Score  0 |

**G. Alcohol and/or Drug Abuse:**

| | |
|---|---|
| No Social, Economic, Legal Problems Due To Abuse | 0 |
| Abuse Resulting In Social, Economic, Legal Problems | 1 |
| Abuse Resulting In Assaultive Behavior | 3    Score  0 |

| SUBTOTAL | SCORE  13 | SUBTOTAL | SCORE  9 |
|---|---|---|---|
| (Add A, B, and C Scores) | | (Add D, E, F, and G Scores) | |
| A TOTAL SCORE OF 7 OR HIGHER IN ITEMS A, B, and C AUTOMATICALLY ASSIGN TO MAXIMUM CUSTODY | | | |

**TOTAL COMPREHENSIVE CUSTODY**
(Add A-G Scores)  SCORE  22

Form:cou/reassess/scale

g:wpfiles/class



## INITIAL CUSTODY ASSESSMENT SCALE

**2. SCALE SUMMARY AND RECOMMENDATIONS**

**A.** Custody Classification Chart:

| | |
|---|---|
| 7 or More Points on Items A, B, and C | MAXIMUM |
| 11 or More Points on Items A through G | MAXIMUM |
| 6 to10 Points on Items A through G | MEDIUM |
| 5 or Fewer Points on Items A through G With Detainer/Warrant | MEDIUM |
| 5 or Fewer Points on Items A through G | MINIMUM |

**B.** Based on the Custody Classification Chart, Circle the Custody Level:

MAXIMUM    MEDIUM    MINIMUM

**C.** Circle All the Special Management Concerns Which Apply:

Protective Custody  
Escape Threat  
Serious Violence Threat  
Substance Abuse  
Suspected Drug Trafficker  
Medical  
Other _____

Psychological Impairment  
Mental Deficiency  
Known Gang Affiliation  
Known Management Problem  
Suicide Risk  
Physical Impairments  
Juvenile

**D.** Circle Whether Override of Scale Custody Level is Recommended:  
(If 'YES' is circled, provide a written explanation    YES    NO

WRITTEN EXPLANATION OF OVERRIDE: _____

**E.** Circle the Recommended Custody Level:  
MAXIMUM    MEDIUM    MINIMUM

**F.** Signature of Assessment Staff Member and Date Assessment Completed: _C Moore 165_

**G.** Supervisory Review of Override:  
Circle Whether Override of Custody Level is Approved or Disapproved.  
(If 'DISAPPROVED' is circled, provide a written explanation)    DISAPPROVED    APPROVED

WRITTEN EXPLANATION OF DISAPPROVAL: _____

Circle Final Custody Level:    MAXIMUM    MEDIUM    MINIMUM

Signature of Supervisor and Date Of Override Review: _____

**H.** Recommended Housing Assignment: _B-6_



## INITIAL CUSTODY ASSESSMENT SCALE

**2. SCALE SUMMARY AND RECOMMENDATIONS**

A. Custody Classification Chart:

| | |
|---|---|
| 7 or More Points on Items A, B, and C | MAXIMUM |
| 11 or More Points on Items A through G | MAXIMUM |
| 6 to10 Points on Items A through G | MEDIUM |
| 5 or Fewer Points on Items A through G With Detainer/Warrant | MEDIUM |
| 5 or Fewer Points on Items A through G | MINIMUM |

B. Based on the Custody Classification Chart, Circle the Custody Level:

   MAXIMUM          MEDIUM          MINIMUM

C. Circle All the Special Management Concerns Which Apply:

Protective Custody                    Psychological Impairment
Escape Threat                         Mental Deficiency
Serious Violence Threat               Known Gang Affiliation
Substance Abuse                       Known Management Problem
Suspected Drug Trafficker             Suicide Risk
Medical                               Physical Impairments
Other_____                  Juvenile _____

D. Circle Whether Override of Scale Custody Level is Recommended:
(If 'YES' is circled, provide a written explanation        YES      NO

WRITTEN EXPLANATION OF OVERRIDE:_____
_____

E. Circle the Recommended Custody Level:
   MAXIMUM          MEDIUM          MINIMUM

F. Signature of Assessment Staff Member and Date Assessment Completed:  _C Moore 165_

G. Supervisory Review of Override:
Circle Whether Override of Custody Level is Approved or Disapproved
(If 'DISAPPROVED' is circled, provide a written explanation)   DISAPPROVED      APPROVED

WRITTEN EXPLANATION OF DISAPPROVAL:_____
_____

Circle Final Custody Level:      MAXIMUM    MEDIUM      MINIMUM

Signature of Supervisor and Date Of Override Review:_____

H. Recommended Housing Assignment:_____  _B-6_

Excerpts from Werner Talley's file  Page 15 of 20

## POTTER COUNTY PRISONER CUSTODY EVALUATION

Inmate Name: **Balentine, John Lezell**   Inmate ASO# **106799**   D.O.B. ▓▓▓▓

Assessment Date: **7-30-98**

## 1. CUSTODY EVALUATION

A. **Severity of Current Offense/Conviction**
(Use Severity of Offense Scale and Rate Most Serious
Offense/Conviction, including any Detainers/Warrants)

| | |
|---|---|
| Low | 0 |
| Moderate | 2 |
| High | 5 |
| **Highest** | 7   SCORE **7** |

B. **Serious Offense History:**
(Use Severity of Offense Scale and Rate Most Serious
Prior Conviction)

| | |
|---|---|
| **None or Low** | 0 |
| Moderate | 1 |
| High | 4 |
| Highest | 7   SCORE **0** |

C. **Escape History:**
(Excluding Current Offense if score in Item A)

No Offenses for Escape,
Escape Attempts, or
Unauthorized Absences   0

Unauthorized Absence
From Community
Corrections Facility or
Assigned Programs   3

Offenses for Escape
from (Secured) Custody,
from Felony Arrest
or Jail, or Attempt
of Same   7   SCORE **7**

D. **Institutional Disciplinary History:**

None or Minor
Disciplinary Reports   0

1 or More Major
Disciplinary Reports   3   SCORE **0**

E. **Prior Felony Convictions:**
(Excluding Current Offense)

| | |
|---|---|
| **None** | 0 |
| One | 2 |
| Two or More | 4   SCORE **0** |

F. **Alcohol and/or Drug Abuse:**

No Social, Economic,
Legal Problems Due To
Abuse   0

Abuse Resulting In
Social, Economic,
Legal Problems   1

Abuse Resulting In
Assaultive Behavior   3   SCORE **0**

G. **Stability Factors**
(Deduct Indicated Points)

Age 26 or Older   -1

Employed/Attending
School 6 Mos Prior to
Arrest   -1

Resided at Same
Address for 1 Yr Prior
to Arrest   -1   SCORE **-1**

| SUBTOTAL   SCORE **14** | SUBTOTAL   SCORE **-1** |
|---|---|
| (Add A, B, and C Scores)<br>A TOTAL SCORE OF 7 OR HIGHER IN ITEMS A, B, AND C<br>AUTOMATICALLY ASSIGN TO MAXIMUM CUSTODY | (Add D, E, and F Scores) |

## TOTAL COMPREHENSIVE CUSTODY

(Add A-G Scores)   SCORE **13**

**TEXAS UNIFORM HEALTH STATUS UPDATE**

(PLEASE PRINT)                                              (INSTRUCTIONS ON BACK)

I.   NAME: _Balentine_   _John_   _Lezell_   DOB: ▮▮▮▮   AGE: _29_
      Last          First          MI
     STATE ID# _NA_              RACE: _B_   SEX: Male ___ Female ___

     COUNTY/TDCJ# _156798_                          WT: _175_  HT: _5_

     COMPLETED BY: _Mike Wer   / M Rasser LVN   6-11-99_
                                              Legible Name/Title
     FACILITY: _Potter County Detention Center / Inmate Medical Services_

     PHONE NUMBER: _806-335-4132_   Fax # _806-335-4134_   DATE: _4 12 99_

II.  **CURRENT/CHRONIC HEALTH PROBLEMS**        III.  **SPECIAL NEEDS (Check all that apply)**
     A. Health Problems                               A. Housing Restrictions
     ✓ 1. None              __14. Seizures             ✓ 1. None
     __2. Asthma            __15. Dialysis             __2. Skilled Nursing Facility
     __3. Pregnancy         __16. Hypertension         __3. Extended Care Facility
     __4. Dental Priority                              __4. Psychiatric Inpatient Facility
     __5. Diabetes                                     __5. Respiratory Isolation
     __6. Drug Abuse                                   __6. Other: ___
     __7. Alcoholism
     __8. Orthopedic Problems                          B. Transportation
     __9. Cardiovascular/Heart Trouble                 ✓ 1. Routine
     __10. Suicidal                                    __2. Crutches/Cane
     __11. Mental Retardation                          __3. Ambulance
     __12. Mental Illness (specify diagnosis) ___      __4. Wheelchair/Wheelchair Van
     __13. Recent Surgery                              __5. Prosthesis

     *NOTE: When screening SAFP clients, please contact the      C. Pending Specialty Clinic Appointment:
     TDCJ-ID Health Services Liaison at (409)437-3589            None ✓ Type ___
     for clients with current mental illness or any
     chronic disease symptoms deemed unstable.                  D. ALLERGIES ___

     B. Preventive Medicine                                     NKA ✓

     ✓ 1. Tuberculosis Status
     Skin Test:  Date Given: _7 31 98_  Date Read: _8 12 98_ Results ___ mm*
     X-Ray: Date: _/_/_ Normal __ Abnormal __ *Anti-Tuberculous Treatment? No __ Yes __ Start Date: _/_/_
     __2. Hepatitis: A __ B __ C __  Other: ___
     __3. HIV Antibody  - Test Date: _/_/_  Results: Negative __ Positive __ CD4: ___ DATE: _/_/_
     __4. Syphilis: Date: _/_/_ Type: ___ Treatment Completed: ___ Yes __ No

     *NOTE: If any treatment has been recommended, the X-Ray was abnormal, or skin test indicates infection please attach tuberculosis record.

     C. Other Health Care Problems/Comments: _N/A_

IV.  **CURRENT PRESCRIBED MEDICATIONS** ✓ None

| Medication | Dosage | Frequency |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

INMATE MEDICAL RECORD                                    Page 1

Last VALENTINE          First JOHN              Mi L    SO # 106898
DOB [redacted]     Sex M        Education Level GED   Height 509 Weight 175

Emergency Notify VALENTINE    , PERRY    Relation    BROTHER
Address 3RD & FLORIDA    AMA, TX    373-1111

          ---- Entry Requires Visual Observation ----
Unconscious N
 Obvious trauma/illness requiring emergency care? N
                    Describe emergency care
Obvious fever, swollen lymph nodes, jaundice or other evidence of
           infection which might spread through the jail N
Poor skin condition/vermin/rashes/needle marks? N
Under influence of alcohol, heroin or other drug? N
Alcohol/Drug withdrawal symptoms N    Describe
Does behavior suggest risk of suicide or assault? N

          ---- Entry Requires Inmate Response ----

Carrying medication/reports being on medication N
List medication allergic to NKDA
Deformities (list)
Diabetic? N     How controlled?
Insu in (type/amount)               Medicine (type)
Are you under a Doctor s Care N    List Operations

        Allergies N         Head Injuries N         Psychiatric Disorder N
        Arthritis N            Fainting N               Tuberculosis N
        Asthma N          Heart Condition N             Ulcers N
        S/T's N               Epilepsy N        Urinary Tract Infection N
Dental Condition N          Hepatitis N                 VD N
Suicide Attempts N——— High Blood Pressure N      Psychiatric Hospital N

Scars/tattoos SEE P-3

Use Alcohol? Y    How Much? 1 BEER          How Often? WEEKLY
    When were you drunk last?          When did you drink last? 2 WKS AGO

Use any Street Drugs? N    What types?
    How often?          How much?
    When did you get high last?
    When did you take drugs last?

If female, is she Pregnant? N    Months
    Delivered recently? N    Date
    On Birth Control Pills? N
    Last Menstral Cycle?

Remarks

Marital Status  S              # of Children 03

Excerpts from Werner Talley's file  Page 18 of 20

INMATE MEDICAL RECORD                                    PAGE 2

Last VALENTINE          First JOHN              AI L   SO # 106798
DOB [redacted]    Sex M      Education Level GED    Height 509 Weight 175

---- Physical Examination ----

Head  N                    Abdomen  OK
Ears  OK                   Feet  FOOT FUNGUS
Eyes  OK                   Skin  OK
Nose  OK                   Grip  OK
Lungs  OK                  Strength  OK
Heart  N                   Gait  OK

Disposition o


I, the undersigned, authorize each and every physician, chiropractor, healer,
hospital, clinic, sanitarium, or other health care provider, reformatory, jail,
State or Federal Penitentiary or Correctional Institution in which I have been
examined, had medical diagnosis, treated or incarcerated, to release any and
all, each and every record pertaining to or in any way related to my past,
present, or future medical conditions to the bearer hereof.

SIGNATURE OF INMATE _John Balentine_____   DATE 7-31-98

SIGNATURE OF SCREENING OFFICER _C Moore 165____   DATE 7/31/98

**Potter County**
**Mental Disability/Suicide Intake Screening**

Name _Balentine_ _John_ _Lezell_   Date of Birth: ▮
        Last        First        Middle

State ID # ▮   ASO # _106775_   Date _7/30/98_   Completed By: _G. Moser_

Was inmate a medical, mental health, or suicide risk during any prior contact or confinement with department?
Yes ___   No _✓_   If Yes, when? ___

Does arresting or transporting officer believe that the inmate is a medical, mental health, or suicide risk?
Yes ___   No _✓_

| A.  QUESTIONNAIRE FOR DETAINEE | | | | B. OBSERVATION QUESTIONS | | |
|---|---|---|---|---|---|---|
| 1. | Have you ever received MHMR Services or other mental health services? | Yes / **No** | 6 | Does the individual act or talk in a strange manner? | Yes / **No** |
| 2. | Do you know where you are? | **Correct** / Incorrect | 7 | Does the individual seem unusually confused or preoccupied? | Yes / **No** |
| 3. | What season is this? | **Correct** / Incorrect | 8 | Does the individual talk very rapidly or seem to be in an unusually good mood? | Yes / **No** |
| 4. | How many months are there in a year? | **Correct** / Incorrect | 9 | Does the individual claim to be someone else like a famous person or fictional figure? | Yes / **No** |
| 5. | (a) Sometimes people tell me they hear noises or voices that other people don't seem to hear. What about you? | Yes / **No** | 10. (a) | Does the individual's vocabulary (in his/her native tongue) seem limited? | Yes / **No** |
|   | (b) If yes, ask for an explanation: "What do you hear?" ___ | | (b) | Does the individual have difficulty coming up with words to express him/herself? | Yes / **No** |

**C.  SUICIDE RLEATED QUESTIONS / OBSERVATIONS**

| | | | | | | |
|---|---|---|---|---|---|---|
| 11. | Have you ever attempted suicide? Have you ever had thoughts about killing yourself? If yes, when? ___ Why? ___ How? ___ | Yes / **No**   Yes / No | 14. | When not on drugs or drinking, have you gone for days without sleep or had a long period in your life when you felt very energetic or excited? | Yes / **No** |
| 12. | Are you thinking about killing yourself today? | Yes / **No** | 15. | Have you ever experienced a recent loss or death of family member or friend or are you worried about major problems other than your legal situation? | Yes / **No** |
| 13. | (a) Have you ever been so down that you couldn't do anything for more than a week? (If no, go to 14.) | Yes / **No** | 16. | Does the individual seem extremely sad, apathetic, helpless or hopeless? | Yes / **No** |
|   | (b) Do you feel this way now? | Yes / **No** | | | |

Comments ___

_A SINGLE INAPPROPRIATE RESPONSE, EXCEPT AS APPROPRIATE IN A.3, INDICATES ADDITIONAL EVALUATION RECOMMENDED._
(S-217)
TCJS/MD/S/8/97

IN THE 320TH DISTRICT COURT
IN AND FOR POTTER COUNTY
AND
IN THE COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS

| | | |
|---|---|---|
| EX PARTE | § | DISTRICT COURT NO. 39,532-D |
| | § | |
| JOHN LEZELL BALENTINE | § | COURT OF CRIMINAL APPEALS NO. 73,490 |
| | § | |

## ORIGINAL POST-CONVICTION APPLICATION
## FOR WRIT OF HABEAS CORPUS

**EVIDENTIARY HEARING REQUESTED**

Kent Birdsong
SBN: 02333630
301 East 7th Avenue
Amarillo, Texas 79101
(806) 371-9333
Fax: (806) 372-5575
**COUNSEL FOR APPLICANT**

FILED

~~CINDY GROOMER~~
DISTRICT CLERK

2001 JAN 22  A ᴵᴼ 07

POTTER COUNTY, TEXAS

BY_____, DEPUTY **000003**

EXHIBIT

RX-112

1

## GROUND FOR RELIEF NUMBER 4

ARTICLE 37.071, OF THE TEXAS CODE OF CRIMINAL
PROCEDURE AND THE TEXAS CAPITAL MURDER STATUTE
IS UNCONSTITUTIONAL AND VIOLATED APPLICANT'S
RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION AND ARTICLE I, SECTION 3, 3a, 10, 13, 14,
AND 19 OF THE TEXAS CONSTITUTION.                                      19-25

## GROUND FOR RELIEF NUMBER 5

THE CAPITAL MURDER/MURDER STATUTE AS
ADMINISTERED IN TEXAS IS CRUEL OR UNUSUAL
PUNISHMENT IN VIOLATION OF ARTICLE 1, SECTION 13, OF
THE TEXAS CONSTITUTION.                                               26

## GROUND FOR RELIEF NUMBER 6

APPLICANT'S RIGHTS WERE VIOLATED UNDER THE
FOURTEENTH AMENDMENT OF THE UNITED STATES
CONSTITUTION AND THE ESTABLISHMENT CLAUSE
BECAUSE THE TEXAS DEATH PENALTY STATUTES UNDER
THE TEXAS PENAL CODE SECTION 19.03 AND ARTICLE 37.071
OF TEXAS CODE OF CRIMINAL PROCEDURE ARE
UNCONSTITUTIONAL.                                                     27-42

## GROUND FOR RELIEF NUMBER 7

APPLICANT'S RIGHTS UNDER THE EIGHTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION WERE VIOLATED BECAUSE THE TEXAS
DEATH PENALTY STATUTE IS CRUEL AND UNUSUAL
PUNISHMENT.                                                          43-46

## GROUND FOR RELIEF NUMBER 8

APPLICANT'S RIGHTS UNDER THE EIGHTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION BECAUSE THE JURY CHARGE DEFINITION
OF MITIGATING EVIDENCE IMPERMISSIBLY RESTRICT THE
JURY'S DISCRETION IN CONSIDERING ALL EVIDENCE THAT
WOULD SUPPORT A DEATH SENTENCE.                                       47-54

iii

000005

### GROUND FOR RELIEF NUMBER 9

APPLICANT'S RIGHTS UNDER THE EIGHTH AMENDMENT AS
INCORPORATED BY THE FOURTEENTH AMENDMENT OF
THE UNITED STATES CONSTITUTION WERE VIOLATED BY
THE TRIAL COURT'S FAILURE TO DEFINE "LIFE SENTENCE"
AND/OR THE FAILURE TO INSTRUCT THE JURY THAT, IF
SENTENCED TO LIFE IN THE TEXAS PENITENTIARY,
APPLICANT MUST SERVE FORTY YEARS BEFORE HE
WOULD BE ELIGIBLE FOR PAROLE.                                    55-66

### GROUND FOR RELIEF NUMBER 10

APPLICANT'S RIGHTS UNDER THE DUE PROCESS CLAUSE
OF THE FOURTEENTH AMENDMENT OF THE UNITED
STATES CONSTITUTION WERE VIOLATED BY THE TRIAL
COURT'S FAILURE TO DEFINE "LIFE SENTENCE" AND/OR
THE FAILURE TO INSTRUCT THE JURY THAT, IF
SENTENCED TO LIFE IN THE TEXAS PENITENTIARY,
APPLICANT MUST SERVE FORTY YEARS BEFORE HE
WOULD BE ELIGIBLE
FOR PAROLE.                                                      55-66

### GROUND FOR RELIEF NUMBER 11

APPLICANT'S RIGHTS WERE VIOLATED UNDER THE
EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED
STATES CONSTITUTION IN THAT THE TEXAS DEATH
PENALTY STATUTE DOES NOT ADEQUATELY PERMIT A
JURY TO CONSIDER THE VICTIM'S PROVOCATION IN
ANSWERING THE SPECIAL ISSUES.                                   67-76

### GROUND FOR RELIEF NUMBER 12

APPLICANT'S RIGHTS UNDER THE EIGHTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION WERE VIOLATED BY THE STATE NOT
HAVING TO PROVE LACK OF PROVOCATION ON BEHALF OF
THE DECEDENTS.                                                  77-80

iv

000006

### GROUND FOR RELIEF NUMBER 13

IN VIEW OF THE DIFFERENT CAPITAL SCHEMES THAT
HAVE BEEN IN OPERATION IN TEXAS SINCE 1989, THE
TEXAS DEATH PENALTY WAS ARBITRARILY IMPOSED
UPON APPLICANT AND, THUS, IS UNCONSTITUTIONAL AS
APPLIED, IN VIOLATION OF THE EIGHTH AMENDMENT,
THE EQUAL PROTECTION AND DUE PROCESS CLAUSES OF
THE FOURTEENTH AMENDMENT OF THE UNITED STATES
CONSTITUTION, AND ARTICLE I, SECTION 13 OF THE TEXAS
CONSTITUTION.                                                                 81-83

### GROUND FOR RELIEF NUMBER 14

APPLICANT'S RIGHTS UNDER THE EIGHTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION WERE VIOLATED BECAUSE TEXAS'
STATUTORY PENRY SPECIAL ISSUE IS IN CONFLICT WITH
THE DIRECTIVE AGAINST "OPEN-MINDED DISCRETION" OF
FURMAN V. GEORGIA.                                                           84-86

### GROUND FOR RELIEF NUMBER 15

APPLICANT'S RIGHTS PURSUANT TO THE FOURTH
AMENDMENT OF THE UNITED STATES CONSTITUTION AND
THE FEDERAL EXCLUSIONARY RULE, AS WELL AS ARTICLE
1, SECTION 9 OF THE TEXAS CONSTITUTION AND THE
TEXAS CODE OF CRIMINAL PROCEDURE WERE VIOLATED
IN THAT THE INITIAL STOP OF APPLICANT WAS
UNJUSTIFIED AND ILLEGAL.                                                  87-90

### GROUND FOR RELIEF NUMBER 16

APPLICANT'S RIGHTS PURSUANT TO THE FOURTH
AMENDMENT OF THE UNITED STATES CONSTITUTION AND
THE FEDERAL EXCLUSIONARY RULE, AS WELL AS ARTICLE
1, SECTION 9 OF TEXAS CONSTITUTION WERE VIOLATED IN
THAT THE SECOND "TERRY" FRISK OF APPLICANT WAS
UNJUSTIFIED AND ILLEGAL.                                                  91-94

v

000007

## GROUND FOR RELIEF NUMBER 17

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF
TRIAL COUNSEL AS SUCH IS GUARANTEED BY THE SIXTH
AND FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE TEXAS
CONSTITUTION AND ARTICLE 1.05 OF THE TEXAS CODE OF
CRIMINAL PROCEDURE BY TRIAL COUNSELS' FAILURE TO
ENFORCE THE MANDATE OF ARTICLE 38.22 (6) OF THE
TEXAS CODE OF CRIMINAL PROCEDURE, REGARDING THE
VOLUNTARINESS OF THE APPLICANT'S IN-CUSTODY
RECORDED STATEMENT.**                                    95-98

## GROUND FOR RELIEF NUMBER 18

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL AS SUCH RIGHT IS GUARANTEED BY THE SIXTH
AND FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE TEXAS
CONSTITUTION BY TRIAL COUNSELS' FAILURE TO
REQUEST A JURY INSTRUCTION PURSUANT TO ARTICLE
38.22 (7), OF TEXAS CODE OF CRIMINAL PROCEDURE.**        99

## GROUND FOR RELIEF NUMBER 19

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF
APPELLATE COUNSEL AS SUCH IS GUARANTEED BY THE
SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED
STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF
THE TEXAS CONSTITUTION, BY APPELLATE COUNSELS
FAILURE TO RAISE AT APPELLATE LEVEL THE FAILURE OF
THE TRIAL COURT TO ISSUE FINDINGS OF FACT AND
CONCLUSIONS OF LAW REGARDING THE VOLUNTARINESS
OF APPLICANT'S IN CUSTODY STATEMENT.**                   100-101

## GROUND FOR RELIEF NUMBER 20

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF
TRIAL COUNSEL, AS SUCH RIGHT IS GUARANTEED BY THE
SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED
STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF
THE TEXAS CONSTITUTION AND ARTICLE 1.05 OF THE
TEXAS CODE OF CRIMINAL PROCEDURE BY TRIAL
COUNSELS' FAILURE TO CALL ANY PUNISHMENT
WITNESSES WHATSOEVER.**                                  102

vi

000008

5

## GROUND FOR RELIEF NUMBER 21

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, AS SUCH RIGHT IS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE TEXAS CONSTITUTION AND ARTICLE 1.05 OF THE TEXAS CODE OF CRIMINAL PROCEDURE BY TRIAL COUNSELS' FAILURE TO ASK FOR A CONTINUANCE TO PERMIT ADDITIONAL TIME FOR ADEQUATE AND THOROUGH PRETRIAL INVESTIGATIONS BY INVESTIGATOR KATHY GARRISON.**

GROUND FOR RELIEF NUMBER 21 ... 103-104

PRAYER ................................................................. 105

CERTIFICATE OF SERVICE .......................................... 106

000009

6

### GROUND FOR RELIEF NUMBER 20

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, AS SUCH RIGHT IS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE TEXAS CONSTITUTION AND ARTICLE 1.05 OF THE TEXAS CODE OF CRIMINAL PROCEDURE BY TRIAL COUNSELS' FAILURE TO CALL ANY PUNISHMENT WITNESSES WHATSOEVER.**

The record indicates trial counsel informed the court the defense punishment case would take approximately a day. Upon the State resting at punishment the defense announced it would also rest. No evidence was presented on behalf of Applicant at the punishment phase.

Trial consisted of two experienced trial counsel, experience combined indicated over 55 years of legal experience between them. Co-counsel Sherrod was a prior elected District Attorney with numerous capital murders prosecutions under his belt. Sherrod would have been familiar with the State prosecution tactics as well as the State's punishment experts. (CR. 269).

Applicant asserts that trial counsel had a duty to personalize Applicant as best as possible, either through presenting evidence regarding his life; and if that wasn't legally viable then a duty to present a picture of what life would be like for a prisoner serving a life sentence. No request was made for expert assistance, and no evidence was presented even when an ex chairman of the prison board was available in town as well as a practitioner of this court. (Exhibit C)

Applicant reurges the arguments under **Strickland** and argues that harm is shown based on the severity of the sentence imposed. (Death as opposed to life). What's the worse that could have happened?

Applicant prays for appropriate relief.

000127

7

## GROUND FOR RELIEF NUMBER 21

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, AS SUCH RIGHT IS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE TEXAS CONSTITUTION AND ARTICLE 1.05 OF THE TEXAS CODE OF CRIMINAL PROCEDURE BY TRIAL COUNSELS' FAILURE TO ASK FOR A CONTINUANCE TO PERMIT ADDITIONAL TIME FOR ADEQUATE AND THOROUGH PRETRIAL INVESTIGATIONS BY INVESTIGATOR KATHY GARRISON.**

The Court's file shows that Investigator Garrison billed the court for work done from March 11, through April 19, 1999. (See Exhibit D). The Clerk's Record shows that a motion and order for the appointment of an investigator was filed and signed by the court on September 10, 1998.

Hearings on the pretrial motions were held on March 11 and 12, 1999. The special venire began on March 22, 1999. Voir dire proceedings continued through April 7, 1999. The case was called on April 12, 1999 and the verdict returned on April 19, 1999. (CR. p. 376)

The affidavit of Investigator Garrison indicates she took over from a previously appointed investigator who provided her with little or nothing regarding work he had performed.

It also indicates the heavy burden placed upon her to communicate with counsel during trial, communicate with Applicant during trial and accumulate records or information to assist in the defense of Applicant. (See Exhibit E)

During the trial the prosecution conveyed an offer of life imprisonment in return for a plea of guilty. (See Exhibit F) Applicant refused the offer and trial continued.

Under **Ex parte Duffy**, and **Strickland** trial counsel has a duty to investigate the facts and provide his client with competent legal advice. *See* **Ex Parte Duffy**, 607 S.W.2d 507 (Tex. Crim. App. 1980) and **Strickland v. Washington**, 466 U.S. 688 (1984). Cases indicating a

Page -103-

000128

8

denial of effective assistance claim regarding preparation include **Flores v. State**, 576 S.W.2d,

632; **Ex Parte Rabern** 658 S.W.2d 602 (Tex. Crim. App. 1983) and **Everage v. State**, 893

S.W.2d, 219 (1995).

Under the **Strickland** two prong test Applicant argues trial counsels performance was

deficient for not having any pretrial investigation done prior to the actual pretrial hearings.

(March 11, 1999).

Counsel was appointed more than six months prior to the time any actual investigation

began.  Once the actual investigation began and an investigator began working on the case, trial

counsel was already immersed in contested pretrial matters in which they didn't even have

investigative assistance!

How could Applicant possibly be given competent legal advice without knowing who or

what would or would not be available for guilt/innocence or punishment?  Harm should be

presumed under these circumstances.  The result is fundamentally unfair (death); or unreliable

with these facts.

Applicant prays for the appropriate relief.

000129

9

## PRAYER

For the foregoing reasons, Applicant respectfully prays that the Court:

1. grant this writ of habeas corpus, returnable to the Court of Criminal Appeals;

2. hold an evidentiary hearing; and

3. enter a judgment ordering Applicant's release, reforming his sentence to life imprisonment, or remanding him to custody of the local sheriff to answer the indictment, as law and facts may require.

Respectfully submitted,

KENT BIRDSONG
State Bar No. 02333630
301 East 7th Avenue
Amarillo, Texas 79101
(806) 371-9333
Fax: (806) 372-5575
ATTORNEY FOR APPLICANT

## AFFIDAVIT

STATE OF TEXAS

BEFORE ME, the undersigned authority, personally appeared Kent Birdsong, a person known unto me and who, upon his oath, did state and depose the following:

My name is Kent Birdsong and I am over the age of 18 years of age and competent to make this affidavit. I have never before been convicted of a felony offense. I am the petitioner in the above and foregoing application/petition for writ of habeas corpus and I swear that the allegations of the application/petition are true and correct, according to my belief.

Kent Birdsong

SUBSCRIBED AND SWORN to before me, the undersigned authority, on this the 19 day of January, 2001.

KELLY C. ANGEL
NOTARY PUBLIC,
STATE OF TEXAS
My Commission Expires 5-3-2001

Notary Public, State of Texas

Page -105-

000130

10

## CERTIFICATE OF SERVICE

I hereby certify that on *January 22*, 2001, a true copy of the foregoing instrument was served upon Mrs. Rebecca King, Potter County District Attorney, Potter County Courts Building, 501 S. Fillmore, Amarillo, Texas 79101, Mr. James Durham, Trial Attorney for Applicant, 1008 West 10th, Amarillo, Texas 79101, Mr. Randall Sherrod, Trial Attorney for Applicant, 817 S. Polk, Suite 204, Amarillo, Texas 79101, Ms. C.J. McElroy, Appellate Counsel for Applicant, 2505 Lakeview Drive, Suite 301, Amarillo, Texas 79109.  I further certify that on the date in this paragraph, ten copies of this writ were mailed to the Texas Court of Criminal Appeals, P.O. Box 12308, Austin, Texas 78711.

Kent Birdsong

000131

11

NO. 73,490

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL COURT |
| | § | |
| | § | OF APPEALS |
| | § | |
| JOHN LEZELL BALENTINE | § | AUSTIN, TEXAS |

## AFFIDAVIT OF SELDEN HALE

STATE OF TEXAS                           §

BEFORE ME, the undersigned authority, on this day personally appeared SELDEN

HALE, to me well known and who, having been by me first duly sworn upon oath stated:

"My name is Selden Hale. I have practiced criminal law in Amarillo, Texas for the last

30 years. I have tried numerous capital murders and hundred of felonies and misdemeanors

throughout my practice.

"I have also served on the Board for the Texas Department of Criminal Justice as

Chairman. I was involved directly in the prison reform that occurred in the early 1990's in Texas.

I have unique knowledge of the Texas prison system from minimum security units to maximum

security units as well as "AD-Seg" and Death Row.

"I know Royce Smithee who often testifies at punishment for the prosecution in capital

murder trials throughout the State. I have heard his testimony on several occasions and have

given contradictory testimony.

"I have testified as an expert regarding the prison system in compliance with Rule 702 in

several capital murder cases in Potter and other Texas counties.

Page -1-

000148

12

"I would gladly have assisted in any way possible with trial counsel in Cause Number 39,532-D; *The State of Texas vs. John Lezell Balentine* in the 320th District Court in Potter County, Texas, whether it been as an advisor or witness regarding the prison system or how to rebut Royce Smithee's testimony at a punishment hearing.

"I was available during the trial preparation and the trial to speak with the lawyers or their investigators.".

THIS STATEMENT IS TRUE AND CORRECT.

SIGNED this 18th day of Jan , 2001.

_____
SELDEN HALE

SUBSCRIBED AND SWORN TO BEFORE ME on this 18th day of January , 2001, to certify which witness my hand and seal of office.



_____
Notary Public, State of Texas

Page -2-

C00149

NO.39,532-D

| | |
|---|---|
| THE STATE OF TEXAS | IN THE 320TH DISTRICT CT |
| VS. | IN AND FOR |
| JOHN L. BALENTINE | POTTER CO. TEXAS |

## ORDER FOR PAYMENT OF COURT
## APPOINTED INVESTIGATION

TO THE HONORABLE JUDGE OF SAID COURT:

On this _____ day of April,1999 came on to be heard Defendant's

Motion for Payment of the Court Appointed Investigator in the above styled and

numbered cause.

It is ORDERED that the County Auditor pay to Jim Patterson Investigations,

Social Security # ████, 3321 Bell, Suite E, Amarillo, Texas, 79106 the sum of

$7744.15 for Investigation Fee's in this matter.

_____
JUDGE PRESIDING

I, ██████, Clerk of the District Courts and
County Courts at Law, in and for Potter County, Texas,
do hereby certify that the foregoing instrument
is a correct copy of the original on file in this office
ATTESTED this ___ day of January 20 01
By _____ Deputy

CINDY GROOME
DISTRICT CLERK
1999 APR 26  P 4: 50
POTTER COUNTY, TEXAS
BY _____ . DEPUTY 000150

#4 - Auditor

14

**JIM PATTERSON, PRIVATE INVESTIGATIONS**
**3321 Bell, SUITE E**
**AMARILLO, TX 79106**
**(806) 358-9979**
**TAX I.D # 75-1712619**

**April 21,1999**

Honorable Don Emerson
320th District Court
Potter County
Amarillo, TX

In re:  State of Texas vs. John L. Balentine # 39,532-D
Attorney: Jim Durham

Investigation:
3-11-99 through 4-19-99
179 hrs. 20 mins @$40 per hour          $7173.20
Expenses to date, excluding phone
charges:                                $ 570.95

Total Due: ____                         $7744.15

Thank you,

*Kathy Garrison*

Kathy Garrison, Inv.

FILED
CINDY GROOMER
DISTRICT CLERK

1999 APR 26  P 4 50

POTTER COUNTY, TEXAS

BY _____ DEPUTY

A CERTIFIED COPY
Page ___ of ___
District Clerk

000151

15

E.C.C. - 335-2406   Brenly Wagner - 353-3262
655-7364

Mothers - 678-6670

Isabel - Soc.   Prosecutor Law Ct.   Jim M 678-

| Date | | | | | |
|---|---|---|---|---|---|
| 3 11 | Kent | | | | |
| 3 12 | Kent | | | | |
| 3 17 | Kent | | | | |
| 3 18 | 4:05 P.M. Rev Case File | | 6:00 P.M. | | 2 |
| 3 19 | 2:00 Call Randy — | Do Comp Stuff | 5:15 P.M. | | 3 15 |
| 3 20 | 1:00 P.M. — Comp. work, find facts | | 4:30 P.M. | | 3 30 |
| 3 21 | | | End 6:30 P.M. | | |
| | 8:45 - Att'y't Conf. April Ryan - Comp Res | | | 9:50 P.M. | 1 15 |

3.22  7:30 AM - April Ryan Called - 353-2551 (Home's) off. at 3:30 - kids until 5:0 P.M.
(6:30 P.M. dept.)  10:30 Am. To Cethede Order - w/ from Judge - to D.A. for pics 12:45 P.M. 2 15
6:15 - Appt. w/ Apre - PAGOR - Dev. - 379-1483  10:30 Rollethen  11:50 Am  5 35
3 23  9:15 Am To cross - Letters  10:30 AM  1 15
12:30 P.M.  815 - 445-0721 - 2nd clg -  2nd 805-425-0871
Angies - 351-2810 - Angie Allen - work to see Mon. Wed.
Conf. P.M.  1:50 P.M.  2:30 P.M.  2 00
7:15 - Angie Allen  8:00 P.M.  45
8:40 P.M. Call Randy - 8:45 - Call the Therms - re Ross left mess
4 couple  - Reached Randy 8:55 P.M. - make arrang. for Jed Drew, can't commit
P.m. ci 9:30  -  Also, meet w/ Jury Spec 8:00 P.M.  Wed P.m
Call Me - Kennimer 379-9621  -  Comp Searches  10:00 P.M.  1 20
3 24  10:00 Call Randy - 10:05 left mess - 3  Ret Call 1:15 pm - To Interview Den 1:3  10
2:30 P.M. Comp Searches  End 3:40 P.M.  10
3:50 P.M. Called P.D. Housing / Mess - not empld there - Call at home  10
answer - 4:00 P.M.
7:30. Conf. w/ Randy & Jim - re div, co's, jurors, etc  10:15 P.M.  2 4
10:25 P.M. Read letters  1:30 P.M.  3 0
3 25  11:45 - Conf. Randy, to det D. plans to go - floor, photos  12:30 P.M.  4
1:15 to Customs w/ D -  4:00 P.M.  3 45
4:15 Called Randy - to Fax stuff to me -  4:30 - Jim - Mas Mem will only p -  05
8:25. To Echo, Rev. rough Measure, etc  30
3 26  9:30. Toser - photo  4:50 P.M.  20
1:00 To Esthou - to Jim D. many - need photo, Appr. et. To Att's office for Eval
called S.C. @ Me - Rickwers lunch to call me w/ info - calc is 11:30 Am  30
11:50 Am - Prep Rel's  55. 1 @ 10  20
12:55 - Prep photos  1:45  20
Read letters  2:15  1 0
3:15 - Prep P. Scene photos Spo Crime Photos & Mgs Scenes Rickwels 3:25  2
4:50 Read Alys. letter  3715 m

A CERTIFIED COPY
Page 2 of
District Clerk
Potter County, Texas
By Brooke
DISCLOSURE
POTTER COUNTY, TEXAS
DEPUTY
000152

870

3/27  10:00 AM  Phy Pics - Sort-Sel-Master P1997 - Review Rel's, Read Ryan letters -         4:00 P.M.         6.00

3 28  1:30  Begin 9th. photos, etc. Gail Master - Call Randy - new pics - √8
3 28  PCCF - arrive 3:10 - Rem to INTA - Leave 5:15 Conf Randy  5:30                          9:50 P.M.    230/235
          7:15 - List authentic - Re-Read Harris info for 106, ADDS
3 29  11:00 Read video/photos, etc                                 1:00 PM                                  2 00/2 30
          3:00 - Tourhome - to case w/AMS, get gang info, get rel'd → 7th century, CHIN's, logs, etc  5:30
          8:05 P.M. Begin review of material -                      12:15 AM                                  3 15
3 30  CALL Gene FRISTOE - GANG Expert - Got Newport Adds. 1√                                                 15
          4:45 P.M. Call Randy - Conf                              4:55                                        10
3 31  10:00 AM  Newport High School - 870 - 523 - 1321
    Do. Castleton  870 - 523 - 1351  Do. Albright  870 - 523 - 1316
          Newport Middle  523 - 1341  Newport Hosp  870 - 523 - 6721
          Harris's Hosp  870 - 523 - 8911 - Fx 523 - 0345 -
          Newport High School - 870 - 523 - 1321  Fx - 523 - 1388             10:50 AM.                       5 00
          12:05 P.M. Call Randy - Call these files for faxes & info
          Dr. Green - 870 - 523 - 9852 -
          Dr. copic to Jim - re Gail's, V letter, V's IR's, etc - April 1 -  1:15 PM                          1 00
          7:30 P.M. Ryan letters Comp Search Warr - list this re Conf + Evidence  10:30 P.M.                  3 00
4 1  10:30 A.M. Phys Dutchess letter, fax salary sheet - Called Mrs. Meadow 373 0640
          got Melinda's no. 373 0639 - to get info 2 or this weekend  701 Bucham
          11:30 A. Middle School - Fax  870 - 523 - 1388 - Mrs Joe Curren Recs, Int
          Vicki Wms Counselor - Scheduling  Recs    spoke w/her                                              5 00
          3:30                                                                                    3.30
          8:35 A.M. Cont. Sherrod insts -                           10:40                                     2 45
4 2  10:20 A.M. to DA's office - check file                        12:10 h M                                 2 50
          1:15  FINISH Photos - Ordered for AMS's            3:45 PM                                          2 30
4 3  11:05 Call Melinda  373 0639 - bellhouse - w/c some             2:05 PM                                 3 00
          Call Randy                                           2:20 PM
4 4  3:55 P.M. Call Bank's, mom's, Cayler, etc - No answer, moved, people have
          there 20's, new -                                        5:30 PM                                   1 35
4 5  10:00 AM. Read Newport H.S. Recs - Call Newport H.S. 870-523-1321
          Dr. Henderson - 214 257 6632 - leftmess  10:30 A M                                                 5 00
          Boykin - 371-0915 - left mess re Expert  Bried Tiffs  685-6225 - give info yet?
          Lisa Taylor - Linstein - New York  Schenectady, NY - Psychologist o Ph
          GANG Counselor - → Texas Gang Inj. Case - Comp look  Expert
          Park Youth Svcs - 501 682 - 980√
          DC - Dale Ramey - Read Clerk - 870 - 247 1500  Mirn No.
          Cancel DC for meds, mental Health - Emps, know, faxed, got info re
          Others 1 Dep - Find GANG Expert - E-Mail everyone  Break  7:40 P.M.                                7 80
          2 P.M. Resume - Call Borden, Call Mann  4 gang exp etc         10:15 P.M.                           1 50
          Conf Randy -
          50 20 min                                                                                       0001

1699

| | # | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4 6 | 3:50 - Conf. w/ Atty's, Dunken office strategy | At Dunken office | | 1:15 PM | | 3.5 |
| | | 5:00 - Do Rlevd assigns - try comp. locate its to file in wb | | | 11:30 Pm | | 2.30 |
| | 4 7 | 9:00 AM Ct - Jury Sel - to Dunken, listening tape & trans. Confession( Not for Mi, Able | | | | | |
| | | st.) To office 11:30 Gather Sole Name - got topics - take Sheriff & Regds - and | | 2:45 | 4:45 - 405-303-6232 → | | |
| | | 5 names - Get Rest of St. | | | | | |
| | | Secky at Lowe's re A comp. - Craword Applebee's do not want to Rel. | | | | 9:30 Pm | |
| | | because A's sign diff on their app. - Per PDC add'l, & criminate Meuts | | | | | 8.0 |
| | 4 8 | 5:30 Ask about Caylor, Sr. & Confe - Conf. - Prepare list all wit - | | | | | |
| | | Steve Powers - Side. Denver Dreem sch on VS - #Rls. | | | | | |
| | | no tie of A to → Threats. Misty - Bid. Oakleaf. | | | | | |
| | | Chris Confer - Moores - Justin Oakleaf - locate Banks | | | | | |
| | | Chris's mom - Call Richie Jones - re Psych Eva | | | | | |
| | | The 2 officer - Chris acted weird - Amos - Chadwick #23 - Silence | | | 202 | | |
| | | Jeff Cone - 373-3177 - 2:15 P.M. - line cease - 2:30 | | | | | |
| | | Ct. Clk. Syd re: Dave & Ronnie - 2:40 April not at work today - | | | | | |
| | | 3:15 Jeff Cone - Ans Ser. Dr. John Ashley - 870-523-3515 - 2:48 P.M. | | | | | |
| | | 3:20 P.m. Cone's office - not return - Dr. Cone said no - | | | | | |
| | | Dorrow - who does MRI's - April - no know Ronnie here - pledge Caylor letter | | | | | |
| | | Dr. Ashley's off. 870-523-3515 - Mrs. Piercy, only - Ronnie & Henry - only kept recrd 5 yrs. | | | | | |
| | | do not have fax machine - mail to 2 Dogwood Drive Newport. 72112 - 5:30 Pm & in | | | | | |
| | | 2:40 P.M. To Pueb) - 12:30 Am 8.0 | | | | | |
| | 4 9 | 1:00 P.M. Newport Jr. High. Called Joan Wright. 870-523-1346 | | | | | |
| | | Reft verbally & firm he witness last Pth. - | | | | | |
| | | Dick Wms - talked w/ counselor in H.S. - knew nothing - 7:05 P.M. | | | | | 1.05 |
| | 4 10 | 1:00 P.M. - look for Wesley Paso, Maye, Merville, Sro Interior Beds & Storm | | | 3:40 Pm | | 2.41 |
| | 4 11 | 8:00 Rpts - 1111 Jim Austin 354-2616 - #2/5 S Western | | | 5:30 Pm | | 130 |
| | | 7:20 PM - writing rpts. 11:40 5 | | | | | 4.0 |
| | 4 12 | 8:45 Court - 12:20 - lunch 1:30 - Crt - 5:20 Conf w Randy & Try, 5 | | | | | 4 5 Pm |
| | | Get to office - call NWS re temp. left message - 1:45 - Re-Scan Files - mark, refile | | | | | 10.0 |
| | 4 13 | 8:30 - Assist Attys. | | | 5:00 Pm | | 7.5 |
| | 4 14 | 8:30. To Court - 11:45 - Lunch - Dropoff Plug Photos - 10 min 1:15 Court - Std. ready, | | | | | 1 |
| | | to Jim's off. conf l Atty's 1:30 5:15 2 office 2:40 P.M. Call Thesn - set up re-creation | | | | | |
| | | for 9:00 A.M. next A.m. - wants 2'w, bottled the - 8:00 pm & O | | | | | 7 00 |
| | | 8:50 To Court Lit offer. 12:15 - lunch 1:30 - Begin Re-creation, put in own | | | 3 45 | | |
| | | Car - Assist Atty's | | | | | 2 5 |
| | | 8:30 - To court - Finm ARGS - 11:50 - Jury out 1:00 - Del. their Rlevd 1:15 Pm W ait - | | | 1 15 | | 10 1 |
| | | 1:00 Jury In - Guilty Cap Murder - Conf. w/ Randy, got sys DSS and - 8:30 Pm | | | | | 1 3 |
| | 4 17 | 11:30 Begin Search Siles - Find Missing Witness - 6:00 P.M. | | | | | 6 3. |
| | 4 18 | 9:20 P.M. Office - Took C? - Amt A - South dat - Fix - Dunken & pic - put toget | | | | | .3 |

81, 2, 3

18

all V's w/ D knowing Call Ready.
5:00 pm
4/9 - 8:45 Ct - Sht celebrity   10:30 to off. call all out fon 1:00   Arrange pl up Tony Brady,
Aguillar, Tim Austin, Nesmie, 12:30   ½ w to cell mr 1:00 515 w/ 13   450
Def Rest/Com   350   Jury out 2:00 pm   Dlib 3:15 pm

3:00 pm   540

535

9.75
10.5

37.15
50.20
81.30
10.15
178 . 80 =

179.20

A CERTIFIED COPY
Page 5 of 7
District Clerk
Potter County, Texas
By _____ Deputy

19

*Hotel Expense Receipt $17.10*

*Hotel This Page: $143.44*

*Ballentine*

PACKARD DRUG
STORE #3326
COPPER DRUG #3326 PH.329-6194 **
2610 S. WASHINGTON, AMARILLO **

PERSON #0149  REG #007  DRAWER #1
STORE #0149  TYPE 10   STORE #3326

952951  EXT PKG.0 F #1    3.51

TX 3.27% FAT       .29
TOTAL            3.89
TEND            10.00
CHANGE           6.20

THE PHOTO STORE
4706 OLSEN BLVD.
AMARILLO, TX 79109
806-355-8616

SALES RECEIPT

SUB-TOTAL
SALES TAX      7.05
TOTAL



### AUDIO REFINERY

1747 AVONDALE
AMARILLO, TEXAS 79106
(806) 355-0072

Name: Garrison Legal Services     Date: 4/7/99
Address: _____     Phone: _____

| Quantity | Description | Price | Amount |
|---|---|---|---|
| 2 | Cassette Dubs | 6 ea | 12 — |
|  | (Balentine) |  |  |
|  |  |  |  |
|  | Pol Cabl |  |  |
|  |  |  |  |
|  | Sub-Total | | 12 — |
|  | Tax | | 99 |
|  | TOTAL | | 12.99 |

A CERTIFIED COPY
Page 6 of 9
District Clerk
Potter County, Texas
By _____, Deputy

000156

20

STORE #3326

```
**   ECKERD DRUG #3326 PH.379-6194
**     2012 S. WASHINGTON,AMARILLO

ASSOC #8491  REG #007  DRAWER #1
TRANS #9877  TYPE 10   STORE #332

952053  EXP PHOTO P 1T   13.77
726235  KODAK FILM   1T    9.42 SA
942037  NESTEA ICE   .N    1.59

    TX @ 25% TAX          1.92
    TOTAL               26.27
    CHARGE              26.27
    XXXX*
    EXPIRATION DATE: 10/01
    AUTHORIZATION #:  91    $25

    CHANGE               .00
MARCH 26  1999         1:05 PM
```

$332.31

Centine

```
HASTINGS ENTERTAINMENT # 9604
     2001 S. GEORGIA
    AMARILLO, TX 79109
0654   03/27/1999   15:25
M. TRANS# 509619 TERM# 3

ETTO D (R)              15.49

                       $15.49

                        $1.28

AL      $16.77

783 600402 4XXXX  EXP: 10/01
IMA                   $16.77

UE                     $0.00

DBACK BEST SELLERS* 49CENT VIDEO
E BUY AND SELL USED CD'S ****
Online Shopping! Visit our
site at www.hastings-ent.com
```

```
Kinko's          (806) 359-9694
3801 Olsen Blvd #2
Amarillo,     TX 79109

QTY   PRICE   DISC    AMT
 6    2.98    0.00   17.88
COLOR 11 X 17 SINGLE SIDE .

XDISC        10.00         -1.79
SUB   16.09  TX   1.33 TOT 17.42
        American Express    17.42
                     CHG    0.00
    CUSTOMER ID  GARRISON LEGAL SERV

*Your American Express discount has
        been applied.

378360040243000  10/01 APPROVE 606220
I agree to pay the above amount
according to the card issuer agreement.
Sign Here: X_____

CW 13 TR   695013 RG 3A 04/11/99 10:52
     Visit us @ http://www.kinkos.com
```

```
Kinko's          (806) 359-9694
3801 Olsen Blvd #2
Amarillo,     TX 79109

QTY   PRICE   DISC     AMT
978    0.25   0.00   244.50
FS S/S F1 Prc Special Price
170    0.05   0.00     8.50
AUX OTHER STAPLING HAND

XDISC       10.00          -0.85
SUB  252.15 TX  20.80 TOT 272.95
        American Express   272.95
                     CHG    0.00
    CUSTOMER ID  GARRISON LEGAL SERV.

*Your American Express discount has
        been applied.

378360040243000  10/01 APPROVE 521397
I agree to pay the above amount
according to the card issuer agreement.
Sign Here: X_____

CW 81 TR   687_____16:10
     Visit us @_____
```

A CERTIFIED COPY

Page_____

District Clerk
Potter County, Texas

21

*26.95*

# Sage Publications, Inc.

2455 Teller Road
Thousand Oaks
California 91320

**CANADA UPS PARCELS ONLY**

PACKAGES: _____ WEIGHT: _____ lbs.

TERMS: C.I.F. + GST

SHIPPER
SIGNATURE:

THIS INVOICE CONTAINS BOOKS, JOURNALS, AND/OR NEWSLETTERS MADE IN USA OR OTHER DUTY-FREE COUNTRIES OF ORIGIN.

**INVOI**

ORIGINAL

CORWIN PRESS, INC.
A Sage Publications Company

ALTAMIRA
PRESS

Phone (805) 499-0721
Fax (805) 499-0871
E-mail: info@sagepub.com

**Pine Forge Press**
A Sage Publications Company

outside
the box, inc.
for significant learning enterprises

| | | | | | |
|---|---|---|---|---|---|
| | 5539127 | 3261170 | 03-23-99 | NET 30 | UPS 2ND DAY |

KATHY GARRISON
2005 MONROE
AMARILLO TX 79109

S
H
I
P

T
O

KATHY GARRISON
2005 MONROE
AMARILLO TX 79109

THANK YOU FOR YOUR ORDER

| 06 | 1 | WRIGHTSMAN: CONFESSIONS IN THE COURTROOM (PAPER) | 17.95 | 17.95 |
|---|---|---|---|---|

A CERTIFIED COPY
Page 8 of 9

District Clerk
Potter County, Texas

By _____ , Dep

|  | |
|---|---|
| SUB TOTAL : | 17.9 |
| SALES TAX : | 0.0 |
| SHIPPING & HANDLING : | 9.0 |
| CASH RECEIVED : | -26.9 |

OICE NUMBER
61170

Please make checks payable to Sage Publications Inc. and return a copy of this invoice with your remittance.

Federal ID# 95-2454902   Canadian GST# 12978 6448 RT

PLEASE PAY
THIS AMOUNT BY 04-22-99 ➡

U.S. $

0.0

000158

22

PAYMENTECH

S A L E S   D R A F T

STEAK & ALE 4421
2915 INTERSTATE 40W
AMARILLO, TX 79102

Merchant: 6741044215
Term ID: 306741044215001
Date: 04/14/99  12:38
Acct: 3783600482430B0
     K GARRISON
Exp: 10/01  Batch:  6  Shft:  1
Card type: AMEX  Tran:  106

AMOUNT:      $25.92

TIP: _____ 4.__ ~Rucker

TOTAL: _____ $29.92    $12.00

X _____
I agree to pay above total amount
according to card issuer agreement.

APPROVAL: 626827

TERMINAL:  1     SERVER:  119

TOP COPY-MERCHANT   BOTTOM COPY-CUSTOMER

I, _____ Clerk of the District Courts and
County Courts at Law, in and for Potter County, Texas,
do hereby certify that the foregoing instrument
is a correct copy of the original on file in this office
ATTESTED this ___ day of _January_ 20 _0_
By _____  Deputy

000159

23

NO. 73,490

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL COURT |
| | § | OF APPEALS |
| | § | |
| JOHN LEZELL BALENTINE | § | AUSTIN, TEXAS |

### AFFIDAVIT OF KATHY GARRISON

STATE OF TEXAS                              §

BEFORE ME, the undersigned authority, on this day personally appeared KATHY GARRISON, to me well known and who, having been by me first duly sworn upon oath stated:

"My name is Kathy Garrison. I am a private investigator working for Patterson Investigations. I have done this for over twelve years.

"I have been court appointed to assist Trial Counsel and Writ Counsel on death penalty cases more than twenty times.

"I have been appointed as an investigator on many more felony matters. I have attended several seminars for death penalty investigations and mitigation specialties.

"Regarding the John Balentine Capital Murder case, I was called in early March to take over for another investigator. I was provided nothing from his files, so I am not sure what he did or didn't do.

"I wanted to learn the case as quickly as possible, to locate and interview witnesses, to procure records and documentation for my client as quickly as could be allowed given the time I had. I was only able to confer with Trial Counsel and John during breaks in trial and after hours. It was a severe disadvantage to be given essentially thirty days (March 11th to April 12th) to investigate the witnesses, investigate any potentially mitigating evidence and confer with Counsel and Applicant.

"Much of the information I requested did not arrive until after the trial. Some of it was helpful for us, some not. Either way, it was too late for John Balentine to use.

000160

24

"My only question is this-would John have taken the plea bargain for life had he known what I was able to learn after the jury returned the verdict. "

THIS STATEMENT IS TRUE AND CORRECT.

SIGNED this _13_ day of _January_, 2001.

_Kathy Garrison_
KATHY GARRISON

SUBSCRIBED AND SWORN TO BEFORE ME on this _13_ day of _January_, 2001, to certify which witness my hand and seal of office.

_Kelly C. Angel_
Notary Public, State of Texas

> KELLY C. ANGEL
> NOTARY PUBLIC,
> STATE OF TEXAS
> My Commission Expires 5-3-2001

Page -2-

000161

25

NO. 73,490

| EX PARTE | § | IN THE CRIMINAL COURT |
|---|---|---|
| | § | |
| | § | OF APPEALS |
| | § | |
| JOHN LEZELL BALENTINE | § | AUSTIN, TEXAS |

### AFFIDAVIT OF JOHN LEZELL BALENTINE

STATE OF TEXAS                    §

BEFORE ME, the undersigned authority, on this day personally appeared JOHN

LEZELL BALENTINE, to me well known and who, having been by me first duly sworn upon

oath stated:

"My name is John Lezell Balentine. I was the capital murder defendant in Cause number

39,532-D. I received a death sentence in that rial. Some time during the trial my lawyers told me

the State offered Life for a plea bargain. I refused it.

"Had I known that there would be no witnesses called on my behalf at the punishment

phase I would have take the deal for life."

THIS STATEMENT IS TRUE AND CORRECT.

SIGNED this _____ day of _____, 2001.


/S/
_____
JOHN LEZELL BALENTINE


SUBSCRIBED AND SWORN TO BEFORE ME on this ____ day of

_____, 2001, to certify which witness my hand and seal of office.


_____
Notary Public, State of Texas


Page -1-

000162

26

11/18/2003  11:49   806██████████        WERNER TALLEY                    PAGE  02

# WERNER TALLEY
## INVESTIGATIONS & POLYGRAPH SERVICE

4415 South Georgia, Suite 209
Amarillo, TX 79110
356-9486      655-3918

Tax ID # ████████

Invoice 169-00

The Honorable Don Emerson          Ref: John Balentine
Judge 320  District Court                Cause # 39,532- D
Potter County Court House           Kent Birdsong, Attorney
Amarillo, Texas 79101

| Date | Description | | Amount |
|------|-------------|---|--------|
| 12/5/2000 | Interview Defense Attorneys. | - 2.00 hrs | $1,680.00 |
| | Retrieve defense file from Durham for Birdsong | | |
| | And  Review Trial Transcript. | - 31.5 hrs | |
| | Interview Jurors | - 8.50 hrs | |
| | Total | -42. hrs | |
| | | @ $40.00 per hr. | |

TOTAL CHARGES    $1,680.00

Received on Account

Current Balance        $1,680.00

THANK YOU! Please mail payments to PO Box 781, Canyon, TX 79015



EXHIBIT
RX-113

2

# Attorney Fees Expense Claim

**Defendant/Child Name** John Lezell Balentine

| | | Court 320th CCA | Attorney Name & Address Kent Birdsong 301 E 7th Amarillo TX 79101 |
|---|---|---|---|
| ☐ Juvenile | ☐ Family Matters | Cause # ~~39532-D~~ 13490 | 39532-D |
| ☐ Misdemeanor | (Specify) | | |
| ☐ Felony | | | |
| ☑ Capital writ | | | |
| ☐ Appeal | | | |
| ☐ Investigation/Expert | | | |

**SS#** ▮▮▮▮▮   **Phone** 371-9333

**TBC#** ▮▮▮▮▮   **Fax** 372-5575

| Type of Service | Hours/Days | Hourly Rate | Fixed Rate | Amount to be Paid |
|---|---|---|---|---|
| Non Issue/Docket Call Appearance | | $35-75 | $100-200 | $ |
| Motion Hearing | | $35-75 | $200-400 | $ |
| Guilty/True Plea | | $35-75 | $300-400 | $ |
| Detention Hearing | | $35-75 | $100-200 | $ |
| Non Jury Trial | | $35-75 | $500-750 | $ |
| Jury Trial | | $35-75 | $500-1000 | $ |
| Out of Court Preparation  see attachment | | $35-75 | | $ |
| Expenses (Attach Itemization) | | | | $ |
| | | | Total | $ 8525 |

Auditor after payment, Send to Ct Crim. Appeals for Reimbursement. DE

I certify that I have performed the services and incurred the expenses listed above in representing the Defendant/Child in accordance with C.C.P. 26.05, T.F.C. § 51.10 or other Texas statutes. I have not received nor will I receive any other payment for representing such person.

Attorney _____

Approved and Ordered paid from the General Fund.

Date: 12/18/00

Judge _____

CINDY GROOMER
DISTRICT CLERK
2000 DEC 18  A 11: 53
POTTER COUNTY, TEXAS
BY _____ , DEPUTY

EXHIBIT
RX-114

Law Office of

# Kent Birdsong

301 East 7th Avenue, Amarillo, Texas 79101
Telephone: 806-371-9333 Fax: 806-372-5575

*Board Certified In Criminal Law*
*Texas Board of Legal Specialization*

December 12, 2000

Hon. Don Emerson
Judge, 320th District Court
Potter County Courts Building
501 S. Fillmore
Amarillo, Texas 79101

39532-D

*RE: Cause No. 39,582-D; The State of Texas vs. John Balentine*
*Court of Criminal Appeals Cause No. 73,490*

Dear Judge Emerson:

Enclosed please find a Claim for Services for the above-named individual.

If you have questions, please call.

Sincerely,

Kent Birdsong

KB/kca
Enclosure

FILED
CINDY GROOMER
DISTRICT CLERK

2000 DEC 18  P 12: 43

POTTER COUNTY, TEXAS

BY_____, DEPUTY

2

-1

**Claim For Services**
**And/or Expenses**
**For Tex. Code Crim. Proc. Ann. Art. 11.071 Appointment**

1. Name of Person Represented:

**JOHN LEZELL BALENTINE**

2. Date of District Court Appointment:

**October 1, 1999**

3. Court of Criminal Appeals Cause Number, County of Convicting Court and Citation, if any.

**73,490, Potter County**

4. Full Name of Counsel:

**Ronald Kent Birdsong**

5. Counsel's Mailing Address:

**301 East 7th Avenue**

**Amarillo, Texas 79101**

6. Counsel's Telephone/Fax Numbers:

**806-371-9333**

**Fax: 806-372-5575**

7. Counsel's Social Security Number:

███████████

FILED
CINDY GROOMER
DISTRICT CLERK

1999 DEC 18  P 2 43

POTTER COUNTY, TEXAS

BY_____, DEPUTY

3

-2

8. Comptroller Vendor Identification Number (if any):

███████

9. Date of Pre-Approval for Claimed Expenses:
**UNKNOWN**

10. Claim Covers Period of:
**10-01-99 to 12-11-00**

11. This Claim is:

__**X**__   An Interim Payment

_____   Final Payment

12. Amount of Previous Payments/Claims:

_____-0-_____ = Prepayments (investigators/expert witnesses)

_____-0-_____ = Expenses (including travel)

_____-0-_____ = Appointed Counsel Fee

13. Amount of this Claim:

_____**$-0-**_____ = Expenses

_____**$8525.00**_____ = Appointed Counsel Fee (Hours x $100.00)

_____**$-0-**_____ = Appointed Counsel Travel Time (Hours x $50.00)

_____**$-0-**_____ = Expert Witness Fee

_____**$-0-**_____ = Investigator Fee (Hours X $50.00)

_____**$-0-**_____ = Investigator Travel (Hours X $25.00)

_____**$8525.00**_____ = TOTAL

4

-3

14. Current deadline to file with convicting court: <u>**January 22, 2001**</u>

I hereby submit this claim for services and/or expenses under my art. 11.071 appointment. The information provided in this claim and supporting worksheet is to the best of my knowledge, true and correct.

_____          12/12/00 _____
Signature of Counsel/Payee                          Date

5

**APPOINTED COUNSEL HOURLY WORKSHEET**

Applicant's Name: Kent Birdsong          CCRA Cause No. 73,490          Date Submitted: December 12, 2000

| DATE | EXPLANATION OF SERVICES PERFORMED | ATTORNEY WORK HOURS | ATTORNEY TRAVEL HOURS |
|---|---|---|---|
| 10-07-99 | Correspondence to Defendant | .5 | |
| 10-18-99 | Review Correspondence from Defendant | .25 | |
| 02-09-00 | Prepared and filed Motion for Authorized to Expend Funds for Investigator | .5 | |
| 04-25-00 | Correspondence to Defendant | .25 | |
| 04-25-00 | Correspondence to District Attorney | .5 | |
| 08-15-00 | Read Transcript | 4.25 | |
| 08-16-00 | Read Transcript | 2.0 | |
| 08-19-00 | Read Transcript | 5.5 | |
| 08-22-00 | Read Transcript | 2.0 | |
| 08-23-00 | Read Transcript | 2.0 | |
| 08-24-00 | Read Transcript | 2.5 | |
| 08-26-00 | Read Transcript | 5.0 | |
| 09-01-00 | Read Transcript | 4.0 | |
| 09-02-00 | Read Transcript | 5.0 | |
| | **PAGE TOTAL** | 34.25 | |

Page 1 of 2

| DATE | EXPLANATION OF SERVICES PERFORMED | ATTORNEY WORK HOURS | ATTORNEY TRAVEL HOURS |
|---|---|---|---|
| 09-04-00 | Read Transcript | 3.0 | |
| 09-12-00 | Read Transcript | 2.0 | |
| 09-18-00 | Read Transcript | 4.5 | |
| 09-19-00 | Research | 4.0 | |
| 09-21-00 | Read Transcript | 4.25 | |
| 09-22-00 | Read Transcript | 3.0 | |
| 09-25-00 | Read Transcript | 6.5 | |
| 09-26-00 | Read Transcript | 7.0 | |
| 10-04-00 | Research | 2.0 | |
| 10-10-00 | Read Transcript | 3.5 | |
| 10-17-00 | Read Transcript | 2.0 | |
| 10-24-00 | Prepare and File Motion and Order for Ninety Days Extension Pursuant to Article 11.071(b) | 1.0 | |
| 10-30-00 | Read Transcript | 3.0 | |
| 11-03-00 | Read Transcript and Organize File | 5.25 | |
| | PAGE TOTAL | 51.0 | |
| | GRAND TOTAL | 85.25 | |

# Attorney Fees Expense Claim

| Defendant/Child Name | *John Lovell Balentine* | |
|---|---|---|

| | | Court | Attorney Name & Address |
|---|---|---|---|
| ☐ Juvenile | ☐ Family Matters | 320 *th* | *Kent Birdsong* |
| ☐ Misdemeanor | (Specify) | Cause # | *301 E 7th* |
| ☐ Felony | | *301 E7th* | |
| ☑ Capital *Writ - 11.071* | | | |
| ☐ Appeal | | *39532-010* | *Amarllo Tx 79101* |
| ☐ Investigation/Expert | | | |

| SS# | ▓▓▓▓▓ | Phone | *371-9333* |
|---|---|---|---|
| TBC# | ▓▓▓▓▓ | Fax | *372-5575* |

| Type of Service | Hours/Days | Hourly Rate | Fixed Rate | Amount to be Paid |
|---|---|---|---|---|
| Non Issue/Docket Call Appearance | | $35-75 | $100-200 | $ |
| Motion Hearing | | $35-75 | $200-400 | $ |
| Guilty/True Plea | | $35-75 | $300-400 | $ |
| Detention Hearing | | $35-75 | $100-200 | $ |
| Non Jury Trial | | $35-75 | $500-750 | $ |
| Jury Trial | | $35-75 | $500-1000 | $ |
| Out of Court Preparation, *see attached* | | $35-75 | | $ |
| Expenses (Attach Itemization) | | | | $ |

*100% reimbursable by state (CCP 11.071)*

| | Total | $ *16,475* |
|---|---|---|

I certify that I have performed the services and incurred the expenses listed above in representing the Defendant/Child in accordance with C.C.P. 26.05, T.F.C. § 51.10 or other Texas statutes. I have not received nor will I receive any other payment for representing such person.

FILED

_____
Attorney

2001 JAN 25 P 4:52

DISTRICT CLERK
POTTER COUNTY, TEXAS

BY_____ DEPUTY

Approved and Ordered paid from the General Fund.

Date: *1/25/01*

_____
Judge

EXHIBIT
RX-115

1

-1

**Claim For Services**
**And/or Expenses**
**For Tex. Code Crim. Proc. Ann. Art. 11.071 Appointment**

1. Name of Person Represented:

**JOHN LEZELL BALENTINE**

2. Date of District Court Appointment:

**October 1, 1999**

3. Court of Criminal Appeals Cause Number, County of Convicting Court and Citation, if any.

**73,490, Potter County**

4. Full Name of Counsel:

**Ronald Kent Birdsong**

5. Counsel's Mailing Address:

**301 East 7th Avenue**

**Amarillo, Texas 79101**

6. Counsel's Telephone/Fax Numbers:

**806-371-9333**

**Fax: 806-372-5575**

7. Counsel's Social Security Number:

███████████

FILED
~~CHERYL~~ DISTRICT CLERK

2001 JAN 25  P 4: 52

POTTER COUNTY, TEXAS

BY_____,DEPUTY

2

-2

8. Comptroller Vendor Identification Number (if any):

███████████

9. Date of Pre-Approval for Claimed Expenses:
**Unknown**

10. Claim Covers Period of:
**12-11-00 to 01-22-01**

11. This Claim is:

_____ An Interim Payment

__X___ Final Payment

12. Amount of Previous Payments/Claims:

_____-0-_____ = Prepayments (investigators/expert witnesses)

_____-0-_____ = Expenses (including travel)

_____$8525.00_____ = Appointed Counsel Fee

13. Amount of this Claim:

___**$831.50**___ = Expenses

___**$16,400.00**___ = Appointed Counsel Fee (Hours x $100.00)

___**$150.00**___ = Appointed Counsel Travel Time (Hours x $50.00)

___**$-0-**___ = Expert Witness Fee

___**$-0-**___ = Investigator Fee (Hours X $50.00)

___**$-0-**___ = Investigator Travel (Hours X $25.00)

___**$17,381.50**___ = TOTAL

3

-3

14. Current deadline to file with convicting court: **January 22, 2001**

I hereby submit this claim for services and/or expenses under my art. 11.071 appointment. The information provided in this claim and supporting worksheet is to the best of my knowledge, true and correct.

_____   _____
Signature of Counsel/Payee       Date

4

**APPOINTED COUNSEL HOURLY WORKSHEET**

Applicant's Name: Kent Birdsong          CCRA Cause No. 73,490          Date Submitted: January 22, 2001

| DATE | EXPLANATION OF SERVICES PERFORMED | ATTORNEY WORK HOURS | ATTORNEY TRAVEL HOURS |
|---|---|---|---|
| 12-13-00 | Research & Draft Writ | 8.0 | |
| 12-15-00 | Research & Draft Writ | 5.0 | |
| 12-16-00 | Research & Draft Writ | 6.0 | |
| 12-18-00 | Flew from Amarillo to Houston | 2.0 | |
| 12-19-00 | Drove to Livingston from Houston and Visited Applicant and Drove from Livingston back to Houston | 2.0 | 3.0 |
| 12-20-00 | Flew from Houston to Amarillo | 2.0 | |
| 12-21-00 | Read Transcript | 4.0 | |
| 12-22-00 | Read Transcript | 6.0 | |
| 12-26-00 | Research & Draft Writ | 8.0 | |
| 12-27-00 | Read Transcript | 6.0 | |
| 12-28-00 | Draft Writ | 8.0 | |
| 12-29-00 | Research & Draft Writ | 5.0 | |
| 12-30-00 | Dictate Writ | 6.0 | |
| 01-02-01 | Dictate Writ | 8.0 | |
| | **PAGE TOTAL** | 76.0 | 3.0 |

Page 1 of 2

| DATE | EXPLANATION OF SERVICES PERFORMED | ATTORNEY WORK HOURS | ATTORNEY TRAVEL HOURS |
|---|---|---|---|
| 01-03-01 | Dictate Writ | 7.0 | |
| 01-04-01 | Research and Draft Writ | 5.0 | |
| 01-08-01 | Draft Writ | 8.0 | |
| 01-09-01 | Research | 8.0 | |
| 01-11-01 | Dictate Writ | 4.0 | |
| 01-14-01 | Dictate and Draft Writ | 10.0 | |
| 01-15-01 | Dictate Writ | 8.0 | |
| 01-16-01 | Draft Writ | 10.0 | |
| 01-17-01 | Proofread Writ | 10.0 | |
| 01-18-01 | Make Changes, Proofread and Dictate Writ | 8.0 | |
| 01-19-01 | Proofread Writ | 5.0 | |
| 01-20-01 | Proofread Writ | 4.0 | |
| 01-22-01 | Letter to Balentine and Court of Criminal Appeals with copies of Writ | 1.0 | |
| | PAGE TOTAL | 88.0 | |
| | GRAND TOTAL | 164.0 | 3.0 |

Page 2 of 2

**EXPENSE WORKSHEET**

Applicant's Name: Kent Birdsong         CCRA Cause No. 73,490         Date Submitted: January 22, 2001

| DATE | BRIEF EXPLANATION | AIRFARE/ CAR RENTAL | MILEAGE LIMITED TO $.28 PER MILE | PARKING | MEALS LIMITED TO $25 PER DAY | LODGING LIMITED TO $70 PER DAY | COPYING NOT TO EXCEED $.07 PER COPY | POSTAGE ONLY | TOLL CALLS |
|---|---|---|---|---|---|---|---|---|---|
| 12-08-00 | Airplane ticket to fly to Houston to visit Applicant | $191.00 (See attached receipt) | | | | | | | |
| 12-19-00 | Motel for visiting Applicant | $72.32 (See attached receipt) | | | | | | | |
| 12-21-00 | Rental car for driving from Houston to Livingston | $114.51 (See attached receipt) | | | | | | | |
| 12-21-00 | Driving time from Houston to Livingston and back to Houston | | 180 miles @.$.28. | | | | | | |
| 01-11-01 | Copies of Case Law at the Potter County Law Library | | | | | | $30.40 (See Attached Receipt) | | |
| | PAGE TOTAL | $377.83 | $50.40 | | | | $30.40 | | |

Page 1 of 2

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 01-16-01 | Overnight letter to John Balentine from Amarillo to Livingston, Texas | | | | | | | $12.25 (See Attached Receipt) |
| 01-19-01 | Copies of Case Law at the Potter County Law Library | | | | | | $22.80 (See Attached Receipt) | |
| 01-20-01 | 20 Copies of Writ made at Kinko's | | | | | | $317.17 (See Attached Receipt) | |
| 01-22-01 | 10 copies of Writ mailed to the Court of Criminal Appeals and 1 copy of Writ mailed to Applicant | | | | | | | $20.65 (See Attached Receipt) |
| | **PAGE TOTAL** | | | | | | $339.97 | $32.90 |
| | **GRAND TOTAL** | $377.83 | $50.40 | | | | $370.37 | $32.90 |

Page 2 of 2

R KENT BIRDSONG

ITEM 5                                                    $72.32
HOLIDAY INN EXPRESS LIVINGSTON      TX

| Cardmember Account No | Date of Charge | Reference Code | Approval Code |
|---|---|---|---|
| | 12/19/00 | 37850015 | 54 |

Service Establishment and Location
HOLIDAY INN EXPRESS LIVINGSTON       TX

Record of Charge

HOLIDAY INNS

ROC NUMBER 0000000000

S/E #   1420183469

| | TOTAL CHARGE AMOUNT | $72.32 |
|---|---|---|

---

ITEM 2                                                    $191.00
CONTINENTAL AIRLINES HOUSTON       TX

| Cardmember Account No | Transaction Date | Ticket Number |
|---|---|---|
| | 12/08/00 | 0052152774295 |

Passenger Name                          Issuing Airline
BIRDSONG/KENTMR                         CONTINENTAL AIRLINES

Travel Agency Name                      Travel Agency Address
CONTINENTAL AIRLINES                    HOUSTON

| From | Carrier | Class | Transaction Amount |
|---|---|---|---|
| AMARILLO TX | | | $191.00 |
| To HOUSTON TX IAH | CO | QR | |
| To AMARILLO TX | | | |
| To | | | Amounts Use Only |
| To | | | 34478607 |
| | | | 000152 |
| | | | 22  346000 |

PASSENGER TICKET
S/E #   7892404687

---

ITEM 4                                                    $114.51
DOLLAR RENT A CAR  HOUSTON       TX

| Cardmember Account No | Date of Charge | Reference Code | Approval Code |
|---|---|---|---|
| | 12/21/00 | BL2073843 | 56 |

Service Establishment and Location
DOLLAR RENT A CAR   HOUSTON       TX

Record of Charge

| LOCATION | | DATE/TIME | |
|---|---|---|---|
| RENTAL HOUSTON | TX | 12/18/00 | BL2073843 |
| RETURN HOUSTON | TX | 12/19/00 | 0 |

S/E #   1423840162

BIRDSONG

| | TOTAL CHARGE AMOUNT | $114.51 |
|---|---|---|

9



KENT BIRDSONG
LAW ACCOUNT
301 EAST 7TH  (806)371-9333
AMARILLO, TX  79101

1440

PAY TO THE ORDER OF  Potter Co. Law Library        $ 30⁰⁰

Thirty dollars 40/100                                    DOLLARS

DATE ____  20 01

Copies Balentine                    Kent Bdy

10

**POST OFFICE TO ADDRESSEE**

**EXPRESS MAIL**
UNITED STATES POSTAL SERVICE™

*EF269431867US*

SEE REVERSE SIDE FOR
SERVICE GUARANTEE AND
INSURANCE COVERAGE LIMITS

ORIGIN (POSTAL USE ONLY)

79105

Day 07 / 16 / 01

Time In 1413

Weight 2.00

Total Postage & Fees $ 12.25

CUSTOMER USE ONLY

FROM: (PLEASE PRINT)  PHONE (806) 371-0333

Kent Birdsong
Attorney
301 East 7th Ave
Amarillo, Tx. 79101

TO: (PLEASE PRINT)

John Balentine
TDCJ 999315
Terrell Unit
12002 FM 35 South
Livingston, Tx. 77351

FOR PICKUP OR TRACKING CALL 1-800-222-1811   www.usps.com

KENT BIRDSONG
LAW ACCOUNT
301 EAST 7TH (806)371-9333
AMARILLO, TX 79101

THE HERRING NATIONAL BANK
P. O. BOX 5068
AMARILLO, TEXAS 79159-0468

1446

DATE 1/19 2001

PAY TO THE ORDER OF Potter Co Law Library          $ 22⁸⁰

Twenty two & 80/100                          DOLLARS

THIS CHECKS DELIVERED FOR PAYMENT ON THE ACCOUNT LISTED

BALENTINE Copies

39532-D

Kent Bird

Amarillo,           TX 79109

| QTY/LIST | DISC | PRICE | AMOUNT |
|---|---|---|---|
| 3200 | FS B&W S/S WHITE STD | | |
| 0.07 | 0.00 | 0.07 | 224.00 |
| 20 | BIND COMB CLEAR STANDARD | | |
| 3.45 | 0.00 | 3.45 | 69.00 |

SUB  293.00  TX    24.17   TOT   317.17
                         CHECK   317.17
                           CHG     0.00
        CUSTOMER ID         BIRDSONG, KENT

CW  TS TR  ██████     01/29/01 14:32
        Visit us @ http://www.kinkos.com



**UNITED STATES POSTAL SERVICE**

```
***** WELCOME TO *****
       DOWNTOWN STATION
    AMARILLO, TX  79105-9998
       01/22/01 11:15AM

Store USPS        Trans     53
Wkstn  sys5005    Cashier   KQ3VY7
Cashier's Name    GEORGE
Stock Unit Id     STAGEORGE
PO Phone Number   806-468-2148

 1. Priority Mail              5.55
    Destination:      77351
    Weight:           2lb 2.60oz
    Postage Type:     PVI
    Total Cost:       5.55
    Base Rate:        5.15
         SERVICES
    Deliv. Confirmation 0.40
      Label#:03001290000071918520
 2. Priority Mail             15.10
    Destination:      78711
    Weight:           17lb 10.80oz
    Postage Type:     PVI
    Total Cost:       15.10
    Base Rate:        14.70
         SERVICES
    Deliv. Confirmation 0.40
      Label#:03001290000071918537

Subtotal                     20.65
Total                        20.65

Personal/ Business Check     20.65


Number of Items Sold: 2

        Thank You
    Please come again!
```

14

Affidavit of Fact

STATE OF TEXAS    §
         §   SS.
COUNTY OF OLDHAM   §

    BEFORE ME, the undersigned authority, on this day personally appeared Kent Birdsong, who being by me duly sworn, did depose and state upon oath as follows:

1.   My name is Kent Birdsong. I am over twenty-one years of age and am fully competent to make this affidavit.

2.   Except where stated that I have been told by someone else, I have personal knowledge of all the facts set forth herein, and all such facts are true and correct.

3.   I was court-appointed on September 30, 1999 to represent John Balentine in state habeas.

4.   At the time of my appointment to represent Mr. Balentine, I was not then, and never have been, admitted to practice in federal court. At the time of my state appointment, I was not familiar with the substantive and procedural law that governed federal capital habeas proceedings. I did not know how my acts or omissions in representing Mr. Balentine in state habeas would affect the rights of Mr. Balentine to merits review in federal court.

5.   At the time of my appointment to represent Mr. Balentine, I did not know about the contents of the ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (1989 ed.). I did not associate a lawyer of established competence in the field of capital habeas to help me in the state habeas proceeding in order to fully preserve all of Mr. Balentine's state and federal rights to habeas relief.



6.    It was obvious from the record, particularly volume 26, that trial counsel had failed to call any witnesses on behalf of Mr. Balentine in the punishment phase of the trial. But at the time of my appointment to represent Mr. Balentine, I did not know that I needed to conduct a mitigation investigation, and provide evidence in the form of affidavits or institutional records about Mr. Balentine's medical history, family and social history, educational history, employment and training history, and prior juvenile and adult correctional experience, to make a *prima facie* showing of the ineffectiveness of trial counsel in failing to provide the sentencer with evidence which might militate against the appropriateness of the death penalty for Mr. Balentine, and/or how it was improbable, if not impossible, for trial counsel to have responsibly advised Mr. Balentine about the merits of different courses of actions without this information (*i.e.,* accepting a life sentence, or trying the case to conclusion).

7.    At the time of my appointment to represent Mr. Balentine I knew that to preserve an issue for appellate review, the trial lawyer was required to make a timely, specific objection.    This is a basic rule of Texas trial practice.

8.    However, I did not having a working knowledge, at the time of my appointment to represent Mr. Balentine, of procedural default law and the complexities of its application to claims as a case made its way through various state and federal court proceedings.  For example, I raised constitutional challenges to the Texas death penalty scheme in state habeas because these challenges were raised by trial counsel in their pre-trial motions. I plead that the claims had been preserved for habeas review because the trial lawyers raised the issues.  *See* footnotes 7, 10, 24, and 26 to Post-Conviction Application for Writ of Habeas Corpus. However, I did not know that, at the same time, I also needed to run an ineffective-assistance-of-appellate-counsel claim to excuse the procedural default arising from the failure of the direct appeal lawyer to raise them.

2

2

9.   What I realize now, that I did not know at the time of my appointment to represent Mr. Balentine, is that a state habeas proceeding is not another direct appeal.


FURTHER AFFIANT SAYETH NOT.

Kent Birdsong
P.O. Box 138
Vega, TX 79092
Phone: 806-267-2233

Before me, a Notary Public, on this day personally appeared Kent Birdsong, known to me (or proved to me on the oath of _____ or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _12th_ day of _June_, (year).

Jeanette Jeanne Petersen
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires 01-10-2014

Notary Public

[seal]

3

● Interview summaries provided by Jane McHan
  - John L. Balentine
  - Clara Smith
  - Helen Lewis
  - Becky Templeton (special education teacher)
  - Charles Vaughn
  - Eric Smith
  - Patrick Smith
  - Lynn Rowe
  - Ora Lee Williams (maternal aunt)
  - Bessie Jackson (maternal aunt)
  - Angelina Watson (mother of Mr. Balentine's son)
  - Angelique Allen (former common-law wife of Freddie Balentine)

● Affidavits by:
  - Jane McHan (mitigation specialist)
  - Charles Vaughn, Lt. Criminal Investigative Division, Jackson County Sheriff's Dept., Newport, Arkansas
  - Helen Lewis (special education teacher, Newport High School)
  - Becky Templeton (special education teacher, Newport High School)
  - Ora Lee Williams (maternal aunt)
  - Angelina Watson (mother of Mr. Balentine's son)

(Affidavit, ECF No. 28-7, pp. 11-12, ¶ 9). Dr. Kessner also "extensively interviewed Mr. John L. Balentine at the Polunsky Unit on 9/18/03 and 7/12/04" (*Id.*, p. 12, ¶ 9). Based on Dr. Kessner's interview of Balentine and her review of the above materials, she identified various "mitigating factors" that she believed could have been developed and presented by counsel during the punishment phase. (*Id.*, pp. 12-17, ¶¶ 9-14). Dr. Kessner additionally provided an expert opinion regarding Balentine's assessment of future dangerousness.

-4-


EXHIBIT
RX-117

① 9/18/03 —

Conceptual, social & practical

7 kids — 3rd oldest — of mother's
kids. 1st 5 have same daddy —
he had 2 older kids.

3   — James Balentine — Cleveland OH.
never met —

3   — Ray Balentine — Cleveland OH.
he came down when I was a kid
— he was abt 18/19 — He was
a joker a nut —
. He shot me w/ a BB gun a
couple times. I was a kid.
pre-K.   abt 3 y/o.
In the butt. Told me to go set
a bottle up & he shot me — I
was setting the bottles up.

3   Lynn "Peanut" — Balentine
Customer Kirkland Lumber yard —
Newport AR at the air base —
ad named — last contact '96.
didn't come to the trial.

5   Doris Balentine Cash —
Manager at Chili's in Houston luie
Stafford — last contact — 12/0/

Δ

B — Freddie lives w/ Doris — or JoAnn — he just
got out of prison — parole violation
domestic abuse — stole a car
were writing by rules changed —
drug head + crack —
went to abt 10th grade — finished 9th
was in Amarillo —

S — JoAnn Balentine H.S. grad —
cancer — disability — sickle cell
+ some other for cancer.
1998 — last contact — if I needed
to could ask her — she doesn't
initiate contact — Houston

B— Eric Smith — Amarillo
married — 3 kids — haven't
heard from L since — 1/98
didn't finish H.S. 7th grade —
got in trouble selling CRACK —
gang intervention type of prog —

Great aunt — ran up out of the house w/
a shot-g—   She & the rest were drinking.
Didn't find it funny then — abt
3-4 y/o — I laughed abt it when
I got older — the way she talked &
the authority she had

Not sure how Freddie got mixed up in
Drugs — drank a lot smoked marijuana
ACID

I denied ever using drugs —
        2 cans of beer put to sleep.
liquor — can drink a lot of that
9-10 y/o buy beer — stayed in
the country & the gas station
right there & wanted sell it to us.
Mister Brim —
        A, Freddie + older neighbor
        child (one year older). his family
also alcoholic —

Wed take sips out of bottles from
great uncle & uncles — They
were passed out — didn't even
say no.
The country life — you'd think there
were o rules — maybe 2x when I fell out
got drunk maybe at 14 or 16,   Seagrams 7  E & J Brandy

(2)

Eric or.
Smoking dope - JoAnn got him
started

B - Patrick. 19 y/o - H.S. grad -
Works at Con-Agra chicken plant
in AR — mom wrote last month
started + said Patrick said "hi" & sent $40 -
w/mom Won't come cause would be upset.

Mother — Newport AR —
— just got out of the hospital, heart
attacks - disability, + oxygen to
her brain —

James Balentine
Dad — I was 2 when he died
Mom was pregnant w/ JoA — at the time —
car wreck — drink & drive. -
He had a history of alcohol abuse

Substance Abuse Hx —
died because of liver Cancer
from drinking   Uncles, grandfather
both sides of family
Daddy's (twins) died of liver disorder
+ CA of the throat -
great - uncle shot himself because
he had liver CA

on Mother's side of the family
the women drink & cuss

③

Mother -
     leave for work 8 AM — take kids
to grandmother —— get back 2 PM
& get ready to go to the nursery
home 3 – 11. get home at 11:30

House cleaning

Mother's
maternal
aunt
"Big Mama"

Bunch of little kids w/ no adult
except grmoth til she moved
when Δ 8 or 9 y/o —— Bir 1889
almost 100 when she died = 1989 —

We were everywhere — across the street —
she had an outhouse —
neighbors had bathrooms —

Δ alcohol influence at any of his criminal beh
very seldom drank —

Didn't know Freddie was using
until just b4 Δ got locked up

By us looking at our parents &
relatives dying from alcohol
& couldn't   Δ Bro use to
drugs   Δ use to the girls.

Olustie's ex-bf would get Δ + Freddie
on pot or alcohol —
12/9/02 —

Mom has never said a.t. abt the
drinking or smoking.

P. Grmoth — didn't like him bringing
girls in the house — P. uncle would let
them drink in the house — w/ him —
Δ poured it out st. cause he didn't
like!

Moth — Alcohol ? never saw my
mother drink — If sb come
into house she would go out w/ them
+ have a drink — She was all
abt working + taking care of the kids

About 8 years after she + dad split
mom remarried —
mom saw him w/ another woman +
mom shot out the back window
of his car — Su $95 She took him
out for his B'day —

He used to whip them — She'd pack
up + leave —— Her BF used to beat
Δ too — remembers a guy Roy King chasing

④



through the house — abt 5 or 6 y/o-
Mother laughed

Just King + Smith as far as he ca
remember —

Doris plotted against Smith one
night - said he was trying to rape
her — Baseball bat ⊕ the girls
had knives — we were asleep before he got
mom beat & home + told home
us to go to bed — Smith always
carried a gun —

15 minutes
whipped w/ an orange extension cord —
slapped me, pulled a pistol on me —

Freddie stepped in stopped it.
probably because he wld have shot
me — ∆ abt 13 y/o.
Mom thought it was funny —

all got whipped w/ extension cord
Doris was hit by a car + had a
body cast — her bottom was showing
+ she got whipped by an extension cord
mom did the whipping — Helpless person
getting whipped
∆ abt 5 at the time

Doris
abt 8 y/o

One same year this decade killed his
3 kids & then killed himself. —

Scent their yard — rode the bus w/
the kids. younger kids — But one a age
& oldest one sis teenage —
Heard the gun shots — The Dad took
the up on Levee to shoot the
the mother at work — remembers the
ambulance —

Thinks mom took her frustration'
out on them too much. Thinks
Step-father is a little crazy.

One lady who was = the car w
Dad who mother shot out the car
window — is dead — I believe
his dad strangled her. burned her
house down.

When we'd get into an argument
argument w/ 2 wed pull out
his pistol & shoot at us —

Shot at Doris once by
whipping & topped with 5 honed
14-16-yo.

(5)

Juvenile Hx —

7th Grade — The Magnus Youth Home
like an orphanage — talked to a psychiatrist
sent to there because he had an "attitude"

1st Breaking into a motorcycle shop —
w/ Freddie ~~Freddie~~
1st time for both of the —
he got a motorcycle
$850 cash        2 pistols —
Freddie ran a red light & they
got stopped —
                  motorcycle
John fell off & police chased him —
kids for an hour & the — the chase
started up —

                    got
Probation — 1 yr & too jim
later teacher paddled s so John
                                        officer
threatened to ———— probation was
called — took ← to a juvenile
lock up a few hours — Cous ——
was the head jailer & told John
to apologize ← probation officer
took to home —

Went back to school & they referred
to to a psychiatrist — 3-4 xs.

Psychiatrist sent L— to the youth home.
4-6 days

Was in violation
of parole contact when he left
Maijones youth Home — Sendd
before then & etc else — She was
the only one for probation officer 13 counties

2) Had a friend Steve Odom — he
was in ROTC w/ Freddie &
L— went in & got the BB guns —
met at school — they were going
to fight but became friends
instead — went to juvenile
trade school 9/82 — 4/83 — 6-7 month
in Pinebluff — "Pinebluff Boys
School"
2 male counselors there wanted the
boys to fight — the
"rather take the beating than
fight — cause that will be worse —"

3) broke into a Texaco & stole some
guns — 22 rifle & 22 pistol
to go squirrel hunting w/.
fired shooting target & L— saw
squirrels
Freddie was w/ L— —

Dr. Kessner's interview w/Balentine Sept. 18, 2003  Page 11 of 13



Freddie stole some motorcycles &
3 wheelers & cops came abt the
Bikes & asked abt Otasco —
"what you know abt that!?" was
shooting squirrels & snakes —
got tired of playing w/ the —
started talking to kids —
probation til 18 y/o —

∅ counseling, ∅ Treatment.


4th  17 y/o — Broke into Walmart
         $40K worth of guns — got
caught in the store —
By self — Freddie not there —
peer pressure — Uncle — Little Rock
worked for S.W. Bell & had lots of $,
wanted △ to steal the guns so he
could sell the —

5 yrs — Tucker — 16-24
fighting all the time —
majority of the kids fought.
Dorm of 100-120 —   "gladiator
2 man cell —             school"
∅ isolation —   "Baby Mason"

thats where I hurt my back —
18 months 64 parole —

white on parole —
        Agg Robbery Charge —
        Coke bottle to the head but a 14 y/o
did — I knew he had done it &
not the ∆ — the judge ~~overruled~~
overruled & sentenced —
polygraphed —
                        judge said
                5 yrs for accessory
jury had said not guilty —
Cummins Unit —

How long?     90 — 93 — 94
Cummins, Vernon, Brightsville —
    Calico Rock

**Interview with John Balentine**
**March 17, 2004**
**Polunsky Unit, TDCJ**

John's earliest memory is of attending his father's funeral when he was two years old. He stated that he remembers standing by the casket, looking in. He explained that his father was killed in a car wreck. John's brothers and sisters told him that his father was not really killed in the wreck, but that "the jaws of life were used and they cut his head off." John stated that he is not sure what really happened, but "I always hated the police after that." He was about 7 or 8 years old when his siblings told him the story about the jaws of life.

John stated that he has no memories of his father, John Henry Balentine. (*John used the name John Henry when discussing his father, but other records and interviews indicate his father's name was James Henry). He remembers seeing a picture at his grandmother's home, of himself and his father standing together, but doesn't remember the picture being taken.

He was told by others that his father "drank a lot and drove fast, that's why he died." He stated that others told him that his father was a drinker. He never heard any stories about his father being abusive in any way.

John stated that he "barely saw" his mom, Clara Balentine Smith. She worked two jobs all of his life. "When we went to school, she was asleep. When we got home, she was at work." She did house cleaning and worked at a nursing home. She had no days off. Her sisters, Carol Lee and Ora Lee, stayed with the kids some of the time, till John was about 8 years old. His mother remarried George Smith when John was about 8. After that, they stayed by themselves if their parents were not at home. Before her relationship with George Smith, John's mother was seeing a man named Mr. King. John described him as "a fling after my father died." John remembered, "Mr. King used to spend the night. I would be at the door, beating on it, telling him to get out, at 12 at night, when he was asleep."

George Smith was physically abusive toward John's mother. John remembers seeing her with "a black eye, a busted lip." John described George Smith as "a worthless piece of crap." Less than a year after they were married, his mother "packed the kids up and moved to Little Rock." They stayed with her sister Ora Lee for a time. Ora Lee's husband, Kenneth Russell, beat John for wetting the bed while they were there. John was about 8 or 9 at the time. He stated that Kenneth Russell "was a crackhead." After the beating, John's mother got a small apartment in Little Rock.

John stated that he had kidney trouble as a child. He wet the bed till he was 10 or 11 years old. He reported that he was "bleeding blood" in his urine in the second grade. He went to see Dr. Green in Newport, AR, who told him he had "bad kidneys." He is not sure if he received any treatment. He stated that Dr. Green "is not a doctor any more. He



EXHIBIT
RX-118

1

got caught selling drugs." He was a white doctor. "There were no black doctors in Newport."

When John was 7 or 8, he was sleeping with his Uncle John (John's father's twin brother) on a pull-out couch at John's grandmother's. His uncle woke him up and told him to pull down his drawers. John shook his head "no." He stated that he was "terrified." His uncle told him two or three times to pull down his pants. John kept refusing. His grandmother came into the room and his uncle stopped. John reported that he lay there and didn't move, he was so scared. Nothing further happened and John "never put myself in that position again." He stated that he has never told anyone this story before.

John stated, "weird stuff used to happen" when he was a child. He asked, "do you think my father was possessing me?" John reported that he saw his father lying under his mother's bed after he died. "He looked dead, like he was in a casket." John told his mother about it and she stated that she had seen his father, too. He said, "we didn't freak out." He also reported that he "used to see two little white kids in the house dressed up like Little House on the Prairie. They were always in the bathroom, looking scared at a house full of blacks." There was a cemetery down the road with graves of children who had died of smallpox. There were Indian arrowheads in the area. John once found an old musket.

He went on to state that he believes his father was possessing him when he refused to let his uncle sexually abuse him. He didn't think he would have been strong enough to say no if his father hadn't been helping him.

John reported that he loved to eat sugar right out of the bag. He would "buy a two pound bag of sugar, sit around and eat the whole thing." He isn't sure why. He stated it was cheaper than buying a lot of candy. "It was a habit. I would still eat it if I had it." On one occasion, George Smith slapped him and they got into a fight over John eating sugar. John stated that he (John) had a "split personality" as a child. He talked back to his stepfather and others but didn't give his mother a hard time. He stated "I was sweet around my mama, but a devil around everyone else."

After living in Little Rock for a short time, the family moved back to Newport. George Smith had a girlfriend when they returned. John's mother reportedly shot a gun at the girlfriend but didn't injure anyone. Several years later, John's mother shot out the back windshield of a car that Smith was driving with another woman. John remembered that George Smith pulled a gun on him when he was about 15. They used to get into physical fights on occasion. One time, Smith gave John a sawed off shotgun he found on the highway when he was working (Smith worked on a highway crew). Another time, Smith bought two motorcycles and "gave one to Freddie, trying to be his friend." Smith reportedly "stole" John's brother Lynn's girlfriend. He reportedly tried to "talk to" one of John's girlfriends on another occasion and John stated he "would take care of him" if he tried to steal his girl.

K24

2

Later, John suspected that Smith may have been sexually abusing John's sister Ann. John stated that Smith bought her a car, something he would not have done for any of the other children. When asked why he thought Smith was abusing Ann, John stated, "they acted like they were married, fussing and fighting all the time." Ann was somewhere between 16 and 18 years old. On one occasion, she wanted her brothers to beat Smith up. John stated, "we didn't take much convincing. We all hated him. We had bats and sticks but he never came home that night" till John's mom was there. John was about 9 or 10 years old at the time.

John's mother divorced Smith somewhere between 1989 and 1991, but he had already left the home in 1988, according to John's recollections.

John stated that he and his brothers and sisters "fought like cats and dogs." His sister, Doris, would pick on him regularly. In Newport, the family lived in a new, three bedroom wooden house. His father started building it and his mom had it finished after his dad died. John stated that it was a pretty nice house, except for the door frames being torn up and doors being torn off by the kids fighting in the house. They lived in a small neighborhood of about 25 homes, a little community where everyone knew each other. It was called the Robinson Addition and then later renamed the Alcorn Addition. He stated that "the dysfunction was not in the family, it was in the neighborhood." He went on to say that there were lots of bullies in the neighborhood who would regularly harass him when he was little. "The bullies in the neighborhood kicked my butt as long as I can remember. There were no police out there, it was all wild." "If I'd been raised in a different environment, it would have been different." His mother's house had three electrical fires over later years and eventually burned down in 1998. His mother now lives in his paternal grandmother's house at 918 Remmel, Newport, AR. John stated that his father's mother died last year and left everything to his mother.

John remembers the first day of first grade. All of the desks had pieces of paper with names on them. He didn't realize his name was John, as he had always been called "Baby Brother" or "Baby Bro." He took the name off his desk and put it inside. His cousin had to tell him that was his name. He doesn't remember much about school. "I was just there." He reported one occasion when he was pretending he was Evil Knievel, jumping over desks and "busted my face and lip."

When he was in first grade, John was injured while "holding onto the back of a bicycle." A friend was riding on a bike with a long banana seat. John grabbed the back of the bike, trying to keep his friend from riding off. Somehow, John tripped and fell, knocking himself unconscious. He stated he was "knocked out for all day, 7 AM to 12 midnight." He stated that he was taken into the house but didn't go to the doctor or the hospital. He woke up in the house and didn't know where he was. He stated that he had a headache and felt dizzy and disoriented. He went back to sleep and didn't wake up till the next morning. He stated that he really didn't remember anything when he woke up.

When he was 9 years old, he ran into a truck mirror and split his lip, requiring 8 stitches.

K24

3

John stated that he was in Special Education "as long as I can remember." He stated that he had a "speech impediment" when he started school and people had trouble understanding him. He thinks he was in speech therapy as a youngster, perhaps in 1st, 2nd and 3rd grades. Because of the speech problem, he feels that he "fell behind." He stated that he was "always slow." He feels that he was doing pretty well up till 4th grade, when the family moved and he had to start at a different school.

John started breaking into stores when he was about 10. His brother, Freddie, was 9. They broke into a motorcycle shop and were caught. He received a sentence of a $400 fine and a year's probation. He stated that the probation "was unsupervised, I never went to see anyone."

He "smoked dope" at 11 or 12 years old but didn't like drinking or drugs for the most part.

In 7th grade, he broke into the local school with a friend. The friend, Steve Oldham, was in ROTC and wanted to get some BB guns. Steve was caught with the guns but John was implicated and sent to "juvenile training school" in Alexander, AR. He was there from about Sept. 1980 to March 1981. "The psychiatrist said I had an attitude problem. I was giving her a hard time, didn't want to see her." He doesn't remember her name. He went to the school there but it was all white and he was constantly in trouble. "The whole football team wanted to kick my butt." He wanted to play football but he "never could get enough credits." He stated that he was always at the bottom of the level system and couldn't work his way up. Finally, after 46 days, "my mama came to get me and they said they were glad to see me go."

At age 13, he started lifting weights. Some Jehovah's Witnesses came to the house. One of them had some weight lifting equipment. John made a deal with them that he would attend their services for a month in exchange for some weights. He tried to go out for sports in high school but "there was always some reason they wouldn't let me play." He wasn't sure why. At some point he said that he "didn't have enough credits to play." He was not in any kind of youth organizations. He went to a Baptist church regularly as a child. It was "a church out in the woods." He stated, "I am a religious person, I believe in God, Jesus, Satan." He had a religious counselor in prison for awhile but the man is now in the V.A. Hospital with medical problems. John stated that he thought he would be back eventually and doesn't feel a need for anyone else at this point.

At age 15 and 16, he reportedly had a sexual affair with a woman named Beverly Ford, who was ten years older than he. They both worked at the Country Club in Newport. She was a cook. "She would come out to the country and pick me up on the corner." She told him that she had known him as a kid and said he "was a bad little fucker."

When he was 17, he broke into Walmart and was apprehended. "The cops pistol whipped me on the head."

K24

4

He continued in Special Ed for English and math until 10th grade, when he was placed in regular math. He continued in Special Ed for English throughout his school years. Becky Templeton was his Special Ed teacher in high school; he stated that she taught him to play chess and he "beat her every time." He quit high school in 11th grade. He reported that he was sleeping in class and another boy was talking. The teacher accused John of talking and disrupting the class. Although others backed him up and said he was asleep, the teacher wanted to have him paddled. "The teacher wouldn't admit his mistake." John decided that school was not worth his time after having this run-in with the teacher and the principal, so decided to leave. He got his GED in 1987.

He believed that the school and the town were racist. He reported that during his high school years, some white girls started dating black guys and "their dads started showing up on their (the boys') doorsteps with shotguns." He remembers the KKK having a rally in Newport in 1981. The National Guard was there and they all had to stay in their houses.

John has never been married. He stated that all of the women he has been with were either "retarded or crazy." He has a 17 year old daughter, Carissa Wren with Vivian Wren. He has a son, John, Jr., who is 13 or 14, with Angelina Watson. He has an 8 or 9 year old daughter, Quinhoja Balentine, with Lisa Childress. In 1992 or 1993, he was out of prison about two weeks at his grandmother's house. There was a girl outside asking questions and "next thing I knew, she was in the back room with me." She got pregnant and moved to Atlanta, GA. Her name was Lisa Young. He is not sure what happened to her or the child. He thinks that he may have fathered another child in Amarillo, but didn't know the mother's name. He stated that Misty Caylor had a baby boy by him after he had been arrested. He thinks Misty may have moved to Lubbock. John stated that he and his brother, Freddie, had a competition to see who could father the most children.

John stated that he loves kids, is good with kids and enjoys playing with them. Misty Caylor's little girl called him "Daddy" and he babysat her for Misty. He would never hurt a child. At the time of the offense, he thought that something bad was going to happen to Angie Allen and her kids. Angie's house had been broken into and $2000 of stereo equipment stolen. Angie thought that her neighbors had done it, but he was afraid it was Mark Caylor because Mark had made two threats against John and Angie was John's friend. In his mind, he thought he had to do something first. "If you push me too hard, I explode. Get even. Get my hands on them. An eye for an eye, a tooth for a tooth." He now thinks he made a bad decision.

John stated that if he could change things, he would go back to the time of his accident when he hit his head in first grade. He is not sure how that incident changed his life, but seems to feel that it had an impact. He stated he would also pay better attention in school. He would like to have a family and a nice job as a mechanic. He "loved staying greasy, working on cars." He stated that he didn't have to have a book, he learned to do mechanic work on his own. At age 12, he fixed the transmission on his mother's car, just figured it out on his own. She let him drive the car after that. He tried to go into the Job

K24

5

Corps to take small engine repair classes, but "my parole officer wouldn't let me." "I wanted to learn a trade." He also knows how to cook and do carpentry work. He misses his kids and people he knew in the world. He feels depressed at times and regrets the offense.

He likes to read "fantasy" books but the prison has "an incomplete library." He wants to get Angel Tree by Ty Williams, about "good vs. evil," and Will of Time by Robert Jordan. John likes to draw and spends time doing art work. He is only permitted to have colored pencils. He has no money in his trust fund. He needs toiletries and personal items. He does not have visitors and receives very little mail or communication. He stated that his mother and relatives "are country people and have no way to get here. I can't hold it against them." He stated that his brother Eric (in Amarillo) uses drugs often, or "at least he used to." He feels he is unreliable. He stated that his brother Freddie is back in prison for violating his parole. His sisters do not communicate with him much. He has not heard from his brother Lynn in a long time.

John was friendly and cooperative throughout the interview. He seemed to have a desire to assist with his case and to explore his memories. Occasionally, he would laugh inappropriately when discussing a serious subject such as his offense or difficulties as a child. He has been described as "acting goofy" by others and this was evident four or five times in the course of our discussion.

**People to contact:**
Joanne Prince at the Country Club in Newport, AR. John worked there as a dishwasher when he was a teenager. She knew his mama real well. She may now live in Little Rock.

Becky Templeton, Special Ed teacher. Her husband was reportedly John's arresting officer on more than one occasion.

Steven Chester, friend. May live in Cave City, AR now.

Donald Alcorn, friend. In prison in AR for aggravated robbery.

Ken Grady, had a lawn service in Newport and knew John. May still be there.

Wade Honey, friend. Now a sgt. on the Newport Police force.

Zack Curtner, former employer at Curtner Lumber Co., Newport.

Mr. Manuel and son Bubba, worked at the Vo-Tech (White River) in Newport and supervised John, had him working on equipment, etc.

Mr. C.L. Borders, former employer, Newport.

K24

Richard Greer, uncle.  Possibly at 101 Webster St., Newport.

Helen Lewis, Special Ed teacher, knows his mother.  He did not have her in class.  Her husband was a coach.

**Further follow up needed:**

Being knocked out all day with no treatment
"Kidney problems"
Find Dr. Green or his records
Special education records/info—was John considered "learning disabled" or "emotionally disturbed"?
Bizarre behaviors; seeing ghosts, "dad possessing body," eating bags of sugar
Counseling records
Poor decision making, impulsivity, inappropriate behavior and affect (laughing about serious events, "acting goofy")
Family relationships and experiences within the family and neighborhood
Is there any evidence that "Uncle John" attempted to sexually assault John or others in the family?
Is there any evidence that George Smith had a sexual relationship with John's sister Ann?
What was the neighborhood like?  John reports being continually harassed by "bullies" from a young age.
Clarify with mom and siblings, if possible, chronological sequence of events related by John.

Jane McHan, LCSW
Mitigation Specialist

K24

7

- Interview summaries provided by Jane McHan
  - John L. Balentine
  - Clara Smith
  - Helen Lewis
  - Becky Templeton (special education teacher)
  - Charles Vaughn
  - Eric Smith
  - Patrick Smith
  - Lynn Rowe
  - Ora Lee Williams (maternal aunt)
  - Bessie Jackson (maternal aunt)
  - Angelina Watson (mother of Mr. Balentine's son)
  - Angelique Allen (former common-law wife of Freddie Balentine)
- Affidavits by:
  - Jane McHan (mitigation specialist)
  - Charles Vaughn, Lt. Criminal Investigative Division, Jackson County Sheriff's Dept., Newport, Arkansas
  - Helen Lewis (special education teacher, Newport High School)
  - Becky Templeton (special education teacher, Newport High School)
  - Ora Lee Williams (materal aunt)
  - Angelina Watson (mother of Mr. Balentine's son)

(Affidavit, ECF No. 28-7, pp. 11-12, ¶ 9). Dr. Kessner also "extensively interviewed Mr. John L. Balentine at the Polunsky Unit on 9/18/03 and 7/12/04" (*Id.*, p. 12, ¶ 9). Based on Dr. Kessner's interview of Balentine and her review of the above materials, she identified various "mitigating factors" that she believed could have been developed and presented by counsel during the punishment phase. (*Id.*, pp. 12-17, ¶¶ 9-14). Dr. Kessner additionally provided an expert opinion regarding Balentine's assessment of future dangerousness.

-4-



EXHIBIT
tabbies
RX-119

7/12/04 ①          John Balentine

Earliest Memory —
   After my daddy died — maybe 3y/o.
abt 2 when he died — so abt 12-18 months
later —
   Being at my grandmother's
mom getting off from work to take
us home ←          1/2 Shepherd.
   We had a little Collie — protective
of older bro — He didn't care who
you were — I was scared of it.
Never bit me but chased me into the
house — Older bro told me to jump
on him & the dog came running

The adults just thought we were outside
playing —


Uncle was staying w/ us he was taking
me for a ride on a bike & got caught
i/the Bike chain — top of toe & toenail
gone — o doctor — to — I don't have
any pleasant memories
very seldom went to the doctor —

— I just remember hurt/pain —

nothing pleasant abt

lived, out in the country   10 houses
didn't know a.t. else existed til
went to town —

at school — Erkle pants — they
pointed on me — so others teased me
split open in back

Not mixed up w/ the kids at school
So they didn't know me

Schools -

Newport, AR.
- Kindergarten -

1st - 6th Castleberry Elem = Newport AR

Robinson Edition - neighborhood
little country area outside of Newport
mix of income status - in the neighborhood
rode the bus to school -
ES went to Newport for school -

went to a little pre-school -
didn't teach at there
just eat sleep & play

Big kids picked on little kids
Bro. never took up for h - (Lynn)
Sis. used to make - us fist gits so
she could fight - to get sh s tarted.
(Doris)

Dad, - teach her how to fight &
she'd teach me how to dance -
She the beat me up but didn't teach
me to dance -

~~Steve & Chester~~ - causins same
grade class - friends at school &
go to their house -

Donald Alcorn + Joe Brown

we white
Steve ~~&~~ Chester — Friends — &
cousins - in same class &

Virgil Deres -
kebe w/o
parole - for
murder

anytime they wanted ab to pick up
the ~~trash~~ outside — I'd be out
there all day all alone —

speech therapy — 1st - 3rd grade
couldn't understand what I was
saying —

Didn't know my name was John
Ballentine - that my name was
~~Barry~~ Barry Brother

о fighting at school — 1st grade
we were stupid.

2nd grade fighting — the bathroom —
v/ 3 white dudes who were in a higher
grade. Teacher paddled me said I
was horseplaying — took me to principal
cause I jerked out of her hand I'd
tell the principal & I think he paddled me too

1st - 3rd grades

(B)

Speech Therapy

we'd all go out + pick up trash together —
stayed — same class all through —

Virgil Deceus — went to his house —
+ he built a tent — + he wanted me +
my Bro — to screw — — have sex w/
— — didn't tell any adults —
play w/ his toys + pidgeons + eat
— currently — prison for murder — AR

3rd grade? winter:
Once at a neighbor's Virgil had shut off
gas to the stove + told S to go —
+ light a a match — — the house —
large explosion — house not damaged
knocked — down —

Spec. education — all through H.S. also.
entire school career — didn't know the
reason — That is was for speech prob
Doesn't remember mom coming
to the school.

Spec. Ed. teacher — 11th grade.

Becky Temple for —

Mrs. Templeton taught him to play
chess —
   Ms. Helen Lewis — also a spec ed
teacher there — but not his teacher —
has corresponded from prison w/ Mrs. Lewis.


Expulsions —

   6th grade — for touching girls
Had played hooky that day & got
kicked out when returned —
— cousin & stereo got kicked out —

stayed in trouble — in school —
   7th & 8th grade stayed in trouble —
   8th grade made some homemade wine —
& drank it.   S.D. had to taste —

Curious wild

                    accused of            but
11th grade — talking & sleeping — in classroom )
Principal/teacher wanted to paddle
him + he said no — so left school
An off fit after — Left school about
one week later —

went back to school next go 11th grade
again — but didn't stay. Had been close to
finishing so tried again to finish

④ Family —

dK: Lynn 40 doubts that he knows his father

Doris — 37

D — 35

Fred — 34

JoAnn (32) Sickle cell, cancer — using one act X
"she dying" weighs abt 300 lbs.

Eric — (83) Nov.

Patrick (85) Sept

Mother married to father — father
Built the house — wooden house
Delivery — for post office — drove
through little towns on the way to Little R.

Car wreck in his personal car —
2 others in the car — they say —
Mom + some other man —

Mom thrown from car — pregnant w/
JoAnn —

Dad was killed — lost control of the
car — he was drunk —

Sister says that when the police came to
the accident — they cut his leg off —

Mom got $$$ to pay off the house &
got a new car —

Asked David Hall to be my dad —
neighbor —

⑤

Bag of Sugar — just something I liked — I'd still do it if I had some —

Q. Buy 2 lb bag — + eat it by the cup —
Step-father used to make sugar sandwiches — sugar on cheese + Bread + butter —

I used to get a whipping cause they thought I'd steal it from the house —

Running through the door — door + window — the screen was locked + But I thought it would open — was chasing someone —
Used to get drunk + pull up stop signs —

Mental Health Clinic in Newport —
Probation Officer referred to
Magnus Youth Home —
Some days he was cooperative w/ her + other days not — st he didn't + want to leave school to see the P.O

Was there 43-46 days — Home for kids not a mental health facility.

Some of the kids runaways.
Some of the kids placed there by parents
who could afford to keep them

0 Treatment — or counseling
just school, + chores. little skating
rink but needed levels to have
levels + grades — stay out of trouble.

Alexandria Youth Home — like TYC —
0 TX — (Breaking) into ROTC Building
that wasn't my idea there was a dude
a year older he was ROTC + wanted
a pellet gun — he was arrested
for trying to sell the gun + told
police he got gun from from A —

mom worked at night + he'd clean house +
cook + when she'd be coming in front
he'd be climbing in the back window —

0 meds when little —
when did from Mognus ____ 0 treatment

⑥

B      Has seen one pic w/ his fath –
       Father has other kids
       met one of half – sibs – who shot
       ⏃ in the butt w/ a BB gun –

       No knowledge of Dad hitting moth –

       Geo & his moth –
       they had to move out of house their
       dad built for the – He wanted
       to move another woman – ⏃

       mom married geo. 78 –
       moved out summer 79 – to Little Rock –
       stayed at Uncle Kenneth Russel's house tit
       he beat Δ – couldn't hardly walk.
                Ora Lee's Husband.

4⁷ᵗ Grade  Joe beat up on moth – busted lip
       blood nose – was put in the car asleep &
       woke up when they were in LR

1      moved back to Geo – Fall 79 –
       Mother's noter Cara Lee came to stay w/them
       because of her husband's abuse –
       She Babysat.
       Cora Lee – domestic violence husband –
       Mary Ann –    "          "    – her
                husband wld come to the house – screaming.
                & pounding on the door. He was militan   1–2x.

Hard on his kids + wife

Oma Lei's husband Kenneth - was in
LR so he would call all the time

Carolee's husband (Tommy) 2 doors down
will watch — he talked her back
home + the ——— broke her arm 3 places
When she got out of Hospital went
straight to LR

79 Kenneth Russell — used a leather
belt on △  One time — He took his
frustration out on me.
couldn't walk — welps from for days
stiff — was in underwear + beat
w/ a belt — Had wet the Bed —
he whipped his own kids like that

CRACK Head — Dope — worked for ~~ATT~~
talked

His way of getting my mother out of
the house

⑦   when mom returned to George he'd still hit
George —                      her.
— any time he wanted to be w/ another
woman — would start a fight w/ mom —
Always seemed to be st else —
the picture —

Ext Extension cord — Δ was taking Geo's
change — Beat Geo w/ it til he was tired
last beating he gave Δ — 3-4th grade
slapped for eating sugar — Ow.
didn't whip him

Doris said he hit her — She tried to get
EB to hide w/ Pat to jump Geo when
he came — Geo was late & EB fell asleep
Doris had said Geo pulled a gun on her —
Geo gave her a car to drive

_____

ⓑ substance abuse —

Geo — drank — not sure if he got drunk

m: gr fath — alcoholic—
pat. uncle — (twin to fath) alcoholic —
Kenneth Russell — crack

all of mother's uncles & her fath bro died of
liver disease. from drinking

Dad's twin died of cancer also -

△ 6-7 y/o

John Balentine — staying at p. gmother's house + he told △ to pull down his drawers — shook head "no"

gr mother hollered + he got up & moved away told him to "come here"

△ fell asleep — △ didn't tell mother or AB tried to forget it totally — but still I looked at him it sad face —

17-18 y/o.
brother Jerry — across the road tried to make me "suck his dick"    △ abt 8-9 y/o.

"put your mouth on this" had my hand trying to make me do it — "No" His dad was there . + came in △ left. Had it out in his hand —

By the time mom got home it was 11 PM + △ asleep — By the next day △ had forgotten abt it. But later △ was watchful w/ Eric & Patrick

C 8

Mother cleaned pple's houses +
nursing home work

Geo didn't spanuise the — "your not
my dabby"

Geo took # Lynn's gf + Lynn didn't
do a.t-wst zt.

D — couldn't get welfare cause she owned
a house + car —

races enuf food — the house —
Free Breakfast + lunch at school —

In summer when at grmothers's house
they wld raid her refrig — She say
I know your mama feeds ya —

"The roaches packed up + left"

○ doctor visits —
○ dentist : has fillings but got thm at TDCJ —
got regular vaccinations for school- free.

clothes — Salvation Army — never
felt shame abt this — j not a kid
did n't think abt .

Baptist church — ○ Benevolence —
small church —

- 3 Bedroom i Bath house —

3 Boys shared.
2 Sisters shared.
Mom her own room.

Aunts slept ~ room w/ girls or w/ his mother

Ⓔ George worked for highway
Bought self new cars — never
helped Mom —
carried $ to pick up girls — But didn't
help mom w/ bills.

Cheryl — Jimm's ♀ the Geo troon up w/
Geo & Cheryl are together

⑨

4½ +
A.

Mom, Geo, Lynn each carried a g——

Geo pulled a g—— on Δ once —— during
an argument — so Δ reached for a g——
Geo had po'd a gun to hi —— Geo called
the police & that Δ w/ a rebellious kid

Fred —— prison for domestic viole—ce
of the victim

no break-ins at the house ——

Mom shot at Geo —— at the dub end
of Main Street area —— he at
was driving by w/ Cheryl ——
Mom shot the back window out ——
Δ arrest — Δ police report

Lyn— carried a 22 But never pulled
it on anyone ——

Matt shot at some girl involved w/
Geo —— when they were i— LR.
girl in a car trying to get away o—
Matt was getting g— to shoot
at her—— Δ police ——

abot a month later girl burned up = her
house = cigarette — , ≥B +hot Geo
had lit to do w/ it

nice quiet neighborhood —

(6) spare time — was trying to draw — on
envelopes but not allowed now.
Have always out at ET = the library
before janitor

11-12 y/o.

H. Alexandria Youth Home — was abusive —
wld beat yo. butt April 80/81
Sept 81

17 months

regular setup — like a door, lock
bars on the window —
Showed in an area where there was
more security — not as punishment —

never slapped or hit him only
happened a couple of times was
any worse the punishment at school

⑩

Acted the fool in court ── Alexandria
acted like a fool ── like a spoiled child.
couldn't be still ── making up noise
juvenile case ── ROTC ──
Booing the judge ── being disrespectful.

One Furlough at Xmas ──
slipped on ice & Broke leg ──

Mental Status ──
   Suicidal ── not b4 came to D.R.
   ── attempts ──
   last Xmas tried ___ ── gets depressed
around Xmas time ── usually able to
over come it & move on ──

── Voices ∅ halls (sees shadows
   + lijt etc)

── meds ── high Blood pressure ── doesn't
know the name of meds ──

Bumps on head —
H. temporal —
Holding on to the back of a bicycle

Freddie & Ray come on a bicycle &
& ∆ at store - said he'd give a ride home

if ∆ holding on the back & fell on highway
- Knocked out - 8 AM - not sure to
at midnight - put to bed w/ a headache.
Unco — til midnight

At first they thought he was playing
til a car almost ran over h

7 y/o - just bf 1st grade —
George shaved his head so the pple
at school thinking - ht he had done
St. asinine) Hair never completely
grew back —

after the bike accident — purposuely
& for attn wld hit his head on
concrete aller kids wld watch

never knocked out again.

⑪

Other Head Injuries —

17 y/o police pistol whipped —
He was in handcuffs — the eyesight
piece pierced the skin — bleeding

*Can't remember how old he was*

Lynn hit him in head w/ Bat —
& took Δ head + beat it up against
a car fender —

By George — mom had a BF named
Mr. King — Δ pounded on the door
— when door was opened Δ w'd wake
up — abt 4 y/o —
*Cussing him out* — spanked Δ w/ his hand — only
in his underwear —

Momma never told nobody to stop
hitting nobody —

Once when Δ was abt 14 he told
George slapped Δ for eating
sugar — so Δ told him he'd whip
him + put him out of the house —

Kenneth Russell —
— stayed w/ him when he got ~~out~~ out
of trucking school — took ↑ up
in a plane — was getting his
license —
later failed his UA ~~test~~ & the
police came to search — he lost his
job —

→ no more abuse then — trying to
help — dirt bikes, playing on the
computer, flying —

— transported marijuana — cocaine
etc.

still hated him for the whipping —
but wanted to get away from home —
Alone much of the time — Kenneth
was at work —

                              △
gave him marijuana — gave it to Mary Ann

△
  No drugs — but did eat sugar —

(12) <u>scar on lip</u>          12 y/o        older
                                  told a kid
"your mama's crazy" + they
went + got a gun + came back
out. I jump out of truck
+ was looking over shoulder laughing
+ just as he looked around
+ ran into side mirror of truck —
split his lip — stitches —

Scar btwn eyes   15-16 y/o —   lawn mower
wldn't start — took top off — Safeguard
flywheel put a nickel = to see if it
wld start tht way —

car jacking —   abt 27 y/o.
helped her move + she didn't
pay — Supervisor where they worked
at nursing home — asked him to
help move her stuff — He needed a
ride — that she owed him a ride

they didn't connect him til TX case.

Freddie — a drug head — crack —

Gucci — aunts 37 — he used to let
them smoke marijuana — △
Stopped "got stupider" grades
got worse the they already were
but too late —

↳ Gloria — his mother sister
" knew they were smoking & drinking



EXHIBIT

RX-120

## SCORE CONVERSION PAGE

| SUBTESTS | Raw Score | Age-Adjusted Scaled Scores | | | | | | Reference Group Scaled Scores |
|---|---|---|---|---|---|---|---|---|
| | | VERBAL | PERF. | VC | PO | WM | PS | |
| Picture Completion | 21 | | 11 | | | | | |
| Vocabulary | 36 | 09 | | | | | | |
| Digit Symbol–Coding | 54 | | 7 | | | | | |
| Similarities | 22 | 09 | | | | | | |
| Block Design | 37 | | 09 | | | | | |
| Arithmetic | 14 | 11 | | | | | | |
| Matrix Reasoning | 20 | | 13 | | | | | |
| Digit Span | 14 | 7 | | | | | | |
| Information | 12 | 7 | | | | | | |
| Picture Arrangement | 17 | | 11 | | | | | |
| Comprehension | 25 | 12 | | | | | | |
| Symbol Search | 32 | | (10) | | | | | |
| Letter–Number Sequencing | | ( ) | | | | | | |
| Object Assembly | | | ( ) | | | | | |
| Sums of Scaled Scores | | | | | | | | |
| | | VERBAL | PERF. | VC | PO | WM | PS | |

Full Scale Score (Verbal + Performance)

For converting raw scores to scaled scores, see Tables A.1 and A.2.

| Optional Procedures | | Raw Score | Cumulative % |
|---|---|---|---|
| Digit Symbol–Incidental Learning | Pairing | | |
| | Free Recall | | |
| Digit Symbol–Copy | | | |

For cumulative %, see Table A.11.

| | |
|---|---|
| Total | = |
| ÷ No. of Subtests | ÷ |
| Mean Score | Overall Mean |

| SUBTESTS | Scaled Score | Mean Score | Difference from Mean | Statistical Significance (.05e) | Strength (S+) | Weakness (-) | Frequency of Difference in Standardization Sample |
|---|---|---|---|---|---|---|---|
| Vocabulary | | | | | | | |
| Similarities | | | | | | | |
| Arithmetic | | | | | | | |
| Digit Span | | | | | | | |
| Information | | | | | | | |
| Comprehension | | | | | | | |
| Letter–Number Sequencing | | | | | | | |
| Picture Completion | | | | | | | |
| Digit Symbol–Coding | | | | | | | |
| Block Design | | | | | | | |
| Matrix Reasoning | | | | | | | |
| Picture Arrangement | | | | | | | |
| Symbol Search | | | | | | | |
| Object Assembly | | | | | | | |

For determining strengths and weaknesses, see Table B.3.

**Determining Strengths & Weaknesses**

Check one:

☐ Difference from Overall Mean

☐ Difference from Verbal Mean and Performance Mean

Statistical significance and frequency of difference are provided in Table B.3 of the Administration and Scoring Manual.

# WAIS-III

DEMOGRAPHICS PAGE

WECHSLER ADULT INTELLIGENCE SCALE – THIRD EDITION

## Record Form

| | Year | Month | Day |
|---|---|---|---|
| Date Tested | 2003 | 9 | 18 |
| Date of Birth | 1969 | 1 | 30 |
| Age | 34 | 7 | 18 |

Name _John Lezell Balentine_ ID _____  Sex ⊙ Male  ○ Female

Address _____
Street        City        State        Zip

Highest level of education _10th_  Examiner _Kessner_

## Behavioral Observations

Referral source/Reason for referral/Presenting complaint(s):
Brandt.

Language (Is English native language? If not, indicate examinee's level of fluency; indicate expressive/receptive problems, unusual verbalizations):
English –

Attitude toward testing (e.g., interest, motivation, work habits, rapport, reaction to success/failure):
motivated, interested in his performanc.

Physical appearance (e.g., formality and appearance of dress, grooming, hygiene, physical characteristics):
stocky build – grooming adequate
white jail clothes — o tattoos

Attention and Concentration:
good, slight distraction in environment
1–2 Xs.

Visual/Auditory/Motor Problems (Were problems corrected, e.g., with glasses, corrective lenses, hearing aids?):
o hearing problems
o glasses

Other Notes:

ISBN 015-4981-06-0

Ⓦ THE PSYCHOLOGICAL CORPORATION®
    Harcourt Brace & Company

Copyright © 1997 by The Psychological Corporation. All rights reserved.

9 780154 981066

# wais-iii

WECHSLER ADULT INTELLIGENCE SCALE – THIRD EDITION

Name _____

Examiner _____

Age _____ Date of Testing _____ _____

## 1. Picture Completion

**TIME LIMIT** 20 seconds each item

**REVERSE RULE** Score of 0 on Item 6 or 7, administer Items 1–5 in reverse sequence until two consecutive perfect scores are obtained

**DISCONTINUE RULE** 5 consecutive scores of 0

| Examinee Response to Item | Examiner Query (Say each query only once for the entire administration) |
|---|---|
| Names object pictured rather than missing part | *Yes, but what is missing?* |
| Mentions part of the picture that is off the page (e.g., the legs of the man in Item 14) | *Something is missing in the picture. What is it that is missing?* |
| Mentions an unessential missing part | *Yes, but what is the most important part that is missing?* |

If the examinee responds correctly after any of the above queries, score 1 point for the response.

| Item | Response | Score (0 or 1) |
|---|---|---|
| 1. Comb | | |
| 2. Table | | |
| 3. Face | | |
| 4. Briefcase | | |
| 5. Train | | |
| 6. Door | | |
| 7. Glasses | | |
| 8. Pitcher | | |
| 9. Pliers | | |

| Item | Response | Score (0 or 1) |
|---|---|---|
| 10. Leaf | *point* | |
| 11. Pie | *point* | |
| 12. Jogging | | |
| 13. Fireplace | smoke | |
| 14. Mirror | comb | |
| 15. Chair | | |
| 16. Roses | | |
| 17. Knife | | |
| 18. Boat | 3rd row seat pier | 0 |

| Item | Response | Score (0 or 1) |
|---|---|---|
| 19. Basket | piece of basket | 1 |
| 20. Clothing | don't see at | 0 |
| 21. Lockers | vent point | 1 |
| 22. Cow | | |
| 23. Tennis Shoes | point | 1 |
| 24. Woman | at 2 foot point | 0 |
| 25. Barn | tractor | 0 |
| | **Total Raw Score** (Maximum = 25) | 21 |

## 2. Vocabulary

**REVERSE RULE** Score of 0 or 1 on Item 4 or 5, administer Items 1–3 in reverse sequence until two consecutive perfect scores are obtained.

**DISCONTINUE RULE** 6 consecutive scores of 0

**SCORING RULE** All Items: 0, 1, or 2 pts.

| Item | Response | Score (0, 1, or 2) |
|---|---|---|
| 1. Bed | | |
| 2. Ship | | |
| 3. Penny | | |
| 4. Winter | season & coldest part of the year | 2 |
| 5. Breakfast | first meal in the morning | 2 |
| 6. Repair | to fix | 2 |
| 7. Assemble | put together | 2 |

## 2. Vocabulary (continued)

| Item | Response | Score (0, 1, or 2) |
|------|----------|--------------------|
| 8. Yesterday | the day after in the day before Q the day before | 2 |
| 9. Terminate | destroy Q I'm thinking about Arnold Salarz to end | 2 |
| 10. Consume | as in buying let go that a job thing Q to eat as in swallow — I'm gary to go up as eat as in swallow | 2 |
| 11. Sentence | A group of words that make a complete Q phrase | 2 |
| 12. Confide | to tell I can think of the thing I but I can say it, to tell, to relate, to trust | 2 |
| 13. Remorse | to feel guilty as in an emotional sense | 2 |
| 14. Ponder | to wonder, to give thought to sit back & think about it | 2 |
| 15. Compassion | compassion affection the same thing ? to show emotional affection I don't know | 0 |
| 16. Tranquil | never heard of it | 0 |
| 17. Sanctuary | of a haven — | 2 |
| 18. Designate | Designated driver → a place — taking a person home | 0 |
| 19. Reluctant | really don't want to do it, reluctant to do something | 2 |
| 20. Colony | group of people in a society or staying together | 1 |
| 21. Generate | to build ? | 1 |
| 22. Ballad | that ain't the one where they do the voting polls or the opera dancing Ballet at the booth | 0 |
| 23. Pout | frown — | 1 |
| 24. Plagiarize | never heard it — no idea can I write it down & look it up. | 0 |
| 25. Diverse | it's a disagreement ion I it | 0 |
| 26. Evolve | to — I know the word — to grow ? Q | 1 |
| 27. Tangible | I'm thinking abt the tangerine, fast e I dk — | 0 |
| 28. Fortitude | never heard of it | 0 |
| 29. Epic | epidemic on I dk it. | 0 |
| 30. Audacious | never heard of it Sounds like s.t. outrageous | 0 |
| 31. Ominous | I dk. It was in a book I was reading | 0 |
| 32. Encumber | never heard of it Isn't it hurt wh they fall one pass out | 0 |
| 33. Tirade | never heard of it. | |

**Total Raw Score
(Maximum = 66)**
(Include credit for items on previous page.)   30

## Digit Symbol—Coding



**Sample Items**

## 3. Digit Symbol—
**Coding**
(previous page) 



| Time Limit | 120" |
|---|---|
| Completion Time | 120 |
| Total Raw Score | Maximum=133 / 62 |

## Digit Symbol—
**Incidental Learning (Optional)**
(Response Booklet)



| | Total Score |
|---|---|
| Pairing | Maximum=18 |
| Free Recall | Maximum=9 |

## Digit Symbol—
**Copy (Optional)**
(Response Booklet) 



| Time Limit | 90" |
|---|---|
| Completion Time | |
| Total Raw Score | Maximum=133 |

## 4. Similarities

 REVERSE RULE  Score of 0 or 1 on item 6 or 7: administer items 1-5 in reverse sequence until two consecutive perfect scores are obtained.

 DISCONTINUE RULE  Scores of 0 on 4 consecutive responses.

 SCORING RULE  Items 1-5: 0 or 1 pt. for each response. Items 6-19: 0, 1, or 2 pts. for each response.

| Item | Response | Score (0 or 1) |
|---|---|---|
| Fork–Spoon | | |
| Socks–Shoes | | |
| Yellow–Green | | |
| Dog–Lion | | |
| Coat–Suit | | |
| 6. Piano–Drum | music instruments | 2 |
| 7. Orange–Banana | fruit | 2 |
| 8. Eye–Ear | senses body sensors | 2 |
| 9. Boat–Automobile | transportation | 2 |
| 10. Table–Chair | furniture | 2 |
| 11. Work–Play | movement a motion things work & you play | 1 |
| 12. Steam–Fog | moisture | 1 |
| 13. Egg–Seed | Both are babies, infants reproduction the Beginning of life | 2 |
| 14. Democracy–Monarchy | their governing | 2 |
| 15. Poem–Statue | ck a plan | 0 |
| 16. Praise–Punishment | I guess emotions feelings — if you give so praise they'll be happy positive & negative emotional input | 0 |
| 17. Fly–Tree | Both snow in — ice wind | 0 |
| 18. Hibernation–Migration | birds fly south, bear sleeps — winter time winter time all the animals do their a cycle | 1 |
| 19. Enemy–Friend | ck birds fly south & bears hibernate people you know | 0 |
| | **Total Raw Score** (Maximum = 33) | 13 |

Dr. Gilda Kessner's Test Data  Page 7 of 44

## 5. Block Design 

| REVERSE RULE | DISCONTINUE RULE | SCORING RULE |
|---|---|---|
| Score of 0 or 1 on Item 5 or 6, administer Items 1-4 in reverse sequence until two consecutive, perfect scores are obtained | 3 consecutive scores of 0 | Items 1-6: 2 pts. for ea. correct design in Trial 1 or pt. for each correct design in Trial 2. 0 pts. for each incorrect design in Trials 1 & 12. Items 7-14: Circle the appropriate score up to a maximum of 7 pts. |

 

**EXAMINEE**

| | Design | Time Limit | Incorrect Design | | Completion Time in Seconds | Correct Design | | Score (Circle the appropriate score for each design.) |
|---|---|---|---|---|---|---|---|---|
| 1. | | 30" | Trial 1 ☐ | Trial 2 ☐ | | Y | N | 0    Trial 2 1    Trial 1 2 |
| 2. | | 30" | Trial 1 ☐ | Trial 2 ☐ | | Y | N | 0    Trial 2 1    Trial 1 2 |
| 3. | | 30" | Trial 1 | Trial 2 | | Y | N | 0    Trial 2 1    Trial 1 2 |
| 4. | | 30" | Trial 1 | Trial 2 | | Y | N | 0    Trial 2 1    Trial 1 2 |
| **START** 5. | | 60" | Trial 1 | Trial 2 | 5 | (Y) | N | 0    Trial 2 1    (Trial 1 2) |
| 6. | | 60" | Trial 1 | Trial 2 | 8 | (Y) | N | 0    Trial 2 1    (Trial 1 2) |
| 7. | | 60" | ☐ | | 12 | (Y) | N | 0    16"-60" 4    11"-15" (5)    6"-10" 6    1"-5" 7 |
| 8. | | 60" | ☐ | | 25 | (Y) | N | 0    16"-60" (4)    11"-16" 5    6"-10" 6    1"-5" 7 |
| 9. | | 60" | ☐ | | 21 | (Y) | N | 0    21"-60" (4)    16"-20" 5    11"-15" 6    1"-10" 7 |
| 10. | | 120" | ☐ | | 52 | (Y) | N | 0    41"-120" (4)    26"-35" 5    21"-25" 6    1"-20" 7 |
| 11. | | 120" | ☐ | | 66 | (Y) | N | 0    66"-120" (4)    46"-65" 5    31"-45" 6    1"-30" 7 |
| 12. | | 120" | ☐ | | 85 | (Y) | N | 0    96"-120" (4)    56"-75" 5    41"-55" 6    1"-40" 7 |
| 13. | | 120" | ☐ scattered | | 120 | Y | (N) | (0)    76"-120" 4    56"-75" 5    41"-55" 6    1"-40" 7 |
| 14. | | 120" | ☐ scattered | | 180 | Y | (N) | (0)    66"-120" 4    46"-65" 5    36"-45" 6    1"-35" 7 |

**EXAMINER**

Total Raw Score
(Maximum = 68)

## 6. Arithmetic 

 

| REVERSE RULE | DISCONTINUE RULE | SCORING RULE |
|---|---|---|
| Score of 0 on Item 5 or 6, administer Items 1–4 in reverse sequence until two consecutive perfect scores are obtained. | 4 consecutive scores of 0 | Items 1–18: 0 or 1 pt. for each response. Items 19–20: 0, 1, or 2 pts. |

| Problem | Time Limit | Completion Time in Seconds | Correct Response | Response | Score (0 or 1) | Problem | Time Limit | Completion Time in Seconds | Correct Response | Response | Score (0 or 1) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 15" | | 3 | | | 11. | 30" | 5 | $10.50 | 1050 | 1 |
| 2. | 15" | | 7 | | | 12. | 60" | 40 | 30¢ | 30¢ | 1 |
| 3. | 15" | | 5 | | | 13. | 60" | 22 | $186.00 | 186.00 | 1 |
| 4. | 15" | | 2 | | | 14. | 60" | | 10 | I don Finder | |
| 5. | 15" | 1 | $9.00 | 9 | | 15. | 60" | | $600.00 | Idk | 0 |
| 6. | 15" | 2 | $4.00 | 4 | | 16. | 60" | 38 | 43 | 43 | 1 |
| 7. | 30" | 10 | 5 | 5 | | 17. | 60" | | $51.00 | never good on percentages | 0 |
| 8. | 30" | 5 | $1.50 | 1.50 | | 18. | 60" | 35 | $49.50 | 49.00 | 0 |
| 9. | 30" | 3 | 8 | 8 | 1 | 19. | 60" | 60 | 1 of 4 or 5 of 20 | Idk | (0, 1, or 2) 0 / 11"–60" 1 / 1"–10" 2 |
| 10. | 30" | 24 | $3.60 | 3.60 | | 20. | 120" | 40 | 96 | 54 | (0, 1, or 2) 0 / 11"–120" 1 / 1"–10" 2 |

Total Raw Score (Maximum = 22)  12

## 7. Matrix Reasoning

  

| REVERSE RULE | DISCONTINUE RULE | SCORING RULE |
|---|---|---|
| Score of 0 on Item 4 or 5, administer Items 1–3 in reverse sequence until two consecutive perfect scores are obtained. | 4 consecutive scores of 0 or 4 scores of 0 on 5 consecutive items | All Items: 0 or 1 pt. for each response. Do not score Sample Items A–C. |

Note: Correct response appears in **bold italic**. Administer Sample Items A–C to all examinees.

| Item | Response Options (Circle one) | | | | | | Score (0 or 1) |
|---|---|---|---|---|---|---|---|
| A. | 1 | 2 | 3 | 4 | 5 | DK | |
| B. | 1 | 2 | 3 | 4 | 5 | DK | |
| C. | 1 | 2 | 3 | 4 | 5 | DK | |
| 1. | 1 | 2 | 3 | 4 | 5 | DK | |
| 2. | 1 | 2 | 3 | 4 | 5 | DK | |
| 3. | 1 | 2 | 3 | 4 | 5 | DK | |
| 4. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 5. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 6. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 7. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 8. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 9. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 10. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 11. | 1 | 2 | 3 | 4 | 5 | DK | 0 |
| 12. | 1 | 2 | 3 | 4 | 5 | DK | 1 |

| Item | Response Options (Circle one) | | | | | | Score (0 or 1) |
|---|---|---|---|---|---|---|---|
| 13. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 14. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 15. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 16. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 17. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 18. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 19. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 20. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 21. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 22. | 1 | 2 | 3 | 4 | 5 | DK | 1 |
| 23. | 1 | 2 | 3 | 4 | 5 | DK | 0 |
| 24. | 1 | 2 | 3 | 4 | 5 | DK | 0 |
| 25. | 1 | 2 | 3 | 4 | 5 | DK | 0 |
| 26. | 1 | 2 | 3 | 4 | 5 | DK | 0 |

Total Raw Score (Maximum = 26)  20

## 8. Digit Span

 **DISCONTINUE RULE:**
Digits Forward & Backward:
Score of 0 on both trials of any item.
For both Digits Forward & Backward, administer both trials
of each item even if Trial 1 is passed. Administer Digits
Backward even if examinee scores 0 on Digits Forward.

 **SCORING RULE:**
Each Trial: 0 or 1 pt. for each response.
Item score = Trial 1 + Trial 2.

| Digits Forward | | Trial Score | Item Score (0, 1, or 2) |
|---|---|---|---|
| **Trial Item/Response** | | | |
| 1. | 1  1-7 | 1 | 2 |
| | 2  6-3 | 1 | |
| 2. | 1  5-8-2 | 1 | 2 |
| | 2  6-9-4 | 1 | |
| 3. | 1  6-4-3-9 | 1 | 2 |
| | 2  7-2-8-6 | 1 | |
| 4. | 1  4-2-7-3-1   4 2 7 3 1 | 0 | 1 |
| | 2  7-5-8-3-6   7 8 5 3 6 | 1 | |
| 5. | 1  6-1-9-4-7-3   6 1 9 7 2 ⁺ 4 7 3 | 0 | 1 |
| | 2  3-9-2-4-8-7   3 9 2 4 8 7 | 1 | |
| 6. | 1  5-9-1-7-4-2-8 | 0 | 0 |
| | 2  4-1-7-9-3-8-6   4 9 1 7 3 4 8 | 0 | |
| 7. | 1  5-8-1-9-2-6-4-7 | | |
| | 2  3-8-2-9-5-1-7-4 | | |
| 8. | 1  2-7-5-8-6-2-5-8-4 | | |
| | 2  7-1-3-9-4-2-5-6-8 | | |

**Digits Forward Total Score (Maximum = 16)** 8

| Digits Backward | | Trial Score | Item Score (0, 1, or 2) |
|---|---|---|---|
| **Trial Item/Response** | | | |
| 1. | 1  2-4 | 1 | 2 |
| | 2  5-7 | 1 | |
| 2. | 1  6-2-9 | 1 | 2 |
| | 2  4-1-5 | 1 | |
| 3. | 1  3-2-7-9 | | 1 |
| | 2  4-9-6-8   8 6 9 5 or 4 5 | 0 | |
| 4. | 1  1-5-2-8-6   6 8 | | 1 |
| | 2  6-1-8-4-3   3 4 8 1 6 | 1 | |
| 5. | 1  5-3-9-4-1-8   8 1 5 | 1 | 0 |
| | 2  7-2-4-8-5-6   6 5 4 2 7 | 0 | |
| 6. | 1  8-1-2-9-3-6-5 | | |
| | 2  4-7-3-9-1-2-8 | | |
| 7. | 1  9-4-3-7-6-2-5-8 | | |
| | 2  7-2-8-1-9-6-5-3 | | |

**Digits Backward Total Score (Maximum = 14)** 6

| Forward | | Backward | | (Maximum = 30) |
|---|---|---|---|---|
| 8 | + | 6 | = | 14 |

## 9. Information

 **REVERSE RULE:**
Score of 0 on Item 5 or 6, administer
Items 1-4 in reverse sequence until two
consecutive perfect scores are obtained.

 **DISCONTINUE RULE:**
6 consecutive scores of 0

 **SCORING RULE:**
All items: 0 or 1 pt.
for each response.

| Item | Response | Score (0 or 1) | Item | Response | Score (0 or 1) |
|---|---|---|---|---|---|
| 1. | Saturday | | 8. Hamlet | dK   Romeo ? | 0 |
| 2. | Age | | 9. Brazil | S. America | 1 |
| 3. | Ball | | 10. MLK, Jr. | Activist  Blackman Spokesmen  Equal Rights | 1 |
| 4. | Months | | 11. Civil War President | Andrew Jackson | 0 |
| 5. | Thermometer   to take your temperature | 1 | 12. Cleopatra | Queen of Egypt Hat wason for | 1 |
| 6. | Sunrise   clast | 1 | 13. Italy | dK — Can I even guess France ? | 0 |
| 7. | Weeks   54 | 0 | 14. Relativity | dK | 0 |

Dr. Gilda Kessner's Test Data  Page 10 of 44

## 7. Information (continued)

| Item | Response | Score (0 or 1) | Item | Response | Score (0 or 1) |
|------|----------|----------------|------|----------|----------------|
| 15. Olympics | Spain | 0 | 22. Vessels | Artery, Vein, up to 3rd one grass, nervous syst | 0 |
| 16. Sahara Desert | Africa | 1 | 23. Catherine | dk | 0 |
| 17. Genesis | Adam + Eve — | 1 | 24. Continents | America, Canada S. Am. Great Britn | 0 |
| 18. Sistine Chapel | dk. | 0 | 25. Curie | dk | 0 |
| 19. Gandhi | DK | 0 | 26. World Population | Couple Billion 3 Billion | 0 |
| 20. Koran | Muslim Bible | 1 | 27. Speed of Light | | |
| 21. Water | 100 102 220 ? 190? | 0 | 28. Faust | | |

Total Raw Score
(Maximum = 28)
(Include credit for items on previous page.)

## 10. Picture Arrangement ⏱



DISCONTINUE RULE
4 consecutive scores of 0, starting with Item 2

SCORING RULE
Item 1 – 2 pts. for correct response on Trial 1
1 pt. for correct response on Trial 2
0 pts. for incorrect response on Trial 1 or Trial 2
Items 2–11: Circle the appropriate score up to a maximum of 2 pts.

Note: Letters in Item Names correspond to correct order for 2-point response (e.g., for Item 5, examinee must arrange Cards in C-L-E-A-N order, for score = 2 points).
Items 2–5 have possible 1-point responses.

| Item (2 pts.) | | Item (1 pt.) | Time Limit | Response Order | Completion Time In Seconds | Score (Circle One) | | |
|---------------|--|--------------|------------|----------------|----------------------------|---|---|---|
| 1. CAP | Trial 1 | | 30" | CAP | 4 | 0 | 1 | (2) |
| | Trial 2 | | 30" | | | 0 | | 2 |
| 2. BAKE | | | 45" | BAKE | 7 | 0 | | (2) |
| 3. OPENS | | | 60" | OPENS | 17 | 0 | | (2) |
| 4. CHASE | | | 60" | CHASE | 15 | 0 | | (2) |
| 5. CLEAN | | NCLEA | 90" | NCLEA | 15 | 0 | (1) | 2 |
| 6. HUNT | | THUN | 90" | THUN | 24 | 0 | (1) | 2 |
| 7. SAMUEL/AMUELS | | SALMUE | 120" | ALMUES | 32 | (0) | 1 | 2 |
| 8. LUNCH | | LUCNH | 120" | LUNCH | 34 | 0 | 1 | (2) |
| 9. CHOIR | | HCOIR | 120" | HCOIR | 24 | 0 | (1) | 2 |
| 10. DREAM | | | 120" | DREAM | 14 | 0 | | (2) |
| 11. SHARK | | | 120" | SHARK | 45 51 | 0 | | (2) |

Total Raw Score
(Maximum = 22)

# 11. Comprehension

 

REVERSE RULE
Score of 0 or 1 on Item 4 or 5:
administer Items 1-3 in reverse
sequence until two consecutive
perfect scores are obtained.

DISCONTINUE RULE
4 consecutive scores of 0

SCORING RULE
Items 1-3: 0 or 1 pt. for each response.
Items 4-18: 0, 1, or 2 pts. for each
response.

| Item | Response | Score (0 or 1) |
|---|---|---|
| 1. Money | | |
| 2. Watches | | |
| 3. Clothes | | (0, 1, or 2) |
| 4. Envelope | mail it sure it to the mailman , take it to the post office ~ | 2 |
| 5. Food* | bacteria make you sick to sterilize it, Q eatable Digestible | 2 |
| 6. Parole | to monitor the convict to make in pay back restitution, it's a privilege if you get out | 2 |
| 7. Child labor | Still developing + don't have... their body have a mental or physical impact on their body | 2 |
| 8. Professional service | School reasons - so they have to get their studies to show they have the required ability to not mess up + make sure they don't mess up | 2 |
| 9. Taxes | to pay the gov't + the president a salary, the public ~ to pay for the schools + fix the roads | 1 ? |
| 10. History | for programs to understand the mistakes that were made + more forward: To know the heritage ~ | 2 |
| 11. Deaf | comprehend sounds, can't comprehend sounds they can't hear they can't register the sounds to copy the sounds | 2 |
| 12. Forest | in the sun Q rising in the east + sets in the west | 1 |
| 13. Jury | 2 people to decide instead of one, more leaning w/12 then w/ one who knows they know at | 2 |
| 14. City land | because there is so little to occupy in the city, because of the economics more jobs more apartments more people wanted to move there | 2 |
| 15. Marriage license | So they can tax the _ So they have their vow as married _ house the _ = the computer | 0 |
| 16. Free press | freedom of speech | 0 |
| 17. Swallow | Ok - going swimming, swallow sea water or S.t. | 0 |
| 18. Shallow brooks | empty heads make a lot of noise | 2 |

\* If the examinee replies with one idea, ask for a second response.
Rephrase the test item saying, "Tell me another reason."

Total Raw Score
Maximum = 33

## 12. Symbol Search 

## 13. Letter–Number Sequencing 

**DISCONTINUE RULE**
Discontinue after 120 seconds

**DISCONTINUE RULE**
After failure on all 3 trials of an item

**SCORING RULE**
0 or 1 pt. for each response
Item score = Trial 1 + Trial 2 + Trial 3

| Time Limit | 120" |
|---|---|
| Completion Time in Seconds | 120 |
| Number Correct | 32 |
| Number Incorrect | 0 |
| Total Raw Score | Maximum = 60 |

START →

| | Trial | Item/Response | Trial Score (0 or 1) | Item Score (0, 1, 2, or 3) |
|---|---|---|---|---|
| 1. | 1 | L – 2 (2 – L) | | |
| | 2 | 6 – P (6 – P) | | |
| | 3 | B – 5 (5 – B) | | |
| 2. | 1 | F – 7 – L (7 – F – L) | | |
| | 2 | R – 4 – D (4 – D – R) | | |
| | 3 | H – 1 – 8 (1 – 8 – H) | | |
| 3. | 1 | T – 9 – A – 3 (3 – 9 – A – T) | | |
| | 2 | V – 1 – J – 5 (1 – 5 – J – V) | | |
| | 3 | 7 – N – 4 – L (4 – 7 – L – N) | | |
| 4. | 1 | 8 – D – 6 – G – 1 (1 – 6 – 8 – D – G) | | |
| | 2 | K – 2 – C – 7 – S (2 – 7 – C – K – S) | | |
| | 3 | 5 – P – 3 – Y – 9 (3 – 5 – 9 – P – Y) | | |
| 5. | 1 | M – 4 – E – 7 – Q – 2 (2 – 4 – 7 – E – M – Q) | | |
| | 2 | W – 8 – H – 5 – F – 3 (3 – 5 – 8 – F – H – W) | | |
| | 3 | 6 – G – 9 – A – 2 – S (2 – 6 – 9 – A – G – S) | | |
| 6. | 1 | R – 3 – B – 4 – Z – 1 – C (1 – 3 – 4 – B – C – R – Z) | | |
| | 2 | 5 – T – 9 – J – 2 – X – 7 (2 – 5 – 7 – 9 – J – T – X) | | |
| | 3 | E – 1 – H – 8 – R – 4 – D (1 – 4 – 8 – D – E – H – R) | | |
| 7. | 1 | 5 – H – 9 – S – 2 – N – 6 – A (2 – 5 – 6 – 9 – A – H – N – S) | | |
| | 2 | D – 1 – R – 9 – B – 4 – K – 3 (1 – 3 – 4 – 9 – B – D – K – R) | | |
| | 3 | 7 – M – 2 – T – 6 – F – 1 – Z (1 – 2 – 6 – 7 – F – M – T – Z) | | |

**Total Raw Score**
(Maximum = 21)

## 14. Object Assembly 
(Optional)

**DISCONTINUE RULE**
Do not discontinue. Administer all items

**SCORING RULE**
Enter time in seconds and enter number of correct junctures. Apply time bonus and weighing, and circle the appropriate score

START →

| Item | Time Limit | Completion Time in Seconds | Number of Correct Junctures | Multiply by | Score (Circle the appropriate score for each object. Completion time in seconds.) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 21–120 | 16–20 | 11–15 | 1–10 | | | |
| 1. Man | 120" | | (0–5) | 1 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | | |
| | | | | | | | | | | | | 36–120 | 31–35 | 21–30 | 1–20 | |
| 2. Profile | 120" | | (0–9) | 1 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | | | | | | | | | | | 51–180 | 31–50 | 21–30 | 1–20 | | |
| 3. Elephant | 180" | | (0–8) | 1 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | | | | | | | | | 111–180 | 71–110 | 51–70 | 1–50 | | | |
| 4. House | 180" | | (0–14) | 1½* | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | | | | | | | | | 111–180 | 76–110 | 51–75 | 1–50 | | | |
| 5. Butterfly | 180" | | (0–8) | 1 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |

* Round half scores up.

**Total Raw Score**
(Maximum = 52)

Copyright © 1997 by The Psychological Corporation
All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording or any information storage and retrieval system, without permission in writing from the publisher.
*The Psychological Corporation* and the *PSI* logo are registered trademarks of The Psychological Corporation.
*Wechsler Adult Intelligence Scale* and *WAIS* are registered trademarks of The Psychological Corporation.
Printed in the United States of America.



**WAIS·III**

WECHSLER ADULT INTELLIGENCE SCALE – THIRD EDITION

Name John Dalentine
Date 9-18-03
Examiner Kessner
Handedness (circle one):   Left   (Right)

## Response Booklet

**Symbol Search**

### Sample Items

### Practice Items

Copyright © 1997 by The Psychological Corporation.

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher.

The Psychological Corporation and the PSI logo are registered trademarks of The Psychological Corporation.

WECHSLER ADULT INTELLIGENCE SCALE and WAIS are registered trademarks of The Psychological Corporation.

Portions of this work were previously published.

Printed in the United States of America.

0154981095

1

YES NO
YES NO
YES NO
YES NO
YES NO
YES NO
YES NO
YES NO
YES NO
YES NO
YES NO
YES NO
YES NO
YES NO
YES NO

2



| | YES | NO |
|---|---|---|
| | YES | NO |
| | YES | NO |
| | YES | NO |
| | YES | NO |
| | YES | NO |
| | YES | NO |
| | YES | NO |
| | YES | NO |
| | YES | NO |
| | YES | NO |
| | YES | NO |
| | YES | NO |
| | YES | NO |
| | YES | NO |

3

4

YES NO

YES NO

YES NO

YES NO

YES NO

YES NO

YES NO

YES NO

YES NO

YES NO

YES NO

YES NO

YES NO

YES NO

YES NO



# RIAS™ Record Form

Cecil R. Reynolds, PhD, and Randy W. Kamphaus, PhD

Name _Joshua Ballentine_    Gender _M_

Ethnicity _Afr Am_    Grade/highest level of education _10_

ID# _____ Examiner _Kess_

Reason for referral _____ Referral source _Brandt_

| | Year | Month | Day |
|---|---|---|---|
| Date Tested | 2004 | 7 | 12 |
| Date of Birth | 1969 | 1 | 30 |
| Age | 35 | 5 | 12 |

## RIAS Subtest Scores/Index Summary

### Age-Adjusted T Scores (refer to Appendix A, Table ____)

| | Raw Scores | Verbal | Nonverbal | | Memory |
|---|---|---|---|---|---|
| Guess What (GWH) | 4 4 | 4 6 | | | |
| Odd-Item Out (OIO) | 7 4 | | 5 3 | | |
| Verbal Reasoning (VRZ) | 3 1 | 4 7 | | | |
| What's Missing (WHM) | 6 9 | | 6 0 | | |
| Verbal Memory (VRM) | | | | | |
| Nonverbal Memory (NVM) | | | | | |

Sum of T Scores    9 3   +   1 1 3   =   2 0 6

**RIAS Indexes** (refer to Appendix B)

VIX    NIX    CIX    CMX

Confidence Interval _95_ %

Percentile Rank

Verbal Intelligence Index    Nonverbal Intelligence Index    Composite Intelligence Index    Composite Memory Index

## Additional Information (optional)

Primary language spoken at home _____ Parental educational attainment (if applicable) _____

Name of school (if applicable) _____ Occupation (if applicable) _____

Vision/hearing/language/motor problems (specify) _States glasses but they were stolen before he came to prison._

History of learning problems _____

History of medical/neurological problems _head injury States he used to wake up unable to move - 5X Glast time abt 25 y/o._

Notes _____

⚠ **Guess What** (*GWH*)

| | |
|---|---|
| **Start Rule** ▶ | All examinees begin testing with the sample item. Then proceed to the first item in the group according to the age of the examinee. |
| **Reverse Rule** ↰ | If an examinee does not answer the first two items correctly, then begin administering the items in reverse order until a basal level of two consecutive correct responses is established. |
| **End Rule** ✋ | Stop testing when the examinee earns 0 points on each of three consecutive items. |
| **Scoring Rule** ✎ | Score 1 point for a correct response (including alternate responses as described in the manual) and 0 points for an incorrect response. Give 1 point credit for each item below the basal level and 0 points for each item beyond the last item administered. |

**Instructions to examinee:**

Say: "Listen carefully while I read you a question. When I finish, tell me your answer."

| | Item | Correct Response | Examinee's Response | Score 0 or 1 |
|---|---|---|---|---|
| **Start** ALL AGES | **Sample Item** | | | |
| | A. What is round, bounces, and is often thrown or kicked? | Ball | *bonu* | ✕ |
| **Start** AGES 3 TO 4 YEARS | 1. What large farm animal can be milked and says moo? | Cow | | |
| | 2. What animal has four legs, barks, and can be trained to help people? | Dog | | |
| | 3. What has feathers, wings, and lives in a nest? | Bird | | |
| | 4. What is on a person's face and is used for smelling things? | Nose | | |
| | 5. What has whiskers, four legs, chases mice, drinks milk, and purrs? | Cat | | |
| **Start** AGE 5 YEARS | 6. What do you have two of, are on your head, and are used for hearing? | Ears | | |
| | 7. Who works in a school, gives us lessons, and helps us learn to read and write? | Teacher | | |
| | 8. What rings, and when you answer it, you say hello? | Telephone | | |
| | 9. What opens and closes, has a handle, and can be locked? | Door | | |
| | 10. What has numbers or hands, keeps time, and lets you know when you are late? | Clock | | |
| | 11. What is round, is a fruit, and is used to make juice to drink? | Orange | | |
| | 12. What animal is large, gray, and has a trunk? | Elephant | | |

*continue* →

3

Dr. Gilda Kessner's Test Data  Page 20 of 44

⚠ **Guess What (GWH)**

| Item | Correct Response | Examinee's Response | Sco 0 or |
|------|------------------|---------------------|----------|
| 13. What has fins, scales, and swims in the ocean? | Fish | | |
| 14. What is part of a wall, is used for seeing outside, and is often made of glass? | Window | | |
| 15. What has pages and a cover, is used for reading, and is often carried by students? | Book | | |
| **START AGE 6 YEARS** 16. What has eight legs, is small, and lives in a web? | Spider | | |
| 17. What has wings, an engine, and flies people through the air? | Airplane | | |
| 18. What is rectangular, has doors, and keeps food cold? | Refrigerator | | |
| 19. What is worn on feet, sometimes has a heel, and can be made of leather? | Shoe(s) | | |
| **START AGE 7 YEARS** 20. What animal likes to fish, eat honey, and sleep all winter? | Bear | | |
| 21. What is attached to a string, has a tail, and can be flown on a windy day? | Kite | | |
| 22. What is made of leather, is bigger than one's hand, and is used to catch baseballs? | Glove | | |
| 23. What is big, usually red or yellow, has a siren, and helps put out fires? | Fire engine | | |
| 24. What is small, comes in different shapes and colors, and is used to get rid of pencil marks? | Eraser | | |
| 25. What heats the earth from space, gives daylight, and is a star? | Sun | | |
| **START AGE 8 YEARS** 26. What has fibers, is usually soft, and covers a floor? | Rug | | |
| 27. What tells the days and weeks of the year, often hangs on the wall, and changes with the months? | Calendar | | |
| 28. What has wheels, pedals, and is ridden by people for transportation? | Bicycle | | |
| **START AGES 9 TO 10 YEARS** 29. What has many pieces, fits together, and must be solved to make a picture or design? | Puzzle | | |
| 30. What is silver-backed, shiny, made of glass, and reflects your image? | Mirror | | |

*continu*

20

4

⚠ **Guess What (GWH)**

| | Item | Correct Response | Examinee's Response | Score 0 or 1 |
|---|---|---|---|---|
| **START** AGE 11 YEARS | 31. What game usually has 11 players per team, a goalie, and does not allow players to strike the ball with their hands? | Soccer | | |
| | 32. What runs on a track, has a long line of connected cars, and is pulled by a locomotive? | Train | | |
| | 33. What burns, is usually made of wax, and gives light? | Candle | | |
| | 34. What has a handle, a head, and drives nails? | Hammer | | |
| **START** AGES 12 TO 15 YEARS | 35. What optical instrument makes distant objects appear closer and is used to study the stars? | Telescope | | |
| | 36. What is tall, has a very bright light, and guides ships at night? | Lighthouse | | |
| | 37. What small mechanical device has a panel of numbered buttons and mathematical symbols and is used for the rapid performance of mathematical operations? | Calculator | | |
| **START** AGES 16 TO 94 YEARS | 38. What tells directions, has degrees, and helps you when you are lost? | Compass | Compass | 1 |
| | 39. What is made mostly of wood, has strings, and is played with a bow? | Violin | Violin | 1 |
| | 40. What travels around the sun once a year, is spherical, and is mostly covered with water? | Earth | earth | 1 |
| | 41. What is used for typing, can be part of a typewriter or a computer, and has numbers and letters on it? | Keyboard | Keyboard | 1 |
| | 42. What is placed on a person's chest and used to listen to a heartbeat or breath sounds? | Stethoscope | Telescope dk | 0 |
| | 43. What is tall, operated by the wind's rotation of large vanes, and serves as a source of energy? | Windmill | Windmill | 1 |
| | 44. What is written, forms a thought, and has a subject and predicate? | Sentence | dk a Sentence | 0 |
| | 45. What is a flightless bird, appears to be wearing "formal attire," and loves to fish? | Penguin | penguin | |
| | 46. What has a pointer, a circular surface, and shows the time by a shadow cast from the sun? | Sundial | Sundial | 1 |
| | 47. What swamp plant has hinged leaves, can snap shut, and eats trapped insects? | Venus flytrap | Venus flytrap | 1 |

continue →

5

## ⚠ Guess What (*GWH*)

| Item | Correct Response | Examinee's Response | S 0 |
|------|------------------|---------------------|-----|
| 48. What is awarded for efforts that represent "the greatest benefit to mankind," was begun in 1901, and is administered in Stockholm, Sweden? | Nobel prize | *dK* | |
| 49. What flows south to north, was home to a Queen's barge, and is also known for its crocodiles? | Nile River | *Australia* | |
| 50. What is a prediction, is necessary for scientific experiments, and can be falsified? | Hypothesis | *dK assumption* | |
| 51. What has a vaulted ceiling, was commissioned by Pope Sixtus IV, and is famous for its fresco masterpiece? | Sistine Chapel | | |
| 52. What measures distance and is usually part of a speedometer? | Odometer | | |
| 53. What has a frame, sliding beads, and can be used to solve mathematical operations? | Abacus | | |
| 54. Who was an actress, the second wife of an Argentine president, and an advocate for women and the poor? | Eva Perón | | |
| 55. What is made from pulp, ignites at Fahrenheit 451°, and can be perforated? | Paper | | |
| 56. Who was an Italian explorer of the 12th and 13th centuries and became a favorite of Kublai Khan? | Marco Polo | | |
| 57. What makes use of electrodes, measures alpha rhythms, and is used to measure brain waves? | Electro-encephalo-graph (EEG) | | |
| 58. What contains 114 suras, begins with the longer ones, and is said to represent words revealed to a prophet? | Koran | | |
| 59. What is asymptotic to its axis, was discovered by Gauss, and is used by some educators to assign marks? | Bell curve | | |
| 60. Who was an economist, held a doctorate in philosophy, and worked closely with Friedrich Engels to develop his theories? | Karl Heinrich Marx | | |
| 61. What is the common name for a major group of invertebrate animals, who are members of the phylum *Coelenterata (si·len''·te·ra'·ta)*, and are found in oceans? | Coral | | |
| 62. What book, written by the students of Confucius, influenced sociopolitical life in China, Japan, and Korea? | Analects | | |

Guess What
Total Raw Score

 **Odd-Item Out (OIO)**

| | | |
|---|---|---|
| **Start Rule** | | All examinees begin testing with the two sample items. Then proceed to the first item in the group according to the age of the examinee. |
| **Reverse Rule** | | If an examinee does not answer the first two items correctly (on the first attempt for each), then begin administering the items in reverse order until a basal level of two consecutive correct (2-point) responses is established. |
| **End Rule** | | Stop testing when the examinee earns 0 points on each of two consecutive items. |
| **Scoring Rule** | | Score 2 points for a correct response on the first attempt of an item, and score 1 point for a correct response on the second attempt of an item. Score 0 points if the examinee responds incorrectly or does not respond for an attempt. Give 2 points credit for each item below the basal level and 0 points for each item beyond the last item administered. |

**Materials:**
Stimulus Book 1, Stopwatch

**Instructions to examinee:**
Say: "Look at these pictures. Point to the one that doesn't belong, the one that doesn't go with the others."
If the examinee is incorrect on the first attempt of an item, say "No, try again. Point to the one that doesn't go with the others."
If the examinee does not provide a response within 30 seconds for the first attempt, score 0 points and say, "Point to the one that doesn't belong."

**Time Limits:**
30 seconds for first response.
20 seconds for second response.



continue →

7

Dr. Gilda Kessner's Test Data  Page 24 of 44

## 2 Odd-Item Out (OIO)

START AGES 10 TO 11 YEARS (Item 13)

START AGES 12 TO 94 YEARS (Item 17)

| Item | Examiner's View | Score |
|---|---|---|
| 13. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 14. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 15. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 16. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 17. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 18. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 19. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 20. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 21. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 22. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 23. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 24. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 25. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |

| Item | Examiner's View | Score |
|---|---|---|
| 26. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 27. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 28. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 29. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 30. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 31. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 32. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 33. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 34. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 35. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 36. | d d b / p q d | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 37. | | 1st 30 sec 0 2 / 2nd 20 sec 0 1 |
| 38. | X B λ / ∀ R Z | 1st 30 sec 0 2 / 2nd 20 sec 0 1 NR |

| Item | Examiner's View | Score |
|---|---|---|
| 39. | X B λ / D ∀ Z | 1st 30 sec 0 / 2nd 20 sec 0 |
| 40. | | 1st 30 sec 0 / 2nd 20 sec 0 |
| 41. | | 1st 30 sec 0 / 2nd 20 sec 0 |
| 42. | Brown | 1st 30 sec 0 / 2nd 20 sec 0 |
| 43. | | 1st 30 sec 0 / 2nd 20 sec 0 |
| 44. | | 1st 30 sec 0 / 2nd 20 sec 0 |
| 45. | | 1st 30 sec 0 / 2nd 20 sec 0 |
| 46. | | 1st 30 sec 0 / 2nd 20 sec 0 |
| 47. | | 1st 30 sec 0 / 2nd 20 sec 0 |
| 48. | | 1st 30 sec 0 / 2nd 20 sec 0 |
| 49. | | 1st 30 sec 0 / 2nd 20 sec 0 |
| 50. | | 1st 30 sec 0 / 2nd 20 sec 0 |
| 51. | | 1st 30 sec 0 / 2nd 20 sec 0 |

Odd-Item Out Total Raw Score

## ⚠ Verbal Reasoning (VRZ)

| | |
|---|---|
| **Start Rule** ▶ | All examinees begin testing with the sample item. Then proceed to the first item in the group according to the age of the examinee. |
| **Reverse Rule** | If an examinee does not answer the first two items correctly, then begin administering the items in reverse order until a basal level of two consecutive correct responses is established. |
| **End Rule** | Stop testing when the examinee earns 0 points on each of three consecutive items. |
| **Scoring Rule** | Score 1 point for a correct response (including alternate responses as described in the manual) and 0 points for an incorrect response. Give 1 point credit for each item below the basal level and 0 points for each item beyond the last item administered. |

**Instructions to examinee:**

Say: "Listen carefully while I read something to you. When I finish, tell me your answer."

| | Item | Correct Response | Examinee's Response | Score 0 or 1 |
|---|---|---|---|---|
| | **Sample Item** | | | |
| **START** ALL AGES | A. An elephant is big, and a mouse is _____? | Small | *Small* | ☒ |
| **START** AGES 3 TO 5 YEARS | 1. You wear a hat on your head and shoes on your _____? | Feet | | |
| | 2. You walk with your legs and talk with your _____? | Mouth | | |
| | 3. Ice is cold, and fire is _____? | Hot | | |
| | 4. Eyes can see, and ears can _____? | Hear | | |
| | 5. A tiger is fast, and a turtle is _____? | Slow | | |
| | 6. You drink from a cup and eat with a _____? | Spoon | | |
| | 7. Day time is light and night time is _____? | Dark | | |
| | 8. Book is to study, as game is to _____? | Play | | |
| | 9. You sit in a chair and ride in a _____? | Car | | |
| **START** AGES 6 TO 7 YEARS | 10. A rock is hard, and a kitten is _____? | Soft | | |
| | 11. A ball is round, and a box is _____? | Square | | |
| | 12. An arm is long, and a finger is _____? | Short | | |

*continue →*

9

## Verbal Reasoning (VR2)

| | Item | Correct Response | Examinee's Response | Score 0 or 1 |
|---|---|---|---|---|
| **START AGES 8 TO 9 YEARS** | 13. Bird is to nest, as spider is to _____? | Web | | |
| | 14. A mountain is high, and a valley is _____? | Low | | |
| | 15. A cow is heavy, and a bird is _____? | Light | | |
| | 16. Orange is to fruit, as carrot is to _____? | Vegetable | | |
| **START AGES 10 TO 11 YEARS** | 17. Adult is to old, as baby is to _____? | Young | | |
| | 18. Mouth is to face, as feet are to _____? | Legs | | |
| **START AGES 12 TO 16 YEARS** | 19. Thermometer is to temperature, as scale is to _____? | Weight | | |
| | 20. Disappointment is to frown, as satisfaction is to _____? | Smile | | |
| | 21. Driver is to car, as conductor is to _____? | Train | | |
| **START AGES 17 TO 94 YEARS** | 22. Actor is to theatre, as teacher is to _____? | Classroom | School | 1 |
| | 23. Instigate is to begin, as terminate is to _____? | End | end | 1 |
| | 24. Bike is to wheel, as table is to _____? | Leg | leg | 1 |
| | 25. Fertilizer is to plants, as food is to _____? | Humans | Hume | 1 |
| | 26. Brush is to painter, as hammer is to _____? | Carpenter | Carpenter | 1 |
| | 27. Galley is to ship, as kitchen is to _____? | House | House | 1 |
| | 28. Roof is to house, as raincoat is to _____? | Person | Person | 1 |
| | 29. Day is to month, as year is to _____? | Decade | Cent | |
| | 30. Author is to novel, as sculptor is to _____? | Statue | artist | 0 |
| | 31. Discord is to harmony, as war is to _____? | Peace | dK | 0 |
| | 32. Cell is to organ, as brick is to _____? | House | Building structure | 1 |
| | 33. Fort is to defense, as warehouse is to _____? | Storage | Store | |
| | 34. Wick is to candle, as light bulb is to _____? | Lamp | socket | 0 |

*continue*

10

## ⚠ Verbal Reasoning (VRZ)

| Item | Correct Response | Examinee's Response | Score 0 or I |
|------|------------------|---------------------|--------------|
| 35. Flour is to bread, as hydrogen is to _____? | Water | *d k~* | O |
| 36. Helmet is to head, as mouthguard is to _____? | Teeth | *Mouth* | O |
| 37. Thermometer is to temperature, as ruler is to _____? | Distance | *Measure* | O |
| 38. Debate is to moderator, as game is to _____? | Umpire | | |
| 39. Courage is to bravery, as cowardice is to _____? | Fear | | |
| 40. Optimism is to pessimism, as objectivity is to _____? | Subjectivity | | |
| 41. Referee is to game, as judge is to _____? | Trial | | |
| 42. Boat is to sails, as car is to _____? | Engine | | |
| 43. Blizzard is to flurry, as rainstorm is to _____? | Drizzle | | |
| 44. Chopin is to piano, as Monet is to _____? | Brush | | |
| 45. Swagger is to gait, as magnesium is to _____? | Chemical element | | |
| 46. Lineage is to person, as derivation is to _____? | Word | | |
| 47. Pearson is to correlation, as Binet is to _____? | Intelligence testing | | |
| 48. Yerkes is to primates, as Darwin is to _____? | Birds | | |

**Verbal Reasoning Total Raw Score**  *3* /48

11

## ⚠ What's Missing (WHM)

| | |
|---|---|
| **Start Rule** ▶ | All examinees begin testing with the sample item. Then proceed to the first item in the group accordi... the age of the examinee. |
| **Reverse Rule** ✋ | If an examinee does not answer the first two items correctly (on the first attempt for each), then be... administering the items in reverse order until a basal level of two consecutive correct (2-point) res... is established. |
| **End Rule** ✋ | Stop testing when the examinee earns 0 points on each of two consecutive items. |
| **Scoring Rule** 👆 | Score 2 points for a correct response on the first attempt of an item, and score 1 point for a correct r... on the second attempt of an item. Score 0 points if the examinee responds incorrectly or does not resp... an attempt. Give 2 points credit for each item below the basal level and 0 points for each item beyond... last item administered. |

**Materials:**
   Stimulus Book 2, Stopwatch

**Instructions to examinee:**
   Say: "Look carefully. What's missing in this picture?"
   If the examinee is incorrect on the first attempt of an item, say "No, try again. What's missing in this picture?"
   If the examinee does not provide a response within 20 seconds for the first attempt, score 0 points and say, "What's missing in this pi...

**Time Limit:**
   🕐 20 seconds for first response.
   10 seconds for second response.

| | Item/Correct Response | Examinee's Response | Score |
|---|---|---|---|
| **START ALL AGES** | **Sample Item** | | |
| | A. Table | | 1st 20 sec |
| | Leg | *Yes* | 2nd 10 sec |

| | Item/Correct Response | Examinee's Response | Score | | Item/Correct Response | Examinee's Response | Sc... |
|---|---|---|---|---|---|---|---|
| **START AGES 3 TO 4 YEARS** | 1. Cow | | 1st 20 sec 0 . 2 | | 7. Zebra | | 1st 20 sec |
| | Ear | | 2nd 10 sec 0 . 1 | | Stripes | | 2nd 10 sec |
| | 2. Car | | 1st 20 sec 0 . 2 | | 8. Chalkboard | | 1st 20 sec |
| | Front tire | | 2nd 10 sec 0 . 1 | | Chalk | | 2nd 10 sec |
| | 3. Bee | | 1st 20 sec 0 . 2 | | 9. Fork | | 1st 20 sec |
| | Wing | | 2nd 10 sec 0 . 1 | | Tine | | 2nd 10 sec |
| **START AGE 5 YEARS** | 4. Fence | | 1st 20 sec 0 . 2 | | 10. Head | | 1st 20 sec |
| | Section of fence | | 2nd 10 sec 0 . 1 | | Ears | | 2nd 10 sec |
| | 5. Horse | | 1st 20 sec 0 . 2 | | 11. Bird | | 1st 20 sec |
| | Tail | | 2nd 10 sec 0 . 1 | | Beak | | 2nd 10 sec |
| **START AGES 6 TO 8 YEARS** | 6. Gas pump | | 1st 20 sec 0 . 2 | | 12. Spider | | 1st 20 sec |
| | Hose | | 2nd 10 sec 0 . 1 | | Rear leg | | 2nd 10 sec |

*co...*

⚠ **What's Missing (WHM)**



| Item/Correct Response | Examinee's Response | | Score | | Item/Correct Response | Examinee's Response | | Score | |
|---|---|---|---|---|---|---|---|---|---|
| 13. Car Numbers on license plate | | 1st 20 sec | 0 | 2 | 27. Teapot Hole in spout | Spout - PC | 1st 20 sec | 0 | ②  |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | 1 |
| 14. Camel Hump | | 1st 20 sec | 0 | 2 | 28. Microwave Numbers on keypad | inside  #'s | 1st 20 sec | ⓪ | 2 |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | ① |
| 15. Book Page number | | 1st 20 sec | 0 | 2 | 29. Sundial Shadow of dial | Shadow PC | 1st 20 sec | 0 | ②  |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | 1 |
| 16. Lock Keyhole | | 1st 20 sec | 0 | 2 | 30. Wagon Tracks of wheels | Tracks for wheels | 1st 20 sec | 0 | ②  |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | 1 |
| 17. Battery Negative pole | | 1st 20 sec | 0 | 2 | 31. Motorboat Wake | Waves Behind Boat | 1st 20 sec | 0 | ②  |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | 1 |
| 18. Shower Shower head | | 1st 20 sec | 0 | 2 | 32. Mirror Reflection | Carpet | 1st 20 sec | ⓪ | 2 |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | 1 |
| 19. Gas pump Hose | hose | 1st 20 sec | 0 | ②  | 33. Helicopter Tail rotor | Back Propellor PC | 1st 20 sec | 0 | ②  |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | 1 |
| 20. Shoe Heel | heel | 1st 20 sec | 0 | ②  | 34. Digital watch Colon | 2 dots PC | 1st 20 sec | 0 | ②  |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | 1 |
| 21. Sphygmo-manometer Needle on gauge | arrow | 1st 20 sec | 0 | ②  | 35. Safety pin Small part of latch | Back side another one | 1st 20 sec | ⓪ | 2 |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | ① | 1 |
| 22. Battery Positive pole | top - ptc | 1st 20 sec | 0 | ②  | 36. Tornado Clouds | a the cloud the house | 1st 20 sec | 0 | ②  |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | 1 |
| 23. Newspaper machine Coin slot | Coin thing ptc. | 1st 20 sec | 0 | ②  | 37. Rattlesnake Fork in tongue | fork in his tongue | 1st 20 sec | 0 | ②  |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | 1 |
| 24. Airplane Rear landing gear | Back wheels | 1st 20 sec | 0 | ②  | 38. Fire hydrant Valve on top | little square shadow | 1st 20 sec | ⓪ | 2 |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | ① |
| 25. Fire hydrant Water outlets | Outlet PC | 1st 20 sec | 0 | ②  | 39. Tire Valve stem | rest of the vehicle dk | 1st 20 sec | 0 | ①  |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | ① |
| 26. Penny Year of issue | year PC | 1st 20 sec | 0 | ⑥  | 40. Computer Spacebar | | 1st 20 sec | 0 | 2 |
| | | 2nd 10 sec | 0 | 1 | | | 2nd 10 sec | 0 | 1 |

**AGES 9 TO 11 YEARS**

**START AGES 12 TO 94 YEARS**

What's Missing Total Raw Score  64 /80

13



WIDE RANGE ACHIEVEMENT TEST □ REVISION 3

NAME *John Balentine*   GENDER ☑ M □ F

DATE *09/18/03* BIRTH DATE *1/30/69*   AGE *34*

SCHOOL _____   GRADE _____

REFERRED BY *Brandt*   EXAMINER *Kessner*

**BLUE TEST SCORES**

|  | Raw Score | Std. Score | %ile Score | Grade Score | Absolute Score |
|---|---|---|---|---|---|
| READING | 37 | 776 | 6 | 4.0 | 505 |
| SPELLING |  |  |  |  |  |
| ARITHMETIC |  |  |  |  |  |

Use only standard scores for comparisons

**SPELLING/A MEASURE OF WRITTEN ENCODING**

by Gary S. Wilkinson

NAME _____ (1 & 2)

|  | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) | (15) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

1. _____   16. _____   31. _____

2. _____   17. _____   32. _____

3. _____   18. _____   33. _____

4. _____   19. _____   34. _____

5. _____   20. _____   35. _____

6. _____   21. _____   36. _____

7. _____   22. _____   37. _____

8. _____   23. _____   38. _____

9. _____   24. _____   39. _____

10. _____   25. _____   40. _____

11. _____   26. _____

12. _____   27. _____

13. _____   28. _____

14. _____   29. _____

15. _____   30. _____

**5/10 RULES**

| Name/Letter Writing |  |
| Word Spelling |  |
| Total Spelling |  |

COPYRIGHT © 1993 by Jastak Associates
A DIVISION OF WIDE RANGE, INC
All rights reserved.  Printed in U.S.A.
1937, 1946, 1965, 1976 1978, 1984, 1993

Photocopying of this test is a violation of copyright law.

WIDE RANGE

15 Ashley Place, Suite 1A, Wilmington, DE 19804-1314



# WRAT 3 ARITHMETIC/A MEASURE OF NUMBER COMPUTATIONS

3 Fingers          8 Fingers          9 or 6?          42 or 28?

3 pennies, spend 1?     3 + 4 apples?     9 marbles, lose 3?   (15)

REDUCE ALL ANSWERS TO LOWEST TERMS

| | | | | |
|---|---|---|---|---|
| 1 + 1 = ____ | $\begin{array}{r}5\\-1\\\hline\end{array}$ | 2 + 7 = ____ | 8 - 4 = ____ | $\begin{array}{r}32\\24\\+40\\\hline\end{array}$ |
| 1 | 2 | 3 | 4 | 5 |
| $\begin{array}{r}9\\+3\\\hline\end{array}$ | $\begin{array}{r}36\\-15\\\hline\end{array}$ | 3 x 4 = ____ | $\begin{array}{r}68\\+23\\\hline\end{array}$ | $\begin{array}{r}7\\\times6\\\hline\end{array}$ |
| 6 | 7 | 8 | 9 | 10 |
| $\begin{array}{r}23\\\times3\\\hline\end{array}$ | $\begin{array}{r}33\\-17\\\hline\end{array}$ | 6 ÷ 2 = ____ | $4\overline{)16}$ | $\begin{array}{r}17\\\times4\\\hline\end{array}$ |
| 11 | 12 | 13 | 14 | 15 |
| $\begin{array}{r}724\\-597\\\hline\end{array}$ | $\begin{array}{r}229\\5048\\63\\+1381\\\hline\end{array}$ | $\frac{15}{5}$ = ____ | $9\overline{)4527}$ | $\frac{1}{3} + \frac{1}{3}$ = ____ |
| 16 | 17 | 18 | 19 | 20 |
| $2\frac{1}{2} + 1\frac{1}{2}$ = ____ | $\begin{array}{r}823\\\times96\\\hline\end{array}$ | .42 = ____ % | $\frac{1}{4} \times \frac{1}{2}$ = ____ | $\begin{array}{r}38\\\times2.4\\\hline\end{array}$ |
| 21 | 22 | 23 | 24 | 25 |

Photocopying of this test is a violation of copyright law.

Dr. Gilda Kessner's Test Data  Page 32 of 44

## WRAT 3 ARITHMETIC / A MEASURE OF NUMBER COMPUTATIONS

$\dfrac{3}{10} \div \dfrac{3}{4} =$

Ans: _____

$6\dfrac{1}{4}$
$1\dfrac{5}{8}$
$+\ 4\dfrac{1}{2}$

$\dfrac{2}{5}$ of 35 = _____

$27\overline{)384}$

6.23
$\times$ 12.7

| 26 | 27 | 28 | 29 | 30 |

$2 - \underline{\quad} = \dfrac{1}{4}$

$10\dfrac{1}{4}$
$-\ 7\dfrac{2}{3}$

Add:

$-X - Y - 23$
$\underline{X - Y + 22}$

15% of 175 =

Ans: _____

Write as common fraction in lowest terms:

.075 = _____

| 31 | 32 | 33 | 34 | 35 |

$\dfrac{r^2 - 5r - 6}{r + 1}$

Ans: _____

$3p - q = 10$
$2p - q = 7$

$p = \underline{\quad}$   $q = \underline{\quad}$

Reduce:

$\dfrac{K^2 + K}{K^2} \bullet \dfrac{3K - 3}{K^2 - 1}$

Ans: _____

$f(x) = 3x^2 + x - 7$

Find $f(-2)$

Ans: _____

| 36 | 37 | 38 | 39 | 40 |

**5 RULE / 15 MINUTES**

**Oral Arithmetic** [____] + **Written Arithmetic** [____] = **Total Arithmetic** [____]

Photocopying of this test is a violation of copyright law.

Page 3

Dr. Gilda Kessner's Test Data  Page 33 of 44

# WRAT3 READING / A MEASURE OF WRITTEN DECODING

## CAUTION: EXAMINER USE ONLY!

# A B O S E  R T H U P  I V Z J Q  (15)

| | | | |
|---|---|---|---|
| 1 **in**<br>in | 2 **cat**<br>kat | 3 **book**<br>buuk | 4 **tree**<br>tree |
| 5 **how**<br>how | 6 **animal**<br>an-ĭ-măl | 7 **even**<br>ee-věn | 8 **spell**<br>spel |
| 9 **finger**<br>fing-gĕr | 10 **size**<br>sīz | 11 **felt**<br>felt | 12 **split**<br>split |
| 13 **lame**<br>laym | 14 **stretch**<br>strech | 15 **bulk**<br>bulk | 16 **abuse**<br>ă-byoos, -byooz |
| 17 **contemporary**<br>kŏn-tem-pō-rer-ee | 18 **collapse**<br>kŏ-laps | 19 **contagious**<br>kŏn-tay-jŭs | 20 **triumph**<br>trī-ŭmf |
| 21 **alcove**<br>al-kohv | 22 **bibliography**<br>bĭb-li-og-rā-fee | 23 **horizon**<br>hō-rī-zŏn | 24 **municipal**<br>myoo-nis-i-pal |
| 25 **unanimous**<br>yoo-nan-i-mŭs | 26 **benign**<br>bi-nīn | 27 **discretionary**<br>di-skresh-ŏ-ner-ee | 28 **stratagem**<br>strat-ă-jem |
| 29 **seismograph**<br>sīz-mō-graf | 30 **heresy**<br>her-ĕ-see | 31 **itinerary**<br>ī-tin-ĕ-rer-ee | 32 **usurp**<br>yoo-surp, -zurp |
| 33 **irascible**<br>i-ras-i-bĕl | 34 **pseudonym**<br>soo-dō-nim | 35 **oligarchy**<br>ol-i-gahr-kee | 36 **covetousness**<br>kuv-ĕ-tŭs-nes |
| 37 **heinous**<br>hay-nŭs | 38 **egregious**<br>i-gree-jŭs | 39 **omniscient**<br>om-nish-ent | |
| 40 **assuage**<br>ă-swayj | 41 **disingenuous**<br>dis-in-jen-yoo-ŭs | 42 **terpsichorean**<br>turp-sĭ-kō-ree-ăn | |

**5/10 RULES**

*(handwritten: that's doesn't* )

| | |
|---|---|
| Letter Reading | 15 |
| Word Reading | 22 |
| Total Reading | 37 |

**OBSERVATIONS/REMARKS:**

COPYRIGHT © 1993 by Jastak Associates
A DIVISION OF WIDE RANGE, INC
All rights reserved. Printed in U.S.A
1937, 1946, 1965, 1976, 1978, 1984, 1993

Photocopying of this test is a violation of copyright law.

WIDE RANGE

15 Ashley Place, Suite 1A, Wilmington, DE 19804-1314

Dr. Gilda Kessner's Test Data  Page 34 of 44

**MMSE**

Date of Examination _7/2/04_   Examiner _Kessner_

Name _John Balentine_   Age _35-6_   Years of School Completed _10_

DOB _1-30-69_

**Instructions:** Words in boldface type should be read aloud clearly and slowly to the examinee. Item substitutions appear in parentheses. Administration should be conducted privately and in the examinee's primary language. Circle 0 if the response is incorrect, or 1 if the response is correct. Begin by asking the following two questions:

**Do you have any trouble with your memory?**   **May I ask you some questions about your memory?**

_pretty good_

## ORIENTATION TO TIME

| | RESPONSE | SCORE (circle one) |
|---|---|---|
| What is the... year? | 2004 | 0 (1) |
| season? | Summer | 0 (1) |
| month of the year? | July | 0 (1) |
| day of the week? | Monday | 0 (1) |
| date? | 12 | 0 (1) |

## ORIENTATION TO PLACE*

**Where are we now? What is the...**

| | RESPONSE | SCORE |
|---|---|---|
| state (province)? | TX | 0 (1) |
| county (or city/town)? | Livingston | 0 (1) |
| city/town (or part of city/neighborhood)? | Polunsky | 0 (1) |
| building (name or type)? | (station) | 0 (1) |
| floor of the building (room number or address)? | 1st | 0 (1) |

*Alternative place words that are appropriate for the setting and increasingly precise may be substituted and noted.

## REGISTRATION*

**Listen carefully. I am going to say three words. You say them back after I stop. Ready? Here they are... APPLE** [pause], **PENNY** [pause], **TABLE** [pause]. Now repeat those words back to me. [Repeat up to 5 times, but score only the first trial.]

| | | SCORE |
|---|---|---|
| APPLE | Apple | 0 (1) |
| PENNY | Penny | 0 (1) |
| TABLE | Table | 0 (1) |

**Now keep those words in mind. I am going to ask you to say them again in a few minutes.**

*Alternative word sets (e.g., PONY, QUARTER, ORANGE) may be substituted and noted when retesting an examinee.

## ATTENTION AND CALCULATION [Serial 7s]*

**Now I'd like you to subtract 7 from 100. Then keep subtracting 7 from each answer until I tell you to stop.**

| | | RESPONSE | SCORE |
|---|---|---|---|
| What is 100 take away 7? | [93] | 93 | 0 (1) |
| If needed, say: **Keep going.** | [86] | 85 | (0) 1 |
| If needed, say: **Keep going.** | [79] | 78 | 0 (1) |
| If needed, say: **Keep going.** | [72] | 71 | 0 (1) |
| If needed, say: **Keep going.** | [65] | 64 | 0 (1) |

*Alternative item (WORLD backward) should only be administered if the examinee refuses to perform the Serial 7s task. ⟶

**PAR** **Psychological Assessment Resources, Inc.** • 16204 N. Florida Avenue • Lutz, FL 33549 • 1.800.331.8378 • www.parinc.com

MMSE Copyright © 1975, 1998, 2001 by MiniMental, LLC. All rights reserved. Published 2001 by Psychological Assessment Resources, Inc. May not be reproduced in whole or in part in any form or by any means without written permission of Psychological Assessment Resources, Inc. This form is printed in red and blue ink. Any other version is unauthorized.

9 8 7 6 5 4 3 2 1            Reorder #RO-4740            Printed in the U.S.A.

Substitute and score this item only if the examinee refuses to perform the Serial 7s task.

**Spell WORLD forward, then backward.**

Correct forward spelling if misspelled,
but score only the backward spelling.

| | (D = 1) | (L = 1) | (R = 1) | (O = 1) | (W = 1) | | (0 to 5) |

## RECALL                                                    RESPONSE                          SCORE
                                                                                              *(circle one)*

**What were those three words I asked you to remember?** [*Do not offer any hints.*]

| | RESPONSE | SCORE |
|---|---|---|
| APPLE | *Apple* | 0  (1) |
| PENNY | *Penny* | (0)  (1) |
| TABLE | | (0)  1 |

## NAMING*
**What is this?** [*Point to a pencil or pen.*]   *Pencil*   0  (1)
**What is this?** [*Point to a watch.*]   *Glasses*   0  (1)

*Alternative common objects (e.g., eyeglasses, chair, keys) may be substituted and noted.

## REPETITION
**Now I am going to ask you to repeat what I say. Ready? "NO IFS, ANDS, OR BUTS."** Now you say that.
[*Repeat up to 5 times, but score only the first trial.*]
       NO IFS, ANDS, OR BUTS.   *No Ifs ands or Buts*   (1)

Detach the next page along the lengthwise perforation, and then tear it in half along the horizontal perforation. Use the upper half of the page (blank) for the Comprehension, Writing, and Drawing items that follow. Use the lower half of the page as a stimulus form for the Reading ("CLOSE YOUR EYES") and Drawing (intersecting pentagons) items.

## COMPREHENSION
**Listen carefully because I am going to ask you to do something.**
**Take this paper in your right hand** [*pause*], **fold it in half** [*pause*], **and put it on the floor** (*or* table).

| | | SCORE |
|---|---|---|
| TAKE IN RIGHT HAND | | 0  1 |
| FOLD IN HALF | | 0  1 |
| PUT ON FLOOR (*or* TABLE) | | 0  1 |

## READING
**Please read this and do what it says.**   [*Show examinee the words on the stimulus form.*]
       CLOSE YOUR EYES   0  (1)

## WRITING
**Please write a sentence.**   [*If examinee does not respond, say:* **Write about the weather.**]   0  (1)
Place the blank piece of paper (unfolded) in front of the examinee and provide a pen or pencil. Score 1 point if the sentence is comprehensible and contains a subject and a verb. Ignore errors in grammar or spelling.

## DRAWING
**Please copy this design.**   [*Display the intersecting pentagons on the stimulus form.*]   0  (1)
Score 1 point if the drawing consists of two 5-sided figures that intersect to form a 4-sided figure.

Assessment of level of consciousness.

| Alert/ | Drowsy | Stuporous | Comatose/ |
| Responsive | | | Unresponsive |

| Total Score = _____ |
|---|
| (*Sum all item scores.*)   (30 points max.) |

CLOSE YOUR EYES

i dont got nothing on my mind.







Copyright © 1991 by Psychological Assessment Resources, Inc. All rights reserved. May not be reproduced in whole or in part in any form or by any means without written permission of Psychological Assessment Resources, Inc. This form is printed in blue ink on 100% recycled paper.   Any other version is unauthorized.   Reorder #1876-FF.       6 7 8 9   Printed in the U.S.A.

Dr. Gilda Kessner's Test Data  Page 39 of 44

SIDE B

| | SOM | ANX | ARD | DEP | MAN | PAR | SCZ | BOR | ANT | AGG |
|---|---|---|---|---|---|---|---|---|---|---|
| nter full scale and ubscale raw scores from orm HS Answer Sheet. otal subscale scores to btain full scale scores. lot full scales on Side A, ubscales above. Subscale | 3 SOM-C | 5 ANX-C | 9 ARD-O | 14 DEP-C | 8 MAN-A | 9 PAR-H | 5 SCZ-P | 3 BOR-A | 14 ANT-A | 0 AGG-A |
| | 15 SOM-S | 10 ANX-A | 5 ARD-P | 14 DEP-A | 4 MAN-G | 11 PAR-P | 17 SCZ-S | 5 BOR-I | 4 ANT-E | 4 AGG-V |
| | 6 SOM-H | 9 ANX-P | 4 ARD-T | 3 DEP-P | 10 MAN-I | 12 PAR-R | 16 SCZ-T | 8 BOR-N | 10 ANT-S | 0 AGG-P |
| | | | | | | | | 4 BOR-S | | |

270 : 2
53 : 2
140 : 2
13 : 2

| Full Scale | ICN | INF | NIM | PIM | SOM | ANX | ARD | DEP | MAN | PAR | SCZ | BOR | ANT | ALC | DRG | AGG | SUI | STR | NON | RXR | DOM | WRM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9 | 8 | 7 | 17 | 24 | 24 | 18 | 31 | 22 | 32 | 23 | 25 | 28 | 3 | 2 | 4 | 6 | 24 | 12 | 7 | 20 | 19 |

**Raw Score Calculation for ICN**

Ab val ( #75 3 minus #115 3 ) = 0
Ab val ( #4 3 minus #44 0 ) = 3
Ab val ( #80 1 minus #100 0 ) = 1
Ab val (#145 0 minus #185 0 ) = 0
Ab val ( #65 2 minus #246 3 ) = 1
Ab val (#102 0 minus #103 0 ) = 0
Ab val ( #22 0 minus #142 2 ) = 2
Ab val (#301 1 minus #140 0 ) = 1
Ab val ((3 minus #270 1) minus #53 2 ) = 0
Ab val ((3 minus #190 1) minus #13 2 ) = 1
Raw Score = 9

# PAI™ Form HS Answer Sheet

Name _John Balentine_   ID# _____   Gender _M_ Age _34_ Today's Date _9/18/03_

Marital Status _S_   Years of Education _10_   Occupation _____   Birth Date _1/30/69_

**F = FALSE, NOT AT ALL TRUE    ST = SLIGHTLY TRUE    MT = MAINLY TRUE    VT = VERY TRUE**



al Assessment Resources, Inc. All rights reserved, part in any form or by any means without written. Resources, Inc.

Printed in the U.S.A.

r #RO-1875

Resources, Inc./P.O. Box 998/Odessa, FL 33556

w.parinc.com



| Item (F ST MT VT) | Item (F ST MT VT) | Item (F ST MT VT) | Item (F ST MT VT) | Item (F ST MT VT) | Item (F ST MT VT) | Item (F ST MT VT) | Item (F ST MT VT) | Item (F ST MT VT) |
|---|---|---|---|---|---|---|---|---|
| 5 | 45 | 85 | 125 | 165 | 205 | 245 | 285 | 325 |
| 6 | 46 | 86 | 126 | 166 | 206 | 246 | 286 | 326 |
| 7 | 47 | 87 | 127 | 167 | 207 | 247 | 287 | 327 |
| 8 | 48 | 88 | 128 | 168 | 208 | 248 | 288 | 328 |
| 9 | 49 | 89 | 129 | 169 | 209 | 249 | 289 | 329 |
| 10 | 50 | 90 | 130 | 170 | 210 | 250 | 290 | 330 |
| 11 | 51 | 91 | 131 | 171 | 211 | 251 | 291 | 331 |
| 12 | 52 | 92 | 132 | 172 | 212 | 252 | 292 | 332 |
| 13 | 53 | 93 | 133 | 173 | 213 | 253 | 293 | 333 |
| 14 | 54 | 94 | 134 | 174 | 214 | 254 | 294 | 334 |
| 15 | 55 | 95 | 135 | 175 | 215 | 255 | 295 | 335 |
| 16 | 56 | 96 | 136 | 176 | 216 | 256 | 296 | 336 |
| 17 | 57 | 97 | 137 | 177 | 217 | 257 | 297 | 337 |
| 18 | 58 | 98 | 138 | 178 | 218 | 258 | 298 | 338 |
| 19 | 59 | 99 | 139 | 179 | 219 | 259 | 299 | 339 |
| 20 | 60 | 100 | 140 | 180 | 220 | 260 | 300 | 340 |
| 21 | 61 | 101 | 141 | 181 | 221 | 261 | 301 | 341 |
| 22 | 62 | 102 | 142 | 182 | 222 | 262 | 302 | 342 |
| 23 | 63 | 103 | 143 | 183 | 223 | 263 | 303 | 343 |
| 24 | 64 | 104 | 144 | 184 | 224 | 264 | 304 | 344 |
| 25 | 65 | 105 | 145 | 185 | 225 | 265 | 305 | |
| 26 | 66 | 106 | 146 | 186 | 226 | 266 | 306 | |
| 27 | 67 | 107 | 147 | 187 | 227 | 267 | 307 | |
| 28 | 68 | 108 | 148 | 188 | 228 | 268 | 308 | |
| 29 | 69 | 109 | 149 | 189 | 229 | 269 | 309 | |
| 30 | 70 | 110 | 150 | 190 | 230 | 270 | 310 | |
| 31 | 71 | 111 | 151 | 191 | 231 | 271 | 311 | |
| 32 | 72 | 112 | 152 | 192 | 232 | 272 | 312 | |
| 33 | 73 | 113 | 153 | 193 | 233 | 273 | 313 | |
| 34 | 74 | 114 | 154 | 194 | 234 | 274 | 314 | |
| 35 | 75 | 115 | 155 | 195 | 235 | 275 | 315 | |
| 36 | 76 | 116 | 156 | 196 | 236 | 276 | 316 | |
| 37 | 77 | 117 | 157 | 197 | 237 | 277 | 317 | |
| 38 | 78 | 118 | 158 | 198 | 238 | 278 | 318 | |
| 39 | 79 | 119 | 159 | 199 | 239 | 279 | 319 | |
| 40 | 80 | 120 | 160 | 200 | 240 | 280 | 320 | |

Copyright © 1991, 1992 by Psychological Assessment Resources, Inc. All rights reserved. May not be reproduced in whole or in part in any form or by any means without written permission of Psychological Assessment Resources, Inc.
9 8 7 Reorder #RO-1875 Printed in the U.S.A.
PAR Psychological Assessment Resources, Inc./P.O. Box 998/Odessa, FL 33556
Toll-Free 1.800.331.TEST/www.parinc.com

# PAI® Critical Items Form

Name _John Balentine_   Identification Number _____   Age _34_ Sex _m_

Marital Status _S_   Years of Education _10_   Occupation _____   Date _9/18/0_

| Item | Scale | Item score | Item and response |
|------|-------|-----------|-------------------|

**3 = VERY TRUE   2 = MAINLY TRUE   1 = SLIGHTLY TRUE   0 = FALSE, NOT AT ALL TRUE**

### Delusions and Hallucinations

| 90 | SCZ-P | 1 | Sometimes it seems that my thoughts are broadcast so that others can hear them. _nobody can hear your thoto less you voice_ |
| 130 | SCZ-P | 0 | Others can read my thoughts. |
| 170 | SCZ-P | 0 | I've heard voices that no one else could hear. |
| 210 | SCZ-P | 0 | There are people who try to control my thoughts. |
| 309 | PAR-P | 0 | I'm the target of a conspiracy. |

### Potential for Self-Harm

| 100 | SUI | 0 | I've made plans about how to kill myself. |
| 183 | BOR-S | 0 | When I'm upset, I typically do something to hurt myself. |
| 206 | DEP-A | 2 | I have no interest in life. _Meant to put slightly true_ |
| 220 | SUI | 1 | Death would be a relief. |
| 340 | SUI | 0 | I'm considering suicide. |

### Potential for Aggression

| 21 | AGG-P | 0 | People are afraid of my temper. |
| 61 | AGG-P | 0 | Sometimes my temper explodes and I completely lose control. |
| 101 | AGG-P | 0 | Sometimes I'm very violent. |
| 181 | AGG-P | 0 | I've threatened to hurt people. |

| Item | Scale | Item score | Item and response |
|------|-------|-----------|-------------------|

**3 = VERY TRUE   2 = MAINLY TRUE   1 = SLIGHTLY TRUE   0 = FALSE, NOT AT ALL TRUE**

### Substance Abuse

| 55 | ALC | 0 | I have trouble controlling my use of alcohol. |

| 222 | DRG | 0 | My drug use is out of control. |

### Potential Malingering

| 9 | NIM | 0 | Sometimes I cannot remember who I am. |

| 49 | NIM | | I have visions in which I see myself forced to commit crimes. *False 6b-threaten you or a loved one - agitate don't not peer pressure* |

| 129 | NIM | | I think I have three or four completely different personalities inside of me. *Some days I know who I am + some days I don't when my back hurts feel like a totally different person plus* |

| 249 | NIM | 0 | Sometimes my vision is only in black and white. |

### Unreliability/Resistance

| 31 | ANT-E | 0 | I've borrowed money knowing I wouldn't pay it back. |

| 71 | ANT-E | | I'll take advantage of others if they leave themselves open to it. *Depends on how you look at it. When mom sent me to store & if there was I left over I'd keep it I don't* |

| 311 | ANT-E | | When I make a promise, I really don't need to keep it. *just apple because I don't want nobody to hustle me* |

### Traumatic Stressors

| 34 | ARD-T | 0 | I keep reliving something horrible that happened to me. |

| 114 | ARD-T | 0 | I've been troubled by memories of a bad experience for a long time. |

| 194 | ARD-T | 0 | I have had some horrible experiences that make me feel guilty. |

| 274 | ARD-T | 2 | Since I had a very bad experience, I am no longer interested in some things that I used to enjoy. *Auto mechanics - I still love mechanics but I can't do it in here.* |

### Notes

PAR Psychological Assessment Resources, Inc./P.O. Box 998/Odessa, FL 33556/Toll-Free 1-800-331-TEST
Copyright © 1990, 1991 by Psychological Assessment Resources, Inc. All rights reserved. May not be reproduced in whole or in part in any form or by any means without written permission of Psychological Assessment Resources, Inc. This form is printed in blue ink on white paper. Any other version is unauthorized.
9 8 7 6 5 4 3 2 1                    Reorder #RO-1878                    Printed in the U.S.A.

Dr. Gilda Kessner's Test Data  Page 44 of 44

STRUCTURED NEUROPSYCHOLOGICAL INTERVIEW
Rex M. Swanda, Ph.D. (1987)

Name _John Lezell Blanton_          Date _7/20/2016_

Informant _____ Examr _____ Birth _1/30/69_

Referrant _____ Unit _____ Age _47_

Current Residence & Co-habitants:

CURRENT HOSPITALIZATION
Reason for referral: _Speech dysfluency, paraphasias_
_profusion for ...._

Patient's account:

MENTAL STATUS EXAMINATION
Level of Consciousness & Orientation:
    Person:
    Place:       X 3
    Time:                        _frmly (jocular outgoing_
Attitude (cooperative) arrogant threatening fearful evasive apathetic hostile...)

Appearance (dress, grooming, eye contact, or physical abnormalities)
    _See wks_
Motor Behavior (restless energetic slow clumsy (graceful)... abnormalities?)

Speech
    Fluency: rate _WNL_        articulation _poor w/ Southern accent_        quantity of output _WNL_

    Comprehension _OK_            Repetition _OK_            Naming _OK_

Thought                                                            _DR_
    Content (delusions, hallucinations, phobias, obsessive thoughts, preoccupations)

    Form / Process: coherence            goal-directedness            logicality

Emotion
    Affect:   _bright, docile, frustration w/ DR, treatment/situation_
        type(s) of emotion observed (bright  anger sadness elation tearful...)
        range and intensity ( flat        constricted        blunted    (broad)
        consistency ( (stable)     . . .        labile )
        appropriateness and relatedness to mood and content of thought

    Mood:
        interpretation of overall emotional state, inferred from pt.'s description
        dysphoric    depressed    angry    suspicious  (anxious)  irritable
        euphoric    elevated    elated    expansive ; (euthymic) ("normal")

    Insight (understanding of current situation)
        _fair_

1


EXHIBIT
RX-121

**BACKGROUND**  *From 4 — ~~A~~ Oralee Johnson (Aunt making) 4+6 of AK*
**Family of Origin**  *(ma Adrian Ann → eleventh)*
*Johns*  Place of Birth / Development  *Nampa AK*
Father's Age (at ~~death~~) *1972*  Health/Cause of Death *cerebral*
Occupation *chuc truck for USPO*  Education *FES*
Mother's Age (at ~~deth~~)  Health/Cause of Death *dialysis for kidney disease, hypertn*
Occupation *nursing home aide*  Education *AK*
Siblings:      Age    Sex    State of Health  *4(6), 2 S.)*
*Died*          *51*    F    *Lynn — Stroke recently*      *married*
*about 20, 2013*   *49*    F    *Dohn — cancer stomach*      *Bessie →*
*in her sleep*    *46*        *Eddie*  *+ cancer*            *hysterectomy*
              *48*        *(Rosie* gustall *+ 1.85 Patrick)*     *was going*
                        *Eric*
**Intimate Relationships:** *4, 1980*
Marital Status: (S)  M  Sep  D  W  ULT  Previous? ____
Describe:  *4 kids*  *Carrissa — 29*        *4 ± dkvine, S. 1998 19*
Children:       *John JV — 26*            *Boy*
             *(P) Quintaja — 22*

**Family Religion** ____  Present Affiliation ____

**Handedness**            **Language**
  patient's report (R) Ambi L    Preferred (best): ____
  writing          (R) Ambi L    1st language learned: ____
  throw a ball      (R) Ambi L    Age 2nd language learned:  *Tucker*
  familial L- or Ambi.              *GED in pris*
Education attained *quit in 11 — finished 10*  *in AK — 88*
  Performance? *all bad*      Learning Problems? *⊕ Spec & Speech Thrpy. 12 2nd*
  Best/Preferred Subjects?        Worst/Disliked Subjects?  *1st grade*
  *Math & Science*                *History*   *(No repeats)*
**Employment**
  Most Recent to Previous? *restaurnt, nursing home, lumber co*
  *car repair doc track*
  Military Service?                      *alteratns (? & ?)*
  Hobbies/Interests?  *(cook  work on cars*  *mechanical repair)*
  *draw*
**Legal Problems** (litigation, charges, convictions)
            *172 → 215 since moment*
**RECENT CHANGES IN HABITS / BEHAVIORS** (past few weeks to months):
  appetite/weight *lost 5 lbs — eat less since infectn*
  sleep *like a chrm w/ Trazadnl — 4/o = 2-7 hrs @ a time*
  social relationships & activities *0 — they say IL B/l/ln*
  sexual (interest / ability) ⊘
  emotional *feel kinda empty ⊕ Talk  T suicds in dec  empty, fuzzy*
  cognitive/memory *make mistakes' diy Cleel & domino's — can't fokus*  *insled*
  speech/language *I get tongue tied lot*
  motor *bad balance*
  sensory (vis., aud., som-gen., gust., olf.) *Glasses since 05*
          ⊘     (⊕)    ⊘  ⊘  ⊘
  continence ⊘       *tingly in hands, d bar wrds,*
  other ____           *pins & needles 2-3 x/wk*

*Anthr inmte askd why R looked so sad  Irritabl &*
*bsy Amt — mjst see tee family*

Mr. *Cloud Smith*

**MEDICAL HISTORY** (Note relevant family history or risk factors)
**Development** (mother's pregnancy, delivery, developmental milestones): *talky/speech*
*I was the biggest one*

**Medical Illness, Surgery, Accidents, Hospitalizations** (dates, dx, trmt):
*hypertension*
*Nov or '95  Police chase → 100mph → hit wagon wheel - broke windshield - $4S1 in face.*
*1986  Gangrene → infection on @ middle knuckle - in hosp + 1 week*

**Specific Neurologic Risk Factors** (dates, dx, trmts, clues to focal/laterality)
Head Trauma ___ *See above*
Seizure ___ *no*
Cerebrovascular ___ *no*
Hypertension ___ *yes  since on DR ~ 2003  R/ "Listoril"*
Diabetes ___ *no*
Other ___ *I made no feel depressed, suicidal thoughts - ↑ dose*

**Psychiatric** (dates, dx, trmts, relevant family history):
*1st - 7th grade  saw x2-3 months - saw her @ earth Home ~ 42 days) ↓ dose*
*13 "  Attitude problem - marked on charge"  Trll things only. Female*
*Human Service Center*

**Suicidal Ideation** (describe, present or past, including specific plan):
*Only ↑ BP meds noted*

**Drug Use** (approximate qty/freq - not "a little", or "occasionally")
tobacco *1990 - 98  pak/day*  Caffeine *3-6/day*
alcohol *not really, (just occasion)* Drugs *tried age 10 "occasionally" beer*
*holidays & didn't get really drunk"*

**Current Medical Examination** (from chart)
General Physical Exam: *— tried a pill or 2 @ 14 on So side home from Little Rock — 1/2 "357" + a coke - Marian Ant*

Neurological Exam: *Just a summer thing*

Lab Studies:
EEG:
CT/MR:
angiogram:
other:

**Physical Limitations** (vision, hearing, motor, etc.):

| Current Medications | dosage | duration | intended effects |
|---|---|---|---|
| *blood presser* | | | |
| *Acid Reflux* | | | |
| *Benadryl* | | | *Sinus* |
| **Relevant Past Medications** | | | |
| | | | |
| | | | |

PCL Interview: p. 3

D. SCHOOL ADJUSTMENT

1. How many different elementary schools did you attend?

1

   ** Why did you change schools?

2. How many secondary schools did you attend?

2     Newport Jr High →/Youth Home + 42 days   Newark Jr High

   ** Why did you change schools?

3. What was your attendance like in school?

Went to school when I felt like it

   ** How often did you skip out? Why? At what age(s)?

leave 6th period (Skip Home Ec + Study hall)
Violate — Started in 6th grade, got worse as he got older

4. What kind of grades did you get in school?

C + D's + C's

   ** Did you ever fail a grade? Why? At what age(s)?

No

5. Did you like school?

⊕   didn't like the ppl — racists
( Principal @ Jr High Fired for racism) 81-82  teachers complment!

   ** Did you find it boring? Did you have any trouble paying attention?

all the time                    ⊖

   ** How would your teachers have described you (day-dreamer, hyper, etc.)?

Sleepy — sleep in class    math class I liked →⊕
it depends — S. classes (hist + civics) didn't like   V. talkative

6. How did you get along with other kids at school?

Great

   ** Did you have any close friends?

Austin — adopted — called me Bubba — died in car wreck

PCL Interview: p. 4

7. How was your behavior at school?

*reckless*

*And 2 jump 7 desks like Evil Kneivil — bust'd nose open
did twice in 1st grade*

** Did you get into physical fights? How often? At what age(s)? Did you start
them, or did the other person? Did you ever hurt someone badly?

*1st = older cousin made him fight "who's toughest?"*

** Did you get into trouble for anything else (disturbing the class, being
drunk/stoned at school, cheating, stealing, selling drugs, bringing weapons to
school, etc.)? How often? At what age(s)?

** Were you ever suspended or expelled? How often? What for? At what age(s)?

*6th grade → had skipped school — next day told I was
suspended — 7. → said he had touched a white girl on the b.#—
said I was the ring leader — was not there that day.
"guilty by association"*

8. Did you graduate from high school?

*11th gr. — teacher said I was talking in class,
but I was sleepy. Told me "3 licks or
3 days". Left + never came back until
next year.*

IF NO, ASK:
** Did you quit school? Why?

9. What did you do after leaving school?

*Started work @ country club
dishwasher*

*Told he was talking to the
Principal → wrong girl (white). "He's
not your kind"*

10. Have you done any upgrading or taken any technical or vocational courses?

** Describe it. How did you do?

PCL Interview: p. 5

E. <u>WORK HISTORY</u>

1. What kind of work have you done in the past?

2. How many different jobs do you think you have had?

3. What was your longest job? What was the shortest? *Afta Lone'l Truck Stop x 2-3 months*

   ' Country Club x 85-86

ASK THE FOLLOWING QUESTIONS ABOUT THREE OF FOUR OF THE INDIVIDUAL'S LONGEST OR MOST RECENT JOBS:
** What was the position? What were the duties?
** How long did you do that for? How old were you when you started? How old were you when you stopped?
** Did you enjoy it? Did you find it boring? How was the money?
** Why did you leave that job? Did you quit, or were you fired?

| Position & Duties | Ages/Dates From:   To: | Financial/personal enjoyment | Why left? |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

PCL Interview: p. 6

4. Are you a reliable employee?

   ** Are you a hard worker?

   ** Did you ever get in trouble at work (for being late or absent,
      drinking/using drugs at work, etc.)? How often? At what age(s)?

   ** Have you ever been fired? How often? At what age(s)?

      *Lare'] That Stage*
      *Dad*

5. Did you ever leave a job with no other job lined up?

   ** How often? Why? At what age(s)?

6. Have you ever been unemployed?

   ** How often? At what age(s)? For how long? How did you support yourself?

   ** Were you looking for work? How seriously?

7. Have you ever collected social assistance (unemployment, SSI, VA benefits, etc.)?

   ** How many times? At what age(s)?

8. On the street, how do you usually support yourself?

   ** Did you ever rely on someone else for food, money or lodging? Who? At what
      age(s)? For how long?

   ** Did you ever support yourself through crime (e.g., selling drugs or weapons,
      thefts, mugging or rolling people, prostitution, pimping, frauds)?  At what
      age(s)?

PCL Interview, p. 10

I. <u>FAMILY LIFE</u>

1. Were you raised by your natural parents?

   *(Y)* *circled*

   ** Did you ever live with anyone else (step/adoptive/foster family, group
   home, etc.)? Who? At what age(s)? How did you come to live there?

   2 ~~sister~~ ladies, sisters

   ASK THE FOLLOWING QUESTIONS ABOUT THE PRIMARY PARENTAL HOME(S):
   ** What was your home life like?   Country - Crop wood, stored feed.

   Dad dead @ 24° yo.
   — Car wreck                                    78-79 remarried d
                                      — love my mom    Step dad - not so much

   ** How did you get along with your parent(s)? Describe them. Were they
   affectionate towards you? What did they do for a living? Did they get along
   well together? Did they argue much? Did they ever have physical fights? Did
   they ever separate? How did this affect you?
   Ma worked 2 Jobs. Step dad beat my Mom - one went to L.A. for a ~~~~ (Kenneth Russel)
   Uncle Bed me and I couldn't walk
   — for praying, scalded, couldn't walk for 2 weeks

   ** Did you have any brothers or sisters? How did you get along with them?

   ** Were things strict at your house? Were there lots of rules? How often did
   you break the rules (<u>lie</u>, run away, steal, etc.)? At what age(s)? Why? How
   were you punished?   Beat & whipped by Step Fa, Mom, teacher
   6 → 13          1x/week "for anything" talking in class

   Electric cord, orange utility cord → bleeding on legs & arms
   ** Did anybody in your home have any troubles with the law? Who? What happened?
   *(circled)*

   ** Did anybody in your home have any serious mental or physical problems? Who?
   What about problems with alcohol or drugs?
                              Bro Freddie
                              Eric
                Step Fa = George Smith = alcohol

Dr. Martell - interview notes   Page 8 of 13

PCL Interview: p. 12

2. Were you ever abused physically, sexually, or emotionally?

   ** By whom? At what age(s)? What happened?

3. How old were you when you left home?

   *15*

   ** Why? At what age(s)? What did you do?

   *moved in 1/2 girls*

4. Have you ever "hit the road" and traveled without real plans?

   ** At what age(s)? What was the longest time you were gone? Where did you go?
      What did you do? Did you tell anyone you were going?

5. What is your relationship with your family like now?

   ** How often do you have contact with them?

   ** What are they doing now? How are they?

Balentine Edan Day 1                    Polunsky
7/21/16                                  Unit
arr @ 9⁰⁰                          Tetas DOC
start @ 9³⁰  stop @ ~~12~~ 1⁰⁰

Warn

- Noctml euvresis until 12:40

- Very distracted by activity in hallway throughout exam
  & CO stationed behind glass, + foot traffic of CO's in hall

- White T-shirt, white socks tie-up, glasses, clean shaven,
  short guys haircut, median copular, stocky, receding hairline

- Occ. stammering ("tongue tied")
Balentine Edan Day II
7/22/16
arr @ 9⁰⁰
start @ 9³⁰  quit @ 1⁰⁰

- effortful on WRAT math, worked onto 15 min

Poor

No food — Shoot squirrel in winter for
food — take to Mom

Did odd jobs to make $ to help mom out

<u>Head Injury</u> :— 3 yo ① MA teary Aunt + drove 1972 —
ran into pole. I was in front seat
Hit head on dash. LOC "for a second"
drove + passed out for

3 yo
6 yo

—4 yo   MA try to teach Grandma how
to drive. Dad had died, try
to get baby sitter who could so to
store ⇒ teach them how to drive.
Hit pole again — banged head off
dash bored. Passed out again

<u>Fell on head.</u> Met
Freddie coming back from
Store — By A/com after
rode on bicycle — tripped
on feet + hit concrete.
PTA ~ 8am ⇒ woke up
in middle of night w/
major h/a.

Head banged L/ @ School ~ 4th 5th 6th
grade. Hit head ~ mom "I'm hard
headed" — slang #.

'86  Pistol whipped by Police — in handcuffs — gash in
⑮ forehead (scar visible) → put me in cell for a week, then
give me a scan. Nobody want to take me to hsp.

Scar in upper lip + ⑮ forehead = hit face on truck mirror ~ 16 yo

8 yo.
3 yr.
13-14
yo.

ATV
3 wheeler — rice patty — rolled over — LOC ~ 3 hrs —
woke up in field — Told Freddie (w/ ATV)

Scar btw eye(s) = lawnmower fragment hit b/twn eyes.

MA said "That's white Devil body in demo"
woke + couldn't move from neck down for Reason Seal @ 6 yo.
+ in pain after hit head on Sofa — next Bhr woke up +
couldn't move @ 2007 (end). Peggy (aka died ("my
White Mama") that day — Saw it in my sleep.

other inmates say B. Bdr

one was I'm alright,
next tell 'em off

— They play "mind games"
   — call him — then say "you're
      being weird"

Speak

set tongue tied
speech therapy 1—4th grade

V hall  (hauntings)
— ghosts, shadows in prison
— "kids in period clothes" @ House — thought they were
— deceased ___ on my bed (370)              in the barn
                                             Age 7-15
   — others saw too ...

Forensic Neuropsychological Report
August 4, 2016

BALENTINE, John
Page **2** of **25**

### **Scope of Examination and Informed Consent**

Mr. Balentine was examined and tested in a quiet, private meeting room at the Texas Department of Criminal Justice Allan B. Polunsky Unit in Livingston, Texas on July 20 and 21, 2016 for a total of approximately nine (9) hours.

He was advised that I have been retained by the Federal Community Defender's Office, and of the limits on his confidentiality in this forensic context. He was also advised that I might be asked to prepare a report and/or come to Court to testify about him. Finally I explained to him that I was not there to treat him for any problems that he might be having.

He provided his informed consent to participate in the examination with this understanding.

### **Tests and Procedures Administered**

Structured Neuropsychological Interview

Rey's 15-item Malingering Test

Test of Memory Malingering

Wechsler Adult Intelligence Scale - IV

Wide Range Achievement Test – IV

Wechsler Memory Scale -IV (Flexible Approach)

California Verbal Learning Test – II

Luria's Tests of Grapho-motor Sequencing and Inhibition

Luria's Tests of Motor Sequencing and Control

Wisconsin Card Sorting Test

Stroop Test

Tests of Verbal Fluency (F-A- S)

Animal Naming Test

Boston Naming Test



EXHIBIT
RX-122

Forensic Neuropsychological Report
August 4, 2016

BALENTINE, John
Page **3** of **25**

Hooper Visual Organization Test

Copy Cross and Cube

Reitan-Kløve Sensory Perceptual Examination

Reitan-Indiana Aphasia Screening Test

Trail Making Test, Parts A and B

Tactual Performance Test

Booklet Category Test

Speech-Sounds Perception Test

Seashore Rhythm Test

Finger Tapping Test

Grooved Pegboard Test

Personality Assessment Inventory

Clinical Interview

## **Background Information**

Mr. Balentine was convicted and sentenced to death for the homicides Mark Caylor, Jr., Kai Geyer, and Steven Brady Watson that occurred on January 21, 1998.  He is currently pursuing his habeas corpus appeals in this matter.

### **Family of Origin**

Mr. Valentine reported that he was born in Newport, Arkansas on January 30, 1969. He is the third of six children born to James and Clara Balentine.  His father had a high school education, and drove a truck for the United States Postal Service. He died in 1972 of a heart attack, when Mr. Balentine was just two years old. His mother worked as a nursing home aid. He does not know how far she went in school. She suffered from the kidney disease and hypertension. He stated that she died March 20, 2013 in her sleep.

# TOMM: Score Sheet

*by Tom Tombaugh, Ph.D.*

Name: John Balantine                Date: 7 / 21 / 16

Age: _____   Gender: Male ☑   Female ☐

Name of Administrator: Dan

# Instructions:

Each trial lists both correct (**bold**, underlined) and incorrect (regular text) responses. While running the test, *circle the name of the item* that the respondent chooses. After administering the test, put a checkmark in the box beside each number that has a circled **bold** and underlined response. Add up the number of checkmarks in both columns to obtain the total number of correct responses and record it at the bottom of each trial.

Copyright © 1996, Multi-Health Systems Inc. All rights reserved. In the U.S.A., P.O. Box 950, North Tonawanda, NY 14120-0950. (800) 456-3003. In Canada, 3770 Victoria Park Avenue, ON M2H 3M6. (800) 268-6011. Internationally, +1-416-492-2627. Fax, +1-416-492-3343 or (888) 540-4484.

Printed in Canada

TOM40

THIS FORM CONTAINS A COPY PROTECTION FEATURE TO PREVENT UNAUTHORIZED REPRODUCTION. TO OBTAIN PERMISSION TO COPY EMAIL legaldept@mhs.com

# TOMM Score Sheet: Trial 1

| A | B | | A | B | |
|---|---|---|---|---|---|
| 1. spinning wheel | cookie | | 26. T.V. | light bulb | |
| 2. tent | kleenex box | | 27. maple leaf | boat | |
| 3. dustpan | mouse | | 28. crutch | wrench | |
| 4. quill pen | teepee | | 29. hoe | cake | |
| 5. birdbath | can | | 30. key | sock | |
| 6. suitcase | comb | | 31. cloud | rose | |
| 7. pennant | boat | | 32. racket | pencil | |
| 8. gas pump | musical notes | | 33. corn | ladder | |
| 9. ring | guitar | | 34. wheelbarrow | fire hydrant | |
| 10. hat | Christmas tree | | 35. whistle | grapes | |
| 11. muffin pan | train | | 36. toilet paper | birdhouse | |
| 12. mailbox | brush | | 37. shopping cart | teddy bear | |
| 13. wheat | axe | | 38. cigarettes | ice cream | |
| 14. jack o' lantern | coat-hanger | | 39. roller skates | glue | |
| 15. wallet | scissors | | 40. cherries | umbrella | |
| 16. safety pin | elephant | | 41. life preserver | mountains | |
| 17. saw | door | | 42. wheelchair | stapler | |
| 18. butterfly net | lawn mower | | 43. swing set | bunk bed | |
| 19. pullout bed | candle | | 44. soup ladle | pail & shovel | |
| 20. motorcycle | knife | | 45. dice | iron | |
| 21. fishing pole | sewing machine | | 46. carrot | book | |
| 22. jack-in-the-box | rocking chair | | 47. drum | dart | |
| 23. bench | fence | | 48. paper clip | bird cage | |
| 24. screw | stool | | 49. vest | telescope | |
| 25. toaster | bow & arrow | | 50. end table | mask | |

## TOTAL Correct for Trial 1 =

THIS FORM CONTAINS A COPY PROTECTION FEATURE TO PREVENT UNAUTHORIZED REPRODUCTION. TO OBTAIN PERMISSION TO COPY EMAIL info@parinc.com

# TOMM Score Sheet: Trial 2

| | A | B | | | A | B | |
|---|---|---|---|---|---|---|---|
| 1. | scissors | clock | ☐ | 26. | vest | baseball bat | ☐ |
| 2. | banana | musical notes | ☐ | 27. | string of pearls | stapler | ☐ |
| 3. | hobbyhorse | tin can | ☐ | 28. | window | spinning wheel | ☐ |
| 4. | ice cream cone | lock & key | ☐ | 29. | iron | lipstick | ☐ |
| 5. | sewing machine | bird feeder | ☐ | 30. | shoe | butterfly net | ☐ |
| 6. | chair | toaster | ☐ | 31. | notebook | roller skate | ☐ |
| 7. | light bulb | eggs | ☐ | 32. | mouse | pine cone | ☐ |
| 8. | elephant | batteries | ☐ | 33. | basketball net | maple leaf | ☐ |
| 9. | ceiling fan | jack o' lantern | ☐ | 34. | stepladder | filing cabinet | ☐ |
| 10. | wrench | ashtray | ☐ | 35. | felt marker | candle | ☐ |
| 11. | suitcase | spray bottle | ☐ | 36. | wishing well | muffin pan | ☐ |
| 12. | container | saw | ☐ | 37. | hat | mustard bottle | ☐ |
| 13. | carrot | chair & table | ☐ | 38. | guitar | hot dog on fork | ☐ |
| 14. | saltshaker | birdhouse | ☐ | 39. | telephone pole | key | ☐ |
| 15. | eyeglasses | rose | ☐ | 40. | pennant | bell | ☐ |
| 16. | clothespin | motorcycle | ☐ | 41. | hairbrush | jack-in-the-box | ☐ |
| 17. | swing set | needle & thread | ☐ | 42. | playing card | life preserver | ☐ |
| 18. | racket | light switch | ☐ | 43. | kleenex box | stump | ☐ |
| 19. | knife | pail & shovel | ☐ | 44. | picnic basket | dart | ☐ |
| 20. | onion | bench | ☐ | 45. | axe | anchor | ☐ |
| 21. | lighter | umbrella | ☐ | 46. | fishhook | paintbrush | ☐ |
| 22. | quill pen | mirror | ☐ | 47. | shopping cart | sack | ☐ |
| 23. | cake | purse | ☐ | 48. | wheelbarrow | thermos | ☐ |
| 24. | fire | paper clip | ☐ | 49. | mask | cross | ☐ |
| 25. | whistle | bricks | ☐ | 50. | oven mitts | stool | ☐ |

## TOTAL Correct for Trial 2 =

THIS FORM CONTAINS A COPY PROTECTION FEATURE TO PREVENT UNAUTHORIZED REPRODUCTION. TO OBTAIN PERMISSION TO COPY EMAIL: depdept_mhs.com

# TOMM Score Sheet: Retention Trial

| | A | B | | | A | B | |
|---|---|---|---|---|---|---|---|
| 1. | light socket | wrench | ☐ | 26. | kleenex box | wagon | ☐ |
| 2. | stapler | fridge | ☐ | 27. | cheese | dart | ☐ |
| 3. | jack-in-the-box | gondola | ☐ | 28. | rose | shoe | ☐ |
| 4. | tree | mask | ☐ | 29. | coat | shopping cart | ☐ |
| 5. | maple leaf | peanuts | ☑ | 30. | bench | fence | ☐ |
| 6. | jack o' lantern | carton | ☐ | 31. | extension cord | umbrella | ☐ |
| 7. | mailbox | carrot | ☐ | 32. | milk | wheelbarrow | ☑ |
| 8. | skip rope | light bulb | ☐ | 33. | can | snowman | ☐ |
| 9. | paintbrush | candy | ☐ | 34. | zipper | ice cream cone | ☐ |
| 10. | life preserver | bird | ☐ | 35. | package | motorcycle | ☐ |
| 11. | elephant | lamp | ☐ | 36. | muffin pan | trophy | ☐ |
| 12. | water faucet | musical notes | ☐ | 37. | swing set | pipe | ☐ |
| 13. | loaf of bread | scissors | ☐ | 38. | diving board | whistle | ☐ |
| 14. | stool | cup | ☐ | 39. | sewing machine | necktie | ☐ |
| 15. | slingshot | birdhouse | ☐ | 40. | can | toaster | ☐ |
| 16. | butterfly net | lighthouse | ☑ | 41. | saw | sign | ☐ |
| 17. | clown | racket | ☐ | 42. | roller skates | scales | ☐ |
| 18. | wagon | pail & shovel | ☐ | 43. | drill | spinning wheel | ☐ |
| 19. | quill pen | footstool | ☐ | 44. | iron | plant | ☐ |
| 20. | cake | dinner bell | ☐ | 45. | electric fan | key | ☐ |
| 21. | candle | church | ☑ | 46. | pennant | rolling pin | ☐ |
| 22. | windmill | vest | ☐ | 47. | phone | mouse | ☐ |
| 23. | hat | kite | ☐ | 48. | suitcase | needle | ☐ |
| 24. | airplane | guitar | ☐ | 49. | clipboard | axe | ☐ |
| 25. | stepladder | water fountain | ☐ | 50. | paper clip | scarf | ☑ |

**TOTAL Correct for Retention Trial =**

PERMISSION REQUIRED TO COPY! COPY COPY COPY COPY COPY

THIS FORM CONTAINS A COPY PROTECTION FEATURE TO PREVENT UNAUTHORIZED REPRODUCTION. TO OBTAIN PERMISSION TO COPY EMAIL fcophi@pnhs.com



 **WAIS-IV**

# Score Report

| Examinee Name | John Balentine | Date of Report | 8/1/2016 |
| Examinee ID | | Grade | 10 |
| Date of Birth | 1/30/1969 | Home Language | English |
| Gender | Male | Handedness | Right |
| Race/Ethnicity | African American | Examiner Name | Daniel A Martell |

Test Administered  WAIS-IV (7/21/2016)    Age at Testing  47 years 5 months    Retest?  No

WAIS–IV Comments

## Composite Score Summary

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 23 | VCI | 87 | 19 | 82-93 | Low Average |
| Perceptual Reasoning | 31 | PRI | 102 | 55 | 96-108 | Average |
| Working Memory | 14 | WMI | 83 | 13 | 77-91 | Low Average |
| Processing Speed | 19 | PSI | 97 | 42 | 89-106 | Average |
| Full Scale | 87 | FSIQ | 91 | 27 | 87-95 | Average |
| General Ability | 54 | GAI | 94 | 34 | 89-99 | Average |

Confidence Intervals are based on the Overall Average SEMs. Values reported in the SEM column are based on the examinee's age.

The GAI is an optional composite summary score that is less sensitive to the influence of working memory and processing speed. Because working memory and processing speed are vital to a comprehensive evaluation of cognitive ability, it should be noted that the GAI does not have the breadth of construct coverage as the FSIQ.

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved. Produced in the United States of America.

 **WAIS®-IV**

## Composite Score Profile



The vertical bars represent the standard error of measurement (*SEM*).

### Composite Scores and Standard Error of Measurement

| Composite | Score | *SEM* |
|-----------|-------|-------|
| VCI | 87 | 2.6 |
| PRI | 102 | 3 |
| WMI | 83 | 3.35 |
| PSI | 97 | 5.41 |
| FSIQ | 91 | 2.12 |
| GAI | 94 | 2.12 |

## Analysis

### Index Level Discrepancy Comparisons

| Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate Overall Sample |
|------------|---------|---------|------------|--------------------|------------------------------|--------------------------|
| VCI - PRI | 87 | 102 | -15 | 7.78 | Y | 13.7 |
| VCI - WMI | 87 | 83 | 4 | 8.31 | N | 38.5 |
| VCI - PSI | 87 | 97 | -10 | 11.76 | N | 26.4 |
| PRI - WMI | 102 | 83 | 19 | 8.81 | Y | 7.4 |
| PRI - PSI | 102 | 97 | 5 | 12.12 | N | 37 |
| WMI - PSI | 83 | 97 | -14 | 12.47 | Y | 17.7 |
| FSIQ - GAI | 91 | 94 | -3 | 3.29 | N | 30.3 |

Base rate by overall sample.
Statistical significance (critical value) at the .05 level.

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved. Produced in the United States of America.

John Balentine
Page 2 of 5

 **WAIS-IV**

## Verbal Comprehension Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Similarities | 21 | 8 | 25 | 8 | 1.04 |
| Vocabulary | 26 | 7 | 16 | 8 | 0.73 |
| Information | 10 | 8 | 25 | 8 | 0.73 |

## Perceptual Reasoning Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Block Design | 41 | 10 | 50 | 9 | 0.95 |
| Matrix Reasoning | 17 | 10 | 50 | 9 | 0.95 |
| Visual Puzzles | 15 | 11 | 63 | 10 | 0.85 |

## Working Memory Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Digit Span | 18 | 5 | 5 | 5 | 0.73 |
| Arithmetic | 13 | 9 | 37 | 9 | 0.9 |

## Processing Speed Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Symbol Search | 33 | 11 | 63 | 10 | 1.56 |
| Coding | 52 | 8 | 25 | 6 | 1.2 |

## Subtest Level Discrepancy Comparisons

| Subtest Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate |
|---|---|---|---|---|---|---|
| Digit Span - Arithmetic | 5 | 9 | -4 | 2.57 | Y | 9.4 |
| Symbol Search - Coding | 11 | 8 | 3 | 3.41 | N | 15.1 |

Statistical significance (critical value) at the .05 level.

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved. Produced in the United States of America.

John Balentine
Page 3 of 5

 **WAIS-IV**

## Subtest Scaled Score Profile



The vertical bars represent the standard error of measurement (*SEM*)

## Determining Strengths and Weaknesses

### Differences Between Subtest and Overall Mean of Subtest Scores

| Subtest | Subtest Scaled Score | Mean Scaled Score | Difference | Critical Value .05 | Strength or Weakness | Base Rate |
|---|---|---|---|---|---|---|
| Block Design | 10 | 8.70 | 1.3 | 2.85 | | >25% |
| Similarities | 8 | 8.70 | -0.7 | 2.82 | | >25% |
| Digit Span | 5 | 8.70 | -3.7 | 2.22 | W | 5-10% |
| Matrix Reasoning | 10 | 8.70 | 1.3 | 2.54 | | >25% |
| Vocabulary | 7 | 8.70 | -1.7 | 2.03 | | >25% |
| Arithmetic | 9 | 8.70 | 0.3 | 2.73 | | >25% |
| Symbol Search | 11 | 8.70 | 2.3 | 3.42 | | >25% |
| Visual Puzzles | 11 | 8.70 | 2.3 | 2.71 | | >25% |
| Information | 8 | 8.70 | -0.7 | 2.19 | | >25% |
| Coding | 8 | 8.70 | -0.7 | 2.97 | | >25% |

Overall: Mean = 8.7, Scatter = 6, Base rate = 68.4.
Base Rate for Intersubtest Scatter is reported for 10 Full Scale Subtests.
Statistical significance (critical value) at the .05 level.

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.  Produced in the United States of America.

John Balentine
Page 4 of 5

Dr. Daniel Martell – neuropsychological testing  Page 11 of 119

 **WAIS-IV**
## Process Analysis

### Working Memory Process Score Summary

| Process Score | Raw Score | Scaled Score | Percentile Rank | Base Rate | SEM |
|---|---|---|---|---|---|
| Digit Span Forward | 6 | 5 | 5 | -- | 1.24 |
| Digit Span Backward | 5 | 6 | 9 | -- | 1.12 |
| Digit Span Sequencing | 7 | 8 | 25 | -- | 1.27 |

### Process Level Discrepancy Comparisons

| Process Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate |
|---|---|---|---|---|---|---|
| Digit Span Forward – Digit Span Backward | 5 | 6 | -1 | 3.65 | N | 46.8 |
| Digit Span Forward – Digit Span Sequencing | 5 | 8 | -3 | 3.6 | N | 20.9 |
| Digit Span Backward – Digit Span Sequencing | 6 | 8 | -2 | 3.56 | N | 28 |

Statistical significance (critical value) at the .05 level.

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.  Produced in the United States of America.

Dr. Daniel Martell – neuropsychological testing  Page 12 of 119

# WAIS-IV   Record Form

WECHSLER ADULT INTELLIGENCE SCALE – FOURTH EDITION

Examinee Name: John Balentine

Examiner Name:

**Calculation of Examinee's Age**

|  | Year | Month | Day |
|---|---|---|---|
| Test Date | 2016 | 7 | 21 |
| Birth Date | 1969 | 1 | 30 |
| Test Age |  |  |  |

## Total Raw Score to Scaled Score Conversion

| Subtest | Raw Score | Scaled Score | Ref. Group Scaled Score |
|---|---|---|---|
| Block Design |  |  |  |
| Similarities |  |  |  |
| Digit Span |  |  |  |
| Matrix Reasoning |  |  |  |
| Vocabulary |  |  |  |
| Arithmetic |  |  |  |
| Symbol Search |  |  |  |
| Visual Puzzles |  |  |  |
| Information |  |  |  |
| Coding |  |  |  |
| Letter–Number Seq.ª |  | ( ) | ( ) |
| Figure Weightsᶜ |  | ( ) | ( ) |
| Comprehension |  | ( ) | ( ) |
| Cancellationª |  | ( ) | ( ) |
| Picture Completion |  | ( ) | ( ) |

**Sum of Scaled Scores**

'16–69 only

| Verbal Comp. | Perc. Rsng. | Work. Mem. | Proc. Speed | Full Scale |
|---|---|---|---|---|

## Subtest Scaled Score Profile

| Verbal Comprehension | | | | Perceptual Reasoning | | | | | Working Memory | | | Processing Speed | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SI | VC | IN | CO | BD | MR | VP | FW | PCm | DS | AR | LN | SS | CD | CA |

(Subtest scaled score profile grid, values 1–19)

## Composite Score Profile

| VCI | PRI | WMI | PSI | FSIQ |
|---|---|---|---|---|

(Composite score profile grid, values 40–160)

## Sum of Scaled Scores to Composite Score Conversion

| | Sum of Scaled Scores | Composite Score | Percentile Rank | Confidence Interval* 90% or 95% |
|---|---|---|---|---|
| Verbal Comprehension | | VCI | | |
| Perceptual Reasoning | | PRI | | |
| Working Memory | | WMI | | |
| Processing Speed | | PSI | | |
| Full Scale | | FSIQ | | |

*For SEMs used to calculate confidence intervals, refer to Table 4.3 of the Technical and Interpretive Manual.

**PEARSON**

Copyright © 2008 by NCS Pearson, Inc. All rights reserved.
Printed in the United States of America.
ISBN 0154980900

# 1. Block Design

 (Time limit: See item)

**Start**
Ages 16–90: Sample item, then Item 5

**Reverse**
Score of 0 on *either* Item 5 or Item 6, administer preceding items in reverse order until two consecutive perfect scores are obtained.

**Discontinue**
After 2 consecutive scores of 0

**Score**
Items 1–4: Score 0, 1, or 2 points.
Items 5–8: Score 0 or 4 points.
Items 9–14: Score 0, 4, 5, 6, or 7 points.
**BDN**
Items 1–4: Score 0, 1, or 2 points.
Items 5–14: Score 0 or 4 points.

| | Design | Presentation Method | Time Limit | Completion Time | | Constructed Design | | Score |
|---|---|---|---|---|---|---|---|---|
| S. | Examinee / Examiner | Model and Picture | 30" | Trial 1 | Trial 2 | Trial 1 | Trial 2 | |
| 1. | | Model and Picture | 30" | Trial 1 | Trial 2 | Trial 1 | Trial 2 | 0  1  2 |
| 2. | | Model and Picture | 30" | | | | | 0  1  2 |
| 3. | | Model and Picture | 30" | Trial 1 | Trial 2 | Trial 1 | Trial 2 | 0  1  2 |
| 4. | | Model and Picture | 30" | Trial 1 | Trial 2 | Trial 1 | Trial 2 | 0  1  2 |
| 5. | Examinee / Examiner | Picture | 60" | 3 | | | | 0  (4) |
| 6. | | Picture | 60" | 8 | | | | 0  (4) |
| 7. | | Picture | 60" | 15 | | | | 0  (4) |
| 8. | | Picture | 60" | 22 | | | | 0  (4) |
| 9. | | Picture | 60" | 16 | | | | 31–60: 4  21–30: 5  11–20: (6)  1–10: 7 |
| 10. | | Picture | 60" | 3ð | | | | 31–60: 4  21–30: (5)  11–20: 6  1–10: 7 |
| 11. | | Picture | 120" | 60 | | | | 76–120: 4  61–75: 5  31–60: (6)  1–30: 7 |
| 12. | | Picture | 120" | 146 OT | | | (0) | 76–120: 4  61–75: 5  31–60: 6  1–30: 7 |
| 13. | | Picture | 120" | OT | | | (0) | 76–126: 4  61–75: 5  31–60: 6  1–30: 7 |
| 14. | | Picture | 120" | | | | 0 | 76–126: 4  61–75: 5  31–60: 6  1–30: 7 |

**Block Design No Time Bonus (BDN) Total Raw Score**
(Maximum = 48)

**Block Design Total Raw Score**
(Maximum = 66)

WAIS–IV Record Form    3

## 2. Similarities

**Start** — Ages 16–90: Sample Item, then Item 4

**Reverse** — Score of 0 or 1 on *either* Item 4 or Item 5, administer preceding items in reverse order until two consecutive perfect scores are obtained.

**Discontinue** — After 3 consecutive scores of 0

**Score** — Score 0, 1, or 2 points. See the Administration and Scoring Manual for sample responses.

| Item | Response | | Score | |
|---|---|---|---|---|
| S. Two – Seven | | | | |
| 1. Fork – Spoon | | 0 | 1 | 2 |
| 2. Yellow – Green | | 0 | 1 | 2 |
| 3. Carrots – Broccoli | | 0 | 1 | 2 |
| †4. Horse – Tiger | Animals | 0 | 1 | 2 |
| †5. Piano – Drum | musi–musi – music instrumd | 0 | 1 | 2 |
| 6. Boat – Automobile | Vehicles more you are place to aothr | 0 | 1 | 3 |
| 7. Nose – Tongue | Senses | 0 | 1 | 2 |
| 8. Food – Gasoline | navishnd   (for car + body – to nose - combustn) | 0 | 1 | 2 |
| 9. Badge – Crown | represntaton of authority | 0 | 1 | 2 |
| 10. Bud – Baby | infant | 0 | 1 | 2 |
| 11. Music – Tides | melody (Q) tides make sounds, musied sots   Sound, rhythm | 0 | 1 | 2 ct |
| 12. Poem – Statue | represent s.t.    emotons or feelys | 0 | 1 | 2 |
| 13. Anchor – Fence | stabilize, keep what evr, Secure, stabilize | 0 | 1 | 2 |
| 14. Wish – Expect | dk | 0 | 1 | 2 |
| 15. Acceptance – Denial | Opposites | 0 | 1 | 2 |
| 16. Always – Never | | 0 | 1 | 2 |
| 17. Enemy – Friend | | 0 | 1 | 2 |
| 18. Allow – Restrict | | 0 | 1 | 2 |

†If the examinee does not obtain a perfect score, provide corrective feedback as instructed in the Administration and Scoring Manual.

Similarities Total Raw Score
(Maximum = 36)    21

# 3. Digit Span

 **Start**
Ages 16–90:
**Forward:** Item 1
**Backward:** Sample item,
then Item 1
**Sequencing:** Sample item,
then Item 1

 **Discontinue**
**Forward:** After scores of 0 on *both trials*
of an item
**Backward:** After scores of 0 on *both trials*
of an item
**Sequencing:** After scores of 0 on *both trials*
of an item

**Score**
Score 0 or 1 point for each trial.
Total raw score for Forward, Backward, and Sequencing, respectively
DSF, DSB, and DSS
LDSF, LDSB, and LDSS
Number of digits recalled on last trial scored 1 point on Forward,
Backward, and Sequencing, respectively

## Forward

| Item | Trial | Response | Trial Score | | Item Score | |
|---|---|---|---|---|---|---|
| 1. | 9 – 7 | 97 | 0 | ①ᵗ | 0 | 1 ② |
| | 6 – 3 | 63 | 0 | ①ᵗ | | |
| 2. | 5 – 8 – 2 | 582 | 0 | ①ᵗ | 0 | 1 ② |
| | 6 – 9 – 4 | 694 | 0 | ①ᵗ | | |
| 3. | 7 – 2 – 8 – 6 | 7286 | 0 | ①ᵗ | 0 | 1 ② |
| | 6 – 4 – 3 – 9 | 6439 | 0 | ①ᵗ | | |
| 4. | 4 – 2 – 7 – 3 – 1 | forgot | ⓪ | 1 | ⓪ | 1 2 |
| | 7 – 5 – 8 – 3 – 6 | 75383 | ⓪ | 1 | | |
| 5. | 3 – 9 – 2 – 4 – 8 – 7 | | 0 | 1 | 0 | 1 2 |
| | 6 – 1 – 9 – 4 – 7 – 3 | | 0 | 1 | | |
| 6. | 4 – 1 – 7 – 9 – 3 – 8 – 4 | | 0 | 1 | 0 | 1 2 |
| | 6 – 9 – 1 – 7 – 4 – 2 – 8 | | 0 | 1 | | |
| 7. | 3 – 8 – 2 – 9 – 6 – 1 – 7 – 4 | | 0 | 1 | 0 | 1 2 |
| | 5 – 8 – 1 – 3 – 2 – 6 – 4 – 7 | | 0 | 1 | | |
| 8. | 2 – 7 – 5 – 8 – 6 – 3 – 1 – 9 – 4 | | 0 | 1 | 0 | 1 2 |
| | 7 – 1 – 3 – 9 – 4 – 2 – 5 – 6 – 8 | | 0 | 1 | | |

LDSF
(Max = 9)

**Digit Span Forward (DSF)**
**Total Raw Score**
(Maximum = 16)   6

## Backward

| Item | Trial | Correct Response | Response | Trial Score | | Item Score | |
|---|---|---|---|---|---|---|---|
| S. | 7 – 1 | 1 – 7 ✓ | | | | | |
| | 3 – 4 | 4 – 3 ✓ | | | | | |
| 1. | 3 – 1 | 1 – 3 ✓ | | 0 | 1 | 0 | 1 ② |
| | 2 – 4 | 4 – 2 ✓ | | 0 | 1 | | |
| 2. | 4 – 6 | 6 – 4 ✓ | | 0 | 1 | 0 | 1 ② |
| | 5 – 7 | 7 – 5 ✓ | | 0 | 1 | | |
| 3. | 6 – 2 – 9 | 9 – 2 – 6 | 927 | ⓪ | 1 | 0 | ① 2 |
| | 4 – 7 – 5 | 5 – 7 – 4 | 574 | 0 | ①ᵗ | | |
| 4. | 8 – 2 – 7 – 9 | 9 – 7 – 2 – 8 | 9782 | ⓪ | 1 | ⓪ | 1 2 |
| | 4 – 9 – 6 – 8 | 8 – 6 – 9 – 4 | 8964 | ⓪ | 1 | | |
| 5. | 6 – 5 – 8 – 4 – 3 | 3 – 4 – 8 – 5 – 6 | | 0 | 1 | 0 | 1 2 |
| | 1 – 5 – 4 – 8 – 6 | 6 – 8 – 4 – 5 – 1 | | 0 | 1 | | |
| 6. | 5 – 3 – 7 – 4 – 1 – 8 | 8 – 1 – 4 – 7 – 3 – 5 | | 0 | 1 | 0 | 1 2 |
| | 7 – 2 – 4 – 8 – 5 – 6 | 6 – 5 – 8 – 4 – 2 – 7 | | 0 | 1 | | |
| 7. | 8 – 1 – 4 – 9 – 3 – 6 – 2 | 2 – 6 – 3 – 9 – 4 – 1 – 8 | | 0 | 1 | 0 | 1 2 |
| | 4 – 7 – 3 – 9 – 6 – 2 – 8 | 8 – 2 – 6 – 9 – 3 – 7 – 4 | | 0 | 1 | | |
| 8. | 9 – 4 – 3 – 7 – 6 – 2 – 1 – 8 | 8 – 1 – 2 – 6 – 7 – 3 – 4 – 9 | | 0 | 1 | 0 | 1 2 |
| | 7 – 2 – 8 – 1 – 5 – 6 – 4 – 3 | 3 – 4 – 6 – 5 – 1 – 8 – 2 – 7 | | 0 | 1 | | |

LDSB
(Max = 8)

**Digit Span Backward (DSB)**
**Total Raw Score**
(Maximum = 16)   5

WAIS–IV Record Form   5

## 3. Digit Span *(continued)*
### Sequencing

Discontinue after scores of 0 on *both trials* of an item.

| Item | Trial | Correct Response | Response | Trial Score | Item Score |
|------|-------|------------------|----------|-------------|------------|
| S. | 2–3–1 | 1–2–3 ✓ | | | |
| | 5–2–2 | 2–2–5 ✓ | | | |
| 1. | 1–2 | 1–2 ✓ | | 0 ①  | 0  1  ② |
| | 4–2 | 2–4 ✓ | | 0 ①  | |
| 2. | 3–1–6 | 1–3–6 ✓ | | 0 ①  | 0  1  ② |
| | 0–9–4 | 0–4–9 ✓ | | 0 ①  | |
| 3. | 8–7–9–2 | 2–7–8–9 | 2789 | 0 ①  | 0  ①  2 |
| | 4–8–7–1 | 1–4–7–8 | 1489 | ⓪ 1 | |
| 4. | 2–6–9–1–7 | 1–2–6–7–9 | 126–9 | ① 1 | 0  ①  2 |
| | 3–8–3–5–8 | 3–3–5–8–8 | 33588 | 0 ① | |
| 5. | 2–1–7–4–3–6 | 1–2–3–4–6–7 | 123467 | 0 ① | 0  ①  2 |
| | 6–2–5–2–3–4 | 2–2–3–4–5–6 | | ⓪ 1 | |
| 6. | 7–5–7–6–8–6–2 | 2–5–6–6–7–7–8 | 2556678 | ① 1 | ⓪  1  2 |
| | 4–8–2–5–4–3–5 | 3–4–4–5–5–8 | 234458 | ① 1 | |
| 7. | 5–8–7–2–7–5–4–5 | 2–4–5–5–5–7–7–8 | | 0  1 | 0  1  2 |
| | 9–4–9–7–3–0–8–4 | 0–3–4–4–7–8–9–9 | | 0  1 | |
| 8. | 5–0–1–1–3–2–1–0–5 | 0–0–1–1–1–2–3–5–5 | | 0  1 | 0  1  2 |
| | 2–7–1–4–8–4–2–9–6 | 1–2–2–4–4–6–7–8–9 | | 0  1 | |

LDSS
(Max = 9)

**Digit Span Sequencing (DSS)**
**Total Raw Score**
(Maximum = 16)  [ 7 ]

**Digit Span Total Raw Score**
(Maximum = 48)  [ 18 ]

## 4. Matrix Reasoning

▶ **Start**
Ages 16–90:
Sample Items A & B,
then Item 4

↑ **Reverse**
Score of 0 on *either* Item 4 or Item 5, administer preceding items in reverse order until two consecutive perfect scores are obtained.

✋ **Discontinue**
After 3 consecutive scores of 0

✏ **Score**
Score 0 or 1 point.
Correct responses are in color.

| Item | Response | | | | | Score | | Item | Response | | | | | Score | |
|------|---|---|---|---|---|---|---|------|---|---|---|---|---|---|---|
| SA. | 1 | 2 | 3 | 4 | ⑤ | | | 13. | ① | 2 | 3 | 4 | ⑤ | 0 | ① |
| SB. | 1 | 2 | 3 | ④ | 5 | | | 14. | 1 | 2 | ③ | 4 | 5 | 0 | ① |
| 1. | 1 | 2 | ③ | 4 | 5 | 0 | ① | 15. | 1 | 2 | 3 | 4 | ⑤ | 0 | ① |
| 2. | 1 | ② | 3 | 4 | 5 | 0 | ① | 16. | 1 | ② | 3 | 4 | 5 | 0 | ① |
| 3. | ① | 2 | 3 | 4 | 5 | 0 | ① | 17. | 1 | ② | 3 | 4 | 5 | 0 | ① |
| 4. | 1 | 2 | 3 | 4 | ⑤ | 0 | ① | 18. | 1 | ② | 3 | 4 | 5 | ⓪ | 1 |
| 5. | 1 | 2 | ③ | 4 | 5 | 0 | ① | 19. | 1 | 2 | 3 | ⑤ | ⓪ | 1 | |
| 6. | 1 | 2 | 3 | ④ | 5 | 0 | ① | 20. | 1 | 2 | 3 | ⑤ | ⓪ | 1 | |
| 7. | 1 | 2 | ③ | ④ | 5 | 0 | ① | 21. | 1 | 2 | 3 | 4 | 5 | 0 | 1 |
| 8. | ① | 2 | 3 | 4 | 5 | 0 | ① | 22. | 1 | 2 | 3 | 4 | 5 | 0 | 1 |
| 9. | 1 | 2 | 3 | ④ | 5 | 0 | ① | 23. | 1 | 2 | 3 | 4 | 5 | 0 | 1 |
| 10. | 1 | ② | 3 | 4 | 5 | 0 | ① | 24. | 1 | 2 | 3 | 4 | 5 | 0 | 1 |
| 11. | ① | 2 | 3 | 4 | 5 | 0 | ① | 25. | 1 | 2 | 3 | 4 | 5 | 0 | 1 |
| 12. | 1 | 2 | 3 | 4 | ⑤ | 0 | ① | 26. | 1 | 2 | 3 | 4 | 5 | 0 | 1 |

**Matrix Reasoning Total Raw Score**
(Maximum = 26)  [ 17 ]

# 5. Vocabulary

**Start** Ages 16–90: Item 5

**Reverse** Score of 0 or 1 on *either* Item 5 or Item 6, administer preceding items in reverse order until two consecutive perfect scores are obtained.

**Discontinue** After 3 consecutive scores of 0

**Score** Items 1–3: Score 0 or 1 point. Items 4–30: Score 0, 1, or 2 points. See the Administration and Scoring Manual for sample responses.

| Item | Response | Score |
|---|---|---|
| 1. Book | | 0  1 |
| 2. Airplane | | 0  1 |
| 3. Basket | | 0  1 (③) |
| 4. Bed | | 0  1 (2) |
| †5. Apple | fruit | 0  1 (2) |
| †6. Glove | hand protector | 0  1 (2) |
| 7. Breakfast | early morning meal | 0  1 (2) |
| 8. Curious | finder, think about s/t (Q) interested in s.t. —how it works | 0 (1) 2 |
| 9. Assemble | group of people —together 2 (Q) to put together | 0  1 (2) |
| 10. Consume | burn up, eat up, use up | 0  1 (③) |
| 11. Terminate | fire, discontinue, set rid of (Q) | 0 (1) 2 |
| 12. Tranquil | peace + quiet | 0  1 (2) |
| 13. Ponder | thinks, wondering | 0  1 (2) |
| 14. Reluctant | hesitant 2 do sth, second thoughts | 0  1 (2) |
| 15. Confide | talk to s.o. about a situation or problem | 0 (1) 2 |

†If the examinee does not obtain a perfect score, provide corrective feedback as instructed in the Administration and Scoring Manual.

WAIS–IV Record Form   7

## 5. Vocabulary *(continued)*

Discontinue after 3 consecutive scores of 0.

| Item | | Score |
|---|---|---|
| 16. Remorse | *feely guilty of s.t. yu did wrong* | 0  1  ②  |
| 17. Plagiarize | *dk* | ⓪  1  2 |
| 18. Acute | *particular individual (Q) a thing for that certain propose* | ⓪  1  2 |
| 19. Generate | *re-energize* | ⓪  1  2 |
| 20. Compassion | | 0  1  2 |
| 21. Tangible | | 0  1  2 |
| 22. Evolve | | 0  1  2 |
| 23. Diverse | | 0  1  2 |
| 24. Fortitude | | 0  1  2 |
| 25. Ominous | | 0  1  2 |
| 26. Encumber | | 0  1  2 |
| 27. Audacious | | 0  1  2 |
| 28. Tirade | | 0  1  2 |
| 29. Pragmatic | | 0  1  2 |
| 30. Palliate | | 0  1  2 |

8   WAIS–IV Record Form

**Vocabulary Total Raw Score (Maximum = 57)** | 26 |

# 6. Arithmetic

(Time limit: 30 seconds)

**Start**
Ages 16–90:
Sample Item, then Item 6

**Reverse**
Score of 0 on *either* Item 6 or Item 7, administer preceding items in reverse order until two consecutive perfect scores are obtained.

**Discontinue**
After 3 consecutive scores of 0

**Score**
Score 0 or 1 point.

| Item | | Completion Time | Correct Response | Response | Score | | Item | | Completion Time | Correct Response | Response | Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S. | Baseballs | | 3 | | | | 12. | Packs | 10 | 200 | 160 | 0 1 |
| †1. | Flowers | | Counts to 3 | | 0 1 | | 13. | Cards | 3 | 38 | 38 | 0 ①  |
| †2. | Apples | | Counts to 10 | | 0 1 | | 14. | Run | 11 | 140 | 130 | 0 1 |
| 3. | Bats | | 6 | | 0 1 | | 15. | Line | 25 | 30 | 30 | 0 ① |
| 4. | Birds | | 9 | | 0 1 | | 16. | Cakes | 11 | 186 | 181 | 0 1 |
| 5. | Leashes | | 2 | | 0 1 | | 17. | Maps | 07 | 600 | 0 | 0 1 |
| 6. | Blankets | 2 | 8 | 8 | 0 ① | | 18. | Hours | 11 | 47 | 47 | 0 ① |
| 7. | Pens | 1 | 5 | 5 | 0 ① | | 19. | Pies | 7 | 49½ | 198 | 0 1 |
| 8. | Toys | 1 | 5 | 5 | 0 ① | | 20. | Laps | 9 | 51 | dk | 0 1 |
| 9. | Older | 2 | 17 | 17 | 0 ① | | 21. | Machines | 25 | 96 | 48 | 0 1 |
| 10. | Books | 8 | 5 | 5 | 0 ① | | 22. | Mail | | 23,100 | 13 | 0 1 |
| 11. | Tickets | 2 | 3 | 2 | ⓪ 1 | | | | | | | |

†If the examinee does not give a correct response, provide corrective feedback as instructed in the Administration and Scoring Manual.

Arithmetic Total Raw Score
(Maximum = 22)  **13**

# 7. Symbol Search

(Time limit: 120 seconds)

**Start**
Ages 16–90:
Demonstration Items, Sample Items, then Test Items

**Discontinue**
After 120 seconds

**Score**
Use the Symbol Search Scoring Key to score the examinee's responses.
Subtract Number Incorrect from Number Correct.
If the total raw score is <0, enter 0 as the total raw score.

| Completion | Number | Number | Symbol Search Total Raw Score |
|---|---|---|---|

**Start**
Ages 16–90:
Demonstration Item, Sample
Item, then Item 5

**Reverse**
Score of 0 on *either* Item 5 or Item 6, administer
preceding items in reverse order until two
consecutive perfect scores are obtained.

**Discontinue**
After 3 consecutive
scores of 0

**Score**
Score 0 or 1 point.
Correct responses are in color.

| Item | Time Limit | Completion Time | Response Choices | | | Score | | Item | Time Limit | Completion Time | Response Choices | | | Score |
|------|-----------|-----------------|-----|-----|-----|------|---|------|-----------|-----------------|-----|-----|-----|------|
| D. | | | | | | | | 13. | 30" | | | | | 1 |
| S. | | | | | | | | 14. | 30" | OT | | | | 0  1 |
| 1. | 20" | | | | | 0  1 | | 15. | 30" | | | | | 1 |
| 2. | 20" | | | | | 0  1 | | 16. | 30" | | | | | 0  1 |
| 3. | 20" | | | | | | | 17. | 30" | | | | | 0  1 |
| 4. | 20" | | | | | 1 | | 18. | 30" | | | | | 0  X |
| 5. | 20" | | | | | 1 | | 19. | 30" | | | | | 0  1 |
| 6. | 20" | | | | | 1 | | 20. | 30" | | | | | 0  1 |
| 7. | 20" | | | | | 0  1 | | 21. | 30" | | | | | 0  1 |
| 8. | 30" | | | | | 0  1 | | 22. | 30" | OT | | | | 0  1 |
| 9. | 30" | | | | | 0  1 | | 23. | 30" | OT | | | | 0  1 |
| 10. | 30" | | | | | 1 | | 24. | 30" | | | | | 0  1 |
| 11. | 30" | | | | | 0  1 | | 25. | 30" | | | | | 0  1 |
| 12. | 30" | | | | | 1 | | 26. | 30" | | | | | 0  1 |

Visual Puzzles Total Raw Score
(Maximum = 26)  **15**

# 9. Information

**Start**
Ages 16–90:
Item 3

**Reverse**
Score of 0 on *either* Item 3 or Item 4, administer preceding
items in reverse order until two consecutive perfect scores are
obtained.

**Discontinue**
After 3 consecutive
scores of 0

**Score**
Score 0 or 1 point.
See the Administration and Scoring
Manual for sample responses.

| Item | Response | Score |
|------|----------|-------|
| *1. Monday | | 0  1 |
| *2. Shape | | 0  1 |
| †3. Thermometer | termometer    takry a sxdy tmp | 0  1 |
| †4. Seconds | 60 | 0  1 |
| 5. MLK Jr. | acti-rek ti vit "actina" AA | 0  1 |
| 6. Line | equator | 0  1 |

*Responses requiring specific query are identified in the Administration and Scoring Manual.
†If the examinee does not give a correct response, provide corrective feedback as instructed in the Administration and Scoring Manual.

16   WAIS–IV Record Form

## 9. Information *(continued)*

Discontinue after 3 consecutive scores of 0.

| Item | Response | | |
|------|----------|---|---|
| 7. Water | $CO_2$ | ⓪ | 1 |
| 8. Hamlet | dk | ⓪ | 1 |
| *9. Brazil | South  Southern  America | 0 | ① |
| 10. Cleopatra | Queen in Pharohi's time (Q) Idk rsty | ⓪ | 1 |
| 11. Civil War | Lincoln | 0 | ① |
| 12. Sahara | Iraq | ⓪ | 1 |
| 13. Italy | Rome | 0 | ① |
| 14. Olympics | Egypt | ⓪ | 1 |
| 15. Relativity | Theodoe R — Einstein | 0 | ① |
| 16. Gandhi | I dk — pacifist  Buddhist Priest | ① | 1 |
| 17. Boil | 120 | ① | 1 |
| 18. Sacagawea | I dk | ⓪ | 1 |
| *19. Vessels | | 0 | 1 |
| 20. Language | | 0 | 1 |
| 21. Organ | | 0 | 1 |
| 22. Catherine | | 0 | 1 |
| 23. Sherlock Holmes | | 0 | 1 |
| *24. Minutes | | 0 | 1 |
| 25. Alice | | 0 | 1 |
| *26. Circumference | | 0 | 1 |

Responses requiring specific query are identified in the Administration and Scoring Manual.

Information Total Raw Score (Maximum = 26)   **10**

## 10. Coding

⏱ (Time limit: 120 seconds)

↻ **Start**
Ages 16–89:
Demonstration Items,
Sample Items, then
Test Items

✋ **Discontinue**
After 120 seconds

✎ **Score**
Use the Coding Scoring Template to
score the examinee's responses.
Score 1 point for each correct response.

Completion Time   **120**

Coding Total Raw Score (Maximum = 135)   **52**

WAIS–IV Record Form   11

Dr. Daniel Martell - neuropsychological testing  Page 22 of 119

# WAIS-IV

### Response Booklet 1

Symbol Search

Coding

Examinee Name: John Balentine

Age:

Examiner Name: Dan

Test Date: 7/21/16

## Symbol Search
### Demonstration Items



### Sample Items

Copyright © 2008 by NCS Pearson, Inc. All rights reserved.

Printed in the United States of America.   3 4 5 6 7 8 9 10 11 12 A B C D E     277148-1  87654

 PEARSON    PsychCorp

ISBN 015-4980-87-0



Dr. Daniel Martell - neuropsychological testing  Page 24 of 119

Dr. Daniel Martell - neuropsychological testing  Page 25 of 119



4

NO

NO

NO

NO

NO

NO

NO

NO

NO

NO

5

c3 10

## Coding



| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|
| ⌐ | ⊃ | ∧ | — | ‖ | ⊢ | ⊂ | ⌐ | ⊣ |

(52)

Demo — Sample

| 6 | 8 | 3 | 9 | 5 | 4 | 1 | 7 | 2 | 1 | 4 | 8 | 2 | 7 | 6 | 9 | 3 | 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ⊢ | ⌐ | ∧ | ⊣ | ‖ | — | ⊃ | ⊂ | ⊃ | ⊃ | — | ⌐ | ⊃ | ⊂ | ⊢ | ⊣ | ∧ | ‖ |

| 8 | 3 | 1 | 9 | 2 | 5 | 6 | 4 | 3 | 7 | 2 | 9 | 8 | 1 | 4 | 7 | 6 | 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ⊣ | ⊣ | ⊃ | ‖ | ⊢ | — | ∧ | ⊂ | ⊃ | ⊣ | ⌐ | ⌐ | — | ⊂ | ⊢ | |

| 9 | 1 | 2 | 4 | 7 | 2 | 5 | 6 | 9 | 5 | 8 | 6 | 4 | 3 | 1 | 7 | 8 | 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ⊃ | ⊃ | — | ⊂ | ⊃ | | | ⊣ | ‖ | ⌐ | ⊢ | — | ∧ | ⊣ | ⊂ | ⌐ | ∧ |

| 1 | 3 | 9 | 6 | 3 | 9 | 7 | 5 | 1 | 4 | 2 | 8 | 7 | 2 | 8 | 5 | 6 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ⊣ | ∧ | ⊣ | ⊢ | ∧ | ⊃ | ⊂ | | | | | | | | | | | |

| 7 | 6 | 4 | 1 | 3 | 2 | 8 | 1 | 7 | 9 | 2 | 5 | 3 | 4 | 8 | 6 | 5 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |

| 8 | 1 | 9 | 5 | 1 | 4 | 2 | 6 | 9 | 8 | 7 | 3 | 5 | 6 | 4 | 7 | 2 | 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |

| 3 | 6 | 8 | 9 | 1 | 8 | 4 | 7 | 5 | 2 | 9 | 6 | 7 | 1 | 5 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |

| 6 | 4 | 1 | 9 | 5 | 7 | 3 | 6 | 8 | 3 | 2 | 7 | 5 | 8 | 4 | 2 | 9 | 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |

# WMS-IV
WECHSLER MEMORY SCALE® – FOURTH EDITION

## Adult Battery (Ages 16–69)
## Record Form

**Calculation of Examinee's Age**

| | Year | Month | Day |
|---|---|---|---|
| Test Date | 2016 | 7 | 21 |
| Birth Date | 1969 | 1 | 30 |
| Test Age | | | |

Examinee Name: John Balentine

Examiner Name:

## Total Raw Score to Scaled Score Conversion

| Subtest | Raw Score | Scaled Score |
|---|---|---|
| Logical Memory I | | |
| Logical Memory II | | |
| Verbal Paired Associates I | | |
| Verbal Paired Associates II | | |
| CVLT–II Trials 1–5 | ( ) | ( ) |
| CVLT–II Long-Delay | ( ) | ( ) |
| Designs I | | |
| Designs II | | |
| Visual Reproduction I | | |
| Visual Reproduction II | | |
| Spatial Addition | | |
| Symbol Span | | |

## Sum of Scaled Scores to Index Conversion

| | Auditory Memory (AMI) | Visual Memory (VMI) | Visual Working Memory (VWMI) | Immediate Memory (IMI) | Delayed Memory (DMI) |
|---|---|---|---|---|---|
| Sum of Scaled Scores | | | | | |
| Index Score | | | | | |
| Percentile Rank | | | | | |
| 90% or 95% Confidence Interval | | | | | |

## Index Score Profile

| AMI | VMI | VWMI | IMI | DMI |
|---|---|---|---|---|

160, 155, 150, 145, 140, 135, 130, 125, 120, 115, 110, 105, 100, 95, 90, 85, 80, 75, 70, 65, 60, 55, 50, 45, 40

## Primary Subtest Scaled Score Profile

| | LM I | LM II | VPA I | VPA II | CVLT–II 1–5 | CVLT–II LD | DE I | DE II | VR I | VR II | SA | SSP | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | | | | | | | | | | | | | 19 |
| 18 | | | | | | | | | | | | | 18 |
| 17 | | | | | | | | | | | | | 17 |
| 16 | | | | | | | | | | | | | 16 |
| 15 | | | | | | | | | | | | | 15 |
| 14 | | | | | | | | | | | | | 14 |
| 13 | | | | | | | | | | | | | 13 |
| 12 | | | | | | | | | | | | | 12 |
| 11 | | | | | | | | | | | | | 11 |
| 10 | | | | | | | | | | | | | 10 |
| 9 | | | | | | | | | | | | | 9 |
| 8 | | | | | | | | | | | | | 8 |
| 7 | | | | | | | | | | | | | 7 |
| 6 | | | | | | | | | | | | | 6 |
| 5 | | | | | | | | | | | | | 5 |
| 4 | | | | | | | | | | | | | 4 |
| 3 | | | | | | | | | | | | | 3 |
| 2 | | | | | | | | | | | | | 2 |
| 1 | | | | | | | | | | | | | 1 |

*Auditory Memory* — LM I, LM II, VPA I, VPA II, CVLT–II 1–5, CVLT–II LD
*Visual Memory* — DE I, DE II, VR I, VR II
*Visual Working Memory* — SA, SSP

| Subtest | Abbreviation |
|---|---|
| Logical Memory I | LM I |
| Logical Memory II | LM II |
| Verbal Paired Associates I | VPA I |
| Verbal Paired Associates II | VPA II |
| CVLT–II Trials 1–5 | CVLT–II 1–5 |
| CVLT–II Long-Delay | CVLT–II LD |
| Designs I | DE I |
| Designs II | DE II |
| Visual Reproduction I | VR I |
| Visual Reproduction II | VR II |
| Spatial Addition | SA |
| Symbol Span | SSP |
| Brief Cognitive Status Exam | BCSE |

PEARSON

Copyright © 2009 by NCS Pearson, Inc. All rights reserved
Printed in the United States of America.

**PsychCorp**
Product Number: 0154895867

## 2. Visual Reproduction I

**Start**
Item 1

**Discontinue**
Do not discontinue.

**Timing**
Present each item stimulus for 10 seconds.
Record the completion time for each item.
Record subtest stop time.

**Score**
See Administration and
Scoring Manual.

Hand used:  ☐ Right   ☐ Left

### Immediate Recall

| ITEM | COMPLETION TIME | Observations |
|------|-----------------|--------------|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |

A scoring page for Visual Reproduction I and II is provided on page 22 of this Record Form.

VR I Total Raw Score
(Maximum = 43)

| Stop Time | : | |
|-----------|---|---|
| | Hr. | Min. |

*Note.* Visual Reproduction II should be administered 20–30 minutes after Visual Reproduction I.

WMS–IV Adult Record Form    7

# 3. Logical Memory I

| | Start Story B | | Discontinue Do not discontinue. | | Timing Record subtest stop time. | | Score Score 0 or 1 point for each story detail. |

**Story B**  Anna Thompson of South Boston, employed as a cook in a school cafeteria, reported at the police station that she had been held up on State Street the night before and robbed of fifty-six dollars. She had four small children, the rent was due, and they had not eaten for two days. The police, touched by the woman's story, took up a collection for her.

## Immediate Recall

| | Story | Credit | | |
|---|---|---|---|---|
| 1. | Anna ✓ | *Anna* or a variant of the name | 0 | ① |
| 2. | Thompson | *Thompson* is required | 0 | 1 |
| 3. | of South | *South* (in any context) | 0 | 1 |
| 4. | Boston, | *Boston* (in any context) | 0 | 1 |
| 5. | employed  *wony* | indication that she held a job | 0 | ① |
| 6. | as a cook | *cook* or some form of the word (e.g., cooked) is required | 0 | ① |
| 7. | in a school | *school* is required | ⓪ | 1 |
| 8. | cafeteria, | *cafeteria* is required | 0 | 1 |
| 9. | reported | indication that a formal statement was made to someone in authority (in any context) | 0 | 1 |
| 10. | at the police | *police* (in any context) | 0 | 1 |
| 11. | station | *station* (in any context) or a word or phrase denoting a police station | 0 | 1 |
| 12. | that she had been held up | indication that she had been held up (e.g., gunpoint or knife) | 0 | 1 |
| 13. | on State Street | *State Street* (in any context) | 0 | 1 |
| 14. | the night before | indication that the hold-up occurred the previous night | 0 | 1 |
| 15. | and robbed | indication that a robbery took place | 0 | ① |
| 16. | of fifty-six dollars. ✓ | indication that an amount of money greater than $49 but less than $60 was taken from her | 0 | ① |
| 17. | She had four | *four* is required, together with an indication that the children were hers | 0 | 1 |
| 18. | small children, | *children* or a synonym is required | 0 | 1 |
| 19. | the rent was due, | indication that the rent was due | 0 | 1 |
| 20. | and they had not eaten | indication that her children or the family were without food | 0 | 1 |
| 21. | for two days. | *two days* is required or a phrase meaning about two days (e.g., couple of days) | 0 | 1 |
| 22. | The police, ✓ | word or phrase signifying one or more members of the police department (in any context) | 0 | ① |
| 23. | touched by the woman's story | indication that her story evoked sympathy | 0 | ① |
| 24. | took up a collection ✓ | indication that money was collected | 0 | ① |
| 25. | for her. ✓ | indication that the money collected was for her or her children | 0 | ① |

Use the space below to write the examinee's verbatim responses if needed.

Story B Total (Maximum = 25)  ⌐8⌐

WMS-IV Adult Record Form

## 3. Logical Memory I *(continued)*

Story C   **At 6:00 on Monday evening, Joe Garcia of Chicago was watching television as he dressed to go out. A weather bulletin interrupted the program to warn that thunderstorms would move into the area within the next two to three hours and remain until morning. The announcer said the storm could bring hail and up to four inches of rain and cause the temperature to drop by fifteen degrees. Joe decided to stay home. He took off his coat and sat down to watch old movies.**

| | Item / Detail | 1-Point Criteria | Score | |
|---|---|---|---|---|
| 1. | At 6:00 | *6:00* is required | 0 | 1 |
| 2. | on Monday | *Monday* is required | 0 | 1 |
| 3. | evening, | *evening* (in any context) | 0 | 1 |
| 4. | Joe | *Joe* or variant of the name | 0 | 1 |
| 5. | Garcia | *Garcia* is required | 0 | 1 |
| 6. | of Chicago | *Chicago* is required | 0 | 1 |
| 7. | was watching television | indication that he was watching/listening to the television | 0 | 1 |
| 8. | as he dressed | indication that he was getting dressed | 0 | 1 |
| 9. | to go out. | indication that he was going out | 0 | 1 |
| 10. | A weather bulletin | indication that there was an announcement about the weather | 0 | 1 |
| 11. | interrupted the program | indication of a break in the regularly-scheduled program | 0 | 1 |
| 12. | to warn that thunderstorms | indication that there was a warning about a storm | 0 | 1 |
| 13. | would move into the area | indication that a storm was coming | 0 | 1 |
| 14. | within the next two to three hours | phrase meaning about two or three hours | 0 | 1 |
| 15. | and remain until morning. | indication that the storm would stay until morning | 0 | 1 |
| 16. | The announcer said | indication that someone was reporting about a storm | 0 | 1 |
| 17. | the storm could bring hail | indication that hail was possible | 0 | 1 |
| 18. | and up to four inches | *four inches* is required | 0 | 1 |
| 19. | of rain | *rain* is required | 0 | 1 |
| 20. | and cause the temperature to drop | indication that the temperature would drop or decrease | 0 | 1 |
| 21. | by fifteen degrees. | relative decrease of 15 degrees is required | 0 | 1 |
| 22. | Joe decided to stay home. | indication that he decided to stay home | 0 | 1 |
| 23. | He took off his coat | indication that he took off outer clothing | 0 | 1 |
| 24. | and sat down | indication that he sat down | 0 | 1 |
| 25. | to watch old movies. | indication of viewing movies is required | 0 | 1 |

Use the space below to write the examinee's verbatim responses if needed.

Story C Total
(Maximum = 25)   **7**

*(Confabulator)*

| Stop Time | 10 : 40 | | Note. Logical Memory II should be administered 20–30 minutes after Logical Memory I. | (Story B + Story C) LM I Total Raw Score (Maximum = 50)  **15** |
|---|---|---|---|---|
| | Hr.   Min. | | | |

WMS–IV Adult Record Form   9

# 5. Visual Reproduction II

**Start** Delayed Recall Item 1

**Discontinue** Do not discontinue.

**Timing** Calculate the elapsed time.
**Delayed Recall:** Record the completion time for each item.

**Score** **Delayed Recall and Copy:** See Administration and Scoring Manual.
**Recognition:** Score 0 or 1 point for each response.

Administer Visual Reproduction II 20–30 minutes after Visual Reproduction I.

Hand used: ☐ Right   ☐ Left

## Delayed Recall

| Item | Completion Time | Observations |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |

A scoring page for Visual Reproduction I and II is provided on page 22 of this Record Form.

**VR II Total Raw Score** [ ]
(Maximum = 43)

## Recognition

| Item | | Response | | | | | | Score | |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 1 | 2 | ③ | 4 | 5 | 6 | | ⓪ | 1 |
| 2. | 1 | 2 | ③ | 4 | 5 | 6 | | 0 | ① |
| 3. | 1 | 2 | 3 | ④ | 5 | 6 | | 0 | ① |
| 4. | 1 | 2 | 3 | 4 | ⑤ | 6 | | 0 | ① |

| Item | | Response | | | | | | Score | |
|---|---|---|---|---|---|---|---|---|---|
| 5. | 1 | ② | 3 | ⊗ | 5 | 6 | | 0 | ① |
| 6. | 1 | 2 | 3 | 4 | 5 | ⑥ | | 0 | ① |
| 7. | 1 | 2 | 3 | 4 | ⑤ | 6 | | ⓪ | 1 |

**VR II Recognition Total Raw Score** [ 5 ]
(Maximum = 7)

## Copy (Optional)

| Item | Observations |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |

A scoring page for Visual Reproduction I and II is provided on page 22 of this Record Form.

**VR II Copy Total Raw Score** [ ]
(Maximum = 43)

WMS–IV Adult Record Form   15

# Logical Memory II

**Start** — Delayed Recall

**Discontinue** — Do not discontinue.

**Timing** — Calculate the elapsed time.

**Score** — Delayed Recall: Score 0 or 1 point for each story detail.
Recognition: Score 0 or 1 point for each response.

...minister Logical Memory II 20–30 minutes after Logical Memory I.

### ...elayed Recall

...ry B                                                                                    ☐ Story B cue given

| ...m | Detail | | 1-Point Criteria | Score | |
|---|---|---|---|---|---|
| :. | Anna | Susa | *Anna* or a variant of the name | 0 | 1 |
| 2. | Thompson | | *Thompson* is required | 0 | 1 |
| 3. | of South | | *South* (in any context) | 0 | 1 |
| 4. | Boston, | | *Boston* (in any context) | 0 | 1 |
| 5. | employed | work | indication that she held a job | 0 | (1) |
| 6. | as a cook | | *cook* or some form of the word (e.g., cooked) is required | 0 | 1 |

## 6. Logical Memory II *(continued)*

Story C                                                                    ☐ Story C cue given

| Item | Detail | 1-Point Criteria | Score |
|------|--------|------------------|-------|
| 1. | At 6:00 | *6:00* is required | 0  1 |
| 2. | on Monday | *Monday* is required | 0  1 |
| 3. | evening, | *evening* (in any context) | 0  1 |
| 4. | Joe | *Joe* or variant of the name | 0  1 |
| 5. | Garcia | *Garcia* is required | 0  ①  |
| 6. | of Chicago | *Chicago* is required | 0  1 |
| 7. | was watching television | indication that he was watching/listening to the television | 0  1 |
| 8. | as he dressed | indication that he was getting dressed | ⓪  1 |
| 9. | to go out. | indication that he was going out | 0. ① |
| 10. | A weather bulletin | indication that there was an announcement about the weather | 0  ① |
| 11. | interrupted the program | indication of a break in the regularly-scheduled program | 0  1 |
| 12. | to warn that thunderstorms | indication that there was a warning about a storm | 0  1 |
| 13. | would move into the area | indication that a storm was coming | 0  1 |
| 14. | within the next two to three hours | phrase meaning about two or three hours | 0  1 |
| 15. | and remain until morning. | indication that the storm would stay until morning | 0  1 |
| 16. | The announcer said | indication that someone was reporting about a storm | 0  1 |
| 17. | the storm could bring hail | indication that hail was possible | 0  1 |
| 18. | and up to four inches | *four inches* is required | 0  1 |
| 19. | of rain | *rain* is required | 0  1 |
| 20. | and cause the temperature to drop | indication that the temperature would drop or decrease | 0  ① |
| 21. | by fifteen degrees. | relative decrease of 15 degrees is required | ⓪  1 |
| 22. | Joe decided to stay home. | indication that he decided to stay home | 0  ① |
| 23. | He took off his coat | indication that he took off outer clothing | 0  1 |
| 24. | and sat down | indication that he sat down | 0  1 |
| 25. | to watch old movies. | indication of viewing movies is required | 0  ① |

Use the space below to write the examinee's verbatim responses if needed.

Story C Total (Maximum = 25) [6]

Confabulation

## . Logical Memory II *(continued)*

### ecognition

| | Story B | | | | | Story C | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Item** | **Question** | **Response** | **Score** | | **Item** | **Question** | **Response** | **Score** | |
| 1. | Was the woman's name Diana Thompson? | N̸ Y | 0 | ①| 16. | Was the man's name Joe Garcia? | N̸ Y | ⓪ | 1 |
| 2. | Was the story set in South Boston? | N Y̸ | 0 | ① | 17. | Was it Sunday evening? | N Y̸ | ⓪ | 1 |
| 3. | Was the woman a cook? | N̸ Y | ⓪ | 1 | 18. | Was it 6:00? | N Y̸ | 0 | ① |
| 4. | Did she work in a restaurant? | N̸ Y | 0 | ① | 19. | Was the story set in Seattle? | N̸ Y | 0 | ① |
| 5. | Did she have four children? | N Y̸ | 0 | ① | 20. | Was the man dressing to go out? | N Y̸ | 0 | ① |
| 6. | Were the children teenagers? | N̸ Y | 0 | ① | 21. | Was he watching television? | N Y̸ | 0 | ① |
| 7. | Did the robbery take place on Sixth Street? | N Y̸ | ⓪ | 1 | 22. | Was the program interrupted? | N Y̸ | 0 | ① |
| 8. | Did the woman report being robbed two nights before? | N̸ Y | 0̸ | ① | 23. | Was the storm expected to move into the area on Tuesday? | N̸ Y | 0 | ① |
| 9. | Did she report the robbery at the police station? | N Y̸ | 0 | ① | 24. | Was the storm expected to stay in the area through the night? | N Y̸ | 0 | ① |
| 10. | Was the woman robbed of seventy-five dollars? | N̸ Y | 0 | ① | 25. | Was the temperature expected to drop 30 degrees? | N̸ Y | 0 | ① |
| 11. | Did the family go without food for four days? | N̸ Y | 0 | ① | 26. | Did the announcer predict 10 inches of rain? | N̸ Y | 0 | ① |
| 12. | Was the rent due? | N Y̸ | 0 | ① | 27. | Did the announcer warn of possible flooding? | N̸ Y | ⓪ | 1 |
| 13. | Did the police catch the thief? | N̸ Y | 0 | ① | 28. | Did the announcer warn that it could hail? | N̸ Y | ⓪ | 1 |
| 14. | Did the police feel sorry for the woman? | N Y̸ | 0 | ① | 29. | Did the man decide to stay home? | N̸ Y̸ | 0 | ① |
| 15. | Did the police take up a collection? | N Y̸ | 0 | ① | 30. | Did he sit down to watch a sports program? | N̸ Y | 0 | ① |

**Story B Recognition Total**
(Maximum = 15) **13**

**Story C Recognition Total**
(Maximum = 15) **11**

**(Story B + Story C)**
**LM II Recognition Total Raw Score** **24**
(Maximum = 30)

## Visual Reproduction I and II Scoring

| Item 1 | Criteria | VR I Immediate Recall | VR II Delayed Recall | VR II Copy |
|---|---|---|---|---|
| | 1 | 0  1 | 0  1 | 0  1 |
| | 2 | 0  1 | 0  1 | 0  1 |
| | 3 | 0  1 | 0  1 | 0  1 |
| | 4 | 0  1 | 0  1 | 0  1 |
| | 5 | 0  1 | 0  1 | 0  1 |
| **Item 1 Total** (Maximum = 5) | | 5 | 0 | |

| Item 2 | Criteria | VR I Immediate Recall | VR II Delayed Recall | VR II Copy |
|---|---|---|---|---|
| | 1 | 0  1 | 0  1 | 0  1 |
| | 2 | 0  1 | 0  1 | 0  1 |
| | 3 | 0  1 | 0  1 | 0  1 |
| | 4 | 0  1 | 0  1 | 0  1 |
| | 5 | 0  1 | 0  1 | 0  1 |
| **Item 2 Total** (Maximum = 5) | | 5 | 5 | |

| Item 3 | Criteria | VR I Immediate Recall | VR II Delayed Recall | VR II Copy |
|---|---|---|---|---|
| | 1 | 0  (1) | 0  (1) | 0  1 |
| | 2 | 0  (1) | 0  (1) | 0  1 |
| | 3 | 0  (1) | 0  (1) | 0  1 |
| | 4 | (0)  1 | (0)  1 | 0  1 |
| | 5 | 0  (1) | 0  (1) | 0  1 |
| | 6 | (0)  1 | (0)  1 | 0  1 |
| | 7 | (0)  1 | (0)  1 | 0  1 |
| **Item 3 Total** (Maximum = 7) | | 5 | 5 | |

| Item 4 | Criteria | VR I Immediate Recall | VR II Delayed Recall | VR II Copy |
|---|---|---|---|---|
| | 1 (A) | 0  (1) | 0  (1) | (0  1)✗ | 0  1 |
| | 2 (A) | 0  (1) | 0  (1) | ✗ | 0  1 |
| | 3 (A) | 0  (1) | 0  (1) | ✗ | 0  1 |
| | 4 (A) | 0  (1) | 0  (1) | ✗ | 0  1 |
| | 5 (A) | 0  (1) | 0  (1) | ✗ | 0  1 |
| | 6 (A) | 0  (1) | 0  (1) | ✗ | 0  1 |
| | 7 | 0  (1) | 0  (1) | | 0  1 |
| | 8 (B) | 0  (1) | 0  (1) | | 0  1 |
| | 9 (B) | 0  (1) | 0  (1) | | -0  1 |
| | 10 (B) | 0  (1) | 0  (1) | | 0  1 |
| | 11 (B) | 0  (1) | 0  (1) | | 0  1 |
| | 12 (B) | 0  (1) | 0  (1) | | 0  1 |
| | 13 (B) | 0  (1) | 0  (1) | | 0  1 |
| **Item 4 Total** (Maximum = 13) | | 13 | 7 | |

| Item 5 | Criteria | VR I Immediate Recall | VR II Delayed Recall | VR II Copy |
|---|---|---|---|---|
| | 1 (C) | 0  (1) | 0  (1) | 0  1 |
| | 2 (C) | 0  (1) | 0  (1) | 0  1 |
| | 3 (C) | 0  (1) | 0  (1) | 0  1 |
| | 4 (C) | 0  (1) | 0  (1) | 0  1 |
| | 5 (C) | 0  (1) | 0  (1) | 0  1 |
| | 6 (C) | 0  (1) | 0  (1) | 0  1 |
| | 7 (C) | 0  (1) | (0)  1 | 0  1 |
| | 8 | 0  (1) | (0)  1 | 0  1 |
| | 9 (D) | 0  (1) | 0  1 | 0  1 |
| | 10 (D) | 0  (1) | 0  1 | 0  1 |
| | 11 (D) | 0  (1) | 0  1 | 0  1 |
| | 12 (D) | (0)  1 | 0  1 | 0  1 |
| | 13 (D) | 0  1 | 0  1 | 0  1 |
| **Item 5 Total** (Maximum = 13) | | 12 | 6 | |

| | |
|---|---|
| **VR I Total Raw Score** (Maximum = 43) | 40 |
| **VR II Total Raw Score** (Maximum = 43) | 23 |
| **VR II Copy Total Raw Score** (Maximum = 43) | 63 |

281194·1/2/6/

WMS–IV  Adult Record Form



**Response Booklet**

**Brief Cognitive Status Exam**

**Visual Reproduction I and II**

Examinee Name:   _John Balentine_

Examiner Name: _D Am_

Test Date: _7/21/16_

Copyright © 2009 by NCS Pearson, Inc. All rights reserved.

Printed in the United States of America.  4 5 6 7 8 9 10 11 12 8 C D E   281484–1  321

PEARSON    PsychCorp

ISBN 0.15-4895-90-3

9 780154 895905

**Visual Reproduction I — Item 1**



4

---

**Visual Reproduction I — Item 2**



5

**Visual Reproduction I — Item 3**



6

**Visual Reproduction I — Item 4**



7

**Visual Reproduction I — Item 5**





**Visual Reproduction II Delayed Recall — Item 1**



10

**Visual Reproduction II Delayed Recall — Item 2**



11

**Visual Reproduction II Delayed Recall — Item 3**



**Visual Reproduction II Delayed Recall — Item 4**

# WRAT4

## BLUE TEST FORM

Name _John Balentine_          Gender _____

Grade _____   Examiner _Dan_

| | Year | Month | Day |
|---|---|---|---|
| Date of Test | 2016 | 7 | 21 |
| Date of Birth | | | |
| Age | | | |

## Score Summary Table

| Subtest/Composite | Raw Score | Standard Score Norms: ☒ Age ☐ Grade (☐Fall, ☐Spring) | Confidence Interval ☐ 85% ☐ 90% ☐ 95% | %ile Rank | Optional Scores ☐ Grade Equivalent ☒ NCE ☐ Stanine |
|---|---|---|---|---|---|
| Word Reading | 51 | 81 | ___ – ___ | 10 | 7.5 |
| Sentence Comprehension | 39 | 82 | ___ – ___ | 12 | 8.9 |
| Spelling | 40 | 92 | ___ – ___ | 30 | 11.0 |
| Math Computation | 36 | 85 | ___ – ___ | 16 | 6.1 |
| Reading Composite* | 163 | 79 | ___ – ___ | 8 | |

*Reading Composite Raw Score = Word Reading Standard Score + Sentence Comprehension Standard Score.

## Standard Score Profile

**Word Reading**
Standard Score _____
Confidence Interval _____
55 60 65 70 75 80 85 90 95 100 105 110 115 120 125 130 135 140 145

**Sentence Comprehension**
Standard Score _____
Confidence Interval _____
55 60 65 70 75 80 85 90 95 100 105 110 115 120 125 130 135 140 145

**Spelling**
Standard Score _____
Confidence Interval _____
55 60 65 70 75 80 85 90 95 100 105 110 115 120 125 130 135 140 145

**Math Computation**
Standard Score _____
Confidence Interval _____
55 60 65 70 75 80 85 90 95 100 105 110 115 120 125 130 135 140 145

**Reading Composite**
Standard Score _____
Confidence Interval _____
55 60 65 70 75 80 85 90 95 100 105 110 115 120 125 130 135 140 145

Percentile Rank (PR) .... 1 ... 2 ... 5 ... 10 ... 16 ... 25 ... 37 ... 50 ... 63 ... 75 ... 84 ... 91 ... 95 ... 98 ... 99 ....
Standard Deviation (SD) Units -3 SD ........ -2 SD ........ -1 SD ........ Mean ........ +1 SD ........ +2 SD ........ +3 SD
Performance Level | Lower Extreme | Low | Below Average | Average | Above Average | Superior | Upper Extreme |

## Standard Score Comparison Table

| Score Comparisons > = < (circle one) | | Score Difference | Significance Level | Prevalence in Standardization Sample |
|---|---|---|---|---|
| Word Reading [ ] > = < [ ] Sentence Comprehension | | | ns .15 .10 .05 .01 | >25% 25% 20% 15% 10% 5% 1% |
| Word Reading [ ] > = < [ ] Spelling | | | ns .15 .10 .05 .01 | >25% 25% 20% 15% 10% 5% 1% |
| Word Reading [ ] > = < [ ] Math Computation | | | ns .15 .10 .05 .01 | >25% 25% 20% 15% 10% 5% 1% |
| Sentence Comprehension [ ] > = < [ ] Spelling | | | ns .15 .10 .05 .01 | >25% 25% 20% 15% 10% 5% 1% |
| Sentence Comprehension [ ] > = < [ ] Math Computation | | | ns .15 .10 .05 .01 | >25% 25% 20% 15% 10% 5% 1% |
| Spelling [ ] > = < [ ] Math Computation | | | ns .15 .10 .05 .01 | >25% 25% 20% 15% 10% 5% 1% |

## WORD READING SUBTEST

**AGES 7 OR YOUNGER:** Administer Part 1: Letter Reading first, followed by Part 2: Word Reading. Discontinue testing if a Participant has responded incorrectly to 10 consecutive items (*10 RULE*).

**AGES 8 OR OLDER:** Administer Part 2: Word Reading first. Discontinue the Word Reading section if the Participant has answered 10 consecutive items incorrectly (*10 RULE*). If the Participant has correctly answered 5 or more items on the Word Reading section before meeting the discontinue criterion, do not administer the preliminary Letter Reading section. If the Participant did not answer at least 5 items correctly on the Word Reading section, then administer Part 1: Letter Reading (*5 RULE*).

### Part 1: Letter Reading Administration Instructions

After handing the Participant the Blue Word Reading List, say, **I want you to look at the letters on this line.** (Point to the row of letters at the top of the card) **Read to me the letters one-by-one across the line.** After the Participant has finished, say, **That's all. Now let's do something different.**

| A | B | O | S | E | R | T | H | U | P | I | V | Z | J | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) | (15) |

### Part 2: Word Reading Administration Instructions

After handing the Participant the Blue Word Reading List, say, **Look at each of these words carefully.** (Point to the words) **Read the words across the page so I can hear you. When you finish the first line, go right on to the second line, and so on down the page until you finish or I tell you to stop. Read slowly and say the words clearly.** Allow 10 seconds for the Participant to respond to each word. If there is no response after 10 seconds, say, **OK, try the next one.** If you did not hear a word clearly, say, **I could not hear you clearly.** Please say the word again just as you did the first time. When the Participant has finished the Word Reading section, say, **That's all. Good job. Thanks. Now we are going to do something else.**

1. cat
   kat
2. in
   in
3. book
   buuk
4. tree
   tree
5. how
   how
6. animal
   an-ĭ-mäl
7. hair
   hair
8. spell
   spel
9. even
   ee-vĕn
10. size
    sīz
11. finger
    fing-gĕr
12. felt
    felt

13. laugh
    laf
14. straight
    strayt
15. stretch
    strech
16. split
    split
17. lame
    laym
18. bulk
    bulk
19. knowledge
    nol-ij
20. abuse
    ă-byoos, -byooz
21. ceiling
    see-ling
22. diagram
    dī-ă-gram
23. doubt
    dowt
24. collapse
    kŏ-laps

25. gigantic *Guy ganti*
    jī-gan-tic
26. contemporary
    kŏn-tem-pō-rer-ee
27. contagious
    kŏn-tay-jŭs
28. exterior
    ik-steer-i-ŏr
29. horizon
    hō-rī-zŏn
30. triumph
    trī-umf
31. alcove
    al-kohv
32. tranquility
    trang-kwil-i-tee
33. efficiency
    i-fish-ĕnt-see
34. inquisitive
    in-kwiz-i-tĭv
35. bibliography *bible*
    bib-li-og-ră-fee *Graph*
36. municipal *biblo*
    myoo-nis-i-pal *guy*

37. unanimous
    yoo-nan-i-mŭs
38. discretionary
    di-skresh-ŏ-ner-ee
39. seismograph
    siz-mō-graf
40. benign
    bi-nīn
41. itinerary
    ī-tin-ĕ-rer-ee
42. heresy
    her-ĕ-see
43. usurp
    yoo-surp, -zurp
44. stratagem
    strat-ă-jĕm
45. pseudonym
    soo-dō-nim
46. irascible
    i-ras-i-bĕl
47. heinous
    hay-nŭs
48. poignant
    poin-yănt

49. disingenuous
    dis-in-jen-yoo-ŭs
50. covetousness
    kuv-ĕ-tŭs-nes
51. omniscient
    om-nish-ent
52. oligarchy
    ol-i-gahr-kee
53. egregious
    i-gree-jŭs
54. assuage
    ă-swayj
55. terpsichorean
    turp-si-kŏ-ree-ăn

| Letter Reading Raw Score | 15 /15 |
|---|---|
| Word Reading Raw Score* | 36 /55 |
| Word Reading Total Raw Score | 51 /70 |

Next administer the Sentence Comprehension subtest, if applicable.
*Use this value for determining starting point on Sentence Comprehension subtest.

## SPELLING SUBTEST

**AGES 7 OR YOUNGER:** Administer Part 1: Letter Writing first, followed by Part 2: Spelling. The Spelling section must be administered individually for participants ages 7 and younger. On the Spelling section, the test should be discontinued after the Participant spells 10 consecutive words incorrectly (*10 RULE*).

**AGES 8 OR OLDER:** Administer Part 2: Spelling first. Discontinue if 10 consecutive errors have been made (*10 RULE*). If the Participant has correctly spelled 5 or more items on the Spelling section before meeting the discontinue criterion, the preliminary Letter Writing section should not be administered. If the Participant does not spell at least 5 words correctly on the Spelling section, then administer Part 1: Letter Writing (*5 RULE*).

2



## BLUE SENTENCE COMPREHENSION TEST FORM

Name ___John Balentine___     Gender __M__

Grade _____ Examiner __D Am__

| | Year | Month | Day |
|---|---|---|---|
| Date of Test | 2016 | 7 | 21 |
| Date of Birth | | | |
| Age | | | |

### STARTING POINT

The starting point for the Sentence Comprehension subtest depends upon the obtained Part 2: Word Reading Raw Score. Use the table to the right, and circle the corresponding Word Reading Raw Score to determine the starting point.

*Note.* Do not administer Sentence Comprehension if the Participant obtained a Part 2: Word Reading Raw Score ≤ 4.

| Part 2: Word Reading Raw Score | Sentence Comprehension Starting Point (Item) | Sample items to be administered |
|---|---|---|
| ≤ 4 | DO NOT ADMINISTER | — |
| 5-23 | A (1) | S-1, S-2, S-3 |
| 24-27 | B (10) | S-1, S-2, S-3 |
| 28-35 | C (15) | S-4, S-5 |
| 36-40 | D (21) | S-4, S-5 |
| 41-44 | E (25) | S-6, S-7 |
| ≥ 45 | F (31) | S-6, S-7 |

**5/7 RULES:** If the Participant does not answer the first 5 items administered correctly, test backwards (reverse direction) from the starting item until he or she obtains 5 consecutive correct answers (*5 RULE*). Then return to the last item administered before starting to test backwards and administer the next item. Continue testing, one item at a time, until the Participant answers 7 consecutive items incorrectly (*7 RULE*) or completes item 50. When the Participant answers 7 consecutive items incorrectly, the discontinue criterion has been met, and testing is discontinued.

### Administration Instructions for Starting Point A or B

Hand the Sentence Comprehension Sample Card to the Participant and say, Now I would like to see how well you can read some sentences. First, let's try some samples. Look at this sample. (Point to S-1) Read the two sentences to yourself. (Pause) What word goes in the blank at the end of the sentence? (Pause for response) Then say, OK, "week" goes in the blank. The sentences say "Our school opened a week ago. Our school has been open one **BLANK**." "Week" is the word that goes in the blank to finish the sentence.

Now read this next one. (Point to S-2 and pause) The sentences say "The bus was completely full. There was not one empty **BLANK**." What word goes in the blank? (Pause for response) OK, "seat" is the correct answer. Other possible answers are "space" and "place." When you can think of more than one word that fills a blank correctly, say the one that you think of first. You do not need to say all of the words that come to mind, just say one word to complete the sentence correctly.

Now go ahead and read the next sample. (Point to S-3 and pause) The sentence says "When the boy saw something fall out of his lunch bag, he quickly reached down to **BLANK** his cookie off the floor." What word goes in the blank? (Pause for response) There are several words you might have chosen, "get" and "take" both fit. The two words "pick up" also fit. This sentence is different because two words together like "pick up" will also complete the sentence correctly. Both words have to be used because neither one by itself completes the meaning of the sentence correctly.

Now I am going to ask you to read more sentences on this card. (Hand the Blue Sentence Comprehension Card to the Participant) Read each sentence to yourself carefully and try to think of ONE word that completes the meaning of the sentence. If you can think of two short words like "pick up" in the sentence we just did, you may say them.

**WIDE RANGE**
COPYRIGHT © 1993, 2006 by WIDE RANGE, INC. All rights reserved.
9 8 7 6 5 4 3 2

Published by:
**PAR** 16204 N. Florida Ave. • Lutz, FL 33549
• 1.800.331.8378 • www.parinc.com
Photocopying of this test is a violation of copyright law. Printed in the U.S.A.

Reorder #RO-5780

WARNING! PHOTOCOPYING OR DUPLICATION OF THIS FORM WITHOUT PERMISSION IS A VIOLATION OF COPYRIGHT LAWS.

## STARTING POINT F

| Item | Correct Response | Incorrect Response | Score (circle one) |
|------|------------------|--------------------|-------------------|
| 31. While we all share certain similarities as members of the _____ species, no two people are completely alike. | human, (same), Homo sapiens (sapiens) | mammals | 0 ①  |
| 32. The northern side of the island has a few hills and valleys; otherwise, it is completely _____. | (flat), even, level, smooth, a plain | bare, barren, deserted, empty, straight | 0 ① |
| 33. The cheerful, enthusiastic manner in which the scientist discussed her laboratory experiments revealed how much she _____ her chosen profession. | enjoyed, adored, cared for, liked, loved, respected, valued, (any synonym for strong positive feelings) | appreciated, knew  *Knows* | ⓪ 1 |
| 34. In order for one to enter an athletic event and win, both talent and determination are _____. | necessary, critical, crucial, essential, fundamental, imperative, important, key, mandatory, a must, needed, required, vital | expected, factors, (involved)  *involved* | ⓪ 1 |
| 35. Some small dogs can run as fast as dogs with long legs, even though small dogs have legs that are _____. | (short(er)) | little, stubby | 0 ① |
| 36. In her science report, Mavis wrote, "Even frogs are better looking than toads, which are usually very _____." | ugly, unattractive | bumpy, fat, odd, slimy  *Similar*  *true* | ⓪ 1 |
| 37. When citizens go to the polls to elect a new mayor this week, they will be asked to _____ between two candidates with contrasting views of the city's future. | (choose), decide, pick, select | vote | 0 ① |
| 38. Of the four poisonous snakes that inhabit North America, the coral snake is not only the most deadly, but, with its bands of red, yellow, and black, it is also the most easily _____. | recogniz(ed) (able), detect(ed) (able), discovered, distinguish(ed) (able), identif(ied) (iable), noticed, observed, seen, spotted, sighted, visible | found, handled  *bright* | ⓪ 1 |
| 39. With the boy tugging at its string, the _____ was highly visible as its long tail dipped, swirled, and danced in the wind. | (kite) | toy, airplane | 0 ① |
| 40. Most of the coach's students needed to study at least two years with her before they were qualified to skate in local and regional events; however, Diane, whose skills were less well developed than those of the typical student, required one _____ year before she was ready for such events. | more, additional, (extra), other | whole | 0 ① |
| 41. Each street-level store space has two apartments on the floor above so that the owners can live, work, and rent out an apartment all in the same _____. | building, area, complex, edifice, facility, location, place, setting, spot, structure, vicinity, (any response denoting the same building or general area/location) | space  *time* | ⓪ 1 |
| 42. Although a cursory examination of the pair of sandals discovered in the archaeological dig of a long-extinct civilization appeared well worn, a more thorough examination undertaken by archaeologists revealed them to be still sturdy, indicating that their ancient creators had _____ them extremely well. | made, assembled, built, constructed, crafted, designed, developed, engineered, fabricated, manufactured, produced, fashioned, formed, sewn, (any response denoting the excellence of craftmanship or design) | cared for, carved, placed, reinforced, tailored, treated, preserved  *treated* | ⓪ 1 |

Note. Continue with Item 43.

*Reads aloud in a whisper*

5

| Item | Correct Response | Incorrect Response | Score |
|---|---|---|---|
| 43. Although the humpback is one of the most studied of the great whales, _____ about its social behavior remain unanswered. | questions, aspects, details, much, mysteries, (some, many) things, a lot, (some, many) factors | answers, characteristics, facts, information, knowledge | ⓪ 1 |
| 44. The organizers of two local fund-raising events realized that if they held them on the same day, they would _____ with each other for donations. | compete, contend, vie, fight(s), conflict, clash, interfere | work, help | 0 ① |
| 45. Animals unable to manufacture certain substances needed for their survival must _____ such substances through their food. | obtain, add, absorb, acquire, extract, find, gain, get, ingest, locate, take in (intake), procure, derive, (any response denoting the process of obtaining, locating, or adding vital substance to the animal) | consume, digest, eat | 0 ① |
| 46. Given the extremely dilapidated condition of his car, the owner was not surprised to find out that it was _____ only a fraction of its original cost. | worth, selling at, sold for, priced at, valued at, (any response denoting the present worth or value) | actually, cost, now | ⓪ 1 |
| 47. Hoping to discover what factors caused one population to contract the disease while another remained _____ of it, the biologists looked for empirical evidence of any characteristics that were unique to each population. | free, clean, clear, devoid/void, immune, rid, unaffected, unharmed, [Q] absent, [Q] untouched | absent, untouched, unaware, impervious | 0 ① |
| 48. The assistant librarian, who typically treated visitors very cordially, was surprisingly _____ when the architect requested help. | rude, abrasive, aloof, angry, belligerent, bitter, blunt, brusque, cranky, crass, cold/cool, curt, discourteous, grouchy, harsh, hostile, impolite, inhospitable, irritated, mad, mean, nasty, obnoxious, short, surly, not nice, uncivil, unfriendly, unkind, (any response denoting rude, discourteous behavior) | agitated, reluctant, terse, unhelpful  naive | ⓪ 1 |
| 49. The long hours worked by the employees, who were frequently required to put in twelve-hour shifts, sometimes adversely _____ the quality of their work. | affect(ed), changed, impacted, influenced, (any response denoting an impact or result of the long hours worked on the quality of work)  poorly | compromised, decreased, diminished, hurt, impaired, lessened, lowered, reduced, suffers | ⓪ 1 |
| 50. It was not until Mario learned that surfing had been invented hundreds of years ago that he realized how _____ the popular sport really is. | old, ancient, long-lived, long-standing, (any response denoting the great age or longevity of surfing)  greatly | enjoyable, historic, important, significant | ⓪ 1 |

## Scoring

The Sentence Comprehension Total Raw Score is obtained by counting the number of items scored correct and then adding that total to the number of items considered correct because they occur before the first item in the earliest set of 5 consecutive items answered correctly.

**OR**

An alternative procedure is to record the number of the last item administered. Next, record the total number of incorrect and omitted items between the first and last items administered. Then subtract the total number of errors/omissions from the last item administered.

| [ ] | + | [ ] | = | /50 |
|---|---|---|---|---|
| Administered items scored as correct | | Items before starting point | | Sentence Comprehension Total Raw Score |

| 50 | − | 11 | = | 39 /50 |
|---|---|---|---|---|
| Last item administered | | Total number of incorrect/ omitted items | | Sentence Comprehension Total Raw Score |

6

Jul 21 16 06:49p    Dr. Den Martell          (949) 786-7478          p.4

# WRAT4

## BLUE RESPONSE FORM

| Name | John Babintine | Gender | | | Year | Month | Day |
|------|----------------|--------|--|--|------|-------|-----|
| | | | Date of Test | | 16 | 7 | 21 |
| Grade | Examiner | DAM | Date of Birth | | | | |
| | | | Age: | | | | |

## SPELLING SUBTEST

### Part 1: Letter Writing

**Write Name**

_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - (1 & 2)

| | | | | |
|--|--|--|--|--|
| (3) | (4) | (5) | (6) | (7) |
| (8) | (9) | (10) | (11) | (12) |
| (13) | (14) | (15) | | |

```
Letter Writing
Raw Score        /15
```

(continue to Part 2: Spelling on page 4)

WIDE RANGE
COPYRIGHT © 2006 by WIDE RANGE, INC. All rights reserved.
Reorder #RO 5778

Published by:
PAR  16204 N. Florida Ave. • Lutz, FL 33549
1.800.331.8378 • www.parinc.com
Photocopying of this test is a violation of copyright law. Printed in the U.S.A.

WARNING! PHOTOCOPYING OR DUPLICATION OF THIS FORM WITHOUT PERMISSION IS A VIOLATION OF COPYRIGHT LAWS.

## MATH COMPUTATION SUBTEST

### Part 2: Math Computation

Write all answers in simplest form

| 1. | 2. | 3. | 4. | 5. |
|---|---|---|---|---|
| $1 + 1 = 2$ | $5$ $-1$ ___ $4$ | Write the missing number: 28, 29, 3o, 31, 32 | $8 - 4 = 4$ | $2 + 7 = 9$ |

| 6. | 7. | 8. | 9. | 10. |
|---|---|---|---|---|
| $9$ $+3$ ___ $12$ | $8 - 3 = 6$ | $32$ $24$ $+40$ ___ $96$ | $36$ $-15$ ___ $21$ | $3 \times 4 = 12$ |

| 11. | 12. | 13. | 14. | 15. |
|---|---|---|---|---|
| $68$ $+23$ ___ $91$ | $6 \div 2 = 3$ | $33$ $-17$ ___ $16$ | $229$ $5,648$ $+\ \ 63$ ___ $5340$ | $17$ $\times 4$ ___ $68$ |

| 16. | 17. | 18. | 19. | 20. |
|---|---|---|---|---|
| $724$ $-597$ ___ $127$ | Round 357 to the nearest ten. Answer 357 | $\frac{15}{5} = 3$ | $\frac{1}{3} + \frac{1}{3} = \frac{2}{2}$ | $2\frac{1}{2} + 1\frac{1}{2} = 3\frac{1}{4}$ |

| 21. | 22. | 23. | 24. | 25. |
|---|---|---|---|---|
| Solve for x: $31 + x = 50$ $x = 350$ | $3\overline{)14}$ $4\ R2$ $12$ ___ $2$ | $4.73 \times 10 = 4730$ | $9\overline{)4527}$ $503$ | $823$ $\times 45$ ___ $453$ $3292$ $37625$ |

2

Jul 21 16.06:48p      Dr. Dan Martell                    (949) 786-7478          p.2



## Part 2: Math Computation

### Write all answers in simplest form

**25.**
2
38
× 2.4
———
1 5 2
7 6
———
9 1.2

2 − $\frac{2}{5}$ = $\frac{1}{4}$

$\frac{1}{4}$ × $\frac{1}{2}$ = ___

Solve for $n$:
$4n - 3 = 29$

$n = $ ___

$\frac{2}{5}$ of 35 = ___

.042 = ___ %

Solve for $s$:
$\frac{25}{100} = \frac{s}{8}$

$s = $ ___

**33.**
6.05
× 12.7
———
23.5
1 2 1 0
6 0.5
———
76.35

15% of 160 =

Answer ___

6 $\frac{1}{4}$
1 $\frac{5}{8}$
+4 $\frac{1}{2}$

14 R 11
27 ) 384
27
114
——
17

$\frac{3}{10}$ + $\frac{3}{4}$ = ___

10 $\frac{1}{4}$
−7 $\frac{2}{3}$

Write as a fraction in simplest form:
.075 = $\frac{1}{3}$

Simplify:
$\frac{r^2 - 5r - 6}{r + 1}$

Answer ___

15 .43   +   21 .60   =   36 .63

Oral Math Raw Score   Math Computation Raw Score   Math Computation Total Raw Score

3       5       6       17       41

3

Dr. Daniel Martell – neuropsychological testing  Page 51 of 119

## SPELLING SUBTEST

### Part 2: Spelling

| | | |
|---|---|---|
| 1. on | 16. believe | 31. possession |
| 2. and | 17. reasonable | 32. exaggarated |
| 3. him | 18. character | 33. medvial |
| 4. make | 19. belief | 34. constraint |
| 5. must | 20. success | 35. stationary |
| 6. cook | 21. quanity | 36. chaotion |
| 7. Light | 22. EXEcutive | 37. ascend |
| 8. enter | 23. discussion | 38. conglasion |
| 9. teach | 24. recognize | 39. |
| 10. should | 25. anxiety | 40. |
| 11. circle | 26. opportunity | 41. |
| 12. correct | 27. | 42. |
| 13. minute | 28. | 43. |
| 14. | 29. RECEIVE | |
| 15. material | 30. conscious | |

| | |
|---|---|
| Letter Writing Raw Score | 15 /16 |
| Spelling Raw Score | 28 /42 |
| Spelling Total Raw Score | 40 /57 |

4


**WMS™-IV**
Flexible Approach

# Score Report

| Examinee Name | John Balentine | Date of Report | 8/1/2016 |
|---|---|---|---|
| Examinee ID | | Years of Education | 10 |
| Date of Birth | 1/30/1969 | Home Language | English |
| Gender | Male | Handedness | Right |
| Race/Ethnicity | African American | Examiner Name | Daniel A Martell, Ph.D., A.B.P.P. |

| Test Administered | WMS-IV Flexible Approach (7/21/2016) | Age at Testing 47 years 5 months | Retest? No |
|---|---|---|---|

| WMS–IV Flexible Approach Comments |
|---|

## WMS–IV Alternate Index Score Summary

| Index | Sum of Scaled Scores | Index Score | Percentile Rank | Confidence Interval | SEM | Qualitative Description |
|---|---|---|---|---|---|---|
| Immediate Memory (LMVR) | 17 | 91 | 27 | 84-100 | 4.74 | Average |
| Delayed Memory (LMVR) | 15 | 85 | 16 | 79-93 | 3.67 | Low Average |
| Auditory Memory (LM) | 11 | 78 | 7 | 72-87 | 4.74 | Borderline |
| Visual Memory (VR) | 21 | 102 | 55 | 97-107 | 2.6 | Average |

WMS–IV Alternate Indexes derived using Logical Memory and Visual Reproduction (LMVR).
Confidence Intervals reported at the 95% Level of Confidence.

## WMS–IV Alternate Index Discrepancy Comparisons

| Comparison | Score 1 | Score 2 | Difference | Critical Value | Significant Difference | Base Rate |
|---|---|---|---|---|---|---|
| IMI (LMVR) – DMI (LMVR) | 91 | 85 | 6 | 11.75 | N | 26.9% |
| AMI (LM) – VMI (VR) | 78 | 102 | -24 | 10.6 | Y | 7.8% |

Statistical significance (critical value) at the .05 level.

## WMS–IV Primary Subtest Scaled Score Summary

| Score | Raw Score | Scaled Score | Percentile Rank |
|---|---|---|---|
| Logical Memory I | 15 | 5 | 5 |
| Logical Memory II | 12 | 6 | 9 |
| Visual Reproduction I | 40 | 12 | 75 |
| Visual Reproduction II | 23 | 9 | 37 |

Copyright © 2009 by NCS Pearson, Inc.
Normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.

 **WMS-IV**
Flexible Approach

### Auditory Memory Process Score Summary

| Score | Raw Score | Scaled Score | Percentile Rank | Cumulative Percentage (Base Rate) |
|---|---|---|---|---|
| LM II Recognition | 24 | - | - | 26-50% |

### Visual Memory Process Score Summary

| Score | Raw Score | Scaled Score | Percentile Rank | Cumulative Percentage (Base Rate) |
|---|---|---|---|---|
| VR II Recognition | 5 | - | - | 26-50% |

Copyright © 2009 by NCS Pearson, Inc.
Normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.

John Balentine
Page 2 of 3

Dr. Daniel Martell - neuropsychological testing  Page 54 of 119

# WMS-IV
Flexible Approach

## WMS—IV Flexible Approach Raw Scores

| WMS—IV Primary Subtests | Score Range Adult | Score Range Older Adult | Raw Score |
|---|---|---|---|
| Logical Memory I | 0–50 | 0–53 | 15 |
| Logical Memory II | 0–50 | 0–39 | 12 |
| Verbal Paired Associates I | 0–56 | | |
| Verbal Paired Associates II | 0–14 | | |
| CVLT–II Trials 1–5 | 5–95 | | |
| CVLT–II Long-Delay | -5–5 | | |
| Designs I | 0–120 | | |
| Designs II | 0–120 | | |
| Visual Reproduction I | 0–43 | 0–43 | 40 |
| Visual Reproduction II | 0–43 | 0–43 | 23 |
| **WMS—IV Process** | **Score Range Adult** | **Score Range Older Adult** | **Raw Score** |
| LM II Recognition | 0–30 | 0–23 | 24 |
| VPA II Recognition | 0–40 | | |
| VPA II Word Recall | 0–28 | | |
| DE I Content | 0–48 | | |
| DE I Spatial | 0–24 | | |
| DE II Content | 0–48 | | |
| DE II Spatial | 0–24 | | |
| DE II Recognition | 0–24 | | |
| VR II Recognition | 0–7 | 0–7 | 5 |
| VR II Copy | 0–43 | 0–43 | |
| **WMS—IV Supplemental Subtests** | **Score Range Ages 16–69** | **Score Range Ages 70–90** | **Raw Score** |
| Logos I | 0–48 | 0–24 | |
| Logos II | 0–16 | 0–8 | |
| Names I | 0–90 | 0–90 | |
| Names II | 0–30 | 0–30 | |
| **WMS—IV Supplemental Process** | **Score Range Ages 16–69** | **Score Range Ages 70–90** | **Raw Score** |
| Names Proper Names | 0–80 | 0–80 | |
| Names Activity | 0–40 | 0–40 | |

Copyright © 2009 by NCS Pearson, Inc.
Normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.





## CVLT-II

### California Verbal Learning Test®
Second Edition · Adult Version
**Dean C. Delis, Joel H. Kramer, Edith Kaplan and Beth A. Ober**

## Comprehensive Scoring System
Dean C. Delis and Alan J. Fridlund

---

**CVLT-II**
**Comprehensive Scoring System**                        **Expanded Report**

---

### Examinee Information

|  |  |
|---|---|
| **Name :** John Balentine | **Test Date Age :** 47 years old |
| **Case ID :** | **Years of Education :** 10 Years |
| **Birth Date :** 1/30/1969 | **Race/Ethnicity :** African/African American |
| **Sex :** Male | **Handedness :** Right |

---

### Test Session Information

|  |  |
|---|---|
| **Examiner :** Daniel A. Martell, Ph.D., A.B.P.P. | **Test Date :** 7/21/2016 |
| **License/Certificate :** | **Form Administered** Standard Form |

---

### Current Medications

---

### Comments

---

*The following report is confidential. The results presented here are not substitutes for experienced clinical judgement and should be interpreted only in the context of an appropriate assessment conducted by a qualified professional.*

*Portions of this report are protected by copyright. Copyright © 2000 by The Psychological Corporation. Normative data copyright © 2000 by The Psychological Corporation. All rights reserved. Produced in the United States of America.*

---



**CVLT-II**
**Comprehensive Scoring System**

Standard Form - Expanded Report

| Name : John  Balentine | Test Date : | 7/21/2016 |

## *Level of Recall*

### *Level of Immediate Recall*

| | Number Correct | | Semantic Clustering (Chance Adjusted) | | Recall Discriminability (Chance Adjusted) | |
|---|---|---|---|---|---|---|
| | Raw | Standard Score | Raw | Standard Score | Raw | Standard Score |
| Trial 1 | 3 | -2.5 | 0.6 | 0.5 | 1.0 | --- |
| Trial 2 | 5 | -1.5 | 0.2 | --- | 0.7 | --- |
| Trial 3 | 10 | 0 | -0.8 | --- | 1.5 | --- |
| Trial 4 | 10 | 0 | -0.8 | --- | 1.8 | --- |
| Trial 5 | 12 | 0.5 | -1.2 | -1 | 2.5 | 0.5 |
| Trials 1-5 Total | 40 | 46 (T-Score) | -0.4 | -1 | 1.5 | -1 |
| Trial B | 4 | -1 | 0.4 | 0 | 0.9 | --- |

### *Level of Delayed Recall*

| | Number Correct | | Semantic Clustering (Chance Adjusted) | | Recall Discriminability (Chance Adjusted) | |
|---|---|---|---|---|---|---|
| | Raw | Standard Score | Raw | Standard Score | Raw | Standard Score |
| Short Delay Free Recall | 11 | 0.5 | -1 | -1 | 2.3 | 0.5 |
| Short Delay Cued Recall | 11 | 0.5 | --- | --- | 1.2 | -1 |
| Long Delay Free Recall | 12 | 1 | -2.2 | -2 | 1.8 | 0 |
| Long Delay Cued Recall | 12 | 0.5 | --- | --- | 1.6 | -0.5 |

Dr. Daniel Martell - neuropsychological testing  Page 57 of 119

**CVLT-II**
**Comprehensive Scoring System**                                    **Standard Form - Expanded Report**

Name : John Balentine                                              Test Date :   7/21/2016

## *Learning Characteristics, Trials 1-5 Total*

|  | Raw | Standard Score |
|---|---|---|
| Semantic Clustering (Chance Adjusted) | -0.4 | -1 |
| Serial Clustering Forward (Chance Adjusted) | 1.7 | 1.5 |
| Serial Clustering Bidirectional (Chance Adjusted) | 1.5 | 1 |
| Subjective Clustering Bidirectional (Chance Adjusted) | 1.1 | 0.5 |
| % Recall from Primacy | 35% | 0.5 |
| % Recall from Middle | 33% | -1 |
| % Recall from Recency | 33% | 0.5 |
| Total Learning Slope Trials 1-5 | 2.3 | 2 |
| Learning Slope Trials 1-2 | 2 | -0.5 |
| Learning Slope Trials 2-5 | 2.1 | 1.5 |
| Across-Trial Recall Consistency | 89 | 1 |

## *Recall Contrast Measures\**

|  | Percent Change | Z-Score Difference |
|---|---|---|
| ***Proactive Interference*** | | |
| List B vs. Trial 1 | 33.3% | 1.5 |
| ***Short-Delay Retention/Retroactive Interference*** | | |
| Short Delay Free Recall vs. Trial 5 | -8.3% | 0 |
| ***Long-Delay Retention*** | | |
| Long Delay Free Recall vs. Trial 5 | 0% | 0.5 |
| Long Delay Free Recall vs. Short Delay Free Recall | 9.1% | 0.5 |

*\* Norms derived from Z-Scores differences.*

Dr. Daniel Martell - neuropsychological testing  Page 58 of 119

**CVLT-II**
**Comprehensive Scoring System**

**Standard Form - Expanded Report**

| Name : John Balentine | Test Date : | 7/21/2016 |
|---|---|---|

### *Recall Errors*

| | Raw | Standard Score |
|---|---|---|
| Total Repetitions (All Recall Trials) | 8 | 1 |
| Total Intrusions (All Recall Trials, All Types) | 15 | 2 |
| Total Immediate Recall Intrusions (Trials 1-5, All Types) | 5 | 2 |
| Total Delayed Recall Intrusions (Free & Cued, All Types) | 9 | 1.5 |
| Total Free Recall Intrusions (Immed. & Delayed, All Types) | 8 | 2 |
| Total Cued Recall Intrusions (All Types) | 7 | 1.5 |

| | Raw | Age Group Freq. | |
|---|---|---|---|
| | | % with this score | Cum. % w/better score |
| Total Non-Category Intrusions (All Recall Trials) | 2.0 | 4.0% | 85.3% |
| Total Synonym/Subordinate Intrusions (All Recall Trials) | 0.0 | 84.7% | 0.0% |
| Total Across-List Intrusions (List B & Delayed Recall Trials) | 4.0 | 3.3% | 93.3% |

| | Raw | Standard Score |
|---|---|---|
| Total Recall Discriminability (List A, All Trials vs. Total Intrusions) | 1.5 | -1 |
| Immediate Recall Discriminability (List A, Trials 1-5 vs. Intrusions, Trials 1-5) | 1.5 | -1 |
| Delayed Recall Discriminability (List A vs. Intrusions, Delayed Recall Trials) | 1.7 | 0 |
| Free Recall Discriminability (List A vs. Intrusions, Immed. & Delayed Free Recall Trials) | 1.6 | -0.5 |
| Cued Recall Discriminability (List A vs. Intrusions, Cued Recall Trials) | 1.4 | -0.5 |

Dr. Daniel Martell - neuropsychological testing  Page 59 of 119



**CVLT-II**
**Comprehensive Scoring System**

**Standard Form - Expanded Report**

Name : John Balentine                                                                 Test Date :        7/21/2016

## *Delayed Recognition Trials*

| | Yes/No Recognition | | | Forced Choice Recognition | | |
|---|---|---|---|---|---|---|
| | Raw | Standard Score | | Raw | **Age Group Freq.**<br>% with this score | Cum. % w/better score |
| Total Hits | 16 | 1 | % Total Accuracy<br>(Hits [16]/16)*100 | 100 | 94.7% | 0.0% |
| Total False Positives | 2 | 0 | | | | |
| Total Recognition Discriminability (d')<br>(Hits vs. Total False Positives) | 3.4 | 1 | % Concrete Accuracy<br>(Hits [8]/8)*100 | 100 | -- | -- |
| Source Recognition Discriminability (d')<br>(Hits vs. List B False Positives [5]) | 3 | 0.5 | % Abstract Accuracy<br>(Hits [8]/8)*100 | 100 | -- | -- |
| Semantic Recognition Discriminability<br>(List A vs. List B Shared [2] &<br>Prototypical [0] False Positives) | 3 | 1 | | | | |
| Novel Recognition Discriminability (d')<br>(Hits vs. Prototypical [0] & Unrelated [0]<br>False Positives) | 3.7 | 1.5 | | | | |
| Total Response Bias (C)*<br>* positive raw scores are in 'NO'<br>response-bias direction, negative raw<br>scores are in the 'YES' response-bias<br>direction. | -0.2 | -1 | | | | |

## *Recall/Recognition Contrast Measures**

| | Percent Change | Z-Score Difference |
|---|---|---|
| Total Recognition Discriminability vs. Long Delay Free Recall* | --- | 0 |
| Total Recognition Discriminability vs. Long Delay Free Recall Discriminability* | 88.9% | 1 |

*\* Norms derived from Z-Scores differences.*

**CVLT-II**
**Comprehensive Scoring System**

**Standard Form - Expanded Report**

Name : John Balentine                                            Test Date :      7/21/2016

### *Critical Items:  Word Count*

| | Raw | Age Group Freq. | |
|---|---|---|---|
| | | % with this score | Cum. % w/better score |
| Number of target words recalled at least once, but missed on Forced Choice Recognition | 0.0 | 97.3% | 0.0% |
| Number of target words that were Hits on Yes/No Recognition, but missed on Forced Choice Recognition | 0.0 | 99.3% | 0.0% |



| CVLT-II Comprehensive Scoring System | Standard Form - Expanded Report |
|---|---|
| Name : John Balentine | Test Date : 7/21/2016 |

## *Raw Score Graph--Correct, Instrusions, Hits, and False Positives*



Dr. Daniel Martell - neuropsychological testing  Page 62 of 119



# California Verbal Learning Test–Second Edition

**Dean C. Delis   Joel H. Kramer   Edith Kaplan   Beth A. Ober**

California Verbal Learning Test™
Second Edition · Adult Version

*Standard Form*

Name: John Balentine   ID#: _____   Examiner: DAM

Sex: ☐ F ☐ M   Race/Ethnicity: _____   Education (years): _____

Handedness: ☐ R ☐ L ☐ Ambidextrous   Hearing adequate? ☐ Y ☐ N   Hearing aid? ☐ Y ☐ N

First language: _____   Preferred language: _____   Effort appear adequate? ☐ Y ☐ ? ☐ N

Affect and mood: _____   Physical appearance: _____

Other behaviors: _____

Major complaints: _____

Diagnostic history: _____
_____

Current medications: _____

|  | Year | Month | Day |
|---|---|---|---|
| Date Tested | 2016 | 7 | 21 |
| Date of Birth | 1969 | 1 | 30 |
| Age at Testing |  |  |  |

| | Raw Score | Standard Score | | Raw Score | Standard Score |
|---|---|---|---|---|---|
| Trial 1 Free Recall Correct | | | Long-Delay Free Recall Correct | | |
| Trial 2 Free Recall Correct | | | Long-Delay Cued Recall Correct | | |
| Trial 3 Free Recall Correct | | | Free-Recall Intrusions (Immediate & Delayed, All Types) | | |
| Trial 4 Free Recall Correct | | | Cued-Recall Intrusions (All Types) | | |
| Trial 5 Free Recall Correct | | | Total Intrusions (All Recall Trials, All Types) | | |
| Trials 1–5 Free Recall Total Correct | | (T score) | Total Repetitions (All Recall Trials) | | |
| List B Free Recall Correct | | | Long-Delay Yes/No Recognition Hits | | |
| Short-Delay Free Recall Correct | | | Long-Delay Yes/No Recognition False-Positives | | |
| Short-Delay Cued Recall Correct | | | Long-Delay Forced-Choice Recognition Accuracy (# hits _____ /16) × 100 | % | |

**PEARSON**

Copyright © 2000 NCS Pearson, Inc.  All rights reserved.

**PsychCorp**

26 27 28 29 30 31 32 33 34 35 36 A B C D E

Product Number 0154035742

**List A Immediate Free Recall Trial 1**
I'm going to read a list of words to you. Listen carefully, because when I'm through, I want you to tell me as many of the words as you can. You can say them in any order, just say as many of them as you can. Are you ready?

*Read List A at an even pace, taking slightly longer than one second per word, so the entire list takes 18 to 20 seconds. Then say: Go ahead.*

**Trial 2**
I'm going to read the same list again. Like before, tell me as many of the words as you can, in any order. Be sure to also say words from the list that you told me the first time.

**Trials 3 and 4**
I'm going to read the same list again. Like before, tell me as many of the words as you can, in any order, including words from the list you've said before.

**Trial 5**
I'm going to read the same list one more time. Like before, tell me as many of the words as you can, in any order, including words from the list you've said before.

*Record all responses verbatim, in the order recalled. Prompt only once (e.g., Anything else?) at the end of each free and cued recall trial (i.e., after 15 seconds with no response or when the examinee says he/she cannot remember more words).*

| | Trial 1 | Resp Type | | Trial 2 | Resp Type | | Trial 3 | Resp Type | | Trial 4 | Resp Type | | Trial 5 | Resp Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | truck | | 1 | truck | | 1 | truck | | 1 | truck | | 1 | truck | |
| 2 | spinach | | 2 | spinach | | 2 | spinach | | 2 | spinach | | 2 | spinach | |
| 3 | cabbage | | 3 | bookshelf | | 3 | giraffe | | 3 | giraffe | | 3 | giraffe | |
| 4 | | | 4 | giraffe | | 4 | cabinet | | 4 | onion | | 4 | cabinet | |
| 5 | | | 5 | zebra | | 5 | squirrel | | 5 | bookshelf | | 5 | giraffe | |
| 6 | | | 6 | bookshelf | | 6 | motorcycle | | 6 | boat | | 6 | lamp | |
| 7 | | | 7 | motorcycle | | 7 | boat | | 7 | squirrel | | 7 | subway | |
| 8 | | | 8 | | | 8 | squirrel | | 8 | zebra | | 8 | onion | |
| 9 | | | 9 | | | 9 | cabbage | | 9 | giraffe | | 9 | boat | |
| 10 | | | 10 | | | 10 | desk | | 10 | cabbage | | 10 | zebra | |
| 11 | | | 11 | | | 11 | zebra | | 11 | desk | | 11 | squirrel | |
| 12 | | | 12 | | | 12 | dust | | 12 | subway | | 12 | desk | |
| 13 | | | 13 | | | 13 | cabbage | | 13 | | | 13 | boat | |
| 14 | | | 14 | | | 14 | | | 14 | | | 14 | cabbage | |
| 15 | | | 15 | | | 15 | | | 15 | | | 15 | | |
| 16 | | | 16 | | | 16 | | | 16 | | | 16 | | |
| 17 | | | 17 | | | 17 | | | 17 | | | 17 | | |
| 18 | | | 18 | | | 18 | | | 18 | | | 18 | | |
| 19 | | | 19 | | | 19 | | | 19 | | | 19 | | |
| 20 | | | 20 | | | 20 | | | 20 | | | 20 | | |

**List A**
truck
spinach
giraffe
bookcase
onion
motorcycle
cabinet
zebra
subway
lamp
celery
cow
desk
boat
squirrel
cabbage

| Trial 1 | | Trial 2 | | Trial 3 | | Trial 4 | | Trial 5 | |
|---|---|---|---|---|---|---|---|---|---|
| Total Correct | C | Total Correct | C | Total Correct | C | Total Correct | C | Total Correct | C |
| Total Repetitions | R | Total Repetitions | R | Total Repetitions | R | Total Repetitions | R | Total Repetitions | R |
| Total Intrusions | I | Total Intrusions | I | Total Intrusions | I | Total Intrusions | I | Total Intrusions | I |



**List B Immediate Free Recall**

Now I'm going to read a second list of words to you. When I'm through, I want you to tell me as many words from this second list as you can, in any order. Don't tell me words from the first list, just this second list.

*Read List B at an even pace, taking slightly longer than one second per word, so the entire list takes 18 to 20 seconds. Then say: Go ahead.*

**List A Short-Delay Free Recall**

Now I want you to tell me all the words you can from the *first* list, the one I read to you several times. Don't tell me words from the second list, just the first list. Go ahead.

**List A Short-Delay Cued Recall**

Tell me all the words from the first list that are furniture.
Tell me all the words from the first list that are vegetables.
Tell me all the words from the first list that are ways of traveling.
Tell me all the words from the first list that are animals.

*Record all responses verbatim, in the order recalled. Prompt only once (e.g., Anything else?) at the end of each free and cued recall trial (i.e., after 15 seconds with no response or when the examinee says he/she cannot remember more words).*

| | Trial B | | | List A | | | Furniture | | | Vegetables | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | violin | | 1 | truck | | 1 | cabinet | | 1 | spinach | |
| 2 | clarinet | | 2 | spring | | 2 | piano | | 2 | cabbage | |
| 3 | rabit | | 3 | giraffe | | 3 | lamp | | 3 | squash | |
| 4 | radish | | 4 | cabb | | 4 | bookshelf | | 4 | | |
| 5 | rabish | | 5 | zebra | | 5 | desk | | 5 | | |
| 6 | | | 6 | desk | | 6 | | | 6 | | |
| 7 | | | 7 | boat | | 7 | | | 7 | | |
| 8 | | | 8 | string | | 8 | | | 8 | | |

**List B**
violin
cucumber
elephant
closet
turnip
guitar
basement
sheep
clarinet
garage
corn
rabbit
patio
saxophone
tiger
radishes

| | List A | |
|---|---|---|
| 9 | lamp | |
| 10 | squirrel | |
| 11 | cabbage | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |

**Ways of Traveling**

| | | |
|---|---|---|
| 1 | truck | |
| 2 | boat | |
| 3 | motorcycle | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |

**Animals**

| | | |
|---|---|---|
| 1 | giraffe | |
| 2 | zebra | |
| 3 | squirrel | |
| 4 | rabbit | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |

Total Correct  C ▢
Total Repetitions  R ▢

Total Intrusions  I ▢

Total Correct  C ▢
Total Repetitions  R ▢
Total Intrusions  I ▢

Total Correct  C ▢
Total Repetitions  R ▢
Total Intrusions  I ▢

*There should be approximately a 20-minute delay between the completion of Short-Delay Cued Recall and the start of Long-Delay Free Recall. Do not inform the examinee that there will be later CVLT-II trials.*

11:26

**List A Long-Delay Free Recall**
I read two different lists of words to you
earlier: a first list that I read to you
several times, and a second list that I read
to you once. Tell me all the words you can
that were from the *first* list. Don't tell me
words from the second list, just the first
list. Go ahead.

| | List A | Resp Type |
|---|---|---|
| 1 | truck | |
| 2 | spinach | |
| 3 | giraffe | |
| 4 | onion | |
| 5 | cabinet | |
| 6 | zebra | |
| 7 | spinach | |
| 8 | boat | |
| 9 | lamp | |
| 10 | onion | |
| 11 | cabbage | |
| 12 | rabbit | |
| 13 | squirrel | |
| 14 | lamp | |
| 15 | bookshelf | |
| 16 | desk | |
| 17 | subway | |
| 18 | boat | |
| 19 | | |
| 20 | | |

| Total Correct | C | |
| Total Repetitions | R | |
| Total Intrusions | I | |

**List A Long-Delay Cued Recall**
Tell me all the words from the first list that are furniture.
Tell me all the words from the first list that are vegetables.
Tell me all the words from the first list that are ways of traveling.
Tell me all the words from the first list that are animals.

**Furniture**
| | | Resp Type |
|---|---|---|
| 1 | lamp | |
| 2 | desk | |
| 3 | cabinet | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |

**Vegetables**
| | | Resp Type |
|---|---|---|
| 1 | spinach | |
| 2 | cabbage | |
| 3 | cucumber | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |

**Ways of Traveling**
| | | Resp Type |
|---|---|---|
| 1 | boat | |
| 2 | truck | |
| 3 | giraffe | |
| 4 | juka | |
| 5 | motorcycle | |
| 6 | subway | |
| 7 | | |
| 8 | | |

**Animals**
| | | Resp Type |
|---|---|---|
| 1 | giraffe | |
| 2 | rabbit | |
| 3 | rabbit | |
| 4 | zebra | |
| 5 | kangaroo | |
| 6 | squirrel | |
| 7 | | |
| 8 | | |

| Total Correct | C | | Total Repetitions | R | | Total Intrusions | I | |

**List A Long-Delay Yes/No Recognition**
Now I'm going to read more words to you. After I
read each one, say "Yes" if that word was from the
first list, or say "No" if it was not from the first list.

*If the examinee responds "I don't know" during Yes/No Recognition,
say, "Tell me whether you think _____ was on the first list."*

| | Response | Item Type | | Response | Item Type | | Response | Item Type | | Response | Item Type |
|---|---|---|---|---|---|---|---|---|---|---|---|
| wallet | Y N | UN | violin | Y N | BN | dog | Y N | PR | turnip | Y N | BS |
| boat | Y N | T | cow | Y N | T | bookcase | Y N | T | cabinet | Y N | T |
| saxophone | Y N | BN | fork | Y N | UN | matches | Y N | UN | onion | Y N | T |
| cucumber | Y N | BS | bus | Y N | PR | spinach | Y N | T | lion | Y N | PR |
| giraffe | Y N | T | celery | Y N | T | clarinet | Y N | BN | camera | Y N | UN |
| carrot | Y N | PR | lamp | Y N | T | truck | Y N | T | guitar | Y N | UN |
| patio | Y N | BN | radishes | Y N | BS | rabbit | Y N | BS | subway | Y N | T |
| cabbage | Y N | T | table | Y N | PR | chair | Y N | PR | tiger | Y N | BS |
| desk | Y N | T | rose | Y N | UN | corn | Y N | UN | coffee | Y N | UN |
| bracelet | Y N | UN | motorcycle | Y N | T | seashell | Y N | UN | zebra | Y N | T |
| car | Y N | PR | sheep | Y N | BS | garage | Y N | BN | lettuce | Y N | PR |
| elephant | Y N | BS | basement | Y N | BN | squirrel | Y N | T | closet | Y N | BN |

T = Target
Distractor Types: BS = List B Shared; BN = List B Non-Shared; PR = Prototypical; UN = Unrelated

*There should be approximately a 10-minute delay between the completion of Yes/No Recognition and the start
of Forced-Choice Recognition. Do not inform the examinee that there will be a later CVLT–II trial.*

16:20

| Total Hits | | |
| Total False-Positives | | |

**List A Long-Delay Forced-Choice Recognition (Optional)**

Earlier, I read some lists of words to you, remember? Now I am going to read some words two at a time. After I read both words, say which of the words was from the *first* list, the one I read to you several times. It may be difficult to remember which one to pick, but even if it's hard for you, just try your best. Ready?

**Was boat or flag on the first list?**

**Was ____ or ____ on the first list?**

*Circle the examinee's responses.*

| If the examinee says "I don't know," say, "I know it may be difficult, but just take your best guess." |
| --- |

| | | | Score (1 or 0) | Dist. type |
|---|---|---|---|---|
| (boat) | or | flag | | C |
| cake | or | (desk) | | C |
| majority | or | (cow) | | A |
| (celery) | or | aspirin | | C |
| (bookcase) | or | silence | | A |
| blender | or | (truck) | | C |
| (onion) | or | logic | | A |
| baseball | or | (zebra) | | C |
| instruction | or | (cabinet) | | A |
| (squirrel) | or | direction | | A |
| blanket | or | (cabbage) | | C |
| (subway) | or | technique | | A |
| height | or | (spinach) | | A |
| (giraffe) | or | towel | | C |
| subject | or | (motorcycle) | | A |
| (lamp) | or | sprinkler | | C |

Distractor types: C = concrete; A = abstract          Total Hits ☐

Total Accuracy: ( _____ /16) × 100 = _____ %

Notes: _____

**List A Long-Delay Forced-Choice Recognition (Optional)**

Earlier, I read some lists of words to you, remember? Now I am going to read some words two at a time. After I read both words, say which of the words was from the *first* list, the one I read to you several times. It may be difficult to remember which one to pick, but even if it's hard for you, just try your best. Ready?

**Was boat or flag on the first list?**

**Was _____ or _____ on the first list?**

*Circle the examinee's responses.*

> *If the examinee says "I don't know," say, "I know it may be difficult, but just take your best guess."*

| | | | Score (1 or 0) | Dist. type |
|---|---|---|---|---|
| (boat) | or | flag | | C |
| cake | or | (desk) | | C |
| majority | or | (cow) | | A |
| (celery) | or | aspirin | | C |
| (bookcase) | or | silence | | A |
| blender | or | (truck) | | C |
| (onion) | or | logic | | A |
| baseball | or | (zebra) | | C |
| instruction | or | (cabinet) | | A |
| (squirrel) | or | direction | | A |
| blanket | or | (cabbage) | | C |
| (subway) | or | technique | | A |
| height | or | (spinach) | | A |
| (giraffe) | or | towel | | C |
| subject | or | (motorcycle) | | C |
| (lamp) | or | sprinkler | | C |

Distractor types: C = concrete; A = abstract    Total Hits [  ]

Total Accuracy: ( _____ /16) × 100 = _____ %

Notes: _____

*John Balentine*
*7/22/16*

**FINGER TAPPING (5 trials within 5 of each other)**



|  | Dominant (R) |  | Non-Dominant (L) |
|---|---|---|---|
| 1. | 55 | 1. | 44 |
| 2. | 57 | 2. | 52 |
| 3. | 59 | 3. | 49 |
| 4. | 55 | 4. | 54 |
| 5. | 58 | 5. | 46 |
| 6. | 65 | 6. | 50 |
| 7. | 53 | 7. | 53 |
| 8. | 57 | 8. | 50 |
| 9. | 59 | 9. | 44 |
| 10. | 57 | 10. | 48 |

Sub-total _____   Sub-total _____
Average __55.9__   Average __48.9__

V. speed is fair
Silently

| AA |  | FL ⓇR |
|---|---|---|
| SS 12 |  | SS 13 |
| T 58 |  | T 60 |

~~PURDUE~~ PEGBOARD

Dominant (R)   Non-dominant (L)   B

Time ~~30~~ 63 sec.   7 sec.

Drops ~~60~~ 11   1

| AA |  | ~~&~~ Ⓛ |
|---|---|---|
| SS 11 |  | SS 11 |
| T 54 |  | T 52 |

**TELEV**

| AA | Bt. | AA | Bt |
|---|---|---|---|
| SS 10 | SS 10 | SS 10 | SS 9 |
| T 62 | T 56 | T 62 | T 53 |

LURIA   R   MMN   oo   De (errors)

**MOTOR SEQUENCING AND CONTROL**

Double Alternating Motor Sequences

__9__   palm up - palm down   (# in 10 seconds)
__10__   fist - flat   (# in 10 seconds)

Fist - Side - Palm

__2__   # trials to successful reproduction (up to 5)
____   transfer to non-dominant hand

Disinhibition  (If I knock once, you knock twice;  if I knock twice, you
knock once)
Ø

a. 2       f. 1
b. 2       g. 1
c. 1       h. 2
d. 2       i. 1
e. 1       j. 2

**STROOP TEST**          Raw    T-Score

Word      ___ / ___
Color     ___ / ___
Word/Color ___ / ___

3



John Balentine   7/21/16

**WISCONSIN CARD SORTING TEST**
Record and Scoring Form

NAME: John Balentine   AGE: ____   SEX: ____   EDUCATION: ____

EXAMINER: DAM   DATE: 7/22/16   OTHER: ____

C, F, N, C, F, N

ORDER: HEATON   SEATING: OPPOSITE

| | Rt | Wrg | ●● / ●● | ✝ ✝✝ | ✻ / ✻ | ▼ | | | Rt | Wrg | ●● / ●● | ✝ ✝✝ | ✻ / .✻ | ▼ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | U | U | C | FN | 33. | / | | CF | N | U | U |
| 2. | / | | N | F | U | C | 34. | 2 | | N | CF | U | U |
| 3. | 2 | | C | U | N | F | 35. | 2 | | U | U | CF | N |
| 4. | 3 | | F | U | U | CN | 36. | | | N | C | U | F |
| 5. | 4 | | N | U | CF | U | 37. | / | | CF | U | N | U |
| 6. | 5 | | U | CF | U | N | 38. | | | U | CN | F | U |
| 7. | 6 | | CN | U | U | F | 39. | | | F | U | C | N |
| 8. | 7 | | F | N | U | C | 40. | / | | CN | F | U | U |
| 9. | 8 | | N | F | C | U | 41. | 2 | | U | U | U | CFN |
| 10. | 9 | | F | C | N | U | 42. | | | C | N | F | U |
| 11. | 10 | | C | U | F | N | 43. | / | | FN | C | U | U |
| 12. | / | | U | N | U | CF | 44. | | | U | U | CN | F |
| 13. | | | C | F | N | U | 45. | | | U | N | F | C |
| 14. | | | U | C | F | N | 46. | | | U | CF | N | U |
| 15. | / | | U | N | C | F | 47. | | | CF | U | U | N |
| 16. | | | CFN | U | U | U | 48. | | | U | CN | U | F |
| 17. | / | | U | U | FN | C | 49. | / | | U | F | CN | U |
| 18. | | | F | CN | U | U | 50. | | | N | C | F | U |
| 19. | | | N | U | U | CF | 51. | / | | C | U | U | FN |
| 20. | | | F | C | U | N | 52. | | | U | N | CF | U |
| 21. | | | C | U | FN | U | 53. | | | F | U | N | C |
| 22. | / | | U | FN | C | U | 54. | / | | N | U | C | F |
| 23. | 2 | | U | C | FN | U | 55. | | | C | F | U | N |
| 24. | | | C | N | U | F | 56. | | | F | N | C | U |
| 25. | / | | N | U | F | C | 57. | | | U | F | N | C |
| 26. | 2 | | U | C | N | F | 58. | 2 | | U | C | U | FN |
| 27. | | | C | FN | U | U | 59. | 3 | | U | FN | U | C |
| 28. | / | | FN | U | U | C | 60. | | | F | U | CN | U |
| 29. | | | U | U | CFN | U | 61. | / | | CN | U | F | U |
| 30. | / | | U | F | U | CN | 62. | 2 | | U | CFN | U | U |
| 31. | 2 | | FN | U | C | U | 63. | 3 | | U | U | N | CF |
| 32. | | | U | U | F | CN | 64. | | | U | F | C | N |

# WISCONSIN CARD SORTING TEST
## Record and Scoring Form

HEATON SCORES: # Categ._____   Total Errors_____   Non-Perseverative Errors_____

Persev. Responses_____   Persev. Errors_____   % Persev. Errors_____   Trials to 1s____

% Conceptual Level Resps._____   Learning-to-Learn_____   Failures to Maintain Set____

| | PR | Rt | Wrg | :: / :: | + / ++ | * / * | Y |
|---|---|---|---|---|---|---|---|
| 65. | 1 | | | U | U | C | FN |
| 66. | 2 | | | N | F | U | C |
| 67. | 3 | | | C | U | N | F |
| 68. | 4 | | | F | U | U | CN |
| 69. | 5 | | | N | U | CF | U |
| 70. | 6 | | | U | CF | U | N |
| 71. | 7 | | | CN | U | U | F |
| 72. | 8 | | | F | N | U | C |
| 73. | 9 | | | N | F | C | U |
| 74. | 10 | | | F | C | N | U |
| 75. | | | | C | U | F | N |
| 76. | | | | U | N | U | CF |
| 77. | 1 | | | C | FC | N | U |
| 78. | 2 | | | U | C | F | N |
| 79. | | | | U | N | C | F |
| 80. | 1 | | | CFN | U | U | U |
| 81. | 2 | | | U | U | FN | C |
| 82. | 3 | | | F | CN | U | U |
| 83. | | | | N | U | U | CF |
| 84. | | | | F | C | U | N |
| 85. | 1 | | | C | U | FN | U |
| 86. | 2 | | | U | FN | U | C |
| 87. | 3 | | | U | C | FN | U |
| 88. | | | | C | N | U | F |
| 89. | | | | N | U | F | C |
| 90. | | | | U | C | N | F |
| 91. | | | | C | FN | U | U |
| 92. | 1 | | | FN | U | U | C |
| 93. | 2 | | | U | U | CFN | U |
| 94. | | | | U | F | U | CN |
| 95. | 1 | | | FN | U | C | U |
| 96. | | | | U | U | F | CN |

| | PR | Rt | Wrg | :: / :: | + / ++ | * / * | Y |
|---|---|---|---|---|---|---|---|
| 97. | | | | CF | N | U | U |
| 98. | 1 | | | N | CF | U | U |
| 99. | | | | U | U | CF | N |
| 100. | 1 | | | N | C | U | F |
| 101. | 2 | | | CF | U | N | U |
| 102. | 3 | | | U | CN | F | U |
| 103. | 4 | | | F | U | C | N |
| 104. | | | | CN | F | U | U |
| 105. | 1 | | | U | U | U | CFN |
| 106. | | | | C | N | F | U |
| 107. | | | | FN | C | U | U |
| 108. | | | | U | U | CN | F |
| 109. | | | | U | N | F | C |
| 110. | 1 | | | U | CF | N | U |
| 111. | | | | CF | U | U | N |
| 112. | 1 | | | U | CN | U | F |
| 113. | 2 | | | U | F | CN | U |
| 114. | 7 | | | N | C | F | U |
| 115. | 4 | | | C | U | U | FN |
| 116. | 5 | | | U | N | CF | U |
| 117. | 6 | | | F | U | N | C |
| 118. | 7 | | | N | U | C | F |
| 119. | 8 | | | C | F | U | N |
| 120. | 9 | | | F | N | C | U |
| 121. | 10 | | | U | F | N | C |
| 122. | | | | U | C | U | FN |
| 123. | | | | U | FN | U | C |
| 124. | | | | F | U | CN | U |
| 125. | 1 | | | CN | U | F | U |
| 126. | 2 | | | U | CFN | U | U |
| 127. | | | | U | U | N | CF |
| 128. | | | | U | F | C | N |

Wisconsin Card Sorting Test: Scoring Program

by
Milton E. Harris   Ph.D.

In consultation with
Robert K. Heaton   Ph.D.

Heaton
p.124-25

Summary of Results for :      John Balentine
                     Age :    47
              Test Date :     07/22/2016

%   T   SS

Category Order =              COLOR FORM NUMBER

Categories Completed =           3   6-10%

Number of Trials =             128

Correct =                       72

Errors =                        56   5   34   76

Perseverative Responses =       37   5   34   76

Perseverative Errors =          31   5   34   76

Nonperseverative Errors =       25

Percent Perseverative Errors =  24.2%

Trials to Complete 1st Category =  12   >16

% Conceptual Level Responses =  35.9%   4   32   73

Failure to Maintain Set =        0

"Learning to Learn" =          -14.2%   2-5%

Wisconsin Card Sorting Test: Scoring Program
Copyright (c) 1988 by Psychological Assessment Resources, Inc.
All Rights Reserved

Scoring Information for: /

```
 1) FN /C/ /*/ /      20) C  /F/C/*/P/E    39) N  /F/C/*/ /
 2) N  /C/ /*/ /      21) C  /F/C/*/P/E    40) F  /F/C/ / /
 3) C  /C/N/ / /      22) FN /F/C/ / /     41) CFN/F/C/ / /
 4) CN /C/N/ / /      23) FN /F/C/ / /     42) N  /F/C/*/ /
 5) CF /C/N/ / /      24) C  /F/C/*/P/E    43) FN /F/C/ / /
 6) CF /C/N/ / /      25) F  /F/C/ / /     44) CN /F/C/*/ /
 7) CN /C/N/ / /      26) F  /F/C/ / /     45) N  /F/N/*/P/E
 8) C  /C/N/ / /      27) C  /F/C/*/P/E    46) N  /F/N/*/P/E
 9) C  /C/N/ / /      28) FN /F/C/ / /     47) N  /F/N/*/P/E
10) C  /C/N/ / /      29) O  /F/C/*/ /     48) CN /F/N/*/ /
11) C  /C/N/ / /      30) F  /F/C/ / /     49) F  /F/N/ / /
12) CF /C/N/ / /      31) FN /F/C/ / /     50) N  /F/N/*/P/E
13) C  /F/C/*/P/E     32) CN /F/C/*/ /     51) FN /F/N/ /P/
14) C  /F/C/*/P/E     33) CF /F/C/ / /     52) N  /F/N/*/P/E
15) F  /F/C/ / /      34) CF /F/C/ / /     53) N  /F/N/*/P/E
16) O  /F/C/*/ /      35) CF /F/C/ / /     54) F  /F/N/ / /
17) FN /F/C/ / /      36) N  /F/C/*/ /     55) C  /F/N/*/ /
18) CN /F/C/*/ /      37) CF /F/C/ / /     56) N  /F/N/*/P/E
19) N  /F/C/*/ /      38) CN /F/C/*/ /
```

```
57) F  /F/N/ / /      75) F  /N/F/*/P/E    93) CFN/N/F/ / /    111) CF
/N/F/*/ /                                                      /N/F/*/ /
58) FN /F/N/ / /      76) CF /N/F/*/ /     94) F  /N/F/*/P/E   112) CN /N/F/
/ /                                                            / /
59) FN /F/N/ / /      77) N  /N/F/ / /     95) FN /N/F/ /P/    113) CN /N/F/
/ /                                                            / /
60) CN /F/N/*/ /      78) N  /N/F/ / /     96) F  /N/F/*/P/E   114) N  /N/F/
/ /                                                            / /
61) F  /F/N/ / /      79) F  /N/F/*/P/E    97) CF /N/F/*/ /    115) FN /N/F/
/ /                                                            / /
62) CFN/F/N/ / /      80) CFN/N/F/ / /     98) N  /N/F/ / /    116) N  /N/F/
/ /                                                            / /
63) CF /F/N/ / /      81) FN /N/F/ / /     99) CF /N/F/*/ /    117) N  /N/F/
/ /                                                            / /
64) F  /F/N/ / /      82) CN /N/F/ / /    100) N  /N/F/ / /    118) N  /N/F/
/ /                                                            / /
65) FN /F/N/ / /      83) CF /N/F/*/ /    101) N  /N/F/ / /    119) N  /N/F/
/ /                                                            / /
66) F  /F/N/ / /      84) F  /N/F/*/P/E  102) CN /N/F/ / /    120) N  /N/F/
/ /                                                            / /
```

```
67) F  /F/N/ / /      85) FN /N/F/ /P/     103) N  /N/F/ / /      121) N  /N/F/
/ /                                                                 / /
68) F  /F/N/ / /      86) FN /N/F/ /P/     104) F  /N/F/*/P/E     122) FN
/C/N/*/ /                                                          /C/N/*/ /
69) CF /F/N/ / /      87) FN /N/F/ /P/     105) CFN/N/F/ /P/      123) FN
/C/N/*/ /                                                          /C/N/*/ /
70) CF /F/N/ / /      88) F  /N/F/*/P/E    106) F  /N/F/*/P/E     124) F
/C/N/*/ /                                                          /C/N/*/ /
71) F  /N/F/*/P/E     89) F  /N/F/*/P/E    107) C  /N/F/*/ /      125) CN /C/N/
/ /                                                                 / /
72) F  /N/F/*/P/E     90) F  /N/F/*/P/E    108) F  /N/F/*/P/E     126) CFN/C/N/
/ /                                                                 / /
73) F  /N/F/*/P/E     91) O  /N/F/*/ /     109) F  /N/F/*/P/E     127) N
/C/N/*/P/E                                                         /C/N/*/P/E
74) F  /N/F/*/P/E     92) FN /N/F/ / /     110) N  /N/F/ / /      128) N
/C/N/*/P/E                                                         /C/N/*/P/E
```

```
KEY:     Card Number)  1 / 2 / 3 / 4 / 5 / 6

    1  Dimensions matched to        4  * = Error
    2  Current category             5  P = Perseverative Response
    3  "perseverated-to" principle  6  E = Perseverative Error
```

| | | | | |
|---|---|---|---|---|
| RED | BLUE | GREEN | RED | BLUE |
| GREEN | GREEN | RED | BLUE | GREEN |
| BLUE | RED | BLUE | GREEN | RED |
| GREEN | BLUE | RED | RED | BLUE |
| RED | RED | GREEN | BLUE | GREEN |
| BLUE | GREEN | BLUE | GREEN | RED |
| RED | BLUE | GREEN | BLUE | GREEN |
| BLUE | GREEN | RED | GREEN | RED |
| GREEN | RED | BLUE | RED | BLUE |
| BLUE | GREEN | GREEN | BLUE | GREEN |
| GREEN | RED | BLUE | RED | RED |
| RED | BLUE | RED | GREEN | BLUE |
| GREEN | RED | BLUE | RED | GREEN |
| BLUE | BLUE | RED | GREEN | RED |
| RED | GREEN | GREEN | BLUE | BLUE |
| BLUE | BLUE | RED | GREEN | RED |
| RED | GREEN | BLUE | RED | GREEN |
| GREEN | RED | GREEN | BLUE | BLUE |
| RED | BLUE | RED | GREEN | RED |
| GREEN | RED | GREEN | BLUE | GREEN |

No. 30150A-3 Color-Word Page
© Stoelting Co.

Dr. Daniel Martell - neuropsychological testing  Page 76 of 119

| XXXX | XXXX | XXXX | XXXX | XXXX |
|------|------|------|------|------|
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX |

No. 30150A-2 Color Page
© Stoelting Co.

| RED | BLUE | GREEN | RED | BLUE |
|---|---|---|---|---|
| GREEN | GREEN | RED | BLUE | GREEN |
| BLUE | RED | BLUE | GREEN | RED |
| GREEN | BLUE | RED | RED | BLUE |
| RED | RED | GREEN | BLUE | GREEN |
| BLUE | GREEN | BLUE | GREEN | RED |
| RED | BLUE | GREEN | BLUE | GREEN |
| BLUE | GREEN | RED | GREEN | RED |
| GREEN | RED | BLUE | RED | BLUE |
| BLUE | GREEN | GREEN | BLUE | GREEN |
| GREEN | RED | BLUE | RED | RED |
| RED | BLUE | RED | GREEN | BLUE |
| GREEN | RED | BLUE | RED | GREEN |
| BLUE | BLUE | RED | GREEN | RED |
| RED | GREEN | GREEN | BLUE | BLUE |
| BLUE | BLUE | RED | GREEN | RED |
| RED | GREEN | BLUE | RED | GREEN |
| GREEN | RED | GREEN | BLUE | BLUE |
| RED | BLUE | RED | GREEN | RED |
| GREEN | RED | GREEN | BLUE | GREEN |

No. 30150A-3 Color-Word Page
© Stoelting Co.

Stroop

|      | Raw | Age Corr | I |
|------|-----|----------|-----|
| W    | 78  | 86       | 35 # |
| C    | 68  | 72       | 44  |
| C-W  | 40  | 45       | 50  |
| Int  |     | -5.9     | 44  |

$$\frac{C \times W}{C + W} = \frac{72 \times 86}{72 + 86} = \frac{6192}{158} = 39.1$$

Raw CW − PredCW = 45 − 39.1 = -5.9

John Balentine
7/22/16

| F | A | S | Ani |
|---|---|---|---|
| firm | appe | seek | monky |
| family | ape | sick | ape |
| "fustrated" | apply | sincere | giraffe |
| fresta | ascended | satisfy | dog |
| farm | another | | parrot |
| fair | | | rosins |
| — 15 — | | | |
| fix | accosted | state | rhino |
| (phone) | | screen | cleetah |
| familiar | aside | sophisticated | tiger |
| | abandon | | donkey |
| | | | elk |
| — 20 — | | | sheep |
| flake | (" apple-eatin") | stop | elephant |
| | accomodate | | aligator |
| | absolute | strategy | bear |
| | | | polar bear |
| | | | whale |
| — 45 — | | | |
| fig | | science | turtle |
| fruit | an | | frog |
| | | suburb | snake |
| (family ⓟ) | | | |
| — 60 — | | | |
| (33) | 11 | 11 | 11 | 20 |

FAS / Ani Norms

From StS p. 506 →        Tombaugh

Table 8-64    Age + Ed

FAS =    $\bar{X}$ = 40.5 / 10.7          $\overline{JB}$
                                         -.7  SD

Ani =    $\bar{X}$ = 19.8 / 4.2          Ø


Lezak

FAS    Adj = 33 + 6 = 39    Normal

Ani    $\bar{X}$ = 22.5 / 6.8       -.3
            Cut off = 12


AA    FAS    Ani              FAS  Ani
SS = 7    10                  SS = Not
T = 45    55                  JB   AVAL.

Name: John Balentine

Age: _____

ID Number _____

Date: 7/22/16

## BOSTON NAMING TEST

| PICTURE | Correct Without Cue | Latency Secs | With Stimulus Cue | | With Phonemic Cue | |
|---|---|---|---|---|---|---|
| | | | Correct | Incorrect | Correct | Incorrect |
| 1. bed (a piece of furniture) | ___ | ___ | ___ | ___ | ___ | ___ |
| 2. tree (something that grows outdoors) | ___ | ___ | ___ | ___ | ___ | ___ |
| 3. pencil (used for writing) | ___ | ___ | ___ | ___ | ___ | ___ |
| 4. house (a kind of building) | ___ | ___ | ___ | ___ | ___ | ___ |
| 5. whistle (used for blowing) | ___ | ___ | ___ | ___ | ___ | ___ |
| 6. scissors (used for cutting) | ___ | ___ | ___ | ___ | ___ | ___ |
| 7. comb (used for fixing hair) | ___ | ___ | ___ | ___ | ___ | ___ |
| 8. flower (grows in a garden) | ___ | ___ | ___ | ___ | ___ | ___ |
| 9. saw (used by a carpenter) | ___ | ___ | ___ | ___ | ___ | ___ |
| 10. toothbrush (used in the mouth) | ___ | ___ | ___ | ___ | ___ | ___ |

PICTURE

11. heli

12. bro

13. octo

14. mus

15. han

16. whe

17. cam

18. mas

19. pret

20. ben

21. racc

22. snai

23. volc

| PICTURE | Correct Without Cue | Latency Secs | With Stimulus Cue | | With Phonemic Cue | |
|---|---|---|---|---|---|---|
| | | | Correct | Incorrect | Correct | Incorrect |
| 11. helicopter (used for air travel) | ___ | ___ | ___ | ___ | ___ | ___ |
| 12. broom (used for cleaning) | ___ | ___ | ___ | ___ | ___ | ___ |
| 13. octopus (an ocean animal) | ___ | ___ | ___ | ___ | ___ | ___ |
| 14. mushroom (something to eat) | ___ | ___ | ___ | ___ | ___ | ___ |
| 15. hanger (found in a closet) | ___ | ___ | ___ | ___ | ___ | ___ |
| 16. wheelchair (found in a hospital) | ___ | ___ | ___ | ___ | ___ | ___ |
| 17. camel (an animal) | ___ | ___ | ___ | ___ | ___ | ___ |
| 18. mask (part of a costume) | ___ | ___ | ___ | ___ | ___ | ___ |
| 19. pretzel (something to eat) | ___ | ___ | ___ | ___ | ___ | ___ |
| 20. bench (used for sitting) | ___ | ___ | ___ | ___ | ___ | ___ |
| 21. racquet (used for sports) | ___ | ___ | ___ | ___ | ___ | ___ |
| 22. snail (an animal) | ___ | ___ | ___ | ___ | ___ | ___ |
| 23. volcano (a kind of mountain) | ___ | ___ | ___ | ___ | ___ | ___ |

| PICTURE | Correct Without Cue | Latency Secs | With Stimulus Cue | | With Phonemic Cue | | PICTURE |
|---|---|---|---|---|---|---|---|
| | | | Correct | Incorrect | Correct | Incorrect | |
| 24. seahorse .......................... (an ocean animal) | ___ | ___ | ___ | ___ | ___ | ___ | 37. escala (yc |
| 25. dart ............................. (you throw it) | ___ | ___ | ___ | ___ | ___ | ___ | 38. harp.. (a |
| 26. canoe ........................... (used in the water) | ___ | ___ | ___ | ___ | ___ | ___ | 39. hamm (yc |
| 27. globe ........................... (a kind of map) | ___ | ___ | ___ | ___ | ___ | ___ | 40. knocke (it's |
| 28. wreath .......................... (an X-mas decoration) | ___ | ___ | ___ | ___ | ___ | ___ | 41. pelican (a ; |
| 29. beaver .......................... (an animal) | ___ | ___ | ___ | ___ | ___ | ___ | 42. stethos (use |
| 30. harmonica ...................... (musical instrument) | ✓ | 1 | ___ | ___ | ___ | ___ | 43. pyrami (fou |
| 31. rhinoceros ...................... (an animal) | ✓ | 2 | ___ | ___ | ___ | ___ | 44. muzzle (use |
| 32. acorn ........................... (it comes from a tree) | ✓ | 1 | ___ | ___ | ___ | ___ | 45. unicorn (my |
| 33. igloo ........................... (type of house) | ✓ | 1 | ___ | ___ | ___ | ___ | 46. funnel . (use |
| 34. stilts ........................... (used to make you taller) | ✓ | 1 | ___ | ___ | ___ | ___ | 47. accordi ia m |
| 35. dominoes ........................ (a game) | ✓ | 1 | ___ | ___ | ___ | ___ | 48. noose (use |
| 36. cactus ........................... (something that grows) | ✓ | 1 | ___ | ___ | ___ | ___ | 49. asparag (som |

-4-

Dr. Daniel Martell - neuropsychological testing  Page 84 of 119

| PICTURE | Correct Without Cue | Latency Secs | With Stimulus Cue | | With Phonemic Cue | |
|---|---|---|---|---|---|---|
| | | | Correct | Incorrect | Correct | Incorrect |
| 37. escalator . . . . . . . . . . . . . . . . . . . (you go up on it) | ✓ | 3 | | | | |
| 38. harp . . . . . . . . . . *orchestra* . . . (a musical instrument) | X | 10 | *harmonica* ✓ | | *harp harp* | |
| 39. hammock . . . . . . . . . . . . . . . (you lie on it) | ✓ | 2 | ✗ | | | |
| 40. knocker . . . . . . . . . . . . . . . . . (it's on a door) | ✓ | 2 | | | | |
| 41. pelican . . . . . . . . . . . . . . . . . . . (a bird) | ✓ | 3 | | | | |
| 42. stethoscope . . . *telescope* . . (used by doctors and nurses) | X | 10 | *tele obstirope* X | | *(nit pwrouve it "steslscope"* ✓ | |
| 43. pyramid . . . . . . . . . . . . . . . . . (found in Egypt) | ✓ | 1 | | | | |
| 44. muzzle . . . . . . . . . . . . . . . . . . (used on dogs) | ✓ | 2 | | | | |
| 45. unicorn . . . . . . . . . . . . . . . . . (mythical animal) | ✓ | 1 | | | | |
| 46. funnel . . . . *fi – funnel* . . . (used for pouring) | ✓ | 3 | | | | |
| 47. accordion . . . *harmonica hot ba+ca* . . . (a musical instrument) | X | 10 | X | | | X |
| 48. noose . . *lynch rope → noose* . (used for hanging) | ✓ | 5 | | | | |
| 49. asparagus . . *broccoli* . . (something to eat) | | X | *brussel* | X | *now ate it Sten* ✓ | |

(5)

| PICTURE | Correct Without Cue | Latency Secs | With Stimulus Cue | | With Phonemic Cue | | Summary |
|---|---|---|---|---|---|---|---|
| | | | Correct | Incorrect | Correct | Incorrect | 1. Numbe |
| | | | *pencil-level* | | | | 2. Numbe |
| 50. compass .................... (for drawing) | X | 10 | ___ | X | ___ | X | 3. Numbe |
| | | | | | | | 4. Numbe |
| 51. latch .................... (part of a door) | ✓ | 2 | | | | | 5. Numbe |
| *easel* | | | *Stanel* | *triangle pol* | | | |
| 52. tripod .................... (photographers or surveyers use it) | X | 10 | X | X | | | |
| | | | *declaration – s... sc...* | *scterrification* | | | |
| 53. scroll .................... (a document) | X | 10 | X | *certificate* *clanification* | | | |
| *get the ice w/it* | | | *p"ice forks"* | *thongs → tongs* | | | |
| 54. tongs .................... (a utensil) | X | 10 | X | | | | |
| *Esiclps   Statue   Pharoh Statue.   Sphid* | | | | | | | |
| 55. sphynx .................... (it's found in Egypt) | X | 10 | X | X | | | |
| 56. yoke .................... (used on farm animals) | ✓ | 2 | | | | | |
| *Ormee for the lawn* | | | *blun –* | | | | |
| 57. trellis .................... (used in a garden) | ∝ | 10 | X | X | | | |
| *paint easel* | | | *"palette" (spalls – can't say)* | | | | |
| 58. palette .................... (artists use it) | X | 10 | X | ∝ | | | |
| 59. protractor .................... (measures angles) | ✓ | 2 | | | | | |
| 60. abacus .................... (it's used for counting) | X | 10 | X | X | | | |

(6)

Dr. Daniel Martell - neuropsychological testing  Page 86 of 119

## Summary of Scores

1. Number of spontaneously given correct responses _____

2. Number of stimulus cues given _____

3. Number of correct responses following a stimulus cue _____

4. Number of phonemic cues _____

5. Number of correct responses following the phonemic cue _____

Total Number Correct (1 + 3) _____

First item failed _____

Total score: allow credit for all items preceding first item failed and add "Total Number Correct." _____ 49 _____

## Norms for Scores on Boston Naming Test Obtained by Children, Normal Adults, and Aphasics

### a. 30 Normal Children, Ages 5.5 to 10.5

| Grade | Mean Age | N | Mean | SD | Range |
|---|---|---|---|---|---|
| Kindergarten | 5.5 | 5 | 29.6 | 5.78 | 20–37 |
| 1 | 6.5 | 5 | 29.0 | 5.55 | 20–34 |
| 2 | 7.5 | 5 | 37.0 | 4.15 | 34–45 |
| 3 | 8.5 | 5 | 38.4 | 2.94 | 33–41 |
| 4 | 9.5 | 5 | 41.6 | 3.56 | 37–47 |
| 5 | 10.5 | 5 | 43.2 | 4.07 | 37–48 |

### b. 84 Normal Adults, Ages 18 to 59

| | N | Mean | SD | Range | |
|---|---|---|---|---|---|
| Breakdown by SCHOOLING: | | | | | |
| 12 years or less | 15 | 55.73 | 4.42 | 42–59 | −1.5 |
| More than 12 years | 31 | 55.71 | 3.33 | 46–60 | |
| Breakdown by AGE: | | | | | |
| 18 | 1 | 42.00 | 0.00 | — | |
| 20–29 | 28 | 55.86 | 2.86 | 46–60 | |
| 30–39 | 23 | 56.65 | 2.84 | 47–60 | −1.6 |
| 40–49 | 10 | 54.40 | 3.47 | 50–60 | |
| 50–59 | 22 | 55.82 | 2.63 | 49–59 | |

### c. 82 Aphasics

| Severity Level | N | Mean | SD | Range |
|---|---|---|---|---|
| 0 | 7 | 0.0 | 0.0 | 0 |
| 1 | 35 | 1.4 | 5.7 | 0–30 |
| 2 | 12 | 18.5 | 18.9 | 0–54 |
| 3 | 13 | 34.2 | 14.3 | 1–54 |
| 4 | 9 | 19.9 | 9.6 | 33–58 |
| 5 | 6 | 39.5 | 21.3 | 2–58 |

*Stimulus cue

# Hooper Visual Organization Test (VOT)
## Answer Sheet

*Published by*

**WPS** WESTERN PSYCHOLOGICAL SERVICES
Publishers and Distributors
12031 Wilshire Boulevard
Los Angeles, California 90025

Name: _John Balentine_    Sex: (M) F   Date: _7/22/16_

Age:_____ Education (Number of Years Completed):_____ Marital Status: _____

Usual Occupation: _____ School or Institution: _____

---

**DIRECTIONS**

    This is a test of your ability to recognize pictures of objects when the pictures have been cut up and rearranged. Look at each picture in the separate booklet of pictures and decide what it might be if it were put together. Write the name of the object on the back of this form next to the number of the picture.

    For example, look at the first picture. What would it be if it were put together? The correct answer is "fish." Write the word "fish" on the back of this form next to the number 1.

    Now do the other pictures in the same way. Toward the end they become rather hard. Try to give an answer even if you are not sure of it.

---

| | |
|---|---|
| Total Raw Score | _27_ |
| Corrected Raw Score | _____ |
| T-Score | _____ |

v. low pros.
of imp.

Copyright © 1983 by WESTERN PSYCHOLOGICAL SERVICES
Based on the original Protocol Booklet © 1957 by H. Elston Hooper.
Not to be reproduced in whole or in part without written permission of Western Psychological Services.
All rights reserved.    1 2 3 4 5 6 7 8 9    Printed in U.S.A.

W-75F

| Picture Number | Response |
|----------------|----------|
| 1. | fish |
| 2. | saw |
| 3. | table |
| 4. | airplane |
| 5. | baseball |
| 6. | hammer |
| 7. | dog |
| 8. | truck |
| 9. | cup |
| 10. | hand |
| 11. | apple |
| 12. | basket |
| 13. | scissors |
| 14. | cane |
| 15. | sailboat |
| 16. | coffee pot |
| 17. | sofa /coach/chair |
| 18. | (calendar) candle (dysnomia) |
| 19. | tea kettle |
| 20. | cat |
| 21. | flower |
| 22. | mouse |
| 23. | book |
| 24. | rabbit |
| 25. | block |
| 26. | lighthouse |
| 27. | basket |
| 28. | key |
| 29. | lock |
| 30. | broom |

Credit

DO NOT WRITE IN THESE BOXES

Balentine   7/21/16



John Ballentine   7/22/16

## REITAN-KLØVE SENSORY-PERCEPTUAL EXAMINATION
(Instance indicated where stimulus was not perceived or was incorrectly perceived.)

**TACTILE:**                                                                                                    Error Totals

Right Hand-Left Hand  –  RH ☐☐☐  LH ☐☐☐  Both:  RH ☐☐☐  LH ☐☐☐   RH 0  LH 0

Right Hand-Left Face  –  RH ☐☐☐  LF ☐☐☐  Both:  RH ☐☐☐  LF ☐☐☐   RH 0  LF 0

Left Hand-Right Face  –  LH ☐☐☐  RF ☐☐☐  Both:  LH ☐☐☐  RF ☐☐☐   RF 0  LH 0

**AUDITORY:**

Right Ear-Left Ear  –  RE ☐☐☐  LE ☐☐☐  Both:  RE ☐☐☐  LE ☐☐☐   RE 0  LE 0

**VISUAL:**

Above eye level
Eye level          RV ☐☐☐  LV ☐☐☐  Both:  RV ☐☐☐  LV ☐☐☐   OK
Below eye level

**TACTILE FINGER RECOGNITION:**

Right:  1 ☐☐☐☐  2 ☐☐☐☐  3 ☐☐☐☐  4 ☐☐☐☐  5 ☐☐☐☐   R 2/20
Left:   1 ☐☐☐☐  2 ☐☐☐☐  3 ☐☐☐☐  4 ☐☐☐☐  5 ☐☐☐☐   L 3/20

**FINGER-TIP NUMBER WRITING PERCEPTION:**

Right:  4 6 3 5   3 5 4 6   6 5 4 3   5 4 6 3   6 3 5 4   R 0/20
Left:                                                     L 0/20

**TACTILE FORM RECOGNITION:**

          ○ ☐ △ +        △ + ○ ☐        + ○ ☐ △        ☐ △ + ○
Errors:  RH              LH              RH              LH              R _____
                                                                        L _____
Response Time:

                              Total Time:  R _____   L _____

**VISUAL FIELDS:**

          Left                Right

Dr. Daniel Martell - neuropsychological testing  Page 91 of 119

## REITAN-INDIANA APHASIA SCREENING TEST

Form for Adults and Older Children

Name: John Belentine          Age: _____ Date: 7/22/16 Examiner: DAu

| | |
|---|---|
| Copy SQUARE ✓ | Repeat TRIANGLE ✓ |
| Name SQUARE ✓ | Repeat MASSACHUSETTS ✗ masatush.. massachsis -- |
| Spell SQUARE Square | Repeat METHODIST EPISCOPAL A methodist episepul |
| Copy CROSS ✗ | Write SQUARE ✓ |
| Name CROSS A plus sign, X, small+ | Read SEVEN ✓ |
| Spell CROSS ✓ Cross | Repeat SEVEN ✓ |
| Copy TRIANGLE ✓ | Repeat/Explain HE SHOUTED THE WARNING. ✓ / S.t. dangers closesy, tellyou the car |
| Name TRIANGLE ✓ | Write HE SHOUTED THE WARNING. ✓ |
| Spell TRIANGLE ✓ triangle | Compute 85 – 27 = 58 |
| Name BABY ✓ | Compute 17 X 3 = 51 |
| Write CLOCK ✓ | Name KEY ✓ |
| Name FORK ✓ | Demonstrate use of KEY ✓ |
| Read 7 SIX 2 ✓ | Draw KEY ✓ |
| Read MGW ✓ | Read PLACE LEFT HAND TO RIGHT EAR. ✓ |
| Reading I ✓ | Place LEFT HAND TO RIGHT EAR ✓ |
| Reading II ✓ | Place LEFT HAND TO LEFT ELBOW ✓ |



Clock   Square

He shouted the warning!

# TRAIL MAKING

28-4
∅ err

## Part A

AD | Bland
SS 10 | SS 9
T 58 | T 50

**SAMPLE**





# TRAIL MAKING

### Part B

62 Sec.
0 err

| AA | TBund |
|----|-------|
| SS 11 | SS 10 |
| T 64 | T 57 |



**SAMPLE**





Tactual Performance Test

| | Time | Blocks | Min/Block |
|---|---|---|---|
| R | 5:40 | 10 | .5.7 |
| L | 5:34 | 10 | .56 |
| B | 3:00 | 10 | .3 |

Memory  5
Location  3                    Total = .48

Notes

R)
Pushes blocks around, then uses fingertip to feel
Tried them in +

L) Same strategy. talks to self while working.
Shifts to feely w/o block for shapes, then
finds block + fit

B) Takes a block in each hand — tries    — note frustr
to go fast — after 4 inserts, switches
to feel L place R strategy

## TPT Norms

| | Raw | SS | T | SS | T |
|---|---|---|---|---|---|
| | | # A | | R.loaded | |
| Total | .48 | 9 | 57 | #9 | 50 |
| (R) | .57 | 10 | 58 | #9 | 48 |
| (L) | .56 | 9 | 53 | 9 | 50 |
| (B) | .3 | 10 | 55 | 9 | 51 |
| Mem | 5 | 6 | 38* | 6 | 37* |
| Loc | 3 | 9 | 51 | 9 | 48 |

# SCORING AND RECORDING FORM FOR THE BOOKLET CATE

Nick A. DeFilippis, Ph.D. and Elizabeth McCampbell, Ph.D.

Name _John Balentine_  7/22/16  Age _____

Education _____ Occupation _____ Premorbid Intellectual Level _____

Total No. Errors Subtests I-VII _0+4+8+2+5+2+5 2 (43)_

*Directions:* Place an 'X' in the square which coincides with the subject's choice for each item. The shaded square indicates the corr... order to obtain a subject's total error score for the completed test, simply count the number of X's which have been placed in no...



v Roman Noodles

Total No. Errors Subtest I _0_

Total No. Errors Subtest II _1_

PAR  Copyright © 1987 by Psychological Assessment Resources, Inc. All rights reserved. Not to be reproduced in whole or in part by any process without written permission of Psychological Assessment Resources, Inc.
9 8 7 6 5

Printed in U.S.A.







SUBTEST IV
25.
26.
27.
28.
29.
30.
31.
32.
33.
34.
SUBTEST IV
35.
36.
37.
38.
39.
40.
Total No. Errors Subtest IV 2
SUBTEST V
1.
2.
3.
SUBTEST V
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
SUBTEST V
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
SUBTEST V
24.
25.
26.
27.
28.
29.
30.
31.
32.
33.
SUBTEST V
34.
35.
36.
37.
38.
39.
40.
Total No. Errors Subtest V 5
SUBTEST VI
1.
2.

**Adult Form**

**Speech–sounds Perception Test**

Name _John Balentine_   Date _7/21/16_   Examiner _DAM_   Score _12 err_

Directions:  Underline the syllable which you hear.

A○ | 8L
SS 7. | 6
T 46 | 39.4

### Series A

1. theeks zeeks <u>theets</u> zeets
2. <u>weech</u> yeech weej yeej
3. leeg <u>bleeg</u> leeng bleeng
4. peez peest teez teest
5. freeb fleeb freep <u>fleep</u>
6. pleeb preeb <u>pleed</u> preed
7. seek <u>seech</u> sheek sheech
8. <u>neek</u> neenk meek meenk
9. wheech heech <u>wheesh</u> heesh
10. <u>preet</u> preekt peet peekt

### Series B

1. peem beem <u>peen</u> been
2. theez <u>theerz</u> feez feerz
3. sheesh <u>sheez</u> zeesh zeez
4. veef weef <u>veeth</u> weeth
5. theel <u>feel</u> theeld feeld
6. peet <u>peent</u> beet beent
7. treep <u>treeb</u> teep teeb
8. steets speets <u>steeks</u> speeks
9. beert <u>beerd</u> peert peerd
10. sheed zeed <u>sheend</u> zeend

1. de
2. we
3. thee fee <u>theer</u> feer
4. neeld <u>neel</u> meeld meel
5. seed zeed seet <u>zeet</u>
6. yeeg <u>yeek</u> heeg heek
7. meen meem neen <u>neem</u>
8. theerd <u>theer</u> teerd teer
9. heez wheez heev wheev
10. neep teep <u>neet</u> teet

### Series D

1. heep <u>heet</u> wheep wheet
2. keev <u>keem</u> feev feem
3. neek <u>neeg</u> meek meeg
4. cheem <u>cheen</u> sheem sheen
5. feep theep <u>feet</u> theet
6. heeld weeld <u>heel</u> weel
7. deed teed <u>deend</u> teend
8. teesh peesh <u>teez</u> peez
9. <u>weef</u> veef weev veev
10. leen heen <u>leeng</u> heeng

### Series E

1. seeng sheeng seen <u>sheen</u>
2. geerd keerd geer keer
3. keen geen <u>keem</u> geem
4. ween weeng heen <u>heeng</u>
5. teed <u>teet</u> peed peet
6. keets <u>keez</u> teets teez
7. theet theent zeet zeent
8. beep peep beet <u>peet</u>
9. tee pee <u>teer</u> peer
10. beeb beed deeb deed

### Series F

1. yeem <u>yeen</u> heem heen
2. leern theern <u>leer</u> theer
3. feeth <u>fees</u> theeth thees
4. reeg treeg <u>reek</u> treek
5. yeed <u>yeet</u> weed weet
6. meep <u>meet</u> deep deet
7. <u>deez</u> dees beez bees
8. teeld <u>teel</u> peeld peel
9. meel <u>meer</u> feel feer
10. ween wheen weem <u>wheem</u>

Copyright © 1979 by Ralph M. Reitan, Ph.D.

## SEASHORE RHYTHM TEST

Name _John Blankine_   Date _1/11/16_   Examiner _D Am_   Raw Score _18_

Raised Score _10_



| | Column A | Column B | Column C |
|---|---|---|---|
| 1. | S | S | S |
| 2. | D | S | S |
| 3. | S | D | S |
| 4. | | D | D |
| 5. | S | S | S |
| 6. | D | S | S |
| 7. | S | D | D |
| 8. | | D | D |
| 9. | S | S | S |
| 10. | S | S | D |

S = Same
D = different

| AA | Bl |
|---|---|
| 8 4 | 4 |
| 33 | 33 |

## TABLE 1

### Halstead Cut-Off Scores Suggesting Brain Damage[a]

| Tests | Halstead Cut-Off Scores |
|---|---|
| Category Test | 51 or more errors |
| TPT Total Time | 15.7 minutes or more |
| Memory | 6 or less correct |
| Localization | 4 or less correct |
| Seashore Rhythm | 25 or less correct (6 or more rank score) |
| Speech-sounds Perception | 8 or more errors |
| Finger Oscillation (Tapping) (Dominant hand) | 50 or less taps in 10 seconds |
| Impairment Index | .5 or above |

| Normal | Mild | Moderate | Severe |
|---|---|---|---|
| 0.0-0.2 | 0.3-0.4 | 0.5-0.7 | 0.8-1.0 |

The following test, while not contributing to the Halstead Impairment Index, has an established cut-off score for brain damage.

| Trail Making | |
|---|---|
| Part A | 40 seconds or more |
| Part B | 91 seconds or more |

*(From Reitan, 1955; 1959)

To calculate the Halstead Impairment Index, one divides the number of scores from Table 1 which are in the impaired range by the total number of tests given which contribute to the Halstead Impairment Index (maximum 7). This results in a decimal value between 0 and 1.0. If none of the scores were in the impaired range, the Impairment Index would be 0.0, while if all of them were in the impaired range (7 divided by 7, or 6 divided by 6, etc.), the Impairment Index would be 1.0. Since it is traditional to round off the results of this to the nearest 1-decimal place, the number of tests in the impaired range and the resulting Impairment Index is based on the prorated schedule on Table 3.

---

Description of the Halstead-Reitan Neuropsychological Battery                    2

## TABLE 2

### Conversion Tables on Tests of the Halstead-Reitan Battery[a]

| TPT Conversion of Seconds to Decimals | | Seashore Rhythm Test Conversion of Raw Scores to Rank Scores | |
|---|---|---|---|
| 1 - 3 | 0.0 | | |
| 4 - .8 | 0.1 | | |
| 9 - 15 | 0.2 | #Correct | Rank |
| 16 - 20 | 0.3 | 29-30 | 1 |
| 21 - 27 | 0.4 | 28 | 2 |
| 28 - 32 | 0.5 | 27 | 3 |
| 33 - 39 | 0.6 | 26 | 5 |
| 40 - 44 | 0.7 | 25 | 6 |
| 45 - 51 | 0.8 | 24 | 8 |
| 52 - 56 | 0.9 | 23 | 9 |
| 57 - 60 | 1.0 | 22 & below | 10 |

*(From Reitan, 1955; 1959)

## TABLE 3

### Calculation of the Halstead Impairment Index Based on Number of Tests Used and Number of Test Scores which Fall Within the Brain-Impaired Range

| | Number of Halstead Tests Utilized | | |
|---|---|---|---|
| Number of Tests in Impaired Range | 7 Tests | 6 Tests | 5 Tests |
| 1 = 0.1 | 1 = 0.2 | 1 = 0.2 |
| 2 = 0.3 | 2 = 0.3 | 2 = 0.4 |
| 3 = 0.4 | 3 = 0.5 | 3 = 0.6 |
| 4 = 0.6 | 4 = 0.7 | 4 = 0.8 |
| 5 = 0.7 | 5 = 0.8 | 5 = 1.0 |
| 6 = 0.9 | 6 = 1.0 | |
| 7 = 1.0 | | |

John Balentine
7/22/16

**FINGER TAPPING (5 trials within 5 of each other)**

| Dominant ( R ) | | Non-Dominant ( L ) | |
|---|---|---|---|
| 1. | 55 | 1. | 40 |
| 2. | 52 | 2. | 44 |
| 3. | 59 | 3. | 54 |
| 4. | 45 | 4. | 54 |
| 5. | 60 | 5. | 46 |
| 6. | 62 | 6. | 46 |
| 7. | 63 | 7. | 53 |
| 8. | 55 | 8. | 52 |
| 9. | 59 | 9. | 49 |
| 10. | 57 | 10. | 48 |

Sub-total _____     Sub-total _____

Average **55.9**     Average **48.9**

|  | AA | BL ⓇR |
|---|---|---|
|  | SS 12 | SS 13 |
|  | T 58 | T 60 |

Rooted
~~PURDUE~~ PEGBOARD

| Dominant ( R ) | Non-dominant ( L ) | B... |
|---|---|---|

Time ~~20~~ **63 sec.**     **7 sec.**

Drops ~~xx~~ **11**     **1**

|  | AA | BL Ⓛ |
|---|---|---|
|  | SS 11 | SS 11 |
|  | T 54 | T 52 |

TELEV...

| | AA | BL | AA | BL | |
|---|---|---|---|---|---|
| LURIA | SS 10 | SS 10 | R: SS 10 | SS 9 | (errors) |
| | T 62 | T 56 | MN... T 62 | T 53 | |

**MOTOR SEQUENCING AND CONTROL**

Double Alternating Motor Sequences

9   palm up – palm down (# in 10 seconds)
10   fist – flat   (# in 10 seconds)

Fist – Side – Palm

2   # trials to successful reproduction (up to 5)
1   transfer to non-dominant hand

Disinhibition (If I knock once, you knock twice; if I knock twice, you
knock once)

Ø

| | | |
|---|---|---|
| a. 2 | f. 1 |
| b. 2 | g. 1 |
| c. 1 | h. 2 |
| d. 2 | i. 1 |
| e. 1 | j. 2 |

**STROOP TEST**          Raw     T-Score

Word      _____ / _____
Color     _____ / _____
Word/Color _____ / _____

3

# PERSONALITY ASSESSMENT INVENTORY™

## Clinical Interpretive Report

by

Leslie C. Morey, PhD
and PAR Staff

## Client Information

| | | |
|---|---|---|
| Client Name | : | John Balentine |
| Client ID | : | None |
| Age | : | 47 |
| Gender | : | Male |
| Education | : | 10 |
| Marital Status | : | Single |
| Test Date | : | 07/21/2016 |
| Prepared For | : | Daniel A. Martell, Ph.D., A.B.P.P. |

The interpretive information contained in this report should be viewed as only one source of hypotheses about the individual being evaluated. No decisions should be based solely on the information contained in this report. This material should be integrated with all other sources of information in reaching professional decisions about this individual.

This report is confidential and intended for use by qualified professionals only. It should not be released to the individual being evaluated.

PAR Psychological Assessment Resources, Inc. • 16204 North Florida Ave. • Lutz, FL 33549 • 1.800.331.8378 • www.parinc.com
Personality Assessment Inventory™ copyright © 1989, 1990, 1991 by Psychological Assessment Resources, Inc. All rights reserved. PAI Clinical Interpretive Report copyright © 1990, 1991, 1993, 1995, 1998, 2000, 2008 by Psychological Assessment Resources, Inc. All rights reserved. May not be reproduced in whole or in part in any form or by any means without written permission of Psychological Assessment Resources, Inc. "Personality Assessment Inventory" is a trademark and "PAI" is a registered trademark owned by Psychological Assessment Resources, Inc.

Personality Assessment Inventory™ Clinical Interpretive Report                    **Page 2**
Client ID  :  None
Test Date  :  07/21/2016

## Full Scale Profile



| Scale | ICN | INF | NIM | PIM | SOM | ANX | ARD | DEP | MAN | PAR | SCZ | BOR | ANT | ALC | DRG | AGG | SUI | STR | NON | RXR | DOM | WRM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw | 9 | 5 | 5 | 5 | 21 | 24 | 19 | 30 | 27 | 33 | 24 | 29 | 17 | 6 | 7 | 16 | 4 | 18 | 16 | 12 | 26 | 18 |
| T | 61 | 59 | 62 | 27 | 60 | 57 | 49 | 67 | 54 | 67 | 63 | 61 | 56 | 50 | 56 | 51 | 51 | 77 | 80 | 46 | 60 | 40 |
| % Complete | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 96 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

Plotted *T* scores are based upon a census matched standardization sample of 1,000 normal adults.
■ indicates that the score is more than two standard deviations above the mean for a sample of 1,246 clinical patients.
♦ Indicates that the scale has more than 20% missing items.

## Subscale Profile

| | | Score Raw | T |
|---|---|---|---|
| *SOM-C* | Conversion | 3 | 51 |
| *SOM-S* | Somatization | 15 | 78 |
| *SOM-H* | Health Concerns | 3 | 47 |
| *ANX-C* | Cognitive | 9 | 57 |
| *ANX-A* | Affective | 10 | 60 |
| *ANX-P* | Physiological | 5 | 52 |
| *ARD-O* | Obsessive-Compulsive | 11 | 54 |
| *ARD-P* | Phobias | 6 | 48 |
| *ARD-T* | Traumatic Stress | 2 | 45 |
| *DEP-C* | Cognitive | 10 | 67 |
| *DEP-A* | Affective | 6 | 55 |
| *DEP-P* | Physiological | 14 | 69 |
| *MAN-A* | Activity Level | 8 | 54 |
| *MAN-G* | Grandiosity | 6 | 45 |
| *MAN-I* | Irritability | 13 | 62 |
| *PAR-H* | Hypervigilance | 13 | 66 |
| *PAR-P* | Persecution | 11 | 72 |
| *PAR-R* | Resentment | 9 | 55 |
| *SCZ-P* | Psychotic Experiences | 7 | 60 |
| *SCZ-S* | Social Detachment | 12 | 66 |
| *SCZ-T* | Thought Disorder | 5 | 52 |
| *BOR-A* | Affective Instability | 4 | 48 |
| *BOR-I* | Identity Problems | 7 | 56 |
| *BOR-N* | Negative Relationships | 13 | 75 |
| *BOR-S* | Self-Harm | 5 | 57 |
| *ANT-A* | Antisocial Behaviors | 13 | 68 |
| *ANT-E* | Egocentricity | 1 | 42 |
| *ANT-S* | Stimulus-Seeking | 5 | 51 |
| *AGG-A* | Aggressive Attitude | 4 | 45 |
| *AGG-V* | Verbal Aggression | 10 | 59 |
| *AGG-P* | Physical Aggression | 2 | 49 |

Missing Items = 1

Plotted *T* scores are based upon a census matched standardization sample of 1,000 normal adults.
■ indicates that the score is more than two standard deviations above the mean for a sample of 1,246 clinical patients.
♦ indicates that the scale has more than 20% missing items.

Personality Assessment Inventory™ Clinical Interpretive Report                    Page 4
Client ID : None
Test Date : 07/21/2016

# Additional Profile Information

## Supplemental PAI Indexes

| Index | Value | T Score | |
|-------|-------|---------|---|
| Defensiveness Index | 1 | 38 | |
| Cashel Discriminant Function | 116.18 | 35 | |
| Malingering Index | 2 | 71 | |
| Rogers Discriminant Function | -0.10 | 58 | |
| Suicide Potential Index | 7 | 62 | |
| Violence Potential Index | 4 | 61 | |
| Treatment Process Index | 2 | 55 | |
| ALC Estimated Score | --- | 58 | (8T higher than ALC) |
| DRG Estimated Score | --- | 56 | (Equal to DRG) |
| Mean Clinical Elevation | --- | 58 | |

## Coefficients of Fit with Profiles of Known Clinical Groups

| Database Profile | Coefficient of Fit |
|------------------|--------------------|
| NIM Predicted | 0.733 |
| Cluster 6 | 0.672 |
| PIM Predicted | 0.663 |
| Schizophrenia | 0.647 |
| Paranoid delusions | 0.641 |
| Cluster 2 | 0.624 |
| Adjustment reaction | 0.614 |
| Cluster 10 | 0.607 |
| Antipsychotic medications | 0.604 |
| Dysthymic Disorder | 0.596 |
| Schizoaffective Disorder | 0.594 |
| Assault history | 0.582 |
| Posttraumatic Stress Disorder | 0.582 |
| Auditory hallucinations | 0.578 |
| Current aggression | 0.573 |
| Fake Bad | 0.559 |

Dr. Daniel Martell - neuropsychological testing  Page 112 of 119

**Personality Assessment Inventory™ Clinical Interpretive Report**                                    **Page 5**
Client ID  :  None
Test Date  :  07/21/2016

| Database Profile | Coefficient of Fit |
|---|---|
| Mania | 0.558 |
| Major Depressive Disorder | 0.546 |
| Antisocial Personality Disorder | 0.545 |
| Borderline Personality Disorder | 0.545 |
| Self-Mutilation | 0.543 |
| Cluster 7 | 0.541 |
| Rapists | 0.535 |
| Anxiety Disorder | 0.535 |
| Suicide history | 0.512 |
| Current suicide | 0.483 |
| Cluster 5 | 0.479 |
| Cluster 4 | 0.479 |
| Somatoform Disorder | 0.476 |
| Prisoners | 0.439 |
| Drug abuse | 0.428 |
| Alcoholic | 0.422 |
| Random responding | 0.418 |
| All "Mainly True" | 0.400 |
| All "Very True" | 0.391 |
| Cluster 3 | 0.389 |
| All "Slightly True" | 0.379 |
| Cluster 8 | 0.375 |
| Spouse abusers | 0.315 |
| Cluster 1 | 0.196 |
| All "False" | 0.174 |
| Cluster 9 | 0.150 |
| Fake Good | -0.545 |

# Validity of Test Results

The PAI provides a number of validity indices that are designed to provide an assessment of factors that could distort the results of testing. Such factors could include failure to complete test items properly, carelessness, reading difficulties, confusion, exaggeration, malingering, or defensiveness. For this protocol, the number of uncompleted items is within acceptable limits.

Also evaluated is the extent to which the respondent attended appropriately and responded consistently to the content of test items. The respondent's scores suggest that he did attend appropriately to item content and responded in a consistent fashion to similar items.

The degree to which response styles may have affected or distorted the report of symptomatology on the inventory is also assessed. The scores for these indicators fall in the normal range, suggesting that the respondent answered in a reasonably forthright manner and did not attempt to present an unrealistic or inaccurate impression that was either more negative or more positive than the clinical picture would warrant.

# Clinical Features

The PAI clinical profile reveals no marked elevations that should be considered to indicate the presence of clinical psychopathology. Scores on one or more scales do, however, show moderate elevations that may reflect sources of difficulty for the person. These problem areas may be related to current stressors or complicated life circumstances. These potential problem areas are described below.

The respondent's self-description suggests that he is quick to feel that he is being treated inequitably and easily believes that there is a concerted effort among others to undermine his interests.

The respondent reports some difficulties consistent with relatively mild or transient depressive symptomatology.

Certain elements of the respondent's self-description suggests that others are likely to see him as being withdrawn, aloof, and somewhat unconventional.

It appears that the respondent has a history of involvement in intense and volatile relationships. In these relationships, he tends to be preoccupied with fears of being abandoned or rejected by those people important to him.

The respondent indicates some concerns about physical functioning and health matters in general. He reports particular problems with the frequent occurrence of various minor physical symptoms (such as headaches, pain, or gastrointestinal problems) and has vague complaints of ill health and fatigue. His physical symptoms are often accompanied by some depression and anxiety.

According to the respondent's self-report, he describes NO significant problems in the following areas: problems with empathy; unusually elevated mood or heightened activity; marked anxiety; problematic behaviors used to manage anxiety.   Also, he reports NO significant problems with alcohol or drug abuse or dependence.

## Self-Concept

The self-concept of the respondent appears to involve a self-evaluation that has both positive and negative aspects.  His attitudes about himself may vary from states of pessimism and self-doubt to periods of relative self-confidence and self-satisfaction.  Some fluctuation in self-esteem may be observed as a function of his current circumstances, although these fluctuations will not be extreme and are comparable to those experienced by most adults. During stressful times in particular, he is prone to be somewhat self-critical, uncertain, and indecisive.

## Interpersonal and Social Environment

The respondent's interpersonal style seems best characterized as pragmatic and independent. He may tend to view relationships as a means to an end, rather than as a source of satisfaction.  He is not likely to be perceived by others as a warm and friendly person, although he is not necessarily lacking in social skills and he can be reasonably effective in social interactions.  Those who know him well are likely to see him as being shrewd, competitive, and self-confident.

In considering the social environment of the respondent with respect to perceived stressors and the availability of social supports with which to deal with these stressors, his responses indicate that he is likely to be experiencing notable stress and turmoil in a number of major life areas.  A review of his current employment situation, financial status, and family and/or close relationships will clarify the importance of these in the overall clinical picture.  A primary source of stress may involve relationship issues because he believes that his social relationships offer him little support; family relationships may be somewhat distant or ridden with conflict, and friends may not be available when needed.  Interventions directed at key problematic relationships (such as those involving family or marital problems) may be of some use in alleviating what may be a major source of dissatisfaction.

## Treatment Considerations

Treatment considerations involve issues that can be important elements in case management and treatment planning.   Interpretation is provided for three general areas relevant to treatment: behaviors that may serve as potential treatment complications, motivation for treatment, and aspects of the respondent's clinical picture that may complicate treatment efforts.

With respect to suicidal ideation, the respondent is not reporting distress from thoughts of self-harm.

With respect to anger management, the respondent describes his temper as within the normal range, and as fairly well-controlled without apparent difficulty.

The respondent's interest in and motivation for treatment is comparable to that of adults who are not being seen in a therapeutic setting. However, his level of treatment motivation is somewhat lower than is typical of individuals being seen in treatment settings. His responses suggest that he is satisfied with himself as he is, that he is not experiencing marked distress, and that, as a result, he sees little need for changes in his behavior. However, the respondent does report a number of strengths that are positive indications for a relatively smooth treatment process, if he were willing to make a commitment to treatment.

If treatment were to be considered for this individual, particular areas of attention or concern in the early stages of treatment could include:
- Current difficulties in his social support system may give a special significance to the therapeutic relationship and any impasse may need to be handled with particular care.
- He may have initial difficulty in placing trust in a treating professional as part of his more general problems in close relationships.

## *DSM-IV* Diagnostic Possibilities

Listed below are *DSM-IV* diagnostic possibilities suggested by the configuration of PAI scale scores. The following are advanced as hypotheses; all available sources of information should be considered prior to establishing final diagnoses.

Axis I:        309.9        Adjustment Disorder, Unspecified

Axis I Rule Out:

               300.81       Somatization Disorder

Axis II:       799.9        Diagnosis Deferred on Axis II

Axis II Rule Out:

               301.9        Personality Disorder NOS (Mixed Personality Disorder With Antisocial, Schizotypal, and Paranoid Features)

## Critical Item Endorsement

A total of 27 PAI items reflecting serious pathology have very low endorsement rates in normal samples. These items have been termed critical items. Endorsement of these critical items is not in itself diagnostic, but review of the content of these items with the respondent may help to clarify the presenting clinical picture. Significant items with item scores of 1, 2, or 3 are listed below.

Personality Assessment Inventory™ Clinical Interpretive Report                    Page 9
Client ID  :  None
Test Date  :  07/21/2016

## Potential for Aggression

61.  *AGG-P*   Sometimes my temper explodes and I completely lose control. (ST, 1)

## Substance Abuse, Current and Historical

334.  *ALC*    My drinking has never gotten me into trouble. *(False)* (F, 3)

## True Response Set

75.  *DEP-P*   I have no trouble falling asleep. *(False)* (ST, 2)
142.  *DRG*    I never use illegal drugs. *(False)* (F, 3)

## Idiosyncratic Context

80.  *INF*    Sometimes I get ads in the mail that I don't really want. *(False)* (MT, 1)

# PAI Item Responses

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1. F | 44. F | 87. F | 130. F | 173. MT | 216. ST | 259. VT | 302. F |
| 2. MT | 45. VT | 88. MT | 131. ST | 174. MT | 217. MT | 260. F | 303. MT |
| 3. F | 46. F | 89. F | 132. F | 175. F | 218. MT | 261. F | 304. VT |
| 4. VT | 47. F | 90. F | 133. MT | 176. MT | 219. F | 262. F | 305. MT |
| 5. F | 48. MT | 91. MT | 134. F | 177. VT | 220. ST | 263. F | 306. VT |
| 6. MT | 49. F | 92. F | 135. F | 178. VT | 221. MT | 264. F | 307. F |
| 7. VT | 50. F | 93. ST | 136. F | 179. VT | 222. F | 265. VT | 308. MT |
| 8. ST | 51. F | 94. MT | 137. F | 180. F | 223. F | 266. F | 309. F |
| 9. F | 52. F | 95. F | 138. VT | 181. F | 224. VT | 267. ST | 310. F |
| 10. ST | 53. MT | 96. ST | 139. MT | 182. F | 225. MT | 268. MT | 311. F |
| 11. F | 54. F | 97. ST | 140. F | 183. F | 226. VT | 269. ST | 312. MT |
| 12. ST | 55. F | 98. F | 141. F | 184. MT | 227. VT | 270. ST | 313. VT |
| 13. MT | 56. VT | 99. VT | 142. F | 185. VT | 228. VT | 271. F | 314. F |
| 14. MT | 57. MT | 100. F | 143. MT | 186. VT | 229. ST | 272. MT | 315. MT |
| 15. F | 58. VT | 101. F | 144. VT | 187. ST | 230. VT | 273. F | 316. MT |
| 16. VT | 59. VT | 102. F | 145. F | 188. F | 231. ST | 274. F | 317. VT |
| 17. F | 60. F | 103. MT | 146. MT | 189. MT | 232. VT | 275. MT | 318. ST |
| 18. F | 61. ST | 104. MT | 147. MT | 190. MT | 233. F | 276. MT | 319. VT |
| 19. ? | 62. F | 105. F | 148. F | 191. F | 234. F | 277. ST | 320. F |
| 20. MT | 63. F | 106. MT | 149. F | 192. MT | 235. MT | 278. F | 321. F |
| 21. F | 64. VT | 107. F | 150. ST | 193. VT | 236. VT | 279. F | 322. VT |
| 22. F | 65. MT | 108. F | 151. F | 194. MT | 237. VT | 280. F | 323. MT |
| 23. F | 66. F | 109. F | 152. F | 195. VT | 238. F | 281. MT | 324. MT |
| 24. VT | 67. ST | 110. MT | 153. MT | 196. ST | 239. VT | 282. MT | 325. MT |
| 25. MT | 68. F | 111. F | 154. F | 197. MT | 240. F | 283. F | 326. F |
| 26. VT | 69. ST | 112. MT | 155. ST | 198. VT | 241. F | 284. ST | 327. VT |
| 27. ST | 70. MT | 113. F | 156. F | 199. F | 242. MT | 285. F | 328. VT |
| 28. F | 71. F | 114. F | 157. MT | 200. F | 243. F | 286. MT | 329. F |
| 29. MT | 72. F | 115. MT | 158. F | 201. ST | 244. ST | 287. F | 330. ST |
| 30. ST | 73. F | 116. F | 159. MT | 202. VT | 245. MT | 288. MT | 331. ST |
| 31. F | 74. F | 117. MT | 160. VT | 203. ST | 246. ST | 289. VT | 332. MT |
| 32. MT | 75. ST | 118. F | 161. F | 204. MT | 247. F | 290. MT | 333. F |
| 33. VT | 76. MT | 119. F | 162. MT | 205. VT | 248. VT | 291. MT | 334. F |
| 34. F | 77. MT | 120. F | 163. MT | 206. F | 249. F | 292. ST | 335. F |
| 35. MT | 78. F | 121. VT | 164. MT | 207. F | 250. MT | 293. MT | 336. MT |
| 36. VT | 79. F | 122. ST | 165. F | 208. MT | 251. F | 294. MT | 337. MT |
| 37. MT | 80. MT | 123. F | 166. ST | 209. F | 252. MT | 295. MT | 338. F |
| 38. F | 81. F | 124. MT | 167. F | 210. VT | 253. MT | 296. ST | 339. ST |
| 39. F | 82. ST | 125. F | 168. F | 211. F | 254. F | 297. VT | 340. F |
| 40. F | 83. F | 126. F | 169. MT | 212. F | 255. F | 298. VT | 341. MT |
| 41. VT | 84. F | 127. MT | 170. F | 213. F | 256. VT | 299. F | 342. VT |
| 42. VT | 85. F | 128. MT | 171. F | 214. F | 257. ST | 300. F | 343. MT |
| 43. F | 86. F | 129. F | 172. VT | 215. F | 258. F | 301. VT | 344. F |

**Personality Assessment Inventory™ Clinical Interpretive Report**
Client ID  :  None
Test Date  :  07/21/2016

Page 11

# Missing Items

The following items were not answered by the respondent:

| Item | Text |
|------|------|
| 19. | My relationships have been stormy. |

### *** End of Report ***

Sex Hx

Aug. 1 / 16
John Balentine

(3°

— Doris — older sister — he was 5
— she was 7
— she covered his eyes + fondled
his penis — told him — don't
move.

— happened more than once — ongoing
had him hump her

— old wake up in the middle ) night
w/ her touching him — didn't know
what was happening — confused

— At age 6 — accident → unconscious

— Auntie Carlie used to take care of them
→ Kids — neighborhood teenagers
in HS — he was abt 6 - 7

— he had some sexual contact w/
these girls — he fondled them —

EXHIBIT
RX- 123

- At 10 - cousin Anita - had sex
same age as him -

- At 7 his uncle John tried to
mess -
- day time - he ~~told~~ ~~him~~ him pull
your drawers down - J.B refused

- "I was shaking like a leaf"

- couple days later he was saying
"I ain't no faggot"
    - JB didn't even know what
    that was

"- it scared the shit out of me"

- Uncle John was alcoholic - he + wife
always fighting - middle of night -

- JB didn't like him -

— JB after tried to stay away from
him — JB wld sleep w/ his grandma
or in a chair when he was over
there —

— "I didn't have a lot of respect for
grown ups"

— his mother old tell him not to disobey
grownups — then he pulls a stunt
like that —

— Randy + Joann had sex
his sisters

— Karen Walker — 2-3 yrs older than
JB, who was 13
— once or twice — Karen the aggressor

— JB was 15 — Renee was 27
— he was dishwasher at country club
— JB was ↔ Renee was cook —

— she was aggressor — she was crazy
— she wd cry, depressed —

— they had relationship for years —

— even when she was married —

— when he turned 16 she asked him to
marry her —

Patricia — older sister of Vivian
└ same age as Renée — 12 ys.
older than
him —
— he lived w/ Patricia +
her sister + Vivian (younger)

— Vivian got crush on him — Patricia
— didn't like that

— only had sex w/ Patricia once

## Phys. Abuse

Mother
- ext. cord — left welt over his legs + back —

- trouble @ school — smart remark — playing too loud — breaking something —

- She was taking her frustrations out on me

- she wld be out of control — JB wld hide under the bed + she wld lift it up to get at him —

- George — was crazy

- went fr. ext. cord to large utility cord.

- One day JB boat brake cable — 5 – 6 – 7 – ext. cord —

— graduated to utility cord by 4th grade

— One time — 4th grade or 5th — George
beat him for 15 mins.

— Kenneth Russell — Uncle —
— he beat his son badly
— he's the one who beat JB so bad
he couldn't get out of a bed — all
because JB wet the bed because
he was on penicillin for kidney
infection
       — JB was in 2nd grade —


— He still thinks abt. his uncle John
+ what he did —

— "I think abt everybody that hurt me"

— As an adult he told women that
he would not discipline the kids — didn't
trust himself —

— didn't want to take chance that
he'd lose control — frustration wld
come out —

DV

The violence always in their room —
she wld come out w/ busted lip
or — black eye —

— didn't hear it —

— His bio father also but JB was
too small —

— His half brother Ray (Ballentine)
would shoot JB w/ his BB gun —
→ bruises —

— I was a pissed off child from time I
was 12 yrs old — chip on my shoulder,
mad at the world — pushing people
away —

— Age 10 — drank beer — a little
weed —
— his bro. Freddy got into drugs
heavy but JB didn't.

Renee was like a mother
figure —

**BALENTINE TRAUMA**

*Family members mentioned:*
- Mother: Clara Smith
- Biological father: James Balentine
- Step-father: George Smith (Tyson)
- Paternal uncle: John Balentine
- Paternal grandmother: Rosa Craven
- Maternal great-grandmother: Albertha Rowe
- Maternal grandfather: Izell Rowe
- Maternal grandmother: Leopher Simmons
- Older sister: Doris Cash
- Older brother: Lynn Rowe
- Younger sister: Joann Balentine
- Younger brother: Freddy Balentine
- Younger half-brother: Eric Smith
- Younger half-brother: Patrick Smith
- Maternal aunt: Ora Lee Rowe
- Boyfriend of maternal aunt: Kenneth Russell

**MOTHER'S TRAUMA**
- Clara's mother (Leopher Simmons) died when she was 9 after a botched C-section
- Raped by her own father (Izell Rowe) throughout childhood, teenage years
  - Father coming home drunk, selecting her or one of her sisters, taking them to the nearby graveyard to rape them
  - Eventually, all became pregnant by him and the state took notice
  - Instead of foster care, Albertha Rowe steps in to care for the kids
  - Mom gives birth to Lynn Rowe (Δ's oldest brother) around age 14
  - Apparently all the first children of Clara and her sisters are products of incest
  - Albertha still allowed Izell to stay with them, and would continue to protect the girls from him with her meat cleaver
- Mom has a miscarriage between Δ's younger half-brothers, Eric and Patrick, and goes into a depression
- Mom has a very difficult birth with Patrick, her last child, goes into a coma
  - Apparently so distraught when she wakes up that he wasn't a girl that she left him at the hospital and sister Doris had to pick him up
- Mom described as blank, distracted
- Mom described as lazy—if not working, at home, in bed
- Mom had nervous ticks
  - Constantly rubbing her legs, lips (sometimes until they bled), rocking/keening
  - Strange mannerisms
  - Confused everyone's names
  - Hoarder



- o Bad handwriting
- Mom was gloomy, dark monotone, did not get excited much
- Mom drank
  - o In later years, beer all night after work

MOTHER'S SEXUALITY
- Leaves her family home to marry James Balentine out of necessity
- After James' death, Mom hits on George, marries him in less than a week
- Used her daughter Doris (Δ's sister) to initiate an affair with Doris' high school track coach, Herbert Lewis
  - o Coach Lewis' wife was one of Clara's best friends
  - o The children routinely saw Coach Lewis in their mother's bed or vice versa (Lewises lived nearby)
  - o Coach Lewis is likely half-brother Patrick's bio father
  - o Also possible another man (not George) was half-brother Eric's bio father
- Mom's boyfriend Roy King after James' death
  - o Δ would beat on the bedroom door
  - o He would beat Δ

DOMESTIC VIOLENCE
- Before he died, Δ's father James Balentine beat his mother
  - o Described repeatedly as a mean man
  - o Clara didn't know if he was about to hug her or beat her when he arrived home
  - o Was a notorious drunk; local bartender knew you had to let James pass out in the bar and wake up once he slept it off; if you woke him prematurely, he was in very bad shape, mean
- Step-father George and Δ's mom would fight, he would beat her
  - o Fights about lack of money and infidelity
  - o Both sides unfaithful
  - o One beating was so bad that mom fled with the children to Little Rock when Δ was young to seek safety at her sister's house
  - o The children saw her with busted lips and black eyes
  - o It was often kept in bedroom, until Δ started forcing his way in as he got older to protect his mom
- Δ's mom once shot out the back of George's car as he drove off with another woman

INCEST AND SEXUAL ASSAULT IN THE HOME
- Δ saw Lynn and Joann having sex in their shared bedroom, ages 10 and 6, respectively
  - o Remembers Lynn on top of her, her legs were in the air
  - o Δ didn't say anything
- Brother Lynn remembers George sneaking into their rooms late at night, flicking the lights on to see who was awake

- George began molesting sister Joann at age 5 until she pulled a knife on him to ward him off around age 13
  - Mom sent Joann to live with her paternal grandmother, Rosa Craven
- George tried to rape Doris in the kitchen her early teenage years, she stabbed him in the leg with a fork, escaped to neighbor's house, called the police, they only said one of them had to leave the house.
  - Mom decided George could stay, Doris could go to the grandmother's house. This caused a great rift between Doris and mom
- George later starts having sex with his step-son Lynn's girlfriend, Cheryl Stewart, when she is 18.
- George uses prostitutes.
- George tries to sexually assault Anita Robinson, a younger maternal cousin
- George has brother Fred drive him around to different young girls' homes so he can have sex with them

YOUNG EXPOSURE/TEENAGE YEARS
- Δ unsure when he lost virginity, maybe age 6 or 7
- Sex with girls Christy and DeDe and older neighbor Randy Warren, all trading off, age 11 or 12
- Brother Fred felt they started doing grown-up stuff at a young age
  - Described he and Δ having sex with a pair of sisters around age 12 or 13
  - Having a contest to see who could make more babies
- Δ began having sex with a much older woman, Renee Ford, when he was a teenager
- Great-grandmother Albertha Rowe would warn the kids to stop being "mannish," which meant sexual
- Age 15, Δ moved in with two prostitutes so that he could work at the country club and send money back to his mom

MOLESTATION OF JOHN, INDICATIONS
- At a young age, Δ was staying at his paternal grandmother's house (Rosa Craven)
  - Paternal uncle John (his father's twin brother) crawled into bed with him
  - Told Δ to pull down his shorts
  - Δ says he said no
  - It ended with grandmother's intervention
  - Δ always worked to not put himself in that position ever again
- Δ wet the bed throughout childhood, would rise early to try to clean the sheets and hide it
  - One time it happened at maternal aunt's house, and her boyfriend viciously beat Δ in front of everyone, Δ was unable to walk the beating was so bad
  - Brother Fred used to get angry at him when they shared a bed because he assumed Δ was just being too lazy to go to the bathroom
- Δ once kissed a blond girl who had a beard and it gave him a migraine
- Δ preemptively defensive about homosexual activity/rape in prison

NEIGHBORHOOD BULLIES
- Neighborhood kids made fun of Δ and his siblings for not having a father after his death
- Jerry and Ray Alcorn
  - Used to throw bricks at the Balentines' dogs
  - Picked on everyone
- Virgil Dicus
  - Few years older than Δ
  - One time made a tent, asked Δ inside, pulled down his pants, told Δ to suck him off
  - Δ says he said no
  - Gave you that creepy, eerie feeling
  - Had a brother a six sisters
  - Sometimes older teenagers would come while they were at the Dicus house, cut off all the lights, catch the little girls and rape them, Δ saw this
  - Virgil drowned a cat in the creek with his bare hands in front of them
  - Stomped turtles
  - Tried to drown brother Fred and called it a baptism
  - Virgil later murders two people, now serving LWOP
  - Δ was in prison with him at Cummins, Virgil caught raping other men numerous times, finally sent to Tucker Max

PHYSICAL ABUSE
- Standard beatings in the home
  - Mom, Albertha Rowe, step-father George Smith/Tyson, aunt's boyfriend Kenneth Russell, Roy King, schoolteachers
    - Δ felt anger towards Kenneth Russell for a long time
- George would beat them with belts, extension cords, and the branches from rose bushes
  - The orange extension cord hurt the worst, left fat whips across Δ's back

PRISON TRAUMA
- Δ goes into youth homes early on following arrests with his brother Fred
  - Alexander Youth Home
    - Age 10
    - Only black kid
    - Was wetting the bed there constantly
  - Magnus Youth Home or Orphanage
- Δ housed in Cummins as a teenager, mix of juvenile and adult population
- Several indications in records of head injuries and other violence against him that Δ attributes to accidents, i.e. "I fell out of my bunk"

OTHER TRAUMA

- Grew up in Robinson Addition, now defunct section of project housing in Newport, Arkansas
  - o Very violent and impoverished area
  - o House built on a smallpox graveyard, lumps in the ground
  - o Concerns about bad spirits and ghosts in the house throughout childhood
- Father's death at a young age, 1971
  - o Was drunk when he crashed the car, speeding around a bend, flipping it into ditch pipes
  - o Was possibly wanted for murder by authorities in another state at the time
  - o Was essentially decapitated as police/towing guy tried to extract him from car
  - o Mom was hospitalized for up to a year
    - ▪ Picking glass out of her head for years
- Rampant alcoholism on both sides of family tree
  - o Brother Fred, father James, paternal uncle John
  - o Maternal grandfather Izell Rowe drinking whiskey, falling into lit stovetop
  - o Maternal great grandfather Ray Rowe, described as a drunk and a depressive, also a white man who was completed outcasted for his involvement with a black woman (wife Albertha Rowe)
  - o Δ rarely drank, did not use drugs
- Mental health issues on both sides of family tree
  - o Depression, sometimes voices:  brother Fred
    - ▪ Funks since he was an adolescent, Devil trying to convince him to commit suicide
  - o Psychotic breaks, suicide attempts, and regular institutional commitments: maternal aunt Ora Lee
    - ▪ Stripping, running naked through the house, yelling that God is coming
  - o Brother Lynn described as in his own world, mentally challenged, delusional, inbred
  - o Brother Patrick suffers from depression, currently incarcerated for drug case
    - ▪ Has funks that last a few weeks at a time that he has to pull himself out of
  - o Δ described as having short temper, crazy sense of humor, laughing inappropriately at times
    - ▪ Began smoking cigarettes to help calm his nerves
- Lack of food in the house, mom buying commodity goods—government rice, cheese
- Mom working two jobs, never home, step-father George working, never home
- Children largely unsupervised
- Maternal great-uncle Freddy Rowe shot himself to death in his home with a shotgun, apparently upon learning he had colon cancer; also an alcoholic
  - o All maternal uncles were alcoholics
- Uncle Morris Woods would beat his wife, maternal aunt Mary Ann, she would escape to Δ's family home, Morris would come stalk the house, wait for Δ's mother to leave, sneak in through the windows, kidnap Mary Ann back

- As a young boy, Δ had to wrestle hogs to the ground for the Stewart family and help castrate them with a razor
  - But everyone remembers how much Δ loved animals, was always bringing home stray cats and dogs, bonding with hummingbirds
- Racial history in the family, open racism in the town
  - Schoolteachers favoring whites
  - KKK rallies
  - Clara and her sisters referred to as "high-yellow"
  - Δ's first girlfriend (white) later murdered while pregnant by her husband because he feared she had slept with a black man, cut the baby out of her
  - Bubba Parnell, principal of their school, on Δ talking to white girl: "She ain't your kind"

## HEAD INJURIES
- Bicycle accident, first grade, Δ's head hits the pavement, lost consciousness, big knot on right side of head, mom refuses to take him to doctor
- Δ runs into a truck side view mirror, splits lip wide open, requires stitches
- Lawnmower part hits Δ in center of forehead
- Bike accident with Joann, Δ's head hits the rocks
- Bike accident with sister Doris, Δ's head hits ground, she lands on top of him
- Arrest as a teenager, police pistol whip Δ in the head behind the Walmart, family later sees the blood on the pavement
- Headaches through life; sharp pains in the right side of his head, behind his right eye

## INTELLECTUAL DISABILITIES IN THE FAMILY
- Mother described as very slow, easily confused
- Joann, Δ, Lynn, Eric all have special education in school
  - Δ, Fred, and mom all have difficulty with speech
    - Fast-talking, inability to express all that Δ had going through his mind
- Doris and half-brother Patrick are only ones to graduate from Newport HS

## HEALTH ISSUES
- Δ urinating blood in the first grade, not knowing why
  - Believes he was given penicillin
- Δ eating sugar straight from the bag
- Everyone had high blood pressure, even as young children
- Sister Joann and broth Lynn both began receiving disability as children
- Brother Patrick describes incessant spider bites from brown recluses in the home, for which mom would refuse to take them to the doctor, scars still present
- All of the kids end up with kidney infections, taken to town doctor, Dr. Green
- Not many people making it past their 60s in the family, many deaths due to cancer and cirrhosis

# PRICE, PROCTOR & ASSOCIATES, LLP

**_A LIMITED LIABILITY PARTNERSHIP OF BOARD CERTIFIED FORENSIC PSYCHOLOGISTS_**

11882 Greenville Ave., Suite 107; Dallas, Texas 75243
Telephone: 972-644-3686•Facsimile: 972-644-3688

## Report of Review of Records and Analysis

| | |
|---|---|
| Name: | John Balentine |
| Date of Birth: | 1/30/69 |
| Date of Report: | 10/14/16 |
| Date of Offense: | 1/21/98 |
| Style of Case: | John Lezell Balentine vs. Lorie Davis, Director, TDCJ-ID |
| Cause No.: | 2:03-CV-00039-J-BB |
| Jurisdiction: | In the United States District Court for the Northern District of Texas Amarillo Division |
| Referring Attorneys: | Katherine Hayes |
| | Jay Clendenin |
| | Office of the Attorney General of the State of Texas |
| | Post Office Box 12548 |
| | Austin, Texas 7871-2548 |
| | TEL:   (512) 427-9057 |
| | (512) 463-1416 |

## Referral Information:

I was asked to review information pertinent to John Balentine by the Office of the Attorney General of the State of Texas. Mr. Balentine is currently pursuing habeas corpus appeals. I was contacted on 8/17/16 by Katherine Hayes of the Office of the Attorney General of the State of Texas (OAG). Ms. Hayes asked me to review and analyze records involving John Balentine, including reports of neuropsychological and psychological evaluations conducted with him, the underlying raw test data for these evaluations, as well as his medical, school, legal, criminal records, records from various sources listed below, as well as the declarations, affidavits, and interviews conducted with individuals related to or acquainted with Mr. Balentine. The primary purpose of this review and analysis was to determine if the opinions of the defense experts are supported by the data and information upon which they relied. I was asked to serve as a consultant to the OAG in interpreting the test results and opinions of these experts and likely testifying at the hearing in Amarillo to be held 10/25/16 to 10/27/16. I agreed to do so for my usual and customary hourly fee of $300 per hour. I charge the same hourly rate for any and all work including records review, report preparation, and court appearances.

EXHIBIT
RX-125

John Balentine

## Qualifications:

I have practiced clinical-forensic psychology and neuropsychology for 33 years. I began an independent practice in 1983 after having earned a B.S., M.S., and Ph.D. in psychology from the University of North Texas and completing a post-doctoral internship at the Baylor Institute of Rehabilitation in Dallas. I also completed a post-doctoral fellowship at the University of Kentucky in 1995 and a graduate certificate in veterinary forensic science in 2016 at the University of Florida. I am board certified in forensic psychology by the American Board of Professional Psychology and in neuropsychology by the American Board of Professional Neuropsychology. I am a Fellow of the National Academy of Neuropsychology. I am licensed to practice psychology in Texas, Oklahoma, and Arkansas. For more information concerning my qualifications, a copy of my basic curriculum vitae is attached to this report as Appendix A.

In addition to practicing psychology and neuropsychology, I was a college professor for 43 years. I currently hold academic positions as Professor Emeritus at Richland College and as Clinical Professor at The University of Texas Southwestern Medical Center in Dallas.

Since 1984, I have served as a consulting or testifying expert witness in more than 400 capital murder cases in 13 states and the District of Columbia. In Texas, I have been involved as a consulting or testifying expert witness in more than 30 counties including both Potter and Randall County. From 1997 to 2016, I have testified at the request of the defense (35%), the prosecution (58%), and by court appointment (7%). The most recent capital murder cases in which I have testified are: (1) The State of Texas vs. Eddie Ray Routh, Erath County, 2/20/15; (2) The State of Texas vs. Jeffrey Hansana, Tarrant County, 4/1/15; (3) The State of Texas vs. Gabriel Paul Hall, Brazos County, 10/5/15; (4) The State of Texas vs. Charles E. Brownlow, 5/18/16-5/19/16, Kaufman County. My current caseload includes 17 capital murder cases where I have been retained by the prosecution (53%), by the defense (41%), and by court-appointment (6%).

## Evaluation Procedures:

I formed my conclusions and opinions in this case based upon my training and experience in forensic-clinical psychology and neuropsychology, my review and analysis of the records provided to me, and a reasonable degree of scientific psychological and neuropsychological certainty. I did not conduct a direct face-to-face evaluation of Mr. Balentine, and as such, the subsequent opinions and conclusions are based solely on the aforementioned factors. I have the necessary information to support the conclusions and opinions expressed in this report. In this case, if I conducted a face-to-face evaluation of Mr. Balentine it is possible but unlikely that I would reach different conclusions and opinions, especially concerning neuropsychological issues, as the evaluation conducted by Dr. Martell was quite comprehensive and conducting a second neuropsychological evaluation so soon would be subject to practice effects. However, my methodology needs to be considered in the scope of the conclusions and opinions expressed in this matter. Finally, the opinions contained in this report need to be

2

John Balentine

considered preliminary as I will consider the testimony of the defense experts during the upcoming hearing.

**Records Provided for Review:**

 Direct Appeal Opinion, Court of Criminal Appeals of Texas, 4/3/02
 Forensic Neuropsychological Preliminary Report, Daniel Martell, 8/4/16
 Addendum by Daniel Martell, Ph.D., 8/24/16
 Raw Test Data from David Martell, Ph.D., 7/20/16, 7/21/16
 Interview Notes, Daniel Martell, Ph.D., 7/20/16
 Preliminary Report by David Lisak, Ph.D., 8/4/16
 Declaration by David Lisak, Ph.D., 8/18/16
 Interview Notes, David Lisak, Ph.D., 8/1/16
 Affidavit of Gilda Kessner, Psy.D., 8/14/04
 Interview Notes, Gilda Kessner, Psy.D., 9/18/03
 Interview Notes, Gilda Kessner, Psy.D., 7/12/04
 Raw test data from Gilda Kessner, Psy.D., 9/18/03, 7/12/03
 Jane McHan Affidavit, 11/21/03
 Jane McHan Telephone Interviews
 Typed report - McHan's Interview with Balentine, 3/17/04
 Jane McHan, Affidavit, 8/6/04
 Jane McHan, Social History Timeline, 8/6/04
 Document Entitled "Balentine Trauma", Undated
 School Records, Newport Special School District
 Employment Records, Love's Country Store, 1997
 Employment Records, Curtner Lumber, 1989-1999
 Interview Notes, Kathy Garrison, 3/25/99
 Interview Notes, Kathy Garrison, 3/28/99
 Interview Form for Clients in Criminal Cases
 Potter Co. Mental Health Intake Screening, 7/31/98
 Interview Form for Clients in Criminal Cases, 8/8/98
 Balentine's Criminal History Records
 Balentine's Interview for Burglary & Theft of Property, 4/29/82
 Balentine's Interview for Burglary & Theft of Property, 7/19/83
 Balentine's Interview for Attempted Theft, 12/20/86
 Arkansas Dept. of Corrections - MMPI Report, 6/19/87
 Balentine's Interview for Carnal Abuse, 10/15/96
 Balentine's Confession for Capital Offense, 7/25/98
 Excerpts from letters written by Balentine to April Ryan
 State's Amended Notice of Prior Criminal Conduct, 3/15/99
 Balentine's Testimony, 2/23/99
 April Ryan - Police Statement, 1/22/98
 April Ryan - 2nd Police Statement, 1/23/98
 Angelique Allen - Police Statement, 1/26/98
 Eric Smith - Police Statement, 1/28/98
 Eric Smith - 2nd Police Statement, 9/2/98
 Tarence Gardner – Interview, 3/21/99
 April Ryan – Interview, 3/22/99
 Angelique Allen – Interview, 3/23/99
 Clara Smith – Interview, 4/5/99

3

John Balentine

C.L. Bordon – Interview, 4/6/99
Angelina Watson – Interview, 10/27/03
Clara Smith – Interview, 10/27/03
Lynn Rowe – Interview, 10/27/03
Eric Smith – Interview, 11/6/03
Eric Smith – Interview, 11/17/03
Angelique Allen – Interview, 11/20/03
Eric Smith – Interview, 11/20/03
Angelina Watson – Interview, 12/15/03
Charles Vaughn – Interview, 6/10/04
Ora Lee Williams – Affidavit, 7/9/09
Patrick Smith – Interview, 7/23/04
Clara Smith – Interview, 7/24/04
Ora Lee Williams – Interview, 7/25/04
Bessie Jackson – Interview, 7/25/04
Helen Lewis – Interview, 7/25/04
Clara Smith – Interview, 7/26/04
Becky Templeton – Interview, 7/27/04
Clara Smith – Interview, 7/30/04
Angelina Watson – Affidavit, 7/30/04
Charles Vaughn – Affidavit, 8/4/04
Helen Lewis – Affidavit, 8/5/04
Becky Templeton – Affidavit, 8/10/04
Clara Smith – Affidavit, 8/10/04
Patrick Smith – Affidavit, 8/10/04
Angelique Allen – Affidavit, 8/11/04 –
Virgil Dicus, Jr. – Affidavit, 7/21/16
Doris Balentine Cash – Declaration, 8/10/04
Bessie Jackson – Declaration, 8/16/16
Lynn Rowe – Declaration, 8/17/04
Eric Smith – Declaration, 8/23/16
Jim Hammons – Declaration, 8/23/16

## Review of Records:

Dr. Martell performed a neuropsychological examination of Mr. Balentine pursuant to his habeas corpus appeals on 7/20/16 and 7/21/16 at the request of the Federal Community Defender's Office. As stated in his preliminary report, it appears that Dr. Martell reviewed the School records from Newport Special School District and the Direct Appeal Opinion from the Court of Criminal Appeals of Texas. Dr. Martell's conclusions based on his evaluation were summarized as noting that:

(1) Mr. Balentine is the product of an impoverished and abusive rural upbringing that placed him at significant risk for neurodevelopmental and behavioral abnormalities.
(2) Those abnormalities are borne out from a very early age in evidence of developmental delays in speech and language acquisition, learning disabilities, speech pathology, poor school achievement, and nocturnal enuresis into early adolescence.

4

(3) On top of these fundamental neurodevelopmental delays, Mr. Balentine suffered multiple concussions with loss of consciousness (an indicator of traumatic brain injury) at ages 3, 4, 6, 14, and into adulthood that served further to undermine his developmental trajectory and brain functioning. The scientific literature has shown that repeated head injuries of this kind, particularly at such a young age, are extremely detrimental to brain development and skill acquisition.

(4) Although he has maintained intact functioning in several areas, he exhibits multiple neurocognitive deficits indicative of brain damage or dysfunction, including weaknesses and impairments in the areas of: Expressive Language (impaired speech, paraphasias, neologisms, and word finding deficits), Verbal Comprehension, Auditory Attention and Concentration, Memory (working memory, auditory and verbal memory, delayed memory, and confabulation), Dyslexia, Global Learning Disabilities, Frontal Lobe Executive Functions (perseveration, adapting to changing problem situations, self-monitoring, and learning from feedback).

Dr. Martell subsequently provided an addendum to his report on 8/24/16 in which he offered the opinion Mr. Balentine was suffering from brain damage at the time of the offense in 1998 brought about by his impoverished rural upbringing and history of concussions. Dr. Martell further extrapolated that Mr. Balentine's early life learning and behavioral difficulties (as evidenced by speech delay, learning disabilities, low academic achievement, and nocturnal enuresis) clearly indicate that brain damage predated 1998 and therefore was present at the time of the offense. Dr. Martell also cites research publications exploring the relationship between developmental trajectory and childhood poverty as well as following concussive events during childhood. However, several issues exist regarding the conclusions Dr. Martell has made based on the information available for this case.

➤ Dr. Martell drew his conclusion regarding brain dysfunction or damage at the time of the offense in part from neuropsychological test scores observed from the 7/20/16 and 7/21/16 evaluation, but other explanations for the few mild to moderately impaired scores were not fully addressed, including aspects of the testing environment, intervening events since the offense, and normal testing variability. With regard to testing conditions, the behavioral observations from Dr. Martell's report indicate that Mr. Balentine was "consistently distracted" by stimuli external to the testing environment during the evaluation, including passing foot traffic, and that Mr. Balentine often called out to a nearby correctional officer. It is possible that such distractions compromised his ability to attend to task demands at times, adversely impacting his performance on measures that require attention (Digit Span) or encoding of new information (WMS-IV Logical Memory I and CVLT-II).

➤ With regard to Mr. Balentine's cognitive development, Dr. Martell cites several articles and a book from the extensive literature linking early environmental factors with developmental and academic difficulties, many of which were experienced by Mr. Balentine. He also references Mr. Balentine's school records as evidence of such difficulties, noting that his IQ was estimated at 71 on the Otis Quick Score Test. This is in the borderline range, and significantly lower than his Full Scale IQ of 98 obtained during a neuropsychological evaluation by Dr. Gilda Kessner in 2003 as well as his Full Scale IQ of 91 obtained during Dr. Martell's

2016 evaluation, both of which fell in the average range. The estimate of Mr. Balentine's IQ of 71 is an underrepresentation of his actual overall ability level, given consistent evidence of normal intellectual functioning as an adult, and is not likely to be related to neurological dysfunction present during childhood.

➤ The available records do provide evidence of learning difficulties and a history of special education programing and poor grades, as well as possible disruptions in his education due to school transfers, excessive absences, lack of interest in school, and use of alcohol and drugs at an early age. Dr. Martell asserted that Mr. Balentine's academic difficulties are the result of brain dysfunction or damage. Dr. Martell further asserts that this brain dysfunction or damage was caused about by Mr. Balentine's early rural, impoverished, and abusive social environment. This assertion is problematic and the underlying notion that impoverished environments cause brain dysfunction damage is controversial. Research in this area has primarily utilized two methods, one involving an experimental research design using laboratory rats as subjects while the other involves a correlational research design with human subjects. The research using laboratory rats has assessed cortical volume differences between those raised in enriched environments relative to those raised in impoverished conditions (lacking stimuli) as well as a stress-based model of removing newborn rats from their mothers (comparing them to newborn rats that were not removed). While these studies have shown differences in relevant cortical areas, notably the hippocampus and temporal lobes (which are linked to memory abilities), it is unclear how closely these conditions mimic the complexity of low socioeconomic status among humans in modern society or those experienced by Mr. Balentine. Furthermore, brains from rats are not equivalent to the brains of humans, which are obviously much larger, but also differ with respect to the ratios of certain brain areas to total brain volume, particularly the frontal cortex. The frontal cortex is much larger relative to other brain regions in humans in comparison to rats and is widely believed to underlie complex, goal-directed behavior, limiting the generalizability of such animal research to humans. The other typical approach, as noted above, is to examine the correlation between childhood poverty and cognition in human participants (comparing cognitive outcomes of individuals reared in lower socioeconomic positions to those from more advantaged backgrounds), without experimental control over group membership. Such research has found that groups of individuals from lower socioeconomic status tend to have lower neurocognitive test performance means and lower average cortical volumes in areas of interest on neuroimaging than control subjects and are at risk for developmental delays and a host of other behavioral and psychiatric difficulties as well as neurologic diagnoses. While operationalizing a construct as complicated as socioeconomic status for this type of research is challenging, application to the case of Mr. Balentine has additional limitations. For example, the findings are based on group differences rather than at the individual level, limiting utility in individual cases. While the average cortical volume of those raised in low SES conditions is 8% smaller than controls, this does not mean that Mr. Balentine's brain volume is 8% smaller than controls or that his brain volume is 8% smaller than if he had a more advantaged upbringing. This research is also correlational in nature, such that statements regarding causality cannot be evaluated, and it cannot definitively support a causal relationship between Mr. Balentine's experience of poverty during childhood and

his academic performance and history of learning difficulties. Also, whether or not Mr. Balentine's childhood environment was as impoverished as defense experts have characterized may not be the case.

➢ Another point regarding Dr. Martell's assertion that Mr. Balentine has brain dysfunction or damage from an impoverished childhood environment as is that such a notion taken to the extreme would suggest that any environment that is suboptimal for neurological development could be considered to result in brain dysfunction or damage. Equating poverty with brain dysfunction or damage would also define a substantial portion of the population as having brain dysfunction or damage as the poverty rate for those under the age of 18 is 19.7% or 14.5 million children (2015 United States Census). This notion also ignores the numerous other potential confounding variables, many of which are highly correlated with both socioeconomic status and cognitive functioning (e.g. quality of education, educational attainment, cultural factors, and test bias). Those variables are widely recognized to contribute to the discrepancies between socioeconomic groupings of individuals on neuropsychological testing. While Mr. Balentine's childhood upbringing occurred in the context of poverty, and research has linked poverty with increased risk of learning disabilities and poor academic achievement, there are many causes of early life learning disabilities. It is erroneous to attribute all such challenges to socioeconomic factors or wholly attribute suppressed performance among individuals with impoverished backgrounds to brain damage.

➢ In my opinion, Dr. Martell tends to over-interpret the results of his evaluation of Mr. Balentine in three ways. I have no quarrel with Dr. Martell's selection, administration, or scoring of the neuropsychological test battery given to Mr. Balentine. First, while many different systems for describing the levels of performance of neuropsychological test results exist, Dr. Martell appears to not adhere to descriptors typically used in the field of neuropsychology (see Appendix B). For example, he used the descriptor "impaired" for the result of the WMS-IV Delayed Memory Index score when the Wechsler system indicates the descriptor of "low average" should be used. Similarly, he used the descriptor "impaired" for the result of the WMS-IV Auditory Memory Index score when the Wechsler system indicates the descriptor of "borderline" should be used. Dr. Martell uses the descriptor of "impaired" for two of the CVLT-II scores that fall at the 16th %tile, which is technically "low average". Second, Dr. Martell used the descriptor "below expectation" for the results of the WRAT-4 subtests based on grade levels, which is statistically problematic and misleading, especially with adults. Third, Dr. Martell tends to rely too heavily on the few below average test results obtained with Mr. Balentine to opine that he has brain damage or dysfunction. The battery of tests given to Mr. Balentine consisted of 22 neuropsychological tests yielding 76 measures or scores. An analysis of the results of this comprehensive battery of tests indicates that approximately 75% of the test measures or scores fall within the average range, 2% of the test measures are borderline, and 22% are below average or abnormal. (See Appendices C and D) Research in neuropsychological assessment indicates that normal, non-neurologically impaired individuals often score below average on several test measures or scores, especially with a large battery of tests and test measures. In a thorough review of the scientific literature, Binder, Iverson, and Brooks (2009) stated that using a cutoff score more than one standard deviation

below the mean, in one study with 40 measures, only 10% of the sample had zero low scores and 12% of the sample had more than 11 low scores. In a seminal study of "abnormal is normal" regarding neuropsychological testing, Dodrill (1997) studied the relationship of the percentage of below average or abnormal scores with normal subjects with IQ levels. For individuals such as Mr. Balentine with FSIQs of 90, scored in the abnormal range on up to approximately 30% of a large battery of neuropsychological tests. Mr. Balentine earned a WAIS-IV FSIQ of 91, and he scored in the low average or abnormal range on 22% of the tests (see Appendices C and D) This is normal variability, indicating that all of us have strengths and weaknesses regarding neurocognitive functioning.

➢ My interpretation of the results of the neuropsychological test battery is that Mr. Balentine's profile of scores does not indicate brain damage or dysfunction other than being consistent with his long-standing learning differences (or disorder) and lack of having profited from school experiences. Mr. Balentine has a relative weakness in verbal compared to his non-verbal abilities (WAIS-IV VCI vs. WAIS-IV PRI). In other words, he is significantly better at dealing with visual-motor tasks than he is at using language and solving problems involving words. His upper extremity motor abilities are also average to high average (Finger Tapping; Grooved Pegboard). These facts are consistent with several people who knew him well describing him as being an excellent mechanic and handyman who, according to C.L. Borden, "could fix anything....cars, radios, VCRs, and about anything else". Dr. Balentine also has relative weaknesses in auditory attention and memory (WMS-IV Auditory Memory; CVLT; WAIS-IV Digit Span Subtest; Seashore Rhythm Test; Speech Sounds Perception Test). His visual attention and memory is a relative strength (WMS-IV Visual Memory) as is his visual problem solving (Trail Making Test; Hooper Visual Organization Test). Mr. Balentine's academic abilities involving reading are relative weakness (WRAT-4 Reading Composite), while his arithmetic and spelling are not as weak (WRAT-4 Math Computation and Spelling; WAIS-IV Arithmetic Subtest). Mr. Balentine's expressive language abilities are mixed with verbal fluency being average and confrontational naming being either average or impaired, depending on which set of norms is used (Boston Naming Test). In my opinion, the errors he made on the Boston Naming Test appear to be related to his lack of environmental opportunities and experience. For example, when shown a line drawing of the following objects, he was unable to accurately name: (1) harp; (2) stethoscope; (3) asparagus; (4) compass (for drawing circles); (5) tripod; (6) scroll; (7) tongs; (8) sphinx; (9) trellis; (10) palette; (11) abacus. Dr. Martell noted some expressive language difficulties during his evaluation of Mr. Balentine. I listened to Mr. Balentine's statement to the police when arrested in 1998, and his speech was normal for rate, volume, and prosody (rhythm). A regional accent was present (flow for floor; doe for door; fo for four; diller for dealer). He did use the wrong word at one point when he used "claim" for "blame". I view these expressive language differences as idiosyncratic and relatively common for certain regions in the southern United States. Importantly, Mr. Balentine's performance was mixed on tests involving executive function. As Dr. Martell noted, Mr. Balentine did poorly on the Wisconsin Card Sorting Test, but he scored in the average range on the Booklet Category Test—both of which require resisting perseveration, adapting to changing problem situations, self-monitoring,

John Balentine

and learning from feedback. Also, Mr. Balentine scored in the average to high
average range on the Trail Making Test and the Stroop Test—both of which
measure aspects of executive functioning. In summary, Mr. Balentine's
performance on neuropsychological testing does not indicate brain damage or
dysfunction regardless of any possible etiologies.

➢ Mr. Balentine also underwent a psychological assessment in 2003 by Gilda
Kessner, Psy.D. that included the WAIS-III, MMSE, PAI, RIAS and WRAT-3.
Results from this evaluation included a Verbal IQ (VIQ) of 96, Performance IQ
(PIQ) of 100, and a Full Scale IQ of 98 obtained from the WAIS-III. (See
Appendix B.) While this was an earlier version of the intelligence assessment
administered by Dr. Martell (WAIS-IV), portions of the testing have remained
similar, including Digit Span as a measure of auditory working memory. On the
testing conducted in 2003 Mr. Balentine demonstrated low average performance
on the Digit Span subtest from the WAIS-III, which was significantly higher than
his score on the Digit Span subtest from the WAIS-IV from 7/2016, which was
mildly impaired and described as his "greatest weakness" by Dr. Martell. This
suggests that Mr. Balentine's performance has declined in the area of auditory
working memory from previously normal levels in 2003 (well after the time of the
offense in 1998), to the impaired range in 2016. This calls into question Dr.
Martell's assertion that the mildly impaired scores from 7/2016 are attributable to
neurodevelopmental factors and concussions sustained prior to the 2003 testing
as well as his reasoning that the 7/2016 results are representative of his
functioning in 1998. Furthermore, Dr. Martell comments in his report that Mr.
Balentine's verbal reasoning skills were significantly lower than his nonverbal
reasoning abilities based on a discrepancy between his VCI and PRI. While the
WAIS-III does not produce these same indices, it does provide a VIQ and PIQ as
noted above, which were quite similar, again suggesting that the 2016 testing
may not be reflective of Mr. Balentine's abilities in 2003 (or at the time of the
offense).

➢ With regard to his history of concussions, there are aspects of Mr. Balentine's
retrospective self-report that are inconsistent with the typical symptom
presentation following a closed head injury. These include anterograde amnesia
followed by periods of paralysis as well as his report of experiencing amnesia
around age 4 and a momentary loss of consciousness at age 3 (which is around
the expected time of dissipation of infantile amnesia). The lack of documentation
pertaining to these events certainly calls into question the severity of these
potential injuries, as retrospective self-report of details surrounding a concussive
event is a notoriously poor determinant of injury severity, particularly in the
context of litigation. Furthermore, a fairly significant event reportedly occurred in
2007 during his incarceration when he hit his head on the bars of his cell and
woke up the next morning unable to walk. It seems incongruent to argue that
concussions have a cumulative and adverse effect on cognition, as Dr. Martell
does, yet fail to address the impact this most recent concussion might have on
his current cognitive functioning. Furthermore, Mr. Balentine reported striking his
head while in prison and awaking the next morning with an inability to move,
which is quite atypical for such an injury.

➢ In addition to the lack of medical documentation of any of the alleged head
injuries, other factors comprised the credibility of some of the allegations of head
injuries. Mr. Balentine's self-report related to head injuries appears to have

9

differed significantly over the years resulting in a range of reports as to the number and characteristics of the injuries. A sample of these reports follows: (1) Based on Mr. Balentine's self-report to Dr. Martell, he has a history of experiencing 8 head injuries, none of which are documented by medical records. (2) Mr. Balentine apparently reported to Dr. Kessner that he had 5 head injuries, all of which resulted in the inability to move the next morning, but Dr. Kessner did not mention any head injuries as potential mitigating factors in her affidavit of 8/14/04. (3) Jane McHan's social history submitted on 8/6/04 indicated that John Balentine had a head injury from a bicycle accident after which he was reportedly unconscious "all day, from 7am to midnight" when he when he was in the 1st grade. He also experienced a head injury involving a rock flying out of a lawnmower and hitting him in the head resulting in a loss of consciousness. (4) In 1987 in the Arkansas Department of Corrections, he was seen in the infirmary after being pushed down on a bunk and cut, after falling down the stairs, and after slipping in the shower. He was seen on 9/25/90 after being hit in the head with a hoe. (5) On the "Interview Form for Clients in Criminal Cases", Mr. Balentine was noted to have had one head injury at age 7 after which he was unconscious for three days. (6) On the document titled "Balentine Trauma", it is noted that Mr. Balentine had 5 head injuries—the bicycle accident in the 1st grade, the lawnmower injury, a bike accident Joann, a bike accident with his sister Doris, and being pistol whipped by the police behind the Wal-Mart. (7) In Clara Smith's affidavit of 8/10/04, she reported the bicycle accident when he was 6 years old which resulted him being unconscious all day. (8) Eric Ontario Smith reported the lawnmower accident, the police beating behind the Wal-Mart, and a 1997 car accident.

> Determining if a family lived in poverty is difficult in the best of circumstances but to do so in hindsight without a clear definition of poverty and without reliable information is even more problematic. A review of the interviews, declarations, and affidavits of people who knew John Balentine revealed mixed information. Some of the people that knew the family well and his family revealed that many individuals did not mention whether or not they perceived poverty to characterize John Balentine's family situation. During interviews, the people who did not mention the family's socioeconomic status include: (1) Angelina Carol Watson; (2) Clara Smith; (3) Lynne Rowe; and, (4) Eric Ontario Smith. Angelina Carol Watson did not mention it during her first interview, but during the follow-up, she said that the family did not have a lot of money but they were doing okay, that the house was not in disrepair, and that they seemed to have food and necessities. Eric Ontario Smith did not mention it during his first interviews, but he did in a later affidavit. Others did not mention John Balentine's family as being poor but that they lived in a poor neighborhood. These individuals include: Charles Vaughn and Patrick Smith. Virgil Dicus, Jr. reported that John Balentine's house was rat and roach invested and they never had food to eat. Doris Cash stated that John's family did not have enough to get by and lived in a rough neighborhood. On the other hand, the records contain a statement by Bessie Jackson relating that Mr. Balentine's family bought a new house. Another individual reported that Mr. Balentine's mother did not have to work when she was married implying that her husband could take care of the family financially.

Dr. David Lisak reviewed "a number of life history documents" provided to him by Mr. Balentine's attorneys and conducted a face-to-face evaluation of Mr. Balentine on 8/1/16. In his preliminary report of 8/4/16 and his declaration of 8/18/16, Dr. Lisak detailed the physical, psychological, and sexual abuse allegedly experienced by Mr. Balentine throughout his childhood. Dr. Lisak concluded the following:

> 1. John Balentine suffered severe physical and sexual abuse throughout his childhood, a combination of traumas that produced lifelong legacies. Like all children who such abuse, Mr. Balentine internalized it. That is, like all children, the abuse became a core of his identify. He came to see himself as worthless, as a child who is as intrinsically bad as he is being treated. Both the physical and sexual abuse he suffered scarred him with the lesson that he and his body were meant for the gratification of adults.

> 2. The abuse and objectification also fueled in Mr. Balentine a longstanding anger. However, because he was abused by his parents and other adults whom he trusted and needed, his anger could never be expressed toward those who harmed him.

> 3. These lifelong legacies of the childhood traumas he suffered would have been current at the time of the offenses.

Based on Dr. Lisak's preliminary report and his declaration, the following points are offered:

> ➢ I cannot determine from the records to what extent Dr. Lisak relied on the self-report of Mr. Balentine. In a forensic evaluation, over-reliance on self-report erodes the validity of the conclusions. This is a factor that will likely be made clear with the testimony of Dr. Lisak. The retrospective aspect of the self-report of a relatively older adult should also be kept in mind when investigating physical and sexual abuse in childhood.
> ➢ Dr. Lisak appears to speak of the reaction of *all* children to abuse, which may ignore individualistic responses to childhood events.
> ➢ An examination of current psychometric data with validity scales is the most objective information contained in the records related to Mr. Balentine's current psychological functioning. Dr. Martell administered the Personality Assessment Inventory (PAI) to Mr. Balentine on 7/21/16.
> ➢ The results of the actuarial interpretation of the validity scales of Mr. Balentine's PAI suggest that Mr. Balentine responded to the PAI in a "reasonably forthright manner and did not attempt to present an unrealistic or inaccurate impression that was either more negative or more positive than the clinical picture would warrant". The results of the actuarial interpretation of the clinical scale profile of

Mr. Balentine's PAI revealed "no marked elevations that should be considered to indicate the presence of clinical psychopathology." The results do suggest that Mr. Balentine feels he is being treated unfairly and not in his best interests. He responded to the items of the PAI indicated relatively mild depressive symptoms. He is likely withdrawn and aloof. He reports a history of intense and volatile relationships where he perceives he was abandoned or rejected by others. He is very concerned about his physical functioning and his health in that he endorses . numerous and vague physical complaints. He tends to view relationships as a means to an end. He appears to feel like he is under a great deal of current stress in his life. The PAI actuarial interpretation suggests a possible diagnosis of an adjustment disorder and is inconsistent with significant long-term effects of severe traumatic stressors earlier in life.

### Conclusions and Opinions:

The conclusions and opinions below are based on my review and analysis of the records made available at this time, my training and experience in clinical-forensic psychology and neuropsychology, and a reasonable degree of scientific neuropsychological certainty. Should further materials or information bearing on these issues become available in this case, I reserve the right to augment, supplement, and/or amend this report to the extent that these materials provide useful information. The conclusions and opinions below are limited to my review and analysis of these records, as I did not conduct a personal, face-to-face psychological or neuropsychological evaluation of the plaintiff in this case. If asked to conduct such an evaluation, the following conclusions and opinions could be subject to change.

1. The neuropsychological test results from Dr. Martell's evaluation in 2016 is inconsistent with "multiple neurocognitive deficits indicative of brain damage or dysfunction" including frontal lobe or executive functioning. Overall, his neuropsychological profile is within the low average to average range, especially for an individual with a history of learning differences and poor academic achievement. In my opinion, Dr. Martell over-interprets the scores and considers a few low scores adequate evident of brain damage or dysfunction when there are many more scores in the average range, even on tests that measure the same function, such as with executive functioning. Furthermore, the evidence is mixed as to whether or not Mr. Balentine grew up in an impoverished environment. Even if he did, the research basis related to brain dysfunction or damage being caused by growing up in an impoverished environment is controversial. The studies are either laboratory studies with rats or correlational studies with humans. On the other hand, the research that multiple concussions can lead to serious brain dysfunction or damage is increasingly clear. However, the number and extent of head traumas that Mr. Balentine experienced is unclear and based either on his self-report or the report of various people who knew him during his life. These reports are inconsistent over time and with each other. Furthermore, none of these allegations are medically documented and possibly exaggerated. Several reports indicate that after hitting his head, Mr. Balentine was unconscious for several hours, ranging from several hours up to 18 hours. Head injuries resulting in periods of unconsciousness for such long periods of time are more often severe or profound and result in neurocognitive and behavioral problems that typically preclude normal daily functioning, which has not been the case with Mr. Balentine. Even the descriptions of the criminal activity for which Mr.

John Balentine

Balentine has been convicted have included planning and problem solving inconsistent with frontal lobe damage.

2. Based on the information contained in the records, the extent to which Mr. Balentine suffered severe physical and sexual abuse throughout his childhood is unclear. His psychological condition and status at earlier times in his life does not appear to have been characterized by serious emotional or behavioral dysfunction other than the emotion of anger and his criminal conduct. Current standardized testing on the Personality Assessment Inventory (PAI) "reveals no marked elevations that should be considered to indicate the presence of clinical psychopathology." The results do indicate "current stressors or complicated life circumstances." This is not surprising considering he has been convicted of capital murder, given the death sentence, and has resided on death row for more than 15 years. The PAI results suggest diagnosis of Adjustment Disorder, which is characterized by depression, anxiety, and/or behaviors related to current stressors. The PAI also suggests a possible Somatization Disorder, which is characterized by the endorsement of multiple physical symptoms and/or pain. These diagnoses do not indicate the serious long-term consequences of severe physical and sexual abuse.

Please note that this evaluator reserves the right to make adjustments or changes to the above diagnoses and opinions if new information becomes available that warrants such changes.

Sincerely,

J. Randall Price, Ph.D.
Licensed Psychologist
States of Texas, Oklahoma, and Arkansas

13

# APPENDIX A

## BRIEF CURRICULUM VITAE
### J. Randall Price, Ph.D., ABPP, FACPN
#### Price, Proctor & Associates, LLP

11882 Greenville Ave.
Suite 107
Dallas, Texas 75243

Tel: (972) 644-8686
Fax: (972) 644-8688
rprice@priceproctor.com

### CREDENTIALS

| |
|---|
| Licensed Psychologist, State of Texas, #22571 |
| Licensed Psychologist, State of Oklahoma, #940 |
| Licensed Psychologist, State of Arkansas, #13-12 |
| Licensed Sex Offender Treatment Provider, State of Texas, #99277 |
| Board Certified in Forensic Psychology, American Board of Professional Psychology, #5664 |
| Board Certified in Neuropsychology, American Board of Professional Neuropsychology, #217 |
| Fellow, American Academy of Forensic Psychology |
| Fellow, American College of Professional Neuropsychology |
| Fellow, National Academy of Neuropsychology |

### EDUCATION

| Degree | Year | Field |
|---|---|---|
| B.S. | 1970 | Psychology, University of North Texas, Denton, Texas |
| M.S. | 1971 | General-Experimental Psychology, University of North Texas, Denton, Texas |
| Ph.D. | 1982 | Psychology, University of North Texas, Denton, Texas |
| Internship | 1983 | Clinical Psychology/Neuropsychology, Baylor Institute of Rehabilitation, Baylor University Medical Center, Dallas, Texas |
| Postdoctoral Fellowship | 1995 | Applications of Technology in Special Education and Related Fields, University of Kentucky, Lexington, Kentucky |
| Certificate | 2016 | Veterinary Forensic Science, University of Florida, Gainesville, Florida |

### CURRENT CLINICAL POSITIONS

| | |
|---|---|
| 1983-Present | Clinical & Forensic Psychologist/Neuropsychologist, Price, Proctor & Associates, LLP, Dallas, Texas |

### CURRENT ACADEMIC APPOINTMENTS

| | |
|---|---|
| 1975-2015 | Professor Emeritus of Psychology, Richland College, Dallas, Texas (Retired on August 15, 2015) |
| 1997-Present | Clinical Professor, The University of Texas Southwestern Medical Center, Department of Psychiatry, Dallas, Texas |

### PROFESSIONAL AFFILIATIONS

| |
|---|
| American Academy of Forensic Psychology |
| American Board of Forensic Psychology |
| American Board of Professional Psychology |
| American Psychological Association |
| American Psychology – Law Society |
| National Academy of Neuropsychology |
| Texas Psychological Association |

*A comprehensive curriculum vitae is available upon request*

**Appendix B**
**Comparison of Test Data**
**Dr. Keesner (1998) vs. Dr. Martell (2016)[1]**

| WAIS-III | Index/Scaled Score | WAIS-IV | Index/Scaled Score |
|---|---|---|---|
| Verbal | 96 | Verbal Comprehension | 87 |
| Performance | 100 | Perceptual Reasoning | 102 |
| Full Scale | 98 | Working Memory | 83 |
| | | Processing Speed | 97 |
| | | Full Scale | 91 |
| | | General Ability | 94 |
| | | | |
| RIAS | Index Score | | |
| Verbal | 91 | | |
| Non-Verbal | 112 | | |
| Composite | 103 | | |
| | | | |
| Subtests | Scaled Score | Subtests | Scaled Score |
| Picture Completion | 11 | | |
| Vocabulary | 9 | Vocabulary | 7 |
| Coding | 7 | Coding | 8 |
| Similarities | 9 | Similarities | 8 |
| Block Design | 9 | Block Design | 10 |
| Arithmetic | 11 | Arithmetic | 9 |
| Matrix Reasoning | 13 | Matrix Reasoning | 10 |
| Digit Span | 8 | Digit Span | 5 |
| Information | 8 | Information | 8 |
| Picture Arrangement | 11 | | |
| Comprehension | 12 | | |
| Symbol Search | 10 | Symbol Search | 11 |
| | | Visual Puzzles | 11 |

---

[1] Note that the WAIS-III is not *directly* comparable with the WAIS-IV.

**Appendix C**

**Comparison Chart of Scores for John Balentine from evaluation with Dr. Martell (2016):**

**Demographics:** African-American Male, Age: 47-5; Educ: 10th

**Heaton Norms for this demographic group were used. Descriptors in italics are from Dr. Martell.**

| Test | Provided Score | Provided Descriptor | Heaton Score[1] | Heaton or Wechsler Descriptor |
|---|---|---|---|---|
| WAIS-IV VCI | 87 (19th %tile) | Low Average | N/A | Low Average |
| WAIS-IV PRI | 102 (55th %tile) | Average | N/A | Average |
| WAIS-IV WMI | 83 (13th %tile) | Low Average | N/A | Low Average |
| WAIS-IV PSI | 97 (42nd %tile) | Average | N/A | Average |
| WAIS-IV FSIQ | 91 (27th %tile) | Average | N/A | Average |
| WAIS-IV GAI | 94 (34th %tile) | Average | N/A | Average |
| WAIS-IV Similarities | 8 (25th %tile) | *None* | N/A | Average |
| WAIS-IV Vocabulary | 7 (25th %tile) | *None* | N/A | Average |
| WAIS-IV Information | 8 (25th %tile) | *None* | N/A | Average |
| WAIS-IV Block Design | 10 (50th %tile) | *None* | N/A | Average |
| WAIS-IV Matrix Reasoning | 10 (50th %tile) | *None* | N/A | Average |
| WAIS-IV Visual Puzzles | 11 (63rd %tile) | *None* | N/A | Average |
| WAIS-IV Digit Span | 5 (5th %tile) | *Impaired* | N/A | Below Average |
| WAIS-IV Arithmetic | 9 (37th %tile) | *None* | N/A | Average |
| WAIS-IV Symbol Search | 11 (63rd %tile) | *None* | N/A | Average |
| WAIS-IV Coding | 8 (25th %tile) | *None* | N/A | Average |
| WMS-IV Immediate Memory | 91 (27th %tile) | Average | N/A | Average |
| WMS-IV Delayed Memory | 85 (16th %tile) | Low Average *Impaired* | N/A | Low Average |
| WMS-IV Auditory Memory | 78 (7th %tile) | Borderline *Impaired* | N/A | Borderline |

[1] Heaton, R. K., Miller, S. W., Taylor, M. J., & Grant, I. (2004). Revised comprehensive norms for an expanded Halstead-Reitan Battery: Demographically adjusted norms for African American and Caucasian adults. *Psychological Assessment Resources, Lutz, Fla, USA.*

| WMS-IV Visual Mem | 102 (55ᵗʰ %tile) | Average | N/A | Average |
|---|---|---|---|---|
| WMS-IV Logical Memory I | 5 | None | N/A | Below Average |
| WMS-IV Logical Memory II | 6 | None | N/A | Below Average |
| WMS-IV Visual Repro. I | 12 | None | N/A | Average |
| WMS-IV Visual Repro II | 9 | None | N/A | Average |
| WRAT-4 Word Reading | 81 (10ᵗʰ %tile) | Below Expectation | N/A | Low Average |
| WRAT-4 Sentence Comp. | 82 (12ᵗʰ %tile) | Below Expectation | N/A | Low Average |
| WRAT-4 Spelling | 92 (30ᵗʰ %tile) | Normal | N/A | Average |
| WRAT-4 Math Computation | 85 (16ᵗʰ %tile) | Below Expectation | N/A | Low Average |
| WRAT-4 Reading Comp. | 79 (8ᵗʰ %tile) | Below Expectation | N/A | Borderline |
| CVLT Trial 1 | Z=-2.5 | Moderate to Severe | N/A | Severe Impairment |
| CVLT Trial 2 | Z=-1.5 | Impaired | N/A | Mild to Moderate Impairment |
| CVLT Trial 3 | Z=0 | Normal | N/A | Average |
| CVLT Trial 4 | Z=0 | Normal | N/A | Average |
| CVLT Trial 5 | Z=0.5 | Normal | N/A | Average |
| CVLT Total Score | 46T | Normal | N/A | Average |
| CVLT Trials 1-5 Semantic Clustering | Z=-1 | Impaired | N/A | Low Average |
| CVLT Trial B | Z=-1 | Impaired | N/A | Low Average |
| CVLT Short Delay Free Recall | Z=0.5 | Normal | N/A | Average |
| CVLT Long-Delay Free Recall | Z=1 | Normal | N/A | Average |
| CVLT Long Delay Semantic Clustering | Z=-2 | Impaired | N/A | Mild to Moderate Impairment |
| CVLT Total Learning Slope | Z=2 | Normal | N/A | High Average |
| CVLT Total Repetitions | Z=1 | Abnormal | N/A | Z≥1 = Impaired |

2

| CVLT Total Intrusions | Z=2 | Very Significant (worse than 85-93% of his age group) | N/A | Z≥1 = Impaired |
|---|---|---|---|---|
| CVLT Recognition Total Correct (Hits) | 16/16 | Not addressed | N/A | Average |
| Trails A | 52T | Normal | 52T | Average |
| Trails B | 57T | Intact | 57T | High Average |
| Booklet Category | 52T | Intact | 52T | Average |
| Verbal Fluency (FAS) | 45T (for AA not blended) | Intact | 45T | Average |
| Verbal Fluency (Animals) | 55T (for AA not blended) | Intact | 55T | Average |
| Boston Naming | Z=-1.5 (Ed.) Z=-1.6 (age) | Impaired | 50T | Average |
| Seashore Rhythm | 33T | Impaired | 33T | Mild to Moderate Impairment |
| Speech Sounds Perception | 39T | Impaired | 39T | Mild Impairment |
| Finger Tapping-RH | 60T | Normal | 60T | High Average |
| Finger Tapping-LH. | 52T | Normal | 52T | Average |
| Grooved Pegboard-RH | 56T | Normal | 56T | Average |
| Grooved Pegboard -LH | 53T | Normal | 53T | Average |
| TPT Total | 50T | Normal | 50T | Average |
| TPT Dom. | 48T | Normal | 48T | Average |
| TPT Non-Dom. | 50T | Normal | 50T | Average |
| TPT Both Hands | 51T | Normal | 51T | Average |
| TPT Memory | 37T | Impaired | 37T | Mild Impairment |
| TPT Location | 48T | Normal | 48T | Average |
| Luria Alt. Sequences | 9,10 Raw | Intact | N/A | Average |
| Luria FSP | 2,1 Raw | Intact | N/A | Average |
| Luria Disinhibition | No Errors | Intact | N/A | Average |
| WCST Errors | 34T | Impaired | 34T | Mild to Moderate Impairment |
| WCST Persv. Errors | 34T | Impaired | 34T | Mild to Moderate Impairment |

3

| WCST Non-Persv. Errors | 34T | Impaired | 34T | Mild to Moderate Impairment |
|---|---|---|---|---|

| WCST Conceptual | 32T | Impaired | 32T | Mild to Moderate Impairment |
|---|---|---|---|---|
| Stroop Word | 35T | Dyslexia | 35T | Mild Impairment |
| Stroop Color | 44T | Intact | 44T | Low Average |
| Stroop Color-Word | 50T | Intact | N/A | Average |
| Stroop Interference | 44T | Intact | N/A | Low Average |
| Hooper Visual Org. | 27 Raw | Normal | Adjusted T= 55 | High Average |
| Reitan-Klove Sensory-Perceptual | 0 errors | Normal | 68T | High Average |
| Reitan-Indiana Aphasia Screening | 3 errors | Impaired (dyspraxia) | N/A | Errors of constructional dyspraxia |

4

**Appendix D**
**Summary of Analysis of Dr. Martell's Test Results**

| Evaluation Procedures | Number | Percentage |
|---|---|---|
| Tests | 22 | 100% |
| Measures | 76 | 100% |

| Analysis of Results | Number | Percentage |
|---|---|---|
| Average Range Results | 57 | 75% |
| Borderline Results | 2 | 3% |
| Abnormal Results | 17 | 22% |

| Average Range Results | Number | Percentage |
|---|---|---|
| Low Average Results | 10 | 13% |
| Average Results | 42 | 55% |
| High Average Results | 5 | 7% |
| Total Average Range | 57 | 75% |
| Borderline Results | 2 | 3% |