The Brandt Law Firm, P.C.
P.O. Box 850843, Richardson, TX 75085-0843

Email Address:  lydiamb@airmail.net
Voice: (972) 699-7020; Fax: (972) 699-7030;



August 17, 2004

Certified Mail RRR #7000-1530-0004-3824-5921
Clerk of Court
U.S. District Court, Northern District of Texas
Amarillo Division
205 East 5th Street
Amarillo, TX 79101

          Re:    Filing Amended Habeas Petition and Copies
                ***Balentine v. Dretke, Case No. 2:03-CV-00039***

Dear Clerk of Court:

Enclosed by mail is one (1) copy of the Amended Petition for Writ of Habeas Corpus and a separate volume of Exhibits, in the aforementioned death penalty case. Also enclosed is a self-addressed stamped envelope. Please file-stamp the additional copy of the amended habeas petition and exhibits volume, and return it to me.

Should you have any questions, please feel free to give me a call at (972) 699-7020.

Very truly yours,

Lydia M.V. Brandt

cc:    Ms. Katherine Hays                   John Balentine #999315
        Assistant Attorney General        Polunsky Unit
        Office of Attorney General         TDCJ
        Capital Station 12548             3872 FM 350 South
        Austin, TX 78711                 Livingston, TX 77351-8580



Box 1of 1
Rec'd 5/21/04



OFFICE *of the* ATTORNEY GENERAL
GREG ABBOTT


RECE____
MAY 2 _ 2004
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

May 19, 2004

Clerk, United States District Court
Northern District of Texas
Amarillo Division
205 East 5th, Room 210
Amarillo, Texas 79101

Re:     *John Balentine v. Doug Dretke, Director, TDCJ-CID*
        Civil Action No. 2:03-CV-0039

Dear Clerk,

Enclosed please find the petitioner's state court records for the above referenced case, which consist of eight volumes of direct appeal records and one volume of the state habeas record (all contained in one box).

Please indicate the date of filing on a copy of the enclosed letter and return it in the postage-paid envelope provided for your convenience.

Sincerely,

KATHERINE D. HAYES
Assistant Attorney General
Postconviction Litigation Division
Austin, Texas 78711
(512) 936-1400

KDH:dmm
Enclosure

cc:     Lydia MV Brandt
        PO Box 850843
        Richardson, Texas 75085-0843

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

JOHN LEZELL BALENTINE,

    *Petitioner,*

v.

                                         Case No. 2:03-CV-00039

DOUG DRETKE, Director
Texas Department of Criminal Justice
    Institutional Division

    *Respondent.*

# O R D E R

    The Court has considered Petitioner John Balentine's Motion for Leave to File an Amended Habeas Petition and Motion for Extension of Time in which to file it.  The Court hereby **GRANTS** the Petitioner's Motions.  The Amended Petition for Writ of Habeas Corpus shall be due no earlier than the 90th day from the date that the court enters its order either granting or denying the accompanying *ex parte*, sealed motion for additional funding for expert and investigative assistance.

    The Respondent is not required to file an answer to the initial habeas petition to be filed on or before December 1, 2003.

ORDERED this _____ day of _____, 2003.

                                                       _____
                                                       UNITED STATES MAGISTRATE JUDGE
                                                       CLINTON E. AVERITTE

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

---

JOHN LEZELL BALENTINE,

    *Petitioner,*

v.

DOUG DRETKE, Director
Texas Department of Criminal Justice
    Institutional Division

    *Respondent.*

Case No. 2:03-CV-00039

---

# O R D E R

The Court has considered Petitioner John Balentine's Motion to Permit *Ex Parte* Consideration of Application for Authorization for Additional Funding for Expert and Investigative Assistance. The Court hereby **GRANTS** the Petitioner's Motion. The request will be sealed by the Court and considered *ex parte*. Any proceedings held in connection with this request will be held *in camera* and on a sealed record. All requests and all hearings will be transcribed and made a part of the record for appellate review pursuant to 21 U.S.C. § 848(q)(9).

ORDERED this _____ day of _____, 2003.

_____
UNITED STATES MAGISTRATE JUDGE
CLINTON E. AVERITTE

John Balentine #999315
TDCJ Polunsky Unit
12002 FM 350 South
Livingston, TX 77351



**Re: Fw: USCA Case Number 09-70026 in Fifth Circuit for 90 Notice of Appeal,
filed by John Lezell Balentine (death penalty case 2:03-cv-39)**
**Monica R Washington**  to: Jeanetta Hetrick                    03/29/2010 11:32 AM

No need to certify the record at this time.



U.S. 5th Circuit Court of Appeals
504.310.7705

Karen Whittington        Monica:  please see the email below.  thanks,              03/29/2010 10:54:35 AM

| | |
|---|---|
| From: | Karen Whittington/CA05/05/USCOURTS |
| To: | Monica R Washington/CA05/05/USCOURTS@USCOURTS |
| Cc: | Jeanetta Hetrick/TXND/05/USCOURTS@USCOURTS |
| Date: | 03/29/2010 10:54 AM |
| Subject: | Fw: USCA Case Number 09-70026 in Fifth Circuit for 90  Notice of Appeal, filed by John Lezell Balentine (death penalty case 2:03-cv-39) |

Monica:  please see the email below.

thanks,


Karen S. Whittington
Case Manager
United States Court of Appeals, Fifth Circuit
600 S. Maestri Place
New Orleans, LA  70130
504-310-7696
----- Forwarded by Karen Whittington/CA05/05/USCOURTS on 03/29/2010 10:54 AM -----

| | |
|---|---|
| From: | Jeanetta Hetrick/TXND/05/USCOURTS |
| To: | Karen Whittington/CA05/05/USCOURTS@USCOURTS |
| Date: | 03/29/2010 10:50 AM |
| Subject: | USCA Case Number 09-70026 in Fifth Circuit for 90  Notice of Appeal, filed by John Lezell Balentine (death penalty case 2:03-cv-39) |

Karen:

This appeal record was returned to us in April 2009, and then another NOA was filed in September 28,
2009.  Should this
record be certified again?   There was oral argument in your court 10/20/09.

Jeanetta

1-26

CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT APPOINTED COUNSEL (Rev. 5/99)

| 1. CIR./DIST./ DIV. CODE | 2. PERSON REPRESENTED: JOHN BALENTINE | VOUCHER NUMBER: 0467260000 09 |
|---|---|---|
| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER: 2:03-CV-00039 | 5. APPEALS DKT./DEF. NUMBER / 6. OTHER DKT. NUMBER |
| 7. IN CASE/MATTER OF (Case Name): BALENTINE V. DRETKE | 8. TYPE PERSON REPRESENTED: ☐ Adult Defendant ☐ Appellant ☐ Other ☑ Habeas Petitioner ☐ Appellee | 9. REPRESENTATION TYPE: ☑ D1 28 U.S.C. § 2254 Habeas (Capital) ☐ D3 28 U.S.C. § 2255 (Capital) ☐ D2 Federal Capital Prosecution ☐ D4 Other (Specify) |

10. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section) *If more than one offense, list (up to five) major offenses charged, according to severity of offense.*

11. ATTORNEY'S NAME (*First Name, M.I., Last Name, including any suffix*), AND MAILING ADDRESS

THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, TX 75085-0843
(972) 699-7020
LYDIA M V. BRANDT

Telephone Number:

13. NAME AND MAILING ADDRESS OF LAW FIRM (*Only provide per instructions*)

THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, TX 75085-0843
(972) 699-7020

12. COURT ORDER:
☐ O Appointing Counsel ☐ C Co-Counsel
☐ F Subs For Federal Defender ☐ R Subs For Retained Attorney
☐ P Subs For Panel ☐ Y Standby Counsel

**Prior Attorney's Name:** ______ **Appointment Date:** ______

(A) Because the above-named person represented has testified under oath or has otherwise satisfied this Court that he or she (1) is financially unable to employ counsel and (2) does not wish to waive counsel, and because the interests of justice so require, the attorney whose name appears in Item 11, who has been determined to possess the specific qualifications by law, is appointed to represent the person in this case.

(B) The attorney named in Item 11 is appointed to serve as: ☐ LEAD COUNSEL ☐ CO-COUNSEL

~~Name of Co-Counsel~~ **or Lead Counsel:** LYDIA BRANDT **Appointment Date:** 5-19-03

(C) If you represented the defendant or petitioner in any prior proceeding related to this matter, attach to your initial claim a listing of those proceedings and describe your role in each (e.g., lead in counsel or co-counsel).

☐ (D) Due to the expected length of this case, and the anticipated hardship on counsel in undertaking representation full-time, for such a period without compensation, interim payments of compensation and expenses are approved pursuant to the attached order.

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
JUL 20 2004
CLERK, U.S. DISTRICT COURT
By Deputy

Signature of Presiding Judicial Officer or By Order of the Court

Date of Order / Nunc Pro Tunc Date

(E) Repayment or partial repayment ordered from the person represented for this service at time of appointment. ☐ YES ☐ NO

## CLAIM FOR SERVICES AND EXPENSES

14. STAGE OF PROCEEDING — Check the box which corresponds to the stage of the proceeding during which the work claimed at item 15 was performed even if the work is intended to be used in connection with a later stage of the proceeding. CHECK NO MORE THAN ONE BOX. Submit a separate voucher for each stage of the proceeding.

| CAPITAL PROSECUTION | | HABEAS CORPUS | | OTHER PROCEEDING | |
|---|---|---|---|---|---|
| a. ☐ Pre-Trial | e. ☐ Appeal | g. ☑ Habeas Petition | k. ☐ Petition for the U.S. Supreme Court Writ of Certiorari | l. ☐ Stay of Execution | o. ☐ Other |
| b. ☐ Trial | f. ☐ Petition for the U.S. Supreme Court Writ of Certiorari | h. ☐ Evidentiary Hearing | | m. ☐ Appeal of Denial of Stay | |
| c. ☐ Sentencing | | i. ☐ Dispositive Motions | | n. ☐ Petition for Writ of Certiorari to the U.S. Supreme Court Regarding Denial of Stay | |
| d. ☐ Other Post Trial | | j. ☐ Appeal | | | |

## HOURS AND COMPENSATION CLAIMED / FOR COURT USE ONLY

| 15. CATEGORIES (*Attach itemization of services with dates*) | HOURS CLAIMED | TOTAL AMOUNT CLAIMED | MATH/TECH. ADJUSTED HOURS | MATH/TECH. ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|---|---|
| a. In-Court Hearings (RATE PER HOUR = $ ) | | | | IN COURT TOTAL Category a | IN COURT TOTAL Category a |
| b. Interviews and Conferences with Client | 2.0 | | | | |
| c. Witness Interviews | | | | | |
| d. Consultation with Investigators & Experts | 3.3 | | | | |
| e. Obtaining & Reviewing the Court Record | | | | | |
| f. Obtaining & Reviewing Documents and Evidence | | | | OUT OF COURT TOTAL Categories b-j | OUT OF COURT TOTAL Categories b-j |
| g. Consulting with Expert Counsel | .5 | | | | |
| h. Legal Research and Writing | | | | | |
| i. Travel | 8.0 | | | | |
| j. Other (*Specify on additional sheets*) | 2.6 | | | | |
| TOTALS: Categories b thru j (RATE PER HOUR = $125) | 16.4 | 2,050.00 | | | |
| **CLAIM FOR TRAVEL AND EXPENSES** (*Attach itemization of expenses with dates*) | | | | | |
| 16. Travel Expenses (*lodging, parking, meals, mileage, etc.*) | | 244.92 | | | |
| 17. Other Expenses (*other than expert, transcripts, etc.*) | | 4.07 | | | |
| **GRAND TOTALS (CLAIMED AND ADJUSTED):** | | 2298.99 | | | |

18. CERTIFICATION OF ATTORNEY/PAYEE FOR THE PERIOD OF SERVICE: 12-01-03 TO: 6/31-04

19. APPOINTMENT TERMINATION DATE IF OTHER THAN CASE COMPLETION

20. CASE DISPOSITION

21. CLAIM STATUS ☐ Final Payment ☑ Interim Payment Number 3 ☐ Supplemental Payment

Have you previously applied to the court for compensation and/or reimbursement for this ☑ YES ☐ NO If yes, were you paid? ☑ YES ☐ NO

Other than from the Court, have you, or to your knowledge has anyone else, received payment (*compensation or anything of value*) from any other source in connection with this representation? ☐ YES ☑ NO If yes, give details on additional sheets.

**I swear or affirm the truth or correctness of the above statements.**

Signature of Attorney: Lydia M V Brandt Date: 7-8-04

## APPROVED FOR PAYMENT — COURT USE ONLY

| 22. IN COURT COMP. | 23. OUT OF COURT COMP. | 24. TRAVEL EXPENSES | 25. OTHER EXPENSES | 26. TOTAL AMT. APPROVED |
|---|---|---|---|---|
| $0.00 | $2,050.50 | $244.92 | $4.07 | 2298.99 |

27. SIGNATURE OF THE PRESIDING JUDICIAL OFFICER: Mary Lou Robinson DATE: 7/15/04 27a. JUDGE CODE: 3915

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

FILED

JUN 18 2004

CLERK, U.S. DISTRICT COURT
By _____
Deputy

JOHN LEZELL BALENTINE,　　　　　§
　　　　　　　　　　　　　　　　§
　　　　Petitioner,　　　　　　　§
　　　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　　　§　　　2:03-CV-00039
　　　　　　　　　　　　　　　　§　　　**Capital Litigant**
DOUGLAS DRETKE, Director,　　　　§
Texas Department of Criminal　　　§
Justice, Institutional Division,　§
　　　　　　　　　　　　　　　　§
　　　　Respondent.　　　　　　　§

## ORDER

Came this day for consideration petitioner JOHN LEZELL BALENTINE's Motion for

Leave to File an Amended Habeas Petition and Motion for Extension of Time in which to file such

Amended Petition filed by petitioner on November 24, 2003.  The Court hereby GRANTS

petitioner's motions as set forth below.

The Amended Petition for Writ of Habeas Corpus shall be filed on or before sixty (60) days

from the date of this Order.

Respondent is not required to file an Answer to the initial habeas petition filed on or about

December 1, 2003.  Respondent shall file its Answer to the Amended Petition within sixty (60) days

after the date such Amended Petition is filed.

IT IS SO ORDERED.

ENTERED this ___18th___ day of June 2004.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

25

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

DEC - 1 2003

JOHN LEZELL BALENTINE,

    *Petitioner*,

v.

                              Case No. 2:03-CV-00039

DOUG DRETKE, Director
Texas Department of Criminal Justice
    Institutional Division

    *Respondent*.

# O R D E R

The Court has considered Petitioner John Balentine's Motion to Permit *Ex Parte* Consideration of Application for Authorization for Additional Funding for Expert and Investigative Assistance. The Court hereby **GRANTS** the Petitioner's Motion. The request will be sealed by the Court and considered *ex parte*. Any proceedings held in connection with this request will be held *in camera* and on a sealed record. All requests and all hearings will be transcribed and made a part of the record for appellate review pursuant to 21 U.S.C. § 848(q)(9).

ORDERED this ____ *1st* ____ day of ____ *December* ____, 2003.

_____
UNITED STATES MAGISTRATE JUDGE
CLINTON E. AVERITTE

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

---

**ACTION NO. 2:03-CV-0039**

---

JOHN LEZELL BALENTINE
Petitioner,

v.

DOUG DRETKE, Director,
Texas Department of Criminal Justice, Institutional Division
Respondent.

---

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY AN INMATE IN STATE CUSTODY
## UNDER A SENTENCE OF DEATH
### and
## EXHIBITS IN SUPPORT THEREOF

**ORIGINAL**

---

NOTE:     *Pursuant to a motion filed with the court on November 21, 2003, Petitioner anticipates filing an amended habeas petition, which will be accompanied by further evidentiary support. The Respondent was unopposed.*

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

COUNSEL FOR PETITIONER



# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   1.   Basis of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   2.   Overview of Procedural History . . . . . . . . . . . . . . . . . . . . . . 2
      A.   Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      B.   Jury Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      C.   Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      D.   State Habeas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      E.   Federal Habeas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      F.   Exhaustion and Procedural Default Statement . . . . . . . . . . . . 11
         1.   A petitioner is not liable for attorney errors committed when the attorney was functioning outside 'the course of the representation' or was not acting 'in furtherance of the litigation' . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
         2.   Birdsong violated the first rule of habeas corpus: The petitioner has the burden of alleging facts which entitle him to relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
         3.   Birdsong violated another rule: A writ of habeas corpus is not a vehicle to litigate matters which should and could have been raised on direct appeal . . . . . . . . . . . . . . . 19
         4.   The result was that Birdsong filed another direct appeal, a pleading he was neither authorized or nor court-appointed to file. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
         5.   Birdsong was not "competent" habeas counsel either at the time of his initial appointment, or thereafter . . . . . . . . 22
            a.   The Rules of Professional Conduct and the ABA Guidelines define "competence" as being "reasonably skilled in the *specialized* practice of *capital* representation" . . . . . . . . . . . . . . . . . . . . 22

      b.     Birdsong did not have a working knowledge of state and federal procedural default law at the time of his appointment, and thus, was not "competent"  . . 26

  6.     Under *Coleman*, *Graves*, and the law of agency, Birdsong's actions are deemed external to Balentine and not fairly attributable to him and therefore form the basis for "cause" under the procedural default doctrine . . . . . . . . . . . . 28

  7.     Exhaustion, Abeyance, Equitable Estoppel . . . . . . . . 29

REASONS TO ISSUE THE WRIT OF HABEAS CORPUS . . . . . . . . . . . . . . . . 30

GROUND ONE:   Balentine was denied his Fourth amendment right to be free from unreasonable searches and seizures when testimony and physical evidence was introduced regarding his illegal detention and search on January 21, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

A.    Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

B.    Balentine was denied his Fourth Amendment rights . . . . . . . 39

  1.     Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . 39

  2.     Balentine was denied his "opportunity for full and fair litigation;" the state court decisions were contrary to or an unreasonable application of Fourth Amendment search and seizure law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

      a.     The *De Facto* Arrest: The detention lasted longer than was necessary to effectuate the purpose of the stop, which was to see if "there was any armed person in the area shooting off rounds"; it evolved into an arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

      b.     The .32 Caliber Bullet: Evidence pertaining to the unlawful search and seizure of the .32 caliber bullet in Balentine's pocket was inadmissible as the fruit of the poisonous tree . . . . . . . . . . . . . . . . . . . . . . . 45

      c.     The error was not harmless . . . . . . . . . . . . . . . . 46

C.    Exhaustion and Procedural Default Statement . . . . . . . . . . . 49

GROUND TWO:   Balentine was denied his Fourth amendment right to be free from unreasonable searches and seizures when the police searched and seized evidence from his dwelling without a warrant . . . . . . . . . . 50

A.    Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

B.    Balentine was denied his Fourth Amendment rights . . . . . . . 52

1.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
2.      Balentine was denied his "opportunity for full and fair litigation;" the state court decisions were contrary to or an unreasonable application of Fourth Amendment search and seizure law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
  a.      The landlord, Means, could not give consent to search the premises of his tenant, Balentine . . . 54
  b.      As a proprietor, Means, could not give consent to search the premises of his guest, Balentine . . . . 56
  c.      Means was coerced by color of law, and the search was not legal . . . . . . . . . . . . . . . . . . . . . . . . 57
  d.      The error was not harmless . . . . . . . . . . . . . . . . 58
C.      Exhaustion and Procedural Default Statement . . . . . . . . . . . 58
GROUND THREE:  Balentine was denied his Sixth and Fourteenth amendment rights to a fair and impartial trial when the trial court failed to provide an article 38.23 jury instruction . . . . . . . . . . . . . . . . . . . . . . . . . 59
A.      Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
1.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . 60
2.      Balentine was denied a fair and impartial trial because the failure to provide the required jury charge, created fundamental error . . . . . . . . . . . . . . . . . . . . . . . . . 60
3.      The Error Was Not Harmless . . . . . . . . . . . . . . . . . . . 61
B.      Exhaustion and Procedural Default Statement . . . . . . . . . . . 62
GROUND FOUR:  Balentine was denied his Sixth amendment right to effective assistance of counsel who failed to object to "consent" by Means, and to request an article 38.23 jury instruction . . . . . . . . . . . . . . . . . . . 64
A.      Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
B.      Balentine was denied his Sixth Amendment right to effective assistance of counsel, who failed to preserve his rights . . . . 65
1.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . 65
2.      Trial counsel's performance was deficient. There is a reasonable likelihood, but for counsel's deficient performance, the outcome would be different . . . . . . . 67
C.      Exhaustion and Procedural Default Statement . . . . . . . . . . . 68
GROUND FIVE:   Balentine was denied his due process right and his right to effective assistance of appellate counsel because the confession was obtained in violation of TEX. CODE CRIM. PROC. 38.22 . . . . . . . . . 69

A.     Statement of Facts ................................... 69
B.     Argument and Authorities .......................... 72
       1.     Standard of Review .......................... 72
       2.     Trial and appellate counsel's performance was deficient
              ......................................... 73
       3.     The deficient performance raises a reasonable probability
              that the outcome would have been different ........ 74
C.     Exhaustion and Procedural Default Statement ............ 75
GROUND SIX:   Balentine was denied his Eighth and Fourteenth amendment
       rights to individualized sentencing because the trial court failed to
       define "life sentence" and/or instruct the jury that if sentenced to life in
       prison, Balentine must serve at least forty (40) years before he would be
       eligible for parole ...................................... 76
A.     Statement of Facts ................................... 76
B.     Balentine was denied his Eighth Amendment right to heightened
       reliability in sentencing ........................... 79
       1.     Standard of Review .......................... 79
       2.     Balentine was denied his Eighth Amendment right to
              heightened reliability in sentencing ............... 80
C.     Balentine was denied his Fourteenth Amendment right to due
       process ......................................... 83
       1.     Standard of Review .......................... 83
       2.     Balentine was denied his Fourteenth Amendment right to
              due process ................................. 83
D.     Exhaustion and Procedural Default Statement ............ 86
GROUND SEVEN (LOCKETT DOCTRINE): Balentine was denied his federal Eighth
       amendment right to individualized sentencing under the Lockett
       Doctrine ........................................... 87
A.     Statement of Facts ................................... 87
B.     Argument and Authorities .......................... 95
       1.     Standard of Review .......................... 95
       2.     Mitigation investigation done to date suggests that there is
              a plethora of Lockett/Skipper evidence ........... 96
C.     Exhaustion and Procedural Default Statement ............ 98
GROUND EIGHT (MITIGATING EVIDENCE − IAC):   Balentine was denied his
       federal Eighth and Fourteenth amendment rights to individualized

sentencing because trial counsel failed to investigate, develop and
present any mitigation evidence at all . . . . . . . . . . . . . . . . . . . . . . 100
A.  Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
B.  Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . 101
  1.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . 101
  2.  Trial counsel's performance was deficient . . . . . . . . 102
    a.  The mitigation evidence uncovered in federal habeas
      would have lead a reasonable attorney to investigate
      further . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
    b.  Trial counsel had an obligation to take steps
      necessary, including requesting a continuance, to
      prepare a defense even if plea negotiations were
      ongoing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
    c.  Trial counsel failed to voir dire on Special Issue #2,
      which was treated essentially as superfluous
      verbiage throughout all phases of the trial . . . 106
    d.  The prosecution capitalized on the deficient
      performance of trial counsel using Balentine
      life history to argue future dangerousness; trial counsel
      offered no testimony to demonstrate how
      Balentine's life history reduced his moral culpability
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
  3.  The deficient performance raises a reasonable probability
    that the outcome would have been different . . . . . . . 109
C.  Exhaustion and Procedural Default Statement . . . . . . . . . . 109
GROUND NINE (DIMINISHED CAPACITY, 8TH AND 14TH AMENDMENT VIOLATIONS
  & EVIDENTIARY INSUFFICIENCY): Balentine was denied his federal 8th
  and 14th amendment rights. The State of Texas secured a conviction
  and sentence of death predicated on evidence that was both legally and
  factually insufficient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
A.  Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
B.  Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . 113
  1.  Standard of Review – Legal Insufficiency: in the light most
    favorable to the prosecution . . . . . . . . . . . . . . . . . . . 113
  2.  Standard of Review  – Factual Insufficiency: without the
    prism of "in the light most favorable to the prosecution"
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

3.     Diminished capacity exists in Texas jurisprudence . . 114

    a.     "Diminished capacity" is distinct from the affirmative defense of "diminished responsibility" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

    b.     Under the opinions of the Texas Court of Criminal Appeals in *Penry, Cowles* and *Wagner* a defendant may introduce, in the guilt/innocence phase, evidence of his diminished capacity to negate specific intent . . . . . . . . . . . . . . . . . . . . . . . . . 116

    c.     The introduction of evidence of diminished capacity is a fundamental right under the 8th and 14th amendment to the U.S. Constitution . . . . . . . . 118

4.     The evidence is legally and factually insufficient; Mr. Balentine lacked the necessary *mens rea* . . . . . . . . . . 120

C.    Exhaustion and Procedural Default Statement . . . . . . . . . . 123

GROUND TEN (DIMINISHED CAPACITY & IAC OF TRIAL COUNSEL): Balentine was denied his federal Sixth and Fourteenth amendment right to effective assistance of trial counsel who failed to hold the State of Texas to its burden of proof of each and every element of the offense of capital murder, particularly, *mens rea* . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

A.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

B.    Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . 125

    1.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . 125

    2.     Trial counsel's performance was constitutionally ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

C.    Exhaustion and Procedural Default Statement . . . . . . . . . . 127

GROUND ELEVEN (THEORY OF THE CASE FOR LIFE – IAC & THE CRONIC STANDARD):  Balentine was denied his Sixth Amendment right to effective assistance of counsel defense counsel when the trial attorneys failed to present a theory of the case that was effective through both phases of the trial, ABA GUIDELINES 11.7.1. . . . . . . . . . . . . . . . . . 128

A.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

B.    Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . 134

    1.     Standard of Review: *Strickland* and *Cronic* . . . . . . . 134

    2.     Trial counsel's performance was deficient . . . . . . . . 135

        (a)     An effective theory has four elements: it has internal logical force, each  fact reinforces the others; it

speaks to the legal elements of the case showing why the law demands relief; it makes maximum use of undisputed facts; and it is easy to believe, encompassing the prosecution's case ........ 136

(b) The defense theory lacked internal logical force. The theory that the police were inept in their investigation, thus giving rise to reasonable doubt, did not logically lead to a sentence of life. The theory failed to create an overriding, organizing approach to the entire case ................ 137

(c) It did not speak to the elements of the case ... 139

(d) It was not plausible ..................... 140

(e) Trial counsel did not make a "strategic" choice to assert the theory ........................ 144

(1) Trial counsel failed to identify, assess and select the theory most likely to be believed or adopted by the trier of fact .......... 144

(2) The "Inept Theory" was affirmatively harmful to Balentine's defense .............. 145

(3) The "Mental Incapacity Theory" was supported by the record and met all the tests to be an effective theory ............ 146

3. Trial counsel's deficient performance was complete; prejudiced is presumed ........................ 148

C. Exhaustion and Procedural Default Statement ........... 149

GROUND TWELVE (PLEA NEGOTIATIONS & IAC OF TRIAL COUNSEL): Balentine was denied his federal Sixth and Fourteenth amendment right to effective assistance of trial counsel who failed to effectively carrying out their obligations in the plea negotiation process .............. 150

A. Statement of Facts ................................. 150

B. Argument and Authorities ......................... 150

1. Standard of Review ......................... 150

2. Trial counsel's performance was constitutionally ineffective ................................. 152

C. Exhaustion and Procedural Default Statement ........... 153

GROUND THIRTEEN (CONFESSION – 4TH & 14TH AMENDMENT VIOLATIONS – SCHNECKLOTH): Mr. Balentine was denied his Fourth and Fourteenth

amendment rights because his confession was not voluntary, and thus it
was inadmissible.  (Direct Appeal Point of Error #12) . . . . . . . . . 154
GROUND FOURTEEN (CONFESSION –    14TH AMENDMENT VIOLATION –
*CONNELLY*): Mr. Balentine was denied his Fourteenth amendment rights
because his mental health deficits resulted in a psychologically coerced
confession that was inadmissible at trial . . . . . . . . . . . . . . . . . . . . 154
GROUND FIFTEEN (CONFESSION –  6TH & 14TH AMENDMENT VIOLATION – *IAC*):
Mr. Balentine was denied his Sixth and Fourteenth amendment rights to
effective assistance of counsel who failed to investigate, develop,
present and adequately preserve the issue of the lack of voluntariness of
the confession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
    A.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
    B.    Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . 155
    C.    Exhaustion and Procedural Default Statement . . . . . . . . . . 157
GROUND SIXTEEN:    Balentine was denied his Fourteenth amendment due
process rights as a result of a *Brady/Kyles* violation, when the
prosecution failed to turn over potentially favorable evidence prior to
trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158
GROUND SEVENTEEN: Balentine's confession was inadmissible because it was
the product of a violation of his Sixth and Fourteenth amendment rights
to counsel and obtained as a result of *Brewer* violation . . . . . . . . 158
    A.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158
    B.    Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . 159
        1.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . 159
        2.    Material evidence was suppressed . . . . . . . . . . . . . . 160
    C.    Exhaustion and Procedural Default Statement . . . . . . . . . . 161
GROUND EIGHTEEN: The cumulative effect of trial errors resulted in an unfair
trial and a denial of due process as guaranteed by the Fourteenth
Amendment to the United States Constitution . . . . . . . . . . . . . . . . 163

REQUEST TO EXPAND THE RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

REQUEST FOR DISCOVERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

REQUEST FOR EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . . . . . . 167

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171
    Exhibit 1:   Attorney Profile, State Bar of Texas, Kent Birdsong . . . . . 171
    Exhibit 2:   Affidavit of Roger Shuy, Ph.D. . . . . . . . . . . . . . . . . . . . . . 171
        Exhibit A: Curriculum Vitae . . . . . . . . . . . . . . . . . . . . . . . . . 171
        Exhibit B:  Analysis of Balentine Confession . . . . . . . . . . . . . . 171
    Exhibit 3:   Analysis of Balentine Confession communicated from Shuy to Herrmann, located in trial counsel files . . . . . . . . . . . . . . . 171
    Exhibit 4:   Affidavit of Jane McHan . . . . . . . . . . . . . . . . . . . . . . . . . 171
    Exhibit 5:   E-mail from Jane McHan, mitigation specialist to Lydia Brandt, (November 22, 2003, 9:25 AM) . . . . . . . . . . . . . . . . . . . . . . . 171

# TABLE OF ABBREVIATIONS

The following are a list of abbreviations used within the pleading:

CR 1:__            CR is the abbreviation for Clerk's Record, as required by TEX. R. APP. PROC. 34.1. It is followed by the volume number before the colon, and the page numbers after the colon.


FFCL              The Findings of Fact and Conclusions of Law.

RR __:__          RR is the abbreviation for Reporter's Record, pursuant to TEX. R. APP. PROC. 34.1,which is the trial transcript testimony recorded by the court reporter. The abbreviation RR is followed by the volume number before the colon, and the page numbers after the colon.

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

JOHN LEZELL BALENTINE,

    *Petitioner,*

v.

Action No. 2:03-CV-0039

DOUG DRETKE[1], Director
Texas Department of Criminal Justice,
    Correctional Institutions Division

    *Respondent.*

## PETITION FOR A WRIT HABEAS CORPUS

John Lezell Balentine (hereinafter also referred to as Petitioner or Balentine)

petitions pursuant to 28 U.S.C. § 2241 & 28 U.S.C.§ 2254 for a writ of habeas corpus

because he is confined by the State of Texas under a sentence of death, in violation

of the laws and Constitution of the United States.  John Lezell Balentine has never

before sought federal habeas corpus relief for these convictions and sentences.  This

is his first appearance in federal district court for any purpose.

---

[1]    In previous pleadings, Janie Cockrell had been names as Director.  On August 18, 2003, Doug Drekte succeeded Cockrell as Director of the Correctional Institutions Division. Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, he "is automatically substituted as a party."  Additionally, the "Institutional Division" of the Texas Department of Criminal Justice was recently renamed the "Correctional Institutions Divison."

1

# INTRODUCTION

### 1.    BASIS OF CONFINEMENT.

John Lezell Balentine, inmate number #999315, is confined by the Texas Department of Criminal Justice, Correctional Institutions Division, by Doug Dretke, Director, TDCJ-ID. Balentine is being denied his liberty and also faces execution under an unconstitutional conviction for capital murder and the concomitant sentence of death.

### 2.    OVERVIEW OF PROCEDURAL HISTORY.

**A.    Indictment.**   On August 26, 1998, an indictment was filed against Balentine.  It read, in part:

> that JOHN LEZELL BALENTINE, a.k.a. JOHN LEZELL SMITH, a.k.a., JOHN ROWE, hereinafter called defendant, on or about the 21st day of January, 1998 and anterior to the presentment of this indictment, in the County of Potter and State of Texas, did then and there intentionally and knowingly cause the death of an individual, namely MARK CAYLOR, JR., by shooting the said MARK CAYLOR, JR., with a firearm, and did then and there intentionally and knowingly cause the death of two other individuals, namely KAI GEYER and STEVEN BRADY WATSON by shooting the said KAI GEYER and STEVEN BRADY WATSON with a firearm and all three murders were committed during the came criminal transaction.

(CR 1:02).

**B.     Jury Trial.** On January 23, 1998, a complaint, numbered 16,877-E, was filed in the 108th District Court of Potter County, by which Balentine was accused by the State of Texas of capital murder.  On August 3, 1998, at the arraignment, the trial judge appointed James Durham, Esq., and Paul Herrmann, Esq. for Balentine in those proceedings.  The State of Texas filed a motion to recuse Herrmann on the basis of a conflict of interest because Herrmann had been an assistant district attorney from August 24, 1992 until August 24, 1998 when Herrmann entered private practice.  As an assistant district attorney, Herrmann had participated in the investigation and prosecution of Balentine for capital murder.  (CR 1:9-10).  On February 26, 1999, Herrmann filed a motion to withdraw as counsel.  On March 8, 1999, Randall Sherrod was substituted in his place.  (CR 1:220).

Jury selection began March 22, 1999 and concluded on April 7, 1999.  On April 7, 1999, the jury was seated and sworn.  (RR 1:19).  The guilt/innocence phase began April 12, 1999 and concluded on April 16, 1999.  No lesser included offense instructions were requested or given.  The jury returned with a verdict of guilty of the offense of capital murder.  (CR 1:314).  The punishment phase lasted one day, April 19, 1999; no witnesses were called on behalf of Balentine.  (RR 26).  The jury answered "yes" to special issues #1 (continuing threat) (CR 1:328), and "No" to special issue #2 (mitigating circumstances).  (CR 1:329).  On April 19, 1999, the trial

court accepted the jury verdicts and imposed a sentence of death.  (RR 26:108-109).

Judgment was entered on April 21, 1999.  (CR 1:337).

On April 23, 1999, Balentine filed a Motion for New Trial alleging various points of error and was overruled in a June 9, 1999 hearing on the motion (RR 28).

**C.**   **Direct Appeal.**   On July 1, 1999, Balentine filed his notice of appeal. (CR 1:358).  On July 9, 1999, C.J.  McElroy was appointed as appellate counsel.  (CR 1:369).  On February 11, 2000, Balentine filed his direct appeal brief in the Texas Court of Criminal Appeals, under case number 73,490.

The brief raised four (4) points of error, which focused on the arrest and search and seizure of Balentine and his residence.  No points of error were raised as to any other aspect of the trial proceedings:

1.   The trial court erred when it allowed into evidence testimony and physical evidence to be introduced regarding Appellant's illegal detention and search on the 21st of January, 1998, violating the Appellant's Fourth Amendment Constitutional rights; Article 1 Sec. 9 of the Texas Constitution and Vernon's Annotated Code of Criminal Procedure § 38.23;

2.   The trial court erred when it allowed testimony and physical evidence to be introduced which was obtained by a warrantless search of Appellant's home; violating the appellant's Fourth Amendment Right under the United States Constitution and further under Article 1 Sec. 9 of the Texas Constitution and Code of Criminal Procedure 38.23;

4

3.    The trial court erred in failing to charge the jury in accordance with Article 38.23 of the Code of Criminal Procedure;

4.    The trial court erred in allowing evidence before the jury of Appellant's arrest and in-custody statement, in violation of his Fourth Amendment rights under the U.S. Constitution, Article 1, Section 9 of the Texas Constitution, and Vernon's Annotated Code of Criminal Procedure, Article 38.23.

On April 3, 2002, the Texas Court of Criminal Appeals ("CCA") in an published opinion, *Balentine v. State*, 71 S.W.3d 763 (Tex. Crim. App. 2002), affirmed the judgment and sentence of death.

**D.    State Habeas.** Kent Birdsong was appointed to represent Balentine in his Application for Writ of Habeas Corpus ("Application") in state court. With fourteen (14) grounds for relief, the Application consisted primarily of challenges to the Texas death penalty scheme. It also re-raised the validity of the arrest, and search and seizure, in five (5) grounds. Finally, it alleged ineffective assistance of trial counsel for failure to call any punishment witnesses in two (2) grounds for relief. All totaled there were twenty-one (21) claims for relief:

1.    The Eighth and Fourteenth amendments of the United States Constitution forbid that the courts and the executive permit the execution of Applicant because a system allowing their failure to act perpetuates the same kind of arbitrariness condemned by the Supreme Court in state systems characterized by mandatory death penalties.

5

2. Applicant's execution under current Texas capital clemency procedures would violate a treaty signed and ratified by the United States and binding upon the states through the Supremacy Clause of the United States Constitution, and Customary International Law as reflected in other international law instruments.

3. Applicant's rights under the Eighth and Fourteenth amendments of the United States Constitution were violated because Texas' statutory capital sentencing statute does not permit meaningful appellate review.

4. Article 37.071 of the Texas Code of Criminal Procedure and the Texas capital murder statute is unconstitutional and violated Applicant's rights under the Fifth, Sixth, Eighth and Fourteenth amendments of the United States Constitution and Article 1, Section 3, 3a, 10, 13, 14 and 19 of the Texas Constitution.

5. The capital murder/murder statute as administered in Texas is cruel or unusual punishment in violation of Article 1, section 13, of the Texas Constitution.

6. Applicant's rights were violated under the Fourteenth amendment of the United States Constitution and the establishment clause because the Texas Death Penalty statutes under the Texas Penal Code section 19.03 and article 37.071 of Texas Code of Criminal Procedure are unconstitutional.

7. Applicant's rights under the Eighth and Fourteenth amendments of the United States Constitution were violated because the Texas death penalty statute is cruel and unusual punishment.

8. Applicant's rights under the Eighth and Fourteenth amendments of the United States Constitution because the jury charge definition of mitigating evidence impermissibly restrict the jury's discretion in considering all evidence that would support a death sentence.

6

9.      Applicant's rights under the Eighth amendment as incorporated by the Fourteenth amendment of the United States Constitution were violated by the trial court's failure to define "life sentence" and/or the failure to instruct the jury that, if sentenced to life in the Texas penitentiary, Applicant must serve forty years before he would be eligible for parole.

10.     Applicant's rights under the due process clause of the Fourteenth amendment of the United States Constitution were violated by the trial court's failure to define "life sentence" and/or the failure to instruct the jury that, if sentenced to life in the Texas penitentiary, Applicant must serve forty years before he would be eligible for parole.

11.     Applications rights were violated under the Eighth and Fourteenth amendments of the United States Constitution in that the Texas death penalty statute does not adequately permit a jury to consider the victim's provocation in answering the special issues.

12.     Applicant's rights under the Eighth and Fourteenth amendments of the United States Constitution were violated by the State not having to prove lack of provocation on behalf of the decedents.

13.     In view of the different capital schemes that have been in operation in Texas since 1989, the Texas death penalty was arbitrarily imposed upon Applicant and, thus, is unconstitutional as applied, in violation of the Eighth amendment, the equal protection and due process clauses of the Fourteenth amendment of the United States Constitution, and Article 1, section 13 of the Texas Constitution.

14.     Applicant's rights under the Eighth and Fourteenth amendments of the United States Constitution were violated because Texas' statutory Penry special issue is in conflict with the directive against "open-minded discretion" of Furman v. Georgia.

15.   Applicant's rights pursuant to the Fourth amendment of the United States Constitution and the Federal exclusionary rule, as well as article 1, section 9 of the Texas Constitution and the Texas Code of Criminal Procedure were violated in that the initial stop of Applicant was unjustified and illegal.

16.   Applicant's rights pursuant to the Fourth amendment of the United States Constitution and the Federal exclusionary rule, as well as article 1, section 9 of the Texas Constitution were violated in that the second "Terry" frisk of Applicant was unjustified and illegal.

17.   Applicant was denied effective assistance of trial counsel as such is guaranteed by the Sixth and Fourteenth amendments of the United States Constitution and article 1, section 10 of the Texas Constitution and article 1.05 of the Texas Code of Criminal Procedure by trial counsel's failure to enforce the mandate of Article 38.22(6) of the Texas Code of Criminal Procedure, regarding the voluntariness of the Applicant's in-custody recorded statement.

18.   Applicant was denied effective assistance of counsel as such right is guaranteed by the Sixth and Fourteenth amendments of the United States Constitution and article 1, section 10 of the Texas Constitution by trial counsel's failure to request a jury instruction pursuant to article 38.22(7), of Texas Code of Criminal Procedure.

19.   Applicant was denied effective assistance of appellate counsel as such is guaranteed by the Sixth and Fourteenth amendments of the United States Constitution and article 1, section 10 of the Texas Constitution, by appellate counsel's failure to raise at appellate level the failure of the trial court to issue findings of fact and conclusions of law regarding the voluntariness of Applicant's in-custody statement.

20. Applicant was denied effective assistance of trial counsel, as such right is guaranteed by the Sixth and Fourteenth amendments of the United States Constitution and article 1, section 10 of the Texas Constitution and article 1.05 of the Texas Code of Criminal Procedure by trial counsel's failure to call any punishment witnesses whatsoever.

21. Applicant was denied effective assistance of trial counsel, as such right is guaranteed by the Sixth and Fourteenth amendments of the United States Constitution and Article 1, section 10 of the Teas Code of Criminal Procedure by trial counsel's failure to ask for a continuance to permit additional time for adequate and thorough pretrial investigations by investigator Kathy Garrison.

On October 18, 2002, in a three-page order, the trial court entered Findings of Fact and Conclusions of Law ("FFCL"). In the Findings of Fact portion of the order, the state habeas court found that "Applicant has presented no fact issue necessary for this Court to resolve." In the Conclusions of Law, the court wrote:

1. ***The United States Supreme Court and/or the Texas Court of Criminal Appeals have rejected the challenges Applicant makes here in his "grounds for relief" 1 through 14*** to the constitutionality of the Texas death penalty scheme. Additionally, Applicant waived review of many of those complaints by not timely raising them in this Court.

2. ***Applicant's challenge to the legality of the police detention and search of him*** in his Grounds for Relief" 15 and ***16, being identical to the challenge he made in his direct appeal***, is not meritorious for the reasons the Texas Court of Criminal Appeals expressed. *Balentine v. State*, 71 S.W.3d 761, 768-71 (Tex. Crim. App. 2002).

3. Applicant's trial counsel was not effective in not requesting findings of fact and conclusions of law on the voluntariness of Applicant's confession after this Court denied his motion to suppress the confession.

9

4.   Applicant's trial counsel was not ineffective in not requesting a jury instruction on the voluntariness of his confession pursuant to article 38.22 secs. 6 and 7 of the Texas Code of Criminal Procedure.

5.   Applicant's appellate counsel was not ineffective in not raising on direct appeal an issue about the failure to secure findings of fact and conclusions of law on the confession's voluntariness.

6.   Applicant's trial counsel was not ineffective in presenting no witnesses in Applicant's behalf in the punishment phase of the trial, as plausible bases can be discerned for that strategic decision. In that connection, ***Applicant has not alleged that witnesses who would have benefitted him were available***.

7.   Applicant's trial counsel was not ineffective in not seeking a trial continuance to allow more time for investigation in preparation of a defense. In that connection, ***Applicant makes no specific allegation about evidence which was denied him by reason of counsel's not requesting a continuance***.

On December 4, 2002, in a two-page order, the Texas Court of Criminal Appeals denied relief, acceding to the recommendation of the state trial judge.

E.   **Federal Habeas.**  Kent Birdsong filed a motion to withdraw as counsel on February 5, 2003, and undersigned counsel was appointed to represent Balentine in federal habeas on May 19, 2003. The initial due date for the petition was on or before October 16, 2003, pursuant to the court's May 19, 2003 order.

Both Balentine and the Attorney General agreed that in calculating the statute of limitations pursuant to 28 U.S.C. § 2244 (d) the federal habeas petition must be filed on or before December 3, 2003. Balentine filed a motion for extension of time, which the court granted and ordered that the habeas petition be filed on or before December 1, 2003. Hence, this petition is timely filed.

10

**F.     Exhaustion and Procedural Default Statement.**

It is anticipated that the government will argue that this claim is unexhausted and procedurally defaulted. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Dispensa v. Lynaugh*, 847 F.2d 211, 217 (5th Cir. 1988); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). However, Balentine can demonstrate cause and prejudice to excuse any default.

In a nutshell, Balentine acted outside the course of the representation, and not in furtherance of the habeas litigation. At the time he was appointed state habeas counsel, he was not "competent" counsel as that term is used in TEX. CODE CRIM. PROC. art. 11.071. Instead of filing a "document worthy of the title 'writ application,'" Birdsong filed another direct appeal, a document which he was not authorized or court-appointed to file. *Ex Parte Kerr*, 64 S.W.3d 414, 416 (Tex. Crim. App. 2002).

**1.     A petitioner is not liable for attorney errors committed when the attorney was functioning outside 'the course of the representation' or was not acting 'in furtherance of the litigation'.**

A petitioner is not liable for attorney errors committed when the attorney was functioning outside 'the course of the representation' or was not acting 'in furtherance of the litigation.' As articulated by Professor Liebman:

Although as indicated above, the Court has not yet supplied an "exhaustive catalog of ... objective impediments to compliance with a procedural rule," the Court, or in some cases the lower courts, have concluded that the following situations satisfy the "cause" requirement:

(5)     Petitioner's counsel was responsible for the default and counsel's actions (or omissions) in this regard may properly be "imputed to the State" because:

....

(b)     Petitioner's counsel was responsible for the default, but petitioner cannot be required to "bear the risk of attorney error that result[ed] [in the] procedural default" because counsel was not acting as "petitioner's agent" with regard to the default.

*Randy Hertz & James Liebman*, 2 FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE 1197, 1208, 1213 (4th ed. 2001).

The cause and prejudice is premised on agency law, which formed a critical part of the analysis by the United States Supreme Court in *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)[2].   In *Coleman*, the Supreme Court rejected counsel's ineffectiveness as "cause" stating that "[i]n a case such as this, where the alleged attorney error is inadvertence in failing to file a timely notice, such a rule would be contrary to well-settled principles of agency law. *See, e.g.*, RESTATEMENT (SECOND)

---

[2]     *But see Martinez v. Johnson*, 255 F.3d 229, 239-240 (5th Cir. 2001) (holding "This court is foreclosed by precedent from considering whether an exception exists under the *Coleman* rule.") and *compare Ex parte Graves*, 70 S.W.3d 103, 124 (Tex. Crim. App. 2002) (Price, J., dissenting, Holcomb, J. joined) ("To the extent that the Fifth Circuit Court of Appeals holds that the question no longer remains open, that Court is mistaken.  And to the extent that the majority fails to address this open question, it is also wrong.").

OF AGENCY § 242 (1958) (master is subject to liability for harm caused by negligent conduct of servant within the scope of employment)."

Conversely the principle, implicitly if not explicitly, stated in *Coleman* is:

> [Except in specific circumstances], [a] master is not subject to liability for the torts of his servants acting outside the scope of their employment.

RESTATEMENT (SECOND) OF AGENCY § 219(2) (1958).

Unlike situations where there is attorney ignorance or inadvertence, "there is no justification for (and the [*Coleman*] Court's own agency law analysis precludes) holding a habeas corpus petitioner liable for attorney errors committed when the attorney was functioning outside 'the course of the representation' or was not acting 'in furtherance of the litigation.'.... Under these circumstances, the attorney's actions must be deemed 'something external to the petitioner, something that cannot be fairly attributable to him and therefore a basis for finding 'cause' under the procedural default doctrine." *Hertz & Liebman*, at 1213, n.39.

The lower federal courts have applied this principle to preclude holding the habeas petitioner liable. *See Manning v. Foster*, 224 F.3d 1129, 1135 (9th Cir. 2000) ("Manning may assert as cause for his procedural default the actions of his attorney which, even though not constitutionally defective, were not attributable to him because they were both unauthorized and tainted by a conflict of interest.".... "We do

13

not attribute an attorney's errors to the client where the attorney is acting only on his or her own behalf, and does not actually represent the client."). *See also Baldayaque v. United States*, 338 F.3d 145, 153-154 (2nd Cir. 2003) (following agency theory and not equitable tolling to excuse untimely filing, "[W]hen an 'agent acts in a manner completely adverse to the principal's interest,' the 'principal is not charged with [the] agent's misdeeds.' *Nat'l Union Fire Ins. Co. v. Bonnanzio* 91 F.3d 296, 303 (2nd Cir. 1996). Here ... there is an evidentiary basis for concluding that the petitioner's lawyer was not acting as agent: he took a $5,000 retainer without undertaking the requested service; set aside his client's interests in favor of his own; and undertook a futile unresearched, and frivolous initiative for the sole purpose of keeping the fee").

Indeed, the Texas courts have refused to hold a habeas petitioner liable when his counsel has acted outside "the course of the representation" or was not acting "in furtherance of the litigation," although it did not use the language of agency theory. But the concept certainly is inherent in the relief granted to the state habeas petitioner in *Ex Part Kerr*, 64 S.W.3d 414 (Tex. Crim. App. 2002). In *Kerr*, the Texas Court of Criminal Appeals found the second writ of habeas corpus filing to be the "initial writ" because the original writ filed by other counsel "was not a true writ that

attacked his conviction or sentence." The state court rejected the second ground that

the original habeas attorney did not provide effective assistance of counsel.

The rationale was that the original writ:

- "did not attack applicant's capital murder conviction or death sentence;"

- "raised no constitutional or jurisdictional claims concerning the fundamental fairness of the underlying trial or the accuracy of the verdict;"

- "this document attacked the constitutionality of the habeas corpus statutory scheme itself as embodied in article 11.071. But that type of derivative claim does not entitle a death row inmate to any 'relief from a judgment imposing a penalty of death.'"

- "has not demonstrated the need for an evidentiary hearing"

*Ex Part Kerr*, 64 S.W.3d at 416.

The Texas Court of Criminal Appeals held that "[t]o constitute a document

worthy of the title 'writ application' filed pursuant to article 11.071, the writ must

seek 'relief from a judgment imposing a penalty of death.' A death penalty 'writ' that

does not  challenge the validity of the underlying judgment and which, even if

meritorious, would not result in immediate relief from his capital murder conviction

or death sentence, is not an 'initial application' for purposes of art. 11.071, § 5 which

generally bars consideration of a subsequent writ after filing the 'initial application.'"

*See also Ex Parte Evans*, 964 S.W.2d 643, 646-647 (Tex. Crim. App. 1998).

It is obvious that appointed state habeas counsel in *Kerr* acted outside "the course of the representation" and not "in furtherance of the litigation" because he was appointed under TEX. CODE CRIM. PROC. 11.071 as habeas counsel, but failed to fulfill even the minimal requirements of that appointment. Thus, the attorney's actions were not attributable to *Kerr*. Balentine is similarly situated to the petitioner in *Kerr*. Birdsong, Balentine's state habeas attorney, acted outside the course of the representation, and not in furtherance of the litigation.

### 2. Birdsong violated the first rule of habeas corpus: The petitioner has the burden of alleging facts which entitle him to relief.

Birdsong violated "the first rule of habeas corpus": The burden of alleging facts which entitle a state habeas petitioner to relief. JOHN G. JASUTA, *Post Conviction Remedies Pursuant to Article 11.071*, STATE BAR OF TEXAS, TEXAS CRIMINAL APPELLATE MANUAL J-11 (1996). More than ten years prior to Balentine's state habeas proceeding, Texas law was clear that "[i]n a post conviction collateral attack, the burden is on the applicant to allege and prove facts which, if true, entitle him to relief." *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985).

Yet, as in *Kerr*, state habeas counsel Birdsong failed to "demonstrate the need for an evidentiary hearing,...." *Ex Part Kerr*, 64 S.W.3d at 416. Examples are

16

Grounds 20 and 21, which pivot on ineffective assistance based on "counsel's failure to call any punishment witnesses whatsoever," or "counsel's failure to ask for a continuance to permit additional time for adequate and thorough pretrial investigation."

These claims were not supported with extra-record evidence in the form of witness affidavits from family, friends, teachers, etc. or institutional records demonstrating what mitigation evidence there was to be found such as childhood abuse, mental illness, mental retardation, community violence, youth, extreme poverty, exposure to trauma, neurologic deficits, etc. *See e.g., Wiggins v. Smith*, __ U.S. __, 123 S.Ct. 2527 (2003) (counsel ineffective for failing to uncover evidence that client never had a stable home and was repeatedly subjected to gross physical, sexual, and psychological abuse); *Williams v. Taylor*, 529 U.S. 362, 395-396 (2000) (counsel ineffective for failing to uncover and present evidence of defendant's "nightmarish childhood," borderline mental retardation, and good conduct in prison).

The affidavits that were submitted had no evidentiary value because they raised no fact issues. For example, the affidavit of Selden Hale merely states he was available to testify, and has in past trials contradicted the prosecution-sponsored, Royce Smithee. Smithee was never called as a prosecution witness in the Balentine

17

trial.  *Compare* Exhibit C to Post-Conviction Application for Writ of Habeas Corpus *with* Court Reporter's Master Index, and index to Volume 26.

Likewise, the Garrison affidavit only attests that she was at a "severe disadvantage" in conducting the investigation because she was assigned to the case within thirty (30) days of the date the guilt/innocence phase began.  She never detailed what witnesses she interviewed (were they fact witnesses for guilt/innocence? or mitigation witnesses?), what she found that "was helpful for us," and whether it was admissible *Lockett* and/or *Skipper* evidence.  *Lockett v. Ohio*, 438 U.S. 586 (1978); *Skipper v. South Carolina* 476 U.S. 1 (1986).

Grounds 17 through and including 19 suffer the same malady.  Although raised as ineffective assistance of counsel claims, they too lacked evidentiary support that raised issues of fact.

As a result, the Findings of Fact recite that "Applicant has presented no fact issue necessary for this court to resolve" and that finding is supported by the Conclusions of Law which state that "Applicant has not alleged that witnesses who would have benefitted him were available. .... Applicant makes no specific allegation about evidence which was denied him by reason of counsel's not requesting a continuance."  (CR 2:255-256).

18

3.     **Birdsong violated another rule: A writ of habeas corpus is not a vehicle to litigate matters which should and could have been raised on direct appeal.**

With respect to the balance of the grounds 1 through and including 16, Birdsong violated another basic principle of habeas corpus: A writ of habeas corpus is not a vehicle to litigate matters which should and could have been raised on direct appeal. *Ex parte Ramos*, 977 S.W.2d 616 (Tex. Crim, App. 1998); *Ex parte Gardner*, 959 S.W.2d 189 (Tex. Crim. App. 1998).

The preservation statements interspersed throughout these grounds demonstrate a singular lack of understanding about the purpose of a writ of habeas corpus. Birdsong made several allegations that "[t]his error was preserved by way of the trial court's denial of Applicant's Pre-Trial Motions Number ...," *See* footnote 7, p. 11; footnote 10, p. 26; footnote 24, p. 81; footnote 26, p. 84. To the extent the issues were preserved by trial counsel, then it was incumbent on appellate counsel to raise the constitutional challenges to the death penalty scheme on direct appeal. Because appellate counsel did not, then it was the obligation of state habeas counsel to raise an ineffective assistance of appellate counsel for failure to raise the issues, as well as raising the issues themselves.     *Ex parte Groves*, 571 S.W.2d 888 (Tex. Crim. App. 1978) (a writ of habeas corpus will not lie as a substitute for a direct appeal).

Likewise, at least two of the state habeas grounds were "identical to the challenge he made in his direct appeal,...."   With respect to other claims, the state habeas courts ruled:  "Applicant waived review of many of those complaints by not timely raising them in this Court." (CR 2:255). *Ex parte Dietzman*, 790 S.W.2d 305, 306 (Tex. Crim. App. 1990) (appellate attorney failure to present many grounds of error for review).

Finally, the broad based challenges to the Texas death penalty in Grounds 1 through 14, are the types of claims that rarely offer a petitioner a realistic chance at a new trial because it is unlikely that federal and state judges in Texas will hand down broad judgments that will call dozens or hundreds of convictions or death sentences into question.  "Unless the judge is satisfied that s/he can give relief in *this* case with no (or very little) prospect that other accused or convicted persons will escape punishment, the judge will simply not rule your way."  ANTHONY AMSTERDAM, Foreword to JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRAC. & PROC. ix (3rd ed. 1998).

Professor Amsterdam's warning was of judicial rejection of over broad claims, found its fulfillment in Balentine's case.  The Conclusions of Law recite: "The United States Supreme Court and/or the Texas Court of Criminal Appeals have rejected the challenges Applicant makes here in his "Grounds for Relief" 1 through 14 to the

constitution of the Texas death penalty scheme.  Additionally, Applicant waived review of many of those complaints by not timely raising them in this Court."  (CR 2:255).

**4.    The result was that Birdsong filed another direct appeal, a pleading he was neither authorized or nor court-appointed to file.**

Thus, the pleading that Birdsong filed:

- raised claims that were identical to those in the direct appeal brief;

- raised broad based constitutional challenges to the Texas death penalty scheme that were the types of claims that were unlikely to entitle a death row inmate to any relief from a judgment imposing a penalty of death.  Not only had these very same claims been denied relief by the U.S. Supreme Court and the Texas Court of Criminal Appeals, the claims were procedurally defaulted under the contemporaneous objection rule;

- failed to "demonstrate[] the need for an evidentiary hearing"

*Compare Ex Part Kerr*, 64 S.W.3d at 416.  The upshot is that instead of filing a "document worthy of the title 'writ application,'" Birdsong filed another direct appeal, a document which he was not authorized or court-appointed to file. *Ex Parte Kerr*, 64 S.W.3d 414, 416 (Tex. Crim. App. 2002).

### 5.    Birdsong was not "competent" habeas counsel either at the time of his initial appointment, or thereafter

In *Ex parte Graves*, 70 S.W.3d 103, 114 (Tex. Crim. App. 2002), the majority opinion stated that "article 11.071 establishes procedures for writs of habeas corpus in all Texas death penalty cases and creates a statutory right to representation. As applicant correctly observes, it would seem an empty gesture to appoint incompetent counsel. We agree that a 'potted plant' appointed as counsel is better than no counsel at all. Our disagreement concerns the time at which counsel is deemed 'competent' to represent the habeas applicant.... The words of the statute themselves state that counsel shall be 'competent' at the time he is appointed."[3]    At the time of appointment, Birdsong was not competent to handle a capital state habeas.

### a.    The Rules of Professional Conduct and the ABA Guidelines define "competence" as being "reasonably skilled in the *specialized* practice of *capital* representation"

The Rules of Professional Conduct Rule 1.01(a) provides that "[a] lawyer shall not accept or continue employment in a legal matter which the lawyer knows or

---

[3]  Balentine contests the notion that "Counsel is required to be competent up until just before the final product, the application, is prepared." Judge Price decried the foolishness of the rule when he wrote: "[a]t that point, counsel may go to pieces, and there is no recourse for the applicant." *Graves*, 70 S.W.3d at 120 (Price, J., dissenting).

should know is beyond the lawyer's competence, .... [with exceptions not here pertinent]."

The Comment to TEX. R. PROF'L CONDUCT 1.01(a) provides:

1.   A lawyer generally should not accept or continue employment in any area of the law in which the lawyer is not and will not be prepared to render competent legal services. ***"Competent" is defined in Terminology as possession of the legal knowledge, skill, and training reasonably necessary for the representation. Competent representation contemplates appropriate application by the lawyer of that legal knowledge, skill and training, reasonable thoroughness in the study and analysis of the law and facts, and reasonable attentiveness to the responsibilities owed to the client***.

2.   ***In determining whether a matter is beyond a lawyer's competence, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience in the field in question, the preparation and study the lawyer will be able to give the matter***, and whether it is feasible either to refer the matter to or associate a lawyer of established competence in the field in question. ***The required attention and preparation are determined in part by what is at stake***; major litigation and complex transactions ordinarily require more elaborate treatment than matters of lesser consequences.

The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases speak to the issue of the minimum threshold for "competency." *See Wiggins v. Smith*, __U.S. __, 123 S.Ct. 2527, 2535 (2003) (In which the U.S. Supreme Court *citing Strickland*, 466 U.S. at 690-691, for the proposition that "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable"); *Williams v. Taylor*, 529

U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).

ABA Guideline 11.2 – Minimum Standards Not Sufficient provides:

A.   ***Minimum standards that have been promulgated concerning representation of defendants in criminal cases generally, and the level of adherence to such standards required for non-capital cases, should not be adopted as sufficient for death penalty cases***.

B.   Counsel in death penalty cases should be required to perform at the level of an attorney reasonably skilled in the specialized practice of capital representation, zealously committed to the capital case, who has had adequate time and resources for preparation.

In a footnote to the majority opinion in *Ex parte Graves*, 70 S.W.3d 103, n.51 (Tex. Crim. App. 2002), the state court wrote that [m]ost recently, the Legislature passed the Texas Fair Defense Act... which mandates the appointment of a State Task Force on Indigent Defense to further ensure that appropriate standards for appointment of counsel in criminal cases are developed and maintained."

This standard flies in the face of ABA GUIDELINE 11.2 which warn that "[m]inimum standards that have been promulgated concerning representation of defendants in criminal cases generally, and the level of adherence to such standards required for non-capital cases, should not be adopted as sufficient for death penalty cases."

24

The dissent in *Graves* also recognized the deficiencies in the Texas Fair Defense Act.

> ***The Texas Fair Defense Act fulls a dire need in this state for ensuring quality representation of indigent criminal defendants.*** Assuming that what improves the quality of the defense bar generally also improves the quality of counsel appointed to represent applicants under article 11.071, the Act is of benefit to such applicants. ***But the Act does not apply to article 11.071 applicants***. It applies to the pretrial appointment of counsel to indigent defendants.
>
> ***The 1999 amendment of article 11.071 did not significantly alter the appointment of counsel for habeas applicants***. Convicting courts make their appointments according to rules adopted by this Court. Texas Court of Criminal Appeals' Rules for the Appointment of Attorneys Under Article 11.071 Sec. 2(d), (effective Sept 1, 1999). ***Under those rules, this Court maintains a list of attorneys eligible for appointment. After the effective date of the amendment, the convicting court chooses from the list of attorneys that we created and maintain***.

The Texas Court of Criminal appeals' Rules for the Appointment of Attorneys Under Article 11.071, sec. 2(d) do not result in the appointment of "competent" counsel as contemplated by the Rules for Professional Conduct, or under the ABA Guidelines. At best, appointment ensures only that a death sentenced client gets an attorney who is competent to "represent[] ... defendants in criminal cases generally, and the level of adherence to such standards required for non-capital cases."

No where in the court rules for appointment of state habeas counsel, is there a required demonstrable proficiency in how the acts and omissions in an earlier capital state proceeding effects the rights of the client in a succeeding state proceeding, *and* in federal court, 28 U.S.C. § 2254 (state custody; remedies in federal

25

court).  Nor is there a required demonstrable proficiency in the strategic steps an attorney must take in order to avoid and/or remedy procedural defaults in earlier proceedings.

Capital representation, as the case winds its way from state trial, appellate, and habeas proceedings into federal court, is a seamless whole.  No attorney can engage in a "strategic" representation of a capital client within the scope of his court-appointment without a full and complete understanding of this seamless web.

### b.   Birdsong did not have a working knowledge of state and federal procedural default law at the time of his appointment, and thus, was not "competent"

At the time he was appointed, Birdsong did not "possess[] ... the legal knowledge, skill, and training reasonably necessary for the representation" of Balentine in the capital state habeas proceeding.  *Comment* to TEX. R. PROF'L CONDUCT 1.01(a).  At the time of his appointment to represent Mr. Balentine in state habeas, Birdsong:

- was not, and never had been, admitted to practice in federal court;

- was not familiar with the substantive and procedural law that governed capital habeas proceedings under 28 U.S.C. § 2254;

- did not know how his acts or omissions in representing Mr. Balentine in state habeas would affect the rights of Mr. Balentine to merits review in a federal proceeding under 28 U.S.C. § 2254;

- did not know about the contents of the ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (1989 ed);

- did not associate a lawyer of established competence in the field of capital habeas to help him in the state habeas proceeding in order to fully preserve all of Mr. Balentine's state and federal rights to habeas relief.

- did not know of the requirement to conduct a mitigation investigation, and provide evidence in the form of affidavits or institutional records about Mr. Balentine's medical history, family and social history, educational history, employment and training history, and prior juvenile and adult correctional experience, to make a *prima facie* showing of the ineffectiveness of trial counsel in failing to provide the sentencer with evidence which might militate against the appropriateness of the death penalty for Mr. Balentine, and/or how it was improbable, if not impossible, for trial counsel to have responsibly advised Mr. Balentine about the merits of different courses of actions without this information (*i.e.,* accepting a life sentence, or trying the case to conclusion).

- did not having a working knowledge of procedural default law and the complexities of its application to claims as a case made its way through various state and federal court proceedings

*See* Exhibit 1:  Attorney Profile, State Bar of Texas, Kent Birdsong.

27

6.  **Under *Coleman*, *Graves*, and the law of agency, Birdsong's actions are deemed external to Balentine and not fairly attributable to him and therefore form the basis for "cause" under the procedural default doctrine.**

TEX. CODE CRIM. PROC. 11.071, § 2(a) allows a defendant to make an election to either act *pro se* or to have a state habeas attorney represent him. When Balentine made the election to seek counsel, he did so with a realistic expectation that his state habeas attorney would act in accord with legislative intent[4] and with the mandates set down for filing an "initial writ application."

To the extent that this court finds that each of the claims raised in this federal habeas petition is unexhausted and/or procedurally defaulted, then there is a *prima facie* showing that Birdsong did not file "an initial writ application" seeking "relief from a judgment imposing a penalty of death." *Ex parte Kerr*, 64 S.W.3d at 419, quoting TEX. CODE CRIM. PROC. 11. 071, § 1. Balentine was deprived of his "one

---

[4]   Representative Pete Gallego, in presenting the habeas bill stated:

And we tell individuals that everything you can possibly raise the first time, we expect you to raise it initially, one bite of the apple, one shot.... What we're attempting to do here is to say "raise everything at one time." You get one bite of the apple. If you have to stick the kitchen sink in there, put it all in there, and we will go through those claims one at a time and make a decision. But none of this "every week you file a new petition" which is currently basically what happens.... The idea is this: you're going to be able to fund counsel in these instances and we are going to give you one very well-represented run at a habeas corpus proceeding. And unless you meet a very fine-tuned exception, you're not going to be able to come back time after time after time.

full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the statute" – not only in state habeas, but in federal proceedings, as well.

As a result, Birdsong functioned outside "the course of the representation" and was not acting "in furtherance of the litigation." Thus, under these circumstances, Birdsong's actions are deemed external to Balentine, something that cannot be fairly attributable to him, and therefore form the basis for 'cause' under the procedural default doctrine. *Hertz & Liebman*, at 1213, n.39. This court must entertain each and everyone of the claims herein.

### 7.       Exhaustion, Abeyance, Equitable Estoppel.

To the extent that this court opines that one or more claims are unexhausted, then Balentine requests that this court hold his federal habeas proceeding in abeyance, while Balentine is allowed to exhaust his claims in state court.

Additionally, Balentine would request that this court's order specifically recite that Balentine is entitled to equitable tolling of the statute of limitations, so that Balentine can return to federal court for a merits review of the claims

**REASONS TO ISSUE THE WRIT OF HABEAS CORPUS**

Balentine's conviction and death sentence were obtained in violation of his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth amendments to the United States Constitution. U.S. CONST. amend. IV, U.S. CONST. amend. V, U.S. CONST. amend. VI, U.S. CONST. amend. VIII, and U.S. CONST. amend. XIV. Set out below are the grounds that warrant the issuance of the writ of habeas corpus. All factual and legal allegations presented in any claim or ground in this Petition are fully incorporated into each and every other claim or ground in the Petition.

**GROUND ONE:   Balentine was denied his Fourth amendment right to be free from unreasonable searches and seizures when testimony and physical evidence was introduced regarding his illegal detention and search on January 21, 1998.**

Balentine was denied his Fourth Amendment right to be free from unreasonable searches and seizures when testimony and physical evidence was introduced regarding his illegal detention and search on January 21, 1998. U.S. CONST. amend. IV. He did not have a full and fair opportunity to litigate this claim in the state courts because there was a lack of a colorable application of the correct Fourth Amendment constitutional standards. *Stone v. Powell*, 428 U.S. 465 (1976), *Gamble v. Oklahoma*, 583 F.2d 1161, 1164-65 (10th Cir. 1978).

**A.     Statement of Facts.**

At trial, the prosecution argued in opening statement and introduced at trial, testimony and physical evidence concerning a .32 caliber bullet to link Balentine to the murder of the victims. Officer Hardin testified he was dispatched to 1703 South Buchanan in response to a shots-fired call in the early morning hours at 2:27 a.m. on January 21, 1998. (RR 21:138).   Officer Hardin described a "shots-fired" call as "a complainant may hear a loud noise in particular area and call it in." (RR 4:75). Officer Hardin testified that as a result of that call, it was his job to

31

*go out and check to see if there's any armed person in the*
*area shooting off rounds or anything of that nature.*

(RR 4:75-76).

Hardin saw an individual walking on East 17th street, preparing to go north onto Buchanan. (RR 21:146-147). Hardin told the individual, who was ultimately identified as Balentine, "to stop, ... place his hands in the air," and had him back into the street. (RR 21:150). Thereafter, Hardin told Balentine to "place his hands on top of his head, interlocking his fingers, so that [Hardin] could conduct a Terry frisk on him." (RR 21:151). Hardin testified that "I had no indication at that point that he was armed." (RR 21:152).

Then the officer conducted a pat down search, whose purpose was "to determine if there's a weapon on the subject...." (RR 21:154). Hardin testified that the basis for stopping Balentine Hardin did not find any weapon during the *Terry* frisk.

Nonetheless, Hardin continued to detain Balentine, questioning him about his name, date of birth, where he lived or if someone else could tell Hardin where Balentine lived, his driver's license, his social security number, and where Balentine was going to. (RR 21:155-157).

32

Hardin then placed Balentine in the back seat of his patrol car, drove to the friend's house and ask the friend to come down and identify Balentine. (RR 21:158). Then Hardin asked Balentine if he had lived anywhere else in the vicinity, and drove Balentine to an address that was a vacant lot. Balentine told the officer he had lived in a trailer there than at been condemned and torn down. (RR 21:160).

Then Hardin stopped his patrol and attempted to further identify Balentine. (RR 21:161). At that point, Hardin placed handcuffs on Balentine whom he had placed in the back seat of his patrol car. (RR 21:163).

Then Hardin conducted a second pat-down search. (RR 21:163). During the second pat down search of Balentine, Hardin found a .32 caliber bullet in Balentine's pocket. (RR 20:18; 21:165-166). The officer let Balentine go after filling out a field interview card because it was not illegal to possess a bullet. (RR 21:166, 193, 196). The entire amount of time that Hardin spent with Balentine from initially stopping him to telling him he was free to go was approximately 45 minutes. (RR 21:203).

But then Hardin offered to give Balentine a ride, and drove him to 404 South Virginia. (RR 21:169). Even after Hardin had dropped Balentine off at 404 South Virginia, Hardin then drove back to Buchanan and continued to search. (RR 21:171). Neither Hardin, nor any other law enforcement officer, knew at the time that there had been a triple homicide. (RR 20:18).

Around three in the afternoon of January 21, 1998, Kelly Moon went to 510 East 17th Street and found the three dead bodies, and Chris Caylor alive. (RR 20:39, 40-42, 44; RR 22:77). The police were called.

At about 3:30 p.m., Sergeant Burgess and Sergeant Horn arrived at the crime scene. (RR 21:78; RR 22:77-78). At about 3:40 p.m., on January 21, 1998, Officer Rickwartz arrived at the crime scene to process the evidence. (RR 20:215). He found .32 caliber shell casings at the crime scene. (RR 20:228-229). Sergeant Horn was the lead special investigator. (RR 22:79).

Learning that .32 caliber shell casings had been found in the victims residence, and that a patrol officer had been called to a shots-fired call in that area the night before, Horn located the field interview card completed by Hardin. (RR 22: 80, 82). Horn went to interview Mr. Means. (RR 22:83-84).

Michael Means owned 308 North Virginia. (RR 4:224). He also owned the property at 510 East 17th Street. Balentine told Means that he had been thrown out of 510 East 17th Street several days before New Year's day, 1998. (RR 4:225). Means "gave [Balentine] a place to live at 308 North Virginia Street." (RR 4:225). There were two structures on 308 North Virginia Street, A and B. Means used the B portion for storage. Although Means referred to Balentine as his "guest," (RR 4:229), Means asked Balentine to "straighten it up a little bit inside the house.... to

34

clean it up some because it was filthy. And that's what he did, he cleaned it up." (RR 4:228-229). Means paid the utilities, which were in his name. (RR 4:230). Although both Means and Balentine had keys to the B building, (RR 4:231), Means testified to Balentine's reasonable expectation of privacy in what Means described as Balentine's "residence" (RR 4:235):

> If I know somebody is inside the house and I knock and they don't open the door for me, then I'll just come back at another time or try to catch them, you know. I'm not a landlord that forces my way in on anybody or tell people – you know, I'm not a dictator, a landlord dictator...."

(RR 4:234). Means confirmed again that because this was Balentine's residence, when was living there, he would not just go in. "I don't do that to my people." (RR 4:236).

Means testified he had allowed the police in because "they was the law." (RR 4:237). "I listen to what the law tells me to do, and they asked if they could search that premises and I told them yes, sir." (RR 4:237).

Horn searched 308 North Virginia Street, the residence of Balentine. He found a receipt for the purchase of a box of .32 caliber ammunition purchased at K-Mart on the night of the murders. (21:268-271; 22:96).

Prior to the trial, the defense had challenged the encounter between Officer Hardin and Balentine, and its fruits, in several motions to suppress, which were

denied by the trial court without written findings of fact and conclusions of law. (CR 1:136, 195). During the trial itself, the defense objected to the pat down search during which Officer Hardin found the .32 caliber bullet in Balentine's pocket and to any testimony by Hardin as to his encounter with Balentine on January 21, 1998, and any reference to any communications by Balentine to Officer Hardin during the encounter. (RR 20:133-134). The objections were overruled. (RR 21:134).

The direct appeal consisted of only four issues. The topic was limited to challenges arising from the encounter between Balentine and Hardin on the night of January 21, 1998, and the fruits thereof.

In its direct appeal opinion the Texas Court of Criminal Appeals set out and "review[ed] the evidence introduced at the hearing on appellant's motion to suppress.

> Officer Timothy Hardin of the Amarillo Police Department testified that he was dispatched on a shots-fired call at 2:26 a.m. on Wednesday, January 21, 1998. When Hardin arrived, the complainant stated that he thought he had heard .22 caliber shots to the east of his residence. Hardin looked around and found nothing in the complainant's backyard or the alleyway behind the house. Two other officers the arrived and offered to assist Hardin by searching the area in their vehicle. After the officers left, Hardin noticed a man, later identified as appellant, walking down the street two houses away from the complainant's residence.

> Hardin testified that when he first saw appellant, appellant had his hands in his pockets, appeared to be nervous, and was constantly looking over his shoulder in Hardin's direction. In addition, appellant was walking away from Hardin at a brisk pace. Hardin ordered appellant to stop and raise his hands in the air. Hardin then approached

appellant, and conducted a pat-down "Terry frisk" because he "didn't know if [appellant] might be the person who had fired shots" and that he "wanted to make sure that there was no weapon on [appellant] while I was speaking to him." Hardin did not feel any weapons.

Nevertheless, Hardin suspected that appellant may have been involved in the reported gunfire and he escorted appellant to the back seat of his patrol car for questioning. When Hardin asked appellant why he was in the area, appellant stated that he was walking from a Wal-Mart, which was approximately five miles away, to his sister's house, which was located several miles across town. Appellant identified himself as "John Lezell Smith" and told Hardin that he was staying with his sister. Appellant initially stated that he did not know his social security number but later told Hardin five of the digits. He then stated that he had planned to visit a friend in the area and agreed to let Hardin ask this friend to identify appellant because appellant did not have a driver's license or an identification card.

Hardin drove appellant to his friend's residence. Appellant's friend identified him as "John" and stated that he lived a block away, which contradicted appellant's story that he was staying with his sister several miles across town. Appellant explained that his friend was unaware he had moved. When Hardin asked appellant to show him where he used to live, appellant gave Hardin an address that turned out to be an empty lot.

Hardin asked appellant if he had ever been arrested in Amarillo and appellant replied that he had not. Hardin contacted the police dispatcher to run a records check. According to the police dispatcher, "John Lezell Smith" had been arrested for traffic warrants. Hardin again became concerned for his safety because he felt that a subject who would like to him during questioning might "commit some type of unsafe act or conceal a weapon."

Hardin placed appellant in handcuffs, had him exit the vehicle, and conducted a second, more thorough pat-down search. When he patted down the outside of appellant's front pants pocket, he felt what

he thought was a small pocket knife.  Hardin put his hand in appellant's pocket and felt what he thought was a small pocket knife.  Hardin put his hand in appellant's pocket and felt that the object was a lighter. While Hardsin was feeling the lighter, his hand touched an object that he immediately recognized as a bullet.  He removed the object from the pocket and saw that it was a .32 caliber bullet.  Appellant told Hardin that he had recently been on a hunting trip and forgotten the bullet in his pocket.  Hardin against placed appellant in the patrol car and called a supervisor who told Hardin to complete a field interview card and then release appellant because possession of a bullet was not against the law.

Hardin returned the bullet to appellant and offered him a ride to his sister's house which appellant accepted.  The trip took five to ten minutes and Hardin dropped appellant off at the residence at 3:36 a.m. Hardin returned to the area where he had detained appellant to have another look around but found nothing.  Later that day, officers for the Amarillo Police Department were called to the scene of a triple homicide that had occurred at a residence fifty yards from where Officer Hardin encountered appellant.  The police identified appellant as a suspect the day the victims were discovered.  Appellant was eventually arrested in July of 1998 in Houston.  At a pre-trial suppression hearing, appellant moved to suppress the physical evidence obtained as a result of Officer Hardin's search.  The trial court denied the motion and Hardin testified at trial about the bullet he found in appellant's pocket.  In addition, the State introduced evidence that the three victims were killed by .32 caliber bullets and that three spent cartridge shells found at the scene of the murders were marked identically to the bullet found on appellant."

*Balentine v. State*, 71 S.W.2d 763, 767-768 (Tex. Crim. App. 2002).

In its direct appeal opinion, the Texas Court of Criminal Appeals wrote that "the trial court did not make explicit findings of historical facts, so we review the evidence in the light most favorable to the trial court's ruling and assume that the trial

court made implicit findings of fact supported in the record." *Balentine*, 71 S.W.2d at 768.

**B.     Balentine was denied his Fourth Amendment rights.**

**1.     Standard of Review.**

The Fourth Amendment to the U.S. Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

In *Stone v. Powell*, 428 U.S. 465, 481-482 (1976), the United States Supreme Court wrote:

> We hold, therefore, that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

The failure of the state courts to apply the correct constitutional standard is a denial of an opportunity for full and fair litigation. *Gamble v. Oklahoma*, 583 F.2d 1161, 1164-65 (10th Cir. 1978); *but see Swicegood v. Alabama*, 577 F.2d 1322 (5th

Cir. 1976). In *Gamble*, the Tenth Circuit discussed the application of the *Stone*

Doctrine. The court wrote:

> Although *Stone* announced a verbal standard, it failed to clothe the words
> "opportunity for full and fair litigation" with any precise meaning. The only hint of
> meaning is a single, oblique footnote signaling the reader to consult *Townsend v.*
> *Sain*....
>
> ....
>
> An increasing number of circuits, including this one, believe that *Townsend* ... is not
> the sole measure of the meaning of "opportunity for full and fair litigation."...
> ***"Opportunity for full and fair consideration" ... contemplates recognition and at***
> ***least colorable application of the correct Fourth Amendment constitutional***
> ***standards***. Thus, a federal court is not precluded from considering Fourth
> Amendment claims in habeas corpus proceedings where the state court willfully
> refuses to apply the correct and controlling constitutional standards....

The Tenth Circuit also wrote that "[a]lthough the court announced it holding in terms

of 'full and fair litigation... its opinion repeatedly spoke of 'full and fair

consideration.'.... The Court's use of the words "consideration" and "litigation

interchangeably" suggests that in some instances more than procedural opportunity

to raise and litigation a Fourth Amendment claim is required. Indeed, consideration

connotes the actual evaluation of a claim under the correct constitutional standard.

Although it is not presented by this case, we also can foresee the possibility that the

correct federal standard could be applied, but in a manner so unconscionable as to

deny a defendant the opportunity for full and Fair Litigation." *Gamble*, 583 F.2d nn.

2 & 3.

40

2. **Balentine was denied his "opportunity for full and fair litigation;" the state court decisions were contrary to or an unreasonable application of Fourth Amendment search and seizure law.**

a. **The *De Facto* Arrest: The detention lasted longer than was necessary to effectuate the purpose of the stop, which was to see if "there was any armed person in the area shooting off rounds"; it evolved into an arrest.**

In its published opinion, the state court found that the investigative detention

"did not evolve into an arrest" on the basis of officer safety. *Balentine*, 71 S.W.3d at

771. The state court justified the *de facto* arrest by the following factors:

- Hardin had encountered appellant in an area where gunfire had been reported;

- appellant exhibited suspicious behavior and lied in response to Hardin's questions;

- Hardin was alone in the patrol car with appellant without a bulletproof partition between the front and back seats.

*Balentine*, 71 S.W.3d at 771. The state court's decision was contrary to and an

unreasonable application of *Terry* and *Royer* because the investigative detention of

Balentine lasted longer than necessary to effectuate the purpose of the stop.

Officer Hardin testified that he was called out on a "shots-fired" call, which he

explained as "a complainant may hear a loud noise in particular area and call it in."

(RR 4:75). Officer Hardin testified that as a result of that call, it was his job to

41

> *go out and check to see if there's any armed person in the*
> *area shooting off rounds or anything of that nature*.

(RR 4:75-76).  Thus, the purpose of the stop was defined by Officer Hardin in his direct testimony.

We will assume for the sake of argument that the state court was correct in finding that the *initial* detention was lawful on the basis of its length, that is, its duration in time.  *Balentine*, 71 S.W.3d at 770 ("C. Unreasonable Detention"). The reasonable suspicion, as articulated by Officer Hardin, was based on the nervous, evasive behavior by a lone individual at 2:30 am in the morning in the vicinity of the shots-fired call.  (RR 4:80-81).

We will also assume that the initial Terry-frisk was proper.  During that Terry-frisk, Balentine fully cooperated with Officer Hardin.  When Officer Hardin ordered Balentine to stop, Balentine complied.  When Officer Hardin ordered Balentine to raise his hands in the air and turn around, Balentine did so. When Hardin ordered Balentine to interlock his fingers and place them on top of his head, Balentine did as instructed.  (RR 4:81-82). Even though Officer Hardin deviated from his training and failed to pull Balentine off balance, Balentine allowed Officer Hardin to pat him down without incident.  (RR 4:84).

42

Although Officer Hardin testified that he was searching Balentine for safety reasons, (RR 4: 123), the point to the Terry-frisk was also to determine if Balentine was the "armed person in the area shooting off rounds."  That search did not produce any evidence to link Balentine to the shots-fired call.  Immediately prior to and during the Terry-frisk, Officer Hardin was within a foot and a half of Balentine. (RR 4:124). He saw Balentine's clothes, and testified that there was nothing unusual about Balentine's appearance.  (RR 4:124).  Officer Hardin did not find any ammunition. Officer Hardin did not find any gun powder residue on Balentine.  (RR 4:85).

At the conclusion of the Terry-frisk, the purpose of the stop had been effectuated. Officer Hardin was required by law to release Balentine.  The continued detention by Officer Hardin after the Terry-frisk, exceeded the purpose of the stop. *Royer*, 460 U.S. at 500 ("the search must be limited in scope to that which is justified by the particular purposes served by the exception"....); *Terry v. Ohio*, 392 U.S. 1, 19 (1968) ("The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible.").

The Terry-frisk revealed no wrongdoing by Balentine that related to the shots-fired call.  Yet, Officer Hardin testified that he "***didn't want to release [Balentine] until I was  – felt that I – that he was not  involved in any crime at that point***." (Emphasis supplied)  (RR 4:131).  Officer Hardin then placed Balentine in the back

43

seat of his patrol car and continued to question Balentine, first about his identity and about other matters.

The questioning that followed the Terry-frisk constituted a *de facto* arrest, and the subsequent search and seizure of a bullet from the pocket of Balentine constituted an unlawful search and seizure, because these actions did not effectuate the purpose of the stop. Police questioning, which extends the duration of the investigatory stop, is illegal under Fourth Amendment law because it is a violation of the "scope" requirement. In *United States v. Shabazz*, 993 F.3d 431, 436 (5th Cir. 1993), the Fifth Circuit wrote:

> In a garden variety *Terry* stop, the nature of the questioning during a later portion of the detention may indicate that the justification for the original detention no longer supports its continuation. ***Thus, when a police officer reasonably suspects only that someone is carrying a gun and stops and frisks that person, the officer, after finding nothing in a pat down, may not thereafter further detain the person merely to question him about a fraud offense.*** This is not because the questioning itself is unlawful, but because ***at that point suspicion of weapons possession has evaporated and no longer justifies further detention. When the officer is satisfied that the individual is not carrying a gun, the officer may not detain him longer to investigate a charge lacking reasonable suspicion***. At that point, continuation of the detention is no longer supported by the facts that justified its initiation. Thus, detention, not questioning, is the evil at which *Terry*'s second prong is aimed.

*See also  United States v. Fernandez*, 18 F.3d 874, 878-881 (10th Cir. 1994); *People v. Banks*, 650 N.E.2d 833 (N.Y. 1995) *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir. 1988) (extensive questioning about other matters unrelated to the stop may violate the Fourth Amendment).

The state court decision was contrary to and an unreasonable application of *Terry v. Ohio*, 392 U.S. 1 (1968) and *Florida v. Royer*, 460 U.S. 491 (1983) when it held that the detention did not evolve into an arrest. A Terry-frisk does not allow a free wheeling investigation, several searches and a seizure. The unlawful detention was tantamount to a *de facto* arrest, which was not supported by probable cause.

**b.      The .32 Caliber Bullet: Evidence pertaining to the unlawful search and seizure of the .32 caliber bullet in Balentine's pocket was inadmissible as the fruit of the poisonous tree.**

The state court decision states that "appellant's behavior became increasingly suspicious after the first pat-down search" and concluded that as a result of Balentine's "false and contradictory answers", that the subsequent search and seizure of the bullet in Balentine's pocket was a lawful search and seizure. But in fact, because the *Terry*-frisk concluded without evidence of past or current criminality of Balentine, the bullet was the fruit of the poisonous tree and evidence of it was inadmissible at trial. *Wong Sun v. United States*, 371 U.S. 471 (1963); TEX. CRIM. PROC. 38.23(a) ("No evidence obtained by an officer or other person in violation of any provision of the ... Constitution or laws of the Untied States of America, shall be admitted in evidence against the accused on the trial of any criminal case."). There was no attenuation by which there would have been an "inevitable discovery" of the

45

bullet, or by which the government would have discovered the bullet from an independent source.

### c.   The error was not harmless.

The introduction of the fruits of the poisonous tree was not harmless.  In *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), the United States Supreme Court specified the harmless error standard that applied in habeas corpus proceedings.  The *Brecht* Court adopted the standard articulated in *Kotteakos v. United States*, 328 U.S. 750 (1946), looking to whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623, *quoting Kotteakos*, 328 U.S. at 776.

There are several factors to be taken into consideration in making the harmless error determination.  They include, among others:

(3)   "the importance of the phase [of trial] affected by the error,"

....

(5)   the frequency of the error or the extent to which it "permeate[d] the proceedings"

(6)   The "central[ity] to the case, as actually tried, of the issue affected by the error."

(7)   The relative weakness of the properly admitted evidence, to the extent that this factor bears on the question whether the constitutional error did or did

not affect the thinking or deliberative processes of the actual jurors, or the "closeness of the case" on the evidence adduced at the original trial.

(8)   In cases in which evidence was improperly admitted, the extent to which:

    (a)   the prosecutor emphasized the improper evidence in closing argument....

    (b)   the improperly admitted evidence was likely to influence the jury's deliberations, either because it was particularly salient or appeared to be particularly probative of the ultimate issue ....

    (c)   the improperly admitted evidence did not duplicate other evidence that was lawfully presented to the jury

(10)   In cases in which there was more than one error, the "cumulative effect" of the errors.

(11)   Whether the court failed to give "curative instructions" or to take other remedial measures sufficient to prevent the error from substantially affecting the jurors' deliberative process.

RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRAC. & PROC. 1406-1412 (4th ed. 2001).

In the case at bar, the admission of Officer Hardin's testimony, particularly as to the .32 caliber bullet he found in the pocket of Balentine resulted in a fundamentally unfair trial. A review of the record demonstrates that this evidence permeated each and every aspect of the trial. The prosecution relied on this illegal search and seizure in his opening statement to link Balentine to the homicides. (RR 20:17-18) ("The police .... learned of Officer Hardin the night before having detained

the Defendant and finding that .32 caliber bullet in his pocket.  And yes, the shell

casings found at the scene of the crime were .32 caliber).

Absent the fruits of the poisonous tree, the case against Balentine was

circumstantial:

- Although Christopher Caylor testified that Balentine had told him he "was going to kill Mark" (RR 20:115), he also testified that Mark had had problems with a gang and had threatened them.  (RR 20:139-140).

- Christopher Caylor was asleep in the house where the homicides took place and was unaware of what happened or who had committed the killings.  (RR 20:117).

- Christopher Caylor testified that when he was first confronted with the deaths, his response was that he didn't know who did it.  (RR 20:161). It was only after reflection and consultation with the police that he named Balentine as the perpetrator.  (RR 20:161).

- Except for the .32 caliber shell casings, Officer Rickwartz testified that no evidence linked Balentine to the homicides:  not fingerprints, not fibers, not shoe prints, not skid marks, not tire tread marks, not a box of .32 caliber shells at Balentine's residence; not a gun at Balentine's residence; and not a gun on Balentine's person.  (RR 20:242; 270-273; 299; 302; 304; 332).

On the whole, the error was not harmless because the fruits of the illegal search

and seizure were central to the case, emphasized by the prosecutor, likely to influence

the jury's deliberations, particularly because there was no testimony from any witness

who saw the killings, and did not duplicate other evidence that was lawfully admitted.

In summary, the state courts' ruling was contrary to and an unreasonable application of *Terry* and *Royer* and the state courts' error was not harmless.


**C.      Exhaustion and Procedural Default Statement.**

This issue was presented in the direct appeal as Point of Error – Number One. It was also reasserted in the state habeas briefing as grounds numbers 15 and 16.

**GROUND TWO:   Balentine was denied his Fourth amendment right to be free from unreasonable searches and seizures when the police searched and seized evidence from his dwelling without a warrant.**

Balentine was denied his Fourth Amendment right to be free from unreasonable searches and seizures when the K-Mart receipt for the .32 caliber ammunition was admitted at trial.  U.S. CONST. amend. IV.  He did not have a full and fair opportunity to litigate this claim in the state courts because there was a lack of a colorable application of the correct Fourth Amendment constitutional standards.  *Stone v. Powell*, 428 U.S. 465 (1976), *Gamble v. Oklahoma*, 583 F.2d 1161, 1164-65 (10th Cir. 1978).

**A.   Statement of Facts.**

Balentine incorporates by reference the Statement of Facts recited in Ground One.  In addition, he adds the following:

At the trial, the court admitted a K-Mart receipt for .32 caliber ammunition at trial.  (RR 22:92-93).  The receipt was found at 308 North Virginia, the residence of John Balentine, whose clothing, tools and housewares were on the premises at the time of the search and seizure.  (RR 4:234-235; 22:92-93).

Michael Means owned 308 North Virginia.  (RR 4:224).  He also owned the property at 510 East 17th Street.  Balentine told Means that he had been thrown out

of 510 East 17th Street several days before New Year's day, 1998. (RR 4:225).

Means "gave [Balentine] a place to live at 308 North Virginia Street." (RR 4:225).

There were two structures on 308 North Virginia Street, A and B. Means used the B

portion for storage. Although Means referred to Balentine as his "guest," (RR

4:229), Means asked Balentine to "straighten it up a little bit inside the house.... to

clean it up some because it was filthy. And that's what he did, he cleaned it up." (RR

4:228-229). Means paid the utilities, which were in his name. (RR 4:230). Although

both Means and Balentine had keys to the B building, (RR 4:231), Means testified to

Balentine's reasonable expectation of privacy in what Means described as Balentine's

"residence" (RR 4:235):

> If I know somebody is inside the house and I knock and they don't open
> the door for me, then I'll just come back at another time or try to catch
> them, you know. I'm not a landlord that forces my way in on anybody
> or tell people – you know, I'm not a dictator, a landlord dictator...."

(RR 4:234). He confirmed again that because this was Balentine's residence, when

was living there, he would not just go in. "I don't do that to my people." (RR 4:236).

The reason that Means allowed the police in was because "they was the law."

(RR 4:237). "I listen to what the law tells me to do, and they asked if they could

search that premises and I told them yes, sir." (RR 4:237).

51

In the state court opinion, the court cited to *Schneckloth v. Bustomonte*, 412

U.S. 218 (1973), *United States v. Matlock*, 415 U.S. 164, 171 (1974), and *Garcia v.*

*State*, 887 S.W.2d 846, 851-52 (Tex. Crim. App. 1994), to uphold the search and

seizure as lawful on the basis that it is not the "third's party's *actual* use of the

premises searched, ..... [but] whether the third party had the *authority* to use the

premises." *Balentine*, 71 S.W.3d at 772-773.


**B.      Balentine was denied his Fourth Amendment rights.**


**1.      Standard of Review.**

The Fourth Amendment to the U.S. Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures, shall not be violated,
> and no Warrants shall issue, but upon probable cause, supported by Oath
> or affirmation, and particularly describing the place to be searched, and
> the persons or things to be seized.

U.S. CONST. amend. IV.

In *Stone v. Powell*, 428 U.S. 465, 481-482 (1976), the United States Supreme

Court wrote:

> We hold, therefore, that where the State has provided an opportunity for
> full and fair litigation of a Fourth Amendment claim, the Constitution
> does not require that a state prisoner be granted federal habeas corpus

relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

The failure of the state courts to apply the correct constitutional standard is a denial of an opportunity for full and fair litigation. *Gamble v. Oklahoma*, 583 F.2d 1161, 1164-65 (10th Cir. 1978); *but see Swicegood v. Alabama*, 577 F.2d 1322 (5th Cir. 1976). In *Gamble*, the Tenth Circuit discussed the application of the *Stone* Doctrine. The court wrote:

> Although *Stone* announced a verbal standard, it failed to clothe the words "opportunity for full and fair litigation" with any precise meaning. The only hint of meaning is a single, oblique footnote signaling the reader to consult *Townsend v. Sain*....
>
> ....
>
> An increasing number of circuits, including this one, believe that *Townsend* ... is not the sole measure of the meaning of "opportunity for full and fair litigation."... ***"Opportunity for full and fair consideration" ... contemplates recognition and at least colorable application of the correct Fourth Amendment constitutional standards***. Thus, a federal court is not precluded from considering Fourth Amendment claims in habeas corpus proceedings where the state court willfully refuses to apply the correct and controlling constitutional standards....

The Tenth Circuit also wrote that "[a]lthough the court announced it holding in terms of 'full and fair litigation... its opinion repeatedly spoke of 'full and fair consideration.'.... The Court's use of the words "consideration" and "litigation interchangeably" suggests that in some instances more than procedural opportunity to raise and litigation a Fourth Amendment claim is required. Indeed, consideration connotes the actual evaluation of a claim under the correct constitutional standard.

Although it is not presented by this case, we also can foresee the possibility that the correct federal standard could be applied, but in a manner so unconscionable as to deny a defendant the opportunity for full and Fair Litigation." *Gamble*, 583 F.2d nn. 2 & 3.

> **2.      Balentine was denied his "opportunity for full and fair litigation;" the state court decisions were contrary to or an unreasonable application of Fourth Amendment search and seizure law.**

Balentine was a tenant of Means, who could not provide consent to search the premises because Balentine had a reasonable expectation of privacy in 308 North Virginia. *Chapman v. United States*, 365 U.S. 610 (1961). Nor could Means provide consent as the proprietor, if Balentine were considered to be a guest, for the same reason. *Stoner v. California*, 376 U.S. 483, 489 (1964). And finally, any "consent" by Means was the result of implied coercion. "Where there is coercion there cannot be consent." *Bumper v. North Carolina*, 391 U.S. 542 (1968).

> **a.      The landlord, Means, could not give consent to search the premises of his tenant, Balentine.**

The state court's decision was contrary to and an unreasonable application of Fourth Amendment law. In the *Balentine* opinion, the state court cited to *Garcia v. State*, 887 S.W.2d 846, 851-52 (Tex. Crim. App. 1994). Balentine, 71 S.W.3d at 773.

The *Garcia* opinion cited to *Chapman v. United States*, 365 U.S. 610 (1961) for the proposition that the Texas Court of Criminal Appeals "continues to adhere to the rule that a landlord cannot generally give effective consent to allow a search of a tenant's premises."

The holding in *Balentine*, was contrary to, and an unreasonable application of *Chapman*. Chapman makes it clear that even if a landlord has the right of entry to inspect or clean the premises, the landlord may not consent to the search of a tenant's premises. In the case at bar, even if Balentine did not pay in U.S. currency, there was both past and present consideration for his lease of 308 North Virginia from his landlord, Means.

Means testified that he offered Balentine the use of building B because in the past Balentine had always been a man of his word. Even though his name was not on the lease at 510 East 17th Street, Balentine had promised Means, "'Mike, I'll have your rent for you on a certain day,' [and] he always had it for me on that day." (RR 4:227). "He kept my residence over there at 510 East 17th Street clean. He would ask me for paint so he could paint the kitchen area, paint the bathroom area...." (RR 4:228).

More importantly, there was present consideration as well. Means testified that in return for allowing Balentine to stay at 308 North Virginia, Means asked Balentine

to "clean it up some because it was filthy.  And that's what he did, he cleaned it up."

(RR 4:229).

Further, Balentine had a reasonable expectation of privacy in 308 North Virginia.  It was Means custom and practice not to invade the premises of his tenants. As he testified, he was not a "dictator landlord."

> If I know somebody is inside the house and I knock and they don't open the door for me, then I'll just come back at another time or try to catch them, you know.  I'm not a landlord that forces my way in on anybody or tell people – you know, I'm not a dictator, a landlord dictator...."

(RR 4:234).  He confirmed again that because this was Balentine's residence, when was living there, he would not just go in.  "I don't do that to my people."  (RR 4:236).

### b.   As a proprietor, Means, could not give consent to search the premises of his guest, Balentine

Even if this court were to construe Balentine as merely a guest, even then the search and seizure was illegal because the state court decision was contrary to and an unreasonable application of *Stoner v. California*, 376 U.S. 483, 489 (1964).  In *Stoner*, the U.S. Supreme Court held that a search of a defendant's hotel room without his consent  or without a search warrant was unlawful even if it was conducted with the consent of hotel clerk or the proprietor.

     **c.**    **Means was coerced by color of law, and the search was not legal.**

And finally, whether or not the thirty party relationship was that of a tenant or a guest, the consent was not legal because it was not voluntary. The state court opinion was contrary to and an unreasonable application of *Amos v. United States*, 255 U.S. 313 (1921) ("The contention that the constitutional rights of defendant were waived when his wife admitted to his home the government officers, who came, without warrant, demanding admission to make search of it under government authority, cannot be entertained. We need not consider whether it is possible for a wife, in the absence of her husband, thus to waive his constitutional rights, for it is perfectly clear that under the implied coercion here presented, no such waiver was intended or effected.").

In the case at bar, Means testified was because "they was the law." (RR 4:237). "I listen to what the law tells me to do, and they asked if they could search that premises and I told them yes, sir." (RR 4:237). There was an implied coercion. "Where there is coercion there cannot be consent." *Bumper v. North Carolina*, 391 U.S. 542 (1968).

### d.   The error was not harmless.

On the whole, the error was not harmless because the fruits of the illegal search and seizure were central to the case, emphasized by the prosecutor, likely to influence the jury's deliberations, particularly because there was no testimony from any witness who saw the killings, and did not duplicate other evidence that was lawfully admitted. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) *quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946); RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRAC. & PROC. 1406-1412 (4th ed. 2001).

## C.   Exhaustion and Procedural Default Statement.

This issue was presented in the direct appeal as Point of Error – Number Two alleging error resulting from the denial of the motion to suppress evidence arising from the warrantless search of the residence of Balentine on January 22, 1998. *Balentine*, 71 S.W.2d at 772-773.  Balentine specifically cited and argued the privacy rights  of a tenant, as well as the rights of a guest.  Direct Appeal Brief, p. 14.

**GROUND THREE:   Balentine was denied his Sixth and Fourteenth amendment rights to a fair and impartial trial when the trial court failed to provide an article 38.23 jury instruction.**

Balentine was denied his Sixth and Fourteenth Amendment rights to a fair and impartial trial when the trial court failed to provide an article 38.23 jury instruction. U.S. CONST. amend VI; U.S. CONST. amend XIV.

**A.      Statement of Facts.**

In the direct appeal briefing, Balentine argued that the trial court erred in failing to instruct the jury to disregard illegally obtained evidence in accordance with Article 38.23. *Balentine*, 71 S.W.3d at 773.    TEX. CODE CRIM. PROC. 38.23 provides, in part:

> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

In its direct appeal opinion, the state court wrote:

> In his third point of error, appellant contends that the trial court erred by failing to instruct the jury to disregard illegally obtained evidence in accordance with Article 38.23.   A trial court is required to include an Article 38.23 instruction in the jury charge only if there is a factual dispute as to how the evidence was obtained. *Thomas v. State*, 723 S.W.2d 696, 707 (Tex. Crim. App. 1986).

> Appellant contends that a fact issue was raised concerning Means's authority to consent to the search of the rear house. The facts that supported the warrantless search of Means's rear building were, however, not controverted. Although appellant

59

now advances the legal argument that Means's authority to use and control the premises was not co-extensive with appellant's, the factual bases for Means authority to consent to the search were uncontroverted at trial. No instruction was required. Appellant's third point of error is overruled.

*Balentine*, 71 S.W.3d at 773-774.

### 1.     Standard of Review.

The Texas Court of Criminal Appeals cited to *Thomas v. State*, 723 S.W.2d

696, 707 (Tex. Crim. App. 1986). *Thomas* held that:

> Normally, the failure to object at trial preserves nothing for review. See discussion, *ante*, at p. 700. However, where jury charge error is first raised on appeal, this Court will consider the complaint, albeit under a more exacting harm analysis if error is found. See *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (Opinion on Rehearing) ("... [I]f no proper objection was made at trial and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'--in short 'egregious harm.' ") Cf. *Kelly v. State*, 669 S.W.2d 720 (Tex. Crim. App.1984) (failure to include Art. 38.23 instruction is not fundamental error in absence of objection).

*Balentine*, 71 S.W.3d at 773.

### 2.     Balentine was denied a fair and impartial trial because the failure to provide the required jury charge, created fundamental error.

For all of the reasons argued in Claims One and Two, incorporated by reference

herein, the search and seizure by Officer Hardin was illegal.   Thus, Balentine was

entitled to an Exclusionary Rule Instruction from the trial court.   The failure to

provide such an instruction constituted fundamental error and harm. *Zuliani v. State*,

60

97 S.W.3d 589 (Tex. Crim. App. 2003) ("Therefore, a reviewing court should not reverse unless a clear abuse of discretion is shown.... An abuse of discretion occurs "only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree.'").

### 3.    The Error Was Not Harmless.

On the whole, the error was not harmless. The fruits of the illegal search and seizure were central to the case. They were emphasized by the prosecutor. They were likely to influence the jury's deliberations, particularly because there was no testimony from any witness who saw the killings, and did not duplicate other evidence that was lawfully admitted. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) *quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946); RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRAC. & PROC. 1406-1412 (4th ed. 2001).

*Balentine* cited to *Thomas*, which in turn cited to *Kelly v. State,* 669 S.W.2d 720 (Tex. Crim. App.1984) for the proposition that failure to include Art. 38.23 instruction is not fundamental error in absence of objection. This proposition is contrary to and an unreasonable application of federal law. *Balentine*, 71 S.W.3d at 773.  In *United States v. Lane*, 474 U.S. 438, 450 & n.13 (1986), the United States

Supreme Court suggested that errors occurring during the trial court's instructions are more important than ones during lengthy presentation of evidence; *Kotteakos*, 328 U.S. at 768 (error not harmless, despite strong evidence of guilt, because error "pervaded the entire [jury] charge.").

## B.    Exhaustion and Procedural Default Statement.

This issue was presented in the direct appeal brief Point of Error – Number Three, although it was plead as an error by the trial court by failing to instruct the jury to disregard illegally obtained evidence in accordance with TEX. CODE CRIM. PROC. 38.23.

The manner in which the claim was plead on direct appeal, nevertheless, called to mind Sixth and Fourteenth amendment violations.  Texas Court of Criminal Appeals cited to *Thomas v. State*,  723 S.W.2d 696, 707 (Tex. Crim. App. 1986) for the proposition that even where a trial objection is not raised, the court will "reverse if the "error is so egregious and created such harm that he '***has not had a fair and impartial trial***' ...."  (Emphasis supplied).   Moreover, the language of the Exclusionary Rule Instruction itself, quoted by the state court, speaks to evidence obtained in violation of "the Constitution ... of the United States of America...." *Balentine*, 71 S.W.3d at 774.

Thus, the state court was on notice of the claim. *Blankenship v. Estelle,* 545 F.2d 510, 514 (5th Cir. 1977), (a "... petitioner ... is not required to cite to the state court 'book and verse' on the federal constitution, ... [although the Fifth Circuit recognized that] he *must* present to the state court some articulated basis and substance for his federal constitutional claim"). *See also Daye v. Attorney General*, 696 F.2d 186, 194 (2nd Cir. 1982).

**GROUND FOUR:   Balentine was denied his Sixth amendment right to effective assistance of counsel who failed to object to "consent" by Means, and to request an article 38.23 jury instruction.**

Balentine was denied his Sixth Amendment right to effective assistance of counsel who failed to controvert the consent to search, and to request an article 38.23 jury instruction. *Strickland v. Washington*, 466 U.S. 466, 686 (1984); ABA GUIDELINE 11.7.3; U.S. CONST. amend VI.

**A.     Statement of Facts.**

TEX. CODE CRIM. PROC. 38.23 provides, in part:

> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

In the direct appeal briefing, Balentine argued that the trial court erred in failing to instruct the jury to disregard illegally obtained evidence in accordance with Article 38.23. *Balentine*, 71 S.W.3d at 773.

The Texas Court of Criminal Appeals denied relief on the basis that "although appellant now advances the legal argument that Means's authority to use and control the premises was not co-extensive with appellant's, the factual bases for Means's authority to consent to the search were uncontroverted at trial.  No instruction was required."  (Emphasis in original). *Balentine*, 71 S.W.3d at 774.

In state habeas, Balentine argued that his trial counsel was ineffective in failing to request a jury charge patterned after article 38.23 §6 (hereinafter the "Exclusionary Rule Instruction").  (CR 1:308).   Apparently the claim was based on the colloquy between defense counsel and the court at the close of the guilt/innocence phase:

| | |
|---|---|
| The Court: | Has the defense had an opportunity to review the proposed Charge of the Court? |
| Mr. Durham: | Yes, I have. |
| The Court: | Are there any requests or objections? |
| Mr. Durham: | No objections. |

(RR 24:5).

In its Findings of Fact and Conclusions of Law, the state habeas court denied relief without specific fact findings and merely concluded:

> 4.    Applicant's trial counsel was not ineffective in not requesting a jury instruction on the voluntariness of his confession pursuant to article 38.22 secs. 6 and 7 of the Texas Code of Criminal Procedure.

## B.    Balentine was denied his Sixth Amendment right to effective assistance of counsel, who failed to preserve his rights.

### 1.    Standard of Review.

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having

produced a just result." *Strickland v. Washington*, 466 U.S. 466, 686 (1984).

*Strickland* stated a two-pronged test for judging claims of ineffective assistance of

counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professionally competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

Further, the United States Supreme Court has looked for guidance to the ABA

Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases

in evaluating counsel's performance. *Wiggins v. Smith*, __U.S. __, 123 S.Ct. 2527,

2535 (2003) (In which the U.S. Supreme Court *citing Strickland*, 466 U.S. at 690-

691, for the proposition that "Prevailing norms of practice as reflected in American

Bar Association standards and the like ... are guides to determining what is

reasonable"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards

for Criminal Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).   In this case, ABA

GUIDELINE 11.7.3 – Objection to Error and Preservation of Issues for Post Judgment

Review, and its Commentary is applicable.

**2.      Trial counsel's performance was deficient.  There is a reasonable likelihood, but for counsel's deficient performance, the outcome would be different**

The 1989 ABA GUIDELINES are applicable because they were in effect at the time of the trial. Specifically applicable is ABA GUIDELINE 11.7.3 – Objection to Error and Preservation of Issues for Post Judgment Review, and its Commentary. It provides:

> ABA GUIDELINE 11.7.3 –      Objection to Error and Preservation of Issues for Post Judgment Review
>
> Counsel should consider, when deciding whether to object to legal error and whether to assert on the record a position regarding any procedure or ruling, that post judgment review in the event of conviction and sentence is likely, and ***counsel should take steps where appropriate to preserve, on all applicable state and Federal grounds, any given question for review***.

Trial counsel's performance was deficient.  We will assume for the sake of argument, as the state court wrote "the factual bases for Means authority to consent to the search were uncontroverted at trial." If this is the case, then the performance of trial counsel was deficient because the search was in violation of basic Fourth amendment rights as argued in Claims One and Two above, yet trial counsel failed to preserve the issue.

Moreover, trial counsel's performance was also deficient because they failed to request an instruction, or voice an objection for failure to give an instruction under TEX. CODE CRIM. PROC. 38.33.

As repeatedly argued in the preceding grounds, the fruits of the illegal search and seizure were a central theme in the case, and the link the prosecution drew between Balentine and killings. In light of the incriminating nature of the illegally seized evidence and the testimony arising from it, there is a reasonable probability that had the issue been properly preserved and the instruction been requested and given, the outcome would have been different.

## C.   Exhaustion and Procedural Default Statement.

This issue was presented as an ineffective assistance of trial counsel error in failing to request the instruction in state habeas as ground number 18.  In the direct appeal opinion, the Texas Court of Criminal Appeals found there was no error in the trial court failing to provide an Exclusionary Rule Instruction, and thus declined to rule on whether their was a waiver arising from the failure of trial counsel to assert the issue. *Balentine*, 71 S.W. 3d at 773-774, n. 11.

**GROUND FIVE:    Balentine was denied his due process right and his right to effective assistance of appellate counsel because the confession was obtained in violation of TEX. CODE CRIM. PROC. 38.22.**

Balentine was denied his due process Fourteenth amendment right to due process when the confession was admitted in violation of TEX. CODE CRIM. PROC. 38.22 §3 (a)(1). This statutory provision is strictly construed, and requires that before an oral or written statement is admissible in a court of law, it must be recorded. The issue was not raised by appellate counsel. But for appellate counsel's deficient performance, the outcome would have been different because without the confession, the case was largely circumstantial. U.S. CONST. amend. IV; *Douglas v. California*, 372 U.S. 353 (1963); *Evicts v. Lucy*, 469 U.S. 387 (1985).

**A.    Statement of Facts.**

Officer Paul Horn, the investigating officer, had interrogated John Balentine in Houston, TX in July, 1999. Horn admitted that Balentine's initial admission was not recorded:

> A.    ***The initial conversation with him was not recorded, nor the first time he told me of his involvement was not recorded.***
>
> ....
>
> Q.    Describe that to the jury, if you would, how you set up the tape recorder.

A.   *After speaking with John and he told me of his involvement, I told him that we needed* –

(Emphasis supplied) (RR 22:109, 112).

Prior to the trial, defense counsel Herrmann, had hired Dr. Shay to provide a linguistic analysis of the confession.   Dr. Shay's analysis reflects that Horn had elicited the confession before it was ever recorded.   Dr. Shuy writes:

Taped Confession of John Lezell Balentine, 7-25-98, 10:55 a.m.

Evidence of an earlier conversation

*This confession statement is clearly a retell of an earlier conversation Valentine had wit the investigator (PH) who did the interrogation.*

*The following statements provide evidence of this:*

p.1 (40 seconds into the tape):

> PH:... and I'll repeat what we already went over earlier at 9:50 o'clock...

p.2     (3 minutes and 50 seconds into the tape)

....

P.10 (11 minutes 57 seconds into the tape)

> JB:   Then I shot Mark in the head, and shot the other two in the head.   Weren't all of them shot in the head?
> PH:   Right.
> JB:   Uh-huh.

Valentine is uncertain of where he is alleged to have shot the men. His question reveals that the officer knows the answer and that Balentine is trying to get the officer's confirmation of something told Balentine earlier.

P. 10 (12 minutes and 15 seconds in to the tape)

70

> **PH:** *And when you shot Markie, what part of his head did you shoot him in?  Do you remember?*
> **JB:** *Dead center, wasn't it?*

> *Balentine is uncertain of where in the head he is alleged to have shot Markie.  His question reveals that the officer knows the answer and that Balentine is trying to get the officer's confirmation of something told Balentine earlier.*

(Emphasis supplied) Exhibit 2: Affidavit of Roger Shuy, Ph.D., Exhibit B:  Analysis of Balentine Confession.

Like the linguist services expert, Dr. Shuy, the trial court too pick up on the illegality of the confession.  The court called counsel to the bench and admonished:

Court:     Now, let me just tell you while we're up here, you know, 15.17 is real specific about tape recording of the confession, correct?

Coyle:     Yes, sir.  15.17?

Court:     I'm sorry, 38.22.

Coyle:     38.22, yes, Your Honor.

Court:     And when you get him talking about the man saying he was implicated before the tape recording goes on, you're playing with some fire here.

Coyle:     I understand, Your Honor.

Court:     That's what he just volunteered for you.

Coyle:     I understand, Your Honor.

Durham:    Which is my objection.

Court:     Well that objection is sustained.

Durham:    May I have an instruction to disregard?

Court:     Yes, sir.

(RR 22:113-114).

Despite being put on notice both by the defense expert and the trial court, defense counsel failed to preserve the issue for review because he did not move for a mistrial. Appellate counsel did not brief the issue at all.

## B.    Argument and Authorities.

### 1.    Standard of Review.

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court has looked for guidance to the ABA Guidelines for the Appointment

72

and Performance of Counsel in Death Penalty Cases. *Wiggins v. Smith*, __U.S. __, 123 S.Ct. 2527, 2535 (2003) (In which the U.S. Supreme Court *citing Strickland*, 466 U.S. at 690-691, for the proposition that "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).

In the case at bar, ABA Guideline 11.7.3, ABA Guideline 11.9.2; ABA Guideline 11.9.3 are applicable. In each instance, the guidelines impose a duty on trial counsel, direct appeal counsel and post-conviction counsel to preserve, on all applicable state and Federal grounds, any given question for review.

### 2.    Trial and appellate counsel's performance was deficient.

As the trial court had pointed out, TEX. CODE CRIM. PROC. 38.22 precludes the admission of any statement obtained in violation of it. The statutory provision is *strictly* construed.   TEX. CODE CRIM. PROC. 38.22 §3 reads:

> (a)    No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
>> (1)    an electronic recording, which may included motion picture, video tape, or other visual recording, is made of the statement;
>
> ....

    (e)    ***The courts of this state shall strictly construe Subsection (a)*** of this section and may not interpret Subsection (a) as making admissible a statement unless al requirements of the subsection have been satisfied by the state,....

Although trial counsel objected and requested an instruction, he failed to thereafter request a mistrial in order to preserve the issue. To the extent that the issue was not preserve because trial counsel failed to obtain an adverse ruling, then his performance was deficient. *Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993).

The performance of appellate counsel was likewise deficient to the extent that at a minimum, direct appeal counsel failed to urge fundamental error.

And to the extent that direct appeal counsel had no obligation to raise an issue that was not preserved and it was the responsibility of state habeas counsel, then the error is cognizable in this proceeding for all the reasons set forth in Introduction, 2.F Exhaustion and Procedural Default Statement, incorporated by reference herein.

**3.**    **The deficient performance raises a reasonable probability that the outcome would have been different.**

As a result, the deficient performance of Balentine's former counsel raises a reasonable probability that the outcome would have been different. The case against John Balentine was largely circumstantial. There had been evidence that Caylor had been involved in drugs and that he had had problems with the West Side gang. (RR 20:140). Indeed, Exhibit 36, showed the word "West" written on the building in

74

which the victims were killed.  And Officer Rickwartz had testified that there were several west side gangs.  (RR 20:304).   There is a reasonable probability, but for the deficient performance of counsel, the outcome would have been different. Accordingly, Mr. Balentine requests habeas relief.


**C.     Exhaustion and Procedural Default Statement.**

It is anticipated that the government will argue that this claim is unexhausted and procedurally defaulted.   *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Dispensa v. Lynaugh*, 847 F.2d 211, 217 (5th Cir. 1988); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).  However, Balentine can demonstrate cause and prejudice to excuse any default.   The arguments in the introductory section are incorporated by reference herein.  *See* Introduction, 2. F.

**GROUND SIX:   Balentine was denied his Eighth and Fourteenth amendment rights to individualized sentencing because the trial court failed to define "life sentence" and/or instruct the jury that if sentenced to life in prison, Balentine must serve at least forty (40) years before he would be eligible for parole.**

Balentine was denied his Eighth and Fourteenth amendment rights to due process and heightened reliability in sentencing because the trial court failed to define "life sentence" and/or instructed the jury that if sentenced to life in prison, Balentine would have to serve a minimum of at least forty (40) years before he would be eligible for parole.  U.S. CONST. amend. VIII;   U.S. CONST. amend. XIV.

**A.      Statement of Facts.**

Pre-trial, defense counsel filed his motion number 10 "to Voir Dire on Parole Law – 40 Year Minimum."  (CR 56).  The motion argued:

> If Defendant is convicted of capital murder, Defendant will be forced to serve a minimum of forty calendar years before Defendant will be eligible for parole.  *The jury has a right to know this information in answering the special issues*.  Further, Defendant has a right to know how this information will affect the jurors' answers to the special issues.  These questions are necessary in order to allow Defendant to intelligently exercise Defendant's peremptory challenges, as well as to have the effective assistance of counsel.  This request is made on the basis of the Sixth Amendment to the United States Constitution, as well as Article I §§ 10 and 15 of the Texas Constitution, and V.A.C.C.P. 36.79.

> Defendant would ask the following questions of each venireman:

> 1.     Would the minimum length of time a defendant could serve in prison before he could be paroled be something you would want to know in answer[sic] the special issues?

> 2.     On which special issue would this be important?

<div align="center">76</div>

3.      How would a 40-year minimum sentence be important to you in answering the special issues?

4.      Would you be more likely, or less likely, generally, to view a defendant as a continuing threat to society if you knew he would not be paroled for a minimum of forty years?

(Emphasis supplied) (CR 1:56).  The trial court summarily denied the motion without explanation.  (CR 1:58).

In addition, Balentine filed pre-trial motion number 12.  He alleged "Texas law prohibits capital jurors from being informed that a defendant convicted of capital murder and given a life sentence must serve at least 40 years before being eligible for parole" and that this failure "violate[s] a capital defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution."  (CR 1:78-80).

At the close of the punishment phase, the defense submitted "Defendant's Special Requested Charge as to Punishment."  (CR 1:315).  The requested charge instructed, among other things:

Should you return an affirmative finding on Special Issue No. 1 and a negative finding on Special Issue No. 2, the Court will sentence the defendant to death.  Should you return a negative finding on Special Issue No. 1, the Court will sentence the defendant to confinement in the Texas Department of Criminal Justice Institutional Division, for life.

Under the law applicable in this case, the defendant, if sentenced to a term of life imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time.  Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation.  If a prisoner engages I [sic "in"]

77

misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned on a life sentence might be reduced by the award of parole.

***Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole until the actual calendar time served, without consideration of good conduct time, equals forty (40) calendar years.  Eligibility for parole does not guarantee that parole will be granted***.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend o [sic] decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded or forfeited by this particular defendant.  You are not to consider the manner in which the parole law may be applied to this particular defendant.

During you [sic] deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice or of the Governor, or how long the defendant would be required to serve to satisfy a sentence of life imprisonment.

(Emphasis supplied) CR 316-317).

The trial court denied the requested charge.  (RR 26:79).  The jury did not receive any instruction about how long Balentine would be required to serve in prison before becoming eligible for parole if they were to give him a life sentence.  The direct appeal did not raise this issue.

78

However, it was raised in state habeas as Eighth and Fourteenth amendment challenges in Grounds 9 and 10.  In the Findings of Fact and Conclusions of Law, the state habeas court wrote:

> 1. The United States Supreme Court and/or the Texas Court of Criminal Appeals have rejected the challenges Applicant makes here in his "Grounds for Relief" 1 through 14 to the constitutionality of the Texas death penalty scheme.  Additionally, Applicant waived review of many of those complaints by not timely raising them in this Court.

(CR 2:255).  The state habeas court denied relief, which was affirmed by the Texas Court of Criminal Appeals.

## B. Balentine was denied his Eighth Amendment right to heightened reliability in sentencing.

### 1. Standard of Review.

The United States Supreme Court has recognized the need for heightened reliability in sentencing.  It wrote:

> While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, ... , requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.... This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

79

*Woodson v. North Carolina*, 428 U.S. 280, 304-305 (1976).

Relying on *Woodson*, Justice Souter in his concurrence in *Simmons v. North Carolina*, 512 U.S. 154, 172-173 (1994), wrote that the Eighth Amendment's "need for heightened reliability... mandates recognition of a capital defendant's right to require instructions of the meaning of legal terms used to describe the sentences... which a jury is required to consider in making a reasoned moral choice between sentencing alternatives."

### 2.    Balentine was denied his Eighth Amendment right to heightened reliability in sentencing

The right to have a capital sentencing jury accurately informed of the meaning of a life imprisonment alternative stems from the Eighth Amendment bar against arbitrary and capricious infliction of the death penalty.  Studies have shown that how long the jurors perceive a defendant will serve, affects their life/death determinations.

As an example, in the 1990 article, RADELET, MICHAEL AND JAMES W. MARQUART, "*Assessing Non-dangerousness During Penalty Phases of Capital Trials*," 54 ALBANY L. REV. 845-861 (1990), the authors wrote:

> ". . . predictions of future behavior are made conditional upon the environment in which the defendant will be living and ***thus a discussion of dangerousness and nondangerousness repeatedly reminds the jury that the offender will be living in prison for many years, if not forever.***

80

*Such reminders are extremely important because, even if the prosecution never mentions the issue, many jurors are likely to assume that, absent execution, the offender will be back on the streets within a few years.* . . . fears of future dangerousness are a strong pro-death penalty argument. (Emphasis supplied). *Id*. at 847.

"A recent telephone poll conducted in Florida, where the only alternative to death is imprisonment for a minimum of twenty-five years, revealed that *ninety percent of the respondents believed that offenders spared the death penalty would be released in less than twenty-five years. Nearly half of those potential jurors stated that they would be less willing to vote for death if they were convinced the offender would be incarcerated for at least twenty-five years.* . . . *Thus, at the very least, raising the question of the probability of future dangerousness (in prison or in the community) during the penalty phase allows the jury to hear that the offender will not be on the streets for many years, if ever.*" *Id*. at 847-848.

Other studies reflect that how long a juror thinks an individual sentenced to life imprisonment will actually serve is directly relevant to whether the juror votes for death:

> AUSTIN SARAT, *Violence, Representation and Responsibility in Capital Trials: The View from the Jury*, 70 IND. L. J. 1109, 1132-1133 (1995) ("The jurors in the Connors case were overwhelmingly concerned with incapacitation as a goal of criminal punishment. None of them believed that executions deterred others, and none embraced a retributivist rationale for capital punishment. Each of them was, however, deeply concerned with the possibility that Connors might someday be back on the streets of Bowling. . . . Life that does not mean life and death that does not mean death. . . . [One juror stated] 'we all pretty much knew that when you vote for death you don't necessarily or even usually get death. Ninety-nine percent of the time they don't put you to death. You sit on death row and get old.'");

EISENBERG & WELL, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1, 3 (1992) ("Not surprisingly jurors assessing dangerousness attach great weight to the defendant's expected sentence if a death sentence is not imposed. Most importantly, jurors who believe the alternative to death is a relatively short time in prison tend to sentence to death. Jurors who believe the alternative treatment is longer tend to sentence to life.").

*See also* BOWERS, *Capital Punishment & Contemporary Values: People's Misgivings and the Court's Misperceptions*, 27 LAW & SOC'Y REV. 157 (1993) (summarizing survey data form Florida, Georgia, Nebraska, New York, and South Carolina and concluding that "both citizen and juror grossly underestimate the time that will usually be served by murderers not sentenced to death").

In *Gregg v. Georgia*, 428 U.S. 153, 190 (1976), in which the Supreme Court found that the imposition of death did not in all circumstances violate Eighth and Fourteenth amendment concerns, the opinion noted that "[i]f an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision." *But see Collier v. Cockrell*, 300 F.3d 577, 58 (5th Cir. 2002).

Balentine was denied his Eighth amendment right to heightened reliability in sentencing because "States can not limit the sentencer's consideration of any relevant circumstance that could cause [the jury] to decline to impose the [death] penalty." *McClesky v. Kemp*, 481 U.S. 279, 306 (1987). In the case at bar, the trial court's ruling limited the jury's consideration of parole eligibility, which could have provided a reason why the jury could have determined death was inappropriate, and also affected the jury's ability to accurately assess the weight to be accorded to Balentine's mitigating evidence. Hence, habeas relief must be granted.

## C.   Balentine was denied his Fourteenth Amendment right to due process.

### 1.   Standard of Review.

The United States Supreme Court held that "[t]he Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" *Simmons v. South Carolina*, 512 U.S. 154 (1994).

### 2.   Balentine was denied his Fourteenth Amendment right to due process.

In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the Court wrote:

The Due Process Clause does not allow the execution of a person "on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*,

> 430 U.S. 349, 362 (1977). In this case, the jury reasonably may have believed that petitioner could be released on parole if he were not executed. To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration.

*See also Shafer v. South Carolina*, 532 U.S. 36 (2001).

*Simmons* was premised on the notion that where the prosecution introduces evidence of future dangerousness, then "the actual duration of the defendant's prison sentence is indisputably relevant... [because] there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole." *Simmons*, 512 U.S. at 163.

At the time of Balentine's trial, Texas juries were provided instructions on the applicability of parole in all felony cases, except that of capital murder. *See* TEX. CRIM. PROC. art. 37.07(4)(a). Commenting on this troubling situation, four justices of the United States Supreme Court wrote:

> The situation in Texas is especially troubling. In Texas, the jury determines the sentence to be imposed after conviction in a significant number of noncapital felony cases. In those noncapital cases, Texas law *requires* that the jury be given an instruction explaining when the defendant will become eligible for parole. Thus, the Texas Legislature has recognized that, without such an instruction, Texas jurors may not fully understand the range of sentencing options available to them. Perversely, however, in capital cases, Texas law *prohibits* the judge from letting the jury know when the defendant will become eligible for parole if he is not sentenced to death. The Texas rule unquestionably tips the scales in favor of a death sentence that a fully informed jury might not impose.

*Brown v. Texas*, 522 U.S. 940 (1997).

Indeed in years following Balentine's trial, the Texas Legislature acknowledged the relevance of parole eligibility by adopting a procedure by which the defendant in a death penalty case may request the jury be instructed on eligibility for parole. *See* TEX. CODE CRIM. PROC., Art. 37.071(2)(e)(2)(B).[5]

Although the life sentence option was one that was forty (40) years before eligibility for parole, "[a]nyone familiar with the current realities of parole in Texas on a capital case knows that the chances of a first parole in Texas are slim to none." DAVE O'NEIL AND BILL HABERN, *What the Jury Needs to Understand: The Parole Process at the Punishment Stage of a Death Penalty Case,* 31 (No. 2) VOICE FOR THE DEFENSE 18, 19 (March 2002). Balentine was 30 years old at the time he was received by the prison. *See* http://www.tdcj.state.tx.us/ stat/ balentinejohn.htm Thus,

---

[5] "[The] amendment to Article 37.071, which ultimately passed, requires that, upon defense request, a jury in a capital case be instructed as follows:

> Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It can not accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

Dave O'Neil and Bill Habern, *What the Jury Needs to Understand: The Parole Process at the Punishment Stage of a Death Penalty Case,* 31 (No. 2) VOICE FOR THE DEFENSE 18 (March 2002).

the earliest – and very unlikely – date by which he would be paroled would be at the age of 70.

Justice Stevens pointed out that Justice Scalia had correctly observed that "'a logical application of that holding [*Simmons*] would permit "the admission of evidence showing that parolable life-sentence murderers are in fact almost never paroled, or are paroled only after age 70; ... or ... the recidivism rate for elderly prisoners released after long incarceration is negligible...." *Brown v. Texas*, 522 U.S. 940, 355 (1997). *But see Collier v. Cockrell*, 300 F.3d 577, 583 (5th Cir. 2002).

Thus, the life sentence in Texas has the practical effect of a life sentence without the possibility of parole because Balentine would not be released, if he were released at all, until an age at which his recidivism possibility would have been negligible. Accordingly, he was entitled to a jury instruction on parole eligibility, and habeas relief should be granted.


**D.   Exhaustion and Procedural Default Statement.**

These issues were presented in the state habeas application as Grounds number 9 and 10, and also in pre-trial motions numbers 10 and 12. (CR 1:56-57; CR 1:78-80).

**GROUND SEVEN (*LOCKETT* DOCTRINE): Balentine was denied his federal Eighth amendment right to individualized sentencing under the *Lockett* Doctrine.**

The evidence developed in federal habeas to date, suggested a plethora of mitigation themes: childhood neglect, mental illness, community violence, extreme poverty, exposure to trauma, neurologic deficits. No mitigation presentation, indeed no testimony at all, was introduced on behalf of Mr. Balentine in the punishment phase of the trial. As a result, the sentencing authority was prevented from hearing and considering crucial evidence that addressed the issue of the moral culpability of Mr. Balentine in answering Special Issue #2. U.S. CONST. amend. VIII; *Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

**A.    Statement of Facts.**

On August 26, 1998, Balentine was indicted. (RR 1:2).

At least as of September 10, 1998, Balentine was represented by James Durham, who filed a motion for an investigator and forensic expert to "conduct the necessary scientific examinations of the evidence in this case...." (CR 1:6). A jury selection expert was also requested. (CR 1:191). Both motions were granted. (CR 18, 194). No motions were filed for forensic psychological or psychiatric assistance to evaluate and testify as to risk assessment and mitigation. No motion for a mitigation specialist was filed.

87

On March 8, 1999, defense counsel filed a motion to remove Darrell Dewey, the investigator appointed by order September, 1998. (CR 1:219). Dewey was replaced by Kathy Garrison, who attested in state habeas:

> Regarding the John Balentine Capital Murder case, I was called in early March to take over for another investigator. I was provided nothing from his files, so I am not sure what he did or didn't do.
>
> I wanted to learn the case as quickly as possible, to locate and interview witnesses, to procure records and documentation for my client as quickly as could be allowed given the time I had. I was only able to confer with Trial Counsel and John during breaks in trial and after hours. It was a severe disadvantage to be given essentially thirty days (March 11th to April 12th) to investigate the witnesses, investigate any potentially mitigating evidence and confer with Counsel and Applicant.
>
> Much of the information I requested did not arrive until after the trial. Some of it was helpful for us, some not. Either way, it was too late for John Balentine to use. My only question is this – would John have taken the plea bargain for life had he known what I was able to learn after the jury returned the verdict.

(Exhibit E to Post Conviction Application for Writ of Habeas Corpus). Trial counsel did not file a motion for continuance.

On March 22, 1999, voir dire began. (CR 1:377). Ultimately, fourteen jurors (including alternates) were selected: John Allen, Andrew Friedrichsen; Lynda Thornton; Dory England; Edward Sisson; Carmen Sena; Angel Kincannon; Alice Eubanks; Robin Henry; Deric Herbert; Tara Cline; Garry Mathis; Steven Fulton; and Douglas Kalka. (CR 1:271).

The defense did not question the venire as a whole, nor any of the seated individuals, about mitigation and special issue #2. The individual questioning of

each seated juror generally lasted for only a matter of a few pages of reporter record. In the main, the defense asked about the race of Balentine, reasonable doubt, and the venire's understanding of special issue #1 (future dangerousness). The one question Durham did ask about Special issue #2 was whether it was a "wimp out question:"

> Q.    Mr. Kalka, counsel used a phrase in talking about Question No. 2 that it's called a wimp out question. He's heard it called that. Do you think that it's macho to give somebody the death penalty?
>
> A.    No.
>
> Q.    So you're not wimping out if you don't do it, are you, sir?
>
> A.    I wouldn't think so.

(RR 15: 145). *See* Defense General Voir Dire (RR 9:96-223; 10:119-262); John Allen, (RR 11:102-104); Andrew Friedricksen (RR 11:149-164); Lynda Thorton (RR 12:77-81); Dory England (RR 12:120-124); Edward Sisson (RR 12:155); Carmen Sena (RR 13:88-89); Angel Kincannon (RR 14:173-184); Alice Eubanks (RR 14:197-206);  Robin Henry (RR 14:265-274); Deric Herbert (RR 14:287-289); Tara Cline (RR 14:299-304); Gary Mathis (RR 15:22); Steve Fulton (RR 15:130-132); Douglas Kalka (RR 15:-145).;    On April 7, 1999 both sides announced ready and the guilt/innocence phase began that day. (CR 1:378).

The theory in the guilt/innocence phase was silent about such mitigation themes as childhood neglect, mental illness, community violence, extreme poverty, exposure to trauma, neurologic deficits.    Even though Dr. Shuy had suggested a

89

possible defense based on mental incapacity, his recommendation was ignored. Instead, the defense argued in opening about "how the police, from the beginning to now, have completely failed to do their job, and the reasonable doubt that's been raised." (RR 23:9).

The defense elicited evidence that the investigating officers did not collect fibers, compare dirt samples, get a positive match to Balentine's fingerprints, made no treadmark or shoe comparisons, failed to take Chris Caylor's blood sample, ignored the West Side 16 as potential suspects, did not find a box of shells or a pistol in Balentine's residence, failed to test fire the gun in the alley. (RR 24:31,28-67).

There had been testimony that Mark Caylor had threatened to kill John Balentine, that Caylor had purchased a gun, and Caylor and his friends had gone looking for John Balentine. (RR 20:104-106, 129, 200). In Balentine's confession, he states that he was told that Caylor was going to shoot him:

Q.     – you were telling me about, that after you were out of the house, that you
       had got word through Angela that Markie was saying that he was going to
       shoot you?

A.     Yeah. Yeah, he sure did.

....

A.     ... he threatened me. He threatened anybody who come over there looking
       for me.

....

A.     And them kids was in the car and stuff, you know, waving it around.

90

....

A.      He was waving the gun around and talking about how he was going to kill my
        black ass and all that.

....

A.      And waving that gun around saying he was going to kill whoever come over
        there looking for me, whether I'm with them or whatever.

....

A.      ... I believed him.  He was on drugs.

(RR 22:131-132).

Following the close of the guilt/innocence phase, the court submitted a jury
charge that contained only a single instruction on capital murder.  (CR 3:651-671)
The defense did not object.  (RR 24:8).  No lesser included offense instructions were
requested or given.  On April 16, 1999, the jury returned a verdict of guilty of capital
murder.  (CR 1: 379).

On April 19, 1999, there was a single day of punishment phase testimony by
the prosecution.  After the State rested, there was the following dialogue between
defense and the court:

Court:      Call your first witness.

Durham:     Your Honor, we, pursuant to instructions from the Court, we are not
            prepared to proceed until 1:30.

Sherrod:    You Honor, can we approach just one minute?

Court:      Sure, Come on up.

91

(Whereupon the following took place at the bench:)

Sherrod:   Judge, Kathy spent most of the weekend trying to change everything because you told us to be ready at 1:30. We've got all of those people subpoenaed. I think all of them are coming. They're suppose to be here at 1:30. I would like 30 minutes form the time they get here to talk to them, if at all possible, if we could start at 2:00.

The only reason I'm not ready, Judge, is because we were assured it would take the whole day and you instructed us to be ready at 1:30, so – I mean, I don't know what else to do.

Durham:   As a matter of fact, we were – you know, based on their conversation Friday, we were talking about staring Tuesday morning with our witnesses because they said it would take the day, today for their witnesses, and you told us to be ready at 1:30.

Sherrod:   Just so the Court will know, we've got about four or five, maybe six, depending on what I talk to them about at 1:30. It's going to go very quickly.

Slaughter:   In the State's defense, Your Honor, I think I told the Court I would be done probably in the morning, but --

Court:   No, sir, that's not what you said at all. You said it would take all day and I told them to be ready at 1:30, knowing that it wouldn't take all day. Well, we can look at the record.

(RR 77-78).

The court released the jury, and asked them to be back at 1:30 in the afternoon.

(RR 26:78). While the jury was out, the jury charge was considered by the court and

counsel for both parties. The defense had submitted "Defendant's Special Requested

Charge as to Punishment. (CR 1:315). When give the choice by the Court to argue

their motion or just have the judge sign the order denying the requested instruction,

92

Durham stated to the court "Just go ahead and sign it. I think we've argued it sufficiently." The court denied the request. (RR 26:79).

The jury returned to the courtroom and the defense rested. (RR 26:80). The court made a notation in the file that the defense "rests w/o having called any Ws." (CR 1:379).

The jury was provided with special issue #2, which read:

> Do you find from the evidence, taking into consideration all of the evidence, including circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(CR 1:329).

In closing arguments following the conclusion of the punishment phase, the prosecution argued to the jury that the second special issue "tells you also ... to consider: the circumstances of the offense, *the Defendant's character and background, and the personal moral culpability of the Defendant*." (RR 26:87).

The prosecution then spoke at length about Balentine's life history:

> Back in the Revolutionary War, a man once said, "Those who forget the past are condemned to repeat it." That phrase fits this trial exactly. It fits this man exactly. Look at the Defendant's past and see if you can portray where this man is headed in his life. When he was 14 years old, in 1983, he was adjudicated delinquent....."

The prosecution concluded that "[w]ithout his past history he is a future danger to society. And when you throw in his past history, you've got the trend to show it."

93

(RR 26:91). "There are no mitigating circumstances ... that warrant a life sentence...."
(RR 26:92).

In closing, the defense argued in the punishment phase for life based once again on inept police investigation and the lack of reasonable doubt – a theory that had already proved ineffective and resulted in a verdict of guilty. The defense asked repeatedly: "How strongly do you feel that Johnny is the one that actually pulled the trigger? How strongly do you feel, if you didn't have the bullet and the testimony from the clerks, how strongly do you feel that that statement was correct?" (RR 26:93).

The defense did nothing to recast Balentine's life experiences as mitigating and relate these experiences to the client and to the crime itself. The prosecution's argument to the jury that there was no mitigating evidence was left unchallenged. The jury answered "yes" to special issue #1 (future dangerousness) and "no" to special issue #2. (CR 1:328-329). Balentine was sentenced to death with a time lapse of little more than six months from the date of indictment.

**B.**     **Argument and Authorities.**

**1.**     **Standard of Review.**

Under the Lockett Doctrine, the "fundamental respect for humanity underlying the Eighth Amendment. . . . [mandates the] consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett v. Ohio*, 438 U.S. 586, 601 (1978) *citing Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).   The U.S. Supreme Court wrote:

> In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." *McCleskey v. Kemp*, 481 U.S. 279, 304, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262 (1987) (emphasis in original). Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that *the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense*. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a " 'reasoned *moral* response to the defendant's background, character, and crime.'

(Emphasis supplied and in the original).  *Penry*, 492 U.S. at 327-328.

Several years later, in *Skipper v. South Carolina* 476 U.S. 1 (1986), "this rule was extended to require admission of evidence that was unrelated to culpability" (*i.e.*, good person evidence, such as good behavior and adjustment to prison following conviction and sentence to death).  *Truesdale v. Aiken*, 480 U.S. 527, 528 (1987)

(Powell, J., dissenting).  (Collectively these *Lockett/Skipper* rulings will be referred to as the Lockett Doctrine).

Under the Lockett Doctrine, the sentencer in a capital case must be permitted to consider any relevant mitigating circumstance.  The definition of "mitigating" is very broad and defined by the U.S. Supreme Court as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett*, 438 U.S. at 604.

### 2.    Mitigation investigation done to date suggests that there is a plethora of Lockett/Skipper evidence

A preliminary mitigation investigation done in federal habeas revealed that there was ample mitigation to be found as attested to by Jane McHan, mitigation specialist.  *Wiggins,* 123 S.Ct. at 2538;  ABA GUIDELINE 11.4.1.

4.    I was court appointed in federal habeas as a mitigation specialist on behalf of John Balentine.  In the course of my investigation, I have done preliminary interviews.  Attached are my reports that summarized the information I learned from Clara Smith (Exhibit A), Eric Smith (Exhibit B), Angelina Watson (Exhibit C), and Lynn Rowe (Exhibit D).  These reports are true and correct and were made by me in the course and scope of my investigation in the Balentine matter.

5.    As aforementioned, these reports are based on preliminary interviews of only a few of the extensive family members of Mr. Balentine.  It has been my experience that in order to fully develop a social history, it is necessary to have several interviews with a witness in order to complete the interview process and obtain a complete picture of what the client's life has been like.

6.    Nonetheless, even based on the limited information revealed to date, there are several mitigation themes that appear, as for example:

96

a.    <u>a history of potential mental illness</u>:  Eric Smith related several strange behaviors of John saying John would eat a whole bag of sugar, he ran through a door for no reason, completely broke through it, although no one was chasing him; his mom was scared John would flip out or something and took John to the mental health clinic in Newport, and thereafter, John was sent off for a month.

b.    <u>a history of domestic abuse and addiction</u>: Clara Smith, John's mother related that John's father, James Henry Balentine, would start drinking on the weekends and that James would slap her in the face, gave her black eyes on many occasions and had a "real hot temper." John witnessed these assaults on his mother.

c.    <u>absence of adult supervision</u>: Eric Smith relates that their mother was not home much because she was working so much and the kids had to fend for themselves a lot.

d.    <u>extreme poverty</u>: Eric Smith relates that his mother would not take welfare; there were seven kids who lived in a three bedroom house; they did not always have enough to eat, but they always had something even if it was just cereal.

e.    <u>absence of a father figure or any positive male role model</u>: Clara Smith relates how James Balentine modeled alcoholism and domestic violence, and died in a car accident. Her subsequent marriage to George Henry Tyson, who went by the last name of Smith, provided no better a role model. Clara relates how she found out "all kinds of things" about Smith, including how he might have shot a preacher before she knew him.

f.    <u>corruptive environment</u>: Angelina Watson relates that she never knew John to be around "positive people" very much and had been "exposed to the wrong environment for so long."

g.    <u>slow learners</u>: Although Clara Smith relates that several of her children were "lazy" there is a recurring themes among several of the children that suggests they were learning disabled, including John who was placed in special education. Eric relates that when he asked to be placed in special education the school refused thinking he "wanted to get out of work" and that his mother "would not push the issue" because she was "non-confrontational." Almost all of the kids did not finish high school.

h.    <u>possible post traumatic stress disorder</u>: There appears to be a pattern that shows that John either witnessed domestic violence, or was

himself physically assaulted over the course of his life, starting as a young child. Eric relates that John told him that the people in the "mental thing" whipped him "all the time with a paddle or a belt," that John was "abused a lot when he was in jail at 17," describing John as having knots on his head like "cartoon knots, like skin peeling back and the knot coming through," and the threats by the victims prior to their death that they wanted to kill John.

7.      I have only scratched the surface, but the combination of poverty, chaotic family life, poor adult example, abuse/neglect, alcohol abuse by dad, and school issues lead me to believe that there is plenty of mitigation evidence in this case, and it was there to be found, if defense counsel had mounted an adequate mitigation investigation.

8.      Various family members consistently reported to me that they were not contacted by the defense attorneys or any agent acting on their behalf. At least one family member told me he had made attempts to contact the defense attorneys, who did not contact him back.

Exhibit 4: Affidavit of Jane McHan.

In summary, deprived of the testimony of family, friends, and forensic experts there was no mitigating evidence for the jury's consideration in answering special issue #2. The language of the jury instruction was treated essentially as superfluous verbiage. Thus, the sentence of death is inherently unreliable. Mr. Balentine, therefore, requests habeas relief. U.S. CONST. amend. VIII; *Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

## C.      Exhaustion and Procedural Default Statement.

It is anticipated that the government will argue that this claim is unexhausted and procedurally defaulted. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971);

*Dispensa v. Lynaugh*, 847 F.2d 211, 217 (5th Cir. 1988); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). However, Balentine can demonstrate cause and prejudice to excuse any default.  The arguments in the introductory section are incorporated by reference herein.  *See* Introduction, 2. F.

**GROUND EIGHT (MITIGATING EVIDENCE – IAC):   Balentine was denied his federal Eighth and Fourteenth amendment rights to individualized sentencing because trial counsel failed to investigate, develop and present any mitigation evidence at all.**

Trial's counsel performance was deficient.   They never questioned the venire to determine if they were able to consider relevant mitigating evidence, or instruct them about special issue #2. The questioning was limited to Balentine' race, the issue of reasonable doubt, and the offense.

Trial counsel also failed to adequately investigate, develop and present mitigating evidence to rebut the aggravating evidence introduced by the prosecutor, ABA GUIDELINE 11.4.1.  They sought no funding for, nor called forensic experts to testify as to risk assessment or mitigation, nor did they call any family or friends.

Even if there were ongoing plea negotiations, trial counsel still has "the obligation to take steps necessary to prepare a defense."   ABA GUIDELINE 11.6.1. Defense counsel failed to comport with the mandate.

The deficient performance raises a reasonable probability that the outcome would have been different.  Where there is an inadequate investigation, there can be no "strategic" decision.  U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *Wiggins v. Smith*, __ U.S. __, 123 S.Ct. 2527 (2003); *Williams v. Taylor,* 529 U.S. 362 (2000); *Strickland v. Washington*, 466 U.S. 668 (1984).

## A.    Statement of Facts.

Mr. Balentine relies on the Statement of Facts in Claim Seven, incorporated by reference herein.

## B.    Argument and Authorities.

### 1.    Standard of Review.

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court has looked for guidance to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. *Wiggins v. Smith*, __U.S. __,

101

123 S.Ct. 2527, 2535 (2003) (In which the U.S. Supreme Court *citing Strickland*, 466 U.S. at 690-691, for the proposition that "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).

In the case at bar, ABA Guideline 11.4.1, ABA Guideline 11.6.1; ABA Guideline 11.7.1, ABA Guideline 11.8.1, and ABA Guideline 11.8.3 (1989) are applicable.

## 2.    Trial counsel's performance was deficient.

In *Wiggins v. Smith*, __U.S.__, 123 S.Ct. 2527 (2003), the U.S. Supreme Court held that in reviewing claims of "strategy":

> [W]e defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments:
>
> > [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; ***and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.*** In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Wiggins*, 123 S.Ct. at 2535.

102

Trial's counsel performance was deficient. It is owed no deference whatsoever, because they failed to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, __U.S.__, 123 S.Ct. 2527 (2003).

### a.   The mitigation evidence uncovered in federal habeas would have lead a reasonable attorney to investigate further.

ABA GUIDELINE 11.4.1 – Investigation provides:

A.   Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.

. . . .

C.   The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. ***This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.***

ABA GUIDELINE 11.8.3 provides:

ABA Guideline 11.8.3 – Preparation for the Sentencing Phase
. . . .

F.   In deciding which witnesses and evidence to prepare for presentation at the sentencing phase, counsel should consider the following:

1.   ***Witnesses familiar with and evidence relating to the client's life and development***, from birth to the time of sentencing, who would be favorable to the client, explicative of the offense(s) for which the

103

client is being sentenced, or would contravene evidence presented by the prosecutor;

2.   ***Expert witnesses*** to provide medical, psychological, sociological or other explanations for the offense(s) for which the client is being sentenced, to give a favorable opinion as to the client's capacity for rehabilitation, etc. and/or to rebut expert testimony presented by the prosecution.

(Emphasis supplied).

A preliminary mitigation investigation done in federal habeas revealed that there was ample mitigation to be found. *Wiggins,* 123 S.Ct. at 2538; ABA GUIDELINE 11.4.1. The themes included:

- the potential mental illness of Balentine;

- extreme poverty;

- addictive disease in the paternal family:

- exposure to domestic violence throughout his childhood;

- absence of a father figure or any positive male role model;

- absence of adult supervision;

- head injury and possible brain damage; and

- possible post traumatic stress disorder as a result of domestic violence, actual assaults on him as a youth both when he was place in a mental health facility and prison.

*See* Exhibit 4: Affidavit Jane McHan.

104

**b.      Trial counsel had an obligation to take steps necessary, including requesting a continuance, to prepare a defense even if plea negotiations were ongoing**

Even if plea negotiations with the prosecution were ongoing, this did not relieve trial counsel of their obligation to investigate or file a continuance so that there was sufficient time to prepare a defense, particularly as to mitigation evidence. ABA GUIDELINE 11.6.1 provides:

A.      Counsel should explore with the client the possibility and desirability of reaching a negotiated disposition of the charges rather than proceeding to a trial. In so doing, counsel should fully explain the rights that would be waived by a decision to enter a plea instead of proceeding to trial, and should explain the legal and/or factual considerations that bear on the potential results of going to trial.

....

E.      ***The existence of ongoing plea negotiations with the prosecution does not relieve counsel of the obligation to take steps necessary to prepare a defense.*** If a negotiated disposition would be in the best interest of the client, initial refusals by the prosecutor to negotiate should not prevent counsel fro making further efforts to negotiate.

The upshot was that the defense provided no *Lockett/Skipper*[6] evidence whatsoever for the jury's consideration. They did not detail evidence of Balentine's childhood neglect, mental illness, extreme poverty, exposure to trauma, neurologic

---

[6]      In *Lockett v. Ohio*, 438 U.S. 586 (1978), the U.S. Supreme Court held that "the Eighth Amendment prohibits States from excluding, at a capital-sentencing proceeding, relevant evidence that tended to lessen the defendant's culpability." *Truesdale v. Aiken*, 480 U.S. 527, 528 (1987) (Powell, J., dissenting). The "fundamental respect for humanity underlying the Eighth Amendment. . . . [mandates the] consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett v. Ohio*, 438 U.S. 586, 601 (1978) *citing Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

In *Skipper v. South Carolina* 476 U.S. 1 (1986), "this rule was extended to require admission of evidence that was unrelated to culpability" (*i.e.*, good person evidence, such as good behavior and adjustment to prison following conviction and sentence to death). *Truesdale v. Aiken*, 480 U.S. 527, 528 (1987) (Powell, J., dissenting).

deficits, etc.   They did not call a single family member or friend to testify to good person evidence.  They did not call – nor had they ever requested funding for — a forensic psychologist or psychiatrist to describe the client's life experiences, and relate these experiences to the client and to the crime itself.

### c. Trial counsel failed to voir dire on Special Issue #2, which was treated essentially as superfluous verbiage throughout all phases of the trial.

The recently updated ABA Guidelines contain a history note that the guideline on voir dire and jury selection, ABA Guideline 11.7.2, was "amended to reflect recent scholarship demonstrating that the starkest failures of capital voir dire are ... the failure to uncover jurors who are unable to consider particular mitigating circumstances."  ABA GUIDELINE 10.10.2, *History of Guideline* (Feb. 2003 3d.).

That failure by defense counsel was obvious in Balentine's trial.   As aforementioned, the defense did not question or instruct the venire as a whole, nor any of the seated individuals, about mitigation and special issue #2.   In the main, the individual questioning of each seated juror generally lasted for only a matter of a few pages of reporter record on the issue of Balentine's race, reasonable doubt, and the venire's understanding of special issue #1 (future dangerousness).

As a result, it was improbable, if not impossible for the jury to have given any meaning to special issue #2, when they had no instruction as to its meaning or evidence to implement its application. They were not even qualified in the jury selection process to determine if they were capable of considering such evidence.

### d.     The prosecution capitalized on the deficient performance of trial counsel using Balentine life history to argue future dangerousness; trial counsel offered no testimony to demonstrate how Balentine's life history reduced his moral culpability.

The jury was provided with special issue #2:

Do you find from the evidence, taking into consideration all of the evidence, including circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(CR 1:329).

In closing arguments following the conclusion of the punishment phase, the prosecution argued to the jury that the second special issue "tells you also ... to consider: the circumstances of the offense, *the Defendant's character and background, and the personal moral culpability of the Defendant*." (RR 26:87).

The prosecution then spoke at length about Balentine's life history:

Back in the Revolutionary War, a man once said, "Those who forget the past are condemned to repeat it." That phrase fits this trial exactly. It fits this man exactly. Look at the Defendant's past and see if you can portray where this man is headed in his life. When he was 14 years old, in 1983, he was adjudicated delinquent....."

107

The prosecution concluded that "[w]ithout his past history he is a future danger to society. And when you throw in his past history, you've got the trend to show it." (RR 26:91). "There are no mitigating circumstances ... that warrant a life sentence...." (RR 26:92).

The defense did nothing to recast Balentine's life experiences as mitigating and relate these experiences to the client and to the crime itself. As a result, defense counsel left unchallenged the prosecution's argument to the jury that there was no mitigating evidence.

The defense argument at the close of the punishment phase was a rehash of the argument following the guilt/innocence phase: it was "mitigating" that the police were deficient in their investigation of the crime. (RR 26:92-98) ("But ladies and gentlemen, that second one [special issue #2] also asks you to talk about the offense.... How strongly do you feel that Johnny is the one that pulled the trigger?".... "Do you feel that the evidence was put together so good by the police that there was no question in your mind?".... "Is there anyone on this jury that questions whether that officer missed the gun?") (RR 26:93, 94).

This argument resulted in a verdict of guilty. Once the jury had determined that there was no reasonable doubt in the guilt/innocence, then it was not a reason to to find for life. A sentence of death was the inevitable result.

### 3. The deficient performance raises a reasonable probability that the outcome would have been different.

As a result, the deficient performance of trial counsel raises a reasonable probability that the outcome would have been different. Counsel's deficient performance: prevented the jury of from hearing information that was crucial to the life/death determination; and allowed the prosecution to capitalized on the lack of mitigation to win a death sentence.

The deficient performance of trial counsel deprived Mr. Balentine of his Eighth and Fourteenth amendment rights to have the jury fully consider this background and its relevance to his moral culpability. *Penry v. Lynaugh*, 492 U.S. 302 (1989); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). There is a reasonable probability, but for the deficient performance of counsel, the outcome would have been different. Accordingly, Mr. Balentine requests habeas relief.


## C. Exhaustion and Procedural Default Statement.

It is anticipated that the government will argue that this claim is unexhausted and procedurally defaulted. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Dispensa v. Lynaugh*, 847 F.2d 211, 217 (5th Cir. 1988); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). However, Balentine can demonstrate cause and

prejudice to excuse any default.   The arguments in the introductory section are incorporated by reference herein.   *See* Introduction, 2. F.

**GROUND NINE (DIMINISHED CAPACITY, 8TH AND 14TH AMENDMENT VIOLATIONS & EVIDENTIARY INSUFFICIENCY): Balentine was denied his federal 8th and 14th amendment rights. The State of Texas secured a conviction and sentence of death predicated on evidence that was both legally and factually insufficient.**

Mr. Balentine was convicted of capital murder in violation of his Eighth and Fourteenth amendment rights to due process and to be free from cruel and unusual punishment. He was convicted on the basis of evidence that was both legally and factually insufficient to prove *mens rea*. Because of his diminished capacity, Mr. Balentine lacked the necessary *mens rea* to commit capital murder and the prosecution secured a conviction, without proof beyond a reasonable doubt as to it. *In re Winship*, 397 U.S. 358, 364 (1970); U.S. CONST. amend. VIII; U.S. Const. amend. XIV.


**A.      Statement of Facts.**

The indictment charged that John Balentine, on or about the 21st day of January 21, 1998, in Potter County, TX "did then and there intentionally and knowingly cause the death of an individual, namely Mark Caylor, Jr., by shooting the said Mark Caylor, Jr. with a firearm, and did then and there intentionally and knowingly cause the death of two other individuals, namely Kai Geyer and Steven Brady Watson by shooting" them with a firearm, all in the same criminal transaction. (CR 1:2).

111

The jury instructions specifically defined intentionally and knowingly as follows:

> A person acts intentionally, or with intent, with respect to the result of his conduct when it is his conscious objective or desire to cause the result.
>
> A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.
>
> A person is criminally responsible if the result would not have occurred but for his conduct.
>
> You are instructed that a person commits an offense only if he voluntarily engages in conduct, including an act, omission, or possession.  Conduct is not rendered involuntary merely because the person did not intend the results of his conduct.

(CR 1:308-308).

Prior to trial, the defense had hired Professor Roger W. Shuy, a professor of Linguistics at Georgetown University, who had been qualified as an expert in numerous cases and jurisdictions.  Professor Shuy reviewed the taped confession of Balentine.  In a writing found in the files of trial counsel, Professor Shuy placed trial counsel on notice, that mental incapacity is possible theory.  *See* Exhibit 3: Shuy communication to Herrmann, located in trial counsel files.

Professor Shuy wrote:

> It is clear that Balentine believed that he had to kill Markie before Markie killed him. I have no idea what kind of self defense theory this could support but there are down sides to it.  For one thing, Balentine had the gun with him when he went to Markie's place.  Secondly, the matter of killing the two other men seems contradictory to his self defense theory.  He doesn't even seem to know who they are.  ***But this does seem to fit a mental incapacity theory, or some mixture thereof.  The prompts by the officer also support a mental incapacity theory.***

Exhibit 2:  Affidavit of Roger Shuy, Ph.D. ; *See also* Exhibit 3:  Shuy communication to Herrmann, located in trial counsel files.

As recited in the aforementioned claims, the preliminary federal habeas mitigation investigation done to date suggests mental health deficits that would have lead to a challenge to the *mens rea* element of capital murder.   *See*  Exhibit 4: Affidavit of Jane McHan, with accompanying reports.


**B.     Argument and Authorities**

**1.     Standard of Review – Legal Insufficiency:  in the light most favorable to the prosecution.**

The standard of review for determining the sufficiency of the evidence in any criminal case "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Thomas v. State*, 605 S.W.2d 290, 292 (Tex. Crim. App. 1980).


**2.     Standard of Review  – Factual Insufficiency: without the prism of "in the light most favorable to the prosecution".**

The standard of review for determining the factual sufficiency of the evidence in any criminal case is the one set forth in *Stone v. State*, 823 S.W.2d 381 (Tex. Crim.

113

App. – Austin, 1992, pet. ref'd) and adopted by the Texas Court of Criminal Appeals in *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). The *Stone* standard assesses all the "evidence 'impartially' to determine if it is factually sufficient for a factfinder to have found appellant guilty beyond a reasonable doubt." *Clewis*, 922 S.W.2d at 134.

### 3. Diminished capacity exists in Texas jurisprudence.

#### a. "Diminished capacity" is distinct from the affirmative defense of "diminished responsibility"

In his 1984 article titled: *Undiminished Confusion in Diminished Capacity*, Stephen J. Morse, a Professor of Law at University of Southern California Law Center, and a Professor of Psychiatry and the Behavioral Sciences at University of Southern California School of Medicine, contrasted the doctrine of "diminished capacity" with the affirmative defense of "diminished responsibility." STEPHEN J. MORSE, *Undiminished Confusion in Diminished Capacity*, 75 J. CRIM. LAW 1, 5-6 (1984).

"*Diminished responsibility*" is an affirmative defense by which a criminal defendant acknowledges that the government has proven all the elements of the offense, but asserts the evidence of his mental abnormality calls for conviction of a lesser included offense than that charged. *Undiminished Confusion*, 75 J. CRIM. LAW

114

at 1. Texas jurisprudence does not recognize the affirmative defense of diminished responsibility, such as voluntary intoxication. *See* TEX. PENAL CODE §§ 8.01-8.07; *Montana v. Egelhoff*, 518 U.S. 37 (1996); *Mata v. State*, 939 S.W.2d 719, 726 (Tex. Crim. App. 1997); *Williams v. State*, 937 S.W.2d 479, 488 (Tex. Crim. App. 1996).

In contrast, the "*diminished capacity*" doctrine, or what Professor Morse refers to as the *mens rea* variant, "allows a criminal defendant to introduce evidence of mental abnormality at trial . . . to negate a mental element of the crime charged, thereby exonerating the defendant of that charge . . . ." *Undiminished Confusion*, 75 J. CRIM. LAW at 1.

> To elaborate,
>
> ... diminished capacity is not a separate defense that deserves to be called [by a name] . . . connoting that it is some sort of special, affirmative defense. The defendant is simply introducing evidence, in this case evidence of mental abnormality, to make the following claim: 'I did not commit the crime charged because I did not possess the requisite *mens rea*.'
>
> The doctrine of diminished capacity is *not* an affirmative defense whereby the defendant admits or has proved against him the elements of the crime charged, but then raises a claim of justification or excuse. Moreover, the doctrine of diminished capacity is *not* asserting some lesser form of legal insanity; that is, he is *not* claiming that he is partially or less responsible for the crime charged.
>
> Rather, when a defendant raises the doctrine of diminished capacity, he is straightforwardly denying the prosecution's *prima facie* case by attempting to cast doubt on the prosecution's claim that a requisite mental element was present at the time of the offense. He is claiming that he is not guilty of that crime at all, although he may be guilty of a lesser crime if all the elements of the latter are proven.

*Undiminished Confusion*, 75 J. CRIM. LAW at 6.

The doctrine of diminished capacity exists in the jurisprudence of the State of Texas. *Penry v. State*, 903 S.W.2d 715, 767-768 (Tex. Crim. App. 1995); *Cowles v. State*, 510 S.W.2d 608, 609-610 (Tex. Crim. App. 1974); *Wagner v. State*, 687 S.W.2d 303, 310 (Tex. Crim. App. 1984). It has also been recognized in thirty-one other states and by the Model Penal Code. *See* KATHERINE A. DREW, *Diminished Capacity as a Result of Intoxication and Addiction: the Capacity to Mitigate Punishment and the Need for Recognition in Texas Death Penalty Litigation*, 5 TEX. WESLEYAN L. REV. 1, n. 11 (1998).

b.     **Under the opinions of the Texas Court of Criminal Appeals in *Penry, Cowles* and *Wagner* a defendant may introduce, in the guilt/innocence phase, evidence of his diminished capacity to negate specific intent.**

The Texas Court of Criminal Appeals in several of its opinions has recognized the doctrine of diminished capacity. In *Penry v. State*, 903 S.W.2d 715, 755 (Tex. Crim. App. 1995), Judge Maloney wrote "[t]his Court has previously addressed the theory of diminished capacity, recognizing its validity but holding that it was inapplicable under the facts of the case." *Penry*, 903 S.W.2d at 767-768 (Maloney, J., concurring).

Judge Maloney also cited Texas case law for the proposition that the doctrine of diminished capacity is admissible in the guilt/innocence phase to negate specific

116

intent. *See Cowles v. State*, 510 S.W.2d 608, 609-610 (Tex. Crim. App. 1974) ("Aside from the question of its sufficiency to raise the issue of insanity, our inquiry is whether or not such evidence is even admissible on the issue of guilt. The great weight of authority is that such evidence is not admissible. . . . ***An exception to this rule is where specific intent is an element of the offense for which the accused is being tried, as in the different degrees of murder and the "with intent" crimes***."); *Wagner v. State*, 687 S.W.2d 303, 310 (Tex. Crim. App. 1984) (". . . specific intent was not in issue, and therefore the exception to the rule announced in *Cowles v. State*, *supra*, could not be invoked").

As explained by Judge Maloney in his concurrence in *Penry*, the *Wagner* court "inexplicably discussed the doctrine of *diminished responsibility*, confusing it with the doctrine of *diminished capacity*." *Penry v. State*, 903 S.W.2d 715, n. 2 (Tex. Crim. App. 1995). *See Wagner v. State*, 687 S.,W.2d at n. 3 ("This different standard for determining insanity does not change the general rule that once insanity has been excluded from the case, evidence of diminished mental capacity will not be admitted.").

### c.     The introduction of evidence of diminished capacity is a fundamental right under the 8th and 14th amendment to the U.S. Constitution.

Due process demands that evidence of diminished capacity be admitted in the guilt/innocence phases in a Texas trial to defend against the State's accusations.  U.S. CONST. amend. XIV.  It is a basic and fundamental principle of American criminal jurisprudence that the prosecution always must prove, beyond a reasonable doubt, in its prima facie case, all the elements necessary to find a defendant guilty of the crime charged or lesser included offenses.  *In re Winship*, 397 U.S. 358, 364 (1970); *McMillian v. Pennsylvania*, 477 U.S. 79, 85 (1986).

Due process demands that evidence of diminished capacity be admitted.  A criminal defendant must be given a fair opportunity to defend against the State's charges.  *Crane v. Kentucky*, 476 U.S. 683 (1986) ("In the absence of any valid state justification, exclusion of this kind of exculpatory evidence [circumstances of confession] deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing."); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); *Washington v. Texas*, 388 U.S. 14 (1967) (prohibiting the State of Texas from establishing rules to prevent whole categories of witnesses from testifying on the basis of their untrustworthiness).

The reasoning underpinning the admission of the evidence of diminished capacity was expounded in *Hendershott v. People*, 653 P.2d 385 (Colo. 1982). In that case, a defendant sought to introduce psychological and psychiatric evidence establishing he suffered from adult minimal brain dysfunction in order to negate the culpability element for the crime charged. Finding that the evidence was admissible, the Supreme Court of the State of Colorado reasoned:

> *it would be a violation of due process to require the prosecution to establish the culpable mental state beyond a reasonable doubt while, at the same time, to prohibit a defendant from presenting evidence to contest this issue.* Such a prohibition assumes all the features of an impermissible presumption of culpability. While it may be permissible to permit a jury to infer an essential ingredient of a crime from a proven fact so long as there is a rational connection between the proven fact and the inferred fact, ... *It is quite another matter to insulate this ingredient from disproof by defense evidence. A rule precluding the defendant from contesting the culpability element of the charge would render the prosecution's evidence on that issue uncontestable as a matter of law, in derogation of the presumption of innocence and the constitutional requirement of prosecutorial proof of guilt beyond a reasonable doubt.*

*Hendershott v. People*, 653 P.2d 385, 391 (Colo. 1982).

Likewise, the prohibitions against cruel and unusual punishment under the Eighth and Fourteenth amendments demand that evidence of diminished capacity be admitted in the guilt/innocence phases in a Texas trial to challenge the *mens rea* element of specific intent crimes. U.S. CONST. amend. VIII; U.S. CONST. amend. XIV. *See Atkins v. Virginia*, 536 U.S. 304, 318 (2003) (Because of their impairments ..., [the mentally retarded], by definition that have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from

119

experience, to engage in logical reasoning, to control impulses and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders").

### 4. The evidence is legally and factually insufficient; Mr. Balentine lacked the necessary *mens rea*.

There is evidence that suggests that Mr. Balentine suffered from mental health deficits that impaired his ability to form the requisite mens rea necessary to establish that he was guilty of capital murder. In particular, mitigation specialist Jane McHan developed preliminary evidence of:

A. <u>A history of potential mental illness</u>: Eric Smith related several strange behaviors of John saying John would eat a whole bag of sugar, he ran through a door for no reason, completely broke through it, although no one was chasing him; his mom was scared John would flip out or something and took John to the mental health clinic in Newport, and thereafter, John was sent off for a month.

120

B.   <u>Potential post traumatic stress disorder</u>[7]: There appears to be a pattern that indicates possible post traumatic stress disorder.  John Balentine either witnessed domestic violence, or was himself repeatedly, physically assaulted over the course of his life, starting as a young child.  Eric relates that John told him that the people in the "mental thing" whipped him "all the time with a paddle or a belt," that John was "abused a lot when he was in jail at 17," describing John as having knots on his head like "cartoon knots, like skin peeling back and the knot coming through." (Exhibit 4: Affidavit of Jane McHan).

The killing of Caylor, Geyer and Watson, were preceded by actual threats from Mark Caylor, who attempted to hunt Balentine down, which Balentine was aware of,

---

[7]    Post Traumatic Stress Disorder has been defined as:

... a psychiatric disorder that can occur following the experience or witnessing of life-threatening events such as military combat, natural disasters, terrorist incidents, serious accidents, abuse (sexual, physical, emotional, ritual), and violent personal assaults like rape. People who suffer from PTSD often relive the experience through nightmares and flashbacks, have difficulty sleeping, and feel detached or estranged, and these symptoms can be severe enough and last long enough to significantly impair the person's daily life.

PTSD is marked by clear biological changes as well as psychological symptoms. PTSD is complicated by the fact that it frequently occurs in conjunction with related disorders such as depression, substance abuse, problems of memory and cognition, and other problems of physical and mental health. ***The disorder is also associated with impairment of the person's ability to function in social or family life***, including occupational instability, marital problems and divorces, family discord, and difficulties in parenting.

National Center for PTSD,  http://www.ncptsd.org/faq.html

which apparently only further exacerbated Mr. Balentine's panic, phobic, and hyper-arousal (*e.g.,* irritability, insomnia, fearfulness, and nervous agitation). (RR 20:102, 192, 200).

Even the defense consult, Roger Shuy, recognized and placed the defense on notice of a potential mental incapacity defense. *See* Exhibit 3: Shuy reported: "But this does seem to fit a mental incapacity theory, or some mixture thereof. The prompts by the officer also support a mental incapacity theory."

Balentine's mental health deficits, alone or in combination, resulted in poor impulse control, the inability to engage in good decision making, and the inability to act rationally. This diminished capacity of Mr. Balentine resulted in an inability to form the necessary intent to commit capital murder.

Because Texas recognizes that evidence of diminished capacity is admissible in Texas to negate specific intent crimes, and because the record suggests several mental health deficits suffered by Mr. Balentine, the evidence was not factually and/or legally sufficient, particularly as to *mens rea*, to sustain a conviction for capital murder. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Thomas v. State*, 605 S.W.2d 290, 292 (Tex. Crim. App. 1980); *Stone v. State*, 823 S.W.2d 381 (Tex. Crim. App. – Austin, 1992, pet. ref'd); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996).

The failure of the prosecution to prove its case, particularly as to *mens rea*, resulted in a violation of Mr. Balentine's due process rights. Accordingly, habeas relief should be granted. *In re Winship*, 397 U.S. 358, 364 (1970); U.S. CONST. amend. XIV.

## C.     Exhaustion and Procedural Default Statement.

It is anticipated that the government will argue that this claim is unexhausted and procedurally defaulted. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Dispensa v. Lynaugh*, 847 F.2d 211, 217 (5th Cir. 1988); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). However, Balentine can demonstrate cause and prejudice to excuse any default. The arguments in the introductory section are incorporated by reference herein. *See* Introduction, 2. F.

**GROUND TEN (DIMINISHED CAPACITY & IAC OF TRIAL COUNSEL):** Balentine was denied his federal Sixth and Fourteenth amendment right to effective assistance of trial counsel who failed to hold the State of Texas to its burden of proof of each and every element of the offense of capital murder, particularly, *mens rea.*

Because trial counsel failed to adequately investigate the social history of Mr. Balentine, they failed to undercover his mental health deficits illness, and place at issue Balentine's ability to have formed the requisite intent to commit capital murder. As a result, defense counsel failed to hold the prosecution to its burden of proof beyond a reasonable doubt that Mr. Balentine was guilty of the crime of capital murder. U.S. CONST. amend. VI; U.S. Const. amend. VIII; U.S. CONST. amend. XIV; *Strickland v. Washington*, 466 U.S. 466 (1984).

### A.    Statement of Facts.

Mr. Balentine incorporates by reference, Claim Nine. In particular, Balentine calls the court's attention to the fact that defense counsel was placed on notice of a potential mental incapacity defense by their own expert, Roger Shuy. *See* Exhibits 3 and 4 in which Professor Shuy states: "But this does seem to fit a mental incapacity theory, or some mixture thereof. The prompts by the officer also support a mental incapacity theory."

Despite having been placed on notice of potential mental health deficits, trial counsel failed to do the requisite due diligence.

124

**B.      Argument and Authorities**

**1.      Standard of Review.**

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

**2.      Trial counsel's performance was constitutionally ineffective.**

Mr. Balentine incorporates by reference the facts and legal authorities and argument in Claim Nine, above.  In addition, he adds the following:

Texas law allows a defendant to place his mental health into issue to challenge the *mens rea* requirement.   Indeed, Judge Maloney wrote in *Penry*:

> ***A reasonable doubt as to guilt may arise*** not only from the prosecution's case, but also ***from defense evidence casting doubt upon what previously may have appeared certain***.  Denying the defendant the opportunity to controvert the prosecution's case ***by reliable and relevant evidence of mental impairment***, in addition to cutting against our traditional concept of the adversary system, downgrades the prosecution's burden to something less than that mandated by due process of law.

125

*Penry*, 903 S.W.2d at 769.

In this case, there were several possible challenges to the *mens rea* element, which could have put into issue the specific intent for the offense of first degree murder, had defense counsel done the requisite due diligence and timely investigation into Mr. Balentine's social history.

At a minimum, introduction of mental-health-deficit evidence would have allowed the jury to consider alternative offenses to capital murder, such as murder, TEX. PENAL CODE § 19.02; murder with sudden passion, TEX. PENAL CODE §19.02(d); manslaughter, TEX. PENAL CODE §19.04; criminally negligent homicide, TEX. PENAL CODE §19.05; aggravated assault, TEX. PENAL CODE §22.02; or deadly conduct, TEX. PENAL CODE §19.02. But other than a choice between guilt or acquittal of capital murder, no other choices were provided in the jury charge. (CR 1:308-314).

Moreover, the introduction of this evidence in the guilt/innocence would have naturally segued into the punishment phase and provided a basis for the jury to return a sentence of life. Instead, without this evidence the jury could not give effect to the second special issue. The returned a sentence of death.

Trial counsel's deficient performance – a failure to investigate, develop and present mitigation evidence, *Wiggins,* 123 S.Ct. at 2538 – denied him the opportunity to place his mental health deficits into issue, and force the prosecution to its burden

of proof.   The failure to investigate, develop and present the mental health deficits of Mr. Balentine, and concomitantly introduced evidence that could have raised the issue of diminished capacity, and/or lesser included offenses, calls into question the fundamental fairness and reliability of the trial as having produced a just result. *Strickland*, 466 U.S. at 686.   Habeas relief must be granted.


**C.    Exhaustion and Procedural Default Statement.**

It is anticipated that the government will argue that this claim is unexhausted and procedurally defaulted. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Dispensa v. Lynaugh*, 847 F.2d 211, 217 (5th Cir. 1988); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). However, Balentine can demonstrate cause and prejudice to excuse any default.   The arguments in the introductory section are incorporated by reference herein.   *See* Introduction, 2. F.

**GROUND ELEVEN (THEORY OF THE CASE FOR LIFE – IAC & THE CRONIC STANDARD):  Balentine was denied his Sixth Amendment right to effective assistance of counsel defense counsel  when the trial attorneys failed to present a theory of the case that was effective through both phases of the trial, ABA GUIDELINES 11.7.1.**

Having an effective theory of the case for life is a national standard of practice when  representing persons accused of capital crimes.  NATIONAL LEGAL AID AND DEFENDER ASSOCIATION, *Guidelines for Criminal Defense Representation* (1995). Trial counsel, James Durham and Randall Sherrod were ineffective because they failed to develop and present a theory of the case that was effective through both phases of the trial.  ABA GUIDELINE 11.7.1 (1989).  The theory asserted by the defense failed to satisfy the essential elements of an adequate theory of the case for life.  STEVEN LUBET, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 8-9 (NITA 2nd ed. 1999).

The absence of a theory that was effective through both phases of the trial made it improbable – if not impossible – for counsel to have been effective at any stage of the trial proceedings.  Without an effective theory, counsel had no roadmap to guide them in their efforts to persuade the jury to sentence to life.  Trial counsel, James Durham and Randall Sherrod were constitutionally deficient because the lack of an effective theory of the case for life deprived Balentine of a fair trial.   There was a complete failure to subject the prosecution's case to meaningful adversarial testing.

*Bell v. Cone*, 535 U.S. 685, 697 (2002). . *Bell v. Cone*, 535 U.S. 685, 697 (2002).

Hence, prejudice is presumed and habeas relief must be granted.


## A.   Statement of Facts.

The Statement of Facts in Ground Seven are incorporated by reference herein.

In particular, Balentine calls the court's attention to the following:

On or about March 1, 1999, Dr. Shuy communicated with Mr. Herrmann, who

had hired Dr. Roger W. Shuy, a linguistics expert, to review the confession of John

Balentine.   Dr. Shuy opined that the contents of the confession

> "seem to fit a mental incapacity theory, or some mixture [of mental incapacity and
> self-defense] thereof.  The prompts by the officer also support a mental incapacity
> theory."

Exhibits 3 and 4:  Affidavit of Roger Shuy, Ph.D. and communication to Herrmann.

Dr. Shuy's communication to Mr. Hermann about a potential mental incapacity

defense was contained in the files of trial counsel received by federal habeas counsel.

On March 8, 1999, Mr. Durham filed a motion to remove Darrell Dewey, the

investigator appointed by order September, 1998.  (CR 1:219).  Dewey was replaced

by Kathy Garrison, who attested in state habeas:

> Regarding the John Balentine Capital Murder case, I was called in early March to take
> over for another investigator.  I was provided nothing from his files, so I am not sure
> what he did or didn't do.
>
> I wanted to learn the case as quickly as possible, to locate and interview witnesses, to
> procure records and documentation for my client as quickly as could be allowed given

the time I had.  I was only able to confer with Trial Counsel and John during breaks in trial and after hours.  It was a severe disadvantage to be given essentially thirty days (March 11th to April 12th) to investigate the witnessess, investigate any potentially mitigating evidence and confer with Counsel and Applicant.

***Much of the information I requested did not arrive until after the trial.  Some of it was helpful for us, some not.  Either way, it was too late for John Balentine to use.*** My only question is this – would John have taken the plea bargain for life had he known what I was able to learn after the jury returned the verdict.

(Exhibit E to Post Conviction Application for Writ of Habeas Corpus).  Trial counsel

did not file a motion for continuance.

On March 22, 1999, voir dire began.  (CR 1:377).  The defense did not question

the venire as a whole, nor any of the seated individuals, about mitigation and special

issue #2.  The individual questioning of each seated juror generally lasted for only a

matter of a few pages of reporter record.  In the main, the defense asked about the race

of Balentine, reasonable doubt, and the venire's understanding of special issue #1

(future dangerousness).

The theory in the guilt/innocence phase was silent about such mitigation themes

as childhood neglect, mental illness, community violence, extreme poverty, exposure

to trauma, neurologic deficits.  Even though Dr. Shuy had suggested a possible

defense based on mental incapacity, his recommendation was ignored.  Instead, the

defense argued in opening about "how the police, from the beginning to now, have

completely failed to do their job, and the reasonable doubt that's been raised."  (RR

23:9).

The defense elicited evidence that the investigating officers did not collect fibers, compare dirt samples, get a positive match to Balentine's fingerprints, made no treadmark or shoe comparisons, failed to take Chris Caylor's blood sample, ignored the West Side 16 as potential suspects, did not find a box of shells or a pistol in Balentine's residence, failed to test fire the gun in the alley. (RR 24:31,28-67).

There had been testimony that Mark Caylor had threatened to kill John Balentine, that Caylor had purchased a gun, and Caylor and his friends had gone looking for John Balentine. (RR 20:104-106, 129, 200). In Balentine's confession, he states that he was told that Caylor was going to shoot him:

Q.       – you were telling me about, that after you were out of the house, that you had got word through Angela that Markie was saying that he was going to shoot you?

A.       Yeah.  Yeah, he sure did.

....

A.       ... he threatened me.  He threatened anybody who come over there looking for me.

....

A.       And them kids was in the car and stuff, you know, waving it around.

....

A.       He was waving the gun around and talking about how he was going to kill my black ass and all that.

....

131

A.      And waving that gun around saying he was going to kill whoever come over there looking for me, whether I'm with them or whatever.

....

A.      ... I believed him.  He was on drugs.

(RR 22:131-132).

Following the close of the guilt/innocence phase, the court submitted a jury charge that contained only a single instruction on capital murder. (CR 3:651-671) The defense did not object.  (RR 24:8).  No lesser included offense instructions such as, murder, TEX. PENAL CODE § 19.02; murder with sudden passion, TEX. PENAL CODE §19.02(d); manslaughter, TEX. PENAL CODE §19.04; criminally negligent homicide, TEX. PENAL CODE §19.05; aggravated assault, TEX. PENAL CODE §22.02; or deadly conduct, TEX. PENAL CODE §19.02.

On April 16, 1999, the jury returned a verdict of guilty.  (CR 1: 379).

On April 19, 1999, there was a single day of punishment phase testimony by the prosecution.  The court made a notation in the file that the defense "rests w/o having called any Ws." (CR 1:379).

In closing arguments following the conclusion of the punishment phase, the prosecution argued to the jury that the second special issue "tells you also ...  to consider: the circumstances of the offense, *the Defendant's character and background, and the personal moral culpability of the Defendant*." (RR 26:87).

132

The prosecution then spoke at length about Balentine's life history:

> Back in the Revolutionary War, a man once said, "Those who forget the past are condemned to repeat it." That phrase fits this trial exactly. It fits this man exactly. Look at the Defendant's past and see if you can portray where this man is headed in his life. When he was 14 years old, in 1983, he was adjudicated delinquent....."

The prosecution concluded that "[w]ithout his past history he is a future danger to society. And when you throw in his past history, you've got the trend to show it." (RR 26:91). "There are no mitigating circumstances ... that warrant a life sentence...." (RR 26:92).

In closing, the defense argued in the punishment phase for life based once again on inept police investigation – a theory that had already proved ineffective and resulted in a verdict of guilty. The defense asked repeatedly: "How strongly do you feel that Johnny is the one that actually pulled the trigger? How strongly do you feel, if you didn't have the bullet and the testimony from the clerks, how strongly do you feel that that statement was correct?" (RR 26:93).

The defense did nothing to recast Balentine's life experiences as mitigating and relate these experiences to the client and to the crime itself. As a result, defense counsel left unchallenged the prosecution's argument to the jury that there was no mitigating evidence.

On April 19, 1999, the jury returned a verdict of "yes" as to Special Issue #1, future dangerousness, and "no" to Special Issue #2, mitigation. (CR 1:379-380).

**B.      Argument and Authorities.**

**1.      Standard of Review: *Strickland* and *Cronic*.**

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professionally competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

The defendant is not required to prove prejudice when there is a complete failure to subject the prosecution's case to meaningful adversarial testing. *Bell v. Cone*, 535 U.S. 685, 697 (2002). Prejudice is presumed. *United States v. Cronic*, 466 U.S. 648, 654 (1984); *Childress v. Johnson*, 103 F.3d 1221 (5th Cir.1997).

The United States Supreme Court has looked for guidance to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases in evaluating counsel's performance. *Wiggins v. Smith*, __U.S. __, 123 S.Ct. 2527, 2535 (2003) (In which the U.S. Supreme Court *citing Strickland*, 466 U.S. at 690-691,

for the proposition that "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).

The 1989 ABA Guidelines are applicable; they were in effect at the time of the trial. In particular, ABA Guideline 11.7.1 is applicable to this claim.


## 2.    Trial counsel's performance was deficient.

ABA GUIDELINE 11.7.1 (1989), in particular is applicable and provides in pertinent part:

> ABA GUIDELINE 11.7.1 –        General Trial Preparation
>
> A.    As the investigation .... produce information, ***counsel should formulate a defense theory***. In doing so, counsel should consider both the guilt/innocence phase and the penalty phase, and ***seek a theory that will be effective <u>through both phases</u>***.

(Emphasis supplied).

An effective theory of the case for life is a national standard of practice when representing persons accused of capital crimes. NATIONAL LEGAL AID AND DEFENDER ASSOCIATION, *Guidelines for Criminal Defense Representation* (1995). As more fully

developed below, the theory asserted by the defense failed to satisfy the minimum

essential elements necessary to constitute an effective theory of the case for life.

> **(a)    An effective theory has four elements: it has internal logical force, each  fact reinforces the others; it speaks to the legal elements of the case showing why the law demands relief; it makes maximum use of undisputed facts; and it is easy to believe, encompassing the prosecution's case**

An effective theory contains the following four elements:

It is logical.  A winning theory has internal logical force.  It is based upon a foundation of undisputed or otherwise provable facts, all of which lead in a single direction.  The facts upon which your theory is based should reinforce (and never contradict) each other.  Indeed, they should lead to each other, each fact or premise implying the next in an orderly and inevitable fashion.

It speaks to the legal elements of your case.  All of your trial persuasion must be in aid of a 'legal' conclusion.  Your theory must not only establish that your client is good or worthy (or that the other side is bad and unworthy), but also that the law entitles you to relief.  Your theory therefore must be directed to prove every legal element that is necessary to both justify a verdict on your behalf and to preserve it on appeal.

It is simple.  A good theory makes maximum use of undisputed facts.  It relies as little as possible on evidence that may be hotly controverted, implausible, inadmissible, or otherwise difficult to prove.

It is easy to believe.  Even "true" theories may be difficult to believe because they contradict everyday experience, or because they require harsh judgments. You must strive to eliminate all implausible elements from your theory. Similarly, you should attempt to avoid arguments that depend upon proof of deception, falsification, ill motive, or personal attack.  An airtight theory is able to encompass the entirety of the other side's case and still result in your victory by sheer logical force.

Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 8-9 (NITA 2nd ed. 1999).

As applied to a capital trial in particular, "skilled litigators develop a compelling, persuasive, consistent theory of the case to persuade decision-makers predisposed to death to substantially increase the likelihood of a life sentence. KENTUCKY'S 2000 DEATH PENALTY MANUAL, Chapter 3: *Theory of the Case for Life*, §§ A, F, G (2000).

> **(b)   The defense theory lacked internal logical force. The theory that the police were inept in their investigation, thus giving rise to reasonable doubt, did not logically lead to a sentence of life. The theory failed to create an overriding, organizing approach to the entire case.**

The first element of an effective theory is that:

[i]t is logical. A winning theory has internal logical force. It is based upon a foundation of undisputed or otherwise provable facts, all of which lead in a single direction. The facts upon which your theory is based should reinforce (and never contradict) each other. Indeed, they should lead to each other, each fact or premise implying the next in an orderly and inevitable fashion.

Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 8 (NITA 2nd ed. 1999).

Put another way, an effective theory is integrated into the *entire* case. That idea is captured in the ABA GUIDELINES 11.7.1, which admonishes trial counsel that they

should "formulate a defense theory ... that will be *effective through both phases*." The reason is that "decision-makers are influenced incrementally, over a period of time." KENTUCKY'S 2000 DEATH PENALTY MANUAL, Chapter 3: *Theory of the Case for Life*, § G (2000).

There was no rigorous, single approach that organized the Balentine case from beginning to end, from jury selection to punishment. The theory in the guilt/innocence phase was the ineptness of the police investigation and that this ineptness created reasonable doubt. This theory, when asserted as the defense punishment phase theory, did not logically lead to the inevitable conclusion that Balentine should be given life for several reasons:

First, the "inept police investigation" was easily refuted and logically explained by Officer Rickwartz.

Second, because the jury returned a verdict of guilty of capital murder indicating they had no reasonable doubt, the theory logically lead to the conclusion that Balentine should be sentenced to death.

Third, there was nothing in the "inept investigation theory" that tied it to Special Issue 2. Instead, Special Issue #2 in the punishment phase jury charge was just "hanging out there" – superfluous, unexplained verbiage in a charge that was seven pages long. (CR 1:323-330). The defense failed to develop mitigation at all, and

never incorporated it into the theory of the case, or into any phase of the trial whatsoever – not in the juror questionnaires, and certainly not in the voir dire. Indeed, the painfully thin record of individual questioning of the seated jurors did not contain a single question as to mitigation, except the "wimp" question.

In summary, the absence of a rigorous, single approach that organized the case from beginning to end  violated a fundamental principle of trial practice that counsel should "***seek a theory that will be effective through <u>both</u> phases***." ABA GUIDELINES 11.7.1.  It failed to comport with the first element of an effective theory of the case for life.

### (c)     It did not speak to the elements of the case.

The second element of an effective theory is that:

> [i]t speaks to the legal elements of your case.  All of your trial persuasion must be in aid of a 'legal' conclusion.  Your theory must not only establish that your client is good or worthy (or that the other side is bad and unworthy), but also that the law entitles you to relief.  Your theory therefore must be directed to prove every legal element that is necessary to both justify a verdict on your behalf and to preserve it on appeal.

Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 9 (NITA 2nd ed. 1999).

The defense theory was in aid of the prosecutions' – not the defense's – legal conclusion.  It naturally lead to a verdict of guilty of capital murder and a sentence of

139

death.  The defense theory, and the jury instructions, gave the jury only one choice: acquit of capital murder or convict.  Once the jury found Balentine guilty, they had no reasonable doubt.  So when the defense relied on reasonable doubt as a justification for a sentence of life, they provided the jury with no option in their choice between death and life.  A death sentence was inevitable.

The theory failed to comport with the second element of an effective theory of the case for life.


### (d)    It was not plausible.

The third and fourth elements of an effective theory of the case are, respectively:

> *It is easy to believe*.  Even "true" theories may be difficult to believe because they contradict everyday experience, or because they require harsh judgments.  You must strive to eliminate all implausible elements from your theory.  Similarly, *you should attempt to avoid arguments that depend upon* proof of deception, falsification, ill motive, or *personal attack*. *An airtight theory is able to encompass the entirety of the other side's case and still result in your victory by sheer logical force*.

> *It is simple*.  A good theory makes maximum use of undisputed facts.  It relies as little as possible on evidence that may be hotly controverted, implausible, inadmissible, or otherwise difficult to prove.

Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 9 (NITA 2nd ed. 1999).

The defense theory was not easy to believe.  Nor was it simple.  It relied on challenges to a plethora of irrelevancies – the failure to collect fiber, hair, tool marks, footprints, tread marks; scrape marks; the failure to discern if the front porch light and TV was on or off, whether a .25 caliber gun was loaded or unloaded – each of which the officer easily refuted in a logical and concise explanation.  (RR 20:331, 338).  Moreover, the defense theory resulted in a personal attack on the officer who did the forensic evidence collection.

For example the defense theory of inept investigation resulted in a trial challenge to the evidence collection by Officer Rickwartz with respect to the footprint and tire tread:

| Durham: | Officer Rickwartz, we've talked a lot about what you did do.  I would like to talk a little bit about what you didn't do out there and get some things established. ... I want to show you . Exhibit 12 and 13 and ask you if those are photographs of some shoe imprint there? .... Did you cast those? |
| --- | --- |
| Officer: | No, I did not. |

(RR 20:269).

| Durham: | ... Exhibits 4 and 5 ....  Are these pictures of the tire marks ... the skid marks.... |
| --- | --- |
| Officer: | These are skid marks....  I did not follow up on it, no. |
| | .... |
| Durham: | Did you take a plaster cast of those [tread marks]? |
| Officer: | No, I did not. |

(RR 20:270-271, 273).

But during the cross-examination, it was defense attorney – not the prosecution – who deflated their own theory by their questioning:

Durham:     What part did these play in the investigation, if any?

Officer:     *The information we had received that the suspect had arrived there on foot*.

Durham:     *So you didn't follow up whether or not somebody came in a car*, did you?

Officer:     No, I did not.

(RR 20:273).

Durham:     *Did you ever check his shoes*?

Officer:     *It was several months after the offense had taken place [that Balentine had been apprehended]. There wasn't any need to look* –

(RR 20:302).

The other challenges were equally as easy for the officer to explain.

- Particles on Shoes:   "No, [Officer Rickwartz did not check Balentine's shoes several months later for dirt particles] because walking would ... the particles would come off the shoes" and further, it would be important only if Balentine had on the same shoes, months later – an unlikely event. (RR 20:302).

- Fingerprint Evidence:   "There were numerous dirty dishes in the kitchen sink.... From the pile of dishes, they could have been there from who knows when" – and moreover, Balentine had lived in that residence and left the fingerprints then. (RR 20:342-343).

142

- <u>Knife & .25 Caliber Gun</u>:  The victims were not killed with a knife.  They were not shot with a .25.  They were not killed in their bed.  (RR 20:344).

In short, as the officer explained: "[I did not process those items] because of the condition of the house at the time, didn't have any idea on how old those dirty dishes were.... they just weren't real good housekeepers...." (RR 20:344).  Assuming no one came in to clean, fingerprints could last "several days," a "week," a "month."  (RR 20:345).  The officer explained why fingerprints are seldom obtained from shell casings.  (RR 20:346).  The fibers were not collected because "I had information that [Balentine] had lived there in the past.  The house, from its condition, was very – it was obvious that they weren't good housekeepers.... if the lab would have found this stuff, hair or whatever, in the house, it could have been there from prior times that [Balentine] was in the house."  (RR 20:348-349).

In summary, the defense theory was not plausible.  Once the theory was easily refuted by the logical explanation of Officer Rickwartz, then there was no "reasonable doubt" remaining as to guilt.  Thus, the theory failed to comport with the fourth element of an effective theory of the case for life.

**(e)     Trial counsel did not make a "strategic" choice to assert the theory.**

The theory was not a "strategic" choice at all. *Wiggins v. Smith*, __U.S. __, 123 S.Ct. 2527, 2535 (2003) ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, ***counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary***.").

**(1)     Trial counsel failed to identify, assess and select the theory most likely to be believed or adopted by the trier of fact.**

"An advocate's task when preparing for trial is to conceive of and structure a true story – comprising only admissible evidence and containing all of the elements of a claim or defense – that is most likely to be believed or adopted by the trier of fact. This is a creative process, since seldom will the facts be undisputed or capable of but a single interpretation. ***To carry through this process the lawyer must 'imagine' a series of alternative scenarios, assessing each for its clarity, simplicity, and believability, as well as for its legal consequences***." (Emphasis supplied). Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 2 (NITA 2nd ed. 1999).

The trial performance of James Durham and Randall Sherrod was deficient because it was not predicated on a "strategic" identification, assessment and choice between and among the various alternative scenarios revealed by the investigation:

Scenario 1 –   The Inept Police Investigation Leading to Reasonable Doubt Theory ("Inept Theory");

Scenario 2 –   The Mental Incapacity Theory

### (2)   The "Inept Theory" was affirmatively harmful to Balentine's defense.

Strategically assessing the Inept Theory for "clarity, simplicity, and believability, as well as for its legal consequences" reflects that it was doomed to failure at the outset.   The theory and the jury charge – that contained no lesser included offense instructions – gave the jury only one choice: guilty, or not guilty of capital murder.  (CR 1:308-314). With the reality that there were three young persons, shot dead in cold blood, two of whom had no connection to the alternations between Caylor and Balentine, the choice was simple: guilty of capital murder.

A verdict of guilty makes it obvious that the jury had no "reasonable doubt" as to Balentine's guilt. So arguing reasonable doubt in the punishment phase compelled a single outcome: a vote for a sentence of death.  The theory provided the jurors with no vehicle, and no evidence, by which they could effect special issue #2.

### (3) The "Mental Incapacity Theory" was supported by the record and met all the tests to be an effective theory.

The record contains at least one indication that Balentine suffered from one or more mental health deficits. Professor Shuy placed defense counsel on notice that:

> It is clear that Balentine believed that he had to kill Markie before Markie killed him. I have no idea what kind of self defense theory this could support but there are down sides to it. For one thing, Balentine had the gun with him when he went to Markie's place. Secondly, the matter of killing the two other men seems contradictory to his self defense theory. He doesn't even seem to know who they are. ***But this does seem to fit a mental incapacity theory, or some mixture thereof. The prompts by the officer [during the interrogation of Balentine] also support a mental incapacity theory.***

Exhibit 2:    Affidavit of Roger W. Shuy, Ph.D.

Had this avenue been explored, followed by an adequate social history investigation and presentation, it could have lead to a theory that would have been consistent in both phases of the trial. Assume that the theory challenged the mens rea element of the capital murder charge and introduced evidence of mental illness, emotional disturbance, post-traumatic stress disorder, or some other form of mental or emotional deficit. The theory would have supported one or more jury charges on lesser included offenses, such as: murder, TEX. PENAL CODE § 19.02; murder with sudden passion, TEX. PENAL CODE §19.02(d); manslaughter, TEX. PENAL CODE §19.04; criminally negligent homicide, TEX. PENAL CODE §19.05; aggravated assault, TEX. PENAL CODE §22.02; or deadly conduct, TEX. PENAL CODE §19.02.

Even had the jury returned a verdict of guilty of capital murder, instead one of the lesser included offenses, the theory would not have foreclosed the jurors consideration of Special Issue #2 – which is what the Inept Theory did. The Mental Incapacity Theory would have naturally lead to a consideration of Balentine's character and background, and his personal moral culpability in light of the circumstances of the offense.

Standing alone, the Mental Incapacity Theory would have met each of the elements for being an effective theory of the case: It had internal logical force. One fact built on the next. It spoke to the elements of the case. It made maximum use of undisputed facts. It encompassed the entirety of the prosecution's case and lent itself to its logical conclusion. Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 8-9 (NITA 2nd ed. 1999).

The Strategic Choice: Given these two scenarios, the Inept Theory standing alone failed all elements of being an effective theory of the case for life. It failed totally to encompass even a shred of the traditional *Lockett/Skipper* evidence. It logically lead to a sentence of death, once the jurors found in the guilt/innocence phase that there was no reasonable doubt.

147

### 3.  Trial counsel's deficient performance was complete; prejudiced is presumed.

"A well thought out theory is the filter and driving force behind [the] negotiations, motion practice, evidentiary hearings, trial, sentencing phase, ... direct examination, cross-examination, opening, closing, instructions, voir dire, and the communications with the public through the media." KENTUCKY'S 2000 DEATH PENALTY MANUAL, Chapter 3: *Theory of the Case for Life*, § G (2000). In the case at bar, the absence of a theory that was effective through both phases of the trial made it improbable – if not impossible – for the defense to have been effective at any stage of the trial proceedings. The lack of an effective theory touched every phase of trial and permeated the entirety of the proceedings. Without an effective theory, the defense had no roadmap to guide them in their efforts to persuade the jury to sentence to life. Without an effective theory, the jurors had no roadmap to guide them in their deliberations to a life sentence.

The United States Supreme Court has made clear that "[i]f no actual 'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee [to effective counsel] has been violated." *United States v. Cronic*, 466 U.S. 648, 654 (1984). Echoing *Cronic*, the Fifth Circuit held: "The right to the assistance of counsel for one's defense . . . encompasses the right to have an advocate for one's cause." *Childress v. Johnson*, 103 F.3d 1221, 1226, 1228 (5th Cir.1997).

148

In the case at bar, James Durham and Randall Sherrod were constitutionally deficient because the lack of an effective theory of the case for life deprived Balentine of a fair trial.    There was a complete failure to subject the prosecution's case to meaningful adversarial testing. *Bell v. Cone*, 535 U.S. 685, 697 (2002).  U.S. CONST. amend. VI; U.S. CONST. amend. XIV.  Hence, prejudice is presumed.  Habeas relief must be granted.


## C.    Exhaustion and Procedural Default Statement.

It is anticipated that the government will argue that this claim is unexhausted and procedurally defaulted. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Dispensa v. Lynaugh*, 847 F.2d 211, 217 (5th Cir. 1988); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). However, Balentine can demonstrate cause and prejudice to excuse any default.  The arguments in the introductory section are incorporated by reference herein. *See* Introduction, 2. F.

**GROUND TWELVE (PLEA NEGOTIATIONS & IAC OF TRIAL COUNSEL): Balentine was denied his federal Sixth and Fourteenth amendment right to effective assistance of trial counsel who failed to effectively carrying out their obligations in the plea negotiation process.**

Trial counsel failed to provide effective assistance of counsel because they were deficient in carrying out their obligations in the plea negotiation process. U.S. CONST. amend. VI; U.S. Const. amend. VIII; U.S. CONST. amend. XIV; *Strickland v. Washington*, 466 U.S. 466 (1984)**.**

**A.      Statement of Facts.**

At some point in the proceedings, the prosecution had offered to allow Mr. Balentine to enter a plea of guilty to capital murder. This issue will be further developed subsequently; additional information will be incorporated into the amended habeas petition.

**B.      Argument and Authorities**

**1.      Standard of Review.**

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having

produced a just result." *Strickland*, 466 U.S. at 686. *Strickland* stated a two-pronged

test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

The ABA Guidelines for the Appointment and Performance of Counsel in Death

Penalty Cases establish the minimum threshold for "competency."   *See Wiggins v.*

*Smith*, __U.S. __, 123 S.Ct. 2527, 2535 (2003) (In which the U.S. Supreme Court

*citing Strickland*, 466 U.S. at 690-691, for the proposition that "Prevailing norms of

practice as reflected in American Bar Association standards and the like ... are guides

to determining what is reasonable"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000)

(citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4- 55 (2d

ed.1980)).

The applicable guidelines are ABA Guideline 11.6.1 – The Plea Negotiation

Process and ABA Guideline 11.6.3 – The Decision to Enter a Plea of Guilty.

## 2.     Trial counsel's performance was constitutionally ineffective.

ABA Guideline 11.6.1 – The Plea Negotiation Process:

A.     Counsel should explore with the client the possibility and desirability of reaching a negotiated disposition of the charges rather than proceeding to a trial.  In doing so, ***counsel should fully explain the rights*** that would be waived by a decision to enter a plea instead of proceeding to trial, ***and should explain the legal and/or factual considerations that bear on the potential results of going to trial***.

....

ABA Guideline 11.6.3 – The Decision to Enter a Plea of Guilty:

A.     Counsel inform the client of any tentative negotiated agreement reached with the prosecution, and explain to the client the full content of the agreement along with the advantage, disadvantages and potential consequences of the agreement.

B.     The decision to enter or to not enter a plea of guilty should be based solely on the client's best interest.

Commentary:  ....  ***In other words, counsel must strive to convince a client to overcome natural emotional resistance to the idea of standing n open court and admitting guilt of what was charged as a capital offense if that will save the client's life***....

Trial counsel's performance was deficient because they failed to comply with even the minimal standards for plea negotiations.  Their deficient performance  calls into question the fundamental fairness and reliability of the trial as having produced a just result.  *Strickland*, 466 U.S. at 686.  Habeas relief must be granted.

**C.**      **Exhaustion and Procedural Default Statement.**

It is anticipated that the government will argue that this claim is unexhausted and procedurally defaulted. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Dispensa v. Lynaugh*, 847 F.2d 211, 217 (5th Cir. 1988); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). However, Balentine can demonstrate cause and prejudice to excuse any default.  The arguments in the introductory section are incorporated by reference herein.  *See* Introduction, 2. F.

153

GROUND THIRTEEN (CONFESSION – 4TH & 14TH AMENDMENT VIOLATIONS – *SCHNECKLOTH*): Mr. Balentine was denied his Fourth and Fourteenth amendment rights because his confession was not voluntary, and thus it was inadmissible. (Direct Appeal Point of Error #12).

GROUND FOURTEEN (CONFESSION – 14TH AMENDMENT VIOLATION – *CONNELLY*): Mr. Balentine was denied his Fourteenth amendment rights because his mental health deficits resulted in a psychologically coerced confession that was inadmissible at trial.

GROUND FIFTEEN (CONFESSION – 6TH & 14TH AMENDMENT VIOLATION – *IAC*): Mr. Balentine was denied his Sixth and Fourteenth amendment rights to effective assistance of counsel who failed to investigate, develop, present and adequately preserve the issue of the lack of voluntariness of the confession.

### A.    Statement of Facts.

The federal habeas investigation done to date has revealed the potentially psychological vulnerabilities of Mr. Balentine. Dr. Shuy had suggested to the defense team in March, 1999, prior to trial that Mr. Balentine suffer from some form of mental incapacity and that the officer's questioning of him also suggested it.

The federal habeas mitigation investigator has uncovered evidence that suggested mental health deficits. *See* Exhibit 4: Affidavit of Jane McHan.

Moreover, there is reason to believe that the tactics of Officer Horn in obtaining the confession from Balentine were secured by coercive techniques. Officer Horn threatened and coerced various family and friends of Balentine in order to obtain information from them.

For example, Eric Smith attests to the coercive behavior of Officer Horn:

3.    I am the half-brother of John Balentine.

4.    I have some concerns about the way John's trial was handled. The police had come to my home at W. 8th and Line, Amarillo, and later at 404 S. Virginia, Apt. A, Amarillo. On several occasions, they surrounded the house, beat on the doors, shined flashlights in the windows, harassed me and my family, and scared my kids. The police did this before John Balentine was apprehended and again after John was in jail. The police did not have a warrant but they wanted to scare me.

Exhibit 6:    Affidavit of Eric Smith.

Similarly, Angie Allen expressed her distress at the tactics of Officer Horn. In the redacted email from Jane McHan to under signed counsel, McHan writes:

I will take some more with Angie. She didn't remember who questioned her but it looked like from the files that it was Paul Horn. I think he was the only one, but I will go into those details with her. She did say that she was frightened and felt that she was being interrogated as if she had done something herself. I got the feeling that she felt completely coerced, though she didn't use those words. Both she and Eric seemed very fearful to try to buck the police in any way....

Exhibit 5: E-mail from Jane McHan, mitigation specialist to Lydia Brandt, November 22, 2003, 9:25 AM).

## B.    Argument and Authorities

The coercive police activity, coupled with Mr. Balentine's mental health deficits reflect that under the totality of the circumstances, Mr. Balentine's statement was not the product of a free and rational choice. *United States v. Doucette*, 979 F.2d 1042, 1045 (5th Cir. 1992) ("A confession is voluntary if, under the "totality of the

circumstances," the statement is the product of the accused's 'free and rational choice.'"). *Colorado v. Connelly*, 479 U.S. 157, 163 (1987); U.S. CONST. amend. IV; U.S. CONST. amend. XIV.  Mr. Balentine's Fourth and Fourteenth amendment rights were violated when his involuntary confession was admitted at trial. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

The confession was also involuntary because the totality of the circumstances reflect that it was the result of police coercive techniques employed during the interrogation that was sufficient to overcome the will of Mr. Balentine given his particular mental health vulnerabilities. *Colorado v. Connelly*, 479 U.S. 157, 163 (1987); U.S. CONST. amend. IV; U.S. CONST. amend. XIV.

Further, had defense counsel been constitutionally effective, they would have made a request of the trial judge that the issue of the voluntariness of the confession, and with it the concomitant issues of Mr. Balentine's mental health problems be decided by the jury.   *State v. Terrazas*, 4 S.W.2d 3d 720, 724 (Tex. Crim. App. 1979) ("when disputed fact issues on the voluntariness question existed, a trial court had no discretion but to submit the voluntariness question to the jury."); *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 1780-88, 12 L.Ed.2d 908 (1964).

To the extent the issues were not investigated, developed, presented and preserved, then Mr. Balentine's counsel was constitutionally ineffective. U.S. CONST.

amend. VI; U.S. CONST. amend. XIV; *Wiggins v. Smith*, ___ U.S. ___, 123 S.Ct. 2527 (2003); *Williams v. Taylor,* 529 U.S. 362 (2000); *Strickland v. Washington*, 466 U.S. 668 (1984).

These issues are plead in skeletal form with a view to providing further evidence in the amended petition to be filed on behalf of Mr. Balentine.

## C.   Exhaustion and Procedural Default Statement.

It is anticipated that the government will argue that this claim is unexhausted and procedurally defaulted. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Dispensa v. Lynaugh*, 847 F.2d 211, 217 (5th Cir. 1988); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). However, Balentine can demonstrate cause and prejudice to excuse any default.  The arguments in the introductory section are incorporated by reference herein.  *See* Introduction, 2. F.

**GROUND SIXTEEN:  Balentine was denied his Fourteenth amendment due process rights as a result of a *Brady/Kyles* violation, when the prosecution failed to turn over potentially favorable evidence prior to trial.**

**GROUND SEVENTEEN: Balentine's confession was inadmissible because it was the product of a violation of his Sixth and Fourteenth amendment rights to counsel and obtained as a result of *Brewer* violation.**

Balentine was denied his Fourteenth Amendment due process rights as a result of a Brady violation, when the prosecution failed to turn over potentially favorable evidence prior to trial.  *Brady v. Maryland*, 373 U.S. 83 (1963); KYLES V. WHITLEY, 514 U.S. 419 (1995); U.S. CONST. amend. XIV.

In addition his confession was obtained as a result of a Sixth and Fourteenth amendment violation of his right to counsel. *Brewer v. Williams*, 430 U.S. 387 (1977).

### A.    Statement of Facts.

Pre-trial, defense counsel filed an extensive "Motion for Discovery Number One."  As part of that motion, Balentine requested that the following be produced:

1.    All written confessions, admissions and statement, made by the defendant to the state in connection with the case.

2.    All oral confessions, admissions and statements, made by the defendant to the state in connection with this case, which have been electronically recorded.

3.    The substance of all oral confessions, admissions and statements made by the defendant to the state in connection with this case, which were not electronically recorded.

4.      All statements, written or oral, electronically recorded or not, given by the defendant which are exculpatory or which tend to mitigate punishment.

(CR 1:231).

## B.      Argument and Authorities

### 1.      Standard of Review.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. A proceeding is rendered fundamentally unfair under the Due Process Clause of the Fourteenth Amendment if: (1) the prosecution suppressed evidence (2) favorable to the defense, and (3) the evidence was material to either guilt or punishment. *United States v. Bagley*, 473 U.S. 667, 683; *Brady*, 373 U.S. at 87.

In *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), the Court placed a new affirmative duty on individual prosecutors to learn of any favorable evidence known to the others acting on the government's behalf, including law enforcement.

Additionally under *Brewer v. Williams*, 430 U.S. 387 (1977), the United States Supreme Court has held that when the police deliberately elicit information in

violation of defendant's Sixth Amendment right to counsel, after the initiation of judicial proceedings, any incriminating statements by him are not admissible.

### 2.      Material evidence was suppressed.

It is anticipated that this claim will be further developed subsequently and any additional facts and arguments arising therefrom, will be incorporated into an amended habeas petition. However, this claim and any potentially related claims are based on the following affidavit of Eric Smith, in which he attests to his good faith belief that there were taped conversations of Mr. Balentine, with others, including possibly, a government informant, while Mr. Balentine was incarcerated. Smith attests:

For example, Eric Smith attests to the coercive behavior of Officer Horn:

3.      The next day, Detective Horn came back and took me to the Police Department, where he interrogated me for about three hours. Detective Horn kept giving me different scenarios, saying "John rushed in, he was frantic, he wanted you to take him somewhere......" He scared the shit out of me. I told him I would sign anything if they would let me go. Detective Horn then told me that he had a tape made of John talking about the crime. Detective Horn reportedly stated, "***I am not supposed to let you hear these tapes (there may have been two)***, I can get in trouble if I let you hear it. I am going to let you hear it because you're a family guy and I don't think you are involved in this, but you could go to jail behind this." He also told me, "I know you don't want to spend the rest of your life in jail."

4.      Detective Horn played bits and pieces of a tape that had John's voice on it. John sounded like he was in his jail cell talking to someone." Detective Horn would fast forward the tape when the other person began to speak. Detective Horn would only let me hear small portions such as, "I was walking......," then he would fast-forward, or "I looked in the window....," then fast-forward. I don't remember John saying anything incriminating in the parts I heard.

160

....

10.    I did not know it was Drew Down on the tape until months later when I ran into him and **Drew made mention of the fact that "one time they put me and your brother in the same cell for three days."** I think it was some kind of set-up, to put two people accused of murder in the same cell and let them talk, see what comes up, and use it against one of them. I think it is interesting that Drew was then released from jail about a month later, although Drew was either being held on a murder charge or had been convicted of a murder charge.

Exhibit 6:    Affidavit of Eric Smith.

There is no tape within the files of trial counsel, or any mention of these taped conversations between Drew Down and Balentine. Hence, the prosecution failed to produce this material in violation of the discovery order, but more importantly in violation of Mr. Balentine's federal constitutional rights. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). To the extent that Balentine's confession is the product of this illegal activity by the police, his confession was inadmissible. *Brewer v. Williams*, 430 U.S. 387 (1977).


**C.    Exhaustion and Procedural Default Statement.**

It is anticipated that the government will argue that this claim is unexhausted and procedurally defaulted. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Dispensa v. Lynaugh*, 847 F.2d 211, 217 (5th Cir. 1988); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). However, Balentine can demonstrate cause and prejudice to

161

excuse any default.  The arguments in the introductory section are incorporated by reference herein.  *See* Introduction, 2. F.

**GROUND EIGHTEEN: The cumulative effect of trial errors resulted in an unfair trial and a denial of due process as guaranteed by the Fourteenth Amendment to the United States Constitution**.

"The cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness." *Jackson v. Johnson*, 194 F.3d 641, n.59 (5th Cir. 1999); U.S. CONST. amend. XVI. Each of the errors complained of in this Petition warrant a new trial or, alternatively, a new sentencing proceeding. Should this Court conclude that the errors do not individually warrant such relief, then the cumulative effect of the errors unquestionably warrants relief. This Court should conclude that all of the aforementioned errors, both individually, and cumulatively, warrant habeas relief. U.S. CONST. amend. XVI.

163

## REQUEST TO EXPAND THE RECORD

As necessary to demonstrate the validity of each claim in this Petition, leave is requested to expand the record to include any evidence, document, letter, and/or affidavit relevant to this case that was not so included in the state Application for Post-Conviction Writ of Habeas Corpus, including any evidence adduced during discovery and an evidentiary hearing, if the requests for same are granted. *See* Rule 7, Rules Governing Section 2254 Cases in the U.S.D.C.

## REQUEST FOR DISCOVERY

In the case at bar, Balentine has a established a *prima facie* showing that his trial counsel were ineffective, as for example, in failing to develop an effective theory of the case, adequately develop and present mitigating evidence, and discuss parole eligibility with the venire and the jurors during the punishment phase.

Likewise, there are grave questions with respect to the legality of the investigation by law enforcement.

Balentine requests that this Court grant discovery under the Federal Rules of Civil Procedure concerning each and every the fact issue presented herein, and also as to any factual issue contested by the Respondent. Rule 6, Rules Governing Section 2254 Cases in the U.S.D.C. In particular, Balentine seeks discovery, including depositions duces tecum, interrogatories and requests for admissions of trial counsel, with respect to any and all claims of ineffective assistance of counsel. Balentine also seeks discovery, including depositions duces tecum, interrogatories and requests for admissions of Officer Paul Horn concerning the investigation of the crimes and the interrogation of Balentine, including any taped conversations with other inmates incarcerated in the same facility as Balentine.

If this court believes that a more detailed statement of the interrogatories, requests for admissions and a list of the documents sought to be produced is required,

then Balentine requests that this court enter an order allowing Balentine to amend his

request and provide a fuller statement as to his requests as to them.

## REQUEST FOR EVIDENTIARY HEARING

"To receive an evidentiary hearing, a habeas corpus petitioner must allege facts which, if proven, would entitle him to relief. *Lavernia v. Lynaugh*, 845 F.2d 493, 501 (5th Cir.1988). 'The court need not blindly accept speculative and inconcrete claims as the basis to order a hearing.' Id. (internal quotations and citations omitted). 'Nor is a hearing required when the record is complete or the petitioner raises only legal claims that can be resolved without the taking of additional evidence.' Id.  *Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996).   Balentine requests that this Court hold an evidentiary hearing on the fact issues presented here, and also as to any factual issue contested by the Respondent.  Rule 8, Rules Governing Section 2254 Cases in the U.S.D.C.

Finally, Balentine requests that upon completion of the discovery and hearing, or without discovery and/or hearing, that this court grant him habeas corpus relief. *See Herrera v. Collins*, 506 U.S. 390, 403 (1993); 28 U.S.C. § 2254(d).

## CONCLUSION

Balentine's trial was so fatally infected by constitutional error, that the fairness of the proceeding is called into question.

WHEREFORE, Balentine prays that this federal court:

1.      Issue a writ of habeas corpus to him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2.      Grant him discovery and an evidentiary hearing at which he may present any evidence in support of these claims, and allow him a reasonable period of time subsequent to any hearing this court determines to conduct, in which to brief the issues of fact and of law raised by this Petition or such hearing.

3.      Direct that under Habeas Corpus Rule 7, the record in this case be expanded to include the "additional materials relevant to the determination of the merits of the petition" which are found in exhibits filed with this Petition;

4.      If this federal court chooses to dismiss this petition for failure to exhaust state remedies, protect Balentine's right to meaningful habeas review either by entering an order specifically holding this case in abeyance pending exhaustion pursuant to *Brewer v. Johnson*, 139 F.3d 491 (5th Cir. 1998); and/or enter an order specifically finding that the federal statute of limitations contained in the Antiterrorism

and Effective Death Penalty Act will be equitably tolled for the entire duration of the time it takes Balentine to prepare and file a petition for writ of habeas corpus in state court.

Respectfully submitted,

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2003, I have served a true and correct copy of the foregoing pleading upon counsel for Respondent:

Ms. Katherine Hayes
Assistant Attorney General
Office of the Attorney General of Texas
Capital Station 12548
Austin, TX 78711

Lydia M.V. Brandt

cc:    John Balentine #999315
Polunsky Unit
Texas Department of Criminal Justice
3872 FM 350 South
Livingston, TX 77351-8580

169

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

---

JOHN LEZELL BALENTINE,

 *Petitioner*,

v.

DOUG DRETKE, Director
Texas Department of Criminal Justice,
 Correctional Institutions Division

 *Respondent.*

Action No. 2:03-CV-0039

---

## VERIFICATION

I, Lydia M.V. Brandt, pursuant to 28 U.S.C. § 2242, acting on behalf of

Petitioner, certify under penalty of perjury that the foregoing Petition for Writ of

Habeas Corpus is true and correct.

Signed this November 28, 2003.

           Lydia M.V. Brandt
           Texas Bar No. 00795262
          THE BRANDT LAW FIRM, P.C.
           P.O. Box 850843
          Richardson, Texas   75085-0843
     (972) 699-7020 Voice; (972) 699-7030 Fax

170

# EXHIBITS

Exhibit 1:    Attorney Profile, State Bar of Texas, Kent Birdsong

Exhibit 2:    Affidavit of Roger Shuy, Ph.D.
Exhibit A: Curriculum Vitae
Exhibit B:  Analysis of Balentine Confession

Exhibit 3:    Analysis of Balentine Confession communicated from Shuy to Herrmann, located in trial counsel files

Exhibit 4:    Affidavit of Jane McHan

Exhibit 5:    E-mail from Jane McHan, mitigation specialist to Lydia Brandt, (November 22, 2003, 9:25 AM)

Exhibit 6:    Affidavit of Eric Smith (*Brady*)



Attorney Profile Update System

| Attorney Profile Summary |





The Texas Attorney Profile provides basic information about Attorneys licensed to practice in Texas. Information is provided as a public service by the State Bar of Texas as outlined in Section 81.115 Government Code. The information contained herein is provided "as is" with no warranty of any kind. Neither the State Bar of Texas, nor its Board of Directors, nor any employee thereof may be held responsible for accuracy of the data. Much of the information has been provided by the attorney and is required to be updated by the attorney annually. The information noted with an asterisk (*) is provided by the State Bar. Grievance/disciplinary information will not appear on the profile until a final determination is reached. Authorized for public use only. Any unauthorized use of this system is subject to both civil and criminal

**MR. R. KENT BIRDSONG**

*License Information*

| | |
|---|---|
| State Bar Card Number*: | 02333630 |
| Texas License Date*: 11/02/1984 | Current Status*: Eligible to Practice in Texas |

*Practice Location & Information*

**Primary Practice Location**

| City | State | Country |
|---|---|---|
| VEGA | Texas | UNITED STATES |

**Services Provided**

| | |
|---|---|
| Are language translation services available? | Not Specified |
| Are hearing impaired translation services available? | Not Specified |
| Are ADA accessible client service areas available? | Not Specified |

**Federal Courts of Admittance**

No Federal Courts reported by attorney

**Other Courts of Admittance**

No Other Courts reported by attorney

**Other States Authorized to Practice**

No Other States reported by attorney

*Education and Certification History*

**Law Schools**

| Law School | Degree Earned | Graduation |
|---|---|---|
| Texas Tech University | Doctor of Jurisprudence/Juris Doctor (J.D.) | 05 / 1984 |

**Texas Board of Legal Specialization Certifications***

| Specialization | Status | Y |
|---|---|---|
| Criminal Law | ACTIVE | 1 |

*Public Disciplinary History*

**Disciplinary History - State Bar of Texas***

No profile data on file for Disciplinary History - State Bar of Texas

**Disciplinary History - Other States**

None reported by attorney

Copyright 2003 State Bar of Texas. All Rights Reserved

Affidavit of Fact

District of Columbia
STATE OF ~~MONTANA~~                    §
         Washington                    §
COUNTY OF ~~MISSOULA~~                  §

BEFORE ME, the undersigned authority, on this day personally appeared ROGER W. SHUY who being by me duly sworn, did depose and state upon oath as follows:

1.  My name is Roger W. Shuy. I am over twenty-one years of age and am fully competent to make this affidavit.

2.  Except where stated that I have been told by someone else, I have personal knowledge of all the facts set forth herein, and all such facts are true and correct.

3.  I was a professor of linguistics during my 30 years at Georgetown University. I have continued to provide linguistics services through my company, Roger W. Shuy, Inc., of which I am the president. I have consulted in over 500 cases and have testified as a linguistics expert witness 52 times in criminal and civil trials (in 26 states), as well as testifying before the US Senate and US House of Representatives in impeachment trials of US Senators and Federal Judges and in International Criminal Tribunal trials.  My curriculum vitae is attached as Exhibit A.

4.  I provided linguistic services for defense counsel, Paul Herrmann, in the case styled: *State of Texas v. John Balentine*, 320th District Court, Potter County, TX, Cause No. 39, 532.

5.  Those services included providing excerpts from William A. Geller, *Police Videotaping of Suspect Interrogations and Confessions: A Preliminary Examination of Issues and Practices, a Report to the National Institute of Justice* (1992). This report, among other things, addresses the issue of videotaping the entire station house interrogation vs. videotaping recapitulations ("recap tape").

6.  My services also included an analysis of the Balentine confession. On or about March 1, 1999, after having analyzed the confession of John Balentine, I communicated my analysis to Mr. Balentine's defense attorney, Paul Herrmann. My analysis and its communication to Mr. Herrmann is recorded in Exhibit B.

1

7.   I am custodian of the records for my company, Roger W. Shuy, Inc.  Exhibit B was created by me and communicated to Paul Herrmann for the *Balentine* case. It is a record kept by me in the regular course of business for Roger W. Shuy, Inc. I have personal knowledge of the act, event, condition, and opinion recorded; and the record was made at or near the time or reasonably soon thereafter.  The record attached hereto is an exact duplicate of the original.

8.   Exhibit B reflects that the videotape of the Balentine confession was a "recap" tape.  Pages 6 & 7 of Exhibit B outline "Some things I don't understand."  In point #3, I made a suggestion that the contents of the taped confession:

> "seem to fit a mental incapacity theory, or some mixture [of mental incapacity and self-defense] thereof.  The prompts by the officer also support a mental incapacity theory."

9.   I provided a copy of Exhibit B to Paul Herrmann in 1999.  To the best of my recollection, neither James Durham or Randall Sherrod contacted me about Exhibit B, or the services I provided to Mr. Herrmann.

FURTHER AFFIANT SAYETH NOT.

*Roger W. Shuy*
Roger W. Shuy
Roger W. Shuy, Inc.
Linguistic Services
629 Beverly Avenue
Missoula, Montana 59801-5919
(406) 721-5559 voice
(406) 549-8660 fax

Before me, a Notary Public, on this day personally appeared Roger W. Shuy, known to me (or proved to me on the oath of ___Montana Driver___' or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ___25th___ day of ___November, 2003___ (year).

*Alinda O Barnes*

NOTARY Public
12/14/06
My Commission Expires

2

CURRICULUM VITAE
November, 2002

Roger W. Shuy, Ph.D.
Distinguished Research Professor of Linguistics, Emeritus
Georgetown University, Washington, D.C.
  Current Office:
  Roger W. Shuy, Inc.
  629 Beverly Avenue
  Missoula, Montana 59801-5919  tel: 406-721-5559
              fax: 406-549-8660
              e-mail: rshuy@montana.com

## DEGREES

Ph.D.: Case Western Reserve University, 1962, English and Linguistics
M.A.: Kent State University, 1954, English
B.A.: Wheaton College (Illinois), 1952, English

## ACADEMIC POSITIONS

Georgetown University
- Distinguished Research Professor ofLinguistics, Emeritus, 1998--
- Distinguished Research Professor of Linguistics, 1996-98
- Professor of Linguistics, 1968-1996
- Head of Sociolinguistics Program, 1968-1987
- Linguistics Department Chair, 1987-1990

Center for Applied Linguistics
- Head, Sociolinguistics Program, 1967-70
- Associate Director, 1971-80 (part time)
- Senior Linguist, 1980-85 (part time)

Michigan State University, Associate Professor of Linguistics, 1964-67
Wheaton College, Assistant Professor of English and Linguistics, 1958-64
Secondary School English Teacher, Akron, Ohio, 1956-58

## PUBLICATIONS: BOOKS
FORENSIC LINGUISTICS

Language Crimes. Oxford: Blackwell, 1993 (reprinted 1996).

The Language of Confession, Interrogation and Deception. Thousand Oaks, CA: Sage Publications, 1998.

Bureaucratic Language in Goverrnment and Business. Washington,DC: Georgetown University Press, 1998.

Linguistic Battles in Trademark Disputes. London: Palgrave Press, 2002.

REGIONAL AND SOCIAL DIALECTS

The Northern-Midland Dialect Boundary in Illinois. University of Alabama Press (American Dialect Society Publication #38). 1962.



2

Social Dialects and Language Learning. Editor. Champaign:National Council of Teachers of English, 1965.

Discovering American Dialects. Champaign:National Council of Teachers of English, 1967.

Field Techniques in an Urban Language Study. Co-author. Washington, D.C:Center for Applied Linguistics, 1968.

Dialects in Culture. Co-editor. University of Alabama:University of Alabama Press, 1979.

SOCIOLINGUISTICS

Sociolinguistics:A Cross-disciplinary Perspective. Editor. Washington,D.C.:Center for Applied Linguistics, 1971.

Sociolinguistics in Cross-cultural Analysis. Co-editor. Washington, D.C.:Georgetown University Press, 1972.

Sociolinguistics:Current Trends and Prospects. Editor. Washington, D.C.:Georgetown University Press, 1973.

Language Planning:Current Issues and Research. Co-editor. Washington, D.C.:Georgetown University Press, 1973.

Language Attitudes:Current Trends and Prospects. Co-editor. Washington, D.C.:Georgetown University Press, 1973.

Some New Directions in Linguistics. Editor. Washington, D.C.:Georgetown University Press, 1973.

New Ways of Analyzing Variation in English. Co-editor. Washington, D.C.:Georgetown University Press, 1973.

Toward Tomorrow's Linguistics. Co-editor. Washington, D.C.:Georgetown University Press, 1974.

Studies in Language Variation. Co-editor. Washington, D.C.:Georgetown University Press, 1977.

Varieties of American English. Co-editor. Washington, D.C.:Georgetown University Press, 1979.

Language Use and the Uses of Language. Co-editor. Washington, D.C.:Georgetown University Press, 1980.

APPLIED LINGUISTICS

Teaching Black Children to Read. Co-editor. Washington, D.C.:Center for Applied Linguistics, 1969.

Sociolinguistic Theory, Materials and Training Programs:Three Related Studies. Co-author. USOE Final Report OEC-3-9-180357-0400(010).

Teaching Standard English in the Inner City. Co-editor. Washington, D.C.:Center for Applied Linguistics, 1970.

Language Differences:Do they Interfere? Co-editor. Newark, Delaware:International Reading Association, 1973.

Ginn Individualized Spelling Program.  Co-author. Boston, Massachusetts:Ginn and Company, 1975.

Linguistic Theory:What Can it Say About Reading? Editor. Newark, Delaware:International Reading Association, 1977.

The Relation of Theoretical and Applied Linguistics. Co-editor. New York:Plenum, 1987.

Dialogue Journal Communication. Co-author. Norwood, NJ:Ablex, 1988.

MEDICAL COMMUNICATION

A Few Months To Live: Different Paths to Life's End.  Co-author. Washington,DC: Georgetown U Press, 2001.

## PUBLICATIONS:  ARTICLES  AND  CHAPTERS

LINGUISTICS AND LAW

Can linguistic evidence build on defense theory in a criminal case? Studia Linguistica 35.1-2 (1981):33-49.

Topic as the unit of analysis in a criminal law case. In D. Tannen (ed.), Analyzing Discourse:Text and Talk. Washington, D.C.:Georgetown University Press, 1982. pp. 113-126.

What did the Abscam tapes really say? Linguistic Reporter  May 1982:3-4.

Entrapment and the linguistic analysis of tapes. Studies in Language 8.2 (1982):215-234.

Linguistics in other professions. Annual Review of Anthropology 13 (1984):419-445.

The decade ahead for applied sociolinguistics. International Journal of the Sociology of Language  45 (1984):101-111.

Context as the highest standard of semantics:A lawsuit involving the meaning of "Accuracy" in accounting. Journal of English Linguistics  19.2 (Oct. 1986):295-303.

Language and the law. Annual Review of Applied Linguistics. Vol. 7. Cambridge:Cambridge University Press, 1986.

Some contributions of a linguist in a criminal case. In S. Fisher and A. Todd (eds.), Discourse and Institutional Authority. Norwood, N.J.:Ablex, 1987.

4

Conversational power in FBI covert tape recordings. In L. Kedar (ed.), Language and Power. Norwood, N.J.:Ablex, 1987 (pp. 43-56)

Comprehensibility in the DWI arrest. The Champion  May 1987:23-46.

Linguistic analysis of real estate commission agreements in a civil law suit. In R. Steele and T. Threadgold (eds.), Language Topics:Essays in Honour of Michael Halliday. Amsterdam:John Benjamins, 1987 (pp. 333-358)

The analysis of tape recorded conversations. In P.P. Andrews and M.B. Peterson (eds.), Criminal Intelligence Analysis. Loomis, California:Palmer, 1990, pp. 117-148.

Evidence of cooperation in conversation:Topic type in a solicitation to murder case. In R. Rieber and W.A.Stewart (eds.), The Language Scientist as an Expert Witness:Issues in Forensic Linguistics. Annals of the New York Academy of Sciences, Vol. 606 (1990), pp. 85-105.

Warning labels:Language law and comprehensibility. American Speech  65.4 (1990):291-303.

Mc: Meaning in the marketplace. American Speech  65.4 (1990) 349-366.

Using language evidence in money laundering trials. In Money Laundering Enforcement Update:Legislative, Regulatory, Enforcement Developments. American Bankers Association and American Bar Association. Washington, D.C., 1990, pp. 936-954.Published in American Speech, 68.1 (1993), pp.

Bilingual evidence in a U.S. criminal court case. Plurilingua, Vol. 13 (1992), pp. 165-173.

Language evidence in distinguishing pilot error from product liability. International Journal of the Sociology of Language, number 100/101,1993.pp.101-114.

The Hidden Witness. Criminal Justice.  Winter, 1994.  pp. 26-30, 57-59.

Deceit, distress and false imprisonment: the anatomy of a car sales event. Forensic Linguistics, Vol.1, issue 2, 1994 . pp. 133-149.

How a judge's voir dire can teach a jury what to say.  Discourse and Society. Vol.6, number 2, 1995.  pp. 207-222.

Dialect as evidence in law cases.  Journal of English Linguistics. Vol. 23, number 1&2, 1995.  pp. 195-208.

Discourse Clues to Coded Language in an Impeachment Hearing.  In G. Guy, C. Feagin, D. Schiffrin and J. Baugh (eds.). Towards a Social Science of Language: Papers in Honor of William Labov. Amsterdam: John Benjamins, 1997.  pp. 121-138.

Ten unanswered language questions about Miranda.  Forensic Linguistics. Vol.4, No. 2, 1997.  pp. 175-196.

5

What we do with English when we take notes: evidence from a civil suit. Studia Anglica Posnaniensia. Vol. 33, 1998. pp. 353-363.

Forensic Linguistics. In M.Aronoff and J. Rees-Miller (eds.).The Handbook of Linguistics. Oxford: Blackwell, 2000. pp. 683-691.

Using a linguist in money laundering trials. In White Collar Crime 2001. Chicago: American Bar Association, 2001, pp. F19-F38

Disourse analysis in the legal context. In D. Schiffrin, D. Tannen and H. Hamilton (eds), The Handbook of Discourse Analysis . Oxford: Blackwell, 2001. pp. 437-452.

DARE'S role in linguistic profiling. DARE Newsletter. Vol.4, No. 3. Summer 2001.

Paved with good intentions: Words of advice for the rocky road of bureaucratic language. In J. Alatis and A.Tan (eds), Language in Our Time. Washington DC: Georgetown U Press, 2001. pp. 98-110.

The removal of Arturo: An immigration case nightmare. In J.Alatis and A.Tan (eds), Language in Our Time. Washington DC: Georgetown U Press, 2001. pp. 418-431.

Language and the law: How lawyers are turning to linguistic experts to help them with their cases. Language Magazine, March 2002. pp. 35-38.

Forensic psycholinguistics: using language analysis for identifying and assessing offenders (co-authored with Special Agent  Sharon Smith), FBI Law Enforcement Bulletin, April 2002. pp. 16-21.

Breaking into language and law. In J. Alatis, H.Hamilton and A.Tan (eds.) Linguistics, Language, and the Professions. Washington DC: Georgetown U Pess, 2002. pp.67-80.

REGIONAL AND SOCIAL DIALECTS

Tireworker terms. American Speech, XXXIX (December 1964) :268-277.

Sauce:Dialect methodology. American Speech  XLI:74-75 (February 1966).

An automatic retrieval program for the Linguistic Atlas of the United States and Canada.  In Paul Garvin and Bernard Spolsky (eds.), Computation in linguistics:A case book. Bloomington:Indiana University Press, 1966.

Dialectology and usage. Baltimore Bulletin of Education XLIII:2-4, 40-51 (1966-67).

A selective bibliography of social dialects. The Linguistic Reporter, June 1968:1-3.

Dialectology. In Ronald Wardaugh and H. Douglas Brown (eds.), A Survey of Applied Linguistics. Ann Arbor:University of Michigan Press, 1977.

6

My Georgia dialect is just as good as your Boston accent. Georgetown Magazine, January 1979, 2-4.

Unexpected by-products of fieldwork. American Speech, Winter 1983:345-358.

The social context of the study of social context of language variation. In Thomas Walsh (ed.), Synchronic and Diachronic Approaches to Linguistic Variation and Change. Washington, D.C.:Georgetown University Press, 1989, pp. 293-309.

A brief history of american sociolinguistics. Historiographia Linguistica 17.1-2 (1990):183-209. Reprinted in The Early Days of Sociolinguistics (C.B. Paulston and G.R. Tucker (eds.), Dallas: Summer Institute of Linguistics,1998, pp. 11-32.

Keeping our tools sharp and knowing when to use them. American Speech 75.3 (Fall,2000): 241-244.

### LANGUAGE ATTITUDES

Subjective judgments in sociolinguistic analysis. in J. Alatis (ed.), 20th Annual Georgetown Round Table. Washington, D.C.:Georgetown University Press, 1969.

Language and success:Who are the judges? In Words and Ways:Language of Teacher Trainers. Minneapolis:University of Minnesota, 1971.

Sociolinguistics and teacher attitudes in a southern school system. In David M. Smith and Roger W. Shuy (eds.), Sociolinguistics in Cross-Cultural Analysis. Washington, D.C.:Georgetown University Press, 1972.

Social dialect and employability:Some pitfalls of good intentions. Studies in Linguistics. University of Alabama Press, 1972, pp. 145-156.

Language and success. Idiom,VII 6:5-13, 1972. (Melbourne, Australia).

Stereotyped attitudes of selected English dialect communities. In R. Shuy and R. Fasold (eds.), Language Attitudes:Current Trends and Prospects. Washington, D.C.:Georgetown University Press, 1973.

Variability and the public image of language. TESOL Quarterly 15.3 (Sept. 1981):315-326.

On discovering language attitudes. In E. Dudley and P. Heller (eds.), American Attitudes Toward Foreign Languages and Foreign Cultures. Bonn:Bouvier Verlag Herbert Grundmann, 1983, pp. 71-93.

Perspectives on Language History in Eighteenth-Century England. In K. Jankowsky (ed.), Multiple Perspectives on the Historical Dimensions of Language, Munster: Nodus Publications, 1996, pp. 83-102.

### RESEARCH METHODOLOGY

Sociolinguistic research at the Center for Applied Linguistics:The correlation of language and sex. In Giornate Internazionali di Sociolinguistica. Rome:Palazzo Baldassini, 1969, pp. 849-857.

The sociolinguists and urban language problems. In Frederick Williams (ed.), Language and Poverty, Chicago: Markham,1970,pp 335-350.

Terminological interference in the study of the social aspects of language. In Sanford Newell (ed.), Dimensions:Language 70, Proceedings of the Sixth Southern Conference on Language Teaching. Spartanburg, S.C.:Converse College, 1970, pp. 71-82.

Some problems in studying negro-white speech differences. In Rodolpho Jacobson, (ed.), The English Record, Special Anthology Issue, 1971.

Contemporary emphases in sociolinguistics. In R. O'Brien, (ed.), 22nd Annual Georgetown Round Table. Washington, D.C.:Georgetown University Press, 1971.

Sociolinguistics as a way of knowing things. In J. Griffith and L.E. Miner (eds.), The Second and Third Lincolnland Conferences on Dialectology. University, Alabama:University of Alabama Press, 1972, 333-347.

The sociolinguistics program at Georgetown University. In William K. Riley and David M. Smith (eds.), Languages and linguistics working papers, number 5. Washington, D.C.:Georgetown University Press, 1972.

Sociolinguistic strategies for studying urban speech. In M. Imhoff (ed.), Viewpoints 47.2 (1972):1-25.

Language and the paradoxical flight from elitism. Semiotica VII 4:352-364.

Some useful myths in social dialectology. Florida FL Reporter XI:17-20, 55 (Spring/Fall 1973).

Sex as a factor in sociolinguistic research. In W.W. Gage (ed.), Language in its Social Setting. Washington, D.C.:Anthropology Society of Washington, 1974, pp. 74-83.

Breaking into and out of linguistics. In F.P. Dinneen, S.J. (ed.), Linguistics:Teaching and Interdisciplinary Relations. Washington, D.C.:Georgetown University Press, 1975.

Toward the description of areal norms of syntax:Some methodological suggestions. Germanistische Linguistik 3-4/77, Marburg/Lahn, 1977, pp. 367-390.

Quantitative language data:A case for and some warnings against. Anthropology and Education Quarterly VII.2:78-82 (May, 1977).

On the relevance of recent developments in sociolinguistics to the study of language learning and education. In G. Szepe (ed.), Studies in Mother Tongue Education. AILA Bulletin, No. 21, pp. 77-105. Pisa, 1978.

The role of research at the Center for Applied Linguistics. Linguistic Reporter 21.7:6-7 (April, 1979)

.Some problems in preparing dialect data for processing. Germanistische Linguistik, 3-4/77, Marburg/Lahn, 1979, pp. 145-158.

Some recent applications of sociolinguistic theory and research. In K. Sajavaara (ed.), Papers from Finnish Summer Schools of Linguistics. Jyvaskyla, Finland:University of Jyvaskyla, No. 8 (1980):31-63.

Educational Linguistics. Die Neueren Sprachen 80.5 (1981):455-468.

The search for content validity through world knowledge.  In George Madaus (ed.), The  Courts, Validity, and Minimal Competency Testing. Boston:Kluwer-Nijhoff, 1982, pp. 207-228.

The decade ahead for applied sociolinguistics. International Journal of the Sociology of Language 45:101-111 (1984).

A sociolinguistic view of interpreter training. In M. McIntire (ed.), Proceedings of the Conference in Interpreter Training. Northridge, CA, 1986.

Aspects of language variability and two areas of application. In H.B. Allen and M.D. Linn (eds.), Dialect and Language Variation. New York:Academic Press, 1986.

Ethical issues in analyzing FBI surreptitious tapes. International Journal of the Sociology of Language (1986) 62:119-128.

Medicine, law, and education: a journey into applied linguistics. In R.O. Selig and M.R. London (eds.), Anthropology Explored: The Best of Smithsonian Anthro Notes.  Washington,DC: Smithsonian Institution, 1998. pp.275-285.

After the Interview (co-author) Qualitative Sociology. 2002.

SPOKEN LANGUAGE

Detroit speech: Careless, awkward and inconsistent or systematic, graceful and regular? In A.L. Davis (ed.), On the Dialects of Children. Champaign:National Council of Teachers of English, 1968.

Locating the switching devices of oral language. In J. Walden (ed.) Oral Language and Reading. Champaign:National Council of Teachers of English, 1969, pp. 89-99.

The relevance of sociolinguistics for language teaching. TESOL Quarterly, March 1969:13-22.

Bonnie and Clyde tactics in English teaching. Florida FL Reporter, July 1969.

Teacher training and urban language problems. In R. Fasold and R. Shuy (eds.), Teaching Standard English in the Inner City. Washington, D.C.:Center for Applied Linguistics, 1970.

Social dialects:Teaching versus learning. Florida FL Reporter 1.1-2 (Spring 1971):28-33,55.

9

Performance contracts and reading:the great oversimplification. Journal of Reading 15.8 (1972):604-612.

Speech differences and teaching strategies: how different is enough? In R. Hodges and E.H.Rudorf (eds.), Language and Learning to Read:What Teachers Should Know about Language. Boston:Houghton Mifflin, 1972.

Language problems of disadvantaged children:A sociolinguistic perspective. In J. Irwin and M. Marge (eds.), Principles of Childhood Language Disabilities. New York:Appleton-Century Crofts, 1972.

Current theory and knowledge for the teaching of English. English in Australia 22:25-45.

Whatever happened to the way kids talk? In M. King, R. Emans and R. Cianciolo (eds.), A Forum for Focus. Champaign:National Council of Teachers of English, 1972.

Nonstandard dialect problems:An overview. In J. Laffey and R. Shuy (eds.), Language Differences:Do They Interfere? Newark:International Reading Association, 1973.

Current theory and knowledge for the teaching of English. In The Teaching of English:Australian UNESCO Seminar. Canberra:Australian Government Publishing Service, 1973, pp. 36-44.

The study of vernacular Black English as a factor in educational change. Research in the Teaching of English VII.3 (Winter 1973):297-311.

Sociolinguistic strategies for teachers in a southern school system. Proceedings of the Third International Conference on Applied Linguistics, Vol. II (ed. A. Verdoodt). Heidelberg:Julius Groos Verlag, 1974, pp. 155-171.

On the relevance of recent developments in sociolinguistics to the study of language learning and early education. In O. Garnica and M. King (eds.), Language, Children and Society. New York:Pergamon Press, 1978.

The child as communicator. Language Arts September 1979:616-618.

Three kinds of bias in standardized testing. In C. Yorio, K. Perkins and J. Schachter (eds.), On TESOL '79:The Learner in Focus. Washington, D.C.:TESOL, 1979.

Vernacular Black English:Setting the issues in time. In M.F. Whiteman (ed.), Reactions to Ann Arbor:Vernacular Black English and Education. Arlington, Va:Center for Applied Linguistics, 1980.

Code-switching in Lady Chatterly's Lover. York Papers in Linguistics, No. 9 (1981), pp. 223-240.

What do they do at school any day: studying functional language. In P. Dickson (ed.), Children's Oral Communication Skills. New York:Academic Press, 1981.

The rediscovery of language in education. Educational Leadership, March 1981.

Learning to talk like teachers. Language Arts 58.2 (February 1981), reprinted in Education Digest, May 1981.

What do the researchers know? Language Arts 58.3 (March 1981).

A holistic view of language. Research in the Teaching of English XV.2 (May 1981):101-111.

What should the language strand in a reading program contain? The Reading Teacher 35.7 (April 1982):806-614.

Assessing oral language ability in children. In L. Feagans and D. Farran (eds.), The Language of Children Reared in Poverty. New York:Academic Press, 1982. pp. 181-198.

The importance of understanding function from a sociolinguist's perspective. In L. Feagans and D. Farran (eds.), The Language of Children Reared in Poverty. New York:Academic Press, 1982. pp. 261-264.

Language as a foundation for education:The school context. Theory Into Practice Summer 1984:167-174. Reprinted in The Education Digest May 1985:21-23.

A szociolingvisztika ufabb eredmenyeinek alkalmazhatosaga a nyeivanulasnak es az iskolazas kezdeteinek tanulmanyozasaban. In Gyergy Szepe (ed.), Az anyanyelui neveles fejlesztesenek nemzetkozi tapasztalatai. Budapest:Tankonyukiado, 1985, pp. 211-239.

Secretary Bennett's teaching: an argument for responsive teaching. Teaching and Teacher Education 2.4 (1986):315-323. Reprinted in Elliot W. Eisner, The Enlightened Eye. New York:McMillan, 1991 (pp. 135-149).

Dialogue as the heart of learning. Language Arts 64.8 (Dec. 1987):890-897.

Identifying dimensions of classroom language. In J.L. Green and J.O. Harker (eds.), Multiple Perspective Analyses of Classroom Discourse. Norwood, N.J.:Ablex, 1988.

LITERACY

Linguistic principles applied to the teaching of reading. Reading and Inquiry X:242-244 (1965).

Starting a reading program for speakers of sub-group dialects. Highlights 1966:51-58.

In what dialect will they read? In New Directions in Reading. New York:Bantam, 1967.

Some language and cultural differences in a theory of reading. In K. Goodman and J. Fleming (eds.), Psycholinguistics and Reading. Newark:International Reading Association, 1969.

A linguistic background for developing reading materials for black children. In J. Baratz and R. Shuy (eds), Teaching Black Children to Read. Washington, D.C.:Center for Applied Linguistics, 1969.

Some considerations for developing reading materials for ghetto children. Journal of Reading Behavior II (Spring 1969).

Social dialect research and interdisciplinary conflict. The Reading Specialist VII.3:41-44.

Some relationships of linguistics to the reading process. Teachers' Manual, Reading 360. Boston:Ginn and Company, 1969, pp. 8-15.

Language variation and literacy. In J. Alan Figurel (ed.), Reading Goals for the Disadvantaged. Newark:International Reading Association, 1970.

Some things that reading teachers need to know about language. In H. Klein (ed.), The Quest for Competency in Teaching Reading. Newark:International Reading Association, 1972, pp. 141-150.

Interdisciplinary perspectives on change in teacher education. In H. Sartain and P. Stanton (eds.), Modular Preparation for Teaching Reading. Newark, Del.:International Reading Association, 1974, pp. 271-292.

Pragmatics: still another contribution of linguistics to reading. In S. Smiley and J. Towner, Language and Reading, The Sixth Western Symposium on Learning, 1975, pp. 36-48.

Sociolinguistics. In R. Shuy (ed.), Linguistic Theory:What Can It Say about Reading? Newark, Del.:International Reading Association, 1977, pp. 80-94.

Linguistic consideration in the simplification/clarification of insurance policy language (co-author). Discourse Processes I (1978):305-321.

The consumer and insurance policy language. In Proceedings of Consumers and Life Insurance:An Exchange of Views. U.S. Office of Consumer Affairs, May 15-16, 1978, pp. 19-34.

The literacy crisis:What can be done about it? Quest (Department of Education, Queensland, Australia) 24 (April 1978):43-54.

What children's functional language can tell us about reading, or, how Joanna got herself invited to dinner. In R. Beach and P.D. Pearson (eds.), Perspective on Literacy, College of Education, University of Minnesota, 1978, pp. 78-96.

Toward future study of the effect of school setting on learning. In Perspectives on the Instructional Dimensions of Study. Washington:National Institute of Education, 1978, pp. 40-49.

Reading and dialect differences. In Dialects and Educational Equity Series. Washington, D.C.:Center for Applied Linguistics, 1979.

12

Language development in the field of writing. In J. Maling-Keepes and B. Keeps (eds.), Language in Education. Canberra, Australia: Curriculum Development Centre, 1979, pp. 269-278.

The mismatch of child language to school language:Implications for beginning reading instruction. In L. Resnick and P. Weaver (eds.), Theory and Practice of Early Reading. Hillsdale, N.J.:Lawrence Erlbaum Associates, 1979.

Balanced decoding and comprehension in a good reading program. Ginn Occasional Papers, Number 5, 1980.

Closing remarks. In A. Humes (ed.), Moving Between Practice and Research in Writing. Los Alamitos, Cal.:SWRL Educational Research and Development, 1981.

What the teacher knows is more important than text or test. Language Arts 58.8 (Nov. 1981):919-929.

Four misconceptions about clarity and simplicity. Language Arts 58.5 (May 1981).

Toward a developmental theory of writing. In C. Frederiksen and J. Dominic (eds.), Writing:The Nature, Development and Teaching of Written Communication. Hillsdale, N.J.:Lawrence Erlbaum Associates, 1981, pp. 919-929.

Importance of the reading teacher's knowledge. The Education Digest April 1982:54-58.

Finding a sense of wonder in language and literacy. In College Reading. New York:Instructional Resource Center, 1983, pp. 23-34.

Dialogue journals and reading comprehension. Dialogue III.1 (December 1985).

A comparison of oral and written language functions. In K. Jankowsky (ed.), Scientific and Humanistic Dimensions of Language. Amsterdam:Benjamins, 1985, pp. 471-482.

Changing linguistic perspectives on literacy. In J. Orasanu (ed.), Reading Comprehension:From Research to Practice. Hillsdale, N.J.:Lawrence Erlbaum Associates, 1986, pp.77-88.

The oral language basis for dialogue journals. In J. Staton et al., Dialogue Journal Communication. Norwood, N.J.: Ablex, 1988, pp. 73-87.

Sentence level language functions. In J. Staton et al., Dialogue Journal Communication. Norwood, N.J.: Ablex, 1988, pp. 107-142.

Discourse level language functions. In J. Staton et al., Dialogue Journal Communication. Norwood, N.J.: Ablex, 1988, pp. 143-161.

Changing language policy in a bureaucracy. In P. Lowenberg (ed.), Language Spread and Language Policy. Washington, D.C.:Georgetown University Press, 1988, pp. 152-174.

Talking our way into writing and reading: dialogue journal practice (co-author). In B.A. Rafoth and D.C. Rubins (eds.), The Social Construction of Written Communication. Norwood, N.J.:Ablex, 1988, pp. 195-217.

The oral language process in writing:A real life writing session. Research in the Teaching of English 24.1 (Feb. 1990):88-100.

An argument for the use of dialogue journals to assess the reading comprehension of deaf students. Georgetown Journal of Languages and Linguistics 1.3 (1990):355-370.

Using language functions to discover a teacher's implicit theory of communicating with students. In J.K. Peyton and Jana Staton, Dialogue Journals n the Multilingual Classroom.  Norwood, N.J.: Ablex, 1993 (pages 127-154).

What it means to be a good colleague. In A.M. Marek and C.Edelsky (eds.),Reflections and Connections: Essays in Honor of Kenneth S. Goodman's Influence on Language Education. Cresskill,N.J.: Hamton Press, 1999, pp. 423-429.

## MULTILINGUALISM

Implications of recent sociolinguistic research for the problems of migrant worker children. In M. deGreve and E. Rosseel (eds.), Problemes Linguistiques des Enfants de Travailleurs Migrants. Brussels:AIMAV, 1977, pp. 187-209.

Multilingualism as a goal of education policy. In B. Kachru (ed.), Linguistics in the Seventies:Directions and Prospects. Urbana, Ill.:Department of Linguistics, 1978, pp. 107-123.

Bilingualism and language variety. In J.E. Alatis (ed.), International Dimensions in Bilingual Education. Washington, D.C.:Georgetown University Press, 1978.

Problems in assessing language ability in bilingual education programs. In H. La Fontaine et al., (eds.), Bilingual Education. Wayne, N.J.:Avery Publishing Co., 1978, pp. 376-381.

Toward a cross-disciplinary view. In Bilingual Education:Current Perspectives, Synthesis. Arlington, Virginia:Center for Applied Linguistics, 1978, pp. 82-88.

On the relevance of recent developments in sociolinguistics to the study of language learning and education. In G. Szepe (ed.), Studies in Mother Tongue Education. Pisa:AILA Bulletin No. 21, 1978, pp. 77-105.

A sociolinguistic framework for bilingualism in the classroom. In H. Baetens Beardsmore (ed.), Elements of Bilingual Theory, Study Series of the Tijdschrift van de Vrije Universiteit Brussel. Brussels, 1981, pp. 93-103.

Conditions affecting language learning and maintenance among Hispanics in the United States. NABE Journal VI.1 (Fall 1981):1-18.

Ohio English. Epic Events 1.4 (Sept. 1988):3-10.

An argument for the use of dialogue journals to assess the reading comprehension of deaf students. Georgetown Journal of Languages and Linguistics 1.3 (1990):355-369.

Some language foundations for future directions in literacy development in the nineties.. Georgetown Journal of Languages and Linguistics 3.1 (1992).

Foreword, In  C.Luas, R. Bayley, and C.Valli, Sociolinguistic Variation in American Sign Language: Washington,DC: Gallaudet U Press, 2001, xi-xiv.

MEDICAL COMMUNICATION

Communications problems in the cross-cultural medical interview. In P. Mozley (ed.), Papers of the Second Annual Conferences on Psychosomatic Obstetrics and Gynecology, Key Biscayne, Florida, 1974.

Recientes investigaciones en sociolinguistica. In El Simposio de San Juan. University of Puerto Rico, 1974, pp. 111-123.

The medical interview: problems in communication. Primary Care ,September, 1976:375-386.

The patient's right to clear communication in the medical interview. Leuven, Belgium:ITL, 1977, pp. 1-26.

Language policy in medicine: some emerging issues. In J.E. Alatis and G.R. Tucker (eds.), Language in Public Life. Washington, D.C.:Georgetown University Press, 1979.

Three types of interference to an effective exchange of information in the medical interview. In S. Fisher and A.D. Todd (eds.), The Social Organization of Doctor-Patient Communication. Washington, D.C.:Center for Applied Linguistics, 1983, pp. 189-202.

PUBLICATIONS:   MEDIA

FILMS

"Varieties of American English:Regional Dialects." 40 minutes, co-author and performer, U.S. International Communication Agency, 1977.

"Varieties of American English:Social Dialects." 45 minutes, co-author and performer, U.S. International Communication Agency, 1977.

"Varieties of American English:Stylistic Differences." 40 minutes, co-author and performer, U.S. International Communication Agency, 1977.

VIDEO TAPES

"Living Language," author and performer, series of twelve 30-minute programs on linguistics for secondary school teachers, WETA, Washington, D.C., 1967.

"American Dialects," 30-minute interview, U.S. International Communication Agency, 1976.

"Language in Education," Sydney (Australia) Educational Television, 1978.

## GRANTS, AWARDS AND RESPONSIBILITIES

### PROGRAM GRANTS

Director, NDEA Title XI Institute for Applied Linguistics (USOE), Summer 1965, Michigan State University.

Director, National Science Foundation grant to Georgetown University to establish a doctoral program in Sociolinguistics, 1970-75.

Director, Teacher Education Program in Social Dialects, Norfolk, Virginia, 1972 (desegregation).

### RESEARCH GRANTS

Director, Detroit Dialect Study (USOE), 1966-67, Michigan State University.

Director, Carnegie Corporation of New York grant to the Center for Applied Linguistics, Urban Dialect Study, 1967-70.

Director, National Institute of Mental Health grant to the Center for Applied Linguistics, Psycholinguistic Attitude Study, 1968-69.

Director, USOE grant to the Center for Applied Linguistics, Sociolinguistics Theory, Materials and Programs, 1969-70.

Director, USOE grant to the Center for Applied Linguistics, Influence of Two Overlapping Systems on the English of Harlem Puerto Ricans, 1970-71.

Director, Carnegie Corporation of New York research grant to the Center for Applied Linguistics to study the acquisition of children's use of language functions, 1975-77.

Director, NIE grant to the Center for Applied Linguistics to build a research agenda in bilingual education, 1975.

Director, Ford Foundation grant to the Center for Applied Linguistics to develop Puerto Rican community awareness of bilingual education in New York, 1975-77.

Co-director, Carnegie Corporation of New York grant to the Center for Applied Linguistics to study cross-disciplinary contributions to bilingual education, 1975-77.

Co-director, NIE grant to the Center for Applied Linguistics to study Inferencing in Reading, 1978-80.

Director, Planning Grant, Ford Foundation, Determining conditions that affect learning of English by Hispanics, Summer 1980.

Co-director, NIE grant to the Center for Applied Linguistics on Functional Language in Vernacular Setting, 1980-83.

Director, NIE grant to the Center for Applied Linguistics, Analysis of Dialogue Journal Writing as a Communicative Event, 1980-82.

Co-director, NIE grant to the Center for Applied Linguistics, "Dialogue Writing:Analysis of Interactive Writing in ESL," 1983-84.

Director, grant from National Senior Citizens Law Center, A Linguistic Comparison of Telephone and In-Person Administrative Hearings, 1992.

Co-director, Kornfeld Foundation grant to Missoula Demonstration Project, "Patients' Perspective on End of Life Care," 1997-98,

### STUDY GRANTS

Graduate Assistant, 1957, Case Western Reserve University.

ACLS Fellow, Summer 1957, University of Michigan.

University of Chicago Research Fellow, Summer 1963.

Air Force Post Doctoral Research Fellow, Summer 1964, Indiana University.

### LECTURE GRANTS

ACLS  grant to lecture at the Third International Conference on Applied Linguistics, Copenhagen, August 1972.

Fulbright-Hays Award, Australian-American Foundation Fellow, Summer 1972, Lecturer and consultant to UNESCO English Curriculum Development Project in Australia.

Ford Foundation Grant to lecture at the Council of Europe Conference on Migrant Worker Children, Ghent, 1976.

Australian National Government award to lecture at the National Committee in English Teaching Conference, Canberra, 1977.

Swedish Government, invited plenary lecturer, Association Internationale de Linguistique Applique, Lund Sweden, 1981.

Moroccan-American Commission for Educational & Cultural Exchange grant to lecture throughout Morocco, 1999.

### AWARDS

Public Service Award, US Social Security Administration. "For Extraordinary Assistance to the Social Security Administration in Improving Our Service to the Public Through Clearly Written Notices"  June, 1986.

American Association of Applied Linguistics. Award for Distinguished Scholarship and Service  March, 1999.

New Ways of Analyzing Variation. "For Distinguished Service to Sociolinguistics and Your Pioneering Effort on Behalf of NWAV," October, 2001.

FBI Award Recognizing Service in the Unibomber Case, March, 2002.

## PROFESSIONAL   RESPONSIBILITIES

### PROFESSIONAL COMMITTEES

Chairman, NCTE Clearinghouse Committee on Social Dialects, 1967-70.

Presidente, Comision de Linguistica y Dialectologia Angloamericanas Inter American Program for Linguistics and Language Teaching, 1968-72.

Member, International Reading Association's Commission on Teacher Education, 1969-72.

Member, International Reading Association's Commission on the Reading Process, 1969-72.

Member, Linguistics Society of America, Program Committee, 1971-73, 1989-90.

Member, Linguistic Society of America, Technical Committee on Language and Cognitive Development, 1970-73.

Chairman, International Reading Association, Linguistics and Reading Committee, 1973-75.

Chairman, Linguistic Society of America, Committee on Linguistics and the Public Interest, 1974-76.

President, Lectological Association, 1972-75.

Member, Social Science Research Council, Committee on Sociolinguistics, 1972-76.

Membership Secretary, Executive Committee, National Conference for Research in English, 1976-79.

Member, Committee on Language Acquisition of Young Children, National Council of Teachers of English, 1977-79.

Member, Executive Committee, National Council of Teachers of English, 1977-81.

Member, Executive Committee, AILA (Association Internationale de Linguistique Applique), 1978-81 (Chairman, Scientific Commissions).

President, American Association of Applied Linguistics, 1978-80.

Member, International Committee, AILA (Association Internationale de Linguistique Applique), 1981-85.

Member, Linguistic Society of America, Committee on Linguistic Institutes and Fellowships, 1984-85.

Member, Linguistic Society of America, Program Committee, 1979, 1989.

Member, Board of Directors, Consortium·on Social Science Associations, 1984-88.

Member, Linguistic Society of America, Membership Committee, 1990-92.

Member, Linguistic Society of America, Committee on Social and Political Concerns, 2001-.

### PROFESSIONAL ADVISORY BOARDS

Member, Advisory Committee, the Australasia Foundation for Education, 1976-80.

Member, National Advisory Board, ERIC Clearinghouse on Languages and Linguistics, 1974-80.

Member, Bilingual Education Task Force of Teacher Corps, 1975-76.

Member, Advisory Board, NSF Linguistics Program, 1976-78.

Member, Scientific Advisory Board, Center for the Study of Reading, 1977-85.

Member, Board of Directors, Institute for the Study of Social Interaction, 1980-81.

Member, Board, International Pragmatics Association, Antwerp, 1985-91.

National Geographic, Atlas of the World (Sixth Edition), Washington, D.C., 1990.

Professional Evaluation Panels

Evaluation Panel, Linguistics Department, SUNY Buffalo, 1972, 1978, 1983, 1987.

Member, Evaluation Panel, Early Childhood Education, National Institute of Education, 1972.

Member, USOE Bureau of Education and Professional Development, Leadership Training Institute, 1970-75.

Member, Joint Consultant Review Panel, Northwest Regional Educational Laboratory, 1971-72.

Evaluation Panel, Center for the Study of Reading (NIE), 1978-85.

Evaluator, Linguistics Program, SUNY Albany, 1980.

Member, Advisory Board, Institute for Medicine and Humanities, Missoula, MT. 1998-.

Member, Research and Development Committee, United Way of Missoula County, 1998-.

Evaluator of Proposals:National Institute of Education, National Institute of Mental Health, US Office of Education, Canada Council, National Science Foundation, British Social Science Research Council, Carnegie Corporation of New York, National Endowment for the Humanities, Ford Foundation, Walter Annenberg Foundation, American Council of Learned Societies

## VISITING FACULTY POSITIONS

LSA Summer Linguistic Institute, State University of New York at Buffalo, 1971.

International Reading Association, Inter-disciplinary Seminar, University of California at Santa Cruz, 1972.

LSA Summer Linguistic Institute, University of Michigan, 1974.

University of Limburg, Co-Chairman, European Applied Linguistics Institute, Belgium, Summer 1974.

University of Texas, San Antonio, 1977.

LSA Summer Institute, State University of New York at Oswego, 1976.

Seattle Pacific University, Summer 1978.

University of Jyvaskyla, Finland, Summer 1979.

University of Jyvaskyla, Finland, Summer 1991.

US Department of Justice, Miami Office, Summer 1991. (Training Drug Enforcement Agents in language used in undercover operations).

## UNIVERSITY COMMITTEE RESPONSIBILITIES

Chairman, NDEA Title VI Graduate Fellowship Committee, 1965-67, Michigan State University.

Chairman, Fulbright-Hays Graduate Fellowship Committee, 1965-67, Michigan State University.

Member, Graduate Committee, Michigan State University, 1965-67.

Member, Board of Graduate Studies, Georgetown University, 1972-73.

Member, Graduate Committee, School of Languages and Linguistics, Georgetown University, 1970-74, 1977-78.

Member, Admissions and Fellowship Committee, Linguistics Department, Georgetown University, 1970-87.

Member, MAT Admissions Program, Georgetown University, 1981-86.

Member, Executive Committee, School of Languages and Linguistics, Georgetown University, 1987-90.

Member, Council of Department Chairs, School of Languages and Linguistics, Georgetown University, 1987-90.

Member, Graduate Council, School of Languages and Linguistics, 1988-90.

PhD Dissertation mentor, Georgetown University, 101 doctoral dissertations.

PhD Dissertation committee reader, Georgetown University, 55 doctoral dissertations.

## EDITORIAL AND ADVISORY BOARD SERVICE

### CURRENT:

Editorial Board, Discourse Processes, 1975-

Editorial Board, Hispanic Linguistics, 1983-

Editorial Board, Forensic Linguistics, 1992-.

Advisory Board, Institute of Medicine and Humanities, Univ. of Montana, 1998-

### PAST:

Editorial Board, Discourse and Society, 1989-2000.

Linguistics Advisor, Ginn and Company, 1967-81.

Editor, Urban Language Series, Center for Applied Linguistics, 1967-74.

Editorial Board, Language in Society, 1973-80.

Editorial Board, International Journal of the Sociology of Language, 1973-90.

Editorial Board, Linguistics and Education, 1986-1993.

Editorial Board, American Speech, 1968-77, 1992-95.

Editorial Board, Reading Abstracts, 1975.

Editorial Board, Language Problems and Language Planning. 1977-96.

Editorial Board, Studies in Language, 1979-89.

Editorial Board, Georgetown University Press, 1994-96.

Editor, Sociolinguistics Series, Newbury House Publishers, 1974-80.

Linguistics Advisor, Xerox Intermediate Dictionary, 1973.

Editor, Literacy Series, Center for Applied Linguistics, 1977-84.

Editorial Consultant, Journal of Educational Psychology, 1977, 1985.

Editorial Consultant, American Journal of Sociology, 1977.

Editorial Consultant, Applied Psycholinguistics, 1980-81.

Editorial Consultant, Reading Research Quarterly, 1981.

Editorial Consultant, Journal of Narrative and Life History, 1990.

Editorial Consultant to Publishers: University Park Press, University of Texas Press, Temple University Press, University of Pennsylvania Press, The Free Press, Wesleyan Press, Rutgers University Press, University of Alabama Press, University of California Press, John Benjamins Publishing Co., Cambridge University Press, Oxford University Press, Blackwell Publishing.

## MEMBERSHIPS IN LEARNED SOCIETIES

### CURRENT:

Linguistic Society of America (Program Committee, Chair of Ethics Committee, Delegate to Consortium of Social Science Organizations, Committee on Linguistics Institutes and Fellowships, Membership Committee, Committee on Social and Political Concerns.)  Life Member. 1957-

American Dialect Society, 1957-

American Association of Applied Linguistics (Vice-President, President, Recipient of Distinguished Scholarship and Service Award), 1977-

Academy for Forensic Application of Communication Sciences, 1985-

International Association of Forensic Linguistics, 1994- (editorial board)

### PAST:

International Reading Association (Linguistics and Reading Committee), 1965-1980.

American Education Research Association, 1970-83.

American Anthropological Association, 1975-82.

Teachers of English to Speakers of Other Languages (Publications Committee), 1970-80.

National Conference on Research in English (Membership Committee Chair), 1974-81.

National Council of Teachers of English (Social Dialects Committee, Language of Children Committee, Elementary English Committee), 1960-1990.

Law and Society Association, 1992-94.

Society for Text and Discourse, 1996-2001.

## PUBLIC SERVICE: FORENSIC LINGUISTICS

Invited Speaker, The Third Annual Institute on Defense of Criminal Cases, Washington, D.C., Oct. 15-16, 1982.

Expert Witness, U.S. House of Representatives Committee on the Judiciary Hearing on Oversight of the FBI, March 2, 1982.

Invited Speaker, D.C. Bar Association, Sept. 29, 1982.

Expert Witness, U.S. Senate, concerning impeachment of U.S. Senator Harrison A. Williams, 1982.

Invited Speaker, Super-Star Seminar in Criminal Defense Litigation, Atlanta, June 1984.

Invited Speaker, Tennessee Association of Criminal Defense Lawyers, March 1985.

Invited Speaker, Virginia ACLU, October 5, 1985.

Speaker, Dallas County Criminal Bar Association, November 1985.

Director of six, six week training programs on clear writing of legal notices, U.S. Social Security Administration, 1985-86.

Expert Witness, U.S. House of Representatives Committee on the Judiciary concerning the impeachment of Federal judge Alcee Hastings, 1988.

Expert Witness, U.S. Senate Special Committee on impeachment of Federal judge Alcee Hastings, 1989.

Invited Speaker, Judge William B. Bryant Inn of Court, Washington, D.C., February 1991.

Director, training program on the Language of Undercover Operations, U.S. Drug Enforcement Agency, Miami, June 1991.

Invited Speaker, Organized Crime and Drug Enforcement Task Force, language of Undercover Operations, Osage Beach, Missouri, 1992.

Expert Witness, D.C. Police Department, Internal Affairs, Hearing on alleged cheating on police promotion examinations, 1993-94.

Invited Speaker, D.C.Association of Criminal Defense Lawyers, May, 1995.

Invited Speaker, National Continuing Legal Education Seminar, Washington DC, March, 1996.

Consultant to the FBI in the Unibomber case and other bombing cases,1996-99.

Consultant to The Royal Canadian Mounted Police on various bomb and bomb threat cases, 1996-98.

Invited plenary speaker: National Defender Investigator Association, National Conference, Baltimore, March, 2000

Invited speaker, University of Washington Law School, Continuing Legal Education Seminar on the UW Law School Innocence Project, April, 2000

Invited speaker, Inns of Court, Portland, Maine, May, 2000.

Invited speaker, American Association for the Advancement of Science, session on linguistics and law, San Francisco, March, 2001.

Invited speaker, American Bar Association Institute on White Collar Crime, San Francisco, March, 2001.

Invited speaker, University of Tennessee Law School, April, 2001.

Invited speaker, University of Montana Law School, April, 2002.

Invited speaker, VOCAL Conference, Seattle, September, 2002.

Invited speaker, Montana Trial Lawyers, Chico, MT, February, 2003.

Invited speaker, International Trademark Association, Arlington, VA, March, 2003.

FROM :                                      FAX NO. : 4065498660                          Nov. 22 2003 11:03AM P2
Case 2:03-cv-00039-D-BR    Document 317   Filed 02/25/19    Page 220 of 314    PageID 17715

1

Taped Confession of John Lezell Balentine, 7-25-98, 10:55 a.m.

       Evidence of an earlier conversation

This confession statement is clearly a retell of an earlier conversation Balentine had with the investigator (PH) who did the interrogation.

The following statements provide evidence of this:

p.1 (40 seconds into the tape):
     PH:...and I'll repeat what we already went over earlier at
        9:50 o'clock...

p.2 (3 minutes and 50 seconds into the tape)

     PH: Well, when you all moved in on East 17th, how long did
        you all live there together?  Before you moved out, about,
        you know.

    Since this topic has not come up in this tape, it can only have been from an earlier conversation.

p.3 (4 minutes and 30 seconds into the tape)
    JB: Then Mark started staying there until the police raided
       the place and picked him up
    PH: Uh-huh
    JB: That I told...(interrupted by PH)

p.5 (6 minutes and 50 seconds into the tape)
    PH: Now you were telling me about...that after you were out of
       the house that you had got word through Angela that
       Markie was saying that he was gonna shoot you

    Since this topic has not come up in this tape, it can only have been from an earlier conversation.

p.5 (7 minutes into the tape)
    PH: But there was more to it about the gun that Angela and
       that you said he uh, wh-, he threatened

    Since this topic has not come up in this tape, it can


Exhibit B

only have been from an earlier conversation.

p. 6 (7 minutes and 51 seconds into the tape)
    PH: How'd you get over there? I know you do a lot of
        walking....as I found out, you do a lot of walking.

Since this topic has not come up in this tape, it can only have been from an earlier conversation

p.10 (11 minutes 57 seconds into the tape)
    JB: Then I shot Mark in the head, and shot the other two in
        the head. Weren't all of them shot in the head?
    PH: Right.
    JB: Uh-huh.

Balentine is uncertain of where he is alleged to have shot the men. His question reveals that the officer knows the answer and that Balentine is trying to get the officer's confirmation of something told Balentine earlier.

p.10 (12 minutes and 15 seconds into the tape)
    PH: And when you shot Markie, what part of his head did you
        shoot him in? Do you remember?
    JB: Dead center, wasn't it?

Balentine is uncertain of where in the head he is alleged to have shot Markie. His question reveals that the officer knows the answer and that Balentine is trying to get the officer's confirmation of something told Balentine earlier.

p.14 (16 minutes into the tape)
    PH: Cause you remember you telling me something about
        going to that one guy that lived in that two story house?
    JB: Oh yeah, he made the stop...Yeah, at, ah, what his name?

Even though the officer elicits the retelling, Balentine does still not know the man's name and asks the officer to repeat it to him once again.

p. 19 (20 minutes and 53 seconds into the tape)

PH:  I thought you told me you're not really a person that, not a gun person.

p.21  (23 minutes and 43 seconds into the tape)
PH:  I'm already, I'm asking you questions about stuff I already know, you know, cause we...right?

The officer's unfinished sentence is of interest because he appears to be about to say "cause we already talked about this."

FROM :                          FAX NO. : 4065498660                    v. 22 2003 11:04AM P5
Case 2:03-cv-00039-D-BR   Document 317   Filed 02/25/19   Page 223 of 314   PageID 17718

4

The officer prompts Balentine

p.6 (7 minutes and 51 seconds into the tape)
 PH: How'd you get over there? I know you do a lot of
  walking...as I found out, you do a lot of walking.
  You cover some ground.

p. 13 (14 minutes and 43 seconds into the tape)
 PH: Uh-huh. And then did he have you sit in the car or get
  out, or stand there, or what happened?

p. 14 (16 minutes into the tape)
 PH: Did you make any stops? Do you remember?...I mean
  before he actually took off?
 JB: Huh-uh.
 PH: Cause you remember you telling me something about going
  to that one guy that lived in that two story house?

p.14 (16 minutes and 7 seconds into the tape)
 PH: Because what did you tell that officer?Did you tell him
  you were going to see that guy? Or did you tell him you
  were going home? Or...

p.16 (17 minutes and 40 seconds into the tape)
 PH: And did you tell him everything about what happened? Or
  did you just tell him you needed to leave?

p.17 (18 minutes and 37 seconds into the tape)
 PH: Now did you call on the phone and she didn't answer? Or
  how, how did you try to get in touch with her?

p. 17  (18 minutes and 45 seconds into the tape)
 PH: How would you go about paging her? How would she know
  it was you?  Like if you used the bus depot number, how
  would she know it was you?

p.17 ( 18 minutes and 50 seconds into the tape)
 PH: She told me, if I remember correctly, that what you would
  do is put your 8, she thought you were 28.

p.18 (20 minutes into the tape)
 PH: Did you just get off for a rest stop? Or...

p.19   (21 minutes and 3 seconds into the tape)
      PH: Somebody give you the gun or did you buy it from
           somebody:?Or...

p.19   (21 minutes and 15 seconds into the tape)
      PH:  Did he sell it to you or give it to you or just loan it to you
          or how did it happen?

FROM :                                    FAX NO. : 4065498660              Nov. 22 2003 11:05AM P7
Case 2:03-cv-00039-D-BR   Document 317   Filed 02/25/19   Page 225 of 314   PageID 17720

6

Some things I don't understand

## 1. About the gun not working

p. 9 (11 minutes and 12 seconds into the tape)

> JB: Then I went back and looked at Mark and them and the
> gun jammed and so I had to go back outside and shoot
> it in the alley. When the police got called.
> PH: So you were gonna use the gun but it was jam, it wouldn't
> work?
> JB: Huh-uh.
> PH: And you went to the alley?  And what did you do with it
> in the alley?
> JB: Shot it in the alley.
> PH: To get it, to make sure it was working?  Okay.

I don't know much about guns but I wonder how JB
knew that the gun was jammed before he tried to shoot it.
And why would it work in the alley but not first in the
house?  Note also that it was PH, not JB, who added the idea
that JB tried the gun in the alley to make sure that it was
working.

## 2. Balentine's mental state at the time of the killing

p. 12 (13 minutes and 35 seconds into the tape)

> PH: Now, let me ask you this. After you got done shooting, how
> long do you think stayed in the house before you actually
> left?
> JB: Five minute.  I think I was stunned after I did it.  I think
> I realized that I had did it.
> PH: Yeah.
> JB: I think I did it, I think five or ten minutes (stayed in the
> house).
> PH: So you, you think you were actually in the house for a
> little while before you walked out?
> JB: Yeah, cause it seemed like, seemed like I had done
> something.  I couldn't believe I had did it.

Perhaps Balentine's stunned condition helps explain
why the officer had to prompt him throughout, such as on

page 10, when Balentine has to ask the officer, "Weren't all of them shot in the head?" and "Dead center, wasn't it?"

### 3. Issues of self defense

It is clear that Balentine believed that he had to kill Markie before Markie killed him. I have no idea what kind of self defense theory this could support but there are down sides to it. For one thing, Balentine had the gun with him when he went to Markie's place. Secondly, the matter of killing the two other men seems contradictory to his self defense theory. He doesn't even seem to know who they are. But this does seem to fit a mental incapacity theory, or some mixture thereof. The prompts by the officer also support a mental incapacity theory

8

## Complete Interrogation/Confession on Tape vs. Recap on Tape

As noted earlier, this is clearly a recap tape. I do not know what the policy of the Amarillo police department is, but I enclose pages from Geller's 1992 survey of police practices in tape recording confession statements. A recap has the advantage of saving money in tapes and equipment use for the police. It also has the advantage of reorganizing the suspect's statement into a coherent sequence for posterity. On the other hand, we have no way of knowing what actually happened in the untaped interrogation that preceded the recap performance, leaving some serious questions unanswered. The recap has the appearance of reality but it is, in fact, like a well rehearsed play. It is not the reality of the confession event; it is a cleaned up version. It gives us no knowledge of any possible coercion, promises, or questionable tactics that might have been used by the police. In short, it can clean up the act.

FROM :                            FAX NO. : 4065498660                    Nov. 23 2003 11:06AM P10

**Significant Transcript Corrections**

p.3 line 5:
    JB: That I told--- (that replaces cause)

p.10 line 9:
    PH: Same way? (way replaces was)

p.10 9 lines from bottom:
    JB: Then I shot Mark in the head, and shot the other two in the
        head. Weren't all of them shot in the head?
    PH: **Right.**
    JB: **Uh-huh.**
    PH: **Now, when you.....** (Bolded words added)

p.11 (beginning 7 lines from bottom)
    JB: I went, I **don't know**, I walked around the house for a
        minute, **stand back.** (Bolded words added)
    PH: Walked around the house, you say?
    JB: I cut on the light where Chris was to see did he wake up.
    (delete repeated words not on tape, "He didn't wake up") He
    never did wake up.....

p. 12 Lines 3 and 4
    JB: Five minute. I think I was stunned after I did it. (delete r
        repeated words not on tape,"After I did it, after I did it
        I don't think") I think I realized that I had did it.

p. 12 line 6
    JB: I think I did it I think five or ten minutes. ("did it"
        replaces "didn't")

p. 12 line 9
    JB: Yeah, cause it seemed like, seemed like I **had done**
        something. I couldn't believe I had did it. ("had done"
        replaces "was stunned.")

p. 14 line 5
    JB: The **the other guy** he had put.......("the other guy" replaces
        inaudible)

Case 2:03-cv-00039-D-BR   Document 317   Filed 02/25/19   Page 229 of 314   PageID 17724

p. 14 line 16
JB: Oh, yeah, he made the stop. He made the stop, yeah, at, ah, **what his name?** (bolded words added)

p. 17  4 lines from bottom
PH: Hummm, she told me, if I remember correctly, that what you would do is put your 8, **she thought** you were 28. (bolded words added)

p.18  7 lines from bottom
JB: (yawning) Sold the gun to a crackhead. Sold the gun to a druggie, what y'all call someone sells drugs, a, a, a... ("what y'all" replaces "which I")

p.21  7 lines from bottom
JB: Cause really, I'm an honest person, really. I don't hurt nobody unless they, unless I think they capable of hurting me. **If I think** (replaces inaudible) somebody say they gonna do something to me, I think about it, then I realize that they would hurt me or not (words added) and if I think they capable of hurting me, I'm gonna hurt them before they hurt me.

# POLICE VIDEOTAPING OF SUSPECT INTERROGATIONS AND CONFESSIONS:

## A Preliminary Examination of Issues and Practices

*A Report to the National Institute of Justice*

by

William A. Geller
Associate Director
Police Executive Research Forum

August 7, 1992

*For additional information about this study, please contact:*

William A. Geller
Associate Director
Police Executive Research Forum
~~2300 M Street, N.W., Ste. 910~~
~~Washington, D.C. 20037~~
~~(202) 466-7820~~

2116 Thornwood Ave.
Wilmette, IL 60091-1452
(708) 256-0017

9/21/94

Case 2:03-cv-00039-D-BR   Document 317   Filed 02/25/19   Page 232 of 314   PageID 17727

Among the agencies to which we made site visits, only Huntington Beach and Orange County videotaped covertly—without notifying the suspect that a recording was being made and without any of the video recording equipment being visible in the interview room. Tulsa police officials indicated an intention in the near future to begin experimenting with covert videotaping. In Kansas City, the equipment is concealed (because, as police explained, it is less distracting to the officer and suspect that way), but the interrogator routinely notifies the suspect of an intent to make a video record of the statement. In Denver, the microphone is in plain view but the camera shoots through a one-way mirror. This is the arrangement as well in most videotaping sites in Bronx County, New York (the prosecutor's office tapes at multiple sites throughout the county—principally at police precinct stations and in the prosecutor's office at the courthouse, and not every site is configured in precisely the same way).

In some other agencies, the camera is visible but the microphone is concealed (e.g., inside a thermostat on the interview room wall in San Diego and in a ceiling tile in Burlington, Massachusetts). In San Diego, interrogators normally do not explicitly notify the suspect that the interview is going to be videotaped, but to all but the most oblivious the video camera mounted on the ceiling and pointing towards the suspect's position in the interview room is a reasonably clear indication that the conversation may be recorded.

In some agencies (Tulsa was one), investigators conducting interrogations outside their home jurisdictions (because a suspect wanted for a local crime was arrested in another town) employed the covert videotaping practices routinely used by the agency in which they actually conducted the interrogation. Thus, for example, Tulsa investigators interrogated a homicide suspect—wanted for allegedly beating a man to death with a railroad tie—in the Oklahoma City Police Department's video interview room, set up for covert taping. After an hour of the suspect persisting in denying his guilt, the interrogators from Tulsa turned off the portable audio recorder they had sitting on the table in the interview room and told the suspect the interrogation was over. The Tulsa detectives left the room, but the hidden video recorder was left on. After a short while, Oklahoma City detectives entered the room, playing "nice cops" to the "tough cops" who had just given up their interrogation efforts. The ensuing conversation between the Oklahoma City police and the suspect was captured on videotape. (In point of fact, the suspect never did desist in his denials, and the Oklahoma City detectives soon abandoned the interrogation as well.)

The practice used by Tulsa detectives in Oklahoma City is one employed by San Diego detectives as well, who reported that, if a suspect asked to go "off-tape" for a portion of the conversation, the detectives would falsely agree to do so but in fact would keep the videotape running, reportedly as a safeguard against accusations that the police engaged in unprofessional conduct during the break in the taping.



## 2.   Videotaping Entire Stationhouse Interrogations Versus Recapitulations and Duration of the Resulting Videotapes

Our national survey revealed that 48 percent of the "videotaping departments" reported taping the *entire* stationhouse interrogation, which, we pointed out in our

Case 2:03-cv-00039-D-BR   Document 317   Filed 02/25/19   Page 233 of 314   PageID 17728

question "may last several hours." The balance (52 percent) reported taping what we term recapitulations—a statement by the suspect or interview of the suspect by officer(s) presented only after some prior untaped interrogation of the suspect by police personnel. The recaps usually contain the highlights of the information the suspect is willing to provide orally. Typically this will include both incriminating and exculpatory information, although, as we discovered in our site visits, some agencies will decide to *not* videotape a recapitulation of the interview's highpoints if they expect only to elicit exculpatory information or denials of culpability.

Some practitioners argue that declining to make a video record of the essence of a suspect's statement on the grounds that nothing of value to the prosecution is being said can be short-sighted, even if one ignores the dimension of fairness in the investigative process. Information that seems unimportant at the time of the interrogation (e.g., the suspect's insistence that he is innocent of murder by reason of self-defense or innocent of robbery by reason of coerced participation) may prove very useful at trial if the accused switches his or her defense strategy and enters an alibi claim. The video statement would be powerful impeachment evidence that the defendant was, contrary to his or her trial claim, present during the commission of the alleged crime.

Compared to videos of entire stationhouse interrogations, recaps, under the guidance of interrogating officers, generally follow a much clearer sequence in recounting the incriminating information. How orderly and sequentially clear the initial off-tape interrogation was that precedes a recap video will often turn substantially on how much information the interrogating officers have prior to asking their questions, how cooperative a guilty suspect is during the interview, and how skillful the interrogator is in conducting a logically ordered interview.

Although we took pains in our national telephone survey to clarify the distinction between taping an entire stationhouse interrogation and taping only a portion of that interrogation, we are nevertheless somewhat skeptical of the survey finding that nearly half of the agencies tape complete interrogations. While we selected jurisdictions across the nation for site visits, only three of 11 videotaping departments (the Huntington Beach, Orange County, and San Diego) law enforcement agencies taped entire stationhouse interrogations on a routine basis. The Tulsa Police reported occasionally videotaping entire stationhouse interrogations and an intention, once they switched to covert taping, to more routinely tape entire interviews. We have not, given time constraints, taken the step of recontacting the surveyed agencies which reported videotaping entire interrogations and attempting through a battery of follow-up questions to verify their response to our survey question.

The question of whether a department tapes entire interviews or only recaps has a variety of important implications, in the view of criminal justice practitioners. There are important fiscal implications. For instance, with a lengthy stationhouse interrogation in a serious felony such as murder, the costs for blank tape, equipment operator time, and transcription (a subject on which more will be said later in this chapter) would be far higher if the entire interview were taped than if only the recapitulated highlights of the interrogation were recorded. Similarly, court expenses attached to viewing entire interview

Case 2:03-cv-00039-D-BR   Document 317   Filed 02/25/19   Page 234 of 314   PageID 17729

tapes versus recaps at preliminary hearings or trials can be expected to differ significantly. There are also implications for the way in which police, prosecutors, defense counsel, judges, juries, and the public at large may view the fairness, efficiency, and effectiveness of the videotape documentation process.

Bronx District Attorney's Office Bureau Chief Sean Walsh expressed the view that the important distinction for appraising the credibility and legitimacy of the process should not be whether an agency videotapes entire interviews versus recaps. Instead, he argues, the key distinction is whether the interrogators conduct the interview in a "conclusionary form with leading questions" to which the suspect simply says "yes" or whether the questions posed allow the suspect to present his or her story without on-camera coaching (Walsh 1992: 3). This does not, of course, resolve any doubts that might exist about pre-tape coaching, but it does seem clear that a video containing leading questions would be less credible than one without such questions. We will explore practitioners' perceptions of the implications or taping full interviews versus recaps more fully in the next chapter.

Given the divergence in practices among our site visit agencies concerning the taping of entire interviews versus recaps, one would expect that the duration of the recorded videotapes would, on average, differ considerably between the two categories of tapers. Among the agencies taping primarily recaps, the average lengths of video statements were estimated at 15 minutes on the short end (in Fort Wayne) to about 45 minutes on the long end. In San Diego, Huntington Beach, and Orange County (where full stationhouse interviews are normally taped), estimates of average duration ranged from two hours to four hours. At the extreme, one or more of these agencies had videotaped interrogations lasting as long as seven hours.

## D.  Willingness of Cooperative Suspects to Have Their Statements Documented Using Videotape Rather Than Another Documentation Method

Since homicide suspects constitute most of those whose confessions are videotaped by American law enforcement agencies, we explored in our national survey the percentage of homicide suspects who give videotaped statements to police. Specifically, we asked:

Of the homicide suspects who are willing to talk with your interrogators, what *percentage* would you estimate are *videotaped giving statements*?

Thus, our question assumes that a certain percentage of homicide suspects will exercise their right to refrain from giving a statement to police. But of those who agreed to talk with police—in agencies with the capacity to videotape interviews—we were curious to find out what percentage of the homicide suspects had their statements memorialized on videotape. As Figure 4 shows, over 70 percent of all videotaping departments recorded *at least some* of their homicide suspects' statements on video. Thirty-nine percent of the agencies videotaped homicide suspects' statements in more than 80 percent of the cases where the suspects were willing to talk. That is to say, 39 percent of American police agencies possessing the technology to videotape a suspect's statement will, eight out of



# ROGER W. SHUY, INC.
## LINGUISTIC SERVICES

629 BEVERLY AVENUE
MISSOULA, MONTANA 59801-5919
TEL. 406-721-5559
FAX. 406-549-8660

## FAX TRANSMITTAL COVER PAGE

DATE: _____3-1-99_____     TIME: ____5:30 MT____

TO: ___Paul Herrmann_____  806-371-0780___

_____

FROM: ___Roger W. Shuy_____

NUMBER OF PAGES: _____16_____
(Including Cover)

RETURN FAX NO: (406) 721-5559  549-8660

MESSAGE

1

# Taped Confession of John Lezell Balentine, 7-25-98, 10:55 a.m.

## Evidence of an earlier conversation

This confession statement is clearly a retell of an earlier conversation Balentine had with the investigator (PH) who did the interrogation.

The following statements provide evidence of this:

p.1 (40 seconds into the tape:
      PH:...and I'll repeat **what we already went over earlier at 9:50 o'clock**...

p.2 (3 minutes and 50 seconds into the tape)

      PH:  Well, when you all moved in on East 17th, how long did you all live there together?  Before you moved out, about, you know.

    **Since this topic has not come up in this tape, it can only have been from an earlier conversation.**

p.3 (4 minutes and 30 seconds into the tape)
      JB:  Then Mark started staying there until the police raided the place and picked him up
      PH:  Uh-huh
      JB:  That I told...(interrupted by PH)

p.5 (6 minutes and 50 seconds into the tape)
      PH:  Now you were telling me about...that after you were out of the house that you had got word through Angela that Markie was saying that he was gonna shoot you

    **Since this topic has not come up in this tape, it can only have been from an earlier conversation.**

p.5 (7 minutes in   e tape)

PH: But ther    s more to it about the gun th    igela and
     that you said he uh, wh-, he threatened

Since this topic has not come up in this tape, it can

2

only have been from an earlier conversation.

## p. 6 (7 minutes and 51 seconds into the tape)

PH: How'd you get over there? I know you do a lot of walking....as I found out, you do a lot of walking.

Since this topic has not come up in this tape, it can only have been from an earlier conversation

p.10 (11 minutes 57 seconds into the tape)
JB: Then I shot Mark in the head, and shot the other two in the head. Weren't all of them shot in the head?
PH: Right.
JB: Uh-huh.

Balentine is uncertain of where he is alleged to have shot the men. His question reveals that the officer knows the answer and that Balentine is trying to get the officer's confirmation of something told Balentine earlier.

p.10 (12 minutes and 15 seconds into the tape)
PH: And when you shot Mafkie, what part of his head did you shoot him in? Do you remember?
JB: Dead center, wasn't it?

Balentine is uncertain of where in the head he is alleged to have shot Markie. His question reveals that the officer knows the answer and that Balentine is trying to get the officer's confirmation of something told Balentine earlier.

p.14 (16 minutes into the tape)
PH: Cause you remember you telling me something about going to that one guy that lived in that two story house?
JB: Oh yeah, he made the stop...Yeah, at, ah, what his name?

Even thou he officer elicits the rete Balentine does still not k the man's name and asks officer to repeat it to him once again.

p. 19  (20 minutes and 53 seconds into the tape)

3

PH:  I thought you told me you're not really a person that, not a gun person.

p.21  (23 minutes and 43 seconds into the tape)

PH:  I'm already, I'm asking you questions about stuff I already know, you know, cause we...right?

The officer's unfinished sentence is of interest because he appears to be about to say "cause we already talked about this."



# ROGER W. SHUY, INC.

## LINGUISTIC SERVICES

629 BEVERLY AVENUE

MISSOULA, MONTANA 59801-5919

TEL. 406-721-5559

FAX. 406-549-8660

## FAX TRANSMITTAL COVER PAGE

DATE: _3-1-99_       TIME: _5:30 mT_

TO: _Paul Herrmann_      _806-371-0780_

FROM: _Roger W. Shuy_

NUMBER OF PAGES:       _16_
(Including Cover)

RETURN FAX NO:      (406) ~~721-5559~~ 549-8660

MESSAGE

3-31-1999 2:37PM    FROM

p.19  (21 minutes and 3 seconds into the tape)
    PH: Somebody give you the gun or did you buy it from
        somebody:?Or...

p.19  (21 minutes and 15 seconds into the tape)
    PH:  Did he sell it to you or give it to you or just loan it to you
        or how did it happen?

Some things I don't understand

## 1. About the gun not working

p. 9 (11 minutes and12 seconds into the tape)

    JB: Then I went back and looked at Mark and them and the gun jammed and so I had to go back outside and shoot it in the alley. When the police got called.

    PH: So you were gonna use the gun but it was jam, it wouldn't work?

    JB: Huh-uh.

    PH: And you went to the alley?  And what did you do with it in the alley?

    JB: Shot it in the alley.

    PH: To get it, to make sure it was working? Okay.

**I don't know much about guns but I wonder how JB knew that the gun was jammed before he tried to shoot it. And why would it work in the alley but not first in the house?  Note also that it was PH, not JB, who added the idea that JB tried the gun in the alley to make sure that it was working.**

## 2. Balentine's mental state at the time of the killing

p. 12 (13 minutes and 35 seconds into the tape)

    PH: Now, let me ask you this. After you got done shooting, how long do you think stayed in the house before you actually left?

    JB: Five minute.  I think I was stunned after I did it.  I think I realized that I had did it.

    PH: Yeah.

    JB:  I think I did it, I think five or ten minutes (stayed in the house)

    PH: So you, you think you were actually in the house for a little while before you walked out?

    JB: Yeah, cause it seemed like, seemed like I had done something.  I couldn't believe I had did it.

**Perhaps Balentine's stunned condition helps explain why the officer had to prompt him throughout, such as on**

page 10, when Balentine has to ask the officer, "Weren't all of them shot in the head?" and "Dead center, wasn't it?"

## 3. Issues of self defense

It is clear that Balentine believed that he had to kill Markie before Markie killed him. I have no idea what kind of self defense theory this could support but there are down sides to it. For one thing, Balentine had the gun with him when he went to Markie's place. Secondly, the matter of killing the two other men seems contradictory to his self defense theory. He doesn't even seem to know who they are. But this does seem to fit a mental incapacity theory, or some mixture thereof. The prompts by the officer also support a mental incapacity theory

### Complete Interrogation/Confession on Tape vs. Recap on Tape

As noted earlier, this is clearly a recap tape. I do not know what the policy of the Amarillo police department is, but I enclose pages from Geller's 1992 survey of police practices in tape recording confession statements. A recap has the advantage of saving money in tapes and equipment use for the police. It also has the advantage of reorganizing the suspect's statement into a coherent sequence for posterity. On the other hand, we have no way of knowing what actually happened in the untaped interrogation that proceeded the recap performance, leaving some serious questions unanswered. The recap has the appearance of reality but it is, in fact, like a well rehearsed play. It is not the reality of the confession event; it is a cleaned up version. It gives us no knowledge of any possible coercion, promises, or questionable tactics that might have been used by the police. In short, it can clean up the act.

**Significant Transcript Corrections**

p.3 line 5:
JB: That I told--- (that replaces cause)

p.10 line 9:
PH: Same way? (way replaces was)

p.10 9 lines from bottom:
JB: Then I shot Mark in the head, and shot the other two in the head. Weren't all of them shot in the head?
PH: **Right.**
JB: **Uh-huh.**
PH: Now, when you..... (Bolded words added)

p.11 (beginning 7 lines from bottom)
JB: I went, **I don't know,** I walked around the house for a minute, **stand back.** (Bolded words added)
PH: Walked around the house, you say?
JB: I cut on the light where Chris was to see did he wake up. (delete repeated words not on tape, "He didn't wake up") He never did wake up.....

p. 12 Lines 3 and 4
JB: Five minute. I think I was stunned after I did it. (delete r repeated words not on tape,"After I did it, after I did it I don't think") I think I realized that I had did it.

p. 12 line 6
JB: I think I did it I think five or ten minutes. ("did it" replaces "didn't")

p. 12 line 9
JB: Yeah, cause it seemed like, seemed like I **had done** something. I couldn't believe I had did it. ("had done" replaces "was stunned.")

p. 14 line 5
JB: The **the other guy** he had put.......("the other guy" replaces inaudible)

p. 14 line 16
JB: Oh, yeah, he made the stop.  He made the stop, yeah, at, ah, **what his name?**  (bolded words added)

p. 17  4 lines from bottom
PH:  Hummm, she told me, if I remember correctly, that what you would do is put your 8, **she thought** you were 28. (bolded words added)

p.18  7 lines from bottom
JB:  **(yawning)** Sold the gun to a crackhead.  Sold the gun to a druggie, **what y'all** call someone sells drugs, a, a, a... ("what y'all" replaces "which I")

p.21  7 lines from bottom
JB:  Cause really, I'm an honest person, really. I don't hurt nobody unless they, unless I think they capable of hurting me. **If I think** (replaces inaudible) somebody say they gonna do something to me, I think about it, then I realize that they would hurt me **or not** (words added) and if I think they capable of hurting me, I'm gonna hurt them before they hurt me.

Affidavit of Fact

STATE OF TEXAS                §
                             §    SS.
COUNTY OF ___Taylor___        §
                             §

BEFORE ME, the undersigned authority, on this day personally appeared Jane McHan, who being by me duly sworn, did depose and state upon oath as follows:

1.    My name is Jane McHan.  I am over twenty-one years of age and am fully competent to make this affidavit.

2.    Except where stated that I have been told by someone else, I have personal knowledge of all the facts set forth herein, and all such facts are true and correct.

3.    I am a licensed master social worker with over twenty years' experience in working with individuals with medical, psychological and social problems.

4.    I was court appointed in federal habeas as a mitigation specialist on behalf of John Balentine.  In the course of my investigation, I have done preliminary interviews. Attached are my reports that summarized the information I learned from Clara Smith (Exhibit A), Eric Smith (Exhibit B), Angelina Watson (Exhibit C), and Lynn Rowe (Exhibit D).  These reports are true and correct and were made by me in the course and scope of my investigation in the Balentine matter.

5.    As aforementioned, these reports are based on preliminary interviews of only a few of the extensive family members of Mr. Balentine.  It has been my experience that in order to fully develop a social history, it is necessary to have several interviews with a witness in order to complete the interview process and obtain a complete picture of what the client's life has been like.

6.    Nonetheless, even based on the limited information revealed to date, there are several mitigation themes that appear, as for example:

      a.    a history of potential mental illness:  Eric Smith related several strange behaviors of John saying John would eat a whole bag of sugar, he ran through a door for no reason, completely broke through it, although no one was chasing him; his mom was scared John would flip out or something and took John to the mental health clinic in Newport, and thereafter, John was sent off for a month.

b.    <u>a history of domestic abuse and addiction</u>: Clara Smith, John's mother related that John's father, James Henry Balentine, would start drinking on the weekends and that James would slap her in the face, gave her black eyes on many occasions and had a "real hot temper." John witnessed these assaults on his mother.

c.    <u>absence of adult supervision</u>: Eric Smith relates that their mother was not home much because she was working so much and the kids had to fend for themselves a lot.

d.    <u>extreme poverty</u>: Eric Smith relates that his mother would not take welfare; there were seven kids who lived in a three bedroom house; they did not always have enough to eat, but they always had something even if it was just cereal.

e.    <u>absence of a father figure or any positive male role model</u>: Clara Smith relates how James Balentine modeled alcoholism and domestic violence, and died in a car accident. Her subsequent marriage to George Henry Tyson, who went by the last name of Smith, provided no better a role model. Clara relates how she found out "all kinds of things" about Smith, including how he might have shot a preacher before she knew him.

f.    <u>corruptive environment</u>: Angelina Watson relates that she never knew John to be around "positive people" very much and had been "exposed to the wrong environment for so long."

g.    <u>slow learners</u>: Although Clara Smith relates that several of her children were "lazy" there is a recurring themes among several of the children that suggests they were learning disabled, including John who was placed in special education. Eric relates that when he asked to be placed in special education the school refused thinking he "wanted to get out of work" and that his mother "would not push the issue" because she was "non-confrontational." Almost all of the kids did not finish high school.

h.    <u>possible post traumatic stress disorder</u>: There appears to be a pattern that shows that John either witnessed domestic violence, or was himself physically assaulted over the course of his life, starting as a young child. Eric relates that John told him that the people in the "mental thing" whipped him "all the time with a paddle or a belt," that John was "abused a lot when he was in jail at 17," describing John as having knots on his head like "cartoon knots, like skin peeling back and the knot coming through," and the threats by the victims prior to their death that they wanted to kill John.

7.      I have only scratched the surface, but the combination of poverty, chaotic family life, poor adult example, abuse/neglect, alcohol abuse by dad, and school issues lead me to believe that there is plenty of mitigation evidence in this case, and it was there to be found, if defense counsel had mounted an adequate mitigation investigation.

8.      Various family members consistently reported to me that they were not contacted by the defense attorneys or any agent acting on their behalf. At least one family member told me he had made attempts to contact the defense attorneys, who did not contact him back.

FURTHER AFFIANT SAYETH NOT.

Jane McHan, LCSW
Mitigation Services
5249 U.S. Hwy, 277 S., #110
Abilene, TX   79605
(325) 691-5331

Before me, a Notary Public, on this day personally appeared Jane McHan, known to me (or proved to me on the oath of _Jane Mc Han_ or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

        Given under my hand and seal of office this _21_ day of _November_, (year). _2003_

                                                Notary Public

KATHRYN D. BAIRD
Notary Public
State of Texas
My Commission Expires
March 6, 2005

[seal]

3

**Jane McHan, LCSW**
**Mitigation Services**
**5249 US Hwy. 277 S., #110**
**Abilene, Texas 79605**
**(325) 691-5331**

**Phone Interview with Clara Smith**
**October 27, 2003**
**1:35 PM to 2:41 PM**

Name:              Clara Mae Rowe Balentine Smith
DOB:               8-6-49
Address:           918 Remmel St.
                   Newport, AR  72112
Phone:             (870) 217-0587
Employment status: Disabled, formerly worked as a nurse's aide for 37 years
Relationship:      John Balentine's mother

Clara Mae Rowe was born on 8-6-49 to Leopher Simmons and Izell Rowe in Augusta,
AR.  Her parents are both now deceased.  Mr. Rowe died of a stroke at age 49, around
1979.  He was also reportedly an alcoholic.  Ms. Simmons died in childbirth in 1960,
cause uncertain.

Clara is the oldest of eight children.  Her siblings are:

Bessie Mae Rowe
Ora Lee Rowe
Johnny B. Rowe
Gloria B. Rowe
Mary Ann Rowe
Gladystine Rowe
Carol Lee Rowe

According to Ms. Smith, all are still living and in relatively good health.

Ms. Smith grew up in Newport, AR.  She attended local schools until the 9th grade, when
she dropped out due to pregnancy.  She did obtain her GED in 1970.

She married James Henry Balentine on 2-25-65.  His DOB was 9-14-34.  She described
her husband as "having a real hot temper."  She stated that he "had been in a lot of
trouble himself" before she knew him.  He was abusive toward her, hit her, gave her
black eyes on many occasions, pushed her down, slapped her in the face.  She stated that



this happened about once a week, usually on the weekends when he would start drinking. She stated that he did not drink during the week, but drank "a lot" on the weekends, mostly whiskey or wine.

Ms. Smith claimed that Mr. Balentine was never abusive toward the children, that he "was crazy about the kids," but that they did witness his abusive behavior toward her on many occasions. She stated that they did not try to help her because they were probably afraid of him. She and Mr. Balentine remained together until he died in a car accident in December of 1971. She was with him in the car and thinks that he fell asleep at the wheel. She was hospitalized for about a week. She stated that, at first, it was suspected that her back was broken, but it was not.

Ms. Smith's children:

Lynn Ray Rowe (male); DOB 3-15-64
326 Border St.
Newport, AR 72112
(870) 523-5419
Lives with his girlfriend Necie (spelling uncertain), not sure of her last name
No children
Lynn works at Curtner Lumber Co.
He was considered a "slow learner" and went to a special rehabilitation school in Hot Springs
According to his mother, he has never had legal troubles.


Doris Helen Balentine Cash, DOB 10-17-66  (also known as Ann)
Address unknown, Houston, TX area
(281) 920-0877
Graduated from high school in Newport
Attended some college in Russellville, AR but didn't finish
Works for a restaurant
Husband Ron Cash
Doris has three children from a previous marriage, Bruce, Erica, and Antoinette


Freddie James Balentine, DOB 4-20-70
Lives with Doris, same contact info
Quit school in 11th grade, was having trouble with school but mother not sure exactly what kind of trouble, thinks he was "lazy"
Served the last three years in prison for beating up his girlfriend
May have obtained his GED in prison
Has one daughter in Amarillo, Ms. Smith has no info about her

Rosie Joann Balentine, DOB 5-16-71
Lives in the Houston area
(866) 750-4275
Graduated from high school in Newport
Was a sickly child, her legs hurt all the time, was later diagnosed with lupus after she
moved to Texas as an adult, now trying to get disability.
Has previously worked in a nursing home and in restaurants
Lives with her boyfriend, Kevin, last name unknown; he works at Chili's
Has a daughter, Carlisa Pittman, almost 14


Eric Ontario Smith, DOB 11-5-75
Lives in Amarillo, Texas
(806) 236-6856
Dropped out of high school in Newport in 11th grade, "lazy and didn't like school"
Got his GED about two years ago
Wife, Lisa
Son, Coby, almost 2 years old
Lisa has a beauty shop, not sure if Eric works
He hasn't been in trouble that she knows of


Patrick Tyrone Smith, DOB 8-15-84
Lives with Clara Smith in Newport
Graduated from high school in 2003
Working for Maytag, assembling washers and dryers
No learning problems, no legal problems, no emotional problems


After James Balentine died, Clara married George Henry Tyson on 5-20-80.  She stated
that he was using the name "Smith" at the time, so that is why her name is Smith.  She
later found out that his real name was Tyson.  She later found out "all
kinds of things" about him, for example, that he might have shot a preacher before she
knew him.  John Balentine did not like him at all.  One day she came home from work and
they were having a fist fight.  John was about 16.  She divorced George Tyson in 1992.
He is the father of Eric and Patrick.  He loves his kids and still sees them.  George is on
disability because of a work related accident.  She stated that he was working for the
Highway Dept. and got into a disagreement with them about job issues.  He threatened to
use the NAACP against them and they "rolled a bunch of pipes in front of him" while he
was working out on the road.  He was injured by the pipes and hasn't been able to work.
She feels that it was done on purpose.

Ms. Smith worked at Regional Health Care Nursing Home as a nurse's aide for 37 years.
She had a heart attack two years ago and is now on Social Security Disability.  She stated
that she has had no other health issues.

She related John's history as follows:

He was born on 1-31-69 after a full term, uncomplicated pregnancy. She had no complications with labor or delivery. He was born at Newport Hospital and weighed 8 lbs., 6 oz. He was 19 inches long. He had a "big head" according to his mother, but "looked fine" and did not have any medical complications at birth. Mother and baby came home in the typical time frame: neither needed additional treatment or observation. He was healthy as a baby. She did not note any abnormalities with his developmental milestones, except that he did not talk well until he was about five years old. She did not feel that he was delayed in any other area. When the children were small, they stayed with Ms. Smith's grandmother, Albertha Rowe. Later, the older children looked after the younger ones while their parents were working.

John reportedly did well in school until high school. He then began to "get into it with his teachers," arguing and causing trouble. Ms. Smith feels that he is "real smart," but didn't like school. He was never in Special Education. He quit school in the 11th grade. He "laid around the house and never tried to work."

His first trouble with the law was at about age 15. He and brother Freddie stole a motorcycle. The police just told her to take them home.

He may have been on probation at one time.

He did see a counselor at the Newport Mental Health Clinic for about six months when he was in high school. He was referred there by someone in the Police Dept. Ms. Smith does not remember the name of the counselor. She took him every Tuesday for about six months. She is not sure if a diagnosis was given or what it was. He was not on any medication.

John had a temper. He would hit his younger brothers. He was never abusive toward his mother. She stated that he was the most helpful of her kids. He would help her around the house, keep her car running. He "had a nice personality." He attended church at Blacksville Baptist Church in Newport. The preacher, Rev. Barnes, might be willing to speak positively about him. Ms. Smith will get us a phone number.

John did do some work for a man named C.L. Borders, working on people's houses. He might also be willing to speak for him. His address is 1117 Walnut St., Newport, 72112 Phone (870) 523-2597. (I noticed in records there is already a statement from Mr. Borders, but it might not hurt to follow up).

At age 17, he broke into the Walmart and stole quite a bit of goods. He ended up going to jail and then prison. He never liked drugs or anyone who used them. Ms. Smith is not sure of any alcohol history for John.

Ms. Smith stated that she has never been contacted by anyone else in John's case.  She stated, "this is the first time anyone has called."  She is willing to sign an affidavit if needed.


Jane McHan, LCSW
Social Worker/Mitigation Specialist

**Jane McHan, LCSW**
**Mitigation Services**
**5249 US Hwy. 277 S., #110**
**Abilene, Texas  79605**
**(325) 691-5331**

**Telephone Interview with Eric Smith**
**November 6, 2003**
**1:53 PM to 2:41 PM**

Name:          Eric Ontario Smith
DOB:           11-5-76
Address:       1406 Harrison
               Amarillo, Texas  79107
Phone:         (806) 236-6856
Relationship:  John Balentine's half-brother

Eric moved to Amarillo in 1995.  He had been to visit his brother, Freddie, and liked it,
so decided to move back.  He has been married to Lisa Smith since 7-23-00.  They have a
son, Kobe Smith, DOB 5-16-01.  Lisa's two children, Brianna Taylor, age 12 and
Devonte Taylor, age 11, also live with them.   The Smiths own a beauty shop, which Lisa
runs, called Salon X Qusite, phone number (806) 373-8808.  Eric works for Rucker
Steam Cleaning, phone number (806) 373-1111 or 383-1111.  The steam cleaning
company is owned by Theory Rucker, who is also a cousin of John's on his father's side.
Eric thought that Theory would be willing to help if contacted.   Eric is attending
Amarillo College to work on a masonry and framing technical degree.

Eric also has three other children who do not live with him at this time:

Eric Smith, Jr., DOB  11-11-96 and Letron Smith, DOB 8-8-97, who live in Amarillo
with their mother, Devonda Patterson.  Eric maintains contact with them and sees them
regularly.

Katara Bell, DOB 3-22-98, who lives in Houston with her mother, Ynette Bell.  Eric has
not seen her in about a year, but sends money to his sisters who make sure that she is
taken care of.

Eric stated that he was fairly young while John still lived at home but that they "grew up
some together."  He stated that John "could fix anything."  He didn't get mad about
much.  He did get in trouble for little things, like stealing a bag of chips or something,
"being young in the ghetto."  The family did not have a lot of money.  Their mother
worked four jobs as long as Eric could remember.  She cleaned three people's houses and
then worked the 3-11 shift at a nursing home.  She was not at home much.  She went into
a lot of credit card debt just trying to keep all the kids in school clothes.



He stated that the kids had to fend for themselves a lot, but they didn't blame their mom because she was working so hard to take care of them. She didn't believe in going on welfare.   All the boys "fought each other all the time." He thought this was because they were all together "in that little house." It was three bedrooms, but there were seven kids. All the boys shared a room.  Maybe they did not always have enough to eat, but they always had something, even if it was just cereal. "A lot of kids had to go on welfare but Mama wouldn't take it."

He remembers John having some strange behaviors. For example, he would eat a whole bag of sugar. No one knew why. Their mom had to hide the sugar. He also "ran through a door" for no reason, completely broke through it. No one was chasing him or threatening him. His mom was "scared he would flip out or something" and took him to the mental health clinic in Newport. Eric thought that he was then "sent off for a month." He did not know further details. He thought John was about 15 at the time.

John did not get along with Eric's dad. They would get into a physical fistfight a couple of times a year. Eric's dad was only there "off and on." The other kids didn't like having a stepfather. Other times they got along okay, would just "fall out" once in awhile. He denied the notion of any abuse taking place in the home.

Eric said that John was "abused a lot when he was in jail at 17." He remembers going to visit John and John had knots on his head, stating the police had done it. Eric describes this as "cartoon knots, like skin peeling back and the knot coming through." He also stated that John told him that the people in the "mental thing" whipped him "all the time with a paddle or a belt."

Eric stated that their brother, Lynn, is "real slow, but he makes do." He said he has a culinary license. He stated that Lynn is "crazy," defined as "has views on life that are different." When asked about that, he stated that Lynn thinks "like 50 years ago" and doesn't want to have much to do with people. He gets along with his family but he doesn't want to get to know others or interact with them. "He doesn't associate with anyone."

According to Eric, none of the brothers finished high school, except the youngest, Patrick, who just graduated. He is not sure why. He stated that school was very hard for him (Eric). He reportedly asked for help, asked to be tested for special education in high school, but the school refused, thinking he "just wanted to get out of work." He stated that his mother "wouldn't push the issue" and "was nonconfrontational." Eric wanted to get training to become an electronic systems technician but the math was too much for him. He is taking masonry courses, hoping they will not involve as much math. He thinks he has a learning problem himself.

Eric has concerns about the way John's trial was handled. He stated that Detective Paul Horn picked Eric up for questioning and had a tape that he played for Eric. On the tape, Eric could hear John's voice, which "sounded like he was just laying back talking to someone." There was another person's voice on the tape, but every time that person

started to speak, the detective fast-forwarded the tape. Eric knows who the other man was, someone they call "Drew Down," who was in jail at the same time as John. Eric's theory is that the police put the two men together and taped their conversation, hoping to "entrap" John. Eric claims that "Drew Down" had been in jail for six years for a murder but then was suddenly set free. He stated that he knows where to find this man and thought he would cooperate if you want to speak with him.

Eric also claims that the "little white kids" who were killed had also been wanted by the police for a drive-by. He stated that they pulled a gun on his sister-in-law, Angie Allen, stating that they would do the same to John.

He made a statement that Detective Ed Smith brought him a subpoena on pink notebook paper, which he thought was very strange. The prosecution wanted him to testify against John because he had driven John to the bus station. Eric stated that that was nothing unusual, John was always coming and going. Eric then went to Albuquerque until after the trial so he would not have to testify against his brother. He stated that the defense never contacted him at all, although he made one call to one of the attorneys (can't remember whom) and never received a call back. He remembered that his mother was considering moving to Houston at the time but stated that she would have testified if she'd been asked.

Eric is open to further discussion and will do whatever he can to help. He is willing to sign an affidavit if needed.


Jane McHan, LCSW
Social Worker/Mitigation Specialist

**Jane McHan, LCSW**
**Mitigation Services**
**5249 US Hwy. 277 S., #110**
**Abilene, Texas  79605**
**(325) 691-5331**


**Telephone Interview with Angelina Watson**
**October 27, 2003**
**1-1:30 PM**


First contact was made with Ms. Watson on Oct. 22, 2003.  She returned a call to me on that date but did not have time for an extended discussion.  She was at work and does not have a home phone.   She did tell me that she was in contact with most of John Balentine's family and would obtain correct contact info for me, as all of the phone numbers I had were wrong or disconnected.  She also stated that no attorney, investigator or other person working on John's case had contacted her in the past.  We agreed that I would call her at 1 PM on Oct. 27, 2003.

Following is a summary of that interview:

Name:          Angelina Carol Watson
DOB:           6-1-74
Address:       900 Manning St.
               Newport, AR  72112
Phone:         Work only -- (870) 512-2209 or 2205
Employment: Administrative Assistant, Correctional Medical Services, Grimes Unit, AR
               State Prison, Newport
Relationship:  Has a son with John Balentine


Angelina Carol Watson was born on 6-1-74 in Oklahoma City, OK.  Her mother is Linda Watson, who lives in Newport, AR.  Her father is unknown.   She preferred not to give further information about her family of origin, siblings' names, etc., as she does not feel that they are relevant to this case.

Angelina moved with her mother to Newport, AR as a baby and has lived there for most of her life.  She did live in Little Rock, AR from 1991-97 and then returned to Newport.

She attended school in Newport, did not graduate, but later got a GED in 1991.

Angelina knew several of John Balentine's female cousins and other family members while she was growing up.  She first met John in 1989, when she was 14 years old. Later in 1989, they developed a serious relationship and she became pregnant.  That same



year, he was sent to jail and then on to prison for "burglary or robbery." They were together until he went to jail.   Their son, John Lezell Balentine, Jr. was born on 1-28-90. Angelina stayed in touch with John while he was in jail and in prison. She took the baby to visit him in jail but did not take him to see John after he was transferred to prison. They wrote letters during John's prison term.   She stated that John demonstrated "very minimum concern" about the child. She described John as "very immature back then" and that he "didn't really act like he wanted to help." She stated that she was well acquainted with his family members but they were really no help to her either. They did not have a bad relationship but didn't offer her any assistance.   She feels that she had a good relationship with his family and continues to have a good relationship with all but his sister Joann, who is "difficult to get along with."

After John got out of prison, Angelina did not have a close relationship with him. He did visit John, Jr. on a few occasions, but not consistently.  After she moved to Little Rock, she would return to Newport periodically and would occasionally run into him.

John never paid child support and he never wrote or called his son on a regular basis till about 1998 or 1999. He does now write letters to both Angelina and their son. She is concerned about how he is coping.  At times, he seems to be feeling all right, but at other times, he is "down" about his situation.  She stated that she does what she can to stay in touch. She believes in Jesus and that everyone deserves a second chance.  If we see John, she would like us to tell him to "be encouraged."  When asked of any learning problems, emotional problems or other difficulties that John has had in his life, she stated that she did not know of any.

Angelina describes John as "a very intelligent person," but feels that he was "exposed to the wrong environment for so long."  When asked about that, she stated that he has been in jail or prison and "that is a bad environment, you never know how they are traumatized there."  She stated that he would have physical fights with people when he was younger, but she felt that it was almost expected of him.  He had a reputation and people expected him to fight, so he got into fights.  She also thought that his father's death in a car accident affected John. She stated that it was rumored that his father either committed suicide or was driving drunk.  She stated that she never knew John to be around "positive people" very much.  He tended to hang out with people who got him into trouble.  His brothers Freddie and Eric have been in trouble quite a bit.  She stated that his sister Joann "doesn't get along with anyone."

Angelina described John's mother, Clara Smith, as "very sweet" and that she "used to be a hard working woman." His youngest brother Patrick she also described as "very sweet."

John has two daughters with two other women in Newport.  Angelina tries to stay in touch with them and has in the past tried to take both of the girls with her and her son to visit John in prison, but this has not worked out.  She did have a picture taken of John, Jr. and his oldest half sister to send to John last year.   She did not have specific contact info for the other women.  One is named Lisa Childers; her daughter's name is Quinoyah

(spelling unknown), about age 8.  The other is Vivian Robinson; her daughter's name is Karissa, age 16.  Angelina stated that neither of them would have anything good to say about John.

John Jr. is now in 8th grade and doing well.  Angelina also has two daughters, Linda Watson, age 12, and Kahdijah Smith, age 9.

Angelina had not had time to track down info on all of the other contacts, but did give me Clara Smith's phone number:  (870) 217-0587.

I read my notes back to Angelina and she agreed that they were correct and accurate.  She is willing to sign an affidavit if needed.  She is willing to state that she was never contacted by anyone else regarding John's case.


Jane McHan, LCSW
Social Worker/Mitigation Specialist

**Jane McHan, LCSW**
**Mitigation Services**
**5249 US Hwy. 277 S., #110**
**Abilene, Texas 79605**
**(325) 691-5331**


**Telephone Interview with Lynn Rowe**
**October 27, 2003**
**8:10 to 8:25 PM**


Name:          Lynn Rowe
DOB:           3-15-64
Address:       323 Border St.
               Newport, AR  72112
Phone:         (870) 523-5419
Employment: Curtner Lumber Company, machine operator
Relationship:  John Balentine's half brother


Mr. Rowe stated that John was "okay as a kid, didn't do much unless someone messed with him." "He didn't bother nobody unless they messed with him first." John could fix anything. He was a "good person." He "could do anything, he is a smart person." He loved kids, "was crazy about kids." He didn't mess with drugs.

"But if he wanted something, he would take it. Just being a kid."

John has a "hot temper" like his daddy. His daddy would "whup your butt if you did something wrong." He was killed in a car wreck. His mom was in the hospital for a year and a half after the wreck. Another man was in the car and broke his neck.

John and his stepfather, George Smith, did not get along. No one liked George Smith too much. He thought he ran everything. He and John "got into it" a couple of times. George Smith was "slick" and took advantage of people. None of the kids liked him when he was with their mother. They got divorced in 1992.

Mr. Rowe went to a Vo-Tech school in Hot Springs, AR. He did fine in school till he got to high school and then had trouble with his grades so was sent to the school in Hot Springs. He just didn't want to do the work. He regrets it now and wishes he could go back and do better. He also went to the Job Corps in Little Rock. He has worked hard all his life. He worked at several restaurants, Kentucky Fried Chicken for 6 years and a steakhouse for 4-5 years. He has been at the lumber business for 7 years.


Exhibit D

Mr. Rowe lives with his girlfriend, Euneice Jarrett in Newport.  Mr. Rowe has one daughter, Laticia Lynn Reed, who lives in Louisiana.

Mr. Rowe does not know of John having any specific medical, educational, psychological or emotional problems.  He stated that he was already out of the house by the time John was having troubles.

Mr. Rowe has never been contacted by an attorney, an investigator, or anyone else regarding John Balentine's case. He stated, "this is the first time anyone has ever called me."  He is willing to sign an affidavit to this effect if needed.  He has tried to write to John in the past,  but his letters were returned because he was not approved to communicate with him.  He is willing to help in any way he can.


Jane McHan, LCSW
Social Worker/Mitigation Specialist

## Lydia Brandt

| | |
|---|---|
| **From:** | "Jane McHan" <jubileeclare@sbcglobal.net> |
| **To:** | "Lydia Brandt" <lydiamb@airmail.net> |
| **Sent:** | Saturday, November 22, 2003 9:25 AM |
| **Subject:** | RE: Angie Allen Affidavit |

Good morning!

I will talk some more with Angie. She didn't remember who questioned her but it looked like from the files that it was Paul Horn. I think he was the only one, but I will go into those details with her. She did say that she was frightened and felt that she was being interrogated as if she had done something herself. I got the feeling that she felt completely coerced, though she didn't use those words. Both she and Eric seemed very fearful to try to buck the police in any way. I will explore these questions with her.

REDACTED



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

JOHN LEZELL BALENTINE,

    *Petitioner,*

v.

DOUG DRETKE, Director
Texas Department of Criminal Justice
    Institutional Division

    *Respondent.*

Case No. 2:03-CV-00039

**ORIGINAL**

## MOTION TO AMEND HABEAS PETITION AND
## FOR EXTENSION OF TIME TO FILE AMENDED HABEAS PETITION

Petitioner, John Balentine, requests leave to file an amended habeas petition, and that it be due no earlier than 90 days from the date that the court enters its order on the accompanying ex parte, sealed motion for additional funding for expert and investigative assistance. As grounds therefore, Balentine would show:

1.    This court entered an order, dated October 7, 2003, ordering Balentine to file his Petition for Writ of Habeas Corpus on or before December 1, 2003.

2.    Balentine will comply with the order and file his initial habeas petition on or before December 1, 2003. In it, Balentine will outline his possible claims based on the investigation due to date.

1



3.      However, as the investigation progressed, it has revealed additional tasks that need to be undertaken, persons to contact and records to collect.  In addition, that investigation has revealed aspects about Mr. Balentine that suggest further evaluation by a forensic expert.

4.      As a result, in an accompanying, *ex parte* sealed motion Balentine is requesting additional funding for expert and investigative assistance.

5.      It is anticipated that this additional investigative and expert assistance will yield crucial information that will support his claims.  For that reason, pursuant to FED. R. CIV. PROC. 15, he seeks to amend his petition as a matter of course.

6.      However, Balentine is requesting that this court enter an order that the amended petition will not be due until 90 days after the court enters an order either denying or granting his *ex parte*, seal motion for additional funding for expert and investigative assistance so that his investigator and expert will have the necessary time to complete their tasks.  The extension will also give his counsel the necessary time to amend the habeas petition to include their work product, or if funding is denied, to include the affidavits of persons contacted to date and the records collected.

7.      Undersigned counsel for Balentine spoke with Katherine Hayes, assistant Attorney General representing the Respondent who stated she was not opposed.  However, the Respondent is requesting that he not be required to answer the initial petition, but answer instead the amended petition after it is filed.

WHEREFORE, Petitioner requests that this court enter an order permitting John Balentine leave to file an amended habeas petition, and that it be due no earlier than the 90th day from the date that the court enters its order on the accompanying *ex parte*, sealed motion for additional funding for expert and investigative assistance, and further ordering that the Respondent is not required to

2

file an answer to the initial petition.

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

## CERTIFICATE OF CONFERENCE

I hereby certify that on November 21, 2003, I conferred with counsel for the Respondent:

> Ms. Katherine Hays
> Assistant Attorney General
> Office of the Attorney General of Texas
> Capital Station 12548
> Austin, TX 78711

concerning this Motion.  Counsel for the Respondent is not opposed.

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2003, I have served a true and correct copy of the

foregoing pleading upon counsel for Respondent:

> Ms. Katherine Hayes
> Assistant Attorney General
> Office of the Attorney General of Texas
> Capital Station 12548
> Austin, TX 78711

Lydia M.V. Brandt

3

cc:    John Balentine #999315
       Polunsky Unit
       Texas Department of Criminal Justice
       3872 FM 350 South
       Livingston, TX 77351-8580



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

JOHN LEZELL BALENTINE,

    *Petitioner,*

v.

DOUG DRETKE, Director
Texas Department of Criminal Justice
    Institutional Division

    *Respondent.*

Case No. 2:03-CV-00039

**ORIGINAL**

## MOTION TO PERMIT *EX PARTE* CONSIDERATION OF APPLICATION FOR AUTHORIZATION FOR ADDITIONAL FUNDING FOR EXPERT & INVESTIGATIVE ASSISTANCE

In an accompanying Application for Authorization for Additional Funding for Expert and Investigative Assistance to Be Heard Ex Parte and to be Placed Under Seal, Petitioner John Lezell Balentine asks this Court, pursuant to 21 U.S.C. § 848(q)(9) and *McFarland v. Scott*, 512 U.S. 849 (1994), to approve additional funding for expert and investigative assistance to counsel in preparing the initial and amended petition for writ of habeas corpus. Formerly, such applications were routinely heard *ex parte* in federal habeas proceedings. The Antiterrorism and Effective Death Penalty Act of 1996 revised the federal appointment statutes to require a "proper showing . . . of the need for confidentiality" in investigative and expert requests in federal habeas proceedings. 21 U.S.C.§§ 848(q)(9).

1

19

In an order entered in the case of *Patrick v. Johnson*, 37 F. Supp. 2d 815 (N.D. Tex. 1999),

Magistrate Kaplan quoted from *Dowthitt v. Johnson*, No. H-98-3282 (S.D. Tex. December 2, 1998)

in which the court set out a procedure for the filing of an *ex parte* submission of a request for

investigative and expert assistance:

> The district judge in Dowthitt required a petitioner seeking expense authorization to: file and serve a brief motion seeking generally authorization for investigative or expert expenses, [including] a short case-specific statement of the need for confidentiality. The statement of need for confidentiality merely must identify generically the type of services needed and the broad issue or topic (e.g. innocence) for which the services are necessary. Simultaneously, the petitioner must file ex parte and under seal his detailed application for authorization for the investigator or expert, and must estimate the amount of fees or expenses likely to be incurred. The petitioner must provide factual support for the funding request. The motion, but not the application with supporting materials, must be served on the respondent.

Magistrate Kaplan's procedure has been favorably followed by other district courts.  *See also*

*Patrick v. Johnson*, 37 F. Supp. 2d 815 (N.D. Tex. 1999); *Graves v. Johnson*, 101 F. Supp. 2d 496

(S.D. Tex. 2000).


I.      **Statement of Need for Confidentiality:  Type of Service and Topic.**

A.      **Petitioner's Claims.**

The Petitioner seeks additional funding for expert and investigative assistance to further

develop various claims, including ineffective assistance of counsel (IAC), raised in the state habeas

petition, as well as additional IAC and state misconduct claims that had not been plead in prior state

filings.  Balentine, however, believes that there is a good faith basis to show cause and prejudice to

excuse the default.

To further detail his funding request for additional expert and investigative assistance in this

motion would require Petitioner to reveal work product or privileged information to adequately justify funding requests under 848(q)(9).

## II.   Conclusion.

Petitioner has satisfied the requirement of amended § 848(q), in particular, complying with the procedure used in the Northern District of Texas by identifying generically the type of service needed and the broad issues or topics for which the services are necessary. Compelling principles of fairness and constitutionality support his request. As the accompanying application demonstrates, the Petitioner's funding request contains information which justifies that it be heard *ex parte*. Accordingly, the Court should consider *ex parte* Petitioner's motion for expert assistance, and any further requests for assistance under 21 U.S.C. § 848(q)(9).

Respectfully submitted,

Lydia M.V. Brandt, Esq.
THE BRANDT LAW FIRM, P.C.
Texas Bar No. 00795262
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR PETITIONER

### CERTIFICATE OF CONFERENCE

I hereby certify that on November 21, 2003, I conferred with counsel for the Respondent:

3

Ms. Katherine Hays
Assistant Attorney General
Office of the Attorney General of Texas
Capital Station 12548
Austin, TX 78711

concerning this Motion. Counsel for the Respondent is not opposed to this motion, however, the

Respondent states that her non-opposition to funding does not constitute a waiver of the rights of the

State of Texas to raise exhaustion and/or procedural defenses.

_____
Lydia M.V. Brandt

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the foregoing pleading upon

counsel for Respondent, Katherine Hays, Assistant Attorney General, Office of the Attorney General,

Capital Station, Box 12548, Austin, TX 78711 by depositing the same in regular United States

Postal Service Mail, to the above address, on November 21, 2003.

_____
Lydia M.V. Brandt

cc:   John Balentine #999315
      Polansky Unit
      Texas Department of Criminal Justice
      3872 FM 350 South
      Livingston, TX 77351-8580

4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



| | | |
|---|---|---|
| JOHN LEZELL BALENTINE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | 2:03-CV-00039 |
| | § | **Capital Litigant** |
| JANIE COCKRELL, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Institutional Division, | § | |
| | § | |
| Respondent. | § | |

### ORDER GRANTING PETITIONER'S MOTION TO WITHDRAW MOTION REQUESTING SHOW CAUSE ORDER DIRECTED TO MR. KENT BIRDSONG FOR FAILURE TO DELIVER FILE TO HABEAS COUNSEL PURSUANT TO MAY 19, 2003 COURT ORDER

Before the Court is the above entitled motion filed July 10, 2003, by petitioner. After considering petitioner's pleading, this Court is of the opinion that it should be GRANTED.

IT IS SO ORDERED.

ENTERED this _____ day of October 2003.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

18

**CASE NUMBER:**      **2:03-CV-39**

**DATE FILED:**      **10-07-03**

# SEALED DOCUMENT

**Document Number:**      **17**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT 7 2003

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| JOHN LEZELL BALENTINE, | § |
| | § |
| Petitioner, | § |
| | § |
| v. | § |
| | § |
| JANIE COCKRELL, Director, | § |
| Texas Department of Criminal | § |
| Justice, Institutional Division, | § |
| | § |
| Respondent. | § |

2:03-CV-00039
**Capital Litigant**

## ORDER GRANTING PETITIONER'S MOTION FOR EXTENSION OF TIME

The Court has considered petitioner's "Motion for Extension of Time to File Habeas Petition," filed October 6, 2003.  The Court hereby GRANTS the motion.  The petition for writ of habeas corpus shall be filed on or before December 1, 2003.  The entry of this Order does not, however, constitute any determination by the Court that the petition will or will not be timely.

IT IS SO ORDERED.

ENTERED this _____7th_____ day of October 2003.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

HAB54\DPENALTY\BALENTINE.EXT:1



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

JOHN LEZELL BALENTINE,

    *Petitioner*,

v.

                                  Case No. 2:03-CV-00039

JANIE COCKRELL, Director
Texas Department of Criminal Justice
    Institutional Division

    *Respondent.*

## ORDER

The Court has considered Petitioner John Balentine's Motion to Permit *Ex Parte* Consideration of the Motion to Modify the 8-21-03 Order. The Court hereby **GRANTS** the Petitioner's Motion. The motion for modification filed by Petitioner will be sealed by the Court and considered *ex parte*. Any proceedings held in connection with this request will be held *in camera* and on a sealed record. All requests and all hearings will be transcribed and made a part of the record for appellate review pursuant to 21 U.S.C. § 848(q)(9).

ORDERED this _____7th_____ day of _____October_____, 2003.

_____
UNITED STATES MAGISTRATE JUDGE
CLINTON E. AVERITTE

15

**CASE NUMBER       2:03-CV-39**
**DATE FILED:    October 6, 2003**

# SEALED
# DOCUMENT

**Document Number:       14**



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

**U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FILED**

**OCT − 6 2003**

**CLERK, U.S. DISTRICT COURT**
By _____
Deputy

JOHN LEZELL BALENTINE,

    *Petitioner,*

v.

JANIE COCKRELL, Director
Texas Department of Criminal Justice
    Institutional Division

    *Respondent.*

Case No. 2:03-CV-00039

---

### MOTION FOR EXTENSION OF TIME
### TO FILE HABEAS PETITION

**ORIGINAL**

    Petitioner, John Balentine, requests that this court grant him an extension of time to file his Petition for a Writ of Habeas Corpus to a date on or before December 1, 2003, to which Respondent is not opposed. As grounds therefore, Balentine would show:

    1.    This court entered an order, dated May 19, 2003, ordering Balentine to file his Petition for Writ of Habeas Corpus on or before October 16, 2003.

    2.    However, undersigned counsel is unable to meet that due date for several reasons: Undersigned counsel had no involvement in the case prior to her appointment by this federal court; although state habeas counsel was ordered to provide the record on or before June 9, 2003, he did not deliver the record to undersigned counsel until June 30, 2003; and undersigned counsel has needed time to seek funding and expert assistance in preparing the initial petition for writ of habeas

13

corpus.

3.      Pursuant to the court order dated May 19, 2003, undersigned counsel in conjunction

with Katherine Hayes, assistant Attorney General, representing the Respondent, has calculated that

the last day for filing before the statute of limitations  runs is December 3, 2003.

4.      Respondent has authorized undersigned counsel to represent that Respondent is not

opposed to the extension of time.  This is the first extension sought by undersigned counsel.

WHEREFORE, Petitioner requests that this court enter an order permitting Petitioner to file

his Petition for Writ of Habeas Corpus on or before December 1, 2003.

<div align="right">

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

</div>

### CERTIFICATE OF CONFERENCE

I hereby certify that on October 2, 2003, I conferred with counsel for the Respondent:

> Ms. Katherine Hays
> Assistant Attorney General
> Office of the Attorney General of Texas
> Capital Station 12548
> Austin, TX 78711

concerning this Motion.  Counsel for the Respondent is not opposed.

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2003, I have served a true and correct copy of the foregoing pleading upon counsel for Respondent:

> Ms. Katherine Hayes
> Assistant Attorney General
> Office of the Attorney General of Texas
> Capital Station 12548
> Austin, TX 78711

_Lydia M.V. Brandt_
Lydia M.V. Brandt

cc:  John Balentine #999315
Polunsky Unit
Texas Department of Criminal Justice
3872 FM 350 South
Livingston, TX 77351-8580



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

JOHN LEZELL BALENTINE,

    *Petitioner,*

v.

    Case No. 2:03-CV-00039

JANIE COCKRELL, Director
Texas Department of Criminal Justice
    Institutional Division

    *Respondent.*

**ORIGINAL**

### MOTION TO PERMIT *EX PARTE*
### CONSIDERATION OF MOTION TO MODIFY 8-21-03 FUNDING ORDER

On August 5, 2003, Petitioner John Lezell Balentine filed a Motion to Permit *Ex Parte*

Consideration of Request for Expert Assistance. By order dated, August, 21, 2003, this Court

granted the motion to seal the pleading and order pertaining to the request for funding for expert

assistance. In a second sealed order, also dated 8-21-03, the court granted Balentine's request for

funding.

Balentine now seeks to have the court modify the second 8-21-03 order in its accompanying

motion, styled Motion to Modify the 8-21-03 Order. Because the original pleading and order were

sealed, the Motion to Modify and the order arising from it must also be treated *ex parte* and under

seal.

Accordingly, Balentine requests that the Court seal Balentine Motion to Modify 8-21-03

1

12

Court Order and any further requests for assistance under 21 U.S.C. § 848(q)(9) arising from it.

Dated: October 3, 2003                                   Respectfully submitted,

                                                        Lydia M.V. Brandt, Esq.
                                                    THE BRANDT LAW FIRM, P.C.
                                                       Texas Bar No. 00795262
                                                            P.O. Box 850843
                                                     Richardson, Texas   75085-0843
                                                (972) 699-7020 Voice; (972) 699-7030 Fax
                                                     COUNSEL FOR PETITIONER


### CERTIFICATE OF CONFERENCE

I hereby certify that on October 2, 2003, I conferred with counsel for the Respondent:

> Ms. Katherine Hays
> Assistant Attorney General
> Office of the Attorney General of Texas
> Capital Station 12548
> Austin, TX 78711

concerning this Motion.  Counsel for the Respondent is not opposed, however, the Assistant

Attorney General states that her non-opposition does not constitute a waiver of the rights of the State

of Texas to raise exhaustion and/or procedural defenses.

                                                        Lydia M.V. Brandt

                                    2

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a true and correct copy of the foregoing pleading upon

counsel for Respondent, Katherine Hays, Assistant Attorney General, Office of the Attorney General,

Capital Station, Box 12548, Austin, TX 78711  by depositing the same in regular United States

Postal Service Mail, to the above address, on October 3, 2003

Lydia M.V. Brandt

cc:     John Balentine #999315
        Polunsky Unit
        Texas Department of Criminal Justice
        3872 FM 350 South
        Livingston, TX 77351-8580

**CASE NUMBER:**          **2:03-CV-39**

**DATE FILED:   8/7/03 & 8/21/03**

# SEALED
# DOCUMENTS

**Document Numbers: 8 - 11**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL 1 0 2003

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

JOHN LEZELL BALENTINE,

   *Petitioner*,

v.

JANIE COCKRELL, Director
Texas Department of Criminal Justice,
   Institutional Division

   *Respondent*.

Action No. 2:03-CV-00039

**ORIGINAL**

---

**MOTION TO WITHDRAW
MOTION REQUESTING SHOW CAUSE ORDER DIRECTED TO
MR. KENT BIRDSONG
FOR FAILURE TO DELIVER
FILES TO HABEAS COUNSEL PURSUANT TO MAY 19, 2003 COURT ORDER**

Petitioner, Balentine, files this motion to withdraw his Motion Requesting Show Cause Order

Directed to Mr. Kent Birdsong for Failure to Deliver Files To Habeas Counsel Pursuant to May 19,

2003 Court Order.

As grounds therefore, Mr. Balentine, through his undersigned counsel would show:

1.        On June 30, 2003, Mr. Balentine's counsel received seven boxes of documents from

Mr. Birdsong.  Undersigned counsel reviewed the contents of those boxes.  Some materials,

including the State's Answer to the state post conviction application, the Findings of Fact and

Conclusions of Law, and the order of the Texas Court of Criminal Appeals were missing.

2.        Undersigned counsel contacted the Attorney General's office.  In a July 8,

2003 conversation with Katherine Hayes, the Assistant Attorney General, Ms. Hayes stated that her

office had copies of the documents needed by undersigned counsel and agreed to provide

undersigned counsel with copies of those documents within a week from today.

3.    Accordingly, based on the documentation in the seven boxes from Mr. Birdsong and

Ms. Hayes agreement to provide copies of the balance of the state court files, it appears that Mr.

Balentine's files for purposes of commencing work on the federal habeas petition appear to be

complete.

WHEREFORE, Mr. Balentine withdraws his Motion Requesting a Show Cause Order

Directed to Mr. Birdsong.

<div align="right">

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

</div>

### Certificate of Service

I hereby certify that on July 8, 2003, I have served a true and correct copy of the foregoing

pleading upon counsel for Respondent:

Katherine Hayes
Assistant Attorney General
Office of the Attorney General of Texas
Capital Station 12548
Austin, TX 78711

<div align="right">

Lydia M.V. Brandt

</div>

cc:    John Balentine, 999-315
       Polansky Unit
       Texas Department of Criminal Justice
       3872 FM 350 South
       Livingston, TX 77351-8580

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



JOHN LEZELL BALENTINE,

    *Petitioner,*

v.

JANIE COCKRELL, Director
Texas Department of Criminal Justice,
    Institutional Division

    *Respondent.*

Action No. 2:03-CV-00039

**ORIGINAL**

## MOTION REQUESTING SHOW CAUSE ORDER DIRECTED TO
## MR. KENT BIRDSONG
## FOR FAILURE TO DELIVER
## FILES TO HABEAS COUNSEL PURSUANT TO MAY 19, 2003 COURT ORDER

Petitioner, Balentine, requests that this court enter a show cause order directed to Mr. Birdsong for failure to comply with this court's May 19, 2003 order that: "Mr. Kent Birdsong . . . shall arrange to deliver his file to Ms. Brandt on or before June 9, 2002." To date, Mr. Birdsong has not complied.

As grounds therefore, Mr. Balentine, through his undersigned counsel would show:

1.    On May 19, 2003, this court entered an order appointing Ms. Brandt as federal habeas counsel and further ordering that "Mr. Kent Birdsong . . . shall arrange to deliver his file to Ms. Brandt on or before June 9, 2002." The court also ordered Mr. Balentine to file his habeas petition on or before October 16, 2003, and to make the necessary inquiry to determine that the October 16, 2003 due date is not time-barred. Exhibit A: May 19, 2003 Order of Court.



2.      Among the documents that must be delivered to Ms. Brandt by Mr. Birdson in order for Ms. Brandt to prepare a habeas petitioner and calculate the statute of limitations are (hereinafter collectively referred to as the "Record"):

A.      Clerk's record;
B.      Court Reporters record;
C.      Exhibits at trial;
D.      The direct appeal brief filed by Balentine;
E.      The response brief filed by the State of Texas;
F.      The reply filed by Balentine;
G.      The direct appeal opinion;
H.      Petition for writ of certiorari to the U.S. Supreme Court and any order;
I.      The state habeas petition filed by Balentine, including exhibits;
J.      The  state habeas petition filed by the State of Texas, together with any exhibits;
K.      Trial counsel files (4-5 boxes);
L.      Findings of Fact and Conclusions of Law on the state habeas application (FFCL); and
M.      The order of the Texas Court of Criminal Appeals on the FFCL.

3.      Ms. Brandt initiated each of the several communications (detailed below) to Mr. Birdsong requesting delivery of the Record. The last communication was on June 19, 2003, during which Mr. Birdsong promised he would keep Ms. Brandt updated every few days about the delivery of the Record.  To date, Mr. Birdsong has not delivered the Record in its entirety, nor has he communicated with Ms. Brandt at all as promised.  The communications were as follows:

A.      On May 21, 2003, undersigned counsel Ms. Brandt called Mr. Birdsong and advised him of the order of the court.  Mr. Birdsong stated he would look for the Record that weekend and mail it to undersigned counsel by UPS. (Exhibit B:  Affidavit Brandt).

B.      By June 9, 2003, no Record was forthcoming from Mr. Birdsong and Ms. Brandt called again and left a message.  Mr. Birdsong stated he had gotten behind and would send out the Record.  (Exhibit B:  Affidavit Brandt).

C.      On June 13, 2003, Ms. Brandt called and left a message again requesting the Record. (Exhibit B:  Affidavit Brandt).

D.      On June 16, 2003, Mr. Birdsong mailed Ms. Brandt a 2½ inch thick envelop that purported to be a partial Record in Mr. Balentine's case.   (Exhibit C: Letter of Birdsong with Brandt's notation of contents rec'd and missing).  Of the

enumerated documents above, the contents of the Record consisted only of:

A.    . . . .
B.    . . . .
C.    . . . .
D.    The direct appeal brief filed by Balentine;
E.    The response brief filed by the State of Texas;
F.    . . . .
G.    The direct appeal opinion;
H.    . . . .
I.    The state habeas petition filed by Balentine, including exhibits;
J.    . . . .
K.    . . . .
L.    . . . .
M.    . . . .

some miscellaneous paper that appear to be Potter county jail records, a two-page memorandum by Werner Talley, investigator, and three paper-clipped packets with yellow post-it notes with the handwritten words "exhibits."

The " . . . ." reflects those documents that were omitted.

E.    On June 19, 2003, Ms. Brandt received the envelop and spoke with Mr. Birdsong, who said that he could not find the balance Record. Mr. Birdsong stated he would call every few days and advise as to the status of the delivery of the Record.  (Exhibit B: Affidavit Brandt).

F.    On June 24, 2003 not having heard again from Mr. Birdsong, Ms. Brandt contacted Mr. Werner Talley, who had been the court-appointed state habeas investigator, and asked if he could locate the files for Ms. Brandt because he was in Amarillo, TX and Ms. Brandt is in Richardson, TX, and because Mr. Talley knew the various attorneys involved in Mr. Balentine's case.  (Exhibit B: Affidavit Brandt). Ms. Brandt also contacted the court reporter and the court coordinator.

G.    On June 26, 2003, Mr. Talley reported that he called trial counsel, Mr. Durham, who stated that he turned over his trial files to Mr. Birdsong. Mr. Talley reported that he recalls seeing and reviewing the contents of 4-5 boxes of trial counsel files.  Mr. Talley reported also that he had called Mr. Birdsong's former Amarillo office, and was told that they do not have the files and that the files should be with Mr. Birdsong.  Mr. Talley also reported that he had called Mr. Birdsong at his Vega, TX office, but his phone call was not returned. (Exhibit B: Affidavit Brandt); (Exhibit D: Affidavit of Talley).

H.    On June 26, 2003, Ms. Brandt spoke with the court reporter, Jill Zimmer. Ms. Zimmer stated that she prepared several copies:

1.    1 copy for direct appeal attorney, McElroy;

2.       1 copy for the habeas lawyer, Mr. Birdsong;
3.       1 copy for the Court of Criminal Appeals; and
4.       1 copy for the District Clerk of Court.

Ms. Zimmer stated that Mr. Birdsong had contacted her on June 26, 2003 and ask her to prepare a copy of the trial transcripts on disk to give to Ms. Brandt. Ms. Zimmer told Ms. Brandt that she replied to Birdsong that electronic copies can not be prepared for several weeks because the persons who does that is out of the office. (Exhibit B: Affidavit Brandt). Further, Ms. Brandt is incapable of reading 28 volumes of transcript on computer and would be put to further time and expense in having to print out that much paper.

I.       Ms. Brandt requested that the state court enter an order directing the state district clerk's office to deliver the reporter's record and clerk's record to her, but to date, Ms. Brandt does not have them.

4.       The sum and substance is that Mr. Birdsong has failed to comply with the court order to deliver the files to Ms. Brandt pursuant to court order. The following documents have not been delivered to Ms. Brandt, and without them, she can not prepare Mr. Balentine's federal habeas petition:

A.       Clerk's record;
B.       Court Reporters record;
C.       Exhibits at trial;
D.       . . . .
E.       . . . .
F.       The reply filed by Balentine;
G.       . . . .
H.       Petition for writ of certiorari to the U.S. Supreme Court and any order;
I.       . . .
J.       The response habeas petition filed by the State of Texas, together with any exhibits;
K.       Trial counsel files (4-5 boxes);
L.       Findings of Fact and Conclusions of Law on the state habeas application (FFCL); and
M.       The order of the Texas Court of Criminal Appeals on the FFCL.

5.       Further, the May 19, 2003 orders that "newly appointed counsel should . . . make such initial inquiries and investigation as necessary to satisfy herself that the petition due on or before October 16, 2003 is not time-barred." To comply with that order, Ms. Brandt is in need of the order

by the Texas Court of Criminal Appeals denying habeas relief, any order of the U.S. Supreme Court denying certiorari, and the order of the Texas Court of Criminal Appeals arising out of the direct appeal. Mr. Birdsong has not delivered these documents either. They are crucial documents because the timing on which they were released affect the date by which the federal statute of limitations runs. The state habeas order is not available on WESTLAW or LEXIS. In past requests, the Texas Court of Criminal Appeals has required that an attorney come to the court and make copies of any order. (Exhibit B: Affidavit Brandt).

WHEREFORE, Mr. Balentine requests that this court enter a show cause order directed to Mr. Birdsong arising from his failure to deliver the entire Record on or before June 9, 2003 as recited in the May 19, 2003 order, and further require that he deliver the Record (in print format) to Ms. Brandt. Without the record, Mr. Balentine's federal 4th, 5th, 6th, 8th, and 14th amendment constitutional rights, and right to seek habeas relief pursuant to federal statute, are in jeopardy.

<div align="right">

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas  75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

</div>

## Certificate of Service

I hereby certify that on June 39, 2003, I have served a true and correct copy of the foregoing pleading upon counsel for Respondent:

Katherine Hayes
Assistant Attorney General
Office of the Attorney General of Texas
Capital Station 12548
Austin, TX 78711

_Lydia M.V. Brandt_
                                           Lydia M.V. Brandt

cc:    John Balentine, 999-315
       Polansky Unit
       Texas Department of Criminal Justice
       3872 FM 350 South
       Livingston, TX 77351-8580

Case 2:03-cv-00039-D-BR   Document 317   Filed 02/25/19   Page 294 of 314   PageID 17789



# United States District Court

Northern District of Texas
Amarillo Division

Notice of Orders or Judgments
Fed. R. Civ. P. 77(d)

**ATTENTION: Docket sheets are now available on the Internet on the Northern District of Texas web site at www.txnd.uscourts.gov**

Date:    05/21/03

To:    Lydia MV Brandt
       Brandt Law Firm
       PO Box 850843
       Richardson, TX  75085-0843

Re: Case Number:    2:03-cv-00039    Instrument Number:    5

If this facsimile cannot be delivered as addressed, please call (806) 324-2352. If this transmission is incomplete, our system will attempt to re-send it up to six times.  If the FAX fails, it will be mailed the next business day.

Number of pages including cover sheet:    3





IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAY 1 9 2003

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| JOHN LEZELL BALENTINE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | 2:03-CV-0039 |
| | § | |
| JANIE COCKRELL, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Institutional Division, | § | |
| | § | |
| Respondent. | § | |

## ORDER GRANTING PETITIONER'S MOTION TO
## APPOINT OTHER COUNSEL PURSUANT TO 21 U.S.C. § 848(q)

Came this day for consideration the above-entitled motion filed February 5, 2003 by

petitioner JOHN LEZELL BALENTINE,[1] a state prisoner.  By his motion, petitioner requests

this Court appoint counsel to represent him in pursuing a petition for a federal writ of habeas

corpus challenging his conviction for capital murder and the resultant death sentence.

On March 6, 2003, the undersigned entered an Order to Supplement therein ordering

petitioner to supplement his motion and provide the Court with an application to proceed *in*

*forma pauperis* together with an *In Forma Pauperis* Data Sheet, to set forth the justification why

state appointed habeas counsel should not be appointed in this case and that alternate counsel

should be appointed, and certain information related to the underlying state proceedings.  On

April 8, 2003, state habeas counsel Mr. Kent Birdsong filed a partial supplementation advising

the Court why he should not be appointed and advising that further information would be

submitted.  To date, nothing additional has been received by this Court.  As this is a pending

---

[1]The motion was filed by petitioner's court appointed state habeas counsel, Mr. Kent Birdsong.

application, and as state habeas counsel has stated justification why he should not be appointed, the Court is of the opinion that alternate counsel should be appointed.

The undersigned finds Ms. Lydia Brandt of Dallas should be and is appointed at the district court stage of this case pursuant to 21 U.S.C. § 848(q)(5)(7).

The undersigned hereby appoints Ms. Lydia Brandt as lead counsel to represent petitioner in this cause. Petitioner, through his appointed counsel, Ms. Lydia Brandt, shall file a petition for writ of habeas corpus with this Court on or before October 16, 2003. The Court has allowed more time than might usually be allowed in other death penalty cases since Ms. Brandt has had no involvement in this case prior to her appointment, and since state habeas counsel will no longer be an attorney of record in the case. Newly appointed counsel should, however, make such initial inquiries and investigation as necessary to satisfy herself that the petition due on or before October 16, 2003 is not time-barred.

State habeas counsel Mr. Kent Birdsong shall confer with counsel Brandt and shall arrange to deliver his file to Ms. Brandt on or before June 9, 2003.

IT IS SO ORDERED.

ENTERED this _17th_ day of May 2003.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

HABS#DPENALTY\BALENTINE APT 3

2

AFFIDAVIT OF FACT

STATE OF TEXAS              §
                           §
COUNTY OF DALLAS           §

BEFORE ME, the undersigned authority, on this day personally appeared Lydia M.V. Brandt,

who being by me duly sworn, did depose and state upon her oath as follows:

1.    My name is Lydia Brandt. I am over twenty-one years of age and am fully competent to make this affidavit.

2.    I was appointed as federal habeas counsel in the case styled: John Balentine v. Janie Cockrell, No. 2:03-CV-0039.

3.    For me to provide competent federal habeas assistance, the records I need – and that should be in the possession of state habeas counsel – include:

      A.    Clerk's record;
      B.    Court Reporters record;
      C.    Exhibits at trial;
      D.    The direct appeal brief filed by Balentine;
      E.    The response brief filed by the State of Texas;
      F.    The reply filed by Balentine;
      G.    The direct appeal opinion;
      H.    Petition for writ of certiorari to the U.S. Supreme Court and any order;
      I.    The state habeas petition filed by Balentine, including exhibits;
      J.    The state habeas petition filed by the State of Texas, together with any exhibits;
      K.    Trial counsel files (4-5 boxes);
      L.    Findings of Fact and Conclusions of Law on the state habeas application (FFCL); and
      M.    The order of the Texas Court of Criminal Appeals on the FFCL.

4.    When I was contacted by the court and asked if I was willing to act as federal habeas counsel for Mr. Balentine, I advised the federal court that in the past that I have encountered problems with state habeas counsel, who have failed to deliver the file. I asked that the court order appointing me counsel and relieving Mr. Birdsong of his responsibility for representing Mr. Balentine, include a requirement that Mr. Birdsong deliver the files by a date certain.

1



5.  On May 19, 2003, the federal court order appointed me counsel, and also ordered that "Mr. Kent Birdsong [state habeas counsel] . . . shall arrange to deliver his file to Ms. Brandt on or before June 9, 2002." The court also ordered Mr. Balentine to file his habeas petition on or before October 16, 2003.

6.  On May 21, 2003, I called Mr. Birdsong and advised him of the order of the court. Mr. Birdsong told me that he would look for the file that weekend and mail it to me by UPS.

7.  By June 9, 2003 I had not received the files from Mr. Birdsong. I called again. Mr. Birdsong told me had gotten behind and would send out the files.

8.  On June 13, 2003, I called and left a message again requesting the files.

9.  On June 19, 2003, I received a 2½ inch thick envelop that purported to be the files in Mr. Balentine's case, accompanied a letter, dated June 16, 2003, from Mr. Birdsong addressed to me. Of the enumerated documents above, the contents consisted of only:

   A.   . . . .
   B.   . . . .
   C.   . . . .
   D.   The direct appeal brief filed by Balentine;
   E.   The response brief filed by the State of Texas;
   F.   . . . .
   G.   The direct appeal opinion;
   H.   . . . .
   I.   The state habeas petition filed by Balentine, including exhibits;
   J.   . . . .
   K.   . . . .
   L.   . . . .
   M.   . . . .

   some miscellaneous paper that appear to be Potter county jail records, a two-page memorandum by Werner Talley, investigator, and three paper-clipped packets with yellow post-it notes with the handwritten words "exhibits."

10. When I received the June 16, 2003 letter and documents, I called Mr. Birdsong. He told me that he could not find any other files for Mr. Balentine. Mr. Birdsong also told me that he would call frequently and advise as to the status of locating the files.

11. On June 24, 2003, because I had not heard again from Mr. Birdsong at all, I contacted Mr. Werner Talley, who had been the investigator who had been court appointed in the state habeas. I asked Mr. Talley if he could help me locate the files because he is in Amarillo, TX and I am in Richardson, TX, a Dallas suburb, and because he knew Balentine's attorneys.

2

12.     On June 26, 2003, Mr. Talley reported that he called the office of trial counsel, Mr. Durham, and was told that trial counsel had turned over his trial files to Mr. Birdsong. Mr. Talley recalls seeing and reviewing the contents of 4-5 boxes of trial counsel files during the state habeas. Mr. Talley told me he had also called Mr. Birdsong's former Amarillo office, and was told that they do not have the files and that the files should be with Mr. Birdsong. Mr. Talley also told me that he had called Mr. Birdsong at Mr. Birdsong's Vega, TX office, but Mr. Birdsong did not return Mr. Talley's call. Mr. Talley told me he was unable to locate any of the files for Mr. Balentine.

13.     On June 26, 2003, I spoke with the court reporter, Jill Zimmer, who reported Mr. Balentine's trial. Ms. Zimmer stated that she had prepared several paper copies of the trial transcript, and made them available to: one copy – the direct appeal attorney, McElroy; one copy – the habeas lawyer, Mr. Birdsong; one copy – the Court of Criminal Appeals; and one copy – the District Clerk of Court. Ms. Zimmer also told me that Mr. Birdsong had contacted her the day before and ask her to prepare a copy of the trial transcripts in electronic format to give to me. Ms. Zimmer told me that electronic copies can not be prepared for several weeks because the person who does that is out of the office. She told me that is what she told Mr. Birdsong also.

14.     Even if electronic copies were available, they will not be sufficient to for purposes of preparing the federal habeas. I need paper copies of the transcripts because I am not capable of reading 28 volumes of transcript on a computer. If I am given the transcripts in electronic format only, I will be required to print out 28 volumes of paper, which will take a substantial amount of time, as well as the cost of the paper.

15.     After having spoken with the court clerk, I submitted an order to the trial court asking the district clerk's office be directed to deliver to me the Reporter's record and Clerk's record and the Findings of Fact and Conclusions of law and the order of the Texas Court of Criminal Appeals as to them, but I have not received that documentation. Even if I were to obtain that record, I am still in need of the 4-5 boxes of trial counsel files in order to make an adequate determination of what was done or not done by trial counsel.

16.     To date, I do not have following documents and can not prepare Mr. Balentine's federal habeas petition, nor can I calculate the date on which the statute of limitations runs:

      A.     Clerk's record;
      B.     Court Reporters record;
      C.     Exhibits at trial;
      D.     . . . .
      E.     . . . .
      F.     The reply filed by Balentine;
      G.     . . . .
      H.     Petition for writ of certiorari to the U.S. Supreme Court and any order;

I.      . . .
J.      The state habeas petition filed by the State of Texas, together with any exhibits;
K.      Trial counsel files (4-5 boxes);
L.      Findings of Fact and Conclusions of Law on the state habeas application (FFCL); and
M.      The order of the Texas Court of Criminal Appeals on the FFCL.

17.     I also can not comply with the May 19, 2003 order that "newly appointed counsel should . . . make such initial inquiries and investigation as necessary to satisfy herself that the petition due on or before October 16, 2003 is not time-barred." The reason is that I do not have all the court orders (missing is information on whether a petition was taken to the U.S. Supreme Court, and the date on which the Texas Court of Criminal Appeals denied relief.) These documents are crucial in determining the date the federal statute of limitations runs. The state habeas order is not available on WESTLAW or LEXIS. It has been my past experience that I can not just call the Texas Court of Criminal Appeals and ask them to fax me a copy of the order on the state habeas. The court requires that someone actually come to the court and make the copies him or herself.

18.     It has been approximately six weeks since my first call to Mr. Birdsong (May 19, 2003) asking for the files, and approximately 3 weeks since the date (June 9, 2003) he was ordered to deliver the files to me. Mr. Birdsong has failed to comply with that order. Without the files, I can not prepare the federal habeas petition, and the federal constitutional rights of Mr. Birdsong, a death-sentenced prisoner, are in jeopardy because of Mr. Birdsong's failure to comply with the federal court order.

FURTHER AFFIANT SAYETH NOT.

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

SUBSCRIBED AND SWORN TO before me this June 30, 2003.

Notary Public

Donald H. Brandt, Jr.
Notary Public, State of Texas
My Commission Expires
AUGUST 07, 2004

4

# COUNTY OF OLDHAM
### State of Texas
## KENT BIRDSONG
**Assistant County/ District Attorney**
*Board Certified - Criminal Law*
*Texas Board of Legal Specialization*

**PO Box 698**
**Vega TX 79092**



**(806)267-2233**
**Fax(806)267-2798**

June 16, 2003

Lydia Brandt
Lawyer
PO 850843
Richardson, TX 75085

Re: Balentine writ

*Rec'd*
*6/19/03*

Dear Lydia:

Enclosed are the briefs and opinions that I should have sent sooner. I thought I could go right to John's boxes. I'll be digging ASAP to get everything else for you. I appreciate what you do and miss that side of the docket. I do not want to make your job any harder than I already have nor than it already is. I'll keep you posted on what I ship to you.

Sincerely

*Kent Birdsong*

Kent Birdsong

*Exhibit C*

*2 ½" inch thick envlop*

*Enclosed were*
*1. Appellate briefs*
*2. Writ of habeas corpus*
*3. Direct appeal opinion*
*4. 2 exhibits*
*5. Tally interview of jurors*

*Missing*
*1. Clerk Rec*
*2. Reporter Rec*
*3. Finding Fact: Conclusion Law (prob)*
*4. Trial Exhibit*
*5. Tx CCA order on FFCL*
*6. Trial Counsel Files*

# AFFIDAVIT OF FACT

STATE OF TEXAS                                  §
                                                §
COUNTY OF POTTER                                §

      BEFORE ME, the undersigned authority, on this day personally appeared Werner

Talley, who being by me duly sworn, did depose and state upon his oath as follows:

1.     My name is Werner Talley.  I am over twenty-one years of age and am fully
competent to make this affidavit.

2.     I am an investigator, who was a court-appointed investigator in the state habeas
proceeding for John Balentine, that was tried in state court in Amarillo, TX.

3.     On June 24, 2003, I received a call from Lydia Brandt. Ms. Brandt told me that she
was Mr. Balentine's federal habeas attorney and that she was having trouble obtaining
Mr. Balentine's files from Mr. Birdsong.  Because I am located in Amarillo, TX and
Ms. Brandt is in Richardson, TX,  Ms. Brandt asked me to help her locate the files.
I agreed.

4.     The results of my search included the following:

     A.     To locate the trial counsel files, I  called the office of Mr. Durham, who was
Mr. Balentine's trial counsel. I was told that the files were given to Mr.
Birdsong, they were not returned to Mr. Durham, and they remain with Mr.
Birdsong.  I remember seeing and reviewing the contents of those trial files,
when I worked as the investigator in the state habeas proceeding.  They
consisted of approximately 4 to 5 boxes.

     B.     I also called the Amarillo, TX office where Mr. Birdsong had worked, to see
if the trial counsel files, state habeas files, and trial transcripts were there. I
was told that they were not, and that those files were with Mr. Birdsong, who
has since moved to Vega, TX.

<div align="center">1</div>

Exhibit D

C.  As part of my search for the files, I also called Mr. Birdsong at his Vega, TX office, but he has not returned my calls.

5.  I been unable to locate any files for Mr. Balentine.

**FURTHER AFFIANT SAYETH NOT.**

Werner Talley
Investigator and Polygraph Service
4415 South Georgia, Suite 209
Amarillo, TX 79110
806-356-9486

SUBSCRIBED AND SWORN TO before me this June 27, 2003.

Notary Public

CHARLES S. WEIGER
Notary Public
State of Texas
My Comm. Exp. 04-21-07

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

NORTHERN DISTRICT OF TEXAS
FILED

MAY 1 9 2003

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

JOHN LEZELL BALENTINE,              §
                                     §
        Petitioner,                  §
                                     §
v.                                   §        2:03-CV-0039
                                     §
JANIE COCKRELL, Director,            §
Texas Department of Criminal         §
Justice, Institutional Division,     §
                                     §
        Respondent.                  §

## ORDER GRANTING PETITIONER'S MOTION TO
## APPOINT OTHER COUNSEL PURSUANT TO 21 U.S.C. § 848(q)

Came this day for consideration the above-entitled motion filed February 5, 2003 by

petitioner JOHN LEZELL BALENTINE,[1] a state prisoner.  By his motion, petitioner requests

this Court appoint counsel to represent him in pursuing a petition for a federal writ of habeas

corpus challenging his conviction for capital murder and the resultant death sentence.

On March 6, 2003, the undersigned entered an Order to Supplement therein ordering

petitioner to supplement his motion and provide the Court with an application to proceed *in

forma pauperis* together with an *In Forma Pauperis* Data Sheet, to set forth the justification why

state appointed habeas counsel should not be appointed in this case and that alternate counsel

should be appointed, and certain information related to the underlying state proceedings.  On

April 8, 2003, state habeas counsel Mr. Kent Birdsong filed a partial supplementation advising

the Court why he should not be appointed and advising that further information would be

submitted.  To date, nothing additional has been received by this Court.  As this is a pending

---

[1] The motion was filed by petitioner's court appointed state habeas counsel, Mr. Kent Birdsong.

5

application, and as state habeas counsel has stated justification why he should not be appointed, the Court is of the opinion that alternate counsel should be appointed.

The undersigned finds Ms. Lydia Brandt of Dallas should be and is appointed at the district court stage of this case pursuant to 21 U.S.C. § 848(q)(5)(7).

The undersigned hereby appoints Ms. Lydia Brandt as lead counsel to represent petitioner in this cause. Petitioner, through his appointed counsel, Ms. Lydia Brandt, shall file a petition for writ of habeas corpus with this Court on or before October 16, 2003. The Court has allowed more time than might usually be allowed in other death penalty cases since Ms. Brandt has had no involvement in this case prior to her appointment, and since state habeas counsel will no longer be an attorney of record in the case. Newly appointed counsel should, however, make such initial inquiries and investigation as necessary to satisfy herself that the petition due on or before October 16, 2003 is not time-barred.

State habeas counsel Mr. Kent Birdsong shall confer with counsel Brandt and shall arrange to deliver his file to Ms. Brandt on or before June 9, 2003.

IT IS SO ORDERED.

ENTERED this _____ day of May 2003.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| **JOHN LEZELL BALENTINE,** § | |
| § | |
| **Petitioner,** § | |
| § | **U.S. DISTRICT COURT NO.** |
| § | **2:03-CV-0039** |
| **-v-** § | |
| § | **CASE NO. 54,071-01 (Texas Court of** |
| **JANIE COCKRELL, Director,** § | **Criminal Appeals)** |
| **Texas Dept. of Criminal Justice,** § | |
| **Institutional Division,** § | |
| § | |
| **Respondent.** § | |
| § | |

**SUPPLEMENTATION TO PETITIONER'S MOTION TO**
**SEEK OTHER COUNSEL IN FEDERAL HABEAS REVIEW**
*THIS IS A DEATH PENALTY CASE.*

Comes now, Kent Birdsong, state appointed writ counsel for Petitioner JOHN LEZELL

BALENTINE, and presents supplementation as requested regarding said Petitioner:

Counsel has accepted a position as an assistant prosecutor for Oldham County, Texas.

Counsel cannot take opposition against the State of Texas criminally once he has taken the oath.

Petitioner requests other counsel be appointed for Petitioner at the federal level.

Counsel attaches an indigency affidavit from Balentine and represents to the Court the

following:

Balentine has been incarcerated since sentencing.

Circumstances have not improved for Petitioner to take him from indigency status.

1



Counsel apologizes for missing the March 20, 2003 deadline and suggests no disrespect was meant to the Court or the Petitioner. Counsel will additionally supplement this motion with an attorney to replace counsel as well as a telephone dictated indigency affidavit from Petitioner by April 9 at 5:00 p.m.

Respectfully submitted,

Kent Birdsong
Writ Attorney For Petitioner
State Bar No. 02333630
P.O. Box 138
Vega, Texas 79092
(806)267-0003
Fax-(806)267-2798

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing motion to be served on Respondent by mailing, via the United States mail, postage prepaid, a copy of the pleading to counsel for Respondent, Capital Litigation Division, Office of the Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711, this _____ day of _____, 2003.

KENT BIRDSONG

2

CAUSE NO: _16,877-E_     CHARGE: _Capital Murder_

THE STATE OF TEXAS                      _320th_____ COURT

VS.                                      OF _Potter_____ COUNTY, TEXAS

_John Lezell Ballentine_

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes _John Lezell Ballentine_, defendant in the above styled and numbered cause, and respectfully petitions the Court to appoint counsel to represent him in said felony cause and would show to the Court that he is too poor to employ counsel.

_John L. Ballentine_
Defendant

Sworn to and subscribed before me on this, the _3_ day of _August_, A.D., 19_98_.

_Gary Johnson_
Notary Public

[Notary seal: GARY JOHNSON / NOTARY PUBLIC, / STATE OF TEXAS / MY COMMISSION EXPIRES 8-18-2000]

## ORDER APPOINTING COUNSEL

On this, the _____ day of _8/3/98_____, A.D., 19 _____ , it appearing to the Court that the above named defendant has executed an affidavit stating that he is without counsel and is too poor to employ counsel, it is ordered that the attorney listed below is appointed to represent the above named defendant in said cause.

_James Durham_
Attorney

Address _____

City _____ State _____ Zip _____

Phone _____

BAR # _____

I, Caroline Woodburn, Clerk of the District Courts and County Courts at Law, in and for Potter County, Texas, do hereby certify that the foregoing instrument is a correct copy of the original on file in this office
ATTESTED this __ day of April 20 03
By _____ Deputy

FILED
CINDY GROOMER
DISTRICT CLERK

1998 AUG -6 P 1:17

POTTER COUNTY, TEXAS

BY _____ DEPUTY

It is further ordered that the said cause is set for: _____

on the _____ day of _____, 19 _____, at 9:00 A.M.

Signed this _____ day of _8/3/98_____, A.D., 19 _____.

_____
Judge Presiding

DISTRICT CLERK

MCD

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAR - 6 2003

CLERK, U.S. DISTRICT COURT
By _____
               Deputy

| | | |
|---|---|---|
| JOHN LEZELL BALENTINE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | 2:03-CV-0039 |
| | § | |
| JANIE COCKRELL, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Institutional Division, | § | |
| | § | |
| Respondent. | § | |

### ORDER TO SUPPLEMENT PETITIONER'S MOTION TO SEEK OTHER COUNSEL IN FEDERAL HABEAS REVIEW

Came this day for consideration the above-entitled motion filed February 5, 2003 by

petitioner JOHN LEZELL BALENTINE,[1] a state prisoner. By his motion, petitioner requests

this Court appoint counsel to represent him in pursuing a petition for a federal writ of habeas

corpus challenging his conviction for capital murder and the resultant death sentence.

Title 21 U.S.C. § 848(q)(4)(B) provides that death-sentenced inmates who challenge their

convictions or sentences pursuant either to section 2254 or section 2255 of Title 28 of the United

States Code, and who are financially unable to obtain adequate representation, are entitled to

court appointed counsel having certain minimum qualifications. The minimum qualifications are

set forth in 21 U.S.C. § 848(q)(5) and (6). Subsection 848(q)(5) provides that if counsel is to be

appointed before judgment, at least one attorney so appointed must have been admitted to

practice in the court in which the prosecution is to be tried for five or more years, and must have

had at least three or more years experience in the actual trial of felony prosecutions in that court.

---

[1] The motion was filed by petitioner's court appointed state habeas counsel, Mr. Kent Birdsong.

3

Subsection 848(q)(6) provides that if counsel is to be appointed after judgment, at least one attorney so appointed must have been admitted to practice in the court of appeals for five or more years, and must have had at least three or more years experience handling appeals in the appellate court. Clearly, subsections 848(q)(5) and (6) are couched in language relating more directly to federal criminal trials and appeals, than to habeas cases seeking relief from state court sentences. As such, section 848(q)(4)(B) seems awkwardly misplaced in this particular statute. *Sterling v. Scott*, 57 F.3d 451, 457 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 715, 133 L.Ed.2d 669 (1996). Nonetheless, the Court must attempt to construe the minimum requirement sections in such a manner as to ensure they fulfill the import of the statute.

The undersigned finds subsection (5) was intended to dictate certain qualifications for counsel to be appointed in actions pending in the federal district court, whether such action be a criminal trial, a petition for writ of habeas corpus by a person in state custody, or a motion to vacate, set aside or correct judgment. The undersigned further finds subsection (6) was intended to dictate certain qualifications for counsel to be appointed after the action in the federal district court has been concluded with the entry of a judgment. Consequently, the undersigned is of the opinion that subsection (5) controls who may be appointed as counsel in a habeas corpus action pending in the federal district court.[2]

By his motion, petitioner requests the Court appoint counsel, other than his state habeas appointed counsel, to pursue federal habeas corpus relief. Petitioner, however, has not sought permission from this Court to proceed *in forma pauperis* with this federal habeas corpus action. Consequently, petitioner shall file with this Court an application to proceed *in forma pauperis*,

---

[2] No federal judgment has issued with respect to petitioner Balentine.

together with an *In Forma Pauperis* Data Sheet from the prison in which petitioner is confined, **as soon as possible but no later than March 20, 2003.**

Further, state appointed habeas counsel has not stated the reason as to why he should not be appointed to represent petitioner in this federal habeas proceeding. State appointed habeas counsel shall advise the Court of the reasons why he should not be appointed in this case. Further, state habeas counsel shall advise the Court of other counsel who meet the qualifications set forth above, or who, for good cause, are otherwise qualified, and who have indicated a willingness to assume state habeas counsel's prosecution of this case.

State appointed habeas counsel shall further advise the Court as to the underlying proceedings involving the conviction to be challenged herein, specifically including information as to when the state habeas petition was denied and when the statute of limitation expires for filing a federal habeas petition.

Petitioner, through his appointed state habeas counsel, Mr. Birdsong, shall file the supplementation required by this Order **as soon as possible but no later than March 20, 2003.**

IT IS SO ORDERED.

ENTERED this _____ day of March 2003.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

FEB 1 3 2003

| | |
|---|---|
| JOHN LEZELL BALENTINE, | § |
| | § |
| Petitioner, | § |
| | § |
| v. | § CIVIL ACTION NO. 2-03CV-0039J |
| | § |
| JANIE COCKRELL, Director, Texas | § |
| Department of Criminal Justice, | § |
| Institutional Division, | § |
| | § |
| Respondent. | § |

## ORDER

IT IS HEREBY ORDERED under the authority of Title 28, United States Code, Section 636(b), that all motions in this case be and are hereby referred to United States Magistrate Judge Clinton E. Averitte, Amarillo, Texas, for determination and for hearing, if necessary, after they have been filed by the Clerk.

All future pleadings concerning these motions shall be accompanied by a transmittal letter addressed to the United States Magistrate Judge at Amarillo, Texas, in order that copies may be forwarded to the Magistrate Judge by the Clerk without delay.

It is SO ORDERED.

Signed this /3 7 day of February 2003.

MARY LOU ROBINSON
UNITED STATES DISTRICT JUDGE

2



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

JOHN LEZELL BALENTINE,

    Petitioner,

    -v-

JANIE COCKRELL, Director,
Texas Dept. of Criminal Justice,
Institutional Division,

    Respondent.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

**2 - 0 3 C V - 0 0 3 9 J**

**U.S. DISTRICT COURT NO.** _____

**CASE NO. 54,071-01 (Texas Court of
Criminal Appeals)**

---

**MOTION TO SEEK OTHER COUNSEL IN FEDERAL HABEAS REVIEW (11071
SECTION 21 (e) Tx.C.C.P.**

**TO THE HONORABLE JUDGES OF SAID COURT:**

    Now comes Kent Birdsong, state-level writ counsel for applicant, JOHN LEZELL
BALENTINE,  and moves the Court to appoint other counsel for federal habeas review.

    Counsel would show the Court that applicant is indigent, on death row and is in
need of other counsel for federal habeas review pursuant to 21 U.S.C. Section 848(g)
and also 11071 Section 2(e), Tx.C.C.P.

                        Respectfully submitted,


                        Kent Birdsong
                        301 E. 7th Avenue
                        Amarillo, Texas  79101
                        (806)371-9333
                        (806)372-5575


By: _____
      Kent Birdsong
      State Bar No. 02333630
      Attorney for LEZELL BALENTINE JOHN

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing motion to be served on Respondent by mailing, via the United States mail, postage prepaid, a copy of the pleading to counsel for Respondent, Capital Litigation Division, Office of the Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711, this _____ day of _____, 2003.

_____
Kent Birdsong